# EXHIBIT 1

5H - 84093001 - 0    Page 1

| | U.S. ENVIRONMENTAL PROTECTION AGENCY<br><br>Grant Agreement | **GRANT NUMBER (FAIN):** 84093001<br>**MODIFICATION NUMBER:** 0<br>**PROGRAM CODE:** 5H | **DATE OF AWARD**<br>07/08/2024 |
|---|---|---|---|
| | | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/11/2024 |
| | | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>X0078 |

| **RECIPIENT TYPE:**<br>State | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>COMMERCE, WASHINGTON STATE DEPARTMENT OF<br>P. O. BOX 42525<br>OLYMPIA, WA 98504-2525<br>EIN: 91-0823820 | **PAYEE:**<br>COMMERCE, WASHINGTON STATE DEPARTMENT OF<br>1011 Plum St SE<br>P.O. Box 42525<br>Olympia, WA 98504-2525 |

| **PROJECT MANAGER**<br>Nora Hawkins<br>P.O. Box 42525<br>OLYMPIA, WA 98504-2525<br>**Email:** Nora.hawkins@commerce.wa.gov<br>**Phone:** 360-819-3739 | **EPA PROJECT OFFICER**<br>Christine Clark<br>77 West Jackson Boulevard<br>Chicago, IL 60604<br>**Email:** Clark.Christine@epa.gov<br>**Phone:** 312-886-9749 | **EPA GRANT SPECIALIST**<br>Shana Etheridge<br>1200 Pennsylvania Ave NW 3903R<br>Washington, DC 20460<br>**Email:** Etheridge.Shana@epa.gov<br>**Phone:** 202-564-9777 |
|---|---|---|

**PROJECT TITLE AND DESCRIPTION**

Washington State Solar for All "Note: A Special payment condition applies to this award."

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>05/01/2024 - 04/30/2029 | **PROJECT PERIOD**<br>05/01/2024 - 04/30/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 156,120,000.00. EPA agrees to cost-share 0.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | **ORGANIZATION / ADDRESS**<br>Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| Digital signature applied by EPA Award Official Keva R. Lloyd - Acting Chief, Grants Management Branch | **DATE**<br>07/08/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 155,720,000 | $ 155,720,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 156,120,000 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br>Clean Air Act: Sec. 134(a)(1)<br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41063 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 155,720,000 |
| | | | | | | | | | $ 155,720,000 |

5H - 84093001 - 0    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 156,120,000 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

***The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:***

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed prior to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

***The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

### *Semi-Annual Report*

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

### Final Report

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition***:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

### 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

### 1. Leveraging

The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

### *The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

### Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

### Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See EPA Guidance on Participant Support Costs

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

### B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

> **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

> **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

> **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

> **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements

The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

<u>3. Additional Requirements</u>

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** <u>EPA's Final Financial Assistance Conflict of Interest Policy</u> **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

## O. Historic Preservation

<u>National Historic Preservation Act (NHPA)</u>

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

> Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

> Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

> National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

> Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

> Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

> Endangered Species Act, as specified in 50 CFR Part 402;

> Federal Funding Accountability and Transparency Act;

> Farmland Protection Policy Act; and

> Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Amy Wheeless (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipients) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the subrecipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

### 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

### 2. Governance Requirements

### A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

### B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT 2

# Greenhouse Gas Reduction Fund
# Solar for All

Work Plan
Project Period: 5/1/24 – 4/30/29
Submitted: October 14, 2024

**Project Title:** Washington State Solar for All
**Grant Number:** #84093001
**Organization Name:** Washington State Department of Commerce
**Geography:** Washington State
**Definition of LIDAC:** Commerce plans to provide Solar for All funds to benefit low-income households, residents of "disadvantaged communities" (DACs), and tribes in Washington.

For the purposes of this workplan, Commerce defines low-income as:

- Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development. Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using the U.S. Department of Housing Development's Family Size Adjustment factor.
- Properties providing affordable housing that fall within either of the following two categories: (1) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (a) Low-Income Housing Tax Credit; (b) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (c) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; or (d) a housing assistance program administered by a Tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)) or  (2) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

Commerce will also enable certain residents of "disadvantaged communities" to participate in Solar for All programs, including tribal households and those who qualify for utility assistance

1

programs. For the purposes of this workplan, Commerce defines "disadvantaged communities" or "DACs" as:

- All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST).
- Geographic areas within federally recognized Tribal lands

Within these definitions, during the Program Planning Year Commerce will explore how to further prioritize participation based on Washington's Environmental Health Disparities mapping tool, which uses environmental health and socio-economic factors to identify communities that are "highly impacted".

*Note: In Washington, because of the state's Healthy Environment for All Act and Climate Commitment Act, state agencies use the term "overburdened communities" or refer to communities that are "highly impacted" to indicate geographic areas where vulnerable populations face combined, multiple environmental harms and health impacts. For the purposes of this Solar for All workplan, Commerce will use the term "DACs" or "disadvantaged communities" to align with federal terminology. Washington's definitions of highly impacted communities are distinct from EPA's definition of DACs so use of that term in this document is intended to reflect when the program will focus on aligning with state definitions.*

# Section 1:  Project Description

## Overview

Through Solar for All, the Washington State Department of Commerce will launch four programs that will expand solar access to income-qualified households, certain residents of DACs, and federally recognized tribes throughout Washington. These programs will complement existing programs and policies to support distributed solar in the state. Washington's deployment of Solar for All funds includes the following:

1. Washington Affordable Solar Homes (WASH): a program focused on providing no cost solar installations to qualified single-family homeowners;
2. Expanded Shared Solar Access Program (ESSAP): a program that expands community solar access to income qualified households and certain residents of DACs, including those who qualify for utility assistance programs and tribal households;
3. Bridging Energy Affordability for Multifamily Solar (BEAMS): a program that provides loans that help multifamily affordable housing properties access other state and federal solar incentives that they might otherwise leave on the table;
4. A tribal solar deployment program that will be co-designed with tribal governments during the Program Planning Year to provide the benefits of solar to tribal households; the name for this program will be developed during the Program Planning Year, but is referred to as the Tribal Solar Program (TSP) for this workplan.

Together, these programs will focus on ensuring the benefits of solar accrue to households with high energy burden throughout the state, with a specific focus on environmental justice communities, in alignment with Justice40 and with Washington's environmental justice commitments.

## Project Outputs, Outcomes, and Linkage to the U.S. EPA's Strategic Goals

Below, Commerce provides estimated outputs and outcomes of implementing this Solar for All award. Commerce assumes that solar funded by this program is new, rather than existing. All outcomes and outputs that will be tracked and reported will be directly driven by this award.

3

## Project Outputs and Outcomes

*Table 1. Project Outputs and Outcomes*

| | Ensure equitable access to the benefits of solar | Provide tangible climate benefits | Continue building a robust solar ecosystem |
|---|---|---|---|
| Overarching outcomes<br><br>These are metrics Commerce will track to understand overall progress on meeting goals. Commerce is looking for directional progress on these to help inform our success. | • Progress on achieving energy burden reduction goals under CETA<br>• Qualified households benefiting from programs | • Progress toward Washington climate goals<br>• Overall greenhouse gas emissions reduced as a result of Solar for All funding<br>• Overall new clean energy generation as a result of Solar for All funding | • Continued growth in number of solar jobs<br>• Broad investment in distributed solar |
| WASH | • Number of households participating in program *(approximately 1,660)*<br>• Average amount of household utility bill savings by project and by geography *(At least 20%, goal of 50%)* | • Solar capacity installed *(over 8 MW)*<br>• Greenhouse gas emissions reduced *(By Year 5, 11,330 tons $CO_2$ annual reduction, with approximately 25% of this achieved in Y2, 75% by year 3, and additional 12.5% each year in years 4 and 5)* | • Number of job trainees working on program projects *(Targeting at least 1 per associated project)*<br>• Number of community-based organizations engaged by Solar for All (At least 40) |
| ESSAP | • Number of households receiving benefits *(approximately 1,430)*<br>• Average amount of household utility bill savings per household *(At least 20%, goal of 50%)* | • Solar capacity installed *(over 13 MW, at least 11 MW of which will support qualified subscribers)*<br>• Greenhouse gas emissions reduced *(By Year 5, 22,080 tons $CO_2$ annual reduction, with approximately 25% achieved in Y2, 50% in Y3, 100% by Y4)* | |
| BEAMS | • Number of households receiving benefits *(approximately 720)*<br>• Average amount of household utility bill savings or equivalent per household *(At least 20%, goal of 50%)* | • Solar capacity installed *(at least 4 MW)*<br>• Greenhouse gas emissions reduced *(By Year 5, 5,760 tons $CO_2$ annual reduction, with approximately 50% in Y3 and each RLF cycle taking 2 years)* | |
| Tribal Solar Program | To be developed in more detail over the Program Planning Year / For budgeting purposes, estimating 1,200 households served, 6 MW of solar deployed and 8,720 tons of tons $CO_2$ annual reduction by year 5 | | |

**Linkage to U.S. EPA's Strategic Goals:**

This award supports the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.
- Goal 1: Tackle the Climate Crisis
    - Objective 1.1: Reduce Emissions that Cause Climate Change

# Section 2:  Project Design Plan

## Activities to be Conducted in Program Planning Year

Commerce plans to take the full Program Planning Year to design and ready for implementation its Solar for All offerings. During this year, Commerce plans to conduct the following activities:

**Program Administration**
- Draft Quality Management Plan (QMP) and Quality Assurance Program Plan (QAPP) and submit to EPA for approval.
- Hire and train program staff to design elements of the program, support contracting and procurement, provide oversight, and other ongoing administration needs.
- Work to secure state level funding to complement and leverage Solar for All federal funds.
- Establish program data management tools, processes, and standard operating procedures for reporting.
- Establish financial tracking and reporting mechanisms to streamline budget monitoring, compliance, and reporting.
- Establish an income verification process, either in-house or via a 3rd party vendor.
- Determine through analysis and outreach whether and how to further prioritize these programs based on Washington's Environmental Health Disparities Map and ensure that programs are accessible throughout the state.

**Communications strategy and Community engagement**
- Develop and maintain a central webpage for Washington's Solar for All program that is easy to access with information provided in multiple languages.
- Develop an email listserv or leverage an existing email listserv to provide regular updates to those interested in the program.
- Develop a comprehensive community engagement plan, aligned with Commerce's Environmental Justice community engagement practices. Anticipated activities include:
    - Holding a kick-off meeting for the public to describe engagement plans and ways to get involved;
    - Holding regular meetings on implementation progress and address key questions, potentially by leveraging targeted focus groups that include potential program beneficiaries;
    - Attending community events to solicit feedback on program design questions, including in-person engagement and tabling;
    - Engaging deeply with organizations that may interact with eligible households on similar projects to align programming, messaging, and share best practices for outreach; and

- o Making clear through all communication when there are decision points about the program, how people can provide feedback, and how decisions will be made.
- Engage with relevant stakeholders to further design workforce development efforts and ensure there is a pipeline of job trainees, including but not limited to nonprofits, labor unions with apprenticeship programs, colleges and tribal colleges, business associations, and relevant state agencies. A key partner in this effort will be Washington's Clean Energy Technology Workforce Advisory Committee, which formed in 2023.
- Pending further guidance from EPA, work with each electric utility across the state to determine their average residential electric bill. This metric will be used to inform program design to ensure each participant experiences savings equal to at least 20% of the average residential electric bill for their electric utility.
- Finalize guidelines for participant support costs and submit to EPA project officer for written confirmation.

**WASH**
- Engage with stakeholders to get feedback on how to recruit and contract with vendors who will have the necessary qualifications to implement the program.
- Run a competitive solicitation to hire multiple vendors to administer a single-family home solar energy installation program. Vendor teams may include both community-based organizations and solar installers.
- Negotiate and execute contracts with vendors that describe all program requirements which may include outreach and education, installation cost parameters, consumer protection measures, income qualification processes, and workforce training.
- Further explore opportunities for third party ownership of solar systems on single family homes as a way to leverage federal tax credits.
- Finalize standards for workforce development requirements.
- Finalize quality inspection protocols to evaluate a percentage of projects for installation and household savings benefits.
- Collaborate with Commerce teams working on other income-qualified programs for single family homes to coordinate and enable handoff/referrals between these programs.
- Determine any conditions under which a home located in a disadvantaged community (DAC) would be eligible to participate in WASH in the absence of income qualification documentation.
- Determine whether program income received by Solar for All could support any operations and maintenance costs of the solar such as inverter replacements post period-of-performance of this grant.
- Finalize program design plan document, which will detail all the important components of the program as an internal reference document.

**ESSAP**
- Engage electric utilities to generate interest in participating in the program and to get input on other design considerations (e.g., appropriate subscription size to provide to their income-qualified customers)
- Provide policy support to utilities looking to launch new community solar offerings
- Get clarification from EPA on whether utilities can have a single community solar offtaker who provides energy assistance to eligible households.

6

- Get clarification from EPA on ability to subsidize community solar subscriptions for projects under power purchase agreements held by utilities.
- Finalize eligibility criteria for subscribers based on outreach and research activities.
- Finalize program design plan document, which will detail all the important components of the program as an internal reference document.

**BEAMS**
- Finalize guidelines for use of subrecipient for revolving loan fund and submit to EPA project officer for written confirmation.
- Set up contracting with Commerce's subrecipient, Washington State Housing Finance Commission (WSHFC). WSHFC is a self-sustaining public agency committed to increasing housing access and affordability for the people of Washington. WSHFC works to provide equitable access to capital through strong partnerships and innovative financing to create and sustain affordable rental housing, homeownership, and community spaces across Washington State. Its programming includes administering the Low-Income Housing Tax Credit program for affordable multifamily housing.
- Support relationship building between WSHFC and Washington State University's Energy Program, which administers the state's Community Solar Expansion Program.
- Conduct outreach to electric utilities to understand which utilities currently enable tenants of multifamily properties to receive bill credits from onsite solar systems. Support information sharing to encourage additional electric utilities to propose tariffs that allow residents of multifamily properties to receive on-bill savings through onsite solar installations.
- Conduct outreach to multifamily affordable housing properties in utility service territories that do not provide bill credits to multiple tenants for electricity generated by onsite solar energy systems to identify non-electric bill benefits they could provide to tenants.
- Run a competitive solicitation to hire a consultant who will complete a solar readiness study of multifamily affordable housing properties in the state during the Program Planning Year. The final report will identify properties that should be prioritized for Solar for All funding due to appropriate roof space to tenant ratios to achieve a minimum 20% electric bill savings metric per participating household. Engage with affordable housing owners and operators who are identified in the solar readiness study to have a pipeline of properties interested in solar when program implementation begins.
- Work with WSHFC to set up the loan products. The specific products are not determined at this time, but options could include loan guarantees or other credit enhancements.
- Determine whether program income received by Solar for All could support any operations and maintenance costs of the solar such as inverter replacements post period-of-performance of this grant.
- Finalize program design plan document, which will detail all the important components of the program as an internal reference document.

**Tribal Solar Program**
- Analyze recent state-funded tribal clean energy programs to align best practices and priority needs for tribal solar projects
- Codesign program with tribal leaders in WA through deep engagement, including:

- o Solar for All staff attendance at Affiliated Tribes of Northwest Indians (ATNI) 2024 Fall and Winter Conventions
- o Existing Tribal Workgroup for the Climate Pollution Reduction planning grant, including findings from tribal GHG inventories and priority measures
- o Align with University of Washington Center for Environmental Health Equity (EPA funded Thriving Communities Technical Assistance Center) on opportunities for technical assistance and grant writing support
- o Connect with tribally-affiliated organizations and CDFIs
- Participate in Commerce's tribal memorandum of understanding process with individual tribal governments. Currently, Commerce has four MOUs in place with tribal governments; these MOUs lay out agreements between the tribal governments and Commerce with regard to data collection, tribal sovereignty, and tribal consultation. These MOUs can help speed up contracting, and for those in place, will be a key piece of supporting the award of funds to tribal government participants through Solar for All.
- Engage with tribal members and citizens to jointly determine how Commerce should allocate Solar for All funds to federally recognized tribal governments located in the state.
- Work with tribes to co-define eligibility for residential beneficiaries of Solar for All funded projects in a way that meets EPA requirements, streamlines program administration, and recognizes tribal sovereignty.
- Finalize program design plan document, which will detail all the important components of the program as an internal reference document.

## Meaningful Benefits Plan

**Household Savings**

Washington's Solar for All program will ensure financial benefits flow to income-qualified households and certain residents of disadvantaged communities, including those who qualify for utility assistance programs and tribal households. Commerce will target a goal of 50% bill savings for all households participating, with a required minimum of 20% bill savings. Commerce does not plan to award any Solar for All funds directly to households, but instead benefits will flow through selected vendors or subrecipients.

*WASH*

Through WASH, Commerce will hire vendors that will identify and recruit income qualified households and tribal households living on tribal lands to receive no-cost solar energy installations and enabling upgrades at their home. During the Program Planning Year, Commerce will work to encourage potential vendors to build teams that are well-equipped to both identify eligible households and provide full wrap around services for their home to lower their energy bills through solar. To maximize funding towards energy burden reduction, WASH will not fund battery storage installation with federal Solar for All funds but will leverage state funds for this purpose, if available. Commerce discusses the reasoning for this decision later on in this workplan in *Resilience Benefits*.

Based on Commerce's analysis, a 5kW system should provide electric bill savings equal to at least 20% of the applicable utility's average residential electric bill for almost all households in Washington, but closer to 50% electric bill savings for most participants. Thus, for estimating the number of households served, Commerce has assumed that each single-family home will receive a 5 kW system. During the Program Planning Year, Commerce will conduct additional analysis to

8

determine whether to set a minimum install size for all WASH participants based on average electric bills or allow vendors to size systems according to each individual household's energy bill and the available roof space. In situations where a roof is not suitable to offset at least 20% of a customer's electric bill, Commerce will direct WASH vendors refer this customer to ESSAP.

