# EXHIBIT 9



160 North LaSalle St.
Suite S-1000
Chicago, IL  60601
312-651-1300
312-651-1350 fax
www.il-fa.com

September 5, 2025

Michael Molina, EPA Dispute Decision Official
U.S. Environmental Protection Agency
molina.michael@epa.gov
Office of Mission Support
1200 Pennsylvania Avenue NW
Washington DC 20460

      RE: Dispute of Termination of EPA Assistance Agreement 5H-84090501 dated August 7, 2025

Dear Mr. Molina:

      Please accept this letter as the Illinois Finance Authority's ("IFA") dispute with the termination notice issued by the Environmental Protection Agency ("EPA") on August 7, 2025, purporting to terminate EPA Assistance Agreement 5H-84090501 under 2 CFR 200.340 ("Termination Letter").[1] The next day, IFA received a document titled "Assistance Amendment" dated August 7, 2025,[2] and IFA responded to that Assistance Amendment with a Disagreement with Modification letter on August 28, 2025.[3] Now, IFA timely files this letter in accordance with 2 C.F.R. § 1500.15 disputing the August 7, 2025 Termination Letter.

      Pursuant to 2 CFR 1500.15, we are writing to notify you, as the EPA Dispute Decision Official, that IFA disagrees with the attempt to terminate the Assistance Agreement. The termination notice: (1) violates the plain language of the One Big Beautiful Bill Act ("OBBBA") Section 60002, which rescinded only unobligated balances and preserved funds already awarded to grantees; (2) violates the legally binding assistance agreement dated July 8, 2024; (3) provides no valid reason for termination pursuant to 2 C.F.R. 200.341; (4) is arbitrary, capricious, and not supported by substantial evidence; (5) violates constitutional boundaries; and (6) causes irreparable harm to Americans in Illinois.

      Below is statement of the specific legal and factual grounds for IFA's notice of disagreement.

## FACTUAL GROUNDS

      IFA is a body politic and corporate established under the laws of the State of Illinois, and it was designated by the Governor of the State of Illinois as the agency to coordinate Solar for All efforts across Illinois state government.[4] On October 11, 2023, IFA submitted an application (the "Application") under EPA's Solar for All Notice of Funding Opportunity EPA-R-HQ-SFA-23-01

---

[1] Ex. 1 (attached).
[2] Ex. 2 (attached).
[3] Ex. 3 (attached).
[4] Ex. 4 (attached).



(the "NOFO").[5] In developing the Application, IFA consulted with more than 150 organizations through 12 public workshops, listening sessions, and stakeholder meetings. The Application included letters of support from a range of organizations that, along with IFA, invested significant time in developing various programs intended to fulfill the objectives of EPA and Congress, as set forth in the NOFO and in the Inflation Reduction Act of 2022, Public Law No. 117-169 (2022). Forty-six organizations provided letters supporting the programs outlined in the Application. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All awards, including "states, territories, Tribal governments, municipalities, and nonprofits."[6] EPA announced that it obligated these funds as part of the larger Greenhouse Gas Reduction Fund.[7] As one of the recipients of the obligated funds, IFA received an Assistance Agreement for $156,120,000.00 dated July 8, 2024.[8]

Relying on the Assistance Agreement, IFA negotiated its Work Plan and budget with EPA between August 2024 and January 2025.[9] IFA received an Assistance Amendment from EPA on December 12, 2024 that incorporated the Work Plan documentation.[10] IFA's Work Plan proposed to deploy Solar for All funding to support $138,250,000 in financial assistance residential-serving solar projects across the state. Financial assistance activities were to span 6 key programmatic areas:

1. $85 million expansion of existing Illinois solar incentive programs:
   o $55 million ($11 million annually for five years) to supplement funding for the existing Illinois Solar for All Community Solar program, which provides incentive payments for community solar projects that enroll low-income subscribers.
   o $30 million ($10 million annually for three years) to supplement funding for the existing Illinois Solar for All Residential Solar program, which provides incentive payments for solar systems installed on single family and small (2-4 unit) multifamily buildings owned by or housing low-income residents.
2. $20 million to support home upgrades to fund repairs or improvements to homes of low-income residents to prepare the home for participation in the Illinois Solar for All Residential Solar program.
3. $7.25 million to support energy storage projects (batteries) in homes of low-income residents.
4. $6 million to establish a revolving loan fund to support:
   o community-driven community solar projects;
   o working capital for small contractors engaged in the Solar for All program; and
   o financing for lease-to-own loans for residential solar systems.

---

[5] *Greenhouse Gas Reduction Fund,* U.S. EPA, https://www.epa.gov/greenhouse-gas-reduction-fund; https://www.epa.gov/system/files/documents/2023-04/GGRF%20Implementation%20Framework_730am.pdf at pp. 41-52.
[6] *See* https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.
[7] *See* https://www.epa.gov/newsreleases/epa-awards-27b-greenhouse-gas-reduction-fund-grants-accelerate-clean-energy-solutions.
[8] Ex. 5 (attached).
[9] Ex. 6 (attached).
[10] Ex. 7 (attached).



