## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HARRIS COUNTY, TEXAS,**
1001 Preston Street, Suite 500,
Houston, TX 77002,

    *Plaintiff*,

  v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    and

**LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    and

**DEVON BROWN, in his official capacity as EPA AWARD OFFICIAL, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460,

    *Defendants*.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Harris County, Texas ("Harris County") brings this action against Defendants the United States Environmental Protection Agency ("EPA"), Lee Zeldin, in his official capacity as Administrator of EPA, and Devon Brown, in his official capacity as EPA Award Official, and alleges as follows:

# INTRODUCTION

1. From day one, the Trump Administration has worked to eliminate, by any means necessary, the programs Congress created through the Inflation Reduction Act. Its latest target is Solar for All, a program mandated by Congress to bring clean, affordable energy to low-income communities across the country.

2. Harris County, Texas—recipient of one of the largest Solar for All awards and leader of the Texas Solar for All Coalition—developed a formidable application and workplan, built an ambitious solar energy program with its Coalition partners, and began to launch critically needed projects to protect the health, safety, and well-being of Texas families. But on August 7, 2025, President Trump's EPA announced that it was shutting down Solar for All. That decision, based on arbitrary and pretextual grounds, violates the Administrative Procedure Act, federal statutes, and the U.S. Constitution. Harris County brings this action to challenge the Trump Administration's lawless efforts to end this important program.

3. In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA"). Pub. L. No. 117-169. The IRA amended the Clean Air Act to authorize EPA to establish the Greenhouse Gas Reduction Fund ("GGRF"), an "historic $27 billion investment to combat the climate crisis by mobilizing financing and private capital for greenhouse gas- and air pollution-reducing projects in communities across the country."[1] Congress directed that $26.97 billion of this funding be obligated through competitive grants by September 30, 2024. Congress also appropriated $30 million to EPA to help cover the program's administrative costs.

---

[1] EPA, *EPA's Implementation Framework for the Greenhouse Gas Reduction Fund*, https://www.epa.gov/system/files/documents/2024-08/epas-implementation-framework-for-the-greenhouse-gas-reduction-fund.pdf (last visited Oct. 9, 2025).

4.   Pursuant to this mandate, EPA created three grant programs: The National Clean Investment Fund ("NCIF"), the Clean Communities Investment Accelerator ("CCIA"), and—the focus of this lawsuit—Solar for All ("SFA").  EPA funded each program from appropriations made in the IRA: $14 billion for NCIF, $6 billion for CCIA, and $7 billion for Solar for All.

5.   Solar for All was designed to expand access to affordable, clean energy in low-income communities and to improve the health, safety, and economic stability of American families nationwide.  EPA established a competitive grant process for government entities and nonprofits to "develop long-lasting solar programs that enable low-income and disadvantaged communities to deploy and benefit from distributed residential solar, lowering energy costs for families, creating good-quality jobs in communities that have been left behind, advancing environmental justice, and tackling climate change."[2]

6.   After completing a rigorous, multi-agency review of applications, EPA selected 60 awardees to receive SFA funding, including Harris County.  By mid-August 2024, EPA had obligated all $7 billion appropriated for Solar for All.

7.   After receiving its SFA award, Harris County and the other members of the Texas Coalition worked tirelessly to build their SFA workplan and advance the Coalition's mission.  The Coalition worked to develop solar energy infrastructure that would lower energy costs and utility bills for low-income Texas families; improve public health for millions of Texas residents; create well-paying jobs and provide job training programs throughout the State; support domestic manufacturing; bolster the resilience and security of the Texas electricity grid to help reduce the

---

[2] Press Release, EPA, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar* (Apr. 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential (last visited Oct. 9, 2025).

devastating harms caused by increasingly frequent extreme-weather events; and promote American energy independence as demand for power continues to drastically outpace supply.

8.  In the months after EPA obligated all GGRF grant funding, during the leadup to the 2024 presidential election, Donald Trump made clear that he had the IRA in his sights.  He vowed to "terminate the Green New Deal," which he also called the "Green New Scam," and pledged that his administration would "rescind all unspent funds under the misnamed Inflation Reduction Act."[3]

9.  On January 20, 2025, President Trump took office and immediately launched an assault on the Greenhouse Gas Reduction Fund, including Solar for All.  Within hours of his inauguration, Trump issued Executive Order 14154, *Unleashing American Energy*.  Section 7 of the Order, titled "Terminating the Green New Deal," directed agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."  In the days that followed, the White House Office of Management and Budget ("OMB") issued two memoranda repeating the Executive Order's directive to executive agencies to "immediately pause" all IRA funds and financial assistance for the "Green New Deal."  OMB Memorandum M-25-11; OMB Memorandum M-25-13.

10. EPA took immediate steps to implement these directives.  Less than ten days into the new Administration, SFA grantees, including Harris County, learned that EPA had suspended their SFA accounts and frozen their grant funds.  EPA restored grantees' access to their funds a week later, only to quickly suspend SFA accounts again.  EPA Administrator Lee Zeldin appeared on national television to discuss the Greenhouse Gas Reduction Fund, parroting President Trump's

---

[3] Emily Peck, *Trump Wants To "Terminate" Green Spending. Here's What Could Stand In His Way*, Axios (Oct. 28, 2024), https://www.axios.com/2024/10/28/trump-climate-law-ira-pullback (last visited Oct. 10, 2025).

campaign promises and stating that the "entire scheme, in [his] opinion, is criminal."[4]  EPA reinstated Solar for All operations only after multiple federal district courts enjoined the Administration's overall freeze on IRA funding.

11. The Administration, however, was committed to ending Solar for All.  On August 7, 2025, EPA announced its decision to eliminate Solar for All—this time citing the One Big Beautiful Bill Act ("OBBBA"), passed by Congress the previous month, as its basis for doing so (the "Elimination Decision").

12. But the OBBBA provides no authority for EPA's Elimination Decision.  Section 60002 of that law, the sole provision addressing the Greenhouse Gas Reduction Fund, states in full: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the ***unobligated*** balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded."  Pub. L. No. 119-21, 139 Stat. 72, 154 (2025) (emphasis added).

13. Section 60002 does not touch SFA funding because all $7 billion in grant funds were obligated long before Section 60002 was enacted.  The only unobligated funds as of the OBBBA's enactment were EPA's $19 million of remaining administrative funds—equivalent to just *seven hundredths of one percent* (0.07%) of the $27 billion Congress appropriated for the Greenhouse Gas Reduction Fund.

14. Nevertheless, on August 7, Defendant Zeldin issued a video statement announcing that EPA was "taking action to end [the SFA] program for good."[5]  Asserting that the OBBBA

---

[4] *See* Sunday Morning Futures (@SundayFutures), X (Feb. 23, 2025, 12:21 PM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Sunday Morning Futures, *Partnership With DOGE 'Has Been Outstanding,' EPA Administrator Zeldin Says*, Fox News (Feb. 23, 2025), https://www.foxnews.com/video/6369222506112.

[5] *See* Lee Zeldin (@EPALeeZeldin), X (Aug. 7, 2025, 2:07 PM), https://x.com/epaleezeldin/status/1953518426602803684.

"eliminates billions of green slush fund dollars," Defendant Zeldin claimed that the new law had repealed Solar for All—a program he described as a "grift" and a "boondoggle."

15. That same day, EPA sent every SFA grant recipient—including Harris County—a notice (Ex. D) informing the grantees that EPA had "made the decision to terminate the SFA program." According to EPA, Section 60002 rescinded not only the unobligated "administrative cost appropriation," but also "the grant appropriations" that had been obligated to Harris County and other grantees a year earlier. *Id.* Indeed, EPA insisted, the OBBBA had "effectively and completely terminated the statutory authority and *all* appropriations related to Solar for All." *Id.* (emphasis added). The agency then asserted, without further explanation or support, that Section 60002 made clear Congress's intent that "the SFA program is no longer to operate." *Id.*

16. EPA is wrong. Section 60002 rescinds only *unobligated* funds, meaning the $19 million EPA has remaining for GGRF administrative costs. The statute does not repeal or rescind *any* grant appropriations (Solar for All or otherwise), because all GGRF grant funds were obligated by September 30, 2024, in conformance with the IRA's deadline. Moreover, Section 60002 applies only *prospectively*, so it does not purport to retroactively repeal EPA's authority to establish and launch Solar for All, nor to undo that process, which was completed more than a year ago.

17. Consistent with the OBBBA's text, the non-partisan Congressional Budget Office estimated that Section 60002 would save the government only $19 million, i.e., EPA's remaining unobligated funding for GGRF administrative costs. Statements from Republican and Democratic lawmakers alike similarly confirm that everyone understood Section 60002 to mean exactly what it says: that it rescinds only unobligated balances, leaving untouched the obligated grant funds, including those of Solar for All.

18. EPA's stated justification for its Elimination Decision is also pretextual. Consistent with the Trump Administration's repeated directives to federal agencies to end the IRA's so-called "Green New Deal," EPA has time and again disparaged Solar for All and the other GGRF programs, making plain its determination to shut them down by whatever means necessary—legal or not. This politically motivated objective, clear from the get-go, is reinforced by EPA's transparently erroneous rationale for shuttering Solar for All.

19. EPA's Elimination Decision is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The Elimination Decision contravenes Section 134 of the Clean Air Act, which remained in effect from August 2022 until July 2025, and Section 60002 of the OBBBA. And, in unilaterally canceling a program established and funded through duly enacted congressional appropriations, with no constitutional or statutory authority, EPA's Elimination Decision violates the Constitution's Appropriations Clause and separation of powers.

20. Defendants' actions have caused and continue to cause irreparable harm to Harris County and its constituents. Harris County personnel and Texas Coalition staff have dedicated countless hours to setting up operations for Solar for All and working to deliver the program's benefits to their constituents. EPA's unlawful Elimination Decision stops this work in its tracks. It jeopardizes the County's ability to deliver critical infrastructure promised to create thousands of well-paying jobs, protect residents from extreme weather by reinforcing the County's electrical grid, and reduce energy costs for tens of thousands of low-income households. The Elimination Decision has also upended Harris County's budgetary and strategic planning, leaving the County unable to honor its commitments to the Coalition and residents of Harris County without diverting funds from other critical public programs. By halting the County's efforts to protect and improve

7

the lives of vulnerable residents, precipitating the loss of key personnel, and undermining the County's reputation as a reliable community and business partner, the Elimination Decision will continue to have an immediate, direct, and devastating impact on Harris County and its residents.

21. Harris County therefore asks this Court to declare unlawful and vacate Defendants' Elimination Decision, and to enjoin Defendants from carrying out the unlawful Elimination Decision.

## PARTIES

22. Defendant EPA is the agency of the federal government of the United States charged with administering the Greenhouse Gas Reduction Fund and Solar for All.  EPA is an agency within the meaning of the Administrative Procedure Act.

23. Defendant Lee Zeldin is the Administrator of EPA and the agency's highest-ranking official.  Harris County sues Mr. Zeldin in his official capacity.

24. Defendant Devon Brown is an EPA Award Official.  Mr. Brown sent the August 7, 2025 letter purporting to terminate Harris County's SFA Award Agreement.  Harris County sues Mr. Brown in his official capacity.

25. Plaintiff Harris County is a political subdivision of the State of Texas.  It is the most populous county in Texas and third most populous in the United States.  EPA awarded Harris County over $249 million under the SFA grant competition to lead a statewide initiative, the Texas Coalition, to expand access to affordable, clean energy in lower-income Texas communities.

## JURISDICTION AND VENUE

26. This Court has jurisdiction over Harris County's claims against Defendants under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

27. Venue is proper in this District because Defendants are located in this District and a

substantial part of the acts or omissions giving rise to the claims occurred in this District.  28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

### I.    Solar for All and Harris County's Award.

28. In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169, 136 Stat. 1818, 2065-67 (2022).  Among other things, the IRA amended the Clean Air Act ("CAA") to include a new Section 134 (42 U.S.C. § 7434) directing EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF") to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services."  136 Stat. at 2067 (CAA § 134(c)(1)(A)).  Congress appropriated $27 billion total for the Greenhouse Gas Reduction Fund—$26.97 billion for competitive grants, plus $30 million for "administrative costs."  *Id.* at 2066 (CAA § 134(a)).

29. Specifically, subsection (a) of Section 134, titled "Appropriations," appropriated $7 billion to make grants to "enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies"; $11.97 billion for grants to "provid[e] [general] financial assistance and technical assistance" consistent with the Greenhouse Gas Reduction Fund's mission; and $8 billion to make grants to "provid[e] financial assistance and technical assistance in low-income and disadvantaged communities" to implement the Greenhouse Gas Reduction Fund's objectives. 136 Stat. at 2066 (CAA § 134(a)(1)-(3)).  Each subsection directed EPA to establish a competitive grant-making process for the appropriated sums and stated that the sums would "remain available until September 30, 2024." *Id.*

30. Subsection (a)(4) of Section 134 addressed "administrative costs," appropriating $30 million for "the administrative costs necessary to carry out activities under [Section 134]."  136 Stat. at 2066 (CAA § 134(a)(4)).  Unlike the appropriations for grant funds in subsections (1)-(3),

the funds appropriated for administrative costs were to remain available through September 30, 2031. *Id.*

31. Following the enactment of the IRA, EPA began a months-long process to "shape implementation of the GGRF."[6]  EPA conducted listening sessions, published a Request for Information seeking public comment, and submitted questions to the Environmental Financial Advisory Board to inform the design of GGRF programs.

32. In April 2023, EPA announced three competitive grant competitions under the Greenhouse Gase Reduction Fund, one of which was Solar for All ("SFA").  Solar for All was designed to "expand the number of low-income and disadvantaged communities that are primed for residential and community solar investment—enabling millions of families to access affordable, resilient, and clean solar energy."  EPA funded Solar for All with the $7 billion appropriated in CAA Section 134(a)(1).

33. The other GGRF programs announced the same day, the National Clean Investment Fund ("NCIF") and the Clean Communities Investment Accelerator ("CCIA"), were funded with the remaining $19.97 billion from Sections 134(a)(2) and (3).[7]

34. On July 28, 2023, EPA released Notice of Funding Opportunity No. EPA-R-HQ-SFA-23-01 announcing a public competition for the SFA grant funds.  *See* Ex. A.  Both individual and coalition applicants were eligible to receive an award.  *Id.* at 15.  Coalition applicants were those "composed of one lead applicant, which partners with one or more non-lead coalition member(s)

---

[6] Richard K. Lattanzio, *EPA's Greenhouse Gas Reduction Fund (GGRF)*, CRS (May 21, 2024), https://www.congress.gov/crs-product/IF12387 (last visited Oct. 9, 2025).

[7] EPA, *Frequent Questions About the Fund*, available at https://web.archive.org/web/20250423001633/https://www.epa.gov/greenhouse-gas-reduction-fund/frequent-questions-about-fund) (archived Apr. 23, 2025).

that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected." *Id.* at 8.

35. Harris County submitted its SFA application on behalf of a Texas-based coalition ("Texas Coalition") on or about October 12, 2023.

36. The Texas Coalition includes Harris County and eight local government and nonprofit subgrantees from across Texas: the Cities of Austin, San Antonio, and Waco; Dallas County; Clean Energy Fund of Texas, Inc.; Houston Advanced Research Center; Opportunity Home San Antonio; and Texas Energy Poverty Research Institute. The Coalition's workplan would increase access to affordable, clean energy in disadvantaged Texas communities; lower energy costs and utility bills for Texas families; create well-paying clean-energy jobs and provide training opportunities for the local workforce; enhance grid reliability and security by adding power supply to meet exploding power demand; alleviate the devastating harms caused by power-system failures during extreme-weather events; promote American energy independence by supporting domestic manufacturing and lessening dependence on foreign fuels; and reduce pollution from energy use. Through these efforts, the Coalition's work would better the lives of millions of Texas residents.

37. Following an extended review and selection process involving multiple federal agencies, EPA announced in April 2024 that it had selected 60 applicants to receive SFA awards.[8] Based on its selections, EPA estimated that Solar for All would deliver solar infrastructure projects benefiting over 900,000 households in low-income communities nationwide, create 200,000 clean-energy jobs, and save an estimated $350 million annually on energy bills during and after the five-

---

[8] Press Release, EPA, *supra* note 2.

year program. *Id.*[9]  EPA allocated the full $7 billion appropriated for Solar for All among the 60 grantees. *Id.*

38. EPA awarded the Harris County-led Texas Coalition $249.7 million, one of the largest SFA awards.

39. In July 2024, Harris County and EPA entered into a grant agreement, Ex. B, which was subsequently amended in December 2024 (as amended, the "Award Agreement"), Ex. C.  The Award Agreement memorializes the Texas Coalition's $249.7 million award and sets forth the terms and conditions of the grant.

40. Harris County developed, and EPA approved, a workplan consistent with the goals of Solar for All.  As described in Harris County's workplan, the Texas Coalition designed a five-year plan aimed at transforming access to distributed solar in low-income communities in Texas.  The Coalition developed an innovative "community solar" program that allows participants  to realize a 20 percent savings against their usual electricity bill by subscribing to large solar projects. Through this community solar model and other components of its ambitious workplan, the Texas Coalition seeks to create new community wealth and savings, and develop and support well-paying jobs, including supporting workforce training to serve low-income and disadvantaged residents. Bolstering solar, energy storage, and grid infrastructure would also increase Harris County's resilience to power system failures, thereby protecting medically vulnerable and other residents

---

[9] *See also* National Renewable Energy Lab, *Technical Assistance for Solar for All Grant Recipients* (Mar. 19, 2025), https://perma.cc/38JH-W8V6 (archived June 30, 2025).

during extreme weather events.[10]  Such efforts are critically important in Harris County, the most hurricane-vulnerable region in the country.[11]

41. Consistent with its workplan, Harris County allocated the award among the Texas Coalition as follows:

a. Harris County retained $58,897,968 to provide financial assistance for community solar to low-income households throughout the County, as well as technical assistance and community-engagement support.

b. The City of Austin received $31,593,683 to administer a community solar program, provide related financial assistance and community engagement, and support workforce development programs for Austin residents.

c. The City of San Antonio received $21,707,659 to administer a community solar program, providing financial assistance, community engagement, and workforce-development support for San Antonio residents.

d. Houston Advanced Research Center ("HARC") received $86,263,600 to provide financial support, community engagement, workforce development, and technical assistance for multi-family and community solar to communities across Texas.

e. The City of Waco received $692,099 to administer a single-family rooftop solar program in partnership with HARC.

---

[10] *See* Abby Church, *Fifth Ward Community Center to Receive Federal Dollars to Become a Safe Haven During Extreme Weather*, Houston Chronicle (May 19, 2025), https://www.houstonchronicle.com/politics/houston/article/carl-walker-shelter-funds-20331575.php (explaining that SFA funds were to be used to reinforce three community centers, "allowing a vital escape for potentially hundreds of residents when storms come through") (last visited Oct. 9, 2025).

[11] *See* U.S. Federal Emergency Management Agency, *National Risk Index*, https://hazards.fema.gov/nri/map (select "Hurricane" under "Risk Index") (last visited Oct. 10, 2025); *see also* Faith Bugenhagen, *Harris County scores worst in the U.S. for hurricane risk*, Chron (Aug. 26, 2025), https://www.chron.com/politics/article/harris-county-top-hurricane-risk-21016396.php (Harris County received the highest hurricane risk score in the country, 100 out of 100) (last visited Oct. 10, 2025).

f.   Dallas County received $1,384,553 to administer a community solar program for Dallas County families in partnership with HARC.

g.   Clean Energy Fund of Texas, Inc. received $3,434,775 to administer a single-family solar program, providing financial assistance and lender engagement for these installations in small and medium-size communities in Texas.

h.   Opportunity Home San Antonio, an affordable housing provider, received $24,043,424 to administer a multifamily solar program, providing financial assistance, community engagement, and workforce-development support.

i.   Texas Energy Poverty Research Institute received $21,682,239 to support community and single-family solar programs in border communities (including Brownsville, City of El Paso, and City of Laredo).

42. After entering into the award agreement with EPA, Harris County received its full SFA award in its Automated Standard Application for Payments ("ASAP") account.  ASAP is an electronic payment system operated by the Treasury's Bureau of the Fiscal Service.  It regularly holds funds awarded to federal grantees to permit grantees to safely and easily access their award funds.  Harris County began accessing SFA grant funds through ASAP on behalf of itself and other Texas Coalition members in December 2024.

43. In the months that followed, Coalition members dedicated enormous resources to launching their SFA workplan.  Harris County, for example, devoted thousands of personnel hours to developing the plans and infrastructure for this work, including drafting, negotiating, and executing inter-local agreements with coalition members, designing systems to audit program spending, issuing purchase orders, and creating financial and performance reporting workflows.

In undertaking this ambitious, five-year plan, Harris County reasonably relied on Congress's authorization of Solar for All and EPA's commitment to achieving the program's aims.

## II.     The New Administration's Campaign to End the Greenhouse Gas Reduction Fund.

44. On January 20, 2025, President Trump took office.  On day one, his Administration launched a determined assault on the Greenhouse Gas Reduction Fund, including Solar for All.

45. Indeed, even before taking office, President Trump ridiculed the GGRF programs, dubbing them the "Green New Scam" and promising to "terminate the Green New Deal."  He further vowed that his administration would "rescind all unspent funds under the misnamed Inflation Reduction Act."[12]

### A.     The Administration's Directives to Freeze IRA Funds.

46. Within hours of his inauguration, President Trump issued Executive Order 14154, *Unleashing American Energy* ("the Energy EO").  Section 7 of the Order, titled "Terminating the Green New Deal," instructed that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."

47. The following day, January 21, 2025, the Office of Management and Budget ("OMB") issued memorandum M-25-11.  That memorandum repeated the Energy EO's "directive" to executive agencies to "immediately pause disbursements of [IRA] funds," including "funds supporting programs, projects or activities … supporting the 'Green New Deal.'"

48. OMB then issued memorandum M-25-13, directing federal agencies to pause "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to … the green new deal."

---

[12] Peck, *supra* note 3.

49. Two lawsuits were quickly filed seeking to enjoin the Administration's funding freeze. After a federal district court stayed OMB memorandum M-25-13, Order of Administrative Stay, *Nat'l Council of Nonprofits v. Trump*, No. 1:25-cv-00239 (D.D.C. Jan. 28, 2025) (ECF No. 13), OMB rescinded the memorandum. But the White House pledged to maintain the funding freeze, with White House Press Secretary Karoline Leavitt announcing that the OMB memorandum's recission was "NOT a rescission of the federal funding freeze."[13] Multiple federal district courts subsequently enjoined the Administration from implementing the funding freeze ordered by the Energy EO, OMB memorandum M-25-11, OMB memorandum M-25-13, "or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress." *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025); *see also Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 108 (D.D.C. 2025) (enjoining OMB memorandum M-25-13); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 479 (D.R.I. 2025) (enjoining multiple agencies, including EPA, from freezing grant funds already awarded under the IRA or Infrastructure Investment and Jobs Act on a non-individualized basis).

**B.     The Initial Freeze of SFA Funding.**

50. The new Administration's efforts to stop the disbursement of funds appropriated through the IRA included a freeze of already-awarded SFA grant funds.

51. On January 29, 2025, SFA grantees—including Harris County—could no longer access the grant funds in their ASAP accounts.[14] The ASAP system showed Harris County's SFA account status as "Suspended." EPA offered no explanation for this change.

---

[13] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM), https://x.com/PressSec/status/1884672871944901034.

[14] *See* Jean Chemnick, *EPA Cuts Off IRA Solar Money Already Under Contract*, E&E News by POLITICO (Jan. 30, 2025), https://www.eenews.net/articles/epa-cuts-off-ira-solar-money-under-contract/ (last visited Oct. 9, 2025).

52. Harris County quickly contacted the EPA project officer for Solar for All to request information related to the account suspension.  The County stressed in its communication the importance of reestablishing access to the funds, explaining that "[t]he delay in obtaining these funds interferes with our project's progress, the ability to pay employees' salaries and subcontractors, our hiring, and other critical aspects of our operations."  The project officer responded: "The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time.  EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order."

53. EPA restored Harris County's access to its SFA funds on February 7, 2025, only to suspend access again four days later.  An EPA spokesperson took a different tack when justifying the suspension this time, claiming that "separate from any Presidential [executive order] or OMB guidance, EPA personnel have identified certain grants programs as having potential inconsistencies with necessary financial and oversight procedural requirements or grant conditions of awards or programs."[15]  EPA never—at that time nor since—identified any financial irregularities or oversight concerns in Solar for All.

54. This on-again, off-again experience was not unique to Harris County.  All SFA grantees experienced similar freezes of their SFA funds in January and February 2025.

55. On February 21, 2025, Harris County received an email from SFA@epa.gov stating that "Solar for All grantees may resume drawing down resources in ASAP."  Beginning that day— and until EPA unlawfully shut down Solar for All in early August 2025—Harris County's SFA funding remained available through the ASAP system.

---

[15] See Miriam Wasser & Barbara Moran, *What to know about the federal freeze on environmental grants in Mass.*, wbur (Feb. 14, 2025), https://www.wbur.org/news/2025/02/14/epa-trump-zeldin-masschusetts-climate-grants (last visited Oct. 10, 2025).

## C.   EPA's Determined Efforts to Terminate All GGRF Programs.

56. Despite the court orders enjoining the Energy EO and OMB Memoranda, EPA steadfastly continued its campaign to end all GGRF programs.

57. In February 2025, Defendant Zeldin began to publicly disparage the programs and grantees.  During an appearance on Fox News, he derided the Greenhouse Gas Reduction Fund, declaring that the "entire scheme, in [his] opinion, is criminal."[16]

58. On March 2, 2025, EPA officials sent a letter to the EPA Office of Inspector General ("OIG") referring the entire "GGRF program" for a "full investigation."[17]  Two weeks later, the agency's OIG announced an audit of Solar for All.[18]

59. Meanwhile, President Trump's Department of Justice took up the cause, initiating its own sham investigation.  In February 2025, the FBI "recommended" to Citibank—the financial institution managing the NCIF and CCIA grant funds in lieu of the ASAP system—that it freeze every GGRF-related account for 30 days owing to suspicions of criminal activity.  *See Climate United Fund v. Citibank, N.A.*, Nos. 25-5122, 25-5123, __ F.4th __, 2025 U.S. App. LEXIS 22532, at *50 (D.C. Cir. Sept. 2, 2025) (Pillard, J., dissenting) (recounting undisputed facts).  Immediately thereafter, the then-Chief of the Criminal Division of the Washington, D.C. U.S. Attorney's Office refused to send a letter *ordering* Citibank to freeze the accounts, citing insufficient evidence to support such an order, and was forced to resign.  *Id.* at 51.  Following her resignation, the then-

---

[16] *See* Sunday Morning Futures, *supra* note 4.

[17] Letter from W.C. McIntosh, Acting Deputy Administrator, EPA, to Nicole Murley, Acting Inspector General, EPA (Mar. 2, 2025), available at https://www.epa.gov/system/files/documents/2025-03/epaigrequest030225.pdf (last visited Oct. 9, 2025).

[18] Memorandum, U.S. EPA Office of Inspector General (Mar. 19, 2025), available at https://web.archive.org/web/20250906080631/https://www.epaoig.gov/sites/default/files/document/2025-03/oig_notification_memo_oa-fy25-0043.pdf (archived Sept. 6, 2025).

interim U.S. Attorney for the District of Columbia personally submitted a seizure warrant application to a magistrate judge, which was denied for lack of probable cause. *Id.*

60. Undeterred, EPA officials themselves directed Citibank to suspend all GGRF accounts "until further notice." *Id.* at *55. When the NCIF grantees sued, EPA responded by shutting down the programs altogether, sending every NCIF and CCIA grantee an identical letter purporting to terminate their grants, "effective immediately." *Id.* at *58.

61. The district court entered a temporary restraining order, and subsequently issued a preliminary injunction, that barred EPA from dismantling the grant programs or clawing back the grant funds. *Id.* at *59-61. The court held that EPA's actions, seeking to "effectively unilaterally dismantle a program that Congress established," violated the constitution's separation of powers. *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 116 (D.D.C. 2025).

62. On appeal, a divided panel of the D.C. Circuit vacated the injunction. *Climate United Fund*, 2025 U.S. App. LEXIS 22532, at *10-12. Judge Pillard dissented, detailing EPA's months-long campaign to dismantle the entirety of the Greenhouse Gas Reduction Fund "[b]ased on nothing more than the President's announced vendetta against the 'Green New Deal.'" *Id.* at *65. Petitions for rehearing en banc are pending as of the date of this complaint. *See Climate United Fund v. Citibank, N.A.*, Nos. 25-5122, 25-5123, Doc. 2134363 (Sept. 10, 2025) & Doc. 2134366 (Sept. 10, 2025).

## III.    EPA's Unlawful Dismantling of Solar for All.

63. With the NCIF and CCIA programs embroiled in litigation, EPA turned its attention to eliminating the final GGRF program: Solar for All. The agency found its answer in Pub. L. No. 119–21, commonly known as the One Big Beautiful Bill Act ("OBBBA"). President Trump signed the OBBBA into law on July 4, 2025.

64. Section 60002 of the OBBBA addresses the GGRF program.  It provides, in its entirety, as follows:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

Pub. L. No. 119-21, 139 Stat. 72, 154 (2025).

65. Consistent with the statutory deadline set out in Section 134, all GGRF grant funds contemplated in Section 134(a)(1)-(3) had been obligated by September 30, 2024.  The only remaining "unobligated balances" as of July 2025 were $19 million made available to EPA for administrative costs under Section 134(a)(4).

66. Consistent with Section 60002's limited rescission of "unobligated balances … made available to carry out" Section 134, the non-partisan Congressional Budget Office ("CBO") estimated that Section 60002 would save the government only $19 million, *i.e.*, the remainder of the funds appropriated for EPA's administrative costs associated with implementing GGRF programs—a tiny fraction of the total $27 *billion* appropriated for the Greenhouse Gas Reduction Fund.[19]

67. Not surprisingly, Members of Congress—Republicans and Democrats alike—shared this understanding.  In May 2025, Representative Morgan Griffith (R-PA), then-chair of the Environmental Subcommittee, stated the following with respect to the legislation that would become Section 60002: "if a grant was already given, as far as this bill is concerned, then that would still be going forward."[20]  Representative Brett Guthrie (R-KY), Chair of the House Energy

---

[19] *See* Congressional Budget Office, *Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline*, Table 6, Rows 20–22 (June 29, 2025), https://www.cbo.gov/publication/61534 (last visited Oct. 9, 2025).

[20] House Committee on Energy and Commerce, *Full Committee Markup of Budget Reconciliation Text Part 1*, at 5:40:23-5:42:03 (YouTube, May 13, 2025), https://www.youtube.com/live/J4fGR1CiNGg?si=0kz8e0kADDcUT35Q&t=20423 (last visited Oct. 9, 2025).

and Commerce Committee likewise stated that the OBBBA "does not close the grants on any obligated funds." *Id.* And Senator Shelley Capito (R-WV), Chair of the Senate Environment and Public Works Committee, explained in the leadup to Section 60002's drafting that Congress would not "'claw back' grants the EPA has distributed to recipients through the [IRA], including $27 billion under the Greenhouse Gas Reduction Fund."[21] "Money that's already been obligated and out the door," she stated, "that's a decision that's final." *Id.*

68. EPA, however, had other ideas. One month after OBBBA was enacted, on August 7, 2025, Defendant Zeldin issued another online video statement about the Greenhouse Gas Reduction Fund—this time concerning Solar for All. Mr. Zeldin claimed that OBBBA had "eliminate[d] billions of green slush fund dollars by repealing the Greenhouse Gas Reduction Fund, including a $7 billion program called Solar for All."[22] Calling Solar for All a "grift" and a "boondoggle," Mr. Zeldin asserted that EPA was "taking action to end this program for good." *Id.*

69. That same day, Devon Brown, on behalf of EPA, sent every SFA grantee—including Harris County—a purported "Termination" notice stating that EPA had decided to terminate Solar for All altogether. *See* Ex. D.

70. In the Notice, EPA explained that it had "made the decision to terminate the SFA program" pursuant to the OBBBA. Ex. D at 1. According to EPA, "Section 60002 of OBBBA repeal[ed] the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434." *Id.* EPA represented that Section 60002 effected a "repeal of the grant appropriations in CAA 134(a)(1)-(3)" as well as a "rescission of the administrative appropriation in section 134(a)(4)." *Id.*

---

[21] *Q&A: Sen. Shelley Moore Capito, Incoming EPW Chair* (Nov. 20, 2024) https://www.capito.senate.gov/news/in-the-news/qanda-sen-shelley-moore-capito-incoming-epw-chair (last visited Oct. 9, 2025).

[22] *See* Lee Zeldin (@EPALeeZeldin), *supra* note 5.

71. EPA further stated:

As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible.

*Id.*

72. Finally, the agency insisted: "Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate." *Id.*

73. EPA did not explain how Section 60002 could have "repealed" or "rescinded" the "grant appropriations in CAA 134(a)(1)-(3)," *id.*—all of which were obligated by Section 134's September 30, 2024 deadline—when Section 60002 explicitly rescinds only "unobligated balances."

74. Moreover, "courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012). Congress did nothing of the sort in Section 60002. Yet EPA did not articulate how, despite the law's plainly prospective application, Section 60002 deprived the agency of "substantive legal authority" to administer already awarded grant funds.

75. Nor did EPA explain how Section 60002 evinced Congress's intent that the "SFA program is no longer to operate," Ex. D, when Section 60002 rescinds just 0.07%—that is, *seven hundredths of one percent*—of the monies Congress appropriated to implement Section 134.

76. Finally, EPA did not explain how its decision to eliminate Solar for All can be squared with Section 134 itself, which remained in effect from August 16, 2022 until July 4, 2025, and

pursuant to which EPA was required to establish the grant program and obligate the grant funds by September 30, 2024.

77. EPA's reading of Section 60002—its sole justification for shutting down the entirety of Solar for All and retracting all $7 billion of grant funds already obligated—is erroneous and pretextual.

78. In a letter sent to EPA following the agency's announcement of the Elimination Decision, 30 additional Senators protested EPA's "false claims that the OBBBA rescinded previously-obligated GGRF funding."[23]  "Lawmakers relied on CBO's 'score,' or the estimated cost or savings of each provision [of the OBBBA]," the Senators wrote, "to ensure the reconciliation bill met each Committee's savings or spending instructions as set by the Budget Committees." *Id.*  And CBO's $19 million estimate "d[id] not include a penny of the three grant programs." *Id.*

79. The day after EPA announced its Elimination Decision, Harris County was blocked from accessing the grant funds in its ASAP account, with the account status again showing as "Suspended," and nearly all of its grant funds wiped out.

80. On August 18, 2025, consistent with EPA's pledge to eliminate Solar for All, Harris County's SFA account status on the ASAP system changed from "Suspended" to "Liquidated."

IV.    **Harris County's Administrative Appeal.**

81. EPA's Notice of Termination set forth a dispute process pursuant to 2 C.F.R. § 1500.15 with a deadline of 30 days to submit a dispute to the agency's Disputes Decision Official ("DDO").

---

[23] Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. On Envtl. & Pub. Works, et al. to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), available at https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf (last visited Oct. 9, 2025).

82. Harris County timely submitted a dispute to the agency's DDO, challenging EPA's termination of its SFA award and decision to dismantle Solar for All.  *See* Ex. E.

83. The dispute-resolution process set out at 2 C.F.R. § 1500.15 does not establish a jurisdictional exhaustion requirement.  *See Darby v. Cisneros*, 509 U.S. 137, 153 (1993).

84. Even if it did so, exhaustion is not required where, as here, agency review is plainly futile. *See Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 157 (D.C. Cir. 2006).  EPA's DDO lacks authority to overturn or disregard the Elimination Decision.  The agency's justification for its Elimination Decision is that, pursuant to OBBBA, it lacks "substantive legal authority" to administer Solar for All.  Moreover, the agency's top official—Defendant Zeldin—has publicly endorsed the program's dismantling, calling Solar for All "a grift" and a "boondoggle," and insisting that "EPA no longer has the authority to administer the program."

85. Accordingly, without an order from this Court setting aside the Elimination Decision, Harris County's administrative dispute is futile.

## V.    Defendants' Actions Have Caused and Will Continue to Cause Irreparable Harm.

86. EPA's unlawful actions have caused irreparable harm to Harris County, jeopardizing the County's work to improve residents' financial stability, health, and safety; harming the County's reputation; creating operational havoc; and undermining the mission of the Texas Coalition to improve community health, safety, and resilience through increased access to and deployment of clean energy.

87. Owing to Defendant's actions, ongoing projects—in which significant personnel time has already been invested—are at risk of collapse and future projects are stalled.  Without Solar for All, Harris County cannot deliver critical infrastructure to reduce energy costs for thousands of low-income families, add power supply in the State to meet exploding demand, or increase electrical-grid resilience to maintain power during extreme weather events for, among others,

medically vulnerable individuals. Harris County thus faces an impossible choice: compromise public safety and backtrack on its promise to lower energy costs for low-income households, or divert funds away from other critical public programs. In either scenario, Harris County residents will suffer irreparable injury to their safety, health, and well-being.

88. Harris County will also experience substantial reputational harm—both vis-à-vis its constituents and community partners (because the County may not be able to deliver on its promises) and with respect to investors and development partners (because the County may not be able to meet its SFA-related financial commitments). Defendants' purported termination of the program will likely force the County (and Coalition members) to breach existing agreements, hindering its ability to secure contracts and partnerships with key stakeholders, particularly on favorable terms.

89. By purporting to eliminate Solar for All, Defendants have also impaired Harris County's ability to recruit and maintain highly skilled employees and contractors who perform essential services. The salaries of at least one Harris County employee and many subgrantee employees are funded exclusively through the County's SFA award. Numerous subgrantee staff have already lost their jobs as a direct result of Defendants' actions, and more employees will likely be laid off in the weeks to come. These losses harm the Texas Coalition and further hinder its ability to lower energy costs and protect the health and safety of millions of Texans.

90. The harms borne by Harris County are illustrative of the devastating harm the Elimination Decision will cause nationwide. Solar for All was an integral part of this country's most ambitious effort to slow the climate crisis, promising millions of Americans access to affordable, clean solar energy; improved public health; American energy production and independence; resilience to grid failures in extreme weather; and hundreds of thousands of clean

energy jobs.  By seeking to dismantle Solar for All in its entirety, Defendants have scuttled awardees' efforts to serve their constituents and stripped millions of Americans of critically needed investments in their family's health, safety, and economic security.

**CAUSES OF ACTION**

**COUNT I – VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT
5 U.S.C. § 706(2)(A)-(C)**

91. Harris County repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

92. Defendants' Elimination Decision constitutes final agency action under the Administrative Procedure Act ("APA").

93. The APA authorizes this Court to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations"; or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A)-(C).

94. Defendants' Elimination Decision is contrary to the U.S. Constitution because, among other things, Article I of the Constitution vests Congress with all legislative and appropriations powers.  The President's role in the legislative process is limited by Article I to the power to veto proposed legislation.  Art. I, § 7, cl. 2-3.  The Constitution does not authorize or permit the President or executive agencies to unilaterally amend or cancel statutes or appropriations that Congress has duly enacted.  Instead, the Executive is charged to "take Care that the Laws be faithfully executed."  Art. II, § 3.  EPA's Elimination Decision violates these precepts and overrides the Constitution's separation of powers by seeking to cancel a congressionally mandated program and lawfully enacted appropriations that were obligated to Harris County before the IRA's September 30, 2024 statutory deadline.

95. Defendants' Elimination Decision exceeds statutory limitations and violates existing law because, among other things:

   a. The Elimination Decision violates Section 60002 of the OBBBA, Pub. L. No. 119-21, which applies prospectively and rescinds only "*unobligated* balances" as of the day before the law's enactment.  Section 60002 does not purport to touch the existing grant programs or displace already obligated funds.  To the contrary, Section 60002's terms make clear that the grant program and funds are to remain in place.

   b. EPA's Elimination Decision violates Section 134 of the Clean Air Act, 42 U.S.C. § 7434, which remained in effect from August 2022 to July 2025, and mandated that EPA establish the grant program and obligate the grant funds by September 30, 2024.  It provides zero authority for EPA to cancel the grant program.

   c. EPA's Elimination Decision violates federal appropriations law, which legally requires EPA to spend the funds appropriated for distribution under Section 134 of the Clean Air Act, 42 U.S.C. § 7434, because Section 60002 applies prospectively and EPA has not satisfied the stringent requirements for rescinding an appropriation under 2 U.S.C. § 683.

96. Defendants' Elimination Decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, among other things:

   a. EPA's stated justification for the Elimination Decision is unreasonable on its face. The agency's rationale patently misrepresents Section 60002 of the OBBBA and otherwise contradicts the law's plain terms.

    b.  EPA's stated justification for the Elimination Decision is pretextual—an excuse to kill Solar for All, which the Trump Administration has sought to do from its first day in office.

    c.  EPA has not otherwise provided an adequate or reasoned basis for its Elimination Decision.

97. Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706(2), Harris County is entitled to: a declaration that Defendants' Elimination Decision violates the APA; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

### COUNT II – VIOLATIONS OF THE U.S. CONSTITUTION
### (Appropriations Clause, Separation of Powers)

98. Harris County repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

99. Article I of the United States Constitution vests "all legislative powers" in Congress. U.S. Const. art. I, § 1.  Article I defines the President's role in the legislative process through the Presentment Clauses, which provide that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States," and that "before [a law] shall take Effect, [it] shall be approved by [the President], or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill." U.S. Const. art. I, § 7, cl. 2-3.  The President's role in the legislative process is thus confined to "a limited and qualified power to nullify proposed legislation by veto."  *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 947 (1983).

100.    Congress also has exclusive "power of the purse."  Article I's Spending Clause vests Congress with the exclusive power to expend Treasury funds for the "general Welfare of the

United States." U.S. Const. art. I, § 8, cl. 1. The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 7. The purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990).

101. The Executive Branch, including the EPA, has only those powers conferred on it by Article II of the Constitution and federal statutes. No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, and neither the President nor executive agencies may unilaterally amend or cancel appropriations Congress has duly enacted.

102. In purporting to eliminate Solar for All, Defendants seek to cancel $7 billion of the $27 billion Congress appropriated, and required to be obligated by September 30, 2024, to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 136 Stat. at 2067.

103. Neither Section 60002 of the OBBBA nor any other statute authorizes Defendants' Elimination Decision; such action instead directly contravenes Section 60002.

104. Defendants purport to cancel a program established and funded through lawfully enacted congressional appropriations, without any basis in constitutional or statutory authority. Defendants have disregarded Congress's legislative enactments and have exceeded the bounds of Executive authority conferred on that branch by the Constitution, in violation of the Constitution's structural separation of powers, including as manifested in the Appropriations Clause.

105. For these reasons, Harris County is entitled to: a declaration that Defendants' Elimination Decision violates the Constitution's Appropriation's Clause, Presentment Clauses,

and separation of powers; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

## COUNT III – ACTIONS IN EXCESS OF STATUTORY AUTHORITY OR CONTRARY TO CONSTITUTION

106.    Plaintiff repeats and incorporates by reference each and every allegation in the preceding paragraphs as if set forth fully herein.

107.    Federal courts possess the power in equity to grant injunctive relief with respect to violations of federal law by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

108.    Defendants' Elimination Decision is *ultra vires* because no act of Congress authorizes that action, and it violates the Constitution of the United States

109.    Pursuant to 28 U.S.C. §§ 2201, 2202, Harris County is entitled to: a declaration that Defendants' Elimination Decision is *ultra vires* and invalid; vacatur of the Elimination Decision; and an injunction barring EPA from implementing the unlawful Elimination Decision.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Harris County, Texas, respectfully requests that this Court grant the following relief:

i.      Declare that Defendants' Elimination Decision violates the Administrative Procedure Act, federal statutes (Section 60002 of the OBBA and Section 134 of the Clean Air Act, 42 U.S.C. § 7434), and the U.S. Constitution;

ii.     Vacate and set aside Defendants' unlawful Elimination Decision;

iii.    Enjoin Defendants from implementing the unlawful Elimination Decision (i.e., from shutting down Solar for All on the erroneous and pretextual grounds given

and from deobligating, expending, or otherwise placing beyond this Court's jurisdiction any funds appropriated by Congress for Solar for All);

iv.      Award Harris County reasonable fees, costs, and expenses, including attorney fees; and

v.      Grant any such other relief that the Court deems just and proper.

Dated: October 13, 2025

Respectfully submitted,

*/s/ Beth C. Neitzel*

Noah C. Shaw (*pro hac vice* forthcoming)
FOLEY HOAG LLP
1301 Ave. of the Americas
25th Floor
New York, NY 10019
Tel. (212) 812-0400
ncshaw@foleyhoag.com

Beth C. Neitzel (103611)
Emily J. Nash (MA0031)
Kevin Y. Chen (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Boulevard
Suite 1600
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com
enash@foleyhoag.com
kchen@foleyhoag.com

**CHRISTIAN D. MENEFEE**
HARRIS COUNTY ATTORNEY

*/s/ Neal A. Sarkar*

**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**NEAL A. SARKAR**
Special Assistant County Attorney
Texas State Bar No. 24093106
D.D.C. Bar ID: TX0088
neal.sarkar@harriscountytx.gov

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

*Counsel for Harris County, Texas*

# EXHIBIT A

**FEDERAL AGENCY AND OFFICE:** U.S Environmental Protection Agency, Office of the Greenhouse Gas Reduction Fund

**FUNDING OPPORTUNITY TITLE:** Solar for All

**ANNOUNCEMENT TYPE:** Request for Applications (RFA)

**FUNDING OPPORTUNITY NUMBER:** EPA-R-HQ-SFA-23-01

**ASSISTANCE LISTING NUMBER:** 66.959

**IMPORTANT DATES:**

| | |
|---|---|
| October 12, 2023 | **Closing Date** |
| March 2024 | **Anticipated** Notification of Selections |
| July 2024 | **Anticipated** Awards |

**Deadline:** Application packages must be submitted on or before October 12, 2023 at 11:59 PM (Eastern Time) through Grants.gov. Please refer to *Section IV.A: Due Date and Submission Instructions* and *Appendix A: Grants.gov Application Submission Instructions* for further instructions.

Applicants are required to submit a **Notice of Intent (NOI)** to be eligible to participate in the Solar for All competition. The deadline for the NOI is July 31, 2023 at 11:59 PM (Eastern Time) for states, the District of Columbia and Puerto Rico; August 14, 2023 at 11:59 PM (Eastern Time) for territories (specifically, The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), municipalities, and eligible nonprofit recipients; and August 28, 2023 at 11:59 PM (Eastern Time) for Tribal governments and Intertribal Consortia. Refer to *Section I.F: Required Notice of Intent* and *Section III. Eligibility Information* for additional information NOI requirements and about applicant eligibility.

**NOTE:** A grantee who transfers funds awarded through this competition must comply with the Procurement Standards in 2 CFR Parts 200 and 1500, EPA's Subaward Policy, and EPA's Guidance on Participant Support Costs, as applicable, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR Part 33. Before naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in *Section III.B: Named Contractors and Named Subrecipients*. In accordance with 2 CFR § 200.320(c)(2) and (4), the Agency does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. However, as provided in 2 CFR § 200.317 *States* as defined in 2 CFR § 200.1 follow the same competitive policies and procedures they use for procurements with non-Federal funds, so EPA defers to state determinations on sole source contracting.

1

# Contents

**Section I. Funding Opportunity Description** ....................................................................... **4**
   A.   Background ................................................................................................. 4
   B.   Statutory Authority and Assistance Listing .............................................. 6
   C.   GGRF Solar for All Program Objectives .................................................. 6
   D.   Competition Terminology .......................................................................... 7
   E.   Scope of Work ......................................................................................... 13
   F.   Required Notice of Intent ........................................................................ 18
   G.   Environmental Results and Strategic Plan Information ........................... 20
   H.   Measuring and Reporting Environmental Results: Example Outputs, Outcomes, and
       Performance Measures ............................................................................ 21
   I.   Additional Provisions for Applicants Incorporated into the Funding Opportunity ....... 23

**Section II. Federal Award Information** ................................................................................ **24**
   A.   Number and Amount of Awards .............................................................. 24
   B.   Period of Performance ............................................................................ 27
   C.   Partial Funding ....................................................................................... 27
   D.   Additional Awards ................................................................................... 27
   E.   Funding Type .......................................................................................... 28

**Section III. Eligibility Information** ...................................................................................... **29**
   A.   Eligible Applicants .................................................................................. 29
   B.   Named Contractors and Named Subrecipients ...................................... 31
   C.   Threshold Eligibility Criteria ................................................................... 32
   D.   Allowable and Unallowable Costs ........................................................... 36
   E.   Cost Sharing or Matching ....................................................................... 38

**Section IV. Application and Submission Information** ...................................................... **39**
   A.   Due Date and Submission Instructions ................................................... 39
   B.   Application Materials ............................................................................... 40
   C.   Content of Application Submission ......................................................... 42
   D.   Pre-Application Assistance ..................................................................... 50

**Section V. Application Review Information** ...................................................................... **51**
   A.   Evaluation Criteria .................................................................................. 51
   B.   Review and Selection Process ................................................................ 62

**Section VI. Award Administration Information** ................................................................ **64**
   A.   Award Notification .................................................................................. 64
   B.   Administrative and National Policy Requirements ................................... 64
   C.   Program Performance Reporting Requirements ..................................... 65
   D.   Administrative Reporting Requirements .................................................. 68
   E.   Remedies for Non-Compliance .............................................................. 69

**Section VII. Contact Information** ...................................................................................... **70**

**Appendix A. Grants.gov Application Submission Instructions** ...................................... **71**
   A.   Requirement to Submit through Grants.gov and Limited Exception Procedures .......... 71
   B.   Submission Instructions .......................................................................... 71
   C.   Technical Issues with Submission ........................................................... 73

**Appendix B. Program Budget**................................................................................ **74**

    A.      Guidance for Detailed Budget Table ................................................. 74

**Appendix C. Household Savings Guidance** .......................................... **79**

**Appendix D. Consumer Protection Examples** .................................... **80**

**Appendix E. Equitable Workforce Development and Job Quality** ...................... **81**

**Appendix F. Guidance for Carbon Dioxide Avoided Calculations** ........................ **83**

# Section I. Funding Opportunity Description

## A. Background

Residential distributed solar generation and energy storage, including rooftop residential and residential-serving community photovoltaic (PV) solar and storage, reduces energy costs for American households, abates pollution from power generation, generates wealth and jobs for local communities, improves public health, and provides resilient and secure power.

Yet, to date low-income and disadvantaged households have been left behind in the rapid deployment of residential distributed solar generation, despite the benefits that this technology can provide to these communities. According to data from the U.S. Department of Energy's (DOE's) Low-Income Energy Affordability Tool, the national average energy burden for low-income households is 8.6%, three times higher than the energy burden for non-low-income households, and, in some cases, can be as high as 30%.[1] Despite this significant opportunity for lower-cost electricity generation and the falling cost of solar PV systems in recent years, low-income households have not benefitted from solar equally. DOE's Solar Futures Study found that only 31% of residential solar adopters are households that earned less than the area median income (AMI).[2] There are numerous barriers to low-income and disadvantaged communities adopting residential distributed solar energy. The barriers are financial as well as non-financial such as community engagement, site suitability, and policy and regulatory.[3] Investing in solar energy and project-deployment services to enable residential distributed solar projects for low-income and disadvantaged households will expand access to the benefits of clean energy—benefits that include household savings, energy resilience, improved air quality, wealth building, and quality jobs.

Solar energy investments in and benefitting low-income and disadvantaged communities support the climate and equity goals of the United States. Achieving the Biden-Harris Administration's goal of a 100% clean-electricity grid by 2035 requires a cumulative solar deployment of 760 to 1,000 gigawatts (GW$_{dc}$), serving 37% to 42% of electricity demand.[4] Distributed generation is expected to satisfy at least 20% of this deployment.[5] Solar deployment is also critical for achieving the 2030 and 2050 climate goals outlined in the U.S. Nationally Determined Contribution by enabling the zero-emissions transition in other sectors including buildings and transportation.[6]

Similarly, solar generation in and benefitting low-income and disadvantaged communities advances the Biden-Harris Administration's equity and environmental justice priorities as detailed in Executive Order 14091 (*Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*) and the President's Justice40 Initiative, established in Executive Order 14008 (*Tackling the Climate Crisis at Home and Abroad*), which sets the goal that 40% of the overall benefits from certain investments flow to disadvantaged

---

[1] U.S. Department of Energy, "Low-Income Community Energy Solutions", accessed May 2023; Energy burden is defined as the percentage of gross household income spent on energy costs.
[2] U.S. Department of Energy, "Solar Futures Study", September 2021
[3] National Renewable Energy Laboratory (NREL), "Affordable and Accessible Solar for All: Barriers, Solutions, and On-Site Adoption Potential", September 2021
[4] U.S. Department of Energy, "Solar Futures Study", September 2021
[5] U.S. Department of Energy, "Solar Futures Study", September 2021
[6] The United States has set bold climate targets to reduce greenhouse gas emissions 50-52% below 2005 levels in 2030 and net-zero emissions no later than 2050.

communities. Residential rooftop and residential-serving community solar generation create meaningful benefits for overburdened households and communities. These benefits include household savings, equitable access to clean energy, power resiliency, asset wealth building, investment in local businesses, and quality jobs in alignment with the Department of Labor's Good Jobs Initiative. Traditional energy communities, a priority focus of the President's Interagency Working Group on Coal and Power Plant Communities, are in a prime position to benefit from solar deployment.

President Biden's Inflation Reduction Act authorized the U.S. Environmental Protection Agency (EPA) to implement the Greenhouse Gas Reduction Fund (GGRF), a historic $27 billion investment to combat the climate crisis by mobilizing financing and private capital for greenhouse gas- and air pollution-reducing projects in communities across the country. As part of this program, EPA is launching a $7 billion Solar for All competition — designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities. Solar for All will tackle the financial and non-financial barriers that limit the ability of low-income and disadvantaged communities across the country to benefit from the rapid growth in distributed solar capacity, thus advancing the Biden-Harris Administration's climate and environmental justice goals.

To support a broader suite of greenhouse gas-reducing projects, EPA is also launching a $14 billion National Clean Investment Fund competition to finance clean technology deployment nationally as well as a $6 billion Clean Communities Investment Accelerator competition to finance clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities. These three grant competitions are complementary programs and will work together to transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities. All competitions are covered under the President's Justice40 Initiative, which sets the goal that 40% of the overall benefits from certain federal investments in climate, clean energy, and other areas flow to disadvantaged communities. Per Section 134(a)(1) of the Clean Air Act, 100% of Solar for All funds must be deployed "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies".

**This Notice of Funding Opportunity (NOFO) is for the $7 billion Solar for All competition.**
This competition will award up to 60 grants to states, territories, Tribal governments, municipalities, and eligible nonprofit recipients to expand the number of low-income and disadvantaged communities primed for distributed solar investment—enabling millions of low-income households to access affordable, resilient, and clean solar energy. Grantees will use funds to expand existing low-income solar programs or design and deploy new Solar for All programs nationwide.[7] EPA will not fund individual projects under this competition.

EPA's $7 billion Solar for All competition will help deliver on the climate and environmental justice goals of the United States. To achieve these goals, Solar for All grantees will provide subsidies and other financial assistance to residential rooftop and residential-serving community

---

[7] The Clean Air Act defines "state" to mean a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

solar projects in and benefiting low-income and disadvantaged communities in addition to project-deployment technical assistance such as workforce development, community outreach, and other project-deployment support (e.g., interconnection technical assistance, siting and permitting support) to help overcome barriers to solar deployment.

## B. Statutory Authority and Assistance Listing

The Inflation Reduction Act amended the Clean Air Act to include Section 134 (42 U.S.C. § 7434), which authorizes the EPA to make competitive grants under the Solar for All competition with appropriations funded by Section 134(a)(1), called Zero Emissions Technologies. The law appropriates $7 billion to EPA to make competitive grants to states, Tribal governments, municipalities, and eligible recipients, as defined in the statute, to provide subgrants, loans, or other forms of financial assistance as well as technical assistance to enable low-income and disadvantaged communities to deploy and benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities.

Section 134(c)(4) defines zero-emission technology as any technology that produces zero emissions of air pollutants listed under Section 108(a) (i.e., particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead), or any precursor to such an air pollutant, or greenhouse gases, defined under Section 134(c)(2) as carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

## C. GGRF Solar for All Program Objectives

Solar for All will advance the three overarching GGRF program objectives:

1.  **Program Objective 1: Reduce emissions of greenhouse gases and other air pollutants.** GGRF program grantees will support projects, activities, and technologies that reduce emissions of greenhouse gases and other air pollutants that harm communities and contribute to climate change. As part of the GGRF program, the Solar for All program grantees will deploy and enable deployment of residential-serving solar, storage, and enabling upgrades across the country, directly supporting the climate goal of the United States to achieve a carbon pollution-free electricity sector by 2035.

2.  **Program Objective 2: Deliver benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities.** GGRF program grantees will invest in projects that directly benefit American communities. All Solar for All funds will enable low-income and disadvantaged communities to deploy and benefit from distributed solar. EPA expects Solar for All grantees will deliver meaningful benefits, such as household savings, quality jobs, and community ownership to American communities and households. EPA expects Solar for All grantees to maximize the breadth and diversity of households served in the program, including rural, urban, and suburban communities; energy communities; and persistent poverty counties, while

6

prioritizing investing in the most disadvantaged and low-income households in the communities the program is designed to serve.[8]

3. **Program Objective 3: Mobilize financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects.** GGRF program grantees will facilitate market transformation by addressing the barriers to mobilizing private capital into clean technology projects in undercapitalized markets. Grantees will catalyze additional investment in underinvested project types critical to achieving our climate goals and in underinvested communities that have long faced barriers to accessing capital. Solar for All grantees will stimulate additional deployment of solar by strengthening the overall market for residential-serving solar by not only providing access to low-cost capital but also providing project-deployment services, such as community outreach and workforce development. Solar for All will catalyze the deployment of residential distributed solar by developing favorable market environments for low-income and disadvantaged communities to deploy and benefit from solar across the country.

Grantees must align their programs with these three objectives, including setting targets as described in *Section IV.C: Content of Application Submission*.

## D. Competition Terminology

This section defines competition terminology referenced throughout this funding opportunity. Some of this terminology includes important requirements of the grant award that should be carefully considered in preparing the application.

**Capital Mobilization:** For this competition, capital mobilization refers to additional capital contributions made toward qualified projects as a result of the grant's activities. Applicants may define methodologies to set goals and targets for capital mobilization for the purposes of their applications. An example methodology is provided below; applicants that do not use this methodology will not be penalized.

Capital mobilization is defined as the total capital contributions toward projects that are financed by the grantee, excluding grant funds; under this definition, capital mobilization for a particular project may be calculated as total capital contributions toward the project, less grant funds committed to the project by the grantee. Total capital contributions may include financing provided by the grantee with funds raised from private capital providers (including through balance-sheet leverage and securitizations), additional sources of financing provided to project sponsors from private capital providers, equity contributions from project sponsors, and sources of public capital including tax increment financing and other tax incentives. Private capital mobilization is defined as a subset of capital mobilization, excluding capital contributions from public entities, including federal, state, and local government entities (such as tax credits and other financial incentives) other than grant funds provided under this competition.

---

[8] Energy communities are coal mining and power plant communities, including but not limited to the 25 energy communities identified by the Interagency Working Group on Coal & Power Plant Communities & Economic Revitalization.

For this competition, the capital mobilization ratio is defined as the grantee's capital mobilization (as defined above), divided by the grantee's capital commitments through financial assistance (i.e., total financial contributions to the project). The private capital mobilization ratio is defined as the grantee's private capital mobilization (as defined above), divided by the grantee's capital commitments through financial assistance. These ratios exclude the grantee's expenditures for project-deployment technical assistance and program administration activities.

**Coalition Application:** A coalition application is one of the two types of eligible applications under this competition. A coalition application is composed of one lead applicant, which partners with one or more non-lead coalition member(s) that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected. The lead applicant must be an eligible applicant and submit the application on behalf of the coalition. The non-lead coalition member(s) may be eligible applicants as defined in Section 134(c)(1) as well as other types of nonprofits, governmental entities, and Institutions of Higher Education[9] that are entities eligible for subawards under the EPA Subaward Policy.[10] **An application submitted by a coalition should describe the overall coalition's program plan, including the role of each coalition member in the Program Narrative**.

If selected, the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CRF Part 200, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members). Additionally, if selected, as provided in 2 CFR § 200.332, non-lead coalition members will become subrecipients accountable to the lead applicant for proper use of EPA funding. Applicants do not need to identify all subgrantees at the time of application (only coalition members must be named), yet applicants should identify in the budget narrative and the Budget Table the intent to award subawards even if the subgrantee is not identified. **Note that pursuant to 2 CFR § 200.332(a)(2), as implemented in Items 2 and 4 of EPA's *Establishing and Managing Subawards* General Term and Conditions, successful lead applicants of coalitions must ensure that the terms and conditions of the grant agreement "flow down" to any coalition members as well as other eligible subrecipients that are provided subawards.**

**Eligible Zero-Emissions Technology:** Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. EPA is implementing this statutory language by identifying the four technology categories that exclusively qualify for financial and technical assistance from Section 134(a)(1). These technology categories are defined below. Note: "distributed solar" is used to refer to residential rooftop and residential-serving community solar throughout this NOFO.

---

[9] See definition of *Institution of Higher Education* at 2 CFR § 200.1. Proprietary colleges and universities and similar for-profit providers of educational services are not eligible for subawards under this program.

[10] For profit firms and individual consultants may not be coalition members.

- **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that support individual households in existing and new single-family homes, manufactured homes, and multifamily buildings. The definition of residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits individual households either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

- **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 MW nameplate capacity, that delivers at least 50% of the power generated from the system to multiple residential customers within the same utility territory as the facility. There are a variety of community solar ownership models that can be considered, including community-owned solar, third-party-owned community solar, and utility-owned community solar.

- **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing residential rooftop and residential-serving community solar deployment, delivering demand response needs, aggregating assets into virtual power plants, and delivering residential power during grid outages. Financial assistance for associated storage must be deployed in conjunction with financial assistance for a solar PV system and the storage asset must be connected to the solar PV system.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy and/or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades can include, but are not limited to, electrical system upgrades, structural building repairs and energy efficiency. Applicants may decide the exact types of enabling upgrades that are eligible for Solar for All financial assistance, yet all enabling upgrades should be energy and building infrastructure related and deployed in conjunction with financial assistance for an eligible solar PV system. **Financial assistance for enabling upgrades may comprise up to 20% of the total financial assistance deployed during the lifetime of the program.**

**Grant Fund Activities:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for financial assistance and technical assistance as well as program administration costs allowable under federal awards. These three cost activities are defined below.

- **Financial Assistance:** Financial assistance is defined as subgrants, rebates, subsidies, other incentive payments, debt (including loans, partially forgivable loans, forgivable loans, soft loans, subordinate debt), and other financial products consistent with the definition of *Federal financial assistance* in 2 CFR § 200.1 and *Participant support costs* in 2 CFR § 1500.1.[11] Solar for All financial assistance is intended to enable low-income and disadvantaged communities to deploy and benefit from solar, storage, and enabling upgrades, while ensuring all projects

---

[11] An applicant may propose a financial assistance strategy which generates program income (as defined at 2 CFR § 200.1 and includes, but is not limited to, repayments of the principal on loans, interest on loans, loan origination fees and may include other income from investments of GGRF grant funds). EPA specific rules on program income are provided at 2 CFR § 1500.8. EPA will negotiate terms and conditions governing program income with a successful applicant who will use EPA funding to capitalize revolving loan funds.

deliver household savings, among other benefits. Most applicants should use **at least 75% of program funds on financial assistance** and should maximize solar deployment funded by this program. **EPA will evaluate proposals more favorably if the applicant proposes to use 75% of program funds or more on financial assistance. Please see *Section I.E: Scope of Work* for additional guidance and details on applicability.**[12]

- **Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "project-deployment technical assistance" and is services and tools provided by grantees to communities and energy stakeholders to overcome non-financial barriers to solar deployment. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support (including procurement of services and tools from National Labs), and coordination with utilities for the purposes of project deployment.

- **Program Administration Activities:** Consistent with 2 CFR § 200.403, expenditures such as program administration costs are allowable under federal awards provided they are necessary and reasonable for the performance of the award—in this program, for the provision of financial assistance and project-deployment technical assistance. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries. Program administration costs include procuring services and tools that support the grantee in program design (e.g., technical assistance from the DOE National Laboratories to support the grantee directly for program design).[13]

**Low-Income and Disadvantaged Communities:** Section 134(a)(1) of the Clean Air Act appropriates $7 billion for the purposes of providing financial and technical assistance to enable "low-income and disadvantaged communities" to deploy and benefit from residential distributed solar. GGRF defines low-income and disadvantaged communities as encompassing the following four categories, as defined below: (a) communities identified as disadvantaged by the CEJST mapping tool; (b) a limited number of additional communities identified as disadvantaged by the EJScreen mapping tool; (c) geographically dispersed low-income households; and (d) properties providing affordable housing.

a. **CEJST-Identified Disadvantaged Communities:** The Climate and Economic Justice Screening Tool (CEJST) is a publicly-available mapping tool developed by the White House

---

[12] Further in this document, EPA explains how Solar for All has three different award options for applicants. Applicants will determine their relevant award option based on the type of communities the applicants are designing a program to serve. Most applicants should use at least 75% of program funds for financial assistance; applicants applying to serve Indian and Alaska Native communities should use at least 65% of program funds for financial assistance. Thus, programs serving Indian and Alaska Native communities may use up to 35% of program funds for project-deployment technical assistance and program administration.

[13] As provided in section 7.0(a) of EPA's Subaward Policy, Federally Funded Research and Development Centers are eligible subrecipients provided the substance of the transaction is consistent with the guidance at 2 CFR § 200.331 and Appendix A: Distinctions Between Subrecipients and Contractors.

10

Council on Environmental Quality. GGRF's definition of "disadvantaged communities" includes all communities identified as disadvantaged through the CEJST.

b. **EJScreen-Identified Disadvantaged Communities:** EJScreen is a publicly-available, place-based environmental justice screening and mapping tool developed by the EPA. GGRF's definition of "disadvantaged communities" includes (1) the limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes[14] when compared to the nation or state or (2) geographic areas within Tribal lands as included in EJScreen.

c. **Geographically Dispersed Low-Income Households:** GGRF's definition of "geographically dispersed low-income households" includes low-income individuals and households that fall within either of the two categories listed below.

- Individuals and households with incomes at or below the greater of:

  o *For Metropolitan Areas:* (1) 80% Area Median Income (AMI) and (2) 200% of the Federal Poverty Level

  o *For Non-Metropolitan Areas:* (1) 80% AMI; (2) 80% Statewide Non-Metropolitan Area AMI; and (3) 200% of the Federal Poverty Level

- Individuals and households currently approved for assistance from or participation in at least one of the following income-based or income-verified federal assistance programs, with an award letter within the last 12 months: (1) U.S. Department of Health and Human Services' (HHS) Low Income Home Energy Assistance Program; (2) U.S. Department of Agriculture's (USDA) Supplemental Nutrition Assistance Program; (3) U.S. Department of Energy's (DOE) Weatherization Assistance Program; (4) Federal Communications Commission's Lifeline Support for Affordable Communications; (5) USDA's National School Lunch Program; (6) U.S. Social Security Administration's Supplemental Security Income; or (7) any other verified government or non-profit program serving Asset Limited, Income Constrained, Employed (ALICE) individuals or households designated by the EPA Administrator

d. **Properties Providing Affordable Housing:** GGRF's definition of "properties providing affordable housing" includes properties serving low-income individuals and households defined as properties that fall within either of the two categories listed below.

- Multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following federal or state housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by the U.S. Department of Housing and Urban Development (HUD), including Public Housing, Section 8 Project-Based Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on the

---

[14] The EJ Supplemental Indexes cover 12 environmental indicators: Particulate Matter 2.5, Ozone, Diesel Particulate Matter, Air Toxics Cancer Risk, Air Toxics Respiratory Hazard Index, Traffic Proximity, Lead Paint, RMP Facility Proximity, Hazardous Waste Proximity, Superfund Proximity, Underground Storage Tanks, and Wastewater Discharge. Within EJScreen, the EJ Supplemental Indexes can be found on the "Maps" tab by clicking the "Threshold Map."

goal of ending homelessness funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally-designated housing entity, as defined in Section 4(21) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 U.S.C. § 4103(22); or (5) any other housing assistance program designated by the EPA Administrator

- Naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units[15]

**Meaningful Benefits of Residential Rooftop and Residential-Serving Community Solar:** Consistent with Section 134(a)(1), this program must "enable low-income and disadvantaged communities to deploy or benefit" from solar. This program defines "benefit" as the five meaningful benefits of residential rooftop and residential-serving community solar defined below. EPA will evaluate applications on their vision and ability to maximize the following benefits received by low-income and disadvantaged communities.

1. **Household Savings:** Delivering a minimum of 20% household savings to all households served under the program, including households in multi-family, master-metered buildings; 20% household savings is defined as 20% of the average household electricity bill in the utility territory. Household savings can be delivered as a direct financial benefit or, for households without an individual utility bill, a direct non-financial benefit equivalent in value to the program's household savings target in the utility territory. Additional detail on how to calculate household savings is included in *Appendix C: Household Savings Guidance*. Applicants may propose preliminary estimates in the financial assistance model for household savings and explain how they plan on refining those estimates during the first year of the program if more analysis is needed. EPA expects to work with grantees to refine estimates for household savings

2. **Equitable Access to Solar:** Ensuring the program increases access to residential distributed solar generation in low-income and disadvantaged communities through financing products and project-deployment technical assistance, maximizing the breadth and diversity of the households that can benefit from solar

3. **Resilience Benefits:** Increasing the resilience of the power grid by creating capacity that can deliver power to low-income and disadvantaged households and/or to critical facilities serving low-income and disadvantaged households during a grid outage

4. **Community Ownership:** Facilitating ownership models that allow for low-income households and disadvantaged communities to access the additional economic benefits of asset ownership

5. **Workforce Development and Entrepreneurship:** Investing in high-quality jobs and businesses in low-income and disadvantaged communities by supporting prevailing wages, investing in effective workforce training programs for underserved populations (e.g., pre-

---

[15] Applicants will be evaluated on their strategies to ensure the long-term housing affordability for properties that receive Solar for All financial assistance.

apprenticeship and registered apprenticeship programs), and prioritizing equitable economic opportunities for women and minority-owned businesses and contractors

**Program Income:** Consistent with 2 CFR § 200.1, program income means gross income earned by the grantee that is directly generated by a supported activity or earned as a result of the grant award. For this competition, program income includes but is not limited to origination fees, interest payments, income from principal and interest payments on loans made with federal award funds (e.g., repayments from revolving loan funds), interest from short-term securities (e.g., cash deposits of program income), asset sales, and other sources of program income (e.g., proceeds from bonds issued by governmental entities that were financed with EPA grant funds). EPA-specific rules on program income are provided at 2 CFR § 1500.8.

## E. Scope of Work

The Solar for All competition will fund applicants applying to expand existing or develop new Solar for All programs. A Solar for All program is a program that ensures low-income households have access to residential rooftop and residential-serving community solar energy, often through providing financial support and other incentives. These programs ensure low-income households receive the benefits of residential distributed solar by providing customers household savings, community ownership, energy resilience, and other meaningful benefits. Solar programs can extend beyond solar generating capacity to include associated storage and enabling upgrades that allow for the deployment of solar energy in low-income and disadvantaged communities. Programs may also include solar project-deployment technical assistance such as workforce training programs that enable underserved communities to participate in the economic opportunity created by the energy transition. All financial and technical assistance funded through GGRF's Solar for All competition must enable low-income and disadvantaged communities to deploy and benefit from solar and storage. The Solar for All competition will fund multi-year programs that subsidize many projects while laying the groundwork to transform distributed residential solar generation markets in low-income and disadvantaged communities.

Existing low-income solar programs are considered existing Solar for All programs, which can be expanded with funding from this competition.[16] Applicants that operate existing Solar for All programs should detail in their application how they will expand their existing program. Examples of expansion strategies include, but are not limited to, increasing program caps or carveouts; reevaluating the current subsidy size; expanding eligibility; introducing new subsidies for storage of solar energy and enabling upgrades; increasing household savings for subscribers; expanding community ownership opportunities; funding workforce training programs; and introducing new project-deployment technical assistance.

---

[16] Grant funds from this competition statutorily must enable low-income and disadvantaged communities (as defined in *Section I.D: Competition Terminology*) to deploy or benefit from distributed solar. GGRF Solar for All program funds can augment existing programs so long as the funds are deployed to enable low-income and disadvantaged communities as defined in this document. This requirement may not be entirely congruent with an existing Solar for All program's definitions, and grantees will need to ensure that GGRF funds are deployed according to the statutory requirements.

Both new and existing programs funded by this competition should align with the scope and vision of the GGRF Solar for All program. This vision includes delivering meaningful benefits, as described in *Section I.D: Competition Terminology*, and achieving the program objectives defined in *Section I.C: GGRF Solar for All Program Objectives*. Solar for All programs funded in this competition will provide financial and technical assistance to enable low-income and disadvantaged communities to deploy and benefit from solar and storage projects over a five-year period of performance. EPA expects all funds to be deployed within the five-year period of performance. Applicants may elect to include a program planning period in their application that should not exceed one year. This planning period can give the grantee time to refine program plans after receiving an award from EPA and before beginning to deploy financial and technical assistance. Using time and grant funds for program planning should help applicants create a strong foundation for a low-income solar program that is sustainable and long-lasting and fundamentally reshapes local solar markets to better serve low-income and disadvantaged communities.

EPA intends to make up to 60 awards under this competition with three award options for applicants. The approximate guidance on number of awards in each bucket are estimated maximums for each award option. EPA intends to limit the total number of awards across all three award options to 60 awards.

    (1) Up to 56 awards, one to serve each of the 56 states/territories eligible for this competition[17]

    (2) Up to 5 awards to serve American Indian and Alaska Native Communities

    (3) Up to 10 awards to serve similar communities across multiple states

The table below explains the eligible applicants for each award option, the number of awards available, and a summary of the different scope of work for each award option.

---

[17] Under this competition, all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands are eligible to compete under the definition of a "State" in section 302(d) of the Clean Air Act.

| | | **Award Option #1** – State and Territory Programs | **Award Option #2** – American Indian and Alaska Native Programs | **Award Option #3** – Multi-state Programs |
|---|---|---|---|---|
| **Eligible applicants** including coalitions with a lead applicant that is an eligible applicant | States | ✓ Eligible | | |
| | Territories | ✓ Eligible | | |
| | Tribal governments | ✓ Eligible | ✓ Eligible | ✓ Eligible |
| | Municipalities (including councils of governments) | ✓ Eligible | | ✓ Eligible |
| | Eligible nonprofit recipients | ✓ Eligible | ✓ Eligible | ✓ Eligible |
| **Number of awards** | | Up to 56 | Up to 5 | Up to 10 |
| **Geographic scope of work** | | Develop Solar for All programs that **serve a specific state/territory or a portion of a state/territory** (e.g., a coalition of municipalities within a state/territory) | Develop Solar for All programs that **serve American Indian and Alaska Native Communities** | Develop Solar for All programs that **serve similar communities in multiple states** |

EPA reserves the right to modify this award allocation based on the quality of applications that are received and other program considerations. EPA aims to maximize national geographic coverage of the program across all three award options. Note that only activities that serve communities within the boundaries of the United States (including Puerto Rico) and its territories are eligible for funding under the Solar for All program.

All low-income and disadvantaged communities nationwide should be able to access the benefits of this program. Solar policies, economics, and market conditions vary significantly across states and territories. EPA has designed three award options to account for these varying contexts, while also leaving room for innovative programs to serve multiple markets and solve shared challenges. To apply to award option #1, an application must cover only <u>one</u> state or territory. If an applicant is interested in serving multiple states and/or territories and is not designing a program to serve similar communities in multiple states as described in award option #3, the applicant must submit an application for each state and/or territory that the applicant proposes to serve. In award option #1, applicants will be ranked against other applicants applying to serve the applicable state or territory. To apply to award option #2, an application must propose a program to serve American

15

Indian and Alaska Native Communities. To apply to award option #3, an applicant must submit a program that serves similar communities in multiple states that face similar barriers to distributed solar deployment. Additional detail on award option requirements can be found in *Section II.A: Number and Amount of Awards*.

EPA anticipates issuing awards of varying amounts. Applicants for all three award options can apply for a small-sized program ($25 - $100 million), a medium-sized program ($100 - $250 million), or a large-sized program ($250 - $400 million). Applicants must follow the guidance in *Section II.A: Number and Amount of Awards,* which describes the program size(s) an applicant is eligible for by reference to the total population of the census tracts identified as disadvantaged by CEJST in the geography the program is applying to serve. The below table summarizes these requirements. Please refer to *Section II.A: Number and Amount of Awards* for additional details on how to determine what size program for which applicants may apply.

|  | Small Programs | Medium Programs | Large Programs |
|---|---|---|---|
| Award range | $25 million and up to $100 million | Greater than $100 million and up to $250 million | Greater than $250 million and up to $400 million |
| Total population of disadvantaged census tracts identified by CEJST in the geography the program will cover | Fewer than 1 million people | Between 1 million people and 5 million people, inclusive | Greater than 5 million people |
| Number of awards EPA anticipates making | Up to 35 | Up to 20 | Up to 5 |

EPA reserves the right to modify the award allocation based on the quality of applications that are received and other program considerations. EPA encourages applicants to maximize households served with the funds requested in their application.

EPA expects applicants to maximize financial assistance to projects. Applicants to award option #1 and award option #3 should aim to use at least 75% of the award for financial assistance to solar projects. Applicants to award option #2 – American Indian and Alaska Native programs should aim to use at least 65% of funds for financial assistance to solar projects. These targets for financial assistance to solar projects includes financial assistance for associated storage and enabling upgrades in conjunction with a solar project supported under this program. The remaining funds may be used for project-development technical assistance and program administration.

16

Since American Indian and Alaska Native Communities face additional challenges in deploying solar, EPA intends to provide additional flexibility in their use of funds for project-deployment technical assistance. For applicants to award option #2 – American Indian and Alaska Native Programs, applicants may use up to 35% of award funds for project-development technical assistance and program administration. Consequently, these applicants should ensure that at least 65% of the program budget is allocated for financial assistance to solar projects.

The table below summarizes the guidance on share of funds that can be used for financial assistance.

|  | **Award Option #1** – State and Territory Programs | **Award Option #2** – American Indian and Alaska Native Programs | **Award Option #3** – Multi-state Programs |
|---|---|---|---|
| **Financial Assistance**, share of funds | Target at least **75%** of funds | Target at least **65%** of funds | Target at least **75%** of funds |

As defined in *Section I.D: Competition Terminology*, eligible financial assistance includes subsidies, grants, rebates, forgivable loans, and recyclable financial products such as loans (including soft loans and subordinate loans). Applicants should detail how they expect to deliver this financial assistance to projects in their application. Some examples of how existing low-income solar programs offer financial assistance include developer subsidies for customer acquisition and installation, subsidies on subscription prices for residential-serving community solar, and supplemental credits on energy bills for new solar deployment.

All financial assistance must enable low-income and disadvantaged communities to deploy and benefit from residential-rooftop and residential-serving community solar capacity, associated storage, and enabling upgrades.

Strategies to integrate financial assistance for storage and enabling upgrades should be designed to maximize solar deployment to the greatest extent possible. EPA encourages that financial assistance for storage be designed to maximize energy resilience for households. In addition, EPA recommends that applicants adopt a flexible definition of enabling upgrades to address the various infrastructure barriers inhibiting solar deployment for low-income and disadvantaged communities. Financial assistance for enabling upgrades should be no more than 20% of the total program financial assistance in the lifetime of the program.

As defined in *Section I.D: Competition Terminology*, eligible project-deployment technical assistance includes community engagement strategies, including education, outreach, and dissemination of information to the public; customer acquisition support; management and verification requirements; cross-program coordination specific to project deployment (e.g., engaging with DOE's WAP); workforce training; and other wrap-around program support

17

elements. Applicants should detail in their application the market barriers in the geography they are applying to serve and how they will use project-deployment technical assistance to address those barriers.

To achieve the statutorily defined role of this program "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies," EPA expects applicants to consider how market structures and regulatory policies in the applicable service area may impact the deployment of solar and storage in low-income and disadvantaged communities. These market structures and policies include net metering, third-party ownership, and renewable portfolio standards, among others. Applicants will be evaluated on their strategies and plans to overcome any relevant structural barriers to maximize the number of households served, including by catalyzing additional solar deployment beyond projects directly funded by Solar for All financial assistance. Strong applicants will have plans to collaborate with relevant market stakeholders such as utilities, public utility commissions, and other jurisdictional entities to address these barriers.

Market transformation is needed to overcome current deployment inequalities—and realization of the associated benefits—in the distributed solar and storage generation market. Solar for All applicants should consider how their proposed program will catalyze public sector and private sector participation in their program design—through financial and technical assistance.

Lastly, Solar for All grantees can also use awards for program administrative activities—such as program personnel, technology, and procuring services and tools that support program design. Additional information on administrative costs is in *Section III.D: Allowable and Unallowable Costs*.

## F. Required Notice of Intent

Applicants are required to submit a Notice of Intent (NOI) to be eligible to apply to the Solar for All competition. An NOI is required for every application you anticipate submitting. You must answer all questions listed in this section to complete the NOI. A list of the organizations that submit NOIs will be made public on epa.gov/GGRF and updated frequently during the NOI open period. EPA will <u>not</u> publicly share which award option the applicant is applying for nor information on the estimated EPA funding requested. NOIs must be submitted by email to GGRF@epa.gov according to the following deadlines and requirements. **In your email, please include one document as an attachment that has both a letter signed by an authorized official based on the instructions and the answers to questions #1 through #3 below.**

- **States, the District of Columbia, and Puerto Rico:** July 31, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials.
  - An official within the relevant governor's (or District of Columbia mayor's) office, or
  - The director of the agency that will respond to the Solar for All competition

18

- **Territories (specifically, The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), Municipalities, and Eligible Nonprofit Recipients:** August 14, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials, depending on the applicant type.
  - **Territories:**
    - An official within the relevant governor's office, or
    - The director of the agency that will respond to the Solar for All competition
  - **Municipalities:**
    - The office of the chief executive (e.g., mayor, county manager)
    - The director of a designated municipal agency in the municipality
    - The executive director or equivalent senior management level official of a council of governments
  - **Eligible Nonprofit Recipients:**
    - The executive director or equivalent senior management level official of the nonprofit (e.g., executive director, chief executive officer, chief operating officer)
- **Tribal Governments and Intertribal Consortia:** August 28, 2023 11:59 PM (Eastern Time). NOIs must include an attached letter or memo in support of the entity applying to the competition signed by one of the following authorized officials.
  - The chief executive of the Tribe (e.g., chairperson) or executive director or equivalent senior management level official of an intertribal consortium that meets the requirements of 40 CFR 35.504.

**NOIs for coalitions:** If applying in a coalition, regardless of the type of applicant, only the lead applicant is required to submit an NOI according to the applicable requirements above, depending on the type of lead applicant. EPA recommends that coalition applicants include the names of all the entities involved in the coalition, but it is not required as part of the NOI.

**In the NOI, applicants must include the following information for every application they plan to submit to the competition:**

1. **Applicant Name.** Identify the name of the organization submitting the application.

2. **Applicant Eligibility.** Indicate whether the applicant is a state/territory, Tribal government, municipality, or eligible nonprofit recipient using the criteria outlined under *Section III.A: Eligible Applicants*.

3. **Number and Type of Applications:** State the number of applications you anticipate submitting. For each application, include:
   a. **Award Option.** State the specific award option (award option #1, #2, or #3) you will apply to as defined in *Section II.A: Number and Amount of Awards*.

19

  b. **Program Location.** Describe the geographic coverage (i.e., which states, territories, Tribes, municipalities your program will cover) for the program.

  c. **Estimated EPA Funding Requested.** Provide an estimate of the award amount you expect to request in your application based on the guidance defined in *Section II.A: Number and Amount of Awards.* (*Note: EPA will not make this information public*).

**Applicants that do not submit a NOI by the above deadlines will be deemed ineligible. Information submitted in the NOI must be identical to information submitted in the application, except answers to question 1 (applicant name) for some applicants and answers to question 3.c (estimated EPA funding amount requested) for all applicants. These exceptions are explained in *Section III.C: Threshold Eligibility Criteria*.**

## G. Environmental Results and Strategic Plan Information

Pursuant to Section 6.a of EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must link proposed assistance agreements with the Agency's Strategic Plan. EPA must also require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements.

Awards made under this funding opportunity will support the following goals and objectives of the FY 2022-2026 EPA Strategic Plan.

- **Goal 1: Tackle the Climate Crisis**
  - Objective 1.1: Reduce Emissions that Cause Climate Change
  - Objective 1.2: Accelerate Resilience and Adaptation to Climate Change Impacts
  - Objective 1.3: Advance International and Subnational Climate Efforts
- **Goal 2: Take Decisive Action to Advance Environmental Justice and Civil Rights**
  - Objective 2.1: Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels
  - Objective 2.2: Embed Environmental Justice and Civil Rights into the EPA's Programs, Policies, and Activities
- **Goal 4: Ensure Clean and Healthy Air for All Communities**
  - Objective 4.1: Improve Air Quality and Reduce Localized Pollution and Health Impacts

## H. Measuring and Reporting Environmental Results: Example Outputs, Outcomes, and Performance Measures

Pursuant to EPA Order 5700.7A1, Environmental Results under Assistance Agreements, EPA must require applicants and grantees to adequately describe environmental outputs and outcomes to be achieved under assistance agreements. Outputs and outcomes differ both in their nature and in how they are measured.

- **Outputs:** The term "output" means an environmental activity, effort, and/or associated work product related to an environmental goal or objective that will be produced or provided over a period or by a specified date. Outputs may be quantitative or qualitative but must be measurable during the period of performance.

- **Outcomes:** The term "outcome" means the result, effect, or consequence that will occur from carrying out an environmental program or activity that relates to an environmental or programmatic goal or objective. Outcomes may be environmental, behavioral, health-related, or programmatic in nature; may be quantitative or qualitative; and may not necessarily be achievable within the period of performance.

Applicants will discuss environmental outputs and outcomes in the Program Narrative as described in *Section IV.C: Content of Application Submission*. Examples outputs and outcomes, that align with the three GGRF program objectives are detailed in the below table. EPA will further describe the required outputs and outcomes, as well as how grantees will measure against those outputs and outcomes, in the reporting requirements defined in the grant's terms and conditions. *Section VI.C: Program Performance Reporting Requirements* details initial guidance on these anticipated requirements.

| Category | Example Solar for All Outputs | Example Solar for All Outcomes[18] |
|---|---|---|
| Climate and Air Pollution Benefits | - **Number of projects financed** by geography and type of project (residential rooftop solar, residential-serving community solar) (#)<br>- **Solar capacity installed** by geography and type of project (MW)<br>- **Storage capacity installed** by geography, type of project (MWh) | - **Clean energy generation** by geography, type of project, and technology (MWh)<br>- **Greenhouse gas emissions reduced and avoided** by geography and type of project (tons $CO_2e$)<br>- **Other air pollution reduced and avoided** by geography and type of project (tons other air pollutants such as particulate matter, nitrogen dioxide, ozone, etc.) |

---

[18] EPA will work with recipients to develop a standardize methodology for measuring and estimating outcome metrics which may include standardized equations, tools such as EPA's Avoided Emissions and Generation Tool (AVERT), and standardized assumption sources.

| Equity and Community Benefits[19] | • **Number of households benefitting** from projects by geography and type of project (#)<br>• **Amount of household savings delivered** by geography and type of project ($)<br>• **Workers trained by workforce development programs** by geography (#) and their starting wages and benefits ($)<br>• **Projects executed using tools to promote good jobs and community benefits** (e.g., Community Workforce Agreement, Community Benefits Agreement, Project Labor Agreement) by geography, project-type (#)<br>• **Investments in or in partnership with women- and minority-owned businesses** by geography, type of engagement (e.g., investment in a business, partnership on a deal, procurement of services), type of project (# of businesses engaged) ($ of procurement costs) | • **Number of households with resiliency benefits** by geography (#)<br>• **Clean energy capacity owned by communities** in direct ownership models by geography, type of project, type of community owner (household, community-based organization) and technology (MW, MWh)<br>• **Number of solar jobs created** by geography (#)<br>• **Reduced disparities in energy burden between low-income and non-low-income households** by geography ($)<br>• **Increased wages for individuals working in solar energy** by geography (%) |
|---|---|---|
| Market Transformation Benefits | • **Grant funds deployed** by type of cost (financial assistance, technical assistance, program administration) ($)<br>• **Financial assistance deployed** by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($)<br>• **Total private sector financing mobilized**, alongside projects funded directly by Solar for All by geography, type of project ($) | • **Changes in net metering caps** by geography by type of project (MW, %)<br>• **Changes in interconnection timelines** by geography (days)<br>• **Changes in Solar Renewable Energy Credit (SREC) values** by geography ($)<br>• **Distributed clean energy capacity deployed benefitting communities** not directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving |

---

[19] Equity and Community Benefits are defined as the meaningful benefits of residential rooftop and residential-serving community solar as defined in *Section I.D: Competition Terminology*.

22

| | • **Number of community-based organizations engaged by Solar for All services** (e.g., technical assistance programs for solar deployment, education programs) by geography (#)<br>• **Financial assistance deployed to consumers with limited credit history** by geography, type of financial assistance, type of project, type of technology ($) | institutions), type of community (low-income and disadvantaged communities, other communities) (MW, MWh)<br>• **Capital deployed to finance distributed clean energy capacity** <u>not</u> directly financed by Solar for All by geography, type of project, type of technology, and recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) ($) |
|---|---|---|

EPA expects applicants to integrate program evaluation activities into their program design as described in *Section IV.C: Content of Application Submission*. Applicants should include plans for conducting evaluations of their GGRF program administration and project portfolios. Program evaluations should include assessment of effectiveness and efficiency in achieving outputs, outcomes, and objectives as described in the logic model. All evaluations must be conducted in adherence with ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings.

Grantees will also be expected to report, on an ongoing basis, the underlying methodologies, technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. EPA will work with grantees to ensure standardized reporting requirements and identifying tools to support reporting.

## I.  Additional Provisions for Applicants Incorporated into the Funding Opportunity

Additional provisions that apply to Sections III, IV, V, and VI of this funding opportunity and/or awards made under this funding opportunity, can be found at EPA Solicitation Clauses. These provisions are important for applying to this funding opportunity and applicants must review them when preparing applications for this funding opportunity. If you are unable to access these provisions electronically at the website above, please contact the EPA point of contact listed in *Section VII: Contact Information* to obtain the provisions.

EPA recommends that you do not include confidential business information (CBI) in your application. However, if CBI is included, it will be treated in accordance with 40 CFR § 2.203. Applicants must clearly indicate which portion(s) of their application they are claiming as CBI. EPA will evaluate such claims in accordance with 40 CFR Part 2. If no claim of confidentiality is made, EPA is not required to make the inquiry to the applicant otherwise required by 40 CFR § 2.204(c)(2) prior to disclosure under the Freedom of Information Act prior to or after selections are made.

23

# Section II. Federal Award Information

## A. Number and Amount of Awards

EPA anticipates awarding approximately $7,000,000,000 under this announcement, depending on Agency funding levels, the quality of applications received, agency priorities, and other applicable considerations.

EPA anticipates making up to 60 awards under this announcement—up to 56 awards for each state/territory eligible in this competition, up to 5 awards set aside to serve American Indian and Alaska Native Communities, and up to 10 awards for multi-state programs. EPA aims to maximize geographic coverage across all three award options. The award options, eligible applicants, and scope of work are explained below.

1. **Award option #1** - **up to 56 awards to serve <u>state and territory geographies</u>:** All eligible applicants (i.e., states, territories, Tribal governments, municipalities, and eligible nonprofit recipients, as defined in Section III.A.) can apply to serve a single state or territory. Geographic areas that Solar for All can serve include each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Applicants interested in serving more than one state and/or territory and not serving similar communities in multiple states as described in award option #3 should submit one application for every geography they aim to serve. EPA is requiring applicants to submit one application per geography to ensure differences in state energy market policies are evaluated in context. A coalition of municipalities in the <u>same state/territory</u> should apply under award option #1. Note: programs under this award option do not need to serve the entirety of the state or territory, yet EPA will evaluate applications that maximize geographic coverage more favorably.

2. **Award option #2** - **up to 5 awards to serve <u>American Indian and Alaska Native Communities</u>:** Tribal governments and/or eligible nonprofit recipients can apply for this award option. Eligible nonprofit recipients must have Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities to compete under this award option. EPA aims to maximize the ability of this program to serve the broadest population of American Indian and Alaska Native Communities, and EPA will evaluate applications on the extent to which they maximize the number of households served and geographic coverage.

3. **Award option #3** - **up to 10 awards to serve <u>similar communities across multiple states</u>:** Tribal governments, municipalities and eligible nonprofit recipients can apply for awards to serve municipalities in multiple states. Applications for award option #3 should explain how the program proposes to address similar market challenges specific low-income and disadvantaged communities face in many states. Grantees will be expected to coordinate with state governments and regulators where applicable. Given the limited number of grants EPA can award under this competition, EPA will evaluate applications that maximize geographic coverage more favorably.

24

| | | Award Option #1 – State and Territory Programs | Award Option #2 – American Indian and Alaska Native Programs | Award Option #3 – Multi-state Programs |
|---|---|---|---|---|
| **Eligible applicants** including coalitions with a lead applicant that is an eligible applicant | States | ✓ **Eligible** | | |
| | Territories | ✓ **Eligible** | | |
| | Tribal governments | ✓ **Eligible** | ✓ **Eligible** | ✓ **Eligible** |
| | Municipalities | ✓ **Eligible** | | ✓ **Eligible** |
| | Eligible nonprofit recipients | ✓ **Eligible** | ✓ **Eligible** | ✓ **Eligible** |
| **Number of awards** | | Up to 56 | Up to 5 | Up to 10 |
| **Geographic scope of work** | | Develop Solar for All programs that **serve a specific state/territory or a portion of a state/territory** (e.g., a coalition of municipalities within a state/territory) | Develop Solar for All programs that **serve American Indian and Alaska Native Communities** | Develop Solar for All programs that **serve similar communities in multiple states** |

There is no limit on the number of applications an applicant can submit to this program. An entity may submit more than one application for the Solar for All competition and more than one application to a particular award option so long as each application is for a different program (serving a different geography and different scope of work) and is separately submitted.

Note: the threshold eligibility differs between the three award options. Please refer to *Section III.C: Threshold Eligibility Criteria* to confirm application eligibility for each of these options. Applicants should clearly state in the Summary Program Cover Sheet the award option for which they are applying.

EPA expects award amounts to vary based on the geography of the proposed program. Awards will range from $25 million to $400 million, broken down by small, medium, and large-sized program awards as described below.

Applicants must submit proposals requesting funding amounts that do not exceed the award ranges described in the table below, a requirement which is based on the total population within

disadvantaged census tracts identified by CEJST in the geography the applicant proposes to serve.[20] For example, an applicant proposing a program covering a geography with a population of four million people in census tracts that are identified as disadvantaged per CEJST may apply for a medium-sized program award up to $250 million.

| | Small Programs | Medium Programs | Large Programs |
|---|---|---|---|
| **Award range** | $25 million and up to $100 million | Greater than $100 million and up to $250 million | Greater than $250 million and up to $400 million |
| **Total population of disadvantaged census tracts identified by CEJST in the geography the program will cover** | Fewer than 1 million people | Between 1 million people and 5 million people, inclusive | Greater than 5 million people |
| **Number of awards EPA anticipates making** | Up to 35 | Up to 20 | Up to 5 |

**Applicants may not request funding amounts that exceed those prescribed in the table above.** For example, an applicant with a program qualifying for a small program award (i.e., such applicant's proposed program covers a geography that includes census tracts identified by CEJST as disadvantaged with a total population less than one million people) **may only** apply for a small program award.

**However, applicants may request funding amounts that are smaller than those prescribed in the table above.** For example, an applicant with a proposed program that qualifies for a large program award (i.e., such proposed program covers a geography that includes more than five million people in census tracts identified by CEJST as disadvantaged) may choose to apply for a large, medium, or small program award.

**All applicants should state clearly in the Summary Program Cover Sheet the geography that the proposed program will cover as well as the total population of the census tracts identified as disadvantaged by CEJST in the identified geography.** To determine the population of census tracts identified by CEJST as disadvantaged, applicants can download an Excel file, titled "Communities list data," from the CEJST downloads webpage. This Excel file includes population data for all census tracts and identifies the census tracts that are disadvantaged according to CEJST.

---

[20] Population size as published by CEJST at the time of application.

26

Applicants can use column "T," titled "identified as disadvantaged," of the communities list data Excel to determine if a census tract is identified as disadvantaged. If this column is "TRUE," the census tract is disadvantaged according to CEJST. Applicants can refer to column "W," titled "total population" of the communities list data Excel to determine the total population of people by census tract. Importantly, the communities list data Excel includes both disadvantaged census tracts and other census tracts. Applicants should only consider the population in census tracts identified as disadvantaged by CEJST to determine their award range.

To determine the applicable program award size for a program, applicants must use the population of disadvantaged census tracts identified by CEJST within the geography the program will serve. Applicants may not augment CEJST identified disadvantaged community population with other population data when determining the applicable program award. EPA is choosing to use CEJST population as a proxy metric to determine the appropriate award range for applications, so all applicants are using the same readily available metric to identify the appropriate award range. Applicants may still serve other categories of low-income and disadvantaged communities as defined in *Section I.D: Competition Terminology* in their programs and proposed workplans.

EPA reserves the right to modify the award allocation described in the table above based on the quality of applications that are received and other program considerations. EPA encourages applicants to maximize households served with the funds requested in their application.

## B. Period of Performance

EPA anticipates the start date for programs funded under this funding opportunity will be July 2024. All activities funded with the initial grant award must be completed within the negotiated program performance period of up to five years, meaning all program grant funds must be deployed as described in the application. In addition, if program income is generated from the program, grantees will be required to retain and reuse program income for additional capital deployment.

## C. Partial Funding

In appropriate circumstances, EPA reserves the right to partially fund applications by funding discrete portions or phases of proposed projects. If EPA decides to partially fund an application, it will do so in a manner that does not prejudice any applicants or affect the basis upon which the application, or portion thereof, was evaluated and selected for award, and therefore maintains the integrity of the competition and selection process.

## D. Additional Awards

EPA reserves the right to make additional awards under this funding opportunity, consistent with Agency policy and guidance, if additional funding becomes available after the original selections are made. Any additional selections for awards will be made no later than six months after the original selection decisions.

27

## E. Funding Type

EPA anticipates awarding cooperative agreements under this funding opportunity. Cooperative agreements provide for substantial involvement between the EPA Project Officer and the selected applicant(s) in the performance of the work supported. Although EPA will negotiate precise terms and conditions relating to substantial involvement as part of the award process (program specific forms of substantial involvement by employees of EPA and other Federal agencies (e.g., DOE) are likely), generally substantial federal involvement for these projects may include any or all the below activities.

- Closely monitoring the successful applicant's performance to verify the results proposed by the applicant

- Collaborating during performance of the scope of work

- Reviewing proposed procurement, in accordance with 2 CFR § 200.317 and 2 CFR § 200.318

- Approving qualifications of key personnel (EPA will not select employees or contractors employed by the award recipient)

- Approving completion of project phases before the recipient can draw down funding for subsequent project phases

- Reviewing and commenting on reports prepared under the cooperative agreement (the final decision on the content of reports rests with the recipient)

EPA does not have the authority to select employees or contractors employed by the recipient. The final decision on the content of reports rests with the recipient.

# Section III. Eligibility Information

## A. Eligible Applicants

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

Consistent with Assistance Listing No. 66.959, Section 134(a)(1) of the Clean Air Act, and EPA's Policy for Competition of Assistance Agreements (EPA Order 5700.5A1), eligible applicants for this competition include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit recipients. Applicants are required to be eligible applicants at the time of application. The definitions of a state, municipality, Tribal government, and eligible nonprofit recipient are described below.

1. **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

2. **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Note: if an applicant is applying as a COG, the applicant must provide a legal opinion from the State Attorney General's Office of the state of the COG's incorporation or charter, or the COG's Chief Legal Officer, confirming that the entity is a public body created by or pursuant to state law. The applicant must describe how they are an eligible applicant in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*.

3. **Tribal Government:** In defining this term, EPA will use Section 302(r) of the Clean Air Act, which defines "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."[21] EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible applicant under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian tribe" in Section 302(r) of the Clean Air Act. Note: Intertribal consortia must provide documentation that it meets the requirements in 40 CFR 35.540(c) through signed memoranda of agreement, charters, copies of emails or conference call minutes establishing that the members of the consortium have authorized applying for Solar for All funding or similar documentation that meets regulatory requirements. The applicant

---

[21] EPA has determined that based on the exclusion of Alaskan Native Corporations (ANCs) from the definition of "Indian tribe" in section 302(r) of the Clean Air Act that ANCs are not eligible for direct grants from EPA under this program. ANCs may, however, receive "non-coalition member" subawards from eligible Solar for All grantees.

must describe how they are an eligible applicant in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*.

4. **Eligible Recipient** (titled "Eligible Nonprofit Recipient"): Section 134(c)(1) of the Clean Air Act provides that an eligible recipient (a) is a non-profit organization; (b) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services; (c) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this program; (d) is funded by public or charitable contributions; and (e) invests in or finances projects alone or in conjunction with other investors. An applicant must describe how they are an eligible recipient in the applicant's Summary Program Cover Page, as described in *Section IV.C: Content of Application Submission*. The applicant must provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) demonstrating that it satisfies <u>all</u> the requirements listed below.

   a. Meets the definition of nonprofit organization set forth in 2 CFR § 200.1[22]

   b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"

   c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act)

   d. Is funded by public or charitable contributions

   e. Has the legal authority to invest in or finance projects

   Further, to be an eligible nonprofit recipient, an applicant cannot be controlled by one or several entities that are not eligible nonprofit recipients, such as for-profit commercial banks or asset managers. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions); or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions, as determined by the EPA.[23] A term and condition specifying compliance with this requirement—and the other requirements of being an eligible recipient—may be

---

[22] 2 CFR § 200.1 states that a *nonprofit organization* "means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

[23] EPA may use the indicia of control described in the 2 CFR § 180.905 definition of "Affiliate" as a basis for making such determinations.

included in the grant agreement and in the closeout agreement to ensure that grantees remain eligible recipients while they retain grant funds.

An eligible applicant, as described above, may apply to this competition as either an individual applicant or a "lead applicant" in a coalition.[24] Please see *Section I.D: Competition Terminology* for additional details on the definition of a coalition applicant.

An organization may submit more than one application for the Solar for All competition and more than one application to a particular award option so long as each application is for a different program (i.e., the program is in a different geography or for a different scope of work) and is separately submitted. As a reminder, an applicant interested in receiving funds from Solar for All should consider which award option the applicant will apply to and consult the guidance on the differences between each award option described in *Section II.A: Number and Amount of Awards*.

## B. Named Contractors and Named Subrecipients

A grantee who transfers funds awarded through this competition must comply with the Procurement Standards in 2 CFR § 200 and 1500, EPA's Subaward Policy, and EPA's Guidance on Participant Support Costs, as applicable, depending on the vehicle that the grantee uses to transfer funds, as well as the Participation by Disadvantaged Business Enterprises in EPA Programs requirements in 40 CFR § 33. Before naming contractors (including consultants) or subrecipients in your application, please carefully review Section IV.d, "Contracts and Subawards," of EPA Solicitation Clauses as well as the guidance in this section. In accordance with 2 CFR § 200.320(c)(2) and (4), the Agency does not accept justifications for sole source contracts for services or products available in the commercial marketplace based on a contractor's role in preparing an application or existing relationships that an applicant may have established without complying with competitive procurement requirements. However, as provided in 2 CFR § 200.317 *States* as defined in 2 CFR § 200.1 follow the same competitive policies and procedures they use for procurements with non-Federal funds, so EPA defers to state determinations on sole source contracting.

**Named Contractors.** EPA does not require or encourage applicants to name procurement contractors (including consultants) in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application, the applicant must comply with the following requirements even if the entity is referred to as a "partner" in the application.

Applicants (other than states) that identify a procurement contractor(s) in their application where the amount of the contract will be more than the micro-purchase threshold in 2 CFR § 200.320(a)(1) ($10,000 for most applicants) must demonstrate, in their application, how the contractor (including consultants) was selected in compliance with the fair and open competition

---

[24] In either case, the individual applicant or lead applicant may make additional subawards to carry out a portion of the grant's activities, even if those subrecipients were not named in the application, provided that they are consistent with the grant's terms and conditions and with all applicable requirements, including the EPA Subaward Policy. EPA provides additional guidances in the EPA Subaward Policy Frequent Questions.

requirements in 2 CRF § 200 and 2 CFR § 1500. EPA provides guidance on complying with the competition requirements in the Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements. For example, EPA will not accept sole source justifications for proposed procurement contracts for services such as environmental consulting and engineering that are available in the commercial marketplace. Applicants (other than states) must describe the procurement procedures that were followed to hire the contractor(s) that is named in this application and include information on where and when the Request for Proposals/Request for Qualifications was posted in the Summary Program Cover Sheet, as described in *Section IV.C: Content of Application Submission*.

**Failure to demonstrate compliance with these requirements for named contractors in the application will result in rejection of the application.**

*Successful applicants that do not name procurement contractors in their applications must also comply with these requirements, regardless of if the contractor was procured before or after the EPA grant agreement is awarded. For example, firms or individual consultants that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals must be excluded from competing for such procurements as provided in 2 CFR § 200.319(b).*

**Named Subrecipients.** With the exception of coalition applications, defined in *Section I.D: Competition Terminology*, EPA does not require nor encourage applicants to name subrecipients in applications for grant funding. For this competition, the EPA requires any named subrecipient to be part of a coalition application as a non-lead coalition member, which must be eligible for a subaward in compliance with Appendix A of EPA's Subaward Policy. This policy provides, among other requirements, that transactions between grantees and for-profit firms and individual consultants are procurement contracts rather than subawards when the transaction involves the acquisition of services from the firm or individual.

**Failure to demonstrate compliance with these requirements for named subrecipients (including coalition members) in the application will result in rejection of the application.**

*Refer to EPA's* Contracts and Subawards Solicitation Clause *for additional guidance on these requirements, which must be met for all contractors (except for micro-purchases) and/or subrecipients specifically named in the application. EPA staff may contact the applicant to clarify issues or obtain additional information before making a final determination of non-compliance and rejection of the application.*


## C. Threshold Eligibility Criteria

All applications must meet the eligibility requirements described in this section. If necessary, EPA may contact applicants to clarify threshold eligibility questions prior to making an eligibility determination. Applicants deemed ineligible for funding consideration because their applications fail to satisfy the threshold eligibility review will be notified within 15 calendar days of the ineligibility determination.

Applications must meet the following threshold criteria to be considered eligible:

- Applications must comply with the content and submission requirements, as listed below.

  - Applications must substantially comply with the application submission instructions and requirements set forth in *Section IV.B: Application Materials* else they will be rejected. Where a page limit is expressed in *Section IV.B* with respect to the application, or parts thereof, pages in excess of the page limitation will not be reviewed. Applicants are advised that readability is of paramount importance and should take precedence in application format, including selecting a legible font type and size for use in the application.

  - Applications must be submitted through Grants.gov as stated in *Appendix A: Grants.Gov Application Submission Instructions* of this funding opportunity (except in the limited circumstances where another mode of submission is specifically allowed for as explained *Appendi*x A) on or before the application submission deadline published in *Section IV.A: Due Date and Submission Instructions* of this funding opportunity. Applicants are responsible for following the submission instructions in *Section IV.A* and *Appendix A* of this funding opportunity to ensure that their application is timely submitted. Please note that applicants experiencing technical issues with submitting through Grants.gov should follow the instructions provided in *Section IV.A* and *Appendix A*, which include both the requirement to contact Grants.gov and email a full application to EPA prior to the deadline.

  - Applications submitted outside of Grants.gov will be deemed ineligible without further consideration unless the applicant can clearly demonstrate that it was due to EPA mishandling or technical problems associated with Grants.gov or SAM.gov. An applicant's failure to timely submit their application through Grants.gov because they did not timely or properly register in SAM.gov or Grants.gov will not be considered an acceptable reason to consider a submission outside of Grants.gov.

- Applicants, including lead applicants for coalitions, must submit a Notice of Intent (NOI) by the listed deadline and according to the instructions in *Section I.F: Required Notice of Intent*. Information submitted in the NOI must be identical to information submitted in the application, except answers to question 1 (applicant name) for some applicants and answers to question 3.c (estimated EPA funding amount requested) for all applicants. These exceptions are explained below.

  - For question 1 (applicant name): units of government that are states (including the District of Columbia and Puerto Rico), territories (i.e., The Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands), Tribal governments, and individual municipalities may change which government agency submits an application after the NOI is submitted, so long as each unit of government submits only one NOI or application. If more than one agency of a unit of government submits an NOI, EPA staff will contact the agencies and advise them to coordinate to

33

decide which agency(ies) will withdraw the NOI(s) such that EPA receives only one NOI per unit of government.

- Applicants that are eligible nonprofits recipients, councils of government, and intertribal consortia must be the same legal entity that submitted an NOI unless EPA's Selection Official or designee grants a waiver to this requirement based on an unanticipated change in circumstances that have taken place since the submission of the NOI.

- For question 3.c (estimated EPA funding amount), all applicants may change the EPA requested funding amount submitted in the NOI in their application. If applicants change their EPA requested funding amount, applicants must explain why the requested funding amount in the application is different than the requested funding amount in the NOI.

- Applicants must be an eligible applicant as described in *Section III.A: Eligible Applicants* and, if required according to *Section III.A*, must provide supporting evidence that demonstrate this eligibility, as described in *Section III.A* and below.

  - Intertribal consortia must provide documentation that it meets the requirements in 40 CFR 35.540(c) through signed memoranda of agreement, charters, copies of emails or conference call minutes establishing that the members of the consortium have authorized applying for Solar for All funding or similar documentation that meets regulatory requirements.

  - Councils of Government (COGs) must provide a legal opinion from the State Attorney General's Office of the state of the COG's incorporation or charter, or the COG's Chief Legal Officer, confirming that the entity is a public body created by or pursuant to state law.

  - Eligible nonprofit recipients must provide supporting evidence (including organizational documents, such as articles of incorporation or similar documents filed with a governmental authority as a condition of carrying out its activities; tax filings; financial statements; investment records; and/or any other information the applicant deems appropriate) demonstrating that it satisfies <u>all</u> the requirements listed below.

    a. Meets the definition of nonprofit organization set forth in 2 CFR § 200.1[25]

    b. Has an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services"

---

[25] 2 CFR § 200.1 states that a *nonprofit organization* "means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that: (1) is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) is not organized primarily for profit; and (3) uses net proceeds to maintain, improve, or expand the operations of the organization."

     c. Does not receive any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act)

     d. Is funded by public or charitable contributions

     e. Has the legal authority to invest in or finance projects

- Applications must comply with the requirements for named contractors and subrecipients, as described in *Section III.B: Named Contractors and Named Subrecipients*. The EPA does not require nor encourage applicants to name procurement contractors (including consultants) or subrecipients in applications for grant funding. However, if an applicant chooses to identify a procurement contractor(s) to conduct work proposed in this application or subrecipient(s) to participate in a coalition application to carry out the substantive activities listed in the grant application, the applicant (other than a state applicant) must demonstrate compliance with the requirement.

- Applicants must submit an application for a program that provides grants, loans, and other forms of financial assistance (e.g., participant support costs), as well as technical assistance, to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar, associated storage, and enabling upgrades as defined in *Section I.D: Competition Terminology*.

- Applicants must request funds for activities that serve communities within the boundaries of the United States (including Puerto Rico) and its territories.

- Applicants must request an award to be expended over a period of performance of five years or less.

- Applications for an award must be for no less than $25 million.

- Applicants must submit proposals for funding amounts that do not exceed the program award ranges requirements described in *Section II.A: Number and Amount of Awards* according to the population of disadvantaged census tracts identified by CEJST in the geography the applicant is covering with their proposed program.

- Applications must not include unallowable costs, as described in *Section III.D: Allowable and Unallowable Costs*. If an application is submitted that includes any unallowable costs, including those described in *Section III.F,* as well as unallowable costs described in 2 CFR § 200, Subpart E and the applicable provisions of 2 CFR § 1500 EPA's Guidance on Selected Items of Cost for Recipients, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

- **Coalitions:** Coalition applications must include a signed Memorandum of Agreement (MOA) that confirms participation of each coalition member in their application.

- Applications must only address one of the three award options as described in *Section II.A: Number and Amount of Awards*. Applicants may submit multiple applications, as long as

each application only addresses one award option. Applications that address more than one award option will be deemed ineligible.

- **For applications to award option #1 - (up to 56 awards to serve state and territory geographies):**

  - Applications must propose a program that serves low-income and disadvantaged communities in only <u>one state or territory</u>. A coalition of municipalities in the <u>same state/territory</u> should apply under award options #1. Note: programs under this award option do not need to serve the entirety of the state. For example, a municipality or coalitions of municipalities in the same state/territory can apply for award option #1. Similarly, a Tribal government may propose a program in one state.

- **For applications to award option #2 - (up to 5 awards to serve American Indian and Alaska Native communities):**

  - Applicants must be a Tribal government (including intertribal consortia), an eligible nonprofit recipient, or a coalition with a lead applicant that is either a Tribal government or an eligible nonprofit recipient as defined in *Section III.A: Eligible Applicants*. If the applicant is an eligible nonprofit recipient, the applicant must have Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities.

  - Applications must propose a program that serves American Indian and Alaska Native Communities.

- **For applications to award option #3 - (up to 10 awards to serve similar communities across multiple states):**

  - Applicants must be a Tribal government (including intertribal consortia), a municipality (including councils of governments), an eligible nonprofit recipient or a coalition with a lead applicant that is either a Tribal government, municipality, or an eligible nonprofit recipient as defined in *Section III.A: Eligible Applicants*.

  - Applications must propose a program that serves low-income and disadvantaged communities in multiple states and territories.

## D. Allowable and Unallowable Costs

The following list outlines **allowable costs** for this competition.

- Costs for eligible financial assistance, as defined in *Section I.D: Competition Terminology* as subgrants, rebates, subsidies, other incentive payments, or loans, consistent with the definition of "federal financial assistance" in 2 CFR § 200.1

- Costs for eligible technical assistance as defined in *Section I.D: Competition Terminology*. Eligible technical assistance examples include workforce training, customer outreach and education, project development & deployment assistance (including services and tools from National Labs), and coordination with utilities for the purposes of project deployment

36

- Participant support costs for trainees in workforce development programs may be allowable with prior approval by the EPA award official pursuant to the EPA Guidance on Participant Support Costs

- Costs for acquiring or improving real property, including related equipment purchases with the prior approval of EPA's Award Official. As provided in 2 CFR § 200.316 EPA will require that grantees " . . . record liens or other appropriate notices of record to indicate that personal or real property has been acquired or improved with a federal award and that use and disposition conditions [described in 2 CFR § 200.311 and 2 CFR § 200.313] apply to the property"

- Costs for fund-raising and preparation of proposals for funding from private foundations, federal agencies, and states may be allowable with prior EPA approval if the funds acquired will be used to meet the statutory objectives of the Solar for All grant program. Additional information is available in Items 4 and 6. b. of EPA's Selected Items of Cost Guidance

- Costs for program administration, including but not limited to:

  o Costs for staff salaries, technology, and other office supplies, as either direct or indirect costs, in accordance with 2 CFR § 200 Subpart E and the applicant's Federally-approved indirect cost rate under 2 CFR § 200.414; note that costs must be consistently characterized as either direct or indirect as provided in 2 CFR § 200.412

  o Costs for advisory councils to meet the GGRF program objectives. Advisory councils are groups of individuals who are not employees of the grantee or a subgrantee that provide strategic and policy advice to the organization; refer to Item 2 of EPA's Selected Items of Cost Guidance for additional information on the allowability of costs for Advisory councils

  o Costs for reporting and compliance, including those to support, monitor, oversee, and audit subrecipients, contractors, and program beneficiaries

  o Costs for program evaluation activities including the personnel and equipment needed for data infrastructure and expertise in data analysis, performance, and evaluation

  o Indirect costs to the extent authorized by applicable provisions of 2 CFR § 200.414 and EPA's Indirect Cost Policy

All costs must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. EPA's Guidance on Selected Items of Cost for Recipients provides additional details on the allowability of costs for advisory councils to meet program objectives for this competition.

The following list outlines **unallowable costs** for this competition.

- Costs for financial and technical assistance for technologies other than projects included as "Eligible Zero-Emissions Technologies" defined in *Section I.D: Competition Terminology*

- Costs that are unallowable under 2 CFR Part 200, Subpart E and under applicable provisions of 2 CFR Part 1500 (i.e., consultant fees in excess of those allowable under 2 CFR § 1500.10)

- Costs for supporting or opposing union organizing, whether directly or as an offset for other funds

- Costs for cost sharing, as defined in 2 CFR § 200.306, absent authorization in a Federal statute

- Costs of acquiring "intangible property," as defined in 2 CFR 200.1, including equity investments, such as purchases of ownership interests in companies

- Direct costs for preparing the application to this competition

If an application is submitted that includes any unallowable costs, that portion of the application will be ineligible for funding and may, depending on the extent to which it affects the application, render the entire application ineligible for funding.

## E.  Cost Sharing or Matching

Cost sharing is not a requirement to be eligible to apply to this solicitation.

# Section IV. Application and Submission Information

## A. Due Date and Submission Instructions

An application package may be obtained by visiting this funding opportunity (EPA-R-HQ-SFA-23-01) on Grants.gov. Applicants will be prompted to initiate the application process by generating a Workspace for this opportunity.

Your organization's Authorized Organization Representative (AOR) must submit your complete application package[26] electronically to EPA through Grants.gov. Only person(s) with the AOR role can submit applications to Grants.gov. Please review the Intro to Grants.gov – Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this process.

Application packages must be submitted on or before October 12th, 2023, at 11:59 PM (Eastern Time) through Grants.gov. Applications received after the closing date and time will not be considered for funding. Please allow enough time to successfully submit your application package and allow for unexpected errors that may require you to resubmit. Occasionally, technical and other issues arise when using Grants.gov.

Refer to *Appendix A: Grants.gov Application Submission Instructions* for the requirements to apply through Grants.gov. In order to submit an application through Grants.gov, your organization must satisfy <u>all</u> of the requirements listed below.

- Have an active System for Award Management (SAM) account in SAM.gov and a Unique Entity Identifier (UEI) assigned by SAM.gov
- Be registered in Grants.gov
- Have the E-Business Point of Contact designate an AOR in Grants.gov

**<u>The registration process for all the above items may take a month or more to complete. Applicants should begin this process as soon as possible.</u>**

In concert with EPA's commitment to conducting business in an open and transparent manner, copies of applications selected under this funding opportunity may be made publicly available on the GGRF website or another public website for a period of time after the selected applications are announced. EPA recommends that applications not include trade secrets or commercial or financial information that is confidential or privileged, or sensitive information, if disclosed, that would invade another individual's personal privacy (e.g., an individual's salary, personal email addresses, etc.). However, if such information is included, it will be treated in accordance with 40 CFR § 2.203 (refer to *Section IV.a* of EPA Solicitation Clauses for additional information).

*Clearly indicate which portion(s) of the application you are claiming as confidential business information. As provided at 40 CFR § 2.203(b), if no claim of confidential treatment accompanies*

---

[26] Note, for the purposes of this competition, the "application package" includes the required federal forms available at www.grants.gov as well as the Program Narrative and associated attachments.

*the information when it is received by EPA, it may be made available to the public by EPA without further notice to you.*

## B. Application Materials

The following forms and documents are required under this announcement and are included in the Workspace you generate on Grants.gov.

**Mandatory Documents:**

1. Application for Federal Assistance (SF-424)
2. Budget Information for Non-Construction Programs (SF-424A)
3. EPA Key Contacts Form 5700-54
4. EPA Form 4700-4 Preaward Compliance Review Report
5. Grants.gov Lobbying Form
6. Program Narrative: Use "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit your Program Narrative, prepared as described in *Section IV.C: Content of Application Submission.* As described in *Section IV.C,* the Program Narrative has a limit of 40 pages. **Please upload the Program Narrative as one document.**
7. Attachments: Use "Project Narrative Attachment Form" in your Workspace on Grants.gov to submit the attachments listed below that must be included in the application package and do **not** count toward the 40-page limit for the Program Narrative. **Please limit the number of files for the attachment items by consolidating all attachment items (excluding Excel uploads if using optional Excel templates EPA has provided) into one document in the order presented below.**

- **Attachment A:** Summary Program Cover Page
- **Attachment B:** Copy of the submitted Notice of Intent, which was submitted by the listed deadline and according to the instructions in *Section I.F: Required Notice of Intent*
- **Attachment C:** Eligibility evidence documents supporting that the applicant is an eligible applicant as described in *Section III.A: Eligible Applicants*. Note: applicants applying as eligible nonprofit recipients, municipalities under the definition of a council of government (COG), or Intertribal Consortia are required to provide evidence documents as described in *Section III.A.*
- **Attachment D:** Program Planning Timeline and Workplan described in Section 1.7 of the Program Narrative; an optional Excel template is included for applicants to download on epa.gov/GGRF
- **Attachment E:** Budget Table described in Section 2.1 Budget Narrative of the Program Narrative; guidance on how to build the Budget Table is included in *Appendix B.A: Guidance for Detailed Budget Table*; an optional Excel template is included for applicants to download on epa.gov/GGRF

40

- **Attachment F:** Programmatic Capability and Environmental Results Past Performance described in Section 3 of the Program Narrative
- **Attachment G (for coalition applications only):** Memorandum of Agreement (MOA) as evidence of coalitions as described in *Section III.C: Threshold Eligibility Criteria*
- **Attachment H (for applications with proposed subgrants only):** Organizational table, which includes all entities by name (if known) or by description/type (e.g., community-based organization, utility) and explains in two to three sentences or bullets what activities each entity will perform for the program

**Optional Documents:**

8. Other Attachments: Use "Other Attachments Form" in your Workspace on Grants.gov to submit the following documentation, which is not required, but encouraged to be submitted, and will **not** count toward the 40-page limit for the Program Narrative. **Please limit the number of files for the attachment items by consolidating all attachment items into one document in the order presented below.**

   - **Attachment I:** Letters of support from potential partnerships with community-based organizations, unions, industry associations, workforce development programs, worker centers, and other partners who are interested in helping the program execute the Section 1.2 Meaningful Benefits Plan as described in *Section IV.C: Content of Application Submission*

   - **Attachment J:** Letters of support from public utility commissions, utilities, governor's offices, lead sponsors on legislative text, or other evidence of support for the proposed scope of work in the Section 1.3 Distributed Solar Power Market Strategy of the Program Narrative, as described in *Section IV.C: Content of Application Submission*, that enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage

   - **Attachment K:** Letters of support from potential partnerships with community-based organizations, nonprofits, unions, industry associations, worker centers, workforce development programs, and other partners who are interested in helping the program execute the Section 1.5 Project-Deployment Technical Assistance Plan as described in *Section IV.C: Content of Application Submission*

   - **Attachment L:** Letters of support from potential partnerships with community-based organizations, public housing authorities, utilities, rural electric utilities, affordable housing developers, unions, industry associations, workforce development programs, and other partners who are interested in helping the program execute the Section 1.6 Equitable Access and Meaningful Involvement Plan as described in *Section IV.C: Content of Application Submission*

9. Disclosure of Lobbying Activities (SF-LLL), if applicable - See Grants.gov Lobbying Form to determine applicability

41

## C. Content of Application Submission

The forms and documents required as part of the application submission are described in *Section IV.B: Application Materials*. Below are the instructions for **Attachment A: Summary Program Cover Page** and the **Program Narrative**.

**Instructions:** The Summary Program Cover Page and Program Narrative should comply with the instructions, format, and content described below. The Program Narrative should also address the criteria in *Section V.A: Evaluative Criteria*. The Program Narrative must follow all the requirements listed below.

- Must not exceed the aforementioned page limits

- Must only rely on the text in the above-mentioned page limits. **While attachments do not count toward the above-mentioned page limits, they may only serve as reference documents** for content described in the Program Narrative; attachments that provide new content, rather than serve as reference documents, will not be reviewed or considered. Links to external websites or content will not be reviewed or considered

- Must be Letter size (8 ½ inches x 11 inches) typed, single-spaced pages in 12-point Times New Roman font with one column per page with 1-inch margins on all sides

It is strongly advised that applicants organize their applications in the order presented in *Section IV.B: Application Materials*, appropriately number and label the sections of the Program Narrative per the numbers and labels used below, and limit the number of attachments when submitting via Grants.gov. **Please upload the Program Narrative as one document and limit the number of files for the attachment items by consolidating all attachment items into one document in the order presented in *Section IV.B: Application Materials*; attachment items that are Excel files (such as the optional template EPA has provided to complete Attachment D: Program Planning Timeline and Workplan and Attachment E: Budget Table available for download on www.epa.gov/GGRF) may be submitted separately as an attachment as Excel files and the file name and title should be clearly titled and lettered according to the attachment item the document addresses.**

**To assist EPA reviewers, applicants are strongly encouraged to reference the numbers and titles of the evaluation criteria in their Program Narratives to help identify where the criteria are being addressed.**

**Summary Program Cover Page** (maximum of four pages) provides an overview of the application and must include the below components.

1. **Program Title:** Provide a name for the program.

2. **Brief Program Summary:** Provide a four- to five-sentence summary of the program, including the program's mission, geography, scope of work, and other relevant summary points. Include in your description an explanation of how the proposed program will deliver on the GGRF program objectives described in *Section I.C: GGRF Solar for All Program Objectives*. If selected, EPA may use this summary publicly describe the program.

3. **Applicant Name:** Identify the name of the organization applying.

4. **Award Option Type:** Identify if you are applying to Award Option #1, Award Option #2, or Award Option #3, as described in *Section II.A: Number and Amount of Awards*. Describe in three to four sentences why you are applying to the specific award option considering the eligibility criteria defined in *Section III.C: Threshold Eligibility Criteria*. *Note: for eligible nonprofit recipients applying to award option #2, please provide evidence for how the applicant has Tribal leadership at the senior management level (e.g., Chief Executive Officer, Chief Operating Officer, at least one Member of the Board of Directors) and experience serving American Indian and Alaska Native Communities (e.g., previous investments in American Indian and Alaska Native Communities).*

5. **Applicant Eligibility:** Indicate whether you are a state/territory, Tribal government, municipality, or eligible nonprofit recipient using the criteria outlined under *Section III.A: Eligible Applicants*. Summarize in two to three sentences the supporting evidence the applicant uses in Attachment C to prove applicant eligibility according to the evidence described in *Section III.A*.

6. **Program Location:** Describe the geographies the program will serve. *Note: applications applying to award option #1 should address only one state/territory geography as described in* *Section II.A: Number and Amount of Awards*.

7. **Program Scope of Work:** Describe in three to four sentences how the proposed program will deliver on the activities described in *Section I.E: Scope of Work*, including a summary of the types of financial and technical assistance the program will perform.

8. **EPA Funding Requested:** Specify the amount you are requesting from EPA and the associated award tier (as specified in *Section II.A: Number and Amount of Awards*). You should specify the amount of funding you stated in your NOI response, and if the funding amount changed between the NOI and the application, explain why the funding requested has changed.

9. **Population of census tracts identified by CEJST as disadvantaged:** Specify the sum total population of the census tracts identified by CEJST as disadvantaged in the geography the program is applying to serve. Applicants can download an Excel file, titled "Communities list data" with population data for all disadvantaged census tracts from the CEJST downloads webpage in order to determine the total population of census tracts identified as disadvantaged.[27] Describe the geography applicants used to determine this population—either at the state/territory, county, or Census tract 2010 ID level. The description of geography should be no different than the program location above.

10. **Impact Targets:** Detail the impact you expect to have through the entire program period by stating (1) the number of households projected to benefit from the solar program (both as an absolute number of households and award funding requested per household); (2) the

---

[27] Please refer to *Section II.A: Number and Amount of Awards* for guidance on how to use the CEJST communities list data Excel. To determine the applicable program award size for a program, applicants must use the population of disadvantaged census tracts identified by CEJST within the geography the program will serve. Applicants may not augment CEJST identified disadvantaged community population with other population data when determining the applicable program award. EPA is choosing to use CEJST population as a proxy metric to determine the appropriate award range for applications, so all applicants are using the same readily available metric to identify the appropriate award range. Applicants may still serve other categories of low-income and disadvantaged communities as defined in *Section I.D: Competition Terminology* in their programs and proposed workplans.

megawatts of solar capacity deployed over time (both as an absolute number of megawatts of solar deployed and dollars of award funding requested per megawatts of solar); (3) megawatt hours of storage capacity deployed over time (both as an absolute number of megawatt hours of storage deployed and dollars of award funding requested per megawatt hours of storage); (4) short tons of annual carbon dioxide ($CO_2$) emissions avoided over time (both as an absolute number of tons of $CO_2$ reduced and dollars of award funding requested per tons of $CO_2$ reduced); and the (5) absolute amount of household savings realized over time (both as an absolute number of dollars saved and dollars of award funding requested per dollars of household savings).

11. **Program Period:** Provide the estimated beginning and ending dates for the period of performance for the program.

12. **Contact Information:** Include a name, title, address, email address, and phone number. You can list both a primary and an administrative contact.

13. **Coalition Partners:** Include the names of all organizations in this application if applying as a coalition. For each organization, include contact information as described above. Include a memorandum of agreement for the entire coalition in Attachment G.

14. **Named Contractors.** Include all named contractors that are part of this application. For each named contractor (for applicants other than state), describe the procurement procedures followed to hire the contractor(s) and include information on where and when the Request for Proposals/Request for Qualifications was posted. If this application does not have named contractors, please write "not applicable."

15. **Additional Named Subrecipients:** Include all named subrecipients that are part of this application, other than the coalition partners covered above. For each organization, explain how that organization is eligible for a subaward under the EPA Subaward Policy. If there are no named subrecipients in this application, please write "not applicable."

**Program Narrative** (maximum of 40 pages) addresses each of the evaluation criteria in *Section V.A: Evaluative Criteria* and must include the below components. Reminder: Any attachments to the Program Narrative referenced below are not considered part of the 40-page limit.

1. **Program Strategy Narrative:** Explain how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities. Include the below components.

   1. **Impact Assessment:** Describe the market environment for residential-serving distributed solar and storage deployment in the geography you are applying to serve, including market-wide historical deployment rates and participation of low-income and disadvantaged households and communities in the market. Based on past deployment rates in the geography you are applying to serve or comparable market data, you should set reasonable output and outcome targets for capacity of solar and storage deployed, households served, projected annual carbon dioxide ($CO_2$) emissions avoided (short tons) according to *EPA's Avoided Emissions and Generation Tool (AVERT)*, annual household savings realized, as well as any additional output and outcome metrics as detailed in *Section I.H: Measuring and*

*Reporting Environmental Results*. If AVERT does not support your geography, please refer to the equation in *Appendix F: Guidance for Carbon Dioxide Avoided Calculations*.[28] If projected outputs and outcomes are evaluated and influence the selection decision, you are expected to achieve them during period of performance.

2. **Meaningful Benefits Plan:** Describe how you will ensure the program delivers meaningful benefits as defined in *Section I.D: Competition Terminology* for low-income and disadvantaged households. The meaningful benefits of solar with storage include (1) delivering a minimum 20% of household savings to program beneficiaries; (2) increasing low-income and disadvantaged households' access to solar through financing products and deployment options; (3) increasing resiliency and grid benefits by creating capacity that can deliver power to low-income and disadvantaged households and/or critical facilities serving low-income and disadvantaged households during a grid outage; (4) facilitating ownership models that support low-income households and communities building equity in projects; and (5) investing in quality jobs and businesses in line with the Administration's Good Jobs Principles and Executive Order 14082 *(Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022)*. You should articulate a plan for creating high quality, middle-class jobs in the rapidly growing residential-serving distributed solar energy industry that pay family-sustaining wages and include strong labor standards, including benefits, safe working conditions, and the free and fair choice to join or form a union. You should describe how these plans are centered on delivering meaningful benefits to low-income and disadvantaged communities where solar energy is being deployed through the creation of high-quality jobs and shared economic opportunity in those communities. Strong applications will include multi-sectoral partnerships with key stakeholders in the workforce development ecosystem needed to execute on this vision for a robust and inclusive clean energy workforce, and applicants may include letters of support from these partners in Attachment I of their application. Additional details on job quality are included in *Appendix E: Equitable Workforce Development and Job Quality*.

3. **Distributed Solar Market Strategy:** Describe the market barriers to residential-serving distributed solar deployment in the geography you are applying to serve and how you plan to address those barriers to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage. Examples of market barriers include net metering policies, third party ownership policies, and opaque interconnection processes. In Attachment J of the application, you may include letters of support from stakeholders, such as Governor's offices, public utility commissions, utilities, in the geography you propose to serve, to evidence that the proposed Distributed Solar Market Strategy is achievable.

4. **Financial Assistance Strategy:** Describe how you will use Solar for All funds to provide eligible financial assistance, as defined in *Section I.D: Competition*

---

[28] AVERT does not include data for Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, nor the Commonwealth of the Northern Mariana Islands.

*Terminology*, to enable low-income and disadvantaged communities to deploy and benefit from residential rooftop and residential-serving community solar and storage. You should include a financial assistance model that defines the type, size, and deployment strategy of financial assistance. You should specify which solar projects the program will provide financial assistance for (i.e., rooftop residential solar and/or residential-serving community solar) and, if the program will include both project-types, the anticipated share of funding for each project-type. You should detail if and how the program will financially support storage (including storage deployment targets) and prudently provide financial assistance for enabling upgrades—while maximizing solar deployment. You should describe how the program will complement, and not duplicate, existing subsidies, tax credits, and other sources of financing and support deployment that would not have occurred otherwise.

5. **Project-Deployment Technical Assistance Strategy:** Describe how you will support communities and other solar market stakeholders (e.g., solar developers, contractors, affordable housing developers, owners) with technical assistance to develop project pipeline and deploy solar, as defined in *Section I.D: Competition Terminology*. Project-deployment technical assistance services should include investments in workforce development, project deployment technical assistance (e.g., siting, permitting, interconnection), and other technical assistance. You should consider what project-deployment technical assistance services are already provided by federal, non-profit, and other market actors to minimize duplication and plan to leverage existing resources. EPA has included a non-exhaustive list of reports and resources on epa.gov/GGRF to help applicants identify potential project-deployment technical assistance resources and tools. As part of catalyzing a robust and inclusive solar energy market, you should demonstrate a plan for developing the necessary workforce to install solar in the geography you propose to serve. In line with the job quality goals discussed in Section 1.2 Meaningful Benefits Plan, training plans should articulate how participants will be trained for and placed in high-quality careers. To meet the labor needs of the rapidly growing solar industry, you should propose workforce training models that prepare individuals from low-income and disadvantaged communities for middle-class career pathways in partnership with workforce partners. See *Appendix E: Equitable Workforce Development and Job Quality* for expanded descriptions and resources for high-quality training models and partnerships.

6. **Equitable Access and Meaningful Involvement Plan:** Describe how your customer acquisition strategy will maximize solar deployment across the geography you will serve, ensuring equitable access to and participation in the program. Equitable access means all communities, especially historically underserved households and communities, can benefit from this program. Explain how you will educate and engage communities on the benefits of solar energy. Describe how your outreach and marketing strategies are culturally appropriate and responsive to the needs of the communities you are proposing to serve. You should consider how you may need to employ different engagement strategies to reach different types of communities, including urban, rural, and suburban communities; communities with limited English proficiency; and different types of residential

46

buildings, including single-family, multi-family, and manufactured homes. To ensure equitable access, you should describe how low-income and disadvantaged communities will be involved in program design and operations. Describe how communities can participate in program and project design, in formal input and feedback structures. These formal structures should include participatory governance and regular, meaningful engagement with community-based organizations and residents of low-income and disadvantaged communities. Applicants applying to award option #2 should center this plan on American Indian and Native Alaska communities. If you are applying to award option #1 and there are American Indian and Native Alaska communities in your geography, you should describe how the program will serve these communities and meaningfully involve these communities in program planning and operations. If you are applying to award option #3 and are choosing to serve American Indian and Native Alaska communities in your geography, you should describe how the program will serve these communities and meaningfully involve these communities in program planning operations.

7. **Program Planning Timeline and Workplan Narrative:** Provide a narrative for your Program Planning Timeline and Workplan to be included in Attachment D of the application. The workplan should describe how you will plan and implement the Solar for All program, including steps and milestones to implement the strategies and plans described in the Meaningful Benefits Plan (Section 1.2), Distributed Solar Market Strategy (Section 1.3), the Financial Assistance Strategy (Section 1.4), the Project-Deployment Technical Assistance Strategy (Section 1.5), and the Equitable Access and Meaningful Involvement Plan (Section 1.6). The workplan may also include steps to refine the program plan during a planning period. If including a program planning period, you should consider existing federal, academic, and philanthropic platforms, tools, and resources you may plan to leverage to support program planning and any partnerships you have established or plan to establish to support program planning and implementation. EPA has included a non-exhaustive list of reports and resources on epa.gov/GGRF to help you identify additional program design questions as well as program planning resources and tools, these examples include DOE's States Collaborative, DOE's National Community Solar Partnership's direct technical expertise and capacity building services. A timely plan will ensure that the planning period is at most one year and that the program spends all funds within five years of the award.

2. **Program Administration Narrative:** Describe how you will administer the grant program and demonstrate you have the policies, procedures, tools, and capabilities to successfully achieve the program goals. You should include the components listed below.

1. **Budget Narrative:** Provide a narrative to describe in more detail the budget found in SF-424A and the Budget Table included in Attachment E of the application. In this narrative, describe how you will deploy funds efficiently and cost-effectively and explain how the costs are prudent and necessary to achieve the outcomes of the program. You should separate out costs (both direct costs and indirect costs charge to the direct costs) for financial assistance to demonstrate in the Budget Table how

47

the program budget achieves the target minimum funding amounts for financial assistance detailed in the table below. For additional information on how to approach the budget, refer to *Appendix B.A: Guidance for Detailed Budget Table*. Please reference and consider allowable and unallowable costs in *Section III.D: Allowable and Unallowable Costs*. For additional guidance on preparing a program budget, refer to EPA's Indirect Cost Guidance and Budget Detail Guidance.

*The below table summarizes the guidance on minimum share of funds for financial assistance by award option. Note: the cost guidance below applies to both direct costs and the associated indirect costs charged to direct costs.*

|  | **Award Option #1** – State and Territory Programs | **Award Option #2** – American Indian and Alaska Native Programs | **Award Option #3** – Multi-state Programs |
|---|---|---|---|
| **Financial Assistance**, share of funds | Target at least **75%** of funds | Target at least **65%** of funds | Target at least **75%** of funds |

2. **Fiscal Stewardship Plan:** Describe your approach to ensuring compliance with the grant's terms and conditions, including but not limited to the requirements in 2 CFR § 200.303 and 2 CFR § 200.332(b) and (d) if the applicant intends to provide subawards to eligible subrecipients and the information specified in Section 3 c. of the EPA Guidance on Participant Support Costs for subsidies, rebates or other incentive payments authorized under 2 CFR 1500.1(b). You should have comprehensive policies and procedures to ensure robust risk management across your activities; prevent fraud, waste, and abuse; and prudently manage grant funds. Additionally, you must explain your plan for consumer protection, including how you will ensure program partners and entities that directly interact, transact, or contract with consumers as part of the program, such as through the sales and marketing of solar products or services, and consumer purchase, leasing and financing (including Property Assessed Clean Energy (PACE) financing), will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdiction(s) your program will serve, and federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 U.S.C. § 45), Consumer Financial Protection Act (12 U.S.C. § 5536), and Fair Debt Collection Practices Act (15 U.S. Code § 1692e), and Regulation Z (12 CFR § 1026), which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit. Your explanation should include descriptions of practices you plan to use for effective consumer protection in your program and processes for screening entities that will directly interact, transact, or contract with consumers in your program. See examples of practices in *Appendix D: Consumer Protection Examples*. If you are proposing to capitalize a revolving

loan fund, you should describe the financial management plan for program income in the fiscal stewardship plan.

3. **Reporting Plan:** Describe your plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes described in *Section I.H: Measuring and Reporting Environmental Results* and referenced in *Section VI.C: Program Performance Reporting Requirements*. EPA plans to establish program performance reporting requirements consistent with 2 CFR § 200.329 in the terms and conditions of the grant award. Grantees will also be expected to report, on an ongoing basis, the underlying methodologies, technologies, data sources, inputs and assumptions, and other significant analytical choices used to calculate or estimate outputs and outcomes. For example, such disclosure may include project-level data (e.g., MW capacity installed), key assumptions to translate project-level data into outcomes (e.g., capacity factors, emissions intensity of displaced power generation, global warming potential of greenhouse gases, asset useful life), and relevant sources (e.g., EPA, DOE National Laboratories, peer-reviewed studies) for estimates compared to a no-action baseline and to other reasonable alternatives. EPA may require these data to be subject to third-party verification, audits, and/or assurance. EPA will work with grantees to establish standardized reporting requirements and identifying tools to support reporting. You should have a plan to integrate program evaluation activities into the reporting plan, including assessing effectiveness and efficiency in achieving outputs and outcomes. Evaluations should be conducted in adherence with EPA Order 1000.33, U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings. EPA Order 1000.33 provides a framework to comply with the Foundations for Evidence-Based Policymaking Act of 2018.

3. **Programmatic Capability and Environmental Results Past Performance:** Submit in Attachment F a list of federally and/or non-federally funded assistance agreements (assistance agreements include federal grants and cooperative agreements but not federal contracts) that your organization performed within the last three years (no more than five agreements) and answer <u>all</u> the below prompts. Note: for coalition applicants, the list of funded assistance agreements must be from the lead applicant.

- Whether, and how, you were able to successfully complete and manage those agreements

- Your history of meeting the reporting requirements under those agreements including whether you adequately and timely reported on your progress towards achieving the expected outputs and outcomes of those agreements (and if not, explain why not) and whether you submitted acceptable final technical reports under the agreements

- Your organizational experience and plan for timely and successfully achieving the objectives of the proposed project, and your staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed project

In evaluating applicants under these factors in *Section V.A: Evaluation Criteria*, EPA will consider the information provided by applicants and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant). If you do not have any relevant or available past performance or past reporting information, please indicate this in the application and you will receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). If you do not provide any response for these items, you may receive a score of 0 for these factors.

## D. Pre-Application Assistance

Applicants are invited to participate in webinars with EPA to address questions about this funding opportunity. Interested parties may access information on these webinars (including dates, times, and registration information) as well as other information on the competition at the following website: www.epa.gov/GGRF.

A recording of each webinar will be posted at the link above along with presented materials. If necessary, EPA may schedule additional webinars. In accordance with EPA Order 5700.5A1, EPA's Assistance Agreement Competition Policy, EPA staff will not meet with individual applicants to discuss draft applications, provide informal comments on draft applications, or provide advice to applicants on how to respond to ranking criteria.

Applicants are responsible for the contents of their applications. However, consistent with the provisions in the announcement, EPA will respond to questions from individual applicants regarding threshold eligibility criteria, administrative issues related to the submission of the application, and requests for clarification about the funding opportunity.

50

# Section V. Application Review Information

## A. Evaluation Criteria

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

Only eligible entities whose applications meet the threshold criteria in *Section III. Eligibility Information* will be evaluated according to the criteria set forth below. Applicants should explicitly address these criteria as part of their application package submittal in the Program Narrative, following the content requirements set forth in *Section IV.C: Content of Application Submission*. Each application will be rated using a point system. Applications will be evaluated based on a total of **245 points** possible.

**To assist EPA reviewers, applicants are strongly encouraged to reference the numbers and titles of the evaluation criteria in their Program Narratives to help identify where the criteria are being addressed.**

1. **Program Strategy Narrative (175 points total):** Each application will be evaluated on the quality and extent to which it articulates a plan to use grant funds to advance GGRF program objectives described in *Section I.C: GGRF Solar for All Program Objectives* by performing the scope of work described in *Section I.E: Scope of Work*. The application should refer to these program objectives in the below application components.

   1. **Impact Assessment (20 points total):** Each application will be evaluated on the extent and quality to which it explains the program's intended impact on addressing current market barriers to low-income solar deployment and sets achievable outcome metrics for the program based on those barriers. Specifically, EPA will evaluate the extent and quality to which the application:

      - Maximizes the impact of the program relative to the amount of funding requested by setting reasonable and ambitious targets for program output and outcome metrics, specifically the number of households projected to benefit from the solar program (both as an absolute number of households and award funding requested per household); the megawatts of solar capacity deployed over time (both as an absolute number of megawatts of solar deployed and dollars of award funding requested per megawatts of solar); megawatt hours of storage capacity deployed over time (both as an absolute number of megawatt hours of storage deployed and dollars of award funding requested per megawatt hours of storage); short tons of annual $CO_2$ emissions avoided over time (both as an absolute number of tons of $CO_2$ avoided and dollars of award funding requested per tons of $CO_2$ avoided); and the absolute annual of household savings realized over time (both as an absolute number of dollars saved and dollars of award funding requested per dollars of household savings). Applications will be evaluated on the extent and quality to which the application efficiently uses program funds to maximize households served by the program. **(10 points)**

      - Justifies how the proposed outcome metrics are reasonably achievable considering historical data (either past deployment of low-income distributed solar and storage in the geography the applicant is applying to serve or based on deployment in geographies

51

with similar conditions); an assessment of the market barriers (e.g., power market barriers, financial barriers, non-financial barriers) in the geography the program will operate in; a summary of how the program will address these barriers (you may reference other sections of the Program Narrative); and, if relevant, a description of the overall structure of how Solar for All will augment an existing low-income solar program. An application from an applicant without an existing low-income solar program will be evaluated on the extent and quality to which they describe the overall structure of the program they will develop with Solar for All funds. **(10 points)**

2. **Meaningful Benefits Plan (30 points <u>total</u>):** Each application will be evaluated on the quality of the program plan to ensure the solar and storage projects receiving financial assistance from the program will deliver meaningful benefits (as defined in *Section I.D: Competition Terminology*) to low-income and disadvantaged communities and households. Specifically, EPA will evaluate the extent and quality to which the application:

   - Details a plan to ensure all households that benefit from the Solar for All program experience minimum household savings of 20% of the average household utility bill in the utility territory. To ensure household savings are maximized, the application will also be evaluated on the extent of the plan to ensure customers receive a minimum household savings of 20%, even if the financial assistance model will require households to incur costs to benefit from the program either directly (e.g., costs to subscribe to the project or to build the project) or indirectly (e.g., costs through increases in taxes or impacts to other financial subsidies such as affordable housing allowances). Additionally, the application will be evaluated on the quality and extent of the plan to deliver equivalent household savings for projects serving households without individual electricity bills (e.g., master-metered, multi-family buildings)—specifically, how the program will ensure households receive a financial or equivalent non-financial benefit of 20% or greater of the average household's annual electricity expenditure; financial and equivalent non-financial benefit examples are described in recent guidance from U.S. Department of Housing and Urban Development. If the household saving figure included in the financial assistance model is an estimate, the application will be evaluated on the extent and quality of the plan to refine the estimated amount of savings a program beneficiary will receive from the program annually, including considering what data is required to better refine the estimate. If further refinement of the household savings figure included in the financial assistance model is not required, the application will be evaluated on the quality of the assumptions and data used to calculate the amount of savings a program beneficiary will receive from the program annually. **(10 points)**

   - Justifies how the program strategy for financial assistance and project-deployment technical assistance detailed later in the Program Narrative will increase low-income and disadvantaged households' access to solar through financial assistance and deployment options. Applicants may reference other sections of the Program Narrative to support these assertions. **(5 points)**

- Describes how the program will deliver energy resilience and grid benefits by creating capacity that can deliver electricity to low-income and disadvantaged households and/or critical facilities in low-income and disadvantaged communities in the event of a grid outage. Applicants may reference how the Financial Assistance Strategy for solar and storage achieves this meaningful benefit. **(5 points)** *(Note: this criteria point complements the criteria point on associated storage in the Financial Assistance Strategy. This criteria point asks applicants how projects funded by the program will support resilience as an overarching program goal, whereas the Financial Assistance Strategy asks how applicants will make decisions about when and how to use financial assistance to invest in associated storage.)*

- Commits to maximizing household and community ownership models and includes a plan to support low-income and disadvantaged households and communities building equity in projects. If community ownership is not being proposed, applicants will be evaluated on the quality to which they justify why the program will be unable to facilitate community ownership models. **(5 points)**

- States a plan for investing in jobs and businesses in low-income and disadvantaged communities through program operations. The application will be evaluated on the extent to which it details a plan to invest in minority- and women-owned businesses as well as historically underutilized business zones (as defined by the U.S. Small Business Administration's "HUBZone" program). Additionally, the application will be evaluated on the quality and extent of the program's commitment to job quality and expanding opportunities for workers from underserved communities in the use of grant funds for solar projects. The application will be evaluated on the extent and quality of the program's plans, policies, procedures, and concrete goals to work with labor unions, developers, contractors, and other partners that are committed to "high road" labor practices, including providing family-sustaining benefits, predictable work schedules, retirement contributions, safe working conditions, the free and fair choice to join a union, providing supportive services for those who need them, and other characteristics of a good job as discussed in *Appendix E: Equitable Workforce Development and Job Quality*. The application will be evaluated on the extent and quality of the plan to use Registered Apprenticeship labor on projects to grow the skilled workforce and promote job quality. The application will be evaluated on the extent and quality of the program's commitment to workers' free and fair choice to collectively bargain and join a union, such as requiring participating contractors to commit to remaining neutral in union organizing and operations and encouraging the use of Project Labor Agreements when appropriate. The application will be evaluated on the extent the plan is supported by letters of support from quality partners (e.g., labor unions, employers, industry associations, worker centers) in Attachment I of the application. **(5 points)** *(Note: this criteria point complements the criteria point on workforce development strategies in the Project-Deployment Technical Assistance strategy. This criteria point asks applicants how projects funded by the program will support jobs and businesses in low-income and disadvantaged communities, whereas the Project-Deployment Technical*

53

*Assistance strategy asks how applicants will invest in workforce development services as part of the technical assistance services the program provides. The strategy for supporting jobs and businesses in low income and disadvantaged communities may include hiring workers trained by the workforce development services explained in the Project-Deployment Technical Strategy).*

3. **Distributed Solar Market Strategy (30 points <u>total</u>):** Each application will be evaluated on the extent to which it identifies and addresses barriers to low-income and disadvantaged community residential distributed solar deployment in relevant power market structures. The application will be evaluated on the extent to which the plans described below are supported with statements of support from governors' offices, public utility commissions, and other energy market stakeholders in the geography the applicant is applying to serve, as included in Attachment J of the application. Specifically, EPA will evaluate the extent and quality to which the application:

- Describes the net metering polices, including net metering caps, in the program's geography and how supportive those policies are to residential distributed solar deployment. If net metering policies are a barrier to residential distributed solar deployment, the application will be evaluated on the quality and extent of the plan to address this barrier. If net metering policies are supportive of residential distributed solar deployment, the application will be evaluated on the extent to which it justifies why net metering is not a barrier and proposes a plan to maximize and leverage these policies. **(6 points)**

- Describes the third-party ownership policies in the geography and how supportive those policies are to residential distributed solar deployment and delivering meaningful benefits—specifically community ownership benefits—to low-income and disadvantaged communities and households. If third-party ownership policies are a barrier to communities deploying and benefiting from distributed residential solar, the application will be evaluated on the extent and quality of the plan to address these barriers. If third-party ownership policies are not a barrier to deployment, the application will be evaluated on the extent to which it justifies why this is not a barrier and proposes a plan to maximize and leverage these policies. **(5 points)**

- Describes barriers to distributed solar deployment from interconnection processes (e.g., excessive fees, limited transparency in processes and timelines) in the geography and describes a reasonable plan to address these barriers. If this barrier is not applicable to the geography, the application will be evaluated on the extent to which it justifies why this is not a barrier and proposes a plan to maximize and leverage these policies. **(5 points)**

- Describes the plan to maximize and leverage relevant enabling renewable portfolio standard (RPS) mandates in the geography the program will operate to support distributed solar deployment. If the geography does not have a RPS, the application will be evaluated on the extent and quality of the plan to address this barrier. **(5 points)**

54

- Describes the geography's enabling regulatory frameworks that support community solar deployment, specifically, whether the geography has adequate deployment caps and/or carveouts to support the Solar for All deployment targets stated in Section 1.1 Impact Assessment; allows for consolidated billing; and values power generation from community solar at or close to retail rates and/or represents a healthy net metering market. If the geography does not have adequate regulatory frameworks for community solar, the application will be evaluated on the extent to which it describes a reasonable plan to address this barrier. If enabling community solar policies are not relevant for the application because the proposed program will only deploy residential rooftop solar, the application should state that this is not applicable. *If not applicable, the application will receive a neutral score for this criterion.* (**4 points**)

- Describes a plan to ensure the program will maximize deployment breadth and diversity across the geography, despite jurisdictional differences between different utility territories and/or regulatory jurisdictions in the geography the application proposes to serve. If none exist, the application will be evaluated on how well it demonstrates that there are no major regulatory differences across jurisdictions that will impact distributed solar deployment. (**5 points**)

4. **Financial Assistance Strategy (30 points <u>total</u>):** Each application will be evaluated on whether the proposed financial assistance model is efficient, leverages other funds to the greatest extent possible, and maximizes solar deployment. Specifically, EPA will evaluate the extent and quality to which the application:

- Details a reasonable financial assistance strategy that includes defining the type and size of the subsidy and/or other financial assistance strategy for all the technologies the program will fund (i.e., residential rooftop solar, residential-serving community solar, and/or associated storage). The financial assistance model will be evaluated on the quality of the plan to maximize the number of households benefitting from the program relative to the amount of award funds. The application will be evaluated on the extent and quality of the program's proposed targets for deployment of residential rooftop solar and residential-serving community solar and the justification that these targets are appropriate given the characteristics and needs of the communities (e.g., building stock, cost of electricity, homeownership ratios) the program will serve. (**10 points**)

- Ensures that the Solar for All financial assistance strategy proposed in the application complements, and does not duplicate, existing sources of capital and financial assistance; is designed to ensure program longevity and market transformation beyond the program period detailed in this application; plans to leverage innovative financing structures such as renewable energy credits, tax credits, debt financing, leases, power purchase agreements, other third-party ownership options, revolving loan programs, green bonds, guarantees, or other financing products; and includes a strategy to engage with other capital providers to maximize deployment including supporting other public (including the National Clean Investment Fund and the Clean Communities Investment Accelerator) and private sources of capital. (**10 points**)

55

- Details reasonable criteria for when the program will provide financial assistance for associated storage and enabling upgrades that maximizes residential distributed solar capacity deployment, households served by the program, and meaningful benefits. In regard to the associated storage plan, the application will be evaluated on the quality and extent to which it details prudent criteria for deciding which projects receive financial assistance for storage and includes reasonable deployment targets for residential storage. In regard to the enabling upgrades plan, the application will be evaluated on the quality and extent to which it presents a prudent strategy for using financial assistance for enabling upgrades (which the applicant may define for the program) to address barriers that reduce the deployment of residential and residential-serving community solar, such as roof upgrades; energy efficiency; behind-the-meter electrical upgrades; and distribution and transmission infrastructure investment that must be borne by the project (i.e., is not rate-based or part of planned capital improvement by a utility). The application will be evaluated on the plan to ensure financial assistance for enabling upgrades are spent judicially, ensuring that no more than 20% of total financial assistance distributed for the lifetime of the program is used for enabling upgrades. The application will be evaluated on the quality of the plan to ensure the program does not use these funds on costs that could be supported by other sources of capital including other assistance programs at the federal, state, and local level, as well as a plan to refer customers to DOE's Weatherization Assistance Program (WAP), or other local, state, and federal programs for energy efficiency financial assistance. **(5 points)**

- Considers the long-term impacts of program financial assistance. The application will be evaluated on the quality and extent of the plan to integrate housing affordability considerations into the program operations, including but not limited to policies that maintain affordability of existing housing stock, anti-displacement policies, and policies that prevent rapid cost increases for low-income and disadvantaged households and communities. Additionally, the application will be evaluated on the quality and extent of the plan to supporting operations, maintenance, and recycling of the assets funded under the program for the lifetime of the assets (i.e., approximately 20 years), including ensuring maximum energy output of the assets and conducting audits of assets to ensure operations and maintenance is performed. **(5 points)**

5. **Project-Deployment Technical Assistance Strategy (20 points total):** Each application will be evaluated on the plan to address the market barriers defined in Section 1.1: Impact Assessment of the Program Narrative with project-deployment technical assistance. This project-deployment technical assistance includes services defined in *Section I.D: Competition Terminology*. Specifically, EPA will evaluate the extent and quality to which the application:

- Details a robust plan to invest in the skilled workforce needed to deploy solar, including expanding participation from workers in low-income and disadvantaged communities in the solar industry. The application will be evaluated on the quality and extent of the plan to train and place workers in high-quality, long-term careers through high road,

56

worker-centered workforce training models, including one or more Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, and training programs in partnership with local community colleges or Minority Serving Institutions. The application will be evaluated on the quality and extent of the plan to recruit and retain participants from low-income and disadvantaged communities, including how those participants will be supported with wrap-around supportive services (e.g., childcare, transportation), case management, and on-the-job support and mentorship. The application will be evaluated on the extent the plan is supported by letters of support from quality partners (e.g., State workforce board and/or State department of labor, community colleges, labor unions, community-based organizations) in Attachment K of the application. **(10 points)**

- Describes a robust plan to provide solar developers and communities with technical assistance to address interconnection challenges, including detailing what interconnection challenges can and cannot be addressed by the program; explaining a plan for how the program will provide support to stakeholders to address these challenges (e.g., using DOE's i2X Technical Assistance program); and describing a plan to partner with utilities and create efficiencies for program deployment. **(5 points)**

- Describes a robust plan to ensure projects funded under the program are efficiently deployed and resilient by providing solar developers and communities with technical assistance for project siting, land-use, permitting, building codes, inspection, and quality control. To ensure projects are efficiently sited and permitted, the applicant will be evaluated on the extent and quality of the plan to provide technical assistance to stakeholders on engaging with utilities on project siting; leveraging community benefits agreements; considering land use planning and zoning requirements that impact siting strategy; incorporating climate hazards (e.g., flood zones, wildfire risks) into siting strategy; committing to protecting critical pollinator habitats, greenspace, wetlands, and productive farmland; adopting agrivoltaics in siting strategy if relevant; using remediated brownfields for project siting; managing permitting processes and challenges; and adopting existing technical assistance tools such as DOE/NREL's SolarAPP+, SolSmart and/or similar technical assistance programs or strategies. To ensure projects are efficiently and soundly built, the application will be evaluated on the quality and extent of the plan to provide technical assistance to solar stakeholders on meeting the most current, broadly accepted consensus-based building codes and standards; ensuring projects are resilient to any relevant physical climate hazards; and incorporating robust post-construction inspection and quality control processes. **(5 points)**

6. **Equitable Access and Meaningful Involvement Plan (30 points total):** Each application will be evaluated on the extent and quality of the plan to ensure the program maximizes access to the program for low-income and disadvantaged communities. The application will be evaluated on the extent to which the plans described below are supported with

statements of support from community-based organization, labor partners, and other potential program partners in Attachment L of the application. Specifically, EPA will evaluate the extent and quality to which the application:

- Commits to maximizing the breadth and diversity of communities served in the geography while prioritizing serving the most disadvantaged and low-income households in the communities the program is designed to serve. The application will be evaluated on the extent and quality of the plan to ensure the program serves all types of communities and households, including rural, suburban, and urban communities; traditional energy communities; communities with limited English proficiency; as well as households who do not own their property, including owners of manufactured homes on leased sites, and households who do not have space for residential rooftop solar. If the application is for award option #1 and there are American Indian and Alaska Native communities in the state or territory the program will operate in, the application will be evaluated on the extent and quality of the plan to serve these communities. If the program will not serve one or more of these types of communities, the application will be evaluated on the quality of the rationale for why. **(10 points)**

- Details a robust plan for participatory governance—formalized structures for communities to be involved in the design and decision-making of the program. The application will be evaluated on the extent and quality of the plan to develop meaningful partnerships with community-based organizations that reflect the communities the program intends to benefit and are designed to reach the most disadvantaged or historically marginalized communities. If the application is serving American Indian and Alaska Native Communities, the application will be evaluated on the quality and extent of the plan to meaningfully involve American Indian and Alaska Native Communities in program planning and operations. **(10 points)**

- Plans to meaningfully engage with Solar for All stakeholders including education, outreach, and community engagement. The application will be evaluated on the quality of the plan to collaborate with trusted community-based organizations and ensure the program effectively engages with all communities, such as communities with limited English proficiency by creating culturally appropriate materials and via diverse channels (e.g., online, in-person, paper messaging). **(5 points)**

- Explains a robust strategy for customer acquisition and management for the program. The strategy for customer acquisition will be evaluated on the extent to which it plans to use partnerships with community-based organizations to acquire customers and plans to coordinate with existing need-based federal, state, Tribal, or utility assistance programs (e.g., WAP, SNAP, TANF, Lifeline, LIHEAP) to leverage complementary resources and acquire customers. To reduce risk from fraud and waste, the application will be evaluated on the extent and quality to which the program plans to perform robust income verification above and beyond attestation—such as categorical eligibility; the forthcoming DOE and HHS Community Solar Subscription Tool; or a similar tool/strategy, while minimizing burdens on households. Categorical eligibility consists of obtaining proof of household participation in a needs-based Federal, State, Tribal,

or utility assistance program with income limits at or below the qualifying income level for the program. **(5 points)**

7. **Program Planning Timeline and Workplan Narrative (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to implement the program described in the Program Narrative Sections 1.2 through 1.6 to achieve the impact targets defined in Section 1.1. The application will be evaluated on the extent and quality of both the narrative as described below as well as the supporting Program Planning Timeline and Workplan in Attachment D (as described in *Section IV.B: Application Materials*). EPA has included an optional template Program Planning Timeline and Workplan in Excel on epa.gov/GGRF. Applicants may use this template as Attachment D. Applicants will not be penalized for not using this template. Specifically, EPA will evaluate the extent and quality to which the application:

- Plans on refining the program plan as detailed in an implementation timeline narrative with clear and reasonable milestones for developing the Solar for All program, ensuring the program completes the program planning stage and begins deploying financial assistance to solar projects within one year of the award and expends all funds within five years of the award. The application will be evaluated on the extent to which the implementation timeline narrative includes reasonable steps for planning and implementing the Meaningful Benefits Plan (Section 1.2), Distributed Solar Market Strategy (Section 1.3), the Financial Assistance Strategy (Section 1.4), the Project-Deployment Technical Assistance Strategy (Section 1.5), and the Equitable Access and Meaningful Involvement Plan (Section 1.6). The application will be evaluated on the quality and extent of the plan to dedicate program planning capacity to incorporate forthcoming EPA guidance on how and when to apply Build America, Buy America and Davis-Bacon Act prevailing wage requirements to Solar for All program operations. See *Section VI.B: Administrative and National Policy Requirements* for more information about these requirements. **(5 points)**

- Coordinates with relevant stakeholders and partners including local and/or state governments, utilities, community-based organizations, state-level assistance programs, labor organizations, and other stakeholders referenced in Sections 1.2 through 1.6, as evidenced by including coordination milestones and steps in the planning phase of the workplan. **(5 points)**

- Commits to adopting residential rooftop and residential-serving community solar best practices by planning to leverage existing technical assistance tools and resources for program planning. The application will be evaluated on the extent and quality of the plan to refine elements of the program plan in the application, which may need to be improved or further detailed with analysis, data, or support from solar industry experts and tools. If no assistance is needed for program planning, the application will be evaluated on the quality of the justification for why the program does not need technical assistance for program planning. **(5 points)**

*Applicants should attach the Program Planning Timeline and Workplan as Attachment D to their application so it will not count against the 40-page Program Narrative limit. However, the Program Planning Timeline and Workplan Narrative should be included in the body of the 40-page Program Narrative and provide clear, explanatory detail about how the program will be implemented efficiently and effectively to achieve the program objectives and impact targets detailed in 1.1 Impact Assessment of the Program Narrative.*

2. **Program Administration Narrative (50 points <u>total</u>):** Each application will be evaluated on the extent to which it will deploy and manage funds efficiently, responsibly, and transparently.

   1. **Budget Narrative (15 points <u>total</u>):** Each application will be evaluated based on the quality of the description of the budget included in SF-424A as well as the extent and quality of the itemized Budget Table in Attachment E of the application. EPA has provided an optional detailed Budget Table template in Excel available for download on epa.gov/GGRF. Applicants that do not use this template will not be penalized. Specifically, EPA will evaluate the extent and quality to which the application:

      - Demonstrates the procedures and controls for ensuring that awarded grant funds will be expended in a timely and efficient manner and explains how the program costs are cost-effective, allowable, and reasonable to accomplish the proposed program plan. An application for award option #1 or #3 will be evaluated on the extent to which it will use 75% or more of requested funds (both direct costs and the indirect costs charged to direct costs attributable to financial assistance activities) on financial assistance for projects; an application to award option #2, will be evaluated on the extent to which it will use 65% or more of requested funds (both direct costs and the indirect costs charged to direct costs attributable to financial assistance activities) on financial assistance for projects. **(10 points)**

      - Demonstrates that the budget is efficient in the detailed Budget Table, which breaks up costs in the proper budget category for each activity for which the application is requesting funding, in Attachment E of the application. **(5 points)**

      *Applicants should attach the itemized Budget Table as Attachment E to their application so it will not count against the 40-page Program Narrative limit. However, the Budget Narrative should be included in the body of the 40-page Program Narrative and provide clear, explanatory detail about the itemized costs in the attached Budget Table. Both the Budget Table and Budget Narrative should be specific and clear.*

   2. **Fiscal Stewardship (20 points <u>total</u>):** Each application will be evaluated on the quality of program controls to manage taxpayer dollars ethically and efficiently as well as the policies and controls for program oversight. Specifically, EPA will evaluate the extent and quality to which the application:

      - Commits to reducing waste, fraud, and abuse by including plans and policies for program oversight, including confidential reporting (e.g., whistleblower protections) and managing conflicts of interest. The application will be evaluated on the extent and

quality of the plan to comply with requirements in 2 CFR § 200.303 and 2 CFR § 200.332(b) and (d) if the applicant intends to provide subawards to eligible subrecipients. **(10 points)**

- Invests in consumer protection, including a plan explaining how program partners and entities that directly interact, transact, or contract with consumers as part of the program, such as through the sales and marketing of solar products or services, and consumer purchasing, leasing and financing (including Property Assessed Clean Energy (PACE) financing), will comply with applicable consumer protection laws, including the consumer protection laws in the jurisdiction(s) the program will serve, in addition to federal consumer protection and consumer financial laws, such as laws prohibiting unfair, deceptive, and abusive practices (e.g., the Federal Trade Commission Act (15 U.S.C. § 45), Consumer Financial Protection Act (12 U.S.C. § 5536), Fair Debt Collection Practices Act (15 U.S. Code § 1692e), and Regulation Z (12 CFR § 1026) which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit). The application will also be evaluated on the extent and quality of the plan to screen entities that will directly interact, transact, or contract with consumers in the program and ensure consumers are not charged illegal upfront or cancellation fees; experience transparent and verifiable subscription payment, where applicable, and billing processes; and have accessibility if they have limited English proficiency, in compliance with *Executive Order 13166 (Improving Access to Services for Persons with Limited English Proficiency)*. The application will also be evaluated based on the extent and quality of the plan to actively combat residential rooftop and residential-serving community solar predatory lending activities, which potentially exist in the geography the applicant proposes to serve. **(7 points)**

- Incorporates guardrails to ensure household savings materialize for program beneficiaries by performing audits or spot-checks of bills. **(3 points)**

3. **Reporting Plan (15 points <u>total</u>):** Each application will be evaluated on the extent and quality of the plan to execute the anticipated reporting requirement described in *Section VI.C: Program Performance Reporting Requirements*. Specifically, EPA will evaluate the extent and quality to which the application:

- Invests program capacity in performing program evidence and evaluation activities and details a plan to publish data, evidence, and evaluation reports publicly during the program lifetime. Please see *Section VI.C: Program Performance Reporting Requirements and ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities* for additional information on evidence and evaluation requirements. **(10 points)**

- Demonstrates an understanding of the award reporting requirements, a plan to execute on the reporting requirements, and the capacity to execute on those reporting requirements. **(5 points)**

3. **Programmatic Capabilities and Environmental Results Past Performance (20 points total):** Each applicant will be evaluated based on their ability to successfully complete and manage the proposed program plan considering their past performance. Applicants will be evaluated based on their ability to successfully complete and manage the proposed program considering their:

- Past performance in successfully completing and managing the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of this NOFO (the applicant will have addressed this information in Attachment F of their application). Demonstrates past performance in successfully completing and managing the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of the NOFO. **(6 points)**

- History of meeting the reporting requirements under the assistance agreements identified in response to *Section IV.C: Content of Application Submission*, Section 3 Programmatic Capabilities and Environmental Results Past Performance of this NOFO, (the applicant will have addressed this information in Attachment F, of their application) including whether the applicant submitted acceptable final technical reports under those agreements and the extent to which the applicant adequately and timely reported on their progress towards achieving the expected outputs and outcomes under those agreements and, if such progress was not being made, whether the applicant adequately reported why not. **(6 points)**

- Organizational experience and a plan for timely and successfully achieving the objective of the proposed program. **(4 points)**

- Staff expertise/qualifications, staff knowledge, and resources or the ability to obtain them, to successfully achieve the goals of the proposed program. **(4 points)**

*Note: In evaluating applicants under the first two factors, EPA will consider the information provided in the application and may also consider relevant information from other sources, including information from EPA files and from current/prior grantors (e.g., to verify and/or supplement the information provided by the applicant). If you do not have any relevant or available past performance or past reporting information, please indicate this in the application and you will receive a neutral score for these factors (a neutral score is half of the total points available in a subset of possible points). If you do not provide any response, you may receive a score of 0.*

## B. Review and Selection Process

Applications will be reviewed and scored under the following process:

1. **Threshold Eligibility Review Process:** All applications will be evaluated for eligibility using the threshold eligibility criteria described in *Section III.C: Threshold Eligibility Criteria.*

2. **Review Panel and Evaluation Process:** Review panel(s) will review, score, and rank all eligible applications that pass the threshold eligibility review based on the merit evaluation criteria listed above. Applicants will be ranked in three separate ranking lists based on award option. The review panel(s) will include EPA staff and may also include staff from other federal agencies and external subject matter experts who are free from any actual or apparent conflicts of interest.

3. **Final Selection Process and Other Factors:** The review panel will present final rankings and selection recommendations to the Selection Official, who will then make the final selections for awards. Selections will be made to maximize geographic coverage across all three award options.

   In addition to this information, the Selection Official may also consider any of the following "other factors" in making final selection decisions from among the high-ranking applications, including GGRF program objectives; EPA strategic goals and objectives; availability of funds. The Selection Official may also consider the "other factors" across the multiple ranking lists described above.

4. **Anticipated Announcement and Federal Award Date:** EPA anticipates it will announce selection decisions in March 2024 and tentatively plans to issue awards by July 2024.

## Section VI. Award Administration Information

Note: Additional provisions that apply to this section can be found at EPA Solicitation Clauses.

## A. Award Notification

EPA anticipates notification of selected applicants will be made via electronic mail by the end of March 2024, with awards tentatively planned to be issued by July 2024. The notification will be sent to the original signer of the application or the contact listed in the application. This notification, which informs the applicant that its application has been selected and is being recommended for award, is not an authorization to begin work. The official notification of an award will be made by the appropriate EPA Award Official. Applicants are cautioned that only a grants officer is authorized to bind the Government to the expenditure of funds; selection does not guarantee an award will be made. For example, statutory authorization, funding or other issues discovered during the award process may affect the ability of EPA to make an award to an applicant. The award notice, signed by an EPA grants officer, is the authorizing document and will be provided through electronic mail. The successful applicant may be requested to prepare and submit additional documents and forms that must be approved by EPA before the grant can officially be awarded. The time between notification of selection and award of a grant can take up to 90 days or longer.

**Administrative and Programmatic Capability Assessment:** Non-profit applicants that are recommended for funding under this announcement are subject to pre-award administrative capability reviews consistent with Section 8b, 8c, and 9d of EPA Order 5700.8: EPA's Policy on Assessing Capabilities of Non-Profit Applicants for Managing Assistance Awards. In addition, non-profit applicants selected for awards over $200,000 may be required to fill out and submit to the EPA Grants Management Office EPA Form 6600.09, United States Environmental Protection Agency Administrative Capability Questionnaire with supporting documents as required in EPA Order 5700.8.

## B. Administrative and National Policy Requirements

The grantee will be subject to administrative and national policy requirements. Note that EPA plans to establish programmatic requirements in the terms and conditions of the grant award to implement these administrative and national policy requirements, which will include but not be limited to the below policies.

- **Build America, Buy America Act (BABA):** Certain projects under this competition are subject to the Buy America Sourcing requirements under the Build America, Buy America (BABA) provisions of the Infrastructure Investment and Jobs Act (IIJA)(P.L. 117-58, §§70911-70917) that apply when using Federal funds for the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States. The Buy America preference requirement applies to all the iron and steel, manufactured products, and construction materials used for the infrastructure project under an award for identified EPA financial assistance funding programs. Please consider this information when preparing budget information. EPA will provide further guidance on which projects are subject to BABA provisions and will work

64

with grantees to support implementation as necessary, as applicants comply with applicable Buy America preference requirements or apply for a waiver for each infrastructure project.

- **Davis-Bacon and Related Acts (DBRA):** The Davis-Bacon Act (42 USC §§3141-3144)(DBA) sets out labor standards, including prevailing wages and fringe benefits, and applies to most federally funded contracts for construction of public works. The DBA labor standards and reporting requirements also apply to projects assisted with grants authorized by the Clean Air Act as provided in Section 314 of the Clean Air Act (DBRA)(42 USC §7614). A term and condition specifying DBRA compliance requirements will be included in the grant agreement.

- **Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA):** The URA applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR § 24 require grantees to follow certain procedures for acquiring property for grant purposes, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. A term and condition specifying URA compliance requirements will be included in the grant agreement.

- **National Historic Preservation Act (NHPA)**: Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant agreement, on historic properties. If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs. A term and condition specifying NHPA compliance requirements will be included in the grant agreement.

- **Justice40 Initiative:** The Justice40 Initiative directs that EPA track and measure program benefits, setting the goal that at least 40% of the overall benefits from certain federal investments in climate, clean energy and other areas flow to disadvantaged communities. The Greenhouse Gas Reduction Fund is a covered program under the Justice40 Initiative.

Note that Section 7(c) of the Energy Supply and Environmental Coordination Act of 1974 (15 U.S.C. § 793(c)(1)) exempts all actions under the Clean Air Act from the requirements of NEPA. This Section states: "No action taken under the Clean Air Act shall be deemed a major federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969." Therefore, as a grant program authorized under the Clean Air Act, NEPA will not apply to projects funded under Solar for All.

## C. Program Performance Reporting Requirements

In accordance with 2 CFR § 200.329, the grantee will be subject to program performance reporting requirements. Reporting requirements during the period of performance will be established in the

grant's terms and conditions, and reporting requirements after the period of performance will be established in the Closeout Agreement. EPA plans to provide reporting templates to assist grantees with compliance against select program performance requirements. **Note that EPA will only collect reporting information from the grantee (rather than from any subrecipients), but the grantee may be required to collect reporting information from subrecipients.**

The grantee will be required to submit annual reports throughout the lifetime of the program within 30 days of the end of each reporting period, as well as a final program report, within 120 days after the end of the project period. EPA will use information from these reports as part of program-wide public reporting, except to the extent such information includes confidential business information (CBI) or personally identifiable information (PII) pursuant to 2 CFR § 200.338. These reporting requirements include requirements detailed in *Section I.H: Measuring and Reporting Environmental Results*.[29] Included below is illustrative information that EPA expects to require in these reports.

| Category | Example metrics and reports[30] |
|---|---|
| **Program activities** | • **Grant funds deployed**, by type of cost (financial assistance, technical assistance, program administration) ($) |
| | • **Funds for financial assistance deployed**, by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) |
| | • **Funds for technical assistance deployed**, by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) |
| | • **Findings from evidence building activities on program operations, impact, outcomes including but not limited to program evaluation reports**, in adherence with ORDER 1000.33 03/25/2022 U.S. Environmental Protection Agency Policy for Evaluations and Other Evidence-Building Activities, including timely publication of findings |
| | • **Reports on program feedback from all stakeholders participating in the program** including community-based organizations, households served, workers trained, contractors, etc. |
| **Climate and air pollution benefits** | • **Number of projects financed** by geography and type of project (residential rooftop solar, residential-serving community solar) (#) |
| | • **Solar capacity installed** by geography and type of project (MW) |
| | • **Storage capacity installed** by geography, type of project (MWh) |

---

[29] Information claimed as CBI in accordance with this Notice will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B.

[30] EPA will work with recipients to develop a standardized methodology for measuring and estimating outcome metrics which may include standardized equations, tools such as EPA's Avoided Emissions and Generation Tool (AVERT), and standardized assumption sources.

| | |
|---|---|
| | • **Clean energy generation** by geography, type of project, and technology (MWh) |
| | • **Greenhouse gas emissions reduced and avoided** by geography and type of project (tons $CO_2e$) |
| | • **Other air pollution reduced and avoided** by geography and type of project (tons other air pollutants such as particulate matter, nitrogen dioxide, ozone, etc.) |
| **Equity and community benefits** | • **Number of households benefitting** from projects by geography and type of project (#) |
| | • **Amount of household savings delivered** by geography and type of project ($) |
| | • **Workers trained by workforce development programs** by geography (#) and their starting wages and benefits ($) |
| | • **Projects executed using tools to promote good jobs and community benefits** (e.g., Community Workforce Agreement, Community Benefits Agreement, Project Labor Agreement) by geography, project-type (#) |
| | • **Investments in or in partnership with women- and minority-owned businesses** by geography, type of engagement (e.g., investment in a business, partnership on a deal, procurement of services), type of project (# of businesses engaged), ($ of procurement costs) |
| | • **Number of households with resiliency benefits** by geography (#) |
| | • **Clean energy capacity owned by communities** in direct ownership models by geography, type of project, type of community owner (household, community-based organization) and technology (MW, MWh) |
| | • **Number of solar jobs created** by geography (#) |
| | • **Reduced disparities in energy burden between low-income and non-low-income households** by geography ($) |
| | • **Increased wages for individuals working in solar energy** by geography (%) |

67

| Market transformation | • **Grant funds deployed** by type of cost (financial assistance, technical assistance, program administration) ($) |
|---|---|
| | • **Financial assistance deployed** by geography, type of cost (solar, storage, and enabling upgrades), type of financial assistance (e.g., subsidy, loans), type of project, type of technology ($) |
| | • **Total private sector financing mobilized**, alongside projects funded directly by Solar for All by geography, type of project ($) |
| | • **Number of community-based organizations engaged by Solar for All services** (e.g., technical assistance programs for solar deployment, education programs) by geography (#) |
| | • **Financial assistance deployed to consumers with limited credit history** by geography, type of financial assistance, type of project, type of technology ($) |
| | • **Changes in net metering caps** by geography by type of project (MW, %) |
| | • **Changes in interconnection timelines** by geography (days) |
| | • **Changes in Solar Renewable Energy Credit (SREC) values** by geography ($) |
| | • **Distributed clean energy capacity deployed benefitting communities** <u>not</u> directly financed by Solar for All by geography, type of project, type of technology, recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) (MW, MWh) |
| | • **Capital deployed to finance distributed clean energy capacity** <u>not</u> directly financed by Solar for All by geography, type of project, type of technology, recipient-type (households, community-serving institutions), type of community (low-income and disadvantaged communities, other communities) ($) |

## D. Administrative Reporting Requirements

The grantee will be subject to several administrative reporting requirements, which will be included in the grant's terms and conditions (example of general terms and conditions included on EPA's website). These requirements will include, but not be limited to the below reports.

- **Federal Financial Report:** In accordance with 2 CFR § 200.328 and 2 CFR § 200.344, the grantee must submit the Federal Financial Report (SF-425) at least annually and no more frequently than quarterly. The frequency of reporting and report submission instructions will be specified in the terms and conditions.

- **Single Audit:** In accordance with 2 CFR § 200.501(a), the grantee will be required to obtain a single audit from an independent auditor, if their organization expends $750,000

or more in total federal funds. The recipient must submit the form SF-SAC and a Single Audit Report Package within nine months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor. The SF-SAC and a Single Audit Report Package MUST be submitted using the Federal Audit Clearinghouse's Internet Data Entry System available at: https://facides.census.gov.

- **Financial Records Retention:** In accordance with 2 CFR § 200.334, the grantee will be required to retain financial records, supporting documents, statistical records, and all other non-federal entity records pertinent to the grant award for a period of three years from the date of submission of the final expenditure report.

- **MBE/WBE Utilization:** When required, the grantee must complete and submit a "MBE/WBE Utilization Under Federal Grants and Cooperative Agreements" report (EPA Form 5700-52A) on an annual basis.

- **Real Property Status Report:** In accordance with 2 CFR § 200.329, the grantee must submit a "Real Property Status Report" (SF-429) to report real property status or request agency instructions on real property that was/will be provided as Government Furnished Property (GFP) or acquired (i.e. purchased or constructed) in whole or in part under a federal financial assistance award.

## E. Remedies for Non-Compliance

In accordance with 2 CFR § 200.208, 2 CFR § 200.339, and 2 CFR § 200.340, EPA is provided authority for multiple potential responses if a grantee violates the terms of the grant agreement.

## Section VII. Contact Information

Further information, if needed, may be obtained by emailing ggrf@epa.gov. Information regarding this funding opportunity obtained from sources other than the EPA may not be accurate.

# Appendix A. Grants.gov Application Submission Instructions

## A. Requirement to Submit through Grants.gov and Limited Exception Procedures

Applicants must apply electronically through Grants.gov under this funding opportunity based on the grants.gov instructions in this announcement. If your organization has no access to the internet or access is very limited, you may request an exception for the remainder of this calendar year by following the procedures outlined here. Please note that your request must be received at least 15 calendar days before the application due date to allow enough time to negotiate alternative submission methods. Issues with submissions with respect to this opportunity only are addressed in *Appendix A. Section C: Technical Issues with Submission* below.

## B. Submission Instructions

1. SAM.gov (System for Award Management) Registration Instructions

   Organizations applying to this funding opportunity must have an active SAM.gov registration. If you have never done business with the Federal Government, you will need to register your organization in SAM.gov. If you do not have a SAM.gov account, then you will create an account using login.gov[1] to complete your SAM.gov registration. SAM.gov registration is FREE. The process for entity registrations includes obtaining Unique Entity ID (UEI), a 12-character alphanumeric ID assigned an entity by SAM.gov, and requires assertions, representations and certifications, and other information about your organization. Please review the Entity Registration Checklist for details on this process.

   If you have done business with the Federal Government previously, you can check your entity status using your government issued UEI to determine if your registration is active. SAM.gov requires you renew your registration every 365 days to keep it active.

   Please note that SAM.gov registration is different than obtaining a UEI only. Obtaining an UEI only validates your organization's legal business name and address. Please review the Frequently Asked Question on the difference for additional details.

   Organizations should ensure that their SAM.gov registration includes a current e-Business (EBiz) point of contact name and email address. The EBiz point of contact is critical for Grants.gov Registration and system functionality.

   Contact the Federal Service Desk for help with your SAM.gov account, to resolve technical issues or chat with a help desk agent: (866) 606-8220. The Federal Service desk hours of operation are Monday – Friday 8am – 8pm ET.

2. Grants.gov Registration Instructions

   Once your SAM.gov account is active, you must register in Grants.gov. Grants.gov will electronically receive your organization information, such as e-Business (EBiz) point of contact email address and UEI. Organizations applying to this funding opportunity must have an active Grants.gov registration. Grants.gov registration is FREE. If you have never applied for a federal grant before, please review the Grants.gov Applicant

71

Registration instructions. As part of the Grants.gov registration process, the Ebiz point of contact is the only person that can affiliate and assign applicant roles to members of an organization. In addition, at least one person must be assigned as an Authorized Organization Representative (AOR). Only person(s) with the AOR role can submit applications in Grants.gov. Please review the Intro to Grants.gov-Understanding User Roles and Learning Workspace – User Roles and Workspace Actions for details on this important process.

Please note that this process can take a month or more for new registrants. Applicants must ensure that all registration requirements are met in order to apply for this opportunity through Grants.gov and should ensure that all such requirements have been met well in advance of the application submission deadline.

Contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov to resolve technical issues with Grants.gov. Applicants who are outside the U.S. at the time of submittal and are not able to access the toll-free number may reach a Grants.gov representative by calling 606-545-5035. The Grants.gov Support Center is available 24 hours a day seven days a week, excluding federal holidays.

3.  Application Submission Process
    To begin the application process under this grant announcement, go to Grants.gov and click the red "Apply" button at the top of the view grant opportunity page associated with this opportunity.

    The electronic submission of your application to this funding opportunity must be made by an official representative of your organization who is registered with Grants.gov and is authorized to sign applications for federal financial assistance. If the submit button is grayed out, it may be because you do not have the appropriate role to submit in your organization. Contact your organization's EBiz point of contact or contact Grants.gov for assistance at 1-800-518-4726 or support@grants.gov.

    Applicants need to ensure that the Authorized Organization Representative (AOR) who submits the application through Grants.gov and whose UEI is listed on the application is an AOR for the applicant listed on the application. Additionally, the UEI listed on the application must be registered to the applicant organization's SAM.gov account. If not, the application may be deemed ineligible.

4.  Application Submission Deadline
    Your organization's AOR must submit your complete application package electronically to EPA through Grants.gov no later than **October 12, 2023 11:59 PM ET**. Please allow for enough time to successfully submit your application and allow for unexpected errors that may require you to resubmit.

Applications submitted through Grants.gov will be time and date stamped electronically. Please note that successful submission of your application through Grants.gov does not necessarily mean your application is eligible for award. Any application submitted after the application deadline time and date deadline will be deemed ineligible and not be considered.

## C. Technical Issues with Submission

If applicants experience technical issues during the submission of an application that they are unable to resolve, follow the below procedures **before** the application deadline date.

1. Contact Grants.gov Support Center **before** the application deadline date.

2. Document the Grants.gov ticket/case number.

3. Send an email with EPA-R-HQ-SFA-23-01 in the subject line to ggrf@epa.gov **before** the application deadline time and date. Applicants **must** include the following information.

   - Grants.gov ticket/case number(s)

   - Description of the issue

   - The entire application package in PDF format

Without this information, EPA may not be able to consider applications submitted outside of Grants.gov. Any application submitted after the application deadline time and date will be deemed ineligible and **not** be considered.

Please note that successful submission through Grants.gov or email does not necessarily mean your application is eligible for award.

EPA will make decisions concerning acceptance of each application submitted outside of Grants.gov on a case-by-case basis. EPA will only consider accepting applications that were unable to submit through Grants.gov due to Grants.gov or relevant SAM.gov system issues or for unforeseen exigent circumstances, such as extreme weather interfering with internet access. Failure of an applicant to submit prior to the application submission deadline date because they did not properly or timely register in SAM.gov or Grants.gov is not an acceptable reason to justify acceptance of an application outside of Grants.gov.

# Appendix B. Program Budget

## A. Guidance for Detailed Budget Table

The detailed Budget Table should be attached to the Program Narrative and does not count toward the maximum 40-page limit. Applicants should include applicable rows of costs for each budget category in their budget table to accurately reflect the proposed program budget. EPA provides detailed guidance on budget development in the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance, but applicants may use other forms as long as total costs per category (and specific descriptions of costs) are included and will not be penalized in the evaluation process.

Applicants must itemize costs related to personnel, fringe benefits, travel, equipment, installation or labor supplies, contractual costs, other direct costs (i.e., subawards, participant support costs), indirect costs, and total costs. Applicants should be aware that if their proposals include using Federal funds for a project that includes the purchase of goods, products, and materials on any form of construction, alteration, maintenance, or repair of infrastructure in the United States, they must comply with the Build America, Buy America Term and Condition if they are selected for award. For applicants proposing to implement a participant support cost or rebate program, the rebates are appropriately listed under the Other budget category as "Participant Support Costs." See EPA Guidance on Participant Support Costs.

- **Personnel - List all staff positions by title. Give annual salary, percentage of time assigned to the program, and total cost for the budget period.** This category includes only direct costs for the salaries of those individuals who will perform work directly for the program (paid employees of the applicant organization as reflected in payroll tax records). If the applicant organization is including staff time (in-kind services) as a cost-share, this should be included as Personnel costs. Personnel costs do not include: (1) costs for services of contractors (including individual consultants), which are included in the "Contractual" category; (2) costs for employees of subrecipients under subawards or non-employee program participants (e.g., interns or volunteers), which are included in the "Other" category; or (3) effort that is not directly in support of the proposed program, which may be covered by the organization's negotiated indirect cost rate. The budget detail must identify the personnel category type by Full Time Equivalent (FTE), including percentage of FTE for part-time employees, number of personnel proposed for each category, and the estimated funding amounts.

- **Fringe Benefits - Identify the percentage used, the basis for its computation, and the types of benefits included.** Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits may include, but are not limited to the cost of leave, employee insurance, pensions, and unemployment benefit plans. If the applicant's fringe rate does not include the cost of leave, and the applicant intends to charge leave to the agreement, it must provide supplemental information describing its proposed method(s) for determining and equitably distributing these costs.

74

- **Travel - Specify the mileage, per diem, estimated number of trips in-state and out-of-state, number of travelers, and other costs for each type of travel.** Travel may be: integral to the purpose of the proposed program (e.g., inspections); related to proposed program activities (e.g., attendance at meetings); or to a technical training or workshop that supports effective implementation of the program activities. Only include travel costs for employees in the travel category. Travel costs do not include: (1) costs for travel of contractors (including consultants), which are included in the "Contractual" category; (2) travel costs for employees of subrecipients under subawards and non-employee program participants (e.g., trainees), which are included in the "Other" category. Further, travel does not include bus rentals for group trips, which would be covered under the contractual category. Finally, if the applicant intends to use any funds for travel outside the United States, it must be specifically identified. All proposed foreign travel must be approved by EPA's Office of International and Tribal Affairs prior to being taken.

- **Equipment - Identify each item to be purchased which has an estimated acquisition cost of $5,000 or more per unit and a useful life of more than one year.** Equipment also includes accessories necessary to make the equipment operational. Equipment does not include: (1) equipment planned to be leased/rented, including lease/purchase agreement; or (2) equipment service or maintenance contracts that are not included in the purchase price for the equipment. These types of proposed costs should be included in the "Other" category. Items with a unit cost of less than $5,000 should be categorized as supplies, pursuant to 2 CFR §200.1, "Equipment." The budget table must include an itemized listing of all equipment proposed under the program. If installation costs are included in the equipment costs, labor expenses shall be itemized with the detailed number of hours charged and the hourly wage. If the applicant has written procurement procedures that define a threshold for equipment costs that is lower than $5,000, then that threshold takes precedence.

- **Supplies - Identify all tangible personal property other than "equipment" as "supplies." The budget detail should identify categories of supplies to be procured (e.g., laboratory supplies or office supplies).** Non-tangible goods and services associated with supplies, such as printing service, photocopy services, and rental costs should be included in the "Other" category.

- **Contractual - Identify each proposed contract and specify its purpose and estimated cost.** Contractual services (including consultant services) are those services to be carried out by an individual or organization, other than the applicant, in the form of a procurement relationship. EPA's Subaward Policy and supplemental frequently asked questions has detailed guidance available for differentiating between contractors and subrecipients. Leased or rented goods (equipment or supplies) should be included in the "Other" category. EPA does not require applicants to identify specific contractors. The applicant should list the proposed contract activities along with a brief description of the anticipated scope of work or services to be provided, proposed duration, and proposed procurement method (competitive or non-competitive), if known. Any proposed non-competed/sole-source contracts in excess of $3,500 must include a justification. Note that it is unlikely that EPA will accept proposed sole source contracts for goods and services (e.g., consulting) that are

75

widely available in the commercial market. Refer to EPA's Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements for EPA's policies on competitive procurements and encouraging the use of small and disadvantaged business enterprises.

- **Other - List each item in sufficient detail for EPA to determine the reasonableness and allowability of its cost.** This category should include only those types of direct costs that do not fit in any of the other budget categories. Examples of costs that may be in this category are: insurance; rental/lease of equipment or supplies; equipment service or maintenance contracts; printing or photocopying; participant support costs such as non-employee training stipends and travel, subsidies or rebates for purchases of pollution control equipment (such as a specified amount of funding for subsidies for solar projects); and subaward costs. Applicants should describe the items included in the "Other" category and include the estimated amount of participant support costs in a separate line item. Additional information about participant support costs is contained in EPA Guidance on Participant Support Costs.

  Subawards (e.g., subgrants) and participant support costs are a distinct type of cost under this category. The term "subaward" means an award of financial assistance (money or property) by any legal agreement made by the recipient to an eligible subrecipient even if the agreement is referred to as a contract. Rebates, subsidies, and similar one-time, lump-sum payments to program beneficiaries for purchase of eligible emission control technologies are considered participant support costs. "Other" does not include procurement purchases, technical assistance in the form of services instead of money, or other assistance in the form of revenue sharing, loans, loan guarantees, interest subsidies, insurance, or direct appropriations. Subcontracts are not subawards and belong in the contractual category. Applicants must provide the aggregate amount they propose to issue as subaward work as a separate line item in the "Other" category, and a description of the types of activities to be supported. Refer to EPA's Subaward Policy and supplemental frequently asked questions for additional guidance.

- **Indirect Charges – Indicate the approved rate and base for indirect charges if included.** Indirect costs (IDCs) are those incurred by the grantee for a common or joint purpose that benefit more than one cost objective or program and are not readily assignable to specific cost objectives or projects as a direct cost. Indirect costs may be budgeted and charged by recipients of Federal assistance agreements in accordance with 2 CFR Part 200. EPA's Indirect Cost Policy for Recipients of EPA Assistance Agreements (IDC Policy) implements the Federal regulations, and the following applies to all EPA assistance agreements, unless there are statutory or regulatory limits on IDCs. Examples of Indirect Cost Rate calculations are shown below.
  - Personnel (Indirect Rate x Personnel = Indirect Costs)
  - Personnel and Fringe (Indirect Rate x Personnel & Fringe = Indirect Costs)
  - Total Direct Costs (Indirect Rate x Total direct costs = Indirect Costs)
  - Direct Costs, less distorting or other factors such as contracts and equipment (Indirect Rate x (total direct cost – distorting factors) = Indirect Costs)

76

In order for an assistance agreement recipient to use EPA funding for indirect costs, the IDC category of the recipient's assistance agreement award budget must include an amount for IDCs and at least one of the following scenarios must apply.

- o With the exception of "exempt" agencies and Institutions of Higher Education as noted below, all recipients must have one of the following current (not expired) IDC rates, including IDC rates that have been extended by the cognizant agency:
  - Provisional;
  - Final;
  - Fixed rate with carry-forward;
  - Predetermined;
  - 10% de minimis rate authorized by 2 CFR § 200.414(f)
  - EPA-approved use of one of the following:
    - 10% de minimis as detailed in Section 6.3 of the IDC Policy; or
    - Expired fixed rate with carry-forward as detailed in Section 6.4.a. of the IDC Policy.
- o "Exempt" state or local governmental departments or agencies are agencies that receive up to and including $35,000,000 in Federal funding per the department or agency's fiscal year, and must have an IDC rate application developed in accordance with 2 CFR § 200 Appendix VII, with documentation maintained and available for audit.
- o Institutions of Higher Education must use the IDC rate in place at the time of award for the life of the assistance agreement (unless the rate was provisional at time of award, in which case the rate will change once it becomes final). As provided by 2 CFR Part 200, Appendix III(C)(7), the term "life of the assistance agreement", means each competitive segment of the project. Additional information is available in the regulation.

IDCs incurred during any period of the assistance agreement that are not covered by the provisions above are not allowable costs and must not be drawn down by the recipient. Recipients may budget for IDCs pending approval of their IDC rate by the cognizant Federal agency or an exception granted by EPA under Section 6.3 or 6.4 of the IDC Policy. However, recipients may not draw down IDCs until their rate is approved or EPA grants an exception.

The IDC Policy does not govern indirect rates for subrecipients or recipient procurement contractors under EPA assistance agreements. Pass-through entities are required to comply with 2 CFR § 200.331(a)(4) when establishing indirect cost rates for subawards.

Additional indirect cost guidance is available in Indirect Cost Guidance for Recipients of EPA Assistance Agreements.

**Note on Management Fees:** When formulating budgets for applications, applicants must not include management fees or similar charges in excess of the direct costs and indirect costs at the rate approved by the applicant's cognizant federal audit agency, or at the rate provided for by the terms of the agreement negotiated with EPA. The term "management fees or similar charges" refers to expenses added to the direct costs in order to accumulate and reserve funds for ongoing business expenses, unforeseen liabilities, or for other similar costs that are not allowable under

EPA assistance agreements. Management fees or similar charges cannot be used to improve or expand the program funded under this agreement, except to the extent authorized as a direct cost of carrying out the work plan.

EPA has provided an optional template for the detailed Budget Table in Excel available for download on epa.gov/GGRF. Applicants that do not use this table will not be penalized.

# Appendix C. Household Savings Guidance

The first of the five meaningful benefits of residential rooftop and residential-serving community solar is "household savings", which is defined as delivering a benefit of at least 20% of average household's electricity bill, including households that do not have individual electricity bills.

Applicants should calculate 20% household savings from the average electricity expenditures of the average household in the utility territory. This financial benefit does not need to be calculated per each individual household and can be based on averages in the utility territory the applicant is serving. Applicants should calibrate the calculation of this financial benefit to the frequency financial benefits are delivered to the households (i.e., monthly bill credits should deliver 20% household savings based on the monthly electricity bill). Each applicant will need to design a financial subsidy or product that delivers this financial benefit or the equivalent to all households served under this program.

Applicants may consider working with electric utilities and using data from the U.S. Energy Information Administration (including the Residential Energy Consumption Survey and electricity data) to calculate the average household annual utility costs.

Applicants will need to deliver these benefits net of any costs households incur from participating in the program. For example, if the program requires applicants to pay a subscriber fee, then the savings must exceed the fee so that households still experience a financial benefit of 20% the average household electricity bill. Applicants should ensure that if the program incurs any indirect costs on households, such as an increase in tax burden, the household savings calculation incorporates those costs and exceeds the 20% household savings accordingly.

For additional guidance for HUD Multi-Family Housing, see guidance from U.S. Department of Housing and Urban Development (HUD) on how to treat on-bill virtual net metering credits.

Delivering household savings for projects serving households who do not receive individual electricity bills (e.g., households master-metered, multi-family buildings) requires additional consideration since typically these savings are applied to electricity bills. For these households, household savings should be delivered as 20% the average household electricity bill as a financial or non-financial benefit with an equivalent financial value that meaningfully improves the lives of households directly, as described in guidance from U.S. Department of Housing and Urban Development. Applicants should explain how the program will appropriately honor the household savings benefit for households without electricity bills. For example, if a building is delivering household savings as a financially equivalent one-time investment, the value of the one-time investment should be calculated as if households benefiting from the program received 20% household savings for the entire lifetime of the asset.

79

# Appendix D. Consumer Protection Examples

As described in *Section IV.C: Content of Application Submission* Section 2.2 Fiscal Stewardship Plan, the explanation of Fiscal Stewardship Plan should include descriptions of practices to ensure effective consumer protection throughout your program. Examples of these practices may include but are not limited to plans for the following practices.

- The provision of written materials to program partners and entities that directly interact, transact, or contract with consumers, where such materials contain detailed expectations for those partners' and entities' compliance with applicable consumer protection laws in the jurisdictions served by your program, fair lending laws, and federal consumer protection and consumer financial laws, including laws that prohibit unfair, deceptive, and abusive practices, and Regulation Z (12 CFR § 1026) which requires the disclosure of terms and cost of consumer credit and offers substantive protections to people who use consumer credit

- All in-person and telephone marketing by entities that directly interact, transact, or contract with consumers as part of the program be conducted in a language in which the consumer subject to the marketing is able to understand and communicate

- Consumer complaints that you may receive arising from consumers' interactions, transactions, or contracts with entities involved in your program

- Periodic audits and spot-checks of program partners or entities that directly interact, transact, or contract with consumers

- Entities that directly interact, transact, or contract with consumers as part of the program adopting policies and practices to:

  o Provide written disclosures to consumers containing information in clear and understandable language regarding the purchasing, leasing, or financing, and the costs associated with a consumer's solar project; the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process

  o Submit to you for review, documents relating to the entities' interactions with consumers, including, for example, sales and marketing materials, training materials, policies and procedures, consumer finance contracts, and consumer contracts for solar products or services

  o Have a meaningful process for handling consumer complaints that includes receiving, tracking, monitoring, investigating, and resolving such complaints

## Appendix E. Equitable Workforce Development and Job Quality

**Good Jobs Principles**

Applicants are encouraged to review the U.S. Department of Labor and Commerce's eight Good Jobs Principles for guidance on what constitutes a good job when developing their plans. These principles include, but are not limited to, all workers are paid a stable and predictable living wage, family-sustaining benefits that promote economic security and mobility, the choice to form and join a union, and safe and healthy working conditions. In addition, this program aims to expand workforce opportunity for underserved communities (as defined by the Good Jobs Initiative) who often face disproportionate barriers to training and employment. For additional resources, see the Good Jobs Toolkit.

**Multi-Sectoral Partnerships**

Multi-sectoral partnerships will be key to meeting the job quality and workforce development goals of this program. Examples of valuable partners include: employers that inform training curriculum and commit to hiring, mentoring, and retaining individuals from low-income and disadvantaged communities; State and local workforce boards that inform statewide and regional workforce strategies; labor unions that partner via Labor-Management Partnerships and are contracted on projects, provide training, and/or advise on labor practices; education and training providers, such as such as pre-apprenticeship programs, community colleges, Minority Serving Institutions, and Historically Black Colleges and Universities; worker centers; and trusted community-based organizations that work in low-income and disadvantaged communities and can assist with recruitment, mentorship, training, and supportive services.

**Job Quality**

EPA aims for this program to create high-quality jobs with grant funds. Applicants are encouraged to proactively determine how they will work with contractors that are committed to "high road" labor practices, such as paying at least the prevailing wage, providing family-sustaining benefits, providing predictable work schedules, paid time-off, retirement contributions, safe and healthy working conditions, providing supportive services to those who need them, and other characteristics of a good job. In addition, EPA is committed to upholding workers' free and fair choice to collectively bargain and join a union. Applicants are encouraged to develop strategies for protecting that right, such as requiring participating contractors to commit to remaining neutral in union organizing and operations and encouraging the use of Project Labor Agreements when appropriate (e.g., through aggregating residential projects under this program). Lastly, if applicants intend to leverage the IRA clean energy tax credits, they are encouraged to review resources from the Department of Treasury and Department of Labor about the prevailing wage and Registered Apprenticeship requirements associated with the tax credits, which aim to promote job quality in the clean energy sector.[31] (DOL tax credit resources:).

---

[31] Additional resources from the Department of Labor on tax credit requirements: Prevailing Wage and Registered Apprenticeship

**Market Building - Workforce Training and Equitable Participation**

Applicants are encouraged to invest in workforce training models that prepare individuals from low-income and disadvantaged communities for middle-class career pathways in solar energy deployment. These models include, but are not limited to, Registered Apprenticeship programs, pre-apprenticeship (apprenticeship readiness) programs affiliated with Registered Apprenticeship programs, Labor-Management Training Partnerships or other union-affiliated training programs, training programs in partnership with a local community college, and other similar models. Training programs should be developed in partnership with employers that are deploying grant funds and committed to hiring participants.

Training models should include a clear description for how they will recruit participants from low-income and disadvantaged communities, in addition to having a robust plan for supporting those students with wrap-around supportive services, case management, and on-the-job support and mentorship.

Applicants are encouraged to consider the use of Community Benefits Agreements, Community Workforce Agreements, and Access and Opportunity Committees as tools for delivering equitable, community- and worker-driven workforce development solutions.

**Resources from the U.S. Department of Labor**

- The Good Jobs Initiative and Good Jobs Toolkit
- Registered Apprenticeship
- Pre-Apprenticeship
- Labor-Management Partnerships
- Project Labor Agreement Resource Guide
- WorkforceGPS

**Resources from the U.S. Department of Energy**

- Solar Workforce Development
- Solar Energy Resources for Job Seekers

82

## Appendix F. Guidance for Carbon Dioxide Avoided Calculations

If EPA's AVERT tool does not support your geography (i.e., Alaska, Hawaii, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands) you can consider calculating the $CO_2$ emissions your program estimates it will abate using the following calculation: Total size of project(s) (MW) x Capacity factor (%) x 8,760 hours (*or 8,784 hours for 2024*) x Avoided $CO_2$ emission rate (tons per MWh) = Estimated annual emission reductions (tons).

The recommended capacity factors for residential rooftop solar and avoided emission rates for geographies not in AVERT can be found in the following table. If you are proposing a program serving community solar, you may calculate your own community solar capacity factor and generation values using NREL's PVWatts Calculate or use a simplifying, yet conservative, assumption that the increased capacity factor of a community solar facility is about equal to the resulting transmission and distribution losses.

|  | Residential Solar Capacity Factor, (%) | Avoided $CO_2$ Emission Rate (lb/MWh) | Avoided $CO_2$ Emission Rate (ton/MWh) |
|---|---|---|---|
| **AK** | 14% | 1,278 | 0.639 |
| **HI** | 18% | 1,748 | 0.874 |
| **PR** | 22% | 1,618 | 0.809 |
| **GU** | 21% | 1,691 | 0.846 |
| **USVI** | 23% | 1,691 | 0.846 |
| **AS** | 21% | 1,691 | 0.846 |
| **CNMI** | 23% | 1,691 | 0.846 |

*Capacity factors are estimates derived from NREL's PVWatts Calculator (accessed June 2023). Avoided emissions rates are based on the 2021 eGRID state annual $CO_2$ non-baseload output emission rate (for AK, HI, and PR) and the eGRID state annual $CO_2$ oil output emission rate for Puerto Rico (for Guam, USVI, American Samoa, and CNMI). Values have been converted to short tons (2,000 lb = 1 ton).*

You are invited, but not required, to determine capacity factors specific to your project(s). If you calculate your own capacity factors, you must include data sources and methods for the calculation. If you are using AVERT and wish to use your own capacity factor, you can edit the default capacity factors in AVERT's Excel Main Module.

83

# EXHIBIT B

5H - 84087701 - 0    Page 1

| | | GRANT NUMBER (FAIN):  84087701 | |
|---|---|---|---|
| ![EPA logo] | **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br><br>Grant Agreement | MODIFICATION NUMBER:   0<br>PROGRAM CODE:          5H | **DATE OF AWARD**<br>07/09/2024 |
| | | **TYPE OF ACTION**<br>New | **MAILING DATE**<br>07/12/2024 |
| | | **PAYMENT METHOD:**<br>ASAP | **ACH#**<br>66868 |

| **RECIPIENT TYPE:** | **Send Payment Request to:** |
|---|---|
| County | Contact EPA RTPFC at: rtpfc-grants@epa.gov |

| **RECIPIENT:** | **PAYEE:** |
|---|---|
| Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-2027<br>EIN:  76-0454514 | Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-2027 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Jesse Dickerman<br>Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-1901<br>**Email:** jesse.dickerman@harriscountytx.gov<br>**Phone:** 713-274-1173 | Lydia Kidane<br>1300 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** Kidane.Lydia@epa.gov<br>**Phone:** 202-564-0506 | ThuyT Nguyen<br>1200 Pennsylvania Ave., NW. 3903R<br>Washington, DC 20460<br>**Email:** Nguyen.ThuyT@epa.gov<br>**Phone:** 202-564-5312 |

**PROJECT TITLE AND DESCRIPTION**

The Texas Solar for All Coalition: A Collaborative Effort to Enable Low-Income Solar and Storage. Note: A special payment condition applies to this award.

See Attachment 1 for project description.

| **BUDGET PERIOD**<br>09/01/2024 - 08/31/2029 | **PROJECT PERIOD**<br>09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 0.00 | **TOTAL PROJECT PERIOD COST**<br>$ 0.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 249,700,000.00. EPA agrees to cost-share <u>0.00%</u> of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,700,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants and Interagency Agreement Management Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460 |

| **THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY** | |
|---|---|
| **Digital signature applied by EPA Award Official for** Barbara Proctor - Associate Award Official<br>**by** Barbara Proctor - Award Official Delegate | **DATE**<br>07/09/2024 |

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 0 | $ 249,300,000 | $ 249,300,000 |
| EPA In-Kind Amount | $ 0 | $ 400,000 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 0 | $ 249,700,000 | $ 249,700,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328)<br>Clean Air Act: Sec. 134(a)(1)<br>National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

| Fiscal | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Site Name | Req No | FY | Approp. Code | Budget Organization | PRC | Object Class | Site/Project | Cost Organization | Obligation / Deobligation |
| - | 2411U41056 | 2224 | E1SF3 | QU | 000MGBXG2 | 4129 | - | - | $ 249,300,000 |
| | | | | | | | | | $ 249,300,000 |

Budget Summary Page

| Table A - Object Class Category (Non-Construction) | Total Approved Allowable Budget Period Cost |
|---|---|
| 1. Personnel | $ 0 |
| 2. Fringe Benefits | $ 0 |
| 3. Travel | $ 0 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 0 |
| 6. Contractual | $ 0 |
| 7. Construction | $ 0 |
| 8. Other | $ 0 |
| 9. Total Direct Charges | $ 0 |
| 10. Indirect Costs: 0.00 % Base | $ 0 |
| 11. Total (Share: Recipient ___0.00 % Federal ___0.00 %) | $ 0 |
| 12. Total Approved Assistance Amount | $ 0 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 249,700,000 |
| 15. Total EPA Amount Awarded To Date | $ 249,700,000 |

## Attachment 1 - Project Description

Note: A special payment condition applies to this award.

This agreement provides funding under the Inflation Reduction Act. The recipient will provide financial and technical assistance to low-income and disadvantaged communities to deploy and benefit from residential-serving distributed solar energy and storage projects. These programs will ensure low-income households receive residential distributed solar by providing program beneficiaries household savings, community ownership, energy resilience, and other meaningful benefits.

Solar projects receiving financial assistance from the recipient may receive assistance for associated energy storage and upgrades that either enable project deployment or maximize the benefits of the project for low-income and disadvantaged communities. The recipient will also provide project-deployment services to enable low-income and disadvantaged communities to deploy and benefit from residential solar.The anticipated deliverables will include steps and milestones to implement the strategies and plans for the Solar for All Program, a distribute solar market strategy, the financial assistance strategy, the project-deployment technical assistance strategy, and an equitable access and meaningful involvement plan.

The expected outcomes include climate and air pollution benefits, equity and community benefits, and market transformation benefits. The intended beneficiaries include households in low-income and disadvantaged communities.

No subawards are included in this assistance agreement.

# Administrative Conditions

## A. General Terms and Conditions

The recipient agrees to comply with the current EPA general terms and conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2023-or-later. These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the general terms and conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition (updated 06/21/24)

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist.

MBE/WBE reports (EPA Form 5700-52A): DBE Coordinator, OMS-OGD-MBE_WBE@epa.gov and EPA Grants Specialist.

All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Project Officer and EPA Grants Specialist

Payment requests (if applicable): EPA Project Officer

Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a recipient or subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

The recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a recipient incurs after EPA has notified the recipient that its application has been selected for award consideration and the start date of the Project Period as provided on the Notice of Award. The pre-award costs must have been included in the recipient's application to be allowable. As provided in 2 CFR 1500.9, recipients incur pre-award cost at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance for additional information.

## E. Pre-Award Administrative Capability

*__The following term and condition on pre-award administrative capability applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit on the Notice of Award:__*

The recipient's pre-award certification review has not been completed. EPA's policy for awarding financial assistance in excess of $200,000 to non-profit organizations requires an Administrative Capability Assessment review of the recipient's administrative and financial management systems to be completed __prior__ to the recipient drawing down any EPA funds per EPA Order 5700.8. Because EPA has not yet completed the review, the recipient is precluded from drawing down funds under this assistance agreement until EPA provides written confirmation of the completion of the assessment with satisfactory results. Please note, any costs incurred prior to EPA approval are at the recipient's own risk. If the recipient fails to respond or is unable to satisfactorily address all identified deficiencies within 90 calendar days of the award date of this assistance agreement or within any extension of time granted by EPA, the agreement may be terminated. Noncompliance with this term and condition may result in adverse action by EPA per 2 CFR 200.339.

## F. New Recipient Training Requirement

The recipient agrees to complete the EPA Grants Management Training for Applicants and Recipients and the How to Develop a Budget training within 90 calendar days of the date of award of this agreement. The recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the recipient should refer to RAIN-2024-G01.

# Programmatic Conditions

**Greenhouse Gas Reduction Fund (GGRF): Solar for ALL (SFA) Programmatic Terms and Conditions**

## I. Programmatic Terms and Conditions

## A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the recipient agrees to the following two requirements of performance reporting: (1) performance reports and (2) transaction-level and project-level data. The recipient agrees to ensure that these reports cover its own expenditures as well as the expenditures of its subrecipients, contractors, and program beneficiaries in implementing the recipient's EPA-approved Solar for All Workplan under the federal award. The recipient agrees that EPA may amend the award agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized.

The recipient acknowledges that knowingly and willfully making a false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make the performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the recipient.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344.

_**The following additional term and condition applicable to performance reporting applies if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:**_

The recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit reporting electronically to the EPA Project Officer. To the extent that the reporting is not compliant with the terms and conditions, or demonstrates noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission.

## 1. Performance Reports

_Semi-Annual Report_

The recipient agrees to submit semi-annual reports (including but not limited to performance metrics) that are in accordance with information collection instruments approved through GGRF Accomplishment

Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit semi-annual performance reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual performance report should cover activities from the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on activities conducted from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on activities conducted from October 1 to March 31 rather than from January 1 to June 30.

_Final Report_

The recipient agrees to submit a final report in a format conducive for immediate public consumption. The final report must contain detailed narratives describing program performance for the entire period of performance, representing an overall assessment of the recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. Additionally, the recipient should detail its program strategy and plans for performance reporting under the Closeout Agreement. The recipient must include the following broad, non-exhaustive elements in its annual reports:

Progress towards objectives on key performance metrics over the entire period of performance,

Summary of key activities completed in the entire period of performance, including case studies across different types of financial assistance and project-deployment technical assistance undertaken to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies,

Geographic coverage of financial assistance and project-deployment technical assistance deployed in the entire period of performance,

Descriptions and examples of actions the program took over the entire period of performance to meaningfully involve the communities the program serves in program design and operations,

Plans for key activities (including current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

These reports must be submitted ready to be published on the EPA website for public consumption and must not include any material that the recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or CBI claims in publishable reports. Reports submitting with CBI claims will not comply with this requirement and may result in remedial action by EPA. Should EPA identify PII in reports, the

EPA Project Officer will require that the recipient re-submit the report without the PII so that it can be published without redaction.

The recipient agrees to submit **the final performance report electronically to** the EPA Project Officer no later than 120 calendar days after the end date of the period of performance.

## 2. Transaction-Level and Project-Level Data

The recipient agrees to submit semi-annual transaction-level and project-level data in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW).

The recipient agrees to submit the transaction-level and project-level data electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The recipient may submit a request to their Project Officer for an extension to 60 days after the end of the reporting period to submit reports. A request may be made once, and it must include 1) an explanation of recipient's unique circumstance as to why they need the extension; 2) the length of the extension; and 3) the duration of the extension.

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. If the period of performance begins prior to July 1, 2024, then the first semi-annual reporting period shall cover the first day of the period of performance through December 31, 2024.

The semi-annual transaction-level and project-level reports should cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends December 31, recipients will provide information on transactions originated from April 1 to September 30 rather than from July 1 to December 31. For the semi-annual reporting period that ends June 30, recipients will provide information on transactions originated from October 1 to March 31 rather than from January 1 to June 30.

## B. Cybersecurity Condition

*The following terms and conditions applicable to cybersecurity apply if the recipient is a State as defined in the Eligible Recipient definition*:

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into

systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the recipient is not identified as a not for profit on the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the recipient's network or information system and EPA networks used by the recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the recipient agrees to contact the EPA Project Officer no later than 90 days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The recipient agrees that any subawards it makes under this agreement will require the subrecipient to comply with the requirements in (b)(1) if the subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The recipient will be in compliance with this condition: by including this requirement in subaward agreements; and during subrecipient monitoring deemed necessary by the recipient under 2 CFR 200.332(d), by inquiring whether the subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the recipient to contact the EPA Project Officer on behalf of a subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA Project Officer for this award.

## D. Signage Required

## 1. Signage Requirements

a. Investing in America Emblem: The recipient will ensure that a sign is placed at construction sites supported in whole or in part by this award displaying the official Investing in America emblem and must identify the project as a "project funded by President Biden's Inflation Reduction Act," where the financial assistance used to fund the construction project exceeds $250,000. The recipient will also make optional

signage available for projects where the construction is less than $250,000. The sign must be placed at construction sites in an easily visible location that can be directly linked to the work taking place and must be maintained in good condition throughout the construction period. The recipient will ensure compliance with the guidelines and design specifications provided by EPA for using the official Investing in America emblem available at: https://www.epa.gov/invest/investing-america-signage.

b. Procuring Signs: Consistent with section 6002 of RCRA, 42 USC 6962, and 2 CFR 200.323, the recipient is encouraged to use recycled or recovered materials when procuring signs. Signage costs are considered an allowable cost under this assistance agreement provided that the costs associated with signage are reasonable. Additionally, to increase public awareness of projects serving communities where English is not the predominant language, the recipient is encouraged to translate the language on signs (excluding the official Investing in America emblem or EPA logo or seal) into the appropriate non-English language(s). The costs of such translation are allowable, provided the costs are reasonable.

## 2. Public or Media Events

The recipient agrees to notify the EPA Project Officer of public or media events publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All Workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice. Additionally, the recipient agrees to provide the EPA Project Officer a minimum of 2 business days notice, with an updated version of the press release, prior to the publication of any press releases related to the Solar for All program. The EPA Project Officer may waive or modify these requirements.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fund Raising

### 1. Leveraging
The recipient agrees to make best efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All Workplan. If the proposed leveraging does not materialize during the period of performance, and the recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future proposals from the recipient. In addition, if the proposed leveraging does not materialize during the period of performance, then EPA may reconsider the legitimacy of the award; if EPA determines that the recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the application, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fund Raising

2 CFR 200.442 provides coverage on allowable fund-raising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fund raising costs are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide financial assistance to eligible zero emissions technologies or project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emission technologies.

Allowable fund-raising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private-sector investors. Funds a recipient raises with costs borne by an EPA financial assistance agreement are considered program income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fund raising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fund-raising costs charged to the award will be treated as program income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving environmental information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The recipient shall ensure that subawards involving environmental information issued under this agreement include appropriate quality requirements for the work. The recipient shall ensure subrecipients develop and implement the Quality Assurance (QA) planning documents(s) in accordance with this term and condition and/or ensure subrecipients implement all applicable approved QA planning documents. Note, EPA will not approve any QA planning documents developed by a subrecipient. The recipient is responsible for reviewing and approving its subrecipient QA planning documents, if required based on the subrecipients environmental information collection operations.

## 1. Quality Management Plan (QMP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Submit a previously EPA-approved and current Quality Management Plan (QMP). The EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the recipient and EPA Project Officer in writing if the previously EPA-approved QMP is acceptable for this agreement,

ii. Develop a QMP in consultation with the EPA Project Officer and EPA QAM if a previously EPA-approved and current QMP is not in place,

iii. Submit the QMP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iv. Review the approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QMP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental

information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

a. Prior to beginning environmental information operations needed to complete the requirements outlined in the Performance Reporting Programmatic Term and Condition, the recipient must:

i. Develop a Quality Assurance Project Plan (QAPP) in consultation with the EPA Project Officer and EPA QAM,

ii. Submit the QAPP within 90 days of the date of award for the first amendment of the agreement and obtain EPA Project Officer and EPA QAM approval,

iii. Review the approved QAPP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the recipient shall revise its QAPP to incorporate minor changes and notify the EPA Project Officer and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QAPP for re-approval. In general, a copy of any QAPP revision(s) made during the year should be submitted to the EPA Project Officer and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QAPP can be found in section 6 of EPA's Quality Assurance Project Plan (QAPP) Standard.

**The following materials contain quality specifications and definitions to facilitate adherence to these terms and conditions:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard;

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

• The Office of Grants and Debarment Implementation of Quality Assurance Requirements for Organizations Receiving EPA Financial Assistance.

## I. Equipment Disposition

***The following term and condition applicable to equipment disposition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

In accordance with 2 CFR 200.313, when original or replacement equipment acquired under this agreement is no longer needed for the original project or program or for other activities currently or previously supported by EPA, the recipient may dispose of the equipment without further instruction from EPA.

## J. Real Property

In accordance with 2 CFR 200.311, title to real property acquired or improved under this agreement will vest upon acquisition in the recipient. This property must be used for the originally authorized purpose as long as needed for that purpose, during which time the recipient must not dispose of or encumber its title or other interests.

## Disposition

When real property is no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where recipient is disposing of real property acquired or improved with a Federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The recipient is entitled to be paid an amount calculated by applying the recipient's percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

## Recordation

As authorized by 2 CFR 200.316, EPA requires that recipients who use EPA funding to purchase and improve real property through an EPA funded construction project record a lien or similar notice in the real property records for the jurisdiction in which the real property is located, which indicates that the real property has been acquired and improved with federal funding and that use and disposition conditions apply to the real property.

## K. Program Income

In accordance with 2 CFR 200.307(e)(2) and 2 CFR 1500.8(b), the recipient and any subrecipient must retain program income earned during the period of performance. Program income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the assistance agreement and beyond the period of performance based on a closeout agreement. Until such a closeout agreement is effective, the recipient and subrecipient are authorized to use program income under the conditions of the assistance agreement, pending execution of the closeout agreement. In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, the recipient and subrecipient may only use program income once the award is fully drawn down or the period of performance ends for a different reason. Program income must be deposited and

held in an account meeting the requirements in the Financial Risk Management Programmatic Term and Condition.

In accordance with 2 CFR 200.307(b), costs incidental to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the EPA award or another Federal financial assistance agreement. The recipient must retain adequate accounting records to document that any costs deducted from program income comply with regulatory requirements.

## L. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the recipient or subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

# II. Additional Programmatic Terms and Conditions

## A. Conflicts Among Authorities

Any inconsistency or conflict among the authorities governing the recipient's administration of this award will be resolved in the following order of precedence: public laws, regulations (including 2 CFR 200 and 2 CFR 1500), applicable notices published in the *Federal Register*, Executive Orders, and these award agreement terms and conditions.

## B. Specific Condition on Completion of EPA-approved Solar for All Workplan

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the recipient's EPA-approved Solar for All Workplan allows the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, until the documents listed below have been approved by the EPA Grants Management Officer or Award Official, the recipient may draw down no more than 2% of the EPA funding, identified in the Notice of Award, for direct costs for the following cost categories: personnel; fringe benefits; contractual costs for consultants procured in accordance with 2 CFR 200 and 1500; and indirect costs, that are necessary for the recipient to finalize the scope of work of this agreement. This limitation includes pre-award costs and costs the recipient incurs after award. EPA cannot confirm whether costs incurred or drawn down are allowable until EPA reviews and approves the documents below. Any costs incurred by the recipient are at their own risk until the documents below are approved by EPA.

Within 90 days of receipt of award, the recipient must submit the following documents to the EPA Project Officer identified in the Notice of Award:

Revised SF-424A, Budget Information for Non-Construction Programs

Indirect Rate Proposal or Agreement, if applicable

Revised Budget Narrative

Revised Project Specific Workplan (i.e., the EPA-approved Solar for All Workplan)

*Action Required to remove the specific condition.* EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of the above documents, EPA will promptly remove this term and condition, as require by 2 CFR 200.208 (e), and all remaining funds will be available to the recipient to draw down reasonable, allocable, and allowable expenditures in accordance with its EPA-approved Solar for All Workplan.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

The EPA Award Official may modify this requirement on a case-by-case basis.

## C. Solar for All Workplan

### 1. EPA-approved Solar for All Workplan

The recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the recipient's EPA-approved Solar for All Workplan allow the recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the recipient must first receive approval from the EPA Grants Management Officer or Award Official on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the recipient are at its own risk.

The recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Grants Management Officer or Award Official, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the recipient makes revisions to its workplan during

the planning period, the recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. EPA will review the recipient's submissions and will work with the recipient to refine the SF-424A to ensure that all costs are reasonable, allocable, and allowable; the budget narrative appropriately reflects the full budget of the award; and that there is sufficient detail of estimated funding amounts for each project task. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will promptly remove this term and condition, as require by 2 CFR 200.208(e), and the recipient may then request payments for the revised work that has been approved by EPA.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## D. Allowable and Unallowable Activities

The recipient agrees to only use the award to support the following allowable activities: financial assistance and project-deployment technical assistance that enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies as well as participant support costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. In addition, the recipient agrees to obtain prior approval from the EPA Award Official prior to the expenditure of the award for activities that involve acquiring real property, including related equipment purchases. Note, the recipient may meet this requirement by specifying the framework for all acquisitions of real property in its EPA-approved Solar for All Workplan.

The recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions. The recipient also agrees not to use the award for activities associated with defending against, settling, or satisfying a claim by a private litigant, except when either (a) the claim stems from the recipient's compliance with the terms and conditions of the award agreement or (b) the recipient has obtained prior written approval from the EPA Project Officer.

## E. Foreign Entity of Concern

As part of carrying out this award, recipient agrees to ensure that entities the recipient contracts with, the recipient makes subawards to, or that receive funds as program beneficiaries at any tier of funding under this grant agreement are not—

(A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

(B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

(C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## F. Low-Income and Disadvantaged Communities Expenditure Requirement

The recipient agrees to ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the recipient and "flows down" to all subrecipients.

## G. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide financial products, including financial products that are categorized as project-deployment technical assistance under this program, that may generate program income as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such financial assistance may include subawards or participant support costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the recipient's subawards from the capitalization of a revolving loan fund.

EPA does not consider the remaining portion of the award as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). As such, all subgrants made by the recipient are subject to the EPA Subaward Policy.

## H. Subawards to For-Profit Entities

**The recipient is authorized to provide subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The recipient agrees to require that for-profit entities that receive such subawards:**

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use program income under the rules for program income pursuant to 2 CFR 1500.8(b) and the terms and conditions of the award agreement;

4. Be subject to the same requirements as non-profit subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(b); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## I. Subawards as Part of Revolving Loan Funds

The following requirements apply when the recipient provides *Subawards* under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the recipient and subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. The recipient agrees to provide written guidelines for all subawards provided as part of a revolving loan fund. The recipient is precluded from drawing down funds for subawards provided as part of a revolving loan fund until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy. Additionally, if a recipient plans to subaward to a for-profit entity the recipient's response to (d) must specifically describe how the for-profit subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the subrecipient does not "profit" from the transaction.

2. The recipient must establish and follow a system that ensures all financial assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(a), including the indirect cost provision of 2 CFR 200.332(a)(4) for subawards. EPA has developed an optional template for subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such subaward agreements.

3. The subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all financial assistance agreements that requires subrecipients to comply with these requirements. No other provisions of the Uniform Grant Guidance, including the Procurement Standards, apply directly to the subrecipient.

4. Prior to making the subaward, the recipient must ensure that the subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(a)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## J. Participant Support Costs

## 1. Participant Support Cost Requirements

The recipient may provide financial assistance and project-deployment technical assistance to enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies in the form of participant support costs.

The recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on participant support costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The recipient and program beneficiaries are responsible for taxes, if any, on payments made to or on

behalf of entities participating in this program that are allowable as participant support costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the recipient and program beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other participant support cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant support cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The recipient, therefore, may not make participant support cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that subrecipients adhere to this requirement as well. The recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

The recipient is precluded from drawing down funds for participant support costs until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the participant support costs; (b) specify the range of funding to be provided through the participant support costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the participant support cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

The recipient agrees to reporting and transaction documentation of participant support costs in support of the reporting requirements in the Performance Reporting Programmatic Term and Condition.

## 2. Participant Support Costs for Fellowship, Internship Programs and Similar Programs

When the recipient uses EPA funds for participant support costs payments as stipends for workforce development, scholarships, tuition remission and other forms of student aid, these participant support costs may only be used for citizens of the United States, its territories, or possessions, or for individuals lawfully admitted to the United States for permanent residence.

The recipient and program participants are responsible for taxes, if any, on payments made to or on behalf of individuals participating in this program that are allowable as participant support costs under 2 CFR 200.1 or 2 CFR 200.456 and scholarships and other forms of student aid such as tuition remission under 2 CFR 200.466. EPA encourages recipients and program participants to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of stipends, tuition remission and other payments. However, EPA does not provide advice on tax issues relating to these payments.

Participant support cost payments, scholarships, and other forms of student aid such as tuition remission are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and EPA's Suspension and Debarment Term and Condition. Recipients, therefore, may not make participant support cost payments to individuals who are excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180. Recipients are responsible for checking the eligibility of program participants in the System for Award Management (SAM) or obtaining eligibility certifications from the program participants.

See [EPA Guidance on Participant Support Costs](#)

## K. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this award agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" and "Residential." The Secretary of Labor's wage determinations are available at [https://sam.gov/content/wage-determinations](https://sam.gov/content/wage-determinations).

Therefore, recipient must ensure that any construction work financed in whole or in part with such financial assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis Bacon Act requirements.

If the recipient encounters a situation that presents uncertainties regarding DBRA applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with subrecipient, program beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with Davis-Bacon, the recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definition in 40 CFR 33.103 the term "construction" as used in this term and condition means the erection, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other improvements to real property.

#### B. Davis-Bacon and Related Acts

[Davis-Bacon and Related Acts (DBRA)](#) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

> Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;

> Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and

> Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

**C. Recipient Responsibilities When Entering Into and Managing Contracts:**

**a. Solicitation and Contract Requirements:**

   **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6 when soliciting bids and awarding contracts.

   **ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

**b. After Award of Contract:**

   **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1) (iii).

   **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

**D. Recipient Responsibilities When Establishing and Managing Additional Subawards:**

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all subawards under this grant: "By accepting this award, the EPA subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of subrecipients and must ensure subrecipients comply with the requirements in 29 CFR 5.6.

The contract clauses set forth in this Term & Condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## 2. Mega Construction Project Program

The recipient must work with the U.S. Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) to identify projects that are within the scope of OFCCP's Mega Construction Project Program, which includes federally-assisted projects with a total project value above $35,000,000. If those projects are selected from a wide range of federally-assisted projects over which OFCCP has jurisdiction, those projects will be required to participate and partner with OFCCP in the OFCCP Mega Construction Projects program.

## 3. Compliance with Federal Statutes and Regulations

The recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with subrecipients, contractors, and other partners. This includes but is not limited to applicable health and safety regulations as administer by the Occupational Health and Safety Administration.

## 4. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## 5. Disadvantaged Business Enterprises

The recipient agrees to comply with 40 CFR Part 33, "Participation by Disadvantaged Business Enterprises in U.S. Environmental Protection Agency Programs" set forth requirements for making good faith efforts to ensure that Disadvantaged Business Enterprises, including Minority Business Enterprises and Women's Business Enterprises receive a fair share of contracts awarded with funds provided by EPA financial assistance agreements. These requirements apply to subrecipients in accordance with 40 CFR 33.102 and the definition of "Recipient" in 40 CFR 33.103.

## L. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that "none of the funds made available for a Federal financial assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America requirements that all recipients of EPA financial assistance awards must comply with.

If the recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this assistance agreement, the recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## M. Consumer Protection Requirements

The recipient agrees to carry out the following consumer financial protection requirements to the extent that the recipient directly interacts, transacts, or contracts with consumers:

1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The recipient agrees to monitor and oversee subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(d) and 2 CFR 200.318.

## N. Financial Risk Management Requirements

### 1. Cash Management Requirements
The recipient and any subrecipient must deposit and maintain advance payments of Federal funds into insured accounts, in accordance with 2 CFR 200.305(b)(7)(ii). Interest income earned on the advance payment from EPA to the recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The recipient and subrecipient are authorized to maintain program income in insured accounts. The recipient and subrecipient are also authorized to maintain program income in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions.  Interest income and other returns earned on funds that have already been disbursed is considered additional program income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(8) and 2 CFR 200.305(b)(9).

### 2. Climate-Related Financial Risks

The recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its

financial risk management policies and procedures.\

<u>3. Additional Requirements</u>

The recipient agrees to not subordinate its interests in any asset that the recipient acquires with EPA funds or program income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law.

The recipient agrees to **apply** <u>EPA's Final Financial Assistance Conflict of Interest Policy</u> **to all subawards  and participant support costs made to entities receiving financial assistance or project-deployment technical assistance.** Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by recipients of revolving loan fund capitalization grants or other EPA financial assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The recipient agrees to provide subrecipients that receive subawards to provide financial assistance or project-deployment technical assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(e).

O. Historic Preservation

<u>National Historic Preservation Act (NHPA)</u>

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant or cooperative agreement, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) buildings or structures that are greater than 50 years old; (c) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (d) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The recipient should work with their Project Officer to ensure that subrecipients are available to work with EPA on any required consultation process with the State or Tribal Historic Preservation Office prior to commencing the project to ensure compliance with Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific,

prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The recipient must ensure that subrecipients performing construction projects are aware of this requirement, and the recipient must notify EPA if the AHPA is triggered.

## P. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The recipient must comply with, and ensure subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the federal award" provision of 2 CFR 200.403(a). The recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## Q. Other Federal Requirements

In addition to the statutes outlined in the Labor and Equitable Workforce Programmatic Term and Condition, Build America, Buy America Programmatic Act Term and Condition, Historic Preservation Programmatic Term and Condition, Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition, Consumer Protection Requirements Programmatic Term and Condition, and Financial Risk Management Programmatic Term and Condition, the recipient must comply with all federal cross-cutting requirements. These requirements include, but are not limited to:

**Endangered Species Act, as specified in 50 CFR Part 402:** Non-Federal entities must identify any impact or activities that may involve a threatened or endangered species. Federal agencies have the responsibility to ensure that no adverse effects to a protected species or habitat occur from actions under Federal assistance awards and conduct the reviews required under the Endangered Species Act, as applicable.

**Federal Funding Accountability and Transparency Act:** Recipients of financial assistance awards must comply with the requirements outlined in 2 CFR Part 170, *Reporting Subaward and Executive Compensation.*

**Farmland Protection Policy Act:** This statute requires EPA to use criteria developed by the Natural Resources Conservation Service (NRCS) to identify the potential adverse effects of Federal programs on farmland and its conversion to nonagricultural uses, to mitigate these effects, and to ensure that programs are carried out in a manner that is compatible with the farmland preservation policies of state and local governments, and private organizations. Recipients may need to work with EPA or NRCS, as appropriate, to ensure compliance.

**Coastal Zone Management Act:** Projects funded under federal financial assistance agreements must be consistent with a coastal State's approved management program for the coastal zone.

For additional information on cross-cutting requirements visit https://www.epa.gov/grants/epa-subaward-cross-cutter-requirements.

## R. Remedies for Non-Compliance

The recipient agrees to comply with the terms and conditions of the award agreement. Should the recipient fail to adhere to the terms and conditions of the award agreement, the EPA may seek remedies under 2 CFR 200.208 or 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as well as advances not yet disbursed for allowable costs.

The recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the recipient violate the statutory requirements of Section 134 by failing to use grant funds in accordance with Section 134 or by failing to ensure that the activities of subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action. Should the recipient or its subrecipients make false claims or statements to EPA, EPA may refer the matter to DOJ to pursue claims under the False Claims Act (31 USC 3729) or take action under the Program Fraud Civil Remedies Act (40 CFR Part 27).

## S. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The recipient agrees to comply with these clarifications.

## 1. Access to Records

In accordance with 2 CFR 200.337, EPA and the EPA Office of Inspector General (OIG) have the right to access any documents, papers, or other records, including electronic records, of the recipient and any subrecipient which are pertinent to this award in order to make audits, examinations, excerpts, and transcripts. This right of access also includes timely and reasonable access to the recipient and subrecipient's personnel for the purpose of interview, discussion, and on-site review related to such documents. This right of access shall continue as long as the records are retained.

## 2. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

## 3. Establishing and Managing Subawards

2 CFR 200.308 requires the recipient to obtain prior agency approval for "subawarding, transferring or contracting out of any work under a Federal award."

EPA will not require additional written approval from the EPA Award Official for a subaward to a subrecipient that is named in the recipient's EPA-approved Solar for All Workplan.

When the subrecipient is not named in the EPA-approved Solar for All Workplan, the recipient agrees to provide written guidelines that must be approved by the EPA Project Officer. The recipient is precluded from drawing down funds for subawards not named in the application until the EPA Project Officer provides written confirmation of the guidelines. These guidelines must: (a) describe the activities that will be supported by the subawards; (b) specify the range of funding to be provided through the subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the subawards; and (d) specify how the subrecipients are eligible subrecipients in accordance with EPA's Subaward Policy, and specifically how the subrecipients will comply with the requirement that the subrecipient recipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 4. Indirect Cost Rate

The recipient should note that subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive participant supports costs cannot charge an indirect cost rate against their participant support cost payments.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000.

## 5. Sufficient Progress

The EPA Project Officer may assess whether the recipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under this assistance agreement within 30 calendar days after the recipient submits its annual reporting requirements for the second, third, and fourth years for the award. "Sufficient progress" shall be assessed based on a comparison of the recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to subrecipients, with the recipient required to assess whether each subrecipient is making sufficient progress in implementing the EPA-approved Solar for All Workplan under its subaward agreement; the recipient may increase the frequency and scope of the review of sufficient progress of subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the recipient has not made sufficient progress in implementing its EPA-approved Solar for All Workplan, the recipient, if directed to do so, must implement a corrective

action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

## 6. Termination

EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR 200.340, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another entity to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR 200.341, EPA must provide the recipient notice of termination.

## T. Period of Performance

The period of performance under this award agreement will start on the date specified in the budget period and project period of the "Notice of Award" for this assistance agreement and end no later than five years from that date. However, the period of performance may end prior to five years from the end date specified in the budget period and project period of the "Notice of Award" if (1) the recipient has disbursed the entire award amount and (2) the EPA Project Officer has advised the EPA Award Official that all required work of the Federal award have been completed, in accordance with 2 CFR 200.344. EPA will not consider all required work to have been completed until the entire award amount (or its equivalent) has been used for allowable activities. In accordance with 2 CFR 200.344(b), the recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the period of performance.

The recipient should note that the recipient will not be considered to have used the entire award amount so long as any subrecipient has not met the requirements for closeout under 2 CFR 200.344.

## U. Closeout Agreement

As provided at 2 CFR 200.307(f) and 2 CFR 1500.8(c), after the end of the period of performance of the assistance agreement, the recipient may keep and use program income at the end of the assistance agreement (retained program income) and use program income earned after the assistance agreement period of performance (post-closeout program income) in accordance with this term and condition. When used in this Closeout Agreement, the term "program income" includes both retained program income and post-closeout program income. The closeout agreement goes into effect for this assistance agreement the day after the assistance agreement period of performance ends, unless otherwise designated by the EPA Grants Management Officer or Award Official.

Prior to the effective date of the Closeout Agreement, the recipient agrees to submit a post-closeout program strategy, covering the use of program income retained and earned by the recipient and its subrecipients. This program strategy will become a condition of the Closeout Agreement, once the program strategy has been approved by the EPA Project Officer. EPA intends to make the program strategy, either in whole or in part, available to the public through disclosing copies of the program strategy as submitted or using the content of the program strategy. Pursuant to 2 CFR 200.338, the recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) accordingly. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made

available to the public by EPA without further notice to the recipient.

This term and condition is the entire Closeout Agreement between the EPA and the recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The recipient shall comply with the requirements specified below as part of the Closeout Agreement. As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to subrecipients such that the recipient must enter into a corresponding Closeout Agreement with all subrecipients that have retained program income and/or that expect to earn post-closeout program income.

## 1. Allowable Activities

The recipient shall use program income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

The recipient shall submit program performance reports to the EPA Project Officer in accordance with the Performance Reporting Programmatic Term and Condition, as applicable. After September 30, 2031, the recipient shall disclose program performance reports publicly rather than submitting them to the EPA.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The recipient shall expend 100% of program income for the purposes of providing financial assistance and technical assistance in and benefiting enable low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The recipient is authorized to maintain program income not yet deployed in support of its program strategy in insured accounts. The recipient is also authorized to maintain program income not yet deployed in support of its program strategy in accounts where such income is used to purchase U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 days and that such instruments are held-to-maturity if purchased directly; or short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. The recipient agrees to enforce these Cash Management Requirements on its subrecipients.

## 5. Remedies for Non-Compliance

The recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable.

## 6. Suspension and Debarment

The recipient agrees to ensure that program income is not used to transfer funds in the form of subawards, participant support costs, or contracts to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The recipient must expend program income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

As provided in 2 CFR 200.300, the general terms and conditions of EPA grants implement nondiscrimination and social policy requirements:

a. Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975. The recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency," in 40 CFR Part 5 and 40 CFR Part 7 the pass-through entity agrees, and will require all subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

b. Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities. As provided in section 301 of the Executive Order, Pass-through entities will ensure that subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of retained and post-closeout program income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. EPA may obtain access to these records to verify that program income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the recipient must maintain adequate accounting records for how program income is managed and spent as well as all other appropriate records and documents related to the activities conducted using retained and post-closeout program income.

The recipient agrees to ensure that subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. Pass-through entities may use the terms of their subaward agreement or other effective means to meet their responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of program income under the terms of this Closeout Agreement:

 Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Programmatic Term and Condition;

 Build America, Buy America Act, as specified in the Build America, Buy America General Term and Condition;

 National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition;

 Uniform Relocation Assistance and Real Property Acquisitions Policy Act, as specified in the Uniform Relocation Assistance and Real Property Acquisitions Policy Act Programmatic Term and Condition;

 Executive Order 11988 (Floodplain Management) and **Executive Order 14030 (Climate-Related Financial Risk)**, as specified in the Financial Risk Management Programmatic Term and Condition;

 Endangered Species Act, as specified in 50 CFR Part 402;

 Federal Funding Accountability and Transparency Act;

 Farmland Protection Policy Act; and

 Coastal Zone Management Act.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient must agree to any modifications to this Closeout Agreement. Agreed-upon modifications must be in writing and signed by each party. Oral or unilateral modifications shall not be effective or binding.

## 11. Termination of the Closeout Agreement

The EPA Award Official or Grants Management Officer and the recipient may mutually agree to terminate this Closeout Agreement.

## 12. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and Hon. Lina Hidalgo (for the recipient). If changes are made to these points of contact, the respective party must notify the other within 30 days of the planned change.

## V. Accounting Principles

Each recipient and subrecipient must account for Solar for All award funds in accordance with generally accepted accounting principles (GAAP) as in effect in the United States. Further, the recipient and subrecipient must segregate and account for Solar for All award funds separately from all other program and business accounts during both the period of performance and under the Closeout Agreement. Additionally, the recipient and subrecipient must segregate and account for program income separately from its drawdowns of EPA award funds during the period of performance to maintain compliance with the Program Income Programmatic Term and Condition and the Period of Performance Programmatic Term and Condition.

## W. Internal Controls

Each recipient and subrecipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## X. Audits

The recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during both the period of performance and under the Closeout Agreement.

The recipient agrees to notify the EPA Project Officer within 30 days of the submission of the recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System; the recipient also agrees to notify the EPA Project Officer within 30 days of the submission of any subrecipient's Single Audit (i.e., at any tier of subrecipients) to the Federal Audit Clearinghouse's Internet Data Entry System.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(h), the recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit subrecipient (i.e., at any tier of subrecipients) that expends $1,000,000 or more of EPA funds from the recipient's grant program in the recipient's fiscal year. Any for-profit subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The subrecipient must submit the audit to the recipient within 9 months of the end of the recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier. As provided in 2 CFR 200.337(a) the recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the subrecipient's independent auditor reports.

## Y. Annual Workshop

Upon the request of the EPA Project Officer, the recipient must participate in an annual workshop (i.e., one workshop per calendar year) with other recipients under Solar for All. The workshop may include recipients from the National Clean Investment Fund and/or Clean Communities Investment Accelerator. The EPA Project Officer will contact the recipient to finalize details for each annual workshop.

## Z. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible recipients effectively carry

out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer, will oversee and monitor the grant agreement through activities including:

1. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

2. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the recipient;

3. Closely monitoring the recipient's management and oversight of subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

4. Closely monitoring the recipient's performance to verify compliance with the EPA-approved Solar for All Workplan and achievement of environmental results;

5. Participating in periodic telephone conference calls with recipient personnel to discuss project successes and challenges, and similar items impacting recipient performance;

6. Reviewing and commenting on performance reports prepared under the award agreement. Note that the final decision on the content of performance reports rests with the recipient;

7. Verifying that the recipient is expending the award on allowable activities, including but not limited to reviewing a sample of financial assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

8. Periodically reviewing costs incurred by the recipient as well as its contractors and subrecipients if needed to ensure appropriate expenditure of grant funds. Note that recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

9. Working with other EPA officials to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

10. Monitoring the use of program income after the period of performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the recipient believes that this specific condition is not warranted or requires modification, the recipient must file a written objection within 21 days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer

identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the recipient may agree to additional areas of oversight and monitoring.

## AA. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the recipient's Solar for All award. These materials may include links to recipient and/or subrecipients' websites. The recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## AB. Flow-Down Requirements

As described in 2 CFR 200.101, the terms and conditions of Federal awards flow down to subawards  unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(a)(2) and in accordance with the Establishing and Managing Subawards General Term and Condition, the recipient agrees to ensure that subrecipients are subject to the same requirements as those that apply to the pass-through entity's EPA award.

For the purposes of this award agreement, all terms and conditions must flow down to subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## AC. Financial Assistance in the Form of Credit Enhancements

If the recipient's EPA-approved Solar for All Workplan includes providing financial assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the recipient's deployment of financial assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the recipient does not retain possession of the grant funds; (2) the recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the recipient; (4) the recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The recipient agrees to provide written guidelines for all financial assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the recipient implementing its strategy, even if the form of credit enhancement is described in the EPA-approved Solar for All Workplan. These guidelines must describe how the expenditure enables low-income and disadvantaged communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the recipient incurs in excess of the grant award funds allocated and expended to

execute its credit enhancement strategy are the recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, subrecipients, or program beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AD. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

The recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by one or several entities that are not eligible recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from low-income and disadvantaged communities).

In accordance with 2 CFR 200.329(e), in the event of a vacancy in board membership, the recipient agrees to notify the EPA Project Officer about the vacancy within 15 calendar days of the vacancy and make its best efforts to fill the vacancy with a qualified member within 120 calendar days of the vacancy.

## B. Board Independence

The recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The recipient agrees to require recusals from any officers or members of the board of directors with a

personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of subawards and participant support cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the [EPA's Final Financial Assistance Conflict of Interest Policy](.).

## 3. Legal Counsel

The recipient agrees to consult appropriate legal counsel. Counsel must review all agreements associated with any form of financial assistance provided that generates program income prior to execution of the documentation, unless the EPA Project Officer waives this requirement. The recipient is required to maintain and appropriately update such documentation during both the period of performance and under the Closeout Agreement. Upon request by the EPA Project Officer, the recipient agrees to provide certification from legal counsel that such documentation complies with these terms and conditions, the EPA-approved Solar for All Workplan, and applicable State and local law.

# EXHIBIT C

| | | | |
|---|---|---|---|
| **U.S. ENVIRONMENTAL PROTECTION AGENCY**<br>Assistance Amendment | **GRANT NUMBER (FAIN):** 84087701<br>**MODIFICATION NUMBER:** 1<br>**PROGRAM CODE:** 5H | | **DATE OF AWARD**<br>12/17/2024 |
| | **TYPE OF ACTION**<br>No Cost Amendment | | **MAILING DATE**<br>12/17/2024 |
| | **PAYMENT METHOD:**<br>ASAP | | **ACH#**<br>66868 |

| **RECIPIENT TYPE:**<br>County | **Send Payment Request to:**<br>Contact EPA RTPFC at: rtpfc-grants@epa.gov |
|---|---|
| **RECIPIENT:**<br>Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-2027<br>EIN: 76-0454514 | **PAYEE:**<br>Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-2027 |

| **PROJECT MANAGER** | **EPA PROJECT OFFICER** | **EPA GRANT SPECIALIST** |
|---|---|---|
| Jesse Dickerman<br>Harris County<br>1001 Preston St Ste 800<br>Houston, TX 77002-1901<br>**Email:** jesse.dickerman@harriscountytx.gov<br>**Phone:** 713-274-1173 | Bryan Fiedorczyk<br>1300 Pennsylvania Ave NW, 1101R<br>Washington, DC 20460<br>**Email:** fiedorczyk.bryan@epa.gov<br>**Phone:** 202-564-9623 | ThuyT Nguyen<br>1200 Pennsylvania Ave., NW. 3903R<br>Washington, DC 20460<br>**Email:** Nguyen.ThuyT@epa.gov<br>**Phone:** 202-564-5312 |

**PROJECT TITLE AND EXPLANATION OF CHANGES**

The Texas Solar for All Coalition: A Collaborative Effort to Enable Low-Income Solar and Storage.

This amendment removes the 2% funding restriction from the Solar for All award and incorporates the necessary budget and workplan documentation

| **BUDGET PERIOD**<br>09/01/2024 - 08/31/2029 | **PROJECT PERIOD**<br>09/01/2024 - 08/31/2029 | **TOTAL BUDGET PERIOD COST**<br>$ 249,700,000.00 | **TOTAL PROJECT PERIOD COST**<br>$ 249,700,000.00 |
|---|---|---|---|

## NOTICE OF AWARD

Based on your Application dated 10/12/2023 including all modifications and amendments, the United States acting by and through the US Environmental Protection Agency (EPA) hereby awards $ 0.00. EPA agrees to cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $ 249,700,000.00. Recipient's signature is not required on this agreement. The recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after the EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after the EPA award or amendment mailing date. If the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to the EPA Award Official within 21 days after the EPA award or amendment mailing date. In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk. This agreement is subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments.

| **ISSUING OFFICE (GRANTS MANAGEMENT OFFICE)** | **AWARD APPROVAL OFFICE** |
|---|---|
| **ORGANIZATION / ADDRESS** | **ORGANIZATION / ADDRESS** |
| Environmental Protection Agency, Grants Management & Business Operations Division<br>1200 Pennsylvania Ave, NW Mail code 3903R<br>Washington, DC 20460 | Environmental Protection Agency, OGGRF<br>OA - Office of the Administrator<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460 |

**THE UNITED STATES OF AMERICA BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY**

| Digital signature applied by EPA Award Official Barbara Proctor - Associate Award Official | **DATE**<br>12/17/2024 |
|---|---|

# EPA Funding Information

| FUNDS | FORMER AWARD | THIS ACTION | AMENDED TOTAL |
|---|---|---|---|
| EPA Amount This Action | $ 249,300,000 | $ 0 | $ 249,300,000 |
| EPA In-Kind Amount | $ 400,000 | $ 0 | $ 400,000 |
| Unexpended Prior Year Balance | $ 0 | $ 0 | $ 0 |
| Other Federal Funds | $ 0 | $ 0 | $ 0 |
| Recipient Contribution | $ 0 | $ 0 | $ 0 |
| State Contribution | $ 0 | $ 0 | $ 0 |
| Local Contribution | $ 0 | $ 0 | $ 0 |
| Other Contribution | $ 0 | $ 0 | $ 0 |
| Allowable Project Cost | $ 249,700,000 | $ 0 | $ 249,700,000 |

| Assistance Program (CFDA) | Statutory Authority | Regulatory Authority |
|---|---|---|
| 66.959 - Zero-Emissions Technology Grant Program | 2023 Consolidated Appropriations Act (PL 117-328) Clean Air Act: Sec. 134(a)(1) National Environmental Policy Act: Sec. 102(2)(I) | 2 CFR 200, 2 CFR 1500 and 40 CFR 33 |

5H - 84087701 - 1    Page 3

Budget Summary Page

| Table A - Object Class Category<br>(Non-Construction) | Total Approved Allowable<br>Budget Period Cost |
|---|---|
| 1. Personnel | $ 1,785,741 |
| 2. Fringe Benefits | $ 625,009 |
| 3. Travel | $ 18,500 |
| 4. Equipment | $ 0 |
| 5. Supplies | $ 31,000 |
| 6. Contractual | $ 51,652,729 |
| 7. Construction | $ 0 |
| 8. Other | $ 195,318,496 |
| 9. Total Direct Charges | $ 249,431,475 |
| 10. Indirect Costs: 10.00 % Base MTDC | $ 268,525 |
| 11. Total (Share: Recipient ___0.00 % Federal __100.00 %) | $ 249,700,000 |
| 12. Total Approved Assistance Amount | $ 249,700,000 |
| 13. Program Income | $ 0 |
| 14. Total EPA Amount Awarded This Action | $ 0 |
| 15. Total EPA Amount Awarded To Date | $ 249,700,000 |

# Administrative Conditions

## A. General Terms and Conditions

The Recipient agrees to comply with the current EPA General Terms and Conditions available at: https://www.epa.gov/grants/epa-general-terms-and-conditions-effective-october-1-2024-or-later . These terms and conditions are in addition to the assurances and certifications made as a part of the award and the terms, conditions, or restrictions cited throughout the award. The EPA repository for the General Terms and Conditions by year can be found at: https://www.epa.gov/grants/grant-terms-and-conditions#general.

## B. Correspondence Condition

The terms and conditions of this agreement require the submittal of reports, specific requests for approval, or notifications to EPA.  Unless otherwise noted, all such correspondence should be sent to the following email addresses:

- Federal Financial Reports (SF-425): rtpfc-grants@epa.gov and EPA Grants Specialist listed on the award
- MBE/WBE reports (EPA Form 5700-52A):  Debora Bradford (Bradford.Debora@epa.gov), OMS-OGD-MBE_WBE@epa.gov, and the EPA Grants Specialist listed on the award
- All other forms/certifications/assurances, Indirect Cost Rate Agreements, Requests for Extensions of the Budget and Project Period, Amendment Requests, Requests for other Prior Approvals, updates to Recipient information (including email addresses, changes in contact information or changes in authorized representatives) and other notifications: EPA Grants Specialist listed on the award and EPA Project Officer listed on the award
- Quality Assurance documents, workplan revisions, equipment lists, programmatic reports and deliverables: EPA Project Officer listed on the award

## C. Intergovernmental Review Period

In accordance with 40 CFR Part 29, EPA must allow for an intergovernmental review comment period when a Recipient or Subrecipient intends to provide financial assistance to a project that involves construction or land use planning. With the exception of projects that will be carried out in the State of California, the Recipient must ensure that directly affected State, areawide, regional, and local government entities have 60 calendar days to review the description of the project contained in the application for funding for the project and provide comments to the EPA Project Officer. Applications for funding for projects that will be carried out in the State of California must be submitted to the California Single Point of Contact at https://cfda.opr.ca.gov for review as provided in California law.

EPA has allowed for an intergovernmental review comment period on behalf of the Recipient. This comment period closed on Tuesday October 22, 2024. The Recipient need not take any additional action with respect to intergovernmental review.

The Recipient agrees to comply with the provisions of 40 CFR Part 29, implementing the Demonstration Cities, Metropolitan Development Act, the Intergovernmental Cooperation Act, and Executive Order 12372 as amended in 1983, to ensure that projects funded under federal programs are consistent with local planning requirements.

## D. Pre-Award Costs

As provided in 2 CFR 200.458, Recipients are authorized to incur pre-award costs, which are costs that would have been allowable if incurred after the date of the Federal award. For competitive grants, EPA interprets the requirement in the regulation that pre-award costs be incurred "directly pursuant to the negotiation and in anticipation of the Federal award" to limit allowable pre-award costs to those a Recipient incurs after EPA has notified the Recipient that its application has been selected for award consideration. The pre-award costs must be included in the workplan and budget to be eligible. As provided in 2 CFR 1500.9, Recipients incur pre-award costs at their own risk. Please refer to *Section I.C: Pre-Award Costs* of the [Interim General Budget Development Guidance for Applicants and Recipients of EPA Financial Assistance](#) for additional information

## E. New Recipient Training Requirement

The Recipient agrees to complete the [EPA Grants Management Training for Applicants and Recipients](#) and the [How to Develop a Budget](#) training within 90 calendar days of the date of award of this agreement. The Recipient must notify the Grant Specialist via email when the required training is complete. For additional information on this training requirement, the Recipient should refer to [RAIN-2024-G01](#).

# Programmatic Conditions

## Solar For All (SFA) Programmatic Terms and Conditions (Updated 12/03/2024)

## I. DEFINITIONS

**Air Pollutant:** "Air Pollutant" means any air pollutant that is listed pursuant to Section 108(a) of the Clean Air Act (or any precursor to such an air pollutant). This includes particulate matter, ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and lead (see 40 CFR Part 50) and their precursors (e.g., volatile organic compounds).

**Award Agreement:** Award Agreement means the set of legally binding documents between EPA and the Recipient under the federal award. Award Agreement is used interchangeably with Assistance Agreement and Notice of Award.

**Apprentice:** Apprentice means an individual working on a project receiving Financial Assistance who is participating in a Registered Apprenticeship program under the National Apprenticeship Act that meets the requirements of 29 CFR Parts 29 and 30.

**Contracts for Delivery of Financial Assistance:** 2 CFR 200.1 defines a contract as "for the purpose of Federal financial assistance, a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Contracts for Delivery of Financial Assistance involve the provision of services through procurement contracts. In this program, Contracts for Delivery of Financial Assistance are a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Eligible Recipient:** Eligible Recipients under the Solar for All program include: (1) states (including territories as defined below), (2) municipalities, (3) Tribal governments, or (4) eligible nonprofit Recipients, each of which is defined in accordance with the Clean Air Act as described below:

- **State:** Section 302(d) of the Clean Air Act defines a state as a state, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands. Eligible Recipients that are states are identified on the Notice of Award as a "state" Recipient type.
- **Municipality:** Section 302(f) of the Clean Air Act provides that a municipality is a city, town, borough, county, parish, district, or other public body created by or pursuant to state law. This term may include councils of government (COGs) created by or pursuant to the laws of one or more states even if a COG is incorporated as a nonprofit organization. Eligible Recipients that are municipality are identified on the Notice of Award as either a "municipal", "county", or "township" Recipient type.
- **Tribal Government:** Section 302(r) of the Clean Air Act "Indian Tribe" as any "Indian Tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians." EPA includes Intertribal Consortia that meet the requirements of 40 CFR § 35.504 as an eligible Recipient under this category pursuant to the authority in 40 CFR § 35.501(b) to issue guidance extending Intertribal Consortia eligibility to environmental programs established subsequent to the effective date of 40 CFR Part 35, Subpart B. As provided in 40 CFR 35.504(a) all members of the Intertribal consortium must meet the definition of "Indian Tribe" in Section 302(r) of the Clean Air Act. Eligible Recipients that are Tribal

governments are identified on the Notice of Award as an Indian Tribe Recipient type. Eligible Recipients that are defined as Tribal governments because they are Intertribal Consortia may be identified as a not for profit on the Notice of Award. In these cases, the EPA-approved Solar for All workplan will identify the Recipient type as an Intertribal Consortia.

• **Eligible Nonprofit Recipient:** In accordance with Section 134(c)(1) of the Clean Air Act, a nonprofit organization must satisfy each of the below requirements to be deemed an eligible nonprofit Recipient under the Solar for All program:

    a. Meeting the definition of *Nonprofit organization* set forth in 2 CFR 200.1;

    b. Having an organizational mission consistent with being "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;"

    c. Not receiving any "deposit" (as defined in Section 3(l) of the Federal Deposit Insurance Act) or "member account" or "account" (as defined in Section 101 of the Federal Credit Union Act);

    d. Being funded by public or charitable contributions; and

    e. Having the legal authority to invest in or finance projects.

Eligible Recipients that are eligible nonprofit Recipients are identified on the Notice of Award as a not for profit Recipient type, excluding Recipients that are identified as Intertribal Consortia on the EPA-approved Solar for All workplan.

**Eligible Zero-Emissions Technology**: Section 134(a)(1) of the Clean Air Act provides that grants be used to provide financial assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Section 134(c)(4) of the Clean Air Act provides that the term zero-emissions technology means any technology that produces zero emissions of (a) any air pollutant that is listed in Section 108(a) (or any precursor to such an air pollutant) and (b) any greenhouse gas. There are four eligible zero-emissions technology categories. The four categories are:

• **Residential Rooftop Solar:** Behind-the-meter solar photovoltaic (PV) power-producing facilities, including rooftop, pole-mounted, and ground-mounted PV systems, that deliver all the power generated from the facilities to residential customers in existing and new single-family homes, manufactured homes, or multifamily buildings. Residential rooftop solar includes behind-the-meter solar facilities serving multifamily buildings classified as commercial buildings so long as the solar facility benefits residential customers either directly or indirectly such as through tenant benefit agreements. Residential rooftop solar includes properties that are both rented and owned.

• **Residential-Serving Community Solar:** A solar PV power-producing facility or solar energy purchasing program from a power-producing facility, with up to 5 $MW_{ac}$ nameplate capacity, that delivers at least 50% of the power generated from the system—by delivering at least 50% of the benefits (e.g., financial savings, renewable energy credits) derived from the power generated by the community solar system—to residential customers within the same utility territory as the facility.

• **Associated Storage:** Infrastructure to store solar-generated power for the purposes of maximizing

residential rooftop and residential-serving community solar deployment that is deployed in conjunction with an eligible residential rooftop solar or residential-serving community solar project. Stand-alone energy storage infrastructure is not an eligible zero-emissions technology.

- **Enabling Upgrades:** Investments in energy and building infrastructure that are necessary to deploy or maximize the benefits of a residential rooftop and residential-serving community solar project. Enabling upgrades must satisfy all of the following criteria to be an eligible zero-emissions technology: (1) an investment in energy or building infrastructure and (2) necessary to deploy or maximize the benefits (i.e., financial savings or resiliency benefits) of a residential rooftop and residential-serving community solar project as defined above.

**Environmental Information:** Environmental Information is defined in EPA's Environmental Information Quality Policy. Environmental Information includes "data and information that describe environmental processes or conditions which support EPA's mission of protecting human health and the environment. Examples include but are not limited to: direct measurements of environmental parameters or processes; analytical testing results of environmental conditions (e.g., geophysical or hydrological conditions); information on physical parameters or processes collected using environmental technologies; calculations or analyses of environmental information; information provided by models; information compiled or obtained from databases, software applications, decision support tools, websites, existing literature, and other sources; development of environmental software, tools, models, methods and applications; and design, construction, and operation or application of environmental technology."

**Environmental Information Operations:** Environmental Information Operations is defined in EPA's Environmental Information Quality Policy. Environmental Information Operations means "[a] collective term for work performed to collect, produce, evaluate, or use environmental information and the design, construction, operation or application of environmental technology."

**EPA Project Officer**: EPA Project Officer means the project officer from the Office of the Greenhouse Gas Reduction Fund that is assigned, along with the EPA Grants Specialist, to monitor the Recipient on programmatic and technical aspects of the project and is typically authorized to make programmatic approvals on behalf of the EPA. Where required, the Recipient must notify or request approval from the EPA Project Officer through the EPA Project Officer's individual EPA email address as well SFA@epa.gov such that the Office of the Greenhouse Gas Reduction Fund may delegate an alternative EPA Project Officer in the case of any absence.

**EPA Award Official**: "EPA Award Official" means the award official from the Office of Grants and Debarment that is authorized to execute the award agreement, as well as any subsequent amendments to the award agreement, and to make any other final determinations required by law or regulation on behalf of the EPA.

**Financial Assistance:** Section 134(a)(1) of the Clean Air Act directs that Recipients use funds to provide financial assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." Consistent with the definition of Federal financial assistance in 2 CFR 200.1, Financial Assistance means financial products, including debt (such as loans, partially forgivable loans, forgivable loans, zero-interest and below-market interest loans, loans paired with interest rate buydowns, secured and unsecured loans, lines of credit, subordinated debt, warehouse lending, and other debt instruments), credit enhancements (such as loan guarantees, loan guarantee funds, loan loss reserves, and other credit enhancement instruments that are not acquisitions of intangible property), subgrants, subsidies, and rebates. Expenditures for Financial Assistance are in the form of Contracts for

Delivery of Financial Assistance, Subawards, or Participant Support Costs, as defined in this Award Agreement. For the avoidance of doubt, financial products that build the capacity of communities and businesses to deploy solar including but not limited to predevelopment loans and grants or working capital lines of credit to businesses or other forms of financing to build the solar project pipeline are classified as Financial Assistance for the purposes of this program.

*Freely Associated States: Freely Associated States means the Republic of the Marshall Islands (the Marshalls), the Federated States of Micronesia (FSM), and the Republic of Palau (Palau).*

**Greenhouse Gas:** Greenhouse Gas means carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride, as defined in Section 134(c)(2) of the Clean Air Act. Greenhouse Gas Emissions mean emissions of Greenhouse Gases.

**Low-Income and Disadvantaged Communities**: Section 134(a)(1) of the Clean Air Act directs that Recipients use funds for Financial Assistance and technical assistance "to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies." "Low-income and disadvantaged communities" means CEJST-identified disadvantaged communities, EJScreen-identified disadvantaged communities, geographically dispersed low-income households, and properties providing affordable housing, as defined below.

- *CEJST-Identified Disadvantaged Communities:* All communities identified as disadvantaged through version 1.0 of the Climate and Economic Justice Screening Tool (CEJST), released on November 22, 2022, which includes census tracts that meet the thresholds for at least one of the tool's categories of burden and land within the boundaries of Federally Recognized Tribes.

- *EJScreen-Identified Disadvantaged Communities:* **All communities** within version 2.3 of EJScreen **that fall within either (a) t**he limited supplemental set of census block groups that are at or above the 90th percentile for any of EJScreen's supplemental indexes when compared to the nation or state or (b) geographic areas within Tribal lands as included in EJScreen, which includes the following Tribal lands: Alaska Native Allotments, Alaska Native Villages, American Indian Reservations, American Indian Off-reservation Trust Lands, and Oklahoma Tribal Statistical Areas.

- *Geographically Dispersed Low-Income Households:* Low-income individuals and households living in Metropolitan Areas with incomes not more than 80% AMI or 200% FPL (whichever is higher), and low-income individuals and households living in Non-Metropolitan Areas with incomes not more than 80% AMI, 200% FPL, or 80% Statewide Non-Metropolitan Area AMI (whichever is highest). Federal Poverty Level (FPL) is defined using the latest publicly available figures from the U.S. Department of Health and Human Services. Area Median Income (AMI) is defined using the latest publicly available figures from the U.S. Department of Housing and Urban Development (HUD). Metropolitan Area and Non-Metropolitan Area are defined using the latest publicly available figures for county-level designations from the Office of Management and Budget. Statewide Non-Metropolitan Area AMI is defined using the latest publicly available figures from the U.S. Department of the Treasury's CDFI Fund, with an adjustment for household size using HUD's Family Size Adjustment factor.

- *Properties Providing Affordable Housing:* Properties providing affordable housing that fall within either of the following two categories: (a) multifamily housing with rents not exceeding 30% of 80% AMI for at least half of residential units and with an active affordability covenant from one of the following housing assistance programs: (1) Low-Income Housing Tax Credit; (2) a housing assistance program administered by HUD, including Public Housing, Section 8 Project-Based

Rental Assistance, Section 202 Housing for the Elderly, Section 811 Housing for Disabled, Housing Trust Fund, Home Investment Partnership Program Affordable Rental and Homeowner Units, Permanent Supportive Housing, and other programs focused on ending homelessness that are funded under HUD's Continuum of Care Program; (3) a housing assistance program administered by USDA under Title V of the Housing Act of 1949, including under Sections 514 and 515; (4) a housing assistance program administered by a tribally designated housing entity, as defined in Section 4(22) of the Native American Housing Assistance and Self-Determination Act of 1996 (25 USC § 4103(22)); or (5) a housing assistance program administered by the Department of Hawaiian Homelands as defined in Title VIII of the Native American Housing Assistance and Self-Determination Act of 1996 (24 CFR 1006.10) or (b) naturally-occurring (unsubsidized) affordable housing with rents not exceeding 30% of 80% AMI for at least half of residential units.

- *Federally Recognized Tribal Entities:* All Federally Recognized Tribal entities, which are considered disadvantaged regardless of whether a Federally Recognized Tribe has land, consistent with M-23-09 (memorandum dated as of January 27, 2023) and CEJST. A "Federally Recognized Tribal Entity" means (i) any individual member of a Federally Recognized Tribe; (ii) any for-profit business that has at least 51 percent of its equity ownership (or the equivalent in limited liability companies) by members of Federally Recognized Tribes; (iii) any non-profit entity with at least 51 percent of its Board of Directors (i.e., Governing Board) comprised of members of Federally Recognized Tribes; or (iv) any Federally Recognized Tribal government entity.  Under this definition, any Federally Recognized Tribal Entity is included within the definition of Low-Income and Disadvantaged Communities, regardless of where that entity is located (i.e., the entity may be located in areas outside of the CEJST land area dataset, including but not limited to tribal service areas or counties).

**Materially Impaired**: For the definition and application of these terms under this Assistance Agreement (e.g. the Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, note that EPA defines "Materially Impaired" in the context of effective performance of the Assistance Agreement as 1) the issuance of a written determination and finding from EPA that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause under the Clarifications to EPA General Terms and Conditions Programmatic Term and Condition and 2) if EPA in its sole discretion determines that a corrective action plan is an appropriate means of remedying the lack of sufficient progress, the subsequent issuance of a separate written determination and finding from EPA that the Recipient has not materially addressed its failure to achieve sufficient progress after implementing a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

**Participant Support Costs**: 2 CFR 200.1 defines Participant Support Costs as "direct costs that support participants (see definition for Participant in § 200.1) and their involvement in a Federal award, such as stipends, subsistence allowances, travel allowances, registration fees, temporary dependent care, and per diem paid directly to or on behalf of participants." EPA regulations at 2 CFR 1500.1(a)(1) expand the definition of Participant Support Costs to include "subsidies, rebates, and other payments to Program Beneficiaries to encourage participation in statutorily authorized environmental stewardship programs," which includes the Greenhouse Gas Reduction Fund. In this program, Participant Support Costs are primarily a form of Financial Assistance to projects which enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies.

**Period of Closeout**: Period of Closeout means the time interval between the beginning of the closeout

period (the date that the award has been closed out, in accordance with 2 CFR 200.344) to the end of the closeout period (the date that the Closeout Agreement has been terminated). The Period of Closeout may also be referred to as the Closeout Period.

**Period of Performance**: 2 CFR 200.1 defines Period of Performance as "the time interval between the start and end date of a Federal award, which may include one or more budget periods." For the purposes of this Award Agreement, the Period of Performance means the time interval between the start of the Federal award (either the first date that the Recipient has incurred allowable pre-award costs or the date on the Notice of Award, whichever is earlier) and the end of the Federal award (the date that the award has been closed out, in accordance with 2 CFR 200.344). The Period of Performance may also be referred to as the Performance Period.

**Post-Closeout Program Income**: Post-Closeout Program Income means Program Income retained at the end of the Period of Performance, which is subject to the terms and conditions of the Closeout Agreement, as well as Program Income earned by the Recipient during the Period of Closeout that is directly generated by a supported activity or earned as a result of the Federal award, which is also subject to the terms and conditions of the Closeout Agreement. Under the Closeout Agreement, the Recipient is authorized to deduct the cost of generating Post-Closeout Program Income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of Post-Closeout Program Income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Post Closeout Program Income. Costs of generating Post-Closeout Program Income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the Post-Closeout Program Income, provided the Recipient can account for the actual costs incurred.

**Program Administration Activities:** "Program administration activities" means activities that support administration of the grant program, to the extent such activities meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500. Expenditures for program administration activities could include those for program performance, financial and administrative reporting, and compliance, including but not limited to activities to support, monitor, oversee, and audit Subrecipients, Contractors, and Program Beneficiaries. Program administration costs include procuring services and tools that support the Recipient in program design. Program administration activities may also include establishing and convening advisory councils, as described in Item 2 of EPA's Guidance on Selected Items of Cost for Recipients, and fundraising, as described in Item 4 of EPA's Guidance on Selected Items of Cost for Recipients.

**Program Beneficiary:** Program Beneficiary means an entity (either an individual or an organization) that receives Financial Assistance or Project Deployment Technical Assistance from the Recipient as an end-user. Expenditures for Financial Assistance or Project Deployment Technical Assistance to Program Beneficiaries are in the form of Participant Support Costs, as defined in 2 CFR 1500.1. A Program Beneficiary is distinct from a Subrecipient, as defined in 2 CFR 200.1.

**Program Income:** 2 CFR 200.1 defines Program Income as "gross income earned by the recipient or subrecipient that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in § 200.307(c)". 2 CFR 200.1 notes that Program Income "includes but is not limited to income from fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a

Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds." For this program, Program Income also includes but is not limited to income from origination fees, servicing fees, and asset management fees; revenue from asset sales; release of grant funds previously used as Financial Assistance (such as through loan guarantees, loan loss reserves, or similar transactions); interest and other earnings on disbursements of grant funds that have not been transferred to third parties; and funds raised with costs charged against the grant award (such as private debt, philanthropic contributions, and other funds raised). EPA-specific rules on Program Income are provided at 2 CFR 1500.8, and rules on allowable fundraising costs are provided under 2 CFR 200.442 (with additional details in Item 4 of the [EPA Guidance on Selected Items of Cost for Recipients](#)). Under this program, the Recipient is authorized to deduct the cost of generating program income under 2 CFR 200.307(d) and 2 CFR 1500.8(b), provided the costs are reasonable and necessary for performance under the federal award and the costs are not charged to the EPA award. Costs incidental to the generation of program income include origination, servicing, and management costs that are not charged as direct costs to the Federal award or to Program Income. Costs of generating program income can be incurred in advance of receiving the gross income, with the Recipient incurring the costs and later using gross income to reimburse itself for no more than the actual costs incurred to generate the program income, provided the Recipient can account for the actual costs incurred. Program Income requirements flow down to Subrecipients but not to Contractors or Program Beneficiaries.

**Project-Deployment Technical Assistance:** Section 134(a)(1) of the Clean Air Act provides that funds for this competition be used for "technical assistance." Technical assistance is defined as "Project-Deployment Technical Assistance" and is services and tools provided by Recipients to enable Low-Income and Disadvantaged Communities to overcome non-financial barriers to rooftop residential solar or residential-serving community solar deployment or build the capacity of communities and businesses to deploy solar. Examples of these services and tools include workforce training, customer outreach and education, project deployment assistance such as siting, permitting, and interconnection support, coordination with utilities for the purposes of project deployment, distributed solar deployment training for developers, and other services and tools that enable Low-Income and Disadvantaged Communities to deploy or benefit from rooftop residential solar, and residential-serving community solar.

**Subaward:** 2 CFR 200.1 defines a Subaward as "an award provided by a pass-through entity to a subrecipient for the subrecipient to contribute to the goals and objectives of the project by carrying out part of a Federal award received by the pass-through entity. It does not include payments to a contractor, beneficiary, or participant". A Subgrant refers to a Subaward in the form of a grant.

**Subrecipient:** Consistent with 2 CFR 200.1, Subrecipient means an entity that receives a Subaward from a pass-through entity to carry out part of a Federal award but does not include an entity that is a Program Beneficiary of such an award. A Subrecipient is distinct from a Program Beneficiary, which is referenced in 2 CFR 1500.1.

**Waste, Fraud, or Abuse:** For the definition and application of these terms under this Assistance Agreement (e.g. under the Financial Risk Management Requirements and Clarifications to EPA General Terms and Conditions) and any associated legal documentation related to the Assistance Agreement, refer to their use in the *Reporting Waste, Fraud, and Abuse* clause in the EPA General Terms and Conditions effective October 1, 2024 and 2 CFR 200.113: "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act 31 U.S.C. 3729-3733."

## II. NATIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Performance Reporting

In accordance with 2 CFR 200.329 and 2 CFR 200.337, the Recipient agrees to the following two requirements of performance reporting: (1) progress reports, (2) transaction and-project level report. These performance reporting requirements "flow-down" as needed to enable the Recipient to comply with the requirements described in this term and condition. The Recipient must ensure that these reports cover its own grant-related activities, and where applicable to a certain performance report or element of a performance report, the grant-related activities of its Subrecipients, Contractors, and/or Program Beneficiaries. The Recipient agrees that EPA may amend the Award Agreement to reflect information collection instruments authorized by GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW), once such instruments are authorized; to the extent that the information is not available for transactions that were closed prior to the amendment, the Recipient will not be out of compliance with the reporting requirements.

The Recipient acknowledges that knowingly and willfully making a material false statement may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

EPA intends to make performance reporting information available to the public, either in whole or in part, through disclosing copies of the reports as submitted or using the content of the reports to prepare EPA reporting documents. Pursuant to 2 CFR 200.338, the Recipient agrees to redact personally identifiable information (PII) and mark confidential business information (CBI) prior to submission to EPA. Information claimed as CBI will be disclosed only to the extent, and by means of the procedures, set forth in 40 CFR Part 2, Subpart B. As provided at 40 CFR 2.203(b), if no claim of confidential treatment accompanies the information when it is received by EPA, it may be made available to the public by EPA without further notice to the Recipient. Recipient agrees that submitted information that does not include PII or CBI may be shared for program evaluation purposes, including with third parties.

The EPA Project Officer may extend the due date for performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. On a case-by-case basis, the EPA Project Officer may waive or modify performance reporting requirements to the extent authorized by 2 CFR 200.329 and 2 CFR 200.344. Notwithstanding any other provision of this Assistance Agreement, if Recipient's inability to submit the required performance reporting is due to issues with EPA systems, the Recipient shall be granted a reasonable extension to submit the reports after the technical issue has been corrected.

***The following additional term and condition applicable to performance reporting applies if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:***

The Recipient agrees to have its chief executive officer (or equivalent) and chief reporting officer (or equivalent) review, sign, and submit performance reporting electronically to the EPA Project Officer. To the extent it is known, or should have been known, by the chief executive officer (or equivalent) and chief reporting officer (or equivalent) that the reporting is not materially compliant with the terms and conditions, or demonstrates material noncompliance with the terms and conditions, the chief executive officer (or equivalent) and chief reporting officer (or equivalent) must note such noncompliance to the EPA Project Officer alongside the submission. Should the chief executive officer (or equivalent) and chief reporting officer (or equivalent) signing the submission knowingly and willfully make any material false statement, they may be subject to criminal prosecution under 18 U.S.C. 1001 and/or other civil and administrative sanctions.

## 1. Progress Reports

### *Semi-Annual Report*

The Recipient agrees to submit semi-annual reports covering six months of the calendar year in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). A single semi-annual report must be submitted to cover grant-related activities of the Recipient as well as Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the semi-annual report.

The Recipient agrees to submit semi-annual reports electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods are as follows: July 1 to December 31; January 1 to June 30. The first semi-annual reporting period ends on December 31 and covers all activities beginning on the first day of the Period of Performance.

### *Final Report*

The Recipient agrees to submit a final report containing two documents. First, the Recipient must submit a report containing detailed narratives describing program performance for the entire Period of Performance, representing an overall assessment of the Recipient's implementation of its EPA-approved Solar for All Workplan, supported with qualitative discussions and quantitative metrics. The Recipient must include the following broad, non-exhaustive elements in its narrative report:

- Progress towards objectives on key performance metrics over the entire Period of Performance,
- Summary of key activities completed in the entire Period of Performance, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-Deployment Technical Assistance deployed in the entire Period of Performance,
- Descriptions and examples of actions the program took over the entire Period of Performance to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved under the Closeout Agreement.

Second, the Recipient must submit its program strategy for the Closeout Period to detail its use of Post-Closeout Program Income over the Closeout Period.

The two documents for the final report must be submitted to cover the grant-related activities of the

Recipient and its Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the final report.

The two documents for the final report must be submitted ready to be published on the EPA website for public consumption and must not include any material that the Recipient considers to be Confidential Business Information (CBI) or Personal Identifiable Information (PII). All reports will undergo an EPA review process to verify that there is no PII or claims of CBI. Should EPA identify PII or claims of CBI in reports, the EPA Project Officer will require that the Recipient re-submit the report without the PII or claims of CBI so that it can be published without redaction.

The Recipient agrees to submit the two documents for the final report electronically to the EPA Project Officer no later than 120 calendar days after the end date of the Period of Performance.

## 2. Transaction and Project-Level Report

The Recipient agrees to submit semi-annual transaction and project-level reporting in accordance with information collection instruments approved through GGRF Accomplishment Reporting (EPA ICR Number 2783.01, OMB Control Number 2090-NEW). The data submission must cover the grant-related activities of the Recipient and Subrecipients as well as the grant-related activities of its Contractors and/or Program Beneficiaries where applicable to a certain element of the data submission.

The Recipient agrees to submit the transaction and project-level report electronically to the EPA Project Officer within 30 calendar days after the semi-annual reporting period ends. The Recipient may submit a request to the EPA Project Officer for a permanent extension to 60 calendar days. A request may be made once, and it must include (i) an explanation of the Recipient's unique circumstance as to why they need the extension; (ii) the length of the extension (i.e., up to but not more than 60 calendar days after the semi-annual reporting period ends); and (iii) the duration of the extension (i.e., up to the remainder of the Period of Performance).

The semi-annual reporting periods for data submission are as follows: October 1 to March 31; April 1 to September 30. The data submissions must cover transactions originated in the preceding two quarters. For the semi-annual reporting period that ends March 31, the Recipient must provide information on transactions originated from July 1 to December 31 rather than from October 1 to March 31. For the semi-annual reporting period that ends September 30, the Recipient must provide information on transactions originated from January 1 to June 30 rather than from April 1 to September 30. The first transaction and project-level report is due 30 calendar days after March 31, 2025, and must cover all transactions originated from the beginning of the Performance Period through December 31, 2024.

## B. Cybersecurity Condition

### *The following terms and conditions applicable to cybersecurity apply if the Recipient is a State as defined in the Eligible Recipient definition*:

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure.

For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Tribal Government as defined in the Eligible Recipient definition so long as the Recipient is not identified as a not for profit on the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable Tribal law and policy cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring

deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

***The following terms and conditions applicable to cybersecurity apply if the Recipient is a Municipality or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition and if the Recipient is both a Tribal government as defined in the Eligible Recipient definition and denoted as a not for profit in the Notice of Award:***

(a) The Recipient agrees that when collecting and managing environmental data under this assistance agreement, it will protect the data by following all applicable State or Tribal law cybersecurity requirements.

(b) (1) EPA must ensure that any connections between the Recipient's network or information system and EPA networks used by the Recipient to transfer data under this agreement, are secure. For purposes of this Section, a connection is defined as a dedicated persistent interface between an Agency IT system and an external IT system for the purpose of transferring information. Transitory, user-controlled connections such as website browsing are excluded from this definition.

If the Recipient's connections as defined above do not go through the Environmental Information Exchange Network or EPA's Central Data Exchange, the Recipient agrees to contact the EPA Project Officer no later than 90 calendar days after the date of this award and work with the designated Regional/Headquarters Information Security Officer to ensure that the connections meet EPA security requirements, including entering into Interconnection Service Agreements as appropriate. This condition does not apply to manual entry of data by the Recipient into systems operated and used by EPA's regulatory programs for the submission of reporting and/or compliance data.

(2) The Recipient agrees that any Subawards it makes under this agreement will require the Subrecipient to comply with the requirements in (b)(1) if the Subrecipient's network or information system is connected to EPA networks to transfer data to the Agency using systems other than the Environmental Information Exchange Network or EPA's Central Data Exchange. The Recipient will be in compliance with this condition: by including this requirement in Subaward agreements; and during Subrecipient monitoring deemed necessary by the Recipient under 2 CFR 200.332(e), by inquiring whether the Subrecipient has contacted the EPA Project Officer. Nothing in this condition requires the Recipient to contact the EPA Project Officer on behalf of a Subrecipient or to be involved in the negotiation of an Interconnection Service Agreement between the Subrecipient and EPA.

## C. Competency Policy

In accordance with Agency Policy Directive Number FEM-2012-02, Policy to Assure the Competency of Organizations Generating Environmental Measurement Data under Agency-Funded Assistance Agreements, the Recipient agrees, by entering into this agreement, that it has demonstrated competency prior to award, or alternatively, where a pre-award demonstration of competency is not practicable, the Recipient agrees to demonstrate competency prior to carrying out any activities under the award involving the generation or use of environmental data. The Recipient shall maintain competency for the duration of the project period of this agreement and this will be documented during the annual reporting process. A copy of the Policy is available online at https://www.epa.gov/sites/production/files/2015-03/documents/competency-policy-aaia-new.pdf or a copy may also be requested by contacting the EPA

Project Officer for this award.

## D. Public or Media Events

For public or media events that are planned more than 15 calendar days in advance, the Recipient agrees to notify the EPA Project Officer of public or media events it has organized publicizing the accomplishment of significant activities related to execution of the EPA-approved Solar for All workplan and provide the opportunity for attendance and participation by federal representatives with at least 15 calendar days' notice.

## E. In-Kind Assistance

This action awards federal funds in the amount specified on the Notice of Award of which $400,000 is anticipated to be through in-kind assistance. The in-kind assistance will include but is not limited to convenings and peer networking, market data collection, research and analysis, tool building, and education and outreach, to assist Recipients in achieving the objectives of the Solar for All program.

## F. Geospatial Data Standards

All geospatial data created must be consistent with Federal Geographic Data Committee (FGDC) endorsed standards. Information on these standards may be found at https://www.fgdc.gov/.

## G. Leveraging and Fundraising

### 1. Leveraging

The Recipient agrees to make commercially reasonable efforts to provide the proposed leveraged funding that is described in its EPA-approved Solar for All workplan. If the proposed leveraging does not substantially materialize during the Period of Performance, and the Recipient does not provide a satisfactory explanation, the Agency may consider this factor in evaluating future grant applications from the Recipient. In addition, if the proposed leveraging does not substantially materialize during the Period of Performance and the Recipient does not provide a satisfactory explanation, then EPA may reconsider the legitimacy of the award; if EPA determines that the Recipient knowingly or recklessly provided inaccurate information regarding the leveraged funding described in the EPA-approved Solar for All workplan, EPA may take action as authorized by 2 CFR Part 200 and/or 2 CFR Part 180 as applicable.

### 2. Fundraising

2 CFR 200.442 provides coverage on allowable fundraising costs, with additional details contained in Item 4 of the EPA Guidance on Selected Items of Cost for Recipients. Fundraising costs described in the EPA-approved Solar for All Workplan are an allowable cost and may include costs that are reasonable and necessary for raising additional capital to provide Financial Assistance to eligible zero emissions technologies or Project-deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emission technologies.

Allowable fundraising costs must meet the following two criteria, in addition to meeting the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500: (1) must be in support of the Greenhouse Gas Reduction Fund's third program objective to mobilize financing and private capital and (2) must be reasonable and necessary to raise capital from private

investors. Funds a Recipient raises for its own use with costs borne by an EPA Financial Assistance Agreement are considered Program Income, which must be treated in accordance with the Program Income Programmatic Term and Condition. When fundraising costs are paid for by both the award as well as other sources, a portion of the funds raised equal to the share of fundraising costs charged to the award will be treated as Program Income.

## H. Quality Assurance

Authority: Quality Assurance applies to all assistance agreements involving Environmental Information as defined in 2 C.F.R. § 1500.12 Quality Assurance.

The Recipient shall ensure that Subawards involving Environmental Information issued under this agreement include appropriate quality requirements for the work. The Recipient shall ensure Subrecipients develop and implement Quality Assurance (QA) planning documents in accordance with this term and condition; and/or ensure Subrecipients implement all applicable approved QA planning documents. EPA will not approve any QA planning documents developed by a Subrecipient; the Recipient is responsible for reviewing and approving its Subrecipient QA planning document(s), if required based on the Subrecipient's Environmental Information Operations.

## 1. Quality Management Plan (QMP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QMP, (ii) prepare the QMP in accordance with the current version of EPA's Quality Management Plan (QMP) Standard and submit the document for EPA review, and (iii) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the Recipient may (i) submit a previously EPA-approved and current QMP and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the QMP is acceptable for this agreement.

The Recipient must submit the QMP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must review their approved QMP at least annually. These documented reviews shall be made available to the sponsoring EPA organization if requested. When necessary, the Recipient shall revise its QMP to incorporate minor changes and notify the EPA PO and QAM of the changes. If significant changes have been made to the Quality Program that affect the performance of environmental information operations, it may be necessary to re-submit the entire QMP for re-approval. In general, a copy of any QMP revision(s) made during the year should be submitted to the EPA PO and QAM in writing when such changes occur. Conditions requiring the revision and resubmittal of an approved QMP can be found in section 6 of EPA's Quality Management Plan (QMP) Standard.

## 2. Quality Assurance Project Plan (QAPP)

Prior to beginning Environmental Information Operations necessary to comply with the requirements specified in the Performance Reporting Programmatic Term and Condition, the Recipient must: (i) develop a QAPP, (ii) prepare the QAPP in accordance with the current version of EPA's Quality Assurance Project Plan (QAPP) Standard, (iii) submit the document for EPA review, and (iv) obtain EPA Quality Assurance Manager or designee (hereafter referred to as QAM) approval. Alternatively, the

Recipient may (i) submit a previously EPA-approved QAPP proposed to ensure the collected, produced, evaluated, or used environmental information is of known and documented quality for the intended use(s) and (ii) the EPA Quality Assurance Manager or designee (hereafter referred to as QAM) will notify the Recipient and EPA Project Officer (PO) in writing if the previously EPA-approved QAPP is acceptable for this agreement.

The Recipient must submit the QAPP within 90 calendar days after the date this amendment to the Award Agreement becomes effective, unless the Recipient requests an extension(s) that is granted by the QAM.

The Recipient must notify the PO and QAM when substantive changes are needed to the QAPP. EPA may require the QAPP be updated and re-submitted for approval.

The Recipient must review their approved QAPP at least annually. The results of the QAPP review and any revisions must be submitted to the PO and the QAM at least annually and may also be submitted when changes occur.

**For Reference:**

• Quality Management Plan (QMP) Standard and EPA's Quality Assurance Project Plan (QAPP) Standard; contain quality specifications for EPA and non-EPA organizations and definitions applicable to these terms and conditions.

• EPA QA/G-5: *Guidance for Quality Assurance Project Plans*.

• EPA's Quality Program website has a list of QA managers, and Non-EPA Organizations Quality Specifications.

## I. Real Property

In accordance with 2 CFR 200.311, title to Real Property acquired or improved under this agreement will vest upon acquisition by the Recipient, including but not limited to title to Real Property acquired through exercise of a remedy for default of a Financial Assistance arrangement. This Real Property must be used for the originally authorized purpose as long as needed for that purpose, during which time the Recipient must not dispose of or encumber its title or other interests. The Real Property Programmatic Term and Condition flows down to Subrecipients but not to Program Beneficiaries or Contractors that receive Financial Assistance, which may acquire title to Real Property after receiving Financial Assistance.

The Recipient must obtain prior approval from the EPA Award Official for the acquisition of Real Property. Note that the Recipient may meet this requirement by specifying the types of acquisitions of Real Property it plans to carry out in its EPA-approved Solar for All Workplan.

### Disposition

If the Recipient disposes of the property and uses the proceeds for the originally authorized purpose (i.e., under the terms and conditions of the Award Agreement), then the proceeds will be treated as Program Income and there are no further disposition requirements.

Otherwise, when Real Property is no longer needed for the originally authorized purpose, the Recipient

must obtain disposition instructions from EPA. The instructions will provide for one of the following alternatives:

1. Retain title after compensating EPA. The amount paid to EPA will be computed by applying EPA's percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where Recipient is disposing of Real Property acquired or improved with a Federal award and acquiring replacement Real Property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate EPA. The amount due to EPA will be calculated by applying EPA's percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the Recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to EPA or to a third party designated/approved by EPA. The Recipient is entitled to be paid an amount calculated by applying the Recipient's percentage of participation in the purchase of the Real Property (and cost of any improvements) to the current fair market value of the property.

<u>Recordation</u>

As authorized by 2 CFR 200.316, EPA requires that Recipients who use EPA funding to purchase and improve Real Property through an EPA funded construction project record a lien or similar notice in the Real Property records for the jurisdiction in which the Real Property is located, which indicates that the Real Property has been acquired and improved with federal funding and that use and disposition conditions apply to the Real Property.

**J. Program Income**

In accordance with 2 CFR 200.307(c) and 2 CFR 1500.8(b), the Recipient must retain Program Income earned during the Period of Performance. Program Income will be added to funds committed to the program by EPA and used for the purposes and under the conditions of the Assistance Agreement and beyond the Period of Performance based on a Closeout Agreement.

In any period of time before such a Closeout Agreement is effective but after the Recipient has fully used the award for allowable activities, the Recipient is authorized to use Program Income under the terms and conditions of the Assistance Agreement, as opposed to the terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition. The terms and conditions outlined under the Closeout Agreement Programmatic Term and Condition will supplant the terms and conditions of the Assistance Agreement once the Closeout Agreement becomes effective.

In accordance with 2 CFR 1500.8(d) as supplemented by the Period of Performance Programmatic Term and Condition, under ordinary circumstances, the Recipient may only use Program Income once the initial award funds are fully used for allowable activities or the Period of Performance ends for a different reason. However, Program Income may be used by the Recipient in advance of the initial award funds being fully used where reasonable and necessary to execute the activities in the EPA-approved Solar for All workplan.

## K. Use of Logos

If the EPA logo is appearing along with logos from other participating entities on websites, outreach materials, or reports, it must **not** be prominently displayed to imply that any of the Recipient or Subrecipient's activities are being conducted by the EPA. Instead, the EPA logo should be accompanied with a statement indicating that the Recipient received financial support from the EPA under an Assistance Agreement. More information is available at: https://www.epa.gov/stylebook/using-epa-seal-and-logo#policy.

## III. ADDITIONAL PROGRAMMATIC TERMS AND CONDITIONS

### A. Solar for All Workplan

#### 1. EPA-approved Solar for All Workplan

The Recipient agrees to implement this grant in accordance with its EPA-approved Solar for All Workplan. The Recipient agrees that the public laws, regulations, applicable notices, Executive Orders, and these award agreement terms and conditions supersede the EPA-approved Solar for All Workplan in the event there are conflicting provisions in the EPA-approved Solar for All Workplan.

#### 2. Specific condition on revisions to EPA-approved Solar for All workplan in the one-year planning period

The Recipient's EPA-approved Solar for All Workplan may include work to refine the program during the one-year planning period. Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(2) and (6), EPA has determined that a specific condition is necessary to ensure that the further revisions to the Recipient's EPA-approved Solar for All Workplan allow the Recipient to effectively carry out the significant scale, complexity, and novelty of the Solar for All program. Based on this determination, if the Recipient makes revisions to its EPA-approved Solar for All Workplan during the one-year planning period, the Recipient must first receive approval from the EPA Project Officer on the revised Solar for All Workplan prior to requesting drawdown on any revised work. EPA will not make payments for unapproved work and any costs incurred for unapproved work by the Recipient are at its own risk.

The Recipient may continue to request payments and EPA will make payments for costs covered by the EPA-approved Solar for All Workplan while the EPA Project Officer, as appropriate, reviews any revised Solar for All Workplan.

*Action Required to remove the specific condition.* If the Recipient makes revisions to its workplan during the planning period, the Recipient must submit the revised workplan to EPA no later than 365 calendar days after the date of award for the first amendment of the agreement. Upon completion and EPA approval of any revisions to the EPA-approved Solar for All Workplan, timeline, budget narrative, budget detail, and SF-424A (if applicable), EPA will provide email confirmation that the grant recipient has met the Planning Period Term and Condition. The email confirmation from EPA will serve as evidence that this specific condition has been satisfied, with the specific condition removed without further action from the Recipient required upon receipt of the email in accordance with 2 CFR 200.208(e).

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or

requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

## B. Allowable and Unallowable Activities

The Recipient agrees to only use the award to support the following allowable activities: Financial Assistance and Project-Deployment Technical Assistance that enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies as well as Participant Support Costs for trainees in workforce development programs. All costs charged to the award to support these activities must meet the requirements for allowability under 2 CFR Part 200, Subpart E as well as applicable provisions of 2 CFR Part 1500.

The Recipient agrees to not use the award for the following unallowable activities: (a) activities that support deployment of projects that do not meet the definition of eligible zero-emissions technologies; (b) Costs of acquiring "intangible property," as defined in 2 CFR 200.1; and (c) activities that support deployment of projects outside the boundaries of the ten EPA regions or in the Freely Associated States. The allowability of legal costs incurred in connection with the award shall be governed by applicable provisions of 2 CFR Part 200, Subpart E, including but not limited to 2 CFR 200.403, 2 CFR 200.435, 2 CFR 200.441 and 2 CFR 200.459.

## C. Foreign Entity of Concern

As part of carrying out this award, the Recipient agrees to ensure that entities the Recipient contracts with, the Recipient makes Subawards to, or that receive funds as Program Beneficiaries at any tier of funding under this grant agreement are not—

      (A) an entity owned by, controlled by, or subject to the direction of a government of a covered nation under 10 U.S.C. 4872(d);

      (B) an entity headquartered in a covered nation under 10 U.S.C. 4872(d); or

      (C) a subsidiary of an entity described in (A) or (B).

As of the date these terms and conditions become effective, covered nations under 10 U.S.C. § 4872(d) are the Democratic People's Republic of North Korea; the People's Republic of China; the Russian Federation; and the Islamic Republic of Iran.

## D. Low-Income and Disadvantaged Communities Expenditure Requirement

The Recipient agrees to ensure that 100% of the award is used for the purposes of enabling Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies. This requirement applies to the entire award provided to the Recipient and "flows down" to each Subrecipient.

## E. Revolving Loan Fund Characterization

EPA considers the portion of the award used to provide Financial Assistance, which may generate Program Income, as a capitalization of a revolving loan fund for the purposes of 2 CFR 1500.8(d). Such

Financial Assistance may include Subawards, Contracts for Delivery of Financial Assistance, or Participant Support Costs. In accordance with section 2.0 *Applicability and Effective Date* and the definition of *Subaward* in section 3.0 of the EPA Subaward Policy, the EPA Subaward Policy does not apply to the Recipient's Subawards from the capitalization of a revolving loan fund.

## F. Subawards to For-Profit Entities

The Recipient is authorized to provide Subawards to for-profit entities as included in the EPA-approved Solar for All Workplan. The Recipient agrees to require that for-profit entities that receive such Subawards:

1. Can only recover their eligible and allowable direct and indirect costs from EPA-funded activities, including recovering the portion of their overhead costs attributable to the activities by applying either a Federally approved indirect cost rate, as authorized by 2 CFR 200.414(f), or the de-minimis rate if the Subrecipient does not have a Federally approved rate;

2. Comply with the Management Fees General Term and Condition, which is incorporated by reference into the Establishing and Managing Subawards General Term and Condition;

3. Account for and use Program Income under the rules for Program Income pursuant to 2 CFR 1500.8 (b) and the terms and conditions of the award agreement;
4. Be subject to the same requirements as non-profit Subrecipients under 2 CFR Part 200 Subparts A through E, as federal awarding agencies are authorized to apply 2 CFR Part 200 Subparts A through E to for-profit entities in accordance with 2 CFR 200.101(a)(2); and

5. Select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.); the Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 calendar days after receiving the report from an independent auditor, whichever is earlier; as provided in 2 CFR 200.337(a) the Recipient must provide EPA, the EPA Office of Inspector General, and the Comptroller General with access to the Subrecipient's independent auditor reports.

## G. Subawards as Part of Revolving Loan Funds

The following requirements apply when the Recipient provides Subawards under 2 CFR 200.1 as part of a revolving loan fund. These requirements apply to the Recipient and Subrecipient in lieu of those specified in the Establishing and Managing Subawards General Term and Condition.

1. For all Subawards as part of a revolving loan fund, the Recipient agrees to provide written documentation including the following information, unless already described in the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy. Additionally, if a Recipient plans to Subaward to a for-profit entity the Recipient's response to (d) must specifically describe how the for-profit Subrecipient will only receive reimbursement for their actual direct or approved indirect costs such that the Subrecipient does not

"profit" from the transaction.

2. The Recipient must establish and follow a system that ensures all Financial Assistance agreements are in writing and contain all of the elements required by 2 CFR 200.332(b), including the indirect cost provision of 2 CFR 200.332(b)(4) for Subawards. EPA has developed an optional template for Subaward agreements available in Appendix D of the EPA Subaward Policy, which may also be used for such Subaward agreements.

3. The Subrecipient must comply with the internal control requirements specified at 2 CFR 200.303 and is subject to the 2 CFR Part 200, Subpart F, *Audit Requirements*. The pass-through entity must include a condition in all Financial Assistance agreements that requires Subrecipients to comply with these requirements.

4. Prior to making the Subaward, the Recipient must ensure that the Subrecipient has a "unique entity identifier." This identifier is required for registering in the System for Award Management (SAM) and by 2 CFR Part 25 and 2 CFR 200.332(b)(1). The unique entity identifier (UEI) is generated when an entity registers in SAM. Information on registering in SAM and obtaining a UEI is available in the General Condition of the pass-through entity's agreement with EPA entitled *"System for Award Management and Universal Identifier Requirements."*

## H. Participant Support Costs

The Recipient may provide Financial Assistance and Project-Deployment Technical Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of Participant Support Costs.

The Recipient agrees to the following eligibility, restrictions, timelines, and other programmatic requirements on Participant Support Costs, in addition to other requirements included in the terms and conditions of this award agreement:

A. The Recipient and Program Beneficiaries are responsible for taxes, if any, on payments made to or on behalf of entities participating in this program that are allowable as Participant Support Costs under 2 CFR 200.1, 2 CFR 200.456, or 2 CFR 1500.1. EPA encourages the Recipient and Program Beneficiaries to consult their tax advisers, the U.S. Internal Revenue Service, or state and local tax authorities regarding the taxability of subsidies, rebates and other Participant Support Cost payments. However, EPA does not provide advice on tax issues relating to these payments.

B. Participant Support Cost payments are lower tiered covered Nonprocurement transactions for the purposes of 2 CFR 180.300 and the Suspension and Debarment General Term and Condition. The Recipient, therefore, may not make Participant Support Cost payments to entities excluded from participation in Federal Nonprocurement programs under 2 CFR Part 180 and must ensure that Subrecipients adhere to this requirement as well. The Recipient is responsible for checking that program participants are not excluded from participation through either (1) checking the System for Award Management (SAM) or (2) obtaining eligibility certifications from the program participants.

For all Financial Assistance provided in the form of Participant Support Costs specifically, the Recipient agrees to provide written documentation including the following information, unless already described in

the EPA-approved Solar for All workplan. The Recipient is precluded from drawing down funds for such uses until the EPA Project Officer provides written approval of the submitted documentation. This documentation must: (a) describe the activities that will be supported by the Participant Support Costs; (b) specify the range of funding to be provided through the Participant Support Costs; (c) identify which types of entities will have title to equipment (if any) purchased with a rebate or subsidy; (d) establish source documentation requirements (e.g., invoices) for accounting records; and (e) describe purchasing controls to ensure that the amount of the Participant Support Cost is determined in a commercially reasonable manner as required by 2 CFR 200.404.

## I. Contracts for Delivery of Financial Assistance

### 2 CFR 200 Procurement Standards

The Recipient may provide Financial Assistance to enable Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies in the form of procurement contracts (Contracts for Financial Assistance). The Recipient agrees to provide Contracts for Financial Assistance in compliance with the conflict of interest and competition requirements described in the 2 CFR Part 200 Procurement Standards. This includes but is not limited to the requirements at 2 CFR 200.318 to:

- Have and use documented procurement procedures to govern Contracts for Financial Assistance;
- Maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts;
- Maintain written standards of conduct covering conflicts of interest and governing the actions of employees engaged in the selection, award, and administration of contracts as well as maintain written standards of conduct covering organizational conflicts of interest;
- Prioritize entering into inter-entity agreements where appropriate for procurement or use of common or shared goods and services as the Recipient seeks to mobilize financing and private capital;
- Award contracts only to responsible contractors possessing the ability to perform successfully under the terms and conditions of the proposed procurement; and
- Maintain records sufficient to detail the history of procurement.

Additional guidance is available at Best Practice Guide for Procuring Services, Supplies, and Equipment Under EPA Assistance Agreements.

## J. Labor and Equitable Workforce Development Requirements

### 1. Davis-Bacon and Related Acts (DBRA)

#### A. Program Applicability

As provided in Section 314 of the Clean Air Act (42 USC § 7614) (DBRA), Davis-Bacon Act (42 USC §§ 3141-3144) labor standards apply to projects assisted by grants and cooperative agreements made under the Greenhouse Gas Reduction Fund. Accordingly, all laborers and mechanics employed by contractors or subcontractors on projects assisted under this Award Agreement shall be paid wages at rates not less than those prevailing for the same type of work on similar construction in the locality as

determined by the Secretary of Labor in accordance with 40 USC Subtitle II, Part A, Chapter 31, Subchapter IV (Wage Rate Requirements). Under the Greenhouse Gas Reduction Fund, the relevant construction type and prevailing wage classifications would be "Building" or "Residential." The Secretary of Labor's wage determinations are available at https://sam.gov/content/wage-determinations.

Under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific construction projects that were not completed prior to the execution of the final binding documentation governing the use of the Financial Assistance. The Recipient must ensure that any construction work financed in whole or in part with such Financial Assistance, as defined in these Terms and Conditions, provided under this agreement complies with Davis-Bacon and Related Act requirements and the requirements of these Terms and Conditions.

Note, however, that under the Greenhouse Gas Reduction Fund, Davis-Bacon and Related Act requirements do not apply to any form of Financial Assistance which meets any of the following criteria:

- Financial Assistance which exclusively funds pre-construction (e.g. permitting or design work) or post-construction activities (e.g. subsidies for subscriptions to already constructed solar assets).
- Financial Assistance which serves end-users who are individual homeowners or tenants of single-family homes or multifamily buildings when these individual end-users ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves end-users who meet the definition of Federally Recognized Tribal Entities, as defined under this Assistance Agreement, when these Federally Recognized Tribal Entities ultimately select the contractor(s) and execute the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.
- Financial Assistance which serves any end-user when such Financial Assistance is less than $250,000 for a project and the end-user ultimately selects the contractor(s) and executes the contract(s) for the construction work, as opposed to the Recipient, Subrecipient, or a contractor hired by the Recipient or Subrecipient.

If the Recipient encounters a situation that presents uncertainties regarding DBRA applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

In the event that a periodic project site visit, audit, or routine communication with a Subrecipient, Program Beneficiary, contractor, or subcontractor determines any instances of non-compliance or potential non-compliance with the requirements of this Term and Condition or the Davis-Bacon and Related Act, the Recipient agrees to promptly inform the EPA Project Officer for possible referral to the U.S. Department of Labor for guidance or enforcement action.

Consistent with the definitions at 29 CFR § 5.2, the term "construction" refers to all types of work done on a particular building or work at the site of the work by laborers and mechanics employed be a contractor or subcontractor. Additional guidance is available in the definition of the term "building or work" in 29 CFR § 5.2.

## B. Davis-Bacon and Related Acts

Davis-Bacon and Related Acts (DBRA) is a collection of labor standards provisions administered by the Department of Labor, that are applicable to grants involving construction. These labor standards include the:

- Davis-Bacon Act, which requires payment of prevailing wage rates for laborers and mechanics on construction contracts of $2,000 or more;
- Copeland "Anti-Kickback" Act, which prohibits a contractor or subcontractor from inducing an employee into giving up any part of the compensation to which he or she is entitled; and
- Contract Work Hours and Safety Standards Act, which requires overtime wages to be paid for over 40 hours of work per week, under contracts in excess of $100,000.

## C. Recipient Responsibilities When Entering Into and Managing Contracts:

### a. Solicitation and Contract Requirements:

**i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** Recipients are responsible for complying with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.

**ii. Include DBRA Requirements in All Contracts:** Include "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."

### b. After Award of Contract:

**i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).

**ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

## D. Recipient Responsibilities When Establishing and Managing Additional Subawards:

**a. Include DBRA Requirements in All Subawards (including Loans):** Include the following text on all Subawards under this grant: "By accepting this award, the EPA Subrecipient acknowledges and agrees to the terms and conditions provided in the DBRA Requirements for EPA Subrecipients."

**b. Provide Oversight to Ensure Compliance with DBRA Provisions:** Recipients are responsible for oversight of Subrecipients and must ensure Subrecipients comply with the requirements in 29 CFR 5.6.

**c. Provide Oversight to Ensure Compliance with Participant Support Cost Requirements:** Recipients are responsible for oversight of Subrecipients and must ensure that Subrecipients comply with the requirements in subsection E, below.

## E. Recipient/Subrecipient Responsibilities When Managing Participant Support Costs to Program

## Beneficiaries

When DBRA is applicable, Financial Assistance provided in the form of a Participant Support Cost to a Program Beneficiary shall include the following text:

> "[Name of Recipient/Subrecipient providing the Financial Assistance] retains the following responsibilities for all contracts and subcontracts assisted by this [form of Financial Assistance]:
>
> **a. Solicitation and Contract Requirements:**
>
> > **i. Include the Correct Wage Determinations in Bid Solicitations and Contracts:** "[Name of Recipient/Subrecipient providing the Financial Assistance] is responsible for ensuring that any contracts or subcontracts made by Program Beneficiaries and/or assisted by Participant Support Costs comply with the procedures provided in 29 CFR 1.6(b) when soliciting bids and awarding contracts.
> >
> > **ii. Include DBRA Requirements in All Contracts:** Include the following text "By accepting this contract, the contractor acknowledges and agrees to the terms provided in the DBRA Requirements for Contractors and Subcontractors Under EPA Grants."
>
> **b. After Award of Contract:**
>
> > **i. Approve and Submit Requests for Additional Wages Rates:** Work with contractors to request additional wage rates if required for contracts under this grant, as provided in 29 CFR 5.5(a)(1)(iii).
> >
> > **ii. Provide Oversight of Contractors to Ensure Compliance with DBRA Provisions:** Ensure contractor compliance with the terms of the contract, as required by 29 CFR 5.6.

The contract clauses set forth in this term and condition, along with the correct wage determinations, will be considered to be a part of every prime contract covered by Davis-Bacon and Related Acts (see 29 CFR 5.1), and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Department of Labor grants a variance, tolerance, or exemption. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.

## F. DBRA Compliance Monitoring Requirement

Reasonable and necessary costs for DBRA compliance are allowable and allocable grant costs. Such costs include, but are not limited to, the procurement of a payroll reporting and compliance management software product to meet the documentation and reporting requirements under 29 CFR 5.5(a)(3)(ii) for all construction projects assisted under this award.

## 1. Compliance with Federal Statutes and Regulations

The Recipient agrees to comply with other applicable federal statutes and regulations related to labor and equitable workforce development as well as to enforce compliance with Subrecipients, contractors, and other partners (e.g., by including such provisions in contractual agreements). This includes but is not

limited to applicable health and safety regulations as administered by the Occupational Safety and Health Administration.

## 2. Free and Fair Choice to Join a Union

In accordance with Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), the Recipient agrees to design and implement a policy to increase high-quality job opportunities for American workers and improving equitable access to these jobs, including in traditional energy communities, through the timely implementation of requirements for prevailing wages and registered apprenticeships and by focusing on high labor standards and the free and fair chance to join a union.

In accordance with the EPA General Terms and Conditions, grant funds may not be used to support or oppose union organizing, whether directly or as an offset for other funds.

## K. Build America, Buy America Act

The Build America, Buy America Act – Public Law 117-58, requires the EPA to ensure that for any activity related to the construction, alteration, maintenance, or repair of infrastructure, "none of the funds made available for a Federal Financial Assistance program for infrastructure, including each deficient program, may be obligated for a project unless all of the iron, steel, manufactured products, and construction materials used in the project are produced in the United States." (P.L. 117-58, Secs 70911 – 70917).

The Recipient is bound to the EPA Build America, Buy America General Term and Condition, which outlines the Build America, Buy America (BABA) requirements that all Recipients of EPA Financial Assistance awards must comply with.

Under the Greenhouse Gas Reduction Fund, BABA requirements apply to forms of Financial Assistance that directly fund and are directly linked to specific infrastructure projects that were not completed prior to the date the Recipient's award funds were obligated by the EPA.

EPA interprets the definition of infrastructure consistent with 2 CFR 184 and M-24-02 (memorandum dated as of October 23, 2023), including the "public function" test, when determining whether projects qualify as public infrastructure, based on the Civil Rights Act definition of public accommodation.

The following types of Greenhouse Gas Reduction projects are deemed infrastructure for the purposes of BABA applicability:

1. The public infrastructure portion of any property (e.g., retail in a mixed-use multi-family property) where the principal purpose of the Financial Assistance is to directly benefit such portion of the property;

2. Privately-owned commercial buildings when they meet the "public function" test;

3. Residential-serving community solar projects, which EPA deems "structures, facilities, and equipment that generate, transport, and distribute energy" per 2 CFR 184.4(c).

The following types of Greenhouse Gas Reduction projects are not deemed infrastructure for the

purposes of BABA applicability:

    1. Single family homes;

    2. Privately-owned, non-mixed-use, multi-family housing properties;

    3. Privately-owned residential portions of mixed-use properties;

    4. Any privately-owned, behind-the-meter energy generation and storage project that does not otherwise meet the definition of infrastructure.

The inclusion of the following types of funding, support, guarantee, or sponsorship in the funding stack of any Greenhouse Gas Reduction fund project does not trigger BABA, in and of itself or in combination:

    1. Low-Income Housing Tax Credit (LIHTC);

    2. Fannie Mae and Freddie Mac Backed Multifamily Mortgages;

    3. Federal Housing Administration Insured Multifamily Mortgages;

    4. HUD Section 8 Funding;

    5. Other Federal, State, Tribal, or Local Housing Assistance Funding Sources: in general, subsidies issued by federal, state, Tribal, or local housing assistance funding sources that do not confer equity or ownership stakes for the governmental funding source do not trigger BABA applicability.

BABA applicability is assessed at the time of provision of Financial Assistance based on the terms, limitations, and requirements of the Financial Assistance. Applicability does not change retroactively based on a change of use (e.g., if a ground floor apartment is re-zoned for a restaurant). Recipients may not temporarily modify or mischaracterize usage to intentionally avoid BABA compliance.

If the Recipient encounters a situation that presents uncertainties regarding Build America, Buy America applicability under this Assistance Agreement, the Recipient must discuss the situation with the EPA Project Officer before authorizing work on the project.

## L. Consumer Protection Requirements

The Recipient agrees to carry out the following consumer protection requirements to the extent that the Recipient directly interacts, transacts, or contracts with consumers in the provision of Financial Assistance:

    1. Comply with the Equal Credit Opportunity Act, the Truth in Lending Act, the Consumer Financial Protection Act, and other federal consumer protection laws that apply;

    2. Provide written disclosures to consumers containing information in clear and understandable language regarding purchasing, leasing, or financing as well as the costs associated with a consumer's transaction;

3. With regard to solar products or services, provide written disclosures on the impact of the solar project on the consumer's ability to sell or refinance their home and recording of any liens on the home; consumer rights; contact information for the solar project provider; and complaint procedures for the consumer if they have a problem with the solar project or sales process;

4. Require that all in-person and telephone marketing that directly interacts, transacts, or contracts with consumers be conducted in a language in which the consumer subject to the marketing is able to understand and communicate; and

5. Maintain a process for receiving, monitoring, and resolving consumer complaints, including ensuring that complaints are appropriately addressed and referring complaints, when necessary, to the appropriate government regulatory agency.

The Recipient agrees to monitor and oversee Subrecipients and contractors with respect to these consumer financial protection requirements to the extent that they directly interact, transact, or contract with consumers, in accordance with 2 CFR 200.332(e) and 2 CFR 200.318.

## M. Financial Risk Management Requirements

### 1. Cash Management Requirements

The Recipient must deposit and maintain advance payments of Federal funds exclusively in insured accounts, in accordance with 2 CFR 200.305(b)(10). As provided in 2 CFR 200.1, an advance payment is "a payment that a Federal agency or pass-through entity makes by any appropriate payment mechanism and payment method before the recipient or subrecipient disburses the funds for program purposes." A Recipient drawing down funds from ASAP prior to disbursement for actual and allowable project costs constitutes an advance payment. Interest income earned on the advance payment from EPA to the Recipient prior to disbursement is subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12); consequently, such interest earned in excess of $500 must be remitted annually to the Department of Health and Human Services Payment Management System.

The Recipient is authorized to maintain Program Income in two types of accounts:

1. Insured accounts, including in amounts in excess of the federal insurance limit of $250,000.
2. Accounts where such income is used to purchase (i) U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities, provided the duration of such instruments is no longer than 90 calendar days (if purchased directly) and that such instruments are held-to-maturity (if purchased directly), or (ii) short-term money market funds consisting solely of the aforementioned investment instruments and offering daily investor redemptions. Note, the underlying instruments included in a short-term money market fund consisting solely of U.S. Savings Bonds, U.S. Treasury Marketable Securities, and U.S. Agency Marketable Securities and offering daily investor redemptions need not be of a particular duration or held-to-maturity.

Interest income and other returns earned on funds that have already been disbursed is considered additional Program Income consistent with 2 CFR 1500.8(d) and is not subject to the requirements on interest earned within 2 CFR 200.305(b)(11) and 2 CFR 200.305(b)(12).

### 2. Climate-Related Financial Risks

The Recipient agrees to comply with Executive Order 11988 (Floodplain Management). This may include accounting for and evaluating practicable alternatives or other mitigation related to ameliorating flood risks and protecting flood plains as part of its financial risk management policies and procedures.

The Recipient agrees to comply with Executive Order 14030 (Climate-Related Financial Risk). This may include accounting for climate-related financial risks—including physical and transition risks—in its financial risk management policies and procedures.

## 3. Additional Requirements

The Recipient agrees to not subordinate its interests in any asset that the Recipient acquires with EPA funds or Program Income in a manner that waives EPA's claim for compensation under any applicable statutory claims, 2 CFR Part 200, or common law. Once a Recipient uses grant funds for program purposes and incurs a financial obligation, as defined under 2 CFR 200.1, EPA will only seek claims on those funds in the event that they were used for costs that do not comply with the terms and conditions of the Award Agreement or if there is adequate evidence of Waste, Fraud, or Abuse, prompting adverse action by EPA per 2 CFR 200.339. This does not prohibit the use of subordinated debt as a form of Financial Assistance.

The Recipient agrees to apply EPA's Final Financial Assistance Conflict of Interest Policy to all Subawards  and Participant Support Costs made to entities receiving Financial Assistance or Project-Deployment Technical Assistance. Notwithstanding the statement in section 2.0 of the Conflict of Interest (COI) Policy that it does not apply to "Subawards in the form of loans, loan guarantees, interest subsidies and principal forgiveness, purchases of insurance or similar transactions entered into with borrowers by Recipients of revolving loan fund capitalization grants or other EPA Financial Assistance agreements where Agency funds may be used for lending activities," EPA is applying the COI Policy to these transactions through this term and condition.

The Recipient agrees to provide Subrecipients that receive Subawards to provide Financial Assistance or Project-Deployment Technical Assistance with training and technical assistance on program-related matters, including on prudent financial risk management practices, in accordance with 2 CFR 200.332(f).

## N. Historic Preservation

## National Historic Preservation Act (NHPA)

Section 106 of the NHPA requires all federal agencies to consider the effects of their undertakings, including the act of awarding a grant, on historic properties, and to provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment on such undertakings. The Recipient must assist the EPA Project Officer in complying with NHPA if any activities funded under this grant impact a historic property. Historic properties can include: (a) land or buildings listed in or eligible for listing on the National Register of Historic Places; (b) archaeologically sensitive areas or in an area where traditional cultural properties are located; and (c) properties that are associated with significant historic events, are associated with significant people, embody distinctive characteristics, and contain important precontact information.

The Recipient should work with their Project Officer to ensure that Subrecipients are available to work with EPA on any required consultation process with the State Historic Preservation Office (SHPO) or Tribal Historic Preservation Office (THPO) prior to commencing the project to ensure compliance with

Section 106 of the NHPA.

If NHPA compliance is required, necessary Section 106 consultation activities, such as historic or architectural surveys, structural engineering analysis of buildings, public meetings, and archival photographs, can be considered allowable and allocable grant costs.

<u>Archeological and Historic Preservation Act (AHPA)</u>

This law applies if archeologically significant artifacts or similar items are discovered after an EPA-funded construction project has begun, and compliance may be coordinated with the NHPA, discussed above. The AHPA requires federal agencies to identify relics, specimens, and other forms of scientific, prehistorical, historical, or archaeologic data that may be lost during the construction of federally-sponsored projects to ensure that these resources are not inadvertently transferred, sold, demolished or substantially altered, or allowed to deteriorate significantly. The Recipient must ensure that Subrecipients performing construction projects are aware of this requirement, and the Recipient must notify EPA if the AHPA is triggered.

## O. Uniform Relocation Assistance and Real Property Acquisition Policies Act

The Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA) applies to acquisitions of property and displacements of individuals and businesses that result from federally assisted programs. The URA and Federal Highway Administration's implementing regulations at 49 CFR Part 24 require the Recipient to follow certain procedures for acquiring property for purposes under the federal award, such as notice, negotiation, and appraisal requirements. The statute and regulations also contain requirements for carrying out relocations of displaced persons and businesses, such as reimbursement requirements for moving expenses and standards for replacement housing. The Recipient must comply with, and ensure Subrecipients comply with, the URA and 49 CFR Part 34 if an EPA-funded acquisition of property results in permanent displacement of individuals or businesses. Note that although the URA does not apply to temporary displacement of residents, the cost for temporary relocation of residents may be an allowable cost under the "necessary and reasonable for the performance of the Federal award" provision at 2 CFR 200.403(a). The Recipient must obtain prior approval of the EPA Project Officer and EPA Award Official for the allowability of costs for temporary relocation of residents.

## P. Remedies for Non-Compliance

The Recipient agrees to comply with the terms and conditions of the Award Agreement. Should the Recipient fail to adhere to the terms and conditions of the Award Agreement, the EPA may impose additional conditions as set forth in 2 CFR 200.208. If the EPA determines that noncompliance cannot be remedied by imposing additional conditions, the EPA may seek remedies under 2 CFR 200.339 up to and including termination and the recovery of unallowable costs as provided in 2 CFR 200.343. As specified in 2 CFR 200.343, which will remain in effect throughout the term of this award, costs during suspension or after termination are allowable if (a) the costs result from financial obligations which were properly incurred by the non-Federal entity before the effective date of suspension or termination, are not in anticipation of it, and (b) the costs would be allowable if the Federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect.

The Recipient agrees to comply with the statutory requirements of Section 134 of the Clean Air Act. Should the Recipient violate the statutory requirements of Section 134 by failing to use grant funds in

accordance with Section 134 or by failing to ensure that the activities of Subrecipients are in accordance with Section 134, EPA may seek remedies under Section 113, which may subject the Recipient to civil administrative penalties through an EPA administrative enforcement action, civil penalties and/or injunctive relief through a civil judicial enforcement action by the U.S. Department of Justice (DOJ), or criminal penalties through a DOJ criminal judicial enforcement action.

Notwithstanding any other provision of this Award Agreement, EPA will not determine that Recipient has failed to comply with the terms and conditions of the Award Agreement, without providing a reasonable opportunity to remedy under 2 CFR 200.208, for good faith efforts to comply with the Performance Reporting National Programmatic Term and Condition, Additional Programmatic Terms and Conditions regarding Build America, Buy America or Labor and Equitable Workforce Development Requirements, requirements for Subrecipient oversight, or to obligate or expend funds for allowable activities.

## Q. Clarifications to EPA General Terms and Conditions

EPA agrees to make the following clarifications to the EPA General Terms and Conditions. These clarifications expand on, rather than replace or modify, the EPA General Terms and Conditions. The Recipient agrees to comply with these clarifications.

### 1. Automated Standard Application Payments (ASAP) and Proper Payment Draw Down

*The following clarification to the ASAP and Proper Payment Draw Downs General Term and Condition applies if the Recipient is a Municipality, Tribal Government, or Eligible Nonprofit Recipient as defined in the Eligible Recipient definition. States, as defined in the Eligible Recipient definition, are subject to the Proper Payment Drawdown for State Recipients General Term and Condition:*

The Recipient is subject to the Automated Standard Application Payments (ASAP) and Proper Payment Draw Down General Term and Condition.

The Recipient is required to notify the EPA Project Officer of draws from ASAP in excess of the following amounts: $10,000,000 within a 24-hour period or $50,000,000 within a 7-day period. The Recipient is required to provide such notification within 3 business days of the draw amount being surpassed.

### 2. Establishing and Managing Subawards

2 CFR 200.308 requires the Recipient to obtain prior agency approval for "Subaward activities not proposed in the application and approved in the Federal award."

EPA will not require additional written approval from the EPA Award Official for a Subaward to a Subrecipient that is named in the Recipient's EPA-approved Solar for All Workplan.

When the Subrecipient is not named in the EPA-approved Solar for All Workplan, the Recipient agrees to provide written documentation that must be approved by the EPA Project Officer. The Recipient is precluded from drawing down funds for Subawards not named in the EPA-approved Solar for All workplan until the EPA Project Officer provides written confirmation of the documentation. The documentation must: (a) describe the activities that will be supported by the Subawards; (b) specify the range of funding to be provided through the Subawards; (c) identify which types of entities (i.e., governmental, non-profit, for-profit) will receive the Subawards; and (d) specify how the Subrecipients are eligible Subrecipients in accordance with EPA's Subaward Policy, and specifically how the

Subrecipients will comply with the requirement that the Subrecipient must only receive reimbursement for their actual direct or approved indirect costs such that they do not "profit" from the transaction.

## 3. Indirect Cost Rate

The Recipient should note that Subrecipients that receive loans cannot charge an indirect cost rate against their loans and that entities that receive Participant Supports Costs cannot charge an indirect cost rate against their Participant Support Cost payments, unless a class exception to this policy is issued by EPA.

Modified total direct costs (MTDC), as defined in 2 CFR 200.1, means all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and up to the first $50,000 of each Subaward (regardless of the period of performance of the Subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, Participant Support Costs and the portion of each Subaward in excess of $50,000.

Notwithstanding the General Term and Condition "Indirect Cost Rate Agreements," the Recipient may claim up to a 15% de minimis rate of modified total direct costs authorized by 2 CFR 200.414(f).

## 4. Sufficient Progress

The EPA Project Officer may assess whether the Recipient is making sufficient progress in implementing the EPA-approved Solar for All workplan under this Assistance Agreement within 90 calendar days of June 30, 2025 as well as within 90 calendar days of June 30 of each year thereafter during the Period of Performance. "Sufficient progress" shall be assessed based on a comparison of the Recipient's planned versus actual expenditures as well as planned versus actual outputs/outcomes. This term and condition "flows down" to Subrecipients, with the Recipient required to assess whether each Subrecipient is making sufficient progress in implementing the workplan under its Subaward Agreement; the Recipient may increase the frequency and scope of the review of sufficient progress of Subrecipients, in accordance with 2 CFR 200.332 *Requirements for Pass-Through Entities.*

If the EPA Project Officer determines that the Recipient has not made sufficient progress in implementing its EPA-approved Solar for All workplan, the Recipient, if directed to do so, must implement a corrective action plan concurred on by the EPA Project Officer and approved by the Award Official or Grants Management Officer pursuant to 2 CFR 200.208.

EPA will not find that the Recipient has failed to make sufficient progress in implementing its EPA-approved Solar For All workplan based on shifts between types of Financial Assistance over the Period of Performance (or other shifts in portfolio allocation, to the extent applicable, such as by region or market segment, over the Period of Performance). If EPA finds the Recipient has failed to achieve sufficient progress on deployment of Financial Assistance in general, or is achieving progress at a slower rate than projected under the EPA-approved Solar for All workplan, the Recipient will have an opportunity to implement a corrective action plan pursuant to 2 CFR 200.208.

## 5. Termination

EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially

Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

## R. Period of Performance

The Period of Performance under this Award Agreement will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to the date specified in the Notice of Award if all required work of the Federal award has been completed, in accordance with 2 CFR 200.344. In accordance with 2 CFR 200.344(b), the Recipient agrees to liquidate all financial obligations incurred under the award no later than 120 calendar days after the end date of the Period of Performance. In this context, to "liquidate all financial obligations" means to pay outstanding bills, such as the payment of staff salaries accrued during the Period of Performance but for which the due date falls after the end date of the Period of Performance. To "liquidate all financial obligations" does not mean to liquidate, terminate, or accelerate outstanding obligations related to the provision of Financial Assistance to Qualified Projects at the end of the Period of Performance, which would continue to be subject to the Closeout Agreement.

The Recipient should note that the Recipient will not be considered to have met the requirements for closeout under its award under 2 CFR 200.344 so long as any Subrecipient has not met the requirements for closeout under its subaward under 2 CFR 200.344.

Notwithstanding the Extension of Project/Budget Period Expiration Date General Term and Condition, in accordance with 2 CFR 200.308(g)(2), the Recipient is authorized to initiate a one-time extension of the Period of Performance by up to 12 months without prior EPA approval, provided that the extension complies with the requirements 2 CFR 200.308(g)(2). In accordance with 2 CFR 200.308(g)(2), the Recipient must "notify the Federal agency in writing with the supporting justification and a revised period of performance at least 10 calendar days before the conclusion of the period of performance."

## S. Closeout Agreement

As provided at 2 CFR 200.307(c) and 2 CFR 1500.8(d), after the end of the Period of Performance of the Assistance Agreement, the Recipient may keep and use Program Income remaining at the end of the Assistance Agreement and use Post-Closeout Program Income in accordance with this term and condition. The Closeout Agreement goes into effect for this Assistance Agreement the earlier of 1) the day after the Assistance Agreement Period of Performance ends, 2) the first date when all required work of the Federal award has been completed in accordance with 2 CFR 200.344 and the Recipient has met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition) or 3) an alternative date that is mutually agreed by the Recipient and the EPA Grants Management Officer or Award Official.

In accordance with 2 CFR 200.344, EPA will proceed to closeout the Award Agreement and enter the

Closeout Period even if the Recipient has not met the requirements for closeout (including but not limited to submitting the final report as specified in the Performance Reporting Programmatic Term and Condition). As provided in 2 CFR 200.344: "When the recipient or subrecipient fails to complete the necessary administrative actions or the required work for an award, the Federal agency or pass-through entity must proceed with closeout based on the information available." This Closeout Agreement is therefore self-executing.

This term and condition is the entire Closeout Agreement between the EPA and the Recipient. If any provisions of this Closeout Agreement are invalidated by a court of law, the parties shall remain bound to comply with the provisions of this Closeout Agreement that have not been invalidated. The Closeout Agreement will be interpreted and, if necessary, enforced under Federal law and regulations. The Recipient shall comply with the requirements specified below as part of the Closeout Agreement. Definitions within 2 CFR 200.1, including as supplemented through *I. Definitions* of this award agreement, apply identically to how they do under the Period of Performance, unless otherwise noted.

As specified in the Flow-Down Requirements Programmatic Term and Condition, the Closeout Agreement Programmatic Term and Condition flows down to Subrecipients such that the Recipient must enter into a corresponding Closeout Agreement with any Subrecipient that has Program Income or anticipates generating Post-Closeout Program Income at the end of the Subrecipient's Period of Performance.

## 1. Allowable Activities

The Recipient shall use Post-Closeout Program Income in accordance with the Allowable and Unallowable Activities Programmatic Term and Condition, as applicable.

## 2. Reporting Requirements

After the Closeout Agreement becomes effective, the Recipient shall disclose annual reports publicly, in lieu of any of the reporting requirements described in the Performance Reporting Programmatic Term and Condition. The Recipient's public annual reports under the Closeout Agreement must meet the following broad requirements:

- Progress towards objectives on key performance metrics over the annual reporting period,
- Summary of key activities completed over the annual reporting period, including case studies across different types of Financial Assistance and Project-Deployment Technical Assistance undertaken to enable Low-Income and Disadvantaged Communities to deploy or benefit from zero-emissions technologies,
- Geographic coverage of Financial Assistance and Project-deployment Technical Assistance deployed over the annual reporting period,
- Descriptions and examples of actions the program took over the annual reporting period to meaningfully involve the communities the program serves in program design and operations,
- Plans for key activities (including anonymized current transaction pipeline) to be completed as well as outputs and outcomes to be achieved in the next annual reporting period.

## 3. Low-Income and Disadvantaged Communities Expenditure Requirements

The Recipient shall expend 100% of Program Income for the purposes of providing Financial Assistance and Technical Assistance in and benefiting Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero emissions technologies and comply with this requirement in accordance with the Low-Income and Disadvantaged Communities Expenditure Requirements Programmatic Term and Condition, as applicable.

## 4. Cash Management Requirements

The Recipient must maintain Post-Closeout Program Income in accordance with the Cash Management Requirements in the Financial Risk Management Requirements Programmatic Term and Condition, as applicable. However, the Recipient may submit a Cash Management Policy for review and approval by the EPA Project Officer, which can authorize the Recipient to deviate from the aforementioned Cash Management Requirements.

## 5. Remedies for Non-Compliance

The Recipient agrees to identical remedies for non-compliance that are specified in the Remedies for Non-Compliance Programmatic Term and Condition, as applicable. During the Closeout Period, the workplan and budget submitted for the Period of Performance are no longer applicable.

## 6. Suspension and Debarment

The Recipient agrees to ensure that Post-Closeout Program Income is not transferred to entities that are currently suspended, debarred, or otherwise declared ineligible under 2 CFR Part 180. The Recipient can maintain compliance with this requirement through either (1) checking the System for Award Management (for Subrecipients, Contractors, or Program Beneficiaries) or (2) obtaining eligibility certifications from counterparties (for Program Beneficiaries). The Recipient may access the System for Award Management (SAM) exclusion list at https://sam.gov/SAM to determine whether an entity or individual is presently excluded or disqualified.

## 7. Non-Discrimination

The Recipient must use Post-Closeout Program Income in compliance with EPA regulations at 40 CFR Part 7 regarding non-discrimination in EPA-funded programs, as applicable.

**Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, The Age Discrimination Act of 1975.** The Recipient agrees to comply with these laws, prohibiting discrimination in the provision of services or benefits, on the basis of race, color, national origin, sex, disability or age, in programs or activities receiving federal financial assistance.

Pursuant to EPA's regulations on "Nondiscrimination in Programs receiving Federal Assistance from the Environmental Protection Agency" in 40 CFR Part 5 and 40 CFR Part 7, the Recipient agrees, and will require all Subrecipients to agree, not to discriminate on the basis of race, color, national origin, sex, disability or age.

**Executive Order 11246 Part III of Executive Order No. 11246 (September 24, 1965) as amended prohibits discrimination in Federally assisted construction activities.** As provided in section 301 of the Executive Order, the Recipient will ensure that Subrecipients include the seven clauses specified in section 202 of the Order in all construction contracts. Section 302 defines "Construction contract" as "any

contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to Real Property." Contracts less than $10,000 are exempt from the requirements of the Order.

## 8. Record-Keeping

In accordance with 2 CFR 200.334(e), the Recipient shall maintain appropriate records to document compliance with the requirements of the Closeout Agreement (i.e., records relating to the use of Post-Closeout Program Income) for a three-year period following the end of the Closeout Agreement, unless one of the conditions specified in the regulation applies. Note that this requirement applies if and when the Closeout Agreement is terminated, in accordance *with Item 14. Termination of the Closeout Agreement*. EPA may obtain access to these records to verify that Post-Closeout Program Income has been used in accordance with the terms and conditions of this Closeout Agreement. Records and documents relating solely to performing the grant agreement prior to closeout may be disposed of in accordance with 2 CFR 200.334.

Additionally, the Recipient must maintain adequate accounting records for how Post-Closeout Program Income is managed and spent as well as all other appropriate records and documents related to the activities conducted using Program Income.

The Recipient agrees to ensure that Subrecipients comply with Federal Funding Accountability and Transparency Act (FFATA) reporting requirements. The Recipient may use the terms of its Subaward Agreements or other effective means to meet its responsibilities.

## 9. Other Federal Requirements

The following other federal requirements apply to the use of Post-Closeout Program Income under the Closeout Period to the same extent they do under the terms of the Performance Period:

- Davis-Bacon and Related Acts, as specified in the Labor and Equitable Workforce Development Requirements Programmatic Term and Condition;
- Build America, Buy America Act, as specified in the Build America, Buy America Act Programmatic Term and Condition; and
- National Historic Preservation Act, as specified in the Historic Preservation Programmatic Term and Condition.

No other federal requirements apply to the use of Post-Closeout Program Income under the terms of this Closeout Agreement, other than those specified in this Closeout Agreement.

## 10. Amendments to the Closeout Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Closeout Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## 11. Audit Requirements

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Closeout Period, as activities related to the Federal award referenced in 2 CFR 200.502(a) include activities during the Closeout Period.

Through September 30, 2031, the Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## 12. Termination of the Closeout Agreement

The Closeout Agreement terminates when either of the following situations occur: (1) the Recipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Recipient and the EPA Award Official or Grants Management Officer mutually agree to terminate the Closeout Agreement, with the Recipient remitting current and future Post-Closeout Program Income to the federal government.

The ability to terminate the Closeout Agreement flows down to Subrecipients, as a Closeout Agreement between the Recipient and Subrecipient terminates when either (1) the Subrecipient holds a de minimis amount of Post-Closeout Program Income and does not anticipate generating more than a de minimis amount of additional Post-Closeout Program Income or (2) the Subrecipient and the Recipient mutually agree to terminate the Closeout Agreement, with the Subrecipient remitting current and future Post-Closeout Program Income to the Recipient.

The de minimis amount must be agreed-upon in writing by the Recipient and the Director of the Office of the Greenhouse Gas Reduction Fund (or equivalent), prior to the Recipient using the "de minimis" criteria to terminate the Closeout Agreement.

## 13. Points of Contact

The points of contact for the Closeout Agreement are the EPA Project Officer (for the EPA) and the Authorized Representative on the EPA Key Contacts Form most recently submitted to the EPA Project Officer (for the Recipient). If changes are made to these points of contact, the respective party must notify the other within 30 calendar days of the planned change.

## T. Accounting Principles

The Recipient must account for all award funds in accordance with Generally Accepted Accounting Principles (GAAP) as in effect in the United States.

The Recipient must segregate and account for the award funds separately from all other program and business accounts. Additionally, the Recipient must segregate and account for Program Income separately from all other program and business accounts.

## U. Internal Controls

The Recipient must comply with standards for internal controls described at 2 CFR 200.303. The "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States referenced in § 200.303 are available online at https://www.gao.gov/assets/gao-14-704g.pdf

## V. Audits

The Recipient agrees to meet the requirements of 2 CFR Subpart F—Audit Requirements during the Period of Performance, as described in the Audit Requirements General Term and Condition.

Additionally, in accordance with 2 CFR 200.332 and 2 CFR 200.501(i), the Recipient agrees to disclose directly to the EPA Project Officer audited financial statements from any for-profit Subrecipient that expends $1,000,000 or more of EPA funds from the Recipient's grant program in the Subrecipient's fiscal year. Any for-profit Subrecipient that must disclose such financial statements is required to select an independent auditor consistent with the criteria set forth in 2 CFR 200.509 and obtain an independent audit substantially similar in scope and quality to that of the Single Audit (see 2 CFR 200.500 et. seq.). The Subrecipient must submit the audit to the Recipient within 9 months of the end of the Recipient's fiscal year or 30 days after receiving the report from an independent auditor, whichever is earlier.

The Recipient agrees to notify the EPA Project Officer within 30 calendar days of the submission of the Recipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System. This requirement "flows-down" to each Subrecipient in that the Recipient must also notify the EPA Project Officer within 30 calendar days of the Subrecipient's Single Audit to the Federal Audit Clearinghouse's Internet Data Entry System.

## W. EPA Project Officer Oversight and Monitoring

Pursuant to 2 CFR 200.206(b) and (c), 2 CFR 200.208(b)(1), and 2 CFR 200.208(c)(3)(4) and (6), EPA has determined that a specific condition is necessary to ensure that eligible Recipients effectively carry out the significant scale, complexity, and novelty of the Solar for All program. This specific condition will remain in effect throughout the period of performance unless the EPA Award Official determines, based on a request by the Recipient or EPA Project Officer, that some or all of the specific conditions are no longer necessary for EPA to manage programmatic or financial risks.

The EPA Project Officer, or other EPA staff designated by the EPA Project Officer or the Division Director of the Solar for All program, will oversee and monitor the grant agreement through activities, if determined necessary, including:

1. Upon request, requiring the Recipient to participate in an annual workshop (i.e., one workshop per calendar year) with other Recipients under the Solar for All program; the EPA Project Officer will contact the Recipient to finalize details for each annual workshop.

2. Participating in project activities, to the extent permissible under EPA policies, such as: consultation on effective methods of carrying out the EPA-approved Solar for All Workplan, provided the Recipient makes the final decision on how to perform authorized activities; coordination by EPA staff with other Recipients under the Greenhouse Gas Reduction Fund and with other EPA programs, and other federal programs to avoid duplication of effort;

3. Reviewing the qualifications of key personnel, including senior management and board-level committee members or contractors employed by Recipients. Note that EPA does not have the authority to select employees or contractors, including consultants, employed by the Recipient;

4. Closely monitoring the Recipient's management and oversight of Subrecipients and procedures for ensuring that program beneficiaries adhere to program participation guidelines;

5. Closely monitoring the Recipient's performance to verify compliance with the EPA-approved

Solar for All Workplan and achievement of environmental results;

6. Participating in periodic telephone conference calls with Recipient personnel to discuss project successes and challenges, and similar items impacting Recipient performance;

7. Reviewing and commenting on performance reports prepared under the Award Agreement. Note that the final decision on the content of performance reports rests with the Recipient;

8. Verifying that the Recipient is expending the award on allowable activities, including but not limited to asking for information on draws from ASAP or reviewing a sample of Financial Assistance transactions to verify compliance with regulatory requirements and the terms and conditions of this award;

9. Periodically reviewing costs incurred by the Recipient as well as its contractors and Subrecipients if needed to ensure appropriate expenditure of grant funds. Note that Recipients are not required to submit documentation of costs incurred before obtaining payments of grant funds;

10. Working with other EPA officials, including but not necessarily limited to the EPA QAM, to review and approve QAPPs and related documents or verifying that appropriate Quality Assurance requirements have been met where quality assurance activities are being conducted pursuant to an EPA-approved QMP; and

11. Monitoring the use of Program Income after the Period of Performance ends, in accordance with the terms of the Closeout Agreement.

*Method for Reconsideration.* If the Recipient believes that this specific condition is not warranted or requires modification, the Recipient must file a written objection within 21 calendar days of the EPA award or amendment mailing date and must not draw down funds until the objection is resolved. The Recipient must submit the written objection via email to the Award Official, Grant Specialist and Project Officer identified in the Notice of Award.

Subject to approval by the EPA Award Official, the EPA Project Officer and the Recipient may mutually agree to additional areas of oversight and monitoring.

## X. Compliant URL Links

The EPA may elect to develop informational materials to publicize the key characteristics of the Recipient's Solar for All award. These materials may include links to Recipient and/or Subrecipients' websites. The Recipient agrees to work with the EPA Project Officer or another member of Solar for All program staff to ensure any such links are compliant with pertinent EPA and government-wide standards.

## Y. Flow-Down Requirements

As described in 2 CFR 200.101(b)(1), the terms and conditions of Federal awards flow down to Subawards unless a particular section of 2 CFR 200.101 or the terms and conditions of the Federal award specifically indicate otherwise. As required by 2 CFR 200.332(b), the Recipient agrees to ensure that Subrecipients are aware of the requirements that apply to the Subrecipient.

For the purposes of this Award Agreement, all terms and conditions must flow down to Subawards to the extent they are applicable. The EPA Project Officer is authorized to waive the applicability of programmatic terms and conditions to Subawards, unless the term and condition implements statutory, regulatory, or executive order requirements.

## Z. Financial Assistance in the Form of Credit Enhancements

If the Recipient's EPA-approved Solar for All Workplan includes providing Financial Assistance in the form of credit enhancements such as loan loss reserves or loan guarantees, the Recipient is authorized to draw down funds as **cash reserves.** "Cash reserves" means cash that is drawn down and subsequently held in order to support the Recipient's deployment of Financial Assistance in the form of credit enhancements. Cash reserves involve the drawdown and disbursement of grant funds into an escrow account meeting the following standards: (1) the Recipient does not retain possession of the grant funds; (2) the Recipient cannot get the funds back from the escrow account upon demand; (3) the entity providing the escrow account is independent from the Recipient; (4) the Recipient is able to use the funds in the escrow account to support eligible uses of cash reserves, as defined here; and (5) the escrow account is with an "insured depository institution," as defined in 12 USC 1813. The Recipient is not authorized to use an escrow account until the substantive terms of the escrow account have been reviewed and approved by the EPA Project Officer.

The Recipient agrees to provide written documentation for all Financial Assistance in the form of credit enhancements that must be approved by the EPA Project Officer prior to the Recipient implementing its strategy, unless already described in the EPA-approved Solar for All workplan. This documentation must describe how the expenditure enables Low-Income and Disadvantaged Communities to deploy and benefit from eligible zero-emissions technologies.

Any obligations that the Recipient incurs in excess of the grant award funds allocated and expended to execute its credit enhancement strategy are the Recipient's responsibility. This limitation on the extent of the Federal Government's financial commitment to the Recipient's credit enhancement strategy shall be communicated to all participating banks, borrowers, Subrecipients, or Program Beneficiaries prior to the execution of any documentation governing such transactions with any such parties.

## AA. Additional Requirements for Eligible Nonprofit Recipients

*The following terms and conditions apply if the Recipient is an Eligible Nonprofit Recipient as defined in the Eligible Recipient definition:*

## 1. Incorporation and Control

**The Recipient agrees to maintain its incorporation in the United States and to maintain its status as not being controlled by** one or several entities that are not eligible Recipients. Control is defined by either (i) control in any manner over the election of a majority of the directors, trustees, or general partners (or individuals exercising similar functions) or (ii) the power to exercise, directly or indirectly, a controlling influence over management policies or investment decisions.

## 2. Governance Requirements

## A. Board Size and Composition

The Recipient agrees to ensure that its board size in terms of number of members (excluding advisory committees) is commensurate with the scope of oversight and monitoring activities as well as the scale, complexity, and risk profile of the Recipient's EPA-approved Solar for All Workplan as well as other business activities. The board must have a sufficient number of members to adequately staff each of its committees.

The Recipient agrees to ensure that its board consists of members that are qualified with relevant expertise, skills, and track record as well as representative members (including from Low-Income and Disadvantaged Communities).

## B. Board Independence

The Recipient agrees to ensure that the majority of the board is independent, in accordance with the Internal Revenue Service's definition of "independent" for the purposes of Form 990 reporting.

## C. Board Policies and Procedures

The Recipient agrees to enforce board policies and procedures including, among others, those that ensure strong ethics and mitigate conflicts of interest; ensure appropriate board training to review and assess internal risk assessments for all of the organization's significant activities; and ensure regular board engagement, including frequency of meetings and attendance procedures.

The Recipient agrees to require recusals from any officers or members of the board of directors with a personal or organizational conflict of interest in the decision-making and management related to financial transactions under this award. Such recusals must include but not be limited to decision-making and management of Subawards and Participant Support Cost payments to or from any organization in which an officer or member of the board of directors or their immediate family is directly employed by or has a consulting or other contractual relationship with, serves on the board, or is otherwise affiliated with the organization. The term "immediate family" has the same meaning as that term in the EPA's Final Financial Assistance Conflict of Interest Policy.

## 3. Legal Counsel

The Recipient agrees to appoint or consult appropriate legal counsel if counsel is not already available.

## AB. Amendments to Award Agreement

The EPA Award Official or Grants Management Officer and the Recipient must agree to any modifications to the terms and conditions of this Award Agreement. Agreed-upon modifications must be in writing. Oral or unilateral modifications shall not be effective or binding.

## AC. Preservation of Guidance and Data

Any statutes, regulations, agency documents, policies, and guidance (including FAQs and EPA's Implementation Framework for the Greenhouse Gas Reduction Fund), or executive orders referenced herein are incorporated by reference into the Award Agreement as of the effective date of this amended Award Agreement. These incorporated documents will be controlling on Recipient and Subrecipients in the event such documents are deleted, repealed, rescinded, or replaced unless a statute provides otherwise. This includes, but is not limited to, the Uniform Administrative Requirements, Cost Principles

and Audit Requirements for Federal Awards; Title 2 CFR Part 200 effective October 1, 2024, and the EPA General Terms and Conditions effective October 1, 2024.

This provision cannot be changed without the consent of the Recipient.

# EXHIBIT D



# OFFICE OF MISSION SUPPORT
WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Termination of EPA Assistance Agreement 5H-84087701 under 2 CFR 200.340

**FROM:**      Devon Brown, EPA Award Official

**TO:**        Hon. Lina Hidalgo, Judge
               Harris County

The purpose of this communication is to notify you that, pursuant to the One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21 (July 4, 2025), the U.S. Environmental Protection Agency (EPA) is hereby terminating Assistance Agreement No. 5H-84087701 awarded to Harris County. Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)-(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

The EPA recognizes that program participants may have begun to rely on funds made available through the Solar for All program and have in some instances made preliminary budgets, projections, outlays, and staffing decisions. Due to the early nature of such expenditures, we expect any harms to interests suffered to be remedied and remediable by the close out processes outlined in the program grants and discussed below.

The process for closeout is generally outlined in 2 CFR 200.344. EPA is clarifying what reports are required and what reports are waived below. Other requirements are still in effect if applicable to your grant.

EPA is requiring the following closeout reports due within 120 days of closeout (2 CFR 200.344a:)
- Final Federal Financial Report, SF-425
- Final Technical Report
- Other programmatic reports identified in your terms and conditions

As part of this termination, EPA is waiving the following closeout reports:
- Property Report, SF-428
- Final Minority Business Enterprise/Woman Business Enterprise Utilization Under Federal Grants and Cooperative Agreements, EPA Form 5700-52A

The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan. Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g).

Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant including reasonable and necessary costs that might occur after the date of this memo. If the recipient drew down funds from ASAP for costs beyond the termination date or for costs that exceed the amount necessary to properly closeout their grant, the recipient must contact RTPFC at rtpfc-grants@epa.gov for instructions on how to return the excess funds.

The EPA Grants Management Office will issue an amendment to the agreement to document the termination.

If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you. Disputes must be sent electronically by email to the DDO, with a copy to the EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR 1500.15

The requirements on post-closeout adjustments and continuing responsibilities, including audit and record retention requirements, at 2 CFR 200.345 remain in effect.

cc: Brandon Pierce, EPA Grant Specialist
    Bryan Fiedorczyk, EPA Project Officer
    Jesse Dickerman, Grantee Program Manager

# EXHIBIT E



From: Jesse Dickerman, Interim County Administrator
Harris County Office of County Administration
1001 Preston, Suite 500
Houston, Texas 77002

To: Michael Molina, Disputes Decision Official
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Devon Brown, EPA Award Official
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Bryan Fiedorczyk, EPA Project Officer
1300 Pennsylvania Ave N.W., 1101R
Washington, DC 20460

Brandon Pierce, EPA Grant Specialist
1200 Pennsylvania Ave., N.W., 3903R
Washington, DC 20460

Date:   August 27, 2025

Re:   Wrongful Termination of EPA Assistance Agreement 5H-84087701 and related August 7, 2025
      Award Amendment

Dear Mr. Molina, Mr. Brown, Mr. Fiedorcyzk, and Mr. Pierce:

        We write to object to EPA's August 7, 2025 Notice of Termination ("Notice") of our award
agreement under the Solar for All ("SFA") program, and the related August 7, 2025 Award Amendment.
Although it is an unnecessary step, we submit this letter of dispute out of an abundance of caution to
preserve our legal rights.

        The dispute-resolution process set out at 2 C.F.R. § 1500.15 does not establish a jurisdictional
exhaustion requirement, *see Darby v. Cisneros*, 509 U.S. 137, 153 (1993), and even if it did, exhaustion
is not required where, as here, agency review is clearly futile, *see Boivin v. U.S. Airways, Inc.*, 446 F.3d
148, 157 (D.C. Cir. 2006).  The agency's basis for the terminations, after all, is that, following the One
Big Beautiful Bill Act ("OBBBA"), it ostensibly lacks "substantive legal authority [and] financial
appropriations" to administer the SFA program.  What is more, the agency's top official—Administrator
Zeldin—has publicly endorsed the Program's dismantling, calling SFA "a grift" and a "boondoggle,"

and that insisting that "EPA no longer has the authority to administer the program."[1]  In light of these facts, and because the August 7, 2025 Notice plainly constitutes final agency action, *see Bennet v. Spear*, 520 U.S. 154, 177–78 (1997), we are free to challenge the purported termination in federal court. Nevertheless, to preserve our rights, we submit this letter in advance of the 30-day dispute deadline reflected in the Notice and the 21-day deadline noted in the Award Amendment for any "notice of disagreement."

     1.   As to EPA's sole basis for termination, it is wrong.  According to the Notice:

> *"As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All."*

But the OBBBA's rescission of *un*obligated funds and repeal of granting authority under 42 U.S.C. 7434 do not empower EPA to terminate Solar for All's roughly $7 billion of *obligated* funding—and, in turn, to dismantle the entire program.  To the contrary, such action clearly contravenes the statute's directives. By its plain language, section 60002 of the OBBBA rescinds only the *unobligated* balances in the appropriations account established by 42 U.S.C. 7434:

> *SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.*

Funds awarded to Solar for All grantees were obligated upon award and remained so when the OBBBA was enacted.  As EPA guidance explains, the agency "properly obligates an appropriation for a grant program by creating a definite liability against the appropriation during the period of its availability and as documented by the EPA grant award in accordance with 31 U.S.C. 1501(a)(5)." [2]  There is no dispute that Solar for All funds were properly obligated.  The OBBBA did not purport to rescind such funds— nor could it have done so.  Accordingly, EPA's purported terminations are not consistent with, or justified by, section 60002; instead, they violate the statute's clear instruction.

     2.   To be sure, EPA also invokes 2 C.F.R. § 200.340 in the subject line of the Notice (stating that the termination is "under 2 C.F.R. § 200.340").  But it nowhere explains how the purported termination is consistent with that authority.  Nor could it.

     The uniform grant regulations at 2 C.F.R 200.340(a) set forth the limited circumstances under which EPA may terminate a grant agreement: (1) failure by the grantee to comply with the grant terms

---

[1] Lee Zeldin on X: "The One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund, which included a $7 billion pot called "Solar for All" (Aug. 7, 2025), available at https://x.com/epaleezeldin/status/1953518426602803684
[2] Grants Policy Issuance- 12-06: Timely Obligation, Award and Expenditure of EPA Grant Funds at https://www.epa.gov/sites/default/files/2014-11/documents/final_gpi_12_06_streamlining_state_grant_and_expediting_outlays.pdf

and conditions; (2) consent of the grantee; (3) request of the grantee; or (4) otherwise pursuant to the terms and conditions of the grant, to the extent authorized by law.

EPA does not allege any non-compliance, nor have we requested or consented to termination. And although section 200.340(a) permits termination "pursuant to the terms and conditions" of the award, our terms and conditions state that EPA may terminate only in the event of substantial noncompliance that materially impairs performance; a material misrepresentation of eligibility status; or adequate evidence of waste, fraud, or abuse (defined as violations of certain federal criminal laws or the False Claims Act). No such thing is alleged here. As with the OBBBA, then, EPA's purported termination of our grant agreement is *contrary to* section 200.340(a)—not pursuant to it.

For these reasons, we hereby dispute EPA's August 7, 2025 Notice and related Award Amendment and ask that the agency immediately reinstate our award. The purported termination is unlawful and will irreparably harm the Texas Solar for All Coalition as well as the tens of millions of Texans who badly need the benefits of this program. Furthermore, on or before August 18, 2025, the Texas Solar for All Coalition's ASAP account was changed to a "liquidated" status and our available balance was eliminated. We request immediate restoration of access to these unlawfully liquidated funds.

Our point of contact for this dispute is Jesse Dickerman; he can be contacted at 713-274-1172 and Jesse.Dickerman@harriscountytx.gov.

Very truly yours,

Jesse Dickerman
Harris County Office of County Administration

Enclosures:

- 12/17/24 Notice of Award
- Memorandum re: 8/7 Termination of EPA Assistance Agreement 5H-84087701 under 2 CFR 200.340
- 8/7/25 Notice of Award

CC:

- Sean Donahue
- Nathaniel Tisa
- Jim Payne
- Wendel Askew
- Daniel Coogan
- Melissa Wise
- Devon Brown
- Brandon Pierce
- Bryan Fiedorczyk