UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON, et al., | CASE NO. C25-1228-KKE |
| Plaintiff(s), | ORDER ON CROSS-MOTIONS FOR |
| v. | SUMMARY JUDGMENT |
| UNITED STATES DEPARTMENT OF EDUCATION, et al., | |
| Defendant(s). | |

In 2018 and 2020, Congress established grant programs via the United States Department of Education ("the Department") to fund mental health services for elementary and secondary schools throughout the country. Recognizing the prevalence of violence and traumatic crises in schools, and the resultant negative effect on the learning environment, Congress allocated appropriations to the Department to "support learning environments where students feel safe, supported, and ready to learn." Dkt. No. 1 ¶ 44 (citation modified).[1] The Department funded hundreds of multi-year grants via these programs. But in April 2025, the Department notified certain grant recipients that their funding would not be renewed at the end of their current budget period, which (in most cases) expires December 31, 2025. Sixteen states filed this lawsuit against

---

[1] This order refers to documents on the docket by their CM/ECF page number.

the Department and its secretary[2] to challenge the Department's actions to discontinue funding to their grantees under, among other things, the Administrative Procedure Act ("APA").  Dkt. No. 1 at 44–45.

The Court granted Plaintiff States' motion for a preliminary injunction, enjoining the Department from implementing or enforcing the discontinuation decisions as to certain affected grantees, from recompeting the grant funds, and from reinstituting the discontinuation decisions on the same or similar grounds.  Dkt. No. 193 at 24.  Now on summary judgment, Plaintiff States ask the Court to vacate the challenged agency action as arbitrary and capricious and contrary to law, and seek declaratory and permanent injunctive relief.  Dkt. No. 208.  The Department cross-moved, arguing that Plaintiff States are not entitled to any relief.  Dkt. No. 256.

As explained in this order, the Court finds that Plaintiff States are entitled to summary judgment on their APA claims because the Department's actions are arbitrary and capricious and contrary to law.  The Court will vacate the challenged agency actions, and grant the injunctive and declaratory relief requested by Plaintiff States.

## I.       BACKGROUND

**A.       Congress Identified the Need to Increase School-Based Mental Health Services.**

In 2018, following the tragic shooting deaths of 14 students and three staff members at Marjory Stoneman Douglas High School in Parkland, Florida, Congress created the Mental Health Professional Demonstration Grant Program ("MHSP") in the Department to increase the number of mental health professionals serving the nation's public schools.  *See* 20 U.S.C. § 7281(a)(1)(B) (authorizing a grant program to "improve students' safety and well-being").   Congress appropriated no more than $10 million to this program to

---

[2] This order refers to Defendants collectively and/or interchangeably as "the Department."

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 2

test and evaluate innovative partnerships between institutions of higher learning and States or high-need local educational agencies to train … mental health professionals qualified to provide school-based mental health services, with the goal of expanding the pipeline of these workers into low-income public elementary schools and secondary schools in order to address the shortages of mental-health service professionals in such schools.

H.R. Rep. No. 115-952, at 543 (2018) (Conf. Rep.), *available at* https://www.congress.gov/115/crpt/hrpt952/CRPT-115hrpt952.pdf.

Shortly thereafter, President Trump established a Federal Commission on School Safety to make recommendations for improving school safety. *See* Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29180, 29181 (June 21, 2019). Noting the lack of access to mental health professionals in high-poverty districts and schools where needs are the greatest, this commission made a series of recommendations, including expanding access to mental health care services in schools, where treatment is much more likely to be effective and completed. *Id.* (citing Betsy DeVos, et al., Federal Commission on School Safety, Final Report of the Federal Commission on School Safety 37 (Dec. 18, 2018), *available at* https://www2.ed.gov/documents/school-safety/school-safety-report.pdf).

For fiscal year 2020, Congress expanded this effort and appropriated $10 million to establish the Department's School-Based Mental Health Services Grant Program ("SBMH"), to "increase the number of qualified, well-trained … mental health professionals that provide school-based mental health services to students." Explanatory Statement, DIVISION A-DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2020, at 134 (Dec. 16, 2019), *available at* https://docs.house.gov/billsthisweek/20191216/BILLS-116HR1865SA-JES-DIVISION-A.pdf.

For fiscal year 2021, Congress maintained MHSP funding at $10 million and increased SBMH funding to $11 million. Joint Explanatory Statement, DIVISION H-DEPARTMENTS OF

LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2021, at 113 (Dec. 21, 2020), *available at* https://docs.house.gov/billsthisweek/20201221/BILLS-116RCP68-JES-DIVISION-H.pdf. In fiscal year 2022, Congress increased the appropriations for the MHSP to $55 million and for SBMH to $56 million. Explanatory Statement, DIVISION H–DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS ACT, 2022, at 126 (Mar. 7, 2022), *available at* https://docs.house.gov/billsthisweek/20220307/BILLS-117RCP35-JES-DIVISION-H_Part1.pdf.

In May 2022, school violence again shook the nation as a former student shot and killed 19 students and two teachers at an elementary school in Uvalde, Texas. *See* John Cornyn et al., *The Bipartisan Safer Communities Act Is Cause for Optimism*, NEWSWEEK (Nov. 25, 2024), *available at* https://www.newsweek.com/bipartisan-safer-communities-act-cause-optimism-opinion-1990754. In response, Congress dramatically increased the funding for both programs, appropriating an additional $100 million per year for each program for fiscal years 2022 through 2026 via the Bipartisan Safer Communities Act. *Id.*; Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1342 (June 25, 2022).

**B.    The Department Established Grant Program Priorities and Awarded Multi-Year Grants.**

Beginning in 2019 and 2020, when the first MHSP and SBMH grant applications were invited (respectively), and in subsequent years when grant applications were solicited, the Department set forth in the Federal Register the priorities that would be used to judge grant applications for that year. The 2019 notice published for the MHSP grant competition stated one "absolute priority" that all applicants were required to meet:

> Expand the capacity of high-need [local educational agencies ("LEAs")] in partnership with [institutes of higher education ("IHEs")] to train school-based

mental health services providers … with the goal of expanding the pipeline of these professionals into high-need public elementary schools and secondary schools in order to address the shortages of school-based mental health service providers in such schools.

84 Fed. Reg. 29180, 29181 (June 21, 2019).  In 2022, the Department again engaged in rulemaking to establish priorities for future MHSP grants.  After providing notice and reviewing comments, the Department announced four final priorities: (1) expand the number of school-based mental health services providers in high-need LEAs through partnerships with IHEs, wherein IHE graduate students would be placed in high-need LEAs; (2) increase the number of school-based mental health services providers in high-need LEAs that reflect the diverse communities served by the high-need LEAs; (3) provide evidence-based pedagogical practices in mental health services provider preparation programs or professional development programs that are inclusive and that prepare school-based mental health services providers to create culturally and linguistically inclusive and identity-safe environments for students when providing services; and (4) partner with historically black colleges and universities; tribal colleges and universities; and minority-serving institutions.  87 Fed. Reg. 60083, 60088 (Oct. 4, 2022).

