# Dep't of Homeland Sec. v. Regents of the Univ. of Cal.

Supreme Court of the United States

November 12, 2019, Argued; June 18, 2020[*], Decided

Nos. 18-587, 18-588, and 18-589.

---

[*] Together with No. 18-588, *Trump, President of the United States, et al.* v. *National Association for the Advancement of Colored People et al.*, on certiorari before judgment to the United States Court of Appeals for the District of Columbia Circuit, and No. 18-589, *Wolf, Acting Secretary of Homeland Security, et al.* v. *Batalla Vidal et al.*, on certiorari before judgment to the United States Court of Appeals for the Second Circuit.

591 U.S. 1, *1; 140 S. Ct. 1891, **1891; 207 L. Ed. 2d 353, ***353; 2020 U.S. LEXIS 3254, ****3254

**Reporter**

591 U.S. 1 *; 140 S. Ct. 1891 **; 207 L. Ed. 2d 353 ***; 2020 U.S. LEXIS 3254 ****; 28 Fla. L. Weekly Fed. S 345

DEPARTMENT OF HOMELAND SECURITY, et al., Petitioners (No. 18-587) v. REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al.

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Subsequent History:** On remand at, Remanded by Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec., 2020 U.S. App. LEXIS 24619 (9th Cir., Aug. 4, 2020)

**Prior History:** [****1] REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

Vidal v. Nielsen, 291 F. Supp. 3d 260, 2018 U.S. Dist. LEXIS 54225 (E.D.N.Y., Mar. 29, 2018)

Vidal v. Nielsen, 279 F. Supp. 3d 401, 2018 U.S. Dist. LEXIS 23547 (E.D.N.Y., Feb. 13, 2018)

Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec., 908 F.3d 476, 2018 U.S. App. LEXIS 31688 (9th Cir. Cal., Nov. 8, 2018)

Vidal v. Duke, 295 F. Supp. 3d 127, 2017 U.S. Dist. LEXIS 186349 (E.D.N.Y., Nov. 9, 2017)

NAACP v. Trump, 298 F. Supp. 3d 209, 2018 U.S. Dist. LEXIS 68589 (D.D.C., Apr. 24, 2018)

**Disposition:** No. 18-587, 908 F. 3d 476, vacated in part and reversed in part; No. 18-588, affirmed; and No. 18-589, February 13, 2018 order vacated, November 9, 2017 order affirmed in part, and March 29, 2018 order reversed in part; all cases remanded.

## Syllabus

[**1896]  [*1]  In 2012, the Department of Homeland Security (DHS) issued a memorandum announcing an immigration relief program known as Deferred Action for Childhood Arrivals (DACA), which allows certain unauthorized aliens who arrived in the United States as children to apply for a two-year forbearance of removal. Those granted such relief become eligible for work authorization and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Two years later, DHS expanded DACA eligibility and created a related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). If implemented, that program would have made 4.3 million parents of U. S. citizens or lawful [*2] permanent residents eligible for the same forbearance from removal, work eligibility, and other benefits as DACA recipients. Texas, joined by 25 other States, secured a nationwide preliminary injunction barring implementation [****2] of both the DACA expansion and DAPA. The Fifth Circuit upheld the injunction, concluding that the program violated the Immigration and Nationality Act (INA), which carefully defines eligibility for benefits. This Court affirmed by an equally divided vote, and the litigation then continued in the District Court.

In June 2017, following a change in [***359] Presidential administrations, DHS rescinded the DAPA Memorandum, citing, among other reasons, the ongoing suit by Texas and new policy priorities. That September, the Attorney General advised Acting Secretary of Homeland Security Elaine C. Duke that DACA shared DAPA's legal flaws and should also be rescinded. The next day, Duke acted on that advice. Taking into consideration the Fifth Circuit and Supreme Court rulings and the Attorney General's letter, Duke decided to terminate the program. She explained that DHS would no longer accept new applications, but that existing DACA recipients whose benefits were set to expire within six months could apply for a two-year renewal. For all other DACA recipients, previously issued grants of relief would expire on their own terms, with no prospect for renewal.

[**1897] Several groups of plaintiffs challenged Duke's [****3] decision to rescind DACA, claiming that it was arbitrary and capricious in violation of the Administrative Procedure Act (APA) and infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. District Courts in California (*Regents*, No. 18-587), New York (*Batalla Vidal*, No. 18-589), and the District of Columbia (*NAACP*, No. 18-588) all ruled for the plaintiffs. Each court rejected the Government's arguments that the claims were unreviewable under the APA and that the INA deprived the courts of jurisdiction. In *Regents* and *Batalla Vidal*, the District Courts further held that the equal protection claims were adequately alleged, and they entered

591 U.S. 1, *2; 140 S. Ct. 1891, **1897; 207 L. Ed. 2d 353, ***359; 2020 U.S. LEXIS 3254, ****3

coextensive nationwide preliminary injunctions based on the conclusion that the plaintiffs were likely to succeed on their APA claims. The District Court in *NAACP* took a different approach. It deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, finding that the rescission was inadequately explained. The court then stayed its order for 90 days to permit DHS to reissue a memorandum rescinding DACA, this time with a fuller explanation of the conclusion that DACA was unlawful. Two months [****4] later, Duke's successor, Secretary Kirstjen M. Nielsen, responded to the court's order. She declined to disturb or replace Duke's rescission decision and instead [*3] explained why she thought her predecessor's decision was sound. In addition to reiterating the illegality conclusion, she offered several new justifications for the rescission. The Government moved for the District Court to reconsider in light of this additional explanation, but the court concluded that the new reasoning failed to elaborate meaningfully on the illegality rationale.

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. While those appeals were pending, the Government filed three petitions for certiorari before judgment. Following the Ninth Circuit affirmance in *Regents*, this Court granted certiorari.

*Held:* The judgment in No. 18-587 is vacated in part and reversed in part; the judgment in No. 18-588 is affirmed; the February 13, 2018 order in No. 18-589 is vacated, the November 9, 2017 order is affirmed in part, and the March 29, 2018 order is reversed in part; and all of the cases are remanded.

No. 18-587, 908 F. 3d 476, vacated in part and reversed in part; No. 18- [***360] 588, affirmed; [****5] and No. 18-589, February 13, 2018 order vacated, November 9, 2017 order affirmed in part, and March 29, 2018 order reversed in part; all cases remanded.

The Chief Justice delivered the opinion of the Court, except as to Part IV, concluding:

1. DHS's rescission decision is reviewable under the APA and is within this Court's jurisdiction. Pp. ___ - ___, 207 L. Ed. 2d, at 366-369.

(a) The APA's "basic presumption of judicial review" of agency action, *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140, 87 S. Ct. 1507, 18 L. Ed. 2d 681, can be rebutted by showing that the "agency action is committed to agency discretion by law," 5 U. S. C.

§701(a)(2). In *Heckler* v. *Chaney*, the Court held that this narrow exception includes an agency's decision not to institute an enforcement action. 470 U. S. 821, 831-832, 105 S. Ct. 1649, 84 L. Ed. 2d 714. The Government contends that DACA is a general non-enforcement policy equivalent to the individual non-enforcement decision in *Chaney*. But the DACA Memorandum did not merely decline to institute enforcement proceedings; it created a program for conferring affirmative immigration relief. [**1898] Therefore, unlike the non-enforcement decision in *Chaney*, DACA's creation--and its rescission--is an "action [that] provides a focus for judicial review." *Id.,* at 832. In addition, by virtue of receiving deferred action, 700,000 DACA recipients may request work authorization [****6] and are eligible for Social Security and Medicare. Access to such benefits is an interest "courts often are called upon to protect." *Ibid.* DACA's rescission is thus subject to review under the APA. Pp. ___ - ___, 207 L. Ed. 2d, at 367-368.

 [*4] (b) The two jurisdictional provisions of the INA invoked by the Government do not apply. Title 8 U. S. C. §1252(b)(9), which bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien," is inapplicable where, as here, the parties do not challenge any removal proceedings. And the rescission is not a decision "to commence proceedings, adjudicate cases, or execute removal orders" within the meaning of §1252(g). Pp. ___ - ___, 207 L. Ed. 2d, at 368-369.

2. DHS's decision to rescind DACA was arbitrary and capricious under the APA. Pp. ___ - ___, 207 L. Ed. 2d, at 369-377.

(a) In assessing the rescission, the Government urges the Court to consider not just the contemporaneous explanation offered by Acting Secretary Duke but also the additional reasons supplied by Secretary Nielsen nine months later. Judicial review of agency action, however, is limited to "the grounds that the agency invoked when it took the action." *Michigan* v. *EPA*, 576 U.S. 743, 758, 135 S. Ct. 2699, 192 L. Ed. 2d 674. If those grounds are inadequate, a court may remand for the agency to offer "a fuller explanation of the agency's reasoning *at [****7] the time of the agency action,*" *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 654, 110 S. Ct. 2668, 110 L. Ed. 2d 579 (emphasis added), or to "deal with the problem afresh" by taking *new* agency action, *SEC* v. *Chenery Corp.*, 332 U. S. 194, 201, 67 S. Ct. 1575, 91 L. Ed. 1995. Because Secretary Nielsen chose not to take new action, she was [***361] limited to elaborating on the

591 U.S. 1, *4; 140 S. Ct. 1891, **1898; 207 L. Ed. 2d 353, ***361; 2020 U.S. LEXIS 3254, ****7

agency's original reasons. But her reasoning bears little relationship to that of her predecessor and consists primarily of impermissible "*post hoc* rationalization." *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136. The rule requiring a new decision before considering new reasons is not merely a formality. It serves important administrative law values by promoting agency accountability to the public, instilling confidence that the reasons given are not simply convenient litigating positions, and facilitating orderly review. Each of these values would be markedly undermined if this Court allowed DHS to rely on reasons offered nine months after the rescission and after three different courts had identified flaws in the original explanation. Pp. ___ - ___, 207 L. Ed. 2d, at 369-372.

(b) Acting Secretary Duke's rescission memorandum failed to consider important aspects of the problem before the agency. Although Duke was bound by the Attorney General's determination that DACA is illegal, see 8 U. S. C. §1103(a)(1), deciding how best to address that determination involved important [****8] policy choices reserved for DHS. Acting Secretary Duke plainly exercised such discretionary authority in winding down the program, but she did not appreciate the full scope of her discretion. The Attorney General concluded that the legal defects in DACA mirrored those that the courts had recognized in DAPA. The Fifth Circuit, the highest court to offer a reasoned opinion on DAPA's [*5] legality, found that DAPA violated the INA because it extended eligibility for benefits to a class of unauthorized aliens. But the defining feature of DAPA (and DACA) is DHS's decision to defer removal, and the [**1899] Fifth Circuit carefully distinguished that forbearance component from the associated benefits eligibility. Eliminating benefits eligibility while continuing forbearance thus remained squarely within Duke's discretion. Yet, rather than addressing forbearance in her decision, Duke treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation. That reasoning repeated the error in *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm*-treating a rationale that applied to only part of [****9] a policy as sufficient to rescind the entire policy. 463 U. S. 29, 51, 103 S. Ct. 2856, 77 L. Ed. 2d 443. While DHS was not required to "consider all policy alternatives," *ibid.*, deferred action was "within the ambit of the existing" policy, *ibid.*; indeed, it was the centerpiece of the policy. In failing to consider the option to retain deferred action, Duke "failed to supply the requisite 'reasoned analysis.' " *Id.,*

at 57.

That omission alone renders Duke's decision arbitrary and capricious, but it was not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742, 116 S. Ct. 1730, 135 L. Ed. 2d 25. Certain features of the DACA policy may affect the strength of any reliance interests, but those features are for the agency to consider in the first instance. DHS has flexibility in addressing any reliance interests and could have considered various accommodations. While the agency was not [***362] required to pursue these accommodations, it was required to assess the existence and strength of any reliance interests, and weigh them against competing policy concerns. Its failure to do so was arbitrary and capricious. Pp. ___ - ___, 207 L. Ed. 2d, at 372-377.

The Chief Justice, joined by Justice Ginsburg, Justice Breyer, and Justice Kagan, concluded in Part IV that respondents' [****10] claims fail to establish a plausible inference that the rescission was motivated by animus in violation of the equal protection guarantee of the Fifth Amendment. Pp. ___ - ___, 207 L. Ed. 2d, at 377-379.

**Counsel: Noel J. Francisco** argued the cause for petitioners. **Theodore B. Olson** argued the cause for private respondents. **Michael J. Mongan** argued the cause for state respondents.

**Judges:** Roberts, Thomas, Ginsburg, Breyer, Alito, Sotomayor, Kagan, Gorsuch, Kavanaugh.

**Opinion by:** ROBERTS

## Opinion

[**1901] [*8] Chief Justice **Roberts** delivered the opinion of the Court, except as to Part IV.

In the summer of 2012, the Department of Homeland Security (DHS) announced an immigration program known as Deferred [*9] Action for Childhood Arrivals, or DACA. That program allows certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. Those granted such relief are also eligible for work authorization [****11] and various federal benefits. Some 700,000 aliens have availed themselves of this opportunity.

Five years later, the Attorney General advised DHS to rescind DACA, based on his conclusion that it was unlawful. The Department's Acting Secretary issued a memorandum terminating the program on that basis. The termination was challenged by affected individuals and third parties who alleged, among other things, that the Acting Secretary had violated the Administrative Procedure Act (APA) by failing to adequately address important factors bearing on her decision. For the reasons that follow, we conclude that the Acting Secretary did violate the APA, and that the rescission must be vacated.

I

A

In June 2012, the Secretary of Homeland Security issued a memorandum announcing an immigration relief program [*10] for "certain young people who were brought to this country as children." App. to Pet. for Cert. in No. 18-587, p. 97a (App. to Pet. for Cert.). Known as DACA, the program applies to childhood arrivals who were under age 31 in 2012; have continuously resided here since 2007; are current students, have completed high school, or are honorably discharged veterans; have not been convicted of any serious [****12] crimes; and do not threaten national security or public safety. Id., at 98a. DHS concluded [***363] that individuals who meet these criteria warrant favorable treatment under the immigration laws because they "lacked the intent to violate the law," are "productive" contributors to our society, and "know only this country as home." Id., at 98a-99a.

"[T]o prevent [these] low priority individuals from being removed from the [**1902] United States," the DACA Memorandum instructs Immigration and Customs Enforcement to "exercise prosecutorial discretion[ ] on an individual basis . . . by deferring action for a period of two years, subject to renewal." Id., at 100a. In addition, it directs U. S. Citizenship and Immigration Services (USCIS) to "accept applications to determine whether these individuals qualify for work authorization during this period of deferred action," id., at 101a, as permitted under regulations long predating DACA's creation, see 8 CFR §274a.12(c)(14) (2012) (permitting work authorization for deferred action recipients who establish "economic necessity"); 46 Fed. Reg. 25080-25081 (1981) (similar). Pursuant to other regulations, deferred action recipients are considered "lawfully present" for purposes of, and therefore eligible to receive, Social Security and Medicare [****13] benefits. See 8 CFR §1.3(a)(4)(vi); 42 CFR §417.422(h) (2012).

