# Hein v. Freedom from Religion Found., Inc.

Supreme Court of the United States

February 28, 2007, Argued ; June 25, 2007, Decided

No. 06-157

**Reporter**

551 U.S. 587 *; 127 S. Ct. 2553 **; 168 L. Ed. 2d 424 ***; 2007 U.S. LEXIS 8512 ****; 75 U.S.L.W. 4560; 44 A.L.R. Fed. 2d 637; 20 Fla. L. Weekly Fed. S 418

JAY F. HEIN, WHITE HOUSE OFFICE OF FAITH-BASED AND COMMUNITY INITIATIVES, et al., Petitioners v. FREEDOM FROM RELIGION FOUNDATION, INC., et al.

**Subsequent History:** [****1] On remand at Freedom from Religion Found. v. Chao, 250 Fed. Appx. 751, 2007 U.S. App. LEXIS 24319 (7th Cir. Wis., Oct. 15, 2007)

**Prior History:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

Freedom from Religion Found., Inc. v. Chao, 433 F.3d 989, 2006 U.S. App. LEXIS 811 (7th Cir. Wis., 2006)

**Disposition:** Reversed.

## Syllabus

[***430] The President, by executive orders, created a White House office and several centers within federal agencies to ensure that faith-based community groups are eligible to compete for federal financial support. No congressional legislation specifically authorized these entities, which were created entirely within the Executive Branch, nor has Congress enacted any law specifically appropriating money to their activities, which are funded through general Executive Branch appropriations. Respondents, an organization opposed to Government endorsement of religion and three of its members, brought this suit alleging that petitioners, the directors [****2] of the federal offices, violated the Establishment Clause by organizing conferences that were designed to promote, and had the effect of promoting, religious community groups over secular ones. The only asserted basis for standing was that the individual respondents are federal taxpayers opposed to Executive Branch use of congressional appropriations for these conferences. The District Court dismissed the claims for lack of standing, concluding that under *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947, federal taxpayer standing is limited to Establishment Clause challenges to the constitutionality of exercises of congressional power under the taxing and spending clause of Art. I, § 8. Because petitioners acted on the President's behalf and were not charged with administering a congressional program, the court held that the challenged activities did not authorize taxpayer standing under *Flast*. The Seventh Circuit reversed, reading *Flast* as granting federal taxpayers standing to challenge Executive Branch programs on Establishment Clause grounds so long as the activities are financed by a congressional appropriation, even where there is no statutory program and the funds are [****3] from appropriations for general administrative expenses. According to the court, a taxpayer has standing to challenge anything done by a federal agency so long as the marginal or incremental cost to the public of the alleged Establishment Clause violation is greater than zero.

*Held: The judgment is reversed.*

433 F.3d 989, reversed.

Justice Alito, joined by The Chief Justice and Justice Kennedy, concluded that because the Seventh Circuit's broad reading of *Flast* is incorrect, respondents lack standing. Pp. 6-25.

1. Federal-court jurisdiction is limited to actual "Cases" and "Controversies." U.S. Const., Art. III. A controlling factor in the definition of such a case or controversy is standing, *ASARCO Inc.* v. *Kadish*, 490 U.S. 605, 613, 109 S. Ct. 2037, 104 L. Ed. 2d 696, the requisite elements of which are well established: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556. Pp. 6-8.

2. Generally, a federal taxpayer's interest in seeing that

W.D. Wash. 000045

551 U.S. 587, *587; 127 S. Ct. 2553, **2553; 168 L. Ed. 2d 424, ***430; 2007 U.S. LEXIS 8512, ****3

Treasury funds are spent in accordance with the Constitution [****4] is too attenuated to give rise to the kind of redressable "personal injury" required for Article III standing. See, *e.g., Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U.S. 447, 485-486, 43 S. Ct. 597, 67 L. Ed. 1078. Pp. 8-10.

3. In *Flast*, the Court carved out a narrow exception to the general constitutional prohibition against taxpayer standing. The taxpayer-plaintiffs there alleged that the distribution of federal funds to religious schools under a federal statute violated the Establishment Clause. The Court set out a two-part test for determining standing: "First, . . . a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8 . . . . Secondly, the taxpayer must . . . show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." 392 U.S., at 102-103, 88 S. Ct. 1942, 20 L. Ed. 2d 947. The Court then held that the particular taxpayer had satisfied both prongs of the test. *Id.*, at 103-104, 88 S. Ct. 1942, 20 L. Ed. 2d 947. [****5] Pp. 11-12.

4. Respondents' broad reading of the *Flast* exception to cover any expenditure of Government funds in violation of the Establishment Clause fails to observe "the rigor with which the *Flast* exception to the *Frothingham* principle ought to be applied." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 481, 102 S. Ct. 752, 70 L. Ed. 2d 700. Given that the alleged Establishment Clause violation in *Flast* was funded by a specific congressional appropriation and was undertaken pursuant to an express congressional mandate, the Court concluded that the taxpayer-plaintiffs had established the requisite "logical link between [their taxpayer] status and the type of legislative enactment attacked." 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947. "Their constitutional challenge [was] made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare." *Id.*, at 103, 88 S. Ct. 1942, 20 L. Ed. 2d 947. But *Flast* "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power'" under the Taxing and Spending Clause. *Valley Forge, supra*, at 479, 102 S. Ct. 752, 70 L. Ed. 2d 700. Pp. 12-13.

5. The link between [****6] congressional action and constitutional violation that supported taxpayer standing

in *Flast* is missing here. Respondents neither challenge any specific congressional action or appropriation nor ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue were not made pursuant to any Act of Congress, but under general appropriations to the Executive Branch to fund day-to-day activities. These appropriations did not expressly [***432] authorize, direct, or even mention the expenditures in question, which resulted from executive discretion, not congressional action. The Court has never found taxpayer standing under such circumstances. *Bowen* v. *Kendrick*, 487 U.S. 589, 619-620, 108 S. Ct. 2562, 101 L. Ed. 2d 520, distinguished. Pp. 13-18.

6. Respondents argue to no avail that distinguishing between money spent pursuant to congressional mandate and expenditures made in the course of executive discretion is arbitrary because the injury to taxpayers in both situations is the same as that targeted by the Establishment Clause and *Flast*--the expenditure for the support of religion of funds exacted from taxpayers. [****7] But *Flast* focused on congressional action, and the invitation to extend its holding to encompass discretionary Executive Branch expenditures must be declined. The Court has repeatedly emphasized that the *Flast* exception has a "narrow application," *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 348, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006), that only "slightly lowered" the bar on taxpayer standing, *United States* v. *Richardson*, 418 U.S. 166, 173, 94 S. Ct. 2940, 41 L. Ed. 2d 678, and that must be applied with "rigor," *Valley Forge, supra*, at 481,102 S. Ct. 752, 70 L. Ed. 2d 700. Pp. 18-19.

7. Also rejected is respondents' argument that Executive Branch expenditures in support of religion are no different from legislative extractions. *Flast* itself rejected this equivalence. 392 U.S., at 102,88 S. Ct. 1942, 20 L. Ed. 2d 947. Because almost all Executive Branch activity is ultimately funded by some congressional appropriation, extending the *Flast* exception to purely executive expenditures would effectively subject every federal action--be it a conference, proclamation, or speech--to Establishment Clause challenge by any taxpayer in federal court. Respondents' proposed rule would also raise serious separation-of-powers concerns, [****8] enlisting the federal courts to superintend, at the behest of any federal taxpayer, the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials. Pp. 19-21.

551 U.S. 587, *587; 127 S. Ct. 2553, **2553; 168 L. Ed. 2d 424, ***432; 2007 U.S. LEXIS 8512, ****8

8. Both the Seventh Circuit and respondents implicitly recognize that unqualified federal taxpayer standing to assert Establishment Clause claims would go too far, but neither has identified a workable limitation. Taking the Circuit's zero-marginal-cost test literally--*i.e.,* that any marginal cost greater than zero suffices--taxpayers might well have standing to challenge some (and perhaps many) speeches by Government officials. At a minimum, that approach would create difficult and uncomfortable line-drawing problems. Respondents' proposal to require an expenditure to be fairly traceable to the conduct alleged to violate the Establishment Clause, so that challenges to the content of any particular speech would be screened out, is too vague and ill defined to be accepted. Pp. 21-23.

9. None of the parade of horribles respondents claim could occur if *Flast* is not extended to discretionary Executive Branch expenditures has happened. In the unlikely event [****9] any do take place, Congress can quickly step in. And respondents make no effort to show that these improbable abuses could not be challenged in federal court by plaintiffs possessed of standing based on grounds other than their taxpayer status. Pp. 23-24.

10. This case does not require the Court to reconsider *Flast*. The Seventh [***433] Circuit did not apply *Flast*; it extended it. *Valley Forge Christian Academy* illustrates that a necessary concomitant of *stare decisis* is that a precedent is not always expanded to the limit of its logic. That is the approach taken here. *Flast* is neither extended nor overruled. It is simply left as it was. Pp. 24-25.

Justice Scalia, joined by Justice Thomas, concurred in the Court's judgment, concluding that *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. 2d 947, should be overruled as wholly irreconcilable with the Article III restrictions on federal-court jurisdiction that are embodied in the standing doctrine. Pp. 1-21.

1. The Court's taxpayer-standing cases involving Establishment Clause challenges to government expenditures are notoriously inconsistent because they have inconsistently described the relevant "injury in fact" that [****10] Article III requires. Some cases have focused on the financial effect on the taxpayer's wallet, whereas *Flast* and the cases that follow its teaching have emphasized the mental displeasure the taxpayer suffers when his funds are extracted and spent in aid of religion. There are only two logical routes available with respect to taxpayer standing. If the mental displeasure

created by Establishment Clause violations is concrete and particularized enough to constitute an Article III "injury in fact," then *Flast* should be applied to (at a minimum) *all* challenges to government expenditures allegedly violating constitutional provisions that specifically limit the taxing and spending power; if not, *Flast* should be overturned. Pp. 2-12.

2. Today's plurality avails itself of neither principled option, instead accepting the Government's submission that *Flast* should be limited to challenges to expenditures that are expressly authorized or mandated by specific congressional enactment. However, the plurality gives no explanation as to why the factual differences between this case and *Flast* are material. (Whether the challenged government expenditure is expressly allocated [****11] by a specific congressional enactment is not relevant to the Article III criteria of injury in fact, traceability, and redressability.) Yet the plurality is also unwilling to acknowledge that *Flast* erred by relying on purely mental injury. Pp. 12-14.

3. Respondents' legal position is no more coherent than the plurality's. They refuse to admit that their argument logically implies that *every* expenditure of tax revenues that is alleged to violate the Establishment Clause is subject to suit under *Flast*. Of course, *that* position finds no support in this Court's precedents or this Nation's history. Pp. 14-16.

4. A taxpayer's purely psychological displeasure that his funds are being spent in an allegedly unlawful manner is never sufficiently concrete and particularized to support Article III standing. See *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 573-574, 112 S. Ct. 2130, 119 L. Ed. 2d 351. Although overruling precedents is a serious undertaking, *stare decisis* should not prevent the Court from doing so here. *Flast* was inconsistent with the cases that came before it and undervalued the separation-of-powers function of standing. Its lack of a logical theoretical underpinning [****12] has rendered the Court's taxpayer-standing doctrine so incomprehensible that appellate judges do not know what to make of it. The case has engendered no reliance interests. Few cases less warrant *stare decisis* effect. It is past time to overturn *Flast*. [***434] Pp. 17-21.

**Counsel: Paul D. Clement** argued the cause for petitioners.

**Andrew J. Pincus** argued the cause for respondents.

**Judges:** Alito, J., announced the judgment of the Court and delivered an opinion, in which Roberts, C. J., and Kennedy, J., joined. Kennedy, J., filed a concurring opinion, post, p. 615. Scalia, J., filed an opinion concurring in the judgment, in which Thomas, J., joined, post, p. 637. Souter, J., filed a dissenting opinion, in which Stevens, Ginsburg, and Breyer, JJ., joined.

**Opinion by:** ALITO

# Opinion

 [***434] [**2559] [*592]    Justice **Alito** announced the judgment of the Court and delivered an opinion, in which The **Chief Justice** and Justice **Kennedy** join.

This is a lawsuit in which it was claimed that conferences held as part of the President's Faith-Based and Community Initiatives program violated the Establishment Clause of the First Amendment because, among other things, President Bush and former Secretary of Education Paige gave speeches that used "religious imagery" and praised the efficacy of faith-based programs in delivering social services. [*593] The plaintiffs contend that they meet [****13] the standing requirements of Article III of the Constitution because they pay federal taxes.

