# Rogers v. United States

United States Claims Court

December 16, 1987

No. 444-85C

**Reporter**

14 Cl. Ct. 39 *; 1987 U.S. Cl. Ct. LEXIS 232 **

Wallace ROGERS, Southeast Kansas Community Action Program, Inc. and the Economic Opportunity Foundation, Inc. v. The UNITED STATES

**Counsel:** [**1] William E. Metcalf, Topeka, Kansas, attorney for the Plaintiffs.

Stuart James, Washington, District of Columbia, with whom was Assistant Attorney General Richard K. Willard, for the Defendant.

**Judges:** Lawrence S. Margolis, Judge, U.S. Claims Court.

**Opinion by:** MARGOLIS

## Opinion

[*41] MARGOLIS, Judge.

Plaintiffs, two Kansas community action agencies which provide assistance to low-income persons, and Wallace Rogers, a recipient of such assistance, brought this action [*42] challenging defendant's refusal to fund plaintiffs' entire 1981 program year. The parties filed cross motions for summary judgment. Defendant has also filed a partial motion to dismiss. After having reviewed the record and after hearing oral argument, defendant's partial motion to dismiss is granted and defendant's motion for summary judgment is granted. The plaintiffs' motion for summary judgment is denied.

FACTS

The Economic Opportunity Act of 1964, Pub. L. No. 88-452, 78 Stat. 508 (codified as amended at 42 U.S.C. §§ 2701-2996) (repealed in part 1981), established the Office of Economic Opportunity (OEO). OEO and its successor agency, the Community Services Administration (CSA), provided financial assistance to the low income population through various state and local community action agencies [**2] (CAAs). Until 1974, each CAA was funded with one grant to cover its entire program year. In 1974, Congress failed to appropriate sufficient funds to re-fund all CAAs at their 1973 levels. To cope with the lowered federal fiscal year (FFY) 1974 appropriation, CSA decided to fund each CAA only to the end of FFY 1974 rather than to the end of the CAA's program year. This change allowed CSA to fund individual CAAs at pre-reduction FFY 1973 levels.

In 1975, the closing date of the FFY was changed from June 30 to September 30. CSA, buoyed by supplemental appropriations, took advantage of this change in the FFY to restore many CAAs to full program year funding. To do this, CAAs were divided into two categories: large CAAs, which received over $ 300,000 annually in Section 221 (42 U.S.C. § 2808) funds, and small CAAs, which received less than $ 300,000 annually in Section 221 funds. There were approximately 740 small CAAs and 160 large CAAs. Small CAAs were returned to full program year funding. However, there were not sufficient funds available to return all large CAAs to full program year funding, and, instead, large CAAs received their funding through two separate grants: one [**3] grant covering the period from the beginning of the CAA's program year to the end of the FFY on September 30, and a second grant covering the period from the beginning of the subsequent FFY on October 1 to the end of the CAA's program year.

During this period, large CAAs generally had their programs funded from congressional appropriations from that FFY. In line with the agency's regulations, CSA's objective was to eventually put all CAAs, both large and small, on full program year funding. *See* 45 C.F.R. § 1067.30-5(8) (stating that "whenever possible" funding will coincide with the program year). By 1981, CSA had restored many large CAAs to full program year funding.

The Omnibus Budget Reconciliation Act of 1981 (Act), Pub. L. No. 97-35, § 683, 95 Stat. 357, 519, enacted on August 13, 1981, repealed major components of the Economic Opportunity Act and altered the method by

W.D. Wash. 000080

which federal funds were distributed to CAAs. These changes were to become effective at the beginning of the following FFY, October 1, 1981. The Act abolished the CSA and replaced it with a Community Service Block Grant Program, which authorized the Secretary of Health and Human Services to make block [**4] grants directly to the States "to ameliorate the causes of poverty in communities within the State." 42 U.S.C. § 9901(a). The Act provided for the Director of the Office of Management and Budget to provide for the termination of the affairs of the CSA. 42 U.S.C. § 9911(e).

