

# OFFICE OF THE ADMINISTRATOR
## WASHINGTON, D.C. 20460

August 7, 2025

**MEMORANDUM**

**SUBJECT:**   Recommendation on Solar for All Program

**FROM:**   Travis Voyles, Associate Deputy Administrator

**TO:**   David Fotouhi, Deputy Administrator

**CC:**   Paige Hanson, Chief Financial Officer

In light of the enactment into law of the One Big Beautiful Bill Act (OBBB), which repealed Section 134 of the Clean Air Act (CAA) and rescinded all associated funds, the Office of the Administrator is weighing options for the future of the Solar for All (SFA) program. To inform your deliberations, we have identified key legal and policy considerations and factors relevant to the decision.



For the following reasons, we recommend that the Agency terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate. As the OBBB explicitly repealed such administration funding along with all grant funding, the Agency is no longer able to monitor for waste, fraud, or abuse and the program is no longer operating with legal sanction.

W.D. Wash. 000089

## I. Response to OBBB Repeal and Rescission

The authorization and appropriation for the SFA program was introduced in the Inflation Reduction Act.[1] CAA section 134 (titled "Greenhouse Gas Reduction Fund") appropriated $7 billion "to make grants . . . to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the Administrator."[2] CAA section 134(a)(4) appropriated $30 million, "to remain available until September 30, 2031, for the administrative costs necessary" to carry out all grant programs initiated under CAA section 134.[3]

In the OBBB, Congress repealed CAA section 134 in its entirety and rescinded the funds made available to carry out that section, including with respect to the SFA program.[4] This repeal of the grant funding in CAA section 134(a)(1)-(3), coupled with rescission of the administrative funding in section 134(a)(4), effectively and completely terminated the statutory authority and all funding related to the SFA program. As both the grant funding and the administrative costs funding provided to EPA are rescinded, the Agency no longer possesses either the substantive legal authority or the dedicated funding that was provided and is needed to continue implementation or oversight of these grants and the SFA program. Thus, any attempt to continue the SFA program's administration, in the absence of any authorizing legislation or congressionally dedicated funding for that purpose, is no longer legally permissible.

The repeal of CAA section 134 eliminates the Agency's substantive grantmaking authority under that chapter. Furthermore, the Agency no longer has the congressionally dedicated funding to carry out its oversight function or evaluate the effective performance and compliance of recipients with the terms of the SFA program.[5] As there is no longer a statutory foundation for the EPA to administer and evaluate awards or to ensure and monitor the compliance of award recipients with grant terms, conditions, or applicable laws—or the ability of EPA to enforce grant contracts against programs previously constituted under that section—the continuation of

---

[1] 42 USC § 7434; *see* Pub. L. 117-169, 136 Stat. 2066 (2022).

[2] 42 USC § 7434(a)(1).

[3] 42 U.S.C. § 7434(a)(4).

[4] *See* Pub. L. 119-21, § 60002 (2025):

> SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND.
>
> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

[5] *See* 42 USC § 7434(c)(1) (defining who qualifies as eligible recipients); *see* Solar for All Terms and Conditions (Dec. 3, 2024) Section (III)(w) (requiring EPA Project Officer Oversight and Monitoring as an ongoing condition for grant eligibility).

2

the SFA program would exceed the Agency's authority, risk flouting congressional intent, and potentially violate the terms and conditions of the grant awards themselves.[6]

Claiming residual legal authority to retain the program using administrative funding dedicated for other purposes would mean that resources expended on the SFA program going forward would come at the expense of funding for other programs and purposes. Given Congress' clear action in OBBB, that would be legally suspect, operationally risky, and inadvisable. General appropriations by Congress to the Agency, including, for example, EPM funds, are needed and already set aside for the administration of other programs for which Congress did *not* specifically appropriate administrative funding. Congress initially appropriated funds *specifically* for the administrative costs associated with grant programs under CAA section 134, clearly indicating that any program established under CAA section 134 was meant to be implemented, administered, and overseen using that specifically appropriated funding. As that funding has now been completely rescinded, it would be improper to reallocate funds dedicated for programs that do not have specifically appropriated administrative funding for any program established under CAA section 134.[7] Given these facts, the EPA would be facing a significant burden and risk to administer and oversee a program with no statutory basis or dedicated funding, and being under no enforceable obligation to allocate funds appropriated by Congress for other purposes, it is reasonable and well within the Agency's discretion as a matter of appropriations law for the Agency to wind down and halt further implementation of the SFA program.[8] Finally, because Congress acted decisively in fully repealing CAA section 134, any prior attempts by the Agency to impose legal requirements by contract that purport to apply notwithstanding a change in law and appropriations are void and have no force and effect.[9]

