**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| STATE OF ARIZONA, STATE OF WASHINGTON, STATE OF MINNESOTA, DISTRICT OF COLUMBIA, STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JESSICA SHIRLEY, Chair of the Pennsylvania Energy Development Authority; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and WISCONSIN ECONOMIC DEVELOPMENT CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, <br><br> Defendants. | No. _____ <br><br><br> NO. 2:25-cv-02015-TMC <br><br> **FIRST AMENDED COMPLAINT** |

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

# I.    INTRODUCTION

1.    The United States Environmental Protection Agency ("EPA") has unilaterally and illegally terminated a multi-billion-dollar program designed to bring low-cost distributed solar energy to over 900,000 households in low-income and disadvantaged communities.

2.    The Plaintiffs ("States") bring this action to challenge EPA's abrupt termination of this program, known as "Solar for All" ("SFA" or "SFA Program"). In 2022, Congress amended the Clean Air Act to establish a program called the "Greenhouse Gas Reduction Fund." Public Law 117-169, Sec. 60103, 136 Stat. 2065-66 (formerly codified at 42 U.S.C. § 7434 (2024), hereinafter "Clean Air Act Section 134"). Congress directed EPA to make competitive grants to states, local governments, Tribes, and non-profits "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." Clean Air Act Section 134(a)(1). Congress appropriated $7 billion to fund these grants, and directed that the funding be obligated by September 30, 2024.

3.    On April 22, 2024, after a rigorous application process, EPA announced it had selected sixty qualified recipients ("SFA Recipients") and awarded the $7 billion appropriated by Congress to carry out the SFA Program. Plaintiffs were SFA Recipients selected to partner with EPA and carry out Congress's mandate.

4.    By August 16, 2024, EPA had obligated all of the $7 billion appropriated for the SFA Program, in accordance with Congress's statutory requirement.

5.    Plaintiffs executed Assistance Agreements with EPA and received their awards in their Automated Standard Application for Payments ("ASAP") accounts. Plaintiffs got to work building out their state SFA programs and doing their part to fulfill Congress's mandate to make solar energy accessible to all, including low-income and other disadvantaged communities.

6.      On July 4, 2025, President Trump signed the "One Big Beautiful Bill Act," or H.R. 1, into law. In H.R. 1, Congress repealed Section 134 of the Clean Air Act. In H.R. 1, Congress expressly rescinded only "the *unobligated* balances of amounts made available to carry out [Section 134] (as in effect on the day before the date of enactment of this Act)." Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (2025) (emphasis added).

7.      Congress did not, however, rescind any funds that had been obligated by "the day before the date of enactment" of H.R. 1, which is July 3, 2025. All of the funds awarded to Plaintiffs were obligated by August 16, 2024, *long before* H.R. 1's enactment. Thus, H.R. 1 did not affect Plaintiffs' obligated funds, nor did it affect the continuation of EPA's administration of the state SFA programs already funded and underway.

8.      Upon information and belief, on or before August 7, 2025, Defendants erroneously interpreted H.R. 1 to eliminate the statutory basis for the SFA Program ("H.R. 1 Interpretation") and, based on that interpretation, decided to terminate the entire SFA Program ("Program Termination Directive"). On August 7, 2025, for the first time, EPA Administrator Lee Zeldin publicly announced on X and on EPA's YouTube channel that "we are ending Solar for All for good!"

9.      That same day, EPA issued a substantively identical termination memorandum to each SFA Recipient ("Termination Memorandum"), including Plaintiffs, explaining that it "has made the decision to terminate the SFA program and existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the program." *See, e.g.*, Memorandum from Devon Brown, EPA Official, to Amy Wheeless, Federal Policy and Program Alignment Manager, Washington State Department of Commerce (Aug. 7, 2028), a true and accurate copy of which is attached hereto as Exhibit A.

10.     Upon information and belief, on or after August 7, 2025, EPA also directed staff to immediately commence deobligation of all remaining SFA funds ("Deobligation

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC                          3                  ATTORNEY GENERAL OF WASHINGTON
                                                                  Environmental Protection Division
                                                                  800 Fifth Avenue STE 2000
                                                                  Seattle, WA 98104
                                                                  206-464-7744

Directive"). Within one week of the Program Termination Directive, Defendants illegally and arbitrarily liquidated and removed from Plaintiffs' ASAP accounts approximately 90% of the funds that were obligated to Plaintiffs before August 16, 2024, despite the fact that H.R. 1 explicitly limited rescission to funds that were unobligated as of July 3, 2025.

11.     As set forth below, EPA's H.R. 1 Interpretation is contrary to H.R. 1's plain meaning, and the Program Termination Directive was therefore unlawful, arbitrary and capricious, in excess of Defendants' statutory authority, and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C). And because the Executive Branch has no authority to unilaterally terminate a program that Congress has funded, Defendants' actions are also unconstitutional.

12.     Plaintiffs have been and will continue to be harmed by Defendants' executive overreach. By arbitrarily terminating a program in which Plaintiffs participated and which was expected to bring substantial benefits to Plaintiffs and their residents, Defendants have illegally eliminated Plaintiffs' ability to participate in and benefit from the SFA Program.

13.     Plaintiffs respectfully request this Court: 1) declare that the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive are unlawful and should be vacated; 2) grant injunctive relief prohibiting EPA from implementing the H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive; and 3) order EPA to reinstate the SFA Program and perform the necessary administrative support to the Program and SFA Recipients.

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT—No. NO. 2:25-CV-02015-TMC                    4

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

## II.    PARTIES

**A.    Plaintiffs**

14.    The State of Arizona is a sovereign state of the United States of America. Arizona is represented by Attorney General Kristin K. Mayes, the State's chief law enforcement officer.

15.    The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, the State's chief legal officer.

16.    The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, the State's chief legal officer.

17.    The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

18.    The State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta, the State's chief law enforcement officer.

19.    The State of Colorado is a sovereign state of the United States of America. Colorado is represented by Attorney General Philip J. Weiser, the State's chief legal officer.

20.    The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by Attorney General William Tong, the State's chief legal officer.

21.    The State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne Lopez, the State's chief legal officer and chief law enforcement officer.

22.    Plaintiff State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

23.    Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81; *Beshear v. Bevin*, 498 S.W.3d 355, 369 (Ky. 2016) (citing Ky. Const. § 81). Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. §§ 11.060, 11.065. The Governor's Executive Cabinet consists of the Secretaries of executive branch cabinets, including the Kentucky Energy and Environment Cabinet that is the Solar for All grantee for Kentucky (Grant Number (FAIN) 84088701).

24.    The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law enforcement officer of the state.

25.    The State of Maine is a sovereign state in the United States of America. Maine is represented by Attorney General Aaron Frey, who is the chief law enforcement officer of Maine.

26.    The Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

6

27.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

28.     The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Matthew J. Platkin.

29.     The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

30.     The State of New York is a sovereign state of the United States of America. New York is represented by Attorney General Letitia James, the State's chief legal officer.

