The Honorable Tiffany M. Cartwright

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| STATE OF ARIZONA, et al., | NO. 2:25-cv-02015-TMC |
| Plaintiffs, | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | NOTED FOR HEARING: MAY 8, 2026, 1:30PM |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; and LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, | |
| Defendants. | |

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................. 1

II. BACKGROUND .............................................................................................. 2

    A. Congress Creates the Greenhouse Gas Reduction Fund ............................ 2

    B. EPA Designs, Launches, and Funds SFA, and Plaintiffs Develop Their Programs ......................................................................................... 2

    C. The Trump Administration Takes Aim at GGRF Programs ....................... 5

    D. Congress Repeals Section 134 and Rescinds Unobligated GGRF Appropriations .................................................................................... 6

    E. Defendants Abruptly Terminate SFA ...................................................... 7

    F. Defendants Drain Plaintiffs' Accounts and Initiate Closeout Procedures ................ 8

    G. Plaintiffs Seek Judicial Relief from Defendants' Unlawful Acts ............. 9

    H. Defendants Double Down on Their Closeout Demands ............................ 9

III. LEGAL STANDARD ...................................................................................... 10

IV. ARGUMENT .................................................................................................. 10

    A. This Court Has Jurisdiction .................................................................... 10

    B. Defendants Acted Illegally When They Terminated SFA ....................... 12

        1. The Directives are contrary to law ................................................... 12

            a. The Directives are contrary to H.R. 1 ....................................... 12

                (1) H.R. 1's Recission Clause affects only unobligated funds ........... 13

                (2) H.R. 1's Repeal Clause is prospective only and neither requires nor authorizes Defendants' rescission of obligated funds ......................................................................... 14

            b. The Directives are unconstitutional ........................................... 16

        2. Defendants' Directives are arbitrary and capricious ........................ 18

            a. Defendants cannot justify the Directives with post hoc rationalizations ....................................................................... 18

            b. Defendants proffer contrived reasons for the Directives .......... 19

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

i

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

         c.    Defendants failed to adequately consider Plaintiffs' significant reliance interests ................................................................................ 20

         d.    Defendants failed to reasonably explain the Directives ......................... 22

  C.  The Court Should Vacate the Directives and Permanently Enjoin Defendants from Relying on Them ....................................................................................... 25

    1.  The Court should vacate the Directives .......................................................... 25

    2.  The Court should permanently enjoin Defendants from implementing or relying on the Directives ................................................................................ 26

        a.    Plaintiffs are irreparably harmed by the Directives.................................. 26

        b.    The balance of the equities and the public interest weigh in Plaintiffs' favor ........................................................................................ 28

    3.  Plaintiffs are entitled to declaratory relief....................................................... 28

V.    CONCLUSION ................................................................................................................... 29

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

ii

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

# I.     INTRODUCTION

Congress created the Solar For All program (SFA) to address climate change, stimulate the economy, and promote energy independence and grid reliability by funding solar energy projects in low-income and disadvantaged communities. Congress appropriated $7 billion for SFA and directed EPA to make grants to make widespread solar energy a reality. EPA obligated all $7 billion for projects poised to benefit over 900,000 households, including $3 billion obligated to Plaintiffs.

The current Administration now seeks to eviscerate these commitments. In July 2025, President Trump signed H.R. 1 (also known as the "One Big Beautiful Bill Act"), which repealed the statutory provisions that created SFA and rescinded unobligated funds appropriated for SFA. H.R. 1 did not, however, rescind *obligated* funds—i.e., grants that had already been awarded to carry out SFA programming—or otherwise authorize EPA to claw back those funds. Accordingly, H.R. 1 did not retroactively terminate SFA in its entirety.

Defendants terminated SFA anyway. In the early morning of August 7, 2025, an EPA political appointee recommended termination of SFA, and by the end of the day, EPA cancelled the entire program, claiming that H.R. 1 "effectively and completely terminated the statutory authority and all appropriations related to [SFA]." Within a week, and before any administrative dispute, appeal, or legal challenge could be mounted, Defendants withdrew nearly $3 billion of Plaintiffs' SFA funds.

All of this is illegal. Defendants' termination of SFA and deobligation of Plaintiffs' grant funds is contrary to law because the supposed source of Defendants' authority—H.R. 1—rescinded only $19 million in unobligated administrative funds. It did not grant EPA authority to terminate SFA and claw back $7 billion Congress appropriated for the program. Defendants' actions likewise violated separation of powers principles because Congress alone has the power of the purse and to make laws; executive agencies cannot simply refuse to spend money appropriated by Congress. Defendants' actions are also arbitrary and

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

1

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1   capricious: in under 24 hours, Defendants hastily terminated SFA, relying on reasoning that

2   plainly conflicts with H.R. 1, and disregarding Plaintiffs' significant reliance interests. Then,

3   when challenged in this suit, Defendants abandoned their stated reasoning and proffered a

4   post hoc rationale, claiming a federal regulation concerning individual grant terminations

5   authorized them to cancel a $7 billion Congressional appropriation. This is not the reasoned

6   decision-making agencies must undertake.

7        This Court should grant summary judgment for Plaintiffs, declare that Defendants'

8   interpretation of H.R. 1 is unlawful, vacate any actions that followed, and enjoin Defendants

9   from implementing the rationale going forward.

10               **II.      BACKGROUND**

11   **A.      Congress Creates the Greenhouse Gas Reduction Fund**

12        In 2022, Congress created a $27 billion Greenhouse Gas Reduction Fund (GGRF) by

13   adding Section 134 to the Clean Air Act (Section 134). Pub. L. 117-169, § 60103, 136 Stat.

14   1818, 2065–66 (Aug. 16, 2022), *codified as* 42 U.S.C. § 7434, *repealed by* Pub. L. 119-21, §

15   60002, 139 Stat. 72, 154 (July 4, 2025). Of that $27 billion, Congress appropriated $7 billion

16   for EPA "to make grants . . . to States" and other "eligible recipients" to promote the adoption

17   of solar power in "low-income and disadvantaged communities[.]" 136 Stat. at 2066. Congress

18   directed EPA to begin making grants within 180 days and required appropriated funds to

19   "remain available until September 30, 2024." *Id*. Congress also appropriated $30 million to

20   EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary

21   to carry out activities under" the GGRF, to be available until September 30, 2031. *Id*.

22   **B.      EPA Designs, Launches, and Funds SFA, and Plaintiffs Develop Their Programs**

23        In June 2023, EPA published a Notice of Funding Opportunity for SFA. Dkt. #126-34.

24   In April 2024, EPA announced its selection of 60 SFA grant recipients, including Plaintiffs. So

25   Decl. Supp. Mot. Summ. J. ("So Decl."), Ex. 1.

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

2

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    Throughout 2024, Plaintiffs collaborated with EPA to negotiate their SFA budgets and

2    work plans. *See, e.g.*, Dkt. #88 ¶¶ 15-16; Dkt. #75 ¶¶ 13-15; Dkt. #67 ¶¶ 16-17. By August

3    2024, EPA had approved Plaintiffs' budgets and plans and signed grant agreements with each

4    Plaintiff. Dkt. #102-1 ¶ 4. EPA obligated the full amount of each Plaintiff's SFA award by

5    executing these agreements and subsequently deposited each Plaintiff's full award into an

6    Automated Standard Application for Payments (ASAP) account,[1] making it available to fund

7    Plaintiffs' allowable SFA costs. *See, e.g.*, Dkt. #126-37; *see also* So Decl. Ex. 3, at 70

8    (defining an "obligation" as a "definite commitment that creates a legal liability of the

9    government").

10    In addition to funding, SFA grantees were awarded in-kind technical assistance from

11    EPA, Dkt. #65 ¶ 37; Dkt. #77 ¶ 39; Dkt. #79 ¶ 38; Dkt. #90 ¶ 41, as well as the opportunity to

12    collaborate with EPA in developing workplans and relationships with other distributed solar

13    providers, Dkt. #65 ¶ 44; Dkt. #73 ¶ 41; Dkt. 88 ¶ 43; VA-Maiden Decl. ¶¶ 16, 34. For

14    example, North Carolina used technical assistance to help it prepare workplans on system

15    design and other equipment-focused questions and utility net metering tariff and retail rates.

16    Dkt. #80 ¶ 57.

17    In reliance on SFA, Plaintiffs developed implementation plans, sought out private

18    partnerships, conducted public outreach, committed state tax dollars, hired or redirected

19    existing staff resources to carry out their state-level SFA programs, and spent significant time

20    negotiating sub-awards and contracts to distribute SFA funds to projects. *See, e.g.*, Dkt. #72 ¶

21    14; Dkt. #73 ¶ 17; Dkt. #76 ¶ 38; Dkt. #75 ¶ 33; Dkt. #78 ¶ 35. For example, Washington hired

22    and trained staff to administer SFA programming; engaged with stakeholders to design

23    workforce development efforts; coordinated with state electric utilities; entered into contracts

24    to administer a solar energy installation program; and finalized guidelines for loans and other

25    financial assistance. Dkt. #88 ¶¶ 19-21. Arizona launched the Solar for All Arizonans Advisory

26

---

[1] ASAP is an electronic system federal agencies use to transfer money to recipient organizations. So Decl. Ex. 2.