To ensure benefits of rooftop solar installations accrue to income-qualified households, Commerce will focus the WASH program on the nearly 40% of homes that are owned and occupied by income-qualified households. Offering this program to income-qualified homeowners avoids any need to pursue affordability covenants or other mechanisms to ensure renters are income qualified and that the addition of solar does not result in a rent increase. The ESSAP offering supports solar benefits for renters. By reducing energy burden, Commerce aims to support households in maintaining housing security and stability. In implementation, Commerce will prioritize homes located in environmental justice communities, aligning with Justice40 requirements and EPA Solar for All definitions. During the Program Planning Year, Commerce will determine any circumstances under which a home located in a DAC would be allowed to participate in WASH without income-qualified documentation. For example, Commerce will work with federally recognized tribes to define tribal households who are living on tribal lands who will be eligible for WASH. Another example is income qualified homeownership properties, such as community land trusts or Habitat for Humanity homes. Additionally, as Commerce develops a standard income qualification process, the agency may also identify a streamlined qualification process for residents of DACs.

*ESSAP*

Through Washington's Solar for All program, Commerce plans to offer a new community solar offering, in support of renters and others who cannot participated in the WASH program. Currently, Washington has a Community Solar Expansion Program, which provides up to $100 million in incentives through 2033 to fund solar and battery energy storage installations. Incentives are only paid after project completion, so participants must be able to finance the upfront solar and storage installation costs. To qualify for incentives, projects must have (1) at least two low-income subscribers or one low-income service provider subscriber, and (2) have a direct current nameplate capacity between 12 kW and 199 kW in size.

With Solar for All funds Commerce will create a new community solar program, ESSAP, that will expand on the Community Solar Expansion Program. To qualify for ESSAP, projects can be 200 kW to 1 MW, with an option to support smaller projects in the unlikely event that the Community Solar Expansion Program incentives are no longer available during the Solar for All period of performance. Commerce intends to administer ESSAP as a grant program and reimburse project costs based on achievement of milestones. At least 85% of the value of solar energy generated must be passed on to qualified residential customers. The remaining 15% can be provided to a single host customer to incentivize site access or to a common area meter of a multifamily building.

Subscribers will be required to meet EPA's income qualification criteria at the time of entering the program or be located in a DAC and eligible for the applicable utility's low-income programs, be a tribal household, or meet other criteria as defined by Commerce during the Program Planning Year. To maximize funding towards energy burden reduction, ESSAP will not fund battery storage installation, but may support some enabling upgrades. Since Commerce assumes most projects will be ground mount systems, enabling upgrades will be limited to less than 5% of budgeted

9

funds. As with WASH, Commerce will prioritize projects sited in and benefiting households in disadvantaged communities, with a potential further prioritization for communities identified as "highly impacted" on Washington's EHD map based on analysis during the Program Planning Year.

Starting during the Program Planning Year and contingent on further EPA guidance on household electric bill savings, Commerce will collaborate with each participating electric utility to determine their average residential electric bill and will work with community solar project administrators to ensure that each qualified residential subscriber receives a bill credit equal to at least 20% of that amount, with a target of a 50% bill credit to maximize energy burden reduction. Based on Commerce's calculations of various utilities' compensation rates for community solar, the average share is anticipated to be approximately 8 kW per household to achieve at least 20% electric bill savings.

As further discussed in the next section, onsite solar installations at multifamily affordable housing may not result in sufficient bill savings for all tenants in a building, so a portion of ESSAP funding will be held to supplement these projects as needed.

*BEAMS*

Washington's existing Community Solar Expansion Program[1] provides incentives to cover the cost of community solar projects between 12 kW and 199 kW that benefit low-income service providers and low-income households. Since funding is not available for critical upgrades like roof repair and because these incentives are only paid once a solar project is fully constructed and interconnected it can be challenging for multi-family affordable housing property to participate. Thus, BEAMS, through Commerce's subrecipient, the Washington State Housing Finance Commission, will offer two loan products for affordable multifamily housing to bridge the financing gap:
- A no-interest forgivable loan to support enabling upgrades, removing key barriers to accessing the state's existing community solar program.
- A no or low-interest revolving loan that can provide bridge financing to support access to the Community Solar Expansion Program and the federal investment tax credit (ITC) for properties that are unable to finance the upfront cost of a solar and storage installation.

Washington anticipates serving at least 720 households over the Solar for All period of performance with the revolving loan fund. This household assumption is based on at least half of households being served in the first two years of implementation, and the majority of the funding cycling back into the revolving loan fund to be leveraged again in the following two years.

Commerce is holding funding for enabling upgrades and energy storage installations under BEAMS. If funds are used for enabling upgrades, the funds will be immediately expended whereas if funds are used for energy storage, they can be part of the revolving loan fund, as energy storage is an eligible cost under the state's Community Solar Expansion program. WSHFC will work with eligible properties to help support their selection of enabling upgrades or energy storage using the results of the solar readiness study.

To participate, multifamily affordable housing projects would need to commit to passing on at

---

[1] Washington State University Energy Program. Community Solar Program. WSU Energy Program > Renewable Energy > Community Solar Program

least 85% of the value of solar energy generated to tenants, preferably as electric bill credits if the building is individually metered and the applicable electric utility provides on bill crediting, or through a tangible benefit to tenants that is documented (e.g., free or reduced cost high-speed internet service).

There is no statewide virtual net-energy metering mandate in Washington, so whether tenants of multifamily affordable housing properties can experience energy burden reduction through electric bill credits will depend on their electric utility. Commerce will work with utilities in the Program Planning Year to encourage billing principles, such as on-bill credit to help address this barrier. A few utilities are working on developing these tariffs now. Notably Washington's public utility commission recently approved the multi-tenant solar tariff proposed by the largest electric utility in the state.[2]

The Washington State Housing Finance Commission (WSHFC), a public agency that provides equitable access to capital to create and sustain affordable housing across Washington State, will administer BEAMS as a subrecipient to Commerce's Solar for All award.

*Tribal Solar Program*
Commerce budgets over 25% of the total Solar for All funding to develop a Tribal Solar Program through formal consultation with tribal governments over the Program Planning Year. This program will use an allocation formula, co-developed with tribes, to provide direct support for residential-serving tribal solar projects. The program will center principles of tribal sovereignty and self-determination and will enable tribes to design and implement their own projects.

The allocation of funds will be based on conversations with federally recognized tribal governments and will build off work underway at Commerce to ensure co-led program design with tribal governments.

While this program will be co-created with tribal governments, Commerce will ensure that the final program complies with other EPA guidance for the Solar for All program, including maximizing household savings and focusing the funds on solar deployment and benefits. Tribal lands are considered to be "disadvantaged" under the CEJST tool, so Commerce anticipates that the participant eligibility for these programs will comply with meeting both Justice40 principles and Washington's environmental justice laws.

In addition to allocating funds for tribes, administrative and technical assistance funds for this program will support tribal specific needs, including:
- Travel funds to ensure in person conversations in Indian country;
- Funds for a tribal mediation pool to support contract negotiation and other legal needs;
- Providing Commerce staff with tribal expertise and funding for further professional development; and
- Consultant services to support tribal nations with technical assistance.

---

[2] UTC Docket UE-240565. PSE's Solar Energy Credit Multi-Occupant Allocation Service.
https://www.utc.wa.gov/casedocket/2024/240565/docsets

**Equitable Access to Solar**

Commerce has experience implementing programs that focus on expanding access for low-income and disadvantaged communities. The Energy Programs in Communities (EPIC) Unit with Commerce's Energy Division will be administering Solar for All programming for Washington and has established a framework for evaluating proposed grant projects that focuses on promoting equitable outcomes for tribes, overburdened communities and vulnerable populations. This spring, the EPIC unit implemented a new approach to combine nine funding streams of $117 million into three tailored clean energy funding opportunities: a rolling opportunity for tribes, a community decarbonization opportunity, and a general funding opportunity.  This new approach prioritizes serving the most overburdened and disadvantaged communities in Washington who have had the least access so that they can benefit from clean energy technologies.

In addition, Commerce offered technical assistance to eligible entities planning a project under the Solar plus Storage for Resilient Communities program which is often essential for under-resourced communities that may be exploring the installation of solar and energy storage for the first time. EPIC grant programs are on track to reach or exceed Washington's targets of 40% of investments directed to overburdened communities and vulnerable populations and 10% to tribes. EPIC also stood up a Community Advisory Committee in Spring 2024 that pays advisors with lived experience in social equity, anti-racism, tribal rights, climate justice and beyond to evaluate proposals and develop funding recommendations to leadership. Commerce will apply the lessons learning from this existing work to Solar for All implementation to ensure programs reach new communities.

Washington's plan provides the majority of funds as direct financial assistance to participants. The Commerce plan is designed to fill critical gaps in current and historic solar programs, by focusing on low-income single-family homes and community solar, multifamily buildings and tribes. Financial assistance will be used to:

- Provide roof repair and support other enabling upgrades on single family homes and multifamily properties to enable solar deployment;
- Purchase solar PV that is installed directly on homes or multifamily buildings;
- Pay for the cost of solar PV that is deployed as community solar projects either on built infrastructure or in low-conflict siting areas; and
- Other direct financial assistance as developed with tribal governments.

For the WASH program, Commerce will competitively select multiple vendors during the Program Planning Year to conduct outreach and support income-qualified homeowners throughout the solar installation process.  The evaluation for this procurement will likely include a number of factors for vendors, such as ability to provide wraparound services for homeowners, education and outreach experience, community engagement, and experience leveraging different funding sources.

For the ESSAP program, Commerce will leverage existing relationships with the over 60 electric utilities serving Washington to launch new community solar offerings. Under the state's Clean Energy Transformation Act, Washington electric utilities must ensure an equitable distribution of the benefits of the transition to clean energy for all electric utility customers and expand energy assistance programs for low-income customers. This law and associated requirement can be a motivation for electric utilities to partner with Commerce in reducing energy burden through solar deployment.

For the BEAMS program, Commerce is pleased to partner with the Washington State Housing Finance Commission, which has existing relationships with a network of multifamily affordable housing properties and a deep understanding of financing in the multifamily affordable housing sector. WSHFC's Sustainable Energy Trust offers tools to affordably develop energy-efficient buildings, upgrade existing buildings, and create or conserve energy. WSHFC's mission is aligned with Solar for All and WSHFC has the expertise to catalyze equitable access to solar deployment in the multifamily affordable housing sector.

For the Tribal Solar Program, Commerce looks forward to working with the federally-recognized sovereign nations in Washington to co-design the program in a way that ensures equitable access to solar for all tribes. This engagement will be a major activity during the Program Planning Year.

Throughout Washington's Solar for All funded offerings, Commerce will ensure that qualified households do not have to pay to participate. For each program Commerce will strive to maximize the geographic diversity of projects, prioritizing projects located in the most overburdened communities across the state. Commerce will use the project planning year to develop and adapt tools and engage diverse community members across the state to ensure equitable access to Solar for All programs.

**Resilience Benefits**

Commerce had planned to include energy storage for single family homes under WASH in the original Solar for All proposal of $250 million. At the awarded amount, Commerce has decided to forgo energy storage investments to prioritize reducing energy burden for as many income qualified homeowners as possible through solar energy deployment and enabling upgrades. Commerce did not make the decision to forego energy storage for single family homes lightly, but in the absence of time varying rates in Washington, there is no added financial benefit for households in deploying behind the meter energy storage. Commerce's calculation is that energy storage would essentially double the cost of each project or put another way, cut in half the number of single-family homes served by Solar for All. Commerce decided to focus on reducing the energy burden of a greater number of single-family homes in light of the reduced award from EPA. In addition, in Washington's next state budget cycle, which will be before the state legislature in spring 2025, Commerce has requested $70 million for solar and storage grants. If appropriated by the legislature, these state funds could be braided with Solar for All funds to add energy storage to behind the meter solar installations for single family homes (WASH) and to larger community solar installations (ESSAP). As stated in Washington's original Solar for All application, Commerce will prioritize any available energy storage funding for households who can benefit the most from added resilience due to their exposure to frequent or long duration outages, as well as vulnerability factors such as age, disability, or medical needs.

In addition, the largest electric utility in the state, Puget Sound Energy, recently began offering enhanced incentives for certain households seeking to install battery energy storage.[3] Commerce will continue to work with all Washington utilities to support equitable access to energy resilience which aligns with the directive in Washington's clean electricity law that utilities must ensure "that

---

[3] Puget Sound Energy. "Flex Batteries Enhanced Incentives." Accessed October 4, 2024.
https://www.pse.com/en/rebates/PSE-flex/flex-batteries/enhanced-incentives

all customers are benefiting from the transition to clean energy: Through the equitable distribution of energy and nonenergy benefits and reduction of burdens to vulnerable populations and highly impacted communities."[4]

Energy storage is already eligible under the existing state Community Solar Expansion Program. As a result, the revolving loan fund under BEAMS will continue to support access to funding for both solar and energy storage. For budgeting purposes, Commerce has assumed that 16% of the available financial assistance is held for enabling upgrades, and half of that funding is assumed to be for energy storage. However, energy storage will be handled on a case-by-case basis and Commerce will have more updated projections at the end of the Program Planning Year, following the completion of the solar readiness study. Any energy storage projects funded by Solar for All will only be deployed with a solar project being funded by Solar for All.

In addition, Commerce will work with federal recognized tribes in Washington during the Program Planning Year to co-design the Tribal Solar Program which will continue to include energy storage as an eligible cost.

**Community ownership**
In addition to the immediate bill savings that solar will provide households, Washington's Solar for All program will provide long-lasting benefits to ensure that wealth accrues to households through the following mechanisms:

- Qualified homeowners who participate in WASH will receive no-cost solar installations and enabling upgrades. This asset can help build equity in the home, as well as contribute to lowering energy burden and longer-term financial stability for a household. Commerce will consider opportunities, such as third-party ownership, to leverage the ITC for these households, which may have little to no tax liability, but if implemented, Commerce will ensure that the systems convert to full ownership to the homeowner within 5 years.  More analysis will be done on leveraging tax incentives during the Program Planning Year. Commerce sought, and the legislature adopted, a Solar Consumer Protection Law in spring 2024 that will help reduce risks of direct ownership for single family homeowners.
- ESSAP and BEAMS will similarly provide benefits in lowering energy burden, which contributes to longer term housing stability and ability to support other important household needs. For multifamily affordable housing properties that participate, the new installations could also contribute to lower operating costs for these organizations since up to 15% of the electricity generated can benefit the common area meter. Solar energy systems installed through BEAMS will be owned by the multi-family affordable housing property owner. In Washington's current regulatory environment, it is unlikely that ESSAP participants will directly own community solar projects as these projects will likely be owned or at least under contract to the applicable electric utility.
- For tribal members, all programs in the Solar for All proposal will prioritize funding for tribes in keeping with the mandates from state climate, energy, and environmental justice laws. The program will center principles of tribal sovereignty and self-determination. Commerce anticipates that solar and energy storage equipment installed under the Tribal Solar Program will be owned directly by the applicable tribal nation.

---

[4] Revised Code of Washington, Chapter 19.405.060. https://app.leg.wa.gov/RCW/default.aspx?cite=19.405.060

**Workforce Development and Entrepreneurship**

Washington's Solar for All program will benefit from Washington's laws and programs that incentivize workforce development in the clean energy transition. Through 2029, the purchaser of eligible equipment for solar energy systems can receive a tax exemption, if the project is certified to meet certain labor, procurement, and community workforce standards:

- 100% of the state/local sales and use tax for systems smaller than 100 kW; and
- 50% of the state/local sales and use tax for systems between 100 kW and 500 kW.

As Washington further designs the Solar for All programs during the Program Planning Year, Commerce will discuss with partners and stakeholders ways to ensure a growing workforce to support project deployment. For WASH, Commerce plans to require that workforce development and training opportunities be provided in every Solar for All funded single family home solar installation, with limited exceptions. Commerce will seek to hire vendors who commit to hiring at least one student or graduate of a job training organization for at least one full paid day of work on each Solar for All installation performed or in a support role on the solar installation (e.g., project design, engineering, project coordination). These workforce training expectations, as well as required labor standards, will be specified in the WASH vendor procurement notice (RFP). To ensure that the program reaches income-qualified homeowners throughout the state, during the Program Planning Year, Commerce will assess on a case-by-case basis whether any exemptions to this workforce training requirement are warranted (e.g., in rural locations with no suitable job training program). Vendors will be prioritized for selection who provide details in their application to Commerce on how they will provide these job opportunities to the low-income and frontline communities where they are installing solar; many of the areas considered disadvantaged by CEJST or "highly impacted" by Washington's EHD Map are also historically underutilized business zones as defined by the U.S. Small Business Administration.

For ESSAP, Commerce will engage with electric utilities to encourage projects for funding that create workforce development opportunities, such as projects that hire individuals associated with job training organizations or that promote hiring in the areas mentioned above. Commerce is also eager to support workforce training opportunities through BEAMS and the Tribal Solar Program. Commerce will ensure any applicable Davis Bacon requirements are met across all Solar for All programs through our contractor and sub-recipient agreements.

**Financial Assistance Strategy**

Washington's Solar for All workplan budgets for 89% of funding to be for financial assistance and 11% for technical assistance. A table below presents a summary of the direct funding for each of the programs.