5. $1.5 million in grants to support adoption and implementation of SolarAPP+, a residential solar permitting platform that streamlines permit reviews ("SolarAPP+ Grants").

6. $14.6 million in grants to support outreach and direct assistance to low-income residents to increase participation in the Illinois Solar for All Residential Solar program ("Residential Solar Outreach Grants").

Beyond financial assistance, IFA's Solar for All program design included developing a technical assistance resource (a contractor portal) to support applications, data flows, and reporting of information associated with the Solar for All program—all intended to ensure program accessibility and compliance.

IFA has taken steps to initiate all of the programs set forth in its Work Plan and has worked expeditiously with stakeholders and EPA's Solar for All team. In December 2024, IFA held a Solar for All kickoff stakeholder engagement webinar, in addition to convening five working group discussions. Working group discussions took place during the first three weeks of December, with topics covering lending program structures, coordination with the Illinois Power Agency ("IPA") and its existing Illinois Solar for All program, municipal programing, and a potential Solar for All intake portal. IFA also used limited agency resources to develop a website highlighting IFA's new Climate Bank initiatives, including the Solar for All program. IFA and EPA worked together between August 2024 and January 2025 to refine the IFA Work Plan to ensure it was consistent with EPA's requirements. Following this process, EPA approved IFA's final Work Plan on January 28, 2025, and informed IFA that it had exited the planning period.

Between January 28 and August 7, 2025, IFA implemented these important and EPA-approved programs. IFA and its partner agency, IPA, with EPA's authorization, drew down $11 million in Solar for All funds to support the expansion of IPA's Illinois Solar for All Community Solar program. IPA's existing solar programs were closely aligned to the purposes and requirements of the Solar for All program. The demand for IPA's programs exceeded the resources available, and it was anticipated that the Solar for All program would allow for a rapid expansion of solar deployment in Illinois. This partnership envisioned IFA contributing financial resources and expertise in public finance and IPA contributing technical expertise on solar projects and accessing state and federal funding through its incentive programs. The IFA-IPA collaboration was a key part of the Work Plan and significant work is underway.

IPA was taking steps to deploy the initial $11 million in Solar for All funds consistent with the Work Plan. As of August 7, 2025, IPA was preparing to finalize a contract award to a solar company for $1.5 million, which would have been funded from the $11 million first year allocation of Solar for All funding. EPA's abrupt termination of the Solar for All program on August 7 occurred right as IPA was finalizing this contract. This would have supported a community solar project 800 kW in size serving approximately 200 income-eligible households and generating savings for those households on the order of approximately $8,800 over 20 years, or about $400 per household per year.

IFA was also making substantial progress on its new Solar for All program offerings and was on the cusp of finalizing several grant agreements when it received the Termination Letter stating the program efforts must end. IFA issued a NOFO for the Illinois Solar for All Expansion: Residential Solar Outreach Grants on April 18, 2025, which closed on May 19, 2025. The NOFO allocated up to $2,600,000 to selected grantees in 2025. After a competitive review process, in mid-

3



July 2025, IFA notified four local governments and nonprofits that they received grant awards through which they would receive Solar for All funding via the Residential Solar Outreach Grant program to connect with applicable communities to sign up for existing community solar projects. Two of the four grantees returned signed agreements to IFA as of August 7, 2025, totaling $925,806.71. The other two grantees did not have the opportunity to return signed grant agreements to IFA prior to August 7, 2025, although the grantees had indicated their intention to accept the grant. IFA would have awarded $886,855.40 total to those two grantees. IFA planned to post the NOFO for a second round of applications in August 2025. IFA also intended to re-open the Residential Solar Outreach Grant application each spring through 2029, with $3,000,000 allocated to each subsequent year.

In April 2025, IFA issued a NOFO for applicants to the Solar APP+ Adoption and Implementation Grant, which allocated up to $300,000 to the grant program in 2025. The initial application period closed May 11, 2025. IFA opened a second NOFO application on June 30, 2025, which would accept applications on a rolling basis through the end of the year. IFA awarded a grant to an applicant in June 2025 but given the EPA's abrupt termination of Solar for All, the grantee was unable to sign the agreement and return it to IFA by August 7, 2025, although the grantee had indicated their intention to accept the grant. IFA also intended to re-open the Solar APP+ Adoption and Implementation Grant application each spring through 2029, with an additional $300,000 allocated to each subsequent year.