The Department engaged in the same priority-setting process for the SBMH, beginning in 2020 and again in 2022.  The four "final priorities" announced in 2022 were: (1) proposals from [state educational agencies ("SEAs")] to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need through recruitment and retention; (2) proposals from LEAs with demonstrated need to increase the number of credentialed school-based mental health services providers through recruitment and retention; (3) proposals prioritizing respecialization, professional retraining, or other preparation plan that leads to a state credential as a school-based mental health services provider and that is designed to increase the number of services providers qualified to serve in LEAs with demonstrated need; and (4) proposals to

increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need. 87 Fed. Reg. 60092, 60097 (Oct. 4, 2022).

When the Department awarded new MHSP/SBMH grants, it approved them for up to a five-year project period: providing funds for the first year and stating its intention to fund the remainder of the project, if requested, through one-year continuation awards. *See, e.g.*, Dkt. No. 203-1 at 2–5. The Department notified grantees approved for multi-year projects that future funding decisions will be considered in accordance with 34 C.F.R. § 75.253. *Id.* at 3.

## C.   The Department Awarded and Then Discontinued Multi-Year MHSP and SBMH Grants in Plaintiff States.

Plaintiffs are sixteen states whose elementary and secondary schools have offered mental health services supported by MHSP and SBMH grants. In furtherance of the priorities published by the Department, grantees in Plaintiff States applied for and were awarded multi-year MHSP or SBMH grants. *See* Dkt. No. 203-1 at 1–6846.

Plaintiff States have submitted evidence describing programs funded by the Grants. For example, Rosemary Reilly-Chammat, Ed.D., of the Rhode Island Department of Elementary and Secondary Education ("RIDE"), testified that RIDE is the "state agency responsible for ensuring every student has access to high-quality teaching and learning opportunities" and tasked with setting "statewide educational priorities." Dkt No. 99 ¶ 4. Dr. Reilly-Chammat testified that Rhode Island's student-to-counselor ratio was far below the recommended average, and that its student population faced "urgent and ongoing mental health challenges" in the wake of the COVID-19 pandemic. *Id.* ¶¶ 9–10. RIDE received a SBMH grant in 2022, which has (among other things) funded nine new school-based mental health professionals and placed 22 graduate-level behavioral health interns across four partner LEAs statewide. *Id.* ¶¶ 11, 13.

Similarly, Dora Soto-Delgado, Interim Superintendent of the El Rancho Unified School District ("ERUSD"), testified that ERUSD used MHSP Grant funds to develop successful relationships with university partners to place graduate students in its schools, even exceeding its goal to hire 14 mental health services providers annually for each year of the Grant.  Dkt. No. 246 ¶ 18.  ERUSD is

> very proud that our grant program has made significant strides in reducing suicidal ideation among our students all while improving the school climate and increasing development assets for our students.  The number of students that feel safe at school has increased, and we have made progress in lowering suspensions and increasing student attendance.

*Id.*

On Feb 5, 2025, the Department's Office of Planning, Evaluation, and Policy Development issued a "Directive on Grant Priorities" calling for the re-review of all new and issued grants based on the new administration's policies.  Dkt. 202-1 at 80–81.  Then, on April 29, the Department notified "most or all" MHSP/SBMH grantees in Plaintiff States that their grants (hereinafter "Grants") would be discontinued at the end of the current budget period (December 31, 2025). Dkt. No. 203-1 at 6847–7122.  The discontinuation notices were identical and stated:

> This letter provides notice that the United States Department of Education has determined not to continue your federal award, S184xxxxxxx, in its entirety, effective at the end of your current grant budget period.  See, inter alia, 34 C.F.R. § 75.253(a)(5) and (f)(1). …
>
> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

*Id.*  In conjunction with sending the notices, the Department informed Congress that it was

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 7

discontinuing approximately $1 billion in awards, and that it planned to re-compete those funds with different priorities. Dkt. No. 50-1 at 2–3. The discontinuation notices informed Grantees that they could request reconsideration, and some of the Grantees[3] availed themselves of this voluntary process. *See* Dkt. Nos. 204, 205, 206.

**D.    Plaintiff States Filed This Lawsuit.**

Plaintiff States filed this action on June 30, 2025, claiming that the Department did not comply with the APA in discontinuing the Grants, and that its actions also violate the United States Constitution's Spending Clause and Separation of Powers and are ultra vires. Dkt. No. 1. With respect to the APA claims, Plaintiff States allege the Department's actions are arbitrary and capricious and contrary to law. *Id.* ¶¶ 95–115, 121–29. The same allegations form the basis for Plaintiff States' constitutional and ultra vires claims. *Id.* ¶¶ 130–56.

Plaintiff States subsequently filed a motion for preliminary injunction, and the Department moved to dismiss. Dkt. Nos. 49, 161. The Court denied the motion to dismiss, and granted the motion for preliminary injunction. Dkt. Nos. 190, 193. The Department appealed those orders and requested on an emergency basis that the Court of Appeals for the Ninth Circuit administratively stay the preliminary injunction. Dkt. Nos. 252, 265. The Ninth Circuit denied that request. Dkt. No. 265.

While the Ninth Circuit proceedings were ongoing, the parties' filed and briefed cross-motions for partial summary judgment. Dkt. Nos. 208, 256. The Court has considered the parties' briefing and the oral argument and now finds, for the reasons below, that Plaintiff States are entitled to judgment as a matter of law on their APA claims.

---

[3] This order uses "Grantees" to refer to those grantees in Plaintiff States whose grants were discontinued and not reinstated upon reconsideration. *See, e.g.*, Dkt. No. 203-1 at 7137–38, 7203–04. There is no such discontinued Grantee in Nevada, apparently. *See* Dkt. No. 245.

## II.    JURISDICTION

The Department's motion raises questions of jurisdiction and reviewability that the Court rejected in its prior order on the Department's motion to dismiss.  *Compare* Dkt. No. 256 at 6–14 *with* Dkt. No. 190 at 13–21.  The Ninth Circuit Court of Appeals found that the Department was not likely to prevail on its challenge to that analysis as well.  *See* Dkt. No. 265 at 7–10.  For those same reasons, the Court rejects the Department's reiterated arguments here.

The Court also previously found that Plaintiff States have Article III standing to bring this action, and that they fall within the zone of interests to bring an APA claim.  *See* Dkt. No. 190 at 9–13, Dkt. No. 193 at 12 n.5.  The Court continues to affirm those findings at the summary judgment stage.

## III.    ANALYSIS

A.    **Legal Standards**

*1.    Summary Judgment*

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  At summary judgment in the APA context, review of final agency action does not require fact-finding on the court's part, but is limited to the administrative record. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).  A court may, however, "consider extra-record evidence in determining whether a party will suffer irreparable harm in the absence of injunctive relief." *Nw. Env't Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011).