In November 2014, two years after DACA was promulgated, DHS issued a memorandum announcing that it would expand DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to [*11] three years. App. to Pet. for Cert. 106a-107a. In the same memorandum, DHS created a new, related program known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. That program would have authorized deferred action for up to 4.3 million parents whose children were U. S. citizens or lawful permanent residents. These parents were to enjoy the same forbearance, work eligibility, and other benefits as DACA recipients.

Before the DAPA Memorandum was implemented, 26 States, led by Texas, filed suit in the Southern District of Texas. The States contended that DAPA and the DACA expansion violated the APA's notice and comment requirement, the Immigration and Nationality Act (INA), and the Executive's duty under the Take Care Clause of the Constitution. The District Court found that the States were likely to succeed on the merits of at least one of their claims [****14] and entered a nationwide preliminary injunction barring implementation of both DAPA and the DACA expansion. See Texas v. United States, 86 F. Supp. 3d 591, 677-678 (2015).

A divided panel of the Court of Appeals for the Fifth Circuit affirmed the preliminary injunction. Texas v. United States, 809 F. 3d 134, 188 (2015). In opposing the injunction, the Government argued that the DAPA Memorandum reflected an unreviewable exercise of the Government's enforcement discretion. The Fifth Circuit majority disagreed. It reasoned that the deferred action described in the DAPA Memorandum was "much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." Id., at 166. From this, the majority concluded that the creation of the DAPA [***364] program was not an unreviewable action "committed to agency discretion by law." Id., at 169 (quoting 5 U. S. C. §701(a)(2)).

The majority then upheld the injunction on two grounds. It first concluded the States were likely to succeed on their procedural claim that the DAPA Memorandum was a substantive [*12] rule that was required to undergo notice and comment. It then held that the APA required DAPA to be set aside because the program was "manifestly contrary" to the INA, which "expressly and carefully provides legal designations allowing

defined [****15] classes" to "receive the benefits" associated with "lawful presence" and to qualify for work authorization, 809 F. 3d, at 179-181, 186 (internal [**1903] quotation marks omitted). Judge King dissented.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote, which meant that no opinion was issued. *United States* v. *Texas*, 579 U.S. ___, 136 S. Ct. 2271, 195 L. Ed. 2d 638 (2016) (*per curiam*). For the next year, litigation over DAPA and the DACA expansion continued in the Southern District of Texas, while implementation of those policies remained enjoined.

Then, in June 2017, following a change in Presidential administrations, DHS rescinded the DAPA Memorandum. In explaining that decision, DHS cited the preliminary injunction and ongoing litigation in Texas, the fact that DAPA had never taken effect, and the new administration's immigration enforcement priorities.

Three months later, in September 2017, Attorney General Jefferson B. Sessions III sent a letter to Acting Secretary of Homeland Security Elaine C. Duke, "advis[ing]" that DHS "should rescind" DACA as well. App. 877. Citing the Fifth Circuit's opinion and this Court's equally divided affirmance, the Attorney General concluded that DACA shared the "same legal . . . defects that the courts recognized as to DAPA" and was "likely" [****16] to meet a similar fate. *Id.*, at 878. "In light of the costs and burdens" that a rescission would "impose[ ] on DHS," the Attorney General urged DHS to "consider an orderly and efficient wind-down process." *Ibid.*

The next day, Duke acted on the Attorney General's advice. In her decision memorandum, Duke summarized the history of the DACA and DAPA programs, the Fifth Circuit [*13] and ensuing affirmance, and the contents of the Attorney General's letter. App. to Pet. for Cert. 111a-117a. "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings" and the "letter from the Attorney General," she concluded that the "DACA program should be terminated." *Id.*, at 117a.

Duke then detailed how the program would be wound down: No new applications would be accepted, but DHS would entertain applications for two-year renewals from DACA recipients whose benefits were set to expire within six months. For all other DACA recipients, previously issued grants of deferred action and work authorization would not be revoked but would expire on their own terms, with no prospect for renewal. *Id.*, at 117a-118a.

B

Within days of Acting Secretary [***365] Duke's rescission announcement, multiple groups of plaintiffs ranging from individual [****17] DACA recipients and States to the Regents of the University of California and the National Association for the Advancement of Colored People challenged her decision in the U. S. District Courts for the Northern District of California (*Regents*, No. 18-587), the Eastern District of New York (*Batalla Vidal*, No. 18-589), and the District of Columbia (*NAACP*, No. 18-588). The relevant claims are that the rescission was arbitrary and capricious in violation of the APA and that it infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause. [1]

All three District Courts ruled for the plaintiffs, albeit at different stages of the proceedings. [2] In doing so, each court [*14] rejected [**1904] the Government's threshold arguments that the claims were unreviewable under the APA and that the INA deprived the court of jurisdiction. 298 F. Supp. 3d 209, 223-224, 234-235 (DC 2018); 279 F. Supp. 3d 1011, 1029-1033 (ND Cal. 2018); 295 F. Supp. 3d 127, 150, 153-154 (EDNY 2017).

In *Regents* and *Batalla Vidal*, the District Courts held that the equal protection claims were adequately alleged. 298 F. Supp. 3d 1304, 1315 (ND Cal. 2018); 291 F. Supp. 3d 260, 279 (EDNY 2018). Those courts also entered coextensive nationwide preliminary injunctions, based on the conclusion that the plaintiffs were likely to succeed on the merits of their claims that the rescission was arbitrary and capricious. These injunctions did not require DHS to accept new

---

[1] Plaintiffs also raised notice and comment claims, which uniformly failed below, and assorted due process challenges, some of which survived motions to dismiss. Those claims are not before us.

[2] In a related challenge not at issue here, the District Court for the District of Maryland granted partial summary judgment in favor of the Government. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 284 F. Supp. 3d 758 (2018). After the Government filed petitions for certiorari in the instant cases, the Fourth Circuit reversed that decision and vacated Acting Secretary Duke's rescission as arbitrary and capricious. *Casa de Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684 (2019), cert. pending, No. 18-1469. The Fourth Circuit has since stayed its mandate.

591 U.S. 1, *14; 140 S. Ct. 1891, **1904; 207 L. Ed. 2d 353, ***365; 2020 U.S. LEXIS 3254, ****17

applications, [****18] but did order the agency to allow DACA recipients to "renew their enrollments." 279 F. Supp. 3d, at 1048; see 279 F. Supp. 3d 401, 437 (EDNY 2018).

In *NAACP*, the D. C. District Court took a different course. In April 2018, it deferred ruling on the equal protection challenge but granted partial summary judgment to the plaintiffs on their APA claim, holding that Acting Secretary Duke's "conclusory statements were insufficient to explain the change in [the agency's] view of DACA's lawfulness." 298 F. Supp. 3d, at 243. The District Court stayed its order for 90 days to permit DHS to "reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority." *Id.*, at 245.

Two months later, Duke's successor, Secretary Kirstjen M. Nielsen, responded via memorandum. App. to Pet. for Cert. 120a-126a. She explained that, "[h]aving considered the [*15] Duke memorandum," she "decline[d] to disturb" the rescission. *Id.*, at 121a. Secretary Nielsen went on to articulate her "understanding" of Duke's [***366] memorandum, identifying three reasons why, in Nielsen's estimation, "the decision to rescind the DACA policy was, and remains, sound." *Ibid.* First, she reiterated that, "as the Attorney General concluded, the DACA policy was [****19] contrary to law." *Id.*, at 122a. Second, she added that, regardless, the agency had "serious doubts about [DACA's] legality" and, for law enforcement reasons, wanted to avoid "legally questionable" policies. *Id.*, at 123a. Third, she identified multiple policy reasons for rescinding DACA, including (1) the belief that any class-based immigration relief should come from Congress, not through executive non-enforcement; (2) DHS's preference for exercising prosecutorial discretion on "a truly individualized, case-by-case basis"; and (3) the importance of "project[ing] a message" that immigration laws would be enforced against all classes and categories of aliens. *Id.*, at 123a-124a. In her final paragraph, Secretary Nielsen acknowledged the "asserted reliance interests" in DACA's continuation but concluded that they did not "outweigh the questionable legality of the DACA policy and the other reasons" for the rescission discussed in her memorandum. *Id.*, at 125a.

The Government asked the D. C. District Court to revise its prior order in light of the reasons provided by Secretary Nielsen, but the court declined. In the court's view, the new memorandum, which [**1905] "fail[ed] to

elaborate meaningfully" on the agency's illegality rationale, still [****20] did not provide an adequate explanation for the September 2017 rescission. 315 F. Supp. 3d 457, 460, 473-474 (2018).

The Government appealed the various District Court decisions to the Second, Ninth, and D. C. Circuits, respectively. In November 2018, while those appeals were pending, the Government simultaneously filed three petitions for certiorari before judgment. After the Ninth Circuit affirmed the nationwide injunction in *Regents*, see 908 F. 3d 476 (2018), [*16] but before rulings from the other two Circuits, we granted the petitions and consolidated the cases for argument. 588 U.S. ___, 139 S. Ct. 2779, 204 L. Ed. 2d 1156 (2019). The issues raised here are (1) whether the APA claims are reviewable, (2) if so, whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim.

II

The dispute before the Court is not whether DHS may rescind DACA. All parties agree that it may. The dispute is instead primarily about the procedure the agency followed in doing so.

[1] The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin* v. *Massachusetts*, 505 U. S. 788, 796, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992). It requires agencies to engage in "reasoned decisionmaking," *Michigan* v. *EPA*, 576 U.S. 743, 750, 135 S. Ct. 2699, 192 L. Ed. 2d 674 (2015) (internal quotation marks omitted), and directs that agency [****21] actions be "set aside" if they are "arbitrary" or "capricious," 5 U. S. C. §706(2)(A). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 513, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009) (internal quotation marks omitted), but instead to assess only whether the [***367] decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971).

But before determining whether the rescission was arbitrary and capricious, we must first address the Government's contentions that DHS's decision is unreviewable under the APA and outside this Court's jurisdiction.

591 U.S. 1, *16; 140 S. Ct. 1891, **1905; 207 L. Ed. 2d 353, ***367; 2020 U.S. LEXIS 3254, ****21

A

[2] The APA establishes a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140, [*17] 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967) (quoting §702). That presumption can be rebutted by a showing that the relevant statute "preclude[s]" review, §701(a)(1), or that the "agency action is committed to agency discretion by law," §701(a)(2). The latter exception is at issue here.

[3] To "honor the presumption of review, we have read the exception in §701(a)(2) quite narrowly," *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. ___, ___, 139 S. Ct. 361, 370, 202 L. Ed. 2d 269 (2018)), confining it to those rare "administrative decision[s] traditionally left to agency discretion," *Lincoln* v. *Vigil*, 508 U. S. 182, 191, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993). This limited category of unreviewable actions includes an agency's decision not to institute [****22] enforcement proceedings, *Heckler* v. *Chaney*, 470 U. S. 821, 831-832, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985), and it is on that exception that the Government primarily relies.

[**1906] In *Chaney*, several death-row inmates petitioned the Food and Drug Administration (FDA) to take enforcement action against two States to prevent their use of certain drugs for lethal injection. The Court held that the FDA's denial of that petition was presumptively unreviewable in light of the well-established "tradition" that "an agency's decision not to prosecute or enforce" is "generally committed to an agency's absolute discretion." *Id.*, at 831, 105 S. Ct. 1649, 84 L. Ed. 2d 714. We identified a constellation of reasons that underpin this tradition. To start, a non-enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies." *Ibid.* The decision also mirrors, "to some extent," a prosecutor's decision not to indict, which has "long been regarded as the special province of the Executive Branch." *Id.*, at 832, 105 S. Ct. 1649, 84 L. Ed. 2d 714. And, as a practical matter, "when an agency refuses to act" there is no action to "provide[ ] a focus for judicial review." *Ibid.*

The Government contends that a general [****23] non-enforcement policy is equivalent to the individual non-enforcement decision [*18] at issue in *Chaney*. In each case, the Government argues, the agency must balance

factors peculiarly within its expertise, and does so in a manner akin to a criminal prosecutor. Building on that premise, the Government argues that the rescission of a non-enforcement policy is no different—for purposes of reviewability—from the adoption of that policy. While the rescission may lead to increased enforcement, [***368] it does not, by itself, constitute a particular enforcement action. Applying this logic to the facts here, the Government submits that DACA is a non-enforcement policy and that its rescission is therefore unreviewable.

But we need not test this chain of reasoning because DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. *Ibid.* Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted [****24] a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U. S., at 831-832, 105 S. Ct. 1649, 84 L. Ed. 2d 714. In short, [4] the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832, 105 S. Ct. 1649, 84 L. Ed. 2d 714.

The benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy. As described above, by virtue of receiving deferred action, the 700,000 DACA recipients may request work authorization and are eligible for Social Security [*19] and Medicare. See *supra*, at ___, 207 L. Ed. 2d, at 363. Unlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest "courts often are called upon to protect." *Chaney*, 470 U. S., at 832, 105 S. Ct. 1649, 84 L. Ed. 2d 714. See also *Barnhart* v. *Thomas*, 540 U. S. 20, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003) (reviewing [**1907] eligibility determination for Social Security benefits).

[5] Because the DACA program is more than [****25] a non-enforcement policy, its rescission is subject to

591 U.S. 1, *19; 140 S. Ct. 1891, **1907; 207 L. Ed. 2d 353, ***368; 2020 U.S. LEXIS 3254, ****25

review under the APA.

B

The Government also invokes two jurisdictional provisions of the INA as independent bars to review. Neither applies.

[6]Section 1252(b)(9) bars review of claims arising from "action[s]" or "proceeding[s] brought to remove an alien." 66 Stat. 209, as amended, 8 U. S. C. §1252(b)(9). That targeted language is not aimed at this sort of case. [7] As we have said before, §1252(b)(9) "does not present a jurisdictional bar" where those bringing suit "are not asking for review of an order of removal," "the decision . . . to seek removal," or "the process by which . . . removability will be determined." *Jennings v. Rodriguez*, 583 U. S. ___, ___-___, 138 S. Ct. 830, 841, 200 L. Ed. 2d 122 (2018) (plurality opinion; *id.*, at ___, 138 S. Ct. 830, 859, 200 L. Ed. 2d 122 (Breyer, J., dissenting). And it is certainly not a bar where, as here, the parties are not challenging any removal proceedings.

[8] Section 1252(g) is similarly narrow. [***369] That provision limits review of cases "arising from" decisions "to commence proceedings, adjudicate cases, or execute removal orders." §1252(g). We have previously rejected as "implausible" the Government's suggestion that §1252(g) covers "all claims arising from deportation proceedings" or imposes "a general jurisdictional limitation." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999). The rescission, which revokes a deferred action program with associated benefits, [****26] is not a decision to "commence proceedings," much less to "adjudicate" a case or "execute" a removal order.