It has long been established, however, that [1] the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government. In light of the size of the federal budget, it is a complete fiction to argue that an unconstitutional federal expenditure causes an individual federal taxpayer any measurable economic harm. And if every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus.

In *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), [2] we recognized a narrow exception to the general rule against federal taxpayer standing. Under *Flast*, a plaintiff asserting an Establishment Clause claim has standing to challenge a law authorizing the use of federal funds in a way that allegedly violates the Establishment Clause. In the present case, Congress did not specifically authorize the use of federal funds to pay for the conferences or speeches that the plaintiffs challenged. Instead, the conferences and speeches were paid [****14] for out of general Executive Branch appropriations.

The Court of Appeals, however, held that the plaintiffs have standing as taxpayers because the conferences were paid for with money appropriated by Congress.

The question that is presented here is whether this broad reading of *Flast* is correct. We hold that it is not. We therefore reverse the decision of the Court of Appeals.

I

A

In 2001, the President issued an executive order creating the White House Office of Faith-Based and Community Initiatives within the Executive Office of the President. Exec. Order No. 13199, 3 CFR 752 (2001 Comp.). The purpose of [*594] this new office was to ensure that "private and charitable community groups, including religious ones . . . have the fullest opportunity permitted by law to compete on a level playing field, so long as they achieve valid public purposes" and adhere to "the bedrock principles of pluralism, nondiscrimination, [***435] evenhandedness, and neutrality." *Ibid*. The office was specifically charged with the task of eliminating unnecessary bureaucratic, legislative, and regulatory barriers that could impede such organizations' [**2560] effectiveness and ability to compete equally for federal assistance. [****15] *Id.*, at 752-753.

By separate executive orders, the President also created Executive Department Centers for Faith-Based and Community Initiatives within several federal agencies and departments.[1] These centers were given the job of ensuring that faith-based community groups would be eligible to compete for federal financial support without impairing their independence or autonomy, as long as they did "not use direct Federal financial assistance to support any inherently religious activities, such as worship, religious instruction, or proselytization." Exec. Order No. 13279, 3 CFR § 2(f), p 260 (2002 Comp.). To this end, the President directed that "[n]o organization should be discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs," *id.*, § 2(c), at 260, and that "[a]ll organizations that receive Federal

---

[1] See, *e.g.*, Exec. Order No. 13198, 3 CFR 750 (2001 Comp.); Exec. Order No. 13280, 3 CFR 262 (2002 Comp.); Exec. Order No. 13342, 3 CFR 180 (2004 Comp.); Exec. Order No. 13397, 71 Fed. Reg. 12275 (2006).

financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief," *id.*, § 2(d), at 260. Petitioners, who have [****16] been sued in their official capacities, are the directors of the White House Office and various Executive Department Centers.

[*595] No congressional legislation specifically authorized the creation of the White House Office or the Executive Department Centers. Rather, they were "created entirely within the executive branch . . . by Presidential executive order." *Freedom From Religion Foundation, Inc.* v. *Chao*, 433 F.3d 989, 997 (CA7 2006). Nor has Congress enacted any law specifically appropriating money for these entities' activities. Instead, their activities are funded through general Executive Branch appropriations. For example, the Department of Education's Center is funded from money appropriated for the Office of the Secretary of Education, while the Department of Housing [****17] and Urban Development's Center is funded through that Department's salaries and expenses account. See GAO, Faith-Based and Community Initiative: Improvements in Monitoring Grantees and Measuring Performance Could Enhance Accountability, 21 (GAO-06-616, June 2006), online at http://www.gao.gov/new.items/d06616.pdf (as visited June 25, 2007, and available in Clerk of Court's case file); see also Amended Complaint in No. 04-C-381-S (WD Wis.), P 23, App. to Pet. for Cert. 71a-72a.

B

The respondents are Freedom From Religion Foundation, Inc., a nonstock corporation "opposed to government endorsement of religion," *id.*, P 5, App. to Pet. for Cert. 68a, and three of its members. Respondents brought suit in the United States District Court for the Western District of Wisconsin, alleging that petitioners violated the Establishment Clause by [***436] organizing conferences at which faith-based organizations allegedly "are singled out as being particularly worthy of federal funding . . ., and the belief in God is extolled as distinguishing the claimed effectiveness of faith-based social services." *Id.*, P 32, App. to Pet. for Cert. 73a. Respondents further alleged [****18] that the content of these conferences sent a message to religious believers "that they are insiders and favored members [**2561] of the political community" [*596] and that the conferences sent the message to nonbelievers "that they are outsiders" and

"not full members of the political community." *Id.*, P 37, App. to Pet. for Cert. 76a. In short, respondents alleged that the conferences were designed to promote, and had the effect of promoting, religious community groups over secular ones.

The only asserted basis for standing was that the individual respondents are federal taxpayers who are "opposed to the use of Congressional taxpayer appropriations to advance and promote religion." *Id.*, P 10, App. to Pet. for Cert. 69a; see also *id.*, PP 7-9, App. to Pet. for Cert. 68a-69a. In their capacity as federal taxpayers, respondents sought to challenge Executive Branch expenditures for these conferences, which, they contended, violated the Establishment Clause.

C

The District Court dismissed the claims against petitioners for lack of standing. See *Freedom From Religion Foundation, Inc.* v. *Towey*, No. 04-C-381-S (WD Wis., Nov. 15, 2004), App. to Pet. for Cert. 27a-35a. It concluded that [****19] under *Flast*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947, federal taxpayer standing is limited to Establishment Clause challenges to the constitutionality of "'exercises of congressional power under the taxing and spending clause of Art. I, § 8.'" App. to Pet. for Cert. 31a (quoting *Flast, supra,* at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947). Because petitioners in this case acted "at the President's request and on the President's behalf" and were not "charged with the administration of a congressional program," the District Court concluded that the challenged activities were "not 'exercises of congressional power'" sufficient to provide a basis for taxpayer standing under *Flast.* App. to Pet. for Cert. 33a-34a.

A divided panel of the United States Court of Appeals for the Seventh Circuit reversed. 433 F.3d 989. The majority read *Flast* as granting federal taxpayers standing to challenge Executive Branch programs on Establishment Clause grounds so long as the activities are "financed by a congressional [*597] appropriation." 433 F.3d at 997. This was the case, the majority concluded, even where "there is no statutory program" enacted by Congress and the funds are "from appropriations for [****20] the general administrative expenses, over which the President and other executive branch officials have a degree of discretionary power." *Id.*, at 994. According to the majority, a taxpayer has standing to challenge anything done by a federal agency or officer so long as "the marginal or incremental cost to the taxpaying public of the alleged violation of

the establishment clause" is greater than "zero." *Id.*, at 995.

In dissent, Judge Ripple opined that the majority's decision reflected a "dramatic expansion of current standing doctrine," *id.*, at 997, that "cuts the concept of taxpayer standing loose from its moorings," *id.*, at 998. Noting that "[t]he executive can do nothing without general budget appropriations [***437] from Congress," *id.*, at 1000, he criticized the majority for overstepping *Flast*'s requirement that a "plaintiff must bring an attack against a disbursement of public funds made in the exercise of *Congress'* taxing and spending power," 433 F.3d at 1000 (emphasis in original).

The Court of Appeals denied en banc review by a vote of 7 to 4. *Freedom From Religion Foundation, Inc. v. Chao,* 447 F.3d 988 (CA7 2006). [****21] Concurring in the denial of rehearing, Chief Judge Flaum expressed doubt about the panel decision, but noted that "the obvious tension which has evolved in this area of jurisprudence . . . can only be resolved by the Supreme [**2562] Court." *Ibid.* We granted certiorari to resolve this question, 549 U.S. 1074, 127 S. Ct. 722, 166 L. Ed. 2d 559 (2006), and we now reverse.

II

A

Article III of the Constitution limits the judicial power of the United States to the resolution of "Cases" and "Controversies," and "'Article III standing . . . enforces the Constitution's [*598] case-or-controversy requirement.'" *DaimlerChrysler Corp.* v. *Cuno,* 547 U.S. 332, 342, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) (quoting *Elk Grove Unified School Dist.* v. *Newdow,* 542 U.S. 1, 11, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004)). "'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines* v. *Byrd,* 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997) (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 37, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)).

[4] "[O]ne of the controlling elements in the definition of a case or controversy [****22] under Article III" is standing. *ASARCO Inc.* v. *Kadish,* 490 U.S. 605, 613, 109 S. Ct. 2037, 104 L. Ed. 2d 696 (1989) (opinion of Kennedy, J.). The requisite elements of Article III standing are well established: "A plaintiff must allege personal injury fairly traceable to the defendant's

allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright,* 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

[5] The constitutionally mandated standing inquiry is especially important in a case like this one, in which taxpayers seek "to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens." *ASARCO, supra,* at 613, 109 S. Ct. 2037, 104 L. Ed. 2d 696 (opinion of Kennedy, J.). This is because "[t]he judicial power of the United States defined by Art. III is not an unconditional authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982). The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the [****23] Constitution. Rather, federal courts sit "solely, to decide on the rights of individuals," *Marbury* v. *Madison,* 5 U.S. 137, 1 Cranch 137, 170, 2 L. Ed. 60 (1803), and must "'refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it,'" *Valley Forge,* [*599] *supra,* at [***438] 474, 102 S. Ct. 752, 70 L. Ed. 2d 700 (quoting *Blair* v. *United States,* 250 U.S. 273, 279, 39 S. Ct. 468, 63 L. Ed. 979 (1919)). As we held over 80 years ago, in another case involving the question of taxpayer standing:

[6] "We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. The question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. . . . The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. [****24] " *Frothingham* v. *Mellon,* decided with *Massachusetts* v. *Mellon,* 262 U.S. 447, 488, 43 S. Ct. 597, 67 L. Ed. 1078 (1923).

[**2563] B

[7] As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in

accordance with the Constitution does not give rise to the kind of redressable "personal injury" required for Article III standing. Of course, a taxpayer has standing to challenge the *collection* of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer. See, *e.g.*, *Follett* v. *Town of McCormick*, 321 U.S. 573, 64 S. Ct. 717, 88 L. Ed. 938 (1944) (invalidating tax on preaching on First Amendment grounds). But that is not the interest on which respondents assert standing here. Rather, their claim is that, having paid lawfully collected taxes into the Federal Treasury at some point, they have [8] a continuing, legally cognizable interest in ensuring that those funds are not *used* by the Government in a way that violates the Constitution.

We have consistently held that this type of interest is too generalized and attenuated to support Article III standing. [*600] In *Frothingham*, a [****25] federal taxpayer sought to challenge federal appropriations for mothers' and children's health, arguing that federal involvement in this area intruded on the rights reserved to the States under the Tenth Amendment and would "increase the burden of future taxation and thereby take [the plaintiff's] property without due process of law." 262 U.S., at 486,43 S. Ct. 597, 67 L. Ed. 1078. We concluded that the plaintiff lacked the kind of particularized injury required for Article III standing:

> [9] "[I]nterest in the moneys of the Treasury . . . is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.
>
> "The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern." *Id.*, at 487, 43 S. Ct. 597, 67 L. Ed. 1078.

Because the interests of the taxpayer are, in essence, the interests of the public at large, deciding [****26] a constitutional [***439] claim based solely on taxpayer standing "would be[,] not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id.*, at 489, 43 S. Ct. 597, 67 L. Ed. 1078; see also *Alabama Power Co.* v. *Ickes*, 302 U.S. 464, 478-

479, 58 S. Ct. 300, 82 L. Ed. 374 (1938).

In *Doremus* v. *Board of Ed. of Hawthorne*, 342 U.S. 429, 433, 72 S. Ct. 394, 96 L. Ed. 475 (1952), we reaffirmed this principle, explaining that [10] "the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure." We therefore rejected a state taxpayer's claim of standing to challenge a [*601] state law authorizing public school teachers to read from the Bible because "the grievance which [the plaintiff] sought to litigate . . . is not a direct dollars-and-cents injury but is a religious difference." *Id.*, at 434, 72 S. Ct. 394, 96 L. Ed. 475. In so doing, we gave effect to the basic constitutional principle that

> [11] "a plaintiff raising only a generally available grievance about government [****27] --claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly [**2564] benefits him than it does the public at large--does not state an Article III case or controversy." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 573-574, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).[2]

---

[2] See also *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) [12] "Standing has been rejected" where "the alleged injury is not 'concrete and particularized,' . . . but instead a grievance the taxpayer 'suffers in some indefinite way in common with people generally'" (quoting *Defenders of Wildlife*, 504 U.S., at 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351, and *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S. Ct. 597, 67 L. Ed. 1078 (1923)); *ASARCO Inc.* v. *Kadish*, 490 U.S. 605, 616, 109 S. Ct. 2037, 104 L. Ed. 2d 696 (1989) (opinion of Kennedy, J.) ("[G]eneralized grievances brought by concerned citizens . . . are not cognizable in the federal courts"); *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 483, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) ([13] "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III"); *United States* v. *Richardson*, 418 U.S. 166, 174, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) ("[A] taxpayer may not 'employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System'" (quoting *Flast* v. *Cohen*, 392 U.S. 83, 114, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968) (Stewart, J., concurring); some internal quotation marks omitted); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S.