The Act provided that, subject to certain reductions, each State would receive "an amount which bears the same ratio to such remaining amount as the amount received by the State for fiscal year 1981 under Section 2808 of this title bore to the total amount received by all States for fiscal year 1981 under such part." 42 U.S.C. § 9903(a) (1). The States were then free to use this money at their discretion to fund [*43] anti-poverty efforts, including funding the former CAAs. 42 U.S.C. §§ 9902(1), 9904(c). The Act permitted States to opt out of the block grant program for FFY 1982 and instead have the Secretary of Health and Human Services directly fund State and local CAAs under the former law. 42 U.S.C. § 9911. Beginning in FFY 1983, all States were required to operate under the block grant program. The State of Kansas elected to participate in the block grant program for FFY 1982.

Plaintiffs Southeast Kansas [**5] Community Action Program (SEK-CAP) and Economic Opportunity Foundation (EOF) are large CAAs in Kansas. Plaintiff Wallace Rogers is a low-income Kansas resident served by SEK-CAP. SEK-CAP's program year runs from June 1 through May 31. SEK-CAP received $ 384,000 for program years 1978, 1979, and 1980. On June 1, 1981, SEK-CAP received $ 114,222 in Section 221 funds for the first four months of its program year through September 30. EOF's program year runs from April 1 to March 31. EOF's annual Section 221 funding was $ 639,000 for fiscal years 1978, 1979, and 1980. On April 1, 1981, EOF received Section 221 funding of $ 300,200 for six months of funding through September 30, 1981. EOF also received an additional $ 80,000 in Section 221 funds on September 30, 1981. With the passage of the new Act on August 13, 1981, there were no monies appropriated to CSA with which to fund CAAs for FFY 1982.

As of August 13, 1981, there remained available less than $ 30 million of unobligated Section 221 funds, which was approximately eight percent of CSA's FFY 1981 appropriation for the Section 221 program. CSA chose to follow its historical funding pattern and use the remaining Section [**6] 221 funds from FFY 1980 to continue funding in full small CAAs whose program years began after August 13 while funding large CAAs only to the end of FFY 1981. After funding these CAAs, surplus funds totaling $ 1.4 million from FFY 1981 remained in the CSA region responsible for distributing funds to CAAs in Kansas. Although the director of this region requested authority to distribute the remaining FFY 1980 funds to large CAAs to cover at least a portion of their program years remaining after October 1, 1981, as had been done in other regions, this request was denied. Instead, CSA recalled the funds to cover close-out administrative expenses and to serve as a reserve for the Anti-Deficiency Act, 31 U.S.C. § 1512.

As FFY 1981 drew to a close, it became evident that the block grant program would not be prepared to disburse funds to the large CAAs in the near future. Large CAAs that had not received the FFY 1982 portion of their 1981 program year budget thus found themselves without any forthcoming FFY 1982 funds.

Therefore, on the last day of FFY 1981, September 30, 1981, the day before the new Act was to take effect and CSA was to be abolished, plaintiffs brought an action in the [**7] District Court for the District of Kansas seeking declaratory, injunctive, and other relief. Plaintiffs sought to enjoin the CSA from returning to the Treasury the $ 8 million that remained of CSA's 1981 appropriations, to obtain a declaratory judgment that CSA's funding decisions from August 13, 1981 to October 1, 1981 violated applicable law and regulations, and to compel CSA to provide funding for SEK-CAP and EOF for the remainders of their 1981 program years. The district court denied plaintiff's motion for a temporary restraining order that would prevent CSA's 1981 appropriations from lapsing into the Treasury. Thereafter, the district court granted the defendant's motion to dismiss, treating it as a motion for summary judgment.

On appeal, the Tenth Circuit Court of Appeals held that the district court lacked jurisdiction to entertain the suit. *Rogers v. Ink,* 766 F.2d 430, 436 (10th Cir. 1985). The court of appeals held that because the suit sought damages from the government in excess of $ 10,000 premised on constitutional, contractual, statutory, and regulatory grounds, exclusive jurisdiction rests in the Claims Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a) [**8] (1). *Id.* at 433-36. The court of appeals

vacated the district court's dismissal on the merits and remanded the case to the district court "with directions [*44] that the action be transferred to the United States Claims Court 'in the interests of justice' under 28 U.S.C. § 1631." *Id.* at 436.