## II.   Reliance Interests and Potential Alternatives

In making this recommendation, we recognize that some program participants in the broader market for solar energy infrastructure and equipment may have begun to rely on the funding made available through the SFA program. Certain reliance interests may have led to initial

---

[6] *See generally* Sections III and IV of Solar for All Terms and Conditions (Dec. 3, 2024), which outline myriad complex conditions for program compliance which EPA is no longer capable of administering, fulfilling, or verifying.

[7] *See Lincoln v. Vigil*, 508 U.S. 182 (1993) (under the Administrative Procedure Act, action that is "committed to agency discretion by law" is not subject to judicial review). An agency's decision to allocate funds within a lump-sum appropriation is committed to agency discretion by law and, therefore, are not subject to judicial review. Indeed, "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 191; *see also Hein v. Freedom from Religion Found., Inc*., 551 U.S. 587 (2007).

[8] *See Rogers v. United States*, 14 Cl. Ct. 39, 47 (1987) (when faced with the difficult circumstance of a program's repeal and inadequate funding, an agency's decisions about how to wind down is not arbitrary and capricious).

[9] To the extent that any contractual language previously agreed to by the Agency in SFA program grants purports to bind the agency with a term or condition which claims to defy Congress's authority to repeal and rescind funding, such a provision is unlawful, void ab initio, and should not be followed by the Agency. *See United States v. Winstar Corp*., 518 U.S. 839 (1996) (regardless of the government's liability for breach of contract—which is something separately addressed by bargained-for financial burden shifting between parties—an agency cannot bind a future Congress against changes in appropriations enactments via a contract).

plans, cost outlays, and staffing for various projects. However, we believe the program's relatively nascent status and the limited funding distributions which took place prior to enactment of the OBBB support termination at this juncture as the best path forward for all parties. Any disruptive impacts caused by this recommended course of action could be lessened further by effective use of the closeout process set out in the grant agreements to ensure that recipients receive any appropriate distributions for expenses reasonably occurred in reliance on the program, thereby promoting an effective wind down of the program in an orderly manner.[10]

*Grant Recipients and Indirect Beneficiaries*

Although grant recipients anticipated continued funding for anticipated projects before enactment of OBBB, several factors limit the harmful impacts of disrupting such reliance. First, the program remains in a nascent stage, and many recipients have not yet begun to plan projects or have made only minimal progress toward planning such projects. Grant agreements for the program were made in late 2024, with a project period of five years and many key recipients have not yet begun to allocate to subs or plan on-the-ground projects in a concrete way. Thus, recipients have not yet incurred substantial fixed or long-term obligations based on assumptions of continued federal support.

Second, the Agency structured the program to fund pass-through entities (States, Tribes, and certain national organizations) rather than directly funding entities and individuals engaged in on-the-ground projects. These pass-through entities are in the process of spending down portions of the funding allocated for overhead, including potentially hiring staff and setting up a process by which funds will be distributed to second-tier pass-throughs or, in some more limited cases, directly to on-the-ground projects. This pass-through feature of the SFA program—which has been criticized as inefficient, as every dollar appropriated results in far less than a dollar contributed to on-the-ground benefits for low- and middle-income communities—functions to limit significant reliance interests on federal support at the present time largely to pass-through entities. The program has not resulted in meaningful reliance interests on the part of potential or speculative individual household beneficiaries because the pass-through structure and implementation delays by many grant recipients mean that potential on-the-ground benefits have not been realized and are not likely to be realized in the near future. As explained below, any examples of on-the-ground projects for which specific expenses have been reasonably incurred may, if appropriate, warrant consideration of further funding through the closeout process.