31.     The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

32.     The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

33.     Jessica Shirley is the Chair of the Pennsylvania Energy Development Authority (PEDA). PEDA is a public corporation and governmental instrumentality exercising public powers of the Commonwealth of Pennsylvania. 71 P.S. § 720.6.

34.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

35.     The State of Vermont, represented by its Attorney General, Charity R. Clark, is a sovereign State in the United States of America. Attorney General Clark is authorized to act on behalf of the State in this matter.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

36.    Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

36.37.   The Wisconsin Economic Development Corporation (WEDC) is a public body corporate and politic created by the legislature of the state of Wisconsin, a sovereign state of the United States of America. Wis. Stat. § 238.02(1). WEDC is represented by its Chief Legal Officer, Jennifer H. Campbell.

**B.    Defendants**

37.38.   Defendant EPA is an independent agency within the executive branch of the United States government.

38.39.   Defendant Lee Zeldin is the Administrator of EPA. Administrator Zeldin oversees EPA and is responsible for the actions and decisions challenged in this suit. He is sued in his official capacity.

39.40.   Defendants are agencies as defined in 5 U.S.C. § 551(1).

### III.    JURISDICTION AND VENUE

40.41.   This action arises under the United States Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.; H.R. 1, Pub. L. No 119-21, § 60002, 139 Stat. 72 (2025). This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

41.42.   Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are federal agencies and officers sued in their official capacities. The State of Washington is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## IV.    FACTUAL BACKGROUND

### I.    Congress Establishes the Greenhouse Gas Reduction Fund

42.43.  On August 16, 2022, President Biden signed the Inflation Reduction Act into law. Pub. L. No. 117-169, 136 Stat. 1818.

43.44.  One key provision of the Act was the $27 billion "Greenhouse Gas Reduction Fund," which Congress added as Section 134 of the Clean Air Act. Public Law 117-169, Sec. 60103, 136 Stat. 2065-66. Congress established the Greenhouse Gas Reduction Fund "to mobilize financing and private capital to address the climate crisis, ensure our country's economic competitiveness, and promote energy independence while delivering lower energy costs and economic revitalization to communities that have historically been left behind."[1]

44.45.  Congress did not simply create a $27 billion Greenhouse Gas Reduction Fund for EPA to administer without restriction. Instead, Congress made four individual appropriations to EPA and gave EPA specific instructions about how to administer those funds.

45.46.  One of those individual appropriations was a $7 billion appropriation for "zero-emission technologies," which funded the SFA Program. More specifically, Congress directed EPA to operate the program by making competitive grants to "eligible recipients"— including states—"for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities[.]" Clean Air Act Section 134(a)(1).

46.47.  Congress also appropriated to EPA $30 million for the "administrative costs necessary to carry out activities under [Section 134]." Clean Air Act Section 134(a)(4). This $30 million appropriation was "[i]n addition to amounts otherwise available." Id.

---

[1] U.S. Env't Prot. Agency, *Greenhouse Gas Reduction Fund,* https://web.archive.org /web/20250930002249/https://www.epa.gov/greenhouse-gas-reduction-fund (last visited Sept. 30, 2025).

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

47.48.  The SFA appropriation was a time-limited, multi-year appropriation beginning in fiscal year 2022 and expiring on September 30, 2024, meaning EPA had just over two years to design and build the SFA Program and to award the funds that Congress had appropriated. Congress further directed that EPA begin its grantmaking "not later than" February 13, 2023. *See, e.g.*, Clean Air Act Section 134(a)(1).

A.    **EPA Creates and Implements the SFA Program**

48.49.  Beginning in October 2022, EPA undertook a months-long public stakeholder engagement process to inform its implementation of the Greenhouse Gas Reduction Fund appropriations, including how to design the competitive grant programs that Congress directed EPA to create.[2]

49.50.  In April 2023, EPA announced a final framework for the three grant competitions EPA would administer under the Greenhouse Gas Reduction Fund, including the $7 billion SFA Program. This framework included details such as "preliminary descriptions of key parameters, application requirements, and anticipated reporting obligations."[3]

50.51.  On June 28, 2023, EPA published its initial Notice of Funding Opportunity, or "NOFO," outlining the SFA grant application requirements. EPA explained in the NOFO that it had designed the SFA Program to encourage the deployment of "residential distributed solar energy to lower energy bills for millions of Americans" and to "catalyze transformation in markets serving low-income and disadvantaged communities."[4]

51.52.  The SFA grant application period closed in October 2023, and EPA commenced a rigorous, six-month application review process. According to EPA, "[o]ver

---

[2] Richard K. Lattanzio, Cong. Rsch. Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* 1–2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.
[3] U.S. Env't Prot. Agency, *EPA Releases Framework for the Implementation of the Greenhouse Gas Reduction Fund as Part of President Biden's Investing in America Agenda*, https://www.epa.gov/newsreleases/epa-releases-framework-implementation-greenhouse-gas-reduction-fund-part-president (last updated Apr. 19, 2023).
[4] U.S. Env't Prot. Agency, *Solar for All Program: Notice of Funding Opportunity*, https://www.grants.gov/search-results-detail/348957 (last visited Oct. 3, 2025).

200 federal experts in climate, power markets, affordable housing, state energy policy, Tribal energy, labor, and consumer protection from across the interagency participated in the [SFA] review and selection process."[5] In all, SFA applicants underwent at least three levels of review by an "expert review panel," a "Senior Review Team," and lastly, EPA's "Selection Officials." *Id.*

~~52.~~53.   On April 22, 2024, EPA announced that it had selected sixty applicants to receive SFA grants, including "states, territories, Tribal governments, municipalities, and nonprofits."[6] Each Plaintiff received a "State" grant under the SFA Program.

~~53.~~54.   Between April 22 and August 16, 2024, EPA worked with each of the selected applicants to finalize how each SFA Recipient would operate its SFA program, which was memorialized in a signed Assistance Agreement. EPA contemplated that the SFA Recipients would "expand[] existing solar programs for low-income and disadvantaged communities and launch[] new ones, which will collectively deliver residential solar to over 900,000 low-income households nationwide."[7]

~~54.~~55.   By August 16, 2024, EPA had obligated all of the $7 billion appropriated under Clean Air Act Section 134(a)(1) ("SFA Funds") and entered into grant agreements with Plaintiffs.

~~55.~~56.   EPA designed the SFA Program to provide programmatic support to SFA Recipients. That support included EPA and SFA Recipients working hand-in-hand in the initial months of the program to finalize program workplans and budgets before beginning to implement their programs and funding projects in early 2025.[8] Other aspects included

---

[5] U.S. Env't Prot. Agency, *Review and Selection Process*, https://web.archive.org/web/20250919230121/https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process-solar-all (last visited Sept. 19, 2025).
[6] U.S. Env't. Prot. Agency, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (Apr. 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.
[7] *Id.*
[8] *Id.*

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC                11          ATTORNEY GENERAL OF WASHINGTON
                                                  Environmental Protection Division
                                                  800 Fifth Avenue STE 2000
                                                  Seattle, WA 98104
                                                  206-464-7744

reporting, procuring services and tools that support recipients in program design, and establishing and convening advisory councils.