3

1    Council to provide input on SFA programming; developed informational materials; and

2    prepared requests for grant applications and procurement processes. Dkt. #65 ¶¶ 15-17. Several

3    Plaintiffs collaborated with tribal governments to ensure access to programming for tribes. *See,*

4    *e.g.*, Dkt. #65 ¶ 16; Dkt. #74 ¶ 23; Dkt. #68 ¶ 13; Dkt. #78 ¶ 19; Dkt. #79 ¶¶ 14-15; Dkt. #82

5    ¶ 14, 17; Dkt. #90 ¶ 17; Dkt. #88 ¶¶ 17, 20. Other Plaintiffs took similar steps to develop their

6    SFA programming, with plans to launch in late 2025 or early 2026. Dkt. #67 ¶¶ 18-21; Dkt.

7    #68 ¶¶ 18-21; Dkt. #69 ¶¶ 15-20; Dkt. #75 ¶¶ 13-18; Dkt. #76 ¶¶ 15-18; Dkt. #77 ¶¶ 17-21;

8    Dkt. #79 ¶¶ 14-16; Dkt. #81 ¶¶ 15-18; Dkt. #80 ¶¶ 21-26; Dkt. #83 ¶¶ 15-18; Dkt. #84 ¶¶ 14-

9    18; Dkt. #85 ¶¶ 19-23; Dkt. #87 Decl. ¶¶ 14-18; Dkt. #90 ¶¶ 16-19; VA-Maiden Dec. ¶¶ 15-18.

10       Still other Plaintiffs began offering SFA programming right away. Dkt. #71 ¶¶ 17-20;

11   Dkt. #73 ¶¶ 16-19; Dkt. #78 ¶¶ 16-20; Dkt. #72 ¶¶ 15-18; Dkt. #89 ¶ 18; Dkt. #82 ¶¶ 14-18;

12   Dkt. #86 ¶¶ 15-18. For example, the District of Columbia began implementing its SFA

13   program in December 2024. In coordination with EPA, the District executed sub-awards with

14   coalition partners; advanced program administration and compliance systems; launched

15   community outreach initiatives; and began financing solar projects totaling tens of millions of

16   dollars, with plans to take advantage of solar tax credits that expired in December 2025. Dkt.

17   #71 ¶¶ 17-19.

18       Congress designed SFA to reduce greenhouse gas emissions and air pollution by

19   providing grantees support to "deploy and enable deployment of residential-serving solar,

20   storage, and enabling upgrades across the country" and "achieve a carbon pollution-free

21   electricity sector by 2035." Dkt. #126-34 at p.6. Thus, each Plaintiff's SFA programming

22   included concrete commitments to expand States' solar capacity to reduce greenhouse gases

23   and other air pollutants. *See, e.g.*, Dkt. #90 ¶ 32; Dkt. #84 ¶ 35; VA-Maiden Dec. ¶ 31.

24   Plaintiffs also made ambitious commitments to reduce greenhouse gas emissions to curb the

25   impacts of climate change, relying on SFA to help meet these policy goals. *See, e.g.*, Dkt. #81

26   ¶ 32; Dkt. #88 ¶ 40; Dkt. #86 ¶ 36.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC                    4                    ATTORNEY GENERAL OF WASHINGTON
                                                              Environmental Protection Division
                                                              800 Fifth Avenue Ste 2000
                                                              Seattle, WA 98104
                                                              206-464-7744

Collectively, Plaintiffs expended thousands of staff hours on developing their SFA programs. *See, e.g.*, Dkt. #68 ¶ 44; Dkt. #71 ¶ 39; Dkt. #80 ¶ 54-55; Dkt. #88 ¶ 37. For many Plaintiffs, SFA funding is an irreplaceable component of their solar energy programs. *See, e.g.*, Dkt. #75 ¶ 35; Dkt. #79 ¶ 36; Dkt. #81 ¶ 37; Dkt. #87 ¶ 38.

## C.    The Trump Administration Takes Aim at GGRF Programs

Within hours of being sworn into office, President Trump issued an executive order, *Unleashing American Energy*, directing agencies to undo so-called "Green New Deal" programs. Exec. Order No. 14,154, 90 Fed. Reg. 8535, Sec. 7 (Jan. 30, 2025) ("Energy EO"). EPA immediately set its sights on GGRF programs.

On January 27, 2025, the Federal Office of Management and Budget (OMB) directed EPA to freeze "all activities related to obligation or disbursement of Federal financial assistance," including "financial assistance for . . . the green new deal." So Decl. Ex. 4. EPA froze Plaintiffs' SFA funds pursuant to this instruction and only restored Plaintiffs' access after a district court ordered the funds unfrozen. *See New York v. Trump*, 764 F.Supp.3d 46 (D.R.I. 2025); *New York v. Trump*, 769 F.Supp.3d 119 (D.R.I. 2025); Dkt. #69 ¶ 16; Dkt. #89 ¶ 20.

EPA Administrator Lee Zeldin, however, continued attacking GGRF. For example, on February 23, 2025, Administrator Zeldin stated that the "entire [GGRF] scheme, in [his] opinion, is criminal." *See Climate United Fund v. Citibank, N.A.,* 778 F.Supp.3d 90, 102-03 (D.D.C. 2025) (detailing Administrator Zeldin's public comments about GGRF) (citation omitted).

Around that same time, EPA and other federal agencies froze funding for two other GGRF programs. After grant recipients for those programs sued, EPA terminated their grants. A court preliminarily enjoined EPA from dismantling the programs or clawing back the grant funds. *See Citibank*, 778 F.Supp.3d 90 (EPA violated separation of powers by seeking to "unilaterally dismantle a program that Congress established"). Those actions remain pending. *See Climate United Fund v. Citibank, N.A.*, Nos. 25-5122, 25-5123, 2025 WL 3663661 (D.C.

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

5

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    Cir. Dec. 17, 2025) (granting rehearing en banc and vacating panel opinion vacating

2    preliminary injunction).

3        And in March 2025, EPA officials directed the EPA Office of Inspector General (OIG)

4    to investigate the GGRF program, including SFA, citing "alleged misconduct, waste, conflicts

5    of interest, and potential fraud within the GGRF program." So Decl. Ex. 5. Following an audit,

6    OIG quietly published findings in January 2026, which found no evidence of wrongdoing by

7    any SFA grantee. So Decl. Ex. 6. To date, EPA has never identified any evidence of

8    misconduct, waste, conflicts of interest, or potential fraud in SFA.

9    **D.    Congress Repeals Section 134 and Rescinds Unobligated GGRF Appropriations**

10        On July 3, 2025, Congress passed a budget reconciliation bill (H.R. 1), signed into law

11   the next day. *See* Pub. L. 119- 21, 139 Stat. 72 (July 4, 2025). Section 60002 of H.R. 1

12   provides:

13           [Section 134] (42 U.S.C. 7434) is repealed and the unobligated
             balances of amounts made available to carry out that section (as
14           in effect on the day before the date of enactment of this Act) are
             rescinded.
15

16   139 Stat. at 154.

17        H.R. 1 explicitly rescinds only "the *unobligated* balances of amounts made available to

18   carry out" Section 134. *Id.* (emphasis added). Legislative materials confirm this. *See* 171 Cong.

19   Rec. S4283 (daily ed. July 9, 2025) (testimony from Representative Brett Guthrie (R-KY)

20   noting H.R. 1 "does not close the grants on any obligated funds"); *id.* at S4282-83 (testimony

21   from Representative Morgan Griffith (R-VA) explaining that "[i]f the grant has already been

22   granted and the money is obligated, . . . then our language does not affect that"); *id.* at S4282–

23   83 (statement from Senator Sheldon Whitehouse (D-RI) noting majority view "made clear that

24   rescissions from environmental grant programs only touched funding that had not yet gone out

25   the door"). All SFA grant awards were obligated before H.R. 1's passage and, therefore, were

26   not rescinded.

                                    6                ATTORNEY GENERAL OF WASHINGTON
                                                        Environmental Protection Division
                                                          800 Fifth Avenue Ste 2000
                                                             Seattle, WA 98104
                                                               206-464-7744

The only unobligated SFA funds rescinded by H.R. 1 were approximately $19 million in administrative funding. *See* So Decl. Ex. 7, at 2. H.R. 1 did not eliminate the remainder of EPA's administrative budget, including roughly $3.2 billion that Congress had appropriated in March 2025 to support EPA's "Environmental Programs and Management." Pub. L. 119-4, § 1802(3), 139 Stat. 30 (Mar. 15, 2025). H.R. 1 did not affect EPA's ability to use that funding to support SFA grants.