15

*Table 2. Financial Assistance Description*

| Program | Total Funding | Scope of Work | Funding for Financial Assistance | Procurement method | Funding Relationship |
|---------|---------------|---------------|----------------------------------|--------------------|--------------------|
| WASH Grant Program | $57,000,000 | Commerce contracted third-party administrator(s) (TPA) to design and run the Single-Family home solar program on behalf of Commerce. TPA provides grants directly to low-income families for projects. | $51,300,000<br><br>100% of funds to TPA(s)<br>- 10% of total funding for TPA administration to build and run the program<br>- 90% of total funding used directly for projects (Financial assistance) | Competitive procurement | Contractual |
| ESSAP Grant Program | $38,000,000 | Commerce run grant program. Funding awarded as grants through competitive application process to utilities and community solar project administrators. | $10,000,000<br><br>100% of funds to utilities and community solar project administrators. Separate staffing assumptions have been built in to support program. | Competitive grant application | Contractual |
| BEAMS Loan Program | $10,000,000 | Funding passed through to Washington State Housing Finance Commission (a government entity) to build and administer the program. 80% of funding is given out as loans for projects and returns as program income for RLF. 20% of funding is used for enabling upgrades for these projects and does not return to RLF. | $9,000,000<br><br>100% of funds to WSHFC:<br>– 10% of total funding for WSHFC administration to build and run program, subject to negotiation; 90% of funds available for financial assistance<br>– 16% of budget is held for enabling upgrades<br>– 80% of funding is cycled in the first two years of implementation and returns as revolving loan fund (RLF)<br>– Estimate $7.4M in program income from RLF | Interagency agreement | Subaward |
| Tribal Grant Program | $40,000,000 | Funding passed through via grants to tribal nations for solar installations, including 20% for enabling upgrades or storage. | $40,000,000<br>100% of funding to tribes for tribal defined projects | Non-competitive | Subaward |

**WASH**: This program will fully cover the costs of an estimated 5 kW onsite solar system per home

16

and use 20% of the budget to support associated enabling upgrades. This direct financial assistance will result in a 20%-50% electric bill savings for households. Commerce plans to work with chosen vendors to size solar arrays to cover at least 20% of individual household's electric bills, with a target to 50% electric bill savings. Assumptions:

- Each homeowner receives a ~5 kW solar installation; installation cost of $5.00 per watt. At least 1,660 homes participate for a minimum solar deployment of over 8 MW.
- 20% of the budget is held for enabling upgrades, such as roof repair, electric panel updates, and efficiency measures not covered by other programs.

Up to 10% of the WASH budget will be used to cover the administrative costs of vendors. These costs include program administration and reporting, customer recruitment and education, and project oversight and quality assurance. Participating homeowners will also receive education on operations and maintenance of the system, as well as information on the warranty and what to do if there are problems.

The WASH program will only be for income-qualified homeowners; renters will be directed to the ESSAP program. This program design method ensures that the long-term benefits of solar stay with the intended recipients of Solar for All funds.

Washington's Solar for All program will not work in a silo – coordinating marketing, outreach, and implementation of this program with other related home energy programs is key to ensure that Commerce maximizes benefits to income qualified households. Commerce's Energy Division also operates the state's weatherization program, and will be implementing the IRA Home Energy Rebate programs, so over the Program Planning Year the EPIC team will be in discussions with teams at Commerce as program design commences to align implementation to ensure households are receiving as much benefit as possible through all of these programs. Commerce will also prioritize vendor applications that seek to leverage existing energy assistance support such as weatherization and LIHEAP as a pipeline for identifying income-qualified homeowners, while ensuring that those programs are at appropriate income qualification levels as compared to Solar for All requirements.[5]

**ESSAP**: The ESSAP community solar program will serve renters and other households without access to sufficient rooftop space to install onsite solar. At least 85% of the value of solar energy generated from each community solar project must be passed on to qualified residential customers. Commerce will work with community solar project administrators to ensure that each qualified residential subscriber receives a bill credit equal to at least 20% of the average electric bill, with a target of a 50% bill credit to maximize energy burden reduction. Based on Commerce's initial calculations, each subscriber will receive an approximately 8 kW share of solar. Since Commerce assumes that many of these larger projects will be installed <u>not</u> on existing buildings, less than 5% of the budget for the program will be held to support associated enabling upgrades. Projects can be between 200 kW and 1 MW, with an allowance for smaller projects in the unlikely event that the state's Community Solar Expansion Program incentives are fully allocated. Assumptions:

---

[5] The Low Income Home Energy Assistance Program (LIHEAP) qualifies households under 150% Federal Poverty Level (FPL) while the Weatherization Assistance Program (WAP) qualifies those under 200% FPL, which is in-line with the definition that EPA uses for income qualified for Solar for All.

- Targeting an installation cost of $2.75 per watt. Assume each households receives an 8 kW subscription.
- At least 85% of value of solar energy generated must be passed on to income qualified customers.
- Approximately 1,430 households participate for an estimated solar deployment of over 13MW, a minimum of 11 MW of which will serve income qualified households.

For ESSAP, Commerce will work with electric utilities to manage customer retention for customers who move. Since Commerce is structuring ESSAP to be based primarily on a customer's residence being in a DAC, if an ESSAP subscriber moves within a utility's service area, the utility would verify their eligibility at their new address since community solar subscriptions. If an ESSAP subscriber is initially located in a DAC and then moves outside of a DAC, they may still be eligible to participate if they meet the Solar for All income qualification criteria. Such customers would  re-qualified through the income qualification process that Commerce will develop during the Program Planning Year. If a customer is no longer eligible or moves outside of the utility's service area, the subscription would be reassigned to another eligible customer. Procedures for retaining and reassigning subscriptions will be included in the negotiated agreements with participating utilities.

Washington's electric utilities will be key partners in ensuring the success of ESSAP. Pursuant to Washington's Clean Energy Transformation Act, utilities must demonstrate progress in providing energy assistance or energy burden reduction to their income qualified customers.6 Utilities must regularly report progress on providing energy assistance to Commerce. As a result, Commerce is confident that participating electric utilities will be motivated to ensure that their ESSAP projects remain fully subscribed and ESSAP will leverage utilities' existing energy assistance education and outreach processes.

**BEAMS**: Solar for All funds will be used to deploy solar at multi-family affordable housing properties. To participate, projects must provide benefits from the solar energy generated to tenants, preferably as electric bill credits if the building is individually metered and the applicable electric utility has an appropriate tariff, or through a tangible benefit to tenants. The BEAMS program will encourage properties to share as much of the benefits with tenants as possible during contract negotiations, but at least 85%. Assumptions:
- Targeting an installation cost of $3.50 per watt.
- For budget purposes, each household is allocated 5 kW for parity with the WASH program but this number will be adjusted to ensure that each participant receives at least 20% electric bill credits according to the specific compensation value provided by the applicable electric utility.
- Approximately 720 households participate for an estimated solar deployment of 4 MW.

Up to $1,000,000 or 10% of the funding for BEAMS will be held for WSHFC's administration costs. This amount will include education to properties on operations and maintenance of the system, as well as information on the warranty and what to do if there are any problems.

Commerce anticipates that most or all properties that participate in BEAMS will be affordable multifamily housing that operates with rent level restrictions or covenants. If properties that are

---

[6] RCW Chapter 19.405.120. RCW 19.405.120: Energy assistance for low-income households. (wa.gov)

considered "naturally occurring affordable housing' seek to participate in BEAMS, Commerce and WSHFC will work together to establish practices that are needed to maintain rental affordability, leveraging other programs' practices, such as the state's weatherization assistance program.

**Tribal Solar Program**: The specific details of this program will be co-designed with tribal governments. Commerce currently anticipates providing 100% of the overall budget for this program will be direct financial assistance, in compliance with the Solar for All grant requirements.

## Project-Deployment Technical Assistance Strategy

In just the past few years, Commerce has seen a significant increase in demand for solar and energy storage projects. This is in large part a result of the very successful technical assistance that Commerce provided through the Solar plus Storage for Resilient Communities program starting in 2022. Thus there is now a pipeline of solar and storage projects ready to be constructed and Commerce hopes to build similar demand for Solar for All projects through additional state funding for technical assistance.

**Workforce Development**

Washington's Solar for All proposal will invest in a skilled workforce in a few ways:

1. For WASH, Commerce will require workforce development and training opportunities to be provided in every Solar for All funded single family home solar installation, with limited exceptions that will be developed during the Program Planning Year. Commerce anticipates that vendors will fold these costs into project deployment costs, as trainees will participate in installations and associated activities. This is part of the reason that for the relatively high estimated installation costs ($5/watt) for this program. If it is possible to leverage tax credits through third party ownership while ensuring adequate consumer protections, however, these install cost would at least one third lower.
2. For ESSAP, Commerce will encourage electric utilities to develop projects that create workforce development opportunities, for example hiring individuals associated with job training organizations or that promote hiring in the areas mentioned above. Through the Tribal Solar Program, it is anticipated that workforce development will be a prime program component. For example, tribal consultation may lead to this program investing a portion of the funding into solar workforce training for tribal members.
3. Commerce will invest staff time in consulting with workforce agencies and partners to promote these workforce training opportunities and identify other ways to enhance the solar workforce to support this program and the overall market. For example, Commerce staff already serve on the Clean Energy Technology Workforce Advisory Committee under Washington's Workforce Training & Education Coordinating Board.[7]

**Resilient Assets**

*Technical assistance for interconnection challenges*

Commerce has longstanding, trusted relationships with electric utilities and with the state's public utility commission that will enable the Solar for All team to navigate interconnection challenges as they arise. As a state with many different electric utilities, most of which are regulated at the local

---

[7] Clean Energy Technology Workforce Advisory Committee | Washington Workforce Training & Education Coordinating Board

level, interconnection standards vary. However, the solar industry has been able to adapt to these standards; Commerce will tap into this existing expertise by selecting WASH vendors who have a proven track record of deploying residential solar in the applicable geography where they proposed to install rooftop solar. In areas where vendors have historically experience delays in interconnection, Commerce may facilitate dialogue with utilities to clarify process and pilot changes. Interconnection of solar projects at multi-family affordable housing properties may be more complex, but Commerce will stay engaged with WSHFC to provide support on this topic in particular. For ESSAP, under the current regulatory landscape, electric utilities will most likely own or contract with the vast majority of community solar projects, so they will be able to select projects based on grid capacity and manage any needed grid updates internally. Commerce will evaluate interconnection risk when selecting ESSAP projects and will review any projects not sponsored by utilities in additional detail, referencing the serving utility's interconnection policies.

*Technical assistance for installation-specific issues*
With an intent of deploying projects statewide and in many different communities, Commerce wants to ensure that these programs do not run into issues regarding siting, land use, permitting, building codes, or other installation-specific issues. To support these projects, Commerce will lean on existing resources:

- Project siting: Commerce will require that community solar projects funded by ESSAP be located on previously developed sites and other locations that do not impact tribal rights and resources, conservation, and agriculture. Commerce will continue to engage with robust, ongoing state efforts to identify appropriate sites for solar that do not conflict with other uses. There are a number of state efforts already in place to identify lower conflict areas for clean energy development.[8] The state's Clean Energy Siting Coordinating Council was created explicitly to improve clean energy siting in the state. Commerce is proposing agency request legislation in Washington's 2025 Legislative session aimed at further streamlining clean energy siting challenges.
- Permitting and land use: Commerce does not anticipate significant permitting-related barriers for WASH implementation, as the agency expects to work with vendors who are adept at navigating solar permitting for single family homes. Where vendors have experienced historical delays in permitting, Commerce may encourage or facilitate conversations with permitting authorities to clarify process and pilot changes. In addition, the Washington Legislature has identified funding to support and encourage local jurisdictions in adopting Solar App+.
- Building codes: Any new multifamily affordable housing properties that participate in BEAMS may need support navigating the new energy code, which took effect in March 2024. This code will require that new properties have a renewable energy generating system of at least 0.5 watt per square foot, with some exceptions. Commerce anticipates that Washington will pursue separate funding under the IRA to support code implementation (e.g., additional training), and will align those efforts with this program.
- Inspection and quality control: Commerce anticipates serving approximately 1,660 households through WASH; to ensure projects are installed properly, Commerce anticipates performing quality inspections for a percentage of projects to ensure projects are well-installed and that expected household savings are being achieved. Commerce anticipates leveraging relationships with electric utilities to assess pre- and post-installation

---

[8] Washington State Department of Natural Resources. "Clean Energy". Clean Energy | WA - DNR

billing data to evaluate household savings on a per-site basis. Commerce assumes that these inspections will be performed by Commerce staff and will develop the procedures based on best practice. Commerce will also develop a plan for any needed quality control at other projects funded by Solar for All, and past success with quality installs will be one way potential vendors are assessed for procurement.

While Commerce will not require ESSAP projects to have community benefit agreements, Commerce will encourage projects (e.g. through scoring) to select community solar projects that are located in DACs and enable the local community to be subscribers. In addition up to 15% of the electricity produced can be provided to the host site, providing a further benefit to the community.

## Equitable Access and Meaningful Involvement Plan

The 2021 Washington State Energy Strategy acknowledges that historically excluded voices must be intentionally sought out, respected, empowered, and privileged.

State Environmental Justice Compliance
Commerce is required by state law to center environmental justice in the development of new grants and programs. The Healthy Environment for All (HEAL) Act directs certain state agencies, including Commerce, to:
- Adopt a community engagement plan that centers environmental justice;
- Incorporate environmental justice into an agency's strategic plan;
- Develop a Tribal consultation framework;
- Prioritize environmental justice in budget and funding decisions; and
- Conduct environmental justice assessments (EJAs) for Significant Agency Actions

Washington's Solar for All programs qualify as Significant Agency Actions and require EJAs, which Commerce will develop throughout the Program Planning Year. After developing the EJA Commerce will also solicit public feedback on it, as required by Washington processes.

Developing Meaningful Engagement
Commerce will make full use of the Program Planning Year to engage deeply with organizations that may interact with eligible households on similar projects to align programming, messaging, and share best practices for outreach. Commerce will leverage existing work and staff to develop materials and support outreach and engagement work.
During this year, the Solar for All team plans to provide transparent communication about decision points for the program, how people can provide feedback, and how decisions will be made. Commerce plans to:
- Continue developing a clear website for the program, written in an accessible and clear way
- Leverage an existing solar email listserv for those interested in the program
- Continue to leverage any Commerce-led meetings on energy assistance to present on Washington's Solar for All program and opportunities to engage on implementation
- Hold a kick-off meeting in fall 2024 for the public to review plans and learn ways to get involved

- Hold quarterly public meetings on progress in implementing the program and any key design questions.
- Attend community events and other gatherings to solicit feedback on program design questions, including in-person engagement and tabling.

To ensure meetings work for most interested stakeholders, events will include evenings or weekends options and offer both virtual and in person meetings. There will be opportunities for comment sessions and any in-person meetings will be scheduled in locations accessible to communities highly prioritized for outreach. Commerce intends to provide translated materials in languages most commonly found in the state.

Commerce has begun to identify specific program design questions where community feedback will be critical, including the best ways to conduct outreach to households that have traditionally not participated in clean energy programs, and how best to prioritize targeted communities to ensure the program is meeting Washington's environmental justice goals and the intent of Justice40. These will be key questions that are addressed in the program design year. Initial ideas for attracting households to these programs include:

- Selecting vendors with deep community connections that can be trusted partners
- Working with community action agencies across the state, who often implement weatherization programs and other assistance programs
- Sharing information with community-based organizations; working with these organizations to identify potential households
- Encouraging utilities to share information on the program with energy burdened customers or those who contact them with high bill complaints
- Co-deployment with the IRA Home Energy Rebates and weatherization programs
- Communicating about available solar programs with customers who are already participating in other income-qualified programs, such as LIHEAP and SNAP[9]

Once the program is fully underway after the Program Planning Year, Commerce is committed to regular report-outs on implementation, soliciting feedback on possible program changes or additions. The agency will work with partners and vendors to ensure that program offerings under Solar for All are reaching households statewide and make iterative adjustments to improve accessibility of the program. To maintain a sustaining program after the grant period of performance, communities across Washington will need to understand the value of Solar for All, so engagement is a key piece of Washington's program.

**Communities Served**

Washington's Solar for All program uses the low-income, multi-family affordable housing, and DAC definitions to align eligibility.  Additionally, Commerce will use a state definition of highly impacted communities to further prioritize outreach and uptake of these programs within the EPA definitions. "Highly impacted" communities are those ranked as 9 or 10 on the Washington Environmental Health Disparities Map, which uses environmental health and socio-economic

---

[9] The Low Income Home Energy Assistance Program (LIHEAP) qualifies households under 150% Federal Poverty Level (FPL) while the Supplemental Nutrition Assistance Program (SNAP) qualifies households under 130% FPL, which is in-line with the definition EPA uses for Solar for All.

indicators to screen individual census tracts.

Commerce has designed four program offerings to ensure Washington's implementation of Solar for All maximizes the diversity of communities served by the program. This includes single family homeowners, households who do not have space for residential rooftop solar, renters, tenants of multi-family affordable housing properties, and federal recognized tribal nations.

*Program Specific Communities*
Income-qualified single family homes
To ensure Washington is providing benefits to income-qualified households in perpetuity, the WASH program directs funding to homes statewide that are owned and occupied by income-qualified households and homes of tribal households that are located on tribal lands. In implementation, Commerce will prioritize homes that are located in communities that are identified as "highly impacted" on Washington's EHD map. During the program design year, Commerce also plans to collaborate with nonprofit organizations that construct houses for income-qualified homeowners and community land trusts to ensure new low-income homeowners can benefit from this program. During the Program Planning Year Commerce will also identify any circumstances under which a home located in a DAC that is not owned by a tribal household would be eligible to receive a no cost solar energy installation in the absence of income-qualification documentation.