Throughout the 13 months since EPA made the Solar for All award to IFA, IFA has worked diligently to implement its Work Plan despite EPA's efforts to disrupt the Solar for All program since January 2025 (e.g., by instituting a "freeze" of the Solar for All program and eliminating access to ASAP between January 30, 2025 and February 20, 2025). IFA planned to have 10 projects outlined in the Work Plan operational by the end of 2025. Given the complexity and size of the Solar for All program, IFA hired and trained consultants and staff to support these programs. IFA's Solar for All team members attended weekly training and information-sharing meetings with other Solar for All recipients and stakeholders, and IFA invested significant time building out its grant administration infrastructure, drafting NOFOs, scoring and reviewing applications, conducting grant applicant risk assessments, drafting grant agreements and related documents, preparing reports to submit to the EPA, communicating with the EPA Project Officer, tracking time and costs related to Solar for All implementation, reviewing invoices and work product of our consultants, preparing updates and materials for presentation at IFA's monthly public board meetings, and responding to EPA's inconsistent administration of this program. IFA also engaged in stakeholder outreach to promote the programs.

EPA's disruptions to the program during 2025 have limited IFA's ability to plan for permanent staffing. IFA had budgeted $5.0 million across the program's five-year period to hire eight new full-time personnel to work exclusively on Solar for All program activities. IFA recently recruited and hired a full-time grants manager despite EPA's efforts to disrupt the Greenhouse Gas Reduction Fund programs.

Prior to the Termination Letter, IFA's ASAP account contained $143,953,649.51 of IFA's Solar for All award. On August 7, IFA's ASAP account was suspended as of 4:30pm CST. On August 8, 2025, IFA's ASAP account was reduced by $133,946,579.89 to $10,007,069.62. Since August 8, 2025, IFA's ASAP account has changed to a "liquidated" status and funds appear



available to draw down. However, the "available balance" on the account was substantially reduced from $143,953,649.51 to $10,007,069.62, and the performance period end dates have changed from April 30, 2029 and August 30, 2029 to August 15, 2025 and December 8, 2025, per Modification 5H-84090501-2.

<div align="center">

**LEGAL GROUNDS**

</div>

1. **EPA's Termination of IFA's Solar for All Assistance Agreement Exceeds and Contradicts OBBBA's Language, Which Rescinded Unobligated Balances and Preserved Funds Already Awarded to Recipients.**

EPA's Termination Letter states that the Assistance Agreement is terminated because it is required by OBBBA. Section 60002 of OBBBA provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

EPA's opinion is that OBBBA "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and that EPA "no longer possesses either the substantive legal authority or the financial appropriations" needed to continue the Solar for All program. The Termination Letter also noted that recipients could continue to request payment from the Automated Standard Application Payments ("ASAP") system for allowable costs incurred up to the date of the Termination Letter.

EPA's conclusion that OBBBA rescinded the grant appropriations for Solar for All is incorrect and contrary to law. IFA's funds were all obligated many months before OBBBA and were, therefore, not rescinded by Section 60002.[11] Funds awarded to Solar for All grantees were obligated upon award and subject to a legally binding Assistance Agreement whereby EPA "promise[d] to spend the money, either immediately or in the future, as work under the obligation is completed."[12] EPA guidance provides that the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)."[13] In other words, the Solar for All funds were obligated at the time OBBBA was passed. OBBBA did not change this and could not legally rescind these obligated funding awards.[14] IFA also notes that on August 1, 2025, its EPA Project Officer wrote in an e-mail to the IFA Solar for All team that "EPA is continuing to administer and oversee grants obligated as part of the Solar for All

---

[11] On August 11, 2025, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R.1 . . . gives [him] the authority to take back obligated funds." Contrary to this claim, "grant funding awarded before [H.R. 1] was enacted . . . does not constitute unobligated funds subject to OBBBA. *See* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

[12] *See* https://www.usaspending.gov/explorer?glossary=obligation.

[13] *See* https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf.

[14] On August 14, 2025, 32 senators wrote to Administrator Zeldin to inform him that his interpretation of OBBBA was incorrect.  *See* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.



program." The same e-mail clarifies that any changes to IFA's Work Plan would not result in incorporating EPA's April 3, 2025, amendment to its General Terms and Conditions (allowing EPA to terminate a grant if it no longer effectuates program goals or EPA priorities) because it "only applies if money is added to an award. The SFA awards are fully obligated so this does not apply."[15]