2.      *Department Regulations and Guidance for Grantees With Multi-Year Projects*

When the Department intends to solicit applications for a new grant program, the Department announces a grant competition in the Federal Register and publishes the selection criteria and Department priorities there.  *See* 34 C.F.R. § 75.217(a) ("The Secretary selects applications for new grants on the basis of applicable statutes and regulations, the selection criteria, and any priorities or other requirements that have been published in the Federal Register and apply to the selection of those applications.").  When the Department approves an application for a multi-year project, the funding is awarded for the first year only, although the Department indicates its intent to continue to award funds for the remainder of the project period.  34 C.F.R. § 75.251(a)–(b).  In subsequent years of a multi-year project, the grantee does not re-apply and compete for the grant funding, but instead must submit certain reports about the progress of the project in order to receive a continuation award.  *See* 34 C.F.R. § 75.253.  This continuation regulation provides, in relevant part:

> (a) ***Continuation award.*** A grantee, in order to receive a continuation award from the Secretary for a budget period after the first budget period of an approved multiyear project, must—
>
> >   (1) Either—
> >
> > >   (i) Demonstrate that it has made substantial progress in achieving—
> > >
> > > >   (A) The goals and objectives of the project; and
> > > >
> > > >   (B) The performance targets in the grantee's approved application, if the Secretary established performance measurement requirements for the grant in the application notice; or
> > >
> > >   (ii) Obtain the Secretary's approval for changes to the project that—
> > >
> > > >   (A) Do not increase the amount of funds obligated to the project by the Secretary; and

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 10

(B) Enable the grantee to achieve the goals and objectives of the project and meet the performance targets of the project, if any, without changing the scope or objectives of the project;

(2) Submit all reports as required by § 75.118;

(3) Continue to meet all applicable eligibility requirements of the grant program;

(4) Maintain financial and administrative management systems that meet the requirements in 2 CFR 200.302 and 200.303; and

(5) Receive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government.

(b) *Information considered in making a continuation award.* In determining whether the grantee has met the requirements described in paragraph (a) of this section, the Secretary may consider any relevant information regarding grantee performance. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

(c) *Funding for continuation awards.* Subject to the criteria in paragraphs (a) and (b) of this section, in selecting applications for funding under a program, the Secretary gives priority to continuation awards over new grants.

The Department also publishes guidance to explain in nontechnical language how it administers the grant application and continuation process. *See* U.S. DEPARTMENT OF EDUCATION, GRANTMAKING AT [THE DEPARTMENT], *Answers to Your Questions About the Discretionary Grants Process*, *available at* https://www.ed.gov/media/document/grantmaking-ed-108713.pdf (2024) (hereinafter "GRANTMAKING"). In this memorandum, the Department encourages grantees to tailor their grant applications to address, among other things, the selection criteria or funding priorities published in the Federal Register for their grant competition. *See* GRANTMAKING at 12–15, 24–25. The memorandum explains that a grantee and the Department hold an initial discussion after a grant is awarded

to establish a mutual understanding of the specific outcomes that are expected, and to clarify measures and targets for assessing the project's progress and results.

> Information on project outcomes is needed to ensure that the project achieves the objectives stated in the application. The post-award conference generally clarifies and lays the groundwork for reporting, monitoring, and ongoing communication between you and [the Department]. These activities are meant to ensure that the grant is administered in compliance with applicable statutes and regulations and that the project's goals are achieved.

*Id.* at 30. The memorandum also explains that "[t]o receive funds after the initial year of a multiyear award, you must submit performance and financial data that describes the progress the project has made toward meeting the performance targets established at the beginning of the project." *Id.* at 31.

## B. Plaintiff States Have Identified Federal Agency Actions Subject to Judicial Review.

Before turning to the merits of Plaintiff States' APA claims, the Court must identify the agency actions under review. The APA provides that "final" agency actions "for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Plaintiff States challenge the Department's "Non-Continuation Decision," which they define to be an agency action with two distinct parts: (1) the policy change whereby the Department applied new priorities to existing grants (*e.g.*, Dkt. No. 202-1 at 80–81), and (2) the discontinuation notices and reconsideration denials sent to individual Grantees. Dkt. No. 208 at 24. Plaintiff States argue that each part constitutes final agency action subject to judicial review under the APA. *Id.*

The Department, for its part, denies the existence of any broad policy change. According to the Department, a new executive administration may have different goals and priorities than the previous administration, but a mere change in goals or priorities does not amount to a "policy change" subject to judicial review. Dkt. No. 256 at 15. The Department does not dispute that the discontinuation notices constitute individual final agency actions, although it emphasizes that there are many of these final actions, rather than one discontinuance action that was effectuated multiple times. *See, e.g.*, Dkt. No. 264 at 13 n.9.

Only "final" agency actions may be reviewed under the APA, meaning that (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)). "To determine whether an agency has changed its practices in the face of its insistence 'that nothing [has] changed,' courts independently review the administrative record." *Am. Bar Ass'n v. U.S. Dep't of Ed.*, 370 F. Supp. 3d 1, 16–27 (D.D.C. 2019) (citing *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924–25 (D.C. Cir. 2017)). Even if a change is not memorialized in writing, a court may nonetheless find that an agency has changed its interpretation or application of a regulation based on evidence in the administrative record and, in some cases, extra-record evidence. *Id.* at 37–40.

Here, to determine whether the Department changed its grant continuation policy in a manner that is reviewable as a final agency action, the Court considers the primary evidence of such a policy change offered by Plaintiff States: the Grant Priorities Directive ("Directive") issued in February 2025. The Directive instructs Department personnel to

> conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of [diversity, equity, and inclusion]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication. … Grants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument. *See* 2 C.F.R. § 200.340(a)(4)–341.

Dkt. No. 202-1 at 80–81. Plaintiff States contend that the procedure contemplated by the Directive

does not comply with the regulation governing continuation decisions for multi-year grants, and departs from the Department's prior interpretation of that regulation. Dkt. No. 208 at 24–25. As evidence of the Department's prior interpretation of the continuation regulation, Plaintiff States cite the 2024 GRANTMAKING memorandum. Dkt. No. 50-14.[4] In this document, the Department answered the question "How do I get funds after the first year if my organization receives a multiyear award?" as follows, in relevant part:

> To receive funds after the initial year of a multiyear award, you must submit performance and financial data that describes the progress the project has made toward meeting the performance targets established at the beginning of the project. …
>
> The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions. The performance report should specify any changes that need to be made to the project for the upcoming funding period. You cannot receive a continuation award if you have not filed all the reports required for the grant. Before a continuation award can be issued, program staff reviews the information in the performance report and the financial and project management activities. The goal is to determine if you have made substantial progress in reaching the project's objectives, if expenditures correspond to the project's plans and timelines, if the recommended funding amount is appropriate, and if continuation of the project is in the best interest of the Federal government.

*Id*. at 31–32. Plaintiff States interpret this guidance to mean that continuation decisions are based on the reports submitted by the grantees, with reference to the program goals set at the beginning of the grant project, as opposed to never-before-disclosed political priorities established by a new presidential administration and retroactively applied to a grantee's original grant application. Dkt. No. 260 at 12. Because Department personnel were ordered to comply with the Directive, and compliance with the Directive had legal consequences—the discontinuation of grants in violation of the process set forth in 34 C.F.R. § 75.253—Plaintiff States contend that the Court should find

---

[4] A 2010 version of this document is also in the record. *See* Dkt. No. 151-4.

1     that the policy change established by the Directive satisfies both requirements of a final agency

2     action subject to judicial review. Dkt. No. 208 at 25.

3         The Department disagrees, emphasizing that for decades, 34 C.F.R. § 75.253 has required

4     a grantee to obtain a determination that continuing its grant is in the best interest of the federal

5     government. Dkt. No. 256 at 16. While the Department acknowledges that the Directive contains

6     new "articulated criteria for what [the Department] understood to be the government's best

7     interest" (*id*. at 19), the Department nonetheless maintains that the "best interest" determination is

8     "a policy question best left to the Executive Branch to determine[.]" *Id*. at 13. Because "different

9     administrations may vary in their respective assessments of what is in the best interests of the

10    Federal Government, differing views on such an expansive topic do not constitute a 'policy

11    change'" that must be explained. *Id*. at 16.