 [*20]  With these preliminary arguments out of the way, we proceed to the merits.

III

A

[9] Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation. The natural starting point here is the explanation provided by Acting Secretary Duke when she announced the rescission in September 2017. But the Government urges us to go on and consider the June 2018 memorandum submitted by Secretary Nielsen as well. That memo was prepared after the D. C. District Court vacated the Duke rescission and gave DHS an opportunity to "reissue a memorandum rescinding DACA, this time providing a fuller explanation

for the determination that the program lacks statutory and constitutional authority." 298 F. Supp. 3d, at 245. According to the Government, the Nielsen Memorandum is properly before us because it was invited by the District Court and reflects the views of the Secretary of Homeland Security—the official responsible for immigration policy. Respondents disagree, arguing that the Nielsen Memorandum, issued nine months after the rescission, impermissibly asserts prudential [****27]  and policy reasons not relied upon by Duke.

[10] It is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Michigan*, 576 U. S., at 758, 135 S. Ct. 2699, 192 L. Ed. 2d 674. If those grounds are inadequate, a court may remand for the agency to do one of two things: First, the agency can offer "a fuller explanation of the agency's reasoning *at the time of the agency action.*" *Pension Benefit Guaranty Corporation* [**1908] v. *LTV Corp.*, 496 U. S. 633, 654, 110 S. Ct. 2668, 110 L. Ed. 2d 579 (1990) (emphasis added). See also *Alpharma, Inc.* v. *Leavitt*, 460 F. 3d 1, 5-6, 373 U.S. App. D.C. 65 (CADC 2006) (Garland, J.) (permitting an agency to provide an "amplified articulation" of a prior "conclusory" observation (internal quotation marks  [*21]  omitted)). This route has important limitations. When an agency's initial explanation "indicate[s] the determinative reason for the final action taken," the agency may elaborate later on that reason (or reasons) but may not provide new ones. *Camp* v. *Pitts*, 411 U. S. 138, 143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (*per curiam*). Alternatively, the agency can "deal with the problem afresh" by taking *new* agency action. *SEC* v. *Chenery Corp.*, 332 U. S. 194, 201, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947) (*Chenery II*). An agency taking this route is not limited to its prior reasons  [***370] but must comply with the procedural requirements for new agency action.

The District Court's remand thus presented DHS with a choice: rest on the Duke Memorandum while elaborating on its prior [****28]  reasoning, or issue a new rescission bolstered by new reasons absent from the Duke Memorandum. Secretary Nielsen took the first path. Rather than making a new decision, she "decline[d] to disturb the Duke memorandum's rescission" and instead "provide[d] further explanation" for that action. App. to Pet. for Cert. 121a. Indeed, the Government's subsequent request for reconsideration described the Nielsen Memorandum as "additional explanation for [Duke's] decision" and asked the District

591 U.S. 1, *21; 140 S. Ct. 1891, **1908; 207 L. Ed. 2d 353, ***370; 2020 U.S. LEXIS 3254, ****28

Court to "leave in place [Duke's] September 5, 2017 decision to rescind the DACA policy." Motion to Revise Order in No. 17-cv-1907 etc. (D DC), pp. 2, 19. Contrary to the position of the Government before this Court, and of Justice Kavanaugh in dissent, *post*, at ___, 207 L. Ed. 2d, at 398 (opinion concurring in judgment in part and dissenting in part), the Nielsen Memorandum was by its own terms not a new rule implementing a new policy.

[11] Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation "must be viewed critically" to ensure that the rescission is not upheld on the basis of impermissible [****29] "*post hoc* rationalization." *Overton Park*, 401 U. S., at 420, 91 S. Ct. 814, 28 L. Ed. 2d 136. But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears little relationship [*22] to that of her predecessor. Acting Secretary Duke rested the rescission on the conclusion that DACA is unlawful. Period. See App. to Pet. for Cert. 117a. By contrast, Secretary Nielsen's new memorandum offered three "separate and independently sufficient reasons" for the rescission, *id*., at 122a, only the first of which is the conclusion that DACA is illegal.

Her second reason is that DACA is, at minimum, legally *questionable* and should be terminated to maintain public confidence in the rule of law and avoid burdensome litigation. No such justification can be found in the Duke Memorandum. Legal uncertainty is, of course, related to illegality. But the two justifications are meaningfully distinct, especially in this context. While an agency might, for one reason or another, choose to do nothing in the face of uncertainty, illegality presumably requires remedial action of some sort.

The policy reasons that Secretary Nielsen cites as a third basis for the rescission are also nowhere to be found in the Duke Memorandum. That document makes no mention of a preference [****30] for legislative fixes, the superiority of case-by-case decisionmaking, the importance of sending a message of robust enforcement, or any other policy consideration. Nor are these points [**1909] included in the legal analysis from the Fifth Circuit and the Attorney General. They can be viewed only as impermissible *post hoc* rationalizations and thus are not properly before us.

The Government, echoed by Justice Kavanaugh, protests that requiring a new decision before considering Nielsen's new justifications would be "an

idle and useless formality." *NLRB* [***371] v. *Wyman-Gordon Co.*, 394 U. S. 759, 766, n. 6, 89 S. Ct. 1426, 22 L. Ed. 2d 709 (1969) (plurality opinion). See also *post*, at ___, 207 L. Ed. 2d, at 399. Procedural requirements can often seem such. But here the rule serves important values of administrative law. [12] Requiring a new decision before considering new reasons promotes "agency accountability," *Bowen* v. *American Hospital Asso.*, 476 U.S. 610, 643, [*23] 106 S. Ct. 2101, 90 L. Ed. 2d 584 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher* v. *SmithKline Beecham Corp.*, 567 U. S. 142, 155, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly [****31] functioning of the process of review," *SEC* v. *Chenery Corp.*, 318 U. S. 80, 94, 63 S. Ct. 454, 87 L. Ed. 626 (1943), forcing both litigants and courts to chase a moving target. Each of these values would be markedly undermined were we to allow DHS to rely on reasons offered nine months after Duke announced the rescission and after three different courts had identified flaws in the original explanation.

Justice Kavanaugh asserts that this "foundational principle of administrative law," *Michigan*, 576 U. S., at 758, 135 S. Ct. 2699, 192 L. Ed. 2d 674, actually limits only what lawyers may argue, not what agencies may do. *Post*, at ___, 207 L. Ed. 2d, at 399. [13] While it is true that the Court has often rejected justifications belatedly advanced by advocates, we refer to this as a prohibition on *post hoc* rationalizations, not advocate rationalizations, because the problem is the timing, not the speaker. The functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves. See *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 539, 101 S. Ct. 2478, 69 L. Ed. 2d 185 (1981) ("[T]he *post hoc* rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action."); *Overton Park*, 401 U. S., at 419, 91 S. Ct. 814, 28 L. Ed. 2d 136 (rejecting "litigation affidavits" from agency officials as "merely '*post hoc*' rationalizations"). [3]

---

[3] Justice Kavanaugh further argues that the contemporaneous explanation requirement applies only to agency adjudications,

[*24] Justice Holmes famously [****32] wrote that "[m]en must turn square corners when they deal with the Government." *Rock Island, A. & L. R. Co.* v. *United States*, 254 U. S. 141, 143, 41 S. Ct. 55, 65 L. Ed. 188, 56 Ct. Cl. 466, 1921-4 C.B. 342 (1920). But it is also true, particularly when so much is at stake, that "the Government should turn square corners in dealing with the people." *St. Regis Paper Co.* v. *United States*, 368 U. S. 208, 229, 82 S. Ct. 289, 7 L. Ed. 2d 240 (1961) (Black, J., dissenting). [14]The basic rule here is clear: An agency must defend its actions based on the reasons [***372] it gave when it acted. This [**1910] is not the case for cutting corners to allow DHS to rely upon reasons absent from its original decision.

B

We turn, finally, to whether DHS's decision to rescind DACA was arbitrary and capricious. As noted earlier, Acting Secretary Duke's justification for the rescission was succinct: "Taking into consideration" the Fifth Circuit's conclusion that DAPA was unlawful because it conferred benefits in violation of the INA, and the Attorney General's conclusion that DACA was unlawful for the same reason, she concluded—without elaboration—that the "DACA program should be terminated." App. to Pet. for Cert. 117a. [4]

Respondents maintain that this explanation is deficient for three reasons. Their first and second arguments work in tandem, claiming that the Duke Memorandum does not adequately [*25] explain the conclusion that DACA is unlawful, and that [****33] this conclusion is, in any event, wrong. While those arguments carried the day in the lower courts, in our view they overlook an important constraint on Acting Secretary Duke's decisionmaking authority—she was *bound* by the Attorney General's legal determination.

---

not rulemakings. *Post*, at ___-___, 207 L. Ed. 2d, at 398-400 (opinion concurring in judgment in part and dissenting in part). But he cites no authority limiting this basic principle—which the Court regularly articulates in the context of rulemakings—to adjudications. The Government does not even raise this unheralded argument.

[4] The Government contends that Acting Secretary Duke also focused on litigation risk. Although the background section of her memo references a letter from the Texas Attorney General threatening to challenge DACA, the memo never asserts that the rescission was intended to avert litigation. And, given the Attorney General's conclusion that the policy was unlawful—and thus presumably could not be maintained or defended in its current form—it is difficult to see how the risk of litigation carried any independent weight.

[15] The same statutory provision that establishes the Secretary of Homeland Security's authority to administer and enforce immigration laws limits that authority, specifying that, with respect to "all questions of law," the determinations of the Attorney General "shall be controlling." 8 U. S. C. §1103(a)(1). Respondents are aware of this constraint. Indeed they emphasized the point in the reviewability sections of their briefs. But in their merits arguments, respondents never addressed whether or how this unique statutory provision might affect our review. They did not discuss whether Duke was required to explain a legal conclusion that was not hers to make. Nor did they discuss whether the current suits challenging Duke's rescission decision, which everyone agrees was within her legal authority under the INA, are proper vehicles for attacking the Attorney General's legal conclusion.

Because of these gaps in respondents' briefing, we do not evaluate [****34] the claims challenging the explanation and correctness of the illegality conclusion. Instead we focus our attention on respondents' third argument—that Acting Secretary Duke "failed to consider . . . important aspect[s] of the problem" before her. *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

[16] Whether DACA is illegal is, of course, a legal determination, and therefore a question for the Attorney General. But deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding [***373] concerns a program with the breadth of DACA. Those policy choices are for DHS.

[*26] Acting Secretary Duke plainly exercised such discretionary authority in winding down the program. See App. to Pet. for Cert. 117a-118a (listing the Acting Secretary's decisions on eight transition issues). [**1911] Among other things, she specified that those DACA recipients whose benefits were set to expire within six months were eligible for two-year renewals. *Ibid.*

But Duke did not appear to appreciate the full scope of her discretion, which picked up where the Attorney General's legal reasoning left off. The Attorney General concluded that "the DACA policy has the same legal . . . defects that the courts recognized as to [****35] DAPA." App. 878. So, to understand those defects, we look to the Fifth Circuit, the highest court to offer a reasoned opinion on the legality of DAPA. That court described

the "core" issue before it as the "Secretary's decision" to grant "eligibility for benefits"—including work authorization, Social Security, and Medicare—to unauthorized aliens on "a class-wide basis." *Texas*, 809 F. 3d, at 170; see *id.,* at 148, 184. The Fifth Circuit's focus on these benefits was central to every stage of its analysis. See *id.,* at 155 (standing); *id.,* at 163 (zone of interest); *id.,* at 164 (applicability of §1252(g)); *id.,* at 166 (reviewability); *id.,* at 176-177 (notice and comment); *id.,* at 184 (substantive APA). And the Court ultimately held that DAPA was "manifestly contrary to the INA" precisely because it "would make 4.3 million otherwise removable aliens" eligible for work authorization and public benefits. *Id.,* at 181-182 (internal quotation marks omitted). [5]

 [*27]  But there is more to DAPA (and DACA) than such benefits. The defining feature of deferred action is the decision to defer removal (and to notify the affected alien of that decision). See App. to Pet. for Cert. 99a. And the Fifth Circuit was careful to distinguish that forbearance component from eligibility for benefits. As it explained, the "challenged portion [****36] of DAPA's deferred-action program" was the decision to make DAPA recipients eligible for benefits. See *Texas*, 809 F. 3d, at 168, and n. 108. The other "[p]art of DAPA," the court noted, "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a class of what he deem[ed] to be low-priority illegal aliens." *Id.,* at 166. Borrowing from this Court's prior description of deferred action, the Fifth Circuit observed that "the states do not challenge the Secretary's decision to 'decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.'" *Id.,* at 168 (quoting *Reno*, 525 U. S., at 484, 119 S. Ct. 936, 142 L. Ed. 2d 940). And the Fifth Circuit underscored that nothing in its decision or the preliminary injunction "requires the [***374] Secretary to remove any alien or to alter" the

Secretary's class-based "enforcement priorities." *Texas*, 809 F. 3d, at 166, 169. In other words, the Secretary's forbearance authority was unimpaired.

Acting Secretary Duke recognized that the Fifth Circuit's holding addressed the benefits associated with DAPA. In her memorandum she explained that the Fifth Circuit concluded that DAPA "conflicted with the discretion authorized by Congress" because the INA "'flatly does not permit the reclassification of millions of [****37] illegal aliens as lawfully present and thereby [**1912] make them newly eligible for a host of federal and state benefits, including work authorization.'" App. to Pet. for Cert. 114a (quoting *Texas*, 809 F. 3d, at 184). Duke did not characterize the opinion as one about forbearance.

 [*28]  In short, the Attorney General neither addressed the forbearance policy at the heart of DACA nor compelled DHS to abandon that policy. Thus, removing benefits eligibility while continuing forbearance remained squarely within the discretion of Acting Secretary Duke, who was responsible for "[e]stablishing national immigration enforcement policies and priorities." 116 Stat. 2178, 6 U. S. C. §202(5). But Duke's memo offers no reason for terminating forbearance. She instead treated the Attorney General's conclusion regarding the illegality of benefits as sufficient to rescind both benefits and forbearance, without explanation.

That reasoning repeated the error we identified in one of our leading modern administrative law cases, *Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.* There, the National Highway Traffic Safety Administration (NHTSA) promulgated a requirement that motor vehicles produced after [****38] 1982 be equipped with one of two passive restraints: airbags or automatic seatbelts. 463 U. S., at 37-38, 46, 103 S. Ct. 2856, 77 L. Ed. 2d 443. Four years later, before the requirement went into effect, NHTSA concluded that automatic seatbelts, the restraint of choice for most manufacturers, would not provide effective protection. Based on that premise, NHTSA rescinded the passive restraint requirement in full. *Id.,* at 38, 103 S. Ct. 2856, 77 L. Ed. 2d 443.