551 U.S. 587, *602; 127 S. Ct. 2553, **2564; 168 L. Ed. 2d 424, ***439; 2007 U.S. LEXIS 8512, ****27

[*602] [****28] C

In *Flast*, the Court carved out a narrow exception to the general constitutional prohibition against taxpayer standing. The taxpayer-plaintiffs in that case challenged the distribution of federal funds to religious schools under the Elementary and Secondary Education Act of 1965, [***440] alleging that such aid violated the Establishment Clause. [15] The Court set out a two-part test for determining whether a federal taxpayer has standing to challenge an allegedly unconstitutional expenditure:

"First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations [****29] imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." 392 U.S., at 102-103, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

The Court held that the taxpayer-plaintiffs in *Flast* had satisfied both prongs of this test: The plaintiff's "constitutional challenge [was] made to an exercise by Congress of its [*603] power under Art. I, § 8, to spend for the general welfare," and she [**2565] alleged a

---

208, 217, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974) ("Respondents seek to have the Judicial Branch compel the Executive Branch to act in conformity with the Incompatibility Clause [of the Constitution], an interest shared by all citizens. . . . And that claimed nonobservance, standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury"); *Frothingham, supra* at 488, 43 S. Ct. 597, 67 L. Ed. 1078 (1923) ([14] "The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally").

violation of [16] the Establishment Clause, which "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8." *Id.*, at 103-104, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

III

A

Respondents argue that this case falls within the *Flast* exception, which they read to cover any "expenditure of government funds in violation of the Establishment Clause." Brief for Respondents 12. But this broad reading fails to observe "the rigor with which the *Flast* exception to the *Frothingham* principle ought to be applied." *Valley Forge*, 454 U.S., at 481, 102 S. Ct. 752, 70 L. Ed. 2d 700.

The expenditures at issue in *Flast* were made pursuant to an express congressional [****30] mandate and a specific congressional appropriation. The plaintiff in that case challenged disbursements made under the Elementary and Secondary Education Act of 1965, 79 Stat. 27. That Act expressly appropriated the sum of $ 100 million for fiscal year 1966, § 201(b), *id.*, at 36, and authorized the disbursement of those funds to local educational agencies for the education of low-income students, see *Flast, supra*, at 86, 88 S. Ct. 1942, 20 L. Ed. 2d 947. The Act mandated that local educational agencies receiving such funds "ma[k]e provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment)" in which students enrolled in private elementary and secondary schools could participate, § 2, 79 Stat. 30-31. In addition, recipient agencies were required to ensure that "library resources, textbooks, and other instructional materials" funded through the grants "be provided on an equitable basis for the use of children and teachers in private elementary and secondary schools," § 203(a)(3)(B), *id.*, at 37.

[*604] [***441] The expenditures challenged in *Flast*, then, were funded by a specific congressional [****31] appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate.[3]

---

[3] At around the time the Act was passed and *Flast* was decided, the great majority of nonpublic elementary and secondary schools in the United States were associated with a church. In 1965-1966, for example, 91.1 percent of all

551 U.S. 587, *604; 127 S. Ct. 2553, **2565; 168 L. Ed. 2d 424, ***441; 2007 U.S. LEXIS 8512, ****31

Indeed, the *Flast* taxpayer-plaintiffs' constitutional claim was premised on the contention that if the Government's actions were "'within the authority and intent of the Act, the Act is to that extent unconstitutional and void.'" *Flast, supra,* at 90, 88 S. Ct. 1942, 20 L. Ed. 2d 947. And the judgment reviewed by this Court in *Flast* solely concerned the question whether "if [the challenged] expenditures are authorized by the Act the statute constitutes a 'law respecting an establishment of religion' and a law 'prohibiting the free exercise thereof'" under the First Amendment. *Flast* v. *Gardner,* 271 F. Supp. 1, 2 (SDNY 1967).

[****32] Given that the alleged Establishment Clause violation in *Flast* was funded by a specific congressional appropriation and was undertaken pursuant to an express congressional mandate, the Court concluded that the taxpayer-plaintiffs had established the requisite "logical link between [their taxpayer] status and the type of legislative enactment attacked." In the [**2566] Court's words, "[t]heir constitutional challenge [was] made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare." 392 U.S., at 102, 103, 88 S. Ct. 1942, 20 L. Ed. 2d 947. But as this Court later noted, [17] *Flast* "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power'" under the Taxing and Spending Clause. *Valley Forge, supra,* at 479, 102 S. Ct. 752, 70 L. Ed. 2d 700.

[*605] B

The link between congressional action and constitutional violation that supported taxpayer standing in *Flast* is missing here. Respondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of [****33] Congress. Rather, Congress provided general appropriations to the Executive Branch to fund its day-to-day activities.[4] These appropriations did not

expressly authorize, direct, or even mention the expenditures of which respondents complain. Those expenditures resulted from executive discretion, not congressional action.

We have never found taxpayer standing under such circumstances. In *Valley Forge,* we held that a taxpayer lacked standing to challenge "a decision by [the federal Department of Health, Education and Welfare] to transfer a parcel of federal property" to a religious college because this transfer was "not a congressional action." 454 U.S., at 479, 102 S. Ct. 752, [***442] 70 L. Ed. 2d 700. In fact, the connection to congressional action was closer in *Valley Forge* than it is here, because in that case, the "particular Executive Branch action" being challenged was at least "arguably [****34] authorized" by the Federal Property and Administrative Services Act of 1949, which permitted federal agencies to transfer surplus property to private entities. *Ibid.,* n. 15, 102 S. Ct. 752, 70 L. Ed. 2d 700. Nevertheless, we found that the plaintiffs lacked standing because *Flast* "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power'" under the Taxing and Spending Clause. 454 U.S., at 479, 102 S. Ct. 752, 70 L. Ed. 2d 700 (quoting *Flast, supra,* at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947).[5]

[*606] Similarly, in *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974), [****35] the taxpayer-plaintiffs contended that the Incompatibility Clause of Article I prohibited Members of Congress from holding commissions in the Armed Forces Reserve. We held that these plaintiffs lacked standing under *Flast* because they "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their Reserve status." 418 U.S., at 228, 94 S. Ct. 2925, 41 L. Ed. 2d 706. This was the case even though the plaintiffs sought to reclaim reservist pay received by those Members--pay that presumably was funded through Congress' general appropriations for the support of the Armed Forces: "Such relief would follow from the invalidity of Executive action in paying persons who

---

[4] nonpublic elementary schools and 78.2 percent of all nonpublic secondary schools in the United States were religiously affiliated. Dept. of Health, Education, and Welfare, Statistics of Nonpublic Elementary and Secondary Schools 1965-66, p. 7 (1968). Congress surely understood that much of the aid mandated by the statute would find its way to religious schools.

[4] See, *e.g.,* 119 Stat. 2472 (appropriating $ 53,830,000 "to be available for allocation within the Executive Office of the President").

---

[5] *Valley Forge* also relied on a second rationale: that the authorizing Act was an exercise of Congress' power under the Property Clause of Art. IV, § 3, cl. 2, and not the Taxing and Spending Clause of Art. I, § 8. 454 U.S., at 480, 102 S. Ct. 752, 70 L. Ed. 2d 700. But this conclusion merely provided an additional--"and perhaps redundan[t]," *ibid.*--basis for denying a claim of standing that was already foreclosed because it was not based on any congressional action.

could not lawfully have been reservists, not from the invalidity of the statutes [**2567] authorizing pay to those who lawfully were Reservists." *Ibid.*, n 17. See also *United States* v. *Richardson*, 418 U.S. 166, 175, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (denying taxpayers standing to compel publication of accounting for the Central Intelligence Agency because "there is no 'logical nexus' between the asserted status of taxpayer and the claimed failure of the Congress to require [****36] the Executive to supply a more detailed report of the expenditures of that agency").

*Bowen* v. *Kendrick*, 487 U.S. 589, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988), on which respondents rely heavily, is not to the contrary. In that case, we held that the taxpayer-plaintiffs had standing to mount an as-applied challenge to the Adolescent Family Life Act (AFLA), which authorized federal grants to private community service groups including religious organizations. The Court found "a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power," notwithstanding the fact that "the funding authorized by Congress ha[d] flowed through [*607] and been administered" by an Executive Branch official. *Id.*, at 620, 619, 108 S. Ct. 2562, 101 L. Ed. 2d 520.

But the key to that conclusion was the Court's recognition that AFLA was "at heart a program of disbursement of funds pursuant to Congress' [***443] taxing and spending powers," and that the plaintiffs' claims "call[ed] into question how the funds authorized by Congress [were] being disbursed *pursuant to the AFLA's statutory mandate.*" *Id.*, at 619-620, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (emphasis added). AFLA not only expressly authorized and appropriated [****37] specific funds for grantmaking, it also expressly contemplated that some of those moneys might go to projects involving religious groups. See *id.*, at 595-596, 108 S. Ct. 2562, 101 L. Ed. 2d 520; see also *id.*, at 623, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (O'Connor, J., concurring) (noting the "partnership between governmental and religious institutions contemplated by the AFLA").[6] Unlike this case, *Kendrick*

involved a "program of disbursement of funds pursuant to Congress' taxing and spending powers" that "Congress had created," "authorized," and "mandate[d]." *Id.*, at 619-620, 108 S. Ct. 2562, 101 L. Ed. 2d 520.

 [****38] Respondents attempt to paint their lawsuit as a *Kendrick*-style as-applied challenge, but this effort is unavailing for the simple reason that they can cite no statute whose application they challenge. The best they can do is to point to unspecified, lump-sum "Congressional budget appropriations" for the general use of the Executive Branch--the allocation of which "is a[n] administrative decision [*608] traditionally regarded as committed to agency discretion." *Lincoln* v. *Vigil*, 508 U.S. 182, 192, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (1993). Characterizing this case as an "as-applied challenge" to these general appropriations statutes would stretch the meaning of that term past its breaking point. It cannot be that every legal challenge to a discretionary Executive Branch action implicates the constitutionality of the underlying congressional [**2568] appropriation. When a criminal defendant charges that a federal agent carried out an unreasonable search or seizure, we do not view that claim as an as-applied challenge to the constitutionality of the statute appropriating funds for the Federal Bureau of Investigation. Respondents have not established why the discretionary Executive Branch expenditures here, which [****39] are similarly funded by no-strings, lump-sum appropriations, should be viewed any differently.[7]

---

and charitable organizations, voluntary associations, and other groups." § 300z(a)(10)(C). And it directed that demonstration projects funded by the government "shall . . . make use of support systems" such as religious organizations, § 300z-2(a), and required grant applicants to describe how they would "involve religious and charitable organizations" in their projects, § 300z-5(a)(21)(B).

[7] Nor is it relevant that Congress may have informally "earmarked" portions of its general Executive Branch appropriations to fund the offices and centers whose expenditures are at issue here. See, *e.g.*, H. R. Rep. No. 107-342, p. 108 (2001). [18] "[A] fundamental principle of appropriations law is that where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on' the agency." *Lincoln*, 508 U.S., at 192, 113 S. Ct. 2024, 124 L. Ed. 2d 101 (quoting *In re LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)); see also *TVA* v. *Hill*, 437 U.S. 153, 191,98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) ("Expressions of committees dealing with

---

[6] For example, the statute noted that the problems of adolescent premarital sex and pregnancy "are best approached through a variety of integrated and essential services provided to adolescents and their families" by "religious and charitable organizations," among other groups. 42 U.S.C. § 300z(a)(8)(B) (1982 ed.). It went on to mandate that federally provided services in that area should "emphasize the provision of support by other family members, religious

[****40] In short, this case falls outside "the narrow exception" that *Flast* [***444] "created to the general rule against taxpayer standing established in *Frothingham*." *Kendrick, supra*, at 618, 108 S. Ct. 2562, 101 L. Ed. 2d 520. Because the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment, respondents' lawsuit is not directed at an exercise of congressional power, see *Valley Forge*, 454 U.S., at 479, 102 S. Ct. 752, 70 L. Ed. 2d 700, and thus lacks the requisite "logical nexus" between [*609] taxpayer status "and the type of legislative enactment attacked", *Flast*, 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

IV

A

1

Respondents argue that it is "arbitrary" to distinguish between money spent pursuant to congressional mandate and expenditures made in the course of executive discretion, because "the injury to taxpayers in both situations is the very injury targeted by the Establishment Clause and *Flast*--the expenditure for the support of religion of funds exacted from taxpayers." Brief for Respondents 13. The panel majority below agreed, based on its observation that "there is so much that executive officials could do to promote religion in ways forbidden [****41] by the establishment clause." 433 F.3d at 995.