Plaintiffs accordingly filed a complaint with this court on August 30, 1985 seeking judgment against the United States in the amount of $ 338,000 plus interest on behalf of plaintiffs EOF and $ 354,778 plus interest on behalf of plaintiffs SEK-CAP and Wallace Rogers. Plaintiffs also seek to recover their costs and attorneys' fees. There being no issues of material fact, the parties have filed cross motions for summary judgment. The defendant has also filed a partial motion to dismiss.

DISCUSSION

Plaintiffs make multiple claims attacking CSA's actions pertaining to distribution of Section 221 funds during FFY 1981. Plaintiffs charge that:

(1) CSA's approval of plaintiffs' grant applications created an express and implied-in-fact contract, which the defendant breached by failing to issue plaintiffs the remaining amounts due under their grants.

(2) The defendant engaged in arbitrary [**9] and capricious decisionmaking in violation of the Administrative Procedure Act.

(3) The defendant failed to provide any reason for the denial of funding as required by 42 U.S.C. § 2944 and 45 C.F.R. § 1067.2.

(4) The defendant failed to afford plaintiffs the opportunity for a full and fair hearing as required by 42 U.S.C. § 2944 and 45 C.F.R. § 1050.115.

(5) In disbursing FFY 1981 funds, defendant violated statutory and regulatory provisions requiring the equitable distribution of funds as required by 42 U.S.C. §§ 2833(b), 2836(8), 2967.

(6) The defendant failed to comply with the requirements of 45 C.F.R. § 1067.30-5(8) that whenever possible grantees shall be funded for their entire program year.

(7) The defendant violated plaintiffs' due process and equal protection rights in violation of the Fifth Amendment of the United States Constitution.

(8) The defendant violated 42 U.S.C. § 2000d that no person should be denied benefits under a federal program on account of race.

(9) The defendant's actions constituted an illegal impoundment of funds in violation of the Impoundment Control Act of 1974, 31 U.S.C. §§ 1400-1407 (current version at 2 U.S.C. §§ 681-688 (1982)).

Defendant [**10] denies each of these contentions and moves for summary judgment. Defendant also moves to dismiss the due process, equal protection, and racial discrimination claims for lack of jurisdiction.

A. *Breach of Contract*

This court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to render judgment on claims for money arising out of a contract with the United States, or under a statute or regulation requiring, or fairly interpreted to require, the payment of money. *United States v. Testan,* 424 U.S. 392, 397-98, 47 L. Ed. 2d 114, 96 S. Ct. 948 (1976); *Eastport Steamship Corp. v. United States,* 178 Ct. Cl. 599, 605, 372 F.2d 1002, 1007 (1967). Because plaintiffs request money damages under an implied-in-fact contract with the government, this court has jurisdiction over the claim.

The parties agree that CSA's approval of plaintiffs' grant application formed an implied-in-fact contract. Both parties agree that the government's obligation under this implied-in-fact contract to provide funding was contingent on two factors: (1) that the plaintiffs comply with all grant conditions; and (2) that funds were available. The government does not allege that either SEK-CAP or EOF violated any grant [**11] conditions. The dispute therefore centers on whether or not CSA had any funds available with which to pay plaintiffs for that part of their 1981 program year that extended into FFY 1982.

Because plaintiffs are large CAAs, they did not receive a single grant to cover the entire program year; each received two grants, one covering the period from the beginning of the program year until the [*45] end of the FFY and a second grant covering the period between the beginning of the subsequent FFY until the end of the CAA's program year. Small CAAs received one grant that covered the entire program year. For the year at issue, plaintiffs' program year began towards the middle of FFY 1981 and ended towards the middle of FFY 1982. The original purpose for bifurcating the funding for large CAAs was so that the first grant could be funded with funds appropriated during that FFY, and the second grant, covering that part of plaintiffs' program year that extended into the next FFY, would come from

W.D. Wash. 000082

funds appropriated for the next FFY in the event the appropriations for the preceding FFY were exhausted. For example, had appropriations for the CSA been continued for FFY 1982, plaintiffs would have received [**12] FFY 1981 funds for the first half of their program year and FFY 1982 funds, or FFY 1981 funds if any remained available, for the second half of their program year.