Third, the grant agreements provide the mechanism for termination and standard grant terms and conditions specify that all federal support is contingent on the relevant statutory authorization, which has since been repealed, and on the availability of appropriations, which the specific

---

[10] The process for closeout is generally outlined in 2 CFR 200.344. The recipient may request payment from the Automated Standard Application Payments (ASAP) system for allowable costs incurred up to the date of a termination notice, provided that such costs were contained in an approved workplan. Requests submitted after notice of termination are allowable only if (a) those costs were properly incurred before the effective date of termination, and not in anticipation of it; and (b) those costs would be allowable if the federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. Also, per 2 CFR 200.472, a recipient may use grant funds to properly closeout their grant, including reasonable and necessary costs that might occur after the date of the termination and closeout notice.

4

congressionally directed funding has since been rescinded.[11]  The legal and appropriations bases for the program have changed so substantially that compliance by both parties is now impossible.[12]  It was evidently foreseeable that Congress could repeal such legal authority and appropriations—as has occurred in the past on multiple occasions—and that is precisely what occurred here.

Finally, mindful of initial outlays potentially made by certain grant recipients, the Agency can offer reimbursement for all reasonably incurred and allowable expenses prior to termination as defined in the grant agreements, including the winding down of subcontracts or other project-related expenses.[13]  These measures should mitigate against potential financial hardship and address all concerns potentially arising from recipients' reliance on federal support.

Thus, while some grant recipients may have made plans in expectation of the program's continuation, significant reliance interests are limited in scope and reasonably mitigated through the closeout process.  Because of the program's pass-through structure and implementation delays attributable in many cases to direct recipients, entities and individual households have not and are not likely to in the near future have significant reliance interests in the program's continuation that could not be mitigated through the closeout process.  None of these considerations are sufficient to overcome the overriding legal and oversight considerations arising from the EPA's lack of statutory authority to continue the program and lack of congressionally directed funding to administer and oversee $7 billion in taxpayer funds in the years to come.

*Domestic Solar Energy Market*

In addition to any potential hardships faced by grant recipients, this recommended course of action may have impacts on the domestic solar energy industry in a more general sense.  In evaluating whether the potential action impacts the domestic solar energy industry, we evaluated whether such impacts legitimately relate to the decision to terminate or fund the SFA program through other means and whether such impacts are serious enough to warrant retaining the SFA program or mitigating by other means.

We believe in limited circumstances that potential domestic solar industry participants may have taken steps to develop plans, hire staff, enter into agreements, and perhaps some may have made initial capital outlays based on the expectation of federal assistance to pass-through grant recipients.  However, these expenses and plans are currently limited in scope due to the nascent status of program implementation; the short duration of time and limited activities to date of

---

[11] *See* 2 CFR 200.339 and 2 CFR 200.340.

[12] *See* Solar for All Terms and Conditions (Dec. 3, 2024) Section III(Q)(5) ("EPA maintains the right to terminate the Assistance Agreement . . . when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status . . . .").

[13] See Supra fn. 10; see also *See Solar for All Terms and Conditions (Dec. 3, 2024) Section III(B)*

recipients are not comparable to situations in which courts have pointed to decades of reliance and serious life-ordering decisions as a reason to forestall otherwise justified agency action.[14]

Critically, the impact on the domestic solar industry is significantly lessened by the prior administration's decision to grant waivers for the SFA program implementation under the Build America, Buy America Act (BABA). The waiver decision allows grant recipients to purchase solar panels with foreign-manufactured solar components, equipment, and infrastructure, thereby seriously undermining and potentially completely negating the potential benefits of the SFA program to any perceived growing American production and investment that was touted or expected as part of this program implementation.

Furthermore, as sophisticated market participants, domestic solar industry participants are aware of the previously mentioned terms of the SFA program grant agreements and their susceptibility to change based on congressional action.[15] These circumstances support termination of such grants now rather than in the future, when at a time when program implementation may be further along and solar energy projects may be actually being considered and selected and termination would be more disruptive to plans and contractual arrangements throughout the industry. As noted above, the closeout process allows for final distributions for any isolated instances in which on-the-ground projects have advanced to the stage of generating expenses and actionable contractual arrangements with industry participants.