56.57.  Relying on Congress's authorization of the Solar for All program, and EPA's creation and implementation of the Solar for All program beginning in October 2022, the SFA Recipients, including Plaintiffs, negotiated work plans and proposed budgets with EPA. The work plan process included identifying program areas for funding, detailing how funds would be allocated, and outlining terms and conditions. Until the work plans were approved, Plaintiffs could only access up to two percent of their total obligated funds.

57.58.  On or about December 2024, the SFA Recipients finalized their work plans with EPA's approval and EPA lifted the two percent funding restriction, allowing the SFA Recipients to proceed with implementation of their work plans with the benefit of all their obligated funds.

58.59.  Some States opted to take advantage of a "Program Planning Period" or "Year", during which they could continue developing and refining their state SFA programs with EPA's support and guidance. States were able to collaborate with their colleagues at EPA to develop plans that would best serve their individual populations, while also achieving the overarching goals of the SFA Program: to "enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies." Clean Air Act Section 134(a)(1).

59.60.  The States that opted for a Program Planning Period took concrete steps to develop their programming during this time. For example, in Washington, staff at the Washington State Department of Commerce spent more than 5,000 employee hours developing state SFA programming, meeting with community members and stakeholders, and negotiating and entering into agreements with contractors and subcontractors to implement Washington's SFA programming. Likewise, in Arizona, the Governor's Office of Resiliency consulted with local governments and utility companies to develop its application

12

and Work Plan. Many States, including Washington, Arizona, New Mexico, Minnesota, and California, used the Program Planning Period to collaborate with tribal governments to ensure that SFA programs would benefit those communities, too.

60.61.  Other States were able to implement their SFA programs immediately, without taking a full Program Planning Period. For example:

    a.  Michigan received EPA approval to exit the Program Planning Period in early February 2025 and released a pilot funding opportunity soon thereafter, selecting thirteen pilot awardees by August 2025;

    b.  Illinois exited its planning period in January 2025 and, with EPA's approval, promptly withdrew $11 million in funds to expand Illinois's existing Community Solar Program and issued NOFOs for residential solar and community solar sub-grant programs; and

    c.  Following EPA's approval to exit the planning period and commence program implementation, Massachusetts hired or reallocated 14.5 full-time employees to implement the program; secured $8,300,000 in complementary state funding to support program administration costs; negotiated and entered into subaward agreements, obligating $96,625,388 to subrecipients; and through subrecipients, issued requests for proposals and selected and notified vendors for contracts totaling $4,895,205 to support the administration of its state SFA program.

/ / /

/ / /

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**B.      President Trump Issues Executive Orders Targeting Clean Energy**

~~61.~~62.   Immediately after his inauguration on January 20, 2025, President Trump issued an Executive Order instructing executive agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)." Exec. Order No. 14154, *Unleashing American Energy*, 90 Fed. Reg. 8353, 8354 (Jan. 29, 2025) at § 7 ("Unleashing EO").

~~62.~~63.   Consistent with the President's pronouncement and a subsequent directive from the Office of Management & Budget ("OMB"), EPA unlawfully froze all SFA Funds, along with funding for other programs under both the Inflation Reduction Act and the Infrastructure Investment and Jobs Act.

~~63.~~64.   For a period following OMB's directive, Plaintiffs were unable to draw down their duly obligated SFA Funds. EPA's unlawful and arbitrary funding freeze was ultimately enjoined by the U.S. District Court for the District of Rhode Island on March 6, 2025. *See New York v. Trump*, 769 F. Supp. 119 (D. R.I. Mar. 6, 2025).

~~64.~~65.   Concurrent with the unlawful Unleashing EO, President Trump issued a second Executive Order purporting to declare a "National Energy Emergency." Exec. Order 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 29, 2025) ("Energy Emergency EO"). One of the energy-related problems that the Energy Emergency EO purports to address is that "our Nation's inadequate energy supply and infrastructure causes and makes worse the high energy prices that devastate Americans, particularly those living on low- and fixed-incomes." 90 Fed. Reg. at 8434.

~~65.~~66.   While the Energy Emergency EO announced the need for emergency measures to encourage development of "a reliable, diversified, and affordable supply of energy," it arbitrarily excluded solar energy from the list of resources that executive agencies

FIRST AMENDED COMPLAINT ~~— No.~~
NO. 2:25-CV-02015-TMC                    14                    ATTORNEY GENERAL OF WASHINGTON
                                                              Environmental Protection Division
                                                              800 Fifth Avenue STE 2000
                                                              Seattle, WA 98104
                                                              206-464-7744

could deploy to combat the alleged "energy emergency," without offering any justification for that exclusion. 90 Fed. Reg. at 8434, § 8(a).

## C.    EPA Targets the SFA Program

~~66.~~67.   On January 29, 2025, the Senate confirmed Defendant Lee Zeldin as EPA Administrator.

~~67.~~68.   In late February, Administrator Zeldin appeared on Fox News and discussed the Greenhouse Gas Reduction Fund. He stated that EPA was working to "re-establish accountability and oversight" over the grant programs and that the "entire scheme, in [his] opinion, is criminal."[9]

~~68.~~69.   Later in the appearance, Administrator Zeldin acknowledged that "agencies should not be coming up with their own interpretations of what law is" and instead should be "following our obligations under the law."[10]

~~69.~~70.   On March 2, EPA asked its Office of Inspector General to initiate an investigation into the entire Greenhouse Gas Reduction Fund program, citing "alleged misconduct, waste, conflicts of interest, and potential fraud."[11]

~~70.~~71.   On March 19, EPA's Office of Inspector General announced an audit of the SFA Program, stating that its "objective [was] to describe the status of funds, top recipients, and potential risks and impacts of EPA's [SFA] program within the Office of the Administrator's Office of the Greenhouse Gas Reduction Fund."[12]

~~71.~~72.   Upon information and belief, EPA's Office of Inspector General's SFA audit has not been completed.

---

[9] Sunday Morning Futures, *Partnership with DOGE 'has been outstanding,' EPA Administrator Zeldin says*, (FOXNEWS television broadcast Feb. 23, 2025), https://www.foxnews.com/video/6369222506112.

[10] Rapid Response 47 (@RapidResponse47), X (Feb. 23, 2025), https://x.com/RapidResponse47/status/1893689799254356000.

[11] Letter from W.C. McIntosh, Acting Deputy Administrator, U.S. Env't Prot. Agency, to Nicole Murley, Acting Inspector General, U.S. Env't Prot. Agency (Mar. 2, 2025), *available at* https://www.epa.gov/system/files/documents/2025-03/epaigrequest030225.pdf.

[12] U.S. Env't Prot. Agency, Office of Inspector Gen., *Audit of the EPA's Greenhouse Gas Reduction Fund: Solar for All Program* (Mar. 19, 2025), https://web.archive.org/web/20250906080631 /https://www.epaoig.gov/sites/default/files/document/2025-03/oig_notification_memo_oa-fy25-0043.pdf.

---

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**D.      Congress repeals Clean Air Act Section 134 and rescinds unobligated funds**

~~72.~~73.   On July 3, 2025, Congress passed its budget reconciliation bill, H.R. 1. Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

~~73.~~74.   Section 60002 of H.R. 1 contains two operative clauses.

~~74.~~75.   First, Congress directed that Clean Air Act Section 134 "is repealed." This refers to the portion of Section 134 authorizing EPA to establish and administer the SFA Program. This means that no future Congress can appropriate funds for the purpose of making competitive grants under Section 134 without first enacting a new authorizing statute. This does not mean, however, that EPA is without authority to administer the SFA Program as to the current SFA Recipients.

~~75.~~76.   Second, Congress directed that any "unobligated balances of amounts" previously appropriated to perform the activities described in Clear Air Act Section 134 "are rescinded." This means that no Greenhouse Gas Reduction Fund funds that were obligated as of July 3, 2025 were rescinded.

~~76.~~77.   Plaintiffs' SFA Funds were all obligated well before Clean Air Act Section 134(a)(1)'s September 30, 2024 deadline, and were, therefore, not rescinded by H.R. 1. EPA is authorized to continue to administer the SFA Program as to the SFA Recipients, including Plaintiffs.

~~77.~~78.   Legislative history and materials confirm this plain meaning of H.R. 1.

~~78.~~79.   The bill summary explains that Section 60002 of H.R. 1 "repeals and rescinds unobligated funds for the Greenhouse Gas Reduction Fund . . . ."[13]

---

[13] H.R. 1., 19th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-bill/1 (emphasis added).

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC

16

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

~~79.~~80.  In committee meetings in May, Representative Morgan Griffith (R-VA), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, affirmed the following regarding the effect of H.R. 1:

- Congress "can't rescind expenditures that have already been obligated. . . ."[14]

- "[I]f a grant was already given, as far as this bill is concerned, then that would still be going forward."[15]

- "If the grant has already been granted and the money is obligated, then our language does not affect that."[16]

~~80.~~81.  Representative Brett Guthrie (R-KY), Chair of the House Energy and Commerce Committee likewise explained that H.R. 1 "does not close the grants on any obligated funds."[17]

~~81.~~82.  Before H.R. 1 was enacted, the Congressional Budget Office ("CBO") "scored" the bill and estimated that repealing and rescinding unobligated funds from all three of the Greenhouse Gas Reduction Fund grant programs would only net $19 million in savings, none of which included the appropriation under Clean Air Act Section 134(a)(1). Upon information and belief, the $19 million in savings refers to approximately the remaining balance of the funds appropriated for EPA's administrative costs under 42 U.S.C. § 7434(a)(4), and is far less than the total obligated funds. This estimate was known to Congress prior to passing H.R. 1.

~~82.~~83.  The Republican Senate Majority accepted CBO's $19 million savings estimate as evidenced by an August 14, 2025 letter from thirty Senators.[18]

---

[14] House Committee on Energy and Commerce, *Full Committee Markup of Budget Reconciliation Text Part 1*, at 5:44:09-5:44:15 (YouTube, May 13, 2025), https://www.youtube.com/live/J4fGR1CiNGg?si=0kz8e0kADDcUT35Q&t=20423 (last visited Oct. 9, 2025).
[15] *Id.* at 5:40:22-5:40:29.
[16] *Id.* at 5:40:34-5:40:40.
[17] *Id.* at 5:41:55-5:42:02.
[18] Letter from Sen. Sheldon Whitehouse, Ranking Member of Senate Comm. on Env't & Pub. Works, et al. to Lee Zeldin, Administrator, U.S. Env't Prot. Agency (Aug. 14, 2025), *available at* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.

83.84.  It was also accepted by the House. "The budgetary significance of this provision is questionable, as only $19 million is available out of the entire $27 billion appropriated. This remaining money is allocated for administrative purposes." H.R. Rep. No. 119-106(I) at 627 (2025).

84.85.  After H.R. 1's enactment, CBO issued a July 21, 2025 report reiterating its assessment that repealing and rescinding unobligated funds from all three of the Greenhouse Gas Reduction Fund grant programs would only net $19 million in savings.

85.86.  The $19 million in unobligated funds rescinded under H.R. 1 did not eliminate EPA's ability to fund its administration of the SFA Program because Congress's original $30 million appropriation was not the exclusive source of funding for EPA's Greenhouse Gas Reduction Fund administrative costs. To the contrary, Congress expressly appropriated $30 million for administrative costs "in addition to amounts otherwise available." Clean Air Act Section 134(a)(4).

86.87.  Alternative sources of administrative funding were available to EPA on August 7, 2025.  For example, on March 15, 2025, Congress passed a continuing resolution for Fiscal Year 2025 appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management," which was unaffected by H.R. 1 and could be used by EPA to fund its administration of the SFA Program.[19]

87.88.  Upon information and belief, Defendants did not immediately understand H.R. 1 to terminate the SFA Program or the administration of it. Rather, EPA staff continued to administer the SFA Program for a period of time following the enactment of H.R. 1.

---

[19] Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025). Notably, EPA had requested additional funding for this appropriations account specifically to support Greenhouse Gas Reduction Fund administration. U.S. Env't Prot. Agency, *Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on Appropriations, Tab 05: Environmental Programs and Management* 40 (March 2024), https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**E.      EPA Terminates the SFA Program Based Solely on the H.R. 1 Interpretation**

~~88.~~89.   On or before August 7, 2025, ignoring the plain text of Section 60002, the wealth of legal authority instructing against rescission by implication, and pre- and post-enactment legislative materials confirming the limited, prospective effect of Section 60002, Defendants devised the H.R. 1 Interpretation.

~~89.~~90.   Defendants then relied on the erroneous H.R. 1 Interpretation in issuing the Program Termination Directive on August 7, 2025.

~~90.~~91.   Administrator Zeldin articulated the Program Termination Directive in a post on X in which he disparaged the SFA Program as a "boondoggle":



~~91.~~92.   Along with the X post, Administrator Zeldin posted a video[20] on EPA's verified YouTube account in which he referred to the SFA Program as a "grift" and made a series of baseless accusations about the Program:

- "[O]ne of the more shocking features of Solar for All was with regards to the massive dilution of the money, as many grants go through pass through after

---

[20] U.S. Env't Prot. Agency, *Administrator Lee Zeldin Announces EPA Is Ending Solar For All*, YOUTUBE (Aug. 8, 2025), https://www.youtube.com/watch?v=CfU3bYKmBOA.

19

pass through after pass through after pass through with all of the middlemen

taking their own cut—at least 15% by conservative estimates;"

- the SFA Program is "exempted" from federal laws requiring "federal agencies
to use American workers, American Products, and American infrastructure for
projects using American taxpayer dollars;" and

- "very little money has been spent."

~~92.~~93.  Shortly after this announcement, each SFA Recipient, including each Plaintiff,
received a nearly identical Termination Memorandum from EPA Award Official Devon
Brown. The Termination Memorandum explained that Defendants had "made the decision to
terminate the SFA program and existing grants because the EPA no longer has a statutory
basis or dedicated funding to continue administering and overseeing" the Program. *See* Exh.
A. The Termination Memorandum purported to implement the Program Termination
Directive and explained that the justification for doing so was the H.R. 1 Interpretation.

~~93.~~94.  The Termination Memorandum identified the following components of
Defendant's H.R. 1 Interpretation:

    a.  The "grant appropriations . . . are rescinded;"

    b.  EPA lacks "substantive legal authority [and] the financial
       appropriations needed to continue implementation, oversight, or
       monitoring . . . of these grants or of Solar for All;"

    c.  "[T]he SFA Program is no longer to operate;" and

    d.  "Any attempt to continue to program's administration . . . is no longer
       legal permissible." *Id.*

~~94.~~95.  The Program Termination Directive, and the H.R. 1 Interpretation on which it
is based, are contrary to H.R. 1's plain language, for several reasons.

~~95.~~96.  First, Congress did not direct Defendants to terminate the SFA Program or
prohibit Defendants from administering the SFA Program as to existing SFA Recipients.

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC                                    20                ATTORNEY GENERAL OF WASHINGTON
                                                                          Environmental Protection Division
                                                                          800 Fifth Avenue STE 2000
                                                                          Seattle, WA 98104
                                                                          206-464-7744

96.97.  Second, not only did Congress not expressly state that "the grant appropriations . . . are rescinded," it stated the opposite: only the unobligated balances of any amount "made available to carry out" Clean Air Act Section 134 are rescinded.

97.98.  Third, while it is true that Section 60002 rescinds the unobligated balance of funds previously appropriated for "administrative costs," the rescission of these funds did not deprive Defendants of the "financial appropriations needed to continue implementation, oversight or monitoring" of the SFA Program, particularly when Congress originally appropriated the funds "in addition to amounts otherwise available." Clean Air Act Section 134(a)(4).

98.99.  Fourth, "courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holders*, 566 U.S. 257, 266 (2012). H.R. 1 Section 60002 contains no express or implied direction that its requirements be applied retroactively.

99.100.      Finally, the Program Termination Directive, and the H.R. 1 Interpretation on which it relies, are also in significant tension with 1 U.S.C. § 109, which provides that: "The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

100.101.      Members of Congress swiftly told Defendants that the Program Termination Directive was contrary to H.R. 1.

101.102.      For example, on August 11, three members of Congress wrote to Administrator Zeldin that he had "falsely claimed that passage and enactment of H.R. 1 . . . gives [him] the authority to take back obligated funds." Contrary to this claim,

"grant funding awarded before [H.R. 1] was enacted . . . does not constitute unobligated funds subject to H.R. 1."[21]

~~102.~~103.    On August 14, thirty-two Senators wrote to Administrator Zeldin to emphasize that all awarded SFA grants had been obligated for a year, and that EPA's attacks on SFA "continued a pattern of false statements" about Greenhouse Gas Reduction Fund programs.[22]

~~103.~~104.    Similarly, on August 14, members of Arizona's Congressional delegation and Arizona Governor Katie Hobbs told Administrator Zeldin and OMB Director Russell Vought that "[r]etracting obligated Solar for All funds is an encroachment on Congress's fiscal authority and a violation of established federal regulations." They demanded "a full and immediate disbursement" of Arizona's SFA funds.[23]

~~104.~~105.    Thus, Defendants' categorical termination of the SFA Program is incompatible with Congress's express directive that only funds that were *unobligated* prior to H.R. 1's enactment should be rescinded.

**F.    EPA's Termination of the SFA Program Includes Cutting Off Funds to the SFA Recipients**

~~105.~~106.    EPA's form Termination Memorandum assured Plaintiffs that they "may request payment from [ASAP] system for allowable costs incurred up to the date of this memo provided that such costs were contained in the approved workplan." *See* Exh. A.

~~106.~~107.    Despite these assurances, on or before August 8, 2025, Defendants devised the Deobligation Directive, and upon information and belief, directed EPA staff to

---

[21] Letter from Rep. Frank Pallone, Jr., et al., to Hon. Lee Zeldin, Env't Prot. Agency Adm'r (Aug. 11, 2025), *available at* https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/august-11-epa-letter-re-ggrf-ejcj-and-hr1.pdf.

[22] Letter from Sen. Sheldon Whitehouse, et al., to Hon. Lee Zeldin, Env't Prot. Agency Adm'r (Aug. 14, 2025), *available at* https://www.epw.senate.gov/public/_cache/files/7/f/7fc428d4-aafa-4991-a25e-655d295fc0e2/D93F6E6E26805AFA241C4D39073BED3B75A6F496F4350B82CC4D782AAE9BC35C.8.14.25-letter-to-epa-re-solar-for-all.pdf.

[23] Letter from Gov. Katie Hobbs, et al., to Hon. Russell Vought & Hon. Lee Zeldin, Env't Prot. Agency Adm'r (Aug. 14, 2025), *available at* https://www.kelly.senate.gov/wp-content/uploads/2025/08/8.14.25-Solar-for-All-Letter.pdf.

---

claw back all remaining SFA Funds previously obligated and made available to the SFA Recipients, including Plaintiffs.

107.108.    Defendants' implementation of the Deobligaton Directive was hasty, inconsistent, and unexplained. For example, beginning on August 8, Defendants "suspended" many (but not all) Plaintiffs' ASAP accounts. This prevented many Plaintiffs from drawing down any of their obligated SFA Funds, even for allowable costs incurred prior to August 7.

108.109.    Seemingly in response to outreach from some Plaintiffs, between August 11 and August 18, Defendants changed (or caused to be changed) many of (but again, not all) Plaintiffs' ASAP account statuses from "suspended" to "liquidated," making the SFA Funds in these accounts available for drawdowns again.

109.110.    Concurrent with the change in account statuses, Defendants also reduced Plaintiffs' available account balances to ten percent or less of what the balance was on August 7, 2025. For example, on August 8, 2025, Arizona's SFA ASAP Account had an available balance of $155,678,188.41. On August 18, Arizona's SFA ASAP Account had an available balance of $10,891,908.14. Likewise, Michigan's ASAP account had an available balance of $154,709,215.59 on August 6, which had dropped to just $10,148,931.94 by August 11. And California's ASAP account dropped from $249,045,222.95 on August 7 to just $17,422,106.08 on August 11.

110.111.    Defendants did not provide and have not provided Plaintiffs with any explanation for why Defendants removed the funds from Plaintiffs' accounts.

111.112.    Upon information and belief, Defendants removed the vast majority of the remaining SFA Funds from all recipient accounts based on the flawed H.R. 1 Interpretation in a calculated effort to enforce the erroneous Program Termination Directive and Deobligation Directive.

~~112.~~113.    As of the date of this filing, many Plaintiffs' ASAP accounts remain in a "liquidated" status and Defendants have not restored Plaintiffs' available balances to August 7, 2025 levels.

**G.    Nearly all Plaintiffs Timely Submitted Administrative Disputes to EPA Challenging the Termination of Their Individual Grants and Challenging the Termination of the SFA Program**

~~113.~~114.    Defendants' form Termination Memorandum outlined a dispute process pursuant to 2 C.F.R. 1500.15 with a deadline of 30 days to submit a dispute to EPA.

~~114.~~115.    With the exception of Virginia, Plaintiffs timely submitted disputes to EPA pursuant to Part 1500 and thereby challenged EPA's termination of their individual grants and the Program Termination Directive.

~~115.~~116.    2 C.F.R. 1500.15 does not establish a jurisdictional exhaustion requirement.

~~116.~~117.    Even if it did, Plaintiffs are not required to exhaust available administrative remedies because agency review is plainly futile in light of EPA's H.R. 1 Interpretation.

~~117.~~118.    Upon information and belief, the Dispute Decision Official responsible for resolving each Plaintiff's Part 1500 dispute lacks authority to overturn or disregard either the agency-wide H.R. 1 Interpretation or the Program Termination Directive.

~~118.~~119.    Without this Court's order vacating the Program Termination Directive and the underlying H.R. 1 Interpretation, Plaintiffs' Part 1500 disputes are futile.

**H.    The Deobligation of the SFA Funds Is Unlawful and Must Be Enjoined by the Court to Preserve the Availability of Those Funds for the SFA Program**

~~119.~~120.    As stated *supra*, Congress's SFA appropriation was a time-limited, multi-year appropriation. EPA obligated all $7 billion of the funds that Congress appropriated pursuant to Clean Air Act Section 134(a)(1) by August 16, 2024, before the appropriation expired on September 30, 2024. Therefore, at the close of the Fiscal Year 2024,

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC                          24                ATTORNEY GENERAL OF WASHINGTON
                                                                 Environmental Protection Division
                                                                 800 Fifth Avenue STE 2000
                                                                 Seattle, WA 98104
                                                                 206-464-7744

these obligated funds were placed in an "expired" treasury account, where they retain their 2024 fiscal-year identity.[24]

~~120.~~121.    This means that, so long as the SFA Funds retain their "obligated" status, the SFA Funds remain available to fund the SFA Program for five years after those funds expire, *i.e.*, until September 30, 2029.[25]

///

///

~~121.~~122.    However, if the SFA Funds become deobligated, they will generally no longer available for EPA to obligate for non-SFA purposes because they expired at the end of Fiscal Year 2024.[26]

~~122.~~123.    EPA has no lawful authority to deobligate any of Plaintiffs' funds because (1) Congress directed EPA to appropriate the SFA Funds, EPA obligated the SFA Funds, and Congress did not direct that the SFA Funds be deobligated; (2) Defendants' H.R. 1 Interpretation and Program Termination Directive are unlawful; and (3) proper deobligation by an executive agency can only occur after the natural end of the grant period or a lawful termination of the grant agreement and, even then, only upon compliance with the closeout procedures identified in 2 C.F.R. §§ 200.344, .345.

~~123.~~124.    Because Defendants had no legal basis to terminate the SFA Program, Defendants cannot lawfully take any steps to deobligate the SFA Funds.

~~124.~~125.    A Court order enjoining the Deobligation Directive is necessary to ensure that the SFA Funds remain available to be restored or redistributed to the SFA Recipients if this Court vacates the Program Termination Directive.

---

[24]    U.S. Gov't Accountability Off., Principles of Federal Appropriations Law ("GAO Redbook") at 5-72, available at https://www.gao.gov/assets/2019-11/202437.

[25]    GAO Redbook at 5-72.

[26]    GAO Redbook at 5-71.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

## II.     PLAINTIFFS' HARMS

~~125.~~126.        Defendants' implementation of the unlawful H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive has harmed and will continue to harm Plaintiffs and their respective residents.

~~126.~~127.        Plaintiffs committed resources, launched programs, entered into agreements, and moved forward in reliance on EPA's continued administration of the SFA Program. After months of cooperation, coordinated planning and reliance, Defendants' wholesale programmatic termination not only upended Plaintiffs' efforts and reasonable reliance, but also stripped away the promised climate and community benefits – clean energy access, cost savings, and equity investments – that the Congressionally mandated SFA Program was designed to deliver.

~~127.~~128.        Plaintiffs relied upon the SFA Program to meet benchmarks for clean energy production, to create jobs, to limit environmental damage caused by pollutants, and to generate energy cost savings for households, including in low-income and disadvantaged communities.

~~128.~~129.        The Program Termination Directive and Deobligation Directive also harm Plaintiffs and their residents, who relied upon SFA participation in meeting statutory clean energy and climate goals, completing projects that would have qualified for federal tax credits expiring on December 31, 2025, achieving sustainability standards, crafting policy initiatives, and implementing clean energy programs as part of the work plan process.

~~129.~~130.        The Program Termination Directive and Deobligation Directive terminate and defund the SFA Program. Even if Plaintiffs successfully appeal the termination of their SFA grants through administrative procedures, they may not be able to access any SFA Funds because of the Deobligation Directive, meaning SFA Funds will become or have already been rendered unavailable, and may indeed expire.

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

130.131.    The underlying unlawful H.R. 1 Interpretation also makes the Plaintiff's ability to challenge their individual grant terminations likely futile. Thus, vacatur of the H.R. 1 Interpretation may increase Plaintiffs' likelihood of success on any direct challenges to the individual grant terminations in other forums.

### III.    CAUSES OF ACTION

**Count I**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Contrary to Law/In Excess of Statutory Authority**

131.132.    Plaintiffs incorporate by reference all preceding allegations.

///

///

132.133.    The H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive are each a final agency action, taken separately and/or in combination. 5 U.S.C. § 704.

133.134.    Under the APA, a reviewing court must set aside a challenged agency action if the action is "not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

134.135.    An agency may not take any action that exceeds the scope of its statutory or constitutional authority or is otherwise contrary to law.

135.136.    Agency action is not in accordance with the law if the action contravenes or otherwise fails to implement the statutory directives of Congress consistent with the statute's text, structure, and purpose.

136.137.    Here, Congress appropriated $7 billion for the SFA Program and directed that Defendants obligate those funds to qualified recipients by September 30, 2024. These funds were timely obligated to the SFA Recipients, including to Plaintiffs.

137.138.    Section 60002 of H.R. 1 did not authorize or direct Defendants to terminate the SFA Program.

FIRST AMENDED COMPLAINT — No.
NO. 2:25-CV-02015-TMC                              27                ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

138.139.    Section 60002 of H.R. 1 did not authorize or direct Defendants to rescind any funds that were obligated prior to the date that H.R. 1 was enacted.

139.140.    Section 60002 expressly excluded Plaintiffs' awards from rescission because Plaintiffs' awards were fully obligated months prior to "the day before the date of enactment of [the] Act."

140.141.    The H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive unlawfully exceed Defendants' statutory authority under H.R. 1, which only authorizes the rescission of unobligated funds.

141.142.    The H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive are contrary to law because, among other things:

    a.  They affect already-obligated funds, not unobligated funds;

    b.  Congress did not direct or otherwise authorize Defendants to terminate the SFA Program;

    c.  Section 60002 of H.R. 1 does not apply retroactively; and

    d.  Section 60002 of H.R. 1 does not extinguish prior liabilities.

142.143.    Plaintiffs are entitled to (1) a declaration that Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive are contrary to law, in excess of Defendants' statutory authority, and violate the APA; (2) vacatur of Defendants' H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, and (3) injunctive relief preventing Defendants from implementing or enforcing the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive.

## Count II
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

143.144.    Plaintiffs incorporate by reference all preceding allegations.

FIRST AMENDED COMPLAINT  No.
NO. 2:25-CV-02015-TMC                     28              ATTORNEY GENERAL OF WASHINGTON
                                                          Environmental Protection Division
                                                          800 Fifth Avenue STE 2000
                                                          Seattle, WA 98104
                                                          206-464-7744

144.145.    The H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive are each a final agency action, taken separately and/or in combination. 5 U.S.C. § 704.

145.146.    The APA requires that a court "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

146.147.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In other words, agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

147.148.    An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

148.149.    Agency action taken on pretextual grounds violates the APA's requirements of reasoned agency decision-making.

149.150.    Agency action is also arbitrary and capricious if the agency fails to consider reasonable alternatives or other important factors, such as legitimate reliance interests.

150.151.    Defendants have identified nothing other than the H.R. 1 Interpretation to support the Program Termination and Deobligation Directives.

151.152.    Defendants' sole stated rationale for the Program Termination Directive is the H.R. 1 Interpretation that "EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." Exh. A. The H.R. 1 Interpretation is an incorrect, irrational, and insufficient explanation and thus not a reasoned basis for that action.

152.153.    Defendants' prior statements and actions demonstrate that their reliance upon the H.R. 1 Interpretation was pretextual and that the real basis for the Program Termination Directive was their desire to eliminate a "boondoggle" and implement an anti-solar energy agenda.

153.154.    Defendants instructed EPA's Office of Inspector General to undertake an audit of the SFA Program but terminated the SFA Program without waiting to see whether the results of the audit confirmed any of Defendants suspicions regarding "misconduct, waste, conflicts of interest, and potential fraud" within the SFA Program.

154.155.    Defendants' H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive are arbitrary and capricious because, among other things:

    a.  Defendants provided no reasoned basis for the actions;

    b.  Defendants ignored Plaintiffs' and subrecipients' substantial reliance interests, and the harmful impact of an abrupt and complete termination of the SFA Program before deciding to terminate the program; and

    c.  Defendants failed to consider reasonable alternatives to terminating the entire program, including whether it could continue administering the SFA Program as to the existing grants by using some of the $3,195,028,000 that Congress appropriated to EPA in March 2025 to pay for "Environmental Programs and Management."

FIRST AMENDED COMPLAINT  No.
NO. 2:25-CV-02015-TMC                    30                    ATTORNEY GENERAL OF WASHINGTON
                                                              Environmental Protection Division
                                                              800 Fifth Avenue STE 2000
                                                              Seattle, WA 98104
                                                              206-464-7744

155.156.    Plaintiffs are entitled to (1) a declaration that Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive are arbitrary and capricious and violate the APA; (2) vacatur of Defendants' H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, and (3) injunctive relief preventing Defendants from implementing or enforcing the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive.

/ / /

/ / /

/ / /

/ / /

### Count III
### U.S. Constitution;
### Appropriations Clause, Separation of Powers Doctrine

156.157.    Plaintiffs incorporate by reference all preceding allegations.

157.158.    The U.S. Constitution "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

/ / /

/ / /

158.159.    The U.S. Constitution's Appropriations Clause, art. I, § 9, cl. 7, provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

159.160.    Appropriations are laws that allow for federal expenditures of "public money for designated purposes." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own

policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

160.161.    Congress also possesses the power to legislate. Article I, Section 1 of the U.S. Constitution states "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representative. U.S. Const., art. I, § 1.

161.162.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." Clinton v. City of New York, 524 U.S. 417, 438 (1998).

162.163.    The Constitution further provides that the executive must "take Care that the laws be faithfully executed." U.S. Const. art. II, § 3. Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

163.164.    Here, Congress appropriated $7 billion for the SFA Program and directed that Defendants obligate those funds to qualified recipients by September 30, 2024. These funds were timely obligated to the SFA Recipients, including to Plaintiffs, pursuant to Congress's spending and appropriations power.

164.165.    Section 60002 of H.R. 1 did not authorize or direct Defendants to terminate the SFA Program.

165.166.    Section 60002 of H.R. 1 did not authorize or direct Defendants to rescind any funds that were obligated prior to the date that H.R. 1 was enacted.

166.167.    Section 60002 expressly excluded Plaintiffs' awards from rescission because Plaintiffs' awards were fully obligated months prior to "the day before the date of enactment of [the] Act."

167.168.    EPA's H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive contravene H.R. 1's plain language and Congress's legislative intent by purporting to terminate and deobligate funds that were obligated to Plaintiffs prior to the September 30, 2024 deadline.

168.169.    Defendants violated constitutional separation-of-powers constraints because, through the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, Defendants have overridden Congress's considered judgments by attempting to terminate the SFA Program and rescind obligated SFA Funds.

169.170.    Plaintiffs are entitled to (1) a declaration that Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive violate the Constitution's Appropriations Clause and constitutional separation of powers principles; (2) vacatur of Defendants' H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, and (3) injunctive relief preventing Defendants from implementing or enforcing the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive.

## Count IV
### Non-Statutory Review *Ultra Vires* - Executive Action in Excess of Statutory Authority

170.171.    Plaintiffs incorporate by reference all preceding allegations.

171.172.    Federal courts possess the power in equity to grant injunctive relief with respect to violations of federal law by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

172.173.    Congress did not authorize or direct Defendants' categorical termination of the SFA Program.

173.174.    The H.R. 1 Interpretation, Program Termination Directive, and Deobligative Directive are incompatible with Congress's directive that only funds that were unobligated prior to H.R. 1's enactment should be rescinded.

174.175.        Defendants have no other constitutional or statutory authority to terminate the SFA Program or rescind or deobligate funds lawfully obligated to Plaintiffs.

175.176.        Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive Termination Directive are *ultra vires* acts because no act of Congress authorizes Defendants to rescind the SFA Program's obligated funds or otherwise terminate the SFA Program.

176.177.        Plaintiffs are entitled to (1) a declaration that Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive are *ultra vires*; (2) vacatur of Defendants' H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, and (3) injunctive relief preventing Defendants from implementing or enforcing the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive.

/ / /

/ / /


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

  a.   Declare unlawful Defendants' H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive;

  b.   Vacate and set aside Defendants' H.R. 1 ~~Guideline~~Interpretation, Program Termination Directive, and Deobligation Directive;

  c.   Order Defendants to reinstate the SFA Program;

  d.   Enjoin Defendants from reobligating, using, expending, or otherwise placing beyond the Court's jurisdiction any funds appropriated by Congress for the SFA Program except for purposes of the SFA Program;

e. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

f. Grant all other relief as this Court deems appropriate.

RESPECTFULLY SUBMITTED this ~~16th~~19th day of ~~October, 2025~~February, 2026.

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
MARY M. CURTIN*
Senior Litigation Counsel
ALEXA G. SALAS*
Assistant Attorney General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
Mary.Curtin@azag.gov
Alexa.Salas@azag.gov

*Attorneys for the State of Arizona*

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ C. L. Junine So*
C. L. JUNINE SO, WSBA # 58779
~~LEAH A. BROWN, WSBA # 45803~~
SARAH E. SMITH-LEVY, WSBA # 55770
TERA HEINTZ, WSBA # 54921
ANDREW HUGHES, WSBA # 49515
Assistant Attorneys General
~~Environmental Protection Division~~
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
206-464-7744
junine.so@atg.wa.gov
~~leah.brown@atg.wa.gov~~
sarah.e.smith-levy@atg.wa.gov
tera.heintz@atg.wa.gov
andrew.hughes@atg.wa.gov

*Attorneys for the State of Washington*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Ryan Pesch*
RYAN PESCH*
CAT RIOS-KEATING*
*Special Assistant Attorneys General*
BRIAN CARTER*
*Special Counsel*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN  55101
(651) 728-7116
ryan.pesch@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Lauren M. Marks*
LAUREN M. MARKS*
Special Assistant Attorney General
~~LAUREN CULLUM*~~
~~Special Assistant Attorney General~~
~~BRIAN CALDWELL*~~
~~Senior Assistant Attorney General~~
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Lauren.marks@dc.gov
~~Lauren.cullum@dc.gov~~
~~Brian.caldwell@dc.gov~~

FIRST AMENDED COMPLAINT ~~– No.~~
NO. 2:25-CV-02015-TMC

35

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

*Attorneys for the District of Columbia*

**ROB BONTA**
Attorney General of California

By: */s/ Marie Elizabeth Logan*
MARIE ELIZABETH LOGAN*
REBECCA HUNTER*
ABIGAIL BLODGETT*
DYLAN C. REDOR*
THEODORE A. MCCOMBS*
MYUNG PARK*
Deputy Attorneys General
California Department of Justice
1515 Clay Street
Oakland, CA 94612
Marie.Logan@doj.ca.gov

*Attorneys for the State of California*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Carrie Noteboom*
CARRIE NOTEBOOM*
Assistant Deputy Attorney General
DAVID MOSKOWITZ*
Deputy Solicitor General
CYNTHIA VITALE*
Assistant Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
David.Moskowitz@coag.gov
Cynthia.Vitale@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Jill Lacedonia*
JILL LACEDONIA*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY*
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

FIRST AMENDED COMPLAINT No.
NO. 2:25-CV-02015-TMC

36

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**KWAME RAOUL**
Attorney General of Illinois

By: */s/ Katharine Roller*
KATHARINE ROLLER*
Complex Litigation Counsel
ELIZABETH B. SCOTT*
Assistant Attorney General
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov

*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.***
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine

By: */s/ Caleb Elwell*
CALEB E. ELWELL*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN*
*Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for the State of Maryland*

FIRST AMENDED COMPLAINT— No.
NO. 2:25-CV-02015-TMC

37

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

<div style="float:left">
1
1
2
2
3
3
4
4
5
5
6
6
7
7
8
8
8
9
9
10
10
11
11
12
12
13
13
14
14
15
15
16
16
17
17
18
18
19
19
20
20
21
21
22
22
23
23
24
24
25
25
26
26
</div>

**ANDREA JOY CAMPBELL**
Attorney General of the Commonwealth of
Massachusetts

By: */s/ Amy Laura Cahn*
AMY LAURA CAHN*
~~MOLLY TEAGUE*~~
*~~Special Assistant Attorneys General~~*
TERRENCE VALES*
*Assistant Attorney General*
~~KATHERINE DIRKS*~~
*~~Chief State Trial Counsel~~*
~~VANESSA ARSLANIAN*~~
*~~State Trial Counsel~~*
One Ashburton Place
Boston, MA 02108
(617) 963-2277
amy.laura.cahn@mass.gov
molly.teague@mass.gov
terrence.vales@mass.gov
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*


~~**MATTHEW J. PLATKIN**~~
**JENNIFER DAVENPORT**
Acting Attorney General of New Jersey

By: */s/ Daniel Resler*
DANIEL RESLER*
LAUREN E. VAN DRIESEN*
JACK VENTURA*
*Deputy Attorneys General*
Office of the Attorney General
33 Washington Street, Ninth Floor
Newark, NJ 07101
(973) 648-4726
Daniel.Resler@law.njoag.gov

*Counsel for the State of New Jersey*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
NEIL GIOVANATTI*
POLLY SYNK*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
SynkP@michigan.gov

*Attorneys for the State of Michigan*


**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ J. Spenser Lotz*
J. SPENSER LOTZ*
Assistant Attorney General
Environmental Protection Bureau
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 616-7560
slotz@nmdoj.gov

*Attorneys for the State of New Mexico*

FIRST AMENDED COMPLAINT ~~No.~~
NO. 2:25-CV-02015-TMC

38

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

**LETITIA JAMES**
Attorney General of New York

By: */s/ Matthew Eisenson*
MATTHEW EISENSON*
KELSEA SUAREZ*
*Assistant Attorneys General*
Environmental Protection Bureau
Office of the Attorney General
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8481
matthew.eisenson@ag.ny.gov

*Attorneys for the State of New York*


**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Coby Howell*
COBY HOWELL*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (971) 283-8657
Fax: (971) 673-5000
Email: Coby.Howell@doj.oregon.gov

*Attorneys for the State of Oregon*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Nicholas M. Vaz*
NICHOLAS M. VAZ*
Special Assistant Attorney General
Office of the Attorney General
Environment and Energy Unit Chief

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
DANIEL T. WILKES*
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

*Attorneys for the State of North Carolina*


**MICHAEL A. BRAYMER**
Chief Counsel
Department of Environmental Protection

By: */s/ Michael J. Heilman*
MICHAEL J. HEILMAN*
Litigation Coordinator
Department of Environmental Protection
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: 412-442-4241
Email: mheilman@pa.gov

*Attorney for JESSICA SHIRLEY, Chair of the Pennsylvania Energy Development Authority*


**CHARITY R. CLARK**
Attorney General of Vermont

By:      */s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609

FIRST AMENDED COMPLAINT — No. NO. 2:25-CV-02015-TMC

39

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744

150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Attorneys for the State of Rhode Island*

**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
TILLMAN J. BRECKENRIDGE*
Solicitor General
MIKAELA A. PHILLIPS*
Assistant Solicitor General
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

*pro hac vice application forthcoming

(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*

**WISCONSIN ECONOMIC
DEVELOPMENT CORPORATION**
Jennifer H. Campbell
Chief Legal Officer

By: */s/ Jennifer H. Campbell*
JENNIFER H. CAMPBELL
2352 S. Park St., Suite 303
Madison, WI 53713
(608) 210-6811
jennifer.campbell@wedc.org

*Attorney for Wisconsin Economic
Development Corporation*

FIRST AMENDED COMPLAINT—No.
NO. 2:25-CV-02015-TMC    40    ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
206-464-7744