**E.    Defendants Abruptly Terminate SFA**

Despite H.R. 1's clear text, EPA executed a pre-determined plan that progressed from an initial recommendation to termination of a multi-billion-dollar program in a single day. The administrative record includes no consideration of H.R. 1 or its impact on SFA until the day EPA terminated the program. At 5:30 a.m. on August 7, 2025, EPA Associate Deputy Administrator Travis Voyles circulated a memorandum recommending that EPA "terminate the [SFA] program and all existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." Dkt. #126-14; *see also* Dkt. #126-15 ("Voyles Memo"). Just three hours later, EPA Deputy Administrator David Fotouhi responded and directed Mr. Voyles to "proceed accordingly." Dkt. #126-14. At 1:30 p.m., Mr. Voyles informed staff that "Agency leadership has decided to terminate the [SFA] program and existing grants" and directed that staff "proceed accordingly in coordination to immediately implement the termination of the SFA program and existing grants." Dkt. #126-20. ("Program Termination Directive"). EPA staff acted immediately to implement this Program Termination Directive.

Half an hour later, Administrator Zeldin announced the termination of SFA through EPA's X account. So Decl. Ex. 9. Administrator Zeldin disparaged SFA as a "boondoggle" and claimed EPA no longer had statutory authority or appropriated funds to administer the program. *Id.*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

7

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    That afternoon, Plaintiffs received substantively identical letters from EPA parroting

2    the Voyles Memo terminating their grants ("Termination Memoranda"). *See, e.g.*, Dkt. #126-

3    40 at p.2. EPA asserted that H.R. 1 "effectively and completely terminated the statutory

4    authority and all appropriations related to [SFA]." *Id*. EPA stated it "no longer possesses either

5    the substantive legal authority or the financial appropriations needed" to implement and

6    oversee SFA and was therefore terminating the program. *Id*. EPA "recognize[d] that program

7    participants may have begun to rely on [SFA] funds," but claimed that "[d]ue to the early

8    nature of such expenditures . . . any harms to interests suffered [would] be remedied and

9    remediable by the close out processes outlined in the program grants." *Id*. EPA's Office of

10   Grants and Debarment issued all Termination Memoranda by 9:30 PM on August 7, just

11   sixteen hours after Deputy Administrator Voyles recommended termination. Dkt. #126-24.

12   **F.      Defendants Drain Plaintiffs' Accounts and Initiate Closeout Procedures**

13   EPA swiftly blocked access to Plaintiffs' SFA funds. On August 8, EPA suspended or

14   disappeared most Plaintiffs' SFA ASAP accounts. *See, e.g.*, Dkt. #88 ¶ 25. Shortly thereafter,

15   EPA restored Plaintiffs' ASAP accounts but "deobligated 93% of the [SFA] grant funds for

16   each recipient, including Plaintiffs." Dkt. #102-1 ¶ 8. In total, EPA withdrew approximately

17   $2.7 billion from Plaintiffs' ASAP accounts without notice or explanation.

18   All Plaintiffs (except Virginia) filed timely administrative disputes under 2 C.F.R.

19   § 1500.15 challenging the termination of their SFA grants on constitutional and statutory

20   grounds ("Disputes"). *See, e.g.*, Dkt. #88 ¶¶ 27-28, Ex. 5 and 6. In response, EPA emailed

21   "closeout procedural guidance," demanding that Plaintiffs complete the closeout process

22   within 120 calendar days of the purported termination, i.e., by early December. *See, e.g.*, Dkt.

23   #88 ¶ 29, Ex. 7. EPA did not acknowledge Plaintiffs' Disputes or explain why the Disputes did

24   not toll the closeout period. EPA's closeout demands conflict with agency practice and federal

25   regulations, which provide that "closeout" processes occur when "all administrative actions

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

8

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1  and required work of [a] Federal award have been completed," 2 C.F.R. § 200.344(a), or EPA

2  lawfully terminates the grant pursuant to 2 C.F.R. § 200.340(a), *see id.* § 200.340(d).

3  **G.**      **Plaintiffs Seek Judicial Relief from Defendants' Unlawful Acts**

4          On October 15, 2025, Plaintiffs sued in the Court of Federal Claims seeking damages

5  for EPA's breach of their SFA grants. *Maryland Clean Energy Center v. U.S.A.*, No. 1:25-cv-

6  01738-LAS, Dkt. #1 (Ct. Cl. Oct. 15, 2025). Plaintiffs brought two claims—breach of contract

7  and breach of the duty of good faith and fair dealing—and sought only *monetary* relief. *Id.* at

8  32.

9          Plaintiffs then filed this lawsuit challenging EPA's program-level decisions: its legal

10  interpretation of H.R. 1 and resulting Program Termination and Deobligation Directives. Here,

11  Plaintiffs seek only *equitable* relief: a declaration that the EPA's actions were unlawful;

12  vacatur of the Termination and Deobligation Directives and any derivative acts; and an

13  injunction preventing Defendants "from reobligating, using, expending, or otherwise placing

14  beyond the Court's jurisdiction any funds appropriated by Congress for the SFA Program

15  except for purposes of the SFA Program." Dkt. #128 at p.34.

16  **H.**      **Defendants Double Down on Their Closeout Demands**

17          Within days of those filings, EPA sent letters to Plaintiffs declaring that "[t]he initiation

18  of legal proceedings supersedes the internal EPA dispute resolution processes" and "any

19  further action on [their] dispute is now moot and will not be addressed by a Disputes Decision

20  Official decision under 2 CFR 1500.17." Dkt. #88 ¶ 30, Ex. 8. ("Mootness Letter"). EPA has

21  since characterized the Mootness Letters as "denying grant reinstatement," Dkt. #102-1 ¶ 6, but

22  the Letters did not contain any such language and, in fact, specifically disclaimed that the

23  Letters were a "decision under 2 CFR 1500.17." *See, e.g.*, Dkt. #88 ¶ 30, Ex. 8. EPA has

24  "taken no action" on Plaintiffs' subsequent objections and requests for clarity. *Id.* ¶ 31, Ex. 9;

25  Dkt. #102-1 ¶ 7.

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

9

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1

## III.     LEGAL STANDARD

2        In Administrative Procedure Act (APA) cases, the Court's role on summary judgment

3   "is to determine whether or not as a matter of law the evidence in the administrative record

4   permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766,

5   769 (9th Cir. 1985); *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (the

6   administrative record includes all documents and materials directly or indirectly considered by

7   agency decisionmakers, not just those compiled by the agency in litigation); *see also* 5 U.S.C.

8   § 706 ("the reviewing court shall decide all relevant questions of law, interpret constitutional

9   and statutory provisions, and determine the meaning or applicability of the terms of an agency

10  action").

11

## IV.     ARGUMENT

12       The Court should grant Plaintiffs summary judgment. Defendants' termination of SFA

13  and claw back of obligated funds under the guise of H.R. 1 are contrary to law and violate

14  constitutional separation of powers principles. In addition, Defendants acted arbitrarily and

15  capriciously by offering conflicting, shifting, and post hoc rationales for terminating SFA, and

16  failing to adequately consider Plaintiffs' reliance interests.

17  **A.     This Court Has Jurisdiction**

18       Plaintiffs' claims are ripe and they have standing. As described above, terminating SFA

19  had immediate effects on Plaintiffs. *See supra* Section II.F. Defendants have conceded that

20  Plaintiffs can establish injury-in-fact and traceability. *See* Dkt. #102 at 26 (challenging only

21  redressability). And Plaintiffs meet the "relatively modest" burden on redressability. *Bennett v.*

22  *Spear*, 520 U.S. 154, 171 (1997). A favorable order from this Court would result in a "change

23  in a legal status" that would "amount to a significant increase in the likelihood" that Plaintiffs

24  will "obtain relief that directly redresses" their injuries, i.e., by vacating the unlawful

25  Directives to terminate SFA. *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see* Dkt. #104 at 7-8.

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

10

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

The Tucker Act does not change the straightforward jurisdictional analysis. The Tucker Act "impliedly forbids" the district court from exercising jurisdiction over a breach-of-contract claim "disguised" as an APA claim. *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). In making this determination, courts look to (1) the source of the rights upon which plaintiffs base their claims and (2) the type of relief sought. Here, both *Megapulse* factors support jurisdiction.

First, Plaintiffs' claims are statutory and constitutional, not contractual. *See* Dkt. #128 ¶¶ 132-177. Defendants violated the APA and the Constitution by adopting policies terminating SFA and clawing back funds. As a majority of the Supreme Court has ruled, this type of challenge to agency directives is within a district court's jurisdiction. *See NIH v. Am. Pub. Health Assoc.*, 145 S.Ct. 2658, 2661 (2025) (Barrett, J., concurring); *see also Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 155 F.4th 1099, 1104 (9th Cir. 2025) ("non-contractual source of Plaintiffs' rights is dispositive" of jurisdiction).

Second, Plaintiffs seek declaratory and injunctive relief and vacatur of the Program Termination and Deobligation Directives—"run-of-the-mill APA request[s]" that do not order Defendants to pay money. *Bd. of Educ. For Silver Consol. Sch. v. McMahon*, 791 F.Supp.3d 1272, 1282 (D.N.M. 2025); *see also Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025) (denying stay of order that "merely [froze] funds at issue until the Department makes a revised continuation or discontinuation determination or wins on the merits of its claims" and did not "order payment of any funds"). Vacating and enjoining these Directives and any derivative acts would not automatically result in money flowing to Plaintiffs. It would instead clarify that the Directives are illegal and prevent EPA from relying on them or their underlying rationales going forward. Plaintiffs do not seek damages in this Court. *See, e.g., American Acad. of Pediatrics v. U.S. Dep't of Health & Human Servs.*, -- F.Supp.3d --, 2026 WL 80796 at *11 (D.D.C. 2026) (injunction barring enforcement of termination orders and

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

11

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

restoration of grants returned plaintiffs to status quo ante and did not seek compensation for harm caused and so did not sound in contract). Nor do Plaintiffs seek an order reinstating funds. *See, e.g., Rhode Island v. Trump*, -- F.Supp.3d ---, 2025 WL 3251113 at *6 (D.R.I. 2025) (court had jurisdiction to consider APA and constitutional claims related to grants). This Court has jurisdiction.

**B.      Defendants Acted Illegally When They Terminated SFA**

Defendants violated the APA in terminating SFA and clawing back obligated funds.[2] First, the Directives are contrary to law, including H.R. 1's plain language and the Constitution. Second, the Directives are arbitrary and capricious.

**1.      The Directives are contrary to law**

Under the APA, a court should set aside agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), exceeds an agency's "statutory jurisdiction, authority, or limitations," or is "short of statutory right," 5 U.S.C. § 706(2)(C); *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (the APA requires courts to set aside agency action that is not in accordance with the law, "which means, of course, *any* law."). The Directives are contrary to H.R. 1's plain language, which rescinded only unobligated funds and did not require (or permit) termination of SFA. And the Directives are contrary to the Constitution because they usurp Congress's exclusive spending and lawmaking powers.

**a.      The Directives are contrary to H.R. 1**

Defendants violated the law by terminating SFA and clawing back Congressionally appropriated funds. Defendants are wrong that H.R. 1 "completely terminated the statutory authority and all appropriations related to [SFA]" and, therefore, that EPA "no longer possesses either the substantive legal authority or the financial appropriations needed to

---

[2] In opposing Plaintiffs' motion for preliminary injunction, Defendants did not dispute that Plaintiffs were challenging final agency action. In any event, the Directives mark the consummation of EPA's decisionmaking process as to the continued existence of SFA. Its position is "definitive," *Her Majesty the Queen in Right of Ontario v. U.S. E.P.A.*, 912 F.2d 1525, 1531 (D.C. Cir. 1990), and not "merely tentative" or "interlocutory." *Bennett*, 520 U.S. at 178.

1    continue implementation, oversight or monitoring." Dkt. #126-40 at p.2. Section 60002 of H.R.

2    1 does two things: it rescinds "unobligated balances of amounts made available to carry out

3    that section" (Rescission Clause) and repeals Section 134 going forward (Repeal Clause). Pub.

4    L. No. 119-21. It does not require or authorize Defendants to terminate SFA and claw back

5    funds that had long been obligated to Plaintiffs.

6                   **(1)    H.R. 1's Recission Clause affects only unobligated funds**

7            By its plain language, the only SFA funds that H.R. 1 rescinded were "the unobligated

8    balances of amounts made available to carry out" Section 134. *Id.*; *see also CVS Health Corp.*

9    *v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language [of the statute] has a plain

10   meaning or is unambiguous, the statutory interpretation inquiry ends there."). EPA concedes as

11   much in the Termination Memoranda, stating that Section 60002 "rescinds unobligated

12   amounts to carry out Section 134." Dkt. #126-40 at p.2. Nothing in the law rescinds billions of

13   dollars in obligated SFA grant funding.

14           In this context, a grant award is an "obligation" because it is "a definite commitment

15   that creates a legal liability of the government for the payment of goods and services ordered

16   or received, or a legal duty on the part of the United States that could mature into a legal

17   liability[.]" So Decl. Ex. 3, at 70. Congress appropriated $7 billion to the EPA "to make

18   grants" for zero-emission technologies by September 30, 2024. Section 134(a)(1). There is

19   no dispute that EPA obligated all appropriated funds to eligible SFA grantees by the statutory

20   deadline, and that those funds remained obligated when H.R. 1 was enacted. *See* So Decl. Ex.

21   6, at 4; Dkt. #126-18.

22           H.R. 1's Rescission Clause did not touch Plaintiffs' already-obligated funds. Insofar

23   as Defendants' Directives rely on the Rescission Clause, they are plainly unlawful.

24

25

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

13

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1

**(2)    H.R. 1's Repeal Clause is prospective only and neither requires nor authorizes Defendants' rescission of obligated funds**

2

3    Defendants also interpreted Section 60002's Repeal Clause to mean that EPA lacked

4    legal authority and financial appropriations to administer SFA. Dkt. #126-15 at p.2.

5    Defendants are wrong for two reasons.

6    First, the Repeal Clause has only prospective effect because H.R. 1 contains no

7    express retroactivity provision. "[C]ourts read laws as prospective in application unless

8    Congress has unambiguously instructed retroactivity." *Vartelas v. Holder,* 566 U.S. 257, 266

9    (2012). Moreover, under the General Savings Statute, "[t]he repeal of any statute shall not

10    have the effect to release or extinguish any . . . liability incurred under such statute, unless

11    the repealing Act shall so expressly provide." 1 U.S.C. § 109; *see also De La Rama S. S. Co.*

12    *v. United States*, 344 U.S. 386, 389 (1953) ("By the General Savings Statute Congress did

13    not merely save from extinction a liability incurred under the repealed statute; it saved the

14    statute itself: 'and such statute shall be treated as still remaining in force for the purpose of

15    [enforcing any such] liability.'"); *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535 (1954)

16    (applying General Saving Statute to uphold agency's authority to enforce violations of an

17    expired statutory provision that occurred before expiration). Defendants' argument that, by

18    repealing Section 134, Congress retroactively undid the statutory basis for existing SFA

19    grants, *see* Dkt. #126-15 at p.2, conflicts with the presumption against implied retroactivity

20    and the General Savings Statute because it has the effect of unwinding a congressional

21    directive that EPA had performed and extinguishes a liability EPA already incurred.

22    Section 134 was an authorizing statute and an appropriations statute: it instructed

23    EPA to establish grant programs and appropriated funds for that purpose. EPA awarded all

24    SFA grant funding before the appropriation expired in 2024. H.R. 1's repeal of Section 134

25    in 2025, therefore, did not touch grants EPA made in 2024. Legislative history confirms that

26    the Repeal Clause "does not close the grants on any obligated funds." *See, e.g.*, House

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC                    14                    ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1  Committee on Energy and Commerce, Full Committee Markup of Budget Reconciliation

2  Text Part 1, (YouTube, May 13, 2025),

3  https://www.youtube.com/live/J4fGR1CiNGg?si=0kz8e0kADDcUT35Q&t=20423 (last

4  visited Oct. 9, 2025) at 5:41:55-5:42:02 (testimony from Representative Guthrie (R-KY); *id.*

5  at 5:40:34-5:40:40 (testimony from Representative Griffith (R-VA) that "[i]f the grant has

6  already been granted and the money is obligated, then our language [in H.R. 1] does not

7  affect that"). And congressmembers have explained that the Repeal Clause was only included

8  in H.R. 1 to ensure that if EPA prevailed in litigation over two other GGRF programs, the

9  $20 billion appropriated for those programs—which EPA purported to terminate *before* H.R.

10  1 was passed (unlike SFA)—would revert back to Treasury. *See* So Decl. Ex. 10, at 13.

11       Nor does the repeal of Section 134 eliminate Defendants' authority to administer SFA

12  for current SFA recipients. By leaving obligated funds untouched, the law requires EPA to

13  expend previously-appropriated grant funding. *See* 2 C.F.R. § 200.300(a) (an agency

14  administering a federal grant program must manage it "in a manner [that] ensure[s] that

15  Federal funding is expended and associated programs are implemented in full accordance with

16  [federal law]."). Further, EPA is wrong that Congress intended the administrative funding

17  "specifically appropriated" by Section 134 to be the exclusive source of funding for

18  administering SFA, *see* Dkt. #126-15 at p.3. Congress explicitly appropriated the

19  administrative funding in Section 134 "*[i]n addition to amounts otherwise available*." Section

20  134(a)(4) (emphasis added). Congress regularly appropriates funds for "Environmental

21  Programs and Management" (EPM) to EPA, a multipurpose fund that EPA can use to

22  administer to any of its programs, subject to any terms or limitations in specific appropriations

23  bills. Indeed, EPA previously requested additional EPM funds to support GGRF

24  implementation, *see, e.g.,* So Decl. Ex. 8, at 40, and was appropriated over $3 billion for EPM

25  for Fiscal Year 2025, barely five months before it purported to terminate SFA. Pub. L. 119-4, §

26  1802(3), 139 Stat. 30 (Mar. 15, 2025).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

15

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    Moreover, the notion that, by rescinding $19 *million* in administrative funds,

2    Congress granted EPA discretion to unilaterally rescind an additional $7 *billion* in SFA

3    funding simply makes no sense. Congress "does not . . . hide elephants in mouseholes."

4    *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). It is a "core

5    administrative-law principle that an agency may not rewrite clear statutory terms to suit its

6    own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302,

7    328 (2014); *Colorado v. U.S. Dep't of Health & Hum. Servs*., 783 F.Supp.3d 641, 648

8    (D.R.I. 2025) (holding that "Congress's decision to eliminate some COVID-era public health

9    measures" but not others "presumably signals its intent to continue that funding" (internal

10    citation omitted)). Had Congress intended H.R. 1 to apply retroactively and reach obligated

11    funds, it would have said so explicitly. It said the opposite.

12    Indeed, Defendants' reading of the Repeal Clause would render the Rescission Clause

13    superfluous. If the Repeal Clause, in fact, "terminated . . . all appropriations related to

14    [SFA]" such that EPA "no longer possesses . . . the financial appropriations needed to

15    continue" SFA, Dkt. #126-40 at p.2, there would be no need for Congress to also "rescind"

16    the unobligated balances of those appropriations. But courts avoid statutory interpretations

17    that render specific provisions superfluous. *See Tulelake Irrigation Dist. v. U.S. Fish &*

18    *Wildlife Serv.,* 40 F.4th 930, 936 (9th Cir. 2022). Both clauses of Section 60002 must be read

19    as a consistent whole: the Rescission Clause cancels only the unobligated balance of

20    Congress's prior appropriation (a mere $19 million), and the Repeal Clause ensures that no

21    future Congress can appropriate funds for future SFA grants without enacting a new

22    authorizing statute. Neither clause touched obligated SFA funds or EPA's authority to

23    administer those funds, which it can do using EPM funds.

24    **b.    The Directives are unconstitutional**

25    The Directives are also contrary to law because they violate constitutional separation of

26    powers principles and the Appropriations Clause. The separation of powers doctrine recognizes

1   that the "United States Constitution exclusively grants the power of the purse to Congress, not

2   the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

3   Congress' spending power has a "fundamental and comprehensive purpose . . . to assure that

4   public funds will be spent according to the letter of the difficult judgments reached by

5   Congress as to the common good and not according to the individual favor of Government

6   agents." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (internal quotation

7   omitted); *see also* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury,

8   but in Consequence of Appropriations made by Law").

9         When an agency is charged with administering a statute, "both [its] power to act and

10   how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569

11   U.S. 290, 297 (2013). "Absent congressional authorization, the Administration may not

12   redistribute or withhold properly appropriated funds in order to effectuate its own policy

13   goals." *San Francisco*, 897 F.3d at 1235. "There is no provision in the Constitution that

14   authorizes the President," let alone a subordinate agency, "to enact, to amend, or to repeal

15   statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Defendants' Directives

16   "effectuate [their] own policy goals," not Congress's. *San Francisco*, 897 F.3d at 1235.

17         Congress appropriated $7 billion for SFA and prescribed how EPA must spend it. EPA

18   obligated those funds consistent with Congress's direction. Even when Congress prospectively

19   repealed Section 134, the floor debate resulted in a clear direction that previously obligated

20   funds were to be left alone. Defendants' decisions to cancel SFA and claw back billions of

21   dollars of obligated funding "subverts the careful balance" struck by Congress, *Ragsdale v.*

22   *Wolverine World Wide, Inc.*, 535 U.S. 81, 94 (2002), that only "the unobligated balances of

23   amounts made available to carry out that section . . . are rescinded." Pub. L. No. 119-21, 139

24   Stat. 72, 154 (2025). Defendants' conclusion that Section 60002 "explicitly repealed [SFA]

25   administration funding along with all grant funding," *see* Dkt. #126-15 at p.1, effectively

26   amends H.R. 1 by executive decree, which the Constitution forbids. *Clinton*, 524 U.S. at 438;

PLAINTIFFS' MOTION FOR SUMMARY                    17                    ATTORNEY GENERAL OF WASHINGTON
JUDGMENT                                                                Environmental Protection Division
No. 2:25-cv-02015-TMC                                                   800 Fifth Avenue Ste 2000
                                                                        Seattle, WA 98104
                                                                        206-464-7744

*see also Ragsdale*, 535 U.S. at 94 ("Courts and agencies must respect and give effect to these sorts of compromises [between groups with marked but divergent interests in the contested provision]."). By supplanting Congress's decision to leave obligated funds untouched with their own policy preferences, Defendants violated separation of powers principles and the Appropriations Clause.

Defendants claimed that because EPA had some ability to terminate individual SFA grants, it had the power to terminate the entire program. Dkt. #102 at 31. But the power to decide *who* gets Congressionally-appropriated money is not the same as the power to decide that *no one* gets the money. "Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" *San Francisco*, 897 F.3d at 1232 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.)). Whatever limited authority EPA might claim to terminate individual grants, it lacks the authority to unilaterally shut down SFA and categorically refuse to spend money appropriated by Congress and already obligated to recipients.

### 2.    Defendants' Directives are arbitrary and capricious

Defendants' Directives are also arbitrary and capricious. An agency action is arbitrary and capricious if it is not reasonable or reasonably explained, if the agency ignored an important aspect of the problem, or if the agency failed to consider reliance interests. *See Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the Directives are arbitrary and capricious for four reasons: (1) Defendants rely on post hoc rationales; (2) Defendants' proffered reasons for the Directives are pretextual; (3) Defendants failed to adequately consider Plaintiffs' significant reliance interests; and (4) the Directives lack a reasoned basis.

### a.    Defendants cannot justify the Directives with post hoc rationalizations

After Plaintiffs sued, Defendants abandoned their claim that H.R. 1 required termination and now offer an entirely new rationale to this Court.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

18

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

As explained above, Defendants claimed for the first time in litigation that EPA used its "existing authority to terminate grants" under 2 C.F.R. § 200.340(a)(4) to end SFA and claw back all funds and reasonably did so because "Congress removed GGRF from the United States' policy agenda." Dkt. #102 at 22, 23. But relying on an agency regulation concerning individual grant terminations to cancel an entire $7 billion Congressional appropriation is absurd and unconstitutional. *Supra* pp.16, 18. Beyond that, this rationale is wholly absent from the record. *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (agency action must be "based on the administrative record and the basis for the agency's decision must come from the record."). Nowhere in the Voyles or Termination Memoranda (or anywhere else) do Defendants cite 2 C.F.R. § 200.340 as authority for terminating SFA. Defendants' post hoc rationalizations cannot justify the Directives. *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1068 (9th Cir. 2021) ("an agency must provide its 'reasoned explanation' in a form that can adequately be examined on judicial review, not simply present arguments in its briefing how the decision might have been reached").

### b.    Defendants proffer contrived reasons for the Directives

The APA requires "agencies [to] offer genuine justifications for important decisions" that can be "scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Defendants' longstanding animus against SFA and the breakneck speed at which the terminations were considered, approved, and executed demonstrates the pretextual nature of Defendants' explanations.

President Trump vowed to shut down the so-called "Green New Scam," promising that his administration would "rescind all unspent funds under the misnamed Inflation Reduction Act." So Decl. Ex. 11. From day one, the Administration made clear its determination to end GGRF programs irrespective of congressional authority to do so. From the Energy EO and OMB directives ordering federal agencies to freeze funding for "green new deal social engineering policies," So Decl. Ex. 4, to EPA's abrupt suspensions of SFA

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC                    19                    ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

ASAP accounts, to Administrator Zeldin's disparaging of SFA as a "grift,"  So Decl. Ex. 9,

to EPA's false representations of H.R. 1's plain text, to Defendants' post hoc justifications in

this litigation, the record is clear: Defendants ended SFA not because H.R. 1 compels or

authorizes that result, but because of "the President's announced vendetta against [GGRF]."

*Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 841 (D.C. Cir. 2025) (Pillard, J.,

dissenting).

    The Administrative Record supports no other conclusion. Far from evidencing

thoughtful decision-making stretching back to H.R. 1's enactment on July 4, 2025,

Defendants' rationale for terminating SFA is captured in a single document, the Voyles

Memo. EPA's Deputy Administrator received the Voyles Memo at 5:20 a.m. on August 7,

2025, and a mere three hours later, directed Mr. Voyles to "proceed accordingly." Dkt. #126-

14. A few hours later, Administrator Zeldin announced the termination of SFA via social

media, and that same day, EPA sent boilerplate termination memoranda to all SFA grantees.

The haste to terminate SFA as soon as Defendants' contrived rationales were documented in

writing betrays the pretense and lack of reasoned decision-making underlying the Directives.

Because the "evidence tells a story that does not match the explanation [Defendants] gave for

[their] decision," *Dep't of Commerce*, 588 U.S. at 784, the Directives are arbitrary and

capricious.

      **c.**      **Defendants failed to adequately consider Plaintiffs' significant reliance interests**

    The Directives are arbitrary and capricious for the additional reason that Defendants

failed to account for Plaintiffs' reliance interests. *Dep't of Homeland Sec. v. Regents of the*

*Univ. of Cal.,* 591 U.S. 1, 33 (2020) (agencies must "assess whether there were reliance

interests, determine [their significance], and weigh any such interests against competing

policy concerns"). Where serious interests exist, "tailored reasons" are required to override or

disregard them. *See Am. Fuel & Petrochemical Mfrs. v. Envtl. Prot. Agency*, 937 F.3d 559,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

20

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

578 (D.C. Cir. 2019). Defendants failed to adequately consider Plaintiffs' reliance interests in two ways.

First, Defendants did not meaningfully engage with all of Plaintiffs' reliance interests. Although Defendants acknowledge that grantees were "in the process of spending down portions of the funding allocated for overhead [and] setting up a process by which funds will be [further distributed]," Dkt. #126-15 at p.4, Defendants completely ignore the significant staff time and efforts that had already been invested at Plaintiffs' expense. These efforts include creation of state-level SFA programs that Plaintiffs launched or were about to launch, the contracts and agreements that Plaintiffs entered into with vendors, contractors and subrecipients, and the commitments that Plaintiffs made to tribal partners, residents, and other stakeholders. *Supra* Section II.B. Defendants also ignored Plaintiffs' reliance on the continued existence of SFA to implement their climate policies. More than half of Plaintiffs are required to meet statutorily mandated climate goals, and relying on SFA support, devoted their limited resources to setting up state-level SFA programs. *See Supra* Section II.B. Now what do Plaintiffs do? Defendants don't say. Defendants' conclusory reference to a fraction of Plaintiffs' reliance interests is arbitrary and capricious. *Massachusetts v. N.I.H.*, 770 F.Supp.3d 277, 310-11 (D. Mass. 2025) (finding NIH failed to consider grantees' reliance interests in changing indirect costs policy, where notice included only a single, conclusory reference to one category of reliance interests and did not mention other substantial reliance interests); *Assoc. of American Universities v. Dept. of Defense*, -- F.Supp.3d ---, 2025 WL 2899765, at *26 (D. Mass. Oct. 10, 2025) (rejecting agency's argument that it considered universities' reliance interests by announcing change in indirect cost cap policy 29 days in advance to allow universities time to adjust operations to account for change in policy).

Second, Defendants do not offer "a reasoned explanation" for disregarding the reliance interests that "underlay or were engendered" by SFA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). Defendants justified overriding Plaintiffs'

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

21

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    reliance interests based on the "nascent stage" of SFA. Dkt. #126-15 at p.4. But, as stated

2    above, Plaintiffs had undertaken significant work in furtherance of Plaintiffs' SFA programs.

3    Similarly, that "the Agency can offer reimbursement for [allowable pre-termination

4    expenses]," Dkt. #126-15 at p.5, does not reasonably justify overriding Plaintiffs' reliance

5    interests because these interests are harmed not just by the loss of funding but by the loss of

6    SFA, and far exceed reimbursable costs. For example, reimbursement of these costs cannot

7    make Plaintiffs whole for the staff time they invested at their own expense in reliance on

8    SFA continuing, the technical support Plaintiffs will lose, or the setbacks  Plaintiffs now face

9    in implementing their climate policies or meeting their state-mandated climate goals. *Supra*

10   Section II.B. Defendants' bare assertion that closeout costs should "address all concerns

11   potentially arising from recipients' reliance on federal support" is unreasoned. Dkt. #126-15

12   at p.5.

13          Finally, Defendants cannot justify disregarding Plaintiffs' substantial reliance

14   interests on the basis that "[i]t was evidently foreseeable that Congress could repeal such

15   legal authority and appropriations . . . and that is precisely what happened here." *Id*.

16   Defendants' incorrect interpretation of H.R. 1 is not a "reasoned explanation" to disregard

17   Plaintiffs' reliance interests. *Fox Television Stations*, 556 U.S. at 515-16.

18                  **d.     Defendants failed to reasonably explain the Directives**

19          When an agency changes position, courts "insist that an agency examine the relevant

20   data and articulate a satisfactory explanation for its action." *Id*. at 513 (quotation omitted).

21   Here, the Voyles and Termination Memoranda are the only documents in the record that

22   explain Defendants' decisions to end SFA and claw back SFA funds. The memoranda offer

23   two rationales for the Directives, but these rationales are unreasoned and contradictory.

24          First, Defendants' claim that H.R. 1 *required* EPA to terminate SFA and claw back all

25   funds is not reasonably explained. As discussed above, H.R. 1 rescinded "the unobligated

26   balances of amounts" appropriated for SFA, not the $7 billion that had already been obligated.

1    While Defendants claim "[t]he repeal of CAA section 134 eliminates the Agency's substantive

2    grantmaking authority under that chapter," Dkt. #126-15 at p.2, the *prospective* repeal of

3    EPA's substantive grantmaking authority under Section 134 cannot *retroactively* eliminate

4    EPA's authority as to existing SFA grants or render EPA's 2024 SFA grant awards improper.

5    *See supra* pp.14-16.

6         Second, Defendants fail to reasonably explain their conclusion that the Directives were

7    "within the Agency's discretion as a matter of appropriations law." Dkt. #126-15 at p.3. The

8    Voyles and Termination Memoranda both assert that H.R. 1 made it "no longer legally

9    permissible" for EPA to continue administering SFA, Dkt. #126-15 at p.2; Dkt. #126-40 at p.2,

10   requiring EPA to issue the Directives. But at the same time, the Voyles Memo claims that it

11   was "well within the Agency's *discretion* as a matter of appropriations law for the Agency to

12   wind down and halt further implementation of the SFA program." Dkt. #126-15 at p.3

13   (emphasis added). Both cannot be true: EPA cannot simultaneously be legally required by H.R.

14   1 to end SFA while also having the discretion to do so, which implies the corresponding

15   discretion not to terminate the Program. This internally inconsistent reasoning renders

16   Defendants' Directives arbitrary and capricious. *See Nat'l Parks Conservation Ass'n v. E.P.A.*,

17   788 F.3d 1134 (9th Cir. 2015) ("an internally inconsistent analysis is arbitrary and

18   capricious").

19        And Defendants provide no explanation for how EPA had discretion to claw back the

20   funds it had already obligated. Defendants simply presuppose that EPA had this discretion,

21   citing *Rogers v. United States*, 14 Cl. Ct. 39 (1987). Dkt. #126-15 at p.3, n.8. But *Rogers* is

22   inapposite: the plaintiffs in that case challenged an agency's decision not to award grant

23   funding that had not yet been obligated. *See Rogers*, 14 Cl. Ct. at 43. *Rogers* did not address an

24   agency's decision to claw back *fully obligated* funds or provide authority to terminate SFA en

25   masse. *See supra* Section IV.B.1.

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

23

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

Defendants also do not attempt to justify the Deobligation Directive. The Record does not even address it. And it strains credulity to believe that EPA staff would uniformly drain over 90% of each SFA grantee's unliquidated balance without *any* direction to do so. But agency action need not be in writing, or even made known to the public, to be challenged. *See, e.g.*, *R.I.L.-R v. Johnson*, 80 F.Supp.3d 164, 184 (D.D.C. 2015); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F.Supp.3d 863, 872 (W.D. Wash. 2020).

In any event, the Directive contravenes EPA's "General Guidance for EPA Project Officers on Recently Terminated Grants," which instructs that EPA "will decrease the recipient's ASAP account by the unused amount" only *after* it has received the grantees' final reports and performed "financial reconciliation of the grant to determine final costs owed to the recipient." Dkt. #126-25 at p.1. Similarly, EPA's internal "Closeout Policy and Responsibilities" guidance does not authorize reducing ASAP accounts before closeout occurs. Dkt. #126-27. Because Defendants' Deobligation Directive is unexplained and contradicted by their own policies, it is arbitrary and capricious. *Fox Television Stations*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

Finally, Defendants fail to reasonably explain the conclusion that it would be "legally suspect, operationally risky, and inadvisable" to use EPM funds to administer SFA. Dkt. #126-15 at p.3. Defendants' position that Congress intended EPA to administer SFA using only the administrative funding "specifically appropriated" by Section 134 is contradicted by Section 134 itself. *See supra* p.15. And nowhere in the record do Defendants acknowledge that EPA sought to use EPM funds to administer GGRF programs before H.R. 1, *see* So Decl. Ex. 8, at 40, or explain why this would no longer be authorized. Likewise, Defendants' claim that "reassigning funds" from EPM "would likely require stripping administration and oversight funding away from programs that Congress intended the Agency to support through other dedicated funding," Dkt. #126-15 at p.7, lacks any basis in the record. The only reason

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

24

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    Defendants offer for changing their position is "Congress'[s] clear action in [H.R. 1]," Dkt.

2    #126-15 at p.3, but Defendants get it exactly backward: Congress rescinded only unobligated

3    funds. Because Congress left obligated funds untouched, and H.R. 1's repeal of Section 134

4    has only prospective effect, nothing in H.R. 1 requires EPA to change how it administers

5    existing SFA grants.[3]

6    **C.    The Court Should Vacate the Directives and Permanently Enjoin Defendants from Relying on Them**

7        **1.    The Court should vacate the Directives**

8        Plaintiffs are entitled to vacatur of the Directives and the actions that flow from them.

9    A court "shall . . . hold unlawful and set aside agency action" that is contrary to law or

10    arbitrary and capricious. 5 U.S.C. § 706(2). Vacatur is the "default remedy under the APA."

11    *Montana Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). "When a federal court sets

12    aside an agency action, the federal court vacates that order in much the same way that an

13    appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of*

14    *Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring). The vacated "agency

15    action is treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1,

16    2 n.1 (2023) (Kavanaugh, J., respecting denial of stay). Vacatur of the challenged Directives—

17    and any acts that flow therefrom, including termination of Plaintiffs' administrative appeals—

18    is appropriate here and within the scope of traditional APA relief. *See Montana Wildlife Fed.*,

19    127 F.4th at 50-52 (affirming district court's vacatur of oil and gas leases because "the errors . .

20    . occurred at the beginning of the oil and gas lease sale process, infecting everything that

21    followed").

22

23

24

25    _____

        [3] Plaintiffs' ultra vires Cause of Action is alternative relief requested in case the Court determines that APA review of Defendants' actions is unavailable. *See Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020).

26    Because Defendants concede APA review is available, *see* Dkt. #102 at 19-23, the Court need not reach this challenge. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 682 (2025) (ultra vires not available if there is an "alternative path to judicial review").

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC                                    25                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Environmental Protection Division
                                                                              800 Fifth Avenue Ste 2000
                                                                              Seattle, WA 98104
                                                                              206-464-7744

1

**2.    The Court should permanently enjoin Defendants from implementing or relying on the Directives**

2

The Court should also issue a permanent injunction prohibiting future implementation

3

or enforcement of the Directives or their rationale against Plaintiffs. *See* 5 U.S.C. § 703

4

(authorizing actions for "prohibitory or mandatory injunction" in addition to vacatur). The

5

criteria for a permanent injunction "is essentially the same as" a preliminary injunction, except

6

that a plaintiff must prevail on the merits. *Indep. Training & Apprenticeship Program v. Cal.*

7

*Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013) (citation omitted).

8

As discussed above, Plaintiffs succeed on the merits. They are also suffering irreparable

9

harm, and the public interest and balance of the equities favor a permanent injunction against

10

the Directives.

11

**a.    Plaintiffs are irreparably harmed by the Directives**

12

Irreparable harm is "harm for which there is no adequate legal remedy," i.e., harm that

13

is not compensable with money damages. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,

14

677 (9th Cir. 2021) (quotation omitted). Absent a permanent injunction, Plaintiffs will be

15

irreparably harmed in at least two ways. First, Plaintiffs will suffer irreparable harm to their

16

sovereign climate goals. Second, some Plaintiffs will be unable to launch or continue operating

17

state-level distributed solar programs, while others' programs will continue to be significantly

18

hampered, because of the termination of SFA and loss of grant funding.

19

Plaintiffs have adopted ambitious plans to expand the availability of solar energy to

20

lower energy costs for low-income and disadvantaged communities and residents and to

21

strengthen their energy grids. *Supra* Section II.B. The Directives inflict profound harm on

22

Plaintiffs' sovereign interest in addressing climate goals within their borders. *See Kansas v.*

23

*United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001); *New York v. Trump*, 490 F.Supp.3d

24

225, 243-44 (D.D.C. 2020) (federal actions impeding States' public health programs caused

25

irreparable harm). Defendants' abrupt shutdown of SFA will make it impossible for Plaintiffs

26

to achieve their climate goals, resulting in further avoidable environmental degradation within

26

1   Plaintiffs' borders. *See supra* Section II.B. This profoundly harms Plaintiffs and their residents.

2   *See supra* Section II.B; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

3   2011) (environmental injuries, by their nature, can seldom be remedied by money damages and

4   are often irreparable). Even if SFA is eventually restored, the delay in launching state-level

5   solar programs will make it more difficult to respond to climate change in the future.

6   *Washington v. U.S. Dep't of Commerce*, C25-1507 MJP, 2025 WL 2978822, at *10 (W.D.

7   Wash. Oct. 22, 2025). This is doubly so where, as here, Defendants' actions are patently

8   unconstitutional and contrary to the APA. *American Trucking Assocs., Inc. v. City of L.A.*, 559

9   F.3d 1046, 1058 (9th Cir. 2009) (a structural constitutional violation, "coupled with the

10  damages incurred," can show irreparable harm).

11         Second, the Directives irreparably harm Plaintiffs' distributed solar programs. Plaintiffs

12  have lost programmatic support and technical assistance that they can only access through the

13  continued existence of SFA. Without EPA's support in developing workplans, providing

14  technical guidance, and collaboration, Plaintiffs cannot launch or continue operating state-level

15  distributed solar programs as Congress intended—or at the very least, they will be substantially

16  hampered in their efforts to do so. *See supra* Section II.B; *Washington v. U.S. Dep't of Transp.*,

17  792 F.Supp.3d 1147, 1190 (W.D. Wash. 2025) (irreparable harm present where termination

18  threatened state programs "dying on the vine").

19         If the Directives are not enjoined, Plaintiffs will not be able to proceed with

20  solicitations and contracts, or work with partners, meaning the delay or end of state-level

21  programs. *See supra* Section II.B. This in turn will mean that the significant job creation

22  promised by SFA—which has already been stymied by EPA-induced delays—will never come

23  to pass. *See, e.g.*, *supra* Section II.B. This loss of federal funding will have cascading effects

24  on Plaintiffs' budgeting, as Plaintiffs scramble to find replacement funding to keep their

25  program and climate goals on track. *See supra* Section II.B. *Planned Parenthood of Greater*

26  *Washington and N. Idaho v. U.S. Dep't of Health and Human Servs.*, 328 F.Supp.3d 1133,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

27

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1150 (E.D. Wash. 2018). Tribal and low-income residents, the intended beneficiaries of SFA, will feel the loss of SFA most acutely; Plaintiffs will lose those communities' trust and goodwill, hindering their ability to provide services for and work with those communities in the future. *See, e.g.*, *supra* Section II.B; *E. Bay Sanctuary Covenant*, 993 F.3d at 677 (intangible injuries to reputation and goodwill support irreparable harm showing).

**b.    The balance of the equities and the public interest weigh in Plaintiffs' favor**

The balance of equities and the public interest strongly favor entry of a permanent injunction in this case. When the government is a party, the Court's inquiry into the balance of the equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020). Plaintiffs have and will use SFA to carry out Congressional intent by developing distributed solar programs, whereas Defendants have openly flouted Congressional intent by slashing a program Congress meant to maintain. Thus, the harms caused by the Directives greatly outweigh any potential hardship to Defendants should the Court order Defendants to reinstate the Program. *See N.D. v. Reykdal*, 102 F.4th 982, 996 (9th Cir. 2024) (affirming injunction where "Congress has already done the relevant balancing of interests"). The public interest is likewise served by agencies complying with the law, including the APA. *Azar*, 911 F.3d at 581; *Washington v. Trump*, 768 F.Supp.3d 1239, 1280 (W.D. Wash. 2025) ("The rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'") (quoting *E. Bay Sanctuary Covenant*, 932 F.3d at 779).

**3.    Plaintiffs are entitled to declaratory relief**

Declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984). "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ.

28

1    P. 57; *see* 28 U.S.C. § 2201(a); 5 U.S.C. §§ 702, 703. Defendants' interpretation of H.R. 1

2    presents an active controversy, and an order clarifying the statute is appropriate here. For all

3    the reasons stated above, the Court should declare that Section 60002 of H.R. 1 does not

4    require or allow EPA to terminate SFA or claw back obligated funds. *See, e.g., Washington v.*

5    *U.S. Dep't of Transp.*, Case No. 2:25-cv-00848-TL, 2026 WL 183584 at *26 (W.D. Wash. Jan.

6    23, 2026) (granting declaratory relief where "[o]nly forward-looking declaratory relief can

7    address the cloud of uncertainty into which Defendants have placed the [terminated

8    program].""). Presumably, once EPA knows what the law is, it will follow it. The Court should

9    grant declaratory relief.

**V.    CONCLUSION**

10

11    The Court should grant Plaintiffs' Motion for Summary Judgment.

12

13    DATED this 24th day of February, 2026.

14    I certify that this memorandum contains 9,496 words, in compliance with the Court's Order

15    Setting Briefing Schedule and Word Limits, Dkt. #124.

16    **KRISTIN K. MAYES**                          **NICHOLAS W. BROWN**
      Attorney General of Arizona                  Attorney General of Washington

17
      By: */s/ Mary M. Curtin*                     */s/ C. L. Junine So*
18    MARY M. CURTIN                               C. L. JUNINE SO, WSBA # 58779
      Senior Litigation Counsel                    SARAH E. SMITH-LEVY, WSBA # 55770
19    ALEXA G. SALAS                               TERA HEINTZ, WSBA # 54921
      Assistant Attorney General                   ANDREW HUGHES, WSBA # 49515
20    Office of the Arizona Attorney General        Assistant Attorneys General
      2005 N. Central Ave.                          800 Fifth Avenue, Suite 2000
21    Phoenix, Arizona 85004                        Seattle, Washington 98104
      Mary.Curtin@azag.gov                         206-464-7744
22    Alexa.Salas@azag.gov                         junine.so@atg.wa.gov
                                                   sarah.e.smith-levy@atg.wa.gov
23    *Attorneys for the State of Arizona*         tera.heintz@atg.wa.gov
                                                   andrew.hughes@atg.wa.gov
24
                                                   *Attorneys for the State of Washington*
25

26

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

29

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Ryan Pesch*
RYAN PESCH
CAT RIOS-KEATING
*Special Assistant Attorneys General*
BRIAN CARTER
*Special Counsel*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 728-7116
ryan.pesch@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**ROB BONTA**
Attorney General of California

By: */s/ Marie Elizabeth Logan*
MARIE ELIZABETH LOGAN
REBECCA HUNTER
ABIGAIL BLODGETT
DYLAN C. REDOR
THEODORE A. MCCOMBS
MYUNG PARK
Deputy Attorneys General
California Department of Justice
1515 Clay Street
Oakland, CA 94612
Marie.Logan@doj.ca.gov

*Attorneys for the State of California*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Lauren M. Marks*
LAUREN M. MARKS
Special Assistant Attorney General
Office of the Attorney General
for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
Lauren.marks@dc.gov

*Attorneys for the District of Columbia*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Carrie Noteboom*
CARRIE NOTEBOOM
Assistant Deputy Attorney General
DAVID MOSKOWITZ
Deputy Solicitor General
CYNTHIA VITALE
Assistant Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
David.Moskowitz@coag.gov
Cynthia.Vitale@coag.gov

*Attorneys for the State of Colorado*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

30

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1  **WILLIAM TONG**
   Attorney General of Connecticut

2
   By: */s/ Jill Lacedonia*
3  JILL LACEDONIA
   Assistant Attorney General
4  165 Capitol Avenue
   Hartford, CT 06106
5  (860) 808-5250
   Jill.Lacedonia@ct.gov
6
   *Attorneys for the State of Connecticut*
7

8

9  **KWAME RAOUL**
   Attorney General of Illinois
10
   By: */s/ Katharine Roller*
11 KATHARINE ROLLER
   Complex Litigation Counsel
12 ELIZABETH B. SCOTT
   Assistant Attorney General
13 Office of the Illinois Attorney General
   115 LaSalle Street
14 Chicago, IL 60603
   (773) 519-1842
15 Katharine.roller@ilag.gov

16 *Attorneys for the State of Illinois*

17

18

19

20 **AARON M. FREY**
   Attorney General of Maine
21
   By: */s/ Caleb Elwell*
22 CALEB E. ELWELL
   Assistant Attorney General
23 Office of the Maine Attorney General
   6 State House Station
24 Augusta, ME 04333
   (207) 626-8545
25 Caleb.elwell@maine.gov

26 *Attorneys for the State of Maine*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
Special Assistant to the Attorney General
KALIKOʻONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ Travis Mayo*
S. TRAVIS MAYO
General Counsel
TAYLOR PAYNE
Chief Deputy General Counsel
LAURA C. TIPTON
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ Steven J. Goldstein*
STEVEN J. GOLDSTEIN
*Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

*Attorneys for the State of Maryland*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC

31

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744

1    **ANDREA JOY CAMPBELL**                    **DANA NESSEL**
     Attorney General of the Commonwealth of    Attorney General of Michigan
2    Massachusetts

3    By: */s/ Amy Laura Cahn*                    By: */s/ Neil Giovanatti*
     AMY LAURA CAHN                              NEIL GIOVANATTI
4    TERRENCE VALES                             POLLY SYNK
     *Assistant Attorney General*               *Assistant Attorneys General*
5    One Ashburton Place                         Michigan Department of Attorney General
     Boston, MA 02108                            525 W. Ottawa
6    (617) 963-2277                              Lansing, MI 48909
     amy.laura.cahn@mass.gov                     (517) 335-7603
7    molly.teague@mass.gov                       GiovanattiN@michigan.gov
     terrence.vales@mass.gov                     SynkP@michigan.gov
8    katherine.dirks@mass.gov
     vanessa.arslanian@mass.gov                  *Attorneys for the State of Michigan*
9
     *Attorneys for the Commonwealth of*
10   *Massachusetts*

11   **JENNIFER DAVENPORT**                      **RAÚL TORREZ**
     Attorney General of New Jersey              Attorney General of New Mexico
12
     By: */s/ Daniel Resler*                     By: */s/ J. Spenser Lotz*
13   DANIEL RESLER                               J. SPENSER LOTZ
     LAUREN E. VAN DRIESEN                       Assistant Attorney General
14   JACK VENTURA                                Environmental Protection Bureau
     *Deputy Attorneys General*                  201 Third St. NW, Suite 300
15   Office of the Attorney General              Albuquerque, NM 87102
     33 Washington Street, Ninth Floor           (505) 616-7560
16   Newark, NJ 07101                            slotz@nmdoj.gov
     (973) 648-4726
17   Daniel.Resler@law.njoag.gov                 *Attorneys for the State of New Mexico*

18   *Counsel for the State of New Jersey*

19   **LETITIA JAMES**                           **JEFF JACKSON**
     Attorney General of New York                Attorney General of North Carolina
20
     By: */s/ Matthew Eisenson*                  LAURA HOWARD
21   MATTHEW EISENSON                            Chief Deputy Attorney General
     KELSEA SUAREZ
22   *Assistant Attorneys General*               By: */s/ Daniel T. Wilkes*
     Environmental Protection Bureau             DANIEL T. WILKES
23   Office of the Attorney General              Assistant Deputy Attorney General
     28 Liberty Street, 19th Floor               North Carolina Department of Justice
24   New York, NY 10005                          PO Box 629
     (212) 416-8481                              Raleigh, NC 27602
25   matthew.eisenson@ag.ny.gov                  919-716-6415
                                                 dwilkes@ncdoj.gov
26   *Attorneys for the State of New York*
                                                 *Attorneys for the State of North Carolina*

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT
No. 2:25-cv-02015-TMC                           32                ATTORNEY GENERAL OF WASHINGTON
                                                                      Environmental Protection Division
                                                                        800 Fifth Avenue Ste 2000
                                                                           Seattle, WA 98104
                                                                            206-464-7744

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Coby Howell*
COBY HOWELL
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (971) 283-8657
Fax: (971) 673-5000
Email: Coby.Howell@doj.oregon.gov

*Attorneys for the State of Oregon*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Attorneys for the State of Rhode Island*


**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
TILLMAN J. BRECKENRIDGE*
Solicitor General
MIKAELA A. PHILLIPS*
Assistant Solicitor General
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*


*pro hac vice application forthcoming

**MICHAEL A. BRAYMER**
Chief Counsel
Department of Environmental Protection

By: */s/ Michael J. Heilman*
MICHAEL J. HEILMAN
Litigation Coordinator
Department of Environmental Protection
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: 412-442-4241
Email: mheilman@pa.gov

*Attorney for JESSICA SHIRLEY, Chair of the Pennsylvania Energy Development Authority*


**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
JONATHAN T. ROSE
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Attorneys for the State of Vermont*


**WISCONSIN ECONOMIC DEVELOPMENT CORPORATION**
Jennifer H. Campbell
Chief Legal Officer

By: */s/ Jennifer H. Campbell*
JENNIFER H. CAMPBELL
2352 S. Park St., Suite 303
Madison, WI 53713
(608) 210-6811
jennifer.campbell@wedc.org

*Attorney for Wisconsin Economic Development Corporation*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
No. 2:25-cv-02015-TMC

33

ATTORNEY GENERAL OF WASHINGTON
Environmental Protection Division
800 Fifth Avenue Ste 2000
Seattle, WA 98104
206-464-7744