Income-qualified community solar
Commerce will use funding to create an income-qualified and DAC-serving community solar program that will be complementary to but distinct from existing state programs. Projects can be 200 kW to 1 MW. Subscribers will be required to meet EPA's income qualification criteria at the time of entering the program, or be an eligible resident of a DAC, including those who qualify for utility assistance programs and tribal households.  Through program design, Commerce will determine any further eligible entities that represent these groups. As with WASH, Commerce will prioritize projects sited in and benefiting residents of communities identified as "highly impacted" on Washington's EHD map.

Multifamily affordable housing
For BEAMS, two financing products will be available to both new and existing multifamily affordable housing properties. Commerce, and its chosen subrecipient, WSHFC, will align the definition of multifamily affordable housing with EPA's definition. To participate, projects would need to commit to passing on at least 85% of the value of solar energy generated to tenants, preferably as electric bill credits if the building is individually metered, or through a tangible benefit to tenants that is documented.

Tribal solar projects
Washington's Solar for All proposal commits a substantial part of its budget to develop a Tribal Solar Program through formal consultation with federally-recognized tribal governments. This program will use an allocation formula, co-developed with federally-recognized tribes, to provide direct support for tribal solar projects. The program will center principles of tribal sovereignty and self-determination and will enable tribes to design and implement their own projects.

23

**Customer Acquisition**

Commerce will use the Program Planning Year to develop processes and parameters for qualifying customers for each program. Commerce plans to leverage existing programs that establish income eligibility such as income-verified federal assistance programs and utility assistance programs. Commerce will lean on recent state programs that leveraged categorical eligibility using state agency data.

Given the overlap between the IRA Home Energy Rebates program definition of low-income and Solar for All's definitions, as well as the need to co-deploy these programs to maximize benefits to households, Commerce anticipates aligning eligibility requirements and processes between these two programs. Commerce will refine these requirements through the Solar for All Program Planning Year and through the IRA Home Energy Rebates development, which is on a slightly faster timeline (estimated launch early 2025).

**Participatory Governance, Education, and Outreach**

Commerce will leverage existing relationships with community-based organizations (CBOs), especially by and for organizations, to develop best practices related to participatory governance models. Commerce has already begun working with a Community Energy Ambassador group comprised of several NGOs and focused on developing processes to incorporate community priorities and voice into decision making. These groups include Front and Centered, Spark Northwest, Kick Gas Now, Rural People's Voice and others, Commerce will also dedicate time to building relationships within communities where Commerce historically has less engagement. As a starting point, Commerce can leverage information from recent state solar program funding rounds to identify new proponents from communities, including food banks, houses of worship, and community centers.

In addition to statewide CBOs, Commerce has been selected to participate in the first cohort of the Just and Clean Energy Future State Implementation Accelerator. This program is led by the Communities First Fund, in partnership with NASEO, AASHTO, Emerald Cities Collaborative, New Urban Mobility Alliance, Race Forward, Lawyers for Good Government, NRDC, and federal agencies implementing clean energy and infrastructure investments. Washington will receive support to strategically navigate the spectrum of federal resources, including Solar for All, and other Justice40-covered programs. This support, in the form of technical assistance from federal agencies and partner intermediary organizations, will specifically focus on participatory governance and wealth and asset-building opportunities.

Commerce will also coordinate with the University of Washington Center for Environmental Health Equity, funded by the EPA Thriving Communities Technical Assistance Center program. There will be continued efforts to align and leverage work.

Commerce will take several actions to educate and engage communities on the benefits of solar energy. First, during the Program Planning Year, Commerce will engage with communities around the state both through virtual workshops and through in person, community meetings with both households and local organizations serving the target populations for Solar for All. These engagement sessions will provide opportunities for Commerce to inform communities about the benefits of solar and our plans for Solar for All, as well as for Commerce to hear directly from communities and community-based organizations on how to implement Solar for All in a culturally

24

appropriate way that responds to the needs of each specific community that will be served. Translated materials will be available, and some sessions will be held in Spanish, the most spoken language in Washington after English. Commerce will also leverage the existing work happening in the state to design a low-income energy assistance program; work will happen during the Program Planning Year and will include understanding the importance of energy access and home energy costs to the lives of multicultural, rural, and indigenous households across Washington.

Second, during program implementation, engagement strategies will include emails, website updates, media ads and earned media, signage, and deep engagement with organizations working in the communities Commerce wishes to serve with the Solar for All program. Commerce will work with contractors, utilities and a subrecipient who have strong existing relationships with the specific types of households that they seek to serve. For WASH, Commerce will prioritize through selection vendors to administer the program who have deep ties in and are trusted by the communities where they propose to install solar. Utilities will be the primary entities administering benefits through community solar under ESSAP so they can leverage their existing customer relationships and communication and outreach mechanisms. Commerce is pleased to partner with WSHFC to administer BEAMS, as WSHFC has existing relationships with most affordable housing properties in the state. Commerce will also leverage Commerce's Housing Division, which administers the state's Housing Trust Fund, a capital funding program to build and maintain affordable housing. Working through this program, Commerce's Solar for All program could reach additional affordable housing properties that are not served by WSHFC. Finally, the tribal solar program is being co-designed with tribes to ensure that tribes lead the implementation of these projects that will serve their communities and to ensure that Solar for All opportunities are being messaged in a culturally appropriate way as described further in the next section.

*Tribal co-governance, outreach and education*
Commerce will develop a Tribal Solar Program that will be co-designed with tribal governments. Tribal engagement will be well informed by Commerce's existing tribal engagement and consultation policies. In addition, the HEAL Act requires Commerce to develop a tribal consultation framework, conduct consultation on actions that affect tribes' rights and interests in their tribal lands, and assess environmental benefits and harms of all program implementation activities.

To ensure that Commerce's engagement is aligned with statewide best practices, Commerce will work with its Office of Tribal Relations and with the Governor's Office of Indian Affairs, who are also supporting the development of other IRA programs, including the Comprehensive Climate Action Plan as part of the EPA Climate Pollution Reduction planning grant program. Commerce can also use existing tribal climate action plans to support objectives and outcomes, including the Columbia River Inter-Tribal Fish Commission's (CRITFC) Energy Vision, Spokane Tribe's Climate action plan, Makah Tribe's renewable energy plan and climate resilience plan and Quinault Indian Nation's climate resilience plan.

Commerce plans to coordinate with an expansive group of tribal entities and resource groups to support program design and marketing, including but not limited to:
- Commerce's Tribal Advisory Committee (COMTAC), a Commerce-convened committee
- Affiliated Tribes of Northwest Indians (ATNI) represents over 50 Northwest tribal governments. Commerce regularly attends ATNI events to engage with members.

- Upper Columbia United Tribes (UCUT), whose members include Confederated Tribes of the Colville Reservation, Spokane Tribe of Indians, and Kalispel Tribe of Indians.
- Northwest Indian College (NWIC) is a public tribal land-grant community college in Bellingham, WA and is the only accredited tribal college serving reservation communities of Washington, Oregon, and Idaho. NWIC has launched a solar energy training program to support growth of renewable energy workforce among tribes.
- University of Washington Center for Environmental Health Equity.
- Tribal and Tribal-Serving Community Development Finance Institutions (CDFIs).
- Tribal planning groups and program implementers such as the South Puget Intertribal Planning Agency and Small Tribes Organization of Western Washington.

# Section 3:  Fiscal Stewardship Plan

**Stewardship of Funds**

For the 2023-2025 budget biennium, is administering a budget of more than $8 billion, including more than $5 billion in capital funding, one of the largest capital budgets amongst Washington state agencies. Much of the funding is provided to Commerce from the state legislature to support direct and competitive grants to communities across the state.

Commerce is governed by a set of accounting and budget policies that ensure efficiency in how the money flows into the agency, how it is documented and accounted for, and how reporting is conducted, and staff are trained on these policies, and have resources available (e.g., more training, one-on-one support) when questions arise. These policies help manage risk, prevent fraud, waste, and abuse, and dictate how funds are managed. These policies include ones around risk management, the federal award process, and cost allocation to programs. All of these policies are in alignment with Washington's Office of Financial Management (OFM), which sets the grounding accounting and administrative policy for the state, and following Commerce's financial management policy, which among other requirements, directs Commerce to design financial policies, procedures, and practices "to be compliant with federal and state laws and regulations." Relevant policies for this federal Solar for All award include:

- Financial Management Policy: A policy statement on how Commerce's financial management practices are designed to be compliant with federal and state laws and regulations; consistent, systematic, and predictable; fair and equitable; simple and provide east of access to all levels of information; supportive of transparency and accountability.
- Allocating Costs to Programs: How Commerce allocates costs through indirect and direct costs, and the basis used to allocate costs, which governs an associated Cost Allocation Procedure and Manual
- Federal Award Processes and Procedures: A policy and procedure for accepting and managing a federal award
- Implementing Enterprise Risk Management: A policy on ensuring there are risk management procedures in place.

Commerce also has strong policies and procedures governing how it distributes money, and has wide experience in receiving, managing, and reporting on federal grants and complying with the Code of Federal Regulations' requirements for administering federal grants. As an entity that manages more than 100 programs, Commerce has robust processes around competitive procurement, which are in alignment with federal requirements, and has a Central Contracts Office which establishes agency-wide procedures, provides training, and advises staff on contracting questions, including monitoring. Commerce also has internal audit and control policies in place to effectively manage risk and prevent waste, fraud, and abuse of funds, and to respond to any findings of our state's Single Audit, which is conducted annually to review the award and oversight of federal funds. Relevant policies and procedures include:

- Monitoring contracts: a policy that directs Commerce contract managers and program managers in certain ways, including the requirement that program managers conduct a risk assessment of each type of service that is contract, develop a monitoring plan, and monitor each contract accordingly.

27

- Monitoring Grantee Audit Requirements: A policy on oversight of subgrantees that receive federal funds through Commerce.
- Awarding Grants and Loans: A policy on procedures related to awarding grants and loans, and how they are distinct from procurement contracts
- Awarding Procurement Contracts: A policy on procedures related to awarding procurement contracts.
- Standardizing Contract Templates: A policy on how best practice for the agency is to use standard contract templates, with separate templates for federally-funded versus state-funded contracts. Any deviations from General Terms and Conditions need approval from the Central Contracts Office.

During the Program Planning Year, Commerce will use its standard procedures to select implementers and named subrecipients. One exception is that Commerce intends to name Washington State Housing Finance Commission as a subrecipient to implement the BEAMS program. As another Washington state agency, the contract between Commerce and WSHFC will be an interagency agreement.

Commerce has standard contract templates for federally-funded programs that have been reviewed to be in compliance with federal requirements; Commerce will review the templates with its Central Contract Office and, if needed, the Attorney General's office, to add any other needed Solar for All-specific term and condition language that will need to flow down to subrecipients and contractors. Commerce will monitor contracts, in alignment with monitoring plan for each subrecipient and Commerce's monitoring policies.

**Consumer financial protections**

In June 2024, Commerce's agency request legislation, House Bill (SB) 2156, went into effect. This legislation establishes new solar consumer protections in Washington. This legislation addresses contracts between property owners and solar installers to ensure that the costs and savings of installing solar energy are accurately described, so that households can make informed decisions about solar. Commerce was particularly motivated to pursue this legislation in anticipation of receiving a Solar for All award. The Washington Solar Energy Industries Association, numerous electric utilities, labor, and others all advocated for this bill and are driving toward the successful implementation of its requirements.

In line with HB 2156, Commerce will require that WASH vendors:
- Communicate in clear, understandable language, including providing needed translation.
- Provide documentation that explains the value of the project; any long-term maintenance costs; any impact on the home's value; the estimated electricity produced by the solar energy system and anticipated bill savings; and the contact information for the vendor to address any complaints.
- Submit to Commerce documents relating to interactions with households, and submit for preapproval any sales and marketing materials and training materials.
- Develop or have a meaningful process for handling consumer complaints and detail what interaction is needed from Commerce in the process.

For all vendors hired under WASH, Commerce will review and approve outreach material developed for Solar for All funded work. Commerce will also require each vendor to submit a copy

of their standard solar energy installation contract for review and approval for use under Solar for All.  Washington's Solar Consumer Protection law establishes that "No person may solicit using any statement or representation with regard to the costs, financing, terms, or conditions of purchase or installation of residential or commercial solar energy systems that is deceptive." Commerce will plan to take immediate action if there is evidence of company not affiliated with Solar for All trying to assert that they have funding to support customers under the program. Commerce has established an open line of communication with the Attorney General Office's Consumer Protection Division and will ask them to take action as warranted. Commerce reserves the right to terminate a contract with any vendor for cause, such as unreasonable number of complaints. If subcontractors are used in the Tribal Solar Program, Commerce anticipates there will be similar consumer protection provisions agreed to and enforced by Commerce and the relevant tribal government, depending on the specific design of the program. WASH is also intended to be a no-cost program for homeowners, with no upfront cost or financing needed; entities that indicate affiliation with Solar for All but market products, such as financing, that is not affiliated with Solar for All, will go through complaint procedures. Washington does not have residential property assessed clean energy programs.

For the ESSAP program, community solar companies are required by law to register with Washington's public utilities commission, which has a formal process to register complaints.

The BEAMS program will work directly with multifamily affordable housing properties, rather than with households. WSHFC's entire work is focused on these kinds of properties. Though the financing products under BEAMS should not result in long-term debt for a property, there will be some short-term debt for those awaiting incentives to be paid back; Commerce will work with WSHFC to develop terms that ensure that no property is overleveraged. Part of the BEAMS program includes capitalizing a revolving loan program; Commerce will work with WSHFC to ensure that program income that comes back into the fund is properly accounted for and moved back into the fund for further use. Commerce works closely with WSU Energy Program staff who administer the Community Solar Expansion Program, which will aid Commerce's ability to ensure incentives are accurately estimated and are paid out timely. It is likely that some projects will use multiple types of financing; WSHFC is familiar with navigating a capital stack for a project that includes multiple different sources.

Commerce is committed to maximizing benefits to households - Washington's Solar for All programs aim to provide a minimum of 20% utility bill savings for households, but is targeting at least 50% bill savings for participants. To ensure that these benefits are reaching households:
- For a percentage of WASH projects, Commerce will have spot checks and quality install inspections are performed to ensure that these projects are meeting the expected household savings predicted and that measures were installed as reported. For example, Commerce may require that a vendor have the first three projects and 5% thereafter be inspected. These requirements will be developed as part of contract negotiations, and Commerce anticipates doing these inspections in-house.
- Under ESSAP, Commerce will require reports from participating electric utilities, scrubbed of any personally identifiable information, to ensure expected benefits are reaching subscribers.

- For BEAMS, Commerce will require affordable housing owners to report on the savings and how it has been passed onto customers. WSHFC or Commerce may perform site visits to review installations and any non-financial benefits that are provided.
- To verify income qualifications, Commerce will leverage other assistance programs, and will align with other utility and state procedures.

## Section 4:  Timeline and Milestones

Commerce was initially obligated funds in July 2024, with a grant period from May 2024 to April 2025. At a high-level, Commerce anticipates the rest of calendar year 2024 being focused on initial activities such as workplan amendment, initial hiring, and initial stakeholder engagement. 2025 will be focused on program planning, and 2026 through 2029 will be program implementation. 2029 will also include close-out activities, unless contract extensions are negotiated.

*Table 3. High-Level Project Schedule*

|  | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|
| Pre-Award and Conditional Drawdown | x | | | | | | | | |
| Program Planning | | x | | | | | | | |
| Implementation | | | x | x | x | x | | | |
| Close-out | | | | | | x | x | x | x |

## Program Planning Year

Commerce plans to use the full Program Planning Year to develop Washington's Solar for All program design. During this year, Commerce will engage in the activities listed in first part of Section 2 and in the attached timeline, which generally cover outreach and engagement to interested stakeholders and associated communication materials, hiring internal staff, procuring and contracting with selected vendors and subrecipients, and finalizing program design decisions that will guide the implementation of the program. Outreach and engagement during the Program Planning Year will include discussions with other Commerce program staff with purview over weatherization and other home energy programs; electric utilities; affordable housing stakeholders; and other interested stakeholders to refine program assumptions and design. Formal consultation will also take place with federally recognized tribal governments on the design and implementation of the Tribal Solar Program.

Commerce anticipates providing EPA a revised workplan draft by October 15, 2025, and providing a final version by December 1, 2025, after responding to any EPA feedback. During the Program Planning Year, Commerce anticipates using the EPA-funded technical assistance provided through DOE, with a particular focus on enabling third party ownership with robust consumer protections and continuing to identify least conflict siting opportunities for community solar.

30

**Conditional Drawdown Period and Program Planning Year**
July 2024 to December 2025

*Table 4. Tasks for Conditional Drawdown and Program Planning Year*

| Task | Q3 2024 | Q4 2024 | Q1 2024 | Q2 2025 | Q3 2025 | Q4 2025 |
|---|---|---|---|---|---|---|
| Amend Workplan and Budget | X | X | | | | |
| Program Start-up | X | X | X | X | X | X |
| Conduct General Outreach and Engagement | X | X | X | X | X | X |
| Conduct Tribal Specific Outreach and Engagement | X | X | X | X | X | X |
| Conduct Workforce Engagement | | | | X | X | X |
| Conduct Utility Engagement re: bill analysis | | | | X | | |
| Quality Assurance Activities | | | | X | | |
| Project Reporting Management | | | | X | X | X |
| Environmental Justice Analysis | | | | X | X | X | X |
| Procurement and Contracting Activities | | | | X | X | X | X |
| Establish income verification process | | | | X | X | X |
| Program Design Activities | | | | X | x | X | X |
| Revised Workplan and Budget | | | | | | X | X |

*Table 5. Milestones, Deliverables, and Stakeholders Consulted, by Task, for Conditional Drawdown and Program Planning Year*

| Task | Start Date | End Date | Milestones | Stakeholders | Deliverable(s), if applicable |
|---|---|---|---|---|---|
| Amend Workplan and Budget | 7/2024 | 12/2024 | • 10/2024: Commerce turns in amended documents to EPA<br>• 12/2024: EPA anticipates approving amendment | • EPA | • Amended workplan<br>• Amended budget and narrative<br>• Amended SF424 and SF424A<br>• Timeline |
| Program Start-Up | 9/2024 | 12/2025 | • 9/2024: Hiring or staff reorganization begins<br>• 1/2025: Regular team meetings begin<br>• 6/2025: Commerce is fully staffed for program | N/A | N/A |

31

| Task | Start Date | End Date | Milestones | Stakeholders | Deliverable(s), if applicable |
|------|-----------|----------|-----------|-------------|------------------------------|
| Conduct General Outreach and Engagement | 7/2024 | 12/2025 | • 7/2024: Update program materials with notice of award<br>• 10/2024: In-person listening sessions in Central Washington<br>• 11/2024: Hold public engagement event on amended workplan<br>• Through 2025: Hold regular public design workshops<br>• Through 2025: Update communication materials as needed | • General Public | N/A |
| Conduct Tribal Specific Outreach and Engagement | 9/2024 | 12/2025 | • 9/2024: Tribal engagement at ATNI<br>• 10/2024: Affordable Housing event<br>• 10/2024: Solar stakeholders event<br>• 3/2025: Finalize guidelines for participant support costs<br>• Through 2025: Other specific engagement events with utilities, affordable housing stakeholder, workforce stakeholders, and others<br>• Through 2025: Formal tribal consultation | • Tribal governments<br>• Tribal serving entities | Guidelines for participant support costs |
| Conduct Workforce Engagement | 1/2025 | 7/2025 | • Bi-monthly: Regular updates at CETWAC meeting<br>• Through July, specific engagement with other workforce entities to gather feedback on workforce plan | • CETWAC | N/A |
| Conduct Utility Engagement re: bill analysis | 1/2025 | 3/2025 | • By 1/2025: Receive additional EPA guidance on household billing analysis<br>• 1-3/2025: Conduct outreach on available bill data to support savings analysis | • Electric utilities<br>• Public Service Commission (WA UTC)<br>• EPA | N/A |
| Quality Assurance Activities | 1/2025 | 3/2025 | • 1/2025: Commerce turns in QMP<br>• 2/2025: EPA approves QMP<br>• 3/2025: Commerce turns in QAPP<br>• 4/2025: EPA approves QAPP | • EPA | • QMP<br>• QAPP |

| Task | Start Date | End Date | Milestones | Stakeholders | Deliverable(s), if applicable |
|---|---|---|---|---|---|
| Project Reporting Management | 1/2025 | 8/2025 | • 8/2025: Procedures and processes for project reporting are established | • Internal Commerce stakeholders | N/A |
| Environmental Justice Analysis | 1/2025 | 12/2025 | • 3/2025: Complete internal environmental justice outreach plan<br>• 8/2025: Determine any further prioritization methods when deploying SFA funds, based on Washington definitions of highly impacted communities<br>• 10/2025: Finalize Environmental Justice Assessment, as required by state law | • Environmental Justice communities<br>• Internal Commerce stakeholders | • If applicable, updated prioritization methods<br>• Environmental Justice Assessment |
| Procurement and Contracting Activities | 1/2025 | 12/2025 | • 1/2025: BEAMS – finalize guidelines for use of revolving loan fund with subrecipient<br>• 1/2025: BEAMS: Complete interagency agreement with WSHFC<br>• 3/2025: WASH: Start competitive procurement for vendors<br>• 10/2025: WASH: Complete contracting for vendors<br>• By 12/25: Receive EPA approval for identified contracts and subawards | • WSHFC<br>• Tribal subrecipients<br>• Selected WASH Vendors<br>• EPA (for approvals) | • RLF guidelines<br>• Named contractors<br>• Named subawards |
| Establish income verification process | 3/2025 | 9/2025 | • 9/2025: Income verification methods and processes are established | • Internal Commerce stakeholders | • N/A |
| Program Design Activities | 1/2025 | 12/2025 | • 1/2025: ESSAP: Get clarification from EPA on program design questions<br>• 9/2025: WASH: Standards for workforce development requirements and quality control inspections protocols finalized<br>• 10/2025: WASH: Determine DAC eligibility, in lieu of income qualification<br>• 11/2025: WASH and BEAMS: Determine whether program income could support post-Solar for All operations and maintenance<br>• 12/2025: Develop final program design documents for internal management | • Stakeholders from previous tasks | • Final program design documents for each program |

| Task | Start Date | End Date | Milestones | Stakeholders | Deliverable(s), if applicable |
|---|---|---|---|---|---|
| Revised Workplan and Budget | 8/2025 | 12/2025 | • 10/2025: Commerce turns in draft revised workplan and budget to EPA<br>• 12/2025: Commerce turns in final draft revised workplan and budget to EPA<br>• 12/2025: Anticipated EPA approval of revised workplan | • EPA | • Amended workplan<br>• Amended budget |

## Program Implementation

Commerce anticipates that all programs described in this workplan will launch in January 2026. Any changes to move up the timing of the launch of some of these programs will be communicated in the revised workplan due by the end of 2025 and directly with the EPA Project Officer.

This schedule assumes that the period of performance will end in April 2029, though there may be no-cost extensions that can be negotiated at a later date. Close-out activities are conducted after the period of performance.

*Table 6. Milestones, Outcomes, and Responsible Parties, by Task, for Program Implementation*

| Task | Start Date | End Date | Milestones | Responsible Party(ies) | Outcome or Deliverable |
|---|---|---|---|---|---|
| Implement WASH program | 1/2026 | 4/2029 | • 1/2026: Program launches<br>• 4/2029: Program achieves grant outcomes and closes | • Selected vendors (implementation)<br>• Commerce (oversight) | 1,660 households are served and electricity bills are reduced for those served |
| Implement ESSAP | 1/2026 | 4/2029 | • 1/2026: Program launches<br>• 4/2029: Program achieves grant outcomes and closes | • Commerce (implementation) | 1,430 households are served and electricity bills are reduced for those served |
| Implement BEAMS | 1/2026 | 4/2029 | • 1/2026: Program launches<br>• 4/2029: Program achieves grant outcomes and closes | • WSHFC (implementation)<br>• Commerce (oversight) | 720 households are served and electricity bills are reduced for those served |
| Implement Tribal Solar Program | 1/2026 | 4/2029 | • 1/2026: Program launches<br>• 4/2029: Program achieves grant outcomes and closes | • Tribal Subrecipients (implementation)<br>• Commerce (oversight) | TBD |
| Regular Team Meetings | 1/2026 | 4/2029 | • N/A | • Commerce | Solar for All team has strong processes and regular connection points to support implementation |

35

| Task | Start Date | End Date | Milestones | Responsible Party(ies) | Outcome or Deliverable |
|------|-----------|----------|-----------|----------------------|----------------------|
| Annual Public Engagement Events | 11/2026 | 11/2028 | • 11/2026: 2026 Public Engagement Event<br>• 11/2027: 2027 Public Engagement Event<br>• 11/2028: 2028 Public Engagement Event<br>(November is estimate) | • Commerce | Public is informed and feedback is gathered |
| Annual Review of QMP and QAPP | 1/2025 | 3/2025 | • 2/2026: QMP and QAPP reviewed<br>• 2/2027: QMP and QAPP reviewed<br>• 2/2028: QMP and QAPP reviewed<br>• 2/2029: QMP and QAPP reviewed | • Commerce (compliance)<br>• EPA (review) | QA documents and processes maintained |
| Required EPA semi-annual reporting and other reporting requirements | 10/2024 | 1/2030 | • Annually: EPA Form 5700-52A submitted<br>• Annually: SF425 submitted<br>• 1/2025: Performance reporting submitted<br>• 7/2025: Performance reporting submitted<br>• 1/2026: Performance reporting submitted<br>• 7/2026: Performance reporting submitted<br>• 1/2027: Performance reporting submitted<br>• 7/2027: Performance reporting submitted<br>• 1/2028: Performance reporting submitted<br>• 7/2028: Performance reporting submitted<br>• 1/2029: Performance reporting submitted<br>• 7/2029: Performance reporting submitted | • Commerce (compliance)<br>• EPA (review) | All required reporting |
| Close-out activities | 4/2029 | 1/2032 | • 8/2029: Post-closeout program strategy submitted<br>• 8/2029: Final report and final federal financial report submitted<br>• 7/2030: Performance reporting submitted<br>• 1/2031: Performance reporting submitted<br>• 7/2031: Performance reporting submitted<br>• 1/2032: Performance reporting submitted | • Commerce (compliance)<br>• EPA (review) | • If applicable, updated prioritization methods<br>• Environmental Justice Assessment |

36

# Section 5: Reporting Requirements

**Reporting Plan**

As an executive level agency in the State of Washington, Commerce participates in the state of Washington's Single Audit, which ensures that the state and its agencies are using federal funds appropriately and is in compliance with all applicable requirements and regulations of each grant award. Commerce will fulfill all the relevant reporting needs of the Solar for All grant:

Performance Reports

- *Semi-Annual Report*

Commerce agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The semi-annual performance report should cover activities from the preceding two quarters.

- *Final Report*

Commerce agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. Commerce will include the following elements in its final report:

- Progress towards objectives on key performance metrics over the entire period of performance,
- Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,
- Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations, and
- Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Commerce agrees to submit the final performance report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

Transaction-Level and Project-Level Data

Commerce agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting, or as otherwise amended. Commerce agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting

period ends. The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30 and should cover transactions originated in the preceding two quarters.

Each program includes dedicated staff time to acquire, track and manage program data, including developing reports for both EPA and for the general public. Each program also includes dedicated staff to focus on monitoring, reporting, and compliance. Once agreed upon metrics are developed during grant award negotiations, Commerce intends to convene a kick-off meeting with staff and subsequently hold regular internal team meetings to review implementation. The kick-off meeting will include a review of the key pieces of data and metrics of success that Commerce is tracking and a discussion to inform the collective understanding of how the needed data will be collected, calculated, and reported.

### Contractors

Any contracts, vendors, or subrecipients selected by Commerce to assist with implementation will also include reporting requirements as part of their scopes of work, to support EPA reporting. Vendors will maintain strict confidentiality of any and all sensitive and personally identifiable information. For a percentage of projects that are run through contractors, Commerce plans to do spot checks and quality installation inspections to ensure that these projects are meeting the expected household savings predicted and that measures were installed as reported.

### Evaluation of the Program

Commerce intends to conduct a mid-point evaluation of our program to help inform any changes and adaptive management needed. Commerce will discuss the specifics of when this program evaluation might occur with stakeholders during program design and with EPA, but the preliminary estimate is that this would happen after the first full year of implementation, to help inform the following three years and ensure ultimate impact. A key part of this evaluation will be review of available quantifiable data, as well as interviews with relevant stakeholders, to help inform whether the program is on track to meet its expected outputs, outcomes, and goals. Evaluation results will be reviewed with Commerce program staff and with any vendors as appropriate, to determine any needed changes in outreach to households, installation of measures, and any directional shifts Washington's program should take to stay on track toward success. Commerce is committed to proactively discussing preliminary and final evaluation findings with both Washington stakeholders and with EPA.

## Section 6:  Budget Narrative

Below is the budget for Commerce's Solar for All Program, which is complemented by a separate Budget Detail document. Commerce does not propose any pre-award costs or the use of any of these funds to support unallowable costs as defined by EPA, such as lobbying, ineligible projects, or work outside the United States.

## Project Budget

*Table 7. Budget Summary, by Year*

|  | YR1 | YR2 | YR3 | YR4 | YR5 | TOTAL |
|---|---|---|---|---|---|---|
| A. Personnel | $903,274 | $903,274 | $903,274 | $903,274 | $903,274 | $4,516,368 |
| B. Fringe Benefits | $334,211 | $334,211 | $334,211 | $334,211 | $334,211 | $1,671,056 |
| C. Travel | $16,574 | $16,574 | $16,574 | $16,574 | $16,574 | $82,870 |
| D. Equipment | $0 | $0 | $0 | $0 | $0 | $0 |
| E. Supplies | $36,000 | $0 | $0 | $0 | $0 | $36,000 |
| F. Contractual | $868,603 | $24,084,160 | $38,234,160 | $26,259,160 | $7,259,160 | $96,705,243 |
| H. Other | $233,560 | $22,738,560 | $22,733,560 | $2,733,560 | $2,633,560 | $51,072,800 |
| J. Indirect Charges | $407,133 | $407,133 | $407,133 | $407,133 | $407,133 | $2,035,663 |
| **Total** | **$2,799,354** | **$48,483,911** | **$62,628,911** | **$30,653,911** | **$11,553,911** | **$156,120,000** |

*Table 8. Budget Summary, By Program*

|  | All programs | BEAMS-MF Solar | ESSAP-Com Solar | Tribal Solar | WASH-SF | Grand Total |
|---|---|---|---|---|---|---|
| A. Personnel | $92,648 | $1,064,413 | $1,064,413 | $1,230,482 | $1,064,413 | $4,516,368 |
| B. Fringe Benefits | $34,280 | $393,833 | $393,833 | $455,278 | $393,833 | $1,671,056 |
| C. Travel | $50,360 |  |  | $32,510 |  | $82,870 |
| D. Equipment | $0 |  |  |  |  | $0 |
| E. Supplies | $36,000 |  |  |  |  | $36,000 |
| F. Contractual | $1,255,243 | $250,000 | $38,000,000 | $200,000 | $57,000,000 | $96,705,243 |
| H. Other | $1,072,800 | $10,000,000 |  | $40,000,000 |  | $51,072,800 |
| J. Indirect Charges | $2,035,663 |  |  |  |  | $2,035,663 |
| **Total** | **$4,576,993** | **$11,708,246** | **$39,458,246** | **$41,918,270** | **$58,458,246** | **$156,120,000** |

**Personnel**

Total personnel costs for the period of performance are $4,516,368, or $903,274 per year. Commerce does not assume any year over year increases in personnel costs as this budget projects all staff at the highest end of the range for recruitment purposes. While there may be cost of living adjustments for salary, these adjustments are provided by the legislature through the budget making process and are not guaranteed.

Salary estimates are derived from using Commerce's standard budget tool that is used to prepare fiscal notes and legislative budget requests. All salary costs are estimated and are set at the highest end of the range to allow for talent recruitment across the state and within King County.

39

King County-based employees receive a 5% location-based premium based on state administrative rules.

*Table 9. Personnel Descriptions. By Title*

| Title | General Duties | Annual Base Salary Estimate |
|---|---|---|
| WMS3 - Unit Director (10%) | Director of Energy Programs in Communities Unit providing strategy, implementation planning, leadership, oversight, supervision of Section Supervisor, and decision making over executive elements of the program. | $    149,637 |
| WMS2 - Solar Section Supervisor (100%) | The Solar Section Supervisor manages the solar energy section of the Energy Programs in Communities (EPIC) unit. The position is responsible for strategic planning, oversight of program execution, budget, policy alignment, technical assistance, external relations and outreach. | $    132,855 |
| Management Analyst 5 (18%) | Independent team member that leads quality assurance work, including development of QMP/QAPP. | $ 102,942 |
| Management Analyst 4 (100%) | Technical expertise on metrics and reporting. This position will also lead the environmental justice assessment and community engagement processes. | $     93,234 |
| EMS2 - Senior Policy Specialist (50%) | Subject matter expertise and consultation in coordinating development of the program and providing expert policy advice. | $    132,855 |
| EMS2 - Tribal Energy Specialist (25%) | Subject matter expertise and consultation in coordinating development of the Tribal Solar program under Solar for All. | $    132,855 |
| Commerce Specialist 5 - Team Manager (100%) | Working under the supervision of the Solar Section Supervisor, will provide ongoing program oversight, coordination, supervision of contracts and staffing and to administer overall fund management. | $    102,942 |
| Commerce Specialist 3 – Program Managers (4 program managers @ 100%) | Develops, solicits, originates, manages and monitors the procurement and grant making process and contracts, and provides evaluation and subject matter expertise on Solar for All programs, monitor budget and expenditures, conduct detailed analysis | $     88,744 |
| Commerce Specialist 2 - Contract Specialists (1 contract specialist at 100%) | Provides coordination support, contract management, contract monitoring, invoicing, and data entry. | $     76,570 |
| Budget Analyst 4 (10%) | Monitors budget and expenditures, conducts detailed analysis, and provides consultative planning for financial reporting, tracking and compliance with EPA guidelines. | $     95,621 |
| Personnel TOTAL | | $4,516,368 |

Of the 9.13 estimated FTE to support delivery of the Solar for All program(s), 8 positions are new.

*Table 10. FTE by Position*

| FTE by Position | All programs | BEAMS-MF Solar | ESSAP-Com Solar | Tribal Solar | WASH-SF | Total |
|---|---|---|---|---|---|---|
| WMS3 - Unit Director | | 0.03 | 0.03 | 0.03 | 0.03 | 0.10 |
| WMS2 - Solar Section Supervisor | | 0.25 | 0.25 | 0.25 | 0.25 | 1.00 |
| Management Analyst 5 | 0.18 | | | | | 0.18 |
| Management Analyst 4 | | 0.25 | 0.25 | 0.25 | 0.25 | 1.00 |
| EMS2 - Tribal Energy Specialist | | | | 0.25 | | 0.25 |
| EMS2 - Senior Policy Specialist | | 0.13 | 0.13 | 0.13 | 0.13 | 0.50 |
| Commerce Specialist 5 - Team Manager | | 0.25 | 0.25 | 0.25 | 0.25 | 1.00 |
| Commerce Specialist 3 - Program/Grant Manager | | 1.00 | 1.00 | 1.00 | 1.00 | 4.00 |
| Commerce Specialist 2 - Contract Specialist | | 0.25 | 0.25 | 0.25 | 0.25 | 1.00 |
| Budget Analyst 4 | | 0.03 | 0.03 | 0.03 | 0.03 | 0.10 |
| **FTE TOTAL** | **0.18** | **2.18** | **2.18** | **2.43** | **2.18** | **9.13** |

*Table 11. Personnel Costs*

| Personnel Costs | YR1 | YR2 | YR3 | YR4 | YR5 | Sum of TOTAL |
|---|---|---|---|---|---|---|
| WMS3 - Unit Director | $14,964 | $14,964 | $14,964 | $14,964 | $14,964 | $74,819 |
| WMS2 - Solar Section Supervisor | $132,855 | $132,855 | $132,855 | $132,855 | $132,855 | $664,275 |
| Management Analyst 5 | $18,530 | $18,530 | $18,530 | $18,530 | $18,530 | $92,648 |
| Management Analyst 4 | $93,234 | $93,234 | $93,234 | $93,234 | $93,234 | $466,170 |
| EMS2 - Tribal Energy Specialist | $33,214 | $33,214 | $33,214 | $33,214 | $33,214 | $166,069 |
| EMS2 - Senior Policy Specialist | $66,428 | $66,428 | $66,428 | $66,428 | $66,428 | $332,138 |
| Commerce Specialist 5 - Team Manager | $102,942 | $102,942 | $102,942 | $102,942 | $102,942 | $514,710 |
| Commerce Specialist 3 - Program/Grant Manager | $354,976 | $354,976 | $354,976 | $354,976 | $354,976 | $1,774,880 |
| Commerce Specialist 2 - Contract Specialist | $76,570 | $76,570 | $76,570 | $76,570 | $76,570 | $382,850 |
| Budget Analyst 4 | $9,562 | $9,562 | $9,562 | $9,562 | $9,562 | $47,811 |
| **Personnel TOTAL** | **$903,274** | **$903,274** | **$903,274** | **$903,274** | **$903,274** | **$4,516,368** |

**Fringe Benefits**

Fringe Benefits of 37% is budgeted for all positions. The basis for computation is Personnel Cost. The types of benefits include paid time Off, Old-Age and Survivors Insurance (OASI), Health and Life Insurance, Disability Insurance, Medical Aid & Industrial Insurance, and Retirement and Pension costs.

**Travel**

Travel estimates based on OFM guidance for WA State Employees

*Table 12. Summary of Travel Costs, By Year*

|  | YR1 | YR2 | YR3 | YR4 | YR5 | TOTAL |
|---|---|---|---|---|---|---|
| Summary of Travel Costs | $16,574 | $16,574 | $16,574 | $16,574 | $16,574 | $82,870 |

The following travel is estimated to support the design, launch, implementation, monitoring and evaluation of the **Tribal Solar Program**.

*Table 13. Tribal Solar Program Travel Description*

| Travel Description | BASE | QUANTITY | TOTAL | *NOTES* |
|---|---|---|---|---|
| In-state: Mileage for one vehicle: 8 trips/year | $402.00 | 8 | **$16,080** | *In-state outreach, engagement, program monitoring, and inspection meetings with tribal nations. Costs based on Olympia to Spokane, 600 miles roundtrip.* |
| In-state: Per Diem 1 staff @ $74/day, 2 day trip | $74.00 | 16 | **$10,350** | |
| In-state: Hotel 1 staff @ $152/night, one night | $152.00 | 8 | **$6,080** | *Per diem assumes 2-day travel, one-night lodging* |

The following travel is estimated to support the design, launch, implementation, monitoring and evaluation of **the BEAMS, ESSAP and WASH programs**.

*Table 14. Other Programs Travel Description*

| Travel Description | BASE | QUANTITY | TOTAL | *NOTES* |
|---|---|---|---|---|
| In-state: Mileage for one vehicle: 8 trips/year | $402 | 8 | **$16,080** | *In-state outreach, engagement, program monitoring, inspection meetings, and workshops. Costs are based on Olympia to Spokane, 600 miles roundtrip. Yr1-3 outreach/engagement, YR4-5 monitoring trips. Per diem assumes 2-day travel, one-night lodging* |
| In-state: Per Diem 1 staff @ $74/day | $74 | 16 | **$5,920** | |
| In-state: Hotel 1 staff @ $152/night | $152 | 8 | **$6,080** | |
| Out-of-state: Airfare | $1,200 | 2 | **$12,000** | *The annual Solar for All grantee meeting assumes travel for two people from Seattle to Washington, D.C.* |
| Out-of-state: lodging | $276 | 4 | **$5,520** | *3 days, 2 nights in Washington, D.C.* |
| Out-of-state: per diem | $92 | 6 | **$2,760** | *3 days x 2 ppl in Washington, D.C.* |
| Out-of-state: transfers | $100 | 4 | **$2,000** | *airport transfers to Seattle-Tacoma, and Washington, D.C. airport (4 transfers per trip), shared by 2 ppl* |

42

## Equipment

No equipment costs are budgeted for.

## Supplies

*Table 15. Supplies Budget*

| SUPPLIES | BASE | QUANTITY | TOTAL |
|---|---|---|---|
| Laptop and peripherals (e.g., mouse, dock, monitors) | $2,890 | 8.00 | **$23,120** |
| Desk | $785 | 8.00 | **$6,280** |
| Chair | $325 | 8.00 | **$2,600** |
| Mobile phone and coverage | $500 | 8.00 | **$4,000** |
| SUPPLIES TOTAL | | | **$36,000** |

All of Commerce's non-information technology purchases are in accordance with the Washington Department of Enterprise Services policies.[10] All of Commerce's purchases of information technology resources are in accordance with Washington Technology Services (WaTech) policies.[11]

## Contractual

*Table 16. Contract Summary*

| CONTRACT | TOTAL | SCOPE OF WORK | DURATION | PROCUREMENT METHOD |
|---|---|---|---|---|
| WASH Program | $57,000,000 | Retain third-party vendor(s) for the Single-Family home solar program | At least 4 years | Competitive procurement: will seek vendors with experience with installing solar and working with communities of interest |
| ESSAP Sub-grants | $38,000,000 | Funding passed through via grants for ESSAP installations | Each grant period of performance ~1-2 years | Competitive procurement |

---

[10] Washington State Procurement Manual | Department of Enterprise Services (DES)
[11] Policies | WaTech

| CONTRACT | TOTAL | SCOPE OF WORK | DURATION | PROCUREMENT METHOD |
|---|---|---|---|---|
| MFAH Solar Readiness study | $250,000 | Consultant services to conduct a multi-family affordable housing Solar readiness study. Estimate is based on similar work, and assumes $250/hour for 1,000 hours. | ~1 year. Expected to occur over Program Planning Year. | Competitive procurement: will seek vendor with experience in the multifamily affordable housing space and solar readiness assessments |
| Tribal Tech Assist | $200,000 | Consultant services to support tribal nations with technical assistance. Cost estimate based on contract for similar services and assumes $200/hour for 1,000 hours. | At least 3 years | Competitive procurement: will see vendor(s) with experience working with tribal nations and providing clean energy technical assistance |
| Legal and tax attorney services | $375,000 | Legal and tax assistance; consulting services. Based on contracts for similar services | At least 3 years | Competitive procurement: will seek vendor(s) with experience with clean energy tax incentives and/or other legal identified during Program Planning Year |
| Language access | $10,000 | Translation of written materials, translation at in-person events | Each year of the period of performance; may be separate contracts depending on contractor availability | Statewide contract; will pick vendor with experience with community events |
| Program website | $459,443 | Develop and maintain program website | Each year of the period of performance | Competitive procurement through open RFP or through two tier statewide master contract list |
| Community engagement meetings: meals and refreshments | $60,800 | Purchase of meals/refreshments at community engagement meetings. Estimate based on 40 people attending 8 events where food is provided; $38/person based on state meal rate | Each year of the period of performance, may be different vendors | State purchasing lists |
| Davis Bacon / BABA LCP Tracker | $350,000 | Software to support reporting and compliance of Davis Bacon and Build America / Buy America provisions | Each year of the period of performance | Anticipated to be request for sole-source procurement, to be refined in program planning year |

44

| CONTRACT | TOTAL | SCOPE OF WORK | DURATION | PROCUREMENT METHOD |
|----------|-------|---------------|----------|--------------------|
| CONTRACT TOTAL | $96,705,243 | | | |

## Construction (if applicable)

Not applicable

## Other

*Table 17. Other Direct Costs Description*

| OBJECT DETAIL | BASE | QUANTITY | TOTAL | NOTES |
|---------------|------|----------|-------|-------|
| EPA required signage for projects | $ 1.00 | 5,000 | $5,000 | *Required signage; estimate based on yard sign - one-time cost* |
| Direct FTE Costs | $ 12,000 | 9.13 | $547,800 | *These are costs that are driven by the number of FTE but are not directly allocated to individual staff. These are separate costs from Commerce's federally negotiated indirect rate. These costs include Seat of Government real estate services fee since state facilities are exempt from paying local property taxes; Department of Personnel required charge; Repair and maintenance to office equipment; Space and Utilities to rent offices. Other direct cost for services from other agencies or services to provide communications, data processing for our outlook mailboxes, the state data center, software licenses and the personnel database. These costs are in alignment with Commerce's cost allocation procedures.* |
| Meeting space | $1,000.00 | 4 | $20,000 | *4 rentals per year @ $1,000 per rental. Cost is only for space.* |
| Media to promote programs/outreach | $1,000.00 | 12 | $60,000 | *$1,000 per media outlet. 3 media outlet per event. 4 events per year receive advertising.* |
| DOE In-Kind Assistance | | | $ 400,000 | *Per EPA budget guidelines, include as one line item in Other* |
| OTHER TOTAL | | | $1,032,800 | |

## Participant Support Costs

In the budget detail, these costs are captured under object class "Other".

*Table 18. Participant Support Costs*

| | BASE | QUANTITY | TOTAL | NOTES |
|---|------|----------|-------|-------|
| Participant support: Stipends | $ 25.00 | 320 | $ 40,000 | *8 engagement opportunities (tribes and non-tribes) per year. Assume 20 ppl received stipends per event, each event is 2 hours. $25/hr based on WA state community compensation guidelines* |

| | BASE | QUANTITY | TOTAL | *NOTES* |
|---|---|---|---|---|
| **Other PSC TOTAL** | | | **$40,000** | |

## Subawards

Below are the funds that Commerce will subaward through non-competitive procurement or competitive grant agreements.

*Table 19. Subawards Description*

| SUBAWARDS | TOTAL | *NOTES* |
|---|---|---|
| Washington State Housing Finance Commission (WSHFC) BEAMS Administrator | $10,000,000 | *Subaward to WSHFC, a government entity. Assumption that 20% of budget is held for enabling upgrades, and that the 80% of funding is cycled in the first two years of implementation and then comes back into the revolving loan fund ("program income") to be cycled out again. Estimate $7.4M in program income.* |
| Tribal Sub-grants | $ 40,000,000 | *Funding passed through via grants to tribal nations for solar installations, including 20% for enabling upgrades or storage; anticipated to be a non-competitive subaward.* |
| **Other Subawards TOTAL** | **$50,000,000** | |

# Additional Items

## Indirect Charges

*Table 20. Indirect Charge Description*

| OBJECT DETAIL | BASE | TOTAL | *NOTES* |
|---|---|---|---|
| Indirect rate | 32.9% | $ 2,035,663 | *Commerce negotiated federal indirect rate of 32.9% of salary + fringe benefits; this number is revisited annually.* |

## Conferences and Workshops

*If this work plan includes conferences or workshops that the recipient will conduct, the recipient must respond to each of the following:*

- *Does the scope of work include conducting conferences or workshops? If so, briefly describe the conference or workshop.*

  Yes, eight Community engagement workshops per year are planned to include community members and tribes in the planning, design, implementation, and evaluation phases of the program. Commerce assumes approximately 40 public members will attend each workshop and that each workshop will be 2 hours long.

- *Who is initiating the conference/workshop/meeting?*

  WA State Department of Commerce

46

- *How is the conference/workshop/meeting being advertised?*

  Through email list servs and program webpages. Some media outreach as well.

- *Whose logo will be on the agenda and conference/workshop/meeting materials?*

  WA State Department of Commerce

- *What is the expected percentage distribution of the persons attending the conference, workshop, or meeting (i.e., percent of federal, state, local, or public participants)?*

  Local and public participants are the target audience for workshops and will be the majority (estimated 95%) of the participants. Support staff from Commerce will be in attendance to facilitate, along with interpretation services (estimated 5%).

- *Is the recipient going to conduct the proceedings or analysis/analyses and disseminate this information back to the appropriate state, local, and scientific community?*

  No

- *Does the recipient anticipate any program income being generated from the conference, workshop, or meeting, including registration fees?*

  No – all workshops will be offered at no cost to participants

**Meals and Refreshments:**
*If this work plan or budget detail includes activities during which meals and/or light refreshments will be provided, the recipient must provide a narrative response to address each of the following:*

- *Briefly describe the event where meals and/or light refreshments will be provided and provide an estimated cost for the event.*

  We have estimated that we will provide meal and/or light refreshments at 8 events per year. Most events will occur during lunch time or after hours to encourage public participation. WA State guidelines for offering food and refreshments at meetings and events will be followed and are estimated to be $38/person. For attendance of 40 people, the total cost over five years is estimated to be $60,800.

- *Will those attending the event receive a per diem financed through grant funds?*

  Meals will be provided by WA State Department of Commerce through grant funds. Individuals will not receive per diem.

- *Why is the provision of light refreshments and/or meals necessary to achieve the objectives of the assistance agreement?*

47

This program is intended to better serve low-income residential households with the benefits of solar. To reach these households and organizations that serve them during program design, implementation, and evaluation, Commerce will provide in-community events during hours that will reach more people. In Commerce's experience, after traditional work hours and during the middle of the day can attract more participants, but light refreshments or meals are needed to support participation.

- *Why is the provision of light refreshments and/or meals necessary to achieve the objectives of the event?*

  To reach the public more broadly, Commerce anticipates holding these workshops during lunchtime and after traditional work hours. The provision of light refreshments and/or meals removes a key barrier for reaching the public during these times by allowing them to attend an event with.

- *When will meals and/or light refreshments be made available (before, during, or after the event)?*

  During event only

**Program Income**
*Describe how Program Income will be generated and expended and an estimate of how much program income will be generated.*

It is estimated that the BEAMS program will cycle its allotted funding for solar and energy storage through a revolving loan fund once during the period of performance. Commerce estimates that this program income is approximately $7.4 million that can be used for additional loans through this program. BEAMS is anticipated to be the only program that will generate program income.

**Other Budget Questions**
- *Will the assistance award result in the development of any copyrighted software or written materials?*

  No

- *Could an invention result from this project? (If yes, provide disposition instructions)*

  No

- *Does the project involve animal subjects?*
  No

- *Does the project involve collecting identical information from 10 or more people?*

48

Yes. Commerce anticipates collecting identical information from 10 or more people to comply with EPA reporting requirements. Evaluative surveys may also be a component of information collection, but will be confirmed during the Program Planning Year.

- Is any work outside the United States include in this grant?

  No

- Does the grant involve or relate to geospatial information? Includes information identifying geographic location, or application/tools associated with such information – GPS, mapping or statistical data.

  Yes, projects are anticipated to collect geographic location as a data point.

EXHIBIT 3

5H - 84093001 - 1    Page 1

| U.S. ENVIRONMENTAL PROTECTION AGENCY  Assistance Amendment | | GRANT NUMBER (FAIN):    84093001  MODIFICATION NUMBER:    1  PROGRAM CODE:    5H | |
|---|---|---|---|
| | | | DATE OF AWARD  01/14/2025 |
| | | TYPE OF ACTION  No Cost Amendment | MAILING DATE  01/14/2025 |
| | | PAYMENT METHOD:  ASAP | ACH#  X0078 |

| RECIPIENT TYPE:  State | Send Payment Request to:  Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| RECIPIENT:  COMMERCE, WASHINGTON STATE DEPARTMENT OF  P. O. BOX 42525  OLYMPIA, WA 98504-2525  EIN:  91-0823820 | PAYEE:  COMMERCE, WASHINGTON STATE DEPARTMENT OF  1011 Plum St SE  P.O. Box 42525  Olympia, WA 98504-2525 |

| PROJECT MANAGER  Nora Hawkins  P.O. Box 42525  Olympia , WA 98504-2525  **Email:** Nora.hawkins@commerce.wa.gov  **Phone:** 360-819-3739 | EPA PROJECT OFFICER  Vineet Pandharpurkar  1200 Pennsylvania Ave., NW, 4410C  Washington, DC 20460  **Email:**  Pandharpurkar.Vineet@epa.gov  **Phone:** 971-645-0444 | EPA GRANT SPECIALIST  Caitlyn Chandler  OGD - GMBOD, 3903R  1200 Pennsylvania Ave. NW  Washington, DC 20460  **Email:**  Chandler.Caitlyn@epa.gov  **Phone:** 202-564-0592 |
|---|---|---|

**PROJECT TITLE AND EXPLANATION OF CHANGES**

Washington State Solar for All

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation

| BUDGET PERIOD  05/01/2024 - 04/30/2029 | PROJECT PERIOD  05/01/2024 - 04/30/2029 | TOTAL BUDGET PERIOD COST  $ 156,120,000.00 | TOTAL PROJECT PERIOD COST  $ 156,120,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/11/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 156,120,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| ISSUING OFFICE (GRANTS MANAGEMENT OFFICE) | AWARD APPROVAL OFFICE |
|---|---|
| ORGANIZATION / ADDRESS | ORGANIZATION / ADDRESS |
| Environmental Protection Agency, Grants Management & Business Operations Division  1200 Pennsylvania Ave, NW Mail code 3903R  Washington, DC 20460 | Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund  OA - Office of the Administrator  1200 Pennsylvania Ave. NW  Washington, DC 20460 |

| THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY | |
|---|---|
| **Digital signature applied by EPA Award Official** Phillip Schindel - Chief, Business Operations Branch | DATE  01/14/2025 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| **EPA Amount This Action** | $ 155,720,000 | $ 0 | $ 155,720,000 |
| **EPA In-Kind Amount** | $ 400,000 | $ 0 | $ 400,000 |
| **Unexpended Prior Year Balance** | $ 0 | $ 0 | $ 0 |
| **Other Federal Funds** | $ 0 | $ 0 | $ 0 |
| **Recipient Contribution** | $ 0 | $ 0 | $ 0 |
| **State Contribution** | $ 0 | $ 0 | $ 0 |
| **Local Contribution** | $ 0 | $ 0 | $ 0 |
| **Other Contribution** | $ 0 | $ 0 | $ 0 |
| **Allowable Project Cost** | $ 156,120,000 | $ 0 | $ 156,120,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | National Environmental Policy Act: Sec. 102(2)(I)<br><br>Clean Air Act: Sec. 134(a)(1)<br><br>2023 Consolidated Appropriations Act (PL 117-328) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84093001 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 4,516,368 |
| 2. Fringe Benefits | $ 1,671,056 |
| 3. Travel | $ 82,870 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 36,000 |
| 6. Contractual | $ 96,705,243 |
| 7. Construction | $ 0 |
| 8. Other | $ 51,072,800 |
| 9. Total Direct Charges | $ 154,084,337 |
| 10. Indirect Costs: 32.90 % Base SW+FB | $ 2,035,663 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 156,120,000 |
| 12. Total Approved Assistance Amount | $ 156,120,000 |
| 13. Program Income | $ 7,400,000 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 156,120,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.

- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.

- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

- **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

  a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

  b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

  c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

  d. Being funded by public or charitable contributions; and

  e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.
- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.
- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States:* *Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a)** the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e. g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities**: "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary**: Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income**: 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

# II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition***:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

## 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

## 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208 (e).

*Method for Reconsideration*. If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved.  The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

> (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

> (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

> (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate

Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive

reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not "profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient

agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at

rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

**E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program**

Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:
>
> **a. Solicitation and Contract Requirements:**
>
> > **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
> >
> > **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
>
> **b. After Award of Contract:**
>
> > **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
> >
> > **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

   1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

   2. Privately-owned commercial buildings when they meet the "public function" test;

   3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

Archeological and Historic Preservation Act (AHPA)

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision of 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

***The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:***

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement.* EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

***The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

### B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

### C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

### 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

### AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

### AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT 4



# OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**    Termination of EPA Assistance Agreement 5H-84093001 under 2 CFR 200.340

**FROM:**    Devon Brown, EPA Award Official

**TO:**    Amy Wheeless, Federal Policy and Program Alignment Manager
Washington State Department Of Commerce

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84093001 awarded to Washington State Department Of Commerce. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Alison Hanlon, EPA Grant Specialist
     Vineet Pandharpurkar, EPA Project Officer
     Nora Hawkins, Grantee Program Manager

2

# EXHIBIT 5



**STATE OF WASHINGTON**
## DEPARTMENT OF COMMERCE
**1011 Plum Street SE • PO Box 42525 • Olympia, Washington 98504-2525 • 360-725-4000**
**www.commerce.wa.gov**

August 28, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington DC 20460

RE:  Disagreement with Modification No. 2 to Grant Number (FAIN): 84093001, dated August 8, 2025

Dear Mr. Brown:

On August 7, 2025, Washington Department of Commerce ("Commerce") received a memorandum from you that purported to terminate EPA Assistance Agreement 5H-84093001 under 2 CFR § 200.340 ("Termination Letter").  The Termination Letter stated, "The EPA Grants Management Office will issue an amendment to the agreement to document the termination."

The next day, Commerce received a document titled "Assistance Amendment" dated August 8, 2025.  That document states it is "Modification Number: 2" to Grant Number 84093001.  Under its "Explanation of Changes" the document states that it requires Commerce to stop work, terminates the agreement, reduces performance period duration, curtails the scope of work, and adds administrative terms and conditions.  In the "Notice of Award" section, it states that if the recipient disagrees with the terms and conditions specified, it must furnish a notice of disagreement within 21 days.

Please accept this letter as Commerce's notice of disagreement with Modification No. 2 dated August 8, 2025, issued under your signature as EPA Award Official.  Commerce also disagrees with any suggestion in the Assistance Amendment that any attempt to draw down funds could constitute acceptance of the termination or function as a waiver of Commerce's dispute rights, which is contrary to the regulations authorizing grantees to draw down eligible costs incurred prior to termination per 2 CFR § 200.305(b)(3) and the Termination Letter's specific statement that costs incurred prior to the termination date are allowable.



**STATE OF WASHINGTON**
## DEPARTMENT OF COMMERCE
**1011 Plum Street SE • PO Box 42525 • Olympia, Washington 98504-2525 • 360-725-4000**
**www.commerce.wa.gov**

Please acknowledge receipt of this notice of disagreement and contact Commerce via the below-signed designee to discuss resolution of this disagreement within fourteen days.

Sincerely,

Jennifer Grove
Assistant Director, Energy Division
(360) 763-2213
Jennifer.Grove@commerce.wa.gov

EXHIBIT 6



**STATE OF WASHINGTON**
## DEPARTMENT OF COMMERCE
**1011 Plum Street SE • PO Box 42525 • Olympia, Washington 98504-2525 • 360-725-4000**
**www.commerce.wa.gov**

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington DC 20460

RE: Dispute of Termination of EPA Assistance Agreement 5H-84093001 dated August 7, 2025

Dear Mr. Molina:

Please accept this letter as the Washington Department of Commerce's ("Commerce") dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Assistance Agreement 5H-84093001 under 2 CFR 200.340 ("Termination Letter").[1] The next day, Commerce received a document titled "Assistance Amendment",[2] which Commerce previously responded to on August 28, 2025. Now, Commerce timely files this letter in accordance with 2 C.F.R. § 1500.15 disputing the August 7, 2025 Termination Letter.

Pursuant to 2 CFR § 1500.15, we are writing to notify you as the EPA Dispute Decision Official that Commerce disagrees with the attempt to terminate the subject award. The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding Assistance Agreement dated July 8, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. § 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to Washington residents.

The following is a more detailed statement of the specific legal and factual grounds for this notice of disagreement:

### FACTUAL GROUNDS

---

[1] Ex. 1 (attached).
[2] Ex. 2 (attached).

On October 11, 2023, Commerce submitted an application under EPA's Solar for All[3] Notice of Funding Opportunity EPA-R-HQ-SFA-23-01. In developing its application, Commerce consulted with a number of unique stakeholder organizations, including utilities, local units of government, technical colleges, tribal nations, solar installers and developers, non-profit organizations, and finance entities. This engagement and the relationships that were cultivated are reflected in the over 20 letters of support that Commerce submitted with its grant application. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All grants, including "states, territories, Tribal governments, municipalities, and nonprofits."[4] EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[5] As one of the recipients of the obligated funds, Commerce received an Assistance Agreement for $156.12 million dated July 8, 2024.[6]

Relying on the Assistance Agreement and award of funding, Commerce negotiated its Work Plan and budget with EPA.[7] Commerce's Work Plan proposed four programs that would expand solar access to income-qualified households, certain residents of disadvantaged communities, and federally recognized tribes throughout Washington. These programs would complement existing programs and policies to support distributed solar in Washington. These programs included:

- Washington Affordable Solar Homes (WASH), a program focused on providing no-cost solar installations to approximately 1,660 qualified single-family homeowners, reducing greenhouse gas emissions by approximately 11,330 tons $CO_2$ annually over five years.
- Expanded Shared Solar Access Program (ESSAP), a program that expands community solar access to approximately 1,430 income-qualified households and certain residents of disadvantaged communities, including those who qualify for utility assistance programs and tribal households, reducing greenhouse gas emissions by approximately 22,080 tons $CO_2$ annually over five years.
- Bridging Energy Affordability for Multifamily Solar (BEAMS), a program that provides approximately 720 loans that help multifamily affordable housing properties access other state and federal solar incentives that they might otherwise leave on the table, reducing greenhouse gas emissions by approximately 5,760 tons $CO_2$ annually over five years.
- A tribal solar deployment program that will be co-designed with tribal governments to provide the benefits of solar to an estimated 1,200 tribal households reducing greenhouse gas emissions by approximately 8,720 tons $CO_2$ annually over five years.

---

[3] *Greenhouse Gas Reduction Fund,* U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund; https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framework_730am.pdf at pp. 41-52.

[4] https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential

[5] https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accelerate-clean-energy-solutions

[6] Ex. 3 (attached).

[7] Ex. 4 (attached).

Before approving Commerce's proposed Work Plan, EPA limited the amount Commerce could draw down from its ASAP account to 2% of the total obligated award, to ensure that Commerce could effectively carry out "the significant scale, complexity, and novelty" of its SFA program.[8] After approving Commerce's Work Plan, EPA removed the funding restriction and incorporated the budget and Work Plan into an updated Assistance Amendment with Commerce on January 14, 2025.[9]

Pursuant to its approved Work Plan, Commerce elected to take a Program Planning Period starting February 2025 to design and ready for implementation its SFA program. During this year, Commerce drafted a Quality Management Plan and Quality Assurance Program Plan for EPA approval; hired and trained five program staff to design, oversee, and implement Washington's SFA program; established program data management tools, processes, and standard operation procedures for reporting; established financial tracking and reporting mechanisms to streamline budget monitoring, compliance and reporting; and worked with communities to ensure that programs reach intended communities and are accessible throughout the State, including through developing a webpage and email listserv, community engagement and outreach.

Commerce also used the Program Planning Period to further develop the four programs outlined in its Work Plan. For example, Commerce entered into a contract with a vendor to complete a Solar Readiness Study (Phase 1) for the BEAMS program; regularly engaged with electric utilities, including Seattle City Light, to keep them aware of Solar for All development and encourage them to participate in future programs when they launched; engaged with the Washington State Housing Finance Commission and Washington State University's Energy Program to provide equitable access to capital through the BEAMS program; and engaged with numerous tribes to determine how to allocate SFA funds to tribal households.

Commerce has been actively working on designing and preparing to launch its SFA programming throughout 2025, and anticipated it would launch Washington's SFA programming in early 2026. In preparation for launching the programs in early 2026, Commerce had begun contract negotiations with vendors for income-qualification and solar-readiness studies and Spanish-language outreach and education; developed a draft request for proposals for a program administrator to develop a qualified contract network and reporting database, manage compliance with the Davis Bacon Act and Build America Buy America, and administer the WASH program; began working with the National Renewable Energy Laboratory to develop educational resources for operations and maintenance, and a methodology for calculating household savings for the program; completed intake and began drafting an environmental justice assessment, as required by state law; held two internal program design workshops and developed customer journey maps for the WASH and BEAMS programs; and began drafting an internal program design memo for the Tribal Solar Program.

The Termination Letter states that OBBBA repealed the underlying authority for the Solar for All program and rescinded unobligated amounts to carry out the program. EPA's opinion is

_____

[8] Ex. 3 at p. 16.
[9] Ex. 5 (attached).

that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The letter also noted that recipients could continue to request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of the termination notice.

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340 and the Letter states that the Commerce should follow the closeout process outlined in 2 C.F.R. 200.344. However, the Letter does not state the grounds EPA relied upon to require the closeout process. To be clear, OBBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025.[10] Further, Commerce has complied with all grant terms and conditions and was achieving all the deliverables and activities within the agreed upon scope of work.

Prior to the Termination Letter, Commerce's ASAP account contained $155,258,763.43 of Commerce's Solar for All award. On August 8, Commerce learned that its ASAP account for the SFA program had been suspended. On August 12, the account remained suspended, but the available balance dropped to around $11 million, around 7% of the originally obligated amount. As of August 18, Commerce's ASAP account access changed to a "liquidated" status and funds became available to draw down. However, the "available balance" on the account remained substantially reduced from $155,258,763.43 to $10,867,815.71 and the performance period end dates were changed from April 30, 2029 and August 30, 2029 to August 15, 2025 and December 8, 2025 per Modification 5H-84093001-2.

## LEGAL GROUNDS

1. **EPA's Termination of Commerce's Solar for All Grant Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded to Grantees.**

EPA's Termination Letter states that the subject grant is terminated because it is required by OBBBA. Section 60002 of OBBBA provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Commerce's funds were all obligated many months before OBBBA and were, therefore, not rescinded by Section 60002.[11]

---

[10] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

[11] On August 11, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R.1 . . . gives [him] the authority to take back obligated funds." Contrary to this claim, "grant funding awarded before [H.R. 1] was enacted . . . does not

Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Assistance Agreement whereby the EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[12] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[13] In other words, the Solar for All grant funds were obligated at the time OBBBA was passed. OBBBA did not change this and could not have legally rescinded these obligated funding awards.

Where the plain language of a statute is unambiguous, no further analysis is required.[14] Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002. EPA's action in terminating Commerce's Solar for All grant is therefore contrary to the plain language of OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[15] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate Commerce's Solar for All grant.

## 2. EPA's Decision to Terminate Commerce's Solar for All Grant Lacks Any Legal Basis.

The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA. The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate a grant agreement, which include (1) failure to comply with the grant terms and conditions; (2) with consent of the grantee; (3) by request of the grantee; or (4) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law.

2 C.F.R. § 200.340 does not authorize EPA to terminate a Federal award when EPA believes that it "no longer possess either the substantive legal authority or the financial

---

constitute unobligated funds subject to OBBBA. *See* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

[12] https://www.usaspending.gov/explorer?glossary=obligation

[13] https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

[14] *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

[15] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

appropriations needed to continue implementation, oversight or monitoring" of a grant program. Nor does it authorize EPA to terminate a Federal award when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges. Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of Commerce's Solar for All award.

The terms and conditions of the award do not allow for termination under the circumstances described in the Termination Letter. Commerce has not, and unequivocally does not, agree to any attempts to terminate this grant award based on an erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. Commerce complied with the grant's terms and conditions, and does not consent to the grant being terminated.

EPA has identified no bases for unilateral termination of Commerce's Solar for All grant. Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[16] Neither condition exists. Indeed, EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that Commerce take action to cure any deficiencies in its performance.

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[17] In 2024, OMB completed another round of revisions to this provision.[18] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[19] The agency must "clearly and unambiguously" include (a)(4) in the grant agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[20]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the awards. EPA acted contrary to the governing

---

[16] Ex. 3 at pp. 36-37.
[17] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).
[18] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).
[19] *Id.* at 30,089.
[20] *Id.*; *accord* 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

regulations.[21] Commerce's grant must be immediately restored to its full amount.[22]  Commerce requests no more or less than for EPA to follow the law and rescind this unlawful termination.

3. **EPA's Decision to Terminate Commerce's Solar for All Grant is Arbitrary and Capricious**.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[23]  In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[24]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[25] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[26] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate Commerce's Solar for All grant is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of Commerce's Solar for All awards, and (3) EPA ignored Commerce's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All program.

EPA's sole stated rationale for the Termination Directive—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action.  EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of Commerce's Solar for All awards before categorically terminating the Solar for All program.  EPA has identified no other

---

[21] 2 C.F.R. § 200.340(b); see 89 Fed. Reg. at 30,089.

[22] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.

[23] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[24] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[25] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

[26] *Id.*

facts which would support the termination. EPA's prior statements demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to Commerce so Commerce could address any alleged failures. 2 C.F.R. 200.208 requires the agency to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to satisfy the conditions. 2 C.F.R. § 200.208(d)-(e). It is only after a grantee fails to meet the conditions imposed that the award can be terminated. 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action). EPA's actions are contrary to these procedures. EPA terminated the grant without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure. 2 C.F.R. § 200.208. Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to Commerce's accounts. The lack of notice was arbitrary, capricious, and deprived Commerce of due process.

### 4. EPA's Withdrawal of Commerce's Duly Appropriated and Obligated Solar for All Grant Violates the Constitution's Separation of Powers.

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[27] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[28] The Executive has no power "to enact, to amend or to repeal statutes."[29] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution also "exclusively grants the power of the purse to Congress, not the President."[30] U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[31]

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[32] For the same reasons

---

[27] U.S. Const. art. I, § 1.
[28] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).
[29] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).
[30] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).
[31] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).
[32] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of Commerce's Assistance Agreement.

*Take Care Clause*

The Constitution provides that the executive must "take Care that the laws be faithfully executed."[33] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[34] Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and Commerce's individual award on the grounds that Section 60002 "effectively and completed terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind Commerce's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[35] EPA's Termination of Commerce's grant contravenes Section 60002's plain language and the Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to Commerce prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[36] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[37] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[38]

---

[33] U.S. Const. art. II, § 3.

[34] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

[35] OBBBA Section 60002.

[36] U.S. Const. Art. I, § 9, cl. 7.

[37] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).

[38] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[39] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating Commerce's Solar for All grant. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[40] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[41] EPA's termination of Commerce's Solar for All grant altered the terms upon which the grant was obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the grant. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of Commerce's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind Commerce's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

**5. The Termination of Commerce's Solar for All Grant Will Cause Irreparable Harm to Washingtonians.**

Commerce's Solar for All grant supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living. Retail electricity prices have risen 13% since 2022, outpacing inflation, and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand.

---

[39] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").
[40] U.S. Const. amend. X.
[41] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).

Between the various programs Commerce intended to offer using Solar for All funding, Commerce was expecting to serve 5,000 low-income households, reducing electrical bills by at least 20%, with a target for 50% reductions. With the loss of Solar for All funding, Commerce will no longer be able to offer no-cost solar installations for low-income homeowners, or provide homeowners and multifamily affordable housing providers financing for upgrades for roof replacement and electrical work or install solar and energy storage. Commerce will not be able to launch its programming for renters and owners and residents of multifamily communities, who cannot install solar where they live, nor will it be able to continue its partnership with tribes.

In addition, Solar for All funding was expected to create at least 700 new green jobs in Washington's solar and clean energy industry. With the end of SFA funding, those jobs will not materialize. Solar installers in Washington, represented by the Washington Solar Energy Industries Association (WASEIA) shared this spring that they were relying on Solar for All to be a bridge for solar installers as residential federal tax credits are expiring. Solar for All funding would have allowed for stability in Washington's solar market and allowed solar installers to pursue training to diversify their skillset to continue employment in clean energy and electrification in Washington. Relationships with unions and workforce development stakeholders and opportunities for training, apprenticeships, and job placements for the solar workforce will be lost.

Commerce will have to terminate relationships with eight contractors and subrecipients who would have worked on SFA programs in Washington. For example, Commerce has incurred around $14,750 in costs for a solar readiness study, but the contractor has not yet completed deliverables, so Commerce will lose the value of the work completed to date. Commerce will also have to cease contract negotiations with these partners, causing those partners to lose planned revenue and Commerce to lose these important working relationships with the clean energy industry.

The premature end of Solar for All funding also harms Commerce as an employer. Commerce had used Solar for All funding to fund nine positions to directly administer its SFA programs. Of those nine positions, five had been filled. But without this funding, Commerce will need to reassign these five FTEs to other work or begin terminating those employees. As a temporary measure, Commerce has reassigned these employees to other funded work within the Energy Division, but this is not a long-term solution.

The Solar for All program also allowed Commerce to work closely with EPA in developing its work plan and with the National Renewable Energy Laboratory in scoping out technical assistance needs. Commerce had planned to receive $400,000 of in-kind technical assistance from the Laboratory to make it easier to carry out and replicate efforts to expand solar access for low-income households but will now have to terminate its relationship with the Laboratory.

Similarly, Commerce will lose access to or staff availability to participate in technical assistance resources for program implementation through the Clean Energy States Alliance, the National Community Solar Partnership Plus, and the National Association of State Energy Offices. Commerce will also lose working relationships with other Solar for All grantees across the country, which informed program design, consumer protection, and workforce development for solar programs. The loss of these collaborations and programmatic support cannot be remedied.

More generally, loss of Solar for All funding and the loss of federal support for solar energy will harm Washington and its residents.  The State of Washington is committed to tackling human contributions to climate change and air pollution and has set ambitious goals to reduce greenhouse gas emissions. In 2020, the Washington Legislature set new greenhouse gas emission limits requiring the State to reduce emission levels by 45 percent by 2030; 70 percent by 2040; and 95 percent by 2050, achieving net zero emissions, as measured against 1990 levels. *See* RCW 70A.45.020. In addition, in 2024, Commerce worked with the Washington Legislature to draft and pass agency request legislation on solar consumer protection in anticipation of receiving Solar for All funding. *See generally* RCW 19.95.

Providing access to solar energy sources to low-income and disadvantaged communities was part of this commitment to reduce greenhouse gas emissions. But now that Commerce SFA's grant has been terminated, it will be significantly more difficult to rely upon increased access to solar as a means to reduce greenhouse gas emissions.

Recent modeling on Washington's electricity needs projects that distributed solar will provide up to 5 GW of electricity by 2050. Without Solar for All, most of this capacity will be deployed by wealthier homeowners who can afford to install solar or who can pay to participate in utility community solar programs. In addition, Solar for All would have enabled multifamily affordable housing providers to access the state's community solar expansion program which only pays incentives after project completion. Thus, without Solar for All, there is no bridge to support projects that may not have the upfront capital to participate in the program. Thus, low-income households will be left behind in the clean energy transition.

Notably, utility assistance programs in Washington are currently lagging behind goals set in our state's Clean Energy Transformation Act, and no county in Washington had a utility program participation rate above 50% of eligible households in 2023. Current trends and utility plans anticipate that low-income households statewide will not have access to crucial monthly bill assistance programs with uniform benefit levels for similarly situated households. Solar for All would have significantly narrowed that gap.

Moreover, Commerce acted in reasonable reliance on its fully-obligated Solar for All funding continuing to be available.  Commerce expended more than 5,000 employee hours on SFA programming. In so doing, Commerce had to forgo other funding opportunities and program structures.  There is no way to recover this lost time or effort.

Nor can Commerce simply backfill with state funds to keep its Solar for All offerings available. Commerce was relying on the continued availability of these obligated funds to pass more than $40 million to tribes in Washington; there is simply no way to replace this money. Moreover, Commerce was planning to leverage the SFA program to further invest state funding in battery back-up systems for vulnerable low-income households, such as seniors and people with disabilities. This threat to Commerce's funding comes as a precarious time for Washington. Our State is one of several facing a budget shortfall. Washington is facing a forecasted budget deficit of more than $770 million over the next four years. Given the State's ongoing budget shortfall, it

is impossible for the State to continue funding these programs without the support of federal funding.

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, Commerce respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until Commerce's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, reinstatement of the notice to proceed, and restoration of the originally awarded amount in Commerce's ASAP account. In furtherance of this Dispute, please find attached:
- A copy of the disputed Agency Decision (Exhibit 1); and
- Copies of supporting documents, including:
  - Exhibit 2 – Assistance Amendment received August 8, 2025
  - Exhibit 3 – Assistance Agreement dated July 8 ,2024
  - Exhibit 4 – Work Plan submitted October 14, 2024
  - Exhibit 5 – Assistance Amendment dated January 14, 2025

The name and contact information, including email address, of Commerce's designated point of contact for this notice of disagreement is: Jennifer Grove, Assistant Director, Energy Division, Jennifer.grove@commerce.wa.gov, 360-763-2213.

Please acknowledge receipt of this notice of disagreement and contact me to discuss resolution of this disagreement as soon as possible.

Very truly yours,

Jennifer Grove
Washington State Department of Commerce

CC: Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)

# EXHIBIT 7

**From:** Hawkins, Nora (COM)
**To:** Grove, Jennifer (COM); Eikenhorst, Jill (COM); Rains, Amanda (COM)
**Subject:** Fw: Solar for All Grant Closeout Instructions
**Date:** Wednesday, October 1, 2025 1:25:23 PM

Just wanted to make sure you all received this.

Get Outlook for Android

**From:** SFA
**Sent:** Wednesday, October 1, 2025 1:21:09 PM
**To:** SFA
**Subject:** Solar for All Grant Closeout Instructions

External Email

Hello,
EPA's Office of the Greenhouse Gas Reduction Fund is providing the following Solar for All grant closeout procedural guidance in accordance with the notice of termination and subsequent award amendment issued on August 7 and 8, 2025, the Closeout Agreement Programmatic Term and Condition (Section III.S), and 2 CFR 200.344.
The award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition. Moving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant. Within 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment), please submit the following to EPA:
Final Federal Financial Report (SF-425)
**Submission Instructions:**
- Please submit the SF-425 electronically via email to EPA's Research Triangle Park Finance Center (RTPFC) at rtpfc-grants@epa.gov and cc your Project Officer, Grant Specialist (listed in your award amendment), and ggrf@epa.gov.

**Details:**
- You may request payment from the Automated Standard Application for Payments (ASAP) system for allowable costs incurred up to the date of the notice of termination (August 7, 2025) provided that such costs were contained in your approved workplan. In accordance with 2 CFR 200.343, costs after the date of the notice of termination are only allowable if: (a) they result from financial obligations that were properly incurred by you or your subrecipient(s) before the date of the notice of termination, and not in anticipation of it; and (b) they would be allowable if your Federal award was not suspended or expired normally at the end of the performance period in which the termination takes effect. These include – but are not limited to – personnel costs for preparing and submitting your latest Semi-Annual Progress Report.
  - You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 CFR 200.344-45 and your award agreement. These include – but are not limited to – your obligation to promptly refund any unobligated funds that have been paid out but are not authorized to be retained.

- Also, in accordance with 2 CFR 200.472, you may use grant funds to properly close out your grant, including reasonable and necessary costs that might occur after the date of the notice of termination. These include – but are not limited to – personnel costs for preparing and submitting your final technical report, preparing your Single Audit, and completing transaction testing follow-up, as well as publication and printing, disposition of equipment and property, and related indirect costs.
  - If you drew down funds from ASAP for costs beyond the date of the notice of termination or for costs that exceed the amount necessary to properly close out your grant, you must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.
- All of these costs should be included in your final SF-425.
- Upon EPA review and certification of the final SF-425, your ASAP system account will be reconciled to allow for final drawdown of allowable costs.

Final Technical Report

**Submission Instructions**:

- Like previous performance reporting, please use the White House Office of Management and Budget (OMB)-approved information collection templates, specifically Appendix D (Transaction- and Project-Level Report) and Appendix E (Semi-Annual Progress Report). Additional materials (e.g., cover memo) are *optional*, but may be used to further supplement your narrative and describe the key elements listed below.
- Please submit the final technical report electronically via email to your Project Officer and cc your Grant Specialist (listed in your latest award amendment) and ggrf@epa.gov.

**Details**:

- The final technical report should provide a detailed narrative of your program's performance during the entire performance period (project start date through date of termination; listed in your latest award amendment), representing a full assessment of the implementation of your workplan, supported with qualitative discussions and quantitative metrics.
- Please ensure that, at minimum, the following elements are included:
  - In accordance with 2 CFR 200.329, a comparison of accomplishments to the outputs/outcomes established in the workplan, explanations for why established outputs/outcomes were not met, and any additional information, analysis, and explanation of cost overruns or high-than-expected unit costs.
  - Progress towards objectives on program key performance metrics during the performance period.
  - Summary of key activities completed during the performance period, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.
  - Geographic coverage of financial assistance and project-deployment technical assistance deployed during the performance period.
  - Descriptions and examples of actions you took during the performance period to meaningfully involve communities you served in program design and operations.
  - *[If applicable]* Plans for key activities, including anonymized current transaction

and subrecipient pipelines, to be completed as well as outputs/outcomes to be achieved under the closeout agreement.

- *[If applicable]* The final technical report must also include your program strategy for the closeout period that details your use of post-closeout program income during this time.
- Like previous performance reporting, the final technical report must cover your grant-related activities as well as those of your subrecipients, contractors, and/or program beneficiaries where applicable to a certain element of the final technical report.
- The final technical report must be submitted ready to be published on the EPA website for public consumption and must not include any material that you consider to be confidential business information (CBI) or personal identifiable information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI.

*NOTE: As of the notice of termination (August 7, 2025), OGGRF has stopped all quality assurance activity, including the review and approval of Quality Management Plans and Quality Assurance Project Plans. Approved quality assurance documents are not needed when submitting your final technical report, even if you are including environmental information.*

The following reports are waived and do not need to be submitted:

- EPA Form 5700-52A (Utilization of Disadvantaged Business Enterprises)
- SF-428 (Tangible Personal Property Report)
- Any additional reports

In accordance with 2 CFR 200.344, EPA will make every effort to complete all closeout actions no later than one year after the end of the performance period. Post-closeout adjustments and continuing responsibility requirements, including audit and record retention, at 2 CFR 200.345 remain in effect. The termination of your grant does not affect the right of EPA to disallow costs and recover funds based on a later audit or other reviews. Please see the EPA Frequent Questions about Closeout for more information and contact your Project Officer (and cc your Grant Specialist and ggrf@epa.gov) with any questions.

Thank you,

Office of the Greenhouse Gas Reduction Fund

# EXHIBIT 8



## OFFICE OF MISSION SUPPORT

WASHINGTON, D.C. 20460

October 23, 2025

**MEMORANDUM**

**SUBJECT:**   Update on Dispute of EPA Assistance Agreement 5H-84093001 under 2 CFR 200.340

**FROM:**   Michael D. Molina, Principal Deputy Assistant Administrator
Grants Dispute Decision Official

**TO:**   Jennifer Grove, Assistant Director, Energy Washington
Department of Commerce

The purpose of this letter is to provide a status update on your dispute regarding the termination of Assistance Agreement 5H-84093001. The assistance agreement was terminated by the U.S. Environmental Protection Agency (EPA) effective August 7, 2025, and your dispute was submitted on August 28, 2025. The EPA has rendered this administrative dispute as moot, given that there is a current lawsuit in place regarding the validity of the termination of your assistance agreement.

The initiation of legal proceedings supersedes the internal EPA dispute resolution processes. Given that you are party to a lawsuit concerning the termination of your grant, any further action on your dispute is now moot and will not be addressed by a Disputes Decision Official decision under 2 CFR 1500.17. Accordingly, EPA will adhere to all legal obligations and cooperate fully with the court proceedings.

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

Sincerely,

MICHAEL
MOLINA

Digitally signed by MICHAEL MOLINA
Date: 2025.10.24 17:07:24 -04'00'

Michael D. Molina, Principal Deputy Assistant Administrator
Office of Mission Support
U.S. Environmental Protection Agency

EXHIBIT 9



**STATE OF WASHINGTON**
## DEPARTMENT OF COMMERCE
**1011 Plum Street SE • PO Box 42525 • Olympia, Washington 98504-2525 • 360-725-4000**
**www.commerce.wa.gov**

November 5, 2025

Devon Brown, EPA Award Official
U.S. Environmental Protection Agency
Office of the Greenhouse Gas Reduction Fund
Office of the Administrator
1200 Pennsylvania Avenue NW
Washington, DC 20460

CC: Michael Molina

RE: Objection to Closeout of EPA Assistance Agreement 5H-84093001

Dear Mr. Brown:

On September 5, 2025, the Washington Department of Commerce (Commerce) submitted to the
U.S. Environmental Protection Agency a Dispute of Termination of EPA Assistance Agreement
5H-84093001 pursuant to 2 C.F.R. § 1500.15. Despite that timely dispute, on October 1, 2025,
Commerce received email correspondence from SFA@epa.gov containing "Solar for All Grant
Closeout Instructions" and demanding that Commerce complete closeout within 120 calendar
days of the "the date of termination that is listed in your award amendment." Commerce has now
received EPA's October 23 letter purporting to declare moot Commerce's "dispute regarding the
termination of Assistance Agreement 5H-84093001." The sole basis for EPA's mootness
determination is that "there is a current lawsuit in place regarding the validity of the termination
of your assistance agreement."

We write to obtain clarification regarding EPA's mootness determination and to formally object
to EPA's demand that Commerce close out Assistance Agreement 5H-84093001.

As an initial matter, clarification is needed because EPA's October 23 letter references "your
dispute . . . submitted on August 28, 2025." But Commerce did not submit its Part 1500 dispute
on August 28. Rather, August 28 is the date that Commerce submitted its 21-day Notice of
Disagreement in accordance with EPA's August 8, 2025 Assistance Amendment. Commerce
submitted its Dispute of Termination on September 5, 2025. Thus, it is unclear which of
Commerce's termination disputes "EPA has rendered" moot. Commerce disagrees with EPA's
apparent position that a timely administrative dispute pursuant to 2 C.F.R. § 1500.15 cannot
proceed if related litigation is pending. EPA cites no authority for this proposition, and we are
aware of no authority that would prohibit EPA from correcting its unlawful termination decision
through a streamlined administrative dispute, rather than through cumbersome litigation. We

request that EPA reverse its mootness determination and, if it does not wish to rectify its error on its own, stay the administrative dispute until the District Court lawsuit concludes.

More importantly, and regardless of any determination regarding the status of Commerce's administrative challenges to the termination, closeout is improper at this time.

As you are aware, Commerce has sued for damages in the United States Court of Federal Claims over EPA's termination of this grant, No. 1:25-cv-01738-LAS, and Commerce also has challenged EPA's cancellation of the Solar for All program in the United States District Court for the Western District of Washington, No. 2:25-cv-02015. It would be inappropriate and prejudicial to require Commerce to close out while litigation is pending that directly concerns EPA's termination of this grant. *Cf.* 48 C.F.R. § 4.804-1(c) (for procurement contracts, "[a] contract file shall not be closed if—(1) The contract is in litigation or under appeal").

Moreover, under 2 C.F.R. § 200.344(a), EPA may close out a grant only after it "determines that all administrative actions and required work of the Federal award have been completed." Commerce has complied—and continues to comply—with the terms and conditions of the Solar for All program. EPA unilaterally terminated these grants and illegally deobligated from Commerce's Automated Standard Application for Payments (ASAP) account, without determining that the work of the grants had been accomplished, and without even waiting for 30-day deadline to file a Part 1500 dispute to expire. As a result of EPA's unlawful actions, Commerce has not been able to complete the work required under Assistance Agreement 5H-84093001. Accordingly, EPA necessarily cannot "determine that all administrative actions and required work of the Federal award have been completed" as would be required to close out.

Commerce does <u>not</u> agree to close out Assistance Agreement 5H-84093001while litigation relating to this grant is pending. We seek an extension for our close-out date until all litigation has been resolved, including any appeals. Additionally, we do not accept any unilateral actions on the part of the EPA to commence close-out procedures without our express and informed consent, as well as our provision of the information required under 2 C.F.R. § 200.344(b)–(c).

**Please confirm receipt of this correspondence no later than 5:00pm Pacific on November 10, 2025.**

Regards,

Jennifer Grove
Assistant Director, Energy Division
Washington State Department of Commerce