Where the plain language of a statute is unambiguous, no further analysis is required.[16] Here, the plain language of OBBBA is clear that obligated funds are not affected by Section 60002. Indeed, after OBBBA passed Congress, the Department of Justice wrote to the court presiding over *Climate United Fund v. Citibank, N.A.* (in relation to EPA's efforts to terminate another Greenhouse Gas Reduction Fund program) to inform it that new legislation, if signed, would "rescind all unobligated funds appropriated for it." (Letter dated July 3, 2025, to the Clerk of the Court from Yaakov Roth, DOJ). In a recent ruling in the *Climate United Fund v. Citibank* litigation, both the majority and dissent recognized that the OBBBA rescinds only unobligated funds and that obligated funds are not affected by OBBBA.[17] By its plain language, which is supported by its legislative history and Congressional Budget Office analysis,[18] the OBBBA only rescinded funds that were unobligated on the date the OBBBA was enacted, and no court has ruled otherwise as of the date of this letter. Agency action that conflicts with the language of the statute the agency has relied upon is not in accordance with law.[19] EPA's action in terminating IFA's Solar for All Assistance Agreement is therefore contrary to the plain language of OBBBA. The Termination Letter also implicitly concedes termination is neither legally required nor the only possible administrative action by acknowledging that EPA was "weighing options" for the future of the Solar for All program following passage of the OBBBA.

An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.[20] Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose. Congress did not direct or otherwise authorize EPA to terminate the Solar for All program. EPA is acting beyond its authority because it defies Congress's express statutory directive in Section 60002 that only the "unobligated balances" of any Solar for All appropriations are rescinded. EPA should therefore reinstate IFA's Solar for All Assistance Agreement.

**2. EPA's Decision to Terminate IFA's Solar for All Assistance Agreement Lacks Any Legal Basis and Is Contrary to the Terms of the Assistance Agreement.**

---

[15] Ex. 8 (attached)

[16] *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.").

[17] *Climate United Fund et al. v. Citibank, N.A. and U.S. Env't Protection Agency*, No. 25-CV-00698, at 7-8, 71-72 (D.C. Cir. 2025).

[18] The Congressional Budget Office's scoring of H.R. 1 does not account for rescinding obligated funds under any Greenhouse Gas Reduction Fund program. CBO's scoring, which is intended to determine the fiscal impact of legislation, determined that the repeal of IRA programs in Section 60002 of H.R. 1 would be just $19 million. This is compelling evidence of Congressional intent and reinforces IFA's position that Section 60002 must not be considered as mandating the rescission of obligated funds.

[19] *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 94 (2d Cir. 2020).

[20] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).



The Termination Letter does not give any reason for termination other than its alleged reliance on OBBBA. The uniform grant regulations at 2 C.F.R. § 200.340(a) provide the circumstances under which the government may terminate an award agreement, which include (1) failure to comply with the agreement's terms and conditions; (2) with consent of the recipient; (3) by request of the recipient; or (4) otherwise pursuant to the terms and conditions of the agreement, to the extent authorized by law.

The subject line of the Termination Letter states that the termination is under 2 C.F.R. § 200.340, and the Termination Letter states that IFA should follow the closeout process outlined in 2 C.F.R. § 200.344. However, the Termination Letter does not state the grounds EPA relied upon to require the closeout process. To be clear, OBBBA did not eliminate EPA's entire administrative budget. To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025.[21] Further, IFA has complied with all Agreement terms and conditions and was working in good faith to achieve all the deliverables and activities within the agreed upon scope of work. EPA has not raised any concerns specific to IFA's administration of its award relative to fraud, waste or duplication, and as demonstrated above, IFA was making sufficient progress in implementing the Work Plan. EPA therefore has no justification to terminate the Grant Agreement because of a violation of the terms and conditions of the Agreement or uniform grant regulations at 2 C.F.R. 200.340(a).

2 C.F.R. § 200.340 does not authorize EPA to terminate an assistance agreement when EPA believes that it "no longer possess either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring" of a Federal program. Nor does it authorize EPA to terminate a assistance agreement when Congress rescinds EPA's "administrative cost appropriation" as the Termination Letter alleges. Indeed, EPA has not identified any provision of 2 C.F.R. § 200.340 which authorizes termination of IFA's Solar for All Assistance Agreement.

The terms and conditions of the Assistance Agreement do not allow for termination under the circumstances described in the Termination Letter. IFA has not agreed, and unequivocally does not agree, to any attempts to terminate the Agreement based on EPA's erroneous, bad faith interpretation of OBBBA Section 60002. Congress intended for these funds to benefit the public by providing efficient and sustainable energy options to meet the country's growing energy needs. IFA complied with the Assistance Agreement's terms and conditions and does not consent to the Assistance Agreement being terminated.

EPA has identified no bases for unilateral termination of IFA's Solar for All Agreement. Termination for noncompliance is only possible when "the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is materially impaired or there is adequate evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination."[22] Neither condition exists. Indeed,

---

[21] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).
[22] Ex. 3 at p. 30; Ex. 5 at p. 25.

IFA
ILLINOIS FINANCE AUTHORITY

EPA has not identified any noncompliance, has provided no evidence of waste, fraud, or abuse, nor has it requested that IFA take action to cure any deficiencies in its performance.[23]

2 C.F.R. § 200.340(a)(4)'s language allowing termination "if an award no longer effectuates the program goals or agency priorities" does not apply either. When 2 C.F.R. § 200.340 was amended in 2020, the Office of Management and Budget ("OMB") confirmed that the termination language relating to agency priorities did not allow agencies to implement arbitrary cancellations.[24] In 2024, OMB completed another round of revisions to this provision.[25] After considering removal of the "agency priorities" provision of (a)(4) altogether, OMB determined to keep the provision as a permissive condition that may form a ground for termination, but only if "the language is included in the terms and conditions of the award."[26] The Trump Administration's recent Executive Order titled "Improving Oversight of Federal Grantmaking" (issued August 7, 2025) confirms that EPA does not have the authority under the uniform guidance to terminate the Assistance Agreement. The Executive Order directs OMB "to amend the uniform guidance to further clarify and require all discretionary grants to permit termination for convenience, including when the award no longer advances agency priorities or the national interest […]."[27] Under existing law, the agency must "clearly and unambiguously" include (a)(4) in the Assistance Agreement for it to be an available basis for termination under 2 C.F.R. § 200.340(a)(4).[28]

Here, because the Assistance Agreement does not include the "agency priorities" provision of (a)(4) as a ground for potential termination in its terms and conditions, 2 C.F.R. § 200.340(a)(4) provides no authority for EPA to terminate the Agreement.[29] EPA's attempted termination of IFA's Solar for All Assistance Amendment is not supported either by 2 C.F.R. § 200.340(a) or any allegation of noncompliance by IFA with the award's terms and conditions. EPA acted contrary to the governing regulations.[30] IFA's award must be immediately restored to its full amount.[31] IFA requests no more or less than for EPA to follow the law and rescind this unlawful termination.

---

[23] IFA submitted information and records to EPA for transaction testing in May 2025. IFA has not received any questions or comments related to this transaction testing and has not received any communication suggesting any potential noncompliance with the requirements of the Solar for All program. If IFA had received any such communication, it would have worked diligently with the EPA team to address any alleged issues. Additionally, the EPA Project Officer for IFA suggested that, although EPA had not finalized guidance on demonstrating "sufficient progress" under the Rebudgeting Amendment to the Assistance Agreement, IFA would likely be viewed as having made sufficient progress based on its activities described above.

[24] Guidance for Grants and Agreements 85 Fed. Reg. 49,506, 49,509 (Aug. 13, 2020).

[25] Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024).

[26] Id. at 30,089.

[27] Exec. Order 14332, 90 Fed. Reg. 38929, 38932 (August 7, 2025).

[28] Id.; accord 2 C.F.R. § 200.340(b) (requiring the agency to "clearly and unambiguously" specify all termination provisions in the terms and conditions of the Federal award).

[29] To the extent that EPA may argue that its April 3, 2025 amendment to EPA's Terms and Conditions included this clause, that argument fails. The April 3, 2025, amendment to the EPA's General Terms and Conditions, by its own terms applies only to "new awards and funding amendments ... made on or after April 3, 2025". This amendment to the EPA's General Terms and Conditions is therefore inapplicable to awards made prior to April 2025, including this Assistance Agreement.

[30] 2 C.F.R. § 200.340(b); see 89 Fed. Reg. at 30,089.

[31] 2 C.F.R. § 200.305(b)(6) provides that payments "must not be withheld at any time" unless the agency finds that the recipient or subrecipient failed to comply with the terms of the federal award, or that the recipient or subrecipient is delinquent in a debt to the United States. No such finding has been made.



EPA's termination is also contrary to the terms of the Rebudgeting Amendment to the Assistance Agreement because the proposed modification is not mutually agreed upon by IFA and EPA. Section AB of the Rebudgeting Amendment (page 32) states that the "EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding." IFA does not agree to the termination or the termination amendment, and there is no basis in the Assistance Agreement allowing EPA to unilaterally terminate this award.

EPA has offered a laundry list of potential and contradictory grounds on which it might have based the termination of IFA's Agreement, but no indication or substantiation of the actual reason. Regardless, there is no merit to any of the numerous potential grounds suggested by EPA. Furthermore, EPA's failure to make IFA aware of the specific grounds for its termination is a violation of 2 C.F.R. § 200.341(a), which requires that a written notice of termination should include the reasons for termination. EPA was required to provide detailed and valid reason(s) for its termination decision. *Neeta Thakur v. Trump*, No. 25-cv-04737-RFL, 2025 U.S. Dist. LEXIS 118980, at *46 (N.D. Cal. June 23, 2025), citing *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007).

### 3. Any Attempt to Liquidate the Remaining Funds in IFA's ASAP Account Would Violate Due Process

As described above, EPA has taken further action that unlawfully pulled back funding that was still legally obligated to IFA. Prior to the Termination Notice, IFA's ASAP account available balance was $143,953,649.51, which represents the remaining cumulative authorized amount of the EPA Award $155,720,000 (excluding EPA's budgeted in-kind contribution) minus funds drawn down by IFA for authorized work prior to that date. On August 8, 2025, IFA's ASAP account access changed to a "liquidated" status and a small portion of the awarded funds appeared to be available to draw down. However, the "available balance" on the account had been substantially reduced to $10,007,069.62, and the performance period end date had been changed from April 30, 2029 and August 30, 2029 to August 15, 2025 and December 8, 2025.

This adjustment to IFA's account balance, which was done prior to the expiration the 30-day dispute period detailed at 2 CFR 1500 Subpart E and prior to any actions from IFA to close out the award violates IFA's right to due process and ignores its reliance interests.

### 4. EPA's Decision to Terminate IFA's Solar for All Assistance Agreement is Arbitrary and Capricious.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency



expertise."[32] In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained."[33]

An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."[34] Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decision-making process."[35] Agency action taken on pretextual grounds violates the requirement of reasoned agency decision-making.

EPA's decision to terminate IFA's Solar for All Assistance Agreement is arbitrary and capricious because: (1) EPA provided no reasoned basis for the termination, (2) EPA failed to undertake any individual assessments of IFA's Solar for All Assistance Agreement, (3) EPA failed to provide IFA notice and an opportunity to cure any alleged noncompliance with the Agreement's terms and conditions, and (4) EPA ignored IFA's substantial reliance interests and the harmful impact of an abrupt and complete termination of the Solar for All Agreement.

EPA's sole stated rationale for the Termination Letter—that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 award recipients"—is a contrived, irrational, and insufficient explanation and thus not a reasoned basis for that action. EPA failed to explain, for example, why it could not use some of the $3,195,028,000 that Congress appropriated to EPA in March to pay for "Environmental Programs and Management."

EPA likewise failed to engage in reasoned consideration of IFA's Solar for All Assistance Agreement before categorically terminating the Solar for All program. EPA has identified no facts that would support the termination. EPA's public statements[36] and prior actions[37] demonstrate that its stated rationale was pretextual.

Also arbitrary was EPA's failure to give notice to IFA so IFA could address any alleged failures. 2 C.F.R. 200.208 requires EPA to provide notice of any specific conditions it decides to impose as a result of risk factors and to provide an opportunity to the grantee, IFA, to satisfy the conditions.[38] It is only after a grantee fails to meet the conditions imposed that an agreement can be terminated.[39] EPA's actions are contrary to these procedures. EPA terminated the Assistance Agreement without identifying any risk factors, without imposing any specific conditions, without giving the required notice to the awardees, and without providing an opportunity to cure.[40] Contrary to Section 200.208's notice-and-cure requirements, EPA operated in secret to withdraw access to

---

[32] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[33] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

[34] *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

[35] *Id.*

[36] Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025, 11:07 AM),
https://x.com/epaleezeldin/status/1953518426602803684; *see also*
https://www.youtube.com/watch?v=CfU3bYKmBOA (referring to Solar for All as a grift).

[37] E.g., the initial "freeze" of the program from January 30 to February 20, 2025, following issuance of the "Unleashing American Energy" Executive Order.

[38] 2 C.F.R. § 200.208(d)-(e).

[39] 2 C.F.R. § 200.339(a) & (c) (authorizing a temporary hold on payments, suspension or termination unless or until the recipient takes corrective action).

[40] 2 C.F.R. § 200.208.



IFA's accounts and even froze its ASAP account prior to issuing the Termination Letter. The lack of notice was arbitrary, capricious, and deprived IFA of due process.[41]

**5.  EPA's Withdrawal of IFA's Duly Appropriated and Obligated Solar for All Assistance Agreement Violates the Constitution's Separation of Powers.**

Article I, Section 1 of the United States Constitution provides that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress."[42] The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself."[43] The Executive has no power "to enact, to amend or to repeal statutes."[44] Therefore, no agency may take any action that exceeds the scope of its constitutional or statutory authority. And no constitutional or statutory authority authorizes EPA to refrain from fulfilling its statutory duties, or to violate federal law.

*Spending Clause*

The Constitution "exclusively grants the power of the purse to Congress, not the President."[45]  U.S. Constitution's Spending Clause, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imports, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause requires States to have fair notice of the terms that apply to the disbursement of funds to them.[46] IFA, as a representative of the State of Illinois, is entitled to this notice.

The Termination Letter and its implementation ignored these constitutional constraints and contradicted the principle that funding restrictions can only impose conditions that are reasonably related to the federal interest in the project and the project's objectives.[47] For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct infringed upon Congress's exclusive domain and impermissibly altered the terms of IFA's funding agreement.

*Take Care Clause*

The Constitution also provides that the Executive Branch must "take Care that the laws be faithfully executed."[48] The Executive Branch violates the Take Care Clause when it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes.[49] Given these principles, where the Executive

---

[41] These arbitrary, capricious, and duplicitous actions mirror EPA's course of conduct in attempting to deprive participants (including IFA) of funding under the National Clean Investment Fund program, another Greenhouse Gas Reduction Fund program.

[42] U.S. Const. art. I, § 1.

[43] *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

[44] *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

[45] *City County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

[46] *See Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17, 25 (1982); *NFIB v. Sebelius*, 567 U.S. 519, 583-84 (2012).

[47] *South Dakota v. Dole*, 483 U.S. 203, 207, 208 (1987).

[48] U.S. Const. art. II, § 3.

[49] *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").



Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

EPA terminated the Solar for All program and IFA's individual Assistance Agreement on the grounds that Section 60002 "effectively and completely terminated the statutory authority and all appropriations related to Solar for All" and therefore "any attempt to continue the programs administration . . . is no longer legally permissible."

Section 60002 did not authorize or direct EPA to rescind IFA's funds, which were obligated months prior to "the day before the date of enactment of [the] Act."[50] EPA's Termination of IFA's Assistance Agreement contravenes Section 60002's plain language and Congress's legislative intent by purporting to terminate and de-obligate funds that were obligated to IFA prior to September 30, 2024. EPA violated constitutional separation-of-powers constraints because EPA's Termination Letter overrode Congress's considered judgments by attempting to rescind obligated Solar for All funds.

*Appropriations Clause*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[51] The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[52] Consistent with these principles, the Executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds.[53] For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Appropriations Clause by acting contrary to the will of Congress.

*Legislative Vesting Clause*

Congress also possesses exclusive power to legislate. Article I, Section 1 of the Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."[54] When Congress passed the Inflation Reduction Act, including the Greenhouse Gas Reduction Fund, through both Houses of Congress, it did so consistent with its legislative powers. EPA cannot usurp the will of Congress by unilaterally terminating IFA's Solar for All Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the separation of powers by undoing valid legislative action.

*Tenth Amendment*

---

[50] OBBBA Section 60002.
[51] U.S. Const. Art. I, § 9, cl. 7.
[52] *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937)).
[53] *See Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).
[54] U.S. Const. art. I, § 1; *see also Clinton*, 524 U.S. at 438 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

The Tenth Amendment of the U.S. Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[55] When actions by the federal government come in the form of "threats to terminate . . . significant independent grants," the actions "are properly viewed as a means of pressuring the States to accept policy changes" and are barred by the Tenth Amendment.[56] EPA's termination of IFA's Solar for All Assistance Agreement altered the terms upon which the funds were obligated and disbursed contrary to Congressional authority. These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the Assistance Agreement. For the same reasons EPA's conduct was contrary to the plain language of OBBBA, it violated the Tenth Amendment.

*Ultra Vires*

The Termination Letter and subsequent termination of IFA's Solar for All award is an *ultra vires* act because no act of Congress authorizes EPA to rescind IFA's obligated funds or otherwise terminate the Solar for All program. For the same reasons that EPA's conduct was contrary to the plain language of OBBBA, its conduct exceeded its jurisdiction, authority, and limitations.

### 6. The Termination of IFA's Solar for All Assistance Agreement Will Cause Irreparable Harm to Illinoisans.

IFA's Solar for All Assistance Agreement supports the Trump Administration's stated priorities of supporting energy independence, reducing energy costs, and protecting clean air and water, thereby reducing the cost of living. Retail electricity prices have risen 13% since 2022, outpacing inflation, and rising temperatures, extreme weather, and expanding data centers will continue to drive higher demand. Skyrocketing energy prices harm households and businesses alike and will significantly impede opportunities for economic growth. Solar energy projects, especially those aligned with domestic manufacturing initiatives, will create jobs and help everyone's bottom line.

With the loss of Solar for All funding, IFA will no longer be able to offer financial assistance that would create jobs and reduce energy costs. These programs would support upgrades for roof replacement and/or electrical work, installation of solar and energy storage equipment, working capital for small solar vendors, a standard lease-to-own product to make smaller solar vendors more competitive, low-interest loans to community-driven community solar projects, grants to expand outreach and education about the Illinois Solar for All Residential program, and grants to improve the residential solar permitting process. Additionally, if this program is terminated, IFA will not be able to expand the existing Illinois Solar for All Residential Solar and Community Solar programs, which allow low-income households to receive the benefits of solar energy.

In addition, Solar for All funding was expected to create new green jobs in Illinois' solar industry, compounding harm already caused to the solar industry by the early end of federal tax credits for distributed solar (which alone is estimated to cost Illinois 21,000 jobs within five years). Surely, economic harm of this magnitude is inconsistent with the Trump Administration's agenda. Without this funding, IFA may also lose access to vendors with expertise on solar energy

---

[55] U.S. Const. amend. X.
[56] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012).



infrastructure projects, which may limit the availability of products and services that IFA can provide with its remaining resources.

IFA will also suffer reputational harm in its relationships and dealings with other Illinois State agencies and vendors with whom it had begun discussing the benefits of the funded programs. Abrupt loss of funding will increase distrust of policymakers and the solar industry in the State's ability to support solar projects for low-income residents and communities. IFA has devoted significant time over the past year to developing internal systems and expertise, financial assistance products, and relationships to support the Solar for All program and other clean energy programs that are now threatened.

The loss of Solar for All funding will also impair Illinois' ability to meet the renewable energy goals set forth in Illinois' Climate and Equitable Jobs Act ("CEJA"). CEJA established a goal of transitioning Illinois to 40% clean energy by 2030, 50% clean energy by 2040, and 100% clean energy by 2045. Replacing energy sources that emit harmful pollutants with renewable solar energy will improve the health of Illinois residents while reducing energy costs. EPA's actions to decimate the solar industry, including terminating the Solar for All program and promoting reliance on non-renewable energy sources, will challenge the clean energy transition and create long-lasting harms to public health. The Solar for All program was critical to achieving this transition because it provided a source of funding for solar projects and clean energy infrastructure projects related to creating durable, reliable, and equitable clean energy infrastructure. For example, the Solar for All programs in IFA's Work Plan included financial support for enabling upgrades (e.g., making improvements to roofs to make them suitable for solar panels) and battery storage projects that would have allowed more low-income communities to be able to take advantage of clean energy. Without the infrastructure and community outreach programs supported by Solar for All, fewer low-income communities will have access to low-cost clean energy. This action will take money out of the pockets of low-income households and make it harder to combat climate change.

Going forward, the loss of funding will delay timelines for solar-related construction projects, including for grantees that made initial investments in their projects in expectation of receiving Solar for All funds, whether from IFA or other recipients. Project developers and homeowners that expected to utilize low-cost Solar for All financing to support their solar projects have already made significant investments in pre-construction activities, and the abrupt loss of Solar for All financing will require a pause in efforts while they seek alternative, and likely higher cost, financing. This will make it difficult for many projects to meet new commence construction timelines necessary to receive clean energy investment and production credits, potentially placing these projects in jeopardy.

Moreover, IFA acted in reasonable reliance on its fully obligated Solar for All funding continuing to be available. IFA and its consultants and State agency partners expended more than 900 hours on application development and early Solar for All programming. Implementation efforts following the Solar for All award may have been reimbursed (in part) by Solar for All funds. IFA could have devoted staff hours to developing other programs and products, and now there is no way to recover this lost time or effort. Applicants to IFA's Solar for All grant opportunities have also made considerable investments in time and resources in expectation of receiving Solar for All funds.



Nor can IFA simply backfill with other funding to keep its Solar for All offerings available. IFA generates its own revenue and does not receive any state appropriations, meaning IFA does not have the ability to fund the proposed Solar for All programs without federal assistance. The Illinois Solar for All program, which is managed by IPA and funded by the State, will continue, but the loss of federal Solar for All funds will severely limit the program's ability to reach more low-income communities. The Solar for All program also allowed IFA to work closely with EPA in developing its work plan and access EPA-provided technical assistance. The loss of that collaboration and programmatic support cannot be remedied.

## REMEDY OR RELIEF SOUGHT

If EPA claims that it no longer possesses the requisite personnel or administrative funding required to oversee and administer the Award, IFA respectfully proposes the appointment of an independent third party to administer and oversee the Award, subject to EPA's reasonable oversight and supervision.

Until IFA's dispute with EPA has been resolved, it objects to any claims of noncompliance under 2 C.F.R. 200.344(i).

The specific remedy or relief sought here is rescission of the termination of this Assistance Agreement, reinstatement of the Assistance Agreement for the originally awarded amount, scope of work, and performance period, and reinstatement of the notice to proceed, and reinstatement of the remaining awarded funds ($133,946,579.89) to IFA's ASAP account. In furtherance of this Dispute, please find attached:
- A copy of the disputed Agency Decision; and
- Copies of supporting documents (Exhibits 1-8).

The name and contact information, including email address, of IFA's designated point of contact for this notice of disagreement is: Christopher Meister, Executive Director, at cmeister@il-fa.com.

Please acknowledge receipt of this Dispute and contact me to discuss resolution of this Dispute as soon as possible.

Regards,

Christopher Meister, Executive Director
Illinois Finance Authority
CMeister@il-fa.com

CC: Devon Brown, EPA Award Official *via email* (brown.devon@epa.gov)
Bryan Fiedorczyk, EPA Project Officer *via email* (fiedorczyk.bryan@epa.gov)
Hazeletta Burgess, EPA Grant Specialist *via email* (burgess.hazeletta@epa.gov)