12        The Department's argument fails to address the two criteria the Court must consider when

13    determining whether an agency action is "final" and therefore subject to judicial review.

14    Specifically, the Department does not suggest that the Directive to re-review grant applications

15    against the agency's new policies was tentative or interlocutory in nature, nor does the Department

16    deny that its personnel were ordered to carry out the Directive, which had legal consequences for

17    the Grantees. And while the Department denies in its briefing that it changed its position on

18    anything, it has in other contexts *emphasized* its change in policy. *See, e.g.*, Dkt. No. 50-1 at 2–3

19    (the Department's statements to Congress: "The Department has undertaken individualized review

20    of grants and determined those receiving these notices reflect the prior Administration's priorities

21    and policy preferences and conflict with those of the current Administration. The prior

22    Administration's preferences are not legally binding. … The Department plans to re-envision and

23    re-compete its mental health program funds to more effectively support students' behavioral health

24    needs.")), 4 (a discontinuation notice: "The Department has undertaken a review of grants and

determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration[.]").

Accordingly, because the Court finds that the discontinuation notices and reconsideration denial letters themselves as well as the Department's change in continuation procedure via the Directive (hereinafter "the Directive procedure") constitute final and consequential agency actions, both actions are subject to judicial review.

## C. Plaintiff States are Entitled to Judgment as a Matter of Law on APA Claim Count I (Arbitrary and Capricious).

Plaintiff States argue that the Department's actions challenged in this suit are arbitrary and capricious. The Court will first address Plaintiff States' arguments as to the Directive procedure, and then as to the discontinuation notices themselves.

### 1. The Directive Procedure is Arbitrary and Capricious Because the Department Did Not Provide Reasoned Notice or Consider Reliance Interests Before Taking a Change in Position.

First, Plaintiff States argue that the Department's adoption of the Directive procedure was arbitrary and capricious because Grantees were not notified of the policy change with a reasoned explanation; the Department simply changed its policy *sub silentio*. Dkt. No. 208 at 26 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The Department denies that any policy change occurred that would need to be explained (Dkt. No. 256 at 15–16), but as discussed earlier in this order, the Court finds ample evidence that the Directive resulted in a change in the procedure for receiving continuation awards. Instead of applying the continuation regulation in a manner consistent with Department guidance, the Department based its continuation decisions on

a re-review of Grantees' initial applications against a set of unpublished new policies.[5]   The

Directive procedure goes back on commitments the Department made in its regulations and

guidance memoranda, and did not notify Grantees of this new procedure until notifying them that

their Grants were discontinued.   The Court thus finds that the Department has failed to provide

even the "minimal level of analysis" needed to support a change in policy.  *See Encino Motorcars,*

*LLC v. Navarro*, 579 U.S. 211, 221 (2016).   The Department's enactment of the Directive

procedure "is arbitrary and capricious and so cannot carry the force of law." *Id.*

Second, Plaintiff States argue that the Directive procedure was arbitrary and capricious

because the Department failed to consider the Grantees' reliance interests before enacting it.  Dkt.

No. 208 at 26–27.   The Supreme Court has explained that an agency acts arbitrarily and

capriciously when it changes an existing policy without considering "'serious reliance interests.'"

*Wages & White Lion Invs.*, 604 U.S. at 568 (quoting *Encino Motorcars*, 579 U.S. at 221–22).

There is undisputed evidence that Grantees structured their project goals and budgets to conform

to the Department's published priorities, which they reasonably believed, consistent with the

regulations and Department guidance, would help them obtain continued funding.  *See, e.g.*, Dkt.

No. 236 ¶ 10, Dkt. No. 239 ¶ 12, Dkt. No. 240 ¶ 8, Dkt. No. 243 ¶¶ 11, Dkt. No. 244 ¶ 7, Dkt. No.

246 ¶¶ 11–15, Dkt. No. 247 ¶ 9, Dkt. No. 248 ¶ 8, Dkt. No. 250 ¶ 13.

The Department argues in opposition that because the regulations explicitly instruct that

continuation awards are not automatically granted, such that future funding is not guaranteed,

Grantees should not have developed reliance interests on future funding.  Dkt. No. 256 at 16–17.

As the Court found in the preliminary injunction order, the Department's litigation position on the

---

[5] Although the Department did not explicitly list the materials it considered in the discontinuation notices, the reconsideration denial letters reference only the original Grant applications and the administrative record does not contain other documentation related to the Grants that is more current than the Grant applications.  When asked at oral argument, the Department's counsel stated that he was not aware what materials the Department considered in issuing discontinuation notices.  The Department has not argued it considered any information beyond the initial grant awards.

strength of the Grantees' reliance interests is not an adequate substitute for the Department's consideration of the Grantees' reliance interests at the time of the discontinuation decisions, however. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020) (where an agency is "not writing on a blank slate" it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation modified)).  In other words, the Department should have considered the Grantees' reliance interests at the time it carried out the Directive procedure, and the Department's post-hoc legal arguments cannot remedy this failure. *See Lotus Vaping Techs., LLC v. U.S. Food & Drug Admin.*, 73 F.4th 657, 668 (9th Cir. 2023) ("[A]n agency 'must defend its actions based on the reasons it gave when it acted,' not with post hoc rationalizations." (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 24)).   Because there is no evidence before the Court that the Department considered any reliance interests (as conceded at oral argument (Dkt. No. 167 at 38–39)), the Court finds that Plaintiff States have shown that the Directive procedure is arbitrary and capricious.

> 2. *The Discontinuation Notices are Arbitrary and Capricious as Unexplained and Conclusory.*

Next, Plaintiff States argue that the discontinuation notices are arbitrary and capricious because they do not contain individualized reasons for not renewing the Grants.  Dkt. No. 208 at 28–29 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) (finding agency action arbitrary and capricious where a party is "compelled to guess at the theory underlying the agency's action")).  The Department does not dispute that the notices are generic and identical, were all issued the same day, and recite a disjunctive list of reasons that the Grants are not in the best interests of the federal government (stating that the discontinued grants "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence

1  in education; undermine the well-being of the students these programs are intended to help; or

2  constitute an inappropriate use of federal funds"). *See, e.g.*, Dkt. No. 50-1 at 4. The notices neither

3  identify *which* principle or principles are in conflict with the Grant, nor explain *why* the Grants

4  conflict with any principle. *Id.* According to Plaintiff States, this lack of individualized reasoning

5  renders the decisions arbitrary and capricious because they are left guessing why the Grants were

6  discontinued. Dkt. No. 208 at 28–29.

7       The Department argues that no further explanation is required. Because the regulations

8  permit the Department to discontinue a grant if it is found to be in the best interest of the federal

9  government to do so, and the Department identified the criteria it applied to make this

10 determination, the Department posits that it has satisfied its obligation to provide a reasonable

11 explanation for the decision. Dkt. No. 256 at 14–15. As the Court found in the preliminary

12 injunction order, this argument is not persuasive. In reviewing an agency decision, courts look to

13 whether the agency "examined 'the relevant data' and articulated 'a satisfactory explanation' for

14 [the] decision, 'including a rational connection between the facts found and the choice made.'"

15 *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicles Mfrs. Ass'n of U.S.,*

16 *Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Here, it is undisputed that the

17 discontinuation notices merely referenced a list of political principles and stated in conclusory

18 fashion that the Grant contravened one or more of the preferences listed, without even identifying

19 which principle it violated. In the absence of any findings in the notices themselves, the Court

20 cannot determine whether the Department's conclusions bear a rational connection to the facts.

21

22

23

24

Rather, the discontinuation notices are wholly conclusory, which prevents meaningful judicial review.[6]

Although an agency decision need not be written with "ideal clarity" (*Fox Television Stations*, 556 U.S. at 513 (citation modified)), the Department concedes that an agency decision must still be "the product of reasoned decisionmaking." Dkt. No. 256 at 14 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). Beyond an unsupported assertion that the Department's review was "individualized and well-reasoned" (*id.*), the Department makes no effort to analogize the discontinuation notices or the process by which the notices were issued to the cases they cite. *See id.* at 16–17. Because the Court agrees with Plaintiff States that the discontinuation notices are unexplained and conclusory, the Court finds that Plaintiff States have established that the discontinuation decisions are arbitrary and capricious.

**D.  Plaintiff States Are Entitled to Judgment as a Matter of Law on APA Count II (Contrary to Law).**

Plaintiff States contend in their second APA claim that the Department's Directive procedure as well as the discontinuation notices themselves are contrary to law because both actions violate the continuation regulation, 34 C.F.R. § 75.523, the regulatory scheme as a whole for continuing multi-year grants, and the statutory requirements for Department rulemaking. Specifically, Plaintiff States argue that the Department's actions were contrary to law because the Department decided whether to continue existing grants based on a review of original grant

---

[6] The complete lack of explanation also precludes a meaningful opportunity to seek reconsideration. The discontinuation notices advise Grantees that under 34 C.F.R. § 75.253(g), they may seek reconsideration of the Department's decision, however, they "must submit information and documentation supporting" their position. *See e.g.*, Dkt. No. 103-4 at 2. But without any information as to the factual basis for the Department's decision, such a process would require Grantees to guess at the Department's rationale, mount arguments against such a rationale, *and* provide documentation to do so. Thus, although the reconsideration denial letters are individualized in so far as each letter nominally references a component of a Grantee's initial grant application, (*see, e.g.*, Dkt. No. 204-1 at 164–65, 273, 365, 447), that some Grantees received a minimally individualized response for the first time upon reconsideration does not cure the defects in the original notices. *See Washington v. U.S. Dep't of Com.*, No. C25-1507 MJP, 2025 WL 2978822, at *8 (W.D. Wash. Oct. 22, 2025) ("One is effectively left to guess at what the new priorities are and why the awards are now misaligned with them—this violates the APA.").

applications as judged against the agency's unpublished policy preferences, rather than complying with the procedure for making continuation awards set out in the regulations and agency guidance. Dkt. No. 208 at 31–35.  The Court agrees, for the following reasons.

> 1.    *The Department's Application of 34 C.F.R. § 75.253(a)(5) is Contrary to Law.*

The Department does not dispute that it must comply with 34 C.F.R. § 75.253 in making continuation decisions, but it argues that subsection (a)(5) of this regulation affords it essentially unlimited discretion to discontinue a grant whenever it finds that continuing the grant is not in the "best interest" of the federal government.  Dkt. No. 256 at 19.

Plaintiff States agree that a multi-year grant may be discontinued if it fails to garner a "best interest" determination, but challenge here the Department's process of making that determination. According to Plaintiff States, regulations require that the Department's "best interest" determination be based solely on grantee performance, citing 34 C.F.R. § 75.253(b).  Dkt. No. 208 at 31.

The Department disputes this interpretation of 34 C.F.R. § 75.253(b).   The Department appeals primarily to a "plain text" reading of 34 C.F.R. § 75.253(b), suggesting in its briefing and at oral argument that "any other relevant information" means that in making a continuation decision it can consider literally *any other* relevant information, including newly adopted policy preferences.  Dkt. No. 264 at 12.  Plaintiff States likewise posit that their reading of the regulation limiting the Department's consideration to performance information is most true to the "plain text."  Dkt. No. 260 at 15–16.[7]

To resolve this dispute about the meaning of the regulatory text, the Court begins with principles of regulatory construction.  "As in any case of statutory and regulatory construction, the

---

[7] The Court notes that as both Plaintiff States and the Department anchor their interpretation of 34 C.F.R. § 75.253 in its plain text, neither asserts that the regulation is ambiguous.

court begins its analysis with the text of the relevant statutes and regulations at issue." *Virachack v. Univ. Ford*, 259 F. Supp. 2d 1089, 1092 (S.D. Cal. 2003). In *Kisor v. Wilkie*, the Supreme Court explained that a "court must carefully consider the text, structure, history, and purpose of a regulation" in the process of regulatory construction. 588 U.S. 558, 575 (2019) (citation modified). "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction ... [and] the starting point of our analysis must begin with the language of the regulation." *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 676 (9th Cir. 2022) (citations omitted). And yet statutory language "cannot be construed in a vacuum." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). "'It is a fundamental canon of [] construction' that regulations 'must be read in their context' and with a view to their place in the overall regulatory scheme." *Leigh v. Raby*, 726 F. Supp. 3d 1207, 1216 (D. Nev. 2024) (alteration in original) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Under "one of the most basic interpretive canons ... a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation modified); *Shulman v Kaplan*, 58 F.4th 404, 410–11 (9th Cir. 2023) ("A court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation modified).

Again, the section in dispute here reads, in its entirety:

> ***Information considered in making a continuation award.*** In determining whether the grantee has met the requirements described in paragraph (a) of this section, the Secretary may consider any relevant information regarding grantee performance. This includes considering reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information.

34 C.F.R. § 75.253(b).  The list of information in the last sentence includes information *other* than performance-related reports—specifically, financial information.  And the subsection (a) criteria includes factors not directly related to performance—specifically, eligibility criteria and financial and management requirements.  Together these sections indicate that the Department may consider information beyond strictly "performance" information.  The Court therefore finds Plaintiff States' reading too narrow: in order to give effect to all parts of both subsections, the Court cannot elevate the first sentence of subsection (b) over the second sentence of subsection (b).  Moreover, the Department advises grantees that "[t]he program staff uses the information in the performance report *in combination with the project's fiscal and management performance data* to determine subsequent funding decisions."  GRANTMAKING at 32 (emphasis added).   And when communicating its intent to fund multi-year grant projects for the entire length of their project periods, the Department highlights the importance of accurate and timely reports as to performance, fiscal issues, and management data.  *See, e.g.*, *id*. at 32–33; 59 Fed. Reg. 30258, 30259 (June 10, 1994) (explaining that under the amended continuation regulation, "the continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of reports as specified by the Secretary, rather than on the submission of a continuation award application").  The full text of the regulation, along with the Department's guidance to grantees, indicate that continuation decisions will be based on a review of *all* reports submitted, not only performance data.

That said, nothing in the existing regulatory scheme comports with the Department's view that multi-year grants may be discontinued whenever the political will to do so arises.  Thus, although the Court agrees with the Department that the "best interest" determination need not be based solely on performance reports, the Court disagrees that the regulatory scheme contemplates that it would be based, as here, on unpublished policy preferences unrelated to the progress of

grant projects.

As support for its view, the Department appeals to the history of the interaction between the "best interest" determination and subsection (b): the "best interest" criterion has been a prerequisite for grant continuation since 1980, long before subsection (b) was added in 2013. *See* Dkt. No. 256 at 21–22. From that timeline, the Department concludes that subsection (a)(5) operates outside subsection (b)'s instruction that the Department "may consider" information relevant to grantee performance. *Id*. The Department essentially reads subsection (b) to permit, but not require, it to consider grantee performance when making a "best interest" determination. *See id*. at 24 (acknowledging that "[c]ertainly, *one* reason that renewal of a grant might not be in the best interest of the federal government is poor performance by the grantee" (emphasis added)).

The Court disagrees that the history of the continuation regulation supports the Department's view. Even before subsection (b) was added to 34 C.F.R. § 75.253, grantees were required to submit certain information with their continuation application. *See, e.g.*, 45 Fed. Reg. 22494, 22503 (Apr. 3, 1980) (explaining how to apply for a continuation award). Likewise, agency guidance predating the addition of subsection (b) states that continuation decisions are based on that information submitted by grantees. *See* Dkt. No. 151-4 at 42.[8] The Department has identified

---

[8] The 2010 memorandum contains language similar to the 2024 GRANTMAKING guidance:

> The program staff uses the information in the performance report in combination with the project's fiscal and management performance data to determine subsequent funding decisions. The performance report should specify any changes that need to be made to the project for the upcoming funding period. A grantee cannot receive a continuation award if it has not filed all the reports required for the grant. Before a continuation award can be issued, the program staff reviews the information in the performance report and the grant's financial and project management activities to determine if a grantee has made substantial progress in reaching the project's objectives, if expenditures correspond to the project's plans and timelines, and if continuation of the project is in the best interest of the federal government. If these requirements are met, the program staff issues a continuation award.

Dkt. No. 151-4 at 42.

1    no part of the history of the regulatory scheme suggesting that the "best interest" criterion has ever

2    operated in the way the Department now claims.[9]

3          With the history, context, and purpose of the continuation regulation in mind, the Court

4    interprets subsection (b)'s reference to "any other relevant information" to refer to "items akin to

5    those specifically enumerated"—namely the required performance, fiscal, and management

6    reports—under the rule of *ejusdem generis*.  *See Fischer v. United States*, 603 U.S. 480, 487 (2024)

7    ("[U]nder the [] canon of *ejusdem generis*, 'a general or collective term at the end of a list of

8    specific items' is typically 'controlled and defined by reference to the specific classes … that

9    precede it.'" (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)).  The Supreme Court

10   has explained that *ejusdem generis* "track[s] the common sense intuition that Congress would not

11   ordinarily introduce a general term that renders meaningless the specific text that accompanies it."

12   *Id*.

13         Although the rule of *ejusdem generis* is "merely a tool for statutory construction" and not

14   dispositive, *United States v. Tobeler*, 311 F.3d 1201, 1205 (9th Cir. 2002), applying it here is

15   consistent with the regulatory scheme as a whole.  To conclude otherwise would permit an agency

16   to base continuation decisions on unpublished policy preferences rather than information

17   submitted to the Department by grantees.  This outcome would frustrate the regulations and agency

18   guidance that uniformly encourages grantees to tailor their grant applications to address *published*

19   priorities and, if the application is approved, to make progress toward the program goals and

20   objectives identified in the application.  *See* GRANTMAKING at 12–16, 30–32.  The Department's

21   proffered interpretation of 34 C.F.R. § 75.253(b) would sabotage grantees' efforts to plan for a

22

23   _____

     [9] To the contrary, undisputed statements from Grantees indicate that grant discontinuances or terminations were
24   extremely rare before 2025 and "historically only occurred in cases of misconduct or poor performance, typically with
     prior notice and opportunities to respond and correct any underlying issues[.]"  Dkt. No. 245 ¶ 13.

successful project that meets program goals and the Department's requirements as to data-driven documentation. *See, e.g.*, 2 C.F.R. § 200.329. To adopt the Department's interpretation would allow the coherent scheme established in the continuation regulation to be upended by a vague, undefined "best interest" determination, which the Court declines to do. *See Kisor*, 588 U.S. at 575 (a court should not "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation" (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)).[10]

Finally, as the Department conceded at oral argument, under the Department's view of subsection (a)(5), the Department could entirely disavow the published priorities selected at the outset of a grant competition and re-evaluate multi-year grantees on the basis of new, unpublished objectives under the guise of a "best interest" determination. As detailed below, interpreting subsection (a)(5) as requested by the Department would permit an end-run around the statutory requirement of notice-and-comment rulemaking applicable to changing requirements for Department grant programs. *See* 20 U.S.C. §§ 1221e-4, 1232. The Department is not at liberty to use the continuation process to establish new grant priorities and apply them retroactively without the procedural protections Congress expressly applied to Department grant programs. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159–60 (2012) (rejecting an agency's interpretation of its regulations as unpersuasive because it is "flatly inconsistent" with the statute the regulations were intended to augment).

For these reasons, the Court finds that Department's construction of subsection (a)(5) is unreasonable, considering the regulatory text, history, and purpose, as well as the applicable

---

[10] *See also Sackett v. E.P.A.*, 598 U.S. 651, 677 (2023) ("We have often remarked that Congress does not hide elephants in mouseholes by altering the fundamental details of a regulatory scheme in vague terms or ancillary provisions." (citation modified)). The Court has no reason to believe the Department would be any more likely than Congress to nullify the continuation criteria it specifically enumerated by operation of a broadly worded catchall.

statutory requirements governing Department grant programs. Under these circumstances, the Court affords no deference to the Department's interpretation of its regulation. *See Kisor*, 588 US. at 576 (explaining that an agency's reading of a regulation must be reasonable to be entitled to deference, and nonetheless not even "every reasonable agency reading of a genuinely ambiguous rule should receive … deference").

In sum, the continuation decisions were based on unpublished policy preferences set forth in the Directive procedure, rather than on information enumerated in 34 C.F.R. § 75.253 or similar relevant information. Thus, the Department acted contrary to law.

> 2. *Making Continuation Decisions Based on Unpublished Criteria is Contrary to Law.*

 Plaintiff States also argue that the Department's actions were contrary to law to the extent that the Department failed to publish the Directive's criteria in the Federal Register to notify grantees how their continuation awards would be determined. Dkt. No. 208 at 34–35. The Department does not contest its statutory rulemaking responsibility, but argues that it is required to publish only priorities used at the outset of a new grant contest, not the criteria used for making continuation awards, as occurred here. Dkt. No. 256 at 19–20. The Court rejects the Department's argument for several reasons.

First, the Department is required to publicly promulgate "any generally applicable rule, regulation, guideline, interpretation, or other requirement that … has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program." 20 U.S.C. § 1232(a)–(f); 20 U.S.C. § 1221e-4. The Department does not dispute that the Directive procedure imposed generally applicable requirements that had legally binding effect in providing financial assistance under an applicable program. The text of the Directive confirms that conclusion: the Directive ordered an across-the-board re-review of Department grants, including

those previously awarded, and measured them against new criteria, which resulted in the discontinuation of grants in Plaintiff States. The Department cites no authority limiting the Section 1232 promulgation requirements to rules imposed at the beginning of a grant contest as opposed to rules imposed at any other point in time.

Second, that the Department engaged in this process under the guise of the 34 C.F.R. § 75.253(a)(5) "best interest" determination is of no consequence.[11]   As explained above, the Directive procedure did not evaluate Grantees based on the reports required for continuation under 34 C.F.R. § 75.253(b). Rather, in response to the Directive, the Department essentially—and surreptitiously—ran a new grant contest evaluating existing original grant applications against new unpublished priorities. In so doing, the Department failed to comply with its statutory obligation to publish the priorities that apply to grant contests. 34 C.F.R. § 75.217(a) ("The Secretary selects applications for new grants on the basis of applicable statutes and regulations, the selection criteria, and any priorities or other requirements that have been published in the Federal Register and apply to the selection of those applications."). The Department also violated its regulations providing that Grantees are *not* required to compete or apply for continued funding. *See* 59 Fed. Reg. 30258, 30260 (June 10, 1994) ("It is important that recipients understand that performance reports now will be due before the end of the current budget period because this information will be used in lieu of continuation applications in deciding whether to make continuation awards.").

---

[11] To the contrary, the Department's insistence that only grant priorities issued at the beginning of a contest need be published only highlights the fact that the "best interest" determination in 34 C.F.R. § 75.253(a)(5) is not intended to involve the application of new, generally applicable rules with legal consequences, as in the Directive procedure. Rather, the Department's longstanding practice of setting grant priorities only at the beginning of a grant contest is consistent with decades of authority under the APA that requires agencies to provide notice and explanation of agency decision-making criteria and avoid surprises to regulated parties. *See, e.g.*, *Christopher*, 567 U.S. at 156 (declining to defer to an agency interpretation of a regulation that "would result in precisely the kind of 'unfair surprise' against which our cases have long warned" (citing, among other cases, *Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 157–58 (1991) (instructing a court to consider whether an agency "has consistently applied the interpretation" it advances, and if not, then regulated parties may not have received adequate notice of that interpretation))).

Finally, by re-reviewing only Grantees' applications, rather than considering their activities since the initial awards were disbursed, the Department likewise violated the regulatory preference for continuing to fund performing grants for their entire project period. *See* 34 C.F.R. § 75.251(a)–(b). Moreover, as the Department planned to use the Grantees' discontinued funds to award new grants aligned with their current policy preferences, it violated the regulatory priority given to continuing multi-year grants rather than funding new grants. 34 C.F.R. § 75.253(c).

In each of these ways, the Department's actions are contrary to law.

## IV.    REMEDY

Having found that the Department's actions are arbitrary and capricious and contrary to law, the Court must now determine the appropriate relief. Plaintiff States' complaint requests declaratory and injunctive relief, as well as vacatur of the challenged agency actions. *See* Dkt. No. 1 at 44–45. The Court will address Plaintiff States' requested forms of relief in turn, to determine the scope of relief appropriate under the circumstances of this case.

### A.    The Court Declares the Department's Actions Unlawful.

As explained earlier in this order, the Court declares that the Department's actions—in enacting the Directive procedure and in issuing discontinuation notices and letters denying reconsideration pursuant to the Directive—are arbitrary and capricious and contrary to law. Therefore, the Court declares that those actions are unlawful and set aside with respect to discontinued Grantees in Plaintiff States. *See* 5 U.S.C. § 706(2).

### B.    The Court Permanently Enjoins the Department From Implementing Its Unlawful Actions in Plaintiff States.

Plaintiff States request an order permanently enjoining the Department from enforcing actions taken to implement the Directive procedure or the Grantees' discontinuation notices or letters denying reconsideration, to allow the Department to make lawful continuation decisions on

the Grants before the funds are allocated elsewhere.  Dkt. No. 208 at 37.  Such injunctive relief is available under the APA.  *See* 5 U.S.C. § 703.

"To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction."  *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013).

As discussed earlier in this order, the Court finds that Plaintiff States have demonstrated actual success on their APA claims.  At the preliminary injunction stage, the Court lacked access to information about each Grantee in Plaintiff States sufficient to establish their entitlement to injunctive relief, and therefore the preliminary injunction was limited to only those Grantees of which the Court had evidence at that time.  *See* Dkt. No. 193 at 22–23.  Since then, the Department filed the administrative record, which contains information about each Grantee in Plaintiff States.  *See, e.g.*, Dkt. No. 202 at 2.  Because the record now before the Court establishes that the Department enforced the unlawful Directive procedure against all discontinued Grantees in Plaintiff States and issued them identical unlawful discontinuation notices, Plaintiff States have demonstrated actual success on the merits of their APA claims with respect to each discontinued Grantee in Plaintiff States.  Thus, Plaintiff States have satisfied the first requirement with respect to all Grantees within their borders.[12]

---

[12] The Department posits that issuing the injunction requested by Plaintiff States will result in "overturning hundreds of individual decisions to non-continue the grant agreements held by [] nonparties *en masse*."  Dkt. No. 256 at 28.  But the administrative record confirms that only 138 Grants in Plaintiff States were discontinued via the Department's actions challenged here.  *See* Dkt. No. 202 at 2.  Moreover, the Department has not rebutted Plaintiff States' evidence suggesting that any Plaintiff State would be similarly harmed in the form of rising Medicaid costs due to the loss of Grant-funded mental health services in schools.  Plaintiff States' claims are not based on a *parens patriae* suit theory (as alleged by the Department (Dkt. No. 256 at 28–29)) but instead are based on Plaintiff States' direct harms resulting from the Department's actions.

Plaintiff States have also satisfied the second and third requirement with respect to all Grantees within their borders. As previously found with respect to the preliminary injunction, Plaintiff States have submitted unrebutted evidence demonstrating the irreparable harm that the Department's actions have inflicted on Plaintiff States' education agencies and mental health systems, for which money damages are inadequate to ameliorate. *See* Dkt. No. 193 at 16–20. The Court reaffirms its reasoning that unlawfully discontinuing the Grants will require Plaintiff States to provide mental health services via Medicaid to students who previously accessed those services at school from providers known and familiar, disrupting the provision of effective therapeutic care. *See, e.g.*, Dkt. No. 211 ¶ 17; Dkt. No. 214 ¶ 13; Dkt. No. 218 ¶ 33; Dkt. No. 220 ¶ 21; Dkt. No. 225 ¶¶ 20–24, 29; Dkt. No. 226 ¶¶ 16–32; Dkt. No. 242 ¶¶ 13–24. The Medicaid Director for the Oregon Health Authority has explained, for example, that:

> While community-based services cost the same as similar school-based services, taking youth away from schools to receive services has additional impacts that result in higher levels of cost for the families and the state in transportation, wages lost, and beyond. Youth who do not receive services in a timely manner may require higher levels of care, including crisis intervention services, which come at a higher cost to the state ($112.87 per 15 minutes) than outpatient services, require more state resources, and in rural counties may also place a burden on first responders outside the cost of healthcare services. Delayed initiation of care often results in need for more intensive services in addition to outpatient care. The highest levels of inpatient services may be provided in specialty hospitals or facilities and cost Oregon a daily rate of $972.93 for psychiatric residential treatment services, and $1,630 for secure inpatient residential treatment.

Dkt. No. 242 ¶ 19. Other Plaintiff States presented similar evidence. *See* Dkt. No. 211 ¶ 17; Dkt. No. 214 ¶ 13; Dkt. No. 218 ¶ 33; Dkt. No. 220 ¶ 21; Dkt. No. 225 ¶¶ 20–24, 29; Dkt. No. 226 ¶¶ 16–32.

Furthermore, the lack of accessible services at school resulting from the unlawful discontinuation of the Grants will likewise increase the burden on Plaintiff States to provide an appropriate education to students entitled to mental health services. *See, e.g.*, Dkt. No. 212 ¶¶ 21–

25, Dkt. No. 222 ¶ 23; Dkt. No. 228 ¶¶ 16–30; Dkt. No. 229 ¶¶ 13–21; Dkt. No. 230 ¶¶ 15–22;

Dkt. No. 232 ¶¶ 31–36; Dkt. No. 241 ¶¶ 15–20; Dkt. No. 249 ¶¶ 9–27.  For example, the State

Superintendent of Education for the Illinois State Board of Education ("ISBE") described the

increasing burdens facing his state because of the discontinuation of Grants:

> In recent years, parents have filed an increasing number of due process hearing requests and state special education complaints with ISBE.  To address the growing complaint volume, ISBE has since 2023 contracted with private attorneys to investigate and adjudicate due process complaints.  During the 2024–2025 school year, ISBE spent a total of $417,000 responding to due process hearing requests.

> As the shortage of school-based mental health providers Illinois already experiences is exacerbated by the non-continuation of federal grants to Illinois school districts and universities, ISBE anticipates that parents will increasingly request mediation and file state special education and due process complaints in an effort to obtain necessary school-based mental health services for their children.

Dkt. No. 241 ¶¶ 18–19.  The record reflects similar harms across Plaintiff States.

And as found with respect to the preliminary injunction, Plaintiff States have also satisfied

the remaining requirements for a permanent injunction.  The public interest is served by requiring

agencies to comply with the APA.  *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("The

public interest is served by compliance with the APA[.]").  And the balance of equities weigh in

Plaintiff States' favor because they greatly depend on federal funding to carry out Congress's

purpose in creating the MHSP and SBMH programs.  Although an injunction would cause the

Department some uncertainty in allocating their appropriations, the Department's counsel

represented at oral argument that the Department has set aside the funds that would have otherwise

been disbursed to Grantees, in compliance with the preliminary injunction.  Requiring the

Department to comply with the continuation regulation will not result in the Department

abandoning its "strong interest in safeguarding the public fisc" (Dkt. No. 256 at 26), it merely

requires the Department to follow its own regulations in doing so.  The hardships faced by Plaintiff

States in the absence of injunctive relief therefore outweigh the hardship the Government would

face in complying with an injunction.

Accordingly, the Court finds that Plaintiff States have satisfied the requirements for a permanent injunction as to all Grantees within their borders. Plaintiff States requested that the Court order the Department to, in compliance with the relief ordered here, issue new continuation decisions by December 26, 2025. Dkt. No. 208-1 at 2. The Court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong[.]" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)). The timeline requested by Plaintiff States may not be feasible, however, particularly because there is no evidence in the record to suggest that Grantees have yet submitted the reports needed for the Department to make a lawful continuation decision in compliance with 34 C.F.R. § 75.253. And at oral argument, the Department's counsel suggested that the necessary funds have been set aside and the Department's ability to access those funds will not expire at the end of the year. Thus, the Court will order the parties to meet and confer to propose a timeline for compliance with the Court's injunction.

## C.   The Department's Actions are Vacated and Cannot Be Enforced Against Grantees in Plaintiff States.

"Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (quoting *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015). "[W]hen equity demands, [an invalid regulation] can be left in place while the agency follows the necessary procedures." *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be

changed.'" *Calif. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,* 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotation marks omitted)).

The Court has found serious, fundamental errors in the Department's Directive procedure that led to unlawful discontinuation of the Grants at issue, and also found that those actions caused significant disruption to Plaintiff States. Allowing the discontinuation decisions to remain in place would be far more disruptive than setting them aside to allow the Department to make lawful continuation determinations. Thus, the Court will vacate the discontinuation notices and letters denying reconsideration that resulted from the Directive procedure.

**D.     No Stay of Injunctive Relief Is Warranted.**

The Department requests, in conclusory fashion, that if the Court issues an injunction "it be stayed pending a determination by the Solicitor General whether to appeal and, if appeal is authorized, pending any appeal." Dkt. No. 256 at 29. As the Court found with respect to the preliminary injunction (Dkt. No. 193 at 24), the Department does not explain why this relief is warranted, or address any of the factors that would impact the Court's analysis of the issue. In the face of this cursory request, the Court will deny the Department's request for a stay pending appeal.

## V.     CONCLUSION

For the reasons explained in this order, the Court hereby GRANTS Plaintiff States' motion for partial summary judgment (Dkt. No. 208), DENIES the Department's cross-motion for partial summary judgment (Dkt. No. 256), and ORDERS as follows:

(1) The Department's Directive procedure, discontinuation notices, and letters denying reconsideration are unlawful, set aside, and VACATED with respect to the discontinued Grantees in Plaintiff States as arbitrary and capricious and contrary to law.

(2) The Court DECLARES that when determining whether a grantee has met the requirements for a continuation award under 34 C.F.R. § 75.253(a), the Department is required under 34 C.F.R. § 75.253(b) to consider the information listed in 34 C.F.R. § 75.253(b) and similar relevant information.

(3) The Court permanently ENJOINS the Department and all its respective officers, agents, servants, employees, attorneys, and any person in active concert or participation with them who receive actual notice of this order from the following:

    a.   Considering new priorities or any other information that is not relevant and similar to the information listed in 34 C.F.R. § 75.253(b) when determining whether a grant within Plaintiff States has met the requirements for a continuation award under 34 C.F.R. § 75.253(a).

    b.   Implementing or enforcing through any means the Directive procedure, the discontinuation notices, or reconsideration denial letters, including recompeting Grant funds, with respect to any discontinued Grant within Plaintiff States. To the extent that this injunction will lead to a lapse in the Grant funding, the Court suspends the lapse while this lawsuit plays out. *See Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024).

    c.   Denying a continuation award based on performance issues, if any, caused by the Department's actions challenged in this case and their disruptive effects.

(4) The Department must make a lawful continuation determination as to each Grant, no later than a date to be set after the parties meet and confer on a reasonable timeline for compliance, including any appropriate interim deadlines (such as due dates for reports the Grantees must submit as required by 34 C.F.R. § 75.253). The parties shall file a

stipulated motion for an order (or a joint status report containing the parties' respective positions if agreement cannot be reached), no later than noon on December 23, 2025.

(5) The Department's counsel shall provide written notice of this Order no later than December 22, 2025, and shall file a status report no later than December 23, 2025, documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent.

(6) Consistent with Federal Rule of Civil Procedure 54(b), the Court finds no just reason for delay in the entry of judgment.

(7) The Court retains jurisdiction to enforce this injunction and judgment.

Dated this 19th day of December, 2025.


Kymberly K. Evanson
United States District Judge