We concluded that the total rescission was arbitrary and capricious. As we explained, NHTSA's justification supported only "disallow[ing] compliance by means of " automatic seatbelts. *Id.,* at 47, 103 S. Ct. 2856, 77 L. Ed. 2d 443. It did "not cast doubt" on the "efficacy of airbag technology" or upon "the need for a passive

---

[5] As the Fifth Circuit noted, DAPA recipients were eligible for Social Security and Medicare benefits because they had been designated "lawfully present." *Texas*, 809 F. 3d, at 168. [17] Lawful presence is a statutory prerequisite for receipt of certain benefits. See *id.,* at 148 (citing 8 U. S. C. §1611). It is not the same as forbearance nor does it flow inexorably from forbearance. Thus, while deferred action recipients have been designated lawfully present for purposes of Social Security and Medicare eligibility, see 8 CFR §1.3; 42 CFR §417.422(h), agencies can also exclude them from this designation, see 45 CFR §152.2(8) (2019) (specifying that DACA recipients are not considered lawfully present for purposes of coverage under the Affordable Care Act).

restraint standard." *Ibid.* Given NHTSA's prior judgment that "airbags are an effective and cost-beneficial lifesaving technology," we held that "the mandatory passive restraint rule [could] not be abandoned without any consideration whatsoever of an airbags-only requirement." *Id.*, at 51, 103 S. Ct. 2856, 77 L. Ed. 2d 443.

[*29] While the factual setting is different here, the error is the same. Even if it is illegal for DHS to extend work authorization and other benefits to DACA recipients, that conclusion supported only "disallow[ing] benefits. *Id.*, at 47, 103 S. Ct. 2856, 77 L. Ed. 2d 443. It did "not cast doubt" on the legality of forbearance or upon DHS's original [****39] reasons for extending forbearance to childhood arrivals. *Ibid.* [***375] Thus, given DHS's earlier judgment that forbearance is "especially justified" for "productive young people" who were brought here as children and "know only this country as home," App. to Pet. for Cert. 98a-99a, the DACA Memorandum could not be rescinded in full "without any consideration whatsoever" of a forbearance-only policy, *State Farm*, 463 U. S., at 51, 103 S. Ct. 2856, 77 L. Ed. 2d 443.[6]

[**1913] The Government acknowledges that "[d]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands." Reply Brief 21. It insists, however, that "DHS was not required to consider whether DACA's illegality could be addressed by separating" the two. *Ibid.* According to the Government, "It was not arbitrary and capricious for DHS to view deferred action and its collateral benefits as importantly linked." *Ibid.* Perhaps. But that response misses the point. The fact that there may be a valid reason not to separate deferred action from benefits does not establish that DHS considered that option or that such consideration was unnecessary.

[*30] The lead dissent acknowledges that forbearance

and benefits are legally distinct and can be decoupled. *Post*, at ___-___, n. 14, 207 L. Ed. 2d, at 393-394 (opinion of Thomas, J.). [****40] It contends, however, that we should not "dissect" agency action "piece by piece." *Post*, at ___, 207 L. Ed. 2d, at 393. The dissent instead rests on the Attorney General's legal determination—which considered only benefits—"to supply the 'reasoned analysis'" to support rescission of both benefits and forbearance. *Post*, at ___, 207 L. Ed. 2d, at 393 (quoting *State Farm*, 463 U. S., at 42, 103 S. Ct. 2856, 77 L. Ed. 2d 443). [18] But *State Farm* teaches that when an agency rescinds a prior policy its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]." *Id.*, at 51, 103 S. Ct. 2856, 77 L. Ed. 2d 443. Here forbearance was not simply "within the ambit of the existing [policy]," it was the centerpiece of the policy: DACA, after all, stands for "*Deferred Action* for Childhood Arrivals." App. to Pet. for Cert. 111a (emphasis added). But the rescission memorandum contains no discussion of forbearance or the option of retaining forbearance without benefits. Duke "entirely failed to consider [that] important aspect of the problem." *State Farm*, 463 U. S., at 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443.

That omission alone renders Acting Secretary Duke's decision arbitrary and capricious. But it is not the only defect. Duke also failed to address whether there was "legitimate reliance" on the DACA Memorandum. *Smiley* v. *Citibank (South Dakota), N. A.*, 517 U. S. 735, 742, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996). [19] When an agency changes course, as DHS did here, it must "be cognizant that longstanding [****41] policies may have 'engendered [***376] serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. ___, ___, 136 S. Ct. 2117, 2120, 195 L. Ed. 2d 382 (2016) (quoting *Fox Television*, 556 U. S., at 515, 129 S. Ct. 1800, 173 L. Ed. 2d 738). "It would be arbitrary and capricious to ignore such matters." *Id.*, at 515, 129 S. Ct. 1800, 173 L. Ed. 2d 738. Yet that is what the Duke Memorandum did.

For its part, the Government does not contend that Duke considered potential reliance interests; it counters that she did not need to. In the Government's view, shared by the lead dissent, DACA recipients have no "legally cognizable [*31] reliance interests" because the DACA Memorandum stated that the program "conferred no substantive rights" and provided benefits only in two-year increments. Reply Brief 16-17; App. to Pet. for Cert. 125a. See also *post*, at ___-___, 207 L. Ed. 2d, at 394-395 (opinion of Thomas, J). But neither the Government nor the lead dissent cites any legal

---

[6] The three-page memorandum that established DACA is devoted entirely to forbearance, save for one sentence directing USCIS to "determine whether [DACA recipients] qualify for work authorization." App. to Pet. for Cert. 101a. The benefits associated with DACA flow from a separate regulation. See 8 CFR §1.3(a)(4)(vi); see also 42 CFR §417.422(h) (cross-referencing 8 CFR §1.3). Thus, DHS could have addressed the Attorney General's determination that such benefits were impermissible under the INA by amending 8 CFR §1.3 to exclude DACA recipients from those benefits without rescinding the DACA Memorandum and the forbearance policy it established. But Duke's rescission memo shows no cognizance of this possibility.

591 U.S. 1, *31; 140 S. Ct. 1891, **1913; 207 L. Ed. 2d 353, ***376; 2020 U.S. LEXIS 3254, ****41

authority establishing that such features automatically preclude reliance interests, and we are not aware of any. [20] These disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to [**1914] normal APA review. There was no such consideration in the Duke Memorandum.

Respondents and their *amici* assert that there was much for DHS to [****42] consider. They stress that, since 2012, DACA recipients have "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the DACA program. Brief for Respondent Regents of Univ. of California et al. in No. 18-587, p. 41 (Brief for Regents). The consequences of the rescission, respondents emphasize, would "radiate outward" to DACA recipients' families, including their 200,000 U. S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. See *id.*, at 41-42; Brief for Respondent State of New York et al. in No. 18-589, p. 42 (Brief for New York). See also Brief for 143 Businesses as *Amici Curiae* 17 (estimating that hiring and training replacements would cost employers $6.3 billion). In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Brief for Regents 6. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year. *Ibid.*

These are certainly [****43] noteworthy concerns, but they are not necessarily dispositive. To the Government and lead dissent's [*32] point, DHS could respond that reliance on forbearance and benefits was unjustified in light of the express limitations in the DACA Memorandum. Or it might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight. And, even if DHS ultimately concludes that the reliance interests rank as serious, they are but one factor to consider. DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance interests. Making that difficult decision was the agency's job, but the agency failed to do it.

DHS has considerable flexibility in carrying out its responsibility. The [***377] wind-down here is a good example of the kind of options available. Acting Secretary Duke authorized DHS to process two-year

renewals for those DACA recipients whose benefits were set to expire within six months. But Duke's consideration was solely for the purpose of assisting the agency in dealing with "administrative complexities." App. to Pet. for Cert. 116a-118a. She should have considered whether she had similar flexibility [****44] in addressing any reliance interests of DACA recipients. The lead dissent contends that accommodating such interests would be "another exercise of unlawful power," *post*, at ___, 207 L. Ed. 2d, at 394 (opinion of Thomas, J.), but the Government does not make that argument and DHS has already extended benefits for purposes other than reliance, following consultation with the Office of the Attorney General. App. to Pet. for Cert. 116a.

Had Duke considered reliance interests, she might, for example, have considered a broader renewal period based on the need for DACA recipients to reorder their affairs. Alternatively, Duke might have considered more accommodating termination dates for recipients caught in the middle of a time-bounded commitment, to allow them to, say, graduate from their course of study, complete their military service, or finish a medical treatment regimen. Or she might have instructed immigration officials to give salient weight to any [*33] reliance interests engendered by DACA when exercising individualized enforcement discretion.

To be clear, DHS was not required to do any of this or to "consider all policy alternatives in reaching [its] decision." [**1915] *State Farm*, 463 U. S., at 51, 103 S. Ct. 2856, 77 L. Ed. 2d 443. [21]Agencies are not compelled to explore "every alternative [****45] device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 551, 98 S. Ct. 1197, 55 L. Ed. 2d 460 (1978). But, because DHS was "not writing on a blank slate," *post*, at ___, n. 14, 207 L. Ed. 2d, at 394 (opinion of Thomas, J.), it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.

The lead dissent sees all the foregoing differently. In its view, DACA is illegal, so any actions under DACA are themselves illegal. Such actions, it argues, must cease immediately and the APA should not be construed to impede that result. See *post*, at ___-___, 207 L. Ed. 2d, at 392-394 (opinion of Thomas, J.).

The dissent is correct that DACA was rescinded because of the Attorney General's illegality determination. See *ante*, at ___, 207 L. Ed. 2d, at 373.

But nothing about that determination foreclosed or even addressed the options of retaining forbearance or accommodating particular reliance interests. Acting Secretary Duke should have considered those matters but did not. That failure was arbitrary and capricious in violation of the APA.

IV

Lastly, we turn to respondents' claim that the rescission violates the equal protection guarantee of the Fifth Amendment.

The parties dispute the proper framing of this claim. The Government [***378] contends [****46] that the allegation that the Executive, motivated by animus, ended a program that disproportionately benefits certain ethnic groups is a selective enforcement claim. Such a claim, the Government asserts, is barred by our decision in *Reno* v. *American-Arab Anti-Discrimination [*34] Committee*. See 525 U. S., at 488, 119 S. Ct. 936, 142 L. Ed. 2d 940 (holding that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation"). Respondents counter that their claim falls outside the scope of that precedent because they are not challenging individual enforcement proceedings. We need not resolve this debate because, even if the claim is cognizable, the allegations here are insufficient.

[22] To plead animus, a plaintiff must raise a plausible inference that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). Possible evidence includes disparate impact on a particular group, "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decisionmaking body." *Id.*, at 266-268, 97 S. Ct. 555, 50 L. Ed. 2d 450. Tracking these factors, respondents allege that animus is evidenced by (1) the disparate impact of the rescission on Latinos from Mexico, who represent [****47] 78% of DACA recipients; (2) the unusual history behind the rescission; and (3) pre- and post-election statements by President Trump. Brief for New York 54-55.

None of these points, either singly or in concert, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. See B. Baker, DHS, Office of Immigration Statistics, Population Estimates,

Illegal Alien Population Residing in the United States: January 2015, Table 2 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/ 18_1214_PLCY_pops-est-report.pdf. [**1916] Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.

Second, there is nothing irregular about the history leading up to the September 2017 rescission. The lower courts concluded that "DACA received reaffirmation by [DHS] as [*35] recently as three months before the rescission," 908 F. 3d, at 519 (quoting 298 F. Supp. 3d, at 1315), referring to the June 2017 DAPA rescission memo, which stated that DACA would "remain in effect," App. 870. But this [****48] reasoning confuses abstention with reaffirmation. The DAPA memo did not address the merits of the DACA policy or its legality. Thus, when the Attorney General later determined that DACA shared DAPA's legal defects, DHS's decision to reevaluate DACA was not a "strange about-face." 908 F. 3d, at 519. It was a natural response to a newly identified problem.

Finally, the cited statements are unilluminating. The relevant actors were most directly Acting Secretary Duke and the Attorney General. As the *Batalla Vidal* court acknowledged, respondents did not "identif[y] statements by [either] that would give rise to an inference of discriminatory [***379] motive." 291 F. Supp. 3d, at 278. Instead, respondents contend that President Trump made critical statements about Latinos that evince discriminatory intent. But, even as interpreted by respondents, these statements—remote in time and made in unrelated contexts—do not qualify as "contemporary statements" probative of the decision at issue. *Arlington Heights*, 429 U. S., at 268, 97 S. Ct. 555, 50 L. Ed. 2d 450. Thus, like respondents' other points, the statements fail to raise a plausible inference that the rescission was motivated by animus.

\* \* \*

We do not decide whether DACA or its rescission are sound policies. "[23] The wisdom" of those decisions "is none of our [****49] concern." *Chenery II*, 332 U. S., at 207, 67 S. Ct. 1575, 91 L. Ed. 1995. We address only whether the agency complied with the procedural requirement that it provide a reasoned explanation for its action. Here the agency failed to consider the conspicuous issues of whether to retain forbearance and what if anything to do about the hardship to DACA recipients. That dual failure raises doubts about whether the agency appreciated the scope of its discretion or

exercised that discretion in a [*36] reasonable manner. The appropriate recourse is therefore to remand to DHS so that it may consider the problem anew.

The judgment in *NAACP*, No. 18-588, is affirmed. [7] The judgment in *Regents*, No. 18-587, is vacated in part and reversed in part. And in *Batalla Vidal*, No. 18-589, the February 13, 2018 order granting respondents' motion for a preliminary injunction is vacated, the November 9, 2017 order partially denying the Government's motion to dismiss is affirmed in part, and the March 29, 2018 order partially denying the balance of the Government's motion to dismiss is reversed in part. All three cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Dissent by:** Sotomayor, J., concurring in part, concurring in the judgment in part, and dissenting in part. Thomas, J., filed an opinion concurring in the judgment in part and dissenting in part, in which Alito and Gorsuch, JJ., joined. Alito, J., and Kavanaugh, J., filed opinions concurring in the judgment in part and dissenting in part

## Dissent

Justice **Sotomayor**, concurring in part, concurring in [****50] the judgment in part, and dissenting in part.

The majority rightly holds that the Department of Homeland Security (DHS) violated the Administrative Procedure Act in rescinding the Deferred Action for Childhood [**1917] Arrivals (DACA) program. But the Court forecloses any challenge to the rescission under the Equal Protection Clause. I believe that determination is unwarranted on the existing record and premature at this stage of the litigation. I would instead permit respondents to develop their equal protection claims on remand.

Respondents' equal protection challenges come to us in a preliminary posture. All that respondents needed to do at this stage of the litigation was state sufficient facts that would "allo[w a] court to draw the reasonable

inference that [a] defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U. S. 662, 678, 129 S. Ct. 1937, [***380] 173 L. Ed. 2d 868 (2009). The three courts to evaluate respondents' pleadings below held that they cleared this modest threshold. 908 F. 3d 476, 518-520 (CA9 2018) (affirming [*37] the District Court's denial of the Government's motion to dismiss); see also *Batalla Vidal* v. *Nielsen*, 291 F. Supp. 3d 260, 274 (EDNY 2018).

I too would permit respondents' claims to proceed on remand. The complaints each set forth particularized facts that plausibly allege discriminatory animus. The plurality disagrees, reasoning that "[n]one of these [****51] points, either singly or in concert, establishes a plausible equal protection claim." *Ante*, at ___, 207 L. Ed. 2d, at 378. But it reaches that conclusion by discounting some allegations altogether and by narrowly viewing the rest.

First, the plurality dismisses the statements that President Trump made both before and after he assumed office. The *Batalla Vidal* complaints catalog then-candidate Trump's declarations that Mexican immigrants are "people that have lots of problems," "the bad ones," and "criminals, drug dealers, [and] rapists." 291 F. Supp. 3d, at 276 (internal quotation marks omitted). The *Regents* complaints additionally quote President Trump's 2017 statement comparing undocumented immigrants to "animals" responsible for "the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, [and] MS13." 298 F. Supp. 3d 1304, 1314 (ND Cal. 2018) (internal quotation marks omitted). The plurality brushes these aside as "unilluminating," "remote in time," and having been "made in unrelated contexts." *Ante*, at ___, 207 L. Ed. 2d, at 379.

But "nothing in our precedent supports [the] blinkered approach" of disregarding any of the campaign statements as remote in time from later-enacted policies. *Trump* v. *Hawaii*, 585 U.S. ___, ___, n. 3, 138 S. Ct. 2392, 2414, 201 L. Ed. 2d 775 (2018) (Sotomayor, J., dissenting). Nor did any of the statements arise in unrelated contexts. [****52] They bear on unlawful migration from Mexico—a keystone of President Trump's campaign and a policy priority of his administration—and, according to respondents, were an animating force behind the rescission of DACA. Cf. *ibid.* (noting that Presidential Proclamation No. 9645, 82 Fed. Reg. 45161 (2017), [*38] which barred entry of individuals from several Muslim-majority countries, was an outgrowth of the President's campaign statements

---

[7] Our affirmance of the *NAACP* order vacating the rescission makes it unnecessary to examine the propriety of the nationwide scope of the injunctions issued by the District Courts in *Regents* and *Batalla Vidal*.

about Muslims). Taken together, "the words of the President" help to "create the strong perception" that the rescission decision was "contaminated by impermissible discriminatory animus." 585 U. S.*, at ___, 138 S. Ct. 2392, 2440, 201 L. Ed. 2d 775 (opinion of Sotomayor, J.). This perception provides respondents with grounds to litigate their equal protection claims further.

Next, the plurality minimizes the disproportionate impact of the rescission decision on Latinos after considering this point in isolation. *Ante*, at ___, 207 L. Ed. 2d, at 378 ("Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection [**1918] grounds"). But the impact of the policy decision must be viewed in the context of the President's public statements on and off the campaign trail. At the motion-to-dismiss stage, I would not so readily dismiss the allegation [****53] that an executive decision disproportionately [***381] harms the same racial group that the President branded as less desirable mere months earlier.

Finally, the plurality finds nothing untoward in the "specific sequence of events leading up to the challenged decision." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 267, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977). I disagree. As late as June 2017, DHS insisted it remained committed to DACA, even while rescinding a related program, the Deferred Action for Parents of Americans and Lawful Permanent Residents. App. 718-720. But a mere three months later, DHS terminated DACA without, as the plurality acknowledges, considering important aspects of the termination. The abrupt change in position plausibly suggests that something other than questions about the legality of DACA motivated the rescission decision. Accordingly, it raises the possibility of a "significant mismatch between the decision . . . made and the rationale . . . provided." *Department of Commerce* v. [*39] *New York*, 588 U. S. ___, ___, 139 S. Ct. 2551, 2575, 204 L. Ed. 2d 978 (2019). Only by bypassing context does the plurality conclude otherwise.

***

The facts in respondents' complaints create more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U. S., at 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868. Whether they ultimately amount to actionable discrimination should be determined only after factual development on remand. [****54] Because the Court prematurely disposes of respondents' equal protection claims by overlooking the strength of their complaints, I join all but Part IV of the opinion and do not concur in

the corresponding part of the judgment.

Justice **Thomas**, with whom Justice **Alito** and Justice **Gorsuch** join, concurring in the judgment in part and dissenting in part.

Between 2001 and 2011, Congress considered over two dozen bills that would have granted lawful status to millions of aliens who were illegally brought to this country as children. Each of those legislative efforts failed. In the wake of this impasse, the Department of Homeland Security (DHS) under President Barack Obama took matters into its own hands. Without any purported delegation of authority from Congress and without undertaking a rulemaking, DHS unilaterally created a program known as Deferred Action for Childhood Arrivals (DACA). The three-page DACA memorandum made it possible for approximately 1.7 million illegal aliens to qualify for temporary lawful presence and certain federal and state benefits. When President Donald Trump took office in 2017, his Acting Secretary of Homeland Security, acting through yet another memorandum, rescinded [****55] the DACA memorandum. To state it plainly, the Trump administration rescinded DACA the same way that the Obama administration created it: unilaterally, and through a mere memorandum.

[*40] Today the majority makes the mystifying determination that this rescission of DACA was unlawful. In reaching that conclusion, the majority acts as though it is engaging in the routine application of standard principles of administrative law. On the contrary, this is anything but a standard administrative law case.

[***382] DHS created DACA during the Obama administration without any statutory authorization and without going through the [**1919] requisite rulemaking process. As a result, the program was unlawful from its inception. The majority does not even attempt to explain why a court has the authority to scrutinize an agency's policy reasons for rescinding an unlawful program under the arbitrary and capricious microscope. The decision to countermand an unlawful agency action is clearly reasonable. So long as the agency's determination of illegality is sound, our review should be at an end.

Today's decision must be recognized for what it is: an effort to avoid a politically controversial but legally correct decision. The [****56] Court could have made clear that the solution respondents seek must come from the Legislative Branch. Instead, the majority has decided to prolong DHS' initial overreach by providing a

591 U.S. 1, *40; 140 S. Ct. 1891, **1919; 207 L. Ed. 2d 353, ***382; 2020 U.S. LEXIS 3254, ****56

stopgap measure of its own. In doing so, it has given the green light for future political battles to be fought in this Court rather than where they rightfully belong—the political branches. Such timidity forsakes the Court's duty to apply the law according to neutral principles, and the ripple effects of the majority's error will be felt throughout our system of self-government.

Perhaps even more unfortunately, the majority's holding creates perverse incentives, particularly for outgoing administrations. Under the auspices of today's decision, administrations can bind their successors by unlawfully adopting significant legal changes through Executive Branch agency memoranda. Even if the agency lacked authority to effectuate the changes, the changes cannot be undone by the same agency in a successor administration unless the successor [*41] provides sufficient policy justifications to the satisfaction of this Court. In other words, the majority erroneously holds that the agency is not only permitted, but required, [****57] to continue administering unlawful programs that it inherited from a previous administration. I respectfully dissent in part. [1]

I

A

In 2012, after more than two dozen attempts by Congress to grant lawful status to aliens who were brought to this country as children, [2] the then-Secretary of Homeland Security Janet Napolitano announced, by memorandum, [***383] a new "prosecutorial discretion" policy known as DACA. App. to Pet. for Cert. in No. 18-587, p. 97a. The memorandum directed immigration enforcement officers not to remove "certain [**1920] young people who were brought to this country as children" [*42] that met delineated criteria. Id., at 97a-98a. In the Secretary's view, the program was consistent with "the framework of the existing law." Id., at 101a.

DACA granted a renewable 2-year period of "deferred action" that made approximately 1.7 million otherwise removable aliens eligible to remain in this country temporarily. [3] By granting deferred action, the memorandum also made recipients eligible for certain state and federal benefits, including Medicare and Social Security. See 8 U. S. C. §§1611(b)(2)-(4); 8 CFR §1.3(a)(4)(vi) (2020); 45 CFR §152.2(4)(vi) (2019). In addition, deferred action enabled the recipients to seek work authorization. 8 U. S. C. §1324a(h)(3)(B); 8 CFR §274a.12(c)(14). Despite these changes, the memorandum contradictorily [****58] claimed that it "confer[red] no substantive right [or] immigration status," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." App. to Pet. for Cert. in No. 18-587, at 101a.

In 2014, then-Secretary of Homeland Security Jeh Johnson broadened the deferred-action program in yet another brief memorandum. This 2014 memorandum expanded DACA eligibility by extending the deferred-action period to three years and by relaxing other criteria. It also implemented a related program, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). DAPA allowed unlawfully present parents to obtain deferred action derivatively through their children who were either citizens or lawful permanent residents. Approximately 4.3 million aliens qualified for DAPA and, as with DACA, these individuals would have become eligible for certain federal and state benefits upon the approval of their DAPA applications. See Texas v. United States, 809 F. 3d 134, 181 (CA5 [*43] 2015). Nevertheless, the 2014 memorandum repeated the incongruous assertion that these programs

---

[1] I concur in the judgment insofar as the majority rejects respondents' equal protection claim.

[2] See Immigrant Children's Educational Advancement and Dropout Prevention Act of 2001, H. R. 1582, 107th Cong., 1st Sess.; Student Adjustment Act of 2001, H. R. 1918, 107th Cong., 1st Sess.; DREAM Act, S. 1291, 107th Cong., 1st Sess. (2001); DREAM Act, S. 1545, 108th Cong., 1st Sess. (2003); Student Adjustment Act of 2003, H. R. 1684, 108th Cong., 1st Sess.; DREAM Act, S. 2863, 108th Cong., 2d Sess., Tit. XVIII (2003); DREAM Act of 2005, S. 2075, 109th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong., 2d Sess., Tit. VI, Subtitle C; American Dream Act, H. R. 5131, 109th Cong., 2d Sess. (2006); DREAM Act of 2007, S. 774, 110th Cong., 1st Sess.; DREAM Act of 2007, S. 2205, 110th Cong., 1st Sess.; STRIVE Act of 2007, H. R. 1645, 110th Cong., 1st Sess., Tit. VI, Subtitle B; Comprehensive Immigration Reform Act of 2007, S. 1348, 110th Cong., 1st Sess., Tit. VI, Subtitle C; DREAM Act of 2009, S. 729, 111th Cong., 1st Sess.; American Dream Act, H. R. 1751, 111th Cong., 1st Sess.; Comprehensive Immigration Reform Act of 2010, S. 3932, 111th Cong., 1st Sess., Tit. V, Subtitle D; DREAM Act of 2010, S. 3827, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3962,

---

111th Cong., 2d Sess.; DREAM Act of 2010, S. 3963, 111th Cong., 2d Sess.; DREAM Act of 2010, S. 3992, 111th Cong., 2d Sess.; DREAM Act of 2010, H. R. 6497, 111th Cong., 2d Sess.; DREAM Act of 2011, S. 952, 112th Cong., 1st Sess.

[3] See J. Passel & M. Lopez, Pew Research Center, Up to 1.7 Million Unauthorized Immigrant Youth May Benefit From New Deportation Rules (Aug. 14, 2012).

"d[id] not confer any form of legal status in this country" and added that deferred action "may be terminated at any time at the agency's [****59] discretion." App. to Pet. for Cert. in No. 18-587, at 104a.

B

Twenty-six States filed suit to enjoin the implementation of these new programs, DAPA and "expanded DACA," maintaining that they violated the Constitution, the Administrative Procedure Act (APA), and the Immigration and Naturalization Act (INA). The States contended that, because the 2014 memorandum allowed aliens to receive deferred action and other benefits, it amounted to a legislative rule that had to comply with the APA's notice and comment procedures. The States also argued that DHS' decision to recategorize an entire class of aliens from "unlawfully present" to "lawfully present" exceeded its statutory authority under [***384] the federal immigration laws. According to the States, these defects rendered the 2014 memorandum arbitrary, capricious, or otherwise not in accordance with law.

The District Court preliminarily enjoined DAPA and expanded DACA. The Fifth Circuit affirmed, rejecting DHS' claim that the programs were an exercise of prosecutorial discretion. *Texas*, 809 F. 3d, at 167, 188. The court concluded that the States were likely to succeed on their claim that the 2014 memorandum was a legislative rule that had to be adopted through notice and comment [****60] rulemaking. [**1921] *Id.*, at 171-178. The court further concluded that the 2014 memorandum was "substantively contrary to law" because the INA did not grant DHS the statutory authority to implement either program. *Id.*, at 170, 178-186.

This Court affirmed the Fifth Circuit's judgment by an equally divided vote. *United States* v. *Texas*, 579 U.S. ___, 136 S. Ct. 2271, 195 L. Ed. 2d 638 (2016) (*per curiam*).

[*44] C

The 2014 memorandum was rescinded on June 15, 2017, before taking effect. Shortly after that rescission, several of the plaintiff States sent a letter to then-Attorney General Jefferson Sessions III. They contended that the 2012 DACA memorandum was also legally defective because, "just like DAPA, DACA unilaterally confers eligibility for . . . lawful presence without any statutory authorization from Congress." App.

873. The States wrote that they would amend their complaint to challenge DACA if the administration did not rescind the 2012 memorandum creating DACA by September 5, 2017.

On September 4, then-Attorney General Sessions wrote to then-Acting Secretary of Homeland Security Elaine Duke, advising her to rescind DACA. Sessions stated that, in his legal opinion, DACA took effect "through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection [****61] of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id.*, at 877. The letter also stated that DACA was infected with the "same legal . . . defects that the courts recognized as to DAPA," *id.*, at 878, and thus DACA would likely be enjoined as well.

Then-Acting Secretary Duke rescinded DACA the next day, also through a memorandum. Her memorandum began by noting that DACA "purported to use deferred action . . . to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." App. to Pet. for Cert. in No. 18-587, at 112a. It described the history of the Fifth Circuit litigation, noting that the court had concluded that DAPA "conflicted with the discretion authorized by Congress" because "the [INA] flatly does not permit the reclassification of millions of illegal aliens as lawfully present." *Id.*, at 114a (internal quotation marks omitted). Finally, the [*45] memorandum accepted then-Attorney General Sessions' legal determination that DACA was unlawful for the same reasons as DAPA. See §1103(a)(1). In light of the legal conclusions reached by the Fifth Circuit [****62] and the Attorney General, then-Acting [***385] Secretary Duke set forth the procedures for winding down DACA.

These three cases soon followed. In each, respondents claimed, among other things, that DACA's rescission was arbitrary and capricious under the APA. Two District Courts granted a preliminary nationwide injunction, while the third vacated the rescission.

II

"'[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.'" *Arlington* v. *FCC*, 569 U. S. 290, 317, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (2013) (Roberts, C. J., dissenting) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U. S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986)). When

an agency exercises power beyond the bounds of its authority, it acts unlawfully. See, *e.g.*, *SAS Institute Inc.* v. *Iancu*, 584 U. S. ___, ___, n., 138 S. Ct. 1348, 1358 n., 200 L. Ed. 2d 695 (2018). The 2012 memorandum [**1922] creating DACA provides a poignant illustration of ultra vires agency action.

DACA alters how the immigration laws apply to a certain class of aliens. "DACA [recipients] primarily entered the country either by overstaying a visa or by entering without inspection, and the INA instructs that aliens in both classes are removable." *Texas* v. *United States*, 328 F. Supp. 3d 662, 713 (SD Tex. 2018) (footnote omitted). But DACA granted its recipients deferred action, *i.e.*, a decision to "decline to institute [removal] proceedings, terminate [removal] proceedings, or decline to institute a final order of [removal]." [****63] *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999) (internal quotation marks omitted). Under other regulations, recipients of deferred action are deemed lawfully present for purposes of certain federal benefits. See *supra*, at ___207 L. Ed. 2d, at 383. Thus, DACA in effect created a new exception to the statutory provisions governing removability [*46] and, in the process, conferred lawful presence on an entire class of aliens.

To lawfully implement such changes, DHS needed a grant of authority from Congress to either reclassify removable DACA recipients as lawfully present, or to exempt the entire class of aliens covered by DACA from statutory removal procedures. No party disputes that the immigration statutes lack an express delegation to accomplish either result. And, an examination of the highly reticulated immigration regime makes clear that DHS has no implicit discretion to create new classes of lawful presence or to grant relief from removal out of whole cloth. Accordingly, DACA is substantively unlawful.

This conclusion should begin and end our review. The decision to rescind an unlawful agency action is *per se* lawful. No additional policy justifications or considerations are necessary. And, the majority's contrary holding—that an agency is not only permitted, but [****64] required, to continue an ultra vires action—has no basis in law.

A

Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions.

[***386] 1

I begin with lawful presence. As just stated, nothing in the federal immigration laws expressly delegates to DHS the unfettered discretion to create new categories of lawfully present aliens. And, there is no basis for concluding that Congress implicitly delegated to DHS the power to reclassify categories of aliens as lawfully present. The immigration statutes provide numerous ways to obtain lawful presence, both temporary and permanent. The highly detailed nature of these provisions indicates that Congress has exhaustively [*47] provided for all of the ways that it thought lawful presence should be obtainable, leaving no discretion to DHS to add new pathways.

For example, federal immigration laws provide over 60 temporary nonimmigrant visa options, including visas for ambassadors, full-time students and their spouses and children, those engaged to marry a United States citizen within 90 days of arrival, athletes and performers, and aliens with specialized [****65] knowledge related to their employers. See §§1101(a)(15)(A)-(V), 1184; 8 CFR §214.1; see also Congressional Research Service, J. Wilson, Nonimmigrant and Immigrant Visa Categories: Data Brief 1-6 (2019) (Table 1). In addition, the statutes permit the Attorney General to grant temporary "parole" into the United States "for urgent humanitarian reasons or [a] significant public benefit," 8 U. S. C. §1182(d)(5)(A); [**1923] provide for temporary protected status when the Attorney General finds that removal to a country with an ongoing armed conflict "would pose a serious threat to [an alien's] personal safety," §1254a(b)(1)(A); and allow the Secretary of Homeland Security (in consultation with the Secretary of State) to waive visa requirements for certain aliens for up to 90 days, §§1187(a)-(d).

The immigration laws are equally complex and detailed when it comes to obtaining lawful permanent residence. Congress has expressly specified numerous avenues for obtaining an immigrant visa, which aliens may then use to become lawful permanent residents. §§1201, 1255(a). Among other categories, immigrant visas are available to specified family-sponsored aliens, aliens with advanced degrees or exceptional abilities, certain types of skilled and unskilled workers, "special immigrants," and those entering the [****66] country to "engag[e] in a new commercial enterprise." §§1153(a)-(b), 1154; see also Congressional Research Service,

Nonimmigrant and Immigrant Visa Categories, at 6-7 (Table 2). Refugees and asylees also may receive lawful [*48] permanent residence under certain conditions, §1159; 8 CFR §§209.1, 209.2. [4] As with temporary lawful presence, each avenue to lawful permanent residence status has its own set of rules and exceptions. [5]

As the Fifth Circuit held in the DAPA litigation, a conclusion with which then-Attorney General Sessions [***387] agreed, "specific and detailed provisions[ of] the INA expressly and carefully provid[e] legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F. 3d, at 179. In light of this elaborate statutory scheme, the lack of any similar provision for DACA recipients convincingly establishes that Congress left DHS with no discretion to create an additional class of aliens eligible for lawful presence. Congress knows well how to provide broad discretion, and it has provided open-ended delegations of authority in statutes too numerous to name. But when it comes to lawful presence, Congress did something strikingly different. Instead of enacting a statute with "broad general directives" and leaving it to the agency to fill in the lion's share of the details, *Mistretta* v. *United States*, 488 U. S. 361, 372, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989), Congress put in place intricate specifications [****67] governing eligibility for lawful presence. This comprehensive scheme indicates that DHS has no discretion to supplement or amend the statutory provisions in any manner, least of all by memorandum. See *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 125, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) (An agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted" (internal quotation [*49] marks omitted)); see also *ETSI Pipeline Project* v. *Missouri*, 484 U. S. 495, 509-510, 108 S. Ct. 805, 98 L. Ed. 2d 898 (1988).

2

The relief that Congress has extended to removable aliens likewise confirms that DACA exceeds DHS' delegated authority. [**1924] Through deferred action, DACA grants temporary relief to removable aliens on a programmatic scale. See *Texas*, 328 F. Supp. 3d, at 714. But as with lawful presence, Congress did not expressly grant DHS the authority to create categorical exceptions to the statute's removal requirements. And again, as with lawful presence, the intricate level of detail in the federal immigration laws regarding relief from removal indicates that DHS has no discretionary authority to supplement that relief with an entirely new programmatic exemption.

At the outset, Congress clearly knows how to provide for classwide deferred action when it wishes to do so. On multiple occasions, Congress has used express language to make certain classes of [****68] individuals eligible for deferred action. See 8 U. S. C. §§1154(a)(1)(D)(i)(II), (IV) (certain individuals covered under the Violence Against Women Act are "eligible for deferred action"); Victims of Trafficking and Violence Protection Act of 2000, 114 Stat. 1522 ("'Any individual described in subclause (I) is eligible for deferred action'"); Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (§USA PATRIOT ACT) of 2001, 423(b), 115 Stat. 361 ("Such spouse, child, son, or daughter may be eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, §§1703(c)(1)(A), (2), 117 Stat. 1694-1695 ("Such spouse or child shall be eligible for deferred [***388] action"). [6] [*50] Congress has failed to provide similar explicit provisions for DACA recipients, and the

---

[4] The immigration statutes also provide for conditional lawful permanent residence status. See §1186a(b)(1)(A)(i) (two years for spouses to demonstrate that the marriage "was [not] entered into for the purpose of procuring an alien's admission as an immigrant"); §1186b (qualifying business entrepreneurs).

[5] For instance, Congress has carved out rules for aliens who served in the Armed Forces, §§1438-1440, and alien spouses who have been subject to domestic abuse, §§1186a(c)(4)(C)-(D).

[6] In the DAPA litigation, DHS noted that some deferred-action programs have been implemented by the Executive Branch without explicit legislation. But "'past practice does not, by itself, create [executive] power.'" *Medellin* v. *Texas*, 552 U.S. 491, 532, 128 S. Ct. 1346, 170 L. Ed. 2d 190 (2008) (quoting *Dames & Moore* v. *Regan*, 453 U. S. 654, 686, 101 S. Ct. 2972, 69 L. Ed. 2d 918 (1981)). If any of these programs had been challenged, it would seem that they would be legally infirm for the same reasons as DACA. Moreover, if DHS had the authority to create new categories of aliens eligible for deferred action, then all of Congress' deferred-action legislation was but a superfluous exercise. *Duncan* v. *Walker*, 533 U. S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001). Finally, whereas some deferred-action programs were followed by legislation, DACA has existed for eight years, and Congress is no closer to a legislative solution than it was in 2012. See, *e.g.*, American Dream and Promise Act of 2019, H. R. 6, 116th Cong., 1st Sess.

immigration laws contain no indication that DHS can, at will, create its own categorical policies for deferred action.

Other provisions pertaining to relief from removal further demonstrate that DHS lacked the delegated authority to create DACA. As with lawful presence, Congress has provided a plethora of methods by which aliens may seek relief from removal. For instance, both permanent and temporary residents can seek cancellation of removal if they meet certain [****69] residency requirements and have not committed certain crimes. §§1229b(a)-(b). And certain nonpermanent residents may have their status adjusted to permanent residence during these proceedings. §1229b(b)(2). Aliens can apply for asylum or withholding of removal during removal proceedings unless they have committed certain crimes. §§1158, 1231(b)(3). Applicants for certain nonimmigrant visas may be granted a stay of removal until the visa application is adjudicated. §1227(d). And, aliens may voluntarily depart rather than be subject to an order of removal. §1229c.

In sum, like lawful presence, Congress has provided for relief from removal in specific and complex ways. This nuanced detail indicates that Congress has provided the full panoply of methods it thinks should be available for an alien to seek relief from removal, leaving no discretion [**1925] [*51] to DHS to provide additional programmatic forms of relief. [7]

3

Finally, DHS could not appeal to general grants of authority, such as the Secretary's ability to "perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter," §1103(a)(3), or to "[e]stablis[h] national immigration enforcement policies and priorities," 6 U. S. C. §202(5). See also 8 U. S. C. §1103(g)(2). Because we must interpret the statutes [****70] "as a symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569, 115 S. Ct. 1061, 131 L. Ed. 2d 1

(1995), these grants of authority must be read alongside the express limits contained within the statute. Basing the Secretary's ability to completely overhaul immigration law on these general grants of authority would eviscerate [***389] that deliberate statutory scheme by "allow[ing the Secretary of DHS] to grant lawful presence . . . to any illegal alien in the United States." *Texas*, 809 F. 3d, at 184. Not only is this "an untenable position in light of the INA's intricate system," *ibid.*, but it would also render many of those provisions wholly superfluous due to DHS' authority to disregard them at will, *Duncan* v. *Walker*, 533 U. S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001). And in addition to these fatal problems, adopting a broad interpretation of these general grants of authority would run afoul of the presumption that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001). And it [*52] would also conflict with the major questions doctrine, which is based on the expectation that Congress speaks clearly when it delegates the power to make "decisions of vast economic and political significance." *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014) (*UARG*) (internal quotation marks omitted); see also *Texas*, 787 F. 3d, at 760-761.

Read together, the detailed [****71] statutory provisions governing temporary and lawful permanent resident status, relief from removal, and classwide deferred-action programs lead ineluctably to the conclusion that DACA is "inconsisten[t] with the design and structure of the statute as a whole." *University of Tex. Southwestern Medical Center* v. *Nassar*, 570 U. S. 338, 353, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). As the District Court stated in the DAPA litigation and as then-Attorney General Sessions agreed, "[i]nstead of merely refusing to enforce the INA's removal laws against an individual, the DHS has enacted a wide-reaching program that awards legal presence . . . to individuals Congress has deemed deportable or removable." *Texas* v. *United States*, 86 F. Supp. 3d 591, 654 (SD Tex. 2015). The immigration statutes contain a level of granular specificity that is exceedingly rare in the modern administrative state. It defies all logic and common sense to conclude that a statutory scheme detailed enough to provide conditional lawful presence to groups as narrowly defined as "alien entrepreneurs," §1186b, is simultaneously capacious enough for DHS to [**1926] grant lawful presence to almost two million illegal aliens with the stroke of a Cabinet secretary's pen.

---

[7] It is uncontested that deferred action frequently occurs on a case-by-case basis, often justified on the grounds that the agency lacks resources to remove all removable aliens. Even assuming that these ad hoc exercises of discretion are permissible, however, we have stated that "[a]n agency confronting resource constraints may change its own conduct, but it cannot change the law." *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 327, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014).

591 U.S. 1, *52; 140 S. Ct. 1891, **1926; 207 L. Ed. 2d 353, ***389; 2020 U.S. LEXIS 3254, ****71

B

Then-Attorney General Sessions concluded that the initial DACA program suffered from the "same legal . . . defects" as DAPA and expanded DACA, finding [****72] that, like those programs, DACA was implemented without statutory authority. App. 877-878. Not only was this determination correct, but [*53] it is also dispositive for purposes of our review. "It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress." *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988). DHS had no authority here to create DACA, and the unlawfulness of that program is a sufficient justification for its rescission.

The majority opts for a different path, all but ignoring DACA's substantive legal defect. See *ante*, at [***390] ___-___, 207 L. Ed. 2d, at 372-373. On the majority's understanding of APA review, DHS was required to provide additional policy justifications in order to rescind an action that it had no authority to take. This rule "has no basis in our jurisprudence, and support for [it] is conspicuously absent from the Court's opinion." *Massachusetts* v. *EPA*, 549 U. S. 497, 536, 127 S. Ct. 1438, 167 L. Ed. 2d 248 (2007) (Roberts, C. J., dissenting).

The lack of support for the majority's position is hardly surprising in light of our Constitution's separation of powers. No court can compel Executive Branch officials to exceed their congressionally delegated powers by continuing a program that was void *ab initio*. Cf. *Clinton* v. *City of New York*, 524 U. S. 417, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998); *INS* v. *Chadha*, 462 U. S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983); see also *EPA* v. *EME Homer City Generation, L. P.*, 572 U. S. 489, 542, n. 5, 134 S. Ct. 1584, 188 L. Ed. 2d 775 (2014) (Scalia, J., dissenting); *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 487, 109 S. Ct. 2558, 105 L. Ed. 2d 377 (1989) (Kennedy, J., concurring in judgment). [****73] In reviewing agency action, our role is to ensure that Executive Branch officials do not transgress the proper bounds of their authority, *Arlington*, 569 U. S., at 327, 133 S. Ct. 1863, 185 L. Ed. 2d 941 (Roberts, C. J., dissenting), not to perpetuate a decision to unlawfully wield power in direct contravention of the enabling statute's clear limits, see *UARG*, 573 U. S., at 327-328, 134 S. Ct. 2427, 189 L. Ed. 2d 372; *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 462, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002).

Under our precedents, DHS can only exercise the authority that Congress has chosen to delegate to it. See *UARG*, 573 U. S., at 327, 134 S. Ct. 2427, 189 L. Ed. 2d 372. In implementing DACA, DHS under the [*54] Obama administration arrogated to itself power it was not given by Congress. Thus, every action taken by DHS under DACA is the unlawful exercise of power. Now, under the Trump administration, DHS has provided the most compelling reason to rescind DACA: The program was unlawful and would force DHS to continue acting unlawfully if it carried the program forward.

III

The majority's demanding review of DHS' decisionmaking process is especially perverse given that the 2012 memorandum flouted the APA's procedural requirements—the very requirements designed to prevent arbitrary decisionmaking. Even if DHS were authorized to create DACA, it could not do so without undertaking an administrative rulemaking. The fact that DHS did not engage in this process likely [****74] provides an independent basis for rescinding DACA. But at the very least, this procedural [**1927] defect compounds the absurdity of the majority's position in these cases.

As described above, DACA fundamentally altered the immigration laws. It created a new category of aliens who, as a class, became exempt from statutory removal procedures, [***391] and it gave those aliens temporary lawful presence. Both changes contravened statutory limits. DACA is thus what is commonly called a substantive or legislative rule. [8] As the name implies, our precedents state that legislative rules are those that "have the force and effect of law." *Chrysler Corp.* v. *Brown*, 441 U. S. 281, 295, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979) (internal quotation marks omitted).

Our precedents allow the vast majority of legislative rules to proceed through so-called "informal" notice and comment rulemaking. See *United States* v. *Florida East Coast R.* [*55] *Co.*, 410 U. S. 224, 237-238, 93 S. Ct. 810, 35 L. Ed. 2d 223 (1973). [9] But under our

---

[8] The majority tacitly acknowledges as much, as it must. See *ante*, at ___-___, 207 L. Ed. 2d, at 368. Otherwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would make its rescission unreviewable. See *Heckler* v. *Chaney*, 470 U. S. 821, 831, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985).

[9] As I have previously pointed out, "the APA actually contemplated a much more formal process for most

precedents, an agency must engage in certain procedures mandated by the APA before its rule carries legal force. *Kisor* v. *Wilkie*, 588 U.S. ___, ___, 139 S. Ct. 2400, 2407, 204 L. Ed. 2d 841 (2019) (plurality opinion) ("[A] legislative rule, . . . to be valid[,] must go through notice and comment"); *id.*, at ___, 139 S. Ct. 2400, 2424, 204 L. Ed. 2d 841 (Gorsuch, J., concurring in judgment) (same); *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 96, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015); cf. *Azar* v. *Allina Health Services*, 587 U. S. ___, ___, 139 S. Ct. 1804, 1806 204 L. Ed. 2d 139 (2019)) (same with respect to materially identical procedures under the Medicare Act). These procedures specify [****75] that the agency "shall" publish a notice of proposed rulemaking in the Federal Register, justify the rule by reference to legal authority, describe "the subjects and issues involved" in the rule, and allow interested parties to submit comments. 5 U. S. C. §§553(b)-(c); see also *Kisor*, 588 U. S., at ___, 139 S. Ct. 2400, 2418, 204 L. Ed. 2d 841 (opinion of Gorsuch, J.). As we have recognized recently, use of the word "shall" indicates that these procedures impose mandatory obligations on the agency before it can adopt a valid binding regulation. See *Maine Community Health Options* v. *United States*, 590 U. S. ___, ___, 140 S. Ct. 1308, 1327, 206 L. Ed. 2d 764 (2020). After undergoing notice and comment, the agency then publishes the final rule, which must "articulate a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States*, *Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (internal quotation marks omitted). Only after completing this process is the legislative rule a valid law. See *Kisor*, 588 U. S., at ___, 139 S. Ct. 2400, 2432, 204 L. Ed. 2d 841 (opinion of Gorsuch, J.). [10]

 [*56] Because DACA has the force and effect of law, DHS was required to observe the [**1928] procedures set out in the APA if it wanted to promulgate a [***392] legislative rule. It is undisputed, however, that DHS did not do so. It provided no opportunity for interested

---

rulemaking." *Perez* v. *Mortg. Bankers Ass'n*, 575 U.S. 92, 128, n. 5, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015) (opinion concurring in judgment).

[10] The APA also provides certain exceptions from notice and comment rulemaking. For example, an agency may promulgate a legally binding rule without notice and comment if good cause exists to do so. 5 U. S. C. §553(b)(B). This text would become a nullity if the agency could achieve the same effect by simply dispensing with notice and comment procedures altogether.

parties to submit comments regarding the effect that the program's dramatic and very significant change in immigration [****76] law would have on various aspects of society. It provided no discussion of economic considerations or national security interests. Nor did it provide any substantial policy justifications for treating young people brought to this country differently from other classes of aliens who have lived in the country without incident for many years. And, it did not invoke any law authorizing DHS to create such a program beyond its inexplicable assertion that DACA was consistent with existing law. Because DHS failed to engage in the statutorily mandated process, DACA never gained status as a legally binding regulation that could impose duties or obligations on third parties. See *id.*, at ___, 139 S. Ct. 2400, 2432, 204 L. Ed. 2d 841 (plurality opinion); *id.*, at ___, 139 S. Ct. 2400, 2432, 204 L. Ed. 2d 841 (opinion of Gorsuch, J.).

Given this state of affairs, it is unclear to me why DHS needed to provide any explanation whatsoever when it decided to rescind DACA. Nothing in the APA suggests that DHS was required to spill *any* ink justifying the rescission of an invalid legislative rule, let alone that it was required to provide policy justifications beyond acknowledging that the program was simply unlawful from the beginning. And, it is well established that we do not remand [****77] for an agency to correct its reasoning when it was required by law to take or abstain from an action. See *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 544-545, 128 S. Ct. 2733, 171 L. Ed. 2d 607 (2008). Here, remand would be futile, because no amount of policy explanation could cure the fact that DHS lacked statutory authority to enact DACA in the first place.

 [*57] Instead of recognizing this, the majority now requires the rescinding Department to treat the invalid rule as though it were legitimate. As just explained, such a requirement is not supported by the APA. [11] It is also absurd, as evidenced by its application to DACA in these cases. The majority insists that DHS was obligated to discuss its choices regarding benefits and forbearance in great detail, even though no such detailed discussion accompanied DACA's issuance. And, the majority also requires DHS to discuss reliance

---

[11] Thus, it is not that the APA "*should* not" be construed to support the majority's result, *ante*, at ___, 207 L. Ed. 2d, at 377 (emphasis added), it is that the APA does not and *cannot* support that result.

interests at length, even though deferred action traditionally does not take reliance interests into account and DHS was not forced to explain its treatment of reliance interests in the first instance by going through notice and comment. See *infra*, at ___-___, 207 L. Ed. 2d, at 394-395. The majority's demand for such an explanation here simply makes little sense.

At bottom, of course, [****78] none of this matters, because DHS *did* provide a sufficient explanation for its action. DHS' statement that DACA was ultra vires was more than sufficient to justify [***393] its rescission. [12] By requiring more, the majority has distorted the APA review process beyond recognition, further burdening all future attempts to rescind unlawful programs. Plaintiffs frequently bring successful challenges to agency actions by arguing that the agency has impermissibly dressed up a legislative rule as a policy statement and must comply [**1929] with the relevant procedures before functionally binding regulated parties. See, *e.g.*, *Mendoza* v. *Perez*, 754 F. 3d 1002, 410 U.S. App. D.C. 210 (CADC 2014); *NRDC* v. *EPA*, 643 F.3d 311, 395 U.S. App. D.C. 397 (CADC 2011); *National Family Planning & Reproductive Health Assn., Inc.* v. *Sullivan*, 979 F.2d 227, 298 U.S. App. D.C. 288 (CADC 1992). But going forward, [*58] when a rescinding agency inherits an invalid legislative rule that ignored virtually every rulemaking requirement of the APA, it will be obliged to overlook that reality. Instead of simply terminating the program because it did not go through the requisite process, the agency will be compelled to treat an invalid legislative rule as though it were legitimate. [13]

IV

─────────────────

[12] I express no view on what other reasons would justify an agency's decision to rescind a procedurally unlawful action. I merely point out that correctly concluding that the program was illegal is sufficient.

[13] In my view, even if DACA were permitted under the federal immigration laws and had complied with the APA, it would still violate the Constitution as an impermissible delegation of legislative power. See *DOT* v. *Ass'n of Am. R.R.*, 575 U.S. 43, 77, 135 S. Ct. 1225, 191 L. Ed. 2d 153 (2015) (Thomas, J., concurring in judgment). Putting aside this constitutional concern, however, the notice and comment process at least attempts to provide a "surrogate political process" that takes some of the sting out of the inherently undemocratic and unaccountable rulemaking process. Asimow, Interim-Final Rules: Making Haste Slowly, 51 Admin. L. Rev. 703, 708 (1999).

Even if I were to accept the majority's premise that DACA's rescission required additional policy justifications, the majority's reasons for setting aside the agency's decision still fail.

A

First, the majority [****79] claims that the Fifth Circuit discussed only the legality of the 2014 memorandum's conferral of benefits, not its "forbearance component"— *i.e.*, the decision not to place DACA recipients into removal proceedings. *Ante*, at ___, 207 L. Ed. 2d, at 373. The majority, therefore, claims that, notwithstanding the then-Attorney General's legal conclusion, then-Acting Secretary Duke was required to consider revoking DACA recipients' lawful presence and other attendant benefits while continuing to defer their removal. *Ante*, at ___-___, 207 L. Ed. 2d, at 374-376. Even assuming the majority correctly characterizes the Fifth Circuit's opinion, it cites no authority for the proposition that arbitrary and capricious review *requires* an agency to dissect an unlawful program piece by piece, scrutinizing [*59] each separate element to determine whether it would independently violate the law, rather than just to rescind the entire program. [14]

[**1930] The then-Attorney General reviewed [***394] the thorough decisions of the District Court and the Fifth

─────────────────

[14] The majority's interpretation of the Fifth Circuit's opinion is highly questionable. Because a grant of deferred action renders DACA recipients eligible for certain benefits and work authorization, it is far from clear that the Department could separate DACA's "forbearance component" from the major benefits it conferred without running into yet another APA problem. The majority points to the fact that, under the Patient Protection and Affordable Care Act of 2010, relevant regulations exclude those receiving deferred action through DACA from coverage. *Ante*, at ___, n. 5, 207 L. Ed. 2d, at 373. But that misses the point. Those regulations were promulgated before "anyone with deferred action under the DACA process applie[d]" for those benefits. See 77 Fed. Reg. 52616 (2012). By contrast, DACA recipients have been eligible for and have received Medicare, Social Security, and work authorization for years. DHS therefore is not writing on a blank slate. Under the majority's rule, DHS would need to amend all relevant regulations and explain why *all* recipients of deferred action who have previously received such benefits may no longer receive them. Alternatively and perhaps more problematically, it would need to provide a reason why other recipients of deferred action should continue to qualify, while DACA recipients should not. It thus seems highly likely that the majority's proposed course of action would be subject to serious arbitrary and capricious challenges.

591 U.S. 1, *59; 140 S. Ct. 1891, **1930; 207 L. Ed. 2d 353, ***394; 2020 U.S. LEXIS 3254, ****79

Circuit. Those courts exhaustively examined the INA's text and structure, the relevant provisions of other federal immigration statutes, the historical practice of deferred action, and the general grants of statutory authority [****80] to set immigration policy. Both decisions concluded that DAPA and expanded DACA violated the carefully crafted federal immigration scheme, that such violations could not be justified through reference to past exercises of deferred action, and that the general grants of statutory authority did not give DHS the power to enact such a sweeping nonenforcement program. Based on the reasoning of those decisions, then-Attorney General Sessions concluded that DACA was likewise implemented without [*60] statutory authority. He directed DHS to restore the rule of law. DHS followed the then-Attorney General's legal analysis and rescinded the program. This legal conclusion more than suffices to supply the "reasoned analysis" necessary to rescind an unlawful program. *State Farm*, 463 U. S., at 42, 103 S. Ct. 2856, 77 L. Ed. 2d 443.

The majority has no answer except to suggest that this approach is inconsistent with *State Farm*. See *ante*, at ___-___, 207 L. Ed. 2d, at 374-375. But in doing so, the majority ignores the fact that, unlike the typical "prior policy" contemplated by the Court in *State Farm*, DACA is unlawful. Neither *State Farm* nor any other decision cited by the majority addresses what an agency must do when it has inherited an unlawful program. It is perhaps for this reason that, rather [****81] than responding with authority of its own, the majority simply opts to excise the "unlawful policy" aspect from its discussion.

B

Second, the majority claims that DHS erred by failing to take into account the reliance interests of DACA recipients. *Ante*, at ___-___, 207 L. Ed. 2d, at 375-377. But reliance interests are irrelevant when assessing whether to rescind an action that the agency lacked statutory authority to take. No amount of reliance could ever justify continuing a program that allows DHS to wield power that neither Congress nor the Constitution gave it. Any such decision would be "not in accordance with law" or "in excess of statutory . . . authority." 5 U. S. C. §§706(2)(A), (C). Accordingly, DHS would simply be engaging in yet another exercise of unlawful power if it used reliance interests to justify continuing the initially [***395] unlawful program, and a court would be obligated to set aside that action. [15]

_____

[15] The majority contends that this argument does not carry

[*61] Even if reliance interests were sometimes relevant when rescinding an ultra vires action, the rescission still would not be arbitrary and capricious here. Rather, as the majority does not dispute, the rescission is consistent with how deferred action has always worked. As a general matter, deferred action creates no rights—it exists [****82] at the Government's discretion and can be revoked at any time. See App. to Pet. for Cert. in No. 18-587, at 104a (DACA and expanded DACA); 8 CFR §214.11(j)(3) (T visas); §214.14(d)(2) (U visas); 62 Fed. Reg. 63249, 63253 (1997) (discussing Exec. Order No. 12711 for certain citizens of the People's Republic of China). The Government has made clear time and again that, because "deferred action is not an immigration status, no alien has the right to deferred action. It is [**1931] used solely in the discretion of the [Government] and confers no protection or benefit upon an alien." DHS Immigration and Customs Enforcement Office of Detention and Removal, Detention and Deportation Officers' Field Manual §20.8 (Mar. 27, 2006); see also Memorandum from D. Meissner, Comm'r, INS, to Regional Directors et al., pp. 11-12 (Nov. 17, 2000); Memorandum from W. Yates, Assoc. Director of Operations, DHS, Citizenship and Immigration Servs., to Director, Vt. Serv. Center, p. 5 (2003). Thus, contrary to the majority's unsupported assertion, *ante*, at ___, 207 L. Ed. 2d, at 375, this longstanding administrative treatment of deferred action provides strong evidence and authority for the proposition that an agency need not consider reliance interests in this context. [16]

[*62] Finally, it is inconceivable to require DHS to study reliance [****83] interests before rescinding DACA considering how the program was previously defended. DHS has made clear since DACA's inception that it would not consider such reliance interests.

_____

force because the rescission implemented a winddown period during which recipients would continue to receive benefits. But whether DHS' decision to wind down DACA was lawful is a separate question from whether DHS was required to consider reliance interests before discontinuing an unlawful program.

[16] The majority's approach will make it far more difficult to change deferred-action programs going forward, which is hardly in keeping with this Court's own understanding that deferred action is an "exercise in administrative discretion" used for administrative "convenience." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 484, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999). Agencies will likely be less willing to grant deferred action knowing that any attempts to undo it will require years of litigation and time-consuming rulemakings.

Contemporaneous with the DACA memo, DHS stated that "DHS can terminate or renew deferred action at any time at the agency's discretion." Consideration of Deferred Action for Childhood Arrivals Process, 89 Interpreter Releases 1557, App. 4, p. 2 (Aug. 20, 2012). In fact, DHS repeatedly argued in court that the 2014 memorandum was a valid exercise of prosecutorial discretion in part *because* deferred action created no rights on which recipients could rely. Before the Fifth Circuit, DHS stated that "DHS may revoke or terminate deferred action and begin removal proceedings at any time at its discretion." Brief for Appellants in *Texas* v. *United States*, No. 15-40238, p. 7; see also *id.*, at 45-46. And before this Court, in that same litigation, DHS reiterated that "DHS has absolute discretion to revoke deferred [***396] action unilaterally, without notice or process." Brief for United States in *United States* v. *Texas*, O. T. 2015, No. 15-674, p. 5; see also *id.*, at 37. If that treatment of reliance interests was incorrect, it provides yet one more [****84] example of a deficiency in DACA's issuance, not its rescission.

***

President Trump's Acting Secretary of Homeland Security inherited a program created by President Obama's Secretary that was implemented without statutory authority and without following the APA's required procedures. Then-Attorney General Sessions correctly concluded that this ultra vires program should be rescinded. These cases could—and should—have ended with a determination that his legal conclusion was correct.

Instead, the majority today concludes that DHS was required to do far more. Without grounding its position in either the APA or precedent, the majority declares that DHS [*63] was required to overlook DACA's obvious legal deficiencies and provide additional policy reasons and justifications before restoring the rule of law. This holding is incorrect, and it will hamstring all future agency attempts to undo actions that exceed statutory authority. I would therefore reverse the judgments below and remand with instructions to dissolve the nationwide injunctions.

[**1932] Justice **Alito**, concurring in the judgment in part and dissenting in part.

Anyone interested in the role that the Federal Judiciary now plays in our constitutional [****85] system should consider what has happened in these cases. Early in the term of the current President, his administration took the controversial step of attempting to rescind the Deferred Action for Childhood Arrivals (DACA) program. Shortly thereafter, one of the nearly 700 federal district court judges blocked this rescission, and since then, this issue has been mired in litigation. In November 2018, the Solicitor General filed petitions for certiorari, and today, the Court still does not resolve the question of DACA's rescission. Instead, it tells the Department of Homeland Security to go back and try again. What this means is that the Federal Judiciary, without holding that DACA cannot be rescinded, has prevented that from occurring during an entire Presidential term. Our constitutional system is not supposed to work that way.

I join Justice Thomas's opinion. DACA presents a delicate political issue, but that is not our business. As Justice Thomas explains, DACA was unlawful from the start, and that alone is sufficient to justify its termination. But even if DACA were lawful, we would still have no basis for overturning its rescission. First, to the extent DACA represented a lawful [****86] exercise of prosecutorial discretion, its rescission represented an exercise of that same discretion, and it would therefore be unreviewable under the Administrative Procedure Act. 5 U. S. C. §701(a)(2); see *Heckler* v. *Chaney*, [*64] 470 U. S. 821, 831-832, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985). Second, to the extent we could review the rescission, it was not arbitrary and capricious for essentially the reasons explained by Justice Kavanaugh. See *post*, at ___-___, 207 L. Ed. 2d, [***397] at 398-400 (opinion concurring in the judgment in part and dissenting in part).

Justice **Kavanaugh**, concurring in the judgment in part and dissenting in part.

For the last 20 years, the country has engaged in consequential policy, religious, and moral debates about the legal status of millions of young immigrants who, as children, were brought to the United States and have lived here ever since. Those young immigrants do not have legal status in the United States under current statutory law. They live, go to school, and work here with uncertainty about their futures. Despite many attempts over the last two decades, Congress has not yet enacted legislation to afford legal status to those immigrants.

In 2012, exercising its view of the Executive's prosecutorial discretion under Article II and the immigration laws, President Obama's administration unilaterally [****87] instituted a program known as Deferred Action for Childhood Arrivals, or DACA. Under DACA, eligible young immigrants may apply for and

591 U.S. 1, *64; 140 S. Ct. 1891, **1932; 207 L. Ed. 2d 353, ***397; 2020 U.S. LEXIS 3254, ****87

receive deferred action. They must renew their DACA status every two years. Under the program, the Executive Branch broadly forbears from enforcing certain immigration removal laws against DACA recipients. And by virtue of the forbearance, DACA recipients also become eligible for work authorization and other benefits.

Since 2017, President Trump's administration has sought to rescind DACA based on its different and narrower understanding of the Executive's prosecutorial discretion under Article II and the immigration laws. In its view, the Executive Branch legally may not, and as a policy matter should not, *unilaterally* forbear from enforcing the immigration laws against such a large class of individuals. The current [*65] administration [**1933] has stated that it instead wants to work with Congress to enact comprehensive legislation that would address the legal status of those immigrants together with other significant immigration issues.

The question before the Court is whether the Executive Branch acted lawfully in ordering rescission of the ongoing DACA program. [****88] To begin with, all nine Members of the Court accept, as do the DACA plaintiffs themselves, that the Executive Branch possesses the legal authority to rescind DACA and to resume pre-DACA enforcement of the immigration laws enacted by Congress. Having previously adopted a policy of prosecutorial discretion and nonenforcement with respect to a particular class of offenses or individuals, the Executive Branch has the legal authority to rescind such a policy and resume enforcing the law enacted by Congress. The Executive Branch's exercise of that rescission authority is subject to constitutional constraints and may also be subject to statutory constraints. The narrow legal dispute here concerns a statutory constraint—namely, whether the Executive Branch's action to rescind DACA satisfied the general arbitrary-and-capricious standard of the Administrative Procedure Act, or APA.

The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. As the Court has long stated, judicial review under that standard is [***398] deferential to the agency. The Court may not substitute its policy judgment for that of the agency. The Court simply ensures that the agency [****89] has acted within a broad zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision. See *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 129 S. Ct.

1800, 173 L. Ed. 2d 738 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

The Executive Branch explained its decision to rescind DACA in two sequential memorandums by successive Secretaries of Homeland Security: the 2017 Duke Memorandum [*66] and the 2018 Nielsen Memorandum. The Duke Memorandum focused on DACA's perceived legal flaws. The Court today finds the Duke Memorandum insufficient under the APA's arbitrary-and-capricious standard.

But regardless of whether the Court is correct about the Duke Memorandum, the Nielsen Memorandum more fully explained the Department's legal reasons for rescinding DACA, and clarified that even if DACA were lawful, the Department would still rescind DACA for a variety of policy reasons. The Nielsen Memorandum also expressly addressed the reliance interests of DACA recipients. The question under the APA's deferential arbitrary-and-capricious standard is not whether we agree with the Department's decision to rescind DACA. The question is whether the Nielsen Memorandum reasonably explained the decision to rescind DACA. Under ordinary application of the arbitrary-and-capricious [****90] standard, the Nielsen Memorandum—with its alternative and independent rationales and its discussion of reliance—would pass muster as an explanation for the Executive Branch's action.

The Nielsen Memorandum was issued nine months after the Duke Memorandum. Under the Administrative Procedure Act, the Nielsen Memorandum is itself a "rule" setting forth "an agency statement of general . . . applicability and future effect designed to implement . . . policy." 5 U. S. C. §551(4). Because it is a rule, the Nielsen Memorandum constitutes "agency action." §551(13). As the Secretary of Homeland [**1934] Security, Secretary Nielsen had the authority to decide whether to stick with Secretary Duke's decision to rescind DACA, or to make a different decision. Like Secretary Duke, Secretary Nielsen chose to rescind DACA, and she provided additional explanation. Her memorandum was akin to common forms of agency action that follow earlier agency action on the same subject—for example, a supplemental or new agency statement of policy, or an agency order with respect to a motion for rehearing or reconsideration. [*67] Courts often consider an agency's additional explanations of policy or additional explanations made, for example, on agency rehearing [****91] or reconsideration, or on

591 U.S. 1, *67; 140 S. Ct. 1891, **1934; 207 L. Ed. 2d 353, ***398; 2020 U.S. LEXIS 3254, ****91

remand from a court, even if the agency's bottom-line decision itself does not change.

Yet the Court today jettisons the Nielsen Memorandum by classifying it as a *post hoc* justification for rescinding DACA. *Ante*, at ___-___, 207 L. Ed. 2d, at 370-371. Under our precedents, however, the *post hoc* justification doctrine merely requires that courts assess agency action based on the official explanations of the agency decisionmakers, and not [***399] based on after-the-fact explanations advanced *by agency lawyers during litigation* (or by judges). See, *e.g.*, *State Farm*, 463 U. S., at 50, 103 S. Ct. 2856, 77 L. Ed. 2d 443 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"); *FPC* v. *Texaco Inc.*, 417 U. S. 380, 397, 94 S. Ct. 2315, 41 L. Ed. 2d 141 (1974) (same); *NLRB* v. *Metropolitan Life Ins. Co.*, 380 U. S. 438, 443-444, 85 S. Ct. 1061, 13 L. Ed. 2d 951 (1965) (same); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168-169, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962) (same). As the D. C. Circuit has explained, the *post hoc* justification doctrine "is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers." *Alpharma, Inc.* v. *Leavitt*, 460 F. 3d 1, 6, 373 U.S. App. D.C. 65 (2006) (Garland, J.) (internal quotation marks omitted).

Indeed, the ordinary judicial remedy for an agency's insufficient explanation [****92] is to remand for further explanation by the relevant agency personnel. It would make little sense for a court to exclude official explanations by agency personnel such as a Cabinet Secretary simply because the explanations are purportedly *post hoc*, and then to turn around and remand for further explanation by those same agency personnel. Yet that is the upshot of the court's application of the *post hoc* justification doctrine today. The Court's refusal [*68] to look at the Nielsen Memorandum seems particularly mistaken, moreover, because the Nielsen Memorandum shows that the Department, back in 2018, considered the policy issues that the Court today says the Department did not consider. *Ante*, at ___-___, 207 L. Ed. 2d, at 373-377.

To be sure, cases such as *Overton Park* and *Camp* v. *Pitts* suggest that courts reviewing certain agency *adjudications* may in some circumstances decline to examine an after-the-fact agency explanation. See

*Camp* v. *Pitts*, 411 U. S. 138, 142-143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (*per curiam*); *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 419-421, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971). But agency adjudications are "concerned with the determination of past and present rights and liabilities," Attorney General's Manual on the Administrative Procedure Act 14 (1947), and implicate the due process interests of the individual parties to the adjudication. Judicial [****93] review of an adjudication therefore ordinarily focuses on what happened during the agency's adjudication [**1935] process of deciding that individual case.

Even if certain agency adjudications have a slightly more stringent restriction on *post hoc* explanations, the APA is "based upon a dichotomy between rule making and adjudication," *ibid.*, and this case involves an ongoing agency rule that has future effect—the rescission of DACA. The Nielsen Memorandum implements and explains the rescission of DACA. I am aware of no case from this Court, and the Court today cites none, that has employed the *post hoc* justification doctrine to exclude an agency's official explanation of an agency rule. For purposes of arbitrary-and-capricious review, it does not matter whether the latest official explanation [***400] was two years ago or three years ago. What matters is whether the explanation was reasonable and followed the requisite procedures. In my view, the Court should consider the Nielsen Memorandum in deciding whether the Department's rescission of DACA satisfies the APA's arbitrary-and-capricious standard.

 [*69] Because the Court excludes the Nielsen Memorandum, the Court sends the case back to the Department of Homeland [****94] Security for further explanation. Although I disagree with the Court's decision to remand, the only practical consequence of the Court's decision to remand appears to be some delay. The Court's decision seems to allow the Department on remand to relabel and reiterate the substance of the Nielsen Memorandum, perhaps with some elaboration as suggested in the Court's opinion. *Ante*, at ___-___, 207 L. Ed. 2d, at 375-377. [*]

―――――――――――――――――

[*] Because I conclude that the Executive Branch satisfied the APA's arbitrary-and-capricious standard, I need not consider whether its prosecutorial enforcement policy was "committed to agency discretion by law" and therefore not subject to APA arbitrary-and-capricious review in the first place. 5 U. S. C. §701(a)(2). Several judges have advanced arguments suggesting that DACA—at least to the extent it was simply an

***

The Court's resolution of this narrow APA issue of course cannot eliminate the broader uncertainty over the status of the DACA recipients. That uncertainty is a result of Congress's inability thus far to agree on legislation, which in turn has forced successive administrations to improvise, thereby triggering many rounds of relentless litigation with the prospect [*70] of more litigation to come. In contrast to those necessarily short-lived and stopgap administrative measures, the Article I legislative process could produce a sturdy and enduring solution to this issue, one way or the other, and thereby remove the uncertainty that has persisted for years for these young immigrants and the Nation's immigration system. In the meantime, as to the narrow APA question presented here, I appreciate the Court's [****95] careful analysis, [**1936] but I ultimately disagree with its treatment of the Nielsen Memorandum. I therefore respectfully dissent from the Court's judgment on plaintiffs' APA claim, and I concur in the judgment insofar as the Court rejects plaintiffs' equal protection claim.

## References

5 U.S.C.S. § 706(2)(A)

6 Immigration Law and Procedure § 72.03 (Matthew Bender)

L Ed Digest, Aliens §§25.5, 36.3

L Ed Index, Deportation or Exclusion of Aliens

---

exercise of forbearance authority—and the repeal of DACA are decisions about whether and to what extent to exercise prosecutorial discretion against a class of offenses or individuals, and are therefore unreviewable under the APA as "committed to agency discretion by law." *Ibid.*; see *Casa De Maryland* v. *United States Dept. of Homeland Security*, 924 F. 3d 684, 709–715 (CA4 2019) (Richardson, J., concurring in part and dissenting in part); *Regents of the Univ. of Cal.* v. *United States Dep't of Homeland Sec.*, 908 F.3d 476, 521-523 (CA9 2018) (Owens, J., concurring in judgment); see also *Texas* v. *United States*, 809 F. 3d 134, 196–202 (CA5 2015) (King, J., dissenting); *Texas* v. *United States*, 787 F. 3d 733, 770-776 (CA5 2015) (Higginson, J., dissenting); cf. *Heckler* v. *Chaney*, 470 U. S. 821, 831–835, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985); *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 277–284, 107 S. Ct. 2360, 96 L. Ed. 2d 222 (1987); *United States* v. *Nixon*, 418 U. S. 683, 693, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *In re Aiken County*, 725 F. 3d 255, 262–264, 406 U.S. App. D.C. 382 (CADC 2013).

Procedural due process requirements in proceedings to exclude or deport aliens--Supreme Court cases. 74 L. Ed. 2d 1066.

---

**End of Document**