But *Flast* focused on congressional action, and we must decline this invitation to extend its holding to encompass discretionary Executive Branch expenditures. *Flast* itself distinguished the "incidental expenditure of tax funds in the administration of an essentially regulatory statute," 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947, and [19] we have subsequently rejected the view that taxpayer standing "extends to 'the Government as a whole, regardless of which branch is at work in a particular instance,'" *Valley Forge, supra*, at 484, n. 20, 102 S. Ct. 752, 70 L. Ed. 2d 700. Moreover, we have repeatedly emphasized that the *Flast* exception has a "narrow application in our precedent," *Cuno*, 547 U.S., at 348, 126 S. Ct. 1854, 164 L. Ed. 2d 589, that only "slightly lowered" the bar on taxpayer standing, *Richardson*, 418 U.S., at 173, 94 S. Ct. 2940, 41 L. Ed. 2d 678, and that must be applied with "rigor," *Valley*

*Forge, supra*, at 481, 102 S. Ct. 752, 70 L. Ed. 2d 700.

It is significant that, in the four decades since its creation, the *Flast* exception has [**2569] largely been confined to its facts. [20] We have declined to lower the taxpayer standing bar in suits alleging violations [****42] of any constitutional provision apart from the Establishment Clause. See *Tilton* v. *Richardson*, 403 U.S. 672, 91 S. Ct. 2091, 29 L. Ed. 2d 790 (1971) (no taxpayer standing to sue under Free Exercise Clause of First Amendment); [*610] *Richardson*, 418 U.S., at 175, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (no taxpayer standing to sue under Statement and Account Clause of Art. I); *Schlesinger*, 418 U.S., at 228, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (no taxpayer standing to sue under Incompatibility Clause of Art. I); *Cuno, supra*, at 349, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (no taxpayer standing to sue under Commerce Clause). We have similarly refused to extend *Flast* to permit taxpayer standing for Establishment Clause challenges that do not implicate [***445] Congress' taxing and spending power. See *Valley Forge, supra*, at 479-482, 102 S. Ct. 752, 70 L. Ed. 2d 700 (no taxpayer standing to challenge Executive Branch action taken pursuant to Property Clause of Art. IV); see also *District of Columbia Common Cause* v. *District of Columbia*, 273 U.S. App. D.C. 137, 858 F.2d 1, 3-4 (CADC 1988); *In re United States Catholic Conference*, 885 F.2d 1020, 1028 (CA2 1989). In effect, we have adopted the position set forth by Justice Powell in his concurrence in *Richardson* [****43] and have "limit[ed] the expansion of federal taxpayer and citizen standing in the absence of specific statutory authorization to an outer boundary drawn by the *results* in *Flast* . . . ." 418 U.S., at 196, 94 S. Ct. 2940, 41 L. Ed. 2d 678.

2

While respondents argue that Executive Branch expenditures in support of religion are no different from legislative extractions, *Flast* itself rejected this equivalence: [21] "It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

Because almost all Executive Branch activity is ultimately funded by some congressional appropriation, extending the *Flast* exception to purely executive expenditures would effectively subject every federal action--be it a conference, proclamation, or speech--to Establishment Clause challenge by any taxpayer in federal court. To see the wide swathe of activity that

---

requests for appropriations cannot be equated with statutes enacted by Congress").

551 U.S. 587, *610; 127 S. Ct. 2553, **2569; 168 L. Ed. 2d 424, ***445; 2007 U.S. LEXIS 8512, ****43

respondents' proposed rule would cover, one need look no further than the amended complaint in this action, which focuses largely on speeches and presentations [*611] made by Executive Branch officials. See, *e.g.*, Amended Complaint P 32, App. to Pet. for Cert. [****44] 73a (challenging Executive Branch officials' "support of national and regional conferences"); *id.*, P 33, App. to Pet. for Cert. 73a-75a (challenging content of speech by Secretary of Education); *id.*, PP 35, 36, App. to Pet. for Cert. 76a (challenging content of Presidential speeches); *id.*, P 41, App. to Pet. for Cert. 77a (challenging Executive Branch officials' "public appearances" and "speeches"). Such a broad reading would ignore [22] the first prong of *Flast*'s standing test, which requires "a logical link between [taxpayer] status and the type of legislative enactment attacked." 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

It would also raise serious separation-of-powers concerns. As we have recognized, *Flast* itself gave too little weight to these concerns. By framing the standing question solely in terms of whether the dispute would be presented in an adversary context and in a form traditionally viewed as capable of judicial resolution, *Flast* "failed to recognize that [23] this doctrine has a separation-of-powers component, which keeps courts within certain traditional bounds vis-a-vis the other branches, concrete adverseness or not." *Lewis* v. *Casey*, 518 U.S. 343, 353, n. 3, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996); [****45] see also *Valley Forge*, 454 U.S., at 471, 102 S. Ct. 752, 70 L. Ed. 2d 700. Respondents' [**2570] position, if adopted, would repeat and compound this mistake.

[24] The constitutional requirements for federal-court jurisdiction--including the standing requirements and Article III --"are an essential ingredient of separation and equilibration of powers." *Steel Co.* v. *Citizens for Better Environment*, 523 U.S. 83, 101, [***446] 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998). "Relaxation of standing requirements is directly related to the expansion of judicial power," and lowering the taxpayer standing bar to permit challenges of purely executive actions "would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government." *Richardson, supra*, at 188, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (Powell, J., concurring). The rule respondents propose would enlist the federal courts to superintend, at the behest [*612] of any federal taxpayer, the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials. This would "be quite at odds with . . . *Flast*'s own promise that it would not transform federal

courts into forums for taxpayers' 'generalized grievances'" [****46] about the conduct of government, *Cuno*, 547 U.S., at 348, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (quoting *Flast, supra*, at 106, 88 S. Ct. 1942, 20 L. Ed. 2d 947), and would "open the Judiciary to an arguable charge of providing 'government by injunction,'" *Schlesinger, supra*, at 222, 94 S. Ct. 2925, 41 L. Ed. 2d 706. It would deputize federal courts as [25] "'virtually continuing monitors of the wisdom and soundness of Executive action,'" and that, most emphatically, "'is not the role of the judiciary.'" *Allen*, 468 U.S., at 760, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (quoting *Laird* v. *Tatum*, 408 U.S. 1, 15, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972)).

3

Both the Court of Appeals and respondents implicitly recognize that unqualified federal taxpayer standing to assert Establishment Clause claims would go too far, but neither the Court of Appeals nor respondents has identified a workable limitation. The Court of Appeals, as noted, conceded only that a taxpayer would lack standing where "the marginal or incremental cost to the taxpaying public of the alleged violation of the establishment clause" is "zero." 433 F.3d at 995. Applying this rule, the Court of Appeals opined that a taxpayer would not have standing to challenge a President's favorable reference to [****47] religion in a State of the Union address because the costs associated with the speech "would be no greater merely because the President had mentioned Moses rather than John Stuart Mill." *Ibid.*

There is reason to question whether the Court of Appeals intended for its zero-marginal-cost test to be taken literally, because the court, without any apparent inquiry into the costs of Secretary Paige's speech, went on to agree that the plaintiffs lacked standing to challenge that speech. *Id.*, at 996. But if we take the Court of Appeals' test literally--*i.e.*, that any marginal cost greater than zero suffices--taxpayers [*613] might well have standing to challenge some (and perhaps many) speeches. As Judge Easterbrook observed: "The total cost of presidential proclamations and speeches by Cabinet officers that touch on religion (Thanksgiving and several other holidays) surely exceeds $ 500,000 annually; it may cost that much to use Air Force One and send a Secret Service detail to a single speaking engagement." 447 F.3d at 989-990 (concurring in denial of rehearing en banc). At a minimum, the Court of Appeals' approach (asking whether the marginal cost exceeded [****48] zero) would surely create difficult and

uncomfortable line-drawing problems. Suppose that it is alleged that a [***447] speechwriter or other staff member spent extra time [**2571] doing research for the purpose of including "religious imagery" in a speech. Suppose that a President or a Cabinet officer attends or speaks at a prayer breakfast and that the time spent was time that would have otherwise been spent on secular work.

Respondents take a somewhat different approach, contending that their proposed expansion of *Flast* would be manageable because they would require that a challenged expenditure be "fairly traceable to the conduct alleged to violate the Establishment Clause." Brief for Respondents 17. Applying this test, they argue, would "scree[n] out . . . challenge[s to] the content of one particular speech, for example the State of the Union address, as an Establishment Clause violation." *Id.*, at 21.

We find little comfort in this vague and ill-defined test. As an initial matter, respondents fail to explain why the (often substantial) costs that attend, for example, a Presidential address are any less "traceable" than the expenses related to the Executive Branch statements and conferences [****49] at issue here. Indeed, respondents concede that even lawsuits involving *de minimis* amounts of taxpayer money can pass their proposed "traceability" test. *Id.*, at 20, n. 6.

Moreover, the "traceability" inquiry, depending on how it is framed, would appear to prove either too little or too [*614] much. If the question is whether an allegedly unconstitutional executive action can somehow be traced to taxpayer funds *in general*, the answer will always be yes: Almost all Executive Branch activities are ultimately funded by *some* congressional appropriation, whether general or specific, which is in turn financed by tax receipts. If, on the other hand, the question is whether the challenged action can be traced to the contributions of a *particular* taxpayer-plaintiff, the answer will almost always be no: As we recognized in *Frothingham*, the interest of any individual taxpayer in a particular federal expenditure "is comparatively minute and indeterminable . . . and constantly changing." 262 U.S., at 487, 43 S. Ct. 597, 67 L.Ed. 1078.

B

Respondents set out a parade of horribles that they claim could occur if *Flast* is not extended to discretionary Executive Branch expenditures. For example, [****50] they say, a federal agency could use its discretionary funds to build a house of worship or to

hire clergy of one denomination and send them out to spread their faith. Or an agency could use its funds to make bulk purchases of Stars of David, crucifixes, or depictions of the star and crescent for use in its offices or for distribution to the employees or the general public. Of course, none of these things has happened, even though *Flast* has not previously been expanded in the way that respondents urge. In the unlikely event that any of these executive actions did take place, Congress could quickly step in. And respondents make no effort to show that these improbable abuses could not be challenged in federal court by plaintiffs who would possess standing based on grounds other than taxpayer standing.

C

Over the years, *Flast* has been defended by some and criticized by others. But the present case does not require us to reconsider that precedent. [***448] The Court of Appeals did not [*615] apply *Flast*; it extended *Flast*.[26] It is a necessary concomitant of the doctrine of *stare decisis* that a precedent is not always expanded to the limit of its logic. That was the approach that then-Justice [****51] Rehnquist took in his opinion for the Court in *Valley Forge*, and it is the approach we take here. We do not extend [**2572] *Flast*, but we also do not overrule it. We leave *Flast* as we found it.

Justice Scalia says that we must either overrule *Flast* or extend it to the limits of its logic. His position is not "[in]sane," inconsistent with the "rule of law," or "utterly meaningless." *Post*, at 618, 168 L. Ed. 2d at 450 (opinion concurring in judgment). But it is wrong. Justice Scalia does not seriously dispute either (1) that *Flast* itself spoke in terms of "legislative enactment[s]" and "exercises of congressional power," 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947, or (2) that in the four decades since *Flast* was decided, we have never extended its narrow exception to a purely discretionary Executive Branch expenditure. We need go no further to decide this case. Relying on the provision of the Constitution that limits our role to resolving the "Cases" and "Controversies" before us, we decide only the case at hand.

\* \* \*

For these reasons, the judgment of the Court of Appeals for the Seventh Circuit is reversed.

It is so ordered.

**Concur by:** Kennedy; Scalia

551 U.S. 587, *615; 127 S. Ct. 2553, **2572; 168 L. Ed. 2d 424, ***448; 2007 U.S. LEXIS 8512, ****51

# Concur

Justice **Kennedy,** concurring.

The separation-of-powers [****52] design in the Constitution is implemented, among other means, by Article III's case-or-controversy limitation and the resulting requirement of standing. See, *e.g.*, *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 559-560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The Court's decision in *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), and in later cases applying it, must be interpreted as respecting separation-of-powers principles but acknowledging as well that these principles, in some cases, must accommodate the First Amendment's Establishment Clause. [*616] The Clause expresses the Constitution's special concern that freedom of conscience not be compromised by government taxing and spending in support of religion. In my view the result reached in *Flast* is correct and should not be called into question. For the reasons set forth by Justice Alito, however, *Flast* should not be extended to permit taxpayer standing in the instant matter. And I join his opinion in full.

Respondents' amended complaint challenged the religious nature of national and regional conferences that promoted President Bush's Faith-Based and Community Initiatives. See App. to Pet. for Cert. 73a-77a. To support the allegation [****53] respondents pointed to speeches given by the President and other executive officers, speeches with religious references. *Id.,* at 73a-76a. The complaint relies on respondents' taxpayer status as the sole basis for standing to maintain the suit but points to no specific use of Congress' taxing and spending power other than general appropriations to fund the administration of the Executive Branch. *Id.,* at 71a-73a.

*Flast* established a "narrow exception" to the rule against taxpayer standing. *Bowen* v. *Kendrick*, 487 U.S. 589, 618, [***449] 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988). To find standing in the circumstances of this case would make the narrow exception boundless. The public events and public speeches respondents seek to call in question are part of the open discussion essential to democratic self-government. The Executive Branch should be free, as a general matter, to discover new ideas, to understand pressing public demands, and to find creative responses to address governmental concerns. The exchange of ideas between and among

the State and Federal Governments and their manifold, diverse constituencies sustains a free society. Permitting any and all taxpayers to challenge the content of [****54] these prototypical executive operations and dialogues would [**2573] lead to judicial intervention so far exceeding traditional boundaries on the Judiciary that there would arise a real [*617] danger of judicial oversight of executive duties. The burden of discovery to ascertain if relief is justified in these potentially innumerable cases would risk altering the free exchange of ideas and information. And were this constant supervision to take place the courts would soon assume the role of speech editors for communications issued by executive officials and event planners for meetings they hold.

The courts must be reluctant to expand their authority by requiring intrusive and unremitting judicial management of the way the Executive Branch performs its duties. The Court has refused to establish a constitutional rule that would require or allow "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti v. Ceballos*, 547 U.S. 410, 423, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006); see also *Cheney* v. *United States Dist. Court for D. C.*, 542 U.S. 367, 382, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004) (noting [****55] that "separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President" and that "mandamus standards are broad enough . . . to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities"). In the Article III context the Court explained that concerns based on separation of powers "counsel[ed] against recognizing standing in a case brought . . . to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties." *Allen* v. *Wright*, 468 U.S. 737, 761, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

The same principle applies here. The Court should not authorize the constant intrusion upon the executive realm that would result from granting taxpayer standing in the instant case. As Justice Alito explains in detail, the Court's precedents do not require it to do so. The separation-of-powers concerns implicated by intrusive judicial regulation of day-to-day executive operations reinforce his interpretation of *Flast*'s framework. Cf. *Allen, supra,* [*618] at 761, n. 26, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (relying "on separation of powers

principles to [****56] interpret the 'fairly traceable' component of the standing requirement").

It must be remembered that, even where parties have no standing to sue, members of the Legislative and Executive Branches are not excused from making constitutional determinations in the regular course of their duties. Government officials must [***450] make a conscious decision to obey the Constitution whether or not their acts can be challenged in a court of law and then must conform their actions to these principled determinations.

Justice **Scalia,** with whom Justice **Thomas** joins, concurring in the judgment.

Today's opinion is, in one significant respect, entirely consistent with our previous cases addressing taxpayer standing to raise Establishment Clause challenges to government expenditures. Unfortunately, the consistency lies in the creation of utterly meaningless distinctions which separate the case at hand from the precedents that have come out differently, but which cannot possibly be (in any sane world) the reason it comes out differently. If this Court is to decide cases by rule of law rather than show of hands, we must surrender to logic and choose sides: Either *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), [****57] should be applied to (at a minimum) *all* challenges to the governmental expenditure of general tax revenues [**2574] in a manner alleged to violate a constitutional provision specifically limiting the taxing and spending power, or *Flast* should be repudiated. For me, the choice is easy. *Flast* is wholly irreconcilable with the Article III restrictions on federal-court jurisdiction that this Court has repeatedly confirmed are embodied in the doctrine of standing.

I

A

There is a simple reason why our taxpayer-standing cases involving Establishment Clause challenges to government [*619] expenditures are notoriously inconsistent: We have inconsistently described the first element of the "irreducible constitutional minimum of standing," which minimum consists of (1) a "concrete and particularized" "'injury in fact'" that is (2) fairly traceable to the defendant's alleged unlawful conduct and (3) likely to be redressed by a favorable decision. See *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). We have alternately relied on two entirely distinct

conceptions of injury in fact, which for convenience I will call "Wallet Injury" and "Psychic Injury."

Wallet Injury [****58] is the type of concrete and particularized injury one would expect to be asserted in a *taxpayer* suit, namely, a claim that the plaintiff's tax liability is higher than it would be, but for the allegedly unlawful government action. The stumbling block for suits challenging government expenditures based on this conventional type of injury is quite predictable. The plaintiff cannot satisfy the traceability and redressability prongs of standing. It is uncertain what the plaintiff's tax bill would have been had the allegedly forbidden expenditure not been made, and it is even more speculative whether the government will, in response to an adverse court decision, lower taxes rather than spend the funds in some other manner.

Psychic Injury, on the other hand, has nothing to do with the plaintiff's tax liability. Instead, the injury consists of the taxpayer's *mental displeasure* that money extracted from him is being spent in an unlawful manner. This shift in focus eliminates traceability and redressability problems. Psychic Injury is directly traceable to the improper *use* of taxpayer funds, and it is redressed when the improper use is enjoined, regardless of whether [***451] that injunction [****59] affects the taxpayer's purse. *Flast* and the cases following its teaching have invoked a peculiarly restricted version of Psychic Injury, permitting taxpayer displeasure over unconstitutional spending to support standing *only if* the constitutional provision allegedly violated is a specific limitation on the taxing and spending power. Restricted or not, this conceptualizing [*620] of injury in fact in purely mental terms conflicts squarely with the familiar proposition that a plaintiff lacks a concrete and particularized injury when his only complaint is the generalized grievance that the law is being violated. As we reaffirmed unanimously just this Term: "'We have consistently held that a plaintiff raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy.'" *Lance* v. *Coffman*, 549 U.S. 437, 439, 127 S. Ct. 1194, 167 L. Ed. 2d 29 (2007) *(per curiam)* (quoting *Lujan, supra,* at 573-574, 112 S. Ct. 2130, 119 L. Ed. 2d 351).

As the [****60] following review of our cases demonstrates, we initially denied taxpayer standing based on Wallet Injury, but then [**2575] found

standing in some later cases based on the limited version of Psychic Injury described above. The basic logical flaw in our cases is thus twofold: We have never explained why Psychic Injury was insufficient in the cases in which standing was denied, and we have never explained why Psychic Injury, however limited, is cognizable under Article III.

B

1

Two pre-*Flast* cases are of critical importance. In *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon,* 262 U.S. 447, 43 S. Ct. 597, 67 L. Ed. 1078 (1923), the taxpayer challenged the constitutionality of the Maternity Act of 1921, alleging in part that the federal funding provided by the Act was not authorized by any provision of the Constitution. See *id.*, at 476-477, 43 S. Ct. 597, 67 L. Ed. 1078 (argument for Frothingham), 479-480, 43 S. Ct. 597, 67 L. Ed. 1078 (opinion of the Court). The Court held that the taxpayer lacked standing. After emphasizing that "the effect upon future taxation . . . of any payment out of [Treasury] funds" was "remote, fluctuating and uncertain," *id.*, at 487, 43 S. Ct. 597, 67 L. Ed. 1078, the Court concluded that [****61] "[t]he party who invokes the power [of judicial review] must be able [*621] to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally," *id.*, at 488, 43 S. Ct. 597, 67 L. Ed. 1078. The Court was thus describing the traceability and redressability problems with Wallet Injury, and rejecting Psychic Injury as a generalized grievance rather than concrete and particularized harm.

The second significant pre-*Flast* case is *Doremus* v. *Board of Ed. of Hawthorne*, 342 U.S. 429, 72 S. Ct. 394, 96 L. Ed. 475 (1952). There the taxpayers challenged under the Establishment Clause a state law requiring public-school teachers to read the Bible at the beginning of each [***452] schoolday. *Id.*, at 430, 433, 72 S. Ct. 394, 96 L. Ed. 475.[1] Relying extensively on

*Frothingham*, the Court denied standing. After first emphasizing that there was no allegation that the Bible reading increased the plaintiffs' taxes or the cost of running the schools, 342 U.S., at 433, 72 S. Ct. 394, 96 L. Ed. 475, and then reaffirming that taxpayers must allege more than an indefinite injury suffered [****62] in common with people generally, *id.*, at 434,72 S. Ct. 394, 96 L. Ed. 475, the Court concluded that the "grievance which [the plaintiffs] sought to litigate here is not a direct dollars-and-cents injury but is a religious difference," *ibid.* In addition to reiterating *Frothingham*'s description of the unavoidable obstacles to recovery under a taxpayer theory of Wallet Injury, *Doremus* rejected Psychic Injury in unmistakable terms. The opinion's deprecation of a mere "religious difference," in contrast to a real "dollars-and-cents injury," can only be understood as a flat denial of standing supported only by taxpayer disapproval of the unconstitutional use of tax funds. If the [*622] Court had thought that Psychic Injury was a permissible basis for standing, it should have sufficed (as the dissenting Justices in *Doremus* suggested, see 342 U.S., at 435,72 S. Ct. 394, 96 L. Ed. 475 (opinion of Douglas, [**2576] J.)) that public employees were being paid in part to violate the Establishment Clause.

2 [****63]

Sixteen years after *Doremus*, the Court took a pivotal turn. In *Flast* v. *Cohen*, 392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), taxpayers challenged the Elementary and Secondary Education Act of 1965, alleging that funds expended pursuant to the Act were being used to support parochial schools. *Id.*, at 85-87, 88 S. Ct. 1942, 20 L. Ed. 2d 947. They argued that either the Act itself proscribed such expenditures or that the Act violated the Establishment Clause. *Id.*, at 87, 90,88 S. Ct. 1942, 20 L. Ed. 2d 947. The Court held that the taxpayers had standing. Purportedly in order to determine whether taxpayers have the "personal stake and interest" necessary to satisfy Article III, a two-pronged nexus test was invented. *Id.*, at 101-102, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

The first prong required the taxpayer to "establish a logical link between [taxpayer] status and the type of legislative enactment." *Id.*, at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947. The Court described what that meant as follows:

"[A] taxpayer will be a proper party to allege the

---

[1] The text of the statute did not just authorize public-school teachers to read from the Bible, but *mandated* that they do so: "At least five verses taken from that portion of the Holy Bible known as the Old Testament *shall be read*, or caused to be read, without comment, in each public school classroom, in the presence of the pupils therein assembled, *by the teacher in charge*, at the opening of school upon every school day . . .

." N. J. Rev. Stat. § 18:14-77 (1937) (emphasis added).

unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of [****64] tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus . . . ." Ibid.*

The second prong required the taxpayer to "establish a nexus between [taxpayer] status and the precise nature of the constitutional infringement [***453] alleged." *Ibid.* The Court elaborated that this required "the taxpayer [to] show that [*623] the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.*, at 102-103,88 S. Ct. 1942, 20 L. Ed. 2d 947. The Court held that the Establishment Clause was the type of specific limitation on the taxing and spending power that it had in mind because "one of the specific evils feared by" the Framers of that Clause was that the taxing and spending power would be used to favor one religion over another or to support religion generally. *Id.*, at 103-104, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (relying exclusively upon Madison's famous Memorial and Remonstrance Against Religious Assessments).

 [****65] Because both prongs of its newly minted two-part test were satisfied, *Flast* held that the taxpayers had standing. Wallet Injury could not possibly have been the basis for this conclusion, since the taxpayers in *Flast* were no more able to prove that success on the merits would reduce their tax burden than was the taxpayer in *Frothingham.* Thus, *Flast* relied on Psychic Injury to support standing, describing the "injury" as the taxpayer's allegation that "his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." 392 U.S., at 106, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

But that created a problem: If the taxpayers in *Flast* had standing based on Psychic Injury, and without regard to the effect of the litigation on their ultimate tax liability, why did not the taxpayers in *Doremus* and *Frothingham* have standing on a similar basis? Enter the magical two-pronged nexus test. It has often been pointed out, and never refuted, that the criteria in *Flast's* two-part test are *entirely unrelated* to the purported goal of ensuring that the plaintiff has a sufficient [**2577] "stake in the outcome of the controversy," 392 U.S., at 103, 88 S. Ct.

1942, 20 L. Ed. 2d 947. See [****66] *id.*, at 121-124, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (Harlan, J., dissenting); see also *id.*, at 107,88 S. Ct. 1942, 20 L. Ed. 2d 947 (Douglas, J., concurring); *United States* v. *Richardson*, 418 U.S. 166, 183, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (Powell, J., [*624] concurring). In truth, the test was designed for a quite different goal. Each prong was meant to disqualify from standing one of the two prior cases that would otherwise contradict the holding of *Flast.* The first prong distinguished *Doremus* as involving a challenge to an "incidental expenditure of tax funds in the administration of an essentially regulatory statute," rather than a challenge to a taxing and spending statute. See 392 U.S., at 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947. Did the Court proffer any reason why a taxpayer's Psychic Injury is less concrete and particularized, traceable, or redressable when the challenged expenditures are incidental to an essentially regulatory statute (whatever that means)? Not at all. *Doremus* had to be evaded, and so it was. In reality, of course, there is simply no material difference between *Flast* and *Doremus* as far as Psychic Injury is concerned: If taxpayers upset with the government's giving money to parochial schools had [****67] standing to sue, so should the taxpayers who disapproved of the government's [***454] paying public-school teachers to read the Bible.[2]

*Flast's* dispatching of [****68] *Frothingham* via the second prong of the nexus test was only marginally less disingenuous. Not only does the relationship of the allegedly violated provision to the taxing and spending power have no bearing upon the concreteness or particularity of the Psychic Injury, see Part III, *infra,* but the existence of that relationship does [*625] not even genuinely distinguish *Flast* from *Frothingham.* It is impossible to maintain that the Establishment Clause is

---

[2] There is a natural impulse to respond that the portion of the teachers' salary that corresponded to the time that they were required to read from the Bible was *de minimis.* But even *Flast* had the decency not to seize on a *de minimis* exception to distinguish *Doremus:* Having relied exclusively on Madison's Remonstrance to justify the conclusion that the Establishment Clause was a specific limitation on the taxing and spending power, see *Flast*, 392 U.S., at 103-104, 88 S. Ct. 1942, 20 L. Ed. 2d 947, the Court could not simultaneously ignore Madison's admonition that "'the same authority which can force a citizen *to contribute three pence only* of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever,'" *id.*, at 103, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (quoting Madison's Remonstrance; emphasis added).

a more direct limitation on the taxing and spending power than the constitutional limitation invoked in *Frothingham, which is contained within the very provision creating the power to tax and spend.* Article I, § 8, cl. 1, provides: "The Congress shall have Power To lay and collect Taxes . . ., to pay the Debts and provide for the common Defence *and general Welfare* of the United States." (Emphasis added.) Though unmentioned in *Flast*, it was precisely this limitation upon the permissible purposes of taxing and spending upon which Mrs. Frothingham relied. See, *e.g.,* Brief for Appellant in *Frothingham,* O. T. 1922, No. 962, p 68 ("[T]he words 'provide for the common defence and general welfare of the United [****69] States' are used *as limitations on the taxing power*"); *id.,* at 26-81 (discussing the general welfare limitation at length).

3

Coherence and candor have fared no better in our later taxpayer-standing cases. The three of them containing lengthy discussion of the Establishment Clause warrant analysis.

*Flast* was dismissively and unpersuasively distinguished just 13 years later in *Valley Forge Christian College* v. *Americans* [**2578] *United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982). The taxpayers there challenged the decision of the Department of Health, Education, and Welfare to give a 77-acre tract of Government property, worth over half a million dollars, to a religious organization. *Id.,* at 468, 102 S. Ct. 752, 70 L. Ed. 2d 700. The Court, adhering to the strict letter of *Flast*'s two-pronged nexus test, held that the taxpayers lacked standing. *Flast*'s first prong was not satisfied: Rather than challenging a congressional taxing and spending statute, the plaintiffs were attacking an agency decision to transfer federal property pursuant to Congress's power under the Property Clause, Art. IV, § 3, cl. 2. 454 U.S., at 479-480, 102 S. Ct. 752, 70 L. Ed. 2d 700.

[*626] In distinguishing [****70] between the Spending Clause and the Property Clause, *Valley Forge* achieved the seemingly impossible: It surpassed the high bar for irrationality set by *Flast*'s distinguishing of *Doremus* and *Frothingham.* Like the dissenters in [***455] *Valley Forge,* see 454 U.S., at 511-512, 102 S. Ct. 752, 70 L. Ed. 2d 700 (opinion of Brennan, J.); *id.,* at 513-514, 102 S. Ct. 752, 70 L. Ed. 2d 700 (opinion of Stevens, J.), I cannot fathom why Article III standing should turn on whether the government enables a religious organization to obtain real estate by giving it a check

drawn from general tax revenues or instead by buying the property itself and then transferring title.

While *Valley Forge*'s application of the first prong to distinguish *Flast* was unpersuasive, the Court was at least not trying to hide the ball. Its holding was forthrightly based on a resounding rejection of the very concept of Psychic Injury:

"[Plaintiffs] fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, [****71] even though the disagreement is phrased in constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." 454 U.S., at 485-486, 102 S. Ct. 752, 70 L. Ed. 2d 700 (emphasis deleted).

Of course, in keeping with what was to become the shameful tradition of our taxpayer-standing cases, the Court's candor about the inadequacy of Psychic Injury was combined with a notable silence as to why *Flast* itself was not doomed.

A mere six years later, *Flast* was resuscitated in *Bowen* v. *Kendrick,* 487 U.S. 589, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988). The taxpayers there [*627] brought facial and as-applied Establishment Clause challenges to the Adolescent Family Life Act, which was a congressional scheme that provided grants to public or nonprofit private organizations to combat premarital adolescent pregnancy and sex. *Id.,* at 593, 108 S. Ct. 2562, 101 L. Ed. 2d 520. The as-applied challenge focused on whether particular grantees selected by the Secretary of Health and Human Services were constitutionally permissible recipients. *Id.,* at 620-622, 108 S. Ct. 2562, 101 L. Ed. 2d 520. [****72] The Solicitor General argued that, under *Valley Forge*'s application of *Flast*'s first prong, the taxpayers lacked standing for their as-applied claim because that claim was really a challenge to executive decisionmaking, not to Congress's exercise of its taxing and spending power. 487 U.S., at 618-619, 108 S. Ct. 2562, 101 L. Ed. 2d 520. The Court rejected this contention, holding that the taxpayers' as-applied claim was still a challenge to Congress's taxing and spending power even though disbursement [**2579] of the funds authorized by

Congress had been administered by the Secretary. *Id.*, at 619, 108 S. Ct. 2562, 101 L. Ed. 2d 520.

*Kendrick*, like *Flast* before it, was obviously based on Psychic Injury: The taxpayers could not possibly make, and did not attempt to make, the showing required for Wallet Injury. But by relying on Psychic Injury, *Kendrick* perfectly revealed the incompatibility of that concept with the outcome in *Doremus*. Just as *Kendrick* did not care whether the appropriated funds would have been spent anyway--given to a different, permissible [***456] recipient--so also *Doremus* should not have cared that the teachers would likely receive the same salary once their classroom activities were limited [****73] to secular conduct. *Flast* and *Kendrick*'s acceptance of Psychic Injury is fundamentally at odds with *Frothingham, Doremus*, and *Valley Forge*.

Which brings me to the final case worthy of mention. Last Term, in *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006), we concisely confirmed that *Flast* was based on Psychic Injury. The taxpayers in that case sought to rely on [*628] *Flast* to raise a Commerce Clause challenge to a state franchise tax credit. 547 U.S., at 347, 126 S. Ct. 1854, 164 L. Ed. 2d 589In rejecting the analogy and denying standing, we described *Flast* as follows:

"The Court . . . understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff. And an injunction against the spending would of course redress *that* injury, regardless of whether lawmakers would dispose of the savings in a way that would benefit the taxpayer-plaintiffs personally." 547 U.S., at 348-349, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (citation omitted; some alterations in original).

What *Cuno*'s conceptualization of *Flast* reveals is that there are [****74] only two logical routes available to this Court. We must initially decide whether Psychic Injury is consistent with Article III. If it is, we should apply *Flast* to *all* challenges to government expenditures in violation of constitutional provisions that specifically limit the taxing and spending power; if it is not, we should overturn *Flast*.

II

A

The plurality today avails itself of neither principled

option. Instead, essentially accepting the Solicitor General's primary submission, it limits *Flast* to challenges to expenditures that are "expressly authorized or mandated by . . . specific congressional enactment." *Ante*, at 608, 168 L. Ed. 2d at 444. It offers no intellectual justification for this limitation, except that "[i]t is a necessary concomitant of the doctrine of *stare decisis* that a precedent is not always expanded to the limit of its logic." *Ante*, at 615, 168 L. Ed. 2d at 448. That is true enough, but since courts purport to be engaged in *reasoned* decisionmaking, it is *only* true when (1) the precedent's logic is seen to require narrowing or readjustment in light of relevant distinctions that the new fact situation brings to the fore; or (2) its logic is fundamentally [*629] flawed, and so [****75] deserves to be limited to the facts that begot it. Today's plurality claims neither of these justifications. As to the first, the plurality offers no explanation of why the factual differences between this case and *Flast* are *material*. It virtually admits that express congressional allocation *vel non* has nothing to do with whether the plaintiffs have alleged an injury in fact that is fairly traceable and likely to be redressed. See *ante*, at 609-610, [**2580] 168 L. Ed. 2d at 444-445. As the dissent correctly contends and I shall not belabor, see *post*, at 639-640, 168 L. Ed. 2d at 463-464 (opinion of Souter, J.), *Flast* is *indistinguishable* from this case for purposes of Article III. Whether the [***457] challenged government expenditure is expressly allocated by a specific congressional enactment *has absolutely no relevance* to the Article III criteria of injury in fact, traceability, and redressability.

Yet the plurality is also unwilling to acknowledge that the logic of *Flast* (its Psychic Injury rationale) is simply wrong, and *for that reason* should not be extended to other cases. Despite the lack of acknowledgment, however, that is the only plausible explanation for the plurality's indifference to whether the "distinguishing" [****76] fact is legally material, and for its determination to limit *Flast* to its "'*result[t]*,'" *ante*, at 610, 168 L. Ed. 2d at 444-445.[3] Why, then, pick a

_____

[3] This explanation does not suffice with regard to Justice Kennedy, who, unlike the other Members of the plurality, openly and avowedly contends both that *Flast* was correctly decided and that respondents should nevertheless lose this case. *Ante*, at 616, 168 L. Ed. 2d at 448 (concurring opinion). He thus has the distinction of being the only Justice who affirms both propositions. I cannot begin to comprehend how the amorphous separation-of-powers concerns that motivate him, *ante*, at 615-618, 168 L. Ed. 2d at 448-450, bear upon whether the express-allocation requirement is grounded in the

distinguishing fact that may breathe life into *Flast* in future cases, preserving the disreputable disarray of our Establishment Clause standing jurisprudence? Why not hold that only taxpayers raising Establishment Clause challenges to expenditures pursuant to the Elementary and Secondary Education Act of 1965 have [*630] standing? That, I suppose, would be too obvious a repudiation of *Flast*, and thus an impediment to the plurality's pose of minimalism.

 [****77] Because the express-allocation line has no mooring to our tripartite test for Article III standing, it invites demonstrably absurd results. For example, the plurality would deny standing to a taxpayer challenging the President's disbursement to a religious organization of a discrete appropriation that Congress had not explicitly allocated to that purpose, even if everyone knew that Congress and the President had informally negotiated that the entire sum would be spent in that precise manner. See *ante*, at 608, n 7, 168 L. Ed. 2d at 443-444 (holding that nonstatutory earmarks are insufficient to satisfy the express-allocation requirement). And taxpayers should lack standing to bring Establishment Clause challenges to the Executive Branch's use of appropriated funds when those expenditures have the *added vice* of violating congressional restrictions. If, for example, Congress instructs the President to disburse grants to hospitals that he deems worthy, and the President instead gives all of the money to the Catholic Church, "[t]he link between congressional action and constitutional violation that supported taxpayer standing in *Flast* [would be] missing." *Ante*, at 605, 168 L. Ed. 2d at 441. Indeed, taking the plurality [****78] at its word, Congress could insulate the President from all *Flast*-based suits by codifying the truism that no appropriation can be spent by the Executive Branch in a manner that violates the Establishment Clause.

Any last pretense of minimalism--of adhering to prior law but merely declining to "extend" it--is swept away by the fact that the Court's holding flatly contradicts *Kendrick*. The whole point of the as-applied challenge in *Kendrick* was that the Secretary, not Congress, had *chosen* inappropriate grant recipients. [***458] 487 U.S., at 620-622, 108 S. Ct. 2562, 101 L. Ed. 2d 520. Both *Kendrick* and this case equally involve, in the relevant [**2581] sense, attacks on executive discretion rather than congressional decision: Congress generally authorized the spending of tax funds for certain [*631] purposes but did not explicitly mandate that they be

spent in the *unconstitutional* manner challenged by the taxpayers. I thus share the dissent's bewilderment, see *post*, at 640-641, 168 L. Ed. 2d at 463-464, as to why the plurality fixates on the amount of *additional* discretion the Executive Branch enjoys under the law beyond the only discretion relevant to the Establishment Clause issue: whether to spend [****79] taxpayer funds for a purpose that is unconstitutional. See *ante*, at 615, 168 L. Ed. 2d at 448 (focusing on whether the case involves "a *purely* discretionary Executive Branch expenditure" (emphasis added)).

B

While I have been critical of the Members of the plurality, I by no means wish to give the impression that respondents' legal position is any more coherent. Respondents argue that *Flast* did not turn on whether Congress has expressly allocated the funds to the allegedly unconstitutional use, and their case plainly rests on Psychic Injury. They repeatedly emphasize that the injury in *Flast* was merely the governmental extraction and spending of tax money in aid of religion. See, *e.g.,* Brief for Respondents 28. Respondents refuse to admit that their argument logically implies, for the reasons already discussed, that *every* expenditure of tax revenues that is alleged to violate the Establishment Clause is subject to suit under *Flast.*

Of course, such a concession would run headlong into the denial of standing in *Doremus.* Respondents' only answer to *Doremus* is the cryptic assertion that the injury there was not fairly traceable to the unconstitutional conduct. Brief for [****80] Respondents 21, and n 7. This makes no sense. On *Flast*'s theory of Psychic Injury, the injury in *Doremus* was perfectly traceable and not in any way attenuated. It consisted of the psychic frustration that tax funds were being used in violation of the Establishment Clause, which was directly caused by the paying of teachers to read the Bible, and which would have been remedied by prohibition of that [*632] expenditure.[4] The hollowness of respondents' traceability argument is perhaps best

---

[4] Nor is the dissent's oblique suggestion that *Doremus* did not involve an "identifiable amoun[t]" of taxpayer funds, *post*, at 639, 168 L. Ed. 2d at 463, any more persuasive. One need not consult a CPA to realize that the portion of the school day during which the teachers' educational responsibilities were to read the Bible corresponded to a fraction of the teachers' taxpayer-funded salaries. And while the amount of money might well have been inconsequential, it was probably greater than three pence. See n 2, *supra*.

---

Article III criteria of injury in fact, traceability, or redressability.

demonstrated by their counsel's game submission at oral argument that there would be standing to challenge the hiring of a single Secret Service agent who guarded the President during religious trips, but no standing if those responsibilities (and the corresponding taxpayer-funded compensation) were spread out over the entire Secret Service protective detail. Tr. of Oral Arg. 38-39.

 [****81] The logical consequence of respondents' position finds no support in this Court's precedents or our Nation's history. Any taxpayer would be able to sue whenever tax funds were used [***459] in alleged violation of the Establishment Clause. So, for example, any taxpayer could challenge the fact that the Marshal of our Court is paid, in part, to call the courtroom to order by proclaiming "God Save the United States and this Honorable Court." As much as respondents wish to deny that this is what *Flast* logically entails, it blinks reality to conclude otherwise. If respondents are to [**2582] prevail, they must endorse a future in which ideologically motivated taxpayers could "roam the country in search of governmental wrongdoing and . . . reveal their discoveries in federal court," transforming those courts into "ombudsmen of the general welfare" with respect to Establishment Clause issues. *Valley Forge*, 454 U.S., at 487, 102 S. Ct. 752, 70 L. Ed. 2d 700.

C

Ultimately, the arguments by the parties in this case and the opinions of my colleagues serve only to confirm that *Flast*'s adoption of Psychic Injury has to be addressed head-on. [*633] Minimalism is an admirable judicial trait, but not when it comes at the cost [****82] of meaningless and disingenuous distinctions that hold the sure promise of engendering further meaningless and disingenuous distinctions in the future. The rule of law is ill served by forcing lawyers and judges to make arguments that deaden the soul of the law, which is logic and reason. Either *Flast* was correct, and must be accorded the wide application that it logically dictates, or it was not, and must be abandoned in its entirety. I turn, finally, to that question.

III

Is a taxpayer's purely psychological displeasure that his funds are being spent in an allegedly unlawful manner ever sufficiently concrete and particularized to support Article III standing? The answer is plainly no.

As I noted at the outset, *Lujan* explained that the "consisten[t]" view of this Court has been that "a plaintiff

raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large-- does not state an Article III case or controversy." 504 U.S., at 573-574, 112 S. Ct. 2130, 119 L. Ed. 2d 351. As evidence of the consistency [****83] with which we have affirmed that understanding, *Lujan* relied on the reasoning in *Frothingham*, and in several other cases, including *Ex parte Levitt*, 302 U.S. 633, 58 S. Ct. 1, 82 L. Ed. 493 (1937)(per curiam)(dismissing suit challenging Justice Black's appointment to this Court in alleged violation of the Ineligibility Clause, Art. I, § 6, cl. 2), *United States* v. *Richardson*, 418 U.S. 166, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (denying standing to challenge the Government's failure to disclose the CIA's expenditures in alleged violation of the Accounts Clause, Art. I, § 9, cl. 7), and *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974) (rejecting challenge to Members of Congress holding commissions in the military Reserves in alleged violation of the Incompatibility Clause, Art. I, § 6, cl. 2). See [*634] 504 U.S., at 573-577, 112 S. Ct. 2130, 119 L. Ed. 2d 351. Just this Term, relying on precisely the same cases and the same reasoning, we held unanimously that suits raising only generalized grievances do not satisfy Article III's requirement that the injury in fact be concrete and [***460] particularized. See *Lance*, 549 U.S., at 439-441, 127 S. Ct. 1194, 167 L. Ed. 2d 29[5]

 [****84] Nor does *Flast*'s limitation on Psychic Injury-- the limitation that it suffices only when the two-pronged "nexus" test is met-- [**2583] cure the Article III deficiency. The fact that it is the alleged violation of a specific constitutional limit on the taxing and spending power that produces the taxpayer's mental angst does not change the fundamental flaw. It remains the case that the taxpayer seeks "relief that no more directly and tangibly benefits him than it does the public at large." *Lujan, supra,* at 573-574, 112 S. Ct. 2130, 119 L. Ed. 2d 351. And it is of no conceivable relevance to this issue

---

[5] It is true that this Court has occasionally in dicta described the prohibition on generalized grievances as merely a prudential bar. But the fountainhead of this dicta, *Warth* v. *Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975), supported its statement only by naked citation of *Schlesinger, Richardson*, and *Levitt. 422 U.S.*, at 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343. But those cases squarely rested on Article III considerations, as the analysis in *Lujan* and *Lance* confirms.

whether the Establishment Clause was originally conceived of as a specific limitation on the taxing and spending power. Madison's Remonstrance has nothing whatever to say on the question whether suits alleging violations of that limitation are anything other than the generalized grievances that federal courts had always been barred from considering before *Flast.Flast* was forced to rely on the slim reed of the Remonstrance since there was no better support for its novel conclusion, in 1968, that violation of the Establishment Clause, unique among the provisions of our law, had always inflicted [****85] a personalized Psychic Injury upon all taxpayers that federal courts had the power to remedy.

Moreover, *Flast* is damaged goods, not only because its fanciful two-pronged "nexus" test has been demonstrated to be irrelevant to the test's supposed objective, but also because [*635] its cavalier treatment of the standing requirement rested upon a fundamental underestimation of that requirement's importance. *Flast* was explicitly and erroneously premised on the idea that Article III standing does not perform a crucial separation-of-powers function:

"The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." 392 U.S., at 100-101, 88 S. Ct. 1942, 20 L. Ed. 2d 947. [****86]

A perceptive Frenchman, visiting the United States some 135 years before Chief Justice Warren wrote these words, perceived that they were false.

"It is true that . . . judicial censure, exercised by the courts on legislation, cannot extend without distinction to all laws, *for there are some of them that can never give rise to the sort of clearly formulated dispute that one calls a case.*" A. de Tocqueville, Democracy in America [***461] 97 (H. Mansfield & D. Winthrop transls. and eds. 2000) (emphasis added).

*Flast*'s crabbed (and judge-empowering) understanding

of the role Article III standing plays in preserving our system of separated powers has been repudiated:

"To permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary [*636] in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'" *Schlesinger*, 418 U.S., at 222, 94 S. Ct. 2925, 41 L. Ed. 2d 706.

See also *Richardson*, 418 U.S., at 179-180, 94 S. Ct. 2940, 41 L. Ed. 2d 678; *Valley Forge*, 454 U.S., at 474, 102 S. Ct. 752, 70 L. Ed. 2d 700; [****87] *Lujan*, *supra*, at 576-577, 112 S. Ct. 2130, 119 L. Ed. 2d 351. We twice have noted explicitly that *Flast* failed to recognize the vital separation-of-powers aspect of Article III [**2584] standing. See *Spencer* v. *Kemna*, 523 U.S. 1, 11-12, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998); *Lewis* v. *Casey*, 518 U.S. 343, 353, n. 3, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996). And once a proper understanding of the relationship of standing to the separation of powers is brought to bear, Psychic Injury, even as limited in *Flast*, is revealed for what it is: a contradiction of the basic propositions that the function of the judicial power "is, solely, to decide on the rights of individuals," *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 170, 2 L. Ed. 60 (1803), and that generalized grievances affecting the public at large have their remedy in the political process.

Overruling prior precedents, even precedents as disreputable as *Flast*, is nevertheless a serious undertaking, and I understand the impulse to take a minimalist approach. But laying just claim to honoring *stare decisis* requires more than beating *Flast* to a pulp and then sending it out to the lower courts weakened, denigrated, more incomprehensible than ever, and yet somehow [****88] technically alive. Even before the addition of the new meaningless distinction devised by today's plurality, taxpayer standing in Establishment Clause cases has been a game of chance. In the proceedings below, well-respected federal judges declined to hear this case en banc, not because they thought the issue unimportant or the panel decision correct, but simply because they found our cases so lawless that there was no point in, quite literally, second-guessing the panel. See *Freedom From Religion Foundation, Inc.* v. *Chao*, 447 F.3d 988 (CA7 2006) (Flaum, C. J., concurring in denial of rehearing en banc); *id.*, at 989-990 [*637] (Easterbrook, J.,

concurring in denial of rehearing en banc) (describing our cases as "arbitrary," "illogical," and lacking in "comprehensiveness and rationality"). We had an opportunity today to erase this blot on our jurisprudence, but instead have simply smudged it.

My call for the imposition of logic and order upon this chaotic set of precedents will perhaps be met with the snappy epigram that "[t]he life of the law has not been logic: it has been experience." O. Holmes, The Common Law 1 (1881). But what experience has shown [****89] is that *Flast*'s lack of a logical theoretical underpinning has rendered our taxpayer-standing doctrine such a jurisprudential disaster that our appellate judges do not know [***462] what to make of it. And of course the case has engendered no reliance interests, not only because one does not arrange his affairs with an eye to standing, but also because there is no relying on the random and irrational. I can think of few cases less warranting of *stare decisis* respect. It is time--it is past time--to call an end. *Flast* should be overruled.

**Dissent by:** SOUTER

# Dissent

Justice **Souter,** with whom Justice **Stevens,** Justice **Ginsburg,** and Justice **Breyer** join, dissenting.

*Flast* v. *Cohen*, 392 U.S. 83, 102, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968), held that plaintiffs with an Establishment Clause claim could "demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements." Here, the controlling, plurality opinion declares that *Flast* does not apply, but a search of that opinion for a suggestion that these taxpayers have any less stake in the outcome than the taxpayers in *Flast* will come up empty: the plurality makes no such finding, nor could it. Instead, [****90] the controlling opinion closes the door on these taxpayers because the Executive Branch, and not the Legislative Branch, caused their injury. I see no basis for this distinction in either logic or precedent, and respectfully dissent.

  [*638] I

We held in *Flast*, and repeated just last Term, that the "'injury' alleged in Establishment Clause [**2585] challenges to federal spending" is "the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

348, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) (quoting *Flast*, *supra*, at 106, 88 S. Ct. 1942, 20 L. Ed. 2d 947; alterations in original). As the Court said in *Flast*, the importance of that type of injury has deep historical roots going back to the ideal of religious liberty in James Madison's Memorial and Remonstrance Against Religious Assessments, that the government in a free society may not "force a citizen to contribute three pence only of his property for the support of any one establishment" of religion. 2 Writings of James Madison 183, 186 (G. Hunt ed. 1901) (hereinafter Madison), quoted in *Flast*, *supra*, at 103, 88 S. Ct. 1942, 20 L. Ed. 2d 947. Madison thus translated into practical terms the right of conscience [****91] described when he wrote that "[t]he Religion . . . of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." Madison 184; see also *Zelman* v. *Simmons-Harris*, 536 U.S. 639, 711, n. 22, 122 S. Ct. 2460, 153 L. Ed. 2d 604 (2002) (Souter, J., dissenting) ("As a historical matter, the protection of liberty of conscience may well have been the central objective served by the Establishment Clause"); *Locke* v. *Davey*, 540 U.S. 712, 722, 124 S. Ct. 1307, 158 L. Ed. 2d 1 (2004) ("Since the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion"); N. Feldman, Divided By God: America's Church-State Problem --And What We Should Do About It 48 (2005) ("The advocates of a constitutional ban on establishment were concerned about paying taxes to support religious purposes that their consciences told them not to support").

The right of conscience and the expenditure [***463] of an identifiable three pence raised by taxes for the support of a religious cause are therefore not to be split off from one another. [*639] The three pence implicates [****92] the conscience, and the injury from Government expenditures on religion is not accurately classified with the "Psychic Injury" that results whenever a congressional appropriation or executive expenditure raises hackles of disagreement with the policy supported, see *ante*, at 624-625, 168 L. Ed. 2d at 454 (Scalia, J., concurring in judgment). Justice Stewart recognized this in his concurring opinion in *Flast*, when he said that "every taxpayer can claim a personal constitutional right not to be taxed for the support of a religious institution," and thus distinguished the case from one in which a taxpayer sought only to air a generalized grievance in federal court. 392 U.S., at 114, 88 S. Ct. 1942, 20 L. Ed. 2d 947.

Here, there is no dispute that taxpayer money in identifiable amounts is funding conferences, and these are alleged to have the purpose of promoting religion. Cf. *Doremus* v. *Board of Ed. of Hawthorne*, 342 U.S. 429, 434, 72 S. Ct. 394, 96 L. Ed. 475 (1952). The taxpayers therefore seek not to "extend" *Flast, ante,* at 615, 168 L. Ed. 2d at 447 (plurality opinion), but merely to apply it. When executive agencies spend identifiable sums of tax money for religious purposes, no less than when Congress authorizes the same thing, taxpayers suffer [****93] injury. And once we recognize the injury as sufficient for Article III, there can be no serious question about the other elements of the standing enquiry: the injury is indisputably "traceable" to the spending, and "likely to be redressed by" an injunction prohibiting it. *Allen* v. *Wright,* 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984); see also *Cuno, supra,* at 348, 126 S. Ct. 1854, 164 L. Ed. 2d 589 ("[A]n injunction against the spending would of course redress *that* injury").

[**2586] The plurality points to the separation of powers to explain its distinction between legislative and executive spending decisions, see *ante,* at 611-612, 168 L. Ed. 2d at 445-446, but there is no difference on that point of view between a Judicial Branch review of an executive decision and a judicial evaluation of a congressional one. We owe respect to each of the other branches, no more to the former than to the latter, and no one has suggested that the Establishment Clause lacks applicability [*640] to executive uses of money. It would surely violate the Establishment Clause for the Department of Health and Human Services to draw on a general appropriation to build a chapel for weekly church services (no less than if a statute required it), and for [****94] good reason: if the Executive could accomplish through the exercise of discretion exactly what Congress cannot do through legislation, Establishment Clause protection would melt away.[1]

So in [****95] *Bowen* v. *Kendrick,* 487 U.S. 589, 108 S. Ct. 2562, 101 L. Ed. 2d 520 (1988), we recognized the equivalence [***464] between a challenge to a congressional spending bill and a claim that the Executive Branch was spending an appropriation, each in violation of the Establishment Clause. We held that "claim that . . . funds [were] being used improperly by individual grantees [was no] less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary," and we added that "we have not questioned the standing of taxpayer plaintiffs to raise Establishment Clause challenges, even when their claims raised questions about the administratively made grants." *Id.,* at 619, 108 S. Ct. 2562, 101 L. Ed. 2d 520.

The plurality points out that the statute in *Bowen* "expressly authorized and appropriated specific funds for grantmaking" and "expressly contemplated that some of those moneys might go to projects involving religious groups." [*641] *Ante,* at 607, 168 L. Ed. 2d at 443. That is all true, but there is no reason to think it should matter, and every indication in *Bowen* that it did not. In *Bowen* we already had found the statute valid on its face before [****96] we turned to the taxpayers' as-applied challenge, see 487 U.S., at 618, 108 S. Ct. 2562, 101 L. Ed. 2d 520, so the case cannot be read to hold that taxpayers have standing only to claim that congressional action, but not its implementation, violates the Establishment Clause. Thus, after *Bowen,* the plurality's distinction between a "congressional mandate" on the one hand and "executive discretion" on the other, *ante,* at 609, 168 L. Ed. 2d at 444, is at once arbitrary and hard to manage: if the statute itself is constitutional, all complaints must be about the exercise of "executive discretion," so there is no line to be drawn between *Bowen* and the case before us today.[2]

---

[1] The plurality warns that a parade of horribles would result if there were standing to challenge executive action, because all federal activities are "ultimately funded by some congressional appropriation." *Ante,* at 610, 168 L. Ed. 2d at 445. But even if there is Article III standing in all of the cases posited by the plurality (and the Court of Appeals thought that at least sometimes there is not, *Freedom From Religion Foundation, Inc., v. Chao,*433 F.3d 989, 996 (CA7 2006)), that does not mean taxpayers will prevail in such suits. If these claims are frivolous on the merits, I fail to see the harm in dismissing them for failure to state a claim instead of for lack of jurisdiction. To the degree the claims are meritorious, fear that there will be many of them does not provide a compelling

reason, much less a reason grounded in Article III, to keep them from being heard.

[2] *Bowen* also indicated that the barrier to standing in *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982), was that the taxpayers challenged "an exercise of executive authority pursuant to the Property Clause of Article IV, § 3." 487 U.S. at 619, 108 S. Ct. 2562, 101 L. Ed. 2d 520. In *Valley Forge,* we had first discussed the executive rather than legislative nature of the action at issue there and then, "perhaps redundantly," 454 U.S., at 480, 102 S. Ct. 752, 70 L. Ed. 2d 700, pointed to the distinction between the Property Clause and the Taxing and Spending Clause. Although at the time *Valley Forge* might have been taken to

[****97] [**2587] II

While *Flast* standing to assert the right of conscience is in a class by itself, it would be a mistake to think that case is unique in recognizing standing in a plaintiff without injury to flesh or purse. Cognizable harm takes account of the nature of the interest protected, which is the reason that "the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition," [*642] leaving it impossible "to make application of the constitutional standing requirement a mechanical exercise." *Allen*, 468 U.S., at 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556. The question, ultimately, has to be whether the injury alleged is "too abstract, or otherwise not appropriate, [***465] to be considered judicially cognizable." *Id.,* at 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556.[3]

[****98] In the case of economic or physical harms, of course, the "injury in fact" question is straightforward. But once one strays from these obvious cases, the enquiry can turn subtle. Are esthetic harms sufficient for Article III standing? What about being forced to compete on an uneven playing field based on race (without showing that an economic loss resulted), or living in a racially gerrymandered electoral district? These injuries are no more concrete than seeing one's tax dollars spent on religion, but we have recognized each one as enough for standing. See *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (esthetic injury); *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U.S. 656, 666, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993) ("[T]he 'injury in fact' is the inability to compete on an

equal footing in the bidding process, not the loss of a contract"); *United States* v. *Hays*, 515 U.S. 737, 744-745, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995) (living in a racially gerrymandered electoral district). This is not to say that any sort of alleged injury will satisfy Article III, but only that intangible harms must be [****99] evaluated case by case.[4]

[*643] Thus, *Flast* speaks for this Court's recognition (shared by a majority of the Court today) that when the Government spends money for religious purposes a taxpayer's injury is serious and concrete enough to be "judicially cognizable," *Allen, supra*, at 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556. The judgment of sufficient injury takes account of the Madisonian relationship of tax money [**2588] and conscience, but it equally reflects the Founders' pragmatic "conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any one of all religions," *Everson* v. *Board of Ed. of Ewing*, 330 U.S. 1, 11, 67 S. Ct. 504, 91 L. Ed. 711 (1947), and the realization continuing to the modern day that favoritism for religion "'sends [****100] the . . . message to . . . nonadherents "that they are outsiders, not full members of the political community,"'" *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U.S. 844, 860, 125 S. Ct. 2722, 162 L. Ed. 2d 729 (2005) (quoting *Santa Fe Independent School Dist.* v. *Doe*, 530 U.S. 290, 309-310, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000), in turn quoting *Lynch* v. *Donnelly*, 465 U.S. 668, 688, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring); omissions in original).[5]

Because the taxpayers in this case have alleged the type of injury this Court has seen as sufficient for standing, I would affirm.

# References

U.S.C.S., Constitution, Art. I, § 8; Art. III; Amendment 1

Moore's Federal Practice §§ 101.02, 101.20, 101.21,

---

support the distinction the plurality draws today, *Bowen* said that *Valley Forge* rested on the distinction between the Property Clause on the one hand and the Taxing and Spending Clause on the other. See also *Valley Forge, supra*, at 480, n. 17, 102 S. Ct. 752, 70 L. Ed. 2d 700 (noting that the transfer of property to a religious college involved no expenditure of funds).

[3] Although the plurality makes much of the fact that the injury in this case is "generalized," *ante*, at 599, 168 L. Ed. 2d at 438, and shared with the "public-at-large," *ante*, at 600, 168 L. Ed. 2d at 438, those properties on their own do not strip a would-be plaintiff of standing. See *FEC v. Akins*, 524 U.S. 11, 24,118 S. Ct. 1777, 141 L. Ed. 2d 10 (1998) ("Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact'").

[4] Outside the Establishment Clause context, as the plurality points out, we have not found the injury to a taxpayer when funds are improperly expended to suffice for standing. See *ante*, at 609-610, 168 L. Ed. 2d at 460-461 (citing examples).

[5] There will not always be competitors for the funds who would make better plaintiffs (and indeed there appears to be no such competitor here), so after accepting the importance of the injury there is no reason to refuse standing as a prudential matter.

551 U.S. 587, *643; 127 S. Ct. 2553, **2588; 168 L. Ed. 2d 424, ***465; 2007 U.S. LEXIS 8512, ****100

101.40-101.42, 101.60, 101.61 (Matthew Bender 3d ed.)

L Ed Digest, Parties § 22

L Ed Index, Taxpayers' Actions

Taxpayer's standing to raise federal constitutional question in federal court--Supreme Court cases. 136 L. Ed. 2d 963.

Requirements of Article III of Federal Constitution as affecting standing to challenge particular conduct as violative of federal law--Supreme Court cases. 70 L. Ed. 2d 941.

Supreme Court's view as to what is a "case or controversy" within the meaning of Article III of the Federal Constitution or an "actual controversy" within the meaning of the Declaratory Judgment Act (28 U.S.C.S. § 2201). 40 L. Ed. 2d 783.

Supreme Court cases involving establishment and freedom of religion clauses of Federal Constitution. 37 L. Ed. 2d 1147.

**End of Document**