It is likely all would have gone according to plan except that Congress decided to repeal the Economic Opportunity Act and replace it with a block grant program supervised by the States. The vote to repeal the Economic Opportunity Act and to dismantle the CSA occurred on August 13, 1981. The termination of the CSA was to occur on October 1, 1981, the first day of FFY 1982. Therefore, CSA did not receive any FFY 1982 appropriations -- appropriations that were needed to avoid having to reduce CAA program year funding.

The absence of FFY 1982 appropriations left CSA in a quandary. On the day of the vote to dismantle the agency, August 13, 1981, CSA found itself with slightly less than $ 30 million in unexpended FFY 1981 Section 221 funds, which represented about eight percent of its FFY 1981 Section 221 appropriation. At this time, the vast majority of CAAs were small CAAs that had already received full funding for their entire 1981 program years. Many large CAAs, including the plaintiffs, had received funding only for [**13] the remainder of FFY 1981. CSA did not have sufficient funds available both to fund each remaining small CAA for its entire program year and to fund each large CAA for the FFY 1982 portion of its program year. CSA determined that it would be more equitable and less disruptive to fund all grantees according to their historical funding patterns, *i.e.,* full program year funding for small CAAs and split funding for large CAAs. The result of this policy was that many of the small CAAs were funded for a period of time in FFY 1982 with the remaining FFY 1981 funds. Large CAAs, including the plaintiffs, however, received few FFY 1981 funds for use in FFY 1982. [1] CSA expected that the block grant program would fund the FFY 1982 portion of the large CAAs' 1981 program year.

After re-funding all of the small CAAs in Region 7, where plaintiffs are located, there remained approximately $ 1.4 million in unobligated Section 221 funds. Plaintiffs claim that these funds should have been used to satisfy the remainder of plaintiffs' grants. [**14] In fact, the Regional Director of Region 7 proposed to distribute these funds to large CAAs in Region 7. These proposals were not approved, however, and in late September 1981, CSA recalled the $ 1.4 million in Section 221 funds to pay administrative expenses and to serve as a cushion for the Anti-Deficiency Act. On September 30, 1981, $ 8 million of CSA appropriations lapsed into the Treasury. This money was the remainder of the fund that had been accumulated for Anti-Deficiency Act purposes and to pay CSA close-out expenses. Plaintiffs contend that the existence of these monies indicates that funds were available with which to fulfill the contract and that the government acted arbitrarily and capriciously in not so using the funds.

1. *Arbitrary and Capricious Decisionmaking*

Plaintiffs allege that CSA's method of distributing funds after August 13, 1981 constituted arbitrary and capricious [*46] decisionmaking in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(a). The scope of review under Section 706(2)(a) of the Administrative Procedure Act is limited. The court's inquiry is not whether it agrees with the agency's decision, but rather, whether the decision [**15] was based on relevant factors, whether the decision lacked a rational basis, or whether the decision lacked a rational basis, or whether the decision represents a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285, 42 L. Ed. 2d 447, 95 S. Ct. 438 (1974); *Bunge Corp. v. United States,* 5 Cl. Ct. 511, 522 (1984), *aff'd,* 765 F.2d 162 (Fed. Cir. 1985). The agency's decision is entitled to substantial deference. *Bunge Corp.,* 5 Cl. Ct. at 522. For the agency's decision to be upheld, "it is not necessary to find that the agency construction is the only reasonable one," and "the judicial function is exhausted when there is found to be a rational basis" for the administrative decision. *Port Authority of St. Paul v. United States,* 193 Ct. Cl. 108, 120, 432 F.2d 455, 461 (1970). The court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation,* 419 U.S. at 285-86.

During August 1981, for CSA to have fully eliminated the distinction between large and small CAAs and to distribute FFY 1981 funds ratably, as plaintiffs suggest was the proper method of distribution, CSA [**16] would have had to attempt to withdraw funds already committed to those CAAs whose 1981 grant

---

[1] Plaintiff EOF, however, did receive a grant of $ 80,000 on September 30, 1981, which covered part of its program year that extended into FFY 1982.

applications were approved and fully funded prior to August 13, 1981. While a *pro rata* distribution may have been a fairer means of distributing all remaining Section 221 funds, CSA's method of distributing the funds did not amount to an abuse of discretion. In fact, the evidence suggests that CSA made every effort to fund all CAAs to the maximum degree possible while at the same time attempting to attend to an orderly close-out. In addition, CSA anticipated that the block grant program would be in place and functioning in early FFY 1982 to fund the FFY 1982 requirements of large CAAs. *See* 127 Cong. Rec. 18940 (1981) (statement of Rep. Ashbrook) (stating that "efforts are underway to insure that community action programs move forward effectively through the transition.")

The termination of an agency presents the agency's director with a set of difficult decisions to make. In this case, the director continued to fund all CAAs according to the practice that had been developed in 1974. CSA's director believed that insufficient time and funds remained available after August 13, [**17] 1981 to establish a new method of distributing the remaining Section 221 funds. Therefore, in the interest of fairness and in light of the heavy workload demanded by close-out responsibilities, the director determined that CSA should continue to follow its preexisting funding policy.

Plaintiffs argue that it was an abuse of discretion for CSA to incur new obligations by funding small CAAs after August 13, 1981 while it was still contractually bound to pay plaintiffs. Plaintiffs' argument, if successful, would completely frustrate the purpose for which split funding was developed. The entire reason split funding was developed was because CSA did *not* have sufficient appropriated funds from a single FFY to fully fund all CAAs on a program year basis. Either CAAs would have to take a cut in funding, or some CAAs would have to receive funds from the subsequent FFY. CSA determined that large CAAs would receive a portion of their appropriations at the beginning of the following FFY. Furthermore, in deciding to maintain the split funding pattern during 1981, CSA anticipated that the new block grant program would satisfy many of plaintiffs' FFY 1982 needs.

The CSA director also set [**18] aside some funds to serve as a cushion for the Anti-Deficiency Act and to pay for certain administrative expenses. Plaintiffs contend that these funds were wrongfully transferred and should be used to pay plaintiffs' grants. Plaintiffs' argument is not compelling. The Anti-Deficiency Act specifically allows agencies to apportion or reapportion an appropriation to establish a [*47] reserve to provide for contingencies. *See* 31 U.S.C. § 1512(c)(1)(a). In view of the large size of Section 221 appropriations, the amount CSA apportioned for Anti-Deficiency Act purposes does not seem to constitute an excessive reserve. The establishment of such a reserve was within the director's discretion, and his decision to so apportion CSA's appropriations was not an abuse of that discretion.

Following enactment of the Omnibus Budget Reconciliation Act on August 13, 1981, Mr. Dwight Ink, CSA Director from June 30, 1981 until September 31, 1981, was concerned that Congress would not appropriate funds for CSA close-out costs. The Act did not include any appropriations for close-out costs. As a result, Mr. Ink believed it necessary to take measures to insure that CSA could meet its obligations to [**19] its employees. Mr. Ink sought advice from CSA's General Counsel on whether CSA could use program funds for administrative close-out expenses. The General Counsel informed Mr. Ink that such a transfer was permissible. In addition, CSA sought guidance from the Office of Management and Budget (OMB) on using FFY 1981 funds for administrative expenses. [2] OMB notified CSA that it was appropriate for CSA to expend the remaining FFY 1981 appropriations to pay certain administrative expenses, including severance pay, lump sum annual leave, and outstanding travel obligations. *See* Appendix, Plaintiffs' Motion for Summary Judgment at E-157. Finally, on October 1, 1981, the day CSA expired, Congress did in fact enact a continuing appropriation for FFY 1982 that included funds for CSA close-out expenses.

Faced with limited time and money, CSA attempted to dole out its resources in such a way as to protect its employees and at the same time to fund as many CAAs as possible. CSA's decision to continue its pattern of funding CAAs did not represent a clear error [**20] of judgment and was not an abuse of discretion. Therefore, this court concludes that CSA's method of distributing funds after August 13, 1981 had a rational basis and was not arbitrary or capricious.

2. *Availability of Funds*

Plaintiffs allege that the $ 8 million that lapsed into the Treasury constituted available funds. Plaintiffs also

---

[2] The Budget Reconciliation Act provided that OMB was to supervise the termination of CSA's affairs. 42 U.S.C. § 9911(e).

allege that the $ 1.4 million in Region 7 Section 221 funds, which were transferred to CSA's administrative account, could have been used to fund plaintiffs. Plaintiffs make much of the fact that in some prior years EOF and SEK-CAP received their second grants from the previous year's funds. That fact is not relevant to the issue before this court. That the second grant had on occasion come from the previous year's funding did not, as plaintiffs argue, create a "historical funding pattern" to which the defendant was bound.

The implied-in-fact contract obligated CSA to fund plaintiffs with FFY 1982 funds, if appropriated, or with FFY 1981 funds *if any were available.* Congress chose not to appropriate any FFY 1982 Section 221 funds, and CSA chose to use FFY 1981 funds for other purposes. The fact that for the past two years CSA had sufficient [**21] funds available to pay plaintiffs' second grants from Section 221 funds remaining from the preceding FFY, does not obligate CSA to do so in this case. The distribution of FFY 1981 funds was within CSA's discretion. CSA, faced with its own termination, decided that the remaining FFY 1981 funds would be applied to termination expenses and Anti-Deficiency Act purposes and, as a result, plaintiffs would not receive their second grant. At the close of FFY 1981, because of these obligations, there were not sufficient Section 221 funds available with which to fund plaintiffs.

3. *Publication in the Federal Register*

The Economic Opportunity Act requires that all rules, regulations, guidelines, [*48] instructions, and application forms must be published in the Federal Register at least 30 days before they are to become effective. 42 U.S.C. § 2971b. Plaintiffs contend that CSA failed to publish its policy of split funding large CAAs, such failure rendering the policy void. Plaintiffs argue that in the absence of a published split funding policy, they are entitled to one grant covering the entire approved program year. In fact, plaintiffs maintain that CSA published a rule that was contrary [**22] to the split funding policy. Plaintiffs are correct that 45 C.F.R. § 1067.30-5(8) expresses a policy that "whenever possible the grantee's fundings will coincide with the grantee's program year." However, the immediately preceding sentence of that regulation unambiguously states that a grantee's program year "will not necessarily agree with the period for which funds are awarded." This section does state, in general terms, CSA's policy regarding split funding, and this section was published in the Federal Register at 41 Fed. Reg. 56197 (Dec. 27, 1976).

CSA's failure to publish specific guidelines in the Federal Register concerning the mechanics of the split funding policy, although the details of the policy probably should have been published, does not render the policy void in this case. Plaintiffs EOF and SEK-CAP had notice of the split funding policy from its inception as they were the policy's first beneficiaries. In 1974, CSA began split funding for all CAAs to avoid a reduction in CAA funding. If CSA had continued to fund CAAs on a program year basis, all CAAs, including plaintiffs, would have received a reduction in funding of up to 40 percent from the 1973 funding levels.

[**23] In *Nason v. Kennebec County CETA,* 646 F.2d 10 (1st Cir. 1981), the court of appeals reviewed CETA's failure to publish an interpretative rule in the Federal Register as required by a statutory provision identical to the one in the Economic Opportunity Act. *Id.* at 19. Just as the plaintiffs in this case have relied on the Administrative Procedure Act, 5 U.S.C. § 551(4), for clarification of 42 U.S.C. § 2971b, the court in *Nason* used Section 552(a) (1) of the APA to shed some light on the CETA provision. The court concluded that the failure to publish a rule "would not invalidate an otherwise proper rule where the party adversely affected had 'actual and timely notice'" of the rule. *Nason,* 646 F.2d at 19 (citing 5 U.S.C. § 552(a)(1)).

In this case, not only did plaintiffs have knowledge of a policy that had been going on for six years, but plaintiffs initially benefited from the policy. Regardless, in this case, properly promulgated CSA regulations, while expressing a preference for program year funding, effectively state a policy that CSA funding might not coincide with the grantee's program year. While perhaps the details of CSA's split funding policy should [**24] have been published, CSA's failure to do so in this particular case does not render the split funding policy void.

B. *Statutory and Regulatory Compliance*

Plaintiffs further allege that the defendant has violated a number of statutory and regulatory provisions. These include: failure to receive the due process rights mandated by the statute and regulation; failure to distribute funds equitably; failure to distribute funds equitably between urban and rural beneficiaries; and, failure to fund all grantees on a program year basis.

1. *Due Process Rights Under the Statute and Regulations*

Before repeal by Congress, 42 U.S.C. § 2944 required

the Director of CSA to prescribe procedures to assure that grantees receive notice of and an opportunity to be heard in the event refunding is denied or if funding is terminated. Both plaintiffs and defendant agree that this is not a situation where refunding has been denied. Plaintiffs SEK-CAP and EOF had their grant action applications approved for an entire program year. Therefore, the regulation governing a denial of refunding, 45 C.F.R. § 1067.2, is not applicable.

Plaintiffs argue that CSA's failure to provide the remainder of funds [**25] due under their grant actions constituted a termination [*49] of funding under 45 C.F.R. § 1050.115. Section 1050.115-2(a) defines termination of a grant as the "cancellation of Federal assistance." In this case, assistance was not terminated. On the date the second grant payment was due, October 1, 1981, CSA did not have any funds available. The condition precedent to the plaintiffs' contract with CSA -- the availability of funds -- did not occur. Therefore, plaintiffs were not entitled to notice and a hearing.

2. *Equitable Distribution of Financial Assistance*

In 42 U.S.C. § 2967 and § 2833(b), the Director of CSA is required to distribute funds equitably between residents of rural and urban areas. Similarly, 42 U.S.C. § 2836(8) mandates that financial assistance "be distributed on an equitable basis in any community and within any State." Plaintiffs believe that CSA's funding pattern, by denying plaintiffs FFY 1982 funding, violated these provisions of the Economic Opportunity Act.

Because all CAAs received full funding for FFY 1981, the plaintiffs' argument must be that serious inequities in funding resulted during FFY 1982, which began on October 1, 1981, the same day that [**26] the CSA ceased to exist and 42 U.S.C. §§ 2833 (b), 2836(8) and 2967 were repealed. *See* 42 U.S.C. § 9912(a). Because the statute was repealed on the same day the Director was unable to fund plaintiffs, the Director's inability to fund plaintiffs could not violate the repealed statutory provisions. There are no indications that any of these alleged statutory violations occurred during FFY 1981 when the statute was in effect.

3. *Program Year Funding*

Section 1067.30-5(8), 45 C.F.R., provides that "whenever possible the grantee's fundings will coincide with the grantee's program year." This regulation states only a policy and is not phrased in mandatory terms. The Director is not required to fund every CAA for the entirety of its program year; rather, CSA's policy is that *whenever possible,* at the Director's discretion, a CAA will be funded for its entire program year. In fact, the vast majority of all CAAs both small and large had gradually been transferred to full program year funding. The Director cannot be said to have violated this regulation.

C. *Jurisdiction over Due Process, Equal Protection, and Racial Discrimination Claims*

Plaintiffs also present claims [**27] that their rights of equal protection and due process of the law have been violated. These claims must be dismissed because this court does not have jurisdiction over claims founded solely on violations of the equal protection and due process components of the Fifth Amendment.

Although the Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction over claims brought against the United States and founded upon the Constitution, it is well settled that this court's jurisdiction extends only to claims upon which monetary damages are mandated. *See Testan,* 424 U.S. at 400; *Mack v. United States,* 225 Ct. Cl. 187, 191, 635 F.2d 828, 832 (1980), *cert. denied,* 451 U.S. 913, 68 L. Ed. 2d 304, 101 S. Ct. 1986 (1981); *Cabrera v. United States,* 10 Cl. Ct. 219, 221 (1986). The Tucker Act itself does not create any substantive rights enforceable against the United States. *Testan,* 424 U.S. at 398; *Walker v. United States,* 11 Cl. Ct. 77, 78 (1986). Therefore, it is necessary for the court to determine whether the constitutional clause or the legislation to which plaintiffs cite can fairly be interpreted to mandate monetary compensation by the United States for the damage sustained. [**28] If not, the Claims Court does not have jurisdiction to grant relief. *Eastport Steamship Corp.,* 178 Ct. Cl. at 607, 372 F.2d at 1009.

In this case, the plaintiffs allege that they have been deprived of equal protection of the laws and deprived of their property without due process of law in violation of the Fifth Amendment. This court has repeatedly stated that these components of the Fifth Amendment standing alone do not mandate payment of monetary damages. *Alabama Hospital Association* [*50] *v. United States,* 228 Ct. Cl. 176, 180, 656 F.2d 606, 609 (1981), *cert. denied,* 456 U.S. 943, 72 L. Ed. 2d 465, 102 S. Ct. 2006 (1982); *Mack,* 225 Ct. Cl. at 192, 635 F.2d at 832; *Carruth v. United States,* 224 Ct. Cl. 422, 445, 627 F.2d 1068, 1081 (1980); *Walton v. United States,* 213 Ct. Cl. 755, 757 (1977); *Cabrera,* 10 Cl. Ct. at 222. Plaintiffs' reliance on *Yuba National Resources, Inc. v. United States,* 10 Cl. Ct. 486 (1986), *rev'd,* 821 F.2d 638 (Fed.

Cir. 1987), is misplaced. The court in *Yuba* applied the Takings Clause of the Fifth Amendment, a clause that specifically mandates compensation; the court did not review a claim based upon the Due Process Clause as plaintiffs [**29] do here. Therefore, plaintiffs' due process and equal protection claims must be dismissed because they do not fall within this court's jurisdiction.

Plaintiffs' racial discrimination claim succumbs to a different jurisdictional limitation. Claims of racial discrimination based upon a statute may only be brought in a United States District Court. 28 U.S.C. § 1343; *J & L Janitorial Services v. United States,* 231 Ct. Cl. 837, 838 (1982); *Williams v. United States,* 212 Ct. Cl. 544, 544-45, 546 F.2d 431 (1976). Section 1343 gives United States District Courts original jurisdiction over civil actions commenced "to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights." 28 U.S.C. § 1343(a) (4). As a result, the United States District Courts have exclusive jurisdiction for claims based on 42 U.S.C. §§ 2000d to 2000d-6, which is an Act of Congress providing for the protection of civil rights. Therefore, plaintiffs' racial discrimination claim based on 42 U.S.C. § 2000d must be dismissed.

D. *Impoundment of Funds*

Plaintiffs' final claim is that the defendant's failure to deplete its entire appropriation, [**30] thereby allowing $ 8 million to lapse into the Treasury, violated the requirements of the Impoundment Control Act of 1974, 31 U.S.C. §§ 1400-1407 (current version at 2 U.S.C. §§ 681-688 (1982)). Although the Impoundment Control Act does manifest congressional disapproval of unauthorized impoundments by the Executive Branch, an examination of the statute indicates that Congress did not intend to create a private cause of action in cases of unauthorized impoundments. Instead, Congress expressly provided that lawsuits based on the Impoundment Control Act must be brought by the Comptroller General in the United States District Court for the District of Columbia. 31 U.S.C. § 1406 (current version at 2 U.S.C. § 687 (1982)); *see also Rocky Ford Housing Authority v. United States Department of Agriculture,* 427 F. Supp. 118, 134 (D.D.C. 1977).

In every action under the Impoundment Control Act, the Comptroller General must receive the tacit approval of Congress. *See* 31 U.S.C. § 1406 (2 U.S.C. § 687 (1982)) (requiring the expiration of 25 days of continuous session of Congress following the Comptroller's explanatory statement before the Comptroller may file a civil action). This [**31] court is compelled to conclude that this lawsuit does not state a cause of action for violation of the Impoundment Control Act. Therefore, this claim is dismissed.

CONCLUSION

Plaintiffs have raised numerous bases upon which they seek payment for the FFY 1982 portion of their 1981 program year funding. Performance under the implied-in-fact contract was conditioned upon the availability of Section 221 funds. No such funds were available. While CSA, in its discretion, could have used FFY 1981 appropriations to fund plaintiffs, it chose not to do so. CSA's allocation of FFY 1981 Section 221 appropriations for other purposes was not arbitrary, capricious, or in violation of regulation or statute. The court is without jurisdiction to review plaintiffs' due process, equal protection, and racial discrimination claims. Based upon the foregoing reasons, the court grants the defendant's partial motion to dismiss. The court also grants the defendant's motion for summary judgment and denies the plaintiffs' motion for summary judgment. [*51] The Clerk will dismiss the complaint. Each party will bear its own costs.

---

**End of Document**