We further considered the market impact of termination in a more general sense, as the total $7 billion figure represents, in theory, a significant percentage of the overall domestic market for solar energy projects and infrastructure. However, this figure should not be understood as completely translating directly to an expansion of the domestic solar market. As noted above, the pass-through structure of the SFA program means that pass-through entities (direct recipients and, in many cases, sub-recipients that also act as pass-throughs) absorb a significant share of the overall figure as overhead costs. Moreover, the prior administration's decision to grant a BABA waiver for the SFA program implementation means that a significant percentage of funding would have gone to growing foreign solar industries rather than any domestic producers and suppliers. And the domestic market is evolving, constantly in flux, and subject to change due to technology, geopolitical realities, and entrepreneurship. Thus, taking the action to rescind this program without further delay will limit the potential of any disruption caused by allowing true reliance interests to form in the growth stages of this market that would have been a direct result of this government subsidized program. The early termination of this source of funding will allow the market to operate without plans being made based upon, or significant initiatives undertaken in reliance on, a source of funding whose authorization has been completely repealed.

---

[14] *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, [31] (2020) ("[T]here was much for DHS to consider . . . since 2012, DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program").

[15] *See* Solar for All Terms and Conditions (Dec. 3, 2024) Section III(Q)(5) "In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination."

*Reasonable Alternatives*

In considering reasonable alternatives to this course of action, we evaluated a number of general funding appropriations by Congress for grant programs that did not include specifically appropriated funds for program implementation and oversight. These general funds dedicated to other purposes, which can aid in the effective supervision and oversight of many programs and projects, are explicitly different from those funds that were appropriated by Congress for the administration and oversight of specific and defined programs—just like the SFA program. In enacting CAA section 134(a)(4), Congress specifically earmarked $30 million for the oversight and administration of all section 134 grant programs. In repealing section 134 and all administrative funding, Congress spoke definitively, and as noted above, it would go against congressional intent to use funds dedicated for other purposes and programs that lack a specific administrative funding appropriation to maintain a program that no longer has a statutory or appropriations basis.

As a practical matter, reassigning funds for the ongoing administration of the SFA program would likely require stripping administration and oversight funding away from programs that Congress intended the Agency to support through other dedicated funding, including EPM appropriations. It also bears noting that the $7 billion scope of the SFA program far exceeds funding awarded through other typical grant programs and that the corresponding oversight and administration burden of the SFA program is larger than that for virtually all of the Agency's other grant programs combined. Shifting any funding from these other programs would result in a significant shortfall in administration and oversight capabilities elsewhere in contravention of the Agency's legal obligations to conduct oversight to prevent waste, fraud, and abuse.

Agencies are required to engage in "reasoned decision making"[16] and to consider the potential reliance interests that may be adversely impacted by an otherwise valid decision.[17] Before recommending this course of action, we carefully evaluated whether grantees, indirect beneficiaries, and the domestic solar market generally may have reasonable relied on SFA program funds such that termination would result in cognizable harm. We further considered the nature of such potential harms and how they might be addressed and minimized by forbearance measures, special accommodations, and mitigation through the closeout process. We conclude, bearing all of these factors in mind, that the appropriate means to satisfy the Agency's legal obligation is to terminate the SFA program grants and use the closeout process to ensure distributions for reasonably incurred expenses prior to termination.[18]

### III.     FTE Considerations

In response to the enactment of CAA section 134 in the Inflation Reduction Act, the Agency established the Office of Greenhouse Gas Reduction Fund (OGGRF) within the Office of the

---

[16] *Michigan v. EPA*, 576 U. S. 743, 750 (2015).

[17] *Regents of Univ. of Cal.*, 591 U.S. at [33] (an agency "[is]required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

[18] *See Supra*. Fn. 10

Administrator. OGGRF includes a division dedicated to administering the SFA program. We recommend further conversations at a future date about the status of the SFA division within OGGRF and options for the current FTE positions assigned for administrative support of the program.

### IV.     Recommendation

For the above discussed reasons, we recommend that the Agency terminate the SFA program and all existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients.