# EXHIBIT 1



# Biden–Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low–Income Americans $350 Million Annually and Advancing Environmental Justice Across America

EPA announces 60 selectees under Greenhouse Gas Reduction Fund grant competition to deliver solar to more than 900,000 low–income and disadvantaged households nationwide through the President's Investing in America agenda

April 22, 2024

**Contact Information**
EPA Press Office (press@epa.gov)

**Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America**

2/20/26, 9:56 AM    Biden-Harris Administration Announces $7 Billion Solar All Grants to Deliver Residential Solar, Saving Low-Income Americans $…

Case 2:25-cv-02015-TMC    Document 130-1    Filed 02/24/26    Page 3 of 686

*EPA announces 60 selectees under Greenhouse Gas Reduction Fund grant competition to deliver solar to more than 900,000 low-income and disadvantaged households nationwide through the President's Investing in America agenda*

**Contact:** EPA Press Office (press@epa.gov)

**Washington** – Today, April 22, as the Biden-Harris Administration celebrates Earth Day, the U.S. Environmental Protection Agency announced 60 selectees that will receive $7 billion in grant awards through the Solar for All grant competition to deliver residential solar projects to over 900,000 households nationwide. The grant competition is funded by President Biden's Investing in America agenda through the Inflation Reduction Act, which created EPA's $27 billion Greenhouse Gas Reduction Fund. The 60 selections under the $7 billion Solar for All program will provide funds to states, territories, Tribal governments, municipalities, and nonprofits across the country to develop long-lasting solar programs that enable low-income and disadvantaged communities to deploy and benefit from distributed residential solar, lowering energy costs for families, creating good-quality jobs in communities that have been left behind, advancing environmental justice and tackling climate change.

"Today we're delivering on President Biden's promise that no community is left behind by investing $7 billion in solar energy projects for over 900,000 households in low-income and disadvantaged communities," **said EPA Administrator Michael S. Regan.** "The selectees will advance solar energy initiatives across the country, creating hundreds of thousands of good-paying jobs, saving $8 billion in energy costs for families, delivering cleaner air, and combating climate change."

"Solar is the cheapest form of electricity—and one of the best ways to lower energy costs for American families," **said John Podesta, Senior Advisor to the President for International Climate Policy.** "Today's announcement of EPA's Solar for All awards will mean that low-income communities, and not just well-off communities, will feel the cost-saving benefits of solar thanks to this investment."

"Residential solar electricity leads to reduced monthly utility bills, reduced levels of air pollution in neighborhoods, and ultimately healthier communities, but too often low-income and disadvantaged communities have been left out. Today's announcement will invest billions to ensure that affordable housing across the U.S. can access solar and increase energy efficiency and climate resilience," **said U.S. Department of**

2/20/26, 9:56 AM    Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $…

Case 2:25-cv-02015-TMC    Document 130-1    Filed 02/24/26    Page 4 of 686

**Housing and Urban Development (HUD) Acting Secretary Adrianne Todman.** "HUD is honored to have played a key role in today's monumental announcement, which will provide meaningful household savings to households in low-income and disadvantaged communities, reduce both greenhouse gas emissions and energy costs, and deliver electricity during grid outages for low-income households."

"Sunlight is powering millions of homes across the nation, and we're working hard to ensure Americans everywhere can benefit from this affordable clean energy resource," **said U.S. Secretary of Energy Jennifer M. Granholm.** "DOE is proud to work alongside our partners at EPA and across the Federal government to help communities access the limitless energy of the sun to light their homes and power their businesses."

"The United States can and must lead the world in transforming our energy systems away from fossil fuels," **said U.S. Senator Bernie Sanders (VT).** "The Solar for All program – legislation that I successfully introduced – will not only combat the existential threat of climate change by making solar energy available to working class families, it will also substantially lower the electric bills of Americans and create thousands of good-paying jobs. This is a win for the environment, a win for consumers, and a win for the economy."

EPA estimates that the 60 Solar for All recipients will enable over 900,000 households in low-income and disadvantaged communities to deploy and benefit from distributed solar energy. This $7 billion investment will generate over $350 million in annual savings on electric bills for overburdened households. The program will reduce 30 million metric tons of carbon dioxide equivalent emissions cumulatively, from over four gigawatts of solar energy capacity unlocked for low-income communities over five years. Solar and distributed energy resources help improve electric grid reliability and climate resilience, which is especially important in disadvantaged communities that have long been underserved.

Solar for All will deliver on the Biden-Harris Administration's commitment to creating high-quality jobs with the free and fair choice to join a union for workers across the United States. This $7 billion investment in clean energy will generate an estimated 200,000 jobs across the country. All selected applicants intend to invest in local, clean energy workforce development programs to expand equitable pathways into family-sustaining jobs for the communities they are designed to serve. At least 35% of selected

applicants have already engaged local or national unions, demonstrating how these programs will contribute to the foundation of a clean energy economy built on strong labor standards and inclusive economic opportunity for all American communities.

The Solar for All program also advances President Biden's Justice40 Initiative [↗] <https://www.whitehouse.gov/environmentaljustice/justice40/>, which set the goal that 40% of the overall benefits of certain federal climate, clean energy, affordable and sustainable housing, and other investments flow to disadvantaged communities that are marginalized by underinvestment and overburdened by pollution. All of the funds awarded through the Solar for All program will be invested in low-income and disadvantaged communities. The program will also help meet the President's goal of achieving a carbon pollution-free power sector by 2035 and net-zero emissions economy by no later than 2050.

Solar for All will expand existing low-income solar programs and launch new ones. The 60 selected applicants will serve households in all 50 states, the District of Columbia, Puerto Rico, and territories, as well as increase access to solar for Tribes. EPA has selected 49 state-level awards totaling approximately $5.5 billion, six awards to serve Tribes totaling over $500 million, and five multistate awards totaling approximately $1 billion. Solar for All will deploy residential solar for households nationwide by not only providing grants and low-cost financing to overcome financial barriers to deployment but also by providing services to communities to overcome other barriers such as siting, permitting, and interconnection. A complete list of the selected applicants can be found on EPA's Greenhouse Gas Reduction Fund Solar for All website. <https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all>

The 60 selected applicants have committed to delivering on the three objectives of the Greenhouse Gas Reduction Fund: reducing climate and air pollution; delivering benefits to low-income and disadvantaged communities; and mobilizing financing to spur additional deployment of affordable solar energy. Solar for All selected applicants are expanding existing low-income solar programs and launching new programs. In at least 25 states and territories nationwide, Solar for All is launching new programs where there has never been a substantial low-income solar program before. In these geographies, Solar for All selected applicants will open new markets for distributed solar by funding new programs that provide grants and low-cost financing for low-income, residential solar.

2/20/26, 9:56 AM    Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $…

Case 2:25-cv-02015-TMG    Document 130-1    Filed 02/24/26    Page 6 of 686

To date, many of the 60 selected Solar for All applicants have supported low-income and underserved communities in installing innovative residential solar projects. With this new funding, selectees can launch thousands more projects like these throughout every state and territory in the nation:

- The threat of storms is a major reason Athens, Georgia resident Delmira Jennings and her husband John used selected applicant **Capital Good Fund's** Georgia BRIGHT leasing program to install a 13-kilowatt solar and 10-kilowatt-hour battery system in February. "Last year, we spent two days without power after what seemed like a mini tornado," Jennings said. After a recent outage, Jennings noted that she didn't even know she lost power. "The batteries kicked in and all the power items we were using were on battery backup."

- Last year, the Northern Cheyenne Tribe, whose successful pilot initiative served as the basis for selected applicant **Mandan, Hidatsa, Arikara (MHA) Nation's** Northern Plains Tribal Solar for All program, took major steps toward a clean energy future with the completion of the first phase of the White River Community Solar project. This project will deploy 15 solar systems at the homes of elders while piloting a groundbreaking approach to solar ownership and management that is intended to set an example for Tribes across the nation.

- Through its existing Solar on Multifamily Affordable Housing (SOMAH) program — a model for equitably providing solar to low-income renters in disadvantaged communities — selected applicant **GRID Alternatives'** team in San Diego installed a solar energy system at Trolley Trestle, home to youth transitioning out of the foster care system. Energy cost savings estimated at over $600k over ten years, will be reinvested to provide additional services to those who call Trolley Trestle home, including more job and life skills training.

**Review and Selection Process Information**

The 60 applicants selected for funding were chosen through a competition review process. This multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection from EPA, Department of Energy, the Department of Housing and Urban Development, Department of Treasury, Department of Agriculture, the Federal Emergency Management Agency, Department of Labor, Department of Defense, Consumer Financial Protection Bureau, and the Department of Energy's National Labs – all

screened through ethics and conflict of interest checks and trained on the program requirements and evaluation criteria. Applications were scored and selected through dozens of review panels and an interagency senior review team.

EPA anticipates that awards to the selected applicants will be finalized in the summer of 2024, and selected applicants will begin funding projects through existing programs and begin expansive community outreach programs to launch new programs in the fall and winter of this year. Selections are contingent on the resolution of all administrative disputes related to the competitions.

**Informational Webinars**

EPA will host informational webinars as part of the program's commitment to public transparency. EPA has scheduled a public webinar for the Solar for All program, and registration details are included below. Information on other GGRF webinars can be found on EPA's Greenhouse Gas Reduction Fund Engagement Opportunities webpage <https://www.epa.gov/greenhouse-gas-reduction-fund/engagement-opportunities>.

- Solar for All webinar: Monday, April 29, 2024, 4:00pm – 4:30pm ET. Register for the April 29 meeting ⧉
  <https://usepa.zoomgov.com/webinar/register/wn_riokuyakr1qeycvrwojcda#/registration>

---

Release updated to reflect minor changes.

Last updated on April 22, 2024

EXHIBIT 2

**ASAP**
Automated Standard Application for Payments

Menu | Index | Search

# Automated Standard Application for Payments

The Automated Standard Application for Payments (ASAP) is a completely electronic system that federal agencies use to quickly and securely transfer money to recipient organizations.

Federal agencies enroll recipient organizations, authorize their payments, and manage their accounts. Recipient organizations then request payments from these pre-authorized accounts.

Recipient organizations include state and local governments, educational and financial institutions, vendors and contractors, profit and non-profit entities and Indian tribal organizations.

ASAP is free for both federal agencies and recipient organizations.

**Translate**

# ASAP Training Opportunities

Upcoming free training to learn more about ASAP.gov:

What's New in ASAP.gov,

02/18/2026, 2:00 - 3:00 pm ET

ASAP.gov: How to Make an ASAP.gov Payment Request,

02/25/2026, 2:00 - 4:00 pm ET

ASAP.gov: Federal Agency Training,

03/04/2026, 2:00 – 4:00 pm ET

ASAP.gov: How ASAP.gov Recipients Enroll,

03/11/2026, 2:00 – 4:00 pm ET

Contact ASAP Production Support to find out about additional training opportunities.



**How ASAP Works**

**STEP 1:**
Federal agency & recipient both enroll in ASAP.gov

**STEP 2:**
Agency adds money to recipient account & sets rules for payments

**STEP 3:**
Recipient requests payment via ASAP.gov

**STEP 4:**
Approved payments can settle as quickly as the same day.

GETTING STARTED          LOGIN TO ASAP

# Benefits of ASAP



Saves time and money for both federal agencies and recipients



Gets money to recipients quickly



Transfers money securely



Reduces the cost and liability of having funds held outside of Treasury



Works without needing to install new software



Lets both federal agencies and recipients see and get reports of relevant data including account balances, history and status of payments, and more



Offers live customer support to both agencies and recipients

# Program Features

- Agencies create and update ASAP accounts for recipients via online or batch

- Agencies submit paperless authorizations to alter the available balance of these accounts

- Agencies can warehouse authorizations up to a year in advance

- Agencies can set withdrawal limits to control recipient payments

- Recipients submit paperless payment requests online

- Recipients select Fedwire to receive payments within minutes

- Recipients select ACH to receive payments within the same or following day

- ASAP automatically rejects payment requests that exceed the available balance

- ASAP allows agencies to intervene and approve or reject payment requests

- ASAP allows electronic payment returns and book entry adjustments

- ASAP provides access to up-to-the-minute reports

- ASAP allows agencies to subscribe to automatically receive end of day reports

- ASAP allows agencies to focus on their distinct mission not payment problems

# Stay Up to Date with ASAP

Subscribe to e-mail notifications and get news and updates delivered right to your inbox!

JOIN THE MAILING LIST

*Last modified 02/12/26*

# Automated Standard Application for Payments

A program of the Bureau of the Fiscal Service

**ASAP MENU**

Home

FAQS

Getting Started

Computer Requirements

Contact Us

**RELATED LINKS**

Multi-factor Authentication

Payment Justification Feature

Five Steps to Avoid Cyber Attacks

Download ASAP.gov Brochure

Training

**The General Public**

**Government Agencies**

**Business & Institutions**

Search Fiscal Service



News

Forms

Training

Careers

Mailing Lists

Reports

Reference

Events

About

Contact

Bureau of the Fiscal Service 2025

*Accessibility Statement | Data Quality | Freedom of Information Act | Privacy Policy
| Privacy Impact Assessments
English is the official and authoritative version of all federal information.*

## FISCAL SERVICE SITES

Direct Express®

Go Direct®

TreasuryDirect.gov

Treasury Hunt

EFTPS.gov

Pay.gov

Administrative Resource Center (ARC)

FiscalData.Treasury.gov

USAspending.gov

TFX.treasury.gov

## MORE GOVERNMENT SITES

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Regulations.gov

PaymentAccuracy.gov

No Fear Act

Vote.gov

## TREASURY BUREAUS

The Alcohol and Tobacco Tax and Trade Bureau

Bureau of Engraving and Printing

Community Development Financial Institutions Fund

Financial Crimes Enforcement Network (FinCen)

Internal Revenue Service

Office of the Comptroller of the Currency

U.S. Mint

# EXHIBIT 3



We are currently updating
the Federal Budget
Glossary. To provide
feedback on the glossary
or suggest potential
changes, please email
budgetglossary@gao.gov

# A Glossary of Terms
# Used in the Federal
# Budget Process

September 2005



# Contents

Preface                                                                    1

Terms and                                                                  2
Definitions

Appendixes      Appendix I:     Overview of the Development and
                                Execution of the Federal Budget      102

                Appendix II:    Federal Budget Formulation and
                                Appropriation Processes              116

                Appendix III:   The Methods for Tracking Funds
                                in the Federal Government            120

                Appendix IV:    Budget Functional Classification     124

                Appendix V:     Federal Budget Account
                                Identification Code                  152

                Appendix VI:    Program and Financing Schedule       155

                Appendix VII:   Object Classification                160

Index of Terms                                                       164

Tables          Table 1:    Functional Classification
                            Structure                                125
                Table 2:    Federal Budget Account
                            Identification Code                      152

Figures         Figure 1:   Federal Budget Formulation
                            Process                                  117
                Figure 2:   Federal Budget and Appropriation
                            Process                                  118
                Figure 3:   Federal Budget Account
                            Identification Code Digits               154

**Contents**

Figure 4:   Example of P&F Schedule Preceded
            by Appropriations Language for
            National Flood Insurance Fund
            Account                                      156
Figure 5:   Example of Object Classification for
            Department of Defense Program                163

**Major Laws Cited**

Antideficiency Act, codified in part at 31 U.S.C. §§ 1341,
    1342, 1512–1514 & 1517

Balanced Budget and Emergency Deficit Control Act of
    1985, Pub. L. No. 99–177, title II, 99 Stat. 1037, 1038
    (Dec. 12, 1985)

Balanced Budget and Emergency Deficit Control
    Reaffirmation Act of 1987, Pub. L. No. 100–119, 101
    Stat. 754 (Sept. 29, 1987)

Balanced Budget Act of 1997, Pub. L. No. 105–33, 111
    Stat. 251 (Aug. 5, 1997)

Budget and Accounting Act of 1921, Pub. L. No. 67–13, 42
    Stat. 20 (June 10, 1921)

Budget Enforcement Act of 1990, Pub. L. No. 101–508,
    title XIII, 104 Stat. 1388, 1388-573 (Nov. 5, 1990)

Budget Enforcement Act of 1997, Pub. L. No. 105–33, title
    X, 111 Stat. 251, 677 (Aug. 5, 1997)

Chief Financial Officers Act of 1990, Pub. L. No. 101–576,
    104 Stat. 2838 (Nov. 15, 1990)

Congressional Budget and Impoundment Control Act of
    1974, Pub. L. No. 93–344, 88 Stat. 297 (July 12, 1974)

**Contents**

Economy Act, 31 U.S.C. § 1535

Federal Credit Reform Act of 1990, Pub. L. No. 101–508, title XIII, subtitle B, 104 Stat. 1388, 1388–609 (Nov. 5, 1990)

Federal Financing Bank Act of 1973, Pub. L. No. 93–224, 87 Stat. 937 (Dec. 29, 1973)

Federal Managers' Financial Integrity Act of 1982, Pub. L. No. 97–255, 96 Stat. 814 (Sept. 8, 1982)

Government Management Reform Act of 1994, Pub. L. No. 103–356, 108 Stat. 3410 (Oct. 13, 1994)

Government Performance and Results Act of 1993, Pub. L. No. 103–62, 107 Stat. 285 (Aug. 3, 1993)

Line Item Veto Act, Pub. L. No. 104–130, 110 Stat. 1200 (Apr. 9, 1996)

Reports Consolidation Act of 2000, Pub. L. No. 106–531, 114 Stat. 2537 (Nov. 22, 2000)

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# Preface

The federal budget process is the primary means by which the President and Congress select among competing demands for federal funds.  The President's budget is the Administration's proposed plan for managing funds, setting levels of spending, and financing the spending of the federal government.  It is not only the President's principal policy statement but is also the starting point for congressional budgetary actions.  The budget's importance makes it essential that it be comprehensive and clear.

This fifth edition of *A Glossary of Terms Used in the Federal Budget Process* replaces the 1993 Exposure Draft.  It fulfills part of GAO's responsibility (31 U.S.C. § 1112) to publish standard terms, definitions, and classifications for the government's fiscal, budget, and program information.  It was developed in cooperation with the Secretary of the Treasury and the Directors of the Office of Management and Budget (OMB) and the Congressional Budget Office (CBO).  This glossary is a basic reference document for the Congress, federal agencies, and others interested in the federal budget-making process.  Like previous editions, this revision emphasizes budget terms, but relevant economic and accounting terms are also defined to help the user appreciate the dynamics of the budget process and its relationship to other key activities (e.g., financial reporting).  It also distinguishes between any differences in budgetary and nonbudgetary meanings of terms.

For this edition, we reviewed all terms in the 1993 Exposure Draft and made additions, revisions, or deletions.  We added a number of performance budgeting-related terms and deleted Budget Enforcement Act terms that are no longer relevant.

The *Glossary* is by no means an exhaustive list of terms related to the budget.  We decided to include only those commonly used terms that are most significant in the congressional and executive budget processes.  Executive, legislative, and other budget experts participated in the selections and definitions of the *Glossary* terms.  While every effort was made to resolve differences, the final selections and definitions were made by GAO. The *Glossary* can be accessed online at www.gao.gov.

David M. Walker
Comptroller General
of the United States

# Terms and Definitions



A

## Account

A separate financial reporting unit for budget, management, and/or accounting purposes. All budgetary transactions are recorded in accounts, but not all accounts are budgetary in nature. Some accounts do not directly affect the budget but are used purely for accounting purposes. Budget accounts are used to record all transfers within the budget, whereas other accounts (such as deposit fund, credit financing, and foreign currency accounts) are used for accounting purposes connected with funds that are nonbudgetary in nature. The Office of Management and Budget (OMB), in consultation with the Department of the Treasury (Treasury), assigns account identification codes reflecting appropriations as enacted in appropriations laws. Treasury establishes and maintains a system of accounts that provides the basic structure for the *U.S. Standard General Ledger* Chart of Accounts. (*See also* Accounts in the President's Budget; Accounts for Purposes Other Than Budget Presentation; Credit Reform Act Accounts *under* Federal Credit; *Standard General Ledger* Chart of Accounts.)

### Appropriation Account

The basic unit of an appropriation generally reflecting each unnumbered paragraph in an appropriation act. An appropriation account typically encompasses a number of activities or projects and may be subject to restrictions or conditions applicable to only the account, the appropriation act, titles within an appropriation act, other appropriation acts, or the government as a whole. (*See also* Appropriation Rider; Continuing Appropriation/Continuing Resolution; Line Item; Supplemental Appropriation.)

## Account in the President's Budget: Expenditure/Appropriation and Receipt Accounts Classified by Fund Types

Accounts used by the federal government to record outlays (expenditure accounts) and income (receipt accounts) primarily for budgeting or management information purposes but also for accounting purposes. All budget (and off-budget) accounts are

classified as being either expenditure or receipt (including offsetting receipt) accounts and by fund group.  Budget (and off-budget) transactions fall within either of two fund groups: (1) federal funds and (2) trust funds.

All federal fund and trust fund accounts are included within the budget (that is, they are on-budget) unless they are excluded from the budget by law.  Federal and trust funds excluded from the budget by law are classified as being off-budget.  The term off-budget differs from the term nonbudgetary.  Nonbudgetary refers to activities (such as the credit financing accounts) that do not belong in the budget under existing concepts, while off-budget refers to accounts that belong on-budget under budget concepts but that are excluded from the budget under terms of law.

## Federal Fund Accounts

Budgetary accounts composed of moneys collected and spent by the federal government other than those designated as trust funds.  Federal fund accounts include general, special, public enterprise, and intragovernmental fund accounts. (*See also Standard General Ledger* Chart of Accounts.)

**General Fund Accounts.**  Accounts in the U.S. Treasury holding all federal money not allocated by law to any other fund account.

*General Fund Receipt Account.*  A receipt account credited with all collections that are not earmarked by law for another account for a specific purpose.  These collections are presented in the President's budget as either governmental (budget) receipts or offsetting receipts.  These include taxes, customs duties, and miscellaneous receipts.

*General Fund Expenditure Account.*  An appropriation account established to record amounts appropriated by law for the general support of federal government activities and the subsequent expenditure of these funds.  It includes spending from both annual and permanent appropriations.

**Intragovernmental Fund Accounts.**  Expenditure accounts authorized by law to facilitate financing transactions primarily within and between federal agencies.

*Intragovernmental Revolving Fund Account.*  An appropriation account authorized to be credited with collections from other federal agencies' accounts that are earmarked to finance a continuing cycle of business-type operations, including working capital funds, industrial funds, stock funds, and supply funds.  According to

the Office of Management and Budget (OMB), collections of intragovernmental revolving fund accounts are derived primarily from within the government.   For example, the franchise fund operations within several agencies provide common administrative services to federal agencies on a fee-for-service basis.  (*See also* Working Capital Fund.)

*Management Fund Account.*  An account established by the Department of the Treasury (Treasury) that is authorized by law to credit collections from two or more appropriations to finance activity not involving a continuing cycle of business-type operations.  Such accounts do not generally own a significant amount of assets, such as supplies, equipment, or loans, nor do they have a specified amount of capital provided—a corpus.  The Navy Management Fund is an example of such an account.

Consolidated Working Fund Accounts are a subset of management funds.  These are special working funds established under the authority of Section 601 of the Economy Act (31 U.S.C. §§ 1535, 1536) to receive advance payments from other agencies or accounts.  Consolidated working fund accounts are not used to finance the work directly but only to reimburse the appropriation or fund account that will finance the work to be performed.  Amounts in consolidated working fund accounts are available for the same periods as those of the accounts advancing the funds.  Consolidated working fund accounts are shown as separate accounts on the books of Treasury but are not separately identified in the President's budget.  Transactions of these accounts are included in the presentation of the appropriation or fund account actually performing the service or providing the materials.

**Public Enterprise Revolving Fund Account.**  A type of revolving fund that conducts cycles of businesslike operations, mainly with the public, in which it charges for the sale of products or services and uses the proceeds to finance its spending, usually without requirement for annual appropriations.  Most government corporations are financed by public enterprise funds.  (*See* Revolving Fund.)

**Special Fund Accounts.**  Federal fund accounts earmarked by law for a specific purpose.

*Special Fund Receipt Account.*  A receipt account credited with collections that are earmarked by law but included in the federal funds group rather than classified as trust fund collections.  These collections are presented in the President's budget as either governmental (budget) receipts or offsetting receipts.  (*See also* Earmarking.)

*Special Fund Expenditure Account.*  An appropriation account established to record appropriations, obligations, and outlays financed by the proceeds of special fund receipts.  (*See also* Earmarking.)

## Trust Fund Accounts

Accounts designated as "trust funds" by law, regardless of any other meaning of the term "trust fund."  A trust fund account is usually either a receipt, an expenditure, or a revolving fund account.  Except in rare circumstances (for example, Indian Trust Funds), a trust fund account imposes no fiduciary responsibility on the federal government.  For a fuller discussion of trust funds, see *Federal Trust and Other Earmarked Funds:  Answers to Frequently Asked Questions* (GAO-01-199SP).  (*See also* Earmarking.)

**Trust Fund Expenditure Account.**  An appropriation account established to record appropriated amounts of trust fund receipts used to finance specific purposes or programs under a trust agreement or statute.

**Trust Fund Receipt Account.**  A receipt account credited with collections classified as trust fund collections.  These collections are recorded as either governmental receipts or offsetting receipts.

**Trust Revolving Fund Account.**  A trust fund expenditure account that is an appropriation account authorized to be credited with collections and used, without further appropriation action, to carry out a cycle of business-type operations in accordance with statute.

# Accounts for Purposes Other Than Budget Presentation

## Clearing Accounts

Accounts that temporarily hold general, special, or trust fund federal government collections or disbursements pending clearance to the applicable receipt or expenditure accounts.

## Deposit Fund Accounts

Nonbudgetary accounts established to account for collections that are either (1) held temporarily and later refunded or paid upon administrative or legal determination as

Terms and Definitions

to the proper disposition thereof or (2) held by the government, which acts as banker or agent for others, and paid out at the direction of the depositor.  Examples include savings accounts for military personnel, state and local income taxes withheld from federal employees' salaries, and payroll deductions for the purchase of savings bonds by civilian employees of the government.  Deposit fund balances are accounted for as liabilities of the federal government.  These accounts are not included in the budget totals because the amounts are not owned by the government.  Therefore, the budget records transactions between deposit funds and budgetary accounts as transactions with the public.  Deposit fund balances may be held in the form of either invested or uninvested balances.  However, since the cash in the accounts is used by the Department of the Treasury to satisfy immediate cash requirements of the government, to the extent that they are not invested in federal debt, changes in uninvested deposit fund balances are shown as a means of financing the deficit in the budget.

## Foreign Currency Fund Accounts

Accounts established in the Department of the Treasury for foreign currency that is acquired without payment of U.S. dollars.  Examples of such accounts are those set up through the Agricultural Trade Development and Assistance Act (7 U.S.C. §§ 1691–1736g).

## Suspense Accounts

Combined receipt and expenditure accounts established to temporarily hold funds that are later refunded or paid into another government fund when an administrative or final determination as to the proper disposition is made.

## Transfer Appropriation (Allocation) Accounts

Accounts established to receive and disburse allocations.  Such allocations and transfers are not adjustments to budget authority or balances of budget authority.  Rather, the transactions and any adjustments therein are treated as nonexpenditure transfers at the time the allocations are made.  The accounts carry symbols that identify the original appropriation from which moneys have been advanced.  Transfer appropriation accounts are symbolized by adding the receiving agency's department prefix to the original appropriation or fund account symbol.  In some cases, a bureau suffix is added to show that the transfer is being made to a particular bureau within the receiving department.  For budget purposes, transactions in the transfer accounts are reported with the transactions in the parent accounts.  For further information,

see the *Treasury Financial Manual*.  (*See also* Allocation; Nonexpenditure Transfer *under* Transfer.)

## Accounts Listed in the Standard General Ledger

*See under Standard General Ledger (SGL)* Chart of Accounts.

## Accounts Payable

Amounts owed by a federal agency for goods and services received from, progress in contract performance made by, and rents due to other entities.  This is a proprietary (or financial) accounting term.  For balance sheet reporting purposes, according to OMB Circular No. A-11 "accounts payable" consists of the amount owed by the reporting entity for goods and services received from other entities, progress in contract performance made by other entities, and rents due to other entities.  (*See also* Accounts Receivable; Proprietary Accounting; app. III.)

## Accounts Receivable

Amounts due from others for goods furnished and services rendered.  Such amounts include reimbursements earned and refunds receivable.  This is a proprietary (or financial) accounting and not a budget term.  Accounts receivable do not constitute budget authority against which an agency may incur an obligation.  For federal proprietary accounting, accounts receivable are assets that arise from specifically identifiable, legally enforceable claims to cash or other assets through an entity's established assessment processes or when goods or services are provided.  (*See also* Accounts Payable; Proprietary Accounting; app. III.)

## Accrual Accounting

A system of accounting in which revenues are recorded when earned and expenses are recorded when goods are received or services are performed, even though the actual receipt of revenues and payment for goods or services may occur, in whole or in part, at a different time. (*See also* Cash Accounting; app. III.)

Terms and Definitions

## Administrative Division or Subdivision of Funds

Any apportionment or other distribution of an appropriation or fund made pursuant to the Antideficiency Act (31 U.S.C. §§ 1511–1519).  The appropriation may be divided or subdivided administratively within the limits of the apportionment (31 U.S.C. § 1513(d)).  The expenditure or obligation of the divided or subdivided appropriation or fund may not exceed the apportionment (31 U.S.C. § 1517(a)).   (*See also* Antideficiency Act; Antideficiency Act Violation; Apportionment; Limitation.)

## Advance Appropriation

Budget authority provided in an appropriation act that becomes available 1 or more fiscal years after the fiscal year for which the appropriation act was enacted.  For example, a fiscal year 2005 appropriation act could provide that the budget authority for a specified activity would not become available until October 1, 2005 (the start of fiscal year 2006), or later.  The amount is not included in the budget totals of the year for which the appropriation act is enacted but rather in those for the fiscal year in which the amount will become available for obligation.  In the example above, the budget authority would be recorded in fiscal year 2006.  (For a distinction, *see* Advance Funding; Forward Funding; Multiple-Year Authority *under* Duration *under* Budget Authority.)

## Advance Funding

Budget authority provided in an appropriation act to obligate and disburse (outlay) in the current fiscal year funds from a succeeding year's appropriation.  Advance funding is a means to avoid making supplemental requests late in the fiscal year for certain entitlement programs in cases where the appropriations for the current year prove to be insufficient.  When such budget authority is used (i.e., funds obligated), the budget records an increase in the budget authority for the fiscal year in which it is used and a reduction in the budget authority for the following fiscal year.  (For a distinction, *see* Advance Appropriation; Multiple-Year Authority *under* Duration *under* Budget Authority; Forward Funding.)

## Advance Payment

An amount paid prior to the later receipt of goods, services, or other assets. Advances are ordinarily made only to payees to whom an agency has an obligation, and they do not exceed the amount of the obligation.

## Agency

No one definition of this term has general, governmentwide applicability.  "Agency" and related terms, like "executive agency" or "federal agency," are defined in different ways in different laws and regulations.  For example, the provisions of the Budget and Accounting Act of 1921 relating to the preparation of the President's budget specifically define "agency" to include the District of Columbia government but exclude the legislative branch or the Supreme Court (31 U.S.C. § 1101).

## Agency Mission

Term used in section 1105(a)(22) of title 31 of the *United States Code*, which outlines content requirements for the President's budget submission to Congress.  Section 1105 requires that the President's budget contain a statement of agency budget authority in terms of agency missions, but this section offers no definition.  The term is generally accepted to refer to the purpose of the programs of the agency and its component organizations.  In the Office of Management and Budget's (OMB) budget functional classification system, agency missions are distinguished from national needs.  National needs are generally described as major functions, while agency missions are generally described in the context of subfunctions. (*See also* Functional Classification.)

## Allocation

For the purposes of budgeting, an allocation means a delegation, authorized in law, by one agency of its authority to obligate budget authority and outlay funds to another agency.  (The appropriation or fund from which the allocation is made is generally referred to as the parent appropriation or fund.)  An allocation is made when one or more agencies share the administration of a program for which appropriations are made to only one of the agencies or to the President.  When an allocation occurs, the Department of the Treasury establishes a subsidiary account called a "transfer appropriation account," and the agency receiving the allocation may obligate up to

the amount included in the account. The budget does not show the transfer appropriation account separately. Transactions involving allocation accounts appear in the Object Classification Schedule, with the corresponding Program and Financing Schedule, in the President's budget. For an illustration of the treatment of Object Classification—With Allocation Accounts, see OMB Circular No. A-11. (*See also* Object Classification; Transfer; Transfer Appropriation (Allocation) Accounts *under* Account for Purposes Other Than Budget Presentation.)

For purposes of section 302(a) of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 633(a)), an allocation is the distribution of spending authority and outlays to relevant committees based on the levels contained in a concurrent resolution on the budget. (*See also* Committee Allocation.)

For purposes of section 302(b) of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 633(b)), an allocation is the distribution of spending authority and outlays to relevant subcommittees based on the levels contained in the concurrent resolution on the budget. (*See also* Subcommittee Allocation.)

For funds control purposes, an allocation is a further subdivision of an apportionment.

## Allotment

An authorization by either the agency head or another authorized employee to his/her subordinates to incur obligations within a specified amount. Each agency makes allotments pursuant to specific procedures it establishes within the general apportionment requirements stated in OMB Circular No. A-11. The amount allotted by an agency cannot exceed the amount apportioned by the Office of Management and Budget (OMB). An allotment is part of an agency system of administrative control of funds whose purpose is to keep obligations and expenditures from exceeding apportionments and allotments. (*See also* Administrative Division or Subdivision of Funds; Apportionment; Reapportionment.)

## Allowance

An amount included in the President's budget request or included in a projection in a congressional resolution on the budget to cover possible additional proposals, such as contingencies for programs whose expenditures are controllable only by statutory

change and other requirements.  As used by Congress in the concurrent resolutions on the budget, an allowance represents a special functional classification designed to include an amount to cover possible requirements.  An allowance remains undistributed until the contingency on which it is based occurs; then it is distributed to the appropriate functional classification.  For agency budgetary accounting and fund control purposes, an allowance is a subdivision of an allotment.  For treatment of undistributed allowances, see function 920 in the table "Outlays by Function and Subfunction" in the *Historical Tables* of the President's budget. (For more details on the government accounting definition, *see Standard General Ledger* Chart of Accounts.)  For federal proprietary accounting, an allowance also represents the estimated uncollectible amount of accounts receivable.

# Antideficiency Act

Federal law that

- prohibits the making of expenditures or the incurring of obligations in advance of an appropriation;
- prohibits the incurring of obligations or the making of expenditures in excess of amounts available in appropriation or fund accounts unless specifically authorized by law (31 U.S.C. § 1341(a));
- prohibits the acceptance of voluntary or personal services unless authorized by law (31 U.S.C. § 1342);
- requires the Office of Management and Budget (OMB), via delegation from the President, to apportion appropriated funds and other budgetary resources for all executive branch agencies (31 U.S.C. § 1512);
- requires a system of administrative controls within each agency (*see* 31 U.S.C. § 1514 for the administrative divisions established);
- prohibits incurring any obligation or making any expenditure in excess of an apportionment or reapportionment or in excess of other subdivisions established pursuant to sections 1513 and 1514 of title 31 of the *United States Code* (31 U.S.C. § 1517); and
- specifies penalties for deficiencies (*see* Antideficiency Act Violation).

The act permits agencies to reserve funds (that is, withhold them from obligation) under certain circumstances.  (*See also* Administrative Division or Subdivision of Funds; Antideficiency Act Violation; Apportionment; Budgetary Reserves; Deferral of Budget Authority; Deficiency Apportionment; Deficiency Appropriation;

Expenditure; Fund Accounting; Congressional Budget and Impoundment Control Act
of 1994; Outlay.)

# Antideficiency Act Violation

Occurs when one or more of the following happens:

- overobligation or overexpenditure of an appropriation or fund account (31 U.S.C. §
  1341(a));
- entering into a contract or making an obligation in advance of an appropriation,
  unless specifically authorized by law (31 U.S.C. § 1341(a));
- acceptance of voluntary service, unless authorized by law (31 U.S.C. § 1342); or
- overobligation or overexpenditure of (1) an apportionment or reapportionment or
  (2) amounts permitted by the administrative control of funds regulations (31 U.S.C.
  § 1517(a)).

Once it has been determined that there has been a violation of the Antideficiency Act,
the agency head must report all relevant facts and a statement of actions taken to the
President and Congress and submit a copy of the report to the Comptroller General.
Penalties for Antideficiency Act violations include administrative discipline, such as
suspension from duty without pay or removal from office.  In addition, an officer or
employee convicted of willfully and knowingly violating the law shall be fined not
more than $5,000, imprisoned for not more than 2 years, or both (31 U.S.C. §§ 1349,
1350, 1518, and 1519).  (*See also* Administrative Division or Subdivision of Funds;
Antideficiency Act; Expenditure.)

# Apportionment

The action by which the Office of Management and Budget (OMB) distributes
amounts available for obligation, including budgetary reserves established pursuant
to law, in an appropriation or fund account.  An apportionment divides amounts
available for obligation by specific time periods (usually quarters), activities,
projects, objects, or a combination thereof.  The amounts so apportioned limit the
amount of obligations that may be incurred.  An apportionment may be further
subdivided by an agency into allotments, suballotments, and allocations.  In
apportioning any account, some funds may be reserved to provide for contingencies
or to effect savings made possible pursuant to the Antideficiency Act.  Funds

apportioned to establish a reserve must be proposed for deferral or rescission pursuant to the Impoundment Control Act of 1974 (2 U.S.C. §§ 681–688).

The apportionment process is intended to (1) prevent the obligation of amounts available within an appropriation or fund account in a manner that would require deficiency or supplemental appropriations and (2) achieve the most effective and economical use of amounts made available for obligation.  (*See also* Administrative Division or Subdivision of Funds; Allotment; Antideficiency Act; Appropriated Entitlement; Budgetary Reserves; Deferral of Budget Authority; Deficiency Apportionment; Deficiency Appropriation; Limitation; Reapportionment; Rescission; Supplemental Appropriation.)

# Appropriated Entitlement

An entitlement whose source of funding is in an annual appropriation act.  However, because the entitlement is created by operation of law, if Congress does not appropriate the money necessary to fund the payments, eligible recipients may have legal recourse.  Veterans' compensation and Medicaid are examples of such appropriated entitlements.  (*See also* Entitlement Authority.)

# Appropriation Act

A statute, under the jurisdiction of the House and Senate Committees on Appropriations, that generally provides legal authority for federal agencies to incur obligations and to make payments out of the Treasury for specified purposes.  An appropriation act fulfills the requirement of Article I, Section 9, of the U.S. Constitution, which provides that "no money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  Under the rules of both houses, an appropriation act should follow enactment of authorizing legislation.  (*See also* Appropriations *under* Forms of Budget Authority *under* Budget Authority; Authorizing Legislation; Limitation.)

Major types of appropriation acts are regular, supplemental, deficiency, and continuing.  Regular appropriation acts are all appropriation acts that are not supplemental, deficiency, or continuing.  Currently, regular annual appropriation acts that provide funding for the continued operation of federal departments, agencies, and various government activities are considered by Congress annually.  From time to time, supplemental appropriation acts are also enacted.  When action on regular

appropriation bills is not completed before the beginning of the fiscal year, a continuing resolution (often referred to simply as "CR") may be enacted in a bill or joint resolution to provide funding for the affected agencies for the full year, up to a specified date, or until their regular appropriations are enacted. A deficiency appropriation act provides budget authority to cover obligations incurred in excess of available budget authority. (*See also* Continuing Appropriation/Continuing Resolution; Supplemental Appropriation; Deficiency Appropriation.)

## Appropriation Rider

Sometimes used to refer to (1) a provision that is not directly related to the appropriation to which it is attached or (2) a limitation or requirement in an appropriation act. (*See also* Limitation.)

## Asset

Tangible or intangible items owned by the federal government, which would have probable economic benefits that can be obtained or controlled by a federal government entity. (*See also* Liability.)

## Asset Sale

The sale of a physical or financial asset owned in whole or in part by the federal government to the public. Asset sales are typically large-dollar transactions ($50 million or more) for which advance notification must be provided to the Department of the Treasury. Revenue from the sale of assets is accounted for in the budget as offsetting receipts or collections.

In general, asset sales increase current cash payments received by the government at the expense of a stream of future income that the government would otherwise receive. (*See also* Direct Loan *under* Federal Credit.)

## Appropriations

*See under* Forms of Budget Authority *under* Budget Authority.

# Authorizing Committee

A standing committee of the House or Senate with legislative jurisdiction over the establishment, continuation, and operations of federal programs or agencies.  The jurisdiction of such committees extends, in addition to program legislation, to authorization of appropriations legislation.  (Normally, authorization of appropriations legislation is a prerequisite for making appropriations for the given programs or agencies.)  An authorizing committee also has jurisdiction in those instances where backdoor authority is provided in the substantive legislation.  For further discussion, see the current rules of the House of Representatives and the Senate.  (*See also* Authorizing Legislation; Backdoor Authority/Backdoor Spending; Oversight Committee; Spending Committee.)

# Authorizing Legislation

Substantive legislation, proposed by a committee of jurisdiction other than the House or Senate Appropriations Committees, that establishes and continues the operation of a federal program or agency either indefinitely or for a specific period or that sanctions a particular type of obligation or expenditure within a program.  This term is used in two different ways: (1) to describe legislation enacting new program authority, that is, authorizing the program, and (2) to describe legislation authorizing an appropriation.

Authorization of appropriations legislation authorizes the enactment of appropriations of specific amounts for specific programs and activities to be provided in an appropriation act.  An authorization of appropriations is, under congressional rules, a prerequisite for such an appropriation.  Thus, for example, a point of order may be raised in either house objecting to an appropriation in an appropriation act that is not previously authorized by law.  An authorization of appropriations may be part of the organic legislation for the agency or program or it may be separate legislation.  Oftentimes, the authorization of appropriation may be inferred from an appropriation provided in an appropriation act.  The authorization of appropriation may specify the amount of budget authority to be included in the appropriation act or it may authorize the appropriation of "such sums as may be necessary."  In some instances, authorizing legislation may contain an appropriation or provide other forms of budget authority, such as contract authority, borrowing authority, or entitlement authority.  (*See also* Appropriation Act; Backdoor Authority/Backdoor Spending; Entitlement Authority; Limitation; Point of Order; Reauthorization.)

Terms and Definitions

# B

## Backdoor Authority/Backdoor Spending

A colloquial phrase for budget authority provided in laws other than appropriations acts, including contract authority and borrowing authority, as well as entitlement authority and the outlays that result from that budget authority.  (*See also* Appropriations *and* Contract Authority *under* Forms of Budget Authority *under* Budget Authority; Authorizing Legislation; Entitlement Authority; Spending Committee.)

## Balanced Budget

A budget in which receipts equal outlays.  (*See also* Deficit; Surplus.)

## Balanced Budget and Emergency Deficit Control Act of 1985

Also known as the Deficit Control Act, originally known as Gramm-Rudman-Hollings. Among other changes to the budget process, the law established "maximum deficit amounts" and a sequestration procedure to reduce spending if those targets were exceeded. The Deficit Control Act has been amended and extended several times— most significantly by the Budget Enforcement Act (BEA) of 1990.  The sequestration and enforcement mechanisms expired or became ineffective at the end of fiscal year 2002.  (*See also* Budget Enforcement Act; Gramm-Rudman-Hollings.)

## Balanced Budget and Emergency Deficit Control Reaffirmation Act of 1987

Amended the Balanced Budget and Emergency Deficit Control Act of 1985 (Gramm-Rudman-Hollings) to extend the date for achieving the goal of a balanced budget until fiscal year 1993, revise sequestration procedures, and require the Director of the Office of Management and Budget (OMB) to determine whether a sequester is

necessary. (*See also* Budget and Accounting Act of 1921; Budget Enforcement Act; Gramm-Rudman-Hollings; Sequestration.)

# Baseline

An estimate of spending, revenue, the deficit or surplus, and the public debt expected during a fiscal year under current laws and current policy.  The baseline is a benchmark for measuring the budgetary effects of proposed changes in revenues and spending.  It assumes that receipts and mandatory spending will continue or expire in the future as required by law and that the future funding for discretionary programs will equal the most recently enacted appropriation, adjusted for inflation.  Under the Budget Enforcement Act (BEA), which will expire at the end of fiscal year 2006, the baseline is defined as the projection of current-year levels of new budget authority, outlays, revenues, and the surplus or deficit into the budget year and outyears based on laws enacted through the applicable date.  (*See also* Projections.)

## CBO Baseline

Projected levels of governmental receipts (revenues), budget authority, and outlays for the budget year and subsequent fiscal years, assuming generally that current policies remain the same, except as directed by law. The baseline is described in the Congressional Budget Office's (CBO) annual report for the House and Senate Budget Committees, *The Budget and Economic Outlook*, which is published in January.  The baseline, by law, includes projections for 5 years, but at the request of the Budget Committees, CBO has provided such projections for 10 years.  In most years the CBO baseline is revised in conjunction with CBO's analysis of the President's budget, which is usually issued in March, and again during the summer.  The "March" baseline is the benchmark for measuring the budgetary effects of proposed legislation under consideration by Congress.

# Bases of Budgeting

Methods for calculating budget figures.  Not all methods are mutually exclusive.  For example, the federal budget includes both net and gross figures and reports both obligations and cash or cash equivalent spending.  As a general rule, budget receipts and outlays are on a cash or cash equivalent basis; however, interest on public issues of public debt is recorded on an accrual basis.  Under credit reform, the subsidy cost of both direct loans and guaranteed loans is included in the budget (i.e., the budget

records the net present value of the estimated cash flows of direct loans and loan guarantees as outlays).  (*See also* Capital Budget; Direct Loan *and* Guaranteed Loan *under* Federal Credit. For a more detailed presentation of this subject, *see* app. III.)

## Accrual Basis

The basis whereby transactions and events are recognized when they occur, regardless of when cash is received or paid.  (*See also* Accrual Accounting.)

## Budgeting in Relation to Totals

**Gross Basis.**  Budgetary totals from which offsetting collections have not been deducted.  In customary use, "gross" refers to the sum or total value of a transaction before reduction by applicable offsets.  Under this display, totals include obligations and expenditures from offsetting collections and governmental receipts rather than as offsets to outlays.  (*See also* Offsetting Collections *and* Offsetting Receipts *under* Collections.)

**Net Basis.**  The use of budgetary totals from which offsetting collections have been deducted.  Under this display, budgetary totals include offsetting collections as offsets to obligations and outlays rather than as receipts.  (*See also* Offsetting Collections *under* Collections.)

## Cash or Cash Equivalent Basis

The basis whereby receipts are recorded when received and expenditures are recorded when paid, without regard to the accounting period in which the receipts are earned or the costs are incurred.  "Cash" generally refers to payment by cash, checks, or electronic funds transfers.  "Cash equivalent" refers to the use of an instrument or process that creates a substitute for cash.  For example, when the government issues a debt instrument of any kind in satisfaction of claims, the transaction is recorded as simultaneous outlays and borrowing—the outlays when the debt instrument is issued, not when it is redeemed.

## Obligations Basis

The basis whereby financial transactions involving the use of funds are recorded in the accounts primarily when goods and services are ordered, regardless of when the resources acquired are to be received or consumed or when cash is received or paid.  (*See also* Liability; Obligation.)

## Benefit-Cost Analysis (Economics Term)

*See under* Cost-Benefit Analysis.

## Biennial Budget

A budget covering a period of 2 years. The federal government has an annual budget, but there have been proposals to shift to a biennial budget. The 2-year period can apply to the budget presented to Congress by the President, to the budget resolution adopted by Congress, or to the frequency and period covered by appropriations acts. The Department of Defense Authorization Act, 1986, Pub. L. No. 99–145, required the Department of Defense to submit 2-year budgets beginning with the budgets for 1988 and 1989. However, to date, appropriations have been made on an annual basis.

## Budget

A detailed statement of anticipated revenues and expenditures during an accounting period. For the federal government, the term "budget" often refers to the President's budget submission to Congress early each calendar year in accordance with the Budget and Accounting Act of 1921, as amended, and represents proposals for congressional consideration. The President's budget includes requests for budget authority for federal programs and estimates of revenues and outlays for the upcoming fiscal year and, with respect to budget authority requests in some cases, for future fiscal years. By law, elements of the budget, such as the estimates for the legislative branch and the judiciary, must be included without review by the Office of Management and Budget (OMB) or approval by the President. In the context of individual federal agencies and their programs, the term "budget" also may be used to refer to their budget submissions or, in response to Congress passing laws providing budget authority, the agencies' plans for spending the funds they were provided. (*See also* President's Budget; app. I.)

## Budget Act

The common name of the Congressional Budget and Impoundment Control Act of 1974. (*See under* Congressional Budget and Impoundment Control Act of 1974.)

Terms and Definitions

## Budget Activity

A specific and distinguishable line of work performed by a governmental unit to discharge a function or subfunction for which the governmental unit is responsible. Activities within most accounts identify the purposes, projects, or types of activities financed. For example, food inspection is an activity performed in the discharge of the health function. A budget activity is presented in the Program by Activities section in the Program and Financing Schedule for each account in the President's budget. (*See also* Functional Classification; for a partial distinction, *see* Program, Project, or Activity.)

## Budget Amendment

A revision to a pending budget request that the President submits to Congress before Congress completes appropriations action.

## Budget and Accounting Act of 1921

Enhanced budgetary efficiency and aided in the performance of constitutional checks and balances through the budget process. It required the President to submit a national budget each year and restricted the authority of the agencies to present their own proposals. (See 31 U.S.C. §§ 1104, 1105.) With this centralization of authority for the formulation of the executive branch budget in the President and the newly established Bureau of the Budget (now the Office of Management and Budget (OMB)), Congress also took steps to strengthen its oversight of fiscal matters by establishing the General Accounting Office, renamed the Government Accountability Office (GAO) in 2004.

## Budget Authority

Authority provided by federal law to enter into financial obligations that will result in immediate or future outlays involving federal government funds. The basic forms of budget authority include (1) appropriations, (2) borrowing authority, (3) contract authority, and (4) authority to obligate and expend offsetting receipts and collections. Budget authority includes the credit subsidy cost for direct loan and loan guarantee programs, but does not include the underlying authority to insure or guarantee the repayment of indebtedness incurred by another person or government.

Budget authority may be classified by its duration (1-year, multiple-year, or no-year), by the timing provided in the legislation (current or permanent), by the manner of determining the amount available (definite or indefinite), or by its availability for new obligations.  (*See also* Current Level Estimate; Credit Subsidy Cost, Direct Loan, *and* Guaranteed Loan *under* Federal Credit; Offsetting Collections *under* Collections.)

## Forms of Budget Authority

**Appropriations.**  Budget authority to incur obligations and to make payments from the Treasury for specified purposes. An appropriation act is the most common means of providing appropriations; however, authorizing and other legislation itself may provide appropriations.  (*See also* Backdoor Authority/Backdoor Spending.)

Appropriations do not represent cash actually set aside in the Treasury for purposes specified in the appropriation act; they represent amounts that agencies may obligate during the period of time specified in the respective appropriation acts.  An appropriation may make funds available from the general fund, special funds, or trust funds.  Certain types of appropriations are not counted as budget authority because they do not provide authority to incur obligations.  Among these are appropriations to liquidate contract authority (legislation to provide funds to pay obligations incurred against contract authority), to redeem outstanding debt (legislation to provide funds for debt retirement), and to refund receipts.  Sometimes appropriations are contingent upon the occurrence of some other action specified in the appropriation law, such as the enactment of a subsequent authorization or the fulfillment of some action by the executive branch.  (*See also* Appropriation Act; Discretionary; Expired Budget Authority *under* Availability for New Obligations *under* Budget Authority; Mandatory.)

**Borrowing Authority.**  Budget authority enacted to permit an agency to borrow money and then to obligate against amounts borrowed.  It may be definite or indefinite in nature.  Usually the funds are borrowed from the Treasury, but in a few cases agencies borrow directly from the public.  (*See also* Debt, Federal.)

**Contract Authority.**  Budget authority that permits an agency to incur obligations in advance of appropriations, including collections sufficient to liquidate the obligation or receipts.  Contract authority is unfunded, and a subsequent appropriation or offsetting collection is needed to liquidate the obligations.  The Food and Forage Act (41 U.S.C. § 11) and the Price Anderson Act (42 U.S.C. § 2210) are examples of such authority. (*See also* Backdoor Authority/Backdoor Spending.)

Terms and Definitions

**Offsetting Receipts and Collections.**  A form of budget authority that permits agencies to obligate and expend the proceeds of offsetting receipts and collections. The Congressional Budget Act of 1974, as amended by the Budget Enforcement Act (BEA) of 1990, defines offsetting receipts and collections as negative budget authority and the reductions to it as positive budget authority. In the President's budget, the Office of Management and Budget (OMB) reports offsetting receipts as appropriations.

## Duration

**One-Year Authority.**  Budget authority available for obligation only during a specific fiscal year that expires at the end of that fiscal year.  It is also known as "fiscal year" or "annual" budget authority.

**Multiple-Year Authority (Multiyear).**  Budget authority available for a fixed period of time in excess of 1 fiscal year.  This authority generally takes the form of 2-year, 3-year, and so forth, availability but may cover periods that do not coincide with the start or end of a fiscal year.  For example, the authority may be available from July 1 of one fiscal year through September 30 of the following fiscal year, a period of 15 months.  This latter type of multiple-year authority is sometimes referred to as "forward funding."  (For a distinction, *see* Advance Appropriation; Advance Funding. *See also* Full Funding.)

**No-Year Authority.**  Budget authority that remains available for obligation for an indefinite period of time.  A no-year appropriation is usually identified by language such as "to remain available until expended."

**Reappropriation.**  Legislation permitting an agency to obligate, whether for the same or different purposes, all or part of the unobligated portion of budget authority that has expired or would otherwise expire if not reappropriated.  In the President's budget, reappropriations of expired balances are counted as new budget authority or balance transfers depending on the year for which the amounts are reappropriated.

## Timing of Legislative Action

**Current Authority.**  Budget authority made available by Congress for the fiscal year or years during which the funds are available for obligation.

**Permanent Authority.**  Budget authority that is available as the result of previously enacted legislation and is available without further legislative action.  For example,

Terms and Definitions

authority to retain and use offsetting receipts tends to be permanent authority.  Such budget authority can be the result of substantive legislation or appropriation acts.

## Determination of Amount

**Definite Authority.**  Budget authority that is stated as a specified sum at the time the authority is enacted.  This type of authority, whether in an appropriation act or other law, includes authority stated as "not to exceed" a specified amount.

**Indefinite Authority.**  Budget authority that, at time of enactment, is for an unspecified amount.  Indefinite budget authority may be appropriated as all or part of the amount of proceeds from the sale of financial assets, the amount necessary to cover obligations associated with payments, the receipts from specified sources—the exact amount of which is determinable only at some future date—or it may be appropriated as "such sums as may be necessary" for a given purpose.

## Availability for New Obligations

**Expired Budget Authority.**  Budget authority that is no longer available to incur new obligations but is available for an additional 5 fiscal years for disbursement of obligations properly incurred during the budget authority's period of availability. Unobligated balances of expired budget authority remain available for 5 years to cover legitimate obligation adjustments or for obligations properly incurred during the budget authority's period of availability that the agency failed to record.  (See 31 U.S.C. §§ 1552(a), 1553(a).) (*See also* Expired Account; Unobligated Balance *under* Obligational Authority; Warrant.)

**Unexpired Budget Authority.**  Budget authority that is available for incurring new obligations.

# Budget Enforcement Act (BEA)

First enacted as Title XIII of the Omnibus Budget Reconciliation Act of 1990.  BEA amended the Balanced Budget and Emergency Deficit Control Act of 1985 and related amendments (Gramm-Rudman-Hollings) and the Congressional Budget and Impoundment Control Act of 1974.  BEA modified procedures and definitions for sequestration and deficit reduction, reformed budgetary credit accounting, maintained the off-budget status of the Old-Age and Survivors Insurance and Disability Insurance Trust Funds, and removed Social Security trust fund receipts and

outlays from deficit and sequestration calculations through fiscal year 1995. Public Law 103–66 (1993) extended the discretionary spending limits, pay-as-you-go (PAYGO) rules, and sequestration procedures through fiscal year 1998. The BEA of 1997, enacted as part of the Balanced Budget Act of 1997, further extended these budget enforcement mechanisms through fiscal year 2002. The BEA of 1997 also added new categories of discretionary spending and made technical and conforming changes to correct drafting errors in the BEA of 1990.

The sequestration and enforcement mechanisms of the Balanced Budget and Emergency Deficit Control Act, as amended by BEA, expired or became ineffective, at the end of fiscal year 2002. (All BEA-specific terms are defined in *A Glossary of Terms Used in the Federal Budget Process:* Exposure Draft, January 1993, GAO/AFMD-2.1.1.) (*See also* Credit Reform; Direct Spending; Gramm-Rudman-Hollings; Mandatory; Off-Budget.)

## Budget Estimates

Estimates of budget authority, outlays, receipts, budget amendments, supplemental requests from the President, or other budget measures that cover the current, budget, and future years, as reflected in the President's budget and budget updates. (*See also* Budget Update.)

## Budget of the U.S. Government

*See under* President's Budget.

## Budget Receipts

*See* Governmental Receipts *under* Collections.

## Budget Resolution

*See under* Concurrent Resolution on the Budget.

## Budget Update

A revised estimate of budget authority, receipts, and outlays issued subsequent to the issuance of the President's budget.  The President is required by provisions of the Congressional Budget and Impoundment Control Act of 1974 (see provisions of 31 U.S.C. §§ 1105(d), 1106) to transmit such statements to Congress by July 15 of each year; however, the President may also submit budget updates at other times during the fiscal year.  (*See also* Budget Estimates.)

## Budget Year

*See under* Fiscal Year.

## Budgetary Accounting

*See under* Obligational Accounting.

## Budgetary Accounts

*See under Standard General Ledger (SGL)* Chart of Accounts.

## Budgetary Reserves

Portions of budgetary resources set aside (withheld through apportionment) by the Office of Management and Budget (OMB) by authority of the Antideficiency Act (31 U.S.C. § 1512) solely to provide for contingencies or to effect savings.  Such savings are made possible through changes in requirements or through greater efficiency of operations.  Budgetary resources may also be set aside if specifically provided for by particular appropriation acts or other laws.

Except as specifically provided by law, no reserves shall be established other than as authorized under the Antideficiency Act (31 U.S.C. § 1512).  Reserves established are reported to Congress in accordance with provisions of the Impoundment Control Act of 1974 (2 U.S.C. §§ 681–688).  (*See also* Antideficiency Act; Apportionment; Deferral of Budget Authority; Rescission.)

## Budgetary Resources

An amount available to enter into new obligations and to liquidate them.  Budgetary resources are made up of new budget authority (including direct spending authority provided in existing statute and obligation limitations) and unobligated balances of budget authority provided in previous years.  (*See also* Budget Authority.)

## Byrd Rule

A rule of the Senate that allows a senator to strike extraneous material in, or proposed to be in, reconciliation legislation or the related conference report.  The rule defines six provisions that are "extraneous," including a provision that does not produce a change in outlays or revenues and a provision that produces changes in outlays or revenues that are merely incidental to the nonbudgetary components of the provision.  The Byrd Rule was first enacted as section 20001 of the Consolidated Omnibus Budget Reconciliation Act of 1985 and later transferred in 1990 to section 313 of the Congressional Budget Act (2 U.S.C. § 644).  The rule is named after its primary sponsor, Senator Robert C. Byrd.  (*See also* Reconciliation; Reconciliation Bill; Reconciliation Instruction; Reconciliation Resolution.)



## Capital

Has different meanings depending on the context in which it is used.

*Physical capital* is land and the stock of products set aside to support future production and consumption.  In the National Income and Product Accounts, private capital consists of business inventories, producers' durable equipment, and residential and nonresidential structures.  (*See* National Income and Product Accounts.)  *Financial capital* is funds raised by governments, individuals, or businesses by incurring liabilities such as bonds, mortgages, or stock certificates.  *Human capital* is the education, training, work experience, and other attributes that enhance the ability of the labor force to produce goods and services.

*Capital assets* are land, structures, equipment, intellectual property (e.g., software), and information technology (including information technology service contracts) that are used by the federal government and have an estimated useful life of 2 years or more.  Capital assets may be acquired in different ways: through purchase, construction, or manufacturing; through a lease-purchase or other capital lease (regardless of whether title has passed to the federal government); through an operating lease for an asset with an estimated useful life of 2 years or more; or through exchange.

Capital assets may or may not be recorded in an entity's balance sheet under federal accounting standards.  Capital assets do not include grants to state and local governments or other entities for acquiring capital assets (such as National Science Foundation grants to universities or Department of Transportation grants to Amtrak), intangible assets (such as the knowledge resulting from research and development), or the human capital resulting from education and training.  For more on capital assets, consult the *Capital Programming Guide* (June 1997), a supplement to OMB Circular No. A-11.

## Capital Budget

A budget that segregates capital investments from the operating budget's expenditures.  In such a budget, the capital investments that are excluded from the operating budget do not count toward calculating the operating budget's surplus or deficit at the time the investment is made.  States that use capital budgets usually include only part of their capital expenditures in that budget and normally finance the capital investment from borrowing and then charge amortization (interest and debt repayment) to the operating budget.

## Capital Lease

A lease other than a lease-purchase that transfers substantially all the benefits and risks of ownership to the lessee and does not meet the criteria of an operating lease. (*See also* Operating Lease.)

## Cash Accounting

A system of accounting in which revenues are recorded when cash is actually received and expenses are recorded when payment is made without regard to the

**Terms and Definitions**

accounting period in which the revenues were earned or costs were incurred. (*See also* Accrual Accounting; app. III.)

## Chain Price Indexes (Economics Term)

Index calculated by linking (chaining) of price indexes based on changing weights to create a time series. Chain-type indexes are used in the Bureau of Economic Analysis National Income and Product Accounts (NIPA). (*See also* Chained Dollars; Real Dollar.)

## Chained Dollars (Economics Term)

Dollar values calculated by taking the current dollar level of a series in the base period (or period from which the weights for a measurement series are derived) and multiplying it by the change in the chain quantity index number for the series (calculated using chained weights) since the base period. Chained-dollar estimates correctly show growth rates for a series, but the summed components do not equal the aggregate in periods other than the period from which the weights for a measurement series are derived. (*See also* Chain Price Indexes; Real Dollar.)

## Closed (Canceled) Account

An appropriation account whose balance has been canceled. Once balances are canceled, the amounts are not available for obligation or expenditure for any purpose. An account available for a definite period (fixed appropriation account) is canceled 5 fiscal years after the period of availability for obligation ends. An account available for an indefinite period (no-year account) is canceled if (1) the head of the agency concerned or the President determines that the purposes for which the appropriation was made have been carried out and (2) no disbursement has been made against the appropriation for 2 consecutive fiscal years. (*See also* Expired Account; Obligational Authority.)

## Collections

Amounts received by the federal government during the fiscal year. Collections are classified into three major categories: (1) governmental receipts (also called budget receipts or federal receipts), (2) offsetting collections, and (3) offsetting receipts.

Governmental receipts result from the exercise of the government's sovereign powers.  Offsetting collections and receipts result from businesslike transactions with the public or transactions between appropriated activities.  Offsetting collections and offsetting receipts are recorded as offsets to spending.  They are offsetting collections when the collections are authorized by law to be credited to expenditure accounts.  Otherwise, they are deposited in receipt accounts and called offsetting receipts.

For further discussion, see "Federal Receipts and Collections" in the *Analytical Perspectives* of the President's budget.  (*See also* Account in the President's Budget; Off-Budget; On-Budget; Revenue.)

## Governmental Receipts

Collections from the public based on the government's exercise of its sovereign powers, including individual and corporate income taxes and social insurance taxes, excise taxes, duties, court fines, compulsory licenses, and deposits of earnings by the Federal Reserve System.  Gifts and contributions (as distinguished from payments for services or cost-sharing deposits by state and local governments) are also counted as governmental receipts.  Total governmental receipts include those specifically designated as off-budget by provisions of law.  Total governmental receipts are compared with total outlays in calculating the budget surplus or deficit.  (*See also* Federal Fund Accounts *under* Account in the President's Budget; Gross Basis *and* Net Basis *under* Budgeting in Relation to Totals *under* Bases of Budgeting; Off-Budget; On-Budget.)

## Offsetting Collections

Collections authorized by law to be credited to appropriation or fund expenditure accounts.  They result from (1) businesslike transactions or market-oriented activities with the public, (2) intragovernmental transfers, and (3) collections from the public that are governmental in nature but required by law to be classified as offsetting.  Collections resulting from businesslike transactions with the public and other government accounts are also known as reimbursements.

Laws authorizing offsetting collections make them available for obligation to meet the account's purpose without further legislative action.  However, it is not uncommon for annual appropriation acts to include limitations on the obligations to be financed by these collections.  The authority to obligate and spend offsetting collections is a form of budget authority.  The Congressional Budget Act of 1974, as

amended by the Budget Enforcement Act (BEA) of 1990, defines offsetting collections as negative budget authority and the reductions to it as positive budget authority.

Offsetting collections include reimbursements, transfers between federal and trust fund accounts, offsetting governmental collections, and refunds.

**Reimbursements.**  When authorized by law, amounts collected for materials or services furnished to the public or other government accounts.  (For accounting purposes, earned reimbursements are also known as revenues.)  These offsetting collections are netted against gross outlays in determining net outlays from such appropriations.  (*See also* Unfilled Customer Orders.)

**Transfers between Federal and Trust Fund Accounts.**  Transfers of resources between federal and trust fund accounts are treated as expenditure transfers regardless of the nature of the transaction.  The receiving account reports offsetting collections from federal sources (for offsetting collections) or intragovernmental receipts (for offsetting receipts).

**Offsetting Governmental Collections.**  A term used by the Office of Management and Budget (OMB) to designate offsetting collections from nonfederal sources that are governmental in nature but are required by law to be credited to expenditure accounts.

**Refunds.**  Payments returned to the government that were made in error.  They are credited to the appropriation originally charged. (*See also* Offsetting Collections *under* Collections.)

## Offsetting Receipts

Collections that are offset against gross outlays but are not authorized to be credited to expenditure accounts.  Offsetting receipts are deposited in receipt accounts.  Like offsetting collections, they result from (1) businesslike transactions or market-oriented activities with the public, (2) intragovernmental transfers, and (3) collections from the public that are governmental in nature but required by law to be classified as offsetting receipts.

Offsetting receipts are offsets to gross budget authority and outlays, usually at the agency or subfunction level, but some are undistributed and are offsets to budget authority and outlays in the aggregate.  (*See also* Undistributed Offsetting Receipts.)

Unlike offsetting collections, offsetting receipts cannot be used without being appropriated. Trust fund offsetting receipts are permanently appropriated and, therefore, can be used without subsequent annual appropriation legislation. (*See* Permanent Authority *under* Timing of Legislative Action *under* Budget Authority; Trust Fund Receipt Account *under* Trust Fund Accounts *under* Account in the President's Budget.) The Congressional Budget Act of 1974, as amended by the Budget Enforcement Act (BEA) of 1990, defines offsetting receipts and collections as negative budget authority and the reductions to it as positive budget authority. (*See also* Earmarking; Reimbursement.)

**Proprietary Receipts from the Public.** Collections from outside the government that are deposited in receipt accounts that arise as a result of the government's business-type or market-oriented activities. Among these are interest received, proceeds from the sale of property and products, charges for nonregulatory services, and rents and royalties. Such collections may be credited to general fund, special fund, or trust fund receipt accounts and are offset against budget authority and outlays. In most cases, such offsets are by agency and by subfunction, but some proprietary receipts are deducted from total budget authority and outlays for the government as a whole. An example of the latter is rents and royalties on the Outer Continental Shelf. (*See* Subfunction 953 in app. IV. *See also* Earmarking.)

**Intragovernmental Transfers.** Collections from other federal government accounts, often as payment for goods or services provided. Most offsetting receipts from intragovernmental transfers are offset against budget authority and outlays of the agency or subfunction that produced the goods or services. However, two intragovernmental transfers are classified as undistributed offsetting receipts: (1) agency payments as employers into employee retirement trust funds and (2) interest received by trust funds. These offsetting receipts appear as offsets to budget authority and outlays for the government as a whole, rather than at the agency level.

Intragovernmental transfers may be (1) intrabudgetary (on-budget), (2) off-budget, or (3) transfers between on-budget and off-budget accounts. Intrabudgetary transfers are further subdivided into three categories: (1) interfund transfers, where the payment is from one fund group, either federal or trust, to a receipt account in the other fund group; (2) federal intrafund transfers, where the payment and receipt both occur within the federal fund group; and (3) trust intrafund transfers, where the payment and receipt both occur within the trust fund group.

Terms and Definitions

**Offsetting Governmental Receipts.**  A term used by the Office of Management and Budget (OMB) to designate receipts that are governmental in nature (e.g., tax receipts, regulatory fees, and compulsory user charges) but are required by law to be classified as offsetting.

# Combined Statement of Receipts, Outlays, and Balances of the United States Government

The Department of the Treasury's annual accounting of the (1) unified budget receipts activities of the federal government, which should be consistent with the aggregated custodial nonexchange revenues (before net accrual adjustment) reported in federal agencies' statements of custodial activity, and (2) unified budget outlays activities of the federal government, which should be consistent with net outlays reported in federal agencies' statements of budgetary resources.  This report also provides a summary accounting of agencies' budget activities: appropriations, borrowings and investments, outlays, and balances based on the agencies' budget execution reports. (*See also* Monthly Treasury Statement.)

# Commitment

An administrative reservation of allotted funds, or of other funds, in anticipation of their obligation.  For federal proprietary accounting, a commitment may also manifest an intent to expend assets (e.g., to provide government social insurance benefits).  See Statement of Federal Financial Accounting Standards (SFFAS) No. 25, *Basis for Conclusions*, para. 8, and SFFAS No. 17, *Basis for Conclusions*, paras. 65 and 94.  (*See also* Allotment; Loan Guarantee Commitment *under* Federal Credit; Obligation.)

# Committee Allocation

The distribution of total proposed new budget authority and outlays, as set forth in the concurrent resolution on the budget, among the congressional committees according to their jurisdictions.  The allocations are set forth in the joint explanatory statement of managers included in the conference report on the congressional budget resolution.  House and Senate committees receive allocations of total new budget authority and total outlays.  House committees also receive allocations of total entitlement authority, and Senate committees also receive allocations of Social Security outlays.  Allocations are committee specific, but not program specific.

Under section 302(a) of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 633(a)), committee allocations are limits, not simply recommendations. (*See also* Allocation; Concurrent Resolution on the Budget; Entitlement Authority.)

## Comparative Statement of New Budget Authority

A table accompanying a regular or supplemental appropriations act in the report of the House or Senate Appropriations Committee.  It compares the appropriation recommended for each account in that act with the amount requested by the President in the budget submission and the amount enacted in the preceding fiscal year.  In some cases, such as when a continuing appropriations act is considered, the statement may be inserted into the *Congressional Record*.

## Concurrent Resolution on the Budget

A concurrent resolution adopted by both houses of Congress as part of the annual budget and appropriations process, setting forth an overall budget plan for Congress against which individual appropriations bills, other appropriations, and revenue measures are to be evaluated.  As a plan for Congress, the resolution is not presented to the President for signature and does not have the force of law.  Pursuant to section 301 of the Congressional Budget Act, as amended (2 U.S.C. § 632), the resolution is expected to establish, for at least 5 fiscal years beginning on October 1 of the year of the resolution, appropriate levels for the following:

• totals of new budget authority and outlays,
• total federal revenues,
• the surplus or deficit in the budget,
• new budget authority and outlays for each major functional category,
• the public debt, and
• outlays and revenues for Social Security insurance programs.

The concurrent resolution generally contains budget levels for the 5 fiscal years and may contain reconciliation instructions to specified committees.  The concurrent resolution most recently adopted may be revised or affirmed before the end of the year to which it applies, as provided in section 304 of the Congressional Budget Act, as amended (2 U.S.C. § 635).  (*See also* Congressional Budget and Impoundment Control Act of 1974.)

## Congressional Budget

The Concurrent Resolution on the Budget is oftentimes referred to as the Congressional Budget.  (*See* Concurrent Resolution on the Budget.)

## Congressional Budget Act

Titles I–IX of the Congressional Budget and Impoundment Control Act of 1974, as amended (2 U.S.C. §§ 601–661), are commonly referred to as the Congressional Budget Act.  (*See also* Congressional Budget and Impoundment Control Act of 1974. For an overview of the federal budget process, *see* app. I.)

## Congressional Budget and Impoundment Control Act of 1974

Established a process through which Congress could systematically consider the total spending policy of the United States and determine priorities for allocating budgetary resources.  The process calls for procedures for coordinating congressional revenue and spending decisions made in separate tax, appropriations, and legislative measures.  It established the House and Senate Budget Committees, the Congressional Budget Office (CBO), and the procedures for congressional review of impoundments in the form of rescissions and deferrals proposed by the President. (*See also* Budget Enforcement Act; Deferral of Budget Authority; Gramm-Rudman-Hollings; Impoundment; Rescission.)

## Consolidated Budget

*See under* Unified Budget.

## Consolidated Financial Statement

The financial statements of a parent and its subsidiary or component entities, presented as if the group were a single entity.  In the U.S. government, there is a consolidated financial statement for the federal government that encompasses the executive, legislative, and judicial branches as well as consolidated statements for agencies that encompass all their offices, bureaus, and activities.

Terms and Definitions

## Constant Dollars (Economics Term)

*See under* Real Dollar.

## Consumer Price Index (CPI) (Economics Term)

A measure of the average change over time in the prices paid by urban consumers for a market basket of consumer goods and services commonly referred to as "inflation." Measures for two population groups are currently published, CPI-U and CPI-W. CPI-U is based on a market basket determined by expenditure patterns of all urban households, while the market basket for CPI-W is determined by expenditure patterns of only urban wage-earner and clerical-worker families. The urban wage-earner and clerical-worker population consists of clerical workers, sales workers, craft workers, operatives, service workers, and laborers. Both indexes are published monthly by the Bureau of Labor Statistics. The CPI is used to adjust for inflation, the income payments of Social Security beneficiaries, and payments made by other programs. In addition, the CPI is used to adjust certain amounts defined by the tax code, such as personal exemptions and the tax brackets.

## Contingent Liability

An existing condition, situation, or set of circumstances that poses the possibility of a loss to an agency that will ultimately be resolved when one or more events occur or fail to occur. Contingent liabilities may lead to outlays. Contingent liabilities may arise, for example, with respect to unadjudicated claims, assessments, loan guarantee programs, and federal insurance programs. Contingent liabilities are normally not covered by budget authority in advance. However, credit reform changed the normal budgetary treatment of loans and loan guarantees by establishing that for most programs, loan guarantee commitments cannot be made unless Congress has made appropriations of budget authority to cover the credit subsidy cost in advance in annual appropriations acts. (*See also* Credit Subsidy Cost *under* Federal Credit; Liability.)

## Continuing Appropriation/Continuing Resolution (often referred to simply as "CR")

An appropriation act that provides budget authority for federal agencies, specific activities, or both to continue in operation when Congress and the President have not

Terms and Definitions

completed action on the regular appropriation acts by the beginning of the fiscal year. Enacted in the form of a joint resolution, a continuing resolution is passed by both houses of Congress and signed into law by the President. A continuing resolution may be enacted for the full year, up to a specified date, or until regular appropriations are enacted. A continuing resolution usually specifies a maximum rate at which the obligations may be incurred based on levels specified in the resolution. For example, the resolution may state that obligations may not exceed the current rate or must be the lower of the amounts provided in the appropriation bills passed in the House or Senate. If enacted to cover the entire fiscal year, the resolution will usually specify amounts provided for each appropriation account. (*See also* Appropriation Act; Current Rate; Joint Resolution; Seasonal Rate; Supplemental Appropriation.)

## Cost

The price or cash value of the resources used to produce a program, project, or activity. This term is used in many different contexts. When used in connection with federal credit programs, the term means the estimated long-term cost to the government of a direct loan or loan guarantee, calculated on a net present value basis over the life of the loan, excluding administrative costs and any incidental effects on governmental receipts or outlays. (*See also* Credit Subsidy Cost *under* Federal Credit; Expense.)

For federal proprietary accounting, the monetary value of resources used or sacrificed or the liabilities incurred to achieve an objective.

In economic terms, it is a measure of what must be given up in order to obtain something, whether by purchase, exchange, or production. Economists generally use the concept of opportunity cost, which is the value of all of the things that must be forgone or given up in obtaining something. The opportunity cost measure may, but will not always, equal the money outlays used to measure accounting costs. Economists sometimes distinguish between the private costs of a good or activity to the consumer or producer and the social costs imposed on the community as a whole.

## Cost-Benefit Analysis (Economics Term)

An analytic technique that compares the costs and benefits of investments, programs, or policy actions in order to determine which alternative or alternatives maximize net benefits (economic efficiency). Cost-benefit analysis attempts to consider all costs

and benefits to whomever they accrue, regardless of whether they are reflected in market transactions.  The costs and benefits included depend upon the scope of the analysis, although the standard federal analysis is national in scope.  Net benefits of an alternative are determined by subtracting the present value of costs from the present value of benefits.  (*See also* Present Value.)

## Cost Estimates

Under the Congressional Budget Act of 1974, estimates of the impact legislation under consideration by Congress would have on the federal budget if the legislation became law.  Cost estimates are provided by the Congressional Budget Office (CBO) on all legislation of a public character reported by a congressional committee and are, typically, published in the report accompanying that legislation.

## Countercyclical Policy (Economics Term)

Policy aimed at reducing the size and duration of swings in economic activity in order to keep economic growth closer to a pace consistent with low inflation and high employment.  It includes monetary and fiscal policies affecting the level of interest rates, money supply, taxes, and government spending.

## Credit, Credit Reform

*See under* Federal Credit.

## Current Dollar (Economics Term)

"In current dollars" means valued in the prices of the current year.  The current dollar value of a good or service is its value in terms of prices current at the time the good or service is acquired or sold.

## Current Level Estimate

An estimate of the amounts of new budget authority, outlays, and revenues for a full fiscal year, based upon enacted law.  Current level estimates used by Congress do not take into account the potential effects of pending legislation.  Current level estimates

include a tabulation comparing estimates with the aggregates approved in the most recent budget resolution, and they are consistent with the technical and economic assumptions in that resolution.  This means that the current level is not only compared to the resolution, but the current level estimate's framework is consistent with the resolution.  Section 308(b) of the Congressional Budget and Impoundment Control Act of 1974, as amended (2 U.S.C. § 639(b)), requires the House and Senate Budget Committees to make this tabulation at least once a month.  The Congressional Budget Office (CBO) assists these committees by regularly submitting reports of the budgetary impact of congressional actions.  (*See also* Budget Authority; Committee Allocation; Congressional Budget Act; Scorekeeping.)

## Current Rate

Used in a continuing resolution, the total amount of budget authority that was available for obligation for an activity during the fiscal year immediately prior to the one for which the continuing resolution is enacted.  Congress often uses the "current rate" as part of a formula to indicate a level of spending that it desires for a program for the duration of the continuing resolution.  The current rate does not allow agencies to fund new initiatives, programs, or both requested for the current year unless Congress specifically authorizes them to be funded.  (*See also* Continuing Appropriation/Continuing Resolution; Seasonal Rate.)

## Current Services Estimates

Estimates submitted by the President of the levels of budget authority and outlays for the ensuing fiscal year based on the continuation of existing levels of service.  These estimates reflect the anticipated costs of continuing federal programs and activities at present levels without policy changes.  Such estimates ignore all new presidential or congressional initiatives, including reductions or increases that are not yet law.

With the proposed budget each year, the President must transmit current services estimates and the economic assumptions upon which they are based.  Updated current services estimates are also included in the *Mid-Session Review* of the President's budget, but are not identified by that title and are confined to those programs that are essentially automatic (that is, they exclude programs controlled through annual appropriations).  The current services data in the *Mid-Session Review* are identified as being for "mandatory and related programs under current law."

Terms and Definitions

The Congressional Budget Office (CBO) also prepares similar estimates. For a more detailed discussion of this term, see "Current Services Estimates" in the *Analytical Perspectives* of the President's budget.  (*See also* Baseline; Multiyear Budget Planning.)

## Current Year

*See under* Fiscal Year.

## Cyclical Surplus/Deficit (Economics Term)

The part of the federal budget surplus or deficit that results from cyclical factors rather than from underlying fiscal policy.  This cyclical component reflects the way in which the surplus or deficit automatically increases or decreases during economic booms or recessions.

## Cyclically Adjusted Surplus or Deficit (Economics Term)

The portion of surplus or deficit remaining after the impact of the business cycle has been removed.



## Daily Treasury Statement (DTS)

*See under* Monthly Treasury Statement.

## Debt, Federal

Generally, the amount borrowed by the government from the public or from government accounts.  Four ways that federal debt may be categorized for reporting purposes are (1) gross federal debt, (2) debt held by the public, (3) debt held by government accounts, and (4) debt subject to statutory debt limit.  For a fuller discussion of federal debt, see *Federal Debt:  Answers to Frequently Asked*

*Questions. An Update* (GAO-04-485SP). (*See also* Borrowing Authority *under* Forms of Budget Authority *under* Budget Authority; Federal Financing Bank; Means of Financing.)

## Buyback

In the context of federal debt, the Department of the Treasury's purchases of marketable Treasury securities from the public prior to their maturity through competitive redemption processes (as opposed to redemptions prior to maturity under call provisions) are often referred to as "debt buybacks." The budget records buyback premiums and discounts as means of financing a surplus or deficit, rather than as outlays or offsetting collections or receipts. The buyback premium or discount is the difference between the reacquisition price of a security and its book value. (*See also* Means of Financing.)

## Debt Held by Government Accounts (Intragovernmental Debt)

Federal debt owed by the federal government to itself. Most of this debt is held by trust funds, such as Social Security and Medicare. The Office of Management and Budget (OMB) contrasts it to debt held by the public by noting that it is not a current transaction of the government with the public; it is not financed by private saving and thus does not compete with the private sector for available funds in the credit market; and it does not represent an obligation to make payments to the public.

## Debt Held by the Public

That portion of the gross federal debt held outside of the federal government. This includes any federal debt held by individuals, corporations, state or local governments, the Federal Reserve System, and foreign governments and central banks. Debt held by government accounts (intragovernmental debt) is excluded from debt held by the public. Debt held by the public is not the same as public debt or Treasury debt.

## Debt Subject to Statutory Debt Limit

Debt guaranteed as to principal and interest by the United States.

As defined by section 3101 of title 31 of the *United States Code*, the debt subject to the statutory debt limit includes debt issued under chapter 31 of that title. This includes Treasury debt except the securities issued by the Federal Financing Bank

(FFB) under authority of section 9(a) of the Federal Financing Bank Act of 1973 (12 U.S.C. § 2888(a)) upon which there is a separate limit of $15 billion, and a small amount of agency debt. Agency debt that by law is not guaranteed as to principal and interest by the United States—for example, the Tennessee Valley Authority (TVA) (under authority of section 15d of the TVA Act of 1933, 16 U.S.C. § 831n-4) and the United States Postal Service (under authority of 39 U.S.C. § 2005(a))—is not subject to the ceiling imposed by section 3101, but is usually subject to its own ceiling.

## Gross Federal Debt

The total amount of federal government debt comprising debt securities issued by the Department of the Treasury (including securities issued by the Federal Financing Bank (FFB) under section 9(a) of the Federal Financing Bank Act of 1973 (12 U.S.C. § 2888(a)) and other government agencies.  Gross federal debt is the sum of debt held by the public and debt held by government accounts (intragovernmental debt).

**Treasury Debt/Public Debt.**  That portion of the gross federal debt issued by the Department of the Treasury to the public or to government accounts (including securities issued by the Federal Financing Bank (FFB) under section 9(a) of the Federal Financing Bank Act of 1973 (12 U.S.C. § 2888(a)). (*See also* Debt Held by Government Accounts *under* Debt, Federal.)

**Agency Debt.**  That portion of the gross federal debt incurred when a federal agency other than the Department of the Treasury (Treasury) is authorized by law to issue debt securities directly to the public or to another government account.  While an agency may have authority to borrow directly from the public, agencies usually borrow from Treasury's Federal Financing Bank (FFB).  Since Treasury borrowing required to obtain the money to lend to the agency through FFB is already part of the gross federal debt, to avoid double counting, agency borrowing from FFB is not included in the gross federal debt.  In addition, federal fund advances from Treasury to trust funds are not included in the gross federal debt to avoid double counting. Debt of government-sponsored, privately owned enterprises, such as the Federal National Mortgage Association, is not included in the federal debt.

## Statutory Debt Limit

The ceiling on the amount of most Treasury and agency debt established by section 3101 of title 31 of the *United States Code*, sometimes referred to as the public debt ceiling or the public debt limit.

## Debt Service

Payment of interest on, and repayment of principal on, borrowed funds.  The term may also be used to refer to payment of interest alone.  (*See also* Means of Financing.)  As used in the Congressional Budget Office's (CBO) *Budget and Economic Outlook*, debt service refers to a change in interest payments resulting from a change in estimates of the surplus or the deficit.

## Deeming Resolution

An informal term that refers to a resolution or bill passed by one or both houses of Congress that in the absence of a concurrent resolution, serves for the chamber passing it as an annual budget resolution for purposes of establishing enforceable budget levels for a budget cycle.  The Congressional Budget and Impoundment Control Act of 1974 requires the adoption each year of a concurrent resolution on the budget.  (*See* Concurrent Resolution on the Budget.)

At a minimum, deeming resolutions provide new spending allocations to the appropriations committees, but they also may set new aggregate budget levels, provide revised spending allocations to other House and Senate committees, or provide for other related purposes. A deeming resolution may even declare that a budget resolution (in its entirety), passed earlier in the session by one house is deemed to have the force and effect as if adopted by both houses.

## Deferral of Budget Authority

Temporary withholding or delaying of the obligation or expenditure of budget authority or any other type of executive action, which effectively precludes the obligation or expenditure of budget authority.  A deferral is one type of impoundment.  Under the Impoundment Control Act of 1974 (2 U.S.C. § 684), budget authority may only be deferred to provide for contingencies, to achieve savings or greater efficiency in the operations of the government, or as otherwise specifically provided by law.  Budget authority may not be deferred for policy or any other reason.

Deferrals may be proposed by agencies but must be communicated to Congress by the President in a special message.  Deferred budget authority may be withheld without further action by Congress.  Congress may disapprove a deferral by law.  A deferral may not extend beyond the end of the fiscal year of the budget authority's

availability.  However, for multiyear funds, the President may re-report the deferral the next fiscal year.  Deferred budget authority that is disapproved by Congress must be made available immediately.  Agencies must release all other deferred budget authority with sufficient time remaining in the fiscal year to prudently obligate that budget authority before the end of the fiscal year.  (*See also* Apportionment; Budgetary Reserves; Impoundment; Rescission.)

# Deficiency Apportionment

As provided for in the Antideficiency Act (31 U.S.C. § 1515) an apportionment by the Office of Management and Budget (OMB) indicating the need for supplemental budget authority to permit payment of pay increases to civilian and military employees and military retirees as required by law.  In addition, the head of an executive branch agency may request a deficiency apportionment if (1) a new law is enacted requiring unanticipated expenditures beyond administrative control or (2) an emergency arises involving the safety of human life or the protection of property.  Approval for requests for such an apportionment does not authorize agencies to exceed available resources within an account. (*See also* Antideficiency Act; Apportionment; Deficiency Appropriation; Supplemental Appropriation.)

# Deficiency Appropriation

An appropriation made to pay obligations for which sufficient funds are not available.  The need often results from violations of the Antideficiency Act.  Though technically distinct from a supplemental appropriation, Congress has stopped passing separate deficiency appropriations and the distinction therefore has become obscured since the 1960s.

# Deficit

The amount by which the government's spending exceeds its revenues for a given period, usually a fiscal year (opposite of surplus).

## Budget Deficit

The amount by which the government's budget outlays exceed its budget receipts for a given period, usually a fiscal year.  (*See also* Budget Surplus *under* Surplus.)

## Unified Deficit/Total Deficit

The amount by which the government's on-budget and off-budget outlays exceed the sum of its on-budget and off-budget receipts for a given period, usually a fiscal year. (*See also* Budget Surplus *under* Surplus; Off-Budget.)

# Deflation (Economics Term)

A sustained decrease in the general price level.

# Deflator (Economics Term)

An index used to adjust a current dollar amount to its real dollar counterpart, that is, to remove the effects of inflation.  (*See also* Inflator.)

# Deobligation

An agency's cancellation or downward adjustment of previously incurred obligations. Deobligated funds may be reobligated within the period of availability of the appropriation.  For example, annual appropriated funds may be reobligated in the fiscal year in which the funds were appropriated, while multiyear or no-year appropriated funds may be reobligated in the same or subsequent fiscal years.  (*See* Reobligation.)

# Depreciation

The systematic and rational allocation of the acquisition cost of an asset, less its estimated salvage or residual value, over its estimated useful life.  Depreciation reflects the use of the asset(s) during specific operating periods in order to match costs with related revenues in measuring income or determining the costs of carrying out program activities.

# Direct Spending

As defined by the Balanced Budget and Emergency Deficit Control Act of 1985, entitlement authority, the Food Stamp Program, and budget authority provided by

law other than appropriations acts. Direct spending may be temporary or permanent, definite or indefinite (as to amount) but it is an appropriation or other budget authority made available to agencies in an act other than an appropriation act. Under expired Budget Enforcement Act (BEA) provisions, new direct spending was subject to pay-as-you-go (PAYGO) requirements. (*See also* Balanced Budget and Emergency Deficit Control Act of 1985; Entitlement Authority; Mandatory; Pay-as-You-Go. For a distinction, *see* Discretionary.)

## Disbursements

Amounts paid by federal agencies, by cash or cash equivalent, during the fiscal year to liquidate government obligations. "Disbursement" is used interchangeably with the term "outlay." In budgetary usage, gross disbursements represent the amount of checks issued and cash or other payments made, less refunds received. Net disbursements represent gross disbursements less income collected and credited to the appropriation or fund account, such as amounts received for goods and services provided. (*See also* Outlay; Expenditure.)

## Discount Rate (Economics Term)

One of the following:

(1) The interest rate used to determine the present value of a future stream of receipts and outlays, or in cost-benefit analysis, of benefits and costs. This use of the term is completely distinct from that in monetary policy, and the interest rates involved are generally not those charged by Federal Reserve Banks.

Discount rate policies of the three major oversight and budget agencies—the Government Accountability Office (GAO), the Office of Management and Budget (OMB), and the Congressional Budget Office (CBO)—are consistent with basic economic principles but vary significantly in their formulations for different analyses. GAO's *Discount Rate Policy* (GAO/OCE-17.1.1), May 1991, describes different approaches and their applications.

In estimating net present values under credit reform, discount rate represents the average interest rate on marketable Treasury securities of similar maturity to the cash flows of the direct loan or loan guarantee for which the estimate is being made. (*See* Credit Subsidy Cost *under* Federal Credit.)

(2) The interest rate that a commercial bank pays when it borrows from a Federal Reserve Bank.  The discount rate is one of the tools of monetary policy used by the Federal Reserve System.  The Federal Reserve customarily raises or lowers the discount rate to signal a shift toward restraining or easing its monetary and credit policy.  (*See also* Monetary Policy.)

## Discretionary

A term that usually modifies either "spending," "appropriation," or "amount." "Discretionary spending" refers to outlays from budget authority that is provided in and controlled by appropriation acts.  "Discretionary appropriation" refers to those budgetary resources that are provided in appropriation acts, other than those that fund mandatory programs.  "Discretionary amount" refers to the level of budget authority, outlays, or other budgetary resources (other than those which fund mandatory programs) that are provided in, and controlled by, appropriation acts. (*See also* Appropriation Act; Appropriations *under* Forms of Budget Authority *under* Budget Authority; One-Year Authority *under* Duration *under* Budget Authority; Gramm-Rudman-Hollings.  For a contrast, *see* Entitlement Authority; Mandatory.)



# E

## Earmarking

Either of the following:

(1) Dedicating collections by law for a specific purpose or program.  Earmarked collections include trust fund receipts, special fund receipts, intragovernmental receipts, and offsetting collections credited to appropriation accounts.  These collections may be classified as budget receipts, proprietary receipts, or reimbursements to appropriations.

(2) Designating any portion of a lump-sum amount for particular purposes by means of legislative language.  Sometimes, "earmarking" is colloquially used to characterize directions included in congressional committee reports but not in the legislation itself.  (*See also* Special Fund Accounts *under* Federal Fund Accounts *under* Account in the President's Budget; Trust Fund Accounts *under* Account in the President's

Budget; Offsetting Collections *under* Collections; Proprietary Receipts from the Public *under* Offsetting Receipts *under* Collections; Committee Allocation.)

## Economy Act

A common reference to section 1535 of title 31 of the *United States Code* that provides general authority for one agency or unit thereof to obtain goods and services from another agency or unit.  Payment may be made in advance or upon the provision of the goods and services ordered.

## Emergency

A term that usually modifies "appropriation," "legislation," or "supplemental."  Under procedures typically prescribed in concurrent resolutions on the budget, the House or the Senate, or their respective committees of jurisdiction, may designate proposed appropriations or other legislation as "emergency legislation" and thereby exempt any new budget authority, outlays, or receipts resulting from such legislation from specified enforcement provisions in the Congressional Budget Act, the concurrent resolution itself, or both.  (*See also* Appropriations *under* Forms of Budget Authority *under* Budget Authority.)

Acts appropriating funds for national or international emergencies such as natural disasters or urgent national security events are typically designated "emergency supplemental."  (*See also* Supplemental Appropriation.)

## Entitlement Authority

Authority to make payments (including loans and grants) for which budget authority is not provided in advance by appropriation acts to any person or government if, under the provisions of the law containing such authority, the U.S. government is legally required to make the payments to persons or governments that meet the requirements established by law (2 U.S.C. § 622(9)).

Under the Budget Enforcement Act (BEA), new entitlement authority was defined as direct spending and was subject to the pay-as-you-go (PAYGO) provisions. (*See also* Appropriated Entitlement; Authorizing Legislation; Backdoor Authority/Backdoor Spending; Budget Enforcement Act; Mandatory; Pay-as-You-Go.)

## Expenditure

The actual spending of money; an outlay.

## Expense

Outflow or other depletion of assets or incurrences of liabilities (or a combination of both) during some period as a result of providing goods, rendering services, or carrying out other activities related to an entity's programs and missions, the benefits from which do not extend beyond the present operating period.

## Expired Account

An account within the Department of the Treasury to hold expired budget authority. The expired budget authority retains its fiscal year (or multiyear) identity for an additional 5 fiscal years.  After the 5-year period has elapsed, all obligated and unobligated balances are canceled, the expired account is closed, and all remaining funds are returned to the general fund of the Treasury and are thereafter no longer available for any purpose.  (*See* Expired Budget Authority *under* Availability for New Obligations *under* Budget Authority.)



# FACTS II

The Federal Agencies' Centralized Trial-Balance System, managed by the Department of the Treasury's Financial Management Service (FMS) for the Office of Management and Budget (OMB).  The system gathers quarterly budget execution information electronically, which is used to prepare Reports on Budget Execution (SF-133), Year-end Closing Statements (FMS-2108), and portions of the actual column of the President's budget.

# Federal Accounting Standards Advisory Board (FASAB)

Sponsored under an agreement between the Department of the Treasury, the Office of Management and Budget (OMB), and Government Accountability Office (GAO). FASAB promulgates Statements of Federal Financial Accounting Standards (SFFAS) after considering the financial and budgetary information needs of citizens, congressional oversight groups, executive agencies, and other users of federal financial information.  See www.FASAB.gov.  (For a discussion of the methods for tracking funds in the federal government, *see* app. III.)

# Federal Credit

Defined by the Federal Credit Reform Act of 1990 (FCRA) as federal direct loans and federal loan guarantees.

## Administrative Expense

The cost that is directly related to credit program operations, including payments to contractors.  The Federal Credit Reform Act of 1990 (FCRA) requires that administrative expenses for both direct loans and loan guarantees be included in program accounts.  Administrative expenses are not included in subsidy costs appropriations but are separately appropriated.

## Cohort

All direct loans or loan guarantees of a program for which a subsidy appropriation is provided for a given fiscal year, even when disbursements occur in subsequent fiscal years.  For direct loans and loan guarantees that receive multiyear or no-year appropriations, the cohort is defined by the year of obligation.  Pre-1992 direct loans that are modified will constitute a single cohort.  Likewise, pre-1992 loan guarantees that are modified constitute a cohort.  (*See also* Direct Loan *and* Guaranteed Loan *under* Federal Credit.)

## Credit Reestimates

Recalculation of the estimated cost to the government of a group of direct loans or loan guarantees.  After new direct loans or loan guarantees are made, the Federal Credit Reform Act of 1990 (FCRA) requires periodic revisions of the subsidy cost estimate of a cohort (or risk category) based on information about the actual

performance, estimated changes in future cash flows of the cohort, or both. Reestimates must generally be made annually (with an associated recalculation of applicable cumulative interest), as long as any loans in the cohort are outstanding. These reestimates represent additional costs or savings to the government and are recorded in the budget. An upward reestimate indicates that insufficient funds had been paid to the financing account, so the increase (plus interest on reestimates) is paid from the program account to the financing account to make it whole. Permanent indefinite budget authority is available for this purpose. A downward reestimate indicates that too much subsidy had been paid to the financing account. The excess identified in a downward reestimate (plus interest) may be credited directly to the program account as offsetting collections for programs classified as mandatory or to a downward reestimate receipt account for programs classified as discretionary.

## Credit Reform

The method of controlling and accounting for credit programs in the federal budget after fiscal year 1991. The Federal Credit Reform Act of 1990 (FCRA) added title V to the Congressional Budget Act of 1974. It requires that the credit subsidy cost be financed from new budget authority and be recorded as budget outlays at the time the direct or guaranteed loans are disbursed. In turn, it authorizes the creation of nonbudgetary financing accounts to receive this subsidy cost payment. Agencies must have appropriations for the subsidy cost before they can enter into direct loan obligations or loan guarantee commitments. (*See also* Credit Subsidy Cost, Direct Loan Obligation, Discount Rate, *and* Loan Guarantee Commitment *under* Federal Credit; Present Value.)

**Risk Category.**  Subdivisions of a cohort of direct loans or loan guarantees that are relatively homogeneous in cost, given the facts known at the time of obligation or commitment. Risk categories will group within a cohort all direct loans or loan guarantees that share characteristics that predict defaults and other costs. They may be defined by characteristics or combinations of characteristics of the loan, the project financed, the borrower, or a combination of these.

Statistical evidence must be presented, based on historical analysis of program data or comparable credit data, concerning the likely costs of defaults, other deviations from contract, or other costs that are expected to be associated with the loans in that category.

## Credit Reform Act Accounts

**Credit Program Account.**  A budget account that receives and obligates appropriations to cover the subsidy cost (on a net present value basis) of a direct loan or loan guarantee and disburses the subsidy cost to the financing account.  Usually, a separate amount is also appropriated in the program account for administrative expenses that are directly related to credit program operations.  (*See also* Present Value.)

**Financing Account.**  A nonbudgetary account (or accounts) associated with each credit program account that holds balances, receives the subsidy cost payment from the credit program account, and includes all other cash flows to and from the government resulting from direct loan obligations or loan guarantee commitments made on or after October 1, 1991.  It disburses loans, collects repayments and fees, makes claim payments, holds balances, borrows from the Department of the Treasury, earns or pays interest, and receives the subsidy cost payment from the credit program account.

**Liquidating Account.**  A budget account that includes all cash flows to and from the government resulting from direct loan obligations or loan guarantee commitments made prior to October 1, 1991.  The Federal Credit Reform Act of 1990 (FCRA) requires that such accounts be shown in the budget on a cash basis.  Agencies are required to transfer end-of-year unobligated balances in these accounts to the general fund as soon as practicable after the close of the fiscal year.

**Negative Subsidy Receipt Account.**  A budget account for the receipt of amounts paid from the financing account when there is a negative subsidy for the original estimate. In most cases, the receipt account is a general fund receipt account and amounts are not earmarked for the credit program. They are available for appropriation only in the sense that all general fund receipts are available for appropriation. Separate downward reestimate receipt accounts are used to record amounts paid from the financing account for downward reestimates.

## Credit Subsidy Cost

The estimated long-term cost to the government of a direct loan or loan guarantee, calculated on a net present value basis and excluding administrative costs.

In estimating the net present value, for loans made, guaranteed, or modified in fiscal year 2001 and after, the cash flow estimated for each year (or other time period) is

discounted using the interest rate on a marketable zero-coupon Treasury security with the same maturity from the date of disbursement as that cash flow. For loans made or guaranteed prior to fiscal year 2001, the discount rate is the average interest rate on marketable Treasury securities of similar maturity to the direct loan or loan guarantee for which the estimate is being made. The rate at which interest will be paid on the amounts borrowed or held as an uninvested balance by a financing account for a particular cohort is the same as the financial discount rate for a cohort, the disbursement-weighted average discount rate (for cohorts before 2001) or a single effective rate (for cohorts 2001 and after) derived from this collection of interest rates. (*See also* Credit Reform, Direct Loan, *and* Guaranteed Loan *under* Federal Credit; Present Value; Subsidy.)

**Direct Loan Subsidy Cost.** The estimated long-term cost to the government of a direct loan, excluding administrative costs. Specifically, the subsidy cost of a direct loan is the net present value, at the time when the direct loan is disbursed from the financing account, of the estimated loan disbursements, repayments of principal, payments of interest, recoveries or proceeds of asset sales, and other payments by or to the government over the life of the loan. These estimated cash flows include the effects of estimated defaults, prepayments, fees, penalties, and expected actions by the government and the borrower within the terms of the loan contract.

**Guaranteed Loan Subsidy Cost.** The estimated long-term cost to the government of a loan guarantee, excluding administrative costs. The Federal Credit Reform Act of 1990 (FCRA) specifies that the credit subsidy cost of a loan guarantee is the net present value, at the time a guaranteed loan is disbursed by the lender, of the following cash flows: (1) estimated payments by the government to cover defaults, delinquencies, interest subsidies, or other payments and (2) the estimated payments to the government, including origination and other fees, penalties, and recoveries.

## Direct Loan

A disbursement of funds by the government to a nonfederal borrower under a contract that requires the repayment of such funds either with or without interest. The term includes the purchase of or the participation in a loan made by a lender; financing arrangements that defer payment for more than 90 days, including the sale of a government asset on credit terms; and loans financed by the Federal Financing Bank (FFB) pursuant to agency loan guarantee authority. It does not include the acquisition of federally guaranteed loans in satisfaction of default or other price support loans of the Commodity Credit Corporation. Under credit reform, the budget records the credit subsidy cost of direct loans as outlays. The subsidies are paid to

the direct loan financing accounts, which, in turn, make the loans to the public.  For more information, see Credit and Insurance and accompanying tables in the President's budget.  (*See also* Asset Sale; Credit Reform, Credit Subsidy Cost, Direct Loan Obligation, *and* Guaranteed Loan *under* Federal Credit.)

## Direct Loan Obligation

A binding agreement by a federal agency to make a direct loan when the borrower fulfills specified conditions.

Under credit reform, direct loan obligations are composed of obligations for both the credit subsidy cost and the unsubsidized amounts of the loan.  When an agency enters into a direct loan obligation, it obligates itself to pay the credit subsidy cost to the direct loan financing account, and the financing account is committed to make the loan to the borrower.  Only the credit subsidy cost is recorded as a budgetary obligation. (*See also* Direct Loan *under* Federal Credit.)

## Guaranteed Loan

A nonfederal loan to which a federal guarantee is attached.  The loan principal is recorded as a guaranteed loan regardless of whether the federal guarantee is full or partial.  For the purposes of the Federal Credit Reform Act of 1990 (FCRA), a loan guarantee is defined as any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a nonfederal borrower to a nonfederal lender, but does not include the insurance of deposits, shares, or other withdrawable accounts in financial institutions.  Under credit reform, the budget records the credit subsidy cost of guaranteed loans as outlays.  The subsidies are paid to the guaranteed loan financing accounts, which hold these uninvested funds to serve as a reserve against future loan defaults or other payments to lenders.  (*See also* Credit Reform, Direct Loan, *and* Loan Guarantee Commitment *under* Federal Credit.)

## Loan Guarantee Commitment

A binding agreement by a federal agency to make a loan guarantee when specified conditions are fulfilled by the borrower, the lender, or any other party to the guarantee agreement. (*See also* Commitment; Credit Reform *and* Guaranteed Loan *under* Federal Credit.)

**Terms and Definitions**

# Federal Credit Reform Act (FCRA)

*See under* Federal Credit.

# Federal Financing Bank (FFB)

A government corporation created by the Federal Financing Bank Act of 1973 under the general supervision of the Secretary of the Treasury. FFB was established to (1) finance federal and federally assisted borrowings in ways that least disrupt private markets, (2) coordinate such borrowing programs with the government's overall fiscal policy, and (3) reduce the costs of such borrowing from the public.

FFB provides financial assistance to or on behalf of federal agencies by (1) making direct loans to federal agencies to help them fund their programs, (2) purchasing loan assets from federal agencies, and (3) making direct loans to nonfederal borrowers (including foreign governments) that are secured by federal agency guarantees against risk of default by borrowers on loan principal and interest payments. FFB obtains funds by borrowing from the Department of the Treasury. For more information, see www.treas.gov/ffb/.

# Feeder Account

Appropriation and revolving fund accounts whose resources are available only for transfer to other specified appropriation or revolving fund accounts.

# Financial Accounting

*See under* Proprietary Accounting.

# Financial Statements

A document that describes an entity's financial activity and status for a specified period. Under federal law and applicable accounting standards, the financial statements for a federal agency usually include a balance sheet, statement of net cost, statement of changes in net position, statement of budgetary resources, and statement of financing.

# Fiscal Policy (Economics Term)

Federal government policies with respect to taxes and spending that affect the level, composition, and distribution of national income and output. The budget process is a major vehicle for determining and implementing federal fiscal policy. Many summary indicators of fiscal policy exist. Some, such as the budget surplus or deficit, are narrowly budgetary. Others attempt to reflect aspects of how fiscal policy affects the economy.

# Fiscal Year

Any yearly accounting period, regardless of its relationship to a calendar year. The fiscal year for the federal government begins on October 1 of each year and ends on September 30 of the following year; it is designated by the calendar year in which it ends. For example, fiscal year 1990 began October 1, 1989, and ended September 30, 1990. (Prior to fiscal year 1977, the federal fiscal year began on July 1 and ended on June 30. The 3-month period, July 1, 1976, to September 30, 1976, between fiscal years 1976 and 1977 is called the transition quarter ("TQ").) (For a more detailed description of the budget process, *see* app. I.)

## Budget Year

A term used in the budget formulation process to refer to the fiscal year for which the budget is being considered, that is, with respect to a session of Congress, the fiscal year of the government that starts on October 1 of the calendar year in which that session of Congress begins.

## Current Year

A term used in the budget formulation process to refer to the fiscal year immediately preceding the budget year under consideration.

## Outyear

In the Concurrent Resolution on the Budget, or in the President's budget submission, any fiscal year (or years) beyond the budget year for which projections are made.

### Prior Year

The fiscal year immediately preceding the current year.

### Program Year

Describes the authorized operating period of a particular program.  The term is usually used to distinguish the program's operating period from the federal government's fiscal year.  For example, a program year may begin on July 1 of a year and end on June 30 of the following year.  Thus, program year 2003 began on July 1, 2003, and ended on June 30, 2004.

## Fixed Appropriation Account

An account in which appropriations are available for obligation for a definite period.  A fixed appropriation account can receive appropriations available for obligation for 1 year (an annual account) or for a specified number of years (a multiyear account).  (For a distinction, *see* No-Year Authority *under* Duration *under* Budget Authority.)

## Forward Funding

Budget authority that is made available for obligation beginning in the last quarter of the fiscal year for the financing of ongoing activities (usually grant programs) during the next fiscal year.  This funding is used mostly for education programs, so that obligations for grants can be made prior to the beginning of the next school year. (For a distinction, *see* Advance Appropriation; Advance Funding; Multiple-Year Authority *under* Duration *under* Budget Authority.)

## Franchise Fund

A type of intragovernmental revolving fund that operates as a self-supporting entrepreneurial entity to provide common administrative services benefiting other federal entities.  These funds function entirely from the fees charged for the services they provide consistent with their statutory authority.  (*See also* Intragovermental Revolving Fund Account *under* Intragovernmental Fund Account *under* Federal Fund Accounts *under* Account in the President's Budget.)

# FTE (Full-Time Equivalent)

Reflects the total number of regular straight-time hours (i.e., not including overtime or holiday hours) worked by employees divided by the number of compensable hours applicable to each fiscal year. Annual leave, sick leave, and compensatory time off and other approved leave categories are considered to be "hours worked" for purposes of defining FTE employment.

# Full Funding

The provision of budgetary resources to cover the total estimated cost of a program or project at the time it is undertaken (regardless of when the funds will actually be obligated). Full funding generally pertains to the acquisition of capital assets, such as the construction of Navy ships or buildings to house federal agencies. (For a distinction, *see* Incremental Funding. *See also* Multiple-Year Authority *under* Duration *under* Budget Authority; Multiyear Budget Planning.)

The term full funding can sometimes refer to the appropriation of the total amount authorized by law. A program is said to be "fully funded" when the appropriation equals the authorized level or when appropriations are sufficient to cover service for all eligible persons or organizations.

# Functional Classification

A system of classifying budget authority, outlays, receipts, and tax expenditures according to the national needs being addressed. Each concurrent resolution on the budget allocates budget authority and outlays among the various functions.

Each budget account appears in the single budget function (for example, national defense or health) that best reflects its major purpose, an important national need. A function may be divided into two or more subfunctions, depending upon the complexity of the national need addressed. (*See also* Budget Activity.)

(For a presentation of the functional classification for the fiscal 2006 budget, *see* app. IV. For a distinction, *see* Object Classification. *See also* Agency Mission; Budget Activity; Subfunction.)

## Fund Accounting

Commonly used to refer to the administrative system of funds control that each agency establishes to ensure compliance with federal fiscal laws.  The statutory basis for fund accounting is found primarily in the requirement of the Antideficiency Act that the head of each agency prescribe, by regulation, a system of funds control (31 U.S.C. § 1514(a)).  (*See also* Antideficiency Act.)



# G

## GDP (Gross Domestic Product) (Economics Term)

The value of all final goods and services produced within the borders of a country such as the United States in a given period, whether produced by residents or nonresidents.  The components of GDP are personal consumption expenditures, gross private domestic investment, net exports of goods and services, and government consumption expenditures and gross investment.  That value is conceptually equal to the sum of incomes generated within the borders of the country in the same time period.  (*See also* GNP; National Income and Product Accounts.)

## GDP Price Index (Economics Term)

A measure of the price level for the whole economy covering the prices of goods and services produced in a country such as the United States.

## Generational Accounting

Estimates who pays for all that the government buys.  Generational accounts estimate the real (inflation-adjusted) net taxes to be paid by the average member of each generation (today's newborns, 1-year-olds, and so on).  They also estimate the net taxes of the average member of the representative future generation (those not yet born).  The accounts project government purchases and net taxes of current generations and calculate their present values.

Generational accounts do not try to estimate who benefits from what the government buys, only who pays for it with their net taxes. They do not try to predict the actual course of policy. Generational accounts act as a gauge, not a predictor or goal. They do not try to say how policy will actually evolve. And they cannot say what distributions are fair; that is a matter of policy, not analysis. The accounts serve only as a norm by which to evaluate prevailing policy and compare alternative policies.

# GNP (Gross National Product) (Economics Term)

The value of all final goods and services produced by labor and capital supplied by residents of a country such as the United States in a given period, whether or not the residents are located within the country. That value is conceptually equal to the sum of incomes accruing to residents of the country in the same time period. GNP differs from GDP in that GNP includes net receipts of income from the rest of the world while GDP excludes them. (*See also* GDP; National Income and Product Accounts.)

# Government Performance and Results Act (GPRA)

The Government Performance and Results Act of 1993. GPRA, also known as the Results Act, intends to improve the efficiency and effectiveness of federal programs by requiring federal agencies to develop strategic plans, annual performance plans, and annual program performance reports.

# Government-Sponsored Enterprise (GSE)

A privately owned and operated federally chartered financial institution that facilitates the flow of investment funds to specific economic sectors. GSEs, acting as financial intermediaries, provide these sectors access to national capital markets. The activities of GSEs are not included in the federal budget's totals because they are classified as private entities. However, because of their relationship to the government, detailed statements of financial operations and conditions are presented as supplementary information in the budget document. For the purposes of the Congressional Budget Act of 1974, as amended (2 U.S.C. § 622(8)), an entity must meet certain criteria to qualify as a GSE. (For distinctions, *see* Mixed-Ownership Government Corporation; Off-Budget; Wholly-Owned Government Corporation.)

## GPRA

*See under* Government Performance and Results Act.

## Gramm-Rudman-Hollings (GRH)

The popular name of the Balanced Budget and Emergency Deficit Control Act of 1985, so named for the Senate sponsors:  Senators Phil Gramm, Warren Rudman, and Ernest F. Hollings.  The act, a mechanism for reducing the federal deficit, set declining deficit targets for the federal government and established an automatic enforcement mechanism called sequestration.  GRH has been amended several times, most significantly by the Budget Enforcement Act of 1990 (BEA) and the Balanced Budget Act of 1997.  (*See also* Budget Enforcement Act; Discretionary; Limitation; Mandatory; Sequestration.)

## Grant

A federal financial assistance award making payment in cash or in kind for a specified purpose.  The federal government is not expected to have substantial involvement with the state or local government or other recipient while the contemplated activity is being performed.  The term "grant" is used broadly and may include a grant to nongovernmental recipients as well as one to a state or local government, while the term "grant-in-aid" is commonly used to refer only to a grant to a state or local government.  (For a more detailed description, *see* the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. §§ 6301–6308.)  The two major forms of federal grants-in-aid are block and categorical.

Block grants are given primarily to general purpose governmental units in accordance with a statutory formula.  Such grants can be used for a variety of activities within a broad functional area.  Examples of federal block grant programs are the Omnibus Crime Control and Safe Streets Act of 1968, the Housing and Community Development Act of 1974, and the grants to states for social services under title XX of the Social Security Act.

Categorical grants can be used only for specific programs or for narrowly defined activities.  They may be formula or project grants.  Formula grants allocate federal funds to states or their subdivisions in accordance with a distribution formula prescribed by law or administrative regulation.  Project grants provide federal

funding for fixed or known periods for specific projects or the delivery of specific services or products.



# I

## Identification Code

Each appropriation or fund account in the President's budget carries an 11-digit code that identifies (1) the agency, (2) the account, (3) the nature or timing of the transmittal to Congress (for example, regular budget cycle or supplemental), (4) the type of fund, and (5) the account's functional and subfunctional classifications. (For a detailed explanation of the account identification code, *see* app. V.)

## Implicit Price Deflator (Economics Term)

Weighted averages of the most detailed price indexes used in estimating real output. Before 1995, implicit price deflators were calculated as the ratio of current- to constant-dollar output multiplied by 100. Since 1995, implicit price deflators have been calculated as the ratio of current- to chained-dollar output multiplied by 100. For all but the most recent estimates, the implicit price deflators are identical to the chain-type price indexes because the weights used to aggregate the detailed prices for the two measures are the same. Implicit price deflators are used in the National Income and Product Accounts (NIPA). (*See also* Chain Price Indexes; Chained Dollars.)

## Impoundment

Any action or inaction by an officer or employee of the federal government that precludes obligation or expenditure of budget authority. There are two types of impoundments: deferrals and proposed rescissions. Not all delays in obligating funds are deferrals. Sometimes obligation delays are due to legitimate programmatic reasons or the result of outside forces not under the agency's control; for example, an agency administering a grant program receives no grant applications so no grants can be made. (*See also* Congressional Budget and Impoundment Control Act of 1974; Deferral of Budget Authority; Rescission.)

## Incremental Funding

The provision or recording of budgetary resources for a program or project based on obligations estimated to be incurred within a fiscal year when such budgetary resources are provided for only part of the estimated cost of the acquisition. (For a distinction, *see* Full Funding.)

## Inflation (Economics Term)

A rise in the general price level.

## Inflator (Economics Term)

An index used to express a current dollar amount in prices of another period.

## Internal Control

An integral component of an organization's management that provides reasonable assurance that the following objectives are being achieved: (1) effectiveness and efficiency of operations, (2) reliability of financial reporting, and (3) compliance with applicable laws and regulations. Safeguarding of assets is a subset of all three of these objectives.



## Joint Resolution

A form of legislation (designated with S.J. Res. or H.J. Res.) that is either:

(1) A congressional action typically used in dealing with matters such as a single appropriation for a specific purpose, increasing the statutory limit on the public debt, or continuing appropriations. There is no real difference between a bill and a joint resolution; both require a majority vote and become law in the same manner, that is, by bicameral enactment and signature of the President.

Terms and Definitions

(2) A congressional action used to propose amendments to the Constitution. Adoption of a joint resolution to propose a constitutional amendment requires a two-thirds majority vote by both the Senate and the House and is not presented to the President for approval.  A proposed amendment becomes effective only when ratified by three-fourths of the states.

(*See also* Continuing Appropriation/Continuing Resolution.  For a distinction, *see* Concurrent Resolution on the Budget.)

## Justification

The documents an agency submits to the appropriations committees in support of its budget request.  The Office of Management and Budget (OMB) prescribes justification materials, which typically explain changes between the current appropriation and the amounts requested for the next fiscal year.



## Lease-Purchase

An agreement between a lessor and lessee in which the lessee agrees to lease a building or other property for a specified length of time and then takes title to the building or other property at the end of the lease period.  (*See also* Capital Lease; Operating Lease.)

## Liability

Defined differently for obligational (or budgetary) and proprietary (or financial) accounting purposes (*see* app. III).

Obligational (or budgetary) accounting, designed to ensure compliance with fiscal laws, is based on the concept of *legal* liability. A legal liability is a claim that may be legally enforced against the government.  It may be created in a variety of ways, such as by signing a contract, grant, or cooperative agreement or by operation of law.  (*See also* Obligation.)

Proprietary (or financial) accounting, designed to generate data for financial statement purposes, is based on the concept of *accounting* liability.  For federal financial accounting purposes, a liability is a probable future outflow or other sacrifice of resources as a result of past transactions or events.  Generally, liabilities are thought of as amounts owed for items or services received, assets acquired, construction performed (regardless of whether invoices have been received), an amount received but not yet earned, or other expenses incurred.  (*See also* Contingent Liability.)

## Life-Cycle Costs

The overall estimated cost, both government and contractor, for a particular program alternative over the time period corresponding to the life of the program, including direct and indirect initial costs plus any periodic or continuing costs of operation and maintenance.

## Limitation

A restriction on the amount, purpose, or period of availability of budget authority. While limitations are most often established through appropriations acts, they may also be established through authorization legislation.  Limitations may be placed on the availability of funds for program levels, administrative expenses, direct loan obligations, loan guarantee commitments, or other purposes.  (*See also* Administrative Division or Subdivision of Funds; Apportionment; Appropriation Act; Appropriation Rider; Authorizing Legislation; Duration *under* Budget Authority.)

## Line Item

In executive budgeting, a particular expenditure, such as program, subprogram, or object class.  For purposes of the concurrent budget resolution, it usually refers to assumptions about particular programs or accounts implicit but not explicit in the budget resolution.  In appropriation acts, it usually refers to an individual account or part of an account for which a specific amount is available.  (*See also* Line Item Veto; Obligated Balance *under* Obligational Authority; Appropriation Rider.)

## Line Item Veto

A phrase used to describe an executive power to veto or "cross out" only certain parts of legislation while allowing the rest of the legislation to become law.  At the federal level, legislation granting the President a line item veto has been declared unconstitutional.  The line item veto exists at the state level because their constitutions grant the power to the governors in forms that vary from state to state.  Some states only permit line item vetoes in bills appropriating money.

Several legislative initiatives have been introduced in Congress over the years to give the President expanded or enhanced rescission or line item veto authority.  In 1996 the Line Item Veto Act was enacted authorizing the President, after signing a bill into law, to cancel in whole any dollar amount of discretionary budget authority, any item of new direct spending, or any limited tax benefit if the President made certain determinations.  In 1998, the United States Supreme Court in *Clinton v. City of New York*, 524 U.S. 417 (1998), held that the Line Item Veto Act violated the Presentment Clause, article 1, section 7, of the U.S. Constitution.  Under that clause, the President must accept or veto in its entirety any bill passed by Congress.  Granting the President line item veto authority would require a constitutional amendment.  See also "Account" in the Department of the Treasury's Annual Report Appendix.  (*See also* Discretionary; Enhanced Rescission *and* Expedited Rescission *under* Rescission; Line Item; Mandatory; Separate Enrollment.)

## Liquidating Appropriation

An appropriation to pay obligations incurred pursuant to substantive legislation, usually contract authority.  A liquidating appropriation is not recorded as budget authority.

## Lockbox

In the budget context, any of several legislative mechanisms that attempt to isolate, or "lock away," funds of the federal government for purposes such as reducing federal spending, preserving surpluses, or protecting the solvency of trust funds.

Terms and Definitions



## Mandatory

A term that usually modifies either "spending" or "amount." "Mandatory spending," also known as "direct spending," refers to budget authority that is provided in laws other than appropriation acts and the outlays that result from such budget authority. Mandatory spending includes entitlement authority (for example, the Food Stamp, Medicare, and veterans' pension programs), payment of interest on the public debt, and nonentitlements such as payments to states from Forest Service receipts. By defining eligibility and setting the benefit or payment rules, Congress controls spending for these programs indirectly rather than directly through appropriations acts. "Mandatory amount" refers to the level of budget authority, outlays, or other budgetary resources that are controlled by laws other than appropriations acts. Budget authority provided in annual appropriations acts for certain programs is treated as mandatory because the authorizing legislation entitles beneficiaries to receive payment or otherwise obligates the government to make payment. (*See also* Appropriated Entitlement; Appropriations *under* Forms of Budget Authority *under* Budget Authority; Multiple-Year Authority *and* No-Year Authority *under* Duration *under* Budget Authority; Committee Allocation; Direct Spending Authority; Discretionary; Entitlement Authority; Gramm-Rudman-Hollings.)

## Mark-Up

Meetings where congressional committees work on language of bills or resolutions. For example, at Budget Committee mark-ups, the House and Senate Budget Committees work on the language and numbers contained in budget resolutions and legislation affecting the congressional budget process.

## Means of Financing

Ways in which a budget deficit is financed or a budget surplus is used. A budget deficit may be financed by the Department of the Treasury (Treasury) (or agency) borrowing, by reducing Treasury cash balances, by the sale of gold, by seigniorage, by net cash flows resulting from transactions in credit financing accounts, by allowing

certain unpaid liabilities to increase, or by other similar transactions.  It is customary to separate total means of financing into "change in debt held by the public" (the government's debt, which is the primary means of financing) and "other means of financing" (seigniorage, change in cash balances, transactions of credit financing accounts, etc.).  (*See also* Debt, Federal; Debt Service; Financing Account *under* Credit Reform Accounts *under* Federal Credit; Seigniorage.)

# Mid-Session Review of the Budget

A supplemental summary and update of the budget that the President submitted to Congress in January or February of that year.  Section 1106 of title 31 of the *United States Code* requires the mid-session review to contain revised estimates of budget receipts, outlays, and budget authority and other summary information and that it be issued by July 15 of each year.  (*See also* Budget Update.)

# Mixed-Ownership Government Corporation

An enterprise or business activity designated by the Government Corporation Control Act (31 U.S.C. § 9101) or some other statute as a mixed-ownership government corporation.  The fiscal activities of some mixed-ownership government corporations appear in the budget.  The Federal Deposit Insurance Corporation (FDIC) is an example of such a corporation.  (For distinctions, *see* Government-Sponsored Enterprise; Off-Budget; Wholly-Owned Government Corporation.)

# Monetary Policy (Economics Term)

A policy affecting the money supply, interest rates, and credit availability that is intended to achieve maximum sustainable output and employment and to promote stable prices (interpreted as a low-inflation environment in practice).  Monetary policy is directed by the Federal Reserve System.  It functions by influencing the cost and availability of bank reserves through (1) open-market operations (the purchase and sale of securities, primarily Treasury securities), (2) changes in the ratio of reserves to deposits that commercial banks are required to maintain, (3) changes in the discount rate, and (4) changes in the federal fund rate.  (*See also* Discount Rate; Fiscal Policy.)

Terms and Definitions

## Money Supply (Economics Term)

Anything that is generally accepted in payment for goods and services or in the repayment of debt. Narrow definitions of the money supply include currency and checking accounts, while broader definitions include other types of assets, such as savings deposits and money market mutual funds.

## Monthly Treasury Statement (MTS)

A summary statement prepared from agency accounting reports and issued by the Department of the Treasury (Treasury). The MTS presents the receipts, outlays, resulting budget surplus or deficit, and federal debt for the month and the fiscal year to date and a comparison of those figures to those of the same period in the previous year. Treasury also issues the Daily Treasury Statement (DTS), which is published every working day of the federal government. It provides data on Treasury's cash and debt operations.

## Multiyear Budget Planning

A process—such as the one used to develop the President's budget and the congressional budget resolution—designed to ensure that the longer range consequences of budget decisions are identified and reflected in the budget totals. The President's (or executive) budget includes multiyear planning estimates for budget authority, outlays, and receipts for 4 years beyond the budget year. As of the date of this glossary, the congressional budget resolution provided budget totals for the budget year and, at least, each of the 4 succeeding fiscal years. This process provides a structure for the review and analysis of long-term program and tax policy choices.

The Office of Management and Budget (OMB) planning estimates are either presidential policy or current services estimates. Presidential policy estimates represent projections or extrapolations of likely outcomes based upon current law and enunciated administration policy. In some cases, outyear presidential policy estimates represent outyear policy rather than an extrapolation from budget-year policy. Current services estimates represent projections of possible outcomes based on the continuation of existing levels of service without policy changes. (*See also* Current Services Estimates; Full Funding; Outyear *under* Fiscal Year; Projections.)



# National Income and Product Accounts (NIPA) (Economics Term)

The comprehensive set of accounts prepared and published by the Department of Commerce that measures the total value of goods and services (gross domestic product, or GDP) produced by the U.S. economy and the total income earned in producing that output.

## Net Present Value (Economics Term)

The present value of the estimated future cash inflows minus the present value of the cash outflows.

## Nominal Dollar (Economics Term)

*See under* Current Dollar.

## Nonbudgetary

A term used to refer to transactions of the government that do not belong within the budget. Nonbudgetary transactions (such as deposit funds, direct loan and loan guarantee financing accounts, and seigniorage) do not belong in the budget because they do not represent net budget authority or outlays, but rather are means of financing. This contrasts with "off-budget," which refers to activities that are budgetary in nature but are required by law to be excluded from the budget. (*See* Off-Budget; Means of Financing.)

Terms and Definitions



# Object Classification

A uniform classification identifying the obligations of the federal government by the types of goods or services purchased (such as personnel compensation, supplies and materials, and equipment) without regard to the agency involved or the purpose of the programs for which they are used.  If the obligations are in a single object classification category, the classification is identified in the Program and Financing Schedule in the President's budget.  For the activities distributed among two or more object classification categories, the budget has a separate object classification schedule to show the distribution of the obligations by object classification.  See also Explanation of Estimates in the "Detailed Budget Estimates" section of the President's budget.  General instructions are provided in OMB Circular No. A-11, revised.  (*See also* Allocation.  For a distinction, *see* Functional Classification.)

# Obligation

A definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States.  Payment may be made immediately or in the future.  An agency incurs an obligation, for example, when it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to another.  The standards for the proper reporting of obligations are found in section 1501(a) of title 31 of the *United States Code*.  See also OMB Circular No. A-11.

# Obligation Limitation

*See under* Limitation.

# Obligational Accounting

The accounting systems, processes, and people involved in collecting financial information necessary to control, monitor, and report on all funds made available to federal entities by legislation, including permanent, indefinite appropriations as well as appropriations enacted in annual and supplemental appropriations laws that may be available for one or multiple fiscal years.  It is through obligational accounting that agencies ensure compliance with fiscal laws, including the Antideficiency Act and statutes related to the purpose and period of availability of appropriations. Obligational accounting rests on the central concepts of the "obligation" and "disbursement" of public funds, as those terms are defined in this glossary.  The Antideficiency Act, codified in part at sections 1341, 1514, and 1517, and the provisions of section 1501 (commonly referred to as the recording statute) of the *United States Code* provide the fundamental components of obligational accounting. Obligational accounting is sometimes also referred to as "fund control accounting," "appropriation accounting," and "budgetary accounting."  (For a discussion of the method for tracking funds in the federal government, *see* app. III.  *See also* Administrative Division or Subdivision of Funds; Antideficiency Act; Apportionment; Disbursements; Obligation.)

# Obligational Authority

The sum of (1) budget authority enacted for a given fiscal year, (2) unobligated balances of amounts that have not expired brought forward from prior years, (3) amounts of offsetting collections to be credited and available to specific funds or accounts during that year, and (4) budget authority transferred from other funds or accounts.  The balance of obligational authority is an amount carried over from one year to the next if the budget authority is available for obligation in the next fiscal year.  Not all obligational authority that becomes available in a fiscal year is obligated and paid out in that same year.  Balances are described as (1) obligated, (2) unobligated, or (3) unexpended.

## Obligated Balance

The amount of obligations already incurred for which payment has not yet been made.  Technically, the obligated balance is the unliquidated obligations.  Budget authority that is available for a fixed period expires at the end of its period of availability, but the obligated balance of the budget authority remains available to liquidate obligations for 5 additional fiscal years.  At the end of the fifth fiscal year, the

account is closed and any remaining balance is canceled.  Budget authority available for an indefinite period may be canceled, and its account closed if (1) it is specifically rescinded by law or (2) the head of the agency concerned or the President determines that the purposes for which the appropriation was made have been carried out and disbursements have not been made from the appropriation for 2 consecutive years. (*See also* Duration *under* Budget Authority; Fixed Appropriation Account.)

## Unobligated Balance

The portion of obligational authority that has not yet been obligated.  For an appropriation account that is available for a fixed period, the budget authority expires after the period of availability ends but its unobligated balance remains available for 5 additional fiscal years for recording and adjusting obligations properly chargeable to the appropriations period of availability.  For example, an expired, unobligated balance remains available until the account is closed to record previously unrecorded obligations or to make upward adjustments in previously underrecorded obligations, such as contract modifications properly within scope of the original contract.  At the end of the fifth fiscal year, the account is closed and any remaining balance is canceled.  For a no-year account, the unobligated balance is carried forward indefinitely until (1) specifically rescinded by law or (2) the head of the agency concerned or the President determines that the purposes for which the appropriation was made have been carried out and disbursements have not been made from the appropriation for 2 consecutive years.  (*See also* Duration *under* Budget Authority; Expired Account; Expired Budget Authority *under* Availability for New Obligations *under* Budget Authority; Fixed Appropriation Account.)

## Unexpended Balance

The sum of the obligated and unobligated balances.

# Off-Budget

Those budgetary accounts (either federal or trust funds) designated by law as excluded from budget totals.  As of the date of this glossary, the revenues and outlays of the two Social Security trust funds (the Old-Age and Survivors Insurance Trust Fund and the Disability Insurance Trust Fund) and the transactions of the Postal Service are the only off-budget accounts.  The budget documents routinely report the on-budget and off-budget amounts separately and then add them together to arrive at the consolidated government totals.  (*See also* Nonbudgetary; On-Budget; Outlay;

Trust Fund Expenditure Account *under* Trust Fund Accounts *under* Account in the President's Budget; Unified Budget.)

# OMB Circular No. A-11

Document that provides detailed guidance to executive departments and establishments by the Office of Management and Budget (OMB) for preparing and submitting the President's budget and executing the budget.

# On-Budget

All budgetary accounts other than those designated by law as off-budget. (*See also* Off-Budget.)

# Operating Budget

A detailed projection of all estimated income and expenses during a given future period.

# Operating Lease

An agreement conveying the right to use property for a limited time in exchange for periodic payments. Operating lease criteria are ownership of the asset remains with lessor, the lease does not contain a bargain-price purchase option, the lease term does not exceed 75 percent of the estimated economic life of the asset, the present value of the minimum lease payments over the life of the lease does not exceed 90 percent of the fair market value of the asset at the beginning of the lease term, the asset is a general purpose asset rather than being for a special purpose of the government and is not built to the unique specification of the government as lessee, and there is a private sector market for the asset. (*See also* Capital Lease.)

# Outlay

The issuance of checks, disbursement of cash, or electronic transfer of funds made to liquidate a federal obligation. Outlays also occur when interest on the Treasury debt held by the public accrues and when the government issues bonds, notes, debentures,

monetary credits, or other cash-equivalent instruments in order to liquidate obligations.  Also, under credit reform, the credit subsidy cost is recorded as an outlay when a direct or guaranteed loan is disbursed.  An outlay is not recorded for repayment of debt principal, disbursements to the public by federal credit programs for direct loan obligations and loan guarantee commitments made in fiscal year 1992 or later, disbursements from deposit funds, and refunds of receipts that result from overpayments.

Outlays during a fiscal year may be for payment of obligations incurred in prior years (prior-year obligations) or in the same year.  Outlays, therefore, flow in part from unexpended balances of prior-year budgetary resources and in part from budgetary resources provided for the year in which the money is spent.

Outlays are stated both gross and net of offsetting collections.  (*See* Offsetting Collections *under* Collections.)  Total government outlays include outlays of off-budget federal entities.  (*See also* Expenditure; Expense.)

## Outyear

*See under* Fiscal Year.

## Oversight Committee

The congressional committee charged with general oversight of an agency's or program's operations.  In most cases, the oversight committee for an agency or program is also its authorizing committee.  The Senate Committee on Homeland Security and Governmental Affairs and the House Committee on Government Reform also have general oversight on budget and accounting measures other than appropriations, except as provided in the Congressional Budget Act of 1974.  (*See also* Authorizing Committee.)

# P

## Pay-as-You-Go (PAYGO)

A budgetary enforcement mechanism originally set forth in the Budget Enforcement Act (BEA), which effectively expired at the end of fiscal year 2002.  Under this mechanism, proposed changes in, or new permanent, law were expected to be deficit neutral in the aggregate in the fiscal year of enactment or in a period of years.  PAYGO was intended to control growth in direct spending and tax legislation.  The Senate, in the concurrent resolution on the budget, has established an internal rule enforcing a requirement that direct spending or receipts legislation under consideration in the Senate be deficit neutral over certain periods of time.  This Senate PAYGO rule is enforced by points of order.  (*See also* Point of Order; Sequestration.)

## Performance Budgeting

Generally understood to refer to the infusion of performance information into the resource allocation process used to develop budget proposals or to execute an agreed-upon budget.  Also known as results-based budgeting.  (*See* Government Performance and Results Act.)

### Agency Mission Statement

Defines the basic purpose, major functions, and operations of the agency.  (*See* Strategic Plan *under* Performance Budgeting.)

### Outcome Measure

An assessment of the result, effect, or consequence that will occur from carrying out a program or activity compared to its intended purpose.

### Output Goal

A description of the level of activity or effort that will be produced or provided over a period or by a specified date, including a description of the characteristics and

attributes (e.g., timeliness) established as standards in the course of conducting the activity or effort.

## Output Measure

The level of activity or effort of a program (i.e., the products and services delivered) over a period that can be expressed quantitatively or qualitatively.

## Performance and Accountability Report (PAR)

Provides financial and performance information that enables Congress, the President, and the public to assess the performance of an organization relative to its mission and for management to be accountable for its actions and resources. The Office of Management and Budget (OMB) provides guidance on the contents of the PARs, which integrate the reporting requirements of several laws, including (1) the Chief Financial Officers Act of 1990, (2) the Federal Managers' Financial Integrity Act of 1982, (3) the Government Management Reform Act of 1994, (4) the Government Performance and Results Act (GPRA) of 1993, and (5) the Reports Consolidation Act of 2000.

## Performance Budget

A presentation that links strategic goals with related long-term and annual performance goals and with the costs of specific activities that contribute to the achievement of those goals.

## Performance Goal

A target level of performance expressed as a tangible, measurable objective, against which actual achievement can be compared, including a goal expressed as a quantitative standard, value, or rate.

## Performance Measure/Performance Indicator

A particular value or characteristic used to measure output, outcome, or efficiency of an organization or program. Performance measures are associated with performance goals in the annual performance plan.

## Performance Plan

A plan that covers each program activity set forth in an agency's budget.  It establishes performance goals to define the level of performance to be achieved by a program activity; expresses such goals in an objective, quantifiable, and measurable form; briefly describes the operational processes, skills, technology, and resources required to meet the performance goals; establishes performance indicators to be used in measuring or assessing the relevant outputs, service levels, and outcomes of each program activity; provides a basis for comparing actual program results with the established performance goals; and describes the means to be used to verify and validate measured values.

## Performance Report

A report that sets forth the performance indicators established in the agency performance plan under the Government Performance and Results Act (GPRA) of 1993, along with the actual program performance achieved compared with the performance goals expressed in the plan for that fiscal year.

## Program Activity

A specific activity or project as listed in the program and financing schedules of the President's budget.

## Strategic Goal/Strategic Objective

A statement of aim or purpose included in a strategic plan (required under the Government Performance and Results Act (GPRA) of 1993) that defines how an agency will carry out a major segment of its mission over a certain period.  The goal is expressed in a manner that allows a future assessment to be made of whether the goal was or is being achieved. In a performance budget/performance plan, strategic goals should be used to group multiple program outcome goals; the program outcome goals should relate to and in the aggregate be sufficient to influence the strategic goals or objectives and their performance measures.

## Strategic Plan

Federal agency plan containing the organization's comprehensive mission statement, general goals and objectives, description of how the goals and objectives are to be achieved, description of how performance goals are related to the general goals and

**Terms and Definitions**

objectives, identification of key external factors, and description of program evaluations used to establish the general goals and objectives. Strategic plans must cover a period of not less than 5 years and must be updated and revised at least every 3 years.

## Performance Measurement

The ongoing monitoring and reporting of program accomplishments, particularly progress toward preestablished goals. It is typically conducted by program or agency management.

Performance measures may address the type or level of program activities conducted (process), the direct products and services delivered by a program (outputs), or the results of those products and services (outcomes).

A program may be any activity, project, function, or policy that has an identifiable purpose or set of objectives. (*See also* Performance Budgeting; Government Performance and Results Act.)

## Point of Order

An objection raised on the House or Senate floor or in committees to an action being taken as contrary to that body's rules. In the House, for example, a point of order may be raised under Rule XXI objecting to an appropriation in an appropriation bill that was not previously authorized by law.

Many of the rules established in the Congressional Budget Act and related rules preclude the consideration of legislation that would violate totals in the budget resolutions, spending limits, or committee allocations. These rules are typically enforced through points of order. Points of order may be waived by a majority vote in the House. In the Senate, only points of order under the Budget Act may be waived (not points of order against actions that violate the Senate's standing rules), but the waiver generally requires a three-fifths vote. (*See also* Concurrent Resolution on the Budget; Congressional Budget Act.)

## Present Value (Economics Term)

The worth of a future stream of returns or costs in terms of money paid immediately (or at some designated date). (Differs from Net Present Value.) A dollar available at some date in the future is worth less than a dollar available today because the latter could be invested at interest in the interim. In calculating present value, prevailing interest rates provide the basis for converting future amounts into their "money now" equivalents. (*See also* Discount Rate; Net Present Value.)

## President's Budget

The document sent to Congress by the President in January or February of each year, as required by law (31 U.S.C. § 1105), requesting new budget authority for federal programs and estimating federal revenues and outlays for the upcoming fiscal year and 4 subsequent outyears. Although the title of the document is *Budget of the U.S. Government*, it represents proposals for congressional consideration. (*See also* Budget; app. I.)

## Program

Generally, an organized set of activities directed toward a common purpose or goal that an agency undertakes or proposes to carry out its responsibilities. Because the term has many uses in practice, it does not have a well-defined, standard meaning in the legislative process. It is used to describe an agency's mission, functions, activities, services, projects, and processes. (*See also* Program, Project, or Activity.)

## Program Account

*See under* Credit Program Account *under* Credit Reform Act Accounts *under* Federal Credit.

## Program and Financing Schedule

A schedule published in the President's budget "Detailed Budget Estimates" presenting budget data by each appropriation or fund account. The schedule consists of eight sections: (1) obligations by program activity; (2) budgetary resources available for obligation; (3) new budget authority (gross), detail; (4) change in

**Terms and Definitions**

obligated balances; (5) outlays (gross), detail; (6) offsets to gross budget authority and outlays; (7) net budget authority and outlays; (8) and memorandum (non add) entries. (For a detailed discussion of the program and financing schedule, *see* app. VI. *See also* Account in the President's Budget.)

## Program Evaluation

An individual systematic study conducted periodically or on an ad hoc basis to assess how well a program is working.  It is often conducted by experts external to the program, either inside or outside the agency, as well as by program managers.  A program evaluation typically examines achievement of program objectives in the context of other aspects of program performance or in the context in which it occurs. (*See also* Performance Budgeting; Performance and Accountability Report *under* Performance Budgeting; Government Performance and Results Act.)

## Program, Project, or Activity (PPA)

An element within a budget account.  For annually appropriated accounts, the Office of Management and Budget (OMB) and agencies identify PPAs by reference to committee reports and budget justifications; for permanent appropriations, OMB and agencies identify PPAs by the program and financing schedules that the President provides in the "Detailed Budget Estimates" in the budget submission for the relevant fiscal year.  Program activity structures are intended to provide a meaningful representation of the operations financed by a specific budget account—usually by project, activity, or organization.

## Projections

Estimates of budget authority, outlays, receipts, or other budget amounts extending several years into the future.  Projections are generally intended to indicate the budgetary implications of existing or proposed programs and legislation.  Projections may include alternative program and policy strategies and ranges of possible budget amounts.  Projections are not firm estimates of what will occur in future years, nor are they intended to be recommendations for future budget decisions.

The statutory basis for preparing and submitting projections is spelled out (1) for the President in section 201(a) of the Budget and Accounting Act (31 U.S.C. § 1105) and (2) for Congress and the Congressional Budget Office (CBO) in sections 202, 308, and

402 of the Congressional Budget and Impoundment Control Act (2 U.S.C. §§ 601, 639, and 653).  (*See also* Baseline; Budget Estimates; Multiyear Budget Planning.)

## Proprietary Accounting

Involves federal entities recording and accumulating financial information on transactions and balances for purposes of reporting both internally to management and externally in an entity's financial statements.  "Proprietary accounting" is also referred to as "financial accounting" and is usually based on generally accepted accounting principles (GAAP), which follow established conventions, such as the recognition of the depreciation of capital assets over time as expenses, instead of recognition on the basis of strict association with the obligation or expenditure of appropriated funds.  Most federal entities are subject to proprietary accounting standards promulgated through the Federal Accounting Standards Advisory Board (FASAB).  (For a discussion of the methods for tracking funds in the federal government, *see* app. III.  *See also* Federal Accounting Standards Advisory Board.)

## Proprietary Accounts

*See under Standard General Ledger (SGL)* Chart of Accounts.

## Public-Private Partnership

An arrangement between a public agency (federal, state, or local) and a for-profit corporation.  Each sector (public and private) contributes skills and assets in delivering a service or facility for the use of the general public or the parties to the partnership.

# R

## Real Dollar (Economics Term)

A dollar value adjusted to remove the effects of inflation by dividing the nominal value (also called the current dollar value) by the appropriate price index.  The

resulting amount can be labeled real or inflation adjusted.  Real dollar values can reflect a measure of purchasing power, such as real income, or a measure of quantity, such as real GDP.  Real dollar is frequently called constant dollar when referring to measures of purchasing power.

# **Real Economic Growth** (Economics Term)

The increase in GDP, adjusted for inflation.

# **Real Interest Rate**

A measure of an interest rate adjusted to remove the effects of expected general inflation.

# **Real Measures** (Economics Term)

Measures of interest rates and prices for specific commodities adjusted to remove the effects of general inflation (i.e., real interest rates and real prices).

# **Reapportionment**

A revision of a previous apportionment of budgetary resources for an appropriation or fund account.  The Office of Management and Budget (OMB) reapportions just as it apportions.  Agencies usually submit requests for reapportionment to OMB as soon as a change becomes necessary due to changes in amounts available, program requirements, or cost factors.  For exceptions, see OMB Circular No. A-11, sec. 120. This approved revision would ordinarily cover the same period, project, or activity covered in the original apportionment.  (*See also* Allotment; Apportionment.)

# **Reauthorization**

Legislation that renews an expiring or expired authorization that was in effect for a fixed period, with or without substantive change.  (*See also* Authorizing Legislation.)

Terms and Definitions

## Receipts

*See under* Governmental Receipts *under* Collections.

## Recession (Economics Term)

A pervasive, substantial decline in overall business activity that is of at least several months' duration.  The National Bureau of Economic Research identifies recessions on the basis of several indicators.  As a rule of thumb, recessions are commonly identified by a decline in real GDP for at least two consecutive quarters.

## Reconciliation

A process Congress uses to reconcile amounts determined by tax, spending, credit, and debt legislation for a given fiscal year with levels set in the concurrent resolution on the budget for the year.  Section 310 of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 641) provides that the resolution may direct committees to determine and recommend changes to laws and pending legislation as required to conform to the resolution's totals for budget authority, revenues, and the public debt.  Such changes are incorporated into either a reconciliation resolution or a reconciliation bill.  (*See also* Concurrent Resolution on the Budget; Congressional Budget Act.)

## Reconciliation Bill

A bill reported pursuant to reconciliation instructions in a congressional budget resolution proposing changes in laws that if enacted, would achieve the budgetary goals set forth in the budget resolution.  (*See also* Congressional Budget Act.)

## Reconciliation Instruction

A provision in a concurrent budget resolution directing one or more committees to report (or submit to the House and Senate Budget Committees) legislation changing existing laws or pending legislation in order to bring spending, revenues, or debt limit into conformity with the budget resolution.  The instructions specify the committees to which they apply, indicate the appropriate total dollar changes to be achieved, and usually provide a deadline by which the legislation is to be reported or submitted.

**Terms and Definitions**

## Reconciliation Resolution

A concurrent resolution (i.e., a resolution that the President does not sign) reported pursuant to reconciliation instructions in a congressional budget resolution directing the Clerk of the House of Representatives or the Secretary of the Senate to make specified changes in bills and joint resolutions that have not been enrolled to bring direct spending or revenue laws into conformity with the budget resolution.

## Reduction

Cancellation of the availability of budgetary resources previously provided by law before the authority would otherwise lapse. Reductions can be account specific and across-the-board. (*See also* Rescission; Sequestration.)

## Refunds

Either (1) the return of money that the government improperly collected or collected in excess of the amount owed (for example, refund is money owed to taxpayers by the government when their total tax payments are greater than their total tax) or (2) money returned as an appropriation by outside sources for payments that the government made in error, overpayments, or adjustment for previous amounts disbursed. (*See also under* Offsetting Collections *under* Collections.)

## Reimbursement

A sum (1) that is received by an agency as a payment for commodities sold or services furnished either to the public or to another government account and (2) that is authorized by law to be credited directly to specific appropriation and fund accounts. Reimbursements between two accounts for goods or services are usually expenditure transactions/transfers.

Anticipated reimbursements are, in the case of transactions with the public, estimated collections of expected advances to be received or expected reimbursements to be earned. In transactions between government accounts, anticipated reimbursements consist of orders expected to be received for which no orders have been accepted. Agencies cannot obligate against anticipated reimbursements without specific statutory authority. (*See also* Offsetting Collections *under* Collections; Unfilled Customer Orders.)

Terms and Definitions

## Reobligation

Obligation of deobligated funds for a different authorized use. (*See also* Deobligation.)

## Reprogramming

Shifting funds within an appropriation or fund account to use them for purposes other than those contemplated at the time of appropriation; it is the shifting of funds from one object class to another within an appropriation or from one program activity to another. While a transfer of funds involves shifting funds from one account to another, reprogramming involves shifting funds within an account. (For a distinction, *see* Transfer.)

Generally agencies may shift funds within an appropriation or fund account as part of their duty to manage their funds. Unlike transfers, agencies may reprogram without additional statutory authority. Nevertheless, reprogramming often involves some form of notification to the congressional appropriations committees, authorizing committees, or both. Sometimes committee oversight of reprogramming actions is prescribed by statute and requires formal notification of one or more committees before a reprogramming action may be implemented.

## Rescission

Legislation enacted by Congress that cancels the availability of budget authority previously enacted before the authority would otherwise expire.

The Impoundment Control Act of 1974 (2 U.S.C. § 683) provides for the President to propose rescissions whenever the President determines that all or part of any budget authority will not be needed to carry out the full objectives or scope of programs for which the authority was provided. Rescissions of budget authority may be proposed for fiscal policy or other reasons.

All funds proposed for rescission must be reported to Congress in a special message. Amounts proposed for rescission may be withheld for up to 45 calendar days of continuous session while Congress considers the proposals. If both houses have not completed action on a rescission bill rescinding all or part of the amount proposed by the President for rescission in his special message within 45 calendar days of

continuous session, any funds being withheld must be made available for obligation. Congress may also initiate rescissions. Such congressional action occurs for various reasons, including changing priorities, program terminations, excessive unobligated balances, offsets, and program slippage. (*See also* Apportionment; Budgetary Reserves; Deferral of Budget Authority; Impoundment; Reduction; Rescission Bill *under* Rescission.)

## Enhanced Rescission

Legislative initiatives, proposed over the years, that would allow the President to withhold funds from obligation upon proposing a rescission and to continue withholding the funds unless and until Congress acts to disapprove the presidential proposal to rescind funds. The President could then veto the disapproval bill, forcing each house to muster a two-thirds majority to override the veto. This would be a reversal of current Impoundment Control Act procedures that require funds proposed for rescission to be released unless Congress approves, by law, all or part of the amount proposed to be rescinded by the President. In 1996, Congress enacted a form of enhanced rescission authority in the Line Item Veto Act, which authorized the President, after signing a bill into law, to cancel in whole any dollar amount of discretionary budget authority, any item of new direct spending, or any limited tax benefit if the President made certain determinations. The act provided that the cancellation was effective unless Congress enacted a disapproval bill into law to void the cancellation. In 1998, the United States Supreme Court in *Clinton v. City of New York*, 524 U.S. 417 (1998), held that the Line Item Veto Act violated the Presentment Clause, Article 1, Section 7, of the U.S. Constitution. (*See also* Impoundment; Line Item Veto; Rescission.)

## Expedited Rescission

Legislative proposals designed to ensure rapid and formal congressional consideration of rescissions proposed by the President. An essential element of an expedited rescission procedure is a prompt up-or-down vote in Congress on the President's proposals to reduce enacted spending authority. This would prevent rescissions from being enacted solely due to absence of action. While such legislation has been proposed at various times in the past, Congress has not enacted expedited rescission procedures. (*See also* Impoundment; Line Item Veto; Rescission.)

## Rescission Bill

A bill or joint resolution to cancel, in whole or in part, budget authority previously enacted by law. Rescissions proposed by the President must be transmitted in a special message to Congress. Under section 1012 of the Impoundment Control Act of 1974 (2 U.S.C. § 683), unless both houses of Congress complete action on a rescission bill within 45 calendar days of continuous session after receipt of the proposal, the budget authority must be made available for obligation. (*See also* Rescission.)

# Results-Based Budgeting

*See under* Performance Budgeting.

# Revenue

Either of the following:

(1) As used in the congressional budget process, a synonym for governmental receipts. Revenues result from amounts that result from the government's exercise of its sovereign power to tax or otherwise compel payment or from gifts to the government. Article I, Section 7, of the U.S. Constitution requires that revenue bills originate in the House of Representatives.

(2) As used in federal proprietary accounting, an inflow of resources that the government demands, earns, or receives by donation. Revenue comes from two sources: exchange transactions and nonexchange transactions. Exchange revenues arise when a government entity provides goods and services to the public or to another government entity for a price. Another term for exchange revenue is "earned revenue." Nonexchange revenues arise primarily from exercise of the government's power to demand payments from the public (e.g., taxes, duties, fines, and penalties) but also include donations. The term "revenue" does not encompass all financing sources of government reporting entities, such as most of the appropriations they receive. Revenues result from (1) services performed by the federal government and (2) goods and other property delivered to purchasers. (*See also* Collections.)

Terms and Definitions

## Revolving Fund

A fund established by Congress to finance a cycle of businesslike operations through amounts received by the fund. A revolving fund charges for the sale of products or services and uses the proceeds to finance its spending, usually on a self-sustaining basis. Instead of recording the collections in receipt accounts, the budget records the collections and the outlays of revolving funds in the same account. A revolving fund is a form of permanent appropriation. (*See also* Account.)

## Rollover

Instead of paying off a loan when due, the principal and sometimes accrued interest outstanding of a borrower is refinanced (rolled over) as a new loan with a new maturity date. (*See also* Federal Credit.)

# S

## Scorekeeping

The process of estimating the budgetary effects of pending legislation and comparing them to a baseline, such as a budget resolution, or to any limits that may be set in law. Scorekeeping tracks data such as budget authority, receipts, outlays, the surplus or deficit, and the public debt limit. The process allows Congress to compare the cost of proposed budget policy changes to existing law and to enforce spending and revenue levels agreed upon in the budget resolution. Budget Committees and the Congressional Budget Office (CBO) score legislation in relation to the levels set by Congress in concurrent budget resolutions.

## Scorekeeping Rules

Guidelines established for use by the Office of Management and Budget (OMB), the Congressional Budget Office (CBO), and the Committees on Budget and Appropriations in the House of Representatives and the Senate in measuring compliance with the Balanced Budget and Emergency Deficit Control Act, as amended by the Budget Enforcement Act (BEA), and with the congressional budget

process. Though the enforcement mechanisms of BEA expired, or became ineffective, at the end of fiscal year 2002, OMB continues to use the same scorekeeping rules developed for use with BEA for purposes of budget execution. Scorekeepers (OMB, CBO, and budget committees) have an ongoing dialogue and may revise rules, as required.

## Scoring

*See under* Scorekeeping.

## Seasonal Rate

The average commitments, obligations, and expenses of 1 or more of the last 5 fiscal years used to determine funding under a continuing resolution. (*See also* Continuing Appropriation/Continuing Resolution; Current Rate.)

## Seigniorage

The difference between the face value of minted circulating coins and the cost of their production, including the cost of metal used in the minting and the cost of transporting the coins to Federal Reserve Banks for distribution to the public. Seigniorage reflects an increase in the value of government assets when coinage metal is converted to a coin whose face value is higher than the cost of the metal. Seigniorage arises from the government's exercise of its monetary powers. In contrast to receipts from the public, seigniorage involves no corresponding payment by another party. For budget reporting purposes, seigniorage is excluded from receipts and treated as a means of financing a deficit—other than borrowing from the public—or as a supplementary amount that can be applied to reduce debt or to increase the Treasury's cash. The budget includes an estimate of receipts (offsetting collections) equal to the cost of manufacturing and distributing circulating coins, including a charge for capital. (*See also* Means of Financing.)

## Separate Enrollment

A procedure that would require that once an appropriation bill is passed by Congress, each provision of funding would be separately enrolled as a discrete "bill." An enrolled bill is the final, official copy of a bill or joint resolution that both houses have

**Terms and Definitions**

passed in identical form to present to the President for signature. Each separately enrolled provision would be presented independently to the President for signature, allowing the veto of some "bills" with spending provisions to which the President objects while allowing signing the others. While such legislation has been proposed at various times in the past as a way of providing the President with something like a line item veto, Congress has not enacted separate enrollment procedures. (*See also* Impoundment; Line Item Veto; Rescission.)

# Sequester

*See under* Sequestration.

# Sequestration (Budget Enforcement Act Term)

Under Budget Enforcement Act (BEA) provisions, which expired in 2002, the cancellation of budgetary resources provided by discretionary appropriations or direct spending laws. New budget authority, unobligated balances, direct spending authority, and obligation limitations were "sequestrable" resources; that is, they were subject to reduction or cancellation under a presidential sequester order. (*See also* Budgetary Resources; Entitlement Authority; Gramm-Rudman-Hollings; Impoundment; Rescission.)

# Special Fund Accounts

*See under* Federal Fund Accounts *under* Accounts in the President's Budget.

# Spending Caps

Overall limits on discretionary spending, which were originally set in the Budget Enforcement Act (BEA) and the enforcement of which expired at the end of fiscal year 2002. Congress, however, continues to set limits on discretionary spending, typically in concurrent budget resolutions, which are enforceable during the congressional budget process. (*See also* Discretionary; Concurrent Resolution on the Budget.)

Terms and Definitions

## Spending Committee

A standing committee of the House or Senate with jurisdiction over legislation permitting the obligation of funds. The House and Senate Appropriations Committees are spending committees for discretionary programs. For other programs, the authorizing legislation itself permits the obligation of funds (backdoor authority). In that case, the authorizing committees are the spending committees. (*See also* Authorizing Committee; Backdoor Authority/Backdoor Spending.)

## Spendout Rate/Outlay Rate

The rate at which budget authority becomes outlays in a fiscal year. It is usually presented as an annual percentage.

## Standard General Ledger (SGL) Chart of Accounts

A chart of accounts (and technical guidance) established to support the consistent recording of financial events as well as the preparation of standard external reports required by the Office of Management and Budget (OMB) and the Department of the Treasury. Agencies are required by law (31 U.S.C. § 3512) to "implement and maintain financial management systems that comply substantially with," among other things, the *Standard General Ledger*. It contains two complete and separate, but integrated, self-balancing sets of accounts—budgetary and proprietary. Budgetary accounts are used to recognize and track budget approval and execution, whereas proprietary accounts are used to recognize and track assets, liabilities, revenues, and expenses. The *Standard General Ledger* is reproduced in the *Treasury Financial Manual* "Standard General Ledger Supplement," available at www.fms.treas.gov/ussgl/index.html. OMB policies regarding the *Standard General Ledger* are in OMB Circular No. A-127.

## Statement of Federal Financial Accounting Standards (SFFAS)

*See under* Federal Accounting Standards Advisory Board.

Terms and Definitions

## Structural/Standardized Budget Surplus/Deficit (Economics Term)

A concept adjusting the surplus/deficit for the effects of the business cycle and other temporary factors such as sales and spectrum auctions.

## Structural Surplus/Deficit (Economics Term)

*See under* Cyclically Adjusted Surplus or Deficit.

## Subcommittee Allocation

As required by section 302(b) of the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 633(b)), the distribution of spending authority and outlays by the appropriations committees of each house of Congress to their relevant appropriations subcommittees of jurisdiction based on the levels contained in the concurrent resolution on the budget.

## Subfunction

A subdivision of a budget function.  For example, health care services and health research are subfunctions of the health budget function.  (For a presentation of the budget in terms of subfunctions, *see* app. IV.  *See also* Functional Classification.)

## Subsidy

Generally, a payment or benefit made by the federal government where the benefit exceeds the cost to the beneficiary.  Subsidies are designed to support the conduct of an economic enterprise or activity, such as ship operations.  They may also refer to (1) provisions in the tax laws for certain tax expenditures and (2) the provision of loans, goods, and services to the public at prices lower than market value.  These include interest subsidies.

Under credit reform, subsidy means the estimated long-term cost to the government of a direct loan or loan guarantee, calculated on a net present value basis over the life of the loan, excluding administrative costs and any incidental effects on

governmental receipts or outlays.  (*See also* Credit Reform *and* Credit Subsidy Cost *under* Federal Credit; Tax Expenditure.)

## Subsidy Cost

*See under* Credit Subsidy Cost *under* Federal Credit.

## Supplemental Appropriation

An act appropriating funds in addition to those already enacted in an annual appropriation act.  Supplemental appropriations provide additional budget authority usually in cases where the need for funds is too urgent to be postponed until enactment of the regular appropriation bill.  Supplementals may sometimes include items not appropriated in the regular bills for lack of timely authorizations.

## Surplus

### Budget Surplus

The amount by which the government's budget receipts exceed its budget outlays for a given period, usually a fiscal year.  Sometimes a deficit is called a negative surplus and is shown in parentheses in budget tables.

### Unified Surplus/Total Surplus

Used interchangeably to refer to the amount by which the sum of the government's on-budget and off-budget receipts exceed the sum of its on-budget and off-budget outlays for a given period, usually a fiscal year.  (*See also* Unified Deficit/Total Deficit *under* Deficit.)

**Terms and Definitions**

# T

## Tax

A sum that legislation imposes upon persons (broadly defined to include individuals, trusts, estates, partnerships, associations, companies, and corporations), property, or activities to pay for government operations.  The power to impose and collect federal taxes is given to Congress in Article I, Section 8, of the U.S. Constitution.  Collections that arise from the sovereign powers of the federal government constitute the bulk of governmental receipts, which are compared with budget outlays in calculating the budget surplus or deficit. (*See also* Government Receipts *under* Collections; Revenue.)

## Tax Credit

An amount that offsets or reduces tax liability.  When the allowable tax credit amount exceeds the tax liability and the difference is paid to the taxpayer, the credit is considered refundable and is considered an increase in outlays in the federal budget.  Otherwise, the difference can be (1) allowed as a carryforward against future tax liability, (2) allowed as a carryback against taxes paid, or (3) lost as a tax benefit. (*See also* Tax Expenditure.)

## Tax Deduction

An amount that is subtracted from the tax base before tax liability is calculated.

## Tax Expenditure

A revenue loss attributable to a provision of the federal tax laws that (1) allows a special exclusion, exemption, or deduction from gross income or (2) provides a special credit, preferential tax rate, or deferral of tax liability.  Tax expenditures are subsidies provided through the tax system.  Rather than transferring funds from the government to the private sector, the U.S. government forgoes some of the receipts that it would have collected, and the beneficiary taxpayers pay lower taxes than they

would have had to pay.  The Congressional Budget Act requires that a list of "tax expenditures" be included in the President's budget.  Examples include tax expenditures for child care and the exclusion of fringe benefits, such as employer-provided health insurance, from taxation.

## Technical and Economic Assumptions

Assumptions about factors affecting estimations of future outlays and receipts that are not a direct function of legislation.  Economic assumptions involve such factors as the future inflation and interest rates.  Technical assumptions involve all other nonpolicy factors.  For example, in the Medicare program, estimations regarding demography, hospitalization versus outpatient treatment, and morbidity all affect estimations of future outlays.

## 302(a) Allocation

*See under* Committee Allocation.

## 302(b) Allocation

*See under* Subcommittee Allocation.

## Transfer

Shifting of all or part of the budget authority in one appropriation or fund account to another.  Agencies may transfer budget authority only as specifically authorized by law.  For accounting purposes, the nature of the transfer determines whether the transaction is treated as an expenditure or a nonexpenditure transfer.  (*See also* Allocation.  For a distinction, *see* Reprogramming.)

### Expenditure Transfer

For accounting and reporting purposes, a transaction between appropriation and fund accounts, which represents payments, repayments, or receipts for goods or services furnished or to be furnished.

Terms and Definitions

Where the purpose is to purchase goods or services or otherwise benefit the transferring account, an expenditure transfer/transaction is recorded as an obligation/outlay in the transferring account and an offsetting collection in the receiving account.

If the receiving account is a general fund appropriation account or a revolving fund account, the offsetting collection is credited to the appropriation or fund account. If the receiving account is a special fund or trust account, the offsetting collection is usually credited to a receipt account of the fund.

All transfers between federal funds (general, special, and nontrust revolving funds) and trust funds are also treated as expenditure transfers.

### Nonexpenditure Transfer

For accounting and reporting purposes, a transaction between appropriation and fund accounts that does not represent payments for goods and services received or to be received but rather serves only to adjust the amounts available in the accounts for making payments. However, transactions between budget accounts and deposit funds will always be treated as expenditure transactions since the deposit funds are outside the budget. Nonexpenditure transfers also include allocations. These transfers may not be recorded as obligations or outlays of the transferring accounts or as reimbursements or receipts of the receiving accounts. For example, the transfer of budget authority from one account to another to absorb the cost of a federal pay raise is a nonexpenditure transfer. (*See* Allocation; *see also* Transfer Appropriation (Allocation) Accounts *under* Accounts for Purposes Other Than Budget Presentation.)

## Transfer Authority

Statutory authority provided by Congress to transfer budget authority from one appropriation or fund account to another.

## Transfer Payment (Economics Term)

A payment made for which no current or future goods or services are required in return. Government transfer payments include Social Security benefits, unemployment insurance benefits, and welfare payments. Taxes are considered

transfer payments.  Governments also receive transfer payments in the form of fees, fines, and donations from businesses and persons.  (*See also* National Income and Product Accounts.)

# Treasury Security

A debt instrument of the U.S. Treasury issued to finance the operations of the government or refinance the government's debt.

## Treasury Bill

The shortest term federal debt instrument or security.  Treasury bills mature within 1 year after the date of issue.

## Treasury Bond

A federal debt instrument with a maturity of more than 10 years.

## Treasury Note

A federal debt instrument with a maturity of at least 1 year but not more than 10 years.

# Trust Fund Accounts

*See under* Account in the President's Budget.



# Uncollected Customer Payments from Federal Sources

Orders on hand from other federal government accounts that are recorded as valid obligations of the ordering account and for which funds or noncash resources have not yet been collected.  The amount represents both accounts receivable from federal sources and unpaid, unfilled orders from federal sources.

Terms and Definitions

## Undelivered Orders

The value of goods and services ordered and obligated that have not been received. This amount includes any orders for which advance payment has been made but for which delivery or performance has not yet occurred. (*See also* Advance Payments; Unliquidated Obligations.)

## Undistributed Offsetting Receipts

Offsetting receipts that are deducted from totals for the government as a whole rather than from a single agency or subfunction in order to avoid distortion of agency or subfunction totals. Offsetting receipts that are undistributed in both agency and functional tables are the collections of employer share of employee retirement payments, rents, and royalties on the Outer Continental Shelf, and the sales of major assets.

Interest received by trust funds is undistributed offsetting receipts in the agency tables, but is distributed by function (i.e., subfunction 950 in functional tables).

## Unemployment Rate (Economics Term)

As defined by the Bureau of Labor Statistics (BLS), the number of people who do not have jobs but have actively looked for work in the prior 4 weeks and are currently available for work, expressed as a percentage of the civilian labor force.

## Unfilled Customer Orders

The dollar amount of orders accepted from other accounts within the government for goods and services to be furnished on a reimbursable basis. In the case of transactions with the public, these orders are amounts advanced or collected for which the account or fund has not yet performed the service or incurred its own obligations for that purpose. (*See also* Reimbursements *under* Offsetting Collections *under* Collections.)

## Unfunded Mandate

Federal statutes and regulations that require state, local, or tribal governments or the private sector to expend resources to achieve legislative goals without being provided federal funding to cover the costs.

The Unfunded Mandates Reform Act of 1995, Pub. L. No. 104–4 (2 U.S.C. §§ 658–658g), generally defines intergovernmental and private sector mandates as "any provision in legislation, statute, or regulation that imposes an enforceable duty" but excludes "conditions of federal assistance" and "duties that arise from participation in a voluntary federal program," among others. The Congressional Budget Office (CBO) is required to determine whether the costs to the states or private sector of a mandate in legislation reported from a congressional committee exceeds certain statutory thresholds. This determination is included in the cost estimate provided to Congress on that legislation. The act also contains procedures for congressional consideration of proposed legislation that contains mandates whose costs are estimated to be over the thresholds unless the legislation also provides funding to cover those costs.

## Unified Budget

Under budget concepts set forth in the *Report of the President's Commission on Budget Concepts*, a comprehensive budget in which receipts and outlays from federal and trust funds are consolidated. When these fund groups are consolidated to display budget totals, transactions that are outlays of one fund group for payment to the other fund group (that is, interfund transactions) are deducted to avoid double counting. The unified budget should, as conceived by the President's Commission, take in the full range of federal activities. By law, budget authority, outlays, and receipts of off-budget programs (currently only the Postal Service and Social Security) are excluded from the current budget, but data relating to off-budget programs are displayed in the budget documents. However, the most prominent total in the budget is the unified total, which is the sum of the on- and off-budget totals. (*See also* Nonbudgetary; Off-Budget; On-Budget.)

## Unliquidated Obligations

The amount of outstanding obligations or liabilities. (*See also* Obligation; Undelivered Orders.)



## Warrant

An official document that the Secretary of the Treasury issues upon enactment of an appropriation that establishes the amount of moneys authorized to be withdrawn from the central accounts that the Department of the Treasury maintains.  Warrants for currently unavailable special and trust fund receipts are issued when requirements for their availability have been met.  (For a discussion of availability, *see* Availability for New Obligations *under* Budget Authority.)

## Wholly-Owned Government Corporation

An enterprise or business activity designated by the Government Corporation Control Act of 1945 (31 U.S.C. § 9101) or some other statute as a wholly-owned government corporation.  Each such corporation is required to submit an annual business-type statement to the Office of Management and Budget (OMB).  Wholly-owned government corporations are audited by Government Accountability Office (GAO) as required by the Government Corporation Control Act, as amended (31 U.S.C. § 9105), and other laws.  The Pension Benefit Guaranty Corporation is an example of a wholly-owned government corporation.  Budget concepts call for any corporation that is wholly owned by the government to be included on-budget.  (For distinctions, *see* Government-Sponsored Enterprise; Mixed-Ownership Government Corporation; Off-Budget.)

## Working Capital Fund

A type of intragovernmental revolving fund that operates as a self-supporting entity that conducts a regular cycle of businesslike activities.  These funds function entirely from the fees charged for the services they provide consistent with their statutory authority.  (*See also* Intragovernmental Revolving Fund Account *under* Intragovernmental Fund Accounts *under* Federal Fund Accounts *under* Account in the President's Budget.)

# Overview of the Development and Execution of the Federal Budget

The United States Constitution gives Congress the power to levy taxes, to finance government operations through appropriations, and to prescribe the conditions governing the use of those appropriations. This power is referred to as the congressional "power of the purse." The power derives from various provisions of the Constitution,[1] particularly article I, section 9, clause 7, which provides that

"No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

Thus an agency may not draw money out of the Treasury to fund agency operations unless Congress has appropriated the money to the agency. At its most basic level, this means that it is up to Congress to decide whether to provide funds for a particular program or activity and to fix the level of that funding. Although the Constitution does not provide detailed instructions on how Congress is to do so, Congress has and continues to implement its power of the purse in two ways: through the enactment of laws that raise revenue and appropriate funds, including annual appropriations acts, and through the enactment of "fiscal statutes" that control and manage federal revenue and appropriations (one such fiscal statute, the Antideficiency Act, is explained in detail in phase 3).[2]

A "budget," in customary usage, is a plan for managing funds, setting levels of spending, and financing that spending.  For purposes of this overview, however, the "federal budget" is used more broadly to include not only the planning through the federal budget process, but also the end result of that plan after the fiscal effect of spending and revenue laws in effect for any given fiscal year are calculated.  Those laws consist of permanent laws enacted in prior years, including any permanent appropriations, and the appropriations acts enacted for that fiscal year.

---

[1] Some examples of other provisions in the Constitution relating to the spending and control of funds are those to lay and collect taxes, duties, imposts, and excises; to borrow money on the credit of the United States; to "pay the Debts and provide for the common Defence and general Welfare of the United States;" and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [listed in art. I, § 8], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."   These provisions are all found in article I, section 8, of the Constitution.

[2] The budget process and the financial management process (i.e., ensuring that federal financial management systems provide accurate, reliable, and timely financial management information to the government's managers, the President, and Congress) are closely related.

Appendix I
Overview of the Development and
Execution of the Federal Budget

Beginning in 1921, Congress enacted laws that provide a framework of procedures for coordinating and planning for federal spending and revenues. The Budget and Accounting Act of 1921 requires the President to submit an annual budget proposal to Congress and established the Office of Management and Budget (OMB) and the Government Accountability Office (GAO) (formerly, the General Accounting Office). In 1974, Congress enacted the Congressional Budget and Impoundment Control Act, which provides for the adoption of a budget resolution and established the House and Senate Budget Committees and the Congressional Budget Office (CBO). These laws overlay the existing processes by which Congress enacts and the President signs into law spending and revenue measures and have come to be known, collectively, as the federal budget process.

The federal budget process provides the means for the federal government to make informed decisions between competing national needs and policies, to determine priorities, to allocate resources to those priorities, and to ensure the laws are executed according to those priorities. The federal budget process can be broken down into four phases: budget formulation, the congressional budget process (during which Congress adopts its budget and enacts laws appropriating funds for the fiscal year), budget execution and control, and audit and evaluation. The discussion that follows describes in detail the four phases of the federal budget process.

## Phase 1: Executive Budget Formulation

The federal government begins to assemble an annual federal budget in a long administrative process of budget preparation and review. This process may well take place several years before the budget for a particular fiscal year is ready to be submitted to Congress. The primary participants in the process at this stage are the agencies and individual organizational units, which review current operations, program objectives, and future plans, and OMB, the office within the Executive Office of the President charged with broad oversight, supervision, and responsibility for coordinating and formulating a consolidated budget submission. (See fig. 1 in app. II.)

By the first Monday in February, the President submits a budget request to Congress for the fiscal year starting on the following October 1 (i.e., in February 2005 the President submitted the budget request for fiscal year 2006, which runs from October 1, 2005, through September 30, 2006). However, preparation of this particular budget request began about 10 months before it was submitted to Congress. For example, for the fiscal year 2006 budget request, transmitted to Congress in February

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

2005, the budget process began in the spring of 2004. Thus, federal agencies must deal concurrently with 3 fiscal years: (1) the current year, that is, the fiscal year in progress; (2) the coming fiscal year beginning October 1, for which they are seeking funds (for purposes of formulation of the President's budget request, this fiscal year is known as the budget year); and (3) the following fiscal year, for which they are preparing information and requests. OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (revised annually), provides detailed guidance to executive departments and establishments on preparing budget submissions.  The President's budget, which is the sole single document with budget information for the entire government, contains

- a record of actual receipts and spending levels for the fiscal year just completed;
- a record of current-year estimated receipts and spending; and
- estimated receipts and spending for the upcoming fiscal year and 9 years beyond, as proposed by the President.

Executive budget formulation, based upon proposals, evaluations, and policy decisions, begins in agencies' organizational units. During executive budget formulation, federal agencies receive revenue estimates and economic projections from the Department of the Treasury (Treasury), the Council of Economic Advisers (CEA), and OMB.

## Executive Budget Formulation Timetable

### Spring–Summer: OMB Establishes Policy for the Next Budget Request

During this period, OMB and the executive branch agencies discuss budget issues and options.  OMB works with the agencies to identify major issues for the upcoming budget request; to develop and analyze options for the upcoming reviews of agency spending and program requests; and to plan for the analysis of issues that will need decisions in the future.  OMB issues policy directions and planning guidance to the agencies for the upcoming budget request and detailed instructions for submitting budget data and materials for the upcoming fiscal year and following 9 fiscal years.

Appendix I
Overview of the Development and
Execution of the Federal Budget

**September–October: Agencies Submit Initial Budget Request Materials**

By law, the President's budget request must include information on all agencies of all three branches of the federal government.[3] Executive branch departments, agencies that are subject to executive branch review, and the District of Columbia must submit their budget requests and other initial materials to OMB typically the first Monday after Labor Day of the year prior to the start of the year that the budget request covers (i.e., September 8, 2004, for fiscal year 2006, which started October 1, 2005). Agencies not subject to executive branch review (e.g., the Federal Reserve Board) and the legislative and judicial branches are required to submit their budget materials in fall of the year prior to the year that the budget requests cover (e.g., in October 2004 for fiscal year 2006).[4]

**October–December: OMB Performs Review and Makes Passback Decisions**

OMB staff representatives conduct the fall review. OMB has informal discussions with agencies about their budget proposals in light of presidential priorities, program performance, and any budget constraints. OMB examiners prepare issues for the Director's review. The Director briefs the President and senior advisors on proposed budget policies and recommends a complete set of budget proposals after a review of all agency requests. The President considers the estimates and makes his decisions on broad policies. In late November, OMB passes back budget decisions to the agencies on their budget requests, the so-called passback. These decisions may involve, among other things, funding levels, program policy changes, and personnel ceilings. The agencies may appeal decisions with which they disagree. If OMB and an agency cannot reach agreement, the issue may be taken to the President.

Final budget decisions will also reflect proposals for management and program-delivery improvements resulting from agency and OMB reviews during the executive budget formulation process. OMB not only assists in making individual budget decisions, it also tracks the result of these decisions. OMB calculates the effect of budget decisions on receipts, budget authority, and outlays. Once final decisions on the budget requests are reached, agencies revise their budget

---

[3] 31 U.S.C. § 1105.

[4] The budget requests for the legislative branch and the judicial branch and its related agencies must be submitted to OMB in late fall of each year and included in the President's budget request without change. The budget requests of several executive branch agencies are not subject to review by OMB. See OMB Circular No. A-11, sec. 25.1. Information on all three branches of government is included in the President's budget request so that Congress may review one submission that covers the entire government.

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

submissions to conform to these decisions. These final estimates are transmitted to
Congress in the President's budget request.

### By the First Monday in February: President Submits Budget Request

In accordance with current law, the President must transmit the budget request to
Congress on or before the first Monday in February.[5]

### By July 15: President Submits Mid-Session Review Document to Congress

The Budget and Accounting Act of 1921, as amended, requires the President to submit
to Congress on or before July 15 a supplementary budget summary that provides data
to aid in evaluation of the President's budget request.[6] This summary, referred to as
the mid-session review, includes updated presidential policy budget estimates,
summary updates to the information contained in the budget submission, and
budget-year baseline estimates.

## Phase 2: The Congressional Budget Process

Once the President submits his budget request, the congressional phase begins. Since
the constitutional power of the purse is vested solely in Congress, the President's
budget request is just that—a request. Congress, of course, may choose to adopt,
modify, or ignore the President's budget proposals when adopting its budget
resolution and when enacting appropriations and other laws.  (See fig. 2 in app. II.)

The Congressional Budget Act establishes the following key steps in the
congressional budget process.

### January–February: CBO Submits Report to the Budget Committees and
### Congress Receives the President's Budget Request

Usually in late January, CBO submits to the Budget Committees its annual report,
entitled *The Budget and Economic Outlook*.  The report contains CBO's projection of
federal revenue and spending for the next 10 years, based on its current economic

---

[5] 31 U.S.C. § 1105(a).

[6] 31 U.S.C. § 1106.

Appendix I
Overview of the Development and
Execution of the Federal Budget

forecast and the general assumption that existing laws and policies remain unchanged.

Congress receives the President's budget request no later than the first Monday in February.  At the same time, the President transmits current services estimates to Congress. The House and Senate Budget Committees, in preparation for drafting the concurrent resolution on the budget, hold hearings to examine the President's economic assumptions and spending priorities.  At the request of the Senate Appropriations Committee, CBO prepares an analysis of the President's request.

**Committees Transmit the Views and Estimates Reports to Budget Committees**

While the Budget Committees examine aggregate budget levels and budget functions, the other committees of Congress with jurisdiction over federal programs transmit to the Budget Committees their views and estimates on spending and revenue levels for programs under their jurisdiction. The Budget Committees use these reports on views and estimates to develop the total revenue and spending estimates that they will propose in the concurrent budget resolution. In conjunction with these views and estimates reports, the Joint Economic Committee submits its recommendations concerning fiscal policy to the Budget Committees.

**March–April: Congress Adopts a Budget Resolution**

Typically, during March, the Budget Committees mark-up and report to their respective houses a budget plan in the form of a concurrent resolution on the budget. This budget resolution is drafted using the President's budget request, information from their own hearings, views and estimates reports from other committees, and CBO's reports.  The budget resolution is required to set forth (for the upcoming fiscal year and for each of at least the next 4 years) the total level of new budget authority, outlays, revenues, the deficit or surplus, the public debt, and spending by functional category.  The budget resolution may include reconciliation instructions to the extent necessary to meet the revenue or direct spending targets in the budget resolution.

The budget resolution is considered in each House under special procedures set forth in the Congressional Budget Act.  When the Senate and House have both adopted their respective versions of the budget resolution, it is referred to a conference committee to resolve the differences between the two versions. Each chamber must then vote on the conference report. The Congressional Budget Act sets April 15 as the date by which Congress should complete action on the budget resolution; however, in

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

practice, Congress may not meet this date.[7]  For example, in 2005 Congress adopted
the budget resolution for fiscal year 2006 on April 28, 2005.  In 1998 (for fiscal year
1999), in 2002 (for fiscal year 2003), and in 2004 (for fiscal year 2005) Congress did not
complete action on budget resolutions.[8]

The joint explanatory statement accompanying a conference report on the budget
resolution includes an allocation of budget authority and outlays to the
Appropriations Committees (for discretionary spending) and to each authorizing
committee (for direct spending) of the House and Senate.  The Appropriations
Committees subsequently subdivide their allocation among their subcommittees
according to jurisdiction.

The concurrent resolution on the budget does not become law; it is not signed by the
President.  The aggregate levels of revenues, budget authority, and outlays and the
committee allocations are guidelines and targets against which subsequent fiscal
legislation—appropriation acts; authorizing legislation that provides budget
authority; revenue acts; and, if necessary, reconciliation acts (see below)—is
measured.

The Congressional Budget Act contains rules of the House and Senate that implement
the priorities agreed to and set in the concurrent resolution on the budget.  These
rules generally prohibit the consideration of legislation that is not in compliance with
the committee allocations or the revenue or spending totals in the resolution.
Accordingly, if legislation is out of compliance, it is subject to a point of order and, if

---

[7] Article I, section 5, clause 2, of the Constitution reserves to each House of Congress the authority to
determine the rules governing its procedures.  The Budget Act contains several titles and sections that
affect the internal procedures of the House and Senate enacted under this constitutional rule-making
authority. Congress enacted the Budget Act with the full recognition that each House could change these
rules at any time and in a manner consistent with past practice. Rule changes are usually accomplished
upon adoption of either a simple resolution (for a change that affects one House) or a concurrent
resolution (for changes that may affect both houses).  S. Rep. No. 105-67 (revised December 1998).

[8] See Bill Heniff, Jr., *Congressional Budget Resolutions: Selected Statistics and Information Guide*
(Washington, D.C.: Congressional Research Service, Jan. 25, 2005).

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

the point of order is sustained, Congress is precluded from further consideration of the legislation until it is brought into compliance.[9]

If changing economic circumstances or policy requirements dictate, Congress may revise its budget resolution during the fiscal year, thereby altering the spending and revenue totals.

### May–September: Congress Addresses Fiscal Legislation

*Reconciliation Measure*

When the concurrent resolution on the budget contains reconciliation instructions, the committees must submit legislative language that changes laws in their jurisdiction to the Budget Committee of their house on the date specified in the instructions.  The Budget Committees may make no substantive changes to the submissions, but must report the submissions to the House or Senate as a single reconciliation bill.  If, however, a reconciled committee fails to meet the numerical targets included in its reconciliation instruction, procedures exist to modify the bill on the floor so that the targets are met.  (If only one committee is instructed, that committee reports its recommendations directly to the House or Senate.)

The reconciliation legislation is a unique vehicle through which Congress enforces its budget plan for revenue and direct spending set forth in the budget resolution.  Both the House of Representatives and the Senate consider the reconciliation legislation reported to them from their respective Budget Committees under special rules. (The Appropriations Committees are not subject to reconciliation instructions.) Generally, in the House, the legislation is considered under a special rule, a simple resolution adopted by the House prior to consideration of the reconciliation legislation that governs the debate and the amendments that are in order.  In the Senate, reconciliation legislation is considered under special procedures set forth in the Congressional Budget Act, which limits the period of debate and the types of amendments that are in order and subjects the legislation and amendments to the Byrd Rule, which prohibits "extraneous material." (See Byrd Rule for more detail.)

---

[9] In fiscal year 1994, Congress began including overall limits on discretionary spending in the budget resolution, known as spending caps or discretionary caps.  Congress established these caps to manage its internal budget process, while the Budget Enforcement Act (BEA) statutory caps continued to govern for sequestration purposes.  The caps were enforceable in the Senate by a point of order that prohibited the consideration of a budget resolution that exceeded the limits for that fiscal year. While the BEA limits expired at the end of fiscal year 2002, Congress continues to use the budget resolution to establish and enforce overall discretionary spending limits.

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

The differences between the two houses are typically resolved in a conference committee and the resulting legislation is passed by both houses and must be signed by the President to become law.

*Appropriations and Other Fiscal Legislation*

Generally, throughout this period, Congress considers revenue legislation and legislation affecting spending, including the regular appropriations acts.[10]  All legislation considered by Congress that affects revenue or spending must comply with the committee allocations and the total levels of revenues and spending in the concurrent resolution on the budget.[11]

Appropriations bills are developed by the House and Senate Appropriations Committees and their subcommittees. Each subcommittee has jurisdiction over specific federal agencies or programs and is responsible for one of the general appropriations bills.[12] The Constitution requires that all revenue (tax) bills originate in the House; by custom, the House also originates appropriations measures.

The Congressional Budget Act requires that the House and Senate Appropriations Committees subdivide the amounts allocated to them under the budget resolution

---

[10] Less than 40 percent of total budget authority is appropriated through the annual appropriations process. The remainder of the budgetary resources spent by the federal government are provided by law other than annual appropriations acts. (For further explanation, see the definitions of Backdoor Authority, Budget Authority, Direct Spending, Obligational Authority, and Outlay.)

[11] The rules of the House of Representatives also prohibit consideration of appropriations bills for expenditures not previously authorized by law. See Rule XXI, Rules of the House of Representatives. A similar, but more limited provision exists in Rule XVI, Standing Rules of the Senate. (See Point of Order.) (Some agency programs or functions are reauthorized every year, while others are authorized for several years or permanently.) The effect of such rules is that an appropriation bill is subject to a point of order if it is not preceded by an authorization of appropriation.

[12] As of March 2005, the House of Representatives has 10 appropriation subcommittees: Agriculture, Rural Development, Food and Drug Administration, and Related Agencies; Defense; Energy and Water Development, and Related Agencies; Foreign Operations, Export Financing and Related Programs; Homeland Security; Interior, Environment, and Related Agencies; Labor, Health and Human Services, Education, and Related Agencies; Military Quality of Life and Veterans Affairs and Related Agencies; Science, the Departments of State, Justice, and Commerce, and Related Agencies; and Transportation, Treasury, and Housing and Urban Development, the Judiciary, and the District of Columbia. The Senate has 12 appropriation subcommittees: Agriculture, Rural Development, and Related Agencies; Commerce, Justice, and Science; Defense; District of Columbia; Energy and Water; Homeland Security; Interior and Related Agencies; Labor, Health and Human Services, Education and Related Agencies; Legislative Branch; Military Construction and Veterans Affairs; State, Foreign Operations, and Related Programs; and Transportation, Treasury, the Judiciary, Housing and Urban Development, and Related Agencies.

Appendix I
Overview of the Development and
Execution of the Federal Budget

among their subcommittees (Section 302(b) allocations).[13] Once the subcommittees receive their allocations, the subcommittees begin drafting their appropriations bills to fund discretionary spending programs. Proposed legislation that would cause the section 302(b) allocations to be exceeded is subject to a point of order.

CBO prepares a cost estimate on each appropriations bill, just as it provides cost estimates for any legislative measure reported by a committee of Congress. The Budget Committees use this information to determine whether the legislation complies with a committee's allocation, a subcommittee's suballocation, and the budget totals in the budget resolution.

Congress must enact these regular appropriations bills by October 1 of each year. If these regular bills are not enacted by the deadline (and they usually are not), Congress must pass a continuing resolution prior to the beginning of each fiscal year to fund government operations into the next fiscal year. When an agency does not receive its new appropriation before its current appropriation expires, it must cease ongoing, regular functions that are funded with annual appropriations, except for those related to emergencies involving the safety of human life or the protection of property.

## Phase 3: Budget Execution and Control

The body of enacted laws providing appropriations for a fiscal year becomes the government's financial plan for that fiscal year. The execution and control phase refers generally to the period during which the budget authority made available by appropriations remains available for obligation. An agency's task during this phase is to spend the money Congress has given it to carry out the objectives of its program legislation in accordance with fiscal statutes and appropriations, while at the same time beginning phase 1 for the next budget.

The Antideficiency Act is one of these fiscal statutes. It is a funds control, financial management statute, and it achieves this funds control objective through a system of apportionments, allotments, suballotments, and allocation of funds. It requires that agency heads prescribe, by regulation, a system of administrative control of funds. The system is also called the funds control system, and the regulations are called funds control regulations.

---

[13] 2 U.S.C. § 633.

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

OMB is responsible for apportioning appropriated amounts to the executive branch agencies, thereby making funds in appropriation accounts (administered by Treasury) available for obligation. The apportionment is intended to achieve an effective and orderly use of available budget authority and ensure that obligations and expenditures are made at a controlled rate to reduce the need for supplemental appropriations, and prevent deficiencies from arising before the end of a fiscal year.

Once OMB apportions funds, it is the agency's responsibility to allocate the funds in accordance with its funds control system and regulations. The purpose of the funds control system and regulations is (1) to prevent overobligations and expenditures and (2) to fix accountability for obligations or expenditures. An obligation or expenditure that exceeds the amount of the appropriation, the apportionment, or the allotment violates the Antideficiency Act. For a more detailed explanation of these controls, see GAO/OGC-92-13, *Principles of Federal Appropriations Law*, volume II, second edition (available at www.gao.gov/legal.htm), and OMB Circular No. A-11, part 4, *Instructions on Budget Execution*.

## Impoundment

At various times, the executive branch has refused to execute appropriations laws, that is, refused to spend money appropriated by Congress because the executive branch disagreed with the use of the funds. Under the Impoundment Control Act of 1974 whenever the President, the Director of OMB, or an agency or other federal government official does not make an appropriation or any part of an appropriation available for obligation, that official is impounding funds. The act permits the President, the Director of OMB, or an agency or other federal government official to impound funds only for certain reasons and under certain circumstances. The act also requires that impoundments be reported to Congress and the Comptroller General of the United States. The act requires the Comptroller General to monitor the performance of the executive branch in reporting proposed impoundments to Congress. For more information on impoundments, see section D.3 (Budget Execution and Control: Impoundment) in *Principles of Federal Appropriations Law*, volume I, third edition, GAO-04-261SP (available at www.gao.gov/special.pubs/redbook1.html).

## Phase 4: Audit and Evaluation

Individual agencies are responsible—through their own review and control systems—for ensuring that the obligations they incur and the resulting outlays adhere

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

to the provisions in the authorizing and appropriations legislation as well as to other laws and regulations governing the obligation and expenditure of funds. OMB Circular No. A-11 provides extensive guidance to agencies on budget execution. In addition, a series of federal laws are aimed at controlling and improving agency financial management. The Inspector General Act of 1978, Pub. L. No. 95–452 as amended, established agency inspectors general to provide policy direction for and to conduct, supervise, and coordinate audits and investigations relating to agency programs and operations. The Chief Financial Officers Act of 1990 established agency chief financial officers to oversee all financial management activities relating to agency programs and operations. The Government Management Reform Act of 1994 requires the audit of agency financial statements and the preparation and audit of a consolidated financial statement for the federal government. And the Federal Financial Management Improvement Act of 1996 directs auditors to report on whether agency financial statements comply with federal financial management systems requirements, federal accounting standards, and the *U.S. Standard General Ledger (SGL)*.

In 1993, Congress enacted the Government Performance and Results Act (GPRA) to improve congressional spending decisions and agency oversight through performance budgeting. GPRA holds federal agencies accountable for achieving program results and requires agencies to clarify their missions, set program goals, and measure performance toward achieving those goals. Among other things, the act requires each agency, on an annual basis, to submit a performance plan and performance report to OMB and Congress covering each program activity in the agency's budget. The agency plan must establish goals that define the level of performance to be achieved by a program activity and describe the operational processes and resources required to achieve goals. The program performance reports present the agency's performance in comparison to the plan for the previous fiscal year.

OMB reviews program and financial reports and monitors agencies' efforts to attain program objectives. Congress exercises oversight over executive branch agencies through the legislative process, formal hearings, and investigations. Congress uses oversight hearings, for example, to evaluate the effectiveness of a program and whether it is administered in a cost-effective manner, to determine whether the agency is carrying out congressional intent, and to identify fraud or abuse.

GAO regularly audits, examines, and evaluates government programs. Its findings and recommendations for corrective action are made to Congress, to OMB, and to the agencies concerned. GAO also has the authority to settle all accounts of the United

**Appendix I**
**Overview of the Development and**
**Execution of the Federal Budget**

States government and to issue legal decisions and opinions concerning the availability and use of appropriated funds.[14] GAO develops government audit and internal control standards. *Government Auditing Standards* (the "Yellow Book") contains standards for audits of government organizations, programs, activities, and functions, and of government assistance received by contractors, nonprofit organizations, and other nongovernmental organizations. These standards, often referred to as U.S. generally accepted government auditing standards, are to be followed by auditors and audit organizations when required by law, regulation, agreement, contract, or policy. The internal control standards, *Standards for Internal Control in the Federal Government*, provide the overall framework for establishing and maintaining internal control and for identifying and addressing major performance and management challenges and areas at greatest risk for fraud and mismanagement. Also, as mentioned above, the Impoundment Control Act of 1974 requires the Comptroller General to monitor the performance of the executive branch in reporting proposed impoundments to Congress.

---

[14] 31 U.S.C. §§ 3526, 3529.

# Federal Budget Formulation and Appropriation Processes

As described in appendix I, figure 1 shows the executive branch budget formulation process, which starts when the President develops budget and fiscal policy and concludes when the President sends the proposed budget to Congress by the first Monday in February.  Congress then starts the budget and appropriations process illustrated in figure 2.

Appendix II
Federal Budget Formulation and
Appropriation Processes

## Figure 1: Federal Budget Formulation Process



Source: Senate Budget Committee, December 1998, adapted by GAO.

[a]The term "agency" refers to either the department, agency, or lower component levels, depending on the level of decision being made. The budget submitted to OMB represents the budget decisions made at the department or the highest organizational level.

Appendix II
Federal Budget Formulation and
Appropriation Processes

## Figure 2: Federal Budget and Appropriation Process



Appendix II
Federal Budget Formulation and
Appropriation Processes



Source: Office of the Majority Leader, March 2005, adapted by GAO.

# The Methods for Tracking Funds in the Federal Government

The federal government uses two different but overlapping methods for tracking funds. This reflects the fact that the federal government is made up of many different entities and serves multiple constituencies. Financial information generated by federal entities serves a range of purposes. For example, Congress seeks to monitor the obligation and expenditure of federal funds it appropriates and evaluate the need for additional funds; managers of federal entities seek to control the cost of operations; and economists seek to understand the effects of federal operations and financing on different markets.

The two methods for tracking funds are generally known as obligational accounting and proprietary accounting. While each method involves different processes, people, and information systems that rely on a given nomenclature, each system plays an important part in ensuring the financial accountability of the government to the American people, and agencies cannot overlook either of them.

Although the budget and budget process largely use obligational accounting, users of this glossary should recognize that terms used in obligational accounting might have different meanings when used in proprietary accounting.[1] The purpose of this appendix is to describe, briefly, the two methods, their statutory bases, and the role each plays in federal government financial accountability. This appendix also supplies references for detailed information on each method. In its simplest form obligational accounting means that an obligation must be recorded when an agency enters into a contract for goods or services. In contrast, under proprietary or financial accounting no transaction is recorded until the entity accepts the goods or services when an "accounts payable" is recorded. The following paragraphs explain these two systems further.

Obligational accounting involves the accounting systems, processes, and people involved in collecting financial information necessary to control, monitor, and report on all funds made available to federal entities by legislation—including both permanent, indefinite appropriations and appropriations enacted in annual and supplemental appropriations laws that may be available for 1 or multiple fiscal years. It is through obligational accounting that agencies ensure compliance with fiscal

---

[1] Some, including OMB, refer to obligational accounting as budgetary accounting. Budgetary accounting, however, more specifically refers to a bookkeeping refinement of obligational accounting. Obligational accounting is also sometimes referred to as funds control accounting or appropriation accounting. See Cornelius E. Tierney, *Handbook of Federal Accounting Practices* (Reading, Mass.: 1982). See also Senate Committee on Government Operations, Financial Management in the Federal Government, S. Doc. No. 87-11 at 85 (1961) (explaining new statute for recording obligations to support agency budget information).

**Appendix III**
**The Methods for Tracking Funds in**
**the Federal Government**

laws, including the Antideficiency Act[2] and the "purpose" and "time" statutes.[3] Obligational accounting rests on the central concepts of the obligation and disbursement of public funds, as those terms are defined in this glossary. The Antideficiency Act and the "recording statute"[4] provide the fundamental components of obligational accounting. The Antideficiency Act requires each agency head to establish an administrative system of funds control designed to restrict obligations or expenditures and to affix responsibility for obligations or expenditures. The recording statute requires agencies to account for obligations as a key mechanism for measuring compliance. The basic premise of obligational accounting is that if an agency controls its obligations, it is unlikely to overspend, or improperly use, its appropriations.

In obligational accounting, the Department of the Treasury (Treasury), in collaboration with the Office of Management and Budget (OMB), establishes federal appropriations and fund accounts to record information on the amount and period of availability of funding appropriated by acts of Congress. Imbedded in the information fields and symbols assigned by Treasury to appropriations and fund accounts are the same Treasury account symbols OMB assigns for budget accounts.[5] For additional levels of control, OMB and federal entities subdivide the appropriations and fund accounts, and then the entities record transactions in these accounts as they occur. (See Apportionment.) Treasury publishes guidance in the *Treasury Financial Manual*, available at www.fms.treas.gov/tfm/, for agencies to follow in accounting for use of funds and in preparing financial reports on their accounts.[6] Reports on the status of funds obligated and expended are periodically reported through Treasury's FACTS II and presented in a manner that is compatible with the federal budget. The Comptroller General also has statutory authority to settle the accounts of the U.S.

---

[2] Codified in part at 31 U.S.C. §§ 1341, 1514, and 1517.

[3] The "purpose" statute states that "appropriations shall be applied only to the objects for which the appropriations were made." 31 U.S.C. § 1301(a). The "time" statutes relate to limits on the availability of appropriations for more than a fiscal year for a definite appropriation. 31 U.S.C. §§ 1301(c) (limitation on construing the availability of appropriations for more than a fiscal year); and 1502(a) (limitations on use of funds appropriated for obligation during a definite period).

[4] 31 U.S.C. § 1501.

[5] Three appropriation and fund accounts are excluded by law from the U.S. budget even though OMB assigns each a budget account symbol (i.e., U.S. Postal Service Fund and the Social Security trust fund accounts). Balances in these accounts are included as the "off-budget" component in the presentation of the total receipts and expenditures of the federal government's "unified budget."

[6] See 31 U.S.C. §§ 331 and 3513, and GAO's *Policy and Procedures Manual for Guidance of Federal Agencies, Title 7 – Fiscal Guidance*, available at www.gao.gov.

government that involves the review and determination that obligations and disbursements from an account were made in accordance with law.[7] GAO's *Principles of Federal Appropriations Law,* available at www.gao.gov, provides a comprehensive discussion of the relevant statutes and case law, including Comptroller General decisions and opinions applicable to obligational accounting.

Proprietary accounting, also referred to as financial accounting, involves federal entities recording and accumulating financial information on transactions and balances for purposes of reporting both internally to management and externally in an entity's financial statements in accordance with a comprehensive basis of accounting.[8] Proprietary accounting is usually based on generally accepted accounting principles, which follow established conventions such as the recognition of transactions on an accrual basis instead of recognition based on strict association with the obligation or expenditure of appropriated funds. For example, in proprietary accounting, the expense associated with a capital asset would be recognized over the asset's life as depreciation. In obligational or budgetary accounting, capital asset costs are recognized as obligations when the commitment to purchase the asset is made and as expenditures when cash is paid for the asset. Most federal entities are subject to proprietary accounting standards promulgated through the Federal Accounting Standards Advisory Board (FASAB).[9] FASAB was established jointly by GAO, Treasury, and OMB to promulgate accounting standards for the executive branch. The Consolidated Financial Statements of the U.S. Government, required by law to be prepared annually by Treasury and audited by GAO, are to be prepared in accordance with FASAB accounting standards.[10] All executive agencies that are not required by another provision of federal law to prepare audited financial statements

---

[7] 31 U.S.C. § 3526. See B-161457, August 1, 1969, for guidance on account settlement procedures.

[8] In the private sector, the internal system of accounting within organizations to support planning (e.g., budgeting) and decision making by managers is also known as managerial accounting or managerial cost accounting. While both systems of accounting used in the federal government contain elements of or may support managerial accounting, the federal government generally does not use such a discrete system of accounting. Federal agencies may also use other special types or applications of accounting for discrete functions or purposes carried out under their cognizance. For example, the Board of Governors of the Federal Reserve System publishes national economic data in its quarterly *Flow of Funds Accounts of the United States.* See www.federalreserve.gov/releases/Z1. See also Statement of Federal Financial Accounting Standards No. 4, *Managerial Cost Accounting Standards.*

[9] See www.fasab.gov.

[10] 31 U.S.C. § 331(e).

are required by 31 U.S.C. § 3515 to prepare audited financial statements. Government corporations are also required to prepare audited financial statements.[11]

Most agencies and some government corporations follow FASAB accounting standards. These agencies use accounts established in the Standard General Ledger (SGL). The SGL accounts, established by Treasury and published in a chart of accounts, record similar types of transactions and balances that aggregate to specific classifications in the financial statements. The SGL accounts are structured differently than, but integrate information from, appropriations and fund accounts. Some federal entities, however, such as government corporations, may follow other generally accepted proprietary accounting standards (such as those issued by the Financial Accounting Standards Board) unless they chose to adopt FASAB standards and the SGL. Other small federal entities, such as boards and commissions, and some legislative and judicial branch entities may not engage in proprietary accounting.

The differences between obligational accounting and proprietary accounting are most apparent in their application to federal entities' transactions, as the following hypothetical text illustrates:

> When an agency official enters into a contract for goods or services, obligational accounting rules dictate that the entity record an obligation of federal funds that will be due for the expected payment. An expenditure is recorded when payment is made (typically, after acceptance of the goods or services). Under proprietary accounting, no transaction is recorded until the entity accepts the goods or services, at which point an account payable and related expense will be recorded.

As illustrated above, each method of tracking funds serves a different purpose, and users need to be cognizant of the different purposes and the different views that these systems provide regarding federal entities' status of funds and financial condition at any given point in time.

---

[11] 31 U.S.C. §§ 9101 *et seq.*

# Budget Functional Classification

The functional classification system is a way of grouping budgetary resources so that all budget authority and outlays of on-budget and off-budget federal entities and tax expenditures can be presented according to the national needs being addressed. National needs are grouped in 17 broad areas to provide a coherent and comprehensive basis for analyzing and understanding the budget. Three additional categories—Net Interest, Allowances, and Undistributed Offsetting Receipts—do not address specific national needs but are included to cover the entire budget. A final category, Multiple Functions, is used for accounts that involve two or more major functions.

To the extent feasible, functional classifications are made without regard to agency or organizational distinctions.[1] Each federal activity is placed in a single functional classification that best defines the activity's most important purpose even though many activities serve more than one purpose. This is necessary so that the sum of the functional categories equals the budget totals. The functional classifications are also the categories that Congress uses in the concurrent resolutions on the budget, pursuant to the Congressional Budget and Impoundment Control Act of 1974 (2 U.S.C. § 632). Different programs within a single function may fall under the jurisdiction of different committees.

A function may be divided into one or more subfunctions, depending upon the complexity of the national need addressed by that function. A three-digit code represents each functional/subfunctional category. The functional codes also make up the last three digits of the account identification code. (See app. V.)

The functional structure is relatively stable, but changes are made from time to time to take into account changing conditions and requirements. As a rule, any changes in this structure are made after the Office of Management and Budget (OMB) consults with the Appropriations and Budget Committees of the Senate and House of Representatives.

Table 1 outlines the functional classification structure as taken from the President's *Budget of the United States Government, Fiscal Year 2006.* The definitions for the subfunctional structure are from OMB's technical staff paper, "The Functional Classification in the Budget" (1979 Revision). Where necessary, these definitions have

---

[1] For a graphic display of budget functions by agency and object class, see GAO, *Federal Budget: Agency Obligations by Budget Function and Object Classification for Fiscal Year 2003*, GAO-04-834 (Washington, D.C.: June 25, 2004).

**Appendix IV**
**Budget Functional Classification**

been updated to accommodate changes since issuance of that document. The three-digit numbers listed under Code and the associated titles and definitions are for the major functions. The three-digit numbers listed under Subcode and the associated titles and definitions are for the subfunctions.

**Table 1: Functional Classification Structure**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|
| **050** | | **National Defense** |

Common defense and security of the United States. It encompasses the

- raising, equipping, and maintaining of armed forces (including civilian support activities), development and utilization of weapons systems (including nuclear weapons), and related programs;

- direct compensation and benefits paid to active military and civilian personnel and contributions to their retirement, health, and life insurance funds;[a]

- defense research, development, testing, and evaluation; and

- procurement, construction, stockpiling, and other activities undertaken to directly foster national security.

Excludes

- benefits or compensation to veterans and their dependents and military and civil service retirees;

- the peaceful conduct of foreign relations;

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|

• foreign military, economic, and humanitarian assistance;

• subsidies to businesses by civilian agencies (such as maritime subsidies) that may be partially justified as promoting national security; and

• research and operations of agencies (such as space research) whose program missions are not directly designed to promote national defense but could result in some significant benefits to our national security.

051    Department of Defense—Military

With minor exceptions, entire agency is included in this subfunction.

053    Atomic energy defense activities

Department of Energy programs devoted to national defense, such as naval ship reactors and nuclear weapons.

054    Defense-related activities

Miscellaneous defense activities, such as the expenses connected with selective services and with defense stockpiles outside of the Departments of Defense and Energy.

**150**    **International Affairs**

Maintaining peaceful relations, commerce, and travel between the United States and the rest of the world and promoting international security and economic

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | | development abroad. (Excludes outlays from domestic programs that may tangentially affect foreign relations or the citizens of other nations.) |
| | 151 | International development and humanitarian assistance |
| | | Humanitarian assistance, development assistance, security support assistance, grants to and investments in international financial and development institutions, and the budgetary costs associated with concessionary agricultural exports. |
| | 152 | International security assistance |
| | | The transfer of defense articles and services to foreign governments, including grants, credit sales, and training. Excludes the military sales trust fund, which is classified under subfunction 155 (international financial programs). |
| | 153 | Conduct of foreign affairs |
| | | Diplomatic and consular operations of the Department of State, assessed contributions to international organizations, and closely related activities in other agencies (such as the Arms Control and Disarmament Agency). |
| | 154 | Foreign information and exchange activities |
| | | Student and cultural exchange programs and foreign library, radio, or other media information activities designed to promote mutual understanding between the people of the United States and other nations. |

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 155 | International financial programs |

Export credit, the military sales trust fund, international commodity agreements, international monetary programs, and other programs designed to improve the functioning of the international financial system. For pre-1992 direct loans or loan guarantees, includes the total cash flows on these loans and guarantees. For loans or loan guarantees obligated or committed after 1991, includes the credit subsidy costs of the loans or guarantees.

**250**       **General Science, Space, and Technology**

Budget resources allocated to science and research activities of the federal government that are not an integral part of the programs conducted under any other function.

Includes the research conducted by the National Science Foundation, all space programs conducted by the National Aeronautics and Space Administration, and general science research supported by the Department of Energy. Includes research and technology programs that have diverse goals and cannot readily be classified under one specific function to avoid detailed splitting of accounts.

    251     General science and basic research

Conducting the National Science Foundation programs and the general science activities of the Department of Energy.

    252     Space flight, research, and supporting activities

Development and operation of space transportation systems, basic scientific research connected with outer space, research and demonstrations designed to promote

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | | |

terrestrial applications of technology developed through space research, and development of new space technologies for future flight missions. Also includes costs of tracking and data relay support for the National Aeronautics and Space Administration space science and applications for flight missions.

**270**             **Energy**

Promoting an adequate supply and appropriate use of energy to serve the needs of the economy. Included are the energy programs of the Department of Energy and its predecessor agencies. Excludes atomic energy defense activities and general science research not closely related to energy.

      271       Energy supply

Increasing the supply of energy through the development of domestic resources and systems capable of using them. Includes the costs of research and demonstration of supply systems.

      272       Energy conservation

Encouraging the prudent use of energy resources.

      274       Emergency energy preparedness

Developing and maintaining a stockpile of energy resources (currently confined to petroleum) to meet emergency needs and associated contingency planning activities.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 276 | Energy information, policy, and regulation |

Unallocable overhead activities of the Department of Energy plus the costs of energy information and regulation activities.

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| **300** | | **Natural Resources and Environment** |

Developing, managing, and maintaining the nation's natural resources and environment. Excludes the outlays for community water supply programs, basic sewer systems, and waste treatment plants, all of which are part of a community or regional development (rather than an environmental enhancement) program or are part of the cost of operating a federal facility (such as a military installation).

| | 301 | Water resources |

Water protection, conservation, irrigation, and related activities, including the total costs of multipurpose water projects where it is not feasible to separate the transportation (navigation) or energy (power) segments of these projects.

| | 302 | Conservation and land management |

Maintaining the public domain and national forests, encouraging conservation of private land, and reclaiming surface mining areas.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|
|      | 303     | Recreational resources |

Acquisition, improvement, and operation of recreational lands and facilities, including fish, wildlife, and parks; also preserving historic areas.

|      | 304     | Pollution control and abatement |

Controlling and reducing air, water, and land pollution, or enhancing the environment. Excludes water resources programs, water treatment plants, and similar programs that are not funded as part of an environmental enhancement activity.

|      | 306     | Other natural resources |

Miscellaneous natural resources programs, not classified under other subfunctions, such as marine-, earth-, and atmosphere-related research and geological surveys and mapping.

| **350** |     | **Agriculture** |

Promoting the economic stability of agriculture and the nation's capability to maintain and increase agricultural production. Excludes programs that though related to rural development, are not directly related to agriculture, such as rural environmental and conservation programs classified in the natural resources function. Also excludes concessionary food export sales or food donations, whether overseas or for domestic income support purposes.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
|      | 351     | Farm income stabilization |

Subsidies and other payments to stabilize agricultural prices at an equitable level. Includes acquiring and storing agricultural commodity stockpiles, but does not include foreign agricultural export losses (classified in the international affairs function) or domestic donations of food (part of an income support, rather than a farm price support, program). Includes the total cash flows of farm price support loans (that is, loans that can be repaid in cash or by surrendering title to the crop used as security for the loan), which are not subject to credit reform. For all other agricultural loans and loan guarantees, includes either the total cash flows (for pre-1992 loans and loan guarantees) or the subsidy cost (for loans and loan guarantees subject to credit reform).

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
|      | 352     | Agricultural research and services |

All other agricultural programs, such as agricultural research and extension services.

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| **370** |     | **Commerce and Housing Credit** |

Promotion and regulation of commerce and the housing credit and deposit insurance industries, which pertain to

- collection and dissemination of social and economic data (unless they are an integral part of another function, such as health);

- general purpose subsidies to businesses, including credit subsidies to the housing industry (for programs subject to credit reform, includes only the credit subsidy costs of loans and loan guarantees); and

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|

• the Postal Service fund and general fund subsidies of that fund.

In general, includes credit and insurance programs; however, if such programs are a means of achieving the basic objectives of another function and are an integral part of the programs of that function, they are classified under the other function.

Excludes regional economic development programs, even if they use credit or insurance to achieve a community development objective. Also excludes other insurance or loan programs (such as railroad loans) that are an integral part of other functions.

371    Mortgage credit

Includes the cash transactions for homeownership and related loan and insurance programs for pre-credit reform activity; under credit reform, includes the credit subsidy cost of any homeownership loans or guarantees.

372    Postal Service

Any net outlays of the Postal Service included in the budget (or off-budget).

373    Deposit insurance

Insurance programs protecting deposits in certain financial institutions; programs to resolve failed institutions. Deposit insurance activities are not subject to credit reform, so the budget records the cash flows for deposit insurance rather than their subsidy values.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|--------------------------|
| | 376 | Other advancement of commerce |

Loan programs to aid specialized forms of business (such as small business) that are not included elsewhere in the functional structure. For such transactions undertaken prior to credit reform, includes the total cash flows. For activities under credit reform, includes the credit subsidy cost of the loans or guarantees. Also includes collecting and disseminating economic and demographic statistics (such as census data) and regulating business.

**400**       **Transportation**

Providing for the transportation of the general public, its property, or both, regardless of whether local or national and regardless of the particular mode of transportation. Includes

- construction of facilities;

- purchase of equipment;

- research, testing, and evaluation;

- provision of communications directly related to transportation (for example, air traffic control by the Federal Aviation Administration);

- operating subsidies for transportation facilities (such as airports) and industries (such as railroads); and

- regulatory activities directed specifically toward the transportation industry rather than toward business.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|

Excludes

- moving personnel or equipment as part of the operation of other government services;

- foreign economic assistance that may involve assisting transportation facilities or programs abroad;

- the construction of roads or trails as an integral part of the operation of public lands, parks, forests, or military reservations, unless they are specifically funded as a part of a broader transportation program;

- the construction of roads or other transportation facilities as an integral part of a broad community facility or regional development program where the clear intent of the program is regional development and the provision of transportation facilities is only an incidental by-product or means to attain the objective of regional development; and

- research and technology activities devoted to space research (except aeronautical technology), even though this research may eventually benefit general transportation.

401    Ground transportation

Aid, and/or regulation of both for the various components of ground transportation, such as roads and highways, railroads, and urban mass transit.

**Appendix IV
Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|
|      | 402     | Air transportation |

Aid for and/or regulation of air transportation, including aeronautical research conducted by the National Aeronautics and Space Administration.

|      | 403     | Water transportation |

Aid for and/or regulation of maritime commerce.

|      | 407     | Other transportation |

General transportation programs and overhead not readily allocable to any of the preceding subfunctions.

**450**        **Community and Regional Development**

Development of physical facilities or financial infrastructures designed to promote viable community economies. Includes transportation facilities developed as an integral part of a community development program (rather than a transportation program). Usually excludes aids to businesses unless such aids promote the economic development of depressed areas and are not designed to promote particular lines of business for their own sake. Usually excludes human development and services programs.

       451        Community development

Grants and related programs designed to aid largely urban community development. Includes community development block grants and predecessor activities, such as the urban renewal and model cities programs. These

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|

programs are generally carried out by the Department of
Housing and Urban Development.

| | 452 | Area and regional development |

Grants, loans, subsidies, and related aids for the economic
development of depressed areas. For pre-credit reform
loans, includes the total cash flows of the loans; for loans
under credit reform, includes the credit subsidy cost of the
loans. All these aids are generally for rural areas or are
more regional than the community development programs.
Area and regional development programs are generally
carried out by agencies other than the Department of
Housing and Urban Development, such as the Farmers
Home Administration, Economic Development
Administration, and Bureau of Indian Affairs.

| | 453 | Disaster relief and insurance |

Helping communities and families recover from natural
disasters.

| **500** | | **Education, Training, Employment, and Social Services** |

Promoting the extension of knowledge and skills,
enhancing employment and employment opportunities,
protecting workplace standards, and providing services to
the needy. Excludes education or training undertaken as an
integral part of the achievement of other functions (such as
training military personnel; veterans education, training,
and rehabilitation; or training of health workers in a health
program). Nutrition or food service programs funded
separately from social services or education are not part of
this function—they are classified as income security.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 501 | Elementary, secondary, and vocational education |

Preschool, elementary, secondary, and vocational education programs.

| | 502 | Higher education |

College and graduate school programs.

| | 503 | Research and general education aids |

Education research and assistance for the arts, the humanities, educational radio and television, public libraries, and museums.

| | 504 | Training and employment |

Job or skill training, employment services and placement, and payments to employers to subsidize employment.

| | 505 | Other labor services |

Aids to or regulation of the labor market, including gathering labor statistics and mediation and conciliation services; excludes employment and training programs and occupational safety and health programs.

| | 506 | Social services |

Programs that provide a broad range of services to individuals to help them improve their vocational capabilities (such as vocational rehabilitation) or family status; services to the poor and elderly that are not

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|

primarily for income support and that are not an integral part of some other function (such as social services block grants).

**550**            **Health**

Programs other than Medicare whose basic purpose is to promote physical and mental health, including the prevention of illness and accidents. Excludes the Medicare program, the largest federal health program, which by law is in a separate function (function 570). Also excludes federal health care for military personnel (051) and veterans (703). Also excludes general scientific research that has medical applications (such as that conducted by the National Science Foundation) and health programs financed through foreign assistance programs.

        551       Health care services

Medical services to individuals and families, whether such services are provided directly by the federal government or financed through grants, contracts, insurance, or reimbursements.

        552       Health research and training

All research programs—whether basic or applied—that are financed specifically as health or medical research. Excludes research that is an integral part of other functions (such as biomedical research in the space program).

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
|      | 554     | Consumer and occupational health and safety |

Meat and poultry inspection, food and drug inspection, consumer product safety, and occupational health and safety.

**570** | | **Medicare**

Federal hospital insurance and federal supplementary medical insurance, along with general fund subsidies of these funds and associated offsetting receipts.

| | 571 | Medicare |

Entire Medicare function.

**600** | | **Income Security**

Support payments (including associated administrative expenses) to persons for whom no current service is rendered. Includes retirement, disability, unemployment, welfare, and similar programs, except for Social Security and income security for veterans, which are in other functions. Also includes the Food Stamp, Special Milk, and Child Nutrition programs (whether the benefits are in cash or in kind); both federal and trust fund unemployment compensation and workers' compensation; public assistance cash payments; benefits to the elderly and to coal miners; and low- and moderate-income housing benefits.

Excludes (1) financial assistance for education, (2) medical care (whether in cash or in kind), (3) subsidies to businesses (such as farm price supports), and

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
|      |         | (4) reimbursement for child care services, even though any of these may end up as income to persons. Also excludes income security programs included in the Social Security function (function 650) and programs restricted to veterans and their dependents. |
|      | 601     | General retirement and disability insurance (excluding Social Security) |
|      |         | Non-needs-tested retirement and disability programs composed mainly of the Railroad Retirement Fund and special benefits for coal miners. Excludes programs specifically restricted to federal employees. |
|      | 602     | Federal employee retirement and disability |
|      |         | All funded retirement and disability programs restricted to federal employees. Includes military retirement benefits for all years, not just the years since the military retirement program began as a funded trust fund (1985). In cases where retirement benefits are not funded (such as in the case of Coast Guard retired pay), includes the cash benefits where the employees were employed (in the Coast Guard case, transportation), because otherwise those functions would never be charged for the retirement costs of their employees. |
|      | 603     | Unemployment compensation |
|      |         | Benefits not conditioned by needs tests for unemployed workers. Excludes other benefits (such as food stamps) that an unemployed person might be eligible for under other programs. |

**Appendix IV
Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 604 | Housing assistance |

Federal income support and related expenses that are specifically for financing or providing housing for individuals and families. Excludes loans, loan guarantees, or insurance. (The distinction between the housing assistance included in subfunction 604 and the mortgage credit assistance in subfunction 371 is that the subfunction 604 payments focus on subsidies to increase beneficiaries' effective income, whereas the credit subsidies in subfunction 371 are primarily aimed at encouraging the housing industry.)

| | 605 | Food and nutrition assistance |

Providing food or nutritional assistance to individuals and families.

| | 609 | Other income security |

Income security programs not included in any other subfunction. Primarily either direct payments or grants-in-aid to finance direct payments that constitute cash income to low-income individuals and families. Also includes refugee assistance and both administrative expenses and offsetting collections in the income security function that are not part of any other subfunction.

**650** **Social Security**

Federal Old-Age and Survivors and Disability Insurance Trust Funds, along with general fund subsidies of these funds and associated offsetting collections.

**Appendix IV
Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|
| | 651 | Social Security |

Includes the entire Social Security function.

| **700** | | **Veterans Benefits and Services** |

Programs providing benefits and services, the eligibility for which is related to prior military service, but the financing of which is not an integral part of the costs of national defense. As a rule, the outlays in this function are similar to those in the broader general purpose functions (such as income security or health), but restricted to veterans, their dependents, and their survivors. Excludes earned rights of career military personnel that are a cost of the defense budget (such as military retired pay or medical care).

| | 701 | Income security for veterans |

Veterans' compensation, life insurance, pensions, and burial benefits.

| | 702 | Veterans' education, training, and rehabilitation |

Composed primarily of the "G.I. Bill" readjustment, vocational rehabilitation benefits, and related programs.

| | 703 | Hospital and medical care for veterans |

Medical care and research financed by the Department of Veterans Affairs.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|------------------------|
| | 704 | Veterans' housing |

Housing loan and guarantee programs for veterans and dependents. Pre-1992 housing loans and guarantees are recorded on a cash basis, whereas under credit reform (post-1991), the budget records the credit subsidy cost of the activity.

| | 705 | Other veterans benefits and services |

Administrative expenses of the Department of Veterans Affairs.

| **750** | | **Administration of Justice** |

Programs to provide judicial services, police protection, law enforcement (including civil rights), rehabilitation and incarceration of criminals, and the general maintenance of domestic order. Includes the provision of court-appointed counsel or other legal services for individuals. Excludes the cost of the legislative branch, the police or guard activities to protect federal property, and activities that are an integral part of a broader function (such as those for postal inspectors, tax collection agents, and Park Service rangers). The cost of National Guard personnel and military personnel who are called upon occasionally to maintain public safety and the cost of military police are included under the national defense function rather than this function.

| | 751 | Federal law enforcement activities |

The costs of operating the Federal Bureau of Investigation, Customs and Border Protection, Immigration and Customs Enforcement, the Drug Enforcement Administration, and

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | | police and crime prevention activities in other programs. Also includes the readily identifiable enforcement cost of civil rights activities. |
| | 752 | Federal litigative and judicial activities |
| | | The cost of the judiciary, the cost of prosecution, and federal expenses connected with financing legal defense activities. |
| | 753 | Federal correctional activities |
| | | Covers the costs of incarceration, supervision, parole, and rehabilitation of federal prisoners. |
| | 754 | Criminal justice assistance |
| | | Grants to state and local governments to assist them in operating and improving their law enforcement and justice systems. |
| **800** | | **General Government** |
| | | General overhead cost of the federal government, including legislative and executive activities; provision of central fiscal, personnel, and property activities; and provision of services that cannot reasonably be classified in any other major function. As a rule, all activities reasonably or closely associated with other functions are included in those functions rather than being listed as part of general government. Also includes shared revenues and other general purpose fiscal assistance. |

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 801 | Legislative functions |

Includes most of the legislative branch. However, the Library of Congress (except the Congressional Research Service), the Tax Court, the Government Printing Office (except for congressional printing and binding), and the Copyright Royalty Tribunal are classified in other subfunctions.

| | 802 | Executive direction and management |

The Executive Office of the President (unless some major grants or operating programs should be included in the Office); occasionally some closely related spending outside the Office is included.

| | 803 | Central fiscal operations |

Covers the general tax collection and fiscal operations of the Department of the Treasury.

| | 804 | General property and records management |

Most of the operations of the General Services Administration (net of reimbursements from other agencies for services rendered).

| | 805 | Central personnel management |

Most of the operating costs of the Office of Personnel Management and related agencies (net of reimbursements from other agencies for services rendered).

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
|      | 806     | General purpose fiscal assistance |

Federal aid to state, local, and territorial governments that is available for general fiscal support. The transactions of the now discontinued general revenue-sharing program are included in the historical data for this subfunction. Also includes grants for more restricted purposes when the stipulated purposes cross two or more major budgetary functions and the distribution among those functions is at the discretion of the recipient jurisdiction rather than the federal government. Includes payments in lieu of taxes, broad-purpose shared revenues, and the federal payment to the District of Columbia. Excludes payments specifically for community development or social services programs.

| | 808 | Other general government |

Miscellaneous other costs, such as federal costs of territorial governments.

| | 809 | Deductions for offsetting receipts |

Includes general government function offsetting receipts that are not closely related to any other subfunction in this function.

| **900** | | **Net Interest** |

Transactions that directly give rise to interest payments or income (lending) and the general shortfall or excess of outgo over income arising out of fiscal, monetary, and other policy considerations and leading to the creation of interest-bearing debt instruments (normally the public debt). Includes interest paid on the public debt, on

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | | uninvested funds, and on tax refunds, offset by interest collections. |
| | 901 | Interest on the Treasury debt securities (gross) |
| | | Outlays for interest on the public debt. (Where this interest is paid to the public, it is on an accrual basis; all other interest outlays in the budget are on a cash basis.) |
| | 902 | Interest received by on-budget trust funds |
| | | Interfund interest collected by on-budget nonrevolving trust funds. Most of this income derives from outlays included in subfunction 901, but this subfunction also includes offsetting receipts from investments in public debt securities issued by the Federal Financing Bank (FFB). |
| | 903 | Interest received by off-budget trust funds |
| | | Interfund interest collected by off-budget nonrevolving trust funds. Normally, all of this income comes from outlays included in subfunction 901. |
| | 908 | Other interest |
| | | All other interest expenditures and offsetting receipts. The principal expenditure in this subfunction normally is interest on refunds of receipts. Since offsetting interest receipts are included in this subfunction, the subfunction totals are usually negative. |

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|---|---|---|
| | 909 | Other investment income |

The actual and estimated earnings on private securities of the Railroad Retirement Investment Trust. The actual year returns include interest, dividends, and capital gains and losses on private equities and other securities. The trust's end-of-year balance reflects the current market value of resources available to the government to finance benefits.

| | 920 | Allowances |

A category that may be included in a budget to ensure that the budget reflects the total estimated budget authority and outlay requirements for future years.

In addition to the budget authority and outlays in each of the functional classifications, the President's budget normally includes some budget authority and outlays classified as allowances.

| | 921-929 | Contingencies for specific requirements |

The specific line entries will vary from budget to budget, depending on what projections are required.

| **950** | | **Undistributed Offsetting Receipts** |

Most offsetting receipts are included as deductions from outlays in the applicable functions and subfunctions. However, there are five major categories of offsetting receipts that are classified as undistributed offsetting receipts rather than being included as offsets in any of the other functions.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 951 | Employer share, employee retirement (on-budget) |

Employing agency payments to funded retirement systems of federal employees are intragovernmental transactions (that is, they are payments by government accounts collected by other government accounts) and, hence, both the payment and collection are included in federal outlays. The payments are included in the various agency outlays, while the offsets are undistributed.[b]

Most federal employees are now covered by the Hospital Insurance portion of the Medicare program. The employing agency payments to the Hospital Insurance fund are also offset in this subfunction.

| | 952 | Employer share, employee retirement (off-budget) |

Includes collections similar in nature to those in subfunction 951, except that the accounts collecting the money are off-budget.

| | 953 | Rents and royalties on the outer continental shelf |

Rents and royalties on the outer continental shelf constitute a large source of nontax income that is largely a windfall to the government. Since there are no major government programs that give rise to this income, it would be inappropriate to offset it against the outlays in any function. Thus, the collections are undistributed.

| | 954 | Sale of major assets |

On occasion, the government derives large returns from the sale of major assets, and the proceeds of the sales are recorded in this category rather than in any major function.

**Appendix IV**
**Budget Functional Classification**

| Code | Subcode | Function or subfunction |
|------|---------|-------------------------|
| | 959 | Other undistributed offsetting receipts |
| | | This category includes items such as collections for the lease of federal lands for petroleum exploitation and a proposal for the Federal Communications Commission to conduct auctions. |

**Multifunction Account**

| | 999 | Multifunction account (used for accounts that involve two or more major functions). |
|------|---------|-------------------------|

Source: GAO.

<sup>a</sup>For years prior to 1985, when the military retirement trust fund began, the historical data included imputed accruals for retirement, with a matching imputed undistributed offsetting collection (subfunction 951). The cash retirement benefits for all years are included in the income security function.

<sup>b</sup>The historical data for this category for years prior to 1985 include an offset equal to the imputed accrual for military retirement that is included in subfunction 051. These imputations were calculated so that the data for the years prior to the creation of the military retirement trust fund would be as comparable as feasible with the subsequent years.

# Federal Budget Account Identification Code

Each account, or group of accounts in the President's budget is assigned an account identification code by the Office of Management and Budget (OMB), in consultation with the Department of the Treasury (Treasury). These codes are used to store and access data in the budget database, run computer reports, and identify accounts in OMB and Treasury documents and computer reports. The budget schedules that are included in the Budget Appendix volume of the President's budget use an 11-digit account identification code that is based on the following coding system (see table 2.)

**Table 2:  Federal Budget Account Identification Code**

| Digits | Explanation |
|---|---|
| **XX**-xxxx-x-x-xxx | Treasury agency code—The first two digits designate the agency code as assigned by Treasury. The term "agency" refers to departments, independent agencies, and instrumentalities of the U.S. government. |
| xx-**XXXX**-x-x-xxx | Account symbol—Each account has an agency-unique number assigned by Treasury, or, in the case of merged or consolidated accounts, by OMB, that corresponds to the fund type. |
| xx-xxxx-**X**-x-xxx | Transmittal code—One-digit code that identifies the nature or timing of the associated schedules, as follows:<br><br>0=Regular budget schedules<br>1=Supplemental proposals<br>2=Legislative proposals requiring authorizing legislation that are not subject to pay-as-you-go (PAYGO)<br>3=Appropriations language to be transmitted later; used when language for a significant policy proposal cannot be transmitted in the budget<br>4=Legislative proposals requiring authorizing legislation that have a PAYGO effect<br>5=Rescission proposal<br>9=Reserved for OMB use |

**Appendix V**
**Federal Budget Account**
**Identification Code**

(Continued From Previous Page)

| Digits | Explanation |
|---|---|
| xx-xxxx-x-**X**-xxx | Fund code—One-digit code that identifies the type of fund, as follows: |
| | 1=General fund |
| | 2=Special fund |
| | 3=Public enterprise revolving fund |
| | 4=Intragovernmental revolving or management fund |
| | 7=Trust non-revolving fund |
| | 8=Trust revolving fund |
| xx-xxxx-x-x-**XXX** | Subfunction code—Three-digit code that corresponds to the account's subfunctional classification. (See app. III for a further explanation of subfunctions.) |

Source: GAO.

An alternate 13-digit identification code is also used by OMB to access data in the budget database and generate computer reports. This code substitutes a 3-digit agency code[1] and a 2-digit bureau code assigned by OMB for the 2-digit agency code assigned by Treasury. (The bureau code is used to designate subordinate units within a department or agency.) The alternate OMB code was developed to facilitate the sequencing of information by agency and subordinate unit within the agency. (See fig. 3.)

---

[1] OMB agency codes are not the same as Treasury agency codes.

Appendix V
Federal Budget Account
Identification Code

## Figure 3: Federal Budget Account Identification Code Digits



Source: GAO representation of OMB data.

# Program and Financing Schedule

The Program and Financing (P&F) schedule for each budget account appears in the *Appendix* of the President's budget (see example in fig. 4). In a standard format, it provides basic information about obligations, budget authority, and outlays for the account. Part A in figure 4 shows the information that precedes the P&F schedule. The numbers on specific features mentioned in part A are explained below:

1.  The account name and the President's proposed language for the budget year's appropriation act (fiscal year 2006 in the example) related to the account appear at the top.

2.  The language of the previous year's appropriation act is used as a base. Brackets enclose material proposed for deletion.

3.  Italic type indicates new proposed language. When a regular appropriation has not been enacted at the time the budget is prepared, the Office of Management and Budget (OMB) may print only the language related to the fiscal year in question, in italics with no brackets shown.

4.  At the end of the final appropriation language paragraph, and printed in italics within parentheses, are citations to relevant authorizing legislation and to the appropriation act from which the basic text of the language is taken.

An 11-digit identification code, found at the top of the P&F schedule, facilitates computer processing of budgetary information. (See app. VI.)

The P&F schedule, part B in figure 4, consists of eight sections. The numbered sections contained in part B are described in detail after the figure.

Appendix VI
Program and Financing Schedule

**Figure 4: Example of P&F Schedule Preceded by Appropriations Language for National Flood Insurance Fund Account**



**Appendix VI**
**Program and Financing Schedule**



*(Continued from previous page)*

**B**

**3** New budget authority (gross), detail:
Spending authority from offsetting collections:
Discretionary:

| | | | | |
|---|---|---|---|---|
| 68.00 | Offsetting collections (cash) | 110 | 119 | 124 |
| 68.45 | Portion precluded from obligation (limitation on obligations) | .............. | – 6 | .............. |
| 68.61 | Transferred to other accounts | – 20 | – 20 | – 28 |
| 68.90 | Spending authority from offsetting collections (total discretionary) | 90 | 93 | 96 |

Mandatory:

| | | | | |
|---|---|---|---|---|
| 69.00 | Offsetting collections (Claims Expense) | 1,782 | 1,950 | 2,107 |
| 69.90 | Spending authority from offsetting collections (total mandatory) | 1,782 | 1,950 | 2,107 |
| 70.00 | Total new budget authority (gross) | ,872 | 2,043 | 2,203 |

**4** Change in obligated balances:

| | | | | |
|---|---|---|---|---|
| 72.40 | Obligated balance, start of year | 808 | 1,527 | 927 |
| 73.10 | Total new obligations | 2,153 | 1,524 | 1,632 |
| 73.20 | Total outlays (gross) | – 1,431 | – 2,124 | – 1,697 |
| 73.45 | Recoveries of prior year obligations | – 3 | .............. | .............. |
| 74.40 | Obligated balance, end of year | 1,527 | 927 | 862 |

**5** Outlays (gross), detail:

| | | | | |
|---|---|---|---|---|
| 86.90 | Outlays from new discretionary authority | 51 | 55 | 58 |
| 86.93 | Outlays from discretionary balances | 35 | 36 | 37 |
| 86.97 | Outlays from new mandatory authority | 653 | 695 | 805 |
| 86.98 | Outlays from mandatory balances | 692 | 1,338 | 797 |
| 87.00 | Total outlays (gross) | 1,431 | 2,124 | 1,697 |

**6** Offsets:
Against gross budget authority and outlays:
Offsetting collections (cash) from:

| | | | | |
|---|---|---|---|---|
| 88.20 | Interest on Federal securities | – 6 | – 1 | – 8 |
| 88.40 | Collection of program expenses | – 1,886 | – 2,068 | – 2,223 |
| 88.90 | Total, offsetting collections (cash) | – 1,892 | – 2,069 | – 2,231 |

**7** Net budget authority and outlays:

| | | | | |
|---|---|---|---|---|
| 89.00 | Budget authority | – 20 | – 26 | – 28 |
| 90.00 | Outlays | – 461 | 55 | – 534 |

**8** Memorandum (non-add) entries:

| | | | | |
|---|---|---|---|---|
| 92.01 | Total investments, start of year: Federal securities: Par value | 580 | .............. | .............. |
| 92.02 | Total investments, end of year: Federal securities: Par value | 784 | .............. | .............. |

Source: GAO representation of OMB data.

**Appendix VI**
**Program and Financing Schedule**

1. *Obligations by program activity.* Shows obligations for specific activities or projects. To provide a meaningful presentation of information for the program being financed, the activity structure is developed individually for each appropriation or fund account. That structure is tailored to the individual account and is not uniform across the government. According to OMB, the activities should clearly indicate the services to be performed or the programs to be conducted; finance no more than one strategic goal or objective; distinguish investment, development, grant and subsidy, and operating programs; and relate to administrative control and operation of the agency. The last entry, "total new obligations," indicates the minimum amount of budgetary resources that must be available to the appropriation or fund account in that year.

2. *Budgetary resources available for obligation.* Lists detailed information on the new budget authority in the account, the unobligated balances of budgetary resources (that have not expired) brought forward from the end of the prior year, and adjustments to those amounts. The end-of-year unobligated balance is obtained by deducting new obligations and expiring amounts.

3. *New budget authority (gross) detail.* Indicates the type of budget authority (i.e. appropriations, contract authority, and spending authority from offsetting collections) and whether the authority is discretionary (controlled by appropriations acts) or mandatory (controlled by other laws).

4. *Change in obligated balances.* Offers a bridge between the start and end of the year's obligated balances. In this section, new obligations are added to previous years' unliquidated obligations. Gross outlays are subtracted from this amount. Adjustments such as transfers of obligated balances and changes in uncollected customer payments from federal sources, are added or subtracted, as appropriate, to determine the obligated balance at year-end. Transactions in unexpired accounts as well as outlays from and adjustments in expired (but not canceled) accounts are also reported.

5. *Outlays (gross), detail.* Shows the account's gross outlays distributed on the basis of the type of the budget authority that financed the outlay. This section separately presents outlays from discretionary and mandatory budget authority and outlays from new authority and carryover balances.

6. *Offsets.* Shows the offsets to gross budget authority and outlays used to arrive at net budget authority and outlays for the account. Gross outlays are reduced by cash collections (both unexpired and expired), while gross budget authority is

**Appendix VI**
**Program and Financing Schedule**

reduced by cash collections (unexpired only) and orders from federal sources that are not accompanied by cash. The offsets section indicates the source of the offsetting collections (such as federal sources, interest on federal securities, and nonfederal sources). The change in uncollected customer payments from federal sources from the start to the end of the year is deducted from gross budget authority only. Increases in uncollected customer payments from the start to the end of the year increase the amount of the offset because the increase constitutes an increase in gross budget authority. Decreases reduce the amount of the offset because a decrease means that a portion of the offsetting collections (cash) received has been applied to liquidate obligations for which an offset was already counted. Only unexpired offsetting collections (cash) are offset from gross budget authority because gross budget authority includes only unexpired amounts.

7.  *Net budget authority and outlays*. Shows the amount available for new obligation net of the offsetting collections attributable to unexpired offsets. Net budget authority is equal to gross budget authority minus cash collections (unexpired only) and orders from federal sources that are not accompanied by cash.  Net outlays are equal to gross outlays minus cash collections (both unexpired and expired).

8.  *Memorandum (non-add) entries*. May include obligations in excess of available budgetary resources, investments in federal securities, and balances of contract authority. The amounts are not added or deducted from the budget authority or outlay amounts.

# Object Classification

Object classes are categories used in budget preparation to classify obligations by the items or services purchased by the federal government. The major object classes and their corresponding numbers are

10 – Personnel compensation and benefits
20 – Contractual services and supplies
30 – Acquisition of assets
40 – Grants and fixed charges
90 – Other

These object classes present obligations according to their initial purpose rather than the result or service. For example, the wage obligations of a federal employee who is paid to construct a building are classified as "Personnel compensation and benefits," but the contractual obligations for the purchase of a building are classified as "Acquisition of assets."

Obligations are recorded when the federal government places an order for an item or a service, awards a contract, receives a service, or enters into transactions that will require payments in the same or a future period. Obligations are also recorded when an expenditure transfer is made between federal government accounts. Object class information is mandated by law (31 U.S.C. § 1104(b)), which requires the President's budget to present obligations by object class for each account.

Object class information is reported whenever obligations are reported on a program and financing schedule (except that object class information is not reported for credit financing accounts). Therefore, obligations are reported by object class separately for the regular budget requests, supplemental budget requests, rescission proposals, and legislative proposals. Object class schedules also separately identify the following types of obligations: direct and reimbursable obligations; obligations covered by statutory limitations; and obligations for allocations between agencies.

Object classes are subdivided into smaller classes. (For an example, see fig. 5.)  The following table of object classification is taken from OMB Circular No. A-11:

| **10** | **Personnel Compensation and Benefits** |
|------|------|
| 11 | Personnel compensation |
| 11.1 | Full-time permanent |

**Appendix VII**
**Object Classification**

| 11.3 | Other than full-time permanent |
| 11.5 | Other personnel compensation |
| 11.7 | Military personnel |
| 11.8 | Special personal services payment |
| 11.9 | Total personnel compensation |
| 12 | Personnel benefits |
| 12.1 | Civilian personnel benefits |
| 12.2 | Military personnel benefits |
| 13 | Benefits of former personnel |
| **20** | **Contractual Services and Supplies** |
| 21 | Travel and transportation of persons |
| 22 | Transportation of things |
| 23 | Rent, communications, and utilities |
| 23.1 | Rental payments to the General Services Administration |
| 23.2 | Rental payments to others |
| 23.3 | Communications, utilities, and miscellaneous charges |
| 24 | Printing and reproduction |
| 25 | Other contractual services |
| 25.1 | Advisory and assistance services |
| 25.2 | Other services |
| 25.3 | Other purchases of goods and services from government accounts |
| 25.4 | Operation and maintenance of facilities |
| 25.5 | Research and development contracts |
| 25.6 | Medical care |
| 25.7 | Operation and maintenance of equipment |
| 25.8 | Subsistence and support of persons |
| 26 | Supplies and materials |
| **30** | **Acquisition of Assets** |
| 31 | Equipment |
| 32 | Land and structures |
| 33 | Investments and loans |
| **40** | **Grants and Fixed Charges** |
| 41 | Grants, subsidies, and contributions |
| 42 | Insurance claims and indemnities |

**Appendix VII**
**Object Classification**

| | |
|------|--------------------------|
| 43 | Interest and dividends |
| 44 | Refunds |
| **90** | **Other** |
| 91 | Unvouchered |
| 92 | Undistributed |
| 93 | Limitation on expenses |
| 94 | Financial transfers |
| 99 | Subtotal, obligations |
| 99.5 | Below reporting threshold |
| 99.9 | Total new obligations |

## Figure 5: Example of Object Classification for Department of Defense Program

**Object Classification** (in millions of dollars)

| Identification code 21–2010–0–1–051 | 2004 actual | 2005 est. | 2006 est. |
|---|---|---|---|
| Direct obligations: | | | |
| Personnel compensation: | | | |
| 11.7 Military personnel | 26,159 | 20,193 | 20,542 |
| 11.8 Special personal services payments | 1 | | |
| 11.9 Total personnel compensation | 26,160 | 20,193 | 20,542 |
| 12.2 Accrued retirement benefits | 4,997 | 3,879 | 4,041 |
| 12.2 Other personnel benefits | 2,130 | 2,484 | 2,460 |
| 12.2 Military personnel benefits | 2,253 | 2,499 | |
| 13.0 Benefits for former personnel | 273 | 53 | 152 |
| 21.0 Travel and transportation of persons | 660 | 347 | 229 |
| 22.0 Transportation of things | 354 | 576 | 774 |
| 25.3 Other purchases of goods and services from Government accounts | 724 | | |
| 25.7 Operation and maintenance of equipment | 28 | 31 | 65 |
| 25.8 Subsistence and support of persons | 805 | 149 | |
| 26.0 Supplies and materials | 1,960 | 110 | 132 |
| 42.0 Insurance claims and indemnities | 13 | 3 | 7 |
| 43.0 Interest and dividends | 6 | | |
| 99.0 Direct obligations | 40,363 | 30,324 | 28,402 |
| 99.0 Reimbursable obligations | 496 | 288 | 297 |
| 99.9 Total new obligations | 40,859 | 30,612 | 28,699 |

Source: GAO representation of OMB data.

# Index of Terms

## A

Account, 2
    appropriation, 2
    identification code, 61, 152
    in the President's Budget, 2
Accounts
    for purposes other than budget presentation, 5
    listed in the Standard General Ledger, see Standard General Ledger Chart of
        Accounts, 91
    payable, 7
    receivable, 7
Accrual
    accounting, 7
    basis, 18
Administrative division or subdivision of funds, 8
Administrative expense, 49
Advance
    appropriation, 8
    funding, 8
    payment, 9
Agency, 9
    debt, 41
    mission, 9
    mission statement, 75
Allocation, 9
Allotment, 10
Allowance, 10
Antideficiency
    Act, 11, 111
    Act violation, 12
Apportionment, 12
Appropriated entitlement, 13
Appropriation
    account, 2
    act, 13
    rider, 14
Appropriations, 21
Asset, 14
    sale, 14

**Index of Terms**

Authorizing
    committee, 15
    legislation, 15
Availability for new obligations, 23

## B

Backdoor authority/Backdoor spending, 16
Balanced Budget, 16
    and Emergency Deficit Control Act of 1985, 16
    and Emergency Deficit Control Reaffirmation Act of 1987, 16
Baseline, 17
Bases of budgeting, 17
Benefit-cost analysis (Economics Term), see Cost-benefit analysis, 36
Biennial budget, 19
Borrowing authority, 21
Budget, 19
    Act, 19
    activity, 20
    amendment, 20
    and accounting Act of 1921, 20
    authority, 20
    deficit, 43
    Enforcement Act (BEA), 23
    estimates, 24
    execution, 111
    formulation, 103, 116
    of the U.S. government, see President's budget, 79
    preparation, 104
    process, 103, 116
    receipts, see Governmental receipts under collections, 29
    resolution, see Concurrent resolution on the budget, 33
    surplus, 93
    update, 25
    year, 55
Budgetary
    accounting, see obligational accounting, 71
    accounts, see Standard General Ledger chart of accounts, 91
    reserves, 25
    resources, 26

**Index of Terms**

Budgeting in relation to totals, 18
Buyback, 40
Byrd Rule, 26

## C

Capital, 26
    budget, 27
    lease, 27, 73
Cash accounting, 27
Cash or cash equivalent basis, 18
CBO baseline, 17
Chain price indexes (Economics Term), 28
Chained dollars (Economics Term), 28
Clearing accounts, 5
Closed (Canceled) account, 28
Cohort, 49
Collections, 28
Combined statement of receipts, outlays, and balances of the United States government, 32
Commitment, 32
Committee allocation, 32
Comparative statement of new budget authority, 33
Concurrent resolution on the budget, 33
Congressional
    budget, 34
    Budget Act, 34
    Budget and Impoundment Control Act of 1974, 34
    budget process, 106
Consolidated
    budget, see unified budget, 99
    financial statement, 34
    working fund accounts, 4
Constant dollars (Economics Term), see Real dollar, 35
Consumer price index (CPI) (Economics Term), 35
Contingent liability, 35
Continuing appropriation/Continuing resolution (often referred to simply as "CR"), 35, 111
Contract authority, 21
Cost, 36

**Index of Terms**

Estimates, 37
Cost-benefit analysis (Economics Term), 36
Countercyclical policy (Economics Term), 37
Credit, see Federal credit, 49
    program account, 51
    reestimates, 49
    reform, 50
    Reform Act accounts, 51
    subsidy cost, 51
Current
    authority, 22
    dollar (Economics Term), 37
    level estimate, 37
    rate, 38
    services estimates, 38
    year, 55
Cyclical surplus/deficit (Economics Term), 39
Cyclically adjusted surplus or deficit (Economics Term), 39

## D

Daily Treasury Statement (DTS), see Monthly Treasury Statement, 68
Debt
    federal, 39
    held by government accounts (intragovernmental debt), 40
    held by the public, 40
    service, 42
    subject to statutory debt limit, 40
Deeming resolution, 42
Deferral of budget authority, 42
Deficiency
    apportionment, 43
    appropriation, 43
Deficit, 43
Definite authority, 23
Deflation (Economics Term), 44
Deflator (Economics Term), 44
Deobligation, 44
Deposit fund accounts, 5
Depreciation, 44

**Index of Terms**

Determination of amount, 23
Direct
    loan, 52
    loan obligation, 53
    loan subsidy cost, 52
    spending, 44
Disbursements, 45
Discount rate (Economics Term), 45
Discretionary, 46
Duration, 22

## E

Earmarking, 46
Economy Act, 47
Emergency, 47
Enhanced rescission, 86
Entitlement authority, 47
Executive budget formulation, 103
Expedited rescission, 86
Expenditure, 48
    transfer, 95
Expense, 48
Expired account, 48
Expired budget authority, 23

## F

FACTS II, 48
FASAB, see Federal Accounting Standards Advisory Board, 49
Federal
    Accounting Standards Advisory Board, 49, 122
    budget process, 102, 116
    credit, 49
    Credit Reform Act (FCRA), see Credit reform, 50
    Financing Bank (FFB), 54
    fund accounts, 3
Feeder account, 54
Financial

**Index of Terms**

accounting, see Proprietary accounting, 81
    statements, 54
Financing account, 51
Fiscal
    policy (Economics Term), 55
    year, 55
Fixed appropriation account, 56
Foreign currency fund accounts, 6
Forms of budget authority, 21
Forward funding, 56
Franchise fund, 56
FTE (full-time equivalent), 57
Full funding, 57
Functional classification, 57, 124
Fund accounting, 58

## G

GDP (Gross Domestic Product) (Economics Term), 58
GDP Price Index (Economics Term), 58
General
    fund accounts, 3
    fund expenditure account, 3
    fund receipt account, 3
Generational accounting, 58
GNP (Gross National Product) (Economics Term), 59
Government Performance and Results Act (GPRA), 59
Government-Sponsored Enterprise (GSE), 59
Governmental receipts, 29
GPRA, see Government Performance and Results Act, 59
Gramm-Rudman-Hollings (GRH), 60
Grant, 60
Gross
    Basis of budgeting, 18
    Domestic Product, see GDP, 58
    federal debt, 41
    National Product, see GNP, 59
Guaranteed loan, 53
Guaranteed loan subsidy cost, 52

**Index of Terms**

# I

Identification code, 61, 152
Implicit price deflator (Economics Term), 61
Impoundment, 61, 112
Incremental funding, 62
Indefinite authority, 23
Inflation (Economics Term), 62
Inflator (Economics Term), 62
Internal control, 62
Intragovernmental
    debt, see Debt held by government accounts, 40
    fund accounts, 3
    revolving fund account, 3
    transfers, 31

# J

Joint resolution, 62
Justification, 63

# L

Lease-purchase, 63
Liability, 63
Life-cycle costs,  64
Limitation, 64
Line
    item, 64
    item veto, 65
Liquidating
    account, 51
    appropriation, 65
Loan guarantee commitment, 53
Lockbox, 65

**Index of Terms**

# M

Management fund account, 4
Mandatory, 66
Mark-up, 66
Means of financing, 66
Mid-session review of the budget, 67, 106
Mixed-ownership government corporation, 67
Monetary policy (Economics Term), 67
Money supply (Economics Term), 68
Monthly Treasury Statement (MTS), 68
Multiple-year authority (Multiyear),  22
Multiyear budget planning, 68

# N

National Income and Product Accounts (NIPA) (Economics Term), 69
Negative subsidy receipt account, 51
Net
    Basis of budgeting, 18
    present value (Economics Term), 69
Nominal dollar (Economics Term), 69
Nonbudgetary, 69
Nonexpenditure transfer, 96
No-year authority, 22

# O

Object classification, 70, 160
Obligated balance, 71
Obligation, 70
    limitation, see Limitation, 70
Obligational
    accounting, 71
    authority, 71
Obligations basis, 18
Off-budget, 72
Offsetting

**Index of Terms**

collections, 29
governmental collections, 30
governmental receipts, 32
receipts, 30
receipts and collections, 22
OMB Circular No. A-11, 73
On-budget, 73
One-year authority, 22
Operating
budget, 73
lease, 73
Outcome measure, 75
Outlay, 73
rate, see Spendout rate/Outlay rate, 91
Output
goal, 75
measure, 76
Outyear, 74
Oversight committee, 74

# P

Passback, 105
Pay-as-you-go (PAYGO), 75
Performance
and Accountability Report (PAR), 76
budget, 76
budgeting, 75
goal, 76
measure/Performance indicator, 76
measurement, 78
plan, 77
report, 77
Permanent authority, 22
Point of order, 78
Present value (Economics Term), 79
President's budget, 79
Prior year, 56
Program, 79

**Index of Terms**

account, 79
activity, 77
and financing schedule, 79
evaluation, 80
year, 56
Project, or Activity (PPA), 80
Projections, 80
Proprietary
accounting, 81, 120
accounts, see Standard General Ledger chart of accounts, 91
receipts from the public, 31
Public debt, see Treasury debt/Public debt, 41
Public enterprise revolving fund account, 4
Public-private partnership, 81

## R

Real
dollar (Economics Term), 81
economic growth (Economics Term), 82
interest rate, 82
measures (Economics Term), 82
Reapportionment, 82
Reappropriation, 22
Reauthorization, 82
Receipts, see Governmental receipts under Collections, 29
Recession (Economics Term), 83
Reconciliation, 83
bill, 83
instruction, 83
resolution, 84
Reduction, 84
Refunds, 30, 84
Reimbursement, 84
Reimbursements, 30
Reobligation, 85
Reprogramming, 85
Rescission, 85
bill, 87

**Index of Terms**

Results-based budgeting, see Performance budgeting, 75
Revenue, 87
Revolving fund, 88
Risk category, 50
Rollover, 88

## S

Scorekeeping, 88
    rules, 88
Scoring, see Scorekeeping, 89
Seasonal rate, 89
Seigniorage, 89
Separate enrollment, 89
Sequester, see Sequestration, 90
Sequestration (Budget Enforcement Act Term), 90
Special
    fund accounts, see Federal fund accounts under Accounts classified by fund
        types, 4
    fund expenditure account, 5
    fund receipt account, 4
Spending
    caps, 90
    committee, 91
Spendout rate/Outlay rate, 91
Standard General Ledger (SGL) chart of accounts , 91
Standardized budget surplus/deficit, see structural/standardized budget
   surplus/deficit, 92
Statement of Federal Financial Accounting Standards (SFFAS), 91
Statutory debt limit, 41
Strategic
    goal/Strategic objective, 77
    plan, 77
Structural surplus/deficit (Economics Term), see Cyclically adjusted surplus or
   deficit, 39
Structural/standardized budget surplus/deficit (Economics Term), 92
Subcommittee allocation, 92
Subfunction, 92
Subsidy, 92
    cost, 93

**Index of Terms**

Supplemental appropriation, 93
Surplus, 93
Suspense accounts, 6

## T

Tax, 94
    credit, 94
    deduction, 94
    expenditure, 94
Technical and economic assumptions, 95
302(a) allocation, 95
302(b) allocation, 95
Timing of legislative action, 22
Total,
    deficit, see Unified deficit/Total deficit, 44
    surplus, see Unified surplus/Total surplus, 93
Transfer, 95
    appropriation (Allocation) accounts, 6
    authority, 96
    payment (Economics Term), 96
Transfers between federal and trust fund accounts, 30
Treasury
    bill, 97
    bond, 97
    debt/Public debt, 41
    note, 97
    security, 97
Trust
    fund accounts, see President's budget, 5
    fund expenditure account, 5
    fund receipt account, 5
    revolving fund account, 5

## U

Uncollected customer payments from federal sources, 97
Undelivered orders, 98
Undistributed offsetting receipts, 98

**Index of Terms**

Unemployment rate (Economics Term), 98
Unexpended balance, 72
Unexpired budget authority, 23
Unfilled customer orders, 98
Unfunded mandate, 99
Unified
    budget, 99
    deficit/Total deficit, 44
    surplus/Total surplus, 93
Unliquidated obligations, 99
Unobligated balance, 72
User fee/User charge, 100

## V

Views and estimates report, 100

## W

Warrant, 101
Wholly-owned government corporation, 101
Working capital fund, 101

# Image Sources

This section contains credit and copyright information for images and graphics in this product, as appropriate, when that information was not listed adjacent to the image or graphic.

Front cover clockwise:

PhotoDisc (Treasury)

Eyewire (White House)

GAO (capitol)

GAO's Mission

The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates."

Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone:   Voice:   (202) 512-6000
                     TDD:     (202) 512-2537
                     Fax:     (202) 512-6061

To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

Congressional Relations

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

Public Affairs

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548

PRINTED ON ♻ RECYCLED PAPER

# EXHIBIT 4



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:      Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:   Temporary Pause of Agency Grant, Loan, and Other Financial Assistance
           Programs


The American people elected Donald J. Trump to be President of the United States and gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024, of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal financial assistance, such as grants and loans. Career and political appointees in the Executive Branch have a duty to align Federal spending and action with the will of the American people as expressed through Presidential priorities. Financial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve.

This memorandum requires Federal agencies to identify and review all Federal financial assistance[1] programs and supporting activities consistent with the President's policies and requirements.[2]  For example, during the initial days of his Administration, President Donald J. Trump issued a series of executive orders to protect the American people and safeguard valuable taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025), *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20, 2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or administer" in various forms, but this term does not include assistance provided directly to individuals. For the purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs (1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or subrecipients of any type except for assistance received directly by individuals.

[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders. In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities. The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis. To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

2

EXHIBIT 5



**THE ADMINISTRATOR**
WASHINGTON, D.C. 20460

Acting Deputy Administrator W.C. McIntosh
U.S. Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

March 2, 2025

Office of Inspector General
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Dear Acting Inspector General Murley:

I am formally referring to your office urgent and deeply concerning matters of financial mismanagement, conflicts of interest, and oversight failures within the Greenhouse Gas Reduction Fund (GGRF).

To restore integrity and public trust, the Environmental Protection Agency (EPA) has launched certain oversight and accountability measures that still exist despite the GGRF being designed to limit oversight. We have placed staff on administrative leave, begun a full assessment of internal controls, and are cooperating with the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) in their ongoing investigation.

Given the severity of the alleged misconduct, waste, conflicts of interest, and potential fraud within the GGRF program, the Administrator is conducting a comprehensive review. Concurrent investigations by the Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) are underway. In response to these developments, the financial institution has voluntarily paused further disbursements, aligning with the ongoing investigation by DOJ and FBI's publicly reported recommendation to freeze the funds. These decisive actions aim to safeguard federal funds and ensure adherence to congressional intent.

**Systemic Failures in Oversight of GGRF and Disturbing Public Information**

Recent findings reveal a pattern of reckless financial management, blatant conflicts of interest, astonishing sums of tax dollars awarded to unqualified recipients, and severe deficiencies in regulatory oversight under the prior administration. The EPA Office of Inspector General (OIG) plays a critical role in eliminating waste and abuse, and we stand with your office in our shared mission to restore accountability and prevent further misuse of taxpayer dollars.

One of the most disturbing initial indicators of financial misconduct is a publicly circulated video of a former Biden Administration EPA political appointee boasting that officials were "tossing gold bars off the Titanic" — rushing to distribute billions in taxpayer dollars before the incoming administration could review or halt improper disbursements.[1] Even more troubling, the official implied that political favoritism influenced funding decisions, with expectations of securing employment at grant-recipient organizations.

**Documented Evidence of Potential Financial Misconduct**

These are not hypothetical concerns; they are supported by troubling evidence that continues to emerge of improper conduct, including:

1. Lack of EPA Oversight in GGRF Distribution

- A large private-sector financial institution was used as an external financial agent, holding $20 billion in taxpayer dollars — an unprecedented arrangement for EPA.
- Only eight prime recipients controlled all $20 billion, acting as pass-through entities to subrecipients — many of which were also structured as pass-throughs, raising serious concerns about transparency and accountability.
- The design of this scheme removed $20 billion from governmental oversight in the days, weeks, and months before a new administration took office.
- The unusual and apparently improper structure of the agreements governing the administration of the GGRF altogether excluded EPA from being a party to Account Control Agreements (ACAs) with subrecipients.

2. Conflicts of Interest and Political Favoritism

- Jahi Wise, the former director of the GGRF, personally oversaw a $5 billion grant to his previous employer, the Coalition for Green Capital — without recusing himself.2

---

[1] https://www.youtube.com/watch?v=CblV6EwzKxg

- A $2 billion grant was awarded to Power Forward Communities, a new nonprofit with ties to Stacey Abrams, despite reporting only $100 in total revenue in 2023.[2]
- Young, Gifted & Green was awarded $20 million, even though its CEO applied for funding while serving on the White House Environmental Justice Advisory Council.[3]

3. Prime Recipients' Lack of Financial Competency

- Recipients were required to begin drawing down funds within 21 days even though EPA, apparently recognizing the lack of qualifications, deemed it necessary that the recipients complete training on "How to Develop a Budget" within 90 days.[4]
- The EPA itself determined that recipients lacked basic financial competency — yet allowed them to manage and distribute billions of taxpayer dollars.
- If an entity requires 90 days to learn how to create a budget, it cannot be trusted to start responsible distribution of taxpayer funds within 21 days.

These examples are the tip of the iceberg and suggest a deeply entrenched pattern of political favoritism, lack of qualifications, and other possibly unlawful allocation of taxpayer funds. Disturbingly, these cases likely represent only a fraction of broader issues.

**Failure of Internal Controls & Structural Weaknesses in GGRF Management**

Your predecessor testified before Congress last September, describing the GGRF's financial structure as "fantastically complex."[5] What we have uncovered since then raises even greater concerns:

- Financial Agent Agreements, Account Control Agreements (ACAs), and Amended Account Control Agreements, signed in the final months (and in some cases just days) of the Biden Administration, *reduced* rather than enhanced EPA oversight.

---

[2] Thomas Catenacci, "DOGE Finds $2 Billion in Taxpayer Funds Earmarked for Stacey Abrams-Linked Group," *Washington Free Beacon*, last modified February 19, 2025, https://freebeacon.com/trump-administration/billions-doge-found-parked-at-bank-earmarked-for-stacey-abrams-backed-green-group/.
[3] Thomas Catenacci, "Biden Environmental Justice Adviser Received Millions in Taxpayer Funds After Personally Applying For EPA Grant," *Washington Free Beacon*, last modified February 24, 2025, https://freebeacon.com/energy/biden-environmental-justice-adviser-received-millions-after-personally-applying-for-epa-grant/.
[4] U.S. Environmental Protection Agency, "RAIN-2024-G01," *EPA Grants*, last modified March 4, 2024, https://www.epa.gov/grants/rain-2024-g01.
[5] U.S. House Committee on Energy and Commerce "Holding the Biden-Harris EPA Accountable for the Radical Rush-to-Green Spending," https://www.youtube.com/watch?v=dkgMglo8g9g (34 minute mark), 19 September 2024.

- ACAs governing the GGRF appear to have been hastily amended, at the behest of GGRF recipients and without consideration, in the days leading up to Inauguration Day.
- EPA was not a party to the Account Control Agreements with subrecipients, allowing taxpayer dollars to be further distributed without proper agency oversight.
- The ironically named "Notice of Exclusive Control," the ostensible purpose of which is to allow EPA to take control of accounts at the financial agent, grants prime recipients and subrecipients the ability to transfer funds to private financial institutions of their choosing outside the scope of the financial agent agreement. It would have been more appropriately called a Notice of Less Control given the manner in which it granted recipients more power over the disposition of the money and the status of their accounts prior to the amendment.
- Contract provisions appear to have been intentionally structured to weaken EPA oversight.

**Immediate Action & Request for OIG Assistance**

Given the magnitude and significant risks to taxpayer funds, I am formally requesting your assistance with a comprehensive review of this arrangement and the issues involved. I value your recommendations.

If your office requires additional resources to conduct a full investigation, please let us know immediately. The EPA is committed to providing any necessary support to ensure a thorough and independent review of the program.

While these issues can be fully investigated, we will continue to aggressively pursue enhanced oversight, answers, and accountability. We stand firmly alongside the Office of the Inspector General in our shared mission to eliminate waste, fraud, and abuse with the EPA. I look forward to your recommendations.

                                        Sincerely,

                                        W.C. McIntosh

                                        W.C. McIntosh
                                        Acting Deputy Administrator
                                        U.S. Environmental Protection Agency

cc:
        Lee Zeldin, Administrator, U.S. EPA
        James Payne, Acting General Counsel, U.S. EPA
        Eric Amidon, Chief of Staff, U.S. EPA

# EXHIBIT 6



# Audit of the EPA's Greenhouse Gas Reduction Fund Solar for All Program

January 7, 2026  |  Report No. 26-P-0008

## Abbreviations

| | |
|---|---|
| C.F.R. | Code of Federal Regulations |
| EPA | U.S. Environmental Protection Agency |
| OGGRF | Office of Greenhouse Gas Reduction Fund |
| OIG | Office of Inspector General |

## Cover Image

Cinnaminson Solar Farm located on a portion of a former Superfund site and successfully redeveloped into an alternate energy source for the Cinnaminson Township in New Jersey. (EPA image)

**Are you aware of fraud, waste, or abuse in an EPA program?**

**EPA Inspector General Hotline**
1200 Pennsylvania Avenue, NW (2431T)
Washington, D.C. 20460
(888) 546-8740
OIG.Hotline@epa.gov

Learn more about our OIG Hotline.

**EPA Office of Inspector General**
1200 Pennsylvania Avenue, NW (2410T)
Washington, D.C. 20460
(202) 566-2391
www.epa.gov/oig

Subscribe to our Email Updates.
Follow us on X @EPAoig.
Send us your Project Suggestions.



**OFFICE OF INSPECTOR GENERAL**
U.S. ENVIRONMENTAL PROTECTION AGENCY

January 7, 2026

<u>MEMORANDUM</u>

**SUBJECT:**    Audit of the EPA's Greenhouse Gas Reduction Fund Solar for All Program
                  Report No. 26-P-0008

**FROM:**        Nicole N. Murley, Deputy Inspector General performing the duties
                  of Inspector General *Nicole N. Murley*

**TO:**           Melissa Wise, Director
                  Office of the Chief Grants Officer
                  Office of Finance and Administration

This is our report on the subject audit conducted by the U.S. Environmental Protection Agency Office of Inspector General. The project number for this audit was OA-FY25-0043. This report discusses the EPA's Greenhouse Gas Reduction Fund Solar for All program, including a description of the status of funds, top recipients, risks, and impacts. The former Office of Greenhouse Gas Reduction Fund provided technical comments to an earlier version of this report, and we incorporated changes as appropriate. Final determinations on matters in this report will be made by EPA managers in accordance with established audit resolution procedures.

A response to this report is not required because the report contains no recommendations. If your office submits a response, however, it will be posted on the OIG's website, along with our memorandum commenting on the response. The response should be provided as an Adobe PDF file that complies with the requirements of section 508 of the Rehabilitation Act of 1973, as amended. The final response should not contain data that your office does not want released to the public; if the response contains such data, your office should identify the data for redaction or removal along with corresponding justification.

We will post this report to our website at www.epa.gov/oig.

## Background

This report provides information about the EPA's Greenhouse Gas Reduction Fund Solar for All program and its activities. Our objective for this audit was to describe the status of funds, top recipients, and potential risks and impacts of the Solar for All program. However, the EPA terminated the program in August 2025.

*To report potential fraud, waste, abuse, misconduct, or mismanagement, contact the OIG Hotline at (888) 546-8740 or OIG.Hotline@epa.gov.*

1

The Inflation Reduction Act of 2022, Pub. L. No. 117-169, signed on August 16, 2022, provided the EPA with $27 billion to establish the Greenhouse Gas Reduction Fund. Of that funding, approximately $20 billion was for the National Clean Investment Fund and Clean Communities Investment Accelerator programs and $7 billion was for zero-emissions technologies, also known as Solar for All. This program was meant to enable low-income and disadvantaged communities to deploy and benefit from zero-emissions technologies, including to carry out other greenhouse gas reduction activities. The Inflation Reduction Act of 2022 included a statutory deadline of September 30, 2024, for the EPA to obligate the Greenhouse Gas Reduction Fund appropriations for eligible recipients.

Also, the Inflation Reduction Act of 2022 provided the EPA $30 million to cover administrative costs necessary to carry out activities for the entire Greenhouse Gas Reduction Fund. The EPA stated that it allocated the administrative funding across budget categories including compensation and benefits, travel, expenses, and contracts. According to the EPA's Office of Greenhouse Gas Reduction Fund, or OGGRF, it used most of the administrative funds to implement and oversee the Greenhouse Gas Reduction Fund, but some funding was utilized for contracts to work on quality assurance and transaction testing and to assist with the data intake system for performance reporting. Additionally, the EPA's Office of the Chief Financial Officer, Office of General Counsel, and Office of Mission Support utilized some of the administrative funding to provide support services to the OGGRF.

The OGGRF issued a notice of funding opportunity from June to October 2023, which informed the public of the Agency's intention to award Solar for All grants. Also, the OGGRF designed the Solar for All competition and implementation framework, evaluated the proposals, and, in April 2024, announced the recipient awards.

In July 2024, two months before the September statutory deadline, the EPA obligated approximately $6.98 billion, or 99.7 percent, of Solar for All funding to grant recipients spanning 36 states, 19 nonprofit organizations, four tribal communities, and one municipality across the United States and its territories. For the remaining approximately .3 percent of funds awarded, the EPA entered into a $24 million interagency agreement with the U.S. Department of Energy's National Renewable Energy Laboratory to provide technical assistance to grant recipients by dedicating $400,000 per award.

The One Big Beautiful Bill Act, Pub. L. No. 119-21, signed on July 4, 2025, repealed the Greenhouse Gas Reduction Fund and rescinded unobligated funds. A termination memorandum issued to all grant recipients on August 7, 2025, stated, "As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All." The memorandum required recipients to provide final financial, technical, and other programmatic closeout reports within 120 days of grant closure. The memorandum further advised that recipients may use grant funds to close out their grants, including for reasonable and necessary costs that might occur after the date of the memorandum. Finally, recipients

were instructed to promptly return to the EPA all unused grant funding that was not authorized to be retained after closeout of a grant.

## Responsible Office

In March 2023, the EPA established the OGGRF to develop, implement, and oversee competitive awards programs that support deployment of projects to reduce or avoid emissions of greenhouse gases and other pollutants, with an emphasis on low-income and disadvantaged communities. As of August 2025, the OGGRF resided in the Office of the Administrator. In September 2025, the EPA launched a reorganization plan that created the Office of Finance and Administration. In November 2025, the Agency moved the OGGRF to the Office of Finance and Administration under the Office of the Chief Grants Officer, where the OGGRF is split into two branches within the Compliance and Oversight Division, one of which will be for the Solar for All program to conduct closeout activities.

## Scope and Methodology

We conducted this performance audit from March to September 2025 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained provides a reasonable basis for our conclusions based on our audit objective.

We assessed the internal controls necessary to satisfy our audit objective.[1] In particular, we assessed the significant internal control components—as outlined in the U.S. Government Accountability Office's *Standards for Internal Control in the Federal Government*—to the extent necessary to address our audit objective. Any potential internal control deficiencies we found are discussed in this report. Because our audit was limited to the internal control components deemed significant to our audit objective, it may not have disclosed all internal control deficiencies that may have existed at the time.

To accomplish our objective, we judgmentally selected the top five grant recipients based on total grant obligation amounts and reviewed statutes, regulations, and policies, as well as grant terms and conditions and grant recipient work plans. Additionally, we interviewed the OGGRF staff and obtained information and data from the OGGRF and grant recipients. We also obtained data from the EPA's financial system related to grant award amounts and drawdowns with assistance from OIG data analysis staff.

---

[1] An entity designs, implements, and operates internal controls to achieve its objectives related to operations, reporting, and compliance. The U.S. Government Accountability Office sets internal control standards for federal entities in GAO-14-704G, *Standards for Internal Control in the Federal Government*, issued September 10, 2014.

## Results

Through our work, we identified the EPA Solar for All program's status of funds, top recipients, and risks and impacts.

### *Status of Funds*

 The EPA obligated all $7 billion of the Solar for All program funds when it awarded grants to 60 recipients. As of August 7, 2025, the 60 grant recipients had drawn down approximately $71 million, or 1.02 percent, of the obligated funds for various aspects of project planning and implementation. According to the OGGRF, as of July 2025, the Agency had spent approximately $15.3 million, or 51 percent, of the administrative funding. Also, as of August 12, 2025, the National Renewable Energy Laboratory had drawn down approximately $2.5 million, or 10.42 percent, of the interagency agreement funds for technical assistance provided to grant recipients.

### *Top Recipients*

 The EPA awarded the top five grant recipients approximately $1.3 billion, or 18.84 percent, of the $6.98 billion in obligated funds. The five recipients intended to use the funds to administer six grant programs across 48 states and territories as well as tribal lands in five states. Figure 1 shows the top five recipients and total rounded funds awarded.

**Figure 1: The top five recipients and total funds awarded**



Source: EPA Solar for All Program awards documentation. (EPA OIG table)

4

## *Program Risks*

 Based on our audit of the EPA's Solar for All program, we identified four risk areas that the EPA should consider, plan for, and address in its implementation of new grant programs. The risks relate to resources for oversight and controls in the form of subrecipient monitoring, standard operating procedures, and quality assurance plans.

Availability of Administrative Funding for Program Oversight: According to the OGGRF, the entire $30 million in administrative funding was anticipated to be exhausted during fiscal year 2026. The EPA previously had requested an additional $5 million in administrative funds to implement the program in fiscal years 2024 and 2025; however, the OGGRF stated that the funding was not allocated to the program. The OGGRF also stated that another EPA office provided the OGGRF with $1 million in surplus funds to be utilized through the end of fiscal year 2025.

Prior to the termination of the grants, the OGGRF would not have had enough administrative funding in place to perform oversight during the five-year period of performance for the 60 grants. According to the OGGRF, grants oversight would include project officers performing transaction testing, annual baseline monitoring, progress reviews, project file reviews, and on-site reviews as a best practice. The OGGRF project officers responsible for managing the top five grant recipients told us that they had not met with recipients in person, and OGGRF management stated that these in-person visits could not be performed due to funding constraints.

The Government Accountability Office's *Standards for Internal Control in the Federal Government* requires entities to determine an oversight structure to fulfill responsibilities set forth by applicable laws and regulations. Even though, according to the OGGRF, the Agency rescinded the administrative funding for the terminated 60 grants, funding will be needed to fulfill closeout responsibilities. The EPA needs to ensure that administrative funding is available for oversight during all phases of any new grant program.

Monitoring of Subrecipient Awards: The OGGRF stated that details about subrecipients are documented in a recipient's individual work plan. However, based on our review of the documented responses, the OGGRF did not have a mechanism in place to track subrecipients' project and funding information to ensure that there was no duplication or overlap of projects or funding among the various subawards.

For example, during our review of recipients' work plans, we noted that there was a subrecipient who was also a recipient of another Solar for All program grant. The recipient could have potentially performed work in the same geographical area as both a recipient and a subrecipient, creating a risk of funding and overlap of projects. When we asked a project officer about the recipient also being a subrecipient, the project officer stated that the recipient was responsible for ensuring that there is no duplication of work. The *Solar for All Terms and Conditions*, dated December 3, 2024, states that project officers or their designees will oversee grant agreements through activities that could include "[c]losely monitoring the recipient's management and oversight of [s]ubrecipients... ." Prior to the program termination, OGGRF management stated that it expected to complete its list of subrecipients to more

easily track subrecipients across all grants. However, information identified by the OGGRF for tracking did not include potential project or funding overlap. If subrecipient monitoring is inadequate, there is a risk that federal grant funds may not be spent as intended. When performing oversight monitoring of recipients' work plans in new grant programs, the EPA should consider developing additional guidance on recipients' use of subrecipients as part of their oversight monitoring as suggested in the grant Uniform Guidance, 2 C.F.R. § 200.331 ("Subrecipient and contractor determinations").

Timely Development of Standard Operating Procedures: As of June 23, 2025, the OGGRF had developed some standard operating procedures for its employees, but the office was still in the process of developing procedures that related to implementation, sufficient progress evaluations, quality assurance procedures, advance grant monitoring, project-file reviews, and onsite reviews. Prior to the Solar for All program termination, the OGGRF stated that its goal was to have most standard operating procedures completed by the end of August 2025, depending on program priorities, to help ensure that the office consistently implemented the program and performed oversight of program grantees. The Government Accountability Office's *Standards for Internal Control in the Federal Government* states that management should have documentation for the effective design, implementation, and operating effectiveness of an entity's internal control system. Since the grants had already been awarded, standard operating procedures were essential to ensuring effective program implementation and operations. When implementing new grant programs, the Agency should develop standard operating procedures prior to awarding grants so that control mechanisms are already in place.

Timely Approval of Quality Assurance Plans: As of August 2025, the OGGRF had not submitted or obtained approval of the quality management plans and quality assurance project plans from the Agency's Enterprise Quality Management Division for approximately 50 out of 60 grant recipients (83 percent). The EPA's Directive No. CIO 2105-P-01.4, *Environmental Information Quality Procedure*, signed on March 20, 2024, requires that all assistance agreements involving environmental information operations develop a quality management plan and a quality assurance program plan prior to any information gathering work, or use, except in special circumstances. A lack of quality assurance measures could lead to inaccurate project data collection and reporting issues. OGGRF management stated that staff were taking steps to ensure that grant recipients did not estimate program outcomes, such as emissions reductions or household savings, prior to having approved quality assurance plans. When creating new grant programs, the EPA should ensure that the required Agency programs submit and obtain approval of quality plans in a timely manner.

## *External Impacts*



Prior to the One Big Beautiful Bill Act, several executive orders and presidential memorandums impacted Solar for All program implementation and operations. For example, Executive Order 14148, *Initial Rescissions of Harmful Executive Orders and Actions*, issued on January 20, 2025, rescinded previous executive orders including some related to climate change which, according to the OGGRF, caused grant recipients to change how they

determined eligible project areas. In addition, according to the OGGRF, the presidential memorandums titled *Hiring Freeze* and *Extension of Hiring Freeze* issued on January 20, 2025, and April 17, 2025, respectively, prevented the OGGRF from hiring additional staff to assist with implementation and oversight. OGGRF stated that, since January 1, 2025, it had lost 21 staff for various reasons, resulting in an approximately 29 percent overall reduction in staff.

The top five Solar for All program grant recipients noted that Executive Order 14154, *Unleashing American Energy*, issued on January 20, 2025, which instructed agencies to pause disbursement of funds, caused an approximately month-long pause in their ability to draw down funds to implement work plans. The EPA needs to consider any other impacts to the terminated grant recipients, such as documentation requirements and program costs, in addition to those associated with the pause in disbursement of funds, during the Agency's closeout of the program operations.

## Conclusion

Given the descriptive nature of our objective to address status of funds, top recipients, and risk areas and impacts, we do not make any recommendations for the EPA. However, the EPA should consider the applicability of the risk areas we have flagged when implementing new programs. It is critical that the Agency consider the amount of funding needed for the full performance period of a program, track subawards to ensure no duplication of projects or funding, develop operating procedures at the start of a program for consistency in program operations, and approve quality assurance plans in a timely manner. Consideration of these areas will help the Agency ensure that it has effective oversight and program success as well as compliance with federal regulations and EPA policies for newly established programs.

cc: Lee Zeldin, Administrator
    David Fotouhi, Deputy Administrator
    Travis Voyles, Associate Deputy Administrator
    Eric Amidon, Chief of Staff, Office of the Administrator
    Wesley J. Carpenter, Deputy Chief of Staff for Management, Office of the Administrator
    Paige Hanson, Agency Follow-Up Official (the CFO)
    Susan Perkins, Agency Follow-Up Coordinator
    José Kercadó, Agency Follow-Up Coordinator
    Andrew LeBlanc, Agency Follow-Up Coordinator
    Shay Bracey, Agency Follow-Up Coordinator
    Sean Donahue, General Counsel
    Sarah Talmage, Associate Administrator for Congressional and Intergovernmental Relations
    Cora Mandy, Deputy Associate Administrator for Public Affairs
    Tyler Rubright, Acting Director, Continuous Improvement Division
    Caitlin Schneider, Audit Follow-Up Coordinator, Office of the Administrator
    Edith Chu, Audit Follow-Up Coordinator, Office of the Administrator

Shari Grossarth, OIG Liaison, Office of Policy, Office of the Administrator

Carolina Penalva-Arana, GAO Liaison, Office of Policy, Office of the Administrator

Gregory Scott, Director, Compliance & Oversight Division, Office of the Chief Grants Officer, Office of Finance and Administration.

Julie Zavala, Manager, Oversight of Greenhouse Gas Reduction Fund, Solar for All, Office of the Chief Grants Officer, Office of Finance and Administration

Aileen Nowlan, Manager, Oversight of Greenhouse Gas Reduction Fund, National Clean Investment Fund and Clean Communities Investment Accelerator Programs, Office of the Chief Grants Officer, Office of Finance and Administration

Nick Thorpe, Senior Advisor, Oversight of Greenhouse Gas Reduction Fund, Solar for All, Office of the Chief Grants Officer, Office of Finance and Administration

Melissa Hopkinson, Project Officer, Oversight of Greenhouse Gas Reduction Fund, Solar for All, Office of the Chief Grants Officer, Office of Finance and Administration

Vineet Pandharpurkar, Project Officer, Oversight of Greenhouse Gas Reduction Fund, Solar for All, Office of the Chief Grants Officer, Office of Finance and Administration



## Whistleblower Protection

U.S. Environmental Protection Agency

*The whistleblower protection coordinator's role is to educate Agency employees about prohibitions against retaliation for protected disclosures and the rights and remedies against retaliation. For more information, please visit our website.*

## Contact us:

 **Congressional & Media Inquiries:** OIG.PublicAffairs@epa.gov

 **EPA OIG Hotline:** OIG.Hotline@epa.gov

 **Web:** epa.gov/oig

## Follow us:

X: @epaoig

LinkedIn: linkedin.com/company/epa-oig

YouTube: youtube.com/epaoig

Instagram: @epa.ig.on.ig



www.epa.gov/oig

# EXHIBIT 7

# United States Senate

WASHINGTON, DC 20510

August 14, 2025

The Honorable Lee M. Zeldin
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

Dear Administrator Zeldin:

We write regarding the Environmental Protection Agency's (EPA) continued efforts to illegally claw back billions of dollars in already-obligated clean energy funding from the Greenhouse Gas Reduction Fund (GGRF). On July 3, 2025, EPA's Department of Justice (DOJ) counsel represented to the D.C. Circuit that, once enacted, the One Big Beautiful Bill Act (OBBBA) "would rescind the appropriated [GGRF] funds that plaintiffs sought to reinstate through this action." Counsel for those GGRF grantees—who had received funding though the GGRF's National Clean Investment Fund (NCIF) and Clean Communities Investment Accelerator (CCIA)—countered this faulty representation in a letter filed with the court on July 7, 2025; one of the undersigned (and Ranking Member of the Senate Environment and Public Works Committee with jurisdiction over EPA) entered a statement into the Congressional Record on July 9, 2025, further rebutting this erroneous representation.

Unfortunately, EPA continues to make false claims that the OBBBA rescinded previously-obligated GGRF funding. On August 7, 2025, EPA announced that it was rescinding all grant funding issued under the GGRF's Solar for All program, again improperly relying on the OBBBA as justification, and began sending termination letters to those grantees.

Section 60002 of the One Big Beautiful Bill Act reads as follows:

SEC. 60002. REPEAL OF GREENHOUSE GAS REDUCTION FUND. Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

By its express language, the OBBBA only rescinds "unobligated balances" under Clean Air Act Section 134. Section 134 had been enacted into law on August 16, 2022, as Section 60103 of the Inflation Reduction Act. Pub. L. 117-169, 136 Stat. 2065 (Aug. 16, 2022). That provision appropriated almost $27 billion (available only through September 30, 2024) for three grant programs,[1] and directed EPA to begin making grants within 180 days of enactment. It then appropriated $30 million to EPA to administer these programs. EPA obligated all of the grant funds before September 30, 2024. For two of the grant programs (NCIF and CCIA), the funds were *fully disbursed* into private bank accounts before September 30, 2024.[2] For Solar for All,

---

[1] Subsection (a) appropriated $7 billion for "zero-emission technologies" and became the Solar for All program. Subsections (b) and (c) appropriated $11.970 billion and $8 billion, respectively, for what become the National Clean Investment Fund and the Clean Communities Investment Accelerator.

49 of the 60 grantees are state-level entities and six are Tribes.[3]  The largest state recipients include Texas (over $249 million), several states receiving over $156 million (among them North Carolina, Pennsylvania, Ohio, Louisiana, and Missouri), West Virginia (over $106 million), South Carolina (over $124 million), and Alaska (over $62 million).[4]  All funds were obligated by August 2024 and are held at the Department of the Treasury for grantees to draw down.[5]  Recipients have so far utilized between $30 and $50 million, with drawdowns expected to have increased significantly this fall as grantees have now been able to fully design their programs, complete competitions for fund recipients, and overcome hurdles created by EPA's earlier freeze.  Some projects have already been completed thanks to the funding.[6]

The strongest evidence for the status of those funds, aside from the plain text of the OBBBA, is the scoring of the OBBBA by the non-partisan Congressional Budget Office (CBO).  Lawmakers relied on CBO's "score," or the estimated cost or savings of each provision, to ensure the reconciliation bill met each Committee's savings or spending instructions as set by the Budget Committees.

When the proposed repeal and rescission of unobligated GGRF funds was initially proposed in the Senate Environment and Public Works Committee, CBO scored the provision as saving $19 million, the remaining appropriated funding for EPA administration and oversight of the program.  (See Appendix A.)  That does not include a penny of the three grant programs.  If the OBBBA had somehow clawed back GGRF money that the federal government had already obligated, that estimate would have been as much as $27 billion: $7 billion for Solar for All, $11.97 billion for the NCIF, and $8 billion for the CCIA.  CBO confirmed, further, that repeal of the program language did not create any additional savings.  The rescission and repeal together only saved $19 million.  At no point did the Majority dispute this score.

Upon enactment, CBO made its final OBBBA budget estimates publicly available.[7]  This final estimate for Section 60002 confirms that repeal and rescission of the GGRF only saved the government $19 million—those dollars that EPA had been awarded for program administration and oversight.

What's more, numerous Republicans have made clear that it is not legally possible to claw back funding that has already been obligated.  For instance:

---

[2] The Treasury Department executed a Fiscal Agency Agreement with Citibank, N.A., on September 19, 2024, for the nearly $20 billion in NCIF and CCIA awards.  A few weeks earlier, EPA had announced the obligation of all $27 billion across the three GGRF grant programs.  Months earlier still, EPA had announced the awards. U.S. Environmental Protection Agency, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4. 2024).

[3] Environmental Protection Agency, Solar for All, https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all, accessed Aug. 11, 2025.

[4] *Id.*

[5] Tracy Wholf & Seiji Yamashita, "EPA terminates $7 billion Solar for All program," *CBS News* (Aug. 8, 2025), https://www.cbsnews.com/news/epa-considers-ending-solar-for-all-program-funding/; Jean Chemnick, "EPA cuts off IRA solar money already under contract," *E&E News* (Jan. 30, 2025), https://www.eenews.net/articles/epa-cuts-off-ira-solar-money-already-under-contract.

[6] *See* Wholf & Yamashita, *supra* note 5.

[7] Congressional Budget Office, "Estimated Budgetary Effects of an Amendment in the Nature of a Substitute to H.R. 1, the One Big Beautiful Bill Act, Relative to CBO's January 2025 Baseline (June 29, 2025), https://www.cbo.gov/publication/61534.

- During the House Energy & Commerce Committee mark-up of the OBBBA on May 13, 2025, Congressman Griffith (R-VA), then-Chair of the Environment Subcommittee, stated: "I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . If the grant has already been granted and the money is obligated, then this—then our language does not affect that… [W]e can't rescind expenditures that have already been obligated."[8]

- In June 2024, *E&E News* quoted Mandy Gunasekara, an EPA Chief of Staff in the first Trump administration and author of the EPA chapter in Project 2025, as saying of the GGRF funding, "Once money is out the door, I don't know of a way you can claw it back."[9]

EPA's attacks on Solar for All continue a pattern of false statements about GGRF, including defamatory accusations you have made that "the entire [GGRF] scheme, in my opinion, is criminal" and that GGRF was "all of the above" when asked if it was "either a kickback, a theft, or graft."[10]  You have led the Trump Administration in waging an unprecedented assault on the NCIF and CCIA portions of the GGRF program, unlawfully weaponizing the federal government in an inexplicable exercise to wage allegations of fraud meant to trigger the narrow basis for terminating grants set forth in those grant agreements, even after:

- the criminal chief for the Washington, DC, United States Attorney's Office quit over the incident;[11]

- a magistrate judge refused to issue a search warrant on the DC Acting United States Attorney's baseless assertions[12];

- at least one other United States Attorney's Office refused to seek a warrant for the same bogus matter;[13]

---

[8] House Committee on Energy & Commerce, *Full Committee Markup of Budget Reconciliation Text* (May 13, 2025), https://energycommerce.house.gov/events/full-committee-markup-of-budget-reconciliation-text.
[9] Jean Chemnick, "The $27B in climate cash that Trump can't cancel," *E&E News* (June 14, 2024), https://subscriber.politicopro.com/article/eenews/2024/06/14/the-27b-in-climate-cash-that-trump-cant-cancel-00163190.
[10] "Judge Slams EPA for Canceling Climate Grants with No Rationale Explanation," *Newsweek* (Apr. 17, 2025), https://www.newsweek.com/judge-slams-epa-canceling-climate-grants-no-rational-explanation-2061209; "Lee Zeldin outlines Biden admin's 'green slush fund,'" *Fox News* (Mar. 6, 2025), https://www.foxnews.com/video/6369704326112.
[11] Spencer S. Hsu, Carol D. Leonnig and Nicolás Rivero, *High-ranking D.C. federal prosecutor resigns over order to freeze EPA funds*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/investigations/2025/02/18/federal-prosecutor-dc-resigns/.
[12] Facing multiple bar charges, Mr. Martin's nomination for this post was withdrawn.  Seung Min Kim and Michael Kunzelman, *Trump pulls the nomination of Ed Martin for DC US Attorney after concerns of partisanship*, Assoc. Press (May 8, 2025), https://apnews.com/article/donald-trump-ed-martin-white-house-justice-department-thom-tillis-cecf801799faa2b56fd1bb4fac48379e.
[13] Spencer S. Hsu, Maxine Joselow, and Nicolas Rivero, *FBI takes up EPA probe amid pushback from judge, prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

Page 4

- DOJ officials failed to find any meaningful evidence of criminality during their investigation;[14] and

- DOJ attorneys backtracked on the fraud allegation in real time, when asked to explain the reason for freezing access to private bank accounts in a DC courtroom.[15]

Despite these baseless attacks, the bottom line is that neither CBO nor Republicans understood the repeal and rescission of the GGRF to save anything more than EPA's unspent oversight dollars. Wishful statutory interpretation on the part of EPA does not enable EPA to cancel lawfully obligated grants.

Your actions undermine thousands of projects that will deliver more affordable housing, community centers for refuge during extreme weather events, and clean energy to American communities. Your attempts to retroactively seize funding from grantees, and then to misrepresent the basis for your actions, are illegal. We urge you to reverse course and restore this important funding.

Sincerely,

Sheldon Whitehouse
United States Senator
Ranking Member
Committee on Environment
and Public Works

Chris Van Hollen
United States Senator

Charles E. Schumer
United States Senator

Tim Kaine
United States Senator

Bernard Sanders
United States Senator

Jack Reed
United States Senator

---

[14] Devlin Barrett, Glenn Thrush, and Adam Goldman, *Investigators see no criminality by EPA officials in case on Biden-era grants*, New York Times (May 16, 2025), https://www.nytimes.com/2025/05/16/us/trump-biden-epa-grants.html.
[15] Jean Chemnick, *EPA's challenges grow in quest to claw back "gold bars"*, E&E (May 23, 2025), https://www.eenews.net/articles/epas-challenges-grow-in-quest-to-claw-back-gold-bars/.

Adam B. Schiff
United States Senator

Angus S. King, Jr.
United States Senator

Elissa Slotkin
United States Senator

Catherine Cortez Masto
United States Senator

Kirsten Gillibrand
United States Senator

Edward J. Markey
United States Senator

Jeffrey A. Merkley
United States Senator

Mark R. Warner
United States Senator

Jeanne Shaheen
United States Senator

Mazie K. Hirono
United States Senator

Mark Kelly
United States Senator

John Hickenlooper
United States Senator

Richard Blumenthal
United States Senator

Jacky Rosen
United States Senator

_____
Michael F. Bennet
United States Senator

_____
Lisa Blunt Rochester
United States Senator

_____
Angela D. Alsobrooks
United States Senator

_____
Tammy Duckworth
United States Senator

_____
Tina Smith
United States Senator

_____
Gary C. Peters
United States Senator

_____
Ron Wyden
United States Senator

_____
Brian Schatz
United States Senator

_____
Peter Welch
United States Senator

_____
Patty Murray
United States Senator

_____
Alex Padilla
United States Senator

_____
Martin Heinrich
United States Senator

<div align="center">

**APPENDIX A**

</div>

**EXCERPTS OF THE CBO SCORE** provided to the Senate Majority

June 21, 2025

| | | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2025-2029 | 2025-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | June 21, 2025 | | | | |
| **Preliminary Estimated Budgetary Effects of** | **MAZ25453** | | | | | | | | | | | | | |
| **[Brett Jortland request by email, 6/21/25]** | | | | | | | | | | | | | | |
| | | | | | | **Change to Direct Spending** | | | | | | | | |
| Sec. _01 | Rescission of Funding for Clean Heavy-Duty Vehicles | | | | | | | | | | | | | |
| | Budget Authority | | -423 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -423 | -423 |
| | Estimated Outlays | | 0 | -20 | -65 | -56 | -79 | -92 | -70 | 0 | 0 | 0 | -220 | -382 |
| Gec. _02 | Repeal of Greenhouse Gas Reduction Fund | | | | | | | | | | | | | |
| | Budget Authority | | -19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -19 | -19 |
| | Estimated Outlays | | -3 | -3 | -3 | -3 | -3 | -3 | -1 | 0 | 0 | 0 | -15 | -19 |
| Sec. _03 | Rescission of Funding for Diesel Emissions Reductions | | | | | | | | | | | | | |
| | Budget Authority | | -60 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -60 | -60 |
| | Estimated Outlays | | -13 | -16 | -12 | -12 | -3 | 0 | 0 | 0 | 0 | 0 | -56 | -56 |
| Sec. _04 | Rescission of Funding to Address Air Pollution | | | | | | | | | | | | | |
| | Budget Authority | | -70 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -70 | -70 |
| | Estimated Outlays | | -5 | -20 | -10 | -5 | -10 | -10 | -10 | 0 | 0 | 0 | -50 | -70 |
| Sec. _05 | Rescission of Funding to Address Air Pollution at Schools | | | | | | | | | | | | | |
| | Budget Authority | | -14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -14 | -14 |
| | Estimated Outlays | | 0 | -3 | -3 | -3 | -3 | 0 | 0 | 0 | 0 | 0 | -12 | -12 |
| Sec. _06 | Rescission of Funding for the Low Emissions Electricity Program | | | | | | | | | | | | | |
| | Budget Authority | | -42 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -42 | -42 |
| | Estimated Outlays | | -5 | -7 | -7 | -7 | -7 | -9 | 0 | 0 | 0 | 0 | -33 | -42 |
| Sec. _07 | Rescission of Funding for Section 211(O) of the Clean Air Act | | | | | | | | | | | | | |
| | Budget Authority | | -3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -3 | -3 |
| | Estimated Outlays | | 0 | -1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -1 | -1 |
| Sec. _08 | Rescission of Funding for Funding for Implementation of the American Innovation and Manufacturing Act | | | | | | | | | | | | | |
| | Budget Authority | | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| | Estimated Outlays | | 0 | 0 | 0 | -3 | 0 | 0 | 0 | 0 | 0 | 0 | -3 | -3 |

\*\*\*

| | | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2025-2029 | 2025-2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subtotal Changes in Direct Spending** | | | | | | | | | | | | | | |
| | **Budget Authority** | | -6,579 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -6,579 | -6,579 |
| | **Estimated Outlays** | | -857 | -936 | -1,237 | -887 | -570 | -360 | -112 | 0 | 0 | 0 | -4,487 | -4,959 |
| | | | | | | | **Change to Revenue** | | | | | | | | |
| Sec. _12 | Rescission of Funding for Methane Emissions and Waste Reduction Incentive Program for Petroleum and Natural Gas Systems | | 0 | 0 | 0 | 0 | 0 | -375 | -300 | -275 | -275 | -275 | 0 | -1,500 |
| Sec. _26 | Project Sponsor Opt-in Fees for Environmental Reviews | | \* | \* | \* | \* | \* | \* | \* | \* | \* | \* | \* | \* |
| **Total Changes in Revenues** | | | 0 | 0 | 0 | 0 | 0 | -375 | -300 | -275 | -275 | -275 | 0 | -1,500 |
| **Net Effect on the Deficit** | | | -857 | -936 | -1,237 | -887 | -570 | 15 | 188 | 275 | 275 | 275 | -4,487 | -3,459 |

\* = between zero and $500,000. The estimates account for judicial decisions and administrative actions through April 10, 2025.

Source: Congressional Budget Office.    Staff Contacts: Aurora Swanson, Lilia Ledezma, Susan Yeh Beyer, David Hughes, Willow Latham-Proença, Matthew

EXHIBIT 8



# United States Environmental Protection Agency

# FISCAL YEAR 2025

## Justification of Appropriation Estimates for the Committee on Appropriations

**Tab 05: Environmental Programs and Management**

EPA-190R24002

March 2024
www.epa.gov/cj

**Environmental Protection Agency**
**FY 2025 Annual Performance Plan and Congressional Justification**

**Table of Contents – Environmental Programs and Management**

**Resource Summary Table** ................................................................................................ 5

**Program Projects in EPM** ............................................................................................... 6

**Alaska Contaminated Lands** ......................................................................................... 11

    Alaska Contaminated Lands .......................................................................................... 12

**Brownfields** ..................................................................................................................... 14

    Brownfields ..................................................................................................................... 15

**Clean Air** .......................................................................................................................... 19

    Clean Air Allowance Trading Programs ....................................................................... 20

    Climate Protection ......................................................................................................... 27

    Federal Stationary Source Regulations ........................................................................ 41

    Federal Support for Air Quality Management ............................................................. 47

    Stratospheric Ozone: Domestic Programs .................................................................... 59

    Stratospheric Ozone: Multilateral Fund ...................................................................... 66

**Compliance** ...................................................................................................................... 68

    Compliance Monitoring .................................................................................................. 69

**Cross-Agency Coordination, Outreach, and Education** .............................................. 78

    Children and Other Sensitive Populations: Agency Coordination ............................... 79

    Executive Management and Operations ........................................................................ 84

    Exchange Network .......................................................................................................... 91

    Environmental Education ............................................................................................... 94

    Small Business Ombudsman .......................................................................................... 97

    Small Minority Business Assistance ............................................................................ 101

    State and Local Prevention and Preparedness ............................................................ 104

    TRI / Right to Know ...................................................................................................... 108

    Tribal - Capacity Building ............................................................................................ 113

**Enforcement** ................................................................................................................... 118

    Civil Enforcement ......................................................................................................... 119

    Criminal Enforcement .................................................................................................. 127

    NEPA Implementation .................................................................................................. 131

**Environmental Justice** ........................................................................... **135**

   **Environmental Justice** ..................................................................... **136**

**Geographic Programs** .............................................................................. **144**

   **Geographic Program:  Chesapeake Bay** ....................................... **145**

   **Geographic Program:  Gulf of Mexico** ......................................... **149**

   **Geographic Program:  Lake Champlain** ........................................ **153**

   **Geographic Program:  Long Island Sound** .................................. **156**

   **Geographic Program:  Other** .......................................................... **159**

   **Geographic Program: South Florida** ............................................ **166**

   **Geographic Program: San Francisco Bay** ................................... **170**

   **Geographic Program: Puget Sound** ............................................. **173**

   **Great Lakes Restoration** ................................................................. **177**

**Homeland Security** ................................................................................... **185**

   **Homeland Security:  Communication and Information** .............. **186**

   **Homeland Security:  Critical Infrastructure Protection** ............ **194**

   **Homeland Security: Protection of EPA Personnel and Infrastructure** ........... **196**

**Indoor Air and Radiation** ....................................................................... **199**

   **Indoor Air:  Radon Program** ......................................................... **200**

   **Radiation:  Protection** .................................................................... **202**

   **Radiation:  Response Preparedness** ............................................. **204**

   **Reduce Risks from Indoor Air** ...................................................... **207**

**International Programs** ............................................................................. **210**

   **International Sources of Pollution** ................................................ **211**

   **Trade and Governance** ................................................................... **216**

   **US Mexico Border** ........................................................................... **219**

**IT/ Data Management/ Security** ............................................................. **223**

   **Information Security** ....................................................................... **224**

   **IT / Data Management** .................................................................... **230**

**Legal/ Science/ Regulatory/ Economic Review** .................................. **235**

   **Administrative Law** ......................................................................... **236**

   **Alternative Dispute Resolution** ..................................................... **239**

   **Civil Rights Program** ....................................................................... **242**

   **Integrated Environmental Strategies** .......................................... **250**

   **Legal Advice: Environmental Program** ....................................... **259**

Legal Advice: Support Program.................................................................. 264

Regulatory/Economic-Management and Analysis................................... 268

Science Advisory Board............................................................................. 273

Science Policy and Biotechnology............................................................ 276

Operations and Administration ..................................................................... 279

Acquisition Management............................................................................ 280

Central Planning, Budgeting, and Finance .............................................. 284

Facilities Infrastructure and Operations ................................................. 290

Financial Assistance Grants / IAG Management..................................... 294

Human Resources Management ................................................................ 297

Regional Science and Technology ............................................................. 302

Pesticides Licensing ......................................................................................... 305

Pesticides: Protect Human Health from Pesticide Risk ......................... 306

Pesticides: Protect the Environment from Pesticide Risk...................... 313

Pesticides: Realize the Value of Pesticide Availability .......................... 322

Resource Conservation and Recovery Act (RCRA) .................................... 326

RCRA:  Corrective Action ........................................................................ 327

RCRA:  Waste Management....................................................................... 331

RCRA:  Waste Minimization & Recycling............................................... 337

Toxics Risk Review and Prevention .............................................................. 341

Endocrine Disruptors ................................................................................ 342

Pollution Prevention Program .................................................................. 346

Toxic Substances:  Chemical Risk Review and Reduction ..................... 353

Toxic Substances:  Lead Risk Reduction Program ................................. 368

Underground Storage Tanks (LUST/UST) .................................................. 372

LUST / UST ................................................................................................. 373

Water Ecosystems ............................................................................................ 377

National Estuary Program / Coastal Waterways.................................... 378

Wetlands ...................................................................................................... 382

Ensure Safe Water ........................................................................................... 385

Beach / Fish Programs ............................................................................... 386

Drinking Water Programs ......................................................................... 389

Preparation for Water Emergencies ........................................................ 400

**Ensure Clean Water** ................................................................................................ **404**

    **Marine Pollution** ................................................................................................ **405**

    **Surface Water Protection** ................................................................................ **409**

**Congressional Priorities** .................................................................................... **420**

    **Congressional Priorities** .................................................................................. **421**

**Environmental Protection Agency**
**FY 2025 Annual Performance Plan and Congressional Justification**

**APPROPRIATION: Environmental Programs & Management**
**Resource Summary Table**
(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| **Environmental Programs & Management** | | | | |
| Budget Authority | $3,077,440 | $3,286,330 | $4,406,988 | $1,120,658 |
| Total Workyears | 8,698.8 | 9,592.7 | 11,212.5 | 1,619.8 |

**Bill Language: Environmental Programs and Management**

*For environmental programs and management, including necessary expenses not otherwise provided for, for personnel and related costs and travel expenses; hire of passenger motor vehicles; hire, maintenance, and operation of aircraft; purchase of reprints; library memberships in societies or associations which issue publications to members only or at a price to members lower than to subscribers who are not members; administrative costs of the brownfields program under the Small Business Liability Relief and Brownfields Revitalization Act of 2002; implementation of a coal combustion residual permit program under section 2301 of the Water and Waste Act of 2016; and not to exceed $10,000 for official reception and representation expenses, $4,406,988,000, to remain available until September 30, 2026: Provided, That funds included under this heading may be used for environmental justice implementation and training grants, and associated program support costs: Provided further, That of the funds included under this heading—*

*(1) $681,800,000, to remain available until expended, shall be for Geographic Programs as specified in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act);*

*(2) $20,012,000, to remain available until expended, shall be for grants, including grants that may be awarded on a non-competitive basis, inter- agency agreements, and associated program support costs to establish and implement a program to assist Alaska Native Regional Corporations, Alaskan Native Village Corporations, federally-recognized tribes in Alaska, Alaska Native Non- Profit Organizations and Alaska Native Nonprofit Associations, and intertribal consortia comprised of Alaskan tribal entities to address contamination on lands conveyed under or pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.) that were or are contaminated at the time of conveyance and are on an inventory of such lands developed and maintained by the Environmental Protection Agency: Provided, That grants awarded using funds made available in this paragraph may be used by a recipient to supplement other funds provided by the Environmental Protection Agency through individual media or multi- media grants or cooperative agreements: Provided further, That of the amounts made available in this paragraph, in addition to amounts otherwise available for such purposes, the Environmental Protection Agency may reserve up to $2,000,000*

*for salaries, expenses, and administration of the program and any other grants related to such program that address contamination on lands conveyed under or pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.) that were or are contaminated at the time of conveyance and are on the EPA inventory of such lands; and (3) In addition to amounts otherwise available for the purposes specified in this paragraph, not to exceed $30,000,000, to remain available until expended, shall be for addressing water emergencies, as determined by the Administrator, using the authorities under the Safe Drinking Water Act (42 U.S.C. 300f et seq.) or the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.): Provided, That, notwithstanding section 1442(b)) of the Safe Drinking Water Act (42 U.S.C. 300j–1(b)) funds available under this paragraph may be used to provide technical assistance and grants regardless of whether such assistance will be used to support actions that would not be taken without such emergency assistance: Provided further, That funds available under this paragraph may be used to provide technical assistance and grants under section 1442(b) of the Safe Drinking Water Act to any appropriate recipient, as determined by the Administrator, to assist in responding to and alleviating an emergency situation affecting a privately owned water system: Provided further, That, notwithstanding section 1431(a) of the Safe Drinking Water Act (42 U.S.C. 300i(a)), funds available under this paragraph may be used to take actions under section 1431 of the Safe Drinking Water Act (42 U.S.C. 300i) in coordination with appropriate state and local authorities, regardless of whether appropriate state and local authorities have acted: Provided further, That funds available under this paragraph may be used to take actions authorized under section 504(a) of the Federal Water Pollution Control Act (33 U.S.C. 1364) deemed by the Administrator as necessary to protect the health or welfare of persons affected by a water emergency, including other necessary actions, such as providing technical assistance and grants to assist in responding to and alleviating any water emergency.*

### Program Projects in EPM
(Dollars in Thousands)

| Program Project | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| Alaska Contaminated Lands | | | | |
| Alaska Contaminated Lands | $3,215 | $20,000 | $20,012 | $12 |
| Brownfields | | | | |
| Brownfields | $22,582 | $26,189 | $39,084 | $12,895 |
| Clean Air and Climate | | | | |
| Clean Air Allowance Trading Programs | $17,268 | $16,554 | $30,743 | $14,189 |
| Climate Protection | $99,292 | $101,000 | $176,485 | $75,485 |
| Federal Stationary Source Regulations | $29,768 | $30,344 | $47,888 | $17,544 |
| Federal Support for Air Quality Management | $134,931 | $147,704 | $258,663 | $110,959 |
| Stratospheric Ozone: Domestic Programs | $6,358 | $6,951 | $72,282 | $65,331 |
| Stratospheric Ozone: Multilateral Fund | $8,326 | $9,244 | $18,000 | $8,756 |
| Subtotal, Clean Air and Climate | $295,943 | $311,797 | $604,061 | $292,264 |

6

| | | | | |
|---|---|---|---|---|
| Clean and Safe Water Technical Assistance Grants | | | | |
|    Congressional Priorities | $25,700 | $30,700 | $0 | -$30,700 |
| | | | | |
| Compliance | | | | |
|    Compliance Monitoring | $104,593 | $112,730 | $168,474 | $55,744 |
| | | | | |
| Cross-Agency Coordination, Outreach, and Education | | | | |
|    Children and Other Sensitive Populations: Agency Coordination | $6,526 | $6,362 | $7,749 | $1,387 |
|    Environmental Education | $8,752 | $9,500 | $8,759 | -$741 |
|    Exchange Network | $12,165 | $14,995 | $14,769 | -$226 |
|    Executive Management and Operations | $53,653 | $56,160 | $73,269 | $17,109 |
|    Small Business Ombudsman | $1,379 | $2,250 | $2,242 | -$8 |
|    Small Minority Business Assistance | $2,225 | $2,056 | $2,018 | -$38 |
|    State and Local Prevention and Preparedness | $14,124 | $15,446 | $24,106 | $8,660 |
|    TRI / Right to Know | $11,987 | $15,052 | $14,123 | -$929 |
|    Tribal - Capacity Building | $12,619 | $14,715 | $35,088 | $20,373 |
| Subtotal, Cross-Agency Coordination, Outreach, and Education | $123,431 | $136,536 | $182,123 | $45,587 |
| | | | | |
| Enforcement | | | | |
|    Civil Enforcement | $177,860 | $205,942 | $256,252 | $50,310 |
|    Criminal Enforcement | $57,374 | $62,704 | $67,829 | $5,125 |
|    NEPA Implementation | $15,171 | $20,611 | $26,049 | $5,438 |
| Subtotal, Enforcement | $250,405 | $289,257 | $350,130 | $60,873 |
| | | | | |
| Ensure Clean Water | | | | |
|    Marine Pollution | $8,081 | $10,187 | $12,724 | $2,537 |
|    Preparation for Water Emergencies | $0 | $0 | $30,000 | $30,000 |
|    Surface Water Protection | $213,320 | $224,492 | $270,573 | $46,081 |
|    Water Infrastructure Finance and Innovation | $0 | $0 | $0 | $0 |
| Subtotal, Ensure Clean Water | $221,402 | $234,679 | $313,297 | $78,618 |
| | | | | |
| Ensure Safe Water | | | | |
|    Beach / Fish Programs | $1,673 | $2,246 | $2,391 | $145 |
|    Drinking Water Programs | $109,958 | $121,607 | $143,886 | $22,279 |
| Subtotal, Ensure Safe Water | $111,631 | $123,853 | $146,277 | $22,424 |
| | | | | |
| Environmental Justice | | | | |
|    Environmental Justice | $109,347 | $102,159 | $317,712 | $215,553 |

| Geographic Programs | | | | |
|---|---|---|---|---|
| Geographic Program: Chesapeake Bay | $74,640 | $92,000 | $92,000 | $0 |
| Geographic Program: Gulf of Mexico | $22,550 | $25,524 | $25,600 | $76 |
| Geographic Program: Lake Champlain | $25,823 | $25,000 | $25,000 | $0 |
| Geographic Program: Long Island Sound | $36,429 | $40,002 | $40,000 | -$2 |
| Geographic Program: Other | | | | |
| *Lake Pontchartrain* | $1,899 | $2,200 | $2,200 | $0 |
| *S.New England Estuary (SNEE)* | $6,546 | $7,000 | $7,000 | $0 |
| *Geographic Program: Other (other activities)* | $2,041 | $5,000 | $5,000 | $0 |
| Subtotal, Geographic Program: Other | $10,486 | $14,200 | $14,200 | $0 |
| Geographic Program: Puget Sound | $48,317 | $54,000 | $54,000 | $0 |
| Geographic Program: San Francisco Bay | $45,061 | $54,500 | $54,500 | $0 |
| Geographic Program: South Florida | $6,806 | $8,500 | $8,500 | $0 |
| Great Lakes Restoration | $361,607 | $368,000 | $368,000 | $0 |
| Subtotal, Geographic Programs | $631,720 | $681,726 | $681,800 | $74 |
| Homeland Security | | | | |
| Homeland Security: Communication and Information | $4,592 | $4,692 | $6,119 | $1,427 |
| Homeland Security: Critical Infrastructure Protection | $249 | $923 | $1,025 | $102 |
| Homeland Security: Protection of EPA Personnel and Infrastructure | $6,059 | $5,188 | $5,158 | -$30 |
| Subtotal, Homeland Security | $10,899 | $10,803 | $12,302 | $1,499 |
| Indoor Air and Radiation | | | | |
| Indoor Air: Radon Program | $2,844 | $3,364 | $5,147 | $1,783 |
| Radiation: Protection | $8,390 | $9,088 | $11,748 | $2,660 |
| Radiation: Response Preparedness | $2,111 | $2,650 | $3,185 | $535 |
| Reduce Risks from Indoor Air | $13,281 | $13,593 | $47,570 | $33,977 |
| Subtotal, Indoor Air and Radiation | $26,627 | $28,695 | $67,650 | $38,955 |
| International Programs | | | | |
| International Sources of Pollution | $7,214 | $7,323 | $26,183 | $18,860 |
| Trade and Governance | $7,390 | $5,510 | $7,201 | $1,691 |
| US Mexico Border | $2,512 | $2,993 | $5,132 | $2,139 |
| Subtotal, International Programs | $17,116 | $15,826 | $38,516 | $22,690 |
| IT / Data Management / Security | | | | |
| Information Security | $8,188 | $9,142 | $23,937 | $14,795 |
| IT / Data Management | $95,631 | $91,821 | $108,601 | $16,780 |
| Subtotal, IT / Data Management / Security | $103,819 | $100,963 | $132,538 | $31,575 |

| | | | | |
|---|---|---|---|---|
| Legal / Science / Regulatory / Economic Review | | | | |
|    Administrative Law | $5,223 | $5,395 | $6,195 | $800 |
|    Alternative Dispute Resolution | $845 | $972 | $2,820 | $1,848 |
|    Civil Rights Program | $10,146 | $12,866 | $32,227 | $19,361 |
|    Integrated Environmental Strategies | $9,702 | $11,297 | $40,197 | $28,900 |
|    Legal Advice: Environmental Program | $60,207 | $60,061 | $86,615 | $26,554 |
|    Legal Advice: Support Program | $15,922 | $18,957 | $20,584 | $1,627 |
|    Regulatory/Economic-Management and Analysis | $16,032 | $17,475 | $19,526 | $2,051 |
|    Science Advisory Board | $4,219 | $4,155 | $4,671 | $516 |
|    Science Policy and Biotechnology | $1,628 | $1,811 | $1,642 | -$169 |
| Subtotal, Legal / Science / Regulatory / Economic Review | $123,923 | $132,989 | $214,477 | $81,488 |
| Operations and Administration | | | | |
|    Acquisition Management | $33,034 | $37,251 | $42,085 | $4,834 |
|    Central Planning, Budgeting, and Finance | $85,840 | $87,099 | $100,595 | $13,496 |
|    Facilities Infrastructure and Operations | $275,614 | $283,330 | $308,134 | $24,804 |
|    Financial Assistance Grants / IAG Management | $28,225 | $30,188 | $34,745 | $4,557 |
|    Human Resources Management | $51,882 | $51,261 | $68,124 | $16,863 |
|    Regional Science and Technology | $1,879 | $1,554 | $7,287 | $5,733 |
| Subtotal, Operations and Administration | $476,474 | $490,683 | $560,970 | $70,287 |
| Pesticides Licensing | | | | |
|    Pesticides: Protect the Environment from Pesticide Risk | $45,217 | $48,704 | $75,963 | $27,259 |
|    Pesticides: Protect Human Health from Pesticide Risk | $59,740 | $62,125 | $66,281 | $4,156 |
|    Pesticides: Realize the Value of Pesticide Availability | $5,774 | $7,637 | $8,316 | $679 |
| Subtotal, Pesticides Licensing | $110,731 | $118,466 | $150,560 | $32,094 |
| Protecting Estuaries and Wetlands | | | | |
|    National Estuary Program / Coastal Waterways | $38,790 | $40,000 | $32,611 | -$7,389 |
|    Wetlands | $19,656 | $21,754 | $26,995 | $5,241 |
| Subtotal, Protecting Estuaries and Wetlands | $58,446 | $61,754 | $59,606 | -$2,148 |
| Research:  Chemical Safety for Sustainability | | | | |
|    Research: Chemical Safety for Sustainability | $153 | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| Resource Conservation and Recovery Act (RCRA) | | | |
| RCRA:  Corrective Action | $37,176 | $40,512 | $42,105 | $1,593 |
| RCRA:  Waste Management | $70,129 | $75,958 | $91,500 | $15,542 |
| RCRA:  Waste Minimization & Recycling | $9,375 | $10,252 | $15,799 | $5,547 |
| Subtotal, Resource Conservation and Recovery Act (RCRA) | $116,681 | $126,722 | $149,404 | $22,682 |
| Toxics Risk Review and Prevention | | | |
| Endocrine Disruptors | $6,010 | $7,614 | $7,701 | $87 |
| Pollution Prevention Program | $12,568 | $12,987 | $29,193 | $16,206 |
| Toxic Substances:  Chemical Risk Management | -$2 | $0 | $0 | $0 |
| Toxic Substances:  Lead Risk Reduction Program | $11,777 | $14,359 | $14,597 | $238 |
| Toxic Substances:  Chemical Risk Review and Reduction | $91,216 | $82,822 | $131,900 | $49,078 |
| Subtotal, Toxics Risk Review and Prevention | $121,568 | $117,782 | $183,391 | $65,609 |
| Underground Storage Tanks (LUST / UST) | | | |
| LUST / UST | $11,034 | $12,021 | $14,604 | $2,583 |
| **TOTAL EPM** | **$3,077,440** | **$3,286,330** | **$4,406,988** | **$1,120,658** |

10

**Alaska Contaminated Lands**

### Alaska Contaminated Lands

Program Area: Alaska Contaminated Lands
Goal: Safeguard and Revitalize Communities
Objective(s): Clean Up and Restore Land for Productive Uses and Healthy Communities

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$3,215* | *$20,000* | *$20,012* | *$12* |
| Total Budget Authority | $3,215 | $20,000 | $20,012 | $12 |
| Total Workyears | 1.5 | 5.0 | 5.0 | 0.0 |

**Program Project Description:**

The Alaska Contaminated Lands Program supports President Biden's Executive Order 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*[1] and seeks to address environmental injustices regarding the 44 million acres transferred from federal ownership to Alaska Native corporations as part of the Alaska Native Claims Settlement Act (ANCSA).[2] Many of these lands were contaminated while not under Alaska Native ownership, and the contaminants on some of these lands – arsenic, asbestos, lead, mercury, pesticides, polychlorinated biphenyls (PCBs), and other petroleum products – pose health concerns to Alaska Native communities, negatively impact subsistence resources, and hamper economic activity.

EPA has initiated a whole-of-government approach to help advance the cleanup of contaminated ANCSA lands through the Arctic Executive Steering Committee. The work continues with the Department of the Interior, Department of Defense, and other federal agencies.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.1, Clean Up and Restore Land for Productive Uses and Healthy Communities in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will:

- Maintain a contaminated ANCSA sites inventory and maintain a public-facing dashboard to provide site information, including cleanup status.

- Continue to engage with the State of Alaska, Alaska Native Corporations, Alaska Native Organizations, and other federal agencies to further develop, modify, and implement the comprehensive approach to advancing cleanup efforts.

---

[1] For additional information, please refer to: https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.
[2] For additional information, please refer to: https://www.epa.gov/r10-tribal/contamination-ancsa-conveyed-lands#background.

12

- Manage the Contaminated ANCSA Lands Grant Program to facilitate assessment and cleanup work at contaminated ANCSA lands.

- Oversee and manage grants awarded under the Contaminated ANCSA Lands Grant Program.

**Performance Measure Targets**:

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$12.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

**Statutory Authority:**

Consolidated Appropriations Act, 2023, Pub. L. 117-328.

**Brownfields**

**Brownfields**

Program Area: Brownfields
Goal: Safeguard and Revitalize Communities
Objective(s): Clean Up and Restore Land for Productive Uses and Healthy Communities

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$22,582* | *$26,189* | *$39,084* | *$12,895* |
| Total Budget Authority | $22,582 | $26,189 | $39,084 | $12,895 |
| Total Workyears | 110.6 | 129.5 | 187.5 | 58.0 |

**Program Project Description:**

Brownfields sites are real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant. Brownfields sites can be found in the heart of America's main streets and former economic centers. The Brownfields Program supports efforts to revitalize these sites by awarding grants and providing technical assistance to states, tribes, local communities, and other stakeholders to work together to plan, inventory, assess, safely clean up, and reuse brownfields sites. Approximately 160 million people (roughly 48 percent of the U.S. population) live within three miles of a brownfields site that receives EPA funding.[3] Similarly, within a half mile of a brownfields site receiving EPA funding, 20 percent of people live below the national poverty level, 16 percent have less than a high school education, 54 percent are people of color, and seven percent are linguistically isolated. As of December 2023, grants awarded by the Program have led to over 10,800 properties made ready for productive use and over 270 thousand jobs and over $40.4 billion leveraged.[4]

The Brownfields Program directly supports the goals of the Administration's Justice40 initiative. Operating activities include: 1) conducting the annual, high volume cooperative agreement competitions; 2) awarding new cooperative agreements; 3) managing the ongoing cooperative agreement workload; 4) providing technical assistance and ongoing support to grantees; 5) providing contractor supported technical assistance to non-grantee communities with brownfields sites; 6) collaborating with other agency programs; 7) operating the Assessment Cleanup and Redevelopment Exchange System (ACRES) online grantee reporting tool; 8) assisting communities to explore land reuse opportunities under the Land Revitalization Program; and 9) developing guidance and tools that clarify potential environmental cleanup liabilities.

---

[3] U.S. EPA, Office of Land and Emergency Management, 2023. Data collected includes: 1) Brownfields site information from ACRES as of the end of FY 2022; 2) Population data from the 2017-2021 American Community Survey.
[4] From ACRES as reported by grantees.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.1, Clean Up and Restore Land for Productive Uses and Healthy Communities in the *FY 2022 - 2026 EPA Strategic Plan*.

Today, there are more than one thousand active Brownfields cooperative agreements (CAs) and hundreds of land revitalization projects, targeted assessments, financial planning, and visioning sessions taking place, funded by regular appropriations and by the historic investment from the Infrastructure Investment and Jobs Act (IIJA). All are supported and invigorated by the Brownfields Program's best tool – community development specialists. Specialists are the backbone of the success of the Agency broadly, and they bring unique technical and program management experience, as well as public and environmental health expertise, to individual brownfields communities. The communities that the Program works with have made significant progress, but without the skilled guidance of EPA community development specialists, the Program would not have had the success that characterizes its history at the nexus between environmental revitalization and community development.

To continue to build on these successes, along with the historic investment from IIJA, the Agency proposes to invest an additional $12.9 million and 58.0 FTE in FY 2025. In FY 2022, a detailed Workload Model Analysis identified a significant barrier to engaging with communities related to the availability of on-the-ground resources to conduct outreach and communication. This investment of regional FTE will provide expanded technical assistance and build capacity in small, rural, Environmental Justice (EJ), and other historically disadvantaged communities and support the Program as it implements a responsive, expansive, and innovative environmental and economic community redevelopment program. Prior to infrastructure funding, approximately 80 people managed more than 1,100 open cooperative agreements across the country. It is estimated that the program will have approximately 2,700 open cooperative agreements to manage by FY 2027. Without additional FTE resources, EPA will not be able to sustain and responsibly manage the unprecedented infrastructure investments in the Brownfields Program.

In FY 2025, community development specialists will continue to manage approximately 1,000 assessment, cleanup, Revolving Loan Fund (RLF), multi-purpose, and Environmental Workforce Development and Job Training (EWDJT) CAs, as well as state and tribal assistance agreements. In addition, EPA will be managing training, research, and technical assistance agreements; Targeted Brownfields Assessments; and land revitalization projects. The Brownfields Program also will continue to foster federal, state, tribal, and public-private partnerships to return properties to productive economic use, including in historically disadvantaged communities and communities with EJ concerns.

In addition, IIJA invests $1.5 billion to scale up community-led brownfields revitalization from FY 2022 through FY 2026. This work includes $1.2 billion in direct grants and technical assistance to assess and clean up brownfields sites, train and place people in environmental jobs, and assist hundreds of communities in identifying equitable reuse options to cultivate healthy, resilient, and livable neighborhoods. An additional $300 million will support State and Tribal Response programs that can provide necessary funds to states and territories and over one hundred tribes to

grow their brownfields programs. EPA will continue to manage an estimated four hundred cooperative agreements funded under IIJA.

In FY 2025, the Brownfields Program will support the following activities:

- **Completing and Awarding New Cooperative Agreements**: Review, select, and award an estimated 170 new cooperative agreements, which will lead to approximately $2.3 billion and 12,135 jobs leveraged in future years.

- **Oversight and Management of Existing Cooperative Agreements:** Continue federal fiduciary responsibility to manage approximately one thousand existing brownfields CAs funded under regular appropriations while ensuring the terms and conditions of the agreements are met, as well as provide limited technical assistance. The Program also will provide targeted environmental oversight support to grantees (*e.g.*, site eligibility determinations, review of environmental site assessment and cleanup reports).

- **Technical Assistance:** Provide technical assistance to states, tribes, and local communities in the form of research, training, analysis, and support for community-led planning workshops. This can lead to cost effective implementation of brownfields redevelopment projects by providing communities with the knowledge necessary to understand market conditions, economic development, and other community revitalization strategies, and how cleanup and reuse can be catalyzed by small businesses.

- **Collaboration:** Work collaboratively with our partners at the state, tribal, and local levels on innovative approaches to help achieve land reuse. The Program, in collaboration with EPA's Office of Enforcement and Compliance Assurance, also will continue to develop guidance and tools that clarify potential environmental cleanup liabilities, thereby providing greater certainty for parties seeking to reuse these properties. In addition, the Program can provide direct support to facilitate transactions for parties seeking to reuse contaminated properties.

- **Accomplishment Tracking**: Support the maintenance of the ACRES online grantee reporting tool. This enables grantees to track accomplishments and report on the number of sites assessed and cleaned up, as well as the amount of dollars and jobs leveraged with brownfields grants.

- **Land Revitalization Program Support:** Provide support for approximately two communities as part of EPA's Land Revitalization Program. The Land Revitalization Program supports communities in their efforts to restore contaminated lands into sustainable community assets.

**Performance Measure Targets:**

Work under this program supports performance results in the Brownfields Projects Program under the STAG appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$2,315.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes an increase for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$10,580.0 / +58.0 FTE) This increase is for community development specialists to manage land revitalization projects, provide one-on-one financial planning support, and educate tribal, rural, and EJ communities on how to address brownfields sites. This investment includes $10.5 million for payroll.

**Statutory Authority:**

Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), §§ 101(39), 104(k), 128(a); Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, § 8001.

**Clean Air**

# Clean Air Allowance Trading Programs

Program Area: Clean Air and Climate
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Improve Air Quality and Reduce Localized Pollution and Health Impacts

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$17,268* | *$16,554* | *$30,743* | *$14,189* |
| Science & Technology | $6,578 | $7,117 | $19,987 | $12,870 |
| Total Budget Authority | $23,846 | $23,671 | $50,730 | $27,059 |
| Total Workyears | 63.8 | 66.7 | 86.1 | 19.4 |

## Program Project Description:

The Clean Air Allowance Trading Programs are nationwide and multi-state programs that address air pollutants that are transported across state, regional, and international boundaries. The programs are designed to control emissions of sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_X$), key precursors of both fine particulate matter ($PM_{2.5}$) and ozone ($O_3$). These programs include Title IV (the Acid Rain Program (ARP)) of the Clean Air Act, the Cross-State Air Pollution Rule (CSAPR), the CSAPR Update, the revised CSAPR Update, and the Good Neighbor Plan. The infrastructure for the Clean Air Allowance Trading Programs also supports implementation of other state and federal programs to control $SO_2$, hazardous air pollutants, and greenhouse gases.

The Clean Air Allowance Trading Programs establish a total emission limit across affected emission sources, which must hold allowances as authorizations to emit one ton of the regulated pollutant(s) in a specific emission control period. The owners and operators of affected emission sources may select among different methods of compliance—installing pollution control equipment, switching fuel types, purchasing allowances, or other strategies. By offering the flexibility to determine how the sources comply, the programs lower the overall cost, making it feasible to pursue greater emission reductions. These programs are managed through a centralized database system operated by EPA.[5] Data collected under these programs are made available to the public through EPA's Clean Air Markets Program Data (CAMPD) website,[6] which provides access to both current and historical data collected as part of the Clean Air Allowance Trading Programs through charts, reports, and downloadable datasets. To implement these programs, EPA operates an emission measurement and reporting program, market operations program, environmental monitoring programs, and a communication and stakeholder engagement program.

In 2022, the eighth year of operation of the CSAPR $SO_2$ programs, sources in both the CSAPR $SO_2$ annual programs and the ARP together reduced $SO_2$ emissions by 14.9 million tons (95 percent) from 1990 levels (before implementation of the ARP), and 9.4 million tons (92 percent)

---

[5] Clean Air Act § 403(d).
[6] For additional information, please refer to https://www.epa.gov/airmarkets/data-resources.

from 2005 levels (before implementation of the Clean Air Interstate Rule (CAIR)[7] and the CSAPR). All ARP and CSAPR sources together emitted a total of 852,000 tons of $SO_2$ in 2022.

In 2022, the eighth year of operation of the CSAPR $NO_X$ annual program, sources in both the CSAPR $NO_X$ annual program and the ARP together emitted 749,000 tons, a reduction of 5.7 million tons (88 percent reduction) from 1990 levels, and 2.9 million tons (79 percent reduction) from 2005 levels.

The Part 75 monitoring program requires almost 4,300 affected sources to monitor and report emission and operation data.[8] The Part 75 monitoring program requires high degrees of accuracy and reliability from continuous emission monitoring systems (CEMS) or approved alternative methods at the affected sources. EPA provides the affected emission sources with technical assistance to facilitate compliance with the monitoring requirements, and software—the Emissions Collection and Monitoring Plan System (ECMPS)—to process, quality assure, and report data to EPA. To assess the quality of the data, the Agency conducts electronic audits, desk reviews, and field and virtual audits of the emission data and monitoring systems. EPA also conducts a Protocol Gas Verification Program (PGVP) in cooperation with National Institute of Standards and Technology (NIST) to ensure calibration gases used for CEMS quality assurance/quality control are of high quality. In addition to the Clean Air Allowance Trading Programs, the emission measurement program and ECMPS software support several state and federal emission control and reporting programs, including the Texas $SO_2$ Trading Program, Regional Greenhouse Gas Initiative (RGGI), Standards of Performance for Greenhouse Gas Emissions for Electric Generating Units, and Mercury and Air Toxics Standards (MATS). It also interfaces with the Greenhouse Gas Reporting Program (GHGRP), ensuring the Part 75 data is seamlessly transferred to that program's infrastructure (Electronic Greenhouse Gas Reporting Tool (eGGRT)).

EPA's centralized market operation system (the allowance tracking system) manages accounts and records allowance allocations and transfers.[9] At the end of each compliance period, working directly with and supporting stakeholders, EPA reconciles allowances against reported emissions to determine compliance for every facility with affected emission sources. For over 25 years, the affected facilities have maintained near-perfect compliance under the trading programs.[10] The market operation system also supports several state and federal emission control and reporting programs, including the Texas $SO_2$ Trading Program, RGGI, and MATS.

The Clean Air Act's Good Neighbor provision[11] requires states or, in some circumstances the Agency, to reduce interstate pollution that significantly contributes to nonattainment or interferes with maintenance of the National Ambient Air Quality Standards (NAAQS). Under this authority, EPA issued CSAPR, which requires 27 states in the eastern U.S. to limit their state-wide emissions of $SO_2$ and/or $NO_X$ to reduce or eliminate the states' contributions to $PM_{2.5}$ and/or ground-level ozone non-attainment of the NAAQS in downwind states. The emission limitations are defined in terms of maximum statewide "budgets" for emissions of annual $SO_2$, annual $NO_X$, and/or ozone-

---

[7] CAIR addressed regional interstate transport of fine particulate matter and ozone. CAIR was replaced by the Cross-State Air Pollution Rule, as of January 1, 2015.
[8] Clean Air Act § 412; Clean Air Act Amendments of 1990. P.L. 101-549 § 821.
[9] Clean Air Act § 403(d).
[10] For more information, please refer to: http://www3.epa.gov/airmarkets/progress/reports/index.html.
[11] Clean Air Act § 110(a)(2)(D); also refer to Clean Air Act § 110(c).

season NO<sub>X</sub> emissions from certain large stationary sources in each state. In 2016, EPA issued the CSAPR Update to address interstate transport of ozone for the 2008 ozone NAAQS in the eastern United States. EPA revised the CSAPR Update on March 15, 2021, to address a ruling of the U.S. Court of Appeals for the D.C. Circuit. In 2022, EPA proposed the Good Neighbor Plan to address interstate transport of ozone for the 2015 ozone NAAQS and included a proposed ozone-season NO<sub>X</sub> trading program for EGUs in 25 states. The Good Neighbor Plan was finalized in spring 2023 and went into effect during the 2023 ozone season. In addition, EPA is supporting state efforts to address regional haze including best available retrofit technology and reasonable progress, as well as interstate air pollution transport contributing to downwind nonattainment of NAAQS as those obligations relate to emissions from electricity generating units.[12] EPA is conducting environmental justice (EJ) analyses of the distribution of these emissions and associated public health impacts on overburdened communities.

EPA manages the Clean Air Status and Trends Network (CASTNET), a rural ambient air monitoring program supporting NAAQS determinations, model validation, and ecological impacts. CASTNET measures ambient ozone and nitrogen and sulfur particles and gases to evaluate air quality effects on human health and environmental loadings. In addition, EPA participates in the National Atmospheric Deposition Program, which monitors wet deposition of sulfur, nitrogen, and mercury, as well as ambient concentrations of mercury and ammonia. Data from these air quality and environmental monitoring programs, in conjunction with $SO_2$, $NO_X$, mercury, and $CO_2$ emissions data from the Part 75 monitoring program and mercury emissions data from the MATS reporting program, have allowed EPA to develop a comprehensive accountability framework to track the results of its air quality programs. EPA applies this framework to the programs it implements and issues annual progress reports on compliance and environmental results achieved by the ARP, CSAPR, the CSAPR Update, and the Revised CSAPR Update, and pollution controls installed and emissions reductions achieved by MATS.[13] Required by Congress since FY 2019 in the appropriations reports, these annual progress reports highlight reductions in $SO_2$ and $NO_X$ emissions, and impacts of these reductions on air quality (*e.g.*, ozone and PM<sub>2.5</sub> levels), acid deposition, surface water acidity, forest health, and other environmental indicators.

EPA produces several tools to inform the public and key stakeholders about power sector emissions, operations, and environmental data. The Emissions & Generation Resource Integrated Database (eGRID)[14] is a comprehensive source of data on the environmental characteristics of almost all electric power generated in the U.S. Data from eGRID are used by other EPA programs, state energy and air agencies, and researchers. Between 2015 and 2021, eGRID was cited by more than 1,600 academic papers. Power Profiler[15] is a web application where electricity consumers can see the fuel mix and air emissions rates of their region's electricity and determine the air emissions associated with their electricity use. In keeping with the Agency's renewed commitment to energy equity and EJ, EPA published the Power Plants and Neighboring Communities web application[16] where consumers and advocates can find information about the demographics of communities

---

[12] Clean Air Act § 110 and § 169A; refer to 40 CFR 52.2312.

[13] To view the progress reports, please refer to: http://www3.epa.gov/airmarkets/progress/reports/index.html.

[14] To view eGRID, please refer to https://www.epa.gov/egrid.

[15] To view Power Profiler, please refer to https://www.epa.gov/egrid/power-profiler.

[16] To view the Power Plants and Neighboring Communities, please refer to https://www.epa.gov/airmarkets/power-plants-and-neighboring-communities.

located near power plants. EPA is developing analytical tools to better understand and communicate the impact of electricity generation on low-income communities and communities of color. EPA also operates several initiatives to engage key stakeholders, including working closely with tribal governments to build tribal air monitoring capacity through partnerships with the CASTNET Program. The EmPOWER Air Data Challenge[17] encourages academic researchers to propose how to integrate the EPA emissions and/or environmental data in their research. The Ask Clean Air Markets Division (CAMD) webinars provide an opportunity for stakeholders to ask EPA about the Clean Air Allowance Trading Programs, Part 75 emission reporting program, and the emission and environmental data programs.

EPA also develops multiple models and tools to project future emissions from the power sector to inform EPA's air quality modeling, as well as water and land regulations affecting power plants. The Integrated Planning Model (IPM) is a state-of-the-art, peer-reviewed, dynamic linear programming model that EPA applies to project power sector behavior under future business-as-usual conditions and to examine prospective air pollution control policies throughout the contiguous United States for the entire electric power system. EPA uses IPM, along with the National Energy Modeling System (NEMS) and the Regional Energy Deployment System (ReEDS), to estimate future electricity market conditions and associated pollutant emissions scenarios resulting from legislative and regulatory policies under consideration by Congress and the Administration. The National Electric Energy Data System (NEEDS) includes geographic, operating, air emissions, and other data on existing and planned grid-connected electric generating units across the contiguous United States. EPA updates and publishes NEEDS on a quarterly basis to inform emission modeling projections and to provide timely information to air quality planners and policymakers developing regulations to address power sector pollution. EPA is augmenting these power sector models and tools to include important information pertinent to EJ analyses and community-level impacts.

**FY 2025 Activities and Performance Plan**:

Work in this program directly supports Goal 4/Objective 4.1, Improve Air Quality and Reduce Localized Pollution and Health Impacts in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to operate the Clean Air Allowance Trading Programs and the systems to assess compliance with the Programs' regulatory requirements and the programs' progress toward the environmental goals required by the Clean Air Act. EPA will work to meet requirements and requests for modeling in support of the power sector emission control programs and for legal defense of regulatory actions. The Programs will continue to support emission reporting for other state and federal programs, including RGGI, MATS, and GHGRP.[18] In FY 2025, EPA anticipates work on regulatory development and implementation  related to power plants including greenhouse gas emission guidelines for existing power plants (replacing the previously promulgated Clean Power Plan and the Affordable Clean Energy Rule); interstate ozone transport obligations under the 2015 ozone standard; and the risk and technology review for

---

[17] For more information about the challenge, refer to https://www.epa.gov/airmarkets/empower-air-data-challenge.

[18] Refer to, 40 C.F.R. Part 63, Subpart UUUUU (*National Emission Standards for Hazardous Air Pollutants: Coal and Oil Fired Electric Utility Steam Generating Units*) and 40 C.F.R. Part 98, Subpart D (*Mandatory Greenhouse Gas Reporting: Electricity Generation*).

MATS. If finalized, the programmatic, operational, and/or data collection and management requirements will be expanded. EPA will continue to update power sector model inputs and capabilities to most accurately reflect changes and inform power sector investments driven by the Inflation Reduction Act and Infrastructure Investment and Jobs Act (IIJA).

This request also expands EPA's ability to perform advanced power sector analyses to tackle the climate crisis, including developing EJ tools to consider the distributional impacts of emissions on overburdened communities.

Allowance tracking and compliance assessment

EPA will allocate $SO_2$ and $NO_X$ allowances to affected emission sources and other account holders as established in the Clean Air Act[19] and state and federal CSAPR implementation plans. These allowance holdings and subsequent allowance transfers will be maintained in an allowance tracking system (*i.e.*, central database).[20] EPA will annually reconcile each facility's allowance holdings against its emissions to ensure compliance for all affected sources.[21]

Emission measurement, data collection, review, and publication

EPA will operate the Part 75 emission measurement program to collect, verify, and track emissions of air pollutants and air toxics from approximately 4,300 fossil-fuel-fired electric generating units.[22] In FY 2025, EPA also will implement several new regulatory actions, including the MATS e-reporting rule[23] and the Good Neighbor Plan and Part 75 regulatory update.[24] These new regulatory actions expand emission and compliance data collection. These emissions, operations, and compliance data will be maintained in an emissions tracking system (*i.e.*, central database) and made publicly available.[25]

Program assessment and communication

EPA will continue to monitor ambient air, deposition, and other environmental indicators through the CASTNET Program, contribute to the National Atmospheric Deposition Program, publish the power sector progress reports required by Congress, and produce additional information to communicate the extent of the progress made by the Clean Air Allowance Trading Programs.[26] EPA will publish emissions, environmental, and EJ-related demographic data on our expanded eGRID website. The expanded eGRID website will integrate new data available from the Energy Information Agency (EIA) and provide visualizations and contextual information to describe the emissions changes in the power sector.

Redesign system applications

EPA will continue the redesign of its markets operation system (CAMD Business System, CBS) and ECMPS software. These mission critical systems support the trading programs, as well as other emissions reporting programs operated by the states (*e.g.*, RGGI) and EPA (*e.g.*, MATS,

---

[19] Clean Air Act §§ 110 and 403.
[20] Clean Air Act §§ 110 and 403.
[21] Clean Air Act §§ 110 and 404-405, and state CSAPR implementation plans.
[22] Clean Air Act § 412; Clean Air Act Amendments of 1990. P.L. 101-549 § 821; and 40 C.F.R. Part 63, Subpart UUUUU.
[23] 40 C.F.R. Part 63, Subpart UUUUU.
[24] 40 C.F.R. Part 75.
[25] Clean Air Act § 412; Clean Air Act Amendments of 1990. P.L. 101-549 § 821.
[26] Government Performance and Results Act § 1115.

GHGRP). Reengineering these decade-old systems will enable EPA to enhance the user experience, comply with EPA security and technology requirements, consolidate software systems, and reduce long-term operation and maintenance costs. EPA released the CAMPD website in FY 2022 to enhance the public's access to the emission and allowance data. ECMPS modules were released in FY 2023 with additional functionality added in FY 2024.

Assistance to states

EPA will work with states to develop emission reduction programs to comply with the Clean Air Act Good Neighbor Provision and Regional Haze program requirements.[27] As part of the emission measurement, data collection, review, and publication, EPA will provide a web portal for states with delegated authority for MATS to access and review emissions and compliance data.

CASTNET will continue to support states in meeting their minimum monitoring requirements and assist with developing exceptional event demonstrations, as needed. Additionally, CASTNET will continue to provide data that can be used for permitting and ecological assessments within state boundaries (*e.g.*, Colorado).

Stakeholder engagement

EPA will continue to engage our stakeholder communities through efforts to maintain and strengthen current tribal air monitoring partnerships and build new ones to the extent possible. In addition, EPA has new efforts underway to identify how power plant pollution impacts historically marginalized and underserved communities, and how EPA air rules can mitigate those impacts. EPA also seeks to communicate information about power plant emissions and the contributions to low-income communities and communities of color and encourage the use of the Clean Air Allowance Trading Programs' data for scientific analysis and communication through various programs and tools, such as Power Plants and Neighboring Communities, EmPOWER Air Data Challenge and Ask CMD Webinars.

Policy and regulatory development

EPA will contribute multi-pollutant and multi-media (*i.e.,* air, water, land) power sector analyses informing EPA's policy agenda to tackle the climate crisis and protect public health and the environment, including EJ analyses to consider the distributional impacts of emissions on overburdened communities. Analytic and policy topics addressing climate change and air pollution that could be analyzed include a wide range of power sector actions under the CAA, as well as analysis of interactions between alternative vehicle electrification futures and associated changes in electric power generation.

**Performance Measure Targets**:

(PM NOX) Tons of ozone season NOx emissions from electric power generation sources.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 355,000 | 344,000 | 332,000 | 332,000 | Tons |
| **Actual** | 443,764 | 389,170 | 341,082 | 359,124 | 324,285 | 293,519 | | | |

---

[27] Clean Air Act § 110(a)(2)(D).

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$14,189.0 / +17.7 FTE) This program change is an increase in support for emissions trading programs, including associated data systems, that protect human health and the environment by delivering substantial emissions reductions in the power sector of $SO_2$, $NO_x$, and hazardous air pollutants. This proposal expands EPA's ability to perform advanced power sector analyses to tackle the climate crisis, including developing environmental justice tools to consider the distributional impacts of emissions on overburdened communities. This investment includes $3.248 million in payroll and additional changes to fixed support costs.

**Statutory Authority:**

Clean Air Act.

# Climate Protection

Program Area: Clean Air and Climate
Goal: Tackle the Climate Crisis
Objective(s): Reduce Emissions that Cause Climate Change

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$99,292* | *$101,000* | *$176,485* | *$75,485* |
| Science & Technology | $9,968 | $8,750 | $10,800 | $2,050 |
| Total Budget Authority | $109,260 | $109,750 | $187,285 | $77,535 |
| Total Workyears | 195.9 | 216.1 | 256.7 | 40.6 |

**Program Project Description:**

EPA's Climate Protection Program is working to tackle the climate crisis at home and abroad through an integrated approach of regulations, partnerships, and technical assistance. This Program takes strong action to limit carbon dioxide ($CO_2$) and methane emissions as well as working to reduce high-global warming potential greenhouse gases (GHG), like hydrofluorocarbons (HFCs), that will help the U.S. realize near-term climate benefits. Through this program, EPA works with federal, state, tribal, local government agencies, and key GHG emitting sectors to tackle the climate crisis and deliver environmental and public health benefits for all Americans. EPA builds partnerships, provides tools, and verifies and publishes GHG data, economic modeling, and policy analysis, all of which increase the understanding of climate science, impacts, and protection. EPA also extends this expertise internationally and plays critical roles in shaping and advancing international agreements and solutions. This international collaboration helps to both improve public health and air quality in the United States and level the global playing field for American businesses.

Greenhouse Gas Reporting Program:
EPA implements the U.S. Greenhouse Gas Reporting Program under the Clean Air Act. In 2007, Congress directed EPA to "require mandatory reporting of greenhouse gas emissions above appropriate thresholds in all sectors of the economy of the U.S." EPA annually collects data from over 8,100 facilities from 41 industrial source categories, including suppliers (*e.g.*, producers, importers, and exporters of GHGs), and uses this data to: 1) improve estimates included in the *Inventory of U.S. Greenhouse Gas Emissions and Sinks*; 2) support federal and state-level policy and regulatory development; 3) share GHG emissions; and 4) share data with state and local governments, tribes, community groups, industry stakeholders, academia, the research community, and the general public.

Inventory of U.S. Greenhouse Gas Emissions and Sinks:
To fulfill U.S. Treaty obligations under Article 4 of the 1992 Framework Convention on Climate Change, which was ratified by the U.S. Senate, EPA prepares the annual *Inventory of U.S. Greenhouse Gas Emissions and Sinks* (*Inventory*). The *Inventory* provides information on total

annual U.S. emissions and removals by source, economic sector, and GHG. The *Inventory* is used to inform U.S. policy and for tracking progress towards the U.S. Nationally Determined Contribution under the Paris Agreement. EPA leads the interagency process of preparing the *Inventory*, working with technical experts from numerous federal agencies, including the Department of Energy's (DOE) Energy Information Administration, Department of Agriculture (USDA), Department of Defense, U.S. Geological Survey, and academic and research institutions.

Managing the Transition from Ozone-Depleting Substances:
EPA implements efforts directed by Section 612 of the CAA to ensure a smooth transition away from ozone-depleting substances (ODS) to safer alternatives. Applying a comparative risk assessment, the Significant New Alternatives Policy (SNAP) Program evaluates the health and environmental effects of alternatives in the sectors and subsectors where ODS and high-global warming potential HFCs are used, providing additional substitute options in key sectors such as refrigeration and air conditioning.

Phasing Down HFCs:
EPA implements the American Innovation and Manufacturing (AIM) Act, enacted to address climate-damaging HFCs by phasing down their production and consumption; maximizing reclamation and minimizing releases of HFCs and their substitutes from equipment; and facilitating the transition to next-generation technologies through sector-based restrictions. This phasedown will decrease the production and import of HFCs in the United States by at least 85 percent by 2036, resulting in significant climate benefits.

ENERGY STAR:
ENERGY STAR is the national symbol for energy efficiency, recognized by more than 90 percent of American households, and is a critical tool to fight the climate crisis. ENERGY STAR addresses barriers in the market so that consumers and businesses can make informed decisions to reduce energy use, save money, and reduce harmful air pollutants. By reducing energy use, ENERGY STAR lowers costs for states and local governments as they design and implement plans to meet their air quality and climate goals.

ENERGY STAR achieves significant and growing GHG reductions by promoting the adoption of cost-effective, energy-efficient, and efficient electric technologies and practices in the residential, commercial, and industrial sectors. The Program yields significant environmental and economic results through its network of thousands of partners. In 2020 alone, ENERGY STAR and its partners helped American families and businesses save more than 520 billion kilowatt-hours of electricity and avoid \$42 billion in energy costs. These savings resulted in emission reductions of more than 400 million metric tons of GHGs (roughly equivalent to more than five percent of U.S. total GHG emissions) and more than 440 thousand tons of criteria air pollutants ($SO_2$, $NO_x$, $PM_{2.5}$). ENERGY STAR's criteria pollutant reductions are estimated to result in \$7 billion to \$17 billion in public health benefits.[28] These investments in turn drive job creation across the economy. More than 750 thousand Americans are employed in manufacturing or installing ENERGY STAR certified equipment alone – roughly 35 percent of all energy

---

[28] For more information on ENERGY STAR's environmental, human health, and economic impacts, please see here: https://www.energystar.gov/about/impacts. For more information on ENERGY STAR calculation methods, see the Technical Notes, available here: https://www.energystar.gov/sites/default/files/asset/document/Technical%20Notes%202022.pdf.

efficiency jobs in 2022, with energy efficiency accounting for 40 percent of all energy sector jobs overall.[29]

EPA manages the ENERGY STAR Program with clearly defined support from the DOE. Specifically, EPA manages and implements the specification development process for more than 75 product categories and the ENERGY STAR Most Efficient recognition program; the ENERGY STAR Residential New Construction Program for single-family homes, manufactured homes, and multifamily buildings; and the ENERGY STAR commercial and industrial programs. This work includes activities such as certification monitoring and verification; setting performance levels for building types; managing and maintaining the ENERGY STAR Portfolio Manager tool to measure and track energy use in buildings; and managing the integrity of the ENERGY STAR brand.

ENERGY STAR's IT portfolio is the foundation for program operation, partner communications, data collection, and analysis. The portfolio includes Portfolio Manager, which is the backbone of roughly 50 mandatory local benchmarking programs across the country; the qualified products exchange, the repository of information on ENERGY STAR products; the ENERGY STAR website, which is the program's primary means of communication with partners and citizens and receives over eight million visits per year; and ES Connect, a customer database used to track and communicate with thousands of stakeholders. All of these resources are supported by a robust cloud-based IT infrastructure to ensure performance, reliability, and security for ENERGY STAR stakeholders.

ENERGY STAR also supports equitable energy solutions by promoting broader access to energy-saving products and home improvements among disadvantaged households. A key focus of the ENERGY STAR Home Upgrade is to facilitate innovative financing approaches designed to address barriers faced by the most energy burdened. The Program prioritizes outreach to low-income populations on products that have the greatest opportunity to save energy and dollars. The ENERGY STAR Program also looks for affordable alternatives to products that may be cost-prohibitive, such as replacement windows (*e.g.*, storm windows). In the residential new construction sector, a quarter of active home builders that partner with ENERGY STAR work in the affordable housing space, including 675 Habitat for Humanity affiliates who have built more than 19,500 ENERGY STAR certified homes and apartments. Over 150 manufactured housing plant partners have constructed more than 155,000 ENERGY STAR certified manufactured homes. Within the multifamily sector, more than 75 percent of ENERGY STAR certified multifamily high-rise buildings are identified as affordable housing.[30]

Renewable Energy Programs:
EPA works with industry and other key groups to promote climate leadership and encourage efficient, clean technologies. For example, EPA's Green Power Partnership drives voluntary participation in the U.S. green power market. This Program provides information, technical assistance, and recognition to companies that use green power at or above minimum partnership benchmarks. At the end of calendar year 2021, more than 700 EPA Green Power Partners reported

---

[29] U.S. Department of Energy. (2023). U.S. Energy and Employment Report. https://www.energy.gov/policy/us-energy-employment-jobs-report-useer (link is external). The survey does not account for retail employment.
[30] For more information on ENERGY STAR's residential program, including affordable new construction, please visit: https://www.energystar.gov/about/how_energy_star_works/why_epa and https://cmadmin.energystar.gov/partner_resources/residential_new.

the collective use of more than 85 billion kilowatt-hours of green power annually. This amount of green power use represents nearly 35 percent of the U.S. voluntary green power market (that goes beyond required purchases under state renewable portfolio standards). Since 2001, the Program has helped prevent more than 375 million metric tons of GHG emissions.[31] In addition, EPA's Green Power Partnership also recognizes more than 120 EPA Green Power Communities nationwide that advance green power access and use to their community members. EPA also establishes norms of climate leadership by encouraging organizations with emerging climate objectives to identify and achieve cost-effective GHG emission reductions, while helping more advanced organizations drive innovations in reducing their greenhouse gas impacts in their supply chains and beyond.

State, Tribal and Local Climate and Energy Programs:
EPA works with state, tribal, and local governments to identify and implement cost-effective programs that reduce GHG emissions, save energy, and improve air quality. EPA provides the necessary tools, data, and technical expertise to help subnational governments implement energy efficiency and clean energy policies and programs that reduce emissions, maximize co-benefits, and prioritize low-income and vulnerable communities. Through trainings, webinars, outreach, and technical assistance, the Programs help dozens of state and local governments develop emissions inventories and analyze the emissions impacts and health benefits of energy efficiency and clean energy strategies. Many more subnational governments use the Programs' resources and policy guidebooks to discover best practices for emissions reductions. These programs also highlight best practices on how to deliver inclusive climate programs that benefit low-income communities and improve energy justice.

SmartWay Transport:
Launched in 2004, SmartWay is the only voluntary program working across the entire freight system to comprehensively address economic and environmental goals related to sustainability. Nearly 4,000 businesses that receive, ship, or carry freight rely upon SmartWay supply chain accounting tools and methods to assess, track, and reduce transportation-related carbon, energy use, and air emissions. By accelerating deployment of cleaner, more efficient technologies and operational strategies across supply chains, SmartWay partners have avoided significant amounts of pollution, helping to address the climate crisis and contributing to healthier air for underserved and overburdened communities living close to freight hubs and routes. Improving supply chain efficiency also helps grow the economy and protect and create jobs while contributing to energy security. Participants in this economic sector are increasingly looking towards zero emission technologies as options to improve environmental performance associated with their activities.

EPA is the SmartWay brand manager and is responsible for the specification process for hundreds of product and vehicle categories, including both family (passenger) vehicles and commercial (heavy-duty freight truck and trailer) vehicles, and the SmartWay Partnership and SmartWay Affiliate recognition programs. EPA's technology verification program enables manufacturers to voluntarily demonstrate fuel saving and emission reduction performance using standard testing protocols. SmartWay partner fleets as well as others in the trucking industry use EPA's verified technology lists to identify products that have been demonstrated to save fuel and reduce

---

[31] For more information on EPA's Green Power Partnership's environmental, human health, and economic impacts, please visit: https://www.epa.gov/greenpower/green-power-partnership-program-results.

emissions. SmartWay also provides relevant information about fleet best practices and new technologies to help program participants determine best approaches to managing their fleets.

Partnerships to Reduce Methane Emissions:

EPA operates several partnership programs that promote cost-effective reductions of methane by working collaboratively with industry. Methane programs offer excellent opportunities for reducing the concentration of GHGs in the atmosphere and providing an energy resource in the process. Methane is a significant source of GHG emissions and has a relatively short atmospheric lifetime of about 9 to 15 years, which means that reductions made today will yield positive results in the near term.

Unlike other GHGs, methane is an important energy resource that allows for cost-effective mitigation. There are many opportunities to recover and re-use or sell methane from the agriculture (manure management), coal mining, oil and gas, and landfill sectors. The AgSTAR Program, which is a collaboration between EPA and USDA, focuses on methane emission reductions from livestock waste management operations through biogas recovery systems. The Coalbed Methane Outreach Program promotes opportunities to profitably recover and use methane emitted from coal mining activities. The Landfill Methane Outreach Program promotes abatement and energy recovery of methane emitted from landfills. The Natural Gas STAR Methane Challenge program spurs the adoption of cost-effective technologies and practices that reduce methane emissions from the oil and natural gas sector through collaborative partnerships with companies.

EPA also manages the implementation of the Global Methane Initiative (GMI), a U.S. led international public-private partnership that brings together over 45 partner governments and over 700 private sector and non-governmental organizations to advance methane recovery and use. GMI builds on the success of EPA's domestic methane programs and focuses on advancing methane reductions from agriculture, coal mines, landfills, oil and gas systems, and municipal wastewater. With assistance from several agencies—particularly EPA and U.S. Department of State—the U.S. Government has supported identification and implementation of more than 1,100 methane mitigation projects since 2005. These projects have reduced methane emissions by about 500 million tonnes of carbon dioxide equivalent (MMTCO$_2$e), including approximately 39 MMTCO$_2$e in 2021. Since 2005, U.S. efforts under the auspices of GMI leveraged more than $650 million for project implementation and training and provided trainings for more than 50,000 people in methane mitigation.[32]

Partnerships to Reduce Fluorinated Greenhouse Gas Emissions:

EPA operates partnership programs that promote cost-effective reductions of fluorinated greenhouse gases (FGHG) by working collaboratively with industry. EPA's FGHG partnership programs continue to make significant reductions in potent GHG emissions, such as perfluorocarbons, HFCs, nitrogen trifluoride, and sulfur hexafluoride. Through its partnership programs, EPA works closely with participating industries to identify cost-effective emissions reduction opportunities, recognize industry accomplishments, and facilitate the transition toward environmentally friendlier technologies and chemicals and best environmental practices. Although

---

[32]For more information on the Global Methane Initiative's environmental, human health, and economic impacts, please visit: https://www.epa.gov/gmi/us-government-global-methane-initiative-accomplishments.

FGHGs account for a small portion of total U.S. GHG emissions, they have very high global warming potentials.

Science, Economic, and Technical Analyses:

EPA conducts a range of economic, scientific, and technical analyses for CAA regulatory actions and to support the Administration's efforts to address climate change. These efforts include the communication of the science of climate change to the public by providing information on the indicators of climate change, climate risks, and actions that can be taken to mitigate the impacts. EPA applies an analytical framework to evaluate avoided risk and economic impacts of GHG mitigation. These efforts also include the development of multiple models and tools to project future multipollutant emissions (including GHGs) from the power sector to inform EPA's air quality modeling and air, water, and land regulations affecting power plants. EPA applies modeling tools and expertise across a wide range of high priority work areas, including supporting U.S. participation in the Paris Agreement, providing analysis and technical expertise to the U.S. Special Presidential Envoy for Climate and other interagency partners to support U.S. engagement with foreign governments on climate change, renewable fuel climate assessments, and conducting legislative analyses as requested by Congressional staff. Furthermore, EPA provides critical, world-renowned non-$CO_2$, agriculture, and forestry analyses and participates in the interagency process to improve and apply the models and analyses as needed. Moreover, EPA is expanding its ability to conduct equity and Environmental Justice (EJ) analyses to identify policy implications and improve collaboration with underserved and frontline communities.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 1/Objective 1.1, Reduce Emissions that Cause Climate Change in the *FY 2022 - 2026 EPA Strategic Plan*. Work in this program also directly supports progress toward the FY 2024-2025 Agency Priority Goal: Phase down the production and consumption of hydrofluorocarbons (HFCs). By September 30, 2025, annual U.S. consumption of HFCs will be 40 percent below the baseline of 302.5 million metric tons of carbon dioxide equivalent (MMTCO$_2$e) consistent with the HFC phasedown schedule in the American Innovation and Manufacturing (AIM) Act and codified in the implementing regulations.

In FY 2025, EPA is requesting resources to help reduce greenhouse gas emissions while also addressing EJ through an integrated approach of regulations, partnerships, and technical assistance. This request enables EPA to take strong action on $CO_2$ and methane as well as high-global warming potential climate pollutants such as HFCs; restores the capacity of EPA's climate partnership programs to provide essential contributions to our Nation's climate, economic, and justice goals; and strengthens EPA's capacity to apply its modeling tools and expertise across a wide range of high priority work areas, including supporting U.S. participation in the Paris Agreement.

EPA will continue to implement the Greenhouse Gas Reporting Program, which currently covers a total of 41 sectors with approximately 8,100 reporters. In FY 2025, additional resources are requested to implement regulations in FY 2025 to update global warming potentials and enhance reporting of emissions from U.S. industrial sectors, including methane emissions from the oil and natural gas sector. In FY 2025, EPA will verify at least 98 percent of Annual Greenhouse Gas

Reports from these sectors prior to the anticipated data publication during the first week of October. Focus areas for the Program will include:

- Implementing recent regulatory amendments to update, streamline, and enhance the scope and quality of the Greenhouse Gas Reporting Program across multiple sectors, GHG emissions data from the oil and gas sector, as well as carbon capture projects;
- Aligning the electronic greenhouse gas reporting tool (e-GGRT) with those regulatory amendments and performing system enhancements to accommodate HFC supply data submitted by industry to meet the reporting requirements of the AIM Act regulations;
- Conducting a verification process through a combination of electronic checks, staff reviews, and follow up with facilities;
- Publishing reported data while enhancing the Facility Level Information on Greenhouse Gases Tool (FLIGHT) mapping feature to visually display the distribution of GHG emissions and sources of GHG supply in areas of the country of EJ and equity concern;
- Continuing the review and decision making on the increased number of Carbon Capture and Storage Monitoring Reporting and Verification plans that are submitted to the GHG Reporting Program due to changes in the IRS 45Q tax code; and
- Implementing administrative actions, including one or more rulemakings, using Inflation Reduction Act (IRA) supplemental funds to revise the GHGRP subpart W (requiring reporting of GHG emissions from Petroleum and Natural Gas Systems) and implementing the Waste Emissions Charge.

In addition, EPA will work to complete the annual *Inventory of U.S. Greenhouse Emissions and Sinks (Inventory)*. In FY 2025, additional resources are requested to enhance the data collection, reporting and publication processes, while also supporting reconciliation and convergence of bottom-up and top-down approaches to measuring methane emissions, ensuring EPA continues to meet the legally binding treaty obligations. Focus areas will include:

- Continuing improvements to inventory methodologies in areas such as oil and gas, land-use, and waste, consistent with Intergovernmental Panel on Climate Change guidelines, and to meet upcoming Paris reporting requirements;
- Disaggregating the national *Inventory* to the state level and publishing the results annually through the online Data Explorer tool;
- Furthering work to make use of advanced observation technologies, including through developing the capacity to publish an annual gridded methane inventory, which is essential for use by atmospheric researchers and as input to other studies;
- Integrating the GHG emission calculator into Portfolio Manager to help users fully comply with accounting protocols and local mandates;
- Enhancing GHG inventory tools and technical assistance to states, local governments, and tribes; and,
- In coordination with National Aeronautics and Space Administration (NASA) and other partners, EPA will continue to study and prototype capabilities for a greenhouse gas monitoring and information system that will integrate data from a variety of sources, with a goal of making data more accessible and usable to federal, state, and local governments, researchers, the public, and other users.

In FY 2025, EPA will continue to implement the ENERGY STAR Program, partnering with nearly 840 utilities (representing an annual collective investment of $7.6 billion in energy efficiency programs) plus state and local governments and nonprofits. These partners leverage ENERGY STAR in their efficiency programs to achieve GHG reductions in major economic sectors, consistent with national commitments. In FY 2025, ENERGY STAR also will continue to modernize its IT infrastructure, including moving existing software to open-source, cloud-based solutions to improve system performance and reliability while also reducing operational costs. ENERGY STAR will further prioritize usability of its web-based tools and resources for both partners and the general public.

More than 50 cities and states have developed mandatory energy requirements for existing commercial and multifamily buildings (*e.g.*, benchmarking, disclosure, and energy or climate performance) that rely on EPA's Portfolio Manager (EPA's online tool for building managers to measure and track energy and water consumption, as well as greenhouse gas emissions) and work with EPA on implementation.

EPA also will support the IRA's expanded incentives – including tax credits and/or rebates for consumers, businesses, and owners of commercial and multifamily buildings that explicitly rely on ENERGY STAR – through both an information hub and targeted outreach and technical assistance to potential users of these incentives.

Under a Memorandum of Understanding (MOU) with DOE, EPA has an obligation to review and update ENERGY STAR specifications on a regular cycle. Failure to update these specifications undermines EPA's commitments under this MOU and risks a situation where ENERGY STAR specifications would be less rigorous than DOE's regulatory standards, or national model energy codes and advanced state-level codes for new construction, which introduces the possibility of legal risk to the Agency. In FY 2025, the Agency is requesting additional resources to address the growing backlog of ENERGY STAR specifications that are overdue for review and update.

ENERGY STAR will work in the Residential Sector to enable and accelerate the adoption of energy efficiency. In FY 2025, the Program will:

- Update up to five product specifications for ENERGY STAR-labeled products to ensure top efficiency performance and complete development of a specification for up to one new product type;
- Further amend up to two ENERGY STAR specifications in response to changes in DOE minimum efficiency standards and test procedures;
- Complete the stakeholder process across all relevant residential and commercial product specifications to prioritize labeling of efficient, electric products;
- Administer third-party certification to ensure consumer confidence in more than 75 categories for ENERGY STAR labeled products, which includes overseeing 500 recognized laboratories worldwide and more than 20 certification bodies;
- Further drive long-term climate goals by advancing the cutting edge of the current and future market through the ENERGY STAR Emerging Technology Awards and the ENERGY STAR Most Efficient recognition program, which recognizes over 2,500 product

models from nearly 350 manufacturers;

- Leverage the market power of the ENERGY STAR brand through the ENERGY STAR Home Upgrade to quickly scale home energy retrofits featuring the high impact, broadly applicable measures (*e.g.*, heat pumps and heat pump water heaters) that are critical to efficiently decarbonizing the residential sector;

- Target energy-saving resources to underserved and energy burdened households with expanded efforts to leverage the ENERGY STAR market power to advance utility-scale uptake of equitable financing approaches for home energy upgrades, a key opportunity to support environmental justice goals;

- Continue to develop and implement critical updates of program requirements for EPA's ENERGY STAR Residential New Construction programs in response to newly-developed and adopted national model codes and unique states codes, such as California, to ensure that the Program continues to deliver at least 10 percent energy savings; and

- Provide support for the implementation of the Section 45L tax credit for energy-efficient new homes, including coordination with other federal agencies (*e.g.*, Treasury and DOE), as well as providing technical assistance for builders and energy rating companies to ensure maximum uptake of available credits that promote increased efficiency in residential new construction.

In addition, ENERGY STAR will continue to partner with businesses and public-sector organizations to advance energy efficiency in the commercial sector. In FY 2025, the program will:

- Continue to operate and maintain ENERGY STAR Portfolio Manager, as well as deliver critical enhancements to accommodate the more than 300 commercial software vendors and utilities that use the tool, and add reporting and tracking functionality and enhanced data quality checks to increase support to corporate and federal, state and local government users;

- Update and expand ENERGY STAR building scores, used to understand how a building's energy consumption compares with similar buildings nationwide;

- Verify the efficiency of more than 7,000 buildings with EPA's ENERGY STAR label, including conducting approximately 250 spot audits;

- Provide guidance and technical assistance to the many local governments and states that are exploring or have adopted building performance standards, as well as continue to support jurisdictions that have adopted mandatory or voluntary energy benchmarking and disclosure policies that rely on EPA's ENERGY STAR Portfolio Manager and related tools; and

- Deploy in marketplace the new ENERGY STAR-based certification program that was launched in FY 2024 to recognize the next generation of existing commercial and multifamily buildings that demonstrate achievement of top efficiency plus low carbon emissions through efficient electrification and use of renewable energy.

ENERGY STAR will continue to work with partners in the industrial sector to improve efficiency and reduce costs while protecting the environment. In FY 2025, the Program will:

- Continue to support ENERGY STAR industrial partners across 33 diverse industrial sectors through webinars, focus industry meetings, company-to-company mentoring, and recognition of efficient plants;
- Update and develop new Energy Performance Indicators to incorporate key factors that impact energy use in the plant and convert electricity inputs to source energy;
- Work with, review, and audit an expected 200 industrial plants applications registered to achieve the ENERGY STAR Challenge for Industry in which industrial sites commit to reducing their energy intensity by 10 percent within five years; and
- Deploy scalable guidance and technical assistance to increase efficiency in lower-resourced small and medium sized industries.

EPA will implement the Green Power Partnership and other activities to accelerate the transition to a carbon-pollution free electricity sector. In FY 2025, the Program will:

- Update and develop new resources, educational tools, and recognition of actions and leadership to incentivize all sectors of Green Power Partners;
- Foster market leadership through the Green Power Leadership Awards that focus on the aggressive actions of Partners to facilitate use of green power within their own operations, supply chains, underserved communities, and among Partner employees;
- Partner with over 130 Green Power Communities to encourage local efforts to increase their use of and investment in renewable electricity, including underserved communities that have traditionally lacked adequate access to green power;
- Promote cost-effective corporate GHG management practices that support the measurement and management of corporate-wide emissions; and
- Maintain and update widely utilized tools, such as the Emissions Factor Hub, that are key to ensuring accurate and credible estimations of corporate greenhouse gas emissions and reporting practices in the measurement and management of greenhouse gas emissions.

In FY 2025, EPA will implement the State and Local Climate and Energy Program to support state, local, and tribal actions that are essential to tackling the climate crisis, reducing pollution, and promoting equity and environmental justice in clean energy programs. Focus areas of the Program will include:

- Providing technical support to dozens of state, tribal, and local governments as they implement climate and clean energy policies for efficiency, renewables, and efficient electrification and provide increased support on equity and environmental justice in clean energy policy design;
- Updating major analytical tools to enable state, tribal and local governments to develop and analyze GHG inventories, pollutant emissions reductions, and public health co-benefits of efficiency, renewables, and efficient electrification;
- Conducting outreach and training on tools to hundreds of state and local officials as well as increased collaboration with other EPA offices and regions with focus on energy efficiency and efficient electrification analytics; and

Case 2:25-cv-02015-TMC    Document 130-1    Filed 02/24/26    Page 267 of 686

- Providing best practices to states and local governments on energy efficiency and efficient electrification program design through webinars and convenings for state and local policymakers.

In FY 2025, EPA will continue to mitigate domestic methane and fluorinated greenhouse gases emissions by implementing partnership outreach programs focused on providing technical information on best practices and cost-effective technologies in the petroleum and natural gas systems, municipal solid waste landfills, livestock manure anaerobic digestion and biogas systems, coal mining, and electric power transmission sectors. EPA's GreenChill Partnership Program will continue to work with key sectors transitioning from ODS and HFCs to promoting lower global warming potential and improved more energy-efficient technologies. The Responsible Appliance Disposal Program partners achieve emissions reductions by collecting and disposing of refrigerated appliances containing ODS and HFCs. Regulatory controls under the AIM Act will further phase down HFCs.

EPA also will continue implementing and promoting global methane mitigation opportunities across multiple sectors (oil and gas, coal mining, municipal solid waste, wastewater, agriculture/manure management) in support of the GMI by:

- Running the secretariat of the GMI, coordinating and organizing overall activities;
- Providing technical leadership across multiple sectors;
- Coordinating with key methane-focused initiatives such as United Nations Economic Commission for Europe, Climate & Clean Air Coalition, and the International Energy Agency; and
- Serving Administration-level priorities, such as the Global Methane Pledge.

In FY 2025, EPA will maintain and enhance the climate change website by updating scientific material and further developing web products that reach the American public and effectively communicate the causes and effects of climate change and Administration priorities. EPA also will support the State Department as the technical lead in developing both current and additional measure projections and compiling information on GHG mitigation policies and measures to assess our progress towards meeting our Nationally Determined Contribution goal. These projections and actions will be included in the upcoming first U.S. Biennial Transparency Report, as required by the United Nations Framework Convention on Climate Change and its Paris Agreement.

EPA will continue its United Nations Framework Convention on Climate Change engagement by serving as negotiators on U.S. delegations, for example, on transparency and markets, and working to assess mitigation potential and information from other countries. EPA also will review national inventory and related reports submitted by other countries, including other major economies such as Brazil, Germany, and China.

EPA will continue to improve work on climate change impacts modeling including how risks and economic impacts can be reduced under mitigation and adaptation scenarios by:

- Advancing the scientific literature on climate impacts through the Climate Change Impacts and Risk Analysis project by publishing and applying sectoral impact

37

methodologies and the FrEDI reduced complexity tool to improve analytical and communication capability;
- Quantifying and monetizing the disproportionate risks of climate change on socially vulnerable populations;
- Continuing to make the Climate Change Indicators more accessible through enhanced products and visualization tools; and
- Collaborating with the interagency U.S. Global Change Research Program through participation in the National Climate Assessment and other key Program activities.

EPA also will analyze program data on GHG emissions from petroleum and natural gas facilities and support the Agency by:

- Developing more detailed oil and gas projections to support the nationally determined contributions under the Paris Agreement; and
- Performing technical analyses, regulatory development, and regulatory impact analyses.

EPA also will analyze program data on greenhouse gas emissions from power plants by:

- Developing regulations, conducting regulatory impact analyses, and model emission projections to address criteria and toxic air pollutants as well as greenhouse gases from the power sector;
- Providing economic analyses and power sector modeling to inform a holistic picture of multipollutant and multimedia regulation of the sector; and
- Conducting detailed analytics and extensive public engagement to integrate environmental justice into policy development for power sector rules.

Also in FY 2025, EPA will continue to achieve significant reductions in climate and other harmful emissions from freight transportation by expanding SmartWay efforts to:

- Develop and refine GHG accounting protocols for freight carriers and their customers;
- Continue to provide expertise and serve as a technical test bed in support of the Agency's efforts to reduce GHG emissions, including activities related to zero emission technologies;
- Continue to transition SmartWay partner tools to an online platform making it easier to benchmark and track performance and expand access to SmartWay for smaller businesses;
- Encourage adoption of SmartWay approaches globally under international frameworks and agreements, including co-administering SmartWay with Canada and continuing a SmartWay pilot in Mexico;
- Contribute to the dissemination and implementation of an International Organization for Standardization (ISO) standard to calculate GHG emissions from transportation operations; and,
- Update GHG requirements for federal purchases of passenger vehicles under the Energy Independence and Security Act as needed.

**Performance Measure Targets:**

**(PM CPP) Million metric tons of carbon dioxide equivalent reduced annually by EPA's climate partnership programs.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 486.9 | 500.7 | 513.9 | 509.3 | MMTCO2e |
| **Actual** | 505.6 | 518.6 | 529.6 | 469.9 | Data Avail 11/2024 | Data Avail 11/2025 |  |  |  |

**(PM REP) Percentage of Annual Greenhouse Gas Emission Reports verified by EPA before publication.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | 65 |  |  |  | 98 | 98 | 98 | 100 | Percent |
| **Actual** | 97 | 96 | 95 | 99 | 97 | 97 |  |  |  |
| **Numerator** | 7,821 | 7,867 | 7,722 | 7,935 | 7,877 | 7,891 |  |  | Reports |
| **Denominator** | 8,061 | 8,165 | 8,126 | 8,029 | 8,141 | 8,130 |  |  |  |

**(PM HFC) Remaining U.S. consumption of hydrofluorocarbons (HFCs).**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 273.5 | 273.5 | 181.5 | 181.5 | MMTCO2e |
| **Actual** |  |  |  |  | 253.4 | Data Avail 11/2024 |  |  |  |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$190.0 / +1.0 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements.

- (+$65,295.0 / +37.3 FTE) This program change is an increase to advance work to reduce greenhouse gas emissions and advance environmental justice through an integrated approach of regulations, partnerships, and technical assistance. The increase would enable EPA to take strong action on $CO_2$ and methane as well as high-global warming potential climate pollutants such as HFCs, as directed by the AIM Act; restore the capacity of EPA's climate partnership programs to provide essential contributions to our nation's climate, economic, and justice goals; and strengthen EPA's capacity to apply its modeling tools and expertise across a wide range of high priority work areas including supporting U.S. participation in the Paris Agreement and the Climate-Macro Interagency Technical Working Group. This investment includes $7.3 million in payroll and additional changes for fixed support costs. This also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$5,000.0) This program change is an increase for EPA, in coordination with NASA, to study and prototype capabilities for a greenhouse gas monitoring and information system

that will integrate data from a variety of sources with a goal of making data more accessible and usable to federal, state, and local governments, researchers, the public, and other users.

- (+$5,000.0) This program change is an increase to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act. The administrative set aside provided for the fund was less than two tenths of one percent.

**Statutory Authority:**

Clean Air Act; Global Change Research Act of 1990; Global Climate Protections Act; Energy Policy Act of 2005 § 756; Pollution Prevention Act §§ 6602-6605; National Environmental Policy Act (NEPA) § 102; Clean Water Act § 104; Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA) § 8001; American Innovation and Manufacturing (AIM) Act.

## Federal Stationary Source Regulations

Program Area: Clean Air and Climate
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Improve Air Quality and Reduce Localized Pollution and Health Impacts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$29,768* | *$30,344* | *$47,888* | *$17,544* |
| Total Budget Authority | $29,768 | $30,344 | $47,888 | $17,544 |
| Total Workyears | 113.2 | 124.5 | 165.3 | 40.8 |

**Program Project Description:**

The Clean Air Act (CAA) requires EPA to take action to improve and protect air quality and limit emissions of harmful air pollutants from a variety of sources. The CAA directs EPA to set National Ambient Air Quality Standards (NAAQS) for six "criteria" pollutants considered harmful to public health and the environment. The criteria pollutants are particulate matter (PM), ozone ($O_3$), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon monoxide (CO), and lead (Pb). The CAA requires EPA to review the science upon which the NAAQS are based and the standards themselves every five years. These national standards form the foundation for air quality management and establish goals that protect public health and the environment. Section 109 of the CAA Amendments of 1990 established two types of NAAQS. Primary standards are set at a level requisite to protect public health with an adequate margin of safety. Secondary standards are set at a level requisite to protect public welfare from any known or anticipated adverse effects.

Sections 111, 112, and 129 of the CAA direct EPA to take actions to control air emissions of toxic, criteria, and other pollutants from stationary sources. Specifically, to address air toxics, the CAA Section 112 program provides for the development of National Emission Standards for Hazardous Air Pollutants (NESHAP) for major sources and area sources; the assessment and, as necessary, regulation of risks remaining after implementation of NESHAP that are based on Maximum Available Control Technology (MACT); the periodic review and revision of the NESHAP to reflect developments in practices, processes, and control technologies; and associated national guidance and outreach. In addition, EPA must periodically review, and, where appropriate, revise both the list of air toxics subject to regulation and the list of source categories for which standards must be developed.

The CAA Section 111 program requires issuing, reviewing, and periodically revising, as necessary, New Source Performance Standards (NSPS) for certain pollutants from listed categories of new, modified, or reconstructed sources of air emissions; issuing emissions guidelines for states to apply to certain existing sources; and providing guidance on Reasonably Available Control Technology through issuance and periodic review and revision of control technique guidelines. The CAA Section 129 program further requires EPA to develop and periodically review standards of performance and emissions guidelines covering air emissions from waste combustion sources.

41

Sections 169A and 169B of the CAA require protection of air quality related values (AQRV) for 156 congressionally mandated national parks and wilderness areas, known as Class I areas. Visibility is one such AQRV, and Congress established a national goal of returning visibility in the Class I areas to natural conditions, *i.e.*, the visibility conditions which existed without manmade air pollution. The Regional Haze Rule sets forth the requirements that state plans must satisfy to make reasonable progress towards meeting this national goal.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.1, Improve Air Quality and Reduce Localized Pollution and Health Impacts in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA is requesting additional resources to propose federal plans to implement rules to limit GHG emissions from new and existing sources in the power sector and new and existing facilities in the oil and gas sector, and to propose or finalize actions with court-ordered or court-enforceable deadlines occurring in FY 2025, as well as other priority air quality actions. This increase also implements a strategy to meet statutory deadlines for Risk and Technology Reviews of Maximum Achievable Control Technology (MACT) standards, per corrective action commitments made in response to OIG recommendations in FY 2022 which include requesting required resources.[33]

NAAQS
EPA strengthened the $PM_{2.5}$ annual standard on February 7, 2024[34]. EPA also is under a consent decree to issue a proposed rulemaking for the secondary NAAQS for sulfur oxides, nitrogen oxides, and particulate matter by April 9, 2024, and to finalize the decision by December 10, 2024.  In FY 2025, EPA will advance the review of the 2020 Ozone NAAQS, will continue its review of the lead NAAQS and anticipates reviewing the primary nitrogen oxides NAAQS under a consent decree schedule. EPA has requested resources commensurate to support these reviews. Each review involves a comprehensive reexamination, synthesis, and evaluation of scientific information; the design and conduct of complex air quality and risk and exposure analyses; and the development of a comprehensive policy assessment providing analysis of the scientific basis for alternative policy options.

With FY 2025 resources, EPA will continue a multi-phased process for improving air pollution health benefits analysis methods to improve the science it uses to quantify health benefits from air quality regulations. This is one of the learning priority areas as part of the Agency's Learning Agenda in the *FY 2022-2026 EPA Strategic Plan.* EPA will finalize a health benefits guidelines document outlining best practices for incorporating new scientific information into methods for health benefits analysis. This will be followed by additional annual reviews and necessary updates

---

[33] The EPA Needs to Develop a Strategy to Complete Overdue Residual Risk and Technology Reviews and to Meet the Statutory Deadlines for Upcoming Reviews. March 30, 2022. Pages: At-A-Glance, 6, 8, 11, 12, 14, 25, 26, & 27. https://www.epa.gov/system/files/documents/2022-03/_epaoig_20220330-22-e-0026.pdf.
[34] For additional information, please see: https://www.epa.gov/system/files/documents/2024-02/pm-naaqs-final-frn-pre-publication.pdf.

of specific methods and applications in the guidelines document. This effort will help ensure transparency and confidence in the process for selecting and applying the latest science in health benefits analysis. EPA also will improve tools and approaches to enable more robust analysis of program impacts on vulnerable communities. EPA will work to achieve and maintain compliance with any existing standards. These include the ozone standards established in 2015, 2008, 1997, and 1979; the 1987 $PM_{10}$ standards; the 2012, 2006, and 1997 $PM_{2.5}$ standards; the 2008 and 1978 lead standards;[35] the 2010 $NO_2$ standard;[36] the 1971 CO standard; and the 2010 $SO_2$ standard.[37] EPA also will work to complete initial area designations for the 2024 $PM_{2.5}$ standard, as well as any other outstanding designation actions for other NAAQS. EPA, in close collaboration with states and tribes, will work to improve air quality in areas not in attainment with the NAAQS, including assisting states and tribes in developing CAA-compliant pollution reduction plans.

Air Toxics
Section 112(d)(6) of the CAA requires EPA to review and revise, as necessary, all NESHAP (for both major and area sources) every eight years. These reviews include compiling information and data already available to the Agency; collecting new information and emissions data from industry; reviewing emission control technologies; and conducting economic analyses for the affected industries needed for developing regulations. Similarly, Section 112(f) of the CAA requires EPA to review the risk that remains after the implementation of MACT standards within eight years of promulgation. In addition, Section 112 requires EPA to periodically review, and, where appropriate, revise both the list of air toxics subject to regulation and the list of source categories for which standards must be developed. The CAA Section 129 Program further requires EPA to develop and periodically review standards of performance and emissions guidelines covering air emissions from waste combustion sources.

In FY 2025, EPA will undertake multiple CAA reviews and associated rulemakings. The air toxics program will prioritize conducting reviews of NESHAP and CAA Section 129 rules, many of which are subject to court-ordered or court-entered dates, or are actions otherwise required by courts. EPA expects to propose or promulgate more than 41 air toxics rules in FY 2025. If EPA receives the resources requested as part of its commitment to the OIG concerning corrective action measures for the Air Toxics Program, EPA also will expect to propose or finalize an additional 48 air toxics rules in FY 2025 – a total of 89 air toxics actions. EPA will enhance risk assessment capabilities to better identify and determine impacts of exposures to air toxics on communities. The Program will prioritize its work, as resources allow, with an emphasis on meeting court-ordered deadlines, and incorporating environmental justice (EJ) considerations as part of the decision-making process. FY 2025 funds also will be used to provide outreach, training, technical assistance, and capacity building to communities and small businesses that may be affected by the rules we promulgate.

As called for in the Administrator's April 27, 2021, *Memorandum Regarding Per- and Polyfluoroalkyl Substances,[5]* EPA will take actions to address PFAS pollution. The EPA Council on PFAS will continue to collaborate on cross-cutting strategies; advance new science; develop coordinated policies, regulations, and communications; and engage with affected states, tribes,

---

[35] In September 2016, EPA completed the review of the 2008 Lead NAAQS and retained the standards without revision.
[36] In April 2018, EPA completed the review of the 2010 $NO_2$ NAAQS and retained the standards without revision.
[37] In February 2019, EPA completed the review of the 2010 $SO_2$ NAAQS and retained the standards without revision.

communities, and stakeholders. The Agency's PFAS Strategic Roadmap outlined a whole-of-agency approach to addressing PFAS contamination. In the Roadmap, the Office of Air and Radiation (OAR) committed to "evaluate mitigation options, and/or pursuing other regulatory and non-regulatory approaches." This includes consideration of appropriate actions using existing CAA authorities.

As called for in the Administrator's April 27, 2021, *Memorandum Regarding Per- and Polyfluoroalkyl Substances,*[5] EPA will take actions to address PFAS pollution. The EPA Council on PFAS will continue to collaborate on cross-cutting strategies; advance new science; develop coordinated policies, regulations, and communications; and engage with affected states, tribes, communities, and stakeholders. The Agency's PFAS Strategic Roadmap outlined a whole-of-agency approach to addressing PFAS contamination. In the Roadmap, the Office of Air and Radiation (OAR) committed to "evaluate mitigation options, and/or pursuing other regulatory and non-regulatory approaches." This includes consideration of appropriate actions using existing CAA authorities.

As part of a forward-looking air toxics strategy, EPA will address these regulatory and emerging issues and improve access to air toxics data. The Agency will continue its transition to an approach that develops and shares air toxics data faster and more regularly to the public, allowing for increased transparency and the ability to see trends and exposure risks over time. In 2025 EPA will report the most current air toxics data available each year in the annual Air Trends Report and an online interactive tool (AirToxScreen) instead of the previous three to four - year cycle for toxics data reporting and provide that data at increased spatial resolution. EPA will continue providing information annually for communities on health risks from exposures to air toxics through the AirToxScreen, which enables the public to identify existing and emerging air toxics issues.

NSPS
Section 111 of the CAA requires EPA to set NSPS for new, modified, or reconstructed stationary sources of air emissions in categories that have been determined to cause, or significantly contribute to, air pollution that may endanger public health or welfare. Section 111 also requires EPA, at least every eight years, to review and, if appropriate, revise NSPS for each source category for which such standards have been established. Under CAA Section 111, EPA must establish emission guidelines for existing sources for which air quality criteria have not been issued, are not included in the list published under Section 108(a), or are emitted from a source category that is regulated under Section 112, but to which a standard of performance would apply if such an existing source were a new source.

In meeting the requirements of Executive Order 13990 and as part of the Administration's comprehensive approach to tackling the climate crisis, EPA also will continue its work to reduce GHGs from fossil-fuel fired power plants and from sources in the oil and natural gas industry. These sources are the two largest categories of stationary sources of GHG emissions in the U.S.[38] EPA issued a notice of proposed rulemaking for fossil-fuel fired power plants in May 2023 to revise new source performance standards for natural gas-fired combustion turbines and to establish emission guidelines for existing steam electric generating units and certain existing natural gas-

---

[38] EPA (2023) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021. U.S. Environmental Protection Agency, EPA 430-R-23-002. https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.

fired combustion turbines. EPA also issued a notice of proposed rulemaking for the oil and natural gas sector in November 2021 and a supplemental proposal in December 2022 to revise new source performance standards and to establish emission guidelines for existing sources. These proposals were informed by extensive engagement with states, tribal nations, communities, and a broad range of stakeholders, as well as a fresh look at pertinent policies, technology, and data. EPA issued a final rule addressing GHGs from new and existing sources in the oil and natural gas industry in fall 2023 and intends to issue a final rule addressing GHGs from new and existing fossil fuel-fired power plants in spring 2024.

In FY 2025, EPA plans to implement new source performance standards and emission guidelines applicable to power plants and to the oil and gas sources that EPA will have finalized under Section 111. As part of this effort, EPA also will provide support for implementation of the final new source performance standards and support to states in the development of state plans to meet oil and natural gas emission guidelines and power plant emission guidelines. EPA also intends to develop proposed federal plans for existing oil and natural gas sources and power plants not covered by a respective state or tribal plan. These actions are key steps toward EPA's commitment to deliver public health protections from these pollutants for communities across America.

In addition, in FY 2025, EPA will work to fulfill the CAA's Section 111 requirements for approximately 11 source categories in multiple rulemaking actions, many of which are subject to court or executive orders or are in litigation.

EPA also will undertake other projects, such as those required by statute or executive order; overdue NSPS and area source technology reviews related to source categories in addition to those described above. EPA will continue work on case-by-case regional and national NESHAP and NSPS applicability determinations.

**Performance Measure Targets:**

**(PM NAAQS) Percentage of air quality improvement in counties not meeting current NAAQS.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 7 | 8 | 9 | 10 | Percent |
| **Actual** | 3 | 7 | 8 | 10 | 8 | Data Avail 11/2024 | | | |

**(PM NAAQS2) Percentage of people with low SES living in areas where the air quality meets the PM2.5 NAAQS.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 90 | 93 | 97 | 100 | Percent |
| **Actual** | 82 | 82 | 81 | 85 | 83 | Data Avail 11/2024 | | | |
| **Numerator** | 52,044,172 | 51,560,102 | 48,678,558 | 50,304,779 | 49,634,175 | | | | People |
| **Denominator** | 63,150,683 | 62,687,368 | 60,053,454 | 59,241,268 | 59,614,742 | | | | |

45

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands)**

- (+$1,132.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (+$13,648.0 / +38.8 FTE) This program change is an increase to support the regulation of stationary sources of air pollution through developing and implementing emissions standards, regulations, and guidelines. This includes resources to implement rules to limit GHG emissions from new and existing sources in the power sector and new and existing facilities in the oil and gas sector and to meet statutory and court-ordered legal deadlines. This increase also is necessary to meet statutory deadlines for Risk and Technology Reviews of Maximum Achievable Control Technology standards, per corrective action commitments made to OIG. This investment includes $7.3 million for payroll.

- (+$2,764.0 / +2.0 FTE) This program change is an increase in support of implementation of the Foundations for Evidence-Based Policymaking Act of 2018, to help the Agency identify, prioritize, and undertake evidence-building activities and develop evidence building capacity to inform policy and decisions. This investment includes $358.0 thousand for payroll.

**Statutory Authority:**

Clean Air Act.

# Federal Support for Air Quality Management

Program Area: Clean Air and Climate
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Improve Air Quality and Reduce Localized Pollution and Health Impacts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$134,931* | *$147,704* | *$258,663* | *$110,959* |
| Science & Technology | $8,950 | $11,343 | $10,754 | -$589 |
| Total Budget Authority | $143,881 | $159,047 | $269,417 | $110,370 |
| Total Workyears | 824.3 | 879.3 | 1,079.7 | 200.4 |

**Program Project Description:**

The Federal Support for Air Quality Management Program assists state, tribal, and local air pollution control agencies in the development, implementation, and evaluation of programs for the National Ambient Air Quality Standards (NAAQS); establishes standards for reducing air toxics; and helps reduce haze and improve visibility in some of America's largest national parks and wilderness areas.

Under this program, EPA develops federal measures and regional strategies that help to reduce emissions from stationary and mobile sources. Delegated states have the primary responsibility (and tribes may choose to take responsibility) for developing clean air measures necessary to meet the NAAQS and protect visibility. At the core of this program is the use of scientific and technical air quality and emissions data. EPA, working with states, tribes, and local air agencies, develops methods for estimating and measuring air emissions and monitoring air quality concentrations, collects these data, and maintains databases (*e.g.*, Emissions Inventory System, Air Quality System, etc.). EPA also supports training for state, tribal, and local air pollution professionals.

NAAQS Development

The Clean Air Act (CAA) requires EPA to set the NAAQS for six "criteria" pollutants considered harmful to public health and the environment. The criteria pollutants are particulate matter (PM), ozone ($O_3$), sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon monoxide (CO), and lead (Pb). Section 109 of the CAA Amendments of 1990 established two types of NAAQS - primary and secondary standards. Primary standards are set at a level requisite to protect public health with an adequate margin of safety, including the health of at-risk populations. Secondary standards are set at a level requisite to protect public welfare from any known or anticipated adverse effects, such as decreased visibility and damage to animals, crops, vegetation, and buildings. The CAA requires EPA to review the science upon which the NAAQS are based and the standards themselves every five years. These national standards form the foundation for air quality management and establish goals that protect public health and the environment.

Air Pollution Information Tracking

For each of the six criteria pollutants, under Section 110 of the CAA, EPA tracks two kinds of air pollution information: air pollutant concentrations based on actual measurements in the ambient (outside) air at monitoring sites throughout the country; and pollutant emissions based on engineering estimates or measurements of the total tons of pollutants released into the air each year.

Air Quality Management Planning

Under CAA Section 110, EPA develops regulations and guidance to clarify requirements for state and local air agencies for developing State Implementation Plans (SIPs) for implementing the NAAQS. SIPs are the plans that ensure attainment and maintenance of the NAAQS. EPA works with state and local governments to ensure the technical integrity of emission source controls in SIPs and with tribes on Tribal Implementation Plans (TIPs). EPA also reviews SIPs to ensure they are consistent with applicable requirements of the CAA and takes regulatory action on SIP submissions consistent with CAA responsibilities.

New Source Review (NSR) Preconstruction Permit Program

The NSR preconstruction permit program in Title I of the CAA is a part of state plans to attain and maintain the NAAQS. The two primary aspects of this program are the Prevention of Significant Deterioration program, described in Section 165 of the CAA, and the Nonattainment NSR program, described in various parts of the CAA, including Sections 173 and 182.

Outer Continental Shelf (OCS) Air Permit Program

Section 328 of the CAA establishes requirements for managing and minimizing air pollution through the permitting of activities located offshore of the United States along the Pacific, Arctic (except the North Slope Borough of Alaska), and Atlantic Coasts, and in certain parts of the Gulf Coast. Additional specific requirements are codified in rulemaking. To support the Nation's transition to clean energy, EPA is developing policy and guidance applicable to offshore wind projects being constructed on the OCS and will devote increased resources to this work to support the Administration's goal of deploying 30 gigawatts of offshore wind power by 2030 as part of the federal government's efforts to tackle climate change.

Protection of Visibility in Class I Areas

Sections 169A and 169B of the CAA require protection of visibility for 156 congressionally mandated national parks and wilderness areas known as Class I areas. Congress established a national goal of returning visibility in the Class I areas to natural conditions (*i.e.*, the visibility conditions that existed without manmade air pollution). The Regional Haze Rule sets forth the requirements that state plans must satisfy to make reasonable progress towards meeting this national goal.

Control of Air Toxics

Toxic air pollutants are known to cause or are suspected of causing increased risk of cancer and other serious health effects, such as neurological damage and reproductive harm. EPA assists state, tribal, and local air pollution control agencies in characterizing the nature and scope of their air toxics issues through modeling, emission inventories, monitoring, and assessments. For example, EPA maintains updated air toxic emission and exposure data, incorporating current

toxicity data to provide recent information on air toxics risks from a national perspective and at a local scale, where possible. EPA also supports programs that reduce inhalation risk and multi-pathway risk posed by deposition of air toxics to water bodies and ecosystems, facilitates international cooperation to reduce transboundary and intercontinental air toxics pollution, develops and improves risk assessment methodologies for toxic air pollutants, and provides training for air pollution professionals.

The provisions of the CAA that address the control of air toxics are located primarily in Section 112 and 129. Section 112 requires issuing National Emission Standards for Hazardous Air Pollutants (NESHAP) for major sources and area sources; the assessment and, as necessary, regulation of risks remaining after implementation of NESHAP that are based on Maximum Available Control Technology (MACT); the periodic review and revision of all NESHAP to reflect developments in practices, processes, and control technologies; and associated national guidance and outreach. In addition, EPA must periodically review, and, where appropriate, revise both the list of air toxics subject to regulation and the list of source categories for which standards must be developed. EPA has promulgated rules for approximately 180 source categories to control air toxics under Section 112 and is continually engaged in their periodic review and revision. EPA will enhance risk assessment capabilities to better identify and determine impacts of exposures to air toxics on communities, including communities impacted by environmental justice (EJ) issues.

The Program prioritizes its work, as resources allow, with an emphasis on meeting court-ordered deadlines and incorporating EJ considerations as part of the decision-making process, as well as implementing a strategy to meet statutory deadlines for Risk and Technology Reviews of Maximum Achievable Control Technology standards, per corrective action commitments made in response to OIG recommendations in FY 2022.[39] Section 129 of the CAA requires a similar approach to review regulations applicable to solid waste incinerators, as well as issuance of new source performance standards and emission guidelines pursuant to CAA Section 111, the review of state plans to implement those guidelines, and development of federal plans to do so if necessary. EPA has promulgated rules for approximately six categories of solid waste incineration units to control air toxics and criteria pollutants under Section 129, and EPA is continually engaged in their periodic review and revision. In addition to this regulatory work, EPA also provides determinations to states and industry seeking information about source-specific applicability of these regulations.

Climate Change

The President has prioritized action to tackle climate change with a focus on an equitable transition to clean energy. These plans call for cuts in greenhouse gas (GHG) pollution to reduce the contribution of human activities to climate change and its impacts on public health, while investing in communities that are on the front line of impacts. EPA issues regulations to limit GHGs and assists states, tribes, and local air pollution control agencies in the development, implementation, and evaluation of programs to reduce GHG pollution. The Program also supports the Agency's work with international partners to combat short-lived climate pollutants. These air pollutants, including black carbon (a component of PM), methane, and tropospheric

---

[39] The EPA Needs to Develop a Strategy to Complete Overdue Residual Risk and Technology Reviews and to Meet the Statutory Deadlines for Upcoming Reviews. March 30, 2022. https://www.epa.gov/system/files/documents/2022-03/_epaoig_20220330-22-e-0026.pdf.

ozone, are contributing to and accelerating the impacts of climate change. In addition, wildfire smoke is expected to increase because of a changing climate, and this will impact an increasingly greater number of people. The Program will support agency efforts to address the public health impacts of wildland fire smoke and help communities prepare for and respond to wildfire/smoke events.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.1, Improve Air Quality and Reduce Localized Pollution and Health Impacts in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA is requesting $110.9 million in additional resources to support critical work to implement climate and clean air regulations and programs both at headquarters and in regional offices. This includes activities such as reviewing and taking action on state plans required under forthcoming GHG standards, priority NAAQS work, taking timely action on SIPs, reducing the SIP backlog, air monitoring and analysis, and EJ activities. EPA also will be undertaking the initial area designations process for the 2024 PM$_{2.5}$ NAAQS, and processing associated exceptional events demonstrations. Also, the EPA's Office of Inspector General (OIG)[40,41,42,43] and the Government Accountability Office (GAO)[44] have documented several programmatic goals that are not being fulfilled due to insufficient resources year after year in both EPA Headquarters and Regions. EPA's corrective actions commit the Agency to seeking resources for these activities as contained in the President's Budget requests.

This request includes resources to support the implementation of emission guidelines for GHGs from oil and gas operations as well as power plants under Section 111(d) of the CAA. Section 111(d) of the CAA provides states with a lead implementing role and considerable flexibility, and the development and implementation of the emission guidelines will require extensive work to develop program implementation infrastructure; engage states, tribes, and communities; assess EJ impacts; evaluate state plans; and ensure consistent application of the emissions guidelines nationwide. Resources will be used to continue developing a standard reporting system for states to use, or adapt as needed, for submitting plans and tracking their compliance data, and ensuring that communities have access to that data.

The request also includes additional support for NAAQS review work and implementation activities, many of which are increasingly complex. Critical to successful implementation is timely issuance of rules and guidance documents, ongoing outreach to states and other entities as well as

---

[40] EPA Has Reduced Its Backlog of State Implementation Plans Submitted Prior to 2013 but Continues to Face Challenges in Taking Timely Final Actions on Submitted Plans. June 14, 2021. https://www.epa.gov/sites/default/files/2021-06/documents/_epaoig_20210614-21-e-0163__0.pdf.

[41] EPA's Title V Program Needs to Address Ongoing Fee Issues and Improve Oversight. January 12, 2022. Pages: At-A-Glance, 15, 19, 22, & 25. https://www.epa.gov/system/files/documents/2022-01/_epaoig_20220112-22-e-0017.pdf.

[42] The EPA Needs to Develop a Strategy to Complete Overdue Residual Risk and Technology Reviews and to Meet the Statutory Deadlines for Upcoming Reviews. March 30, 2022. Pages: At-A-Glance, 6, 8, 11, 12, 14, 25, 26, & 27. https://www.epa.gov/system/files/documents/2022-03/_epaoig_20220330-22-e-0026.pdf.

[43] EPA's Processing Times for New Source Air Permits in Indian Country Have Improved, but Many Still Exceed Regulatory Time Frames. April 22, 2020. Pages: At-A-Glance, 9, 15, 16, 24, & 31. https://www.epa.gov/sites/default/files/2020-04/documents/_epaoig_20200422-20-p-0146.pdf.

[44] AIR POLLUTION: Opportunities to Better Sustain and Modernize the National Air Quality Monitoring System. November 12, 2020. https://www.gao.gov/assets/gao-21-38.pdf.

development of NAAQS implementation and permitting-related tools. EPA will engage with states and tribes to develop guidance to assist air programs with meeting implementation deadlines. These critical resources also will support efforts to reduce the SIP backlog as well as ensure timeliness of review of incoming SIPs, permitting needs (both NAAQS and GHG-related, onshore and offshore), and air quality monitoring and analysis needs. This increase also will enhance EPA's abilities to forecast where smoke will impact people; identify and communicate when and where smoke events are occurring through monitoring and AirNow's Fire and Smoke Map; build community capacity to be Smoke Ready and reduce smoke exposure; and strengthen internal as well as state, local, and tribal capacity to better coordinate and communicate regarding wildfire smoke and address related regulatory activities. During a 2023 air quality episode originating from wildfires in Canada, the AirNow website received more than 10 million page views on June 8th, 2023 and was the most-visited federal government website that day.[45]

Addressing Climate Change

EPA expects to take action in FY 2025 for rules finalized in FY 2024 in accordance with Executive Order 13990, which directed EPA to revise and address as appropriate the regulation of GHGs from fossil-fuel fired power plants and the oil and gas sector, the two principal sources of industrial GHG emissions.[46] In FY 2025, EPA plans to propose federal plans to implement amended new source performance standards and emission guidelines applicable to power plants and the oil and gas sector that it will have finalized under Section 111 in FY 2024. Additionally, EPA expects to review rules covering emissions from municipal solid waste landfills, the third-largest U.S. source of anthropogenic methane emissions[47] and propose the results of that review in FY 2025.

EPA will continue to work with other countries to take action to address climate change. EPA will consider the results of a range of international assessments to address the climate impacts of short-lived climate pollutants. Reducing emissions of these pollutants can create near-term climate and public health benefits. EPA will continue to identify the most significant domestic and international sources of black carbon and ozone precursor emissions by working with the multilateral Climate and Clean Air Coalition (CCAC), the Arctic Council, the Convention on Long-Range Transboundary Air Pollution (LRTAP), and other related international efforts. Based on these findings and enhanced analytical capabilities, EPA will pursue effective steps for reducing these emissions. For instance, EPA is scaling up online tools and resources focused on assisting low-and middle-income countries to implement best practices for addressing air pollution in ways that achieve climate co-benefits.

In FY 2025, the Agency will provide on-the-ground resources to assist overburdened and underserved communities as they work to engage on EPA's regulatory efforts and address the impacts of climate change. These community resource coordinators will work with external partners, such as community stakeholder organizations, other federal agencies, state, local and regional governments, private sector entities, academic institutions, and foundations to assist communities as they begin to plan for climate change and implement actions to increase resilience to climate impacts.

---

[45] According to https://analytics.usa.gov/.

[46] EPA (2023) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021. U.S. Environmental Protection Agency, EPA 430-R-23-002. https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.

[47] EPA (2023) Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2021. U.S. Environmental Protection Agency, EPA 430-R-23-002. https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.

Finally, in FY 2025 EPA is requesting an increase of $1.1 million, including payroll, and one FTE to support implementation of EPA's Climate Adaptation Action Plan. This increase will support priority commitments, such as actions to integrate climate adaptation into EPA programs, policies, and processes, efforts to address climate adaptation science and data needs, and efforts to consult and partner with outside stakeholders.

Improving Air Quality

In FY 2025, EPA requests increased resources to support efforts to maintain and rebuild programmatic capabilities that focus on protecting clean air. Air quality has improved significantly for communities across the country since passage of the CAA in 1970 (with amendments in 1977 and 1990). Between 1990 and 2022, for example, national average levels have decreased by 22 percent for $O_3$, 34 percent for coarse PM, 90 percent for $SO_2$, and since 2010, national average levels for Pb have decreased 88 percent.[48] In FY 2025, EPA will continue to prioritize key activities in support of attainment of the NAAQS and implementation of stationary source regulations by state, tribal, and local air agencies. This includes activities in key nonattainment areas along the U.S.-Mexico border as part of U.S. commitments under the *Border 2025* agreement.

NAAQS Review

In FY 2025 EPA will continue its CAA-mandated responsibilities to review the science upon which the NAAQS are based and the standards themselves. Periodic review of the NAAQS requires significant resources and analysis of scientific and technical information to ensure for each NAAQS that public health is protected with an adequate margin of safety, considering at-risk populations.

EPA strengthened the $PM_{2.5}$ annual standard on February 7, 2024.[49] EPA also is under a consent decree to issue a proposed rulemaking for the secondary NAAQS for $SO_2$, $NO_x$, and PM by April 9, 2024, and to finalize the decision by December 10, 2024.  In FY 2025, EPA will advance the review of the 2020 $O_3$ NAAQS, will continue its review of the Pb NAAQS, and anticipates reviewing the primary $NO_x$ NAAQS under a consent decree schedule. EPA has requested resources commensurate to support these reviews. Each review involves a comprehensive reexamination, synthesis, and evaluation of scientific information; the design and conduct of complex air quality and risk and exposure analyses; and the development of a comprehensive policy assessment providing analysis of the scientific basis for alternative policy options.

EPA will continue to administer the NAAQS by reviewing SIPs and decisions consistent with statutory obligations; taking federal oversight actions, such as action on SIP and TIP submittals; and developing regulations and policies to ensure continued health and welfare protection during the transition between existing and new standards. EPA will work with air agencies to determine the need for additional federal rulemakings and guidance documents to support state and tribal efforts to meet CAA SIP/TIP requirements, in alignment with capacity and priorities. EPA will provide technical and policy assistance to states and tribes developing or revising SIPs/TIPs. To

---

[48] For additional information on air quality trends, please see the Air Quality -National Summary at: https://www.epa.gov/air-trends/air-quality-national-summary and at *Our Nation's Air: Status and Trends Through 2021*.

[49] For additional information, please see: https://www.epa.gov/system/files/documents/2024-02/pm-naaqs-final-frn-pre-publication.pdf.

the extent that the above-referenced NAAQS reviews result in a change to the standards, air quality designations related activities for the changed standard(s) would be required. For example, EPA will be working on initial area designations for the 2024 $PM_{2.5}$ standard. The timing of any additional initial area designations, or other designations, work would depend on when the final NAAQS are promulgated.

NAAQS Nonattainment Areas

EPA, in close collaboration with states and tribes, will work to improve air quality in areas not in attainment with the NAAQS, including identifying and, where necessary, redesignating to nonattainment areas that previously were in attainment. The Agency will continue to implement changes to improve the efficiency and effectiveness of the SIP process, with a goal of maximizing the timely processing of state-requested SIP actions and reducing the backlog. The Agency also will act on redesignation requests of nonattainment areas to attainment in a timely manner. EPA will maximize use of its comprehensive, online State Planning Electronic Collaboration System (SPeCS) to promote efficiencies for states to submit SIP revisions to EPA, and for EPA to track and process state submittals. Since it launched in January 2018, more than 1,900 SIP submittals (about 90 percent official submissions and 10 percent draft submittals) have come through SPeCS, and more than 400 users have registered from all 50 states and eight air districts. EPA also will complete its re-platforming of SPeCS to improve system integrity and functionality and work to provide additional transparency to the public about NAAQS nonattainment areas, state SIP requirements, and related EPA actions.

SIPs for Regional Haze

In FY 2025, EPA will continue reviewing and taking action on regional haze SIP revisions for the second planning period (and working on any remaining first planning period obligations). EPA will continue to work on any outstanding SIP matters and continue providing technical assistance to ensure that states are making reasonable progress towards their visibility improvement goals, consistent with statutory obligations. Consistent with this, EPA may be undertaking work on Federal Implementation Plans (FIPs) as needed to fully implement the Regional Haze requirements. Under the Regional Haze Rule, states are required to submit updates to their plans to demonstrate how they have and will continue to make progress towards achieving their visibility improvement goals. EPA also has indicated its intent to undertake a notice-and-comment rulemaking process to address future planning periods.

Fulfilling Legal Obligations

One of EPA's priorities is to fulfill its statutory and court-ordered obligations. Section 112 of the CAA sets deadlines for EPA to review and update, as necessary, all NESHAP every eight years, accounting for developments in practices, processes, and technologies related to those standards. Section 112 also requires that EPA conduct risk assessments within eight years of promulgation of each MACT-based NESHAP to determine if it appropriately protects public health and to revise it as needed, and that EPA review and revise, as appropriate, the list of hazardous air pollutants. Sections 111 and 129 similarly require review of rules promulgated under those programs to address air pollution. In FY 2025, EPA will undertake these required reviews and associated rulemakings. EPA will enhance risk assessment capabilities to better identify and determine impacts on communities. The Program will prioritize conducting reviews of NESHAP and rules issued under Sections 111 and 129, many of which are subject to court-ordered or court-entered

dates or are actions otherwise required by courts and incorporating EJ considerations as part of the decision-making process. From this work, EPA expects to propose or promulgate more than 51 rules in FY 2025. Additionally, if EPA receives the funding requested to implement its strategy to meet statutory deadlines for reviewing air toxics rules, per corrective action commitments made in response to OIG recommendations in FY 2022, EPA expects to take action on another 48 air toxics rules in FY 2025.

<u>Technical Assistance to External Government Partners</u>
EPA will continue to assist other federal agencies and state and local governments in implementing the conformity regulations promulgated pursuant to Section 176 of the CAA. These regulations require federal agencies undertaking activities in nonattainment and maintenance areas to ensure that the emissions caused by their activities will conform to the SIP.

In FY 2025, EPA also will continue to provide training and technical assistance to state, local, and tribal air agencies for NSR, OCS, and Title V (operating) permits. This support will occur at appropriate times and as requested, consistent with applicable requirements, before and during the permitting process. EPA expects to implement such support in an efficient manner and consistent with established timeframes for applicable oversight of state, tribal, and local air agencies during the permitting process. Where EPA is the permitting authority for wind energy projects located on the OCS, the Agency will prioritize timeliness in providing guidance, feedback, and review of permit applications consistent with CAA and Fixing America's Surface Transportation (FAST) Act (Title 41) requirements. EPA's Electronic Permitting System and Title V petition submittal portal will improve EPA interaction with state, local, and tribal air agencies and the general public, and improve data availability and transparency.

In FY 2025, EPA will continue to assist state, tribal, and local air agencies with various technical activities. EPA develops and provides a broad suite of analytical tools and associated technical guidance, such as: source characterization analyses; emission factors and inventories; statistical analyses; source apportionment techniques; quality assurance protocols and audits; improved source testing and monitoring techniques; fenceline monitoring techniques, source-specific dispersion, and regional-scale photochemical air quality models; and augmented cost/benefit tools to assess control strategies.[50] The Agency will maintain the core function of these tools (*e.g.*, integrated multiple pollutant emissions inventory, air quality modeling platforms, etc.) to provide the technical underpinnings for scientifically sound, efficient, and comprehensive air quality management by state, local, and tribal agencies.

In FY 2025, EPA will continue providing information and assistance to tribes, states, and communities through documents, websites, webinars, and training sessions on tools to help them build capacity and to provide input into EJ assessments that can inform risk reduction strategies for air toxics. The Agency will continue to communicate and effectively collaborate with communities to address a myriad of environmental concerns.

In FY 2025, EPA will provide support for critical response to the growing number of wildfire smoke events through real-time, accessible air quality information, as well as supporting communication documents and websites. The Agency also will enhance its partnerships across the

---

[50] For additional information, please see: https://www.epa.gov/technical-air-pollution-resources.

federal government, such as with the Center for Disease Control and the U.S. Forest Service, to ensure a consistent and coherent response and deployment of technical assistance to address the public health impacts of wildland fire smoke. EPA expects this work to support tribal, state, local, and community needs to prepare for an increasing number of wildfires and the impacts those fires have on public health across the country, building capacity for "smoke ready" communities.

In FY 2025, state and local air agencies will continue to lead the implementation of the National Air Toxics Trends Sites (NATTS). The NATTS Program is designed to capture the impacts of widespread air toxics and is comprised of long-term monitoring sites throughout the Nation.[51] EPA will continue to consult on priority data gaps to improve the assessment of population exposure to toxic air pollution.

<u>Maintaining Analytical Capabilities and Continuing Data Management</u>
EPA will maintain baseline analytical capabilities required to develop effective regulations, including: analyzing the economic impacts and health benefits of regulations and policies; developing and refining source sampling measurement techniques to determine emissions from stationary sources; updating dispersion models for use in source permitting; and conducting air quality modeling to characterize the future air quality changes that inform estimates of public health and environmental impacts of our rules and policy actions. Resources from the Science and Technology appropriation component of this program support the scientific development of these capabilities.

The Inflation Reduction Act (IRA) provided EPA supplemental appropriations under numerous provisions including, but not limited to, fenceline monitoring (60105(a)), multipollutant monitoring (60105(b)), sensors (60105(c)), wood heaters (60105(d)), and methane monitoring (60105(e)). EPA will work on the planning, awarding, and implementation of these funds in FY 2025.

EPA, using resources from the IRA, will begin a multi-year project to develop a new information technology infrastructure. The new information technology infrastructure will allow access to air quality, emissions, and regulatory information for communities, environmental agencies, and other stakeholders. Access to this information will enable the development and implementation of strategies to improve air quality and reduce emissions of climate pollutants. During the requirements analysis and gathering phase of the project, the development team will look to incorporate the business processes so that one or more of the following legacy Agency systems and applications can be retired once the infrastructure is operational: Air Quality System (AQS), AirNow, Emissions Inventory System (EIS), Electronic Reporting Tool (ERT), Compliance and Emissions Data Reporting Interface (CEDRI), Combined Air Emission Reporting System (CAERS), Web Factor Information Retrieval System (WebFIRE), State Planning Electronic Collaboration System (SPeCS), Exceptional Events Submission and Tracking System (EETS), and Petitions to Object to Title V Permits (POTVP). Additionally, during the requirements analysis and gather phase of the project, EPA will investigate the feasibility of incorporating other business processes supported by other existing tools/applications. While funding of operations and maintenance for legacy systems will still be required as the new infrastructure is being developed,

---

[51] For additional information, please see: https://www.epa.gov/amtic/air-toxics-ambient-monitoring.

EPA's intent is that once the new infrastructure is operational, existing funding from these legacy systems will be shifted to support the new infrastructure.

In FY 2025, EPA will develop the new information technology infrastructure, and continue to operate and maintain the Air Quality System (AQS) and AirNow, which houses the Nation's regulatory ambient air quality data. EPA also will continue to support the AQS Data Mart, which provides that same ambient air quality data to the scientific community and the general public. The Agency's national real-time ambient air quality data system, AirNow, will maintain baseline operations. The public increasingly relies on AirNow for ambient air quality information during wildfires. In FY 2025, EPA will continue integrating the Fire and Smoke map by engaging tribal, state, and local agencies for input to provide information that millions of people rely on during periods of smoke from wildfires.

EPA will continue to operate and maintain baseline operations of the Emissions Inventory System (EIS), which quality assures and stores current and historical emissions inventory data and supports the development of the National Emissions Inventory (NEI). EPA, states, and others use the NEI to aid in state and local air agency SIP development, serve as a vital input to air quality modeling, help analyze public health risks from air toxics, develop strategies to manage those risks, and support multi-pollutant analysis for air emissions. As needed, the Agency will enhance EIS to support the revised Air Emissions Reporting Requirements (AERR) rule and other user-focused needs.

In FY 2025, as EPA develops the new information technology infrastructure, the Agency will continue to streamline emissions data reporting for multiple agency programs through the Combined Air Emissions Reporting System (CAERS). This system is a central hub that takes a single submission of data in a single format and sends it to the appropriate EPA program system. When fully developed, CAERS is expected to reduce the cost to industry by only reporting emissions data for multiple agency programs to one system and to the government by better managing emissions data and making that data available in a timely fashion. EPA will enhance CAERS to support the revised AERR rule and continue to onboard state, local, and tribal air agencies.

In FY 2025, EPA will continue a multi-phased process for strengthening air pollution health benefits analysis methods to improve the science it uses to quantify health benefits from air quality regulations. EPA will finalize a health benefits guidelines document outlining best practices for incorporating new scientific information into methods for health benefits analysis. This will be followed by additional annual reviews and necessary updates of specific methods and applications in the guidelines documents. This effort will help ensure transparency and confidence in the process for selecting and applying the latest science in health benefits analysis. EPA also will improve tools and approaches to enable more robust analysis of program impacts on communities with EJ concerns and vulnerable populations.

As part of a forward-looking air toxics strategy, EPA will address regulatory and emerging issues and improve access to air toxics data. The Agency will continue implementation of a new approach that develops and shares air toxics data faster and more regularly to the public, allowing for increased transparency and the ability to see trends and exposure risks over time. In 2025, EPA will continue reporting the most current air toxics data each year in the annual Air Trends Report

and an online interactive tool, instead of the previous three to four-year cycle for reporting air toxics data, and providing that data at an increased spatial resolution. EPA will continue providing information annually for communities on health risks from exposures to air toxics through the Air Toxics Screening Assessment (AirToxScreen), so that the public can more easily identify existing and emerging air toxics issues.

**Performance Measure Targets:**

(PM NAAQS) Percentage of air quality improvement in counties not meeting current NAAQS.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 7 | 8 | 9 | 10 | Percent |
| **Actual** | 3 | 7 | 8 | 10 | 8 | Data Avail 11/2024 | | | |

(PM NAAQS2) Percentage of people with low SES living in areas where the air quality meets the PM2.5 NAAQS.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 90 | 93 | 97 | 100 | Percent |
| **Actual** | 82 | 82 | 81 | 85 | 83 | Data Avail 11/2024 | | | |
| **Numerator** | 52,044,172 | 51,560,102 | 48,678,558 | 50,304,779 | 49,634,175 | | | | People |
| **Denominator** | 63,150,683 | 62,687,368 | 60,053,454 | 59,241,268 | 59,614,742 | | | | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$17,219.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes $1.1 million to support critical agencywide infrastructure for Executive order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$92,640.0 / +193.4 FTE) This program change is an increase to support critical work to implement climate and clean air regulations and programs. This includes activities such as reviewing and taking action on state plans required under forthcoming GHG standards, priority NAAQS work, taking timely action on SIPs and reducing the SIP backlog, air monitoring and analysis, and EJ activities. Total includes $36.4 million for payroll.

- (+$1,100.0 / +1.0 FTE) This program change is an increase to support implementation of the EPA Climate Adaptation Action Plan. In particular, this increase is to support priority commitments, such as actions to integrate climate adaptation into EPA programs, policies, and processes, efforts to address climate adaptation science and data needs, and efforts to consult and partner with outside stakeholders. This investment includes $187.0 thousand for payroll.

**Statutory Authority:**

Clean Air Act.

## Stratospheric Ozone: Domestic Programs

Program Area: Clean Air and Climate
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Improve Air Quality and Reduce Localized Pollution and Health Impacts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$6,358* | *$6,951* | *$72,282* | *$65,331* |
| Total Budget Authority | $6,358 | $6,951 | $72,282 | $65,331 |
| Total Workyears | 20.6 | 28.2 | 52.2 | 24.0 |

**Program Project Description:**

EPA's stratospheric ozone protection program implements provisions of the Clean Air Act (CAA) which facilitates a global phaseout of ozone-depleting substances (ODS); the American Innovation and Manufacturing (AIM) Act of 2020 to phase down climate-damaging hydrofluorocarbons (HFCs); and the *Montreal Protocol on Substances that Deplete the Ozone Layer* (Montreal Protocol). These actions help protect both the climate system and the stratospheric ozone layer, which shields all life on Earth from harmful solar ultraviolet (UV) radiation.

Scientific evidence demonstrates that ODS used around the world destroy the stratospheric ozone layer,[52] which raises the incidence of skin cancer, cataracts, and other illnesses through overexposure to increased levels of UV radiation.[53] Based on EPA's peer-reviewed Atmospheric and Health Effects Framework model, the Montreal Protocol is expected to prevent approximately 443 million cases of skin cancer, 2.3 million skin cancer deaths, and 63 million cases of cataracts for people in the United States born in the years 1890–2100.[54] EPA developed this model to better understand the benefits to public health of stratospheric ozone protection. As a result of global action to phase out ODS, the ozone layer is expected to recover to its pre-1980 levels by mid-century.

The AIM Act addresses the climate impact of HFCs by phasing down their production and consumption, maximizing reclamation and minimizing releases of HFCs and their substitutes from equipment, and facilitating the transition to next-generation technologies through sector-based

---

[52] World Meteorological Organization (WMO). Scientific Assessment of Ozone Depletion: 2022, GAW Report No. 278, 509 pp.; WMO: Geneva, 2022.
[53] Ross J. Salawitch (Lead Author), Laura A. McBride, Chelsea R. Thompson, Eric L. Fleming, Richard L. McKenzie, Karen H. Rosenlof, Sarah J. Doherty, David W. Fahey, Twenty Questions and Answers About the Ozone Layer: 2022 Update, Scientific Assessment of Ozone Depletion: 2022, 75 pp., World Meteorological Organization, Geneva, Switzerland, 2023.
This report is available on the internet at: https://www.csl.noaa.gov/assessments/ozone/2022.
[54] U.S. Environmental Protection Agency (EPA). Updating the Atmospheric and Health Effects Framework Model: Stratospheric Ozone Protection and Human Health Benefits. EPA: Washington, DC. May 2020. Available on the internet at: https://www.epa.gov/sites/production/files/2020-04/documents/2020_ahef_report.pdf.

restrictions. A global phasedown of HFCs is expected to prevent up to 0.5 °C of global warming by 2100.[55]

EPA uses a combination of regulatory and partnership programs to implement Title VI of the CAA and the AIM Act and to further the protection of the ozone layer and climate system. Title VI provides for a phaseout of production and consumption of ODS and requires controls on their use, including banning certain emissive uses, requiring labeling to inform consumer choice, and requiring sound servicing practices for the use of refrigerants in air-conditioning and refrigeration appliances. Title VI also prohibits venting ODS and their substitutes and requires listing of alternatives that reduce overall risks to human health and the environment, ensuring that businesses and consumers have alternatives that are safer for the ozone layer than the chemicals they replace.

The AIM Act provides for a phasedown of production and consumption of HFCs in the United States by 85 percent, supports industry's transition to next-generation technology, and requires management of HFCs and their substitutes. EPA has established an allowance allocation program to implement the phasedown, as well as robust compliance assurance and enforcement mechanisms to provide a level playing field for producers and importers of HFCs and ensure the program delivers the intended environmental benefits. EPA also works with the Department of Homeland Security, including U.S. Customs and Border Protection, to manage an interagency task force to prevent and deter illegal trade in HFCs and support enforcement of the phasedown.

As a signatory to the Montreal Protocol, the U.S. is committed to ensuring that our domestic program is at least as stringent as international obligations, and to regulating and enforcing the terms of the Montreal Protocol respective of domestic authority. In 2007, with U.S. leadership, the Parties to the Montreal Protocol agreed to a more aggressive phaseout for ozone-depleting hydrochlorofluorocarbons (HCFCs) equaling a 47 percent reduction in overall emissions during the period 2010 – 2040. The adjustment in 2007 also called on Parties to the Montreal Protocol to promote the selection of alternatives to HCFCs that minimize environmental impacts, in particular impacts on climate.[56] The CAA provides the necessary authority to ensure EPA can collect and validate data, and where appropriate, report data on production and consumption of ODS on behalf of the United States. The Parties to the Montreal Protocol also agreed to the Kigali Amendment in 2016,[57] which seeks to globally phase down the production and consumption of HFCs consistent with the AIM Act. The United States ratified the Kigali Amendment on October 31, 2022. The AIM Act and EPA's existing HFC allocation regulations provide EPA with the authority to collect and validate data and report data on production and consumption of HFCs on behalf of the United States.

Partnership programs are designed to increase benefits by focusing on specific areas where the Agency has identified the most significant opportunities. The Responsible Appliance Disposal

---

[55] World Meteorological Organization, Scientific Assessment of Ozone Depletion: 2018, World Meteorological Organization, Global Ozone Research and Monitoring Project—Report No. 58, 588 pp., Geneva, Switzerland, 2018. Available on the internet at: https://ozone.unep.org/sites/default/files/2019-05/SAP-2018-Assessment-report.pdf.

[56] *Montreal Protocol Decision XIX/6: Adjustments to the Montreal Protocol with regard to Annex C, Group I, substances (hydrochlorofluorocarbons).*

[57] Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Kigali 15 October 2016, found at: https://treaties.un.org/doc/Publication/CN/2016/CN.872.2016-Eng.pdf.

(RAD) Program[58] is a partnership that protects the ozone layer and reduces emissions of greenhouse gases through the recovery of ODS and HFCs from old refrigerators, freezers, window air conditioners, and dehumidifiers prior to disposal. RAD has approximately 50 partners and affiliates, including manufacturers, retailers, utilities, and state governments. The GreenChill Partnership Program[59] helps supermarkets transition to environmentally friendlier refrigerants, reduce harmful refrigerant emissions, and move to advanced refrigeration technologies, strategies, and practices that lower the industry's impact on the ozone layer and climate. The Program includes stores in all 50 states and represents over 30 percent of the United States' supermarkets. GreenChill partners are reducing refrigerant leak rates to half the estimated national average and developing annual plans for further improvements.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.1, Improve Air Quality and Reduce Localized Pollution and Health Impacts in the *FY 2022 - 2026 EPA Strategic Plan*. Work in this program also directly supports progress toward the FY 2024-2025 Agency Priority Goal: Phase down the production and consumption of hydrofluorocarbons (HFCs). By September 30, 2025, annual U.S. consumption of HFCs will be 40 percent below the baseline of 302.5 million metric tons of carbon dioxide equivalent (MMTCO$_2$e) consistent with the HFC phasedown schedule in the AIM Act and codified in the implementing regulations.

In FY 2025 an additional $65 million and 24 FTE are requested to implement provisions in the American Innovation and Manufacturing Act to phase down the use of HFCs, to facilitate U.S. entry into the Kigali amendment to the Montreal Protocol, and to restore staff capacity around efforts to tackle the climate crisis.

Title VI of the Clean Air Act and Montreal Protocol Activities
In carrying out the requirements of the CAA and the Montreal Protocol in FY 2025, EPA will continue to meet its ODS consumption caps and work toward the required gradual reduction in production and consumption of ODS. To meet the FY 2026 long-term performance goal for lowering consumption of HCFCs to 76.2 tons per year of ozone depletion potential,[60] EPA will issue allowances for HCFC production and import in accordance with the requirements established under CAA Sections 605 and 606; review petitions to import used ODS under sections 604 and 605; manage information that industry identifies as confidential under CAA Section 603; and implement regulations concerning the production, import, and export of ODS and maintenance of the tracking system used to collect the information. The FY 2022 result for this goal is -6.36 metric tons of HCFCs. This result is negative because exports and destruction together exceeded production and imports in calendar year 2022. In FY 2025, EPA anticipates proposing a rule on feedstock uses of ODS. EPA also will implement a rule on reporting of process agent use and emissions that is expected to be finalized in FY 2024. EPA also will prepare and submit the annual report under Article 7 of the Montreal Protocol on U.S. consumption and production of ODS and

---

[58] For more information, please visit: https://www.epa.gov/rad.
[59] For more information, please visit: http://www.epa.gov/greenchill.
[60] The HCFC consumption cap of 15,240 ODP-weighted metric tons for the U.S. was effective January 1, 1996, and became the U.S. consumption baseline for HCFCs.

HFCs consistent with the treaty.[61]

In FY 2025, EPA will continue to implement the CAA Section 608 and 609 refrigerant management requirements related to the use and emission of ODS, HFCs, and other substitutes.

CAA Section 612 requires continuous review of alternatives for ODS through EPA's Significant New Alternatives Policy (SNAP) program to both find those that pose less overall risk to human health and the environment and ensure a smooth transition to safer alternatives.[62] Through these evaluations, SNAP generates lists of acceptable and unacceptable substitutes for approximately 50 end-uses across eight industrial sectors. In FY 2025, EPA expects to list through notice as well as a notice-and-comment rulemaking substitutes that would expand the list of acceptable lower-GWP alternatives, particularly for end-uses where there is an urgent need for more options such as certain air-conditioning and refrigeration applications as well as fire suppression, which also will support implementation of the AIM Act. EPA also will continue to work towards ensuring the uptake of safer alternatives and technologies, while supporting innovation, and ensuring adoption of alternatives through support for changes to industry codes and standards. EPA also anticipates finalizing a rule in FY 2025 that would address court decisions concerning the extent to which manufacturers must replace HFCs with substitute substances.

With the decline in allowable ODS production, a significant stock of equipment that continues to use ODS will need access to recovered and recycled/reclaimed ODS to allow for proper servicing. EPA will continue to review available market and reported data to monitor availability of recycled and reclaimed ODS where production and import of new material is phased out to support this need. In addition, EPA will continue to implement a petition process to allow for the import of used ODS, primarily halon for fire suppression purposes. EPA also will implement other provisions of the Montreal Protocol, including exemption programs to allow for a continued smooth phaseout of ODS, particularly for laboratory and analytical uses, feedstock, process agents,[63] and HCFCs used consistent with the servicing tail.

AIM Act Implementation Activities

In FY 2025, the Agency will continue to implement the AIM Act HFC phasedown through an allowance allocation program established in FY 2021, and this work also will support implementation of EPA's FY 2024-2025 Agency Priority Goal. In FY 2025, resources are requested to promulgate rulemakings to establish requirements for the management of HFCs and HFC substitutes in equipment, distribute grants to support technology transition, equipment transition, and to provide program support for and coordination of implementation efforts within EPA and working with other federal agencies.

The Agency will continue to implement and administer an electronic HFC reporting system, which will begin collecting new reports required by regulations finalized in FY 2023 and FY 2024, and develop additional tracking, review, and data tools to better ensure compliance with the phasedown

---

[61] The Article 7 report prepared by EPA on behalf of the United States contains chemical-specific production, import and export data. The data included in the report is aggregated and available at: https://ozone.unep.org/countries/profile/usa.

[62] For more information, please visit: https://www.epa.gov/snap.

[63] EPA will implement a rule on process agents that was finalized in FY2024.

regulations, and work with other agencies to prevent illegal imports. In FY 2025, resources are requested to implement innovative IT solutions, such as database integration across EPA and Customs and Border Patrol databases. Specifically, EPA will ensure that the phasedown is not undermined by illegal imports; implement a regulation expected to be finalized in FY 2024 to establish requirements for the management of HFCs and HFC substitutes in equipment servicing, repair, disposal, or installation, as appropriate; distribute grants to small businesses to support technology transition; support enforcement by EPA and across the government by continuing to lead the interagency HFC taskforce; and stand up new protocols for rules finalized in FY 2023 addressing products containing HFCs. EPA also will educate stakeholders on HFC phasedown requirements. EPA will implement a regulation finalized in FY 2023 to issue allowances for HFC production and consumption for calendar years 2024 through 2028. The Agency also will complete a review required by the AIM Act and finalize a rulemaking to be proposed in FY 2024 on whether to reauthorize the issuance of application-specific allowances for the six uses of HFCs identified in subsection (e)(4)(B) beyond 2025, which include:

- a propellant in metered-dose inhalers;
- defense sprays;
- structural composite preformed polyurethane foam for marine use and trailer use;
- the etching of semiconductor material or wafers and the cleaning of chemical vapor deposition chambers within the semiconductor manufacturing sector;
- mission-critical military end uses, such as armored vehicle engine and shipboard fire suppression systems and systems used in deployable and expeditionary applications; and
- onboard aerospace fire suppression.

Under subsection (h) of the AIM Act, in FY 2025, EPA will begin implementing a rule expected to be finalized in FY 2024 that will  control certain practices, processes, or activities regarding: 1) the servicing, repair, disposal, or installation of equipment that involves a regulated substance; 2) a substitute for a regulated substance; 3) the reclaiming of a regulated substance used as a refrigerant; or 4) the reclaiming of a substitute for a regulated substance used as a refrigerant.

Under subsection (i) of the AIM Act, in FY 2025 the Agency will continue to implement regulations finalized in FY 2023 to restrict use of HFCs in products and equipment within certain sectors or subsectors where HFCs are used, promoting a transition to next-generation technologies. EPA will implement new reporting tools, upgrade existing data systems, and develop additional compliance mechanisms to implement this regulation. Other activities under subsection (i) include granting and/or denying petitions for sector-based restrictions on HFCs. In FY 2025, EPA anticipates proposing a rule that would implement AIM subsection (i)(5) which provides EPA authority to assess substitutes under the AIM Act.

The AIM Act also authorizes EPA to establish a grant program for small businesses for purchase of recycling, recovery, or reclamation equipment for HFC substitutes, including for servicing motor vehicle air conditioners. In FY 2025, additional funding is requested to fund distribution of grants to support technology transition already underway and equipment transition. This builds off EPA's FY 2024 request to initiate a grant program for small businesses for purchase of recycling, recovery, or reclamation equipment for HFC substitutes, including for servicing motor vehicle air conditioners.

In FY 2025, EPA will continue to provide technical expertise for the Montreal Protocol's Technology and Economic Assessment Panel and its Technical Options Committees, advancing reductions of ODS and HFC consumption and ensuring U.S. interests are represented.

In FY 2025, EPA will continue to conduct its essential work to support a level playing field for companies operating legally under the CAA and AIM Act regulations and those that have transitioned to alternatives for ODS and HFCs. Under both the AIM Act and the Montreal Protocol, in FY 2025 EPA will be implementing a 40 percent reduction in HFCs from historic levels. EPA exchanges data with U.S. Customs and Border Protection and the Department of Homeland Security on ODS and HFC importers and exporters to determine admissibility and target illegal shipments entering the United States, as well as reviews and approves imports flagged in the Automated Commercial Environment. With the significant reduction of available HFC allowances in FY 2025, this data exchange will increase in importance as accurate data will be needed on a real-time basis. EPA also will continue to work with partner agencies, including through the Interagency Task Force on Illegal HFC Trade, to detect, deter, and disrupt attempts to illegally import or produce HFCs in the United States, as well as work with State Department and other Departments to carry out the Administration's whole-of-government approach. These efforts also include EPA's work to support federal sector management and transition from HFCs through continued cooperation with organizations such as Department of Defense and the General Services Administration.

**Performance Measure Targets:**

**(PM HCFC) Remaining U.S. consumption of hydrochlorofluorocarbons (HCFCs), chemicals that deplete the Earth's protective ozone layer, in ozone depletion potential (ODP)-weighted metric tons.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 76.2 | 76.2 | 76.2 | 76.2 | Metric Tons |
| **Actual** | 434.1 | 224.2 | -110.8 | -20.8 | -6.36 | Data Avail 10/2024 |  |  | |

**(PM HFC) Remaining U.S. consumption of hydrofluorocarbons (HFCs).**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 273.5 | 273.5 | 181.5 | 181.5 | MMTCO2e |
| **Actual** |  |  |  |  | 253.4 | Data Avail 11/2024 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$648.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$64,683.0 / +24.0 FTE) This program change is an increase to implement provisions in the American Innovation and Manufacturing Act to phase down the use of HFCs, to support

U.S. entry to the Kigali amendment to the Montreal Protocol, and to build staff capacity around efforts to tackle the climate crisis. This investment includes $4.4 million for payroll.

**Statutory Authority:**

Title VI of the Clean Air Act and the American Innovation and Manufacturing Act.

## Stratospheric Ozone: Multilateral Fund

Program Area: Clean Air and Climate
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Improve Air Quality and Reduce Localized Pollution and Health Impacts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$8,326* | *$9,244* | *$18,000* | *$8,756* |
| Total Budget Authority | $8,326 | $9,244 | $18,000 | $8,756 |

**Program Project Description:**

The *Montreal Protocol on Substances that Deplete the Ozone Layer* (Montreal Protocol) is the international treaty designed to protect the stratospheric ozone layer by facilitating a global phaseout of ozone-depleting substances (ODS) and since 2016, phasing down climate-damaging hydrofluorocarbons (HFCs) under its Kigali Amendment. EPA is phasing down ODS under Title VI of the Clean Air Act and HFCs under the American Innovation and Manufacturing (AIM) Act of 2020. As a result of global action to phase out ODS, the ozone layer is expected to recover to its pre-1980 levels by mid-century. A global phasedown of HFCs is expected to prevent up to 0.5 °C of global warming by 2100.

The *Multilateral Fund for the Implementation of the Montreal Protocol* (Multilateral Fund) was created by the Parties to the Montreal Protocol to provide funds that enable developing countries to comply with their obligations following agreed upon schedules. The United States and other developed countries contribute to the Multilateral Fund. The United States holds a permanent seat on the Multilateral Fund's governing body (the Executive Committee) and can help focus efforts on cost-effective assistance and encourage climate-friendly transitions. The U.S. contribution to the Multilateral Fund is split between EPA and the Department of State.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.1, Improve Air Quality and Reduce Localized Pollution and Health Impacts in the *FY 2022 - 2026 EPA Strategic Plan*.

EPA's contributions to the Multilateral Fund in FY 2025 will primarily continue to support cost-effective projects designed to build capacity and eliminate ODS production and consumption in over 140 developing countries and provide support for the global phasedown of HFCs. Through 2022, the Multilateral Fund supported over 9,175 activities in 145 countries that have phased out 292,732 ozone-depletion potential (ODP) metric tons, 305,336 carbon dioxide equivalent metric tons of consumption of controlled substances, and 205,377 ODP metric tons of production of controlled substances. Additional projects will be submitted, considered, and approved in accordance with Multilateral Fund guidelines.

66

In FY 2025, the United States will continue to promote developing country transitions to climate-friendly alternatives and will support projects to phase down HFCs under the Kigali Amendment. A small number of demonstration projects aimed at furthering climate projection are anticipated. These projects will concern either planning for reclaim, recycling, and refrigerant disposal or energy efficiency upgrades. The United States also will support preparatory activities such as establishing HFC baselines, phasedown starting points, and Kigali HFC Implementation Plans to phase down HFCs in developing countries, as well as projects to reduce HFC-23 byproduct emissions, ensuring that the global HFC phasedown will leverage the expertise and experience gained during the 30-year history with phasing out ODS. Taken together, this work will support developing countries' compliance with Protocol obligations.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$8,756.0) This program change reflects an increase to help fund additional activities associated with the adoption of the Kigali Amendment and developing country phase down of HFCs while continuing to support ODS phaseout activities.

**Statutory Authority:**

Title VI of the Clean Air Act.

**Compliance**

## Compliance Monitoring

Program Area: Compliance
Goal: Enforce Environmental Laws and Ensure Compliance
Objective(s): Detect Violations and Promote Compliance

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$104,593* | *$112,730* | *$168,474* | *$55,744* |
| Inland Oil Spill Programs | -$5 | $649 | $2,154 | $1,505 |
| Hazardous Substance Superfund | $1,377 | $1,017 | $1,036 | $19 |
| Total Budget Authority | $105,966 | $114,396 | $171,664 | $57,268 |
| Total Workyears | 441.1 | 478.9 | 544.6 | 65.7 |

**Program Project Description:**

The Compliance Monitoring Program is a key component of EPA's Office of Enforcement and Compliance Assurance (OECA) that supports both compliance with federal environmental laws and identifies noncompliance. Compliance monitoring activities, such as inspections and investigations, or review of self-reported compliance monitoring information and other forms of offsite compliance monitoring, are conducted by EPA and other co-regulators (states, federally recognized tribes, and territories) to determine if regulated entities are complying with environmental statutes, applicable regulations, and permit conditions. A robust inspection, compliance assistance and enforcement program are essential to advancing the promise of clean air, land, and water to many communities across the country, including those that are vulnerable and overburdened, and for implementing Executive Order 14008 on *Tackling the Climate Crisis at Home and Abroad*.[64]

Compliance information gathered from these activities is reported into EPA's data systems for analyses and inspection or enforcement targeting. A variety of data is available to co-regulators and the public to increase compliance with EPA statutes and to identify programs and sectors with high noncompliance in order to focus resources through National Enforcement and Compliance Initiatives (NECIs).[65] The NECIs can help identify conditions that may present an imminent and substantial endangerment to human health and the environment and thereby warrant immediate attention. The Compliance Monitoring Program further supports each NECI with specific and robust targeting and data analysis (including developing dashboards and data integration systems to allow EPA, states, and tribes to analyze national compliance datasets).

Given the large number of regulated entities, effective targeting of compliance monitoring and analysis of compliance data plays a critical role in achieving the goals EPA has set forth for

---

[64] For additional information, please visit: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.
[65] For additional information, please visit: https://www.govinfo.gov/content/pkg/FR-2023-01-12/pdf/2023-00500.pdf.

protecting health and the environment. The Compliance Monitoring Program utilizes a number of tools and approaches to carry out its work, including:

- **Compliance Program Data Management and Electronic Reporting:** EPA has a national enforcement and compliance data system, the Integrated Compliance Information System (ICIS), which supports both the compliance monitoring and civil enforcement programs. ICIS is a critical infrastructure tool used by the Agency, state, tribal, local, and territorial governments as well as the regulated community and other federal agencies, to track compliance and enforcement of environmental statutes. States are a major user of this resource. For instance, twenty-one state governments depend on ICIS to directly manage their clean water permitting and compliance activities. EPA utilizes ICIS enforcement and compliance data and other information technology tools to: 1) Identify potential violations of federal environmental laws; 2) Facilitate efficient enforcement; and 3) Promote compliance with these requirements. ICIS data is available to the public via the internet-accessible Enforcement and Compliance History Online (ECHO) system as well as the companion data change notification tool ECHO Notify. Using ICIS and ECHO to electronically track its civil enforcement work allows EPA to better ensure that its enforcement resources are used to facilitate transparency and address the most significant noncompliance problems, including noncompliance affecting overburdened or vulnerable communities and noncompliance that leads to climate impacts. EPA, through the National Targeting Center (NTC), utilizes the data in ECHO to help identify the worst problem areas to align inspections and enforcement activities. EPA collaborates with state, local, federal, tribal, and industry partners, through the E-Enterprise initiative, to leverage technologies such as promoting electronic reporting and permitting. EPA and states implement the National Pollution Discharge Elimination System (NPDES) Electronic Reporting Rule through ICIS, the NPDES eReporting Tool (NeT), and the Network Discharge Monitoring Report (NetDMR). These are key tools for improving the availability of clean water compliance data to EPA, states, and the public.[66]

- **Support for the Clean Water Act (CWA) National Pollutant Discharge Elimination System (NPDES) Program:** The Agency will continue to implement Phases 1 and 2 of the NPDES Electronic Reporting Rule which covers electronic discharge monitoring reports, Notices of Intent to discharge in compliance with a general permit and data sharing requirements for EPA and states that includes permit and compliance monitoring data. EPA will continue to work with states to ensure complete and high-quality data acquisition from permits and from compliance and enforcement data. The Program will evaluate and prioritize the development of additional electronic reporting tools that support states. EPA will continue to provide tools and support for tracking, interpreting, and reducing their NPDES noncompliance rate and will provide support to states to strengthen their NPDES compliance programs. In FY 2023, the percentage of permittees in significant noncompliance with their NPDES permits was 9.3 percent, down from a FY 2018 baseline of 20.3 percent. For federal facilities in FY 2023, the percentage of permittees in significant noncompliance with their NPDES permits was 4.0 percent, which is a 74 percent reduction for federal facilities from their FY 2018 baseline.

---

[66] For more information, please visit: https://www.epa.gov/compliance/npdes-ereporting.

- **Building Capacity in the Compliance Assurance Program's Inspector Cadre for EPA, State, Tribal and Local Governments and Restoring EPA's National Enforcement Training Institute as the premier National Enforcement Training Center in the United States:** To ensure the quality of compliance monitoring activities, EPA develops national policies, updates inspection manuals, establishes training requirements for inspectors, and issues inspector credentials. The Pollution Prosecution Act of 1990 required the establishment of the National Enforcement Training Institute (NETI) to provide training to federal, state, and local lawyers; inspectors; civil and criminal investigators; and technical experts in the enforcement of the Nation's environmental laws. The Agency will build capacity in EPA's inspector cadre and restore NETI, both of which are critical to advancing the *FY 2022 -2026 EPA Strategic Plan* "Goal 3: Enforce Environmental Laws and Ensure Compliance." This includes OECA's goal to conduct 55 percent of annual inspections at facilities affecting vulnerable or overburdened communities by September 30, 2026, an estimated 25 percent increase over EPA's historical average. The Compliance Monitoring Program uses inspectors on the ground to help identify public health concerns and environmental regulatory violations throughout the United States, including in communities with Environmental Justice (EJ) concern. In FY 2023, EPA outperformed and achieved over 60 percent of on-site inspections in overburdened communities and is on target to continue this rate in FY 2024. EPA delivers critical in-person and online training courses to new and experienced federal, state, tribal, and local inspectors to ensure the integrity of the national Compliance Monitoring Program. EPA hosts several in-person inspector training programs, such as the annual CWA NPDES Technical Inspector Workshop, the Safe Drinking Water Act (SDWA) Public Water System Supervision (PWSS) Advanced Inspector Training, and the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Pesticide Inspector Residential Training Program.

- **Compliance Assistance:** Compliance assistance is a valuable tool to assist regulated facilities in understanding their compliance obligations and achieving and maintaining compliance. EPA provides compliance assistance by working with third-party organizations and federal agencies to support 17 web-based, sector-specific compliance assistance centers and other web-based assistance resources. In addition, the Agency develops webinars, compliance advisories, and other assistance materials to help EPA, state regulators, and the regulated community to understand compliance rules and obligations. EPA also provides through the Compliance Advisors for Sustainable Water Systems Program, facility specific technical assistance to regulated entities under the CWA and SDWA programs and the polychlorinated biphenyl program.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 3/Objective 3.2, Detect Violations and Promote Compliance in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the Agency requests an increase of $41.4 million and 56.2 FTE in Compliance Monitoring resources to implement the NECIs and continue to rebuild the inspector cadre. A robust inspection and enforcement program is essential to advancing the promise of clean air, land, and water to many communities across the country. Increased staffing can identify public health

concerns and potential environmental regulatory violations. This is critical to protect communities, including those that are vulnerable and overburdened.

In FY 2025, NETI will increase staffing and continue in its effort to re-establish its role as the premier National Enforcement Training Center in the United States by building training capacity (including for the NECIs), establishing inspector internship, cross-regional training, and mentorship programs; creating a digital training hub; and educating the future workforce in the enforcement of environmental laws in accordance with its statutory mandate.

EPA's inspection programs have been under-resourced for over a decade leading to a loss of agency expertise and a decline in the numbers of inspections. To meet EPA's EJ goals and the mission to protect human health and the environment, EPA must rebuild and strengthen its inspection program with increased hiring and training of new and existing inspectors, including in-person basic inspector training for the following programs: Clean Air Act (CAA); SDWA; CWA; Resource Conservation and Recovery Act (RCRA); FIFRA; and Toxic Substances Control Act (TSCA). Additionally, the Agency is requesting additional funding to purchase health, safety, and inspection monitoring equipment. Some of the equipment include the following: Forward Looking InfraRed (FLIR) cameras, Data Acquisition Real-Time (DART), flame ionization detectors/photo ionization detectors, fence line monitors, and Smart Tools software and hardware for inspectors.

EPA will continue its customer-focused, evidence-based targeting approaches to help inspectors find environmental problems by utilizing software and technical assistance from the National Targeting Center (NTC). The NTC works with media-specific communities of practice to collaborate with EPA, regions, state, tribal partners, and builds and maintains relationships with academic data science labs to develop training and tools. ECHO (and ECHO Gov) serves as the data integration hub used by the NTC for developing models, publishing tools, and providing a means for accessing the results of these efforts.

EPA will continue to implement its comprehensive action plan for integrating EJ and climate change considerations throughout all aspects of the Program, including a performance measure tracking the percentage of inspections affecting communities with potential EJ concerns. This effort answers the President's call to "strengthen enforcement of environmental violations with disproportionate impact on overburdened or vulnerable communities through the Office of Enforcement and Compliance Assurance".[67] This work includes, but is not limited to, multi-state/multi-regional matters, issues of national significance, complex contamination at and from federal facilities, and emergency situations.

In addition, EPA will provide targeted oversight and support to state, local, tribal, and other federal agency programs. To accomplish this objective, the Agency will prioritize work with states to

---

[67] For additional information on the Executive Order on *Tackling the Climate Crisis at Home and Abroad*, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

develop methods that successfully leverage advances in both monitoring and information technology.

In FY 2025, EPA is requesting an increase of approximately $3.0 million and 5.0 FTE to continue its modernization efforts which was started with IRA funding.[68] EPA will continue to improve ICIS and ECHO, including future integration of the data collected using Smart Tools, which will facilitate better access to compliance data and community information (*e.g.*, EPA's EJ screening tool) for EPA, states, tribes, other federal agencies, and the public. The Agency will continue to modernize its national enforcement and compliance data system as it expands its compliance monitoring and technical assistance efforts to address EJ issues (including the Compliance Advisors for Sustainable Water Systems Program), per- and poly-fluoroalkyl substances (PFAS), and climate change concerns including resilience and reduction in the use of hydrofluorocarbons (HFCs).

In FY 2025, EPA requests an increase of $2.0 million to expand the Program's software solutions for field inspectors to improve the effectiveness and efficiency of compliance inspections conducted by EPA and authorized states. In FY 2020 and 2021, EPA rolled out its Smart Tools for inspectors in the RCRA Hazardous Waste Program and the CWA - NPDES Program. Smart Tools software makes the process of documenting field inspections and preparing inspection reports more efficient. This tool allows the Program to use its compliance monitoring resources more efficiently, including monitoring for noncompliance. It also allows the Agency to make inspection reports more readily and timely available to the regulated entities and the public. The work on the design and development of software for additional inspection programs (*e.g.*, Underground Storage Tanks, CAA Risk Management Program, TSCA lead-based paint, FIFRA Good Laboratory Practices Standards) will continue through FY 2025 and beyond.

Additionally, in FY 2025, EPA requests an increase of $1.1 million and 2.0 FTE to strengthen EPA's Drinking Water Agenda. EPA will increase its implementation of the Evidence Act through the "Drinking Water Systems Out of Compliance" priority area in EPA's Learning Agenda.[69] Safe drinking water is critical to the health of communities and each year thousands of community water systems violate one or more health-based drinking water standards. Drinking water noncompliance is greatest in small, under-resourced communities and may be higher than EPA data suggests due to under reporting. In FY 2025, EPA will continue to collect new information and conduct studies under this learning priority area to evaluate the efficacy of policy instruments. EPA will define potential metrics of public water systems' technical, managerial, and financial capacity for early identification of at-risk drinking water systems. The analysis will test existing and new predictive analytic tools designed to identify at-risk systems. EPA will continue to work with states, tribes, and academic experts to implement OECA's Compliance Learning Agenda. The agenda will improve the effectiveness of enforcement and compliance programs, approaches, and tools by prioritizing the most pressing programmatic questions; planning evidence-based studies to address these questions; and identifying effective and innovative approaches for improving compliance. The first two priority projects identified through this effort will focus on assessing the effectiveness of offsite compliance monitoring and identifying the root causes of municipal noncompliance.

---

[68] OECA is working with the CIO to refine cost estimates for ICIS modernization.
[69] Foundations for Evidence-Based Policymaking Act (Public Law 115–435):
https://www.congress.gov/115/plaws/publ435/PLAW-115publ435.pdf .

In FY 2025, EPA also is requesting an increase of $2.0 million to support the Agency's Compliance Advisors for Sustainable Water Systems Program (previously called the Circuit Riders Program), which reduces noncompliance at small public water systems (PWSs) and small wastewater treatment facilities (WWTFs) by providing hands-on technical assistance. Many small drinking water and wastewater systems are under-resourced, in overburdened or vulnerable communities, and unable to achieve and maintain compliance due to lack of technical, managerial, and financial capacity. These communities are impacted by factors such as aging infrastructure, workforce shortages, and declining rate bases. These challenges are the root cause of most violations of the SDWA and CWA. Part trainer and part consultant, Compliance Advisors troubleshoot issues, develop plans to return systems to compliance, and increase the technical capacity of operators. The Compliance Advisors may revisit systems as needed, promoting sustainable compliance.

Through FY 2023, Compliance Advisors have provided technical assistance to approximately 232 small PWSs and 61 WWTFs in under-resourced communities nationwide, across all Regions – covering 25 states, Puerto Rico, and seven tribes. There are thousands more small systems and facilities that need technical support to help them achieve and stay in compliance. In general, the systems supported by the Compliance Advisor Program are small (serving populations of less than 10,000). Approximately 84 percent are in overburdened or vulnerable communities.[70] Compliance Advisors have completed work at 24 wastewater systems and 130 drinking water systems and provided more than 1,000 standard operating procedures, checklists, and other tools to help these small systems return to sustained compliance. In order to meet the significant demand for targeted technical assistance, this investment will bolster other agency technical assistance efforts. The regions working with states, tribes and territories will continue to identify and nominate systems to receive Compliance Advisor help to return to and sustain compliance.

In FY 2025, EPA will continue to support inspections and fund compliance monitoring efforts to support development of civil enforcement cases. The Agency will use compliance monitoring funds to continue supporting enforcement and compliance inspections adhering to CAA requirements including for motor vehicles, engines and fuels, stationary sources, chemical accident prevention, wood heaters, municipal solid waste landfills, and stratospheric ozone; CWA requirements for permitted discharges, preventing and addressing oil spills and spills of sewage or other hazardous substances, wetlands protection, and biosolids use and disposal; TSCA requirements for new and existing chemicals, lead based paint in target housing including privatized military housing, and PCBs; FIFRA requirements for pesticide registration; Emergency Planning and Community Right to Know Act requirements for emergency planning and Toxics Release Inventory reporting; American Innovation and Manufacturing (AIM) Act requirements to reduce the harmful effects of climate-change causing chemicals like HFCs; RCRA requirements for hazardous and non-hazardous solid waste; and SDWA requirements for public water systems.

In FY 2025, EPA proposes to hire additional inspectors for federal facility investigations to increase sampling capabilities to identify regulatory violations and threats to public health and the environment. These resources will help ensure that EPA meets the RCRA statutory requirement of annual inspections of federal facility treatment, storage, and disposal facilities. This investment

---

[70] OECA protocols for identifying Areas of Potential EJ Concern.

will assist in dispute resolution and case development against federal agencies that are responsible for contamination (*e.g*., PFAS), thereby protecting military families and the public health of surrounding communities affected by these contaminants, particularly those communities with EJ concerns.

In FY 2025, the Agency is requesting an increase of $3.0 million to support EPA's PFAS Strategic Roadmap and EPA's PFAS NECI. Resources will be used to actively investigate and identify releases of PFAS to the air, land, and water from large manufacturers, processing facilities, waste disposal facilities, and federal facilities where PFAS are suspected of contaminating various environmental media. This investment will support case development and issuance of information requests, including the potential identification of imminent and substantial endangerment issues under CWA, SDWA, or RCRA.

In addition, resources will be used to continue the operation and development of the PFAS Analytic Tools, a data integration platform currently used by the Agency, states, and researchers to analyze national PFAS data sets. The funding will provide enhancements including increasing data availability to the public, including communities with potential EJ concerns. Compliance monitoring funds will advance protection of communities by supporting investigations into PFAS contamination, including activities associated with EPA's PFAS NECI, and assisting with the identification of areas for compliance assistance to ensure nearby facilities adhere to regulations designed to protect vulnerable populations. The increased funding will help create and expand programs to further environmental protections and increase monitoring capabilities.[71]

**Performance Measure Targets:**

**(PM 409) Number of federal on-site compliance monitoring inspections and evaluations and off-site compliance monitoring activities.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 11,000 | 12,000 | Inspections & Evaluations |
| **Actual** | 10,600 | 10,300 | 8,500 | 10,800 | 13,900 | 13,100 |  |  | |

**(PM 444) Percentage of EPA inspection reports sent to the facility within 70 days of inspection.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  | 75 | 75 | 75 | 75 | 75 | Percent |
| **Actual** |  |  | 83 | 85 | 83 | 77 |  |  | |
| **Numerator** |  |  | 4,177 | 1,940 | 4,362 | 5,521 |  |  | Reports |
| **Denominator** |  |  | 5,037 | 2,287 | 5,237 | 7,129 |  |  | |

---

[71] For additional information, please see: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7530144/pdf/nihms-1627933.pdf.

**(PM 450) Percentage of EPA inspections at facilities affecting communities with potential environmental justice concerns.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 45 | 50 | 50 | 55 | Percent |
| Actual |  |  |  |  | 57 | 61 |  |  | |
| Numerator |  |  |  |  | 3,333 | 4,700 |  |  | Inspections |
| Denominator |  |  |  |  | 5,861 | 7,750 |  |  | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$2,346.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$41,357.0 / +56.2 FTE) This program increase will focus compliance monitoring resources on implementation of the National Enforcement Compliance Initiatives, including continued efforts to rebuild EPA's inspector cadre. Additional funding will build capacity for inspections, case development, and to supplement the Program's training budget by providing FTE to restore the NETI. This funding will enhance EPA's compliance monitoring programmatic capabilities to improve efforts to address pollution in overburdened and vulnerable communities and increase compliance. This investment includes $10.16 million for payroll.

- (+$2,000.0) This program increase will allow the Compliance Advisor Program to provide critical technical assistance to an additional 80-100 systems to achieve and maintain compliance. This investment also will be used to support inspections and case development in the regional offices. The available funds will be used to support vulnerable and overburdened communities identified by EPA and States as having concerns because of lead Action Level exceedances.

- (+$3,000.0) This program increase will allow EPA to actively investigate and identify releases of PFAS to the air, land, and water from large manufacturers, processing facilities, federal facilities, and waste disposal facilities where PFAS are suspected of contaminating various environmental media. In addition, these funds will allow EPA to continue operation and development of the PFAS Analytic Tools, a data integration platform currently used by EPA and states to analyze national PFAS data sets.

- (+$2,954.0 / +5.0 FTE) This program increase will support the modernization efforts of ICIS and enhance its communication integration (internet-based services) with ECHO. This modernization process will enhance EPA's efforts to address compliance data exchange concerns in disadvantaged or vulnerable communities. This investment includes $904.0 thousand for payroll.

- (+$2,000.0) This program increase will allow EPA to advance work on the Smart Tools for Field Inspectors to develop tools for some of the smaller Agency programs that have more of a direct impact for EJ communities such as the TSCA lead-based paint programs.

- (+$1,061.0 / +2.0 FTE) This program increase will allow EPA to evaluate the Drinking Water Learning Agenda, developed under the Evidence Act, and thereby test the efficacy of policies to address drinking water noncompliance. The increase will allow the program to conduct studies with broader participation with more partners (*e.g.*, states and tribes,) to test the effectiveness of inspection and enforcement approaches to improve compliance in the drinking water program. This investment includes $361.0 thousand for payroll.

- (+$645.0 / +0.5 FTE) This program increase will support implementation of OECA's Climate Adaptation Implementation Plan. Resources will support completion of priority actions including continued staff training to build climate change knowledge and consideration of climate change in all aspects of the Agency's enforcement program. This investment includes $90.0 thousand for payroll.

- (+$381.0 / +2.0 FTE) This program increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $361.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Act to Prevent Pollution from Ships (MARPOL Annex VI); American Innovation and Manufacturing Act: Clean Air Act; Clean Water Act; Emergency Planning and Community Right-to-Know Act; Federal Insecticide, Fungicide, and Rodenticide Act; Marine Protection, Research, and Sanctuaries Act; Oil Pollution Act; Resource Conservation and Recovery Act; Rivers and Harbors Act; Safe Drinking Water Act; Toxic Substances Control Act.

**Cross-Agency Coordination, Outreach, and Education**

## **Children and Other Sensitive Populations: Agency Coordination**

Program Area: Cross-Agency Coordination, Outreach, and Education
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$6,526* | *$6,362* | *$7,749* | *$1,387* |
| Total Budget Authority | $6,526 | $6,362 | $7,749 | $1,387 |
| Total Workyears | 17.3 | 18.4 | 19.4 | 1.0 |

**Program Project Description:**

The Children's Health Program coordinates and advances the protection of children's environmental health across EPA by assisting with developing regulations, improving risk assessment and science policy, implementing community-level outreach and education programs, and tracking indicators of progress on children's health. Children's environmental health refers to the effect of the environment on children's growth, wellness, development, and risk of disease. EPA strives for all parts of the Agency to apply and promote the use of the best available science, policy, partnerships, communications, and action to protect children from adverse health effects resulting from harmful environmental exposures. The Children's Health Program is directed by the *EPA' Policy on Children's Health,*[72] Executive Order (EO) 13045: *Protection of Children's Health from Environmental Health Risks and Safety Risks,*[73] statutory authorities addressing children's environmental health, and other existing guidance.[74] The Program works to tackle the climate crisis and advance environmental justice (EJ) by identifying and reducing inequitable impacts of climate change and adverse environmental exposures on children, particularly children in underserved communities.

In FY 2023, the Children's Health Program supported Pediatric Environmental Health Specialty Units by providing programming on children's health in EJ communities;[75] hosted a workshop to provide technical assistance to grantees to support the improvement of school facilities with an emphasis on underserved communities;[76] implemented a partnership with the Association of State and Territorial Health Officials to support inclusion of children's environmental health at the state level; oversaw the publication of an interactive website based on a workshop by the National Academy of Science to identify the latest priorities to protect children's health; conducted an internal workshop to prioritize children's health research needs and the inclusion of research findings in EPA decision-making; updated several documents used internally to enhance incorporation of children's health protection in the EPA regulatory decision-making process; developed a training course on children environmental health risk assessment for EPA rule

---

[72] For more information, please see: https://www.epa.gov/children/epas-policy-childrens-health.
[73] For more information, please see: https://www.govinfo.gov/content/pkg/FR-1997-04-23/pdf/97-10695.pdf.
[74] For more information, please see: https://www.epa.gov/children/guidance-tools-and-glossary-key-terms-regarding-childrens-environmental-health.
[75] For more information, please see: https://www.pehsu.net/.
[76] For more information, please see: https://www.epa.gov/children/childrens-health-grants-and-funding-opportunities.

managers; published a national-scale, multi-sector report that quantifies projected health effects to children from climate change; published an online toolkit that compiles educational and outreach materials highlighting the risks from heavy metal exposure primarily to children from a variety of cultural and religious products; began scoping work to enhance America's Children and the Environment (a resource on children's environmental health indicator data trends); conducted two plenary meetings of the Children's Health Protection Advisory Committee (CHPAC),[77] and received advice on 1) American's Children and the Environment, 2) Climate Change Priorities for Children's Health; implemented CHPAC's recommendations on health learning environments, pesticides and TSCA, and initiated a new request for advice regarding prevention of lead exposure through enhanced community engagement; hosted a series of events to educate the public about children's health protection, including webinars regarding the Pediatric Environmental Health Specialty Units and ways to protect children from extreme heat; updated website pages and conducted events and outreach to stakeholders to reinvigorate EPA's presence and voice, among other initiatives. Together, EPA programs completed 298 actions toward its children's health long-term performance goal in FY 2023 having set a target of 163 actions at the beginning of the year. The Program supported several Interagency Policy Councils on Child and Maternal Health to assist their development of all-of-government approaches for protecting children's health in schools and improving maternal health outcomes. EPA's Office of Children's Health Protection (OCHP) contributed to the Lead Exposure and Prevention Advisory Committee and the National Committee on Children, Climate and Disasters hosted by the Department of Health and Human Services, the Cancer Moonshot, and others.

The Children's Health Program has a successful track record of collaboration with non-governmental organizations, state, local and tribal governments, and other federal agencies. To further protect children in EJ communities, and those affected by climate change, the Program led the steering committee of the President's Task Force on Environmental Health Risks and Safety Risks to Children to develop interagency work plans to span the next five years. OCHP played a key role in implementing EPA's Strategy to Reduce Lead Exposures and Disparities in U.S. Communities and prepared the draft of a companion high-level update to the interagency Federal Lead Action Plan to Reduce Lead Exposures report for OMB review. Within EPA, OCHP and the regional coordinators collaborate closely with EPA's national program managers and regional offices, as well as with EPA's Office of Environmental Justice and External Civil Rights, to develop effective tools and messages in support of children in underserved communities who disproportionately suffer from adverse environmental exposures, and to advance information and messaging to address health risks to children from climate change. In EPA's 2023 Equity Action Plan, EPA included as priority action #4, *Protect Children Equitably from Exposure to Environmental Contaminants.*

In FY 2024, the Children's Health Program will contribute to the development of regulations, scientific assessments and/or policies, including actions under the Toxic Substances Control Act, Safe Drinking Water Act, Food Quality Protection Act and Clean Air Act, among others. To implement EPA's *Policy on Children's Health,*[78] OCHP will continue to train children's health champions in each EPA program office, use the newly updated guidance documents to support

---

[77] For more information, please see: https://www.epa.gov/children/childrens-health-protection-advisory-committee-chpac.
[78] For additional information, please see: https://www.epa.gov/system/files/documents/2021-10/2021-policy-on-childrens-health.pdf.

program office work on protecting the health of children, and expand training on how to conduct children's health evaluations. In FY 2024, OCHP also will implement the second year of its first long-term performance goal for advancing protection of children's environmental health applicable to relevant EPA national programs. Together, EPA programs will aim to complete 166 actions toward this long-term performance goal in FY 2024. OCHP continued a coordinated national approach among regional Healthy Schools programs. With its newly updated webpages, OCHP will reach stakeholders through more than 161,000 page views, and institute approaches to better coordinate headquarters and regional children's environmental health activities.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests a total investment of $7.75 million and 19.4 FTE for the Children's Health Program, which is approximately $1.4 million and 1.0 FTE over the FY 2024 annualized continuing resolution Program budget. The Agency will continue to protect children in underserved communities who suffer disproportionately from the effects of exposures magnified by socio-economic determinants of health, and to address children's exposures, which are exacerbated by climate change. EPA actions will be informed by two important considerations: first, the scientific understanding of childhood as a sequence of life stages, and second, the recognition that protecting children's health is necessary to protect human health, because every adult was once a child.

In FY 2025, the Children's Health Program will work to tackle the climate crisis and advance EJ by following up on recommendations from the National Academy of Science, which highlighted the latest scientific advancement and challenges to protecting children's health. The Program will continue to implement the *EPA Policy on Children's Health* and its associated long-term performance goal to ensure that EPA consistently and explicitly considers early life exposures and lifelong health in all human health decisions. OCHP will continue to engage with EPA national programs to appropriately include assessment and consideration of risk to children's environmental health in risk assessment, risk management decisions, regulations, policies, guidance documents, program initiatives, and public engagement. As part of these activities and in support of the Cancer Moonshot, the Program will continue to compile data and provide analysis on children's health to reduce or prevent exposure to carcinogens and protect children from cancer risks. Additionally, the Program will continue to compile national data on childhood cancer[79] in the America's Children and the Environment interactive online tool and promote its guidance to assess children's susceptibility to early life exposure to carcinogens.

Further, EPA will improve its ability to monetize the economic benefits to children's health of environmental rules by quantifying children-related health endpoints that are not currently included in EPA benefit-cost analyses. This work will improve substantially EPA's ability to communicate to the public the impact of its regulations.

---

[79] For additional information, please see: https://www.epa.gov/americaschildrenenvironment/health-childhood-cancer.

The Program will convene the Steering Committee of President's Task Force on Environmental Health Risks and Safety Risks to Children to report on progress across the federal government in the areas of climate change and disasters, childhood lead; asthma disparities; and climate, emergencies and disasters, exposure to toxic chemicals, and other topics. The Program also will continue to build on partnerships with key stakeholders and leverage resources and work for durable, nationally relevant improvements in children's health protection.

The Program will host a variety of activities to mark Children's Health Month in October to educate parents, caregivers, teachers, and others on how to better protect children from adverse environmental exposure and continue to modernize its social media presence to improve outreach to affected communities. The Program also will coordinate two meetings of the CHPAC, with delivery of expert responses to additional charge questions related to high priority children's environmental health issues.

**Performance Measure Targets:**

**(PM CH01) Number of EPA actions that concern human health that include assessment and consideration of environmental health information and data for children at all life stages to the extent relevant data are available.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 50% | 163 | 166 | TBD | Actions |
| **Actual** |  |  |  |  | N/A | 298 |  |  | |

**(PM CH02) Number of EPA regional offices with stakeholder engagement on children's environmental health designed to provide durable, replicable, and widespread results.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 3 | 6 | 9 | 10 | Regional Offices |
| **Actual** |  |  |  |  | 6 | 9 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$884.0 / +1.0 FTE) This program increase supports EPA's efforts to improve the Agency's cost benefits analysis for children's health. This investment includes $203.0 thousand for payroll and additional changes to fixed support costs.

- (+$503.0) This program change is an increase to provide additional support for existing programs and workforce in the Children's Health Program. This includes updating and expanding indicators and trends in America's Children and the Environment by gathering evidence to better represent impacts of environmental exposures on children in underserved communities and by making improvements in the accessibility and presentation of the underlying data.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Toxic Substances Control Act (TSCA); Safe Drinking Water Act (SDWA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); and Food Quality Protection Act (FQPA).

## Executive Management and Operations

Program Area: Cross-Agency Coordination, Outreach, and Education
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$53,653* | *$56,160* | *$73,269* | *$17,109* |
| Total Budget Authority | $53,653 | $56,160 | $73,269 | $17,109 |
| Total Workyears | 276.7 | 278.6 | 319.2 | 40.6 |

Total workyears in FY 2025 include 7.3 FTE to support Executive Management Operations working capital fund (WCF) services.

**Program Project Description:**

The Executive Management and Operations Program supports various offices that provide direct executive and logistical support to EPA's Administrator. In addition to the Administrator's Immediate Office (IO), the Program supports the Office of Congressional and Intergovernmental Relations (OCIR), Office of Administrative and Executive Services (OAES), Office of the Executive Secretariat (OEX), the Office of Public Affairs (OPA), and the Office of Public Engagement (OPE).

The Program also supports EPA's 10 regional offices. The Program's management, coordination, and policy activities link the Agency's engagement with outside entities, including Congress, state and local governments, tribes, nongovernmental organizations, national and community associations, and the public.

Within the Program, key functions include responding to congressional requests for information; coordinating and providing outreach to state and local governments, tribes, and rural communities; and supporting press and other communications activities. The Program also resources mission support functions, including but not limited to administrative management services involving correspondence control and records management systems, human resources management, budget formulation and execution, outsourcing, and information technology management services.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan.*

In FY 2025, the Agency requests an additional $17.1 million and 40.6 FTE for the Executive Management and Operations Program. These additional resources will strengthen engagement with state and local partners; enhance training of healthcare providers in underserved communities on the prevention, diagnosis, management, and treatment of children's exposure to lead; implement and strengthen the Agency's ability to carry out effective risk communication; restore

core capacity to the Executive Management and Operations Program; provide contract support for the Agency's management operations and multi-media and risk communications; increase EPA's efforts to address a range of environmental issues as they relate to youth through EPA's National Environmental Youth Advisory Council established in 2023; and improve the Agency's public engagement, partnership, and outreach initiatives at the regional level and across the Agency. This investment also provides an annual payroll increase for existing FTE; essential workforce support costs; support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for Freedom of Information Act (FOIA) and litigation support; implementation of Trusted Vetting 2.0; and FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and EPA's Equity Action Plan, which is required under various Executive Orders.

OCIR serves as EPA's principal point of contact for Congress, regions, states, and local governments and as the coordination point for interaction with other agency offices and officials. OCIR is comprised of two main components: the Office of Congressional Affairs (OCA) and Office of Intergovernmental Relations (OIR). OCA facilitates all legislative activity and interactions with Congress. OIR manages interactions with state and local governments and serves as the liaison for the Agency with national associations for state and local officials.

In FY 2025, OCA will continue to prepare EPA officials for hearings, oversee responses to written inquiries and oversight requests from members of Congress, and coordinate and provide technical assistance and briefings on legislative areas of interest to members of Congress and their staff.

In FY 2025, OIR will continue to inform and consult with state and local governments on regulations and other EPA activities. Additionally, OIR will continue to lead the Agency's efforts to support and build partnerships with the states, local governments, and tribes on environmental priorities through regular engagements with intergovernmental associations and state and local officials, as well as through the National Environmental Performance Partnership System and the increased use of Performance Partnership Agreements and Grants with a focus on addressing climate change and ensuring underserved communities are considered throughout the process. OIR also will continue to operate its Local Government Advisory Committee and Small Communities Advisory Subcommittee, which provide crucial advice to the Administrator. OIR will continue to enhance support for the Office of the Municipal Ombudsman (42 U.S.C. 4379j(a)(1)) to work with communities on water and climate change and in leveraging diverse new federal funding sources for optimal outcomes.

Additionally, OIR will enhance opportunities for internal policy/decision making through its management of the Agency's Executive Management Council and other venues dedicated to senior level engagement. In addition, OCIR will continue to regularly review and evaluate its processes for responding to congressional and intergovernmental correspondence and FOIA requests; prepare for hearings or briefings; provide technical assistance; and coordinate with EPA's program offices, regional offices, states, local officials, and associations. This will include modernizing some of our operations to create more efficiency in the various functions and workflows within the office.

OPA facilitates the exchange of information between EPA and the public, media, Congress, and state and local governments; broadly communicates EPA's mission; assists in public awareness of environmental issues; and informs EPA employees of important issues that affect them. Annually, OPA issues nearly 1,500 press releases; responds to approximately 8,000 media inquiries; and oversees more than 150 audio-visual productions, 500 graphic productions, 2,700 event photographs, and 40 portraits. In addition, in terms of digital media, OPA receives over 160 million impressions on the internet, including www.epa.gov and EPA social media accounts, and posts nearly 100 unique EPA homepage internet news banners. Also, to facilitate communications with EPA employees nationwide, OPA annually posts over 200 intranet banners; issues 48 issues of a weekly e-newsletter - *This Week @ EPA* - with a total of 240 articles; and sends more than 100 agencywide employee Mass Mailers from EPA's Administrator, Deputy Administrator, and other senior leaders. In FY 2025, OPA will continue to inform the media of agency initiatives and deliver timely, accurate information. The Office will continue to update the Agency's internet site to provide stakeholders with transparent, accurate, and comprehensive information on EPA's activities and policies. OPA will continue using social media, multimedia, and new media tools to provide stakeholders with information. The Office also will work with EPA's program and regional offices to improve employee communication; external communication on relevant environmental and human health risks; collaboration and engagement with internal and external stakeholders; updates to the Agency's intranet site; and the use of other communication tools.

OPA also is responsible for ensuring that EPA carries out effective risk communication by sharing critical information on how we are addressing human health and environmental risks with the American public, communities, public officials, and other stakeholders in a way that it is tailored to their needs, reaching a wide audience, and providing meaningful actions they can take to reduce risk. This is integral to most of the work done across the Agency's offices and regions and is essential to carrying out EPA's mission of protecting human health and the environment.

EPA will keep working to ensure that risk communicators at the Agency are connected to best practices from the field, high quality training opportunities, and agencywide efforts underway to improve risk communication. Further, EPA regularly faces intractable risk communication issues that often need sustained focus by highly trained staff who can apply evidence-based practices. Addressing these issues and meeting the challenges of the future requires creating sustained culture change, building agency knowledge and a robust community of practice, and developing strong relationships with the academic community and our federal, state, and tribal partners.

In FY 2025, the Agency will continue to strengthen EPA's ability to carry out effective and consistent risk communication and position the Agency to meet the risk communication challenges of the future by:

(1) Significantly expanding training across the Agency and with its partners, to create a community of practice and increase staff knowledge in a meaningful and sustainable way. This will increase the number of staff at the Agency and among partners who are using the same best practices in their risk communication efforts while at the same time building a network of staff located across all regions and offices who are well-positioned to share their risk communication expertise.

(2) Launching an internal risk communication fellowship program to increase EPA's progress on the most difficult risk communication issues. The fellowship program will be open to EPA employees and will provide 10 weeks of intensive risk communication study and training followed by 10 to 13 weeks of applying the knowledge gained to an intractable risk communication problem facing the home office or region.

(3) Developing academic partnerships to study EPA's risk communication challenges and improve the Agency's reliance on evidence-based practices. This includes increasing research partnerships to develop a research portfolio with the explicit goal of studying EPA-relevant risk communication questions, and then translating findings into usable tools, applications, and best practices for use across the Agency.

In FY 2025, the President's Task Force on Environmental Health Risks and Safety Risks will convene to report on progress across the federal government in the areas of climate change and disasters, childhood lead, asthma disparities, and exposure to toxic chemicals. The Lead Subcommittee will continue to focus on an all of government approach to reducing exposures to lead. There is an opportunity to improve the environmental education and training of healthcare providers and medical professionals in identifying and communicating the causes and impacts of childhood lead exposure in underserved communities in an effort to prevent and reduce exposures. EPA will work with healthcare providers and families to address this problem directly. To further support the Administration's Lead Exposure Reduction Initiative, and in coordination with EPA's program and regional offices, in FY 2025, the Agency will continue to lead ongoing efforts to: 1) strengthen EPA's communications with the public on the risks of lead exposure by working with external leaders in the field to build upon the way the Agency conducts its outreach; and 2) leverage EPA's existing relationship with Pediatric Environmental Health Specialty Units (PEHSUs)[80] to enhance and support training of healthcare providers in underserved communities to prevent and reduce children's exposure to lead.

There are several unique risk communication challenges regarding lead, but also unique assets for the Agency to deploy to reduce risk to the American public—especially to children. Lead exposure to children can result from multiple sources and can cause irreversible and life-long health effects. There is no level of lead exposure which is safe. This means that anything the Agency can do to reduce exposure and lower children's blood lead levels will lead to significant improvements in public health and brighter, more productive futures for America's children. The specific goals for FY 2025 include implementing coordinated federal strategies to prevent lead exposure and associated effects; disseminating information to diverse audiences, including policy makers, health care providers, the general public, and other stakeholders; and coordinating and disseminating an inventory of federal actions to reduce childhood lead exposures.

As the central mission support administrative management component of the Administrator's Office (AO), the OAES provides advice, tools, and assistance to the AO's programmatic operations across 12 offices. In FY 2025, OAES will continue to conduct the following mission

---

[80] Pediatric Environmental Health Specialty Units (https://www.pehsu.net/) provide expert information, training and consultation for health care professionals and the public on evidence-based prevention, diagnosis, management, and treatment of children's environmental health conditions. The PEHSU Program increases the ability of the general public to take simple steps to reduce harmful exposures by raising awareness among parents, school officials and community leaders.

support functions: human resources management, budget and financial management, information technology and security, outsourcing, facilities management, and Government Accountability Office/Office of the Inspector General audit management.

In FY 2025, OEX will continue to provide critical administrative support to the Administrator, Deputy Administrator, Chief of Staff, senior agency officials, and staff to comply with the statutory and regulatory requirements under the Federal Records Act, Freedom of Information Act, Plain Writing Act, Privacy Act, and related statutes and regulations. OEX will continue to manage the AO's correspondence management, records management, records digitization, Privacy Act implementation, Controlled Unclassified Information (CUI), and FOIA response activities. OEX also will continue to manage Quill, the EPA's enterprise correspondence tracking and workflow management information technology application.

OEX also will continue to process correspondence for the Administrator and Deputy Administrator; review and prepare documents for their signature; manage the Administrator's primary email account; serve as custodian of the Administrator's, Deputy Administrator's, and IO senior officials' records; oversee the records management program and CUI program for all AO staff offices; and review and issue ethics determinations for gifts received by the Administrator and Deputy Administrator. OEX also will manage the privacy program for the AO and monitor, review, and audit AO systems of records. Finally, OEX will continue to manage the AO FOIA program and respond to all requests for records held by any of the AO's five associate administrator offices, seven staff offices, and the Immediate Office of the Administrator.

In FY 2025, OPE will continue providing advice to the Administrator and senior staff on activities surrounding different stakeholder groups, including generating and distributing outreach plans for most regulatory actions. Such plans often include meeting regularly with stakeholder groups to communicate the Administration's agenda at EPA; providing advance notification communications to relevant stakeholder groups on upcoming regulatory actions; facilitating in-state visits by the Administrator and/or senior staff to collect regulatory feedback; communicating key dates to stakeholders pertaining to opportunities to comment on EPA rulemakings; and organizing conference calls on regulatory topics with impacted stakeholders.

In FY 2025, EPA requests an additional investment of approximately $6.2 million and 2.5 FTE. OPE will work directly with the regional offices to coordinate, communicate, and enhance agency public engagement initiatives [*e.g.*, Justice40; Journey to Justice and other community tours; Historically Black Colleges and Universities (HBCUs), Minority Serving Institution (MSI) engagements]. This investment will support the Administrator to ensure visibility with local stakeholders, community members and greater coordination with the Regional Administrators. OPE will continue to manage and plan the Administrator's Journey to Justice tours, highlighting longstanding environmental justice concerns in under-severed communities at the forefront of environmental burdens. OPE will continue to manage and convene at least one meeting of the HBCU/MSI Consortium and Federal Advisory Committee to help develop the next generation of environmental leaders. OPE also will explore, engage, and foster public and private partnerships with outside stakeholders to elevate the Agency and the Administrator to non-traditional stakeholders. In 2023, EPA established the National Environmental Youth Advisory Council (NEYAC) to provide independent advice and recommendations to the Administrator on how to

increase EPA's efforts to address a range of environmental issues as they relate to youth, with an emphasis on communities below 29 years of age.[81] OPE will engage the NEYAC to provide a critical perspective on how the impacts of climate change and other environmental harms affects youth communities. OPE also will work to enhance public engagement to amplify the environmental education work that's happening on the local level.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$535.0) This net change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$6,191.0 / +2.5 FTE) This program change is an increase to expand and improve the Agency's public engagement, partnership, and outreach initiatives; explore the creation of a National Environmental Youth Advisory Council; create an HBCU/MSI Consortium and Federal Advisory Committee. This change includes a realignment of $875.0 thousand and 2.0 FTE from the Environmental Education Program. This investment includes approximately $474.0 thousand for payroll.

- (+$6,129.0 / +22.5 FTE) This program change is an increase to support engagement with state and local partners, enhanced training of healthcare providers in underserved communities on the prevention, diagnosis, management, and treatment of children's exposure to lead, and increased funding to implement and strengthen the Agency's ability to carry out effective risk communication. This investment includes $4.3 million for payroll.

- (+$2,550.0 / +8.0 FTE) This program change is an increase to support evidence building activities in support of the Foundations for Evidence-Based Policymaking Act of 2018. This investment includes $1.5 million for payroll.

- (+$1,752.0 / +2.5 FTE) This program change is an increase to restore core capacity to the Executive Management and Operations Program and provide contract support for the Agency's management operations and multi-media and risk communications. This investment includes $474.0 thousand for payroll.

- (+$533.0 / +2.6 FTE) This program change increases FTE to provide executive and logistical support and advance EPA engagement with partners, specifically for the

---

[81] For additional information, please see: https://www.epa.gov/faca/national-environmental-youth-advisory-council-neyac.

municipal ombudsman and for work on water grants. This investment includes approximately $493.0 thousand for payroll.

- (+$489.0 / +2.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes approximately $474.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); and Environmental Research, Development, and Demonstration Authorization Act (ERDDAA).

**Exchange Network**
Program Area: Cross-Agency Coordination, Outreach, and Education
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$12,165* | *$14,995* | *$14,769* | *-$226* |
| Hazardous Substance Superfund | $1,018 | $1,328 | $1,328 | $0 |
| Total Budget Authority | $13,183 | $16,323 | $16,097 | -$226 |
| Total Workyears | 23.2 | 30.2 | 30.2 | 0.0 |

**Program Project Description:**

EPA's Environmental Information Exchange Network (EN) is a standards-based, secure approach for EPA and its state, tribal, and territorial partners to exchange and share environmental data over the internet. Capitalizing on advanced technology, data standards, open-source software, shared services for EPA's E-Enterprise Digital Strategy (EEDS), and reusable tools and applications, the EN offers its partners tremendous capabilities for managing and analyzing environmental data more effectively and efficiently, leading to improved decision-making.

The Central Data Exchange (CDX) is the largest component of the EN Program and serves as the point of entry on the EN for environmental data transactions with the Agency.[82] CDX provides a set of core shared services that promote a leaner and more cost-effective service framework for the Agency by avoiding the creation of duplicative applications. It enables faster and more efficient transactions for internal and external EPA clients, resulting in reduced burden.

Working in concert with CDX is EPA's System of Registries, which is a system of shared data services designed to enhance efficiency, reduce burden on the regulated community, and improve environmental outcomes, including environmental justice (EJ). EPA and EN partners routinely reference these shared data registries, from commonly regulated facilities and substances to the current list of federally recognized tribes. They identify the standard or official names for these assets, which, when integrated into EPA and partner applications, foster data consistency and data quality as well as enable data integration.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to support core functions for the EN information technology (IT) systems. The EN Program will continue to be a pivotal component of EPA's Digital Strategy that

---

[82] For more information on the Central Data Exchange, please see: https://cdx.epa.gov/.

supports business process change agencywide. Under this strategy and the 21st Century Integrated Digital Experience Act,[83] the Agency is streamlining business processes and systems to reduce reporting burden on states and regulated facilities and to improve the effectiveness and efficiency of environmental programs for EPA, states, and tribes. EPA also is responsible for managing EN technical governance groups and administering the pre- and post-award phases of the EN grants to states, tribes, and territories. These efforts support a standards-based, secure approach for EPA and its state, tribal, and territorial partners to efficiently exchange and share environmental data electronically. The Agency also administers and implements the Cross-Media Electronic Reporting Regulation (CROMERR) that removes regulatory obstacles for e-reporting to EPA programs under Title 40 of the Code of Federal Regulations (CFR).

EPA aims to reduce burden and avoid costs while improving IT. With CDX's migration to the cloud, the Agency will continue to carry out baseline support for data exchange services leveraged by states and tribal partners. This also includes providing a technology framework – shared CROMERR services – which reduces the burden on programs and external reporters by providing CROMERR compliant solutions. For example, the shared electronic identity proofing and signature services for CROMERR supports 31 partner regulatory reporting programs to date. EPA estimates that partners adopting shared CROMERR services save $120 thousand in development and at least $30 thousand in operations each year, which results in a cost avoidance of greater than $2.5 million for EN partners.

In FY 2025, EPA will continue to improve the functionality and use of the System of Registries.[84] In addition to streamlining the Registries, EPA will continue to implement a broader effort across the enterprise to engage organizations and facilitate the adoption of these data services through cloud technology and Representational State Transfer (REST or RESTful) application programming interfaces (API). Registries are shared data services in which common data are managed centrally but shared broadly. They improve data quality in EPA systems, enable integration and interoperability of data across program silos, and facilitate discovery of EPA information. An example of the Agency's effort to promote the adoption of data services is the integration of the tribal identification services (TRIBES) across EPA systems.

In FY 2025, EPA will continue implementing a solution related to shared facility identification information. Centralized facility management also is fundamental to better environmental management by bringing together EPA data across programmatic silos. Like facility data, substance information also is regulated across EPA programs, with many EPA programs relying on the Substance Registry Service (SRS) to improve data quality and reduce burden.

EPA tracks a wide range of data for each registry to measure customer usage and engagement. The Agency also tracks web service hits to measure the number of users leveraging publicly available APIs. For example, the SRS website has approximately 90 thousand pageviews per month; many of these pageviews are users visiting the SRS web area to understand regulatory information about chemicals. SRS also receives between 20 and 140 thousand web service hits per month (depending on reporting cycles), mostly by EPA systems that have incorporated the web services into their

---

[83] For more information on the 21st Century Integrated Digital Experience Act, please refer to: https://www.congress.gov/115/plaws/publ336/PLAW-115publ336.pdf.
[84] For more information, please see: https://ofmpub.epa.gov/sor_internet/registry/sysofreg/about/about.jsp.

online reporting forms. FY 2025 priorities for EPA registries include continually improving registry technologies by migrating the registries to a cloud-based environment open-source platform to make them easier to locate, access, and utilize.

In FY 2025, EPA will continue to expand the number of EPA and partner systems that integrate registry services into their online reports and systems, reducing burden and improving data quality. This includes updating EPA's dataset registry to allow EPA scientists, external partners, and others to share information and make information easier to find in the cloud.

In FY 2025, EPA will continue to work with the Department of Homeland Security's Customs and Border Protection (CBP) to maintain, utilize, and improve systems to facilitate the import and export of legitimate goods and leverage big data and artificial intelligence tools to identify and prevent or stop illegal goods from entering or leaving the United States. EPA supports over 16 data exchange types within EPA and with CBP to automate and streamline over 8 million annual import and export filings. This automation is essential for managing a significantly increasing number of imports and exports (due to e-Commerce) and allows coordinators/officers to focus on compliance monitoring and high value targeting activities for non-compliant imports and exports, and to better coordinate with CBP.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$732.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (-$958.0) This program change is a reduction to the Exchange Network to reflect the completion of a one-time investment to migrate the TRIBES, SRS, and READ applications to a cloud based open-source platform.

**Statutory Authority:**

Federal Information Security Management Act (FISMA); Clean Air Act (CAA); Clean Water Act (CWA); Toxic Substances Control Act (TSCA); Federal Insecticide Fungicide and Rodenticide Act (FIFRA); Resource Conservation and Recovery Act (RCRA); Government Performance and Results Act (GPRA); Government Management Reform Act (GMRA); Clinger-Cohen Act (CCA).

## Environmental Education

Program Area: Cross-Agency Coordination, Outreach, and Education
Goal: Take Decisive Action to Advance Environmental Justice and Civil Rights
Objective(s): Promote Environmental Justice and Civil Rights at the Federal, Tribal, State and
Local Levels

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$8,752* | *$9,500* | *$8,759* | *-$741* |
| Total Budget Authority | $8,752 | $9,500 | $8,759 | -$741 |
| Total Workyears | 8.9 | 11.2 | 9.2 | -2.0 |

**Program Project Description:**

In 1990, the National Environmental Education Act (NEEA) was established with the objective of improving the public's understanding and knowledge of the natural and built environment, enabling people to effectively solve environmental problems. NEEA states "there is growing evidence of international environmental problems, such as global warming…that pose serious threats to human health and the environment."[85] The Environmental Education Program implements environmental education (EE) programming that helps EPA address these issues from the local community to national and international levels with a focus on communities that are pollution-burdened and as well as underserved communities. Staff manage the National Environmental Education Act Federal Advisory Committee (NEEAC). Congress established the Agency's NEEAC under the NEEA, to advise the Administrator on a wide range of environmental education matters.

The Program provides management and technical support to these advisory committees. The Committee provides EPA's Administrator with independent advice on environmental issues, addresses environmental issues, like climate change, that impact frontline and underserved communities, through education, a commitment to equity, and stakeholder grants authorized by the NEEA. The Program supports the Agency's environmental and public health protection goals by empowering communities with expanded access to quality environmental and climate education, providing educational materials for teachers, hosting educational events, and engaging stakeholders through the National Environmental Education and Training Program (teacher training program), the Presidential Environmental Youth Award (PEYA) Program, and the Presidential Innovation Award for Environmental Educators (PIAEE) Program. These programs promote civic action to reduce the impacts of climate change and promote environmental and climate equity through an educational lens.

---

[85] For more information, please see: https://www.epa.gov/sites/production/files/documents/neea.pdf.

94

Each year, our Nation's youth are recognized for their outstanding dedication to environmental stewardship projects and teachers are honored for promoting environmental awareness and education. The PIAEE awards recognize outstanding kindergarten through grade 12 teachers who employ innovative approaches to environmental education and use the environment as a context to engage their students. The PEYA honors and highlights a wide variety of projects developed by K through 12th grade students, school classes and clubs, youth camps, and youth organizations to promote environmental awareness and action in their schools and communities. Students in all 50 U.S. states and territories are invited to participate in the Program.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 2/Objective 2.1, Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests approximately $8.8 million and 9.2 FTE for the Environmental Education Program. The Program will implement the teacher training program and regional grant program with a focus on fighting climate change and protecting public health through EE and improved engagement with frontline communities that are pollution-burdened as well as underserved communities.

In FY 2025, resources will:

- Support career development through education by funding innovative EE grant projects in frontline communities that can lead to inclusive, just, and pollution-free communities and an economy that supports high-quality jobs.

- Create a grant website tool for the public that provides detailed and valuable information on all EE regional grants, including information on audience, project format and duration, environmental topic, and the environmental and educational impacts achieved.

- Ensure formal and non-formal educators have the knowledge and teaching skills necessary to help advance environmental and climate literacy in America through the National Environmental Education and Training Program.

- Build strategic partnerships that include underserved and overburdened communities to increase the conversation around using EE as a tool to achieve environmental protection goals while achieving environmental justice, climate equity, and economic prosperity.

- Request that the National Environmental Education Advisory Council (NEEAC) provides a set of national recommendations on how frontline and underserved communities can use EE to build capacity to become resilient to the effects of climate change.

- Continue the long-standing partnership with NEEF (National Environmental Education Foundation) as we work collaboratively to identify opportunities to achieve environmental education goals. EPA and NEEF will have an MOU to work together on water infrastructure and safe drinking water, public health, climate change, environmental justice, and citizen and climate science. EPA and NEEF will seek to work together on additional education and public outreach efforts as appropriate.

- Utilize an information management system that will track outputs and outcomes for each grant to ensure program effectiveness, improve program efficiency, and improve overall customer service. The information tracking system also will be used for the PEYA and PIAEE Programs.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$134.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (-$875.0 / -2.0 FTE) This program change realigns resources from the Environmental Education program to the Executive Management and Operations program to support public engagement and partnership activities and proactively engage stakeholders and organizations impacted by EPA policies and regulations.

**Statutory Authority:**

National Environmental Education Act (NEEA); Clean Air Act (CAA), § 103; Clean Water Act (CWA), § 104; Solid Waste Disposal Act (SWDA), § 8001; Safe Drinking Water Act (SDWA), § 1442; Toxic Substances Control Act (TSCA), § 10; Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), § 20; and the Federal Advisory Committee Act (FACA).

## Small Business Ombudsman

Program Area: Cross-Agency Coordination, Outreach, and Education
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$1,379* | *$2,250* | *$2,242* | *-$8* |
| Total Budget Authority | $1,379 | $2,250 | $2,242 | -$8 |
| Total Workyears | 3.3 | 5.6 | 5.6 | 0.0 |

**Program Project Description:**

The Small Business Ombudsman Program includes the Asbestos and Small Business Ombudsman (ASBO),[86] housed within the Office of Small and Disadvantaged Business Utilization (OSDBU). It also includes the Small Business Advocacy Chair and other small business activities located within the Office of Policy's (OP) Office of Regulatory Policy and Management. These activities within OP collectively lead EPA's responsibilities under the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act.[87]

The ASBO Program provides a suite of resources, technical assistance, and opportunities for small business engagement, training, and advocacy for fair consideration. The ASBO Program operates through two roles: EPA's Asbestos Ombudsman and EPA's Small Business Ombudsman. The Asbestos Ombudsman role services a toll-free hotline, functioning as an informational liaison and guide in responding to asbestos-related questions and concerns from the public. The Small Business Ombudsman role provides informal guidance and support in the rulemaking process and offers environmental compliance assistance and resources for small business. The ASBO advocates for a fair process in working with small business, and in so doing, partners with a variety of internal and external stakeholders, including EPA programs and regional offices, State Small Business Environmental Assistance Programs (SBEAPs),[88] and the U.S. Small Business Administration's (SBA) Office of Advocacy, and Office of the National Ombudsman. The ASBO also engages with various small business groups and associations.

Overall, the core functions of the ASBO Program include:

- Assisting the public with hotline questions and complaints.

- Improving access to federal and state environmental information and assistance.

---

[86] For more information, please see: https://www.epa.gov/resources-small-businesses/asbestos-small-business-ombudsman.
[87] For more information, please see: https://www.epa.gov/aboutepa/about-office-policy-op#ORPM.
[88] For more information, please see: https://nationalsbeap.org/.

- Supporting EPA in better understanding small business perspectives when considering regulatory impacts or enforcement issues.

- Advocating for and facilitating informal small entity engagement activities.

- Developing recommendations or reports on EPA's asbestos and small business compliance assistance programs.

Based on the Agency's overall small business regulatory and environmental compliance assistance activities, EPA has earned a grade of "A" in the last 16 SBA Office of the National Ombudsman Annual Reports to Congress.[89]

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

Consistent with EPA's priorities for addressing climate change, equity, and Environmental Justice (EJ) in FY 2025, the ASBO will:

- Gather and manage ASBO program reporting data and activities to help guide the Agency on issues related to asbestos, small business regulatory compliance questions and adherence to the 507 Program requirements. The 1986 Asbestos Hazard Emergency Response Act (AHERA) (15 U.S.C. §2641-2656) and the 1990 Clean Air Act (CAA) Amendments' Small Business Stationary Source Technical and Environmental Compliance Assistance Program (42 U.S.C. § 7661f), provide for ASBO monitoring and reporting on the effectiveness of EPA's asbestos resources and small business environmental compliance assistance programs. Consistent with the Program's integrated strategy for carrying out those monitoring and reporting responsibilities, in FY 2023, the ASBO issued an internal EPA ASBO Program Report on Fiscal Year 2022 Public Inquires, and further posted a summary of the Report's "Quick Stats and Facts" on the ASBO website.[90] In FY 2025, the ASBO will continue to carry out these monitoring and reporting activities in accordance with the strategy, to help identify opportunities to strengthen EPA's asbestos program services and small business regulatory and compliance assistance.

- Continue to strengthen and support state small business stakeholder engagement with EPA's EJ activities through the ASBO's ongoing collaboration and cooperative assistance agreement with the Kansas State University. ASBO funds the cooperative agreement in support of the National SBEAP. SBEAPs are a key stakeholder on EJ activities as they work directly with small businesses within the EJ community and provide environmental compliance assistance to small and disadvantaged businesses within their state. In response

---

[89] For more information, please see: https://www.sba.gov/document/report--national-ombudsmans-annual-reports-congress.
[90] The "Quick Stats and Facts" posting is accessible at: https://www.epa.gov/system/files/documents/2023-06/ASBO%20Program%20FY22%20Stats%20and%20Facts%20508_0.pdf.

to Executive Order (EO) 13985,[91] the SBEAPs created an EJ Subcommittee to provide targeted support to small and disadvantaged businesses located in underserved communities and are in the process of finalizing EJ communication materials to support small business engagement in EJ communities. In FY 2025, the ASBO will continue to collaborate and support the SBEAP EJ Subcommittee efforts and engagement throughout the Regions. Additionally, as part of the ASBO's cooperative agreement in support of the National SBEAP, the ASBO will continue to support, enhance, and promote the SBEAP foreign language webpage, which is a key EJ resource for assisting the underserved, non-English speaking business community on environmental compliance.

- Continue to strengthen small business access to and awareness of regulatory and environmental compliance resources and updates. In FY 2025, the ASBO will leverage the Program's monthly *SmallBiz@EPA* newsletter, using its new subscription management and data analytics tools obtained in FY 2023, to help expand small business education and familiarity with regulatory and environmental topics of interest to the small business community.

- Foster stronger internal communication and collaboration involving EPA rule writers, especially EPA's Office of Air and Radiation, which has specific implementation responsibilities for Tackling the Climate Crisis at Home and Abroad, under EO 14008.[92] In FY 2025, ASBO will continue to develop resources to guide EPA rule writers in conducting early and informal small business stakeholder engagement activities. This will allow the Agency to better understand the most up-to-date industry practices and potential business impacts for better informed decision making and consideration of available options.

- Under OP's Small Business Advocacy Chair, work with the SBA Office of Advocacy and OMB to convene and manage Small Business Advocacy Review Panels. These Panels develop recommendations to reduce the cost of EPA rules that may have a significant impact on a substantial number of small entities.

- Continue to provide analytical support for assessing the impacts of EPA rules on small entities, which is critical in informing underserved, non-English speaking business community on environmental compliance.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

---

[91] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[92] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$8.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. The increase in fixed and other costs is offset by a slight reduction to the Program. The Agency will prioritize activities to continue to maintain compliance with its statutory obligations under the Small Business Act.

**Statutory Authority:**

Asbestos Hazard Emergency Response Act (AHERA), 1986 (adding Title II to the Toxic Substances Control Act (TSCA)) (15 U.S.C. §2641-2656); Clean Air Act, Title 5, Section 507; Small Business Stationary Source Technical and Environmental Compliance Assistance Program (42 U.S.C. §7661f); Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. 104-121, as amended by Pub. L. 110-28; Small Business Paperwork Relief Act, 44 U.S.C. 35; 42 U.S.C. § 7661f; and 15 U.S.C. §§ 2641-2656.

## Small Minority Business Assistance

Program Area: Cross-Agency Coordination, Outreach, and Education
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$2,225* | *$2,056* | *$2,018* | *-$38* |
| Total Budget Authority | $2,225 | $2,056 | $2,018 | -$38 |
| Total Workyears | 8.0 | 7.6 | 7.6 | 0.0 |

**Program Project Description:**

EPA's Office of Small and Disadvantaged Business Utilization (OSDBU) manages the Agency's Small Business Contracting Program mandated under Section 15(k) of the Small Business Act, 15 U.S.C. § 644(k). As prescribed under that section, the Program provides expertise in maximizing small business prime and subcontracting opportunities to help promote procurement equity and expand EPA's competitive supplier base in carrying out the Agency's mission. Under the Program, OSDBU provides EPA's contracting community statutorily required counseling and training on all aspects of governing small business requirements throughout the federal acquisition cycle. It also engages in statutorily mandated advocacy on behalf of the various categories of small businesses, including disadvantaged businesses; small businesses located in Historically Underutilized Business Zones (HUBZones); service-disabled veteran-owned small businesses (SDVOSBs); and women-owned small businesses (WOSBs). In accordance with Section 15(k), OSDBU further hosts or participates in an average of one small business outreach and training conference each month, providing needed technical assistance to hundreds of small and socioeconomic businesses across the country.

In implementing the statutory responsibilities required under Section 15(k), OSDBU reviews acquisition strategies to maximize small business prime and subcontracting opportunities; provides expertise in conducting market research for EPA acquisitions; performs contract bundling reviews to avoid unnecessary or unjustified limitations on small business utilization; reviews purchase card transactions within the statutory threshold; and evaluates large prime contractor subcontracting plans. In addition, OSDBU assists in the coordination of unsolicited proposals for agency acquisitions and in the resolution of small business payment issues under EPA acquisitions. It further provides a broad range of training, outreach, and technical assistance to new and prospective small business contract awardees.

Historically, data reported in the Federal Procurement Data Systems (FPDS) indicates that EPA awards an average of 40 percent of total acquisition dollars to small businesses annually – far exceeding the government-wide goal of 23 percent. EPA most recently earned a grade of "A" on the FY 2022 Small Business Procurement Scorecard.[93] This represents the 14th consecutive year

---

[93] For more information on the FY 2022 Small Business Procurement Scorecard, please see https://www.sba.gov/agency-scorecards/scorecard.html?agency=GW&year=2022.

that EPA has earned at least an "A" on the Procurement Scorecard. In addition, based on available provisional data, in FY 2023 EPA awarded a record level of contracting dollars in four out of the five small and socioeconomic business categories, including a record of $1 million in total small business contract awards, amounting to 45.3 percent of the Agency's total contract spend.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

Consistent with EPA's priorities to advance Environmental Justice (EJ), further procurement equity to support underserved businesses and communities, and expand the Nation's supplier base, in FY 2025, the Program will:

- Leverage technology to foster more efficient and effective vendor engagement as a pivotal component in expanding small and socioeconomic business participation in EPA acquisitions. Industry has specifically indicated in various EPA listening sessions and reverse industry day events that ensuring small business access to federal procurement opportunities and the corresponding responsible officials is indispensable to furthering procurement equity. In FY 2025, OSDBU will capitalize on a new system, slated for deployment in FY 2024, to simplify matching small and socioeconomic vendors with EPA contracting opportunities and responsible EPA officials. Utilizing matchmaking technology will take advantage of available technology to ensure small and disadvantaged businesses have meaningful access and opportunities to market their solutions, experience, and capabilities to EPA officials. This will help streamline acquisition planning and market research, resulting in reductions in the overall procurement action lead time.

- Continue engagement in more dynamic acquisition planning and market research by strengthening OSDBU's role as an essential member of the Agency's integrated acquisition team. In FY 2025, OSDBU will continue to strengthen agencywide compliance with internal vendor engagement metrics to expand EPA's market intelligence and familiarity with socioeconomic small business sources available in the federal marketplace. OSDBU will assume a leading role in providing small business expertise and counsel in tailoring and coordinating innovative vendor engagement strategies to maximize meaningful small and socioeconomic business procurement opportunities.

- Assist in the implementation and training on a new policy to expand large business utilization of small and socioeconomic businesses in the performance of prime contracts. The utilization strategy is intended to incentivize prime contractors to maximize small business contracting teaming arrangements consistent with the efficient performance of prime contracts. In FY 2024, OSDBU in partnership with EPA's Office of Acquisition Solutions (OAS) began to develop a formal policy to mandate application of the strategy to defined EPA acquisitions. In FY 2025, OSDBU will continue this partnership to ensure effective policy implementation and training. Significantly, implementing the mandatory strategy will encourage large business joint venture, mentor-protégé, and subcontracting relationships with small businesses. This will help build small and socioeconomic business

102

capabilities, capacity, and experience, and thereby diversify and expand the federal supplier base in accordance with governmentwide procurement equity directives[94] on expanding procurement equity.

- Conduct robust EPA in-reach activities to educate the Agency's acquisition workforce on structuring acquisitions to expand small business contracting opportunities and reduce barriers to procurement equity. OSDBU also will continue collaboration with OAS to provide bootcamp training to enhance small business proficiency in competing for EPA contract awards and in complying with contract administration requirements.

**Performance Measure Targets:**

**(PM SB1) Percentage of EPA contract spending awarded to HUBZone businesses.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 3.0 | 3.2 | 3.4 | 3.7 | Percent |
| Actual | 2.4 | 2.2 | 2.0 | 4.9 | 3.1 | 3.1 |  |  | |
| Numerator | 37.5 | 35.0 | 30.3 | 75.6 | 59.6 | 69.3 |  |  | Millions of |
| Denominator | 1,500 | 1,500 | 1,500 | 1,500 | 1,900 | 2,265 |  |  | Dollars |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$38.0) This change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefits costs.

**Statutory Authority:**

Small Business Act, 15 U.S.C § 644(k).

---

[94] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/ and https://www.whitehouse.gov/wp-content/uploads/2021/12/M-22-03.pdf.

## State and Local Prevention and Preparedness

Program Area: Cross-Agency Coordination, Outreach, and Education
Goal: Safeguard and Revitalize Communities
Objective(s): Prepare for and Respond to Environmental Emergencies

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$14,124* | *$15,446* | *$24,106* | *$8,660* |
| Total Budget Authority | $14,124 | $15,446 | $24,106 | $8,660 |
| Total Workyears | 55.1 | 67.1 | 93.1 | 26.0 |

**Program Project Description:**

The State and Local Prevention and Preparedness Program establishes a structure composed of federal, state, local, and tribal partners who work together with industry to protect emergency responders, local communities, facility workers, the environment, and property from chemical accident risks through accident prevention and emergency response programs, community and facility engagement, and improved safety systems. This framework provides the foundation for community and facility chemical hazard response planning and reduction of risk posed by chemical facilities.

Under Section 112(r) of the 1990 Clean Air Act (CAA) Amendments, chemical facilities that store more than a threshold quantity of listed extremely hazardous substances are required to implement a Risk Management Plan (RMP) program. These facilities, known as RMP facilities, take preventive measures, report data, mitigate and/or respond to chemical releases, and work with communities, first responders, and planning groups to increase understanding of risks.[95]

The Emergency Planning and Community Right-to-Know Act (EPCRA) of 1986 was enacted to help communities plan for chemical emergencies and to inform the public about chemicals in their community. Under EPCRA, facilities are required to report about the chemicals they produce, use, and store to state and local governments. States, tribes, and local governments use this information to prepare communities for potential chemical releases from these facilities through the development of local emergency response plans.[96]

Under Section 311(j)(5) of the Clean Water Act (CWA), EPA is required to issue and implement regulations requiring certain facilities to develop plans to respond to worst case discharges of hazardous substances that could threaten navigable waters.

---

[95] For additional information, please refer to: https://www.epa.gov/rmp.
[96] For additional information, please refer to: https://www.epa.gov/epcra.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.3, Prepare for and Respond to Environmental Emergencies in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional investment of approximately $8.7 million for the State and Local Prevention and Preparedness Program. The Program will perform the following activities:

- Support inspection of RMP and EPCRA facilities to ensure compliance with accident prevention and preparedness regulations, and work with chemical facilities to reduce chemical risks and improve safety. There are approximately 11,600 chemical facilities that are subject to the RMP regulations. Of these, approximately 1,800 facilities have been designated as high-risk based upon their accident history, quantity of on-site dangerous chemicals stored, and proximity to large residential populations.[97] EPA prioritizes inspections at high-risk facilities.

- The Program aims to conduct approximately 300 inspections a year, or three percent of all RMP facilities. EPA will focus on high-risk facilities located in communities with environmental justice concerns and communities with increased climate-related risks (*e.g.*, extreme weather, flooding, wildfires, etc.). Additional resources requested in this program will help enable the Program to meet the target number of 300 inspections and support the Agency's Chemical Accident Risk Reduction National Enforcement and Compliance Initiative (NECI).

- Additional resources also will address outstanding recommendations from the US Chemical Safety and Hazard Investigation Board, such as developing an inspection database to track common deficiencies found during inspections, including any related to natural hazards and climate change, and use that information to target compliance assistance.

- Protect fenceline communities through regulatory updates and outreach, compliance assistance, and inspections at regulated facilities, thereby reducing risks to human health and the environment by decreasing the likelihood and impacts of chemical accidents.

- Provide basic and advanced RMP and EPCRA inspector training for federal and state inspectors.

- Maintain and upgrade the RMP national database, which is the Nation's premier source of information on chemical process risks and contains hazard information on all RMP facilities. Industry electronically submits updated RMPs to this secure database. Using funding requested in FY 2025, EPA will continue improvements to the RMP national database to accommodate new risk management plan submission elements resulting from

---

[97] Located in EPA's RMP database.

recent regulatory changes and providing increased public access to non-sensitive portions of the RMP database and subsequent analytics.

- Develop updates to the Computer-Aided Management of Emergency Operations (CAMEO) software suite (*i.e.,* the CAMEO Chemicals, CAMEO*fm,* Areal Locations of Hazardous Atmospheres, and Mapping Application for Response, Planning, and Local Operational Tasks applications), which provides free and publicly available information for firefighting, first aid, emergency planning, and spill response activities.

- Implement the changes made in the RMP Safer Communities by Chemical Accident Prevention final rule, which the Agency expects to complete before Spring 2024. This rule will initiate the updating of EPA interpretive guidance and training of EPA, state, and local inspectors on new and updated regulatory provisions to address Administration priorities on environmental justice and climate change.

- EPA is under a consent decree to complete a final rulemaking under CWA section 311(j)(5) by September 2024. The final rule will establish a new regulatory program requiring certain facilities to develop plans for responding to a worst-case discharge, or to a substantial threat of such a discharge, of CWA-listed hazardous substances. EPA requests $300 thousand and 2.0 FTE in FY 2025 to begin implementation efforts for this new regulatory program, as no current resources are associated with this effort. These additional funds and staff will be used to develop implementation guidance and training and outreach materials and begin training regional staff on conducting inspections and exercises for the new regulatory provisions.

- Conduct outreach to regulated industry concerning changes or updates to RMP and EPCRA regulations and interpretive guidance.

- Coordinate and collaborate with state, tribal, and local response entities on emergency response plans and procedures to ensure cohesive and effective responses to chemical releases.

**Performance Measure Targets:**

Work under this program directly supports performance results in the Superfund: EPA Emergency Preparedness program under the Superfund appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$661.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$7,499.0 / +26.0 FTE) This program change is an increase to support a multi-pronged approach to protect fenceline communities at risk from nearby chemical facilities, including providing increased outreach and inspections at regulated facilities to ensure facilities have measures in place to prevent chemical accidents. This investment includes $4.6 million for payroll.

- (+$500.0) This program increase is to upgrade and support operations and maintenance of the existing RMP database.

**Statutory Authority:**

The Emergency Planning and Community Right-to-Know Act (EPCRA); the Clean Air Act (CAA) § 112(r); Clean Water Act (CWA) § 311(j)(5).

**TRI / Right to Know**

Program Area: Cross-Agency Coordination, Outreach, and Education
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Promote Pollution Prevention

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$11,987* | *$15,052* | *$14,123* | *-$929* |
| Total Budget Authority | $11,987 | $15,052 | $14,123 | -$929 |
| Total Workyears | 36.9 | 37.0 | 37.0 | 0.0 |

**Program Project Description:**

EPA's success in carrying out its mission to protect human health and the environment depends on collecting and making available timely, accurate, and relevant information to communities, non-governmental organizations, industry, academia, and government agencies at the local, state, tribal, federal, and international levels. EPA's Toxics Release Inventory (TRI) Program[98] supports the Agency's mission by annually collecting and publishing in a publicly accessible form: release, other waste management (*e.g.,* recycling), and pollution prevention (P2) data on over 800 TRI-listed chemicals and chemical categories that include almost 200 per- and polyfluoroalkyl substances (PFAS).[99] Approximately 21,000 industrial and federal facilities report to TRI annually.

EPA's TRI Program is a premiere source of cross-media toxic chemical information for stakeholders. Using technological advances, the TRI Program has developed several analytical tools that provide the public with easy access, mapping, and analysis of information on TRI chemicals released or otherwise managed as waste at facilities in communities across the United States and its territories. Some of these tools incorporate demographic indicators such as low income, people of color, unemployment, education level, linguistically isolated households, and young and elderly populations, as well as tribal land and risk indicators.

The TRI Program collaborates with other EPA programs on data analyses to describe relevant trends in releases, recycling, treatment, energy recovery, and implementation of P2 practices with respect to toxic chemicals and to support innovative approaches by industry and other partners to reduce pollution. As a robust, community-focused, annual, cross-media dataset on toxic chemical information, the TRI lends itself to comparative analyses with other program-specific data managed by the Agency, providing insights that may not be apparent when viewing the datasets independently. Such insights are especially valuable for 1) identifying opportunities based on TRI-reported, location-specific release trends to reduce toxic chemical releases in disadvantaged

[98] For additional information, please visit: http://www.epa.gov/tri/.
[99] Many per- and polyfluoroalkyl substances (PFAS) were added to the TRI chemical list as a component of the National Defense Authorization Act for Fiscal Year 2020 (NDAA) when the Act was signed into law on December 20, 2019. The first year of TRI reporting these PFAS was calendar year 2020.

communities in accordance with the Administration's environmental justice (EJ) priorities, and 2) promoting TRI-reported pollution prevention (P2) practices that reduce the release of toxic chemicals and/or emissions of greenhouse gases (GHGs).

The TRI Program serves as a central component of EPA's strategy to increase access to environmental pollution information and enable communities, scientists, policymakers, and other stakeholders to apply the information in their decisions and engagements to address impacts and deter adverse burdens, particularly to low-income and disadvantaged communities.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.2, Promote Pollution Prevention in the *FY 2022 – 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to build upon the regulatory foundation of TRI to ensure that communities have access to timely and meaningful data on toxic chemical releases and other waste management and pollution prevention activities at facilities. As part of this effort, the TRI Program will continue to update toxic chemical reporting requirements as appropriate, pursue additional chemical listings, expand the scope of industry coverage (as applicable), respond to petitions, improve the reporting experience, take steps to further optimize the quality of TRI data, explore enhanced access and analytical capability with respect to this valuable information, identify opportunities to reduce toxic chemical releases, and share and promote pollution prevention approaches with industry.

This work supports the Administration's EJ priorities as the TRI Program will play an important role in conducting analyses to support EPA's goals for disadvantaged communities with EJ concerns. Additionally, the Program may conduct analyses in support of the Administration's climate priorities such as review of TRI-reported P2 practices implemented to reduce or prevent releases, waste management of TRI chemicals and chemicals identified by EPA as greenhouse gases.

EPA also will continue to provide its online reporting application, the *TRI-MEweb (TRI Made Easy web)* reporting tool, to assist reporting facilities with electronic preparation and submission of TRI reports through EPA's Central Data Exchange (CDX),[100] which manages TRI access and authentication services and provides identity proofing. *TRI-MEweb* has built-in functionality to help prevent facilities from making reporting errors. In addition, the TRI data collected by EPA are shared with states, tribes, and territories that are partners of the TRI Data Exchange (TDX).[101] EPA will continue to maintain *TRI-MEweb* and the TDX throughout FY 2025. The Agency also will continue to support the TRI Processing System (TRIPS) database, which is the repository for TRI data.

In FY 2025, as a key element of its data quality assurance strategy, the Program will conduct at least 650 data quality checks to help optimize the accuracy and completeness of the reported data and thereby improve the Program's analyses and the utility of the data to the public. EPA also will

---

[100] To access the CDX, please visit: https://cdx.epa.gov/.
[101] For additional information, please visit: https://www.epa.gov/toxics-release-inventory-tri-program/tri-data-exchange.

continue to improve its systems, processes, and products based on feedback from users (*i.e.*, communities; academia; industry; and state, tribal and local governments). Additionally, EPA will explore opportunities to streamline the process it uses to determine whether chemicals should be added to the TRI chemical list, to enhance efficiencies in the TRI Program.

The Program also will continue to publish English and Spanish versions of the annual TRI National Analysis,[102] which provides, among other things, up-to-date trends in releases and other waste management practices of toxic chemicals and highlights innovative approaches by industry to reduce pollution. The Analysis will include industry sector profiles, parent company analyses, and TRI information reported from facilities in specific urban communities, watersheds, and tribal lands. The TRI Program also will continue to make the preliminary data available to the public shortly after the reporting deadline as downloadable data files and through online analytical tools such as Envirofacts.[103] The Program will continue to provide support to EPA's Enforcement and Compliance Assurance programs by supplying facility target lists developed through the comparison of TRI reporting with facility reporting to other EPA programs (*e.g.,* air permits required by the Clean Air Act). The TRI Program will continue to foster discussions and collaborations in analyzing and using its data with stakeholders such as industry, government, academia, non-governmental organizations, and the public. Engagement will include organizing targeted webinars and, if resources permit, hosting an in-person TRI National Conference.

Section 7321 of the National Defense Authorization Act (NDAA) of 2020 requires EPA to assess certain PFAS to determine whether they meet Emergency Planning and Community Right-to-Know Act (EPCRA) Section 313 chemical listing criteria. The NDAA automatically added seven additional PFAS to the TRI list, effective January 1, 2024. EPA expects similar automatic additions of PFAS to the TRI list over calendar year 2024, which will be implemented in FY 2025. Also in FY 2024, EPA finalized a rule that designates NDAA-added PFAS to the TRI list of chemicals of special concern; among other reporting changes, this eliminates the use of the de minimis exemption as well as the option for facilities to use the Form A certification statement. Additionally, in FY 2025, EPA expects to finalize a rule to list additional PFAS to TRI based on their hazard characteristics, pursuant to section 7321 of the FY 2020 NDAA. EPA will publish the proposed rule in FY 2024 and expects to respond to comments and promulgate the final rule in FY 2025.

Further, the TRI Program's information, data, and analyses will support the Toxic Substances Control Act (TSCA) Program, helping to identify conditions of use and to evaluate and estimate occupational, general population, and potentially exposed and susceptible subpopulation exposures for those chemicals undergoing risk evaluation and that are included on the TRI chemical list. This work will assist agency chemical programs in their prioritization work, from the identification of candidate chemicals for future risk evaluations to the support of other chemical assessments across program and regional offices, advancing the work of chemical safety agencywide.

The TRI Program will additionally pursue chemical listings, including TSCA Work Plan chemicals and other substances of interest to the Agency that are not included on the TRI chemical list, as

---

[102] To access the *TRI National Analysis*, please visit: https://www.epa.gov/trinationalanalysis. EPA publishes each National Analysis approximately six months after that year's data are reported.

[103] *EnviroFacts* may be accessed at: https://enviro.epa.gov/.

well as respond to TRI chemical listing petitions. Additional chemicals or sectors may be assessed for TRI listing suitability and associated listing actions, and as required by EPCRA, the Agency will respond to EPCRA chemical petitions regarding TRI within 180 days after receipt.[104] The quantity and complexity of petitions are unknown until submitted to EPA. EPA will continue to respond to any TRI chemical petitions received during FY 2025.

Because electronic systems that collect and disseminate TRI data largely have been developed, FY 2025 work will focus on the operations and maintenance of TRI-MEweb, TRIPS, and processes that contribute to quality control in the development of the annual TRI National Analysis. By leveraging agency cloud services, the TRI systems will improve system performance, reliability, efficiencies, portability, and administrative services (security, upgrades, patches, etc.). This also will improve integration/consistency with other cloud-based systems and applications and will provide quicker data processing. Moreover, this will enhance the capabilities of EPA's public-facing TRI analytical tools.

In FY 2025 the TRI Program will identify facilities and sectors that released TRI-listed substances proximal to disadvantaged communities (using functionalities within EPA's analytical tools, such as TRI Toxics Tracker and EJScreen). The Program also will develop maps and other products to help facilitate exploration and understanding of potential impacts from chemical releases to surrounding communities, including those that might be more susceptible to climate change impacts (*i.e.,* sea level rise and facilities located along the coasts of major bodies of water).

Additionally, TRI reporting includes information on institutional/firm environmental stewardship, pollution prevention (P2), and other sustainability practices and activities (*e.g.,* voluntary climate mitigation-, adaptation- or resilience-oriented work) undertaken by facilities during the reporting year. TRI's P2 reporting data[105] include thousands of instances of source reduction implementation and other sustainability activities by facilities, which often reflect economic benefits coupled with improved environmental performance. TRI's P2 data tools have a wide range of capabilities to help identify and amplify improvement to environmental practices, and the Program will continue to conduct analyses of these practices and to develop profiles of these environmental improvements, which can be useful for P2 practitioners including those seeking to advance sustainability and strengthen the resilience of facilities near disadvantaged communities with EJ concerns. The Program also will continue to support the Agency's P2 Program, and other Agency source reduction and sustainability programs, specifically efforts to advance P2 best practices among national emphasis areas, including tools to advance priorities such as the P2-EJ Facility Mapping Tool.[106]

---

[104] Additional information on current petitions may be found at: https://www.epa.gov/toxics-release-inventory-tri-program/toxics-release-inventory-laws-and-regulatory-activities.
[105] For additional information, please visit: https://www.epa.gov/tri/p2.
[106] To access the P2 EJ Facility Mapping Tool, please visit https://www.epa.gov/p2/p2-ej-facility-mapping-tool.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$316.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (-$1,245.0) This program change is a decrease in contract resources to support IT analytical tools.

**Statutory Authority**:

Emergency Planning and Community Right-to-Know Act (EPCRA) § 313; Pollution Prevention Act of 1990 (PPA) § 6607.

## Tribal - Capacity Building

Program Area: Cross-Agency Coordination, Outreach, and Education
Goal: Take Decisive Action to Advance Environmental Justice and Civil Rights
Objective(s): Promote Environmental Justice and Civil Rights at the Federal, Tribal, State and Local Levels

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$12,619* | *$14,715* | *$35,088* | *$20,373* |
| Total Budget Authority | $12,619 | $14,715 | $35,088 | $20,373 |
| Total Workyears | 70.4 | 78.6 | 166.9 | 88.3 |

**Program Project Description:**

EPA is responsible for protecting human health and the environment under federal environmental statutes and the Tribal Capacity Building Program serves a critical role in advancing this mission working with tribal communities. Under the Agency's 1984 Indian Policy, [107] EPA works with federally recognized tribes on a government-to-government basis, in recognition of the federal government's trust responsibility to tribes, to implement federal environmental programs in Indian Country.

To do this, EPA will:

- Use key environmental justice principles, such as equity for underserved communities, strong, meaningful tribal engagement, and fair treatment as it prioritizes implementation of EPA directly implemented programs, and for other activities;
- Fully consider ways in which program funding can best be used to address climate change concerns to build climate resiliency for federally recognized tribes; and,
- Work to enhance the consideration and integration of tribal treaty rights and reserved rights into EPA decision-making and regulatory development.

This program also supports the Categorical Grant: Tribal General Assistance Grants Program.

EPA's American Indian Environmental Office leads the agencywide effort to ensure environmental protection in Indian Country.[108]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 2/Objective 2.1, Promote Environmental Justice and Civil Rights at the Federal, Tribal, State, and Local Levels in the *FY 2022-2026 EPA Strategic*

---

[107] EPA Policy for the Administration of Environmental Programs on Indian Reservations, available at https://www.epa.gov/tribal/epa-policy-administration-environmental-programs-indian-reservations-1984-indian-policy.
[108] Please see http://www.epa.gov/tribal for more information.

*Plan.* To support this work, EPA is requesting $18.5 million in additional resources and an increase of 87.3 FTEs to focus on advancing environmental justice in Indian Country by ensuring full and robust implementation of the laws that EPA administers in all areas where EPA has the authority and responsibility to ensure protections while simultaneously honoring the federal trust responsibility to the hundreds of federally recognized tribes EPA works with throughout the United States in FY 2025.

Overall, the Agency continues to make steady progress toward strengthening human health and environmental protection in Indian Country. In FY 2025, EPA will further the following priorities:

- Strengthen tribal partnerships and engagements, including through EPA's revised Tribal Consultation Policy and tribal engagement strategies;
- Build tribal capacity to administer and meaningfully participate in environmental programs;
- Directly implement programs in Indian Country for equitable environmental protection, especially for underserved tribal communities; and,
- Enhance the protection of tribal treaty rights in EPA activities through the revised Tribal Treaty Rights Guidance.

The strategic investment will directly result in the following enhancements and deliverables:

- Improve public health by reducing disparities in compliance rates between Indian Country and the national average through greater Office of International and Tribal Affairs support and leadership to EPA programs and regions for planning and measuring EPA direct implementation actions in Indian Country.
- Continue the General Assistance Program (GAP) oversight and evaluation process to ensure GAP funds are being efficiently distributed and used.
- Continue national coordination with intertribal consortia for technical assistance and GAP planning.
- Provide support for EPA Direct Implementation Tribal Cooperative Agreement (DITCA) funding to Tribes for direct implementation activities that are excluded or restricted from GAP.
- Fully implement the revised EPA Tribal Consultation Policy and Implementation Guidance to improve consultation practices in conformance with Executive Order 13175 on Tribal Consultation and train EPA staff. Review and improve access to and quality of tribal data and information held in EPA information management systems to enable informed management and budget decisions on tribal matters.
- Provide technical assistance for tribes to support delegation of federal authority to the tribal government that allows tribes to implement EPA-overseen programs.
- Improve the availability of EPA regulatory tribal information available to tribal members and the public on EPA's data systems through technical changes to existing EPA data systems to allow improvements to a registry of EPA regulated facilities and entities in Indian Country that is publicly available.
- Improve and disseminate best practices for engagement of communities by tribal governments with delegated federal authority.
- Reduce the ratio of grants per project officer for tribal GAP grants.

- Support tribes and EPA regions in negotiating EPA-Tribal Environmental Plans (ETEPs) and all aspects of the National Environmental Performance Partnership System (NEPPS), including Performance Partnership Grants (PPGs).
- Provide greater regional liaison work to strengthen partnerships with tribes with "more time per tribe" for GAP technical assistance.
- Provide greater and earlier meaningful engagements with tribes on actions that require consultation.
- Improve efficiency and use of the EPA GAP grant performance management system to measure, evaluate, and improve how well GAP is meeting its statutory purposes and establish benefits for tribes and EPA.
- Work as national program coordinator and connector for regional Environmental Justice Thriving Communities Navigators.
- Work as the liaison to the Office of Policy's Climate Adaptation Program to strengthen regional liaison work to implement tribal-related climate and treaty right priorities in the EPA Strategic Plan and Climate Adaptation Implementation Plans including consideration of a whole government approach to implement Tribal Climate Adaptation Implementation Plans.

**Tribal Consultation:** EPA revised the *EPA Policy on Consultation and Coordination with Indian Tribes* (Consultation Policy) [109] in 2023. The Consultation Policy builds on the EPA Indian Policy and establishes clear agency standards for a consultation process promoting consistency and coordination. From FY 2011 through FY 2025, EPA expects to have completed over 1,270 tribal consultations, including an anticipated 125 tribal consultations in FY 2025. EPA will continue to support the Agency's web-based Tribal Consultation Opportunities Tracking System (TCOTS), a publicly accessible database used to communicate upcoming and current EPA consultation opportunities to tribal governments. EPA's work increases access to public benefit programs and advances environmental justice through simplified access to TCOTS information. The system provides a management, oversight, and reporting structure that helps ensure accountability and transparency.

**Capacity Building:** EPA will continue to support mechanisms for tribes to pursue developing and implementing federal environmental programs, including the "treatment in a manner similar to a state" (TAS) process and the use of the Direct Implementation Tribal Cooperative Agreement (DITCA) authority. The Agency will continue to provide technical and financial assistance to tribal governments to build their capacity to meaningfully participate and engage in environmental protection activities. At the beginning of FY 2024, EPA had approved 107 TAS regulatory program delegations to tribes, including 21 approvals for compliance and enforcement authority. EPA had 14 DITCAs with tribes in place at the beginning of FY 2024.

**Indian Environmental General Assistance Program Capacity Building Support**: GAP grants to tribal governments help build the basic components of a tribal environmental program. The Agency manages GAP grants according to its Indian Environmental GAP Guidance on Financial Assistance Agreements. [110] In FY 2025, EPA will continue to administer GAP financial assistance to build tribal capacity and address environmental issues on tribal lands under new GAP guidance

---

[109] Please refer to: https://www.epa.gov/tribal/consultation-tribes.
[110] Please refer to https://www.epa.gov/tribal/gap-guidance-financial-assistance-agreements for further information.

and training. EPA's work in FY 2025 also will continue to enhance EPA-tribal partnerships through development and implementation of ETEPs with a continued focus on tracking and reporting measurable outcomes and results of GAP-funded activities. GAP funding also continues to support EPA PPG goals. EPA will strive to incorporate environmental justice and climate change considerations in these activities.

**GAP Performance Measurement**: EPA will use, and adjust as needed, the performance management application to align with the 2022 GAP Guidance and begin compiling and analyzing data. The information technology-based performance application will provide a data-driven basis for supporting funding decisions, funding priorities, and contribute to program accountability. Increased GAP performance will complement tribal capacity in media programs including efforts for CWA and SDWA SRF tribal set-asides.

**Direct Implementation:** EPA will continue to provide federal environmental program protections in Indian Country by directly implementing programs. In FY 2025, EPA will continue to evaluate its direct implementation responsibilities and activities on a program-by-program basis in Indian Country and make the data and information it relies upon available through EPA's data and information applications.

**Performance Measure Targets:**

**(PM E21) Number of significant actions taken by EPA programs with direct implementation authority that will result in measurable improvements in Indian country.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | No Target Established | 25 | 20 | 15 | Significant Actions |
| **Actual** |  |  |  |  | 25 | 25 |  |  | |

**(PM EC41) Percentage of EPA Tribal consultations that may affect Tribal treaty rights that consider those rights as part of the consultation.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 20 | 25 | 80 | 100 | Percent |
| **Actual** |  |  |  |  | 100 | 100 |  |  | |
| **Numerator** |  |  |  |  | 19 | 10 |  |  | Tribal Consultations |
| **Denominator** |  |  |  |  | 19 | 10 |  |  | |

**FY 2025 Change from FY 2023 Annualized CR Budget (Dollars in Thousands):**

- (+$1,715.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$183.0 / +1.0 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements.

- (+$2,524.0 / +12.0 FTE) This program change provides initial FTE and associated resources to stand-up a national direct implementation program specifically to work with tribes, tribal members, and others residing in Indian Country in carrying out EPA responsibilities for environmental and human health programs under EPA statutes in Indian Country. EPA's goal is to ensure that environmental programs implemented inside Indian Country are as robust and protective as those same programs implemented outside of Indian Country. This includes $2.38 million in associated payroll.

- (+$15,951.0 / +75.3 FTE) This program change increases FTE and resources to advance equitable implementation of EPA authorities and directives in Indian Country. This increase will allow the Agency to work effectively with tribal governments and communities, administer tribal grants and critical technical assistance, and fulfill the federal trust responsibilities that align with the environmental statutes. Support will be provided to priority commitments made in EPA and Tribal Climate Adaptation Implementation Plans and allow additional incorporation of Indigenous Knowledge into climate change efforts. This includes $13.81 million in associated payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

**Enforcement**

# Civil Enforcement

Program Area: Enforcement
Goal: Enforce Environmental Laws and Ensure Compliance
Objective(s): Hold Environmental Violators and Responsible Parties Accountable

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$177,860* | *$205,942* | *$256,252* | *$50,310* |
| Leaking Underground Storage Tanks | $594 | $661 | $690 | $29 |
| Inland Oil Spill Programs | $2,580 | $2,565 | $2,699 | $134 |
| Hazardous Substance Superfund | $15 | $0 | $0 | $0 |
| Total Budget Authority | $181,048 | $209,168 | $259,641 | $50,473 |
| Total Workyears | 904.4 | 998.1 | 1,096.7 | 98.6 |

**Program Project Description:**

The goal of EPA's Civil Enforcement Program is to protect human health and the environment by ensuring compliance with the Nation's environmental laws and regulations. The Civil Enforcement Program works in partnership with its federal, state, local, tribal, and territorial regulatory partners to encourage compliance, compel regulated entities to correct and/or mitigate violations, mitigate past harm, and assess appropriate penalties for violations, including removing any economic benefit that a violator gained from noncompliance.

The Civil Enforcement Program works closely with the U.S. Department of Justice (DOJ), state and local governments, tribal governments, territories, and other federal agencies to ensure consistent and fair enforcement of all major environmental statutes and regulations. Millions of public, federal, and private regulated entities are subject to one or more of these statutory requirements. The Civil Enforcement Program develops, litigates, and settles administrative and civil judicial cases against violators of environmental laws. The Agency's National Enforcement Investigations Center (NEIC) provides field investigation, laboratory analysis, toxicology, chemistry, engineering, and regulatory support to the Civil Enforcement Program. In FY 2023, because of EPA civil enforcement actions, over 73 million pounds of air, water, and toxic pollutants and over 1.1 billion pounds of waste were treated, minimized, or properly disposed.[111]

EPA is responsible for direct implementation of programs that are not delegable or where a state or tribe has not sought or obtained the authority to implement a program (or program components). Examples of programs that are not delegable include the Clean Air Act (CAA) mobile source and Ozone Depleting Substances programs; pesticide labeling and registration under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); the new and existing chemicals program under the Toxic Substances Control Act (TSCA); and enforcement in Indian Country (except

---

[111] For additional information on EPA's FY 2023 enforcement and compliance assurance program results, please visit:https://www.epa.gov/enforcement/enforcement-and-compliance-annual-results-fiscal-year-2023.

where the Program has been delegated to the tribe). Many statutes have programs or regulations that states have not obtained authority to implement, including the American Innovation and Manufacturing (AIM) Act, as well as portions of the Resource Conservation and Recovery Act (RCRA), the Clean Water Act (CWA), the Safe Drinking Water Act (SDWA), the Toxic Substances Control Act (TSCA) (lead-based paint program), and the Clean Air Act (CAA) (chemical accident prevention) where EPA must play this role.

Even where a state is authorized or has delegated program implementation responsibility, EPA retains concurrent enforcement authority. The Agency and authorized states have a joint responsibility to achieve and maintain high levels of compliance with the Nation's environmental laws. EPA works with authorized states and tribes to ensure a level playing field and assists states and tribes in their implementation of delegated/authorized programs when needed, such as in cases where the Agency maintains a unique expertise or capability, or where direct federal action is necessary to take timely or appropriate steps to address threats to public health and the environment. The Agency also carries out its statutory oversight responsibilities to ensure states and tribes are meeting national compliance monitoring standards and taking timely and appropriate actions to return facilities to compliance. EPA's work to protect communities with Environmental Justice (EJ) concerns and to address violations that contribute to climate change are priorities for the Agency and represent shared goals of EPA and partner agencies. For the Program to carry out statutory oversight responsibilities, a robust inspection and enforcement program is essential to advancing the promise of clean air, land, and water to many communities across the country, especially in overburdened communities and communities impacted by climate change.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 3/Objective 3.1, Hold Environmental Violators and Responsible Parties Accountable in the *FY 2022 – 2026 EPA Strategic Plan*. The Civil Enforcement Program advances other goals in the Agency's Strategic Plan, with a particular focus on the cross-cutting goals: Goal 1: Tackle the Climate Crisis and Goal 2: Take Decisive Action to Advance Environmental Justice.

A robust inspection and enforcement program is essential to advancing the promise of clean air, land, and water to the many communities across the country that have not received the full benefits from EPA's decades of progress. Staff on the ground that can identify public health concerns and potential environmental regulatory violations are critical to protecting communities that are vulnerable or overburdened. Travel funding for inspections is essential to getting inspectors into the field to conduct increased inspections in all of EPA's ten regional offices. EPA's inspection programs have been under-resourced for over a decade leading to a loss of agency expertise and a decline in the numbers of inspections. To meet EPA's EJ goals and its mission to protect human health and the environment, the Agency must rebuild and strengthen its inspection program with increased hiring and training of new and existing inspectors, including in-person basic inspector trainings and travel funding for the trainings for the following programs: CAA; SDWA; CWA; RCRA; FIFRA; and TSCA. The increase in funding is needed to purchase health and safety equipment and inspection monitoring equipment such as Forward Looking InfraRed (FLIR) cameras, Data Acquisition Real-Time (DART), flame ionization detectors/photo ionization detectors, fenceline monitors, and Smart Tools software and hardware for inspectors. These tools

will modernize the process of collecting, inspecting, and recording inspection data to increase enforcement results.

In FY 2025, the Agency requests an increase of approximately $19.6 million and 41.4 FTE to advance the Agency's Strategic Plan goals of tackling the climate crisis, taking decisive action to advance EJ, and enforcing environmental laws and ensuring compliance by 1) Focusing resources on the most serious environmental problems by implementing the FY 2024 through FY 2027 National Enforcement and Compliance Initiatives (NECIs) and 2) Supporting other EPA agencywide priorities such as reducing children's exposure to lead and increased community engagement.[112]

In FY 2025, EPA will focus its enforcement resources on the most serious environmental violations by implementing NECI priorities that seek to mitigate climate change, improve air quality, provide for clean and safe water, and ensure chemical safety. The Agency has selected the following six NECIs for FY 2024 - 2027: 1) Mitigating Climate Change, 2) Addressing Exposure to per – and polyfluoroalkyl substances (PFAS), 3) Protecting Communities from Coal Ash Contamination, 4) Reducing Air Toxics in Overburdened Communities, 5) Increasing Compliance with Drinking Water Standards, and 6) Chemical Accident Risk Reduction. For the first time, the Program will have a national focus of enforcement and compliance resources on mitigating climate change, addressing exposure to PFAS, and protecting communities from carcinogenic coal ash contamination. The Agency will strengthen its efforts to address hazardous air pollution in overburdened communities focusing on communities facing high levels of toxic air pollution from hazardous air pollutants (HAPs), such as benzene, ethylene oxide and other pollutants. This focused initiative will include the corollary benefit of reducing concentrations of criteria air pollutants such as ozone and particulate matter and addressing climate change impacts directly. EPA will continue the FY 2020 – 2023 national initiatives focused on providing safe drinking water and reducing the risk of deadly chemical accidents. Each of these initiatives addresses urgent environmental and public health challenges that would be difficult for EPA and its state partners to tackle without additional resources and concerted effort. These initiatives incorporate EJ considerations to ensure that the benefits of our Nation's environmental laws can be shared by everyone living in the United States.

In FY 2025, the Agency requests an increase of $4.6 million and 20.0 FTE to advance the Office of Enforcement and Compliance Assurance's (OECA's) expanded role in water sector emergency response. In addition to this expanded role, as water systems continue to be adversely impacted by climate change and aging infrastructure, there is an increase in the number of systems across the country that are challenged to provide safe water to its residents. The Agency plays an important role in providing a safety net where states are not able to act in a timely or effective way to ensure safe water. This can include inspections to ensure compliance, enforcement efforts to compel corrective actions, or require entities (*e.g.*, public water systems or private facilities) to distribute bottled water, filters, or testing kits. It also can include the Agency acting to directly distribute and/or provide water, filters and testing kits on a short-term basis. This investment will allow OECA to respond to the increasing number of water incidents across the Nation, many of which affect EJ communities as evident from past incidents in Flint, Michigan; Jackson, Mississippi;

---

[112] For additional information on the NECIs, please visit: https://www.epa.gov/enforcement/national-enforcement-and-compliance-initiatives.

Benton Harbor, Michigan; and Coachella Valley, California. Two factors are expected to increase the future likelihood of EPA intervention in water incidents. First, the aging of America's water infrastructure has been well documented by EPA and other sources over the last twenty years (*e.g.*, *Water Infrastructure Gap Analysis*, EPA 2002; 7th Drinking Water Infrastructure Needs Survey and Assessment, EPA 2023).[113] Second, with the increasing frequency and severity of extreme weather events (drought, flooding, hurricanes) due to climate change, water systems will be subject to more disruptive events.

All of OECA's national civil enforcement initiatives focus on protecting overburdened and vulnerable communities. The NECIs provide an opportunity to address widespread, high priority violations in areas that have a strong nexus with the goals set forth in the *FY 2022 – 2026 EPA Strategic Plan.* By prioritizing and concentrating enforcement efforts and resources in alignment with the Agency's Strategic Plan, the enforcement program can advance the Agency's broader environmental and public health goals. To meet these goals, additional staff (*e.g.*, inspectors, field investigators, attorneys, and chemists) and extramural support (*e.g.*, contract support, travel, and training) are needed.

In FY 2025, the Agency requests an increase of $8.2 million and 19.9 FTE to enforce the AIM Act by preventing the illegal importation and use of hydrofluorocarbons (HFCs), potent greenhouse gases, in the United States, facilitating a transition to next-generation technologies, and managing HFCs in existing equipment. Enforcing the phase down of HFCs is essential to tackling climate change. HFCs can have negative impacts on the climate hundreds to thousands of times greater than the same amount of carbon dioxide.[114] The Program's job will be exponentially more challenging in FY 2025 as additional requirements come into effect, increasing the universe of regulated products as a result of new phasedown requirements and restrictions on the import, manufacture, and use of certain products. As a result of these expanded restrictions, enforcing the AIM Act in FY 2025 will require more than double the level of effort as compared to enforcing the 2021 HFC Phasedown regulations. EPA requests this additional infusion of FTE and extramural resources for equipment, training, and other important tools to lead the HFC Task Force and to catch and deter potentially widespread illegal imports in FY 2025. The HFC Task Force will identify, intercept, and interdict illegal HFC imports, share data to support allowances, train customs officers and enforcement personnel, and address common HFC import experiences with other countries. The Program will implement new HFC allowance modules and expand its ozone depleting substances (ODS) tracking system to assess ongoing compliance. Additionally, in FY 2025, training on the new enforcement techniques and support for implementation of both the AIM Act and HFC enforcement will be needed. As a result, EPA's Civil Enforcement Program needs additional attorneys and inspectors to ensure adequate personnel are trained to develop and take enforcement actions against violators. The additional FTE for case development will assist in developing enforceable AIM Act rulemakings planned for FY 2025 and beyond. Without additional staff, the Program will be hindered in its efforts to increase enforcement of HFC imports.

[113] For additional information, please visit: https://www.epa.gov/system/files/documents/2023-04/Final_FAQ_DWINSA_4.4.23.v1.pdf
[114] For additional information, please visit: https://www.epa.gov/climate-hfcs-reduction/frequent-questions-phasedown-hydrofluorocarbons#overview.

In FY 2025, EPA will continue to protect overburdened communities at risk from cumulative impacts of large chemical manufacturing facilities, petrochemical operations, and refineries. Through coordinated assessment of noncompliance in multiple statutory areas, EPA's Civil Enforcement Program will plan inspections, case development, and enforcement actions to integrate RCRA, CWA, SDWA, CAA (including Section 112(r)), TSCA, and the Emergency Planning and Community Right-to-Know Act (EPCRA) to ensure comprehensive compliance with environmental regulations, thereby reducing risk to human health and the environment by decreasing the likelihood of excess emissions, releases, and discharges.

In FY 2025, EPA requests an increase of $4.0 million to incorporate EJ and climate change into every aspect of Civil Enforcement. EPA will continue to integrate EJ and climate change considerations (including HFCs) throughout the Program. This work will answer the President's call to "strengthen enforcement of environmental violations with disproportionate impact on underserved communities through the Office of Enforcement and Compliance Assurance" [*EO 14008, sec. 222(b)(i)*] and to "combat the climate crisis with bold, progressive action" (*EO 14008, sec. 201*).[115] To address climate change, the Program will implement the *Climate Enforcement and Compliance Strategy*,[116] which directs all EPA enforcement and compliance offices to address climate change, as appropriate, in every matter within their jurisdiction. The strategy recognizes the urgency of the climate crisis and prioritizes enforcement and compliance actions to mitigate climate change and include climate adaptation and resilience in case conclusions whenever appropriate. The strategy builds on existing efforts underway to implement the OECA Climate Adaptation Implementation Plan and EPA's first-ever Mitigating Climate Change enforcement initiative targeting methane emissions from oil and gas facilities and landfills as well as illegal importation of HFCs. The Program will focus on strengthening enforcement and resolving environmental noncompliance through remedies with tangible benefits for disadvantaged communities by preventing further pollution due to noncompliance; mitigating past impacts from pollution; securing penalties to recapture economic benefit of noncompliance and deter future violations; seeking early and innovative relief (*e.g.*, fenceline monitoring and transparency tools); and incorporating Supplemental Environmental Projects (SEPs) in settlements, where appropriate and to the extent permitted by law and policy. Additionally, EPA will continue its strong emphasis on identifying and resolving CAA noncompliance in the oil and gas sector and requiring compliance with the Renewable Fuel Standard regulations.

In FY 2025, EPA requests an increase of $437 thousand and 2.2 FTE to expand PFAS enforcement. The Program will utilize resources to focus on implementing EPA's PFAS Strategic Roadmap and holding responsible those who significantly contribute to the release of PFAS into the environment, such as major manufacturers and users of manufactured PFAS, federal facilities that are significant sources of PFAS, and other industrial parties. PFAS released into the environment can present an urgent public health and environmental threat. The Program will continue to investigate releases, address imminent and substantial endangerments, and prevent exposure to PFAS, under multiple environmental statutes. OECA is using its resources to 1) Issue corporate-wide information requests and analyze responses, 2) Create site profiles and information databases

---

[115] For additional information on the Executive Order on *Tackling the Climate Crisis at Home and Abroad*, please visit: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

[116] For more additional information, please visit: https://www.epa.gov/system/files/documents/2023-09/epasclimateenforcmentandcompliancestrategy.pdf .

on specific facilities, 3) Obtain site-specific data such as PFAS sampling of private drinking water wells in communities with EJ concerns located near military installations, and 4) Use administrative and judicial authorities to require sampling to characterize nature and extent of PFAS contamination and compel response actions to protect human health and the environment.

In FY 2025, EPA requests an increase of $3.4 million and 7.0 FTE to expand efforts to enforce the Coal Combustion Residuals (CCR) Rule. EPA's review of publicly posted CCR Rule compliance information suggests widespread noncompliance with CCR regulations. In enforcing the CCR Rule, coal ash units would be made more resilient to extreme weather events and reduce contamination in communities near coal ash units. CCR evaluations are technically complex and require review and analysis of facility assessments that cover corrective action measures and facility plans to permanently close units (the units can sometimes be hundreds of acres in size). EPA needs to conduct CCR compliance reviews to ensure that facilities properly address the significant health risks posed by these units and bring enforcement actions when violations are found. This work is identified as a priority in the *FY 2022 - 2026 EPA Strategic Plan.*

## Performance Measure Targets:

**(PM 434) Millions of pounds of pollutants and waste reduced, treated, or eliminated through concluded enforcement actions.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | 325 | 325 | 325 | 325 | 325 | 325 | No Target Established | No Target Established | Millions of Pounds |
| **Actual** | 810 | 347 | 2,058 | 7,864 | 195 | 1,214 |  |  | |

**(PM 436) Number of open civil judicial cases more than 2.5 years old without a complaint filed.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  | 129 | 120 | 99 | 99 | 96 | 95 | 94 | Cases |
| **Actual** |  | 94 | 74 | 66 | 65 | 50 |  |  | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$7,628.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes resources for critical agencywide infrastructure support for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$19,653.0 / +41.4 FTE) This program increase will advance enforcement efforts on the most serious environmental violations through the NECIs that seek to improve air quality, provide for clean and safe water, and ensure chemical safety. Additional FTE and resources will support continued efforts to rebuild EPA's civil enforcement inspector cadre for inspections, case development, training, and travel budget. This funding also will enhance EPA's civil enforcement programmatic capabilities to boost efforts to address pollution in

overburdened and vulnerable communities. This investment includes $7.8 million for payroll.

- (+$8,250.0 / +19.9 FTE) This program increase will allow EPA to expand the work of the Interagency HFC Task Force, which is focused on ensuring compliance with the AIM Act. Additional FTE will allow EPA to build this major Congressional priority program from the ground up, address existing requirements, and prepare for both additional new regulatory requirements and expansion of the Program into EPA's regional offices. This investment includes $3.75 million for payroll.

- (+$4,602.0 / +20.0 FTE) This program increase will provide additional support to the water NECI as EPA works to become the lead federal agency for responding to water emergencies. These resources will help EPA build capacity to address multiple water emergencies and provide regional staffing of field support and oversight during water emergencies. This includes $3.77 million for payroll.

- (+$4,000.0) This program change will support increased focus on EJ and climate change considerations by developing and implementing a comprehensive action plan for integrating climate and EJ considerations throughout all aspects of the Civil Enforcement Program (*e.g.*, private parties and federal facilities) in Headquarters and across EPA's ten regional offices.

- (+$3,420.0 / +7.0 FTE) This program change will strengthen capacity to enforce the CCR/coal ash rule. The requested resources are needed to provide technical and legal support with noncompliant facilities. This investment includes $1.32 million for payroll.

- (+$954.0 / +4.0 FTE) This program change will increase protection for fenceline communities, including from industrial accidents caused by the increased frequency and intensity of extreme weather events from climate change. Increased resources will support CAA section 112(r) inspections and enforcement actions to prevent industrial accidents. This investment includes $754.0 thousand for payroll.

- (+$649.0 / +0.5 FTE) This program change will support implementation of OECA's Climate Adaptation Implementation Plan. Resources will support completion of priority actions including expanding headquarters and regional communication about climate change resources, tools and guidance; establishing a repository of climate examples; and continued staff training to build climate change knowledge and consideration of climate change in all aspects of enforcement. This investment includes $94.0 thousand for payroll.

- (+$617.0 / +3.1 FTE) This program increase supports additional FTE for the Agency's Regional laboratories and their support of the Civil Enforcement Program, which is critical in building strong cases. This investment includes $585.0 thousand for payroll.

- (+$437.0 / +2.2 FTE) This investment will increase EPA's effort to focus on implementing EPA's PFAS Strategic Roadmap and holding responsible those who significantly contribute to the release of PFAS into the environment, such as major manufacturers and

125

users of manufactured PFAS, federal facilities that are significant sources of PFAS, and other industrial parties. This investment includes $415.0 thousand for payroll.

- (+$100.0 / +0.5 FTE) This program increase supports the agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $94.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Act to Prevent Pollution from Ships (MARPOL Annex VI); American Innovation and Manufacturing Act; Clean Air Act; Clean Water Act; Emergency Planning and Community Right-to-Know Act; Federal Insecticide, Fungicide, and Rodenticide Act; Marine Protection, Research, and Sanctuaries Act; Oil Pollution Act; Resource Conservation and Recovery Act; Safe Drinking Water Act; and Toxic Substances Control Act.

# Criminal Enforcement

Program Area: Enforcement
Goal: Enforce Environmental Laws and Ensure Compliance
Objective(s): Hold Environmental Violators and Responsible Parties Accountable

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$57,374* | *$62,704* | *$67,829* | *$5,125* |
| Hazardous Substance Superfund | $6,766 | $7,999 | $8,876 | $877 |
| Total Budget Authority | $64,140 | $70,703 | $76,705 | $6,002 |
| Total Workyears | 252.7 | 269.3 | 299.4 | 30.1 |

**Program Project Description:**

EPA's Criminal Enforcement Program enforces the Nation's environmental laws through investigation of criminal conduct, committed by individual and corporate defendants, that threatens public health and the environment. EPA's criminal investigators (special agents) investigate violations of environmental statutes and associated violations of Title 18 of the United States Code such as fraud, conspiracy, false statements, and obstruction of justice.

The Criminal Enforcement Program collaborates with other EPA Program offices, the Environmental Justice (EJ) Program, and the U.S. Department of Justice (DOJ) to ensure enforcement work addresses the impacts of illegal environmental pollution activities nationwide and especially in overburdened communities.

Criminal Enforcement special agents are supported by forensic scientists, attorneys, technicians, engineers, and other experts. EPA's criminal enforcement attorneys provide legal and policy support for all program responsibilities, including forensics and expert witness preparation, to ensure program activities are carried out in accordance with legal requirements and EPA policies. The Agency's National Enforcement Investigations Center (NEIC) provides field investigation, laboratory analysis, toxicology, chemistry, engineering, and regulatory support to the Criminal Enforcement Program. These efforts support successful environmental crime prosecutions by U.S. Attorneys' Offices and the DOJ's Environmental Crimes Section. In FY 2023, the criminal enforcement program opened 199 new cases. The conviction rate for criminal defendants charged because of EPA criminal investigations in FY 2023 is 100 percent, with sentences totaling 106 years of incarceration.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 3/Objective 3.1, Hold Environmental Violators and Responsible Parties Accountable in the *FY 2022 - 2026 EPA Strategic Plan*.

127

In FY 2025, EPA will continue to focus on the most egregious cases (*e.g.*, significant human health, environmental, and deterrent impacts). The Agency will continue expanding its capacity to support the criminal enforcement program, with an emphasis in several priority areas, including communities with EJ concerns, mitigating climate change [including the enforcement of unauthorized imports, production and consumption of hydrofluorocarbons (HFCs)], addressing methane emissions from the oil, natural gas and landfill sectors, criminal enforcement initiatives, and preventing the illegal importation, sale, and distribution of unregistered pesticides. Program goals and priorities include the following:

- In FY 2025, EPA requests an investment of $5.0 million and 26.6 FTE to continue to prioritize and to dedicate additional criminal enforcement resources for investigations which involve vulnerable communities or those that have historically been overburdened by pollution, including communities with Environmental Justice (EJ) concerns. This effort has been part of the National Enforcement and Compliance Initiatives (NECIs), with an emphasis on addressing environmental crimes and crime victims in these areas.[117] The Criminal Investigation Division (CID) works with partners at the DOJ to jointly prosecute wrongdoing and reduce the impact pollution has on these areas through investigation, judicial actions, and settlements while maintaining case initiation standards.

- In FY 2025, EPA's Environmental Crime Victim Witness Assistance Program will continue to closely align its implementation of the Criminal Victims' Rights Act and the Victims' Rights and Restitution Act with EPA's EJ work.[118] Activities include data mining and mapping to identify where communities with EJ concerns, environmental crime victims, and public health impacts overlap. This strategy will aid the Program in identifying sources of pollution impacting these communities to better focus criminal enforcement resources on the Nation's most overburdened or vulnerable populations and, where appropriate, use the crime victim program resources and emergency funds to assist individuals in such communities. EPA conducts outreach to environmental crime victims and overburdened communities using the social media platform Nextdoor, sharing information relating to EJ, sources of pollution, and links to EPA's Report a Violation webpage directly to households in overburdened communities.

- In FY 2025, the Agency requests an additional $719 thousand and 2.1 FTE to support efforts to interdict the illegal import, manufacture, and use of certain HFC products, pursuant to the American Innovation and Manufacturing (AIM) Act. This work will directly support implementation of the NECIs to mitigate climate change. The Task Force will continue to identify, intercept, and interdict illegal HFC imports, share data to support allowances, train customs officers and enforcement personnel, and address common HFC import experiences with other countries. The Program will continue to build its new enforcement and compliance program, which includes training, outreach, and coordination with federal, state, and local partners. This includes work with Customs and Border Protection (CBP), DOJ and other federal partners to successfully enforce federal laws related to HFCs. Critically important to

---

[117] For additional information, please see: https://www.govinfo.gov/content/pkg/FR-2023-01-12/pdf/2023-00500.pdf.
[118] For additional information, please see: https://www.justice.gov/usao/resources/crime-victims-rights-ombudsman/victims-rights-act.

success in this media are dedicated analysts in the Criminal Enforcement Program to research, assess, and coordinate with federal partners, private industry, and task force members.

- In FY 2025, the Criminal Enforcement Program will continue to work with Interpol and other federal partners to combat climate change through domestic and international law enforcement collaboration. This work will include formalized information sharing related to preventing illegal importation of prohibited products that contribute to global climate instability and building capacity with other countries. Specifically, the Program will collaborate with Interpol and other international law enforcement on cases that have a transnational organized crime nexus.

- In FY 2025, the Criminal Enforcement Program also will increase its collaboration and coordination with the Civil Enforcement Program to ensure that EPA's Enforcement Program identifies the most egregious cases by responding to them effectively and efficiently to ensure compliance and deter future conduct. The Agency will continue to investigate violations of environmental statutes and associated violations of Title 18 of the United States Code to protect public health and the environment.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$687.0) This net change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefits costs. It includes critical agencywide infrastructure support for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$5,093.0 / +26.6 FTE) The net program increase will support investigations related to the NECIs, expands enforcement in communities with EJ concerns, enforcement of climate-related regulations, and increases polluter accountability. The increase is offset by a decrease in contractual support for criminal enforcement activities.

- (+$719.0 / +2.1 FTE) This program investment will ensure EPA has the capacity and technical expertise to investigate, analyze, sample, test, and transport HFCs. The increase in FTE will allow analysts to research, assess, and coordinate with federal partners, private industry, and task force members.

**Statutory Authority:**

Title 18 of the U.S.C.; 18 U.S.C. § 3063; Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Resource Conservation and Recovery Act; Clean Water Act; Safe Drinking Water Act; Clean Air

Act; Toxic Substances Control Act; Emergency Planning and Community Right-To-Know Act; Federal Insecticide, Fungicide, and Rodenticide Act; Ocean Dumping Act; Rivers and Harbors Act; Pollution Prosecution Act of 1990; American Innovation and Manufacturing Act.

# NEPA Implementation

Program Area: Enforcement
Goal: Enforce Environmental Laws and Ensure Compliance
Objective(s): Detect Violations and Promote Compliance

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$15,171* | *$20,611* | *$26,049* | *$5,438* |
| Total Budget Authority | $15,171 | $20,611 | $26,049 | $5,438 |
| Total Workyears | 80.3 | 104.9 | 115.9 | 11.0 |

**Program Project Description:**

EPA's National Environmental Policy Act (NEPA) Implementation Program implements the environmental requirements of NEPA and Section 309 of the Clean Air Act (CAA) to review other federal agency environmental impact statements (EISs) and NEPA regulations. This work includes engaging with officials throughout the federal government and across EPA while supporting EPA's lead NEPA Official. EPA has special authority and responsibilities under CAA section 309 to review and publicly comment on NEPA environmental analyses for major projects across the federal government. This work is substantially increasing in scope and importance given recent legislation related to energy development and infrastructure and the need to incorporate consideration of climate change and environmental justice (EJ) into these assessments.

Consistent with Executive Orders (EO) 13990[119] and 14008,[120] the Council on Environmental Quality (CEQ) issued Interim *NEPA guidance on Consideration of Greenhouse Gas Emissions and Climate Change*[121] in January 2023. CEQ is in the process of updating NEPA regulations and key guidance for addressing impacts to communities with EJ concerns. Through a Memorandum of Understanding (MOU) with CEQ,[122] EPA regularly supports and assists CEQ in the development of guidance and technical tools. EPA also provides technical assistance to other federal agencies on implementing NEPA, including identifying potential programmatic options to streamline NEPA analyses while maintaining quality environmental analyses and meaningful engagement with the public.

---

[119] For additional information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/.
[120] For additional information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.
[121] For additional information, please refer to: Federal Register : National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change.
[122] 1977 Memorandum of Understanding (MOU) between CEQ and EPA addressed the allocation of responsibilities between the two agencies for assuring government-wide implementation of NEPA. This includes the operational duties associated with the administrative aspects of EISs. Through this MOU, EPA became the official recipient for all copies of EISs.

EPA focuses on early engagement with other federal agencies consistent with NEPA principles and uses interagency cooperation for early identification of issues and potential solutions to reduce impacts and improve environmental outcomes. EPA's unique expertise helps other agencies analyze and resolve complex NEPA issues. Through the review of other federal agencies' EISs and the tools and training the program provides, EPA facilitates the robust consideration of impacts related to climate change and EJ. EPA plays a critical role in identifying ways to mitigate negative environmental impacts, including on overburdened and underserved communities.

In addition, EPA's NEPA Implementation Program manages e-NEPA, a web-based application that serves as the official EIS filing system and clearinghouse for all federal EISs on behalf of CEQ in accordance with the MOU with CEQ and 40 CFR Part 1506. The Program also oversees EPA's actions subject to NEPA (40 CFR Part 6) and reviews of EISs for non-governmental activities in Antarctica (40 CFR Part 8).

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 3/Objective 3.2, Detect Violations and Promote Compliance in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $5.4 million and 11.0 FTE for the NEPA Implementation Program to sustain the continued need for technical expertise in emerging subject matter areas. This investment includes considering impacts associated with climate change and to communities with EJ concerns. EPA plans to develop and update tools and training to equip NEPA/CAA 309 reviewers with ever evolving knowledge, strengthening its ability to provide recommendations to improve environmental outcomes. Investing in EPA's responsiveness and technical assistance to support other agencies in conducting environmental reviews will ensure the continued capacity and expertise to improve environmental and community outcomes for priority infrastructure environmental reviews subject to deadlines established in recent amendments to NEPA.

Additional funding will bolster EPA's commitment to assist and improve environmental reviews while allowing the Program to continue to meet challenges, including rebuilding core capacity, hiring of subject matter experts knowledgeable in various sector-based activities, and positioning EPA to respond to national priorities and provide adequate succession planning and professional development across EPA's NEPA/309 community. This strategic investment of subject matter expertise provides new FTE in EPA's regional offices, which is critical as the majority of the NEPA reviews and programmatic assistance to other federal agency field offices is conducted by EPA regions. FY 2025 resource needs will be used to support economically beneficial initiatives. For context, the American Recovery and Reinvestment Act triggered a very similar substantial increase in volume of NEPA reviews across the federal government. EPA's requested investment to the NEPA Implementation Program will address current and anticipated future environmental review workloads and provide increased staffing and resource support to meet the Nation's infrastructure goals, particularly with respect to climate change and EJ.

CEQ has proposed revisions of its regulations for implementing NEPA procedures. EPA's NEPA Implementation Program will make revisions accordingly to support the application of CEQ's updates to NEPA regulations, guidance, and process improvements for priority federal projects. It

is anticipated that in FY 2025 agencies also will update NEPA implementation procedures to be consistent with updated CEQ regulations and guidance. EPA will be required under CAA section 309 to review these procedures for all federal agencies and must provide technical assistance to CEQ and other agencies. This support will promote quality environmental review processes across federal agencies to improve environmental and community outcomes.

In FY 2025 EPA will continue to work with the Office of Management and Budget (OMB), CEQ, and other federal agencies to evaluate ways to coordinate, streamline, and improve the NEPA process, as well as to incorporate robust science-based analyses of project-related impacts and potential measures to minimize and mitigate those impacts. Federal agencies received a substantial increase in funded actions that will likely require EISs and thus necessitate EPA environmental reviews due to the increase in projects funded by the American Rescue Plan Act of 2021 (P.L. 117-2),[123] the Infrastructure Investment and Jobs Act (IIJA), the Creating Helpful Incentives to Produce Semiconductors for America Act (CHIPs Act), and other economic recovery and federal investment actions, as well as policies and initiatives, such as EO 14017 *America's Supply Chains*[124] and the Energy Act MOU between the Bureau of Land Management and EPA. EPA anticipates its existing workload will likely double based on interagency discussions hosted by CEQ and OMB. This continued substantial increase in priority actions will require early engagement and may require expedited reviews. With the additional resources requested in FY 2025, EPA will work with other agencies to prioritize and support the increase in environmental review of Federal EISs. These initiatives support other federal agencies establishment of clear timeline goals and will improve EPA's responsiveness, technical assistance, and support to other agencies to enhance the overall environmental and community outcomes in other agency environmental reviews.

EPA's commitment to engage early with federal agencies, as part of the Administration's Permitting Action Plan, highlights the Agency's commitment to improved quality of EISs and minimize delays. Early engagement helps accelerate robust environmental reviews through early cross-agency coordination; supports the establishment of clear timelines and tracking; facilitates early and meaningful outreach and communication with states, tribes, territories, and local communities; provides technical assistance in areas of subject matter expertise; and promotes interagency cooperation to improve environmental and community outcomes. As part of the Permitting Action Plan, EPA has been updating its Policies and Procedures Manual for conducting NEPA/309 reviews in FY 2023. In FY 2023, EPA also started developing and updating a limited set of technical review guidance documents for priority sectors and topics to help NEPA/309 reviewers be more efficient and effective in their reviews that will be finalized in FY 2024. In FY 2025, EPA will continue to update technical review guidance documents on priority sectors and topic areas. EPA also plans to continue to expand training curricula for NEPA/309 reviewers to incorporate recent changes in CEQ regulations and guidance for NEPA related topics. In FY 2025, EPA will continue to provide early engagement and identify improved approaches for effective and streamlined environmental reviews from the start of the NEPA review through completion to meet deadlines established in the 2023 amendments to NEPA. Updating actions associated with the Permitting Action Plan will help improve EPA's responsiveness, technical assistance, and

---

[123] For additional information, please refer to: https://www.congress.gov/117/bills/hr1319/BILLS-117hr1319enr.pdf.
[124] For additional information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/02/24/executive-order-on-americas-supply-chains/.

support to other agencies with the objective of improving environmental and community outcomes based on environmental reviews.

Executive Order (EO) 14096 of April 21, 2023, requires EPA in carrying out its responsibilities under CAA section 309, to assess whether agencies analyze and avoid or mitigate disproportionate human health and environmental effects on communities with EJ concerns. Further, the EO requires EPA to submit an annual report to CEQ and the White House Environmental Justice Interagency Council (WHEJAC). In FY 2024, EPA will be developing recommendations to automate the data collection process to support the development of the annual report. In FY 2025, EPA will implement the approved automation strategy that will allow for efficient and effective annual reporting to CEQ and the WHEJAC.

EPA will support and collaborate with other federal agencies on priority actions and emerging sectors, such as critical minerals mining, carbon sequestration, renewable energy, and energy storage. In FY 2025, EPA will provide staff with specialized expertise at both headquarters and the regional offices to facilitate timely interagency coordination on environmental reviews and permitting actions. As part of this specialized expertise, EPA will support development of analytic tools to help NEPA/309 reviewers and other agencies implement CEQ Interim NEPA Guidance on Consideration of GHG and Climate Change. This support will improve EPA's technical assistance capacity to help support improved environmental and community outcomes in review of other federal agency NEPA documents.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$1,581.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$3,857.0 / + 11.0 FTE) This program change is an increase to build core capacity, support the increase in environmental reviews of Federal EISs, hire and train new staff and subject matter experts, and facilitate timely interagency coordination on environmental reviews and permitting actions. This investment includes $2.0 million for payroll.

**Statutory Authority:**

National Environmental Policy Act (NEPA); Clean Air Act (CAA) § 309; Antarctic Science, Tourism, and Conservation Act; Clean Water Act § 511(c); Endangered Species Act; Fishery Conservation and Management Act; Fish and Wildlife Coordination Act; and Title 41 of the Fixing America's Surface Transportation Act.

**Environmental Justice**

## Environmental Justice

Program Area: Environmental Justice
Goal: Take Decisive Action to Advance Environmental Justice and Civil Rights
Objective(s): Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and
Activities

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$109,347* | *$102,159* | *$317,712* | *$215,553* |
| Hazardous Substance Superfund | $890 | $5,876 | $5,901 | $25 |
| Total Budget Authority | $110,237 | $108,035 | $323,613 | $215,578 |
| Total Workyears | 116.4 | 223.6 | 264.6 | 41.0 |

**Program Project Description:**

EPA's Environmental Justice (EJ) Program coordinates the Agency's efforts to address the needs of overburdened and vulnerable communities by decreasing environmental burdens, increasing environmental benefits, and developing collaborative partnerships with all stakeholders to build healthy, sustainable communities based on residents' needs and desires. In 2022, EPA reorganized its Office of Environmental Justice into a new national program along with the External Civil Rights Compliance Office and the Conflict Prevention and Resolution Center. This new national program is the Office of Environmental Justice and External Civil Right (OEJECR). OEJECR focuses on collaboration as a central principle and method of advancing justice. The Program's core philosophy is that EJ challenges need strong collaborative partnerships that include federal, state, local, and tribal governments along with the private sector, academia, and philanthropy to support communities in addressing multifaceted problems and positively changing conditions on the ground. The Program provides grants, technical assistance, and expert consultative support to communities, partners at all levels of government, and other stakeholders such as business and industry, to achieve protection from environmental and public health hazards for people of color, low-income communities, and indigenous communities.

Work in this program directly supports Administrator Michael Regan's message in the memo titled "Our Commitment to Environmental Justice" issued on April 7, 2021.[125] In addition, this work supports implementation of Executive Order (EO) 14096: *Revitalizing Our Nation's Commitment to Environmental Justice for All*,[126] EO 14091: *Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*,[127] EO 13985: *Advancing Racial*

[125] For additional information, please refer to: https://www.epa.gov/sites/default/files/2021-04/documents/regan-messageoncommitmenttoenvironmentaljustice-april072021.pdf.
[126] For additional information, please refer to: https://www.federalregister.gov/documents/2023/04/26/2023-08955/revitalizing-our-nations-commitment-to-environmental-justice-for-all.
[127] For additional information, please refer to: https://www.federalregister.gov/documents/2023/02/22/2023-03779/further-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal.

*Equity and Support for Underserved Communities Through the Federal Government*,[128] and EO 14008: *Tackling the Climate Crisis at Home and Abroad*.[129] In accordance with the America's Water Infrastructure Act (AWIA) of 2018 (P.L. 115-270), every EPA regional office employs a dedicated EJ coordinator, and the Agency maintains a list of these persons on EPA's website.[130]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 2/Objective 2.2, Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $215.6 million and 41.0 FTE for the Environmental Justice Program in the EPM appropriation. This investment will provide unprecedented levels of capacity-building grants and technical assistance to more communities, governmental partners, and academic institutions. To ensure greater opportunity for investment and the resulting outcomes for communities, EPA will offer more grant trainings and methods of technical assistance to help underserved and under-resourced communities and their partners apply for competitive grant opportunities and provide robust new levels of support to help communities and their partners navigate the array of federal assistance programs to maximize the ability of programs to leverage positive change on the ground. For example, this enhanced assistance will support broader investment in climate initiatives in communities with EJ concerns as well as provide critical support to community-based organizations, indigenous organizations, states, tribes, local governments, territorial governments, and state and local EJ advisory councils, in pursuit of identifying and addressing EJ issues through multi-partner collaborations. EPA also will continue to support and engage grantees from previous years' competitions to ensure successful project completion.

In FY 2025, EPA will continue funding existing grant programs:

1) $33.0 million for the Environmental Justice Community Grants Program (formerly named Environmental Justice Small Grants) which competitively awards funding to a network of external grant recipients to issue subgrants to non-profit, community-based organizations to reduce the disproportionate health impacts of environmental pollution in communities with EJ concerns;
2) $31.5 million for the Environmental Justice Government to Government Grant Program (formerly named State, tribes, and Territories Environmental Justice Grants) which provides funding for states, tribes, local governments, and territories to create or support community-driven partnerships and associated environmental justice partnerships;
3) $15.0 million for the competitive, community-based Participatory Research Grant Program which awards competitive grants to higher education institutions that develop partnerships

---

[128] For additional information, please refer to: https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.

[129] For additional information, please refer to: https://www.federalregister.gov/documents/2021/02/01/2021-02177/tackling-the-climate-crisis-at-home-and-abroad.

[130] For additional information, please refer to: https://www.epa.gov/environmentaljustice/forms/contact-us-about-environmental-justice.

with community entities to improve the health outcomes of residents and workers in communities with EJ concerns; and

4) $3.0 million for the competitive, Environmental Justice training program which awards competitive grants to community-based nonprofit organizations and partnerships between community-based nonprofit organizations and institutions of higher education.

**Environmental Justice and External Civil Rights (EJECR) National Program**

In FY 2025, EPA's EJECR National Program will continue leading the integration of EJ in agency decision making and implement a comprehensive framework for considering cumulative impacts in relevant EPA decisions. Implementation of the cumulative impacts framework, as part of EPA's FY 2024-2025 Agency Priority Goal, will position EPA to consider and address cumulative impacts that affect community health and well-being in its decisions, thus fundamentally integrating EJ issues within the core regulatory decisions of the Agency. The EJECR National Program will continue to provide essential support across all EPA programs to consider EJ in environmental permitting, rulemaking, enforcement and compliance, emergency/disaster response and recovery, and climate change priorities.

The FY 2025 Budget proposes to invest $69.7 million and 39.3 FTE to continue to enhance its engagement with communities by building out community-centered technical assistance hubs, the Thriving Community Technical Assistance Centers (TCTACs) established in FY 2023 and ensuring that the network provides coverage across the United States. The TCTACs will be instrumental in providing dedicated EPA staff, hands-on facilitation of connecting underserved communities and their partners directly with fundamental technical assistance and capacity building EPA program resources in addition to resources available through other federal partners. The EJECR National Program will ensure that all community support activities provide a stream of tools, data, and methods back to the Agency to help other EPA programs analyze the EJ implications of policy decisions and program implementation, such as through National Environmental Policy Act processes or the consideration of costs and benefits in economic analyses.

The FY 2025 resources also will continue to provide capacity to integrate EJ and civil rights compliance principles across all programs and regularly engage with and support community and state, tribal, and local partners. This will ensure the elimination of barriers to participation in EPA programs and other activities by the public. Specific focuses will be on strengthening EPA's language assistance and other services to improve access for people with Limited English Proficiency and implementation of EPA external disability program as required under Section 504 of the Rehabilitation Act of 1973. Additionally, the EJECR National Program will monitor indicators developed to track EPA's performance in eliminating disparities in environmental and public health conditions, as directed by the Agency Priority Goal for the first two years in the *FY 2022 - 2026 EPA Strategic Plan*.

**Engagement with Partners, Stakeholders, and Communities**

In addition to the TCTACs, EPA will continue to pursue a broad array of activities to support efforts by partners, stakeholders, and communities to advance EJ. The EJ Program will continue

to build and support trainings for an increasingly broad array of program development and learning resource areas for other governmental agencies, communities, and other partners. This will primarily be accomplished through the "EJ clearinghouse" mandated in EO 14096. These trainings focus on the integration of equity and justice from communities through all levels of government, as well as the private sector, with special focus on state agencies, tribal governments, Indigenous populations, territorial governments, and insular areas such as Pacific Island Nations. During FY 2023, this included ongoing partnership with the Environmental Council of States to provide additional and more finely tailored resources to support state efforts to advance equity and justice in their agencies and the establishment of an unprecedented foundation of learning tools and knowledge management resources available publicly through EPA's EJ Program.

EPA will continue to host regular National EJ Community Engagement calls.[131] These calls will continue to focus on a wide spectrum of topics related to EJ, the Justice40 Initiative,[132] and EJ mapping and screening tools, and will reach thousands of participants. Each call will feature opportunities, such as expansive listening sessions, during which speakers interact with comments and questions from participants. EPA also will continue to host "office hours" for users of EJScreen to engage with the EPA EJScreen team with questions and feedback for further enhancements to the tool. The EJ Program also will have greater communications presence with more focused content, targeted communications, and other ways to reach communities and those not yet engaged through both headquarters and regional EJ program activities and direct outreach and support.

EPA also continues to directly engage community organizations and leaders while supporting internal EPA efforts to integrate EJ considerations into all EPA policies, programs, and activities. Work with the National Environmental Justice Advisory Committee (NEJAC) will continue to help EPA advance and further integrate EJ into agency decision-making. In addition to the NEJAC, EPA will report on progress to the Science Advisory Board, National Tribal Caucus, Children's Health Protection Advisory Committee, Local Government Advisory Committee, and other regular public engagement forums.

In FY 2025, EPA will continue to develop education, training, and outreach resources associated with EJ to answer the ever-increasing demand for such resources, particularly from other federal agencies and state and local governmental partners. These resources include: 1) an EJ Training Program to increase the capacity of residents in communities with EJ concerns to identify and address negative impacts; 2) an EJ educational curriculum to broaden understanding of EJ to more of the American public; and 3) an EJ Clearinghouse to serve as an online resource for EJ information.

### EJ Grants Program

EPA's EJ Grants Program funding has grown significantly due to the additional $3 billion Inflation Reduction Act[133] resources received in FY 2022. The Program includes the EJ Thriving Community Grantmakers Network and the innovative new EJ Community Change grant to directly

---

[131] For additional information, please refer to: https://www.epa.gov/environmentaljustice/community-outreach-and-engagement.
[132] For additional information, please refer to: https://www.whitehouse.gov/environmentaljustice/justice40/.
[133] Inflation Reduction Act: https://www.congress.gov/117/plaws/publ169/PLAW-117publ169.pdf.

fund community-driven collaborative efforts to implement change-making projects on the ground in communities. In FY 2025, EPA will continue to support the EJ Thriving Community Grantmakers network to efficiently provide subgrants to communities and their partners, the EJ TCTACs to provide technical support to community-based organizations and their partners such as tribes and local governments, and to award and support the implementation of collaborative EJ community Change grants across the United States. This holistic approach to grant funding and technical assistance will support development of the capacity of community-based organizations and their partners to build strong collaborative efforts to effectively identify and address community concerns in addition to providing funding to governmental partners to support their integration of EJ considerations into their policies, programs, and activities. EPA also will continue to provide grants to states, local governments, tribes, and territories through the EJ Government to Government grant program. These grants will support our governmental partners' effort to engage local communities and further equity and justice priorities of their partnerships.

The EJ Grants Program priorities funded in FY 2023 included the new, larger EJ Community Change implementation grant program that funds projects that implement solutions to long-standing EJ challenges, development of cumulative impacts assessments, public education, engagement of communities with state and federal processes, training, emergency planning and preparedness, and addressing climate and disaster resiliency. EPA's EJ Program will continue to focus support primarily for small community-based nonprofit organizations and their local partners in an attempt to ensure EJ funding reaches lower-capacity and new organizations with the most acute capacity building and environmental public health needs. The EJ Grants Program also will work to minimize barriers for applicants by working with EPA's Office of Grants and Debarment to develop submission flexibilities to help applicants from underserved communities and other low-capacity institutions such as tribes and rural local governments apply for competitive grant opportunities.

**Interagency Coordination**

In FY 2025, EPA will continue to support the efforts of the NEJAC as referenced above in addition to supporting the efforts of the White House Environmental Justice Advisory Council (WHEJAC) established by EO 14008.[134] EPA also will support the Council on Environmental Quality (CEQ) as it leads the Interagency Council on Environmental Justice as well as a suite of EPA bi- and multi-lateral initiatives to support and partner directly with other federal agencies. EPA also will continue to co-chair with the Department of Transportation the federal interagency Thriving Community Network which focuses on aligning and leveraging federal agency resources such as technical assistance, grants, and the efforts of regional/field staff across the United States.

**EJScreen**

The FY 2025 Budget provides an investment of $8.9 million, EPA will continue to support and improve our national EJ screening and mapping tool (EJScreen). Efforts will focus on identifying and adding valuable new data sources to the tool to include potential cumulative impacts index score(s) for areas facing disproportionate environmental burdens in addition to inclusion of new

---

[134] For more information, please visit: https://www.federalregister.gov/documents/2021/02/01/2021-02177/tackling-the-climate-crisis-at-home-and-abroad.

climate-relevant data and enhancing user interface elements. EPA will enhance EJScreen based upon user requests and feedback – from both within EPA and from external users – to further inform equitable decision making across the federal government in addition to providing more robust and diverse data to effectively prioritize communities in need and will ensure that EPA programs develop guidance on using EJ tools such as EJScreen to support their decision making. These enhancements will enable EPA to further focus program design to benefit communities with EJ concerns and those most at risk to the effects of climate change.

## Performance Measure Targets:

**(PM EJCR01) Percentage of EPA programs and regional offices that provide capacity-building resources to communities with environmental justice concerns to improve how the public's feedback and comments influence the Agency's decision-making process.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | | 25 | 50 | 75 | Percent |
| **Actual** | | | | | | N/A | | | |
| **Numerator** | | | | | | | | | Programs |
| **Denominator** | | | | | | | | | |

**(PM EJCR04) Percentage of new grant workplans submitted by states that include commitments to address disproportionate impacts.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | | 5 | 25 | 50 | Percent |
| **Actual** | | | | | | N/A | | | |
| **Numerator** | | | | | | | | | Agreements |
| **Denominator** | | | | | | | | | |

**(PM EJCR08) Percentage of significant EPA actions with environmental justice implications that respond to environmental justice concerns and reduce or address disproportionate impacts.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | | 40 | 50 | 60 | Percent |
| **Actual** | | | | | | N/A | | | |
| **Numerator** | | | | | | | | | Actions |
| **Denominator** | | | | | | | | | |

**(PM EJCR09) Percentage of EPA programs that have developed guidance on the use of environmental justice and equity screening tools.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | | 50 | 75 | 100 | Percent |
| **Actual** | | | | | | N/A | | | |
| **Numerator** | | | | | | | | | Programs |
| **Denominator** | | | | | | | | | |

**(PM EJCR13) Percentage of EPA national programs and regions that have established environmental justice and external civil rights implementation plans.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | | 100 | 100 | 100 | Percent |
| Actual | | | | | | 100 | | | |
| Numerator | | | | | | 17 | | | Regions and Programs |
| Denominator | | | | | | 17 | | | |

**(PM EJCR18) Number of information sharing sessions and outreach and technical assistance events held with overburdened and underserved communities and environmental justice advocacy groups on civil rights and environmental justice issues.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 8 | 90 | 650 | 1,100 | Sessions and Events |
| Actual | | | | 40 | 30 | 235 | | | |

**(PM EJCR19) Percentage of EPA national programs and regions that have created a new meaningful involvement plan for a specific agency project or decision with potential impacts in communities with environmental justice concerns.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | | | 45 | 60 | Percent |
| Actual | | | | | | | | | |
| Numerator | | | | | | | | | Programs |
| Denominator | | | | | | | | | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$8,506.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure support for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$85,621.0) This program change increases support for EJ work across the Agency. This investment supports the significantly expanded base activity and agencywide coordination required across the EJ Program.

- (+$69,715.0 / +39.3 FTE) This program increase will fully build out the Thriving Community Technical Assistance Centers to support basic capacity building of communities and their partners to advance equity and justice in their communities and support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $6.8 million for payroll.

- (+$13,500.0) This program change increases support for the community-based Participatory Research Grant Program. Eligible recipients would be higher education

142

institutions that aim to develop partnerships with community entities to improve the health outcomes of residents and workers in communities with EJ concerns.

- (+$13,000.0) This program change increases the Environmental Justice Community Grant Program to non-profit, community-based organizations to reduce the disproportionate health impacts of environmental pollution in communities with EJ concerns.

- (+$8,500.0) This program change increases support for the Environmental Justice Government to Government Grant Program.

- (+$8,900.0) This program change increases support for EJScreen to improve how the Agency utilizes nationally consistent data that combines environmental and demographic indicators to map and identify communities with EJ concerns. In addition, resources are included to update EPA's IT systems to support the Climate and Economic Justice Screening tool and the EJ Clearinghouse, which would serve as an online resource for information on EJ.

- (+$6,000.0) This program change increases support for the National Environmental Justice Advisory Council; other federal advisory council activities; and the White House Environmental Justice Advisory Council.

- (+$1,500.0) This program change increases support for the competitive, EJ training program which awards competitive grants to community-based nonprofit organizations and partnerships between community-based nonprofit organizations and institutions of higher education.

- (+$311.0 / +1.7 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $294.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98-80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); American Rescue Plan Act of 2021 (Pub. L. 117-2).

**Geographic Programs**

## Geographic Program:  Chesapeake Bay

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$74,640* | *$92,000* | *$92,000* | *$0* |
| Total Budget Authority | $74,640 | $92,000 | $92,000 | $0 |
| Total Workyears | 35.7 | 41.2 | 41.2 | 0.0 |

The Infrastructure Investment and Jobs Act (Public Law 117-58) includes $47.6M for this program in FY 2025.

**Program Project Description:**

The Chesapeake Bay is the largest estuary in the United States, with a drainage area that covers six states and the District of Columbia in the mid-Atlantic. The Bay is not only treasured for recreational purposes but also serves as a vital resource for ecological and economic activities in the region and beyond. The Chesapeake Bay Program operates under the authority of Section 117 of the Clean Water Act and includes the seven Chesapeake Bay watershed jurisdictions (Delaware, Maryland, the District of Columbia, New York, Virginia, Pennsylvania, and West Virginia), the Chesapeake Bay Commission, and the federal government. EPA coordinates and supports the activities of the partnership and represents the federal government on the partnership's Chesapeake Executive Council. On June 16, 2014, the Chesapeake Bay Program partners signed the most recent Chesapeake Bay Watershed Agreement (Agreement).[135] The Agreement establishes 10 goals and 31 outcomes including restoration of wetlands and riparian forest buffers, sustainable fisheries, water quality, vital habitats, climate change, and toxic contaminants, with Management Strategies and two-year Logic & Action Plans guiding the work of each outcome. Progress toward the Agreement commitments is updated regularly and publicly available for evaluation.

EPA, the watershed jurisdictions, and other key federal agencies set two-year water quality milestones  that measure progress made in achieving the Chesapeake Bay Total Maximum Daily Load (Bay TMDL) and  the jurisdictions' Watershed Implementation Plans.[136] The Bay TMDL satisfies a requirement of the Clean Water Act and EPA commitments under Court-approved consent decrees for Virginia and the District of Columbia dating to the late 1990s.[137] The Bay TMDL is designed to ensure all nitrogen, phosphorus, and sediment pollution control efforts needed to restore the Bay and its tidal rivers are in place by 2025.

---

[135] The Chesapeake Bay Watershed Agreement (2014) as amended in 2022, available at:
https://d18lev1ok5leia.cloudfront.net/chesapeakebay/Chesapeake-Bay-Watershed-Agreement-Amended.pdf.
[136] The federal and jurisdictional milestones related to water quality in the Chesapeake Bay watershed are available at https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-milestones#2022.
[137] The Chesapeake Bay TMDL, available at: http://www.epa.gov/chesapeake-bay-tmdl/.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to focus on supporting implementation of the two-year Logic and Action Plans for the 25 management strategies developed under the Agreement, with particular focus on improving performance toward achieving outcomes where progress is lagging. While the 2014 Agreement does not have an end date, many of the Agreement's outcomes have target dates of 2025. In FY 2024, the Chesapeake Bay Program will evaluate progress made toward the outcomes of the current Agreement to determine the focus of the work beyond FY 2025, while considering recent advances in science and restoration. The Program also will conduct an overall program evaluation to ensure our operations and organization are effective and efficient. The Program is increasing focus on environmental justice, ensuring the benefits of the Chesapeake Bay Program are distributed equitably. In addition, the Program is increasing efforts in the climate change space by focusing initiatives on the resiliency of the watershed. Specific emphases include:

- At the Fall 2022 Executive Council meeting, it was acknowledged that although the jurisdictions met their sediment reduction goals ahead of schedule, the current outlook was that necessary nitrogen and phosphorus reductions would not be met on time. At the following Executive Council meeting (Fall 2023), recommendations to accelerate progress were accepted, which include considerations for geographic targeting, social science, robust monitoring networks, and climate-induced water temperature changes.
- Accelerating implementation of outcomes that help keep the watershed resilient in the face of climate change (*e.g.,* forest buffers, urban tree canopy, wetland protection and restoration, and land conservation).
- Increasing community engagement in achieving program outcomes and initiating efforts to garner partnership commitment to outyear priorities to achieve a restored Chesapeake Bay, considering current scientific understanding and emerging issues, and ensuring consideration of diversity, equity, inclusion, and justice.
- Maintaining and expanding the historically strong submerged aquatic vegetation, and tidal and non-tidal water quality monitoring programs implemented through grants with jurisdictional partners and federal interagency agreements.
- Ensuring the most up-to-date science is used throughout the Chesapeake Bay Program to support decision-making, implementation, and future condition assessment (for example, improving computer models to help predict the impact of climate change on the Chesapeake Bay Program's ability to meet water quality standards in the tidal waters of the Chesapeake Bay); and
- Increasing investment and tracking of investments in diversity, equity, inclusion, and justice in Chesapeake Bay Program restoration efforts, including implementing EPA CBPO's 2023 Equity Strategy and the Chesapeake Bay Program partnership's 2021 Diversity Equity Inclusion Justice (DEIJ) action strategy, and supporting local level actions targeting disadvantaged communities. This includes working with the EPA's National Center of Environmental Economics to develop a methodology for understanding and tracking benefits to disadvantaged communities from Bay restoration work.

146

Environmental results, measured through data collected by the jurisdictions and shared with the federal government, show the importance of the investment that federal, state, and local governments have made in providing clean and safe water. Every year, the Chesapeake Bay Program uses available monitoring information from the 92 segments of the Chesapeake Bay to estimate whether each segment is attaining criteria for one or more of its designated uses. EPA, along with other federal, state, and academic partners, are using this information to demonstrate progress toward meeting water quality standards and the Bay TMDL.

The seven Chesapeake Bay jurisdictions have reported that, as of 2022, best management practices to reduce pollution are in place to achieve 51 percent of the nitrogen reductions, 60 percent of the phosphorus reductions, and 100 percent of the sediment reductions needed to attain applicable water quality standards when compared to the 2009 baseline established in the Bay TMDL.[138] In FY 2025, EPA will evaluate progress toward meeting the 2024 – 2025 milestone commitments of the jurisdictions. The two-year milestones are intended to demonstrate how the jurisdictions will meet their pollution reduction goals by 2025 through the major source sectors (*e.g.,* agricultural sector, urban stormwater, and wastewater).

EPA will continue to provide the Chesapeake Bay Program partnership with funding and technical assistance, expand our ability to track and report progress across our suite of outcomes, coordinate and facilitate partnership efforts to reach our mutual goals of a healthy Bay and watershed. While continuing progress toward restoring the Bay watershed, EPA and other Executive Council members signed and released the historic *Statement in Support of Diversity, Equity, Inclusion and Justice.*[139] This statement reaffirmed the Executive Council's commitment to recruit and retain staff and volunteers that reflect the diversity of the watershed, foster a culture of inclusion and respect across all partner organizations, and ensure the benefits of our science, restoration, and partnership programs are distributed equitably without disproportionate impacts on disadvantaged communities.

Additionally, EPA is working to accelerate integration of climate change in Bay restoration efforts. EPA and other Executive Council members signed and released the *Collective Action for Climate Change* directive.[140] One key activity is the launch of a Climate Directive Pilot Project which prioritizes implementation projects that advance progress towards multiple Agreement outcomes in disadvantaged and/or climate vulnerable communities. EPA also is addressing climate change by: 1) starting in 2025, predicting the impact of 2035 climate changes on water quality and adjusting pollution targets; 2) understanding adaptations needed in the watershed and coastal regions; and 3) maintaining or improving the watershed's resiliency to climate change. Work is underway to develop state-of-the-science models of the Chesapeake airshed, watershed, and tidal waters to refine the 2035 climate risk assessment. Also, EPA and the Bay Program partnership are actively investigating best management practices to better protect the watershed and tidal Bay against the observed increased precipitation volumes and intensity brought about by climate change in urban and agricultural regions.

---

[138] For more information, please see https://www.chesapeakeprogress.com/clean-water/watershed-implementation-plans.
[139] For more information, please see https://www.chesapeakebay.net/channel_files/40996/deij_statement_final_all_signatures.pdf
[140] For more information, please see https://d18lev1ok5leia.cloudfront.net/chesapeakebay/documents/climatedirective_final_3.pdf.

In addition, the Infrastructure Investment and Jobs Act (Public Law 117-58) includes $47.6 million for this program in FY 2025. In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

**Statutory Authority:**

Clean Water Act, Section 117; Estuary Restoration Act of 2000; Chesapeake Bay Accountability and Recovery Act of 2014; Clean Air Act; Further Consolidated Appropriations Act, 2023, Pub. L. 117-328.

148

# Geographic Program:  Gulf of Mexico

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$22,550* | *$25,524* | *$25,600* | *$76* |
| Total Budget Authority | $22,550 | $25,524 | $25,600 | $76 |
| Total Workyears | 16.1 | 21.7 | 21.7 | 0.0 |

**Program Project Description:**

The Gulf of Mexico is an iconic and important body of water, providing ecological, economic, cultural, and recreational opportunities for millions of residents and visitors to the region. The Gulf of Mexico is heavily impacted by the Mississippi River, the main river system which drains into it. The Mississippi River watershed captures drainage from 41 percent of the land area of the contiguous United States (includes nearly 1.5 million square miles over parts of 31 states). Through the Gulf of Mexico Division (GMD), EPA collaborates with federal, state, and local partners to restore the Gulf, and ultimately improve the health of the coastal area, benefiting approximately 16 million Americans.[141]

The mission of the EPA's GMD is to facilitate collaborative actions that protect, maintain, and restore the health and productivity of the Gulf of Mexico in ways consistent with the economic and ecological well-being of the region. The GMD competitively funds projects and uses interagency agreements and strategic partnerships to accomplish its mission. All GMD projects and partnership work are linked to one or more of the following performance measures: 1) improve and/or restore water quality; 2) protect, enhance, or restore coastal and upland habitats; 3) promote and support environmental education and outreach to inhabitants of the Gulf watershed; and 4) support the demonstration of programs, projects, and tools which strengthen community resilience.[142] The GMD provides significant leadership and coordination among state and local governments, the private sector, tribes, scientists, and citizens to align efforts that address the challenges facing the communities and ecosystems of the Gulf Coast. The GMD is committed to voluntary, non-regulatory actions and solutions based on scientific data and technical information underpinning the Agency's work with the stakeholders.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

---

[141] For more information please see: https://www.census.gov/content/dam/Census/library/visualizations/2019/demo/coastline-america-print.pdf.
[142] For more information please see: https://www.epa.gov/system/files/documents/2022-12/GMD2022AR%20FINAL_0.pdf.

In FY 2025, the Agency will continue supporting specific actions and solutions designed to improve the environmental and economic health of the Gulf of Mexico region through cooperative efforts and partnerships. Specifically, the Agency will address nutrient reduction on working lands with targeted habitats. Additionally, GMD will center its focus on sustainable agriculture and resilience in the farming community. EPA will continue to expand Science, Technology, Engineering, Arts, and Mathematics (STEAM) experiential education and workforce development to underserved communities. Through green infrastructure practices such as artificial reefs, riparian buffers, prairies, and living shorelines, GMD will continue to build the adaptive capacity of ecosystems and communities. The GMD projects are competitively funded and coordinated with and complement ongoing Resource and Ecosystems Sustainability, Tourist Opportunities, Revived Economies (RESTORE) and Natural Resource Damages Assessment (NRDA) activities related to the Deepwater Horizon oil spill. The GMD continues to seek broad participation and input from the diverse stakeholders who live, work, and recreate in the Gulf Coast region.

The GMD directly funds assistance agreements, interagency agreements and partnerships, which support the following activities:

<u>Environmental Education and Outreach</u>

In FY 2025, the GMD will continue to promote the use of best available science and sustainable environmental practices by developing programs, establishing partnerships, and competitively funding projects that increase environmental literacy. The GMD will enhance experiential learning opportunities for Gulf residents and visitors alike.

To ensure that environmental education and outreach efforts extend to overburdened and underserved populations, GMD will work with various sectors of government, community leaders, and academia on projects that promote capacity building and lead to behavioral changes in communities with environmental justice concerns. Education and outreach are vital to accomplishing the Agency's mission to protect human health and the environment, to inform and provide actionable information to communities with environmental justice challenges, and to meet the GMD-specific goals of promoting healthy and resilient coastal communities.

GMD will evaluate success of this work by tracking the number of participants involved in environmental literacy and stewardship activities. Recipients of competitively funded projects are required to report on this data quarterly and personnel must input direct engagement efforts into the GMD's quarterly metrics tracking database.

<u>Strengthen Community Resilience</u>

Coastal and inland communities continuously face a range of natural and man-made challenges, including storm risk, land and habitat loss, depletion of natural resources, compromised water quality, and resulting economic instability. In FY 2025, the GMD will continue to emphasize robust partnerships and extensive community engagement to strengthen coastal and near-shore community preparedness. Through actions, activities, partnerships, and projects, communities throughout the Gulf will be more resilient, and thus better prepared for natural disasters or other

emergencies. The GMD will leverage its Community Resilience Index Tool to provide municipalities with a method to assess vulnerabilities and take steps to mitigate risks.

GMD will evaluate success of this work by tracking the number of communities informed on vulnerabilities and risks and those with programs, projects, and tools developed and/or demonstrated to identify vulnerabilities and to manage risks as a way of improving the social well-being, the economy, and/or the environment. Recipients of competitively funded projects are required to report on this data quarterly and personnel must input direct engagement efforts into the GMD's quarterly metrics tracking database.

Improve Water Quality

The Clean Water Act provides authority and resources to protect and improve the water quality in the Gulf of Mexico and all waters of the United States. The GMD supports projects and works with partners, such as the Hypoxia Task Force, to improve water and habitat quality throughout the Gulf of Mexico watershed. In FY 2025, the GMD will fund projects which improve water quality on a watershed basis through monitoring nutrient reduction, analyzing data, and assessing changes.

GMD will evaluate success of this work by tracking the number of water segments/bodies with improved understanding of water quality conditions and/or water quality parameters through competitively funded projects and partnerships with stakeholders. Recipients of competitively funded projects are required to report on this data quarterly and personnel must input direct engagement efforts into the GMD's quarterly metrics tracking database.

Enhance, Protect, or Restore Coastal Habitats

Managing critical ecosystems is widely recognized as a fundamental environmental priority throughout the Gulf Coast region. Critical issues include, but are not limited to, sediment management, marsh/habitat loss due to subsidence, the continued reduction of freshwater in-flow, and climate change. For decades, the Gulf Coast has endured extensive natural and man-made damage to key habitats such as coastal wetlands, estuaries, barrier islands, upland habitats, seagrass vegetation, oyster reefs, coral reefs, and offshore habitats. In FY 2025, the GMD will continue to fund projects and work with partners to enhance coastal ecosystems, improve sediment movement/management, restore acreage where feasible and cost-effective, and reverse the effects of long-term habitat degradation.

GMD will evaluate success of this work by tracking the number of habitats restored, improved, or enhanced through competitively funded projects and partnerships with stakeholders. Recipients of competitively funded projects are required to report on this data quarterly and personnel must input direct engagement efforts into the GMD's quarterly metrics tracking database. This work will be further reported on to assess commitments as part of the Evidence and Evaluations Act.

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$519.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (-$443.0) This program change is a decrease to offset fixed and other costs.

**Statutory Authority:**

Clean Water Act, Consolidated Appropriations Act, 2023, Pub. L. 117-328.

## Geographic Program:  Lake Champlain

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$25,823* | *$25,000* | *$25,000* | *$0* |
| Total Budget Authority | $25,823 | $25,000 | $25,000 | $0 |
| Total Workyears | 0.1 | 1.0 | 1.0 | 0.0 |

**Program Project Description:**

The trans-boundary region of Lake Champlain is a resource of national significance and home to more than 600,000 people, about 35 percent of whom depend on the lake for drinking water. The 8,234-square mile basin includes areas in Vermont, New York, and the Province of Quebec. Lake Champlain draws millions of visitors annually. The Patrick Leahy Lake Champlain Basin Program (LCBP) supports implementation in Vermont and New York of a comprehensive pollution prevention, control, and restoration plan for protecting the future of the Lake Champlain Basin. Through the LCBP, EPA is addressing various threats to Lake Champlain's water quality, including phosphorus loadings, invasive species, and toxic substances.[143]

The Program's goal is to achieve clean waters that will sustain diverse ecosystems, vibrant communities, and working landscapes. These ecosystems should provide clean water for drinking and recreation and support a habitat that is resilient to extreme events and free of aquatic invasive species.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

EPA's budget request will allow the Program to address high levels of phosphorus by implementing priority actions identified in the Opportunities for Action Management Plan to reduce phosphorus loads.[144] The 2016 Vermont Total Maximum Daily Load (TMDL) for Phosphorus for Lake Champlain is central to the planning and implementation work within the Lake Champlain Basin to reduce phosphorus loads and meet the wasteload and load allocations specified in the TMDL. Phosphorus reductions from the New York portion of the basin continue to be subject to the TMDL approved in 2002, and the state is expected to release an updated Lake Champlain Watershed Implementation Plan in 2024. The Program also seeks to prevent the

---

[143] For additional information please see: https://www.epa.gov/tmdl/lake-champlain-phosphorus-tmdl-commitment-clean-water and http://www.lcbp.org,

[144] For additional information please see: https://www.lcbp.org/wp-content/uploads/2016/03/OFA_2022_Full-Plan.pdf.

impacts of aquatic invasive species and to restore habitat across its basin. The LCBP also will increase efforts to better understand how to address harmful algal blooms (HABs) and prevent the introduction and spread of invasive species.

In FY 2025, EPA will focus on the following activities:

- Ninety-three percent of the total phosphorus load to the lake is from stormwater or nonpoint source runoff, and seven percent is from wastewater treatment plant sources in Vermont, New York, and Quebec. EPA and its partners will continue to reduce phosphorous pollution from stormwater runoff, nonpoint sources, and wastewater treatment facilities to meet reductions specified in the Vermont and New York TMDLs. Specifically, EPA will focus on:
    - Implementing stormwater planning, design, and construction of green stormwater infrastructure at Vermont public schools and state universities, including implementing best management practices on rural roads in both Vermont and New York, thereby increasing their resiliency to climate impacts.
    - Addressing agricultural nonpoint sources including continued research to determine the efficiency of agricultural best management practices; evaluating farm practices to identify where improvements to practices are needed; and decommissioning former agricultural lands better suited for habitat and floodplain restoration efforts.

The Program also aims to restore healthy ecosystems to provide clean water for recreation and drinking water and intact habitat that is resilient to extreme events and invasive species. In FY 2025 the Program will support:

- Biodiversity, by preventing habitat fragmentation and improving resilience to changing weather conditions.
- Prevention of aquatic invasive species that harm the environment, economy, or human health, including aquatic plants, animals, and pathogens. EPA will continue to work with partners to understand the impact of any potential spread. The Agency also will continue to monitor invasive water chestnuts and fund efforts to reduce their density and distribution. Additionally, EPA and its partners will continue to implement the activities identified in the Great Lakes and Lake Champlain Invasive Species Program Report submitted to Congress under requirements of the Vessel Incidental Discharge Act.[145]
- Collection of cyanobacteria data that will increase public awareness of bloom conditions, the effects of excessive phosphorus in the Lake, and continue to document where algal blooms are prevalent across the basin to inform management decisions.
- The LCBP will continue to support the development of new ways to understand the high seasonal concentrations of harmful algal blooms, report on their potential health impacts, and provide necessary information to the health departments of New York and Vermont to close beaches, protect drinking water intakes, or take other actions. In addition, the Program will investigate developing new approaches for urban and agricultural stormwater control.

---

[145] For more information please visit: https://www.epa.gov/greatlakes/great-lakes-and-lake-champlain-invasive-species-program-report.

- The Lake Champlain Basin Program will continue to address environmental justice concerns in the basin through implementation of its strategic plan, and implementation of the program's approved Equity Strategy for the Justice40 Initiative.
- The Program's 2022 management plan includes new metrics to expand tracking and reporting of implementation efforts. In FY 2025 the Program will continue development of a new project tracking database to better analyze, visualize, and share program results with stakeholders and the public.
- The triennial State of the Lake and Ecosystem Indicators Report from the Lake Champlain Basin Program will be published in FY 2025 presenting the most recent information on the conditions of Lake Champlain and its watershed.
- Infrastructure Investment and Jobs Act (IIJA) (Public Law 117-58) appropriations includes $8 million for the Program in FY 2025. LCBP will continue implementation of priority projects funded via IIJA including a competitive aquatic organism passage grant program, strategic land acquisition of priority parcels for water quality, aquatic habitat and /or climate change mitigation, wetland and floodplain restoration in New York, and aquatic invasive species management and spread prevention in the Lake Champlain basin.

In FY 2025, EPA is requesting appropriation language that will provide funding for the Lake Champlain Program in no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

**Statutory Authority:**

Boundary Waters Treaty of 1909; Clean Water Act §120; Consolidated Appropriations Act, 2023 (Pub. L. 117-328).

155

## Geographic Program:  Long Island Sound

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$36,429* | *$40,002* | *$40,000* | *-$2* |
| Total Budget Authority | $36,429 | $40,002 | $40,000 | -$2 |
| Total Workyears | 3.6 | 8.0 | 8.0 | 0.0 |

**Program Project Description:**

The Long Island Sound Program protects wildlife habitat and water quality in one of the most densely populated areas of the United States, with nearly nine million people living in the watershed. In total, the Long Island Sound watershed comprises more than 16 thousand square miles, including virtually the entire state of Connecticut, and portions of New York, Rhode Island, Massachusetts, Vermont, and New Hampshire. The Long Island Sound provides recreation for millions of people each year and provides a critical transportation corridor for goods and people. The Long Island Sound continues to provide feeding, breeding, nesting, and nursery areas for diverse animal and plant life. The ability of the Long Island Sound to support these uses is dependent on the quality of its waters, habitats, and living resources. The Long Island Sound watershed's natural capital provides between $17 and $37 billion in ecosystem goods and services every year.[146]

Improving water quality and reducing nitrogen pollution are priorities of the Long Island Sound Program. The Program is making measurable differences in the region. Through State Revolving Fund and local investments of more than $2.5 billion to improve wastewater treatment, the total nitrogen load to the Long Island Sound in 2022 decreased by more than 49 million pounds from 1990 levels, a 70 percent reduction in the effective load of nitrogen. This and other investments have enabled the EPA-State partnership to attain the pollution reduction targets set in the nitrogen total maximum daily load (TMDL) 2000. As a result, water quality is improving. The average maximum area of waters not attaining dissolved oxygen criteria protection of aquatic life has decreased by more than 50 percent since 2010.

The Program also is focused on habitat protection and restoration. Program partners have restored 593 acres of coastal habitat between 2015 - 2022, well ahead of the pace needed to achieve the goal of restoring 1,000 coastal acres by 2035. In 2022, program partners completed 25 projects in coastal habitats, restoring 134.3 acres. An average of 50 acres a year is needed to meet the 2035 target. The Program is currently averaging 89.6 acres a year. The Program also is ahead of schedule in meeting its Comprehensive Conservation and Management Plan (CCMP) target of reopening

---

[146] For more information please see: Kocian, M., Fletcher, A., Schundler, G., Batker, D., Schwartz, A., Briceno, T. 2015. The Trillion Dollar Asset: The Economic Value of the Long Island Sound Basin. Earth Economics, Tacoma, WA.

200 miles of river migratory corridors by 2035 for fish passage to Long Island Sound. The initiative has so far reconnected 125.2 river miles, 62.7 percent of the way toward meeting the target.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the Program will continue to oversee implementation of the Long Island Sound Study (LISS) CCMP by coordinating the cleanup and restoration actions of the LISS Management Conference. The LISS CCMP is organized around four major themes:[147] 1) clean waters and healthy watersheds; 2) thriving habitats and abundant wildlife; 3) sustainable and resilient communities; and 4) sound science and inclusive management. Throughout the four themes, the CCMP incorporates key challenges and environmental priorities including resiliency to climate change, long-term sustainability, and environmental justice. The plan also set 20 quantitative ecosystem recovery targets to drive progress. In 2020, the LISS updated the CCMP with 136 implementation actions covering the period 2020 - 2024. In FY 2025, EPA will focus on the following:

- Finalize a revised CCMP that sets new ecosystem targets and establishes a new five-year action plan for the period 2025 - 2029.
- Continue to reduce nitrogen pollution through implementing the Nitrogen Reduction Strategy. EPA will work cooperatively with Connecticut and New York to expand modeling and monitoring to develop numeric nitrogen targets that are protective of designated uses and set local nitrogen reduction targets where necessary.
- Coordinate priority watershed protection programs such as increasing streamside buffer zones as natural filters of pollution.
- Support community sustainability and resiliency through the Sustainable and Resilient Communities Work Group to help communities plan for climate change impacts while strengthening ecological health and protecting local economies.
- Coordinate the protection and restoration of critical coastal habitats to improve the productivity of tidal wetlands, inter-tidal zones, and other key habitats that have been adversely affected by unplanned development, overuse, land use-related pollution effects, and climate change (*e.g.*, sea level rise, warming temperatures, changes in salinity, and other ecological effects).
- Integrate environmental justice considerations across program decision-making and implementation through the new LISS Environmental Justice Work Group.
- Conduct targeted outreach and engagement efforts to understand community needs in areas with environmental justice concerns.
- Increase the participation of new and diverse partners in LISS programs and decision-making.
- Continue program evaluations in response to *GAO-Report 18-410 Long Island Sound Restoration: Improved Reporting and Cost Estimates Could Help Guide Future Efforts*.[148]

---

[147] For more information please visit: https://longislandsoundstudy.net/2015/09/2015-comprehensive-conservation-and-management-plan/.
[148] To read the report, visit: https://www.gao.gov/products/gao-18-410.

The purpose of the evaluation is to assess progress made toward meeting the goals, actions, and schedules of the LISS CCMP, including quantifiable targets of ecosystem condition.

- Finalize the Long Island Sound Office's biennial report to Congress summarizing the progress made in implementing the CCMP, highlighting any modifications to the CCMP, and recommendations concerning the CCMP.
- Continue coordinated water quality monitoring, modeling, and research.
- Support community partnerships to reduce pollution, protect and restore habitats, and increase sustainability and resiliency through the Long Island Sound Futures Fund.
- Conduct focused scientific research into the causes and effects of pollution on the Sound's living marine resources, ecosystems, water quality, and human uses to assist managers and public decision-makers in developing policies and strategies to address environmental, social, and human health impacts.

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$42.0) This change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefit costs.

- (+$40.0) This program change is an increase to resources available to restore Long Island Sound.

**Statutory Authority:**

Clean Water Act § 119.

158

**Geographic Program:  Other**

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$10,486* | *$14,200* | *$14,200* | *$0* |
| Total Budget Authority | $10,486 | $14,200 | $14,200 | $0 |
| Total Workyears | 5.4 | 6.7 | 6.7 | 0.0 |

In addition, the Infrastructure Investment and Jobs Act (Public Law 117-58) includes $30.2 million for this program in FY 2025.

**Program Project Description:**

EPA targets efforts to protect and restore many of the unique communities and ecosystems across the United States through the geographic programs. To protect and restore these treasured resources, the Agency develops and implements approaches to mitigate sources of pollution and cumulative risks posed by a variety of geographically distinct environmental stressors. These approaches improve water resource quality in ecosystems and the health and economic vitality of residents that rely on them. While substantial progress has been made in all these programs, more work is required to further reduce toxins, lower nutrient loads into watersheds and water bodies, increase ecologically and economically important species, restore habitats, and protect human health. The programs also are focused on targeting investments and benefits to disadvantaged communities within their reach, consistent with the goals of the Justice40 initiative, and prioritizing investments with climate adaptation and mitigation outcomes.

The Northwest Forest Program

The Northwest Forest Program addresses water quality impairments in forested watersheds and works to improve the quality and quantity of surface water to meet beneficial use and drinking water/source water protection goals. Climate change is increasing the demands on the Program due to the increase of catastrophic wildfires and resulting impacts to water quality and municipal drinking water.

The Northwest Forest Program supports monitoring of watershed conditions across 72 million acres of forest and rangelands in the Northwest. In Oregon and Washington, 40 to 90 percent of the land area within national forests supply drinking water to communities west of the Cascade Range crest. This Program provides the data communities need to help manage these drinking water resources. Funding allows EPA to provide critical support to the Aquatic Riparian Effectiveness Monitoring Program and the Pacfish/Infish Biological Opinion Effectiveness Monitoring Program. These regional scale watershed monitoring programs are essential to

159

determining the effectiveness of riparian management in meeting aquatic/riparian habitat, ecosystem function, and water quality standards.

The Northwest Forest Program also helps EPA respond to tribal trust and treaty responsibilities. EPA staff are key to protection and restoration of watersheds and water quality important to tribes. EPA has tribal trust responsibilities in the Northwest for tribes reliant on salmon and shellfish.

Lake Pontchartrain Basin Restoration Program (PRP)

The purpose of PRP is to restore the ecological health of the Lake Pontchartrain Basin by developing and funding restoration projects and related scientific and public education projects.

The basin comprises 16 Louisiana parishes and four Mississippi counties. The land use of the basin ranges from rural to urban and is the most densely populated region in Louisiana, including metropolitan New Orleans and Louisiana's capitol, Baton Rouge. The basin provides a home and natural habitat to over 2.1 million people and is one of the largest estuarian systems in the United States. The basin's topography ranges from rolling woodlands in the north to coastal marshes in the south, with the 630 square mile Lake Pontchartrain, the second largest saltwater lake in the United States, as its centerpiece.

Projects funded under this program maintain, protect, and restore the water quality and ecosystems of the basin. These projects reduce the risk of pollution, increase protection of fisheries and drinking water sources and enhance recreational opportunities for the citizens of Louisiana.

Southeast New England Program (SNEP)

Southeast New England (from Westerly, Rhode Island, to Pleasant Bay, Massachusetts) faces environmental challenges that are both unique and highly representative of critical national problems, especially in coastal areas. Typical problems include rivers hydrologically disconnected by dams and restrictions, lost wetland functions, urbanization, and centuries-old infrastructure, all compounded by the increasing impacts of excess nutrients from wastewater, stormwater runoff, and atmospheric deposition. Excess nutrients have contributed to severe water quality problems including algal blooms, low dissolved oxygen conditions, fish kills, impaired benthic communities, and habitat loss (*e.g.,* sea grass and salt marsh) in estuaries and near-coastal waters of this region and worldwide. The impacts of climate change, especially the likelihood of extreme weather events and increased precipitation, will further stress these systems in coming years, not only environmentally but also socially and economically. The Program seeks to link environmental quality to economic opportunity and jobs by delivering local solutions in a regional and watershed context. Taking up and successfully addressing these issues will enable the Program to serve as a model for other areas.

SNEP serves as a hub to enable protection and restoration of the coastal watersheds of Southeast New England. Protecting these watersheds and the ecosystem services they provide will help sustain the region's communities and environmental assets into the future. SNEP draws upon networks of stakeholders and experts to seek out and support innovations in practices, technology, and policies that will enable better and more effective watershed protection and restoration. The

goal is to create a sustainable path for change and to lead the next generation of environmental management by:

- Developing and investing in innovative, cost-effective restoration and protection practices, as well as new regulatory, economic, and technology approaches.
- Providing technical assistance to tribes, municipalities and local organizations.
- Supporting local restoration efforts.
- Integrating delivery of programs to the public by our fellow agencies and partners.
- Focusing on ecosystem services.
- Improving technology transfer and delivery of restoration programs across the region.
- Developing regional approaches to collate water quality and habitat data in order to provide a report on regional trends.
- Developing and implementing metrics to track the impact of SNEP projects throughout the region.

Columbia River Basin Restoration Program (CRBRP)

The Columbia River Basin is one of North America's largest watersheds, covering approximately 260 thousand square miles, originating in British Columbia, Canada, with seven states including significant portions of Idaho, Montana, Oregon, and Washington. The basin provides environmental, economic, cultural, and social benefits and is vital to many entities and industries in the Pacific Northwest, including tribal, recreational, and commercial fisheries; agriculture; forestry; recreation; and electric power generation.

Human activities have contributed to impaired water quality that impacts human health and fish and wildlife species survival. Tribal fish consumers, other high fish consumers and subsistence fishers are exposed to known toxic contaminants and increased human health risks. Beginning in 2004, EPA has made a priority commitment to reducing toxics in the basin reflecting a responsibility to environmental justice for tribal people to protect human health and help restore and protect fish and wildlife populations. There are several endangered fish and wildlife species throughout the basin. A major salmon restoration effort is underway that has expended millions of dollars to restore salmon throughout the basin. Additionally, this is a part of EPA's contribution to support the September 2023 President's Memorandum of "Restoring Healthy and abundant Salmon, Steelhead, and Other Native Fish Populations in the Columbia River Basin."[149]

In 2016, Congress adopted the Columbia River Basin Restoration Act as Section 123 of the Clean Water Act (CWA), which directs EPA to lead a basin-wide collaboration and competitive grant program to assess and reduce toxics in the basin. Section 123 also directs EPA to establish a Columbia River Basin Restoration Program (CRBRP) to assess trends in water quality; collect and assess data to identify possible causes of environmental problems; provide grants for projects for specific purposes; and establish a voluntary Columbia River Basin Restoration Working Group.

---

[149] For more information please see: https://www.federalregister.gov/documents/2023/10/02/2023-21882/restoring-healthy-and-abundant-salmon-steelhead-and-other-native-fish-populations-in-the-columbia.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

Funding will be split amongst the Northwest Forest Program, Lake Pontchartrain Program, Southern New England Program, and Columbia River Basin Program for restoration of the four geographic programs with an emphasis on initiatives that advance environmental justice and address the threats exacerbated by climate change.

Northwest Forest Program

In FY 2025, the Program will support the following activities:
- Monitoring and assessment of wildfire impacts to water quality, including ongoing efforts in watersheds impacted by the catastrophic 2020 Labor Day fires in Oregon.
- Table-top exercises with federal, tribal, and state, land management, water quality and air quality experts to address barriers to implementing the Wildfire Crisis Strategy.
- Aquatic and Riparian Effectiveness Monitoring Program (AREMP) of the Northwest Forest Plan and Bureau of Land Management (BLM) Western Oregon Resource Management Plan to help maintain and restore watersheds across 24 million acres of federal lands in western Washington and Oregon, and northern California.
- The PacFish/InFish Biological Opinion Effectiveness Monitoring Program to monitor stream and riparian habitats for both inland fish species and anadromous fish like salmon that rely on both the Pacific Ocean and freshwater rivers to ensure conservation strategies are working effectively to sustain fish populations.
- The Drinking Water Providers Partnership— an annual public-private funding opportunity for water providers and watershed restoration practitioners in Oregon and Washington to implement riparian or in-stream restoration actions to restore and protect the health of watersheds and drinking water.
- States' implementation of forestry non-point source programs and development of Total Maximum Daily Loads (TMDLs) and Best Management Practices for forestry.
- Development of Spatial Statistical Network models to evaluate impacts of forest practices and climate change on stream temperatures across entire watersheds. Further support for watershed management and development and implementation of TMDLs.
- Collaboration with partners and local water providers to address sediment and temperature impairments in forested watersheds.

Lake Pontchartrain Basin Restoration Program (PRP)

In FY 2025, the Program will help restore the ecological health of the Lake Pontchartrain Basin by:
- Implementing the current Lake Pontchartrain Basin Program Comprehensive Management Plan (CCMP) and Comprehensive Habitat Management Plan (CCHP), including implementation of restoration projects.
- Revising the CCMP/CCHP to meet the current needs of the basin and updating recommendations to meet current best management practices and technology.

- Working with the executive committee and management conference to expand the reach of the Program to communities who have not participated in the past and to reinvigorate participation in the management conference.
- Incorporating Justice40 into the PRP through:
  - identification of key areas for investments;
  - development of robust protocols for proposal review and project review;
  - outreach to eligible applicants to include investments and benefits to disadvantaged communities in their projects; and
  - tracking and reporting the investments and benefits of PRP projects to disadvantaged communities in the basin.
- Continue to evaluate (1) the suitability of the management conference and the Program's organizational structure in achieving the Program's objectives; (2) the grantee's performance related to PRP grants; and (3) the program's progress toward achieving the PRP equity strategy goals. This evaluation is partially in response to *GAO Report-23-105547 Lake Pontchartrain Basin: Additional Transparency and Performance Management Could Improve EPA's Restoration Program.*[150]

## Southeast New England Program (SNEP)

In FY 2025, the Program will support technical assistance, grants, interagency agreements, and contracts to spur investment in regionally significant and/or landscape-scale restoration opportunities, more fully integrate restoration actions, build local capacity, promote policy and technology innovation, encourage ecosystem (water quality and habitat) approaches, and enact the Southeast New England Program's *Five-Year Strategic Plan.*[151] SNEP is tracking community engagement and is striving to provide funding or technical assistance to 70 percent of regional municipalities (93 out of 133) and all of the federally-recognized tribes (3) by the end of FY 2025. Specific activities include:

- Investing in on-the-ground environmental restoration/protection projects through the SNEP Watershed Implementation Grants (SWIG) Program.
- Building capacity of municipalities and other organizations to actively participate in implementing restoration projects and effectively manage their environmental programs through the SNEP Network.
- Promoting the development of next-generation watershed management tools.
- Collaborating amongst the Narragansett Bay and Buzzards Bay National Estuary Programs, the states of Rhode Island and Massachusetts, the Cape Cod and Martha's Vineyard Commissions and other Cape and Island organizations, municipalities, and key stakeholders to identify, test, promote, and implement approaches that can be replicated across Southeastern New England, with a focus on the nexus between habitat, nutrients, and stormwater and ecosystem and community resilience.
- Funding pilot projects and research to introduce innovations and practices that accelerate and guide ecosystem restoration and avoid or reduce nutrient impacts.
- Continuing the SNEP Pilot Watershed Initiative which seeks to concentrate and quantitatively evaluate the effectiveness of coordinated environmental restoration projects

---

[150] For more information visit: https://www.gao.gov/products/gao-23-105547.
[151] For more information visit: https://www.epa.gov/snep/snep-strategic-plan
.

at a sub-watershed scale. Leveraging for efficiency and effectiveness by coordinating operations, resources, and funding principles amongst restoration partners, including federal and state agencies.

- Supporting efforts to restore ecological health and build resiliency in disadvantaged communities.
- Continuing development of a regional water and habitat monitoring strategy that incorporates current monitoring efforts to tracks environmental restoration progress and inform the public about the health of the SNEP region.
- Funding vital applied research efforts related to eelgrass restoration, permeable reactive barriers, and remote sensing of lake and pond water quality.
- Continuing updates to the SNEP Dashboard grants tracking system to better understand the environmental, social, and economic impacts the Program has on the region through selected metrics.

## Columbia River Basin Restoration Program (CRBRP) - Section 123 of the Clean Water Act

EPA CRBRP's vision is to be a catalyst for broad toxics reduction work efforts and basin-wide collaboration to achieve a healthy ecosystem with significantly reduced toxic levels in fish, wildlife, and water, thus enabling communities to access unimpaired watersheds with healthy fish and wildlife habitat. The major FY 2025 plans for EPA's CRBRP include:

- Continuing to manage the implementation of the CRBRP Funding Assistance Program awards to monitor and reduce toxics in the basin.
- Competing a sixth round of CRBRP funding assistance in support of the statutory directive to provide voluntary competitive grants.
- Providing technical assistance and communication products for the Columbia River Basin Restoration Working Group and the public.
- Continuing to update EPA Columbia River Basin website, which serves as a source of technical references and other information on understanding and reducing toxics in the basin.[152]
- Integrating Environmental and Tribal Justice and Treaty Rights into the Program.
- Supporting climate adaptation strategies and resilience as it relates to toxics reduction.

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

---

[152] For more information visit: https://www.epa.gov/columbiariver.

**Statutory Authority:**

Clean Water Act.

## Geographic Program: South Florida

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$6,806* | *$8,500* | *$8,500* | *$0* |
| Total Budget Authority | $6,806 | $8,500 | $8,500 | $0 |
| Total Workyears | 1.2 | 3.0 | 3.0 | 0.0 |

The Infrastructure Investment and Jobs Act (Public Law 117-58) includes $3.2 million for this program in FY 2025.

**Program Project Description:**

The South Florida Program ecosystem extends from Chain of Lakes near Orlando, Florida to the full extent of the Florida Keys including the Dry Tortugas which is over 250 miles south. Nine million people, two federally recognized Native American tribes: Seminole and Miccosukee, three national parks, 15 national wildlife refuges, Big Cypress National Preserve, the Florida Keys National Marine Sanctuary, the Everglades, and unique coastal resources: St. Lucie and Caloosahatchee Estuaries, Indian River Lagoon, Biscayne Bay, Florida Bay, Florida Keys, and coral reefs make up this unique and sensitive ecosystem. These ecosystems support a multi-billion-dollar economy through outdoor tourism, boating, recreational and commercial fishing, coral reef diving, and world-class beaches.

Challenges faced include: the long-term sustainability of sensitive natural areas, agriculture, and the expanding human population; balancing the region's often conflicting flood control, water supply and water quality needs; and mitigating and adapting to extreme weather events and sea-level rise.

EPA's South Florida Program (SFP) coordinates research and restoration activities in south Florida where water quality and habitat are directly affected by development, pollution, and climate change. The SFP has developed an equity strategy that includes an emphasis on addressing the dual burdens of pollution and climate in disadvantaged communities. EPA implements, coordinates, and facilitates activities through a variety of programs in the region including: the Clean Water Act (CWA); the Everglades Water Quality Restoration Strategies Program; the Florida Keys National Marine Sanctuary Water Quality Protection Program; the Florida Keys National Marine Sanctuary Water Quality Monitoring Program; the Coral Reef Environmental Monitoring Program; the Benthic Habitat Monitoring Program; the Southeast Florida Coral Reef Initiative, as directed by the U.S. Coral Reef Task Force; and other programs.[153],[154]

---

[153] For more information please see: http://www.epa.gov/aboutepa/about-epa-region-4-southeast.
[154] For more information please see: https://www.epa.gov/everglades.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

The SFP supports efforts to protect and restore ecosystems impacted by environmental challenges. In FY 2025, EPA will focus on the Florida Keys Water Quality Protection Program, Florida Coral Reef Tract, impacts of Everglades Restoration, nutrient reduction to reduce harmful algal blooms, and CWA implementation.

- Through the Florida Keys National Marine Sanctuary Water Quality Protection Program, the SFP will engage stakeholders across the breadth of the Florida Keys (and beyond) to review long-term monitoring projects of water quality and ecosystems related to water quality in the Keys. Data generated by EPA partners informs these programs which have documented periodic oceanographic events such as algal blooms, seagrass die-offs and coral diseases. These monitoring programs have provided the foundational data for the development of nutrient numeric criteria. The long-term status and trend collected by the Coral Reef Environmental Monitoring Program is tracking the ongoing Stony Coral Tissue Loss Disease that continues to decimate reef building coral species of the Florida Reef Tract. To date, the SFP has provided more than $3 million to support coral research to hinder or halt the disease destroying corals reefs that are vital to Florida's eco-tourism industry and that serve as a natural barrier to storms and hurricanes. The SFP will continue to support these efforts.

- The SFP will complete study reports associated with the Everglades Regional Environmental Monitoring and Assessment Program (REMAP) in 2024 and 2025 based upon monitoring completed in 2023 and 2024. This is an EPA conducted extensive assessment of the Everglades' health which has been performed since 1993. Federal agencies, tribes, state agencies, agriculture, the public, non-governmental organizations, and the National Academies of Sciences use the data to understand water quality and ecological conditions and to assess restoration progress. The data also help to explain the effectiveness of pollution control programs.

- EPA will continue CWA and National Environmental Policy Act coordination with the U.S. Army Corps of Engineers, Florida Department of Environmental Protection, South Florida Water Management District, and tribes for the Comprehensive Everglades Restoration Plan (CERP) and Western Everglades Restoration Plan planning and Implementation. CERP is a $20 billion federal-state restoration effort with over 60 projects that affect aquatic resources throughout south Florida.

- The SFP will continue implementation of the Florida Keys Wastewater Master Plan to provide advanced wastewater treatment or best available technology services to all homes and businesses in the Florida Keys through the EPA and state co-chaired Florida Keys National Marine Sanctuary (FKNMS) Water Quality Protection Program. The goal is to remove from service all non-functioning septic tanks, cesspits, and non-compliant wastewater facilities. More than 90 percent of Florida Keys homes and business are on advanced wastewater treatment systems and more than 30 thousand septic tanks have been eliminated. The SFP will

also consider the impacts of wastewater dischargers on nearshore waters affecting the Keys and the Florida's Reef.

- The SFP will continue support for restoration, monitoring, and modeling of seagrass communities within St. Lucie Estuary, the Caloosahatchee Estuary, Indian River Lagoon, Biscayne Bay and Florida Keys to address of loss of seagrass meadows from phosphorus enrichment and chlorophyll increases resulting in dying seagrass beds, increasing harmful algal blooms, fish kills, and manatee deaths.

- EPA will continue work with state and local governments, universities, and non-governmental organizations to implement on-the-ground and satellite water quality monitoring programs for the Florida Keys, Biscayne Bay, St. Lucie Estuary, Florida Bay, and Caloosahatchee Estuary. EPA has provided more than $4 million to support water quality that includes water quality monitoring; harmful algal blooms detection, nutrient source identification and tracking; bacteria (enterococcus) tracking for healthy beaches; and submarine groundwater discharge to evaluate groundwater as a potential nutrient source.

- The FY 2025 budget request continues support for oysters, seagrass, mangroves, and sponge restoration efforts that reestablish and rehabilitate these natural systems; identify and map habitat areas for protection, restoration and management; and develop conservation/ restoration plans for these resilient ecosystems that provide habitat, food, nutrient removal, water filtration, storm attenuation, carbon storage and shoreline stabilization in South Florida.

- EPA will develop an annual Request for Applications for FY 2025 funds and continue management of more than $20 million in South Florida prior-year projects enhancing water quality, coral and seagrass monitoring; restoring coral, seagrass and sponge ecosystems; developing models to identify pollutant sources; investigating emerging contaminants and researching water quality environments conducive to algal blooms.

- EPA will begin to draft a multi-year management plan specific to the entire region that identifies the areas where impacts from EPA programs will have the greatest impact in protecting and restoring waters in the region.

- EPA will continue to work with the Florida Department of Environmental Protection, local municipalities and grantees to quantifying the impact of shallow wastewater effluent injection on groundwater nutrient fluxes to surface waters in the FKNMS.

- The program will support CWA Section 404 implementation, including wetlands conservation, permitting, dredge and fill, and mitigation banking strategies through collaboration with U.S. Army Corps of Engineers and Florida Department of Environmental Protection.

- EPA will continue to work with the State of Florida on Everglades Water Quality Restoration Strategies to address pollution. Part of this work will be tracking progress on the National Pollutant Discharge Elimination System permits and consent orders within the Everglades, including discharge limits for phosphorus and corrective actions that are consistent with state and federal law and federal court consent decree requirements.

168

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

**Statutory Authority:**

Florida Keys National Marine Sanctuary and Protection Act of 1990; National Marine Sanctuaries Program Amendments Act of 1992; Clean Water Act; Water Resources Development Act of 1996; Water Resources Development Act of 2000; National Environmental Policy Act.

## Geographic Program: San Francisco Bay

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$45,061* | *$54,500* | *$54,500* | *$0* |
| Total Budget Authority | $45,061 | $54,500 | $54,500 | $0 |
| Total Workyears | 2.6 | 7.8 | 7.8 | 0.0 |

The Infrastructure Investment and Jobs Act (Public Law 117-58) includes $4.8 million for this program in FY 2025.

**Program Project Description:**

The San Francisco Bay-Delta Estuary is recognized as an estuary of national importance by EPA, other federal agencies, state partners, and local stakeholders. The Bay Area, home to more than seven million people, is one of the densest urban areas in the nation. While historically, San Francisco Bay had about 200 thousand acres of mudflats and tidal marshes, over 90 percent of that was lost to diking and filling for agriculture and urbanization. San Francisco Bay supports 500 species of wildlife, more than a quarter of which are either threatened or endangered. Investing in wetland restoration is pivotal to the bay's resiliency to rising sea levels and other hydrologic changes.

Since 2008, EPA has received an annual appropriation for a competitive grant program, the San Francisco Bay Water Quality Improvement Fund (SFBWQIF), to support projects that protect and restore San Francisco Bay and advance the Estuary Blueprint/Comprehensive Conservation and Management Plan (CCMP) restoration goals.[155] Funding for the SFBWQIF is specifically targeted for the watersheds and shoreline areas of the nine San Francisco Bay Area counties that drain into the Bay. Since 2008, the SFBWQIF has invested over $128 million in 83 grant awards to restore wetlands and improve stormwater quality around San Francisco Bay. SFBWQIF grants have leveraged $248.5 million in funding from partners; the grant program represents a collaborative investment with local partners guided by the Estuary Blueprint/CCMP. The San Francisco Estuary restoration community is working rapidly to meet its goal of restoring 100,000 acres of wetlands that can provide flood protection, recreation, water quality improvement, and habitat for surrounding communities. SFBWQIF has invested $62 million of the total $128 million to restore over 11,400 acres of wetlands around the Bay, including tidal wetlands.

The FY 2025 request will support increased investments in projects around San Francisco Bay that are designed for resiliency considering a wide range of climate change impacts. The program will increase focus on historically underserved and overburdened communities through continued outreach and capacity building with partner organizations.

---

[155] For more information, please see: https://www.sfestuary.org/estuary-blueprint/.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the Program will focus on the following activities:

- Issue a Request for Applications soliciting proposals to restore wetlands, restore water quality, and implement green development practices that use natural hydrologic processes to treat polluted runoff around San Francisco Bay.
- Issue a Request for Applications soliciting proposals to support underserved populations in the Bay Area to improve the habitat and water quality in their local communities and improve the ease in which underserved community voices are included in the planning for regional environmental projects.
- Continue to administer the SF Bay Water Quality Improvement Fund and gather evidence of progress, consistent with the San Francisco Estuary Partnership's Comprehensive CCMP.[156]
- Continue to build the resilience of San Francisco Bay ecosystems, shorelines and communities to climate change and sea level rise.
- Continue to use EPA grants to fund climate resilient projects and improve access to funds for underserved communities.
- Provide funding and technical support to implement a new regional monitoring program for San Francisco Bay wetlands. The Wetlands Regional Monitoring Program (WRMP) will provide baseline data and include the following: 1) monitoring site network; 2) open data sharing platform; 3) comprehensive science framework. Building upon the WRMP Plan released in April 2020, EPA will continue to provide additional funding to SFEP/San Francisco Estuary Institute (SFEI) and partners for implementation of the WRMP.
- Continue technical support for the San Francisco Bay Regional Monitoring Program (RMP), a 28-year-old partnership between regulatory agencies and the regulated community to provide a long-term data set and scientific foundation to make water quality management decisions. The RMP monitors water quality, sediment quality and bioaccumulation of priority pollutants in fish, bivalves, and birds. To improve monitoring measurements or the interpretation of data, the RMP also regularly funds special studies.
- Seek to leverage other sources of funding such as the Clean Water State Revolving Fund and Federal Emergency Management Agency's pre-hazard mitigation funds in support of priority CCMP projects such as SFEP working with municipal partners on the Hayward Shoreline horizontal levee pilot project and the related "First Mile" project.
- Continue EPA's participation in the Bay Restoration Regulatory Integration Team (BRRIT), a five-year, multi-agency pilot effort to facilitate the complex permitting of restoration projects. The goal of BRRIT is for agencies with permitting jurisdiction over multi-benefit habitat restoration projects to improve the permitting process. BRRIT agencies use dedicated staff time to conduct early design review, provide written guidance and comments, identify Agency requirements that need to be met, and resolve regulatory issues early in the project planning and design phase. This permitting effort enables the accelerated implementation of BRRIT funded restoration projects. EPA will continue to provide agency staff support to the technical

---

[156] Please see the SFEP Comprehensive Conservation and Management Plan (2016) at https://www.sfestuary.org/wp-content/uploads/2017/08/CCMP-v26a-all-pages-web.pdf.

and managerial aspects of the regulatory improvement process to benefit wetlands restoration projects in the Bay.

- Continue to increase the reuse of dredged material for wetlands restoration, which is critical in preparing and responding to sea level rise in San Francisco Bay.
- Establish funding for new ocean acidification monitoring through the Nutrient Management Strategy to establish baseline data that expands the relevant datasets the wastewater sector depends on in making infrastructure upgrade decisions. Regular SF Bay water quality surveys (USGS/Nutrient Management Strategy) currently miss key ocean acidification metrics including, partial pressure of carbon dioxide (pCO2), alkalinity, and dissolved inorganic carbon, that are high priority parameters identified through regional ocean acidification workshops.
- Key actions include continued partnerships with state and federal agencies to implement and track fourteen TMDLs,[157] provide technical assistance when asked by Delta stakeholders to sustain the Delta Regional Monitoring Program (RMP), and work towards continued integration of long-term data sets in the Bay and Delta, such as the Bay Regional Monitoring Program for water quality (RMP) and the Interagency Ecological Program.
- Continue setting up the San Francisco Bay Program Office as authorized by the Water Resources Development Act of 2022 as part of the National Defense Authorization Act.

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

**Statutory Authority:**

Clean Water Act, Consolidated Appropriations Act, 2023 (Pub. L. 117-328). Section 125 of the Clean Water Act, 33 U.S.C. § 1276a

---

[157] For more information, please see the SF Bay Delta TMDL Progress Assessment at http://www.epa.gov/sfbay-delta/sf-bay-delta-tmdl-progress-assessment.

# Geographic Program: Puget Sound

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$48,317* | *$54,000* | *$54,000* | *$0* |
| Total Budget Authority | $48,317 | $54,000 | $54,000 | $0 |
| Total Workyears | 6.7 | 9.0 | 9.0 | 0.0 |

In addition, the Infrastructure Investment and Jobs Act (Public Law 117-58) includes $17.8 million for this program in FY 2025.

**Program Project Description:**

Puget Sound is the southern portion of the international Salish Sea and is the largest estuary by water volume in the United States. The Sound is an economic and cultural engine for the region's more than 4.7 million people, including nineteen federally recognized tribes. Nearly 71 percent of all jobs and 77 percent of total income in Washington State are found in the Puget Sound Basin. By 2040, the population is projected to grow to seven million, the equivalent of adding approximately four cities the size of Seattle to the watershed.

Puget Sound's beneficial uses are significant. In 2017, the value of Puget Sound commercial fishing (finfish and shellfish) was $114 million, and the gross domestic product from Puget Sound-related tourism and recreation activities was $4.7 billion. Puget Sound's shellfish industry is considered the Nation's most valuable and is an important source of family wage jobs in economically challenged rural communities.

Development and land use conversion have adversely impacted the beneficial uses of Puget Sound's waters. For example, pollution and agricultural runoff reduce the safe harvest and consumption of shellfish across 143 thousand acres of shellfish beds and cause the closure of popular swimming beaches and recreational sites annually. Southern resident killer whales and 59 populations of Chinook salmon, steelhead, and bull trout are listed under the Endangered Species Act. Tribal nations also are unable to sustain their culture and way of life.

A healthy and functioning Puget Sound benefits all who live, visit, or recreate in the Sound or have a connection to the region. A properly functioning ecosystem provides residents with food, water, and raw materials; regulates and moderates harmful elements; and provides cultural, spiritual and recreational experiences.

Federal support of Puget Sound recovery comes from many programs, most of which are administered by EPA, the National Oceanic and Atmospheric Administration, the U.S. Department of Agriculture, U.S. Department of Interior, and the U.S. Army Corps of Engineers.

Since 2010, Congress has appropriated over $470 million using Clean Water Act Section 320 authority for Puget Sound. Under Section 320, EPA has provided the National Estuary Program and Geographic Program funding and support to help communities make on-the-ground improvements for clean and safe water, protect, and restore habitat, allow for thriving species and a vibrant quality of life for all, while supporting local jobs.

EPA's work with the Puget Sound Partnership, tribes, state agencies and other partners has supported important gains in recovery. Examples include:

- Comprehensive regional plans to restore the Sound;
- More than $1 billion of non-federal dollars leveraged for recovery;
- Partnerships with 19 federally recognized tribes;
- Transboundary collaboration with Canada;
- Scientific gains on toxic effects of urban stormwater (such as 6PPD-quinone) and related mitigation actions;
- Development and use of funding and decision-making tools to integrate environmental justice and climate adaptation plans and projects;
- Since 2007, a net increase of harvestable shellfish beds;
- Over 41 thousand acres of habitat protected and/or restored (cumulative from 2006); and
- More than six thousand acres of shellfish harvest bed upgraded (cumulative from 2007).

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

Key FY 2025 activities for EPA's Puget Sound Program include:

- EPA will fund assistance agreements with the 19 federally recognized tribes in Puget Sound, three Tribal consortia and the Northwest Indian Fisheries Commission. EPA proposes to provide funding to tribes for both capacity building and implementing priority tribal projects in the Puget Sound basin.
- EPA will fund over $7 million in tribal projects to support key local watershed science and monitoring; local partnerships in restoration projects to support habitat and water quality; and enhancement of ongoing programs and policies for recovery.
- EPA is a co-chair of the overall federal effort to address Tribal Treaty Rights at Risk consistent with the roles assigned by the Council on Environmental Quality. This is an essential role for EPA and other federal leaders in the region to meaningfully engage and develop actions with Puget Sound tribes to address their treaty rights.
- The Program will continue to implement actions under the Puget Sound National Program Office and the Puget Sound Federal Leadership Task Force as outlined in the new Clean Water Act amendment for Puget Sound (Section 126 of the CWA). This includes a report to Congress in December 2023.

- The Program will enhance Federal Task Force leadership, including leadership and implementation of the *FY 2022 – 2026 Puget Sound Federal Task Force Action Plan.*[158] This will leverage hundreds of millions of dollars in federal investments in Puget Sound and provides alignment of program and policies for recovery.
- The Program will build on over 20 years of international cooperation with Canada implementing the Canada - U.S. Cooperation in the *Salish Sea: 2021-2024 Action Plan.*[159] The Program will participate in a series of workshops on topics of shared interest in transboundary work including joint efforts for southern resident killer whales, science collaboration and enhancing transboundary governance opportunities.
- The FY 2025 budget request will help fulfill National Estuary Program responsibilities, including support for the implementation of the Comprehensive Conservation and Management Plan (CCMP) for recovering Puget Sound (the Action Agenda). The Program received, reviewed, and approved the updated CCMP in FY 2022 that sets up the next four years of collaborative implementation of recovery efforts in Puget Sound. In 2025 EPA will work with the Puget Sound Partnership and the Puget Sound Management Conference to develop the 2026-2030 Action Plan (CCMP).
- The Program will continue to integrate climate adaptation and environmental justice while supporting local jobs. The Program is building climate resiliency into the actions and projects funded with Puget Sound assistance agreements for habitat, shellfish, and water quality, which presents the opportunity to grow and integrate climate justice in all program areas with federal, state, tribal and local partners.
- The Program will be managing and awarding up to $100 million in projects from Puget Sound funding over the next five years consistent with the EPA's *2021 Strategic Initiative Lead Funding Model.*[160] The Program will fund over $17 million in shellfish, habitat and stormwater projects and programs.
- The program will continue to fund and coordinate cutting-edge science in the Salish Sea with funding over $6 million in science projects from Puget Sound funding and programs with federal, state, tribal and academic partners.

In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

---

[158] For more information please visit: https://www.epa.gov/system/files/documents/2022-06/puget-sound-federal-task-force-action-plan-2022-2026.pdf

[159] For more information please see: https://www.epa.gov/puget-sound/actions-plans-us-canada-cooperation-salish-sea.

[160] For more information please visit: https://snohomishcountywa.gov/DocumentCenter/View/87563/FY21-EPA-Funding-Guidance-to-SILs_FINAL.

**Statutory Authority:**

Clean Water Act. Consolidated Appropriations Act, 2023 (Pub. L. 117-328).

# Great Lakes Restoration

Program Area: Geographic Programs
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$361,607* | *$368,000* | *$368,000* | *$0* |
| Total Budget Authority | $361,607 | $368,000 | $368,000 | $0 |
| Total Workyears | 63.2 | 77.0 | 77.0 | 0.0 |

The Infrastructure Investment and Jobs Act (Public Law 117-58) includes $200M for this program in FY 2025.

## Program Project Description:

The Great Lakes are the largest system of surface freshwater on Earth, containing 20 percent of the world's surface freshwater and 95 percent of the United States' surface freshwater. The watershed includes two nations, eight states, two Canadian provinces, and 35 tribes.

Through a coordinated interagency process led by EPA, the implementation of the Great Lakes Restoration Initiative (GLRI) is helping to restore the ecosystem. This restoration effort provides environmental and public health benefits to the region's thirty million Americans who rely on the Great Lakes for drinking water, recreation, and fishing. The restoration and protection of the Great Lakes also fuels local and regional economies and community revitalization efforts across the basin.

This interagency collaboration accelerates progress, promotes leveraging, avoids potential duplication of effort, and saves money. In accordance with the Clean Water Act (CWA), EPA and its partners are accomplishing this restoration through the implementation of a five-year GLRI Action Plan. The implementation of the GLRI Action Plan III, covering FY 2020 through FY 2024, began in October 2019. EPA and its partners are currently in the process of developing the GLRI Action Plan IV, which will cover FY 2025 to FY 2029.

EPA and its partners have achieved significant results since the GLRI started in 2010,[161] including:
- Five Areas of Concerns (AOCs) delisted, including the Ashtabula River AOC in FY 2021. (Prior to GLRI, only one Great Lakes AOC was delisted.) Ten others have had the cleanup and restoration actions necessary for delisting completed.
- 112 Beneficial Use Impairments (BUIs) at 28 AOCs in the eight Great Lakes states have been removed, more than eleven times the total number of BUIs removed in the preceding 22 years.
- Over 4.3 million cubic yards of contaminated sediment have been remediated.
- Over 265,000 acres on which invasive species control activities have been implemented.

---

[161] For more information, please see https://glri.us/.

- Self-sustaining populations of Silver and Bighead carp have been kept out of the Great Lakes.
- Over 16 million pounds of invasive carp have been removed from the Illinois River, reducing the potential for these species to invade the Great Lakes.
- Loadings of over 2.3 million pounds of phosphorus were reduced through implementation of conservation practices (phosphorus is a major driver of harmful algal blooms in Great Lakes priority watersheds).
- More than 500,000 acres of habitat have been protected, restored, or enhanced; and,
- Over 685,000 youths have benefited from Great Lakes based education and stewardship projects.

Under the GLRI, funds are first appropriated to EPA. After annual evaluation and prioritization consistent with the GLRI Action Plan, EPA and its partner agencies collaboratively identify projects and programs that will best advance progress under GLRI. EPA then provides a substantial portion of those funds to its partner federal agencies to implement GLRI projects and programs in partnership with EPA, states, and tribes. EPA and its partner federal agencies will directly implement projects and fund projects performed by other entities such as states, tribes, municipalities, counties, universities, and nongovernmental organizations. GLRI funding can supplement each partner agency's base funding.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the GLRI will continue to support activities that target the most significant environmental problems in the Great Lakes. Emphasis will continue to be placed on 1) cleaning up and delisting AOCs, which will help to revitalize and generate community benefits in environmental justice communities; 2) reducing phosphorus contributions that contribute to harmful algal blooms and other water quality impairments; and 3) invasive species prevention GLRI Action Plan III targets GLRI restoration within the focus areas, objectives, and performance goals described below. In FY 2025, the GLRI also will continue to emphasize providing benefits to underserved communities who are marginalized, underserved, or overburdened by pollution. Under Action Plan IV, these and other investments in underserved communities will continue to grow ensuring GLRI investments are just, equitable, and responsive to multiple voices and viewpoints in planning and implementation.

<u>Toxic Substances and Areas of Concern Objectives:</u>

- Remediate, restore, and delist AOCs: EPA, U.S. Fish & Wildlife Service (FWS), U.S. Army Corps of Engineers (USACE), United States Geological Survey (USGS), National Oceanic and Atmospheric Administration (NOAA), and other GLRI partners will continue accelerating the pace the U.S. BUI removals. EPA and its federal partners will work with and fund stakeholders to implement management actions necessary to remove the BUIs (indicators of poor environmental health) that will ultimately lead to the delisting of the remaining AOCs on the U.S. side of the border. Agencies target collective efforts under the GLRI to maximize

178

removal of BUIs and delisting of AOCs. Agencies will support BUI removal through sediment remediation under the Great Lakes Legacy Act (part of the GLRI) and other restoration activities. FY 2025 targets are: ten BUIs (for a total of 138 BUIs cumulative since 1987) removed in AOCs; and two AOCs delisted (for a total of 8 AOCs delisted since 1987).

- Engage underserved communities and share information on the risks and benefits of consuming Great Lakes fish, wildlife, and harvested plant resources with the people who consume them: Federal agencies and their state and tribal partners will continue to help the public make informed decisions about healthy options for safe fish consumption. Expansion of successful pilot programs will increase the availability and accessibility of safe fish consumption guidelines to vulnerable populations that consume Great Lakes fish. Additional emphasis will be placed on the safe consumption of wildlife and harvested plant resources.

- Increase knowledge about contaminants that have impacted or pose the potential to impact the ecological and/or public health of the Great Lakes and its natural resources: Federal agencies will coordinate with appropriate state and tribal partners to begin to fill critical monitoring and data gaps for priority chemicals in the Great Lakes. Monitoring data from this process will provide information on the magnitude and extent of these chemicals in the Great Lakes and help in the evaluation of associated ecological, economic, and recreational consequences.

Invasive Species Objectives:

- Protect native species and communities by preventing introductions of new non-native species: GLRI federal agencies and their partners will implement a prioritized plan to significantly reduce pathways by which non-native species may still enter the Great Lakes basin. Coordination and planning with state, tribes, and other entities as well as feedback received by the Great Lakes Aquatic Nuisance Species (ANS) Regional Panel will inform prioritized and interjurisdictional projects that significantly address pathways including recreational boating, bait release, organisms-in-trade, and others. GLRI will support efforts to test and implement new technologies holding great promise to assess, block, or manage specific pathways. GLRI will continue to help protect the Great Lakes from invasive carp, principally through high-priority projects that prevent Silver and Bighead Carp introduction into the Great Lakes, prevent Grass Carp establishment in the Great Lakes with an emphasis in Lake Erie, Lake Michigan, and its tributaries, and better understanding the spread of Black Carp toward the Great Lakes. In FY 2025, the goal will be to address one regional introduction pathways for non-native species invasion through interjurisdictional, comprehensive approaches.

- Reduce economic, ecological, and human health impacts to the Great Lakes by limiting range expansion, including lake-to-lake transfers, of invasive species: GLRI federal agencies and their partners will increase the probability of detecting invasive species through refinement of current detection strategies and deployment of new sampling technologies and approaches. Sustained funding to states and tribes will be a key strategy to ensure rapid response, eradication, or containment efforts can occur after new detections of invasive species. impacts of non-native species and deploy the latest control technologies and approaches. Great Lakes partners will continue to efficiently distribute information on invasive species regionally through GLANSIS and tailor educational products so that the public can play a large role in

179

reducing the economic, ecological, and human health impacts of invasive species. In FY 2025, the goal is to conduct eight rapid response exercises.

- Provide ecosystem and human benefits through prioritized and collaborative invasive species control efforts: GLRI federal agencies, states, tribes, and their partners will prioritize maintaining the benefits of previously completed invasive species control projects by ensuring staff capacity and tools are in place so that infestations do not reappear. Prioritization of completed projects in upland and coastal habitat projects completed under previous GLRI Action Plans will guide future investment so that benefits to fish and wildlife species as well as residents are not lost over time and sites do not revert to previous degraded conditions. Advancing the Great Lakes Sea Lamprey Control Program will continue to be a priority for GLRI to ensure that lake trout restoration accomplishments made through past GLRI investments are maintained and accelerated further. Technology development, testing, and field trials will be prioritized to address critical, continuing pathways for non-native species to enter the Great Lakes as well as battling invaders already established in the Great Lakes in habitats highly valued for the ecosystem benefits provided. In FY 2025, the goal is to control invasive species on 10,000 acres.

Nonpoint Source Pollution Impacts on Nearshore Health Objectives:

- Reduce nutrient loads from agricultural watersheds to reduce harmful algal blooms (HABs): GLRI federal agencies and their partners will continue to support direct farmer assistance and outreach to reduce nutrient losses in agricultural watersheds as well as continue to strategically target and design projects based on the latest science. EPA will do this by: (1) expanding outreach and demonstration farm networks to improve adoption of on-farm nutrient management practices; and (2) demonstrating practices that slow down and filter agricultural stormwater runoff, such as expanding buffers to waterways, widening floodplains on drainage ditches, and creating wetlands in receiving waterbodies. FY 2025 targets are:
  - Reduce 300,000 pounds of phosphorus from conservation practice implementation throughout Great Lakes watersheds; and
  - Provide technical or financial assistance on 150,000 acres in priority watersheds.

- Reduce untreated stormwater runoff to improve water quality: GLRI federal agencies and their partners will continue to encourage and accelerate implementation of projects to reduce or prevent stormwater runoff to protect nearshore water quality. EPA will continue to support green infrastructure practices to infiltrate stormwater runoff, with a focus on implementation in underserved communities. These projects will capture or slow the flow of untreated runoff and filter out sediment, nutrients, toxic contaminants, pathogens, and other pollutants from runoff before it enters Great Lakes tributaries, beaches, and nearshore waters. Federal agencies and their partners also will continue to support implementation of watershed management projects that slow and intercept runoff in urban and rural communities to prevent runoff and erosion, now and in future conditions with a changing climate. FY 2025 targets are:
  - Capture or treat 75 million gallons of untreated stormwater runoff captured or treated; and,
  - Restore or protect 13 miles of Great Lakes shoreline and riparian corridors restored or protected.

- Improve effectiveness of nonpoint source control efforts to reduce HABs**:** EPA and its federal partners will continue to adaptively manage to maximize nonpoint source control efforts. Strategies will include 1) testing or piloting new/innovative ways to achieve nutrient reductions, such as slow-release fertilizer and manure transformation technologies; 2) assessing the ability of wetlands to capture nutrients; and 3) monitoring nutrient levels in the major tributaries to the Great Lakes and nearshore areas experiencing algal blooms.

Habitats and Species Objectives:

- Protect, enhance, and increase resilience of habitats necessary for sustaining native aquatic and terrestrial species important to the future Great Lakes ecosystem: GLRI federal agencies and their partners will build upon past restoration efforts targeted at critical habitat types, increase access and use of project sites by residents, tribes, and underserved communities, and continue to generate lessons learned from projects so that climate adaptation options for future projects are identified upfront in the planning process. Projects will be largely based on the following priorities:
    o Watersheds predicted to retain cold-water habitat necessary for native fish populations.
    o Coastal habitats that support productive fisheries, recreational and cultural uses by communities, and protection of infrastructure against lake-level changes.
    o Forest ecosystems, subtypes, and associated communities of species that provide resiliency for insect and wildlife populations or enhance critical corridors for future movement of species in response to changing climate.

    FY 2025 targets are:
    o Restore, protect, or enhance 10,000 acres of coastal wetland, nearshore, and other habitats; and
    o 200 miles of connectivity between rivers, streams, and lakes providing passage for aquatic species.

- Increase resiliency and representation of native species under future climate conditions: EPA and its federal partners will continue to provide significant funding to agencies, entities, and Tribal Nations that manage, stock, and restore populations of native species and incorporate climate adaption options into their restoration strategies. Reintroduction of species important to Tribal Nations will be planned and implemented to provide important food resources and cultural uses. GLRI agencies will continue restoring the native top predator (lake trout) and native prey fish species (*e.g.,* cisco, bloater, kiyi, and others), bringing back critical elements of the food web in Lake Ontario, Lake Huron, and additional locations in the Great Lakes. Coastal wetland habitats and reefs important to native fish and breeding marsh birds will be prioritized so projects provide increased resiliency and the habitat diversity needed for breeding, nursery, and feeding. A subset of federally threatened and endangered species will be identified for accelerated population recovery actions so that iconic species found here in the Great Lakes not only persist, but are restored to self-sustaining populations, and are downlisted in the future. In FY 2025, the target is to complete actions to significantly protect or promote recovery of populations of one species.

<u>Foundations for Future Restoration Actions Objectives:</u>

- With a focus on underserved communities, (1) educate the next generations about the Great Lakes ecosystem; and (2) teach people the skills needed to enter the environmental restoration and protection workforce: EPA and its federal partners will continue to promote Great Lakes-based ecosystem education and stewardship for K-12 school students and community members (for example, courses at parks, nature centers, museums, zoos, and on-board vessels) while investing in youth in underserved communities. GLRI agencies and partners will continue to support activities centered on providing experience-based learning opportunities, with an emphasis on youth, and continue to develop Great Lakes literate educators using the essential principles and fundamental concepts included in the Great Lakes Literacy curriculum. These activities will support the overall goal of educating students and next generations to foster Great Lakes stewardship, promote conservation, and expose and prepare under-represented youth for higher education opportunities in natural resource management.  With enhanced focus under Action Plan IV, GLRI agencies and their partners will implement workforce development programs to teach people in underserved communities the skills needed to enter the environmental restoration and protection workforce that supports GLRI projects.

- Conduct targeted science to inform and assess Great Lakes restoration:  GLRI federal agencies and their partners will continue to support targeted science projects and implement programs that will help track progress towards GLRI long-term goals and inform future restoration actions. There will be a continued focus on priority issues such as HABs and coastal resiliency, but also new efforts such as ecosystem monitoring in winter. There also will be continued support for assessing the health of the Great Lakes through long-term monitoring programs and CSMI.

In addition, the Infrastructure Investment and Jobs Act (IIJA) (Public Law 117-58) includes $200 million for this program in FY 2025. In FY 2025, EPA is requesting appropriations language that will provide funding under this program as no-year funds.

<u>GLRI Funding Allocations:</u>

EPA leads the cooperative process to determine funding allocations for programs and projects of the GLRI agencies. Under the CWA Section 118, EPA provides the appropriate authorizing and appropriating committees of the Senate and the House of Representatives a yearly detailed description of the progress of the GLRI and amounts transferred to participating federal departments and agencies.

## Summary of FY 2018 - 2025 Allocations* by Focus Area
### (Dollars in Thousands)

| Focus Area | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|---|
| Toxic Substances and AOC | $105,600 | $107,400 | $115,800 | $118,500 | $62,600 | $95,200 | $106,600 | TBD |
| Invasive Species | $56,700 | $57,000 | $62,900 | $66,000 | $81,000 | $69,200 | $71,700 | TBD |
| Nonpoint Source Pollution Impacts on Nearshore Health | $50,600 | $51,200 | $51,000 | $55,400 | $83,800 | $78,100 | $76,300 | TBD |
| Habitat and Species | $52,400 | $51,400 | $54,500 | $56,200 | $79,500 | $77,600 | $72,100 | TBD |
| Foundations for Future Restoration Actions | $34,700 | $33,000 | $35,800 | $33,900 | $41,100 | $47,900 | $41,300 | TBD |
| TOTAL | $300,000 | $300,000 | $320,000 | $330,000 | $348,000 | $368,000 | $368,000 | TBD |

Allocations are based on budgets approved by Regional Working Group (RWG) agencies. The FY 2022 thru FY 2024 allocations reflect adjustments as a result of allocating BIL funding, principally to cleanup of AOCs. RWG agencies develop allocations for future funding, such as FY 2024 and FY 2025, based on the authorized GLRI funding level and will make adjustments upon appropriation.

## Summary of FY 2017 – 2025 Allocations* by Agency
### (Dollars in Thousands)

| Agency | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|---|---|
| DHS-USCG | $1,580 | $500 | $1,661 | $1,250 | $1,300 | $1,200 | $1,300 | TBD | TBD |
| DOC-NOAA | $12,027 | $24,629 | $29,405 | $28,163 | $16,621 | $30,361 | $22,789 | TBD | TBD |
| DOD-USACE | $55,940 | $43,559 | $37,387 | $30,599 | $42,612 | $29,067 | $12,315 | TBD | TBD |
| DOI-BIA | $10,904 | $11,617 | $9,842 | $15,840 | $15,765 | $19,724 | $21,244 | TBD | TBD |
| DOI-NPS | $4,379 | $3,940 | $3,822 | $3,794 | $4,968 | $7,816 | $7,614 | TBD | TBD |
| DOI-USFWS | $41,794 | $52,902 | $47,272 | $53,523 | $59,288 | $86,082 | $79,327 | TBD | TBD |
| DOI-USGS | $26,817 | $25,724 | $21,603 | $19,780 | $19,790 | $24,980 | $22,875 | TBD | TBD |
| DOT-MARAD | $800 | $675 | $803 | $5,500 | $8,000 | $6,500 | $2,100 | TBD | TBD |
| HHS-ATSDR/CDC | $593 | $590 | $0 | $0 | $0 | $0 | $0 | TBD | TBD |
| USDA-APHIS | $1,262 | $1,176 | $1,312 | $1,378 | $1,459 | $1,832 | $2,138 | TBD | TBD |
| USDA-NRCS | $22,072 | $25,096 | $20,697 | $22,239 | $24,374 | $31,824 | $33,091 | TBD | TBD |
| USDA-USFS | $11,355 | $10,153 | $11,646 | $9,921 | $12,464 | $12,958 | $14,148 | TBD | TBD |
| IA Totals: | $189,522 | $200,560 | $185,448 | $191,988 | $206,641 | $252,343 | $218,941 | TBD | TBD |
| EPA and Misc IAs | $110,478 | $99,440 | $114,552 | $128,012 | $123,359 | $95,657 | $149,058 | TBD | TBD |
| Totals: | $300,000 | $300,000 | $300,000 | $320,000 | $330,000 | $348,000 | $368,000 | TBD | TBD |

Allocations are based on budgets approved by Regional Working Group (RWG) agencies. The FY 2022 and FY 2023 allocations reflect adjustments as a result of allocating BIL funding, principally to cleanup of AOCs. RWG agencies develop allocations for future funding, such as FY 2024 and FY 2025, based on the authorized GLRI funding level and will make adjustments upon appropriation.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- There is no change in program funding.

**Statutory Authority:**

Clean Water Act Section 118.

**Homeland Security**

## Homeland Security:  Communication and Information

Program Area: Homeland Security
Goal: Safeguard and Revitalize Communities
Objective(s): Prepare for and Respond to Environmental Emergencies

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$4,592* | *$4,692* | *$6,119* | *$1,427* |
| Total Budget Authority | $4,592 | $4,692 | $6,119 | $1,427 |
| Total Workyears | 11.8 | 13.3 | 15.3 | 2.0 |

**Program Project Description:**

There has been an evolution of the term and mission of national and homeland security since 9/11. National security is now widely understood to include non-military dimensions, such as climate and environmental security, economic security, energy security, and cybersecurity, as well as traditional homeland security topics. Due to this, the homeland security roles and responsibilities of the EPA have expanded and several areas (*e.g.,* climate, natural disasters) now involve engagement from the broader national security community. Systematic preparation is essential for the threats that pose the greatest risk to the security of the Nation, including acts of terrorism, climate change, pandemics, catastrophic natural disasters, cyber-attacks, and other national security emergencies. The White House, Congress, and the Department of Homeland Security (DHS) have defined responsibilities for EPA in several areas, including critical water infrastructure protection and response to chemical, biological, radiological, and nuclear events, through a series of statutes, presidential directives, and national plans.

In addition, EPA supports disaster recovery and mitigation and this essential work has been steadily expanding to include climate change and climate security work identified in recent Executive Orders. EPA's Mitigation and Recovery Order 2074 reaffirms our role using EPA programs and resources and directs Regions to assign coordinators to support the agency-wide efforts with mitigation and recovery. EPA's critical mitigation work prepares communities to prevent or reduce impacts when natural (*e.g.*, climate change) or human-made disaster (*e.g.*, dirty bomb, anthrax) occurs. Regions work with federal, state, territorial, tribal, and local communities to provide technical assistance to reduce loss of life and environmental impact per the *National Mitigation Framework* and the *National Investment Mitigation Strategy*. Climate change will continue to increase the frequency, extent, and severity of natural disasters.

As our response roles are executed and the event continuum transfers to recovery, EPA then focuses on how best to restore, redevelop, and revitalize the health, social fabric, economy, and environment of the community using the six Recovery Support Functions of the National Disaster Recovery Framework.

EPA's Homeland Security: Communication and Information Program has two components. The Office of Homeland Security (OHS) supports the Agency's coordination and communication activities related to national security and homeland security. The Office of Mission Support, which manages the Agency's Enterprise Security Operations Center (SOC), is responsible for the centralized, integrated, and coordinated cybersecurity prevention, detection, response, and supporting recovery capability for EPA networks.

OHS provides technical, policy, and intelligence advice to senior agency leadership related to national and homeland security. OHS coordinates the Agency's intelligence activities, including EPA's engagement with the White House, National Security Council (NSC), and other federal departments and agencies on the development of new national and homeland security policies and requirements. OHS also ensures that the NSC and other lead federal entities understand the impacts of new national security initiatives and policies on existing EPA programs. OHS maintains intelligence operations and analyses capabilities focusing on EPA's equities, including the protection of critical infrastructure, specifically the water sector, climate change and security issues, and biodefense and global health security issues. OHS serves as the Federal Intelligence Coordinating Office (FICO) for EPA and coordinates with the Intelligence Community (IC) in support of policy development and consequence management efforts. OHS also focuses on coordination and integration of chemical, biological, and radiological preparedness and response programs. More specifically, OHS focuses on the protection of air and water quality and the prevention of land contamination, through external engagement with federal departments and agencies and internal coordination with EPA program offices with homeland security responsibilities. OHS also has developed a Classified Information Management Program to ensure effective classified communications with all 10 EPA Regions in the event of a national security emergency or incident. OHS coordinates with regional, state, and local Fusion Centers and Joint Terrorism Task Forces to focus on integrating EPA regional offices with the information sharing environment and DHS' intelligence sharing network. OHS also advances implementation of the National Counterintelligence and Security Center's Enterprise Threat Mitigation Framework via the following programs: EPA Insider Threat, Safeguarding Science/Research Security, National Operations Security (OPSEC), and Defensive Counterintelligence. OHS also manages the program that supports the Department of Treasury with the Committee on Foreign Investment in the United States (CFIUS) and Foreign Visitors to EPA.

In addition, OHS works closely with EPA's Water Program to coordinate and integrate water security efforts internally and externally with stakeholders regarding physical threats and contamination and cyber threats to operations. EPA serves as the Sector Risk Management Agency (SRMA) for the water sector. The *Annual Threat Assessment of the U.S. Intelligence Community (IC)* (February 2023)[162] indicated that cyber threats from nation states and non-nation states remain an acute growing problem threatening U.S. critical infrastructure. Cyberattacks across critical infrastructure sectors are rapidly increasing in volume and sophistication, impacting both information technology (IT) and operational technology (OT) systems in the water sector.

EPA's Enterprise SOC provides a centralized, integrated, and coordinated cybersecurity incident response capability that defends against unauthorized activity within computer networks, by

---

[162] Please see the following for more information: https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-assessment.pdf and https://www.dni.gov/files/ODNI/documents/assessments/ATA-2023-Unclassified-Report.pdf.

preventing, detecting, monitoring, analyzing, and responding to suspicious or malicious activity through its Computer Security Incident Response Capability (CSIRC). The SOC and CSIRC also provide situational and threat awareness, cyber network defense infrastructure, cybersecurity tool engineering and support, vulnerability and risk assessments, and threat intelligence processing and threat hunting capabilities. The SOC leverages an enterprise security information and event manager, enterprise logging, endpoint detection and response, and other capabilities to perform its mission, as well as maintain communications with DHS' Liaison Officers to respond to alerts that have potential national security impact.

National and homeland security information technology efforts are closely coordinated with the agencywide information security and infrastructure activities, which are managed by EPA's Information Security and IT/Data Management programs. These IT support programs also enable contact among localities, EPA program and regional offices, and laboratories in emergency situations.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.3, Prepare for and Respond to Environmental Emergencies in the *FY 2022 - 2026 EPA Strategic Plan*. With the resources requested in FY 2025, this program will:

- Continue to promote a coordinated approach to EPA's homeland security activities and support the alignment of resources with government-wide national and homeland security priorities and requirements as defined by the NSC and the IC, including climate security, cybersecurity, and biodefense.

- Continue to build on and develop the Agency's cybersecurity intelligence capabilities to provide a level of support that would enable EPA to better prepare for and respond timely to specific threats, mitigate attacks, assess evolving water sector cyber intelligence requirements, and assist in developing proposals to prevent/mitigate cyber incidents. By further building these capabilities, the Agency will be able to increase research, analyses, and engagement with the water and wastewater sector and partner agencies who deal with cybersecurity (*i.e.,* DHS' Cybersecurity and Infrastructure Security Agency (CISA)) and help EPA fulfill the requirements in Section 9002 of the FY 2021 National Defense Authorization Act. All indicators suggest cybersecurity threats and requirements, particularly those associated with the critical infrastructure sector, will only increase in number, complexity, and potential consequences for the foreseeable future.

- OHS and EPA's Water Program will continue to develop an integrated strategy to work together more effectively to coordinate water and wastewater sector-wide cybersecurity threat information and intelligence sharing efforts. Specific examples of OHS' roles/responsibilities in this area include:

  o Engaging with the Water Sector Coordinating Council and the Water Information Sharing and Analysis Center (ISAC) to more closely work with CISA and the intelligence and law enforcement communities to facilitate the identification of

intelligence requirements and priorities of critical infrastructure owners and operators, in the water and wastewater sector, in coordination with the Director of National Intelligence and the heads of other Federal departments and agencies, as appropriate;

o   Supporting risk assessment and risk management efforts by EPA in conjunction with CISA; and

o   Working with CISA to provide and facilitate awareness, within the water and wastewater sector, of ongoing, and where possible, real-time awareness of identified threats, vulnerabilities, mitigations, and other actions related to the security of the water and wastewater sector.

- Continue to develop new collaborative practices and methods, with Intelligence Community agencies, to meet the cybersecurity needs of the water and wastewater sector, along with other critical sectors, to address increasingly sophisticated and complex threat actor tactics and techniques. EPA has coordinated with NSC, CISA, Federal Bureau of Investigation (FBI), and water sector entities, on several occasions, regarding cyber-attacks on the water sector's IT and OT systems, which has resulted in a renewed emphasis on notification and communication efforts with the water utilities.

- Continue to develop new collaborative practices and methods with Intelligence Community agencies and the National Security Council to meet the requirement in Executive Order (EO) 14008, *Tackling the Climate Crisis at Home and Abroad*,[163] "to place the climate crisis at the forefront of this Nation's foreign policy and national security planning," and to address emerging domestic and global biological risks, including pandemics and national bio-preparedness policies.

- Provide more comprehensive support to the expanding collaborations with Department of Energy (DOE), CISA, and other programs on cyber threat response.

- Promote a coordinated approach to communicating classified and sensitive information to EPA programs, laboratories, and regional offices via secure communications systems to support timely intelligence and information sharing to enable safe and effective operational preparedness and response.

- Continue to develop a program, working with the Office of Policy, to support the regional Disaster Recovery Coordinators, increasing national disaster mitigation and recovery capacity and climate resilience. OHS also will support regional Mitigation Coordinators to increase mitigation planning and advance policy to increase resilience in support of Executive Order 14008, "*Tackling the Climate Crisis at Home and Abroad.*"

- Support federal, state, tribal, and local efforts to prevent, protect, mitigate, respond to, and recover from the impacts of natural disasters, acts of terrorism, and other emergencies by providing leadership and coordination across EPA's program offices and regions.

---

[163] For additional information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

189

- Provide technical, policy, and intelligence advice to senior agency leadership related to biodefense and pandemic preparedness. For the Agency, track the targets and outcomes of the National Biodefense Strategy (NBS) and its Implementation Plan. Serving as the EPA Federal Intelligence Coordination Office, coordinate analytical intelligence support capacity across the Agency to meet EPA's NBS requirements and whole-of-government biological response obligations. Enhance focus on coordination and integration of biological preparedness and response programs as they relate to protection of human health and the environment through external engagement with federal departments and agencies and internal coordination with EPA program offices.

- Ensure appropriate agency representation in various White House and other federal national security and homeland security policy activities. These efforts include serving as EPA's representative for homeland and national security, national disaster response, and mitigation and recovery policy in monthly meetings of the Homeland Preparedness and Response Interagency Policy Committee (IPC), the Homeland Critical Infrastructure Resilience IPC, chaired by the NSC, and in weekly NSC Cyber Response Group meetings and other national security policy committees, including the Recovery IPC, Artificial Intelligence IPC, and the Cyber IPC. In addition, OHS serves as EPA's representative in monthly meetings of the Recovery Support Function Leaders Group, chaired by the Federal Emergency Management Agency (FEMA), and the Mitigation Framework Leadership Group, also chaired by FEMA, and on other interagency workgroups.

- Expand Agency secure video telecommunications (SVTC) capabilities, in support of agency representation in various White House and other federal national security and homeland security policy activities.

- Focus on filling critical policy, knowledge, and technology gaps that may be essential for an effective EPA response, including working with our interagency partners to define collective capabilities and resources that may contribute to closing common homeland security gaps, including emerging chemical threats and cybersecurity concerns for critical water infrastructure.

- Provide EPA end-users with relevant, accurate, reliable, objective, and timely intelligence bearing on matters of environmental policy and regulation and domestic threats and counterintelligence, where EPA functions to preserve or assist in the restoration of human health and the environment.

- Continue phased implementation of EO 13587, *Structural Reforms to Improve the Security of Classified Networks and the Responsible Sharing and Safeguarding of Classified Information*[164] to meet the main pillars of classified information protection with a focus on the implementation of an Insider Threat Program to address and mitigate threats to national security.

---

[164] For more information, please see: https://obamawhitehouse.archives.gov/the-press-office/2011/10/07/executive-order-13587-structural-reforms-improve-security-classified-net.

- Track emerging national and homeland security issues, through close coordination with the U.S. Intelligence Community, to anticipate and avoid crisis situations and target the Agency's efforts proactively against threats to the United States.

- Phase in National Security Presidential Memorandum 28 (NSPM-28) to support OPSEC for the Agency.

- Support the coordination and communication requirements of NSPM-32 to share information on critical incidents in a timely and effective manner.

- Phase in NSPM-33 to support other offices' work in Safeguarding Science/Research Security for the Agency.

In FY 2025, EPA also will continue to support EO 14028, *Improving the Nation's Cybersecurity,*[165] implementation through monitoring across the Agency's IT infrastructure to detect, remediate, and eradicate malicious activity/software from EPA's computer and data networks. Specific activities include:

- Continue to mature and enhance internal Computer Security Incident Response Capability to ensure rapid identification and reporting of suspicious activity through increased training and awareness of cybersecurity threats.  Training opportunities (*e.g.*, Annual Training, Quarterly Phishing exercises, and Cybersecurity Awareness Month Activities) are provided to individual users to identify the most recent cybersecurity threats along with Quarterly Incident Response tabletop exercises to develop agency staff proficiency in responding to cyber security incidents.

- Improve threat intelligence sharing. EPA personnel are active participants in the United States Computer Emergency Readiness Team, a DHS-led group of experts from incident response and security response teams. Indicators and warnings are shared between EPA incident responders and their cleared counterparts in other agencies and with the Intelligence Community. This provides the ability to integrate actionable intelligence with deployed systems to improve cybersecurity defensive capabilities.

- Continue maturation and refinement of the Agency's Incident Response procedures in compliance with EO 14028 and CISA's Playbook for Responding to Cybersecurity Vulnerabilities and Incidents.

- In compliance with OMB Memorandum M-22-01, *Improving Detection of Cybersecurity Vulnerabilities and Incidents on Federal Government Systems through Endpoint Detection and Response,*[166] EPA will continue work to integrate End Point Detection and Response (EDR) capabilities with the Continuous Diagnostics and Mitigation Program to support proactive detection of cybersecurity incidents within the EPA information environment, supporting active cyber threat hunting, containment, remediation, and incident response.

---

[165] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/05/12/executive-order-on-improving-the-nations-cybersecurity/.

[166] For more information, please see: https://www.whitehouse.gov/wp-content/uploads/2021/10/M-22-01.pdf.

This work includes extensive coordination with CISA and deployment of capabilities across the Agency.

- Mature the security logging capabilities, as outlined in OMB Memorandum M-21-31, *Improving the Federal Government's Investigative and Remediation Capabilities Related to Cybersecurity Incidents*.[167] This activity will build on implementation of Event Logging Level 3 for Advanced Logging requirements at all criticality levels. It will focus on fully implementing Security Orchestration, Automation, and Response tools to streamline threat and vulnerability management, incident response, and security operations automation, as well as User Behavior Monitoring analytics to enable early detection of malicious behavior.

- In compliance with OMB Memorandum M-22-09,[168] M*oving the U.S. Government Toward Zero Trust Cybersecurity Principles,* the SOC will support implementation of a Zero Trust Architecture across the Agency to enable increased visibility and use of analytics to help strengthen Information Security and Privacy governance.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$1,007.0 / +1.0 FTE) This program change increases resources and FTE for implementing the EPA Climate Adaptation Action Plan, supporting the increased resilience of EPA programs, and strengthening the capacity of states, communities, and businesses to adapt to climate change, with a particular focus on enhancing environmental justice.  This includes $213.0 thousand in payroll costs.

- (+$446.0 / +1.0 FTE) This program change increases resources and FTE for enhancing homeland security coordination and communication efforts across the Agency.  This includes $213.0 thousand in payroll costs.

- (+$25.0) This program change provides an increase in resources for the Agency to share emerging bio-surveillance threat information and intelligence within the Agency, track and coordinate environmental countermeasures development for National Biodefense Strategy (NBS) quarterly reporting, and perform bio-surveillance integration with the interagency.

- (-$51.0) This program change reflects efficiencies realized from streamlining homeland security IT efforts across the Agency.

---

[167] For more information, please see: https://www.whitehouse.gov/wp-content/uploads/2021/08/M-21-31-Improving-the-Federal-Governments-Investigative-and-Remediation-Capabilities-Related-to-Cybersecurity-Incidents.pdf.
[168] For additional information, please see: https://www.whitehouse.gov/wp-content/uploads/2022/01/M-22-09.pdf.

**Statutory Authority:**

Resource Conservation and Recovery Act, §§ 1001, 2001, 3001, 3005; Safe Drinking Water Act; Clean Water Act, §§ 101, 102, 103, 104, 105, 107; Clean Air Act, §§ 102, 103, 104, 108; Toxic Substances Control Act, §§ 201, 301, 401; Federal Insecticide, Fungicide, and Rodenticide Act, §§ 136a-136y; Bio Terrorism Act of 2002, §§ 303, 305, 306, 307; Homeland Security Act of 2002; Post-Katrina Emergency Management Reform Act; Defense Against Weapons of Mass Destruction Act; and Food Safety Modernization Act, § 208.

## Homeland Security:  Critical Infrastructure Protection

Program Area: Homeland Security
Goal: Safeguard and Revitalize Communities
Objective(s): Prepare for and Respond to Environmental Emergencies

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$249* | *$923* | *$1,025* | *$102* |
| Science & Technology | $12,249 | $10,852 | $34,351 | $23,499 |
| Total Budget Authority | $12,498 | $11,775 | $35,376 | $23,601 |
| Total Workyears | 26.2 | 26.6 | 57.6 | 31.0 |

**Program Project Description:**

The Critical Infrastructure Protection (CIP) Program supports EPA's efforts to coordinate and provide technical expertise to enhance the protection of the Nation's critical water infrastructure from terrorist threats and all-hazard events through effective information sharing and dissemination. This program provides water systems with current information on methods and strategies to build preparedness for natural and man-made threats.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.3, Prepare for and Respond to Environmental Emergencies in the *FY 2022 - 2026 EPA Strategic Plan*.

This program also supports the Agency's Infrastructure Investment and Jobs Act (IIJA) implementation priorities including preparing for and responding to cybersecurity challenges so that water systems are more resilient.

In FY 2025, EPA will build capacity, at water systems, to identify and respond to threats to critical national water infrastructure by:

- Providing timely information on contaminant properties, water treatment effectiveness, detection technologies, analytical protocols, and laboratory capabilities;

- Supporting effective communication conduits to disseminate threat and incident information and to serve as a clearinghouse for sensitive information;

- Encouraging information sharing between the water sector and environmental professionals, scientists, emergency services personnel, law enforcement, public health agencies, the intelligence community, and technical assistance providers. Through this exchange, water systems can obtain up-to-date information on current technologies in water security, accurately assess their vulnerabilities to terror acts, and work cooperatively

194

with public health officials, first responders, and law enforcement officials to respond effectively in the event of an emergency;

- Providing water utilities, of all sizes, with access to a comprehensive range of important materials, including the most current information, tools, training, and protocols designed to enhance the security (including cybersecurity), preparedness, and resiliency of the water sector (including addressing natural hazards and climate change); and

- Ensuring that water utilities receive timely and informative alerts about changes in the homeland security advisory level and regional and national trends in certain types of water-related incidents. For example, should there be types of specific, water-related threats or incidents that are recurring, EPA, in coordination with the Department of Homeland Security and other appropriate agencies, will alert utilities of the increasing occurrence of or trends in these incidents.

Providing this information, coupled with effective information sharing processes, allows the water sector to improve its understanding of the latest water security and resiliency protocols and threats. These protocols reduce risk by enhancing the water sector's ability to prepare for an emergency.

**Performance Measure Targets:**

Work under this program supports Safe Drinking Water Act implementation and compliance and performance results in the Drinking Water Programs, under the EPM appropriation, to support safe drinking water for the Nation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$34.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$68.0) This program change provides increased resources to promote the protection of critical water infrastructure.

**Statutory Authority:**

Safe Drinking Water Act, §§ 1431-1435; Clean Water Act; Public Health Security and Bioterrorism Emergency and Response Act of 2002; Emergency Planning and Community Right-to-Know Act, §§ 301-305.

## Homeland Security: Protection of EPA Personnel and Infrastructure

Program Area: Homeland Security
Goal: Safeguard and Revitalize Communities
Objective(s): Prepare for and Respond to Environmental Emergencies

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$6,059* | *$5,188* | *$5,158* | *-$30* |
| Science & Technology | $625 | $625 | $501 | -$124 |
| Building and Facilities | $3,944 | $6,676 | $6,676 | $0 |
| Hazardous Substance Superfund | $1,167 | $1,029 | $1,530 | $501 |
| Total Budget Authority | $11,795 | $13,518 | $13,865 | $347 |
| Total Workyears | 12.3 | 13.3 | 13.3 | 0.0 |

Total workyears in FY 2025 include 13.3 FTE to support Homeland Security Working Capital Fund (WCF) services.

**Program Project Description:**

Environmental Programs and Management resources for the Homeland Security: Protection of EPA Personnel and Infrastructure Program supports EPA efforts to maintain a robust physical security and preparedness infrastructure, ensuring that its facilities are secured and protected in line with the federally mandated Interagency Security Committee (ISC) standards.

In order to secure and protect EPA's personnel and physical infrastructure, the Agency operates a USAccess Personal Identity Verification (PIV) program, which adheres to the requirements as set forth in *Homeland Security Presidential Directive-12* (HSPD-12).[169] This program ensures the Agency complies with government-wide standards for the issuance of secure and reliable forms of identification to federal employees and contractors who require access to federally controlled facilities and networks. Additionally, EPA's National Security Information (NSI) program manages and safeguards EPA's classified information for its federal workforce and contractors, including conducting mandatory training and NSI inspections at EPA's accredited facilities. In addition to the NSI program, EPA operates a Personnel Security Program that initiates and adjudicates personnel background investigations, processes fingerprint checks, determines individual eligibility to access classified NSI, and maintains personnel security records for all federal and non-federal employees.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.3, Prepare for and Respond to Environmental Emergencies in the *FY 2022 - 2026 EPA Strategic Plan.*

---

[169] For additional information, please see: https://www.dhs.gov/homeland-security-presidential-directive-12.

As part of the nationwide protection of buildings and critical infrastructure, EPA performs physical security vulnerability assessments on its facilities each year. Through this program, the Agency also recommends security risk mitigations, reviews and manages access control measures, determines physical security measures for new construction and leases, and manages the lifecycle of security equipment.

In FY 2025, EPA will continue to partner with GSA on implementing Enterprise Physical Access Control Systems (ePACS). ePACS modernizes EPA's security infrastructure in compliance with HSPD-12[1] and ensures that the Agency is enhancing safety, security, and efficiency with more effective controlled access to EPA physical space and networks.

In FY 2025, EPA will complete security projects to ensure protection of occupants and compliance with federal mandates and ISC standards, including:

- Migrating to ePACS at the Research Triangle Park, NC Laboratory, Gulf Breeze, FL Laboratory, the Newport, OR Environmental Laboratory, the Washington, DC EPA Headquarters facilities, the Edison, NJ Region 2 Laboratory, and the New York City, NY Region 2 Headquarters.
- Upgrading closed-circuit television and physical security in response to vulnerabilities identified in physical security assessments.

The Agency will continue to utilize GSA's Managed Service Office program, USAccess, for Personal Identity Verification card enrollment and issuance. USAccess is a GSA managed, shared services solution that provides EPA the ability to produce and maintain secure and reliable forms of identification for all EPA employees and contractors as required per HSPD-12.

The Agency will continue to prioritize implementation of Trusted Workforce 2.0[170] (TW 2.0). TW 2.0 is a whole-of-government background investigation reform effort overhauling the personnel vetting process by creating one government-wide system that allows reciprocity across organizations. This effort includes moving from periodic reinvestigations every five to ten years towards a Continuous Vetting program, which protects the trusted workforce in real time. Additionally, the Agency will expand continuous vetting enrollment to include Non-Sensitive Public Trust (NSPT) personnel and report on performance metrics mandated in the *Performance Management Implementation Guidance*, jointly issued by OPM and the Director of National Intelligence in 2023.

In FY 2025, pursuant to the June 2023 Trusted Workforce Implementation Strategy, issued by the Security, Suitability, and Credentialing Performance Accountability Council, EPA will complete projects that support the transition to TW 2.0, including: enrollment of EPA personnel into the continuous evaluation program managed by the Defense Counterintelligence and Security Agency and integration of EPA processes with National Background Investigation Services (NBIS),[171] continuing to implement a new personnel vetting IT system for the background investigation process to deliver stronger security, faster processing, and better information sharing.

---

[170] For additional information, please see: https://www.performance.gov/trusted-workforce/.
[171] For additional information, please see: https://www.dcsa.mil/is/nbis/.

EPA complies with *5 CFR 1400*,[172] which requires that federal and non-federal positions are designated for both risk and sensitivity and that personnel have appropriate background investigations commensurate with their position's risk and sensitivity designation. EPA will continue to manage the personnel security, suitability, fitness, and NSI programs and conduct background investigations following appropriate federal guidance, ensuring that personnel are properly investigated for the positions they encumber and that classified material and activity is properly handled. As federal guidelines and policies change or are introduced, the systems supporting background investigations and the NSI Program will be updated and enhanced, as needed.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$30.0) This net change reflects cost efficiencies associated with the continued adoption of the Enterprise Physical Access Control System (ePACS) shared service across EPA facilities.

**Statutory Authority:**

Intelligence Reform and Terrorism Prevention Act of 2004; Privacy Act of 1974; REAL ID Act of 2005; Homeland Security Act of 2002; Americans with Disabilities Act; Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

---

[172] For additional information, please see: https://www.ecfr.gov/current/title-5/chapter-IV/part-1400.

**Indoor Air and Radiation**

## Indoor Air:  Radon Program

Program Area: Indoor Air and Radiation
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Reduce Exposure to Radiation and Improve Indoor Air

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$2,844* | *$3,364* | *$5,147* | *$1,783* |
| Science & Technology | $70 | $199 | $173 | -$26 |
| Total Budget Authority | $2,914 | $3,563 | $5,320 | $1,757 |
| Total Workyears | 8.0 | 9.0 | 12.4 | 3.4 |

**Program Project Description:**

Title III of the Toxic Substances Control Act (TSCA) authorizes EPA to take a variety of actions to address the public health risk posed by exposure to indoor radon. Under the statute, EPA studies the health effects of radon, assesses exposure levels, sets an action level, provides technical assistance to states, industry, and the public, advises the public of steps they can take to reduce exposure, and promotes the availability of reliable radon services and service providers to the public.

Radon is the second leading cause of lung cancer in the United States – and the leading cause of lung cancer mortality among non-smokers – accounting for about 21,000 deaths per year.[173] EPA's non-regulatory Indoor Air: Radon Program promotes actions to reduce the public's health risk from indoor radon. EPA and the Surgeon General recommend that all homes be tested for radon and if radon levels above EPA's guidelines are confirmed, elevated levels should be reduced by home mitigation using proven, straightforward techniques. EPA also recommends that new homes be built using radon-resistant features in areas where there is elevated radon. Nationally, risks from radon have been reduced in millions of homes, but there are millions more that are still in need of mitigation. Additionally, low-income families and tribal communities lack access to resources to address radon. This voluntary program promotes partnerships among national organizations, the private sector, and more than 50 state, local, tribal, and territory governmental programs to reduce radon risk.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.2, Reduce Exposure to Radiation and Improve Indoor Air in the *FY 2022 - 2026 EPA Strategic Plan*.

---

[173] https://www.epa.gov/radon.

EPA will continue to lead the federal government's response to radon and to implement the Agency's own multi-pronged radon program. Work in this program supports the President's priority of advancing environmental justice (EJ). EPA will drive action at the national level to reduce radon risk in homes and schools through the National Radon Action Plan, partnerships with the private sector and public health groups, technical assistance to states and industry, public outreach, and education activities. The Agency will encourage radon risk reduction as a normal part of doing business in the real estate marketplace, will promote local and state adoption of radon prevention standards in building codes, and will participate in the development of national voluntary standards (*e.g.,* mitigation and construction protocols) for adoption by states and the radon industry. EPA will continue to support the framework that ensures a quality, credentialed radon workforce.

**Performance Measure Targets:**

**(PM LCD) Number of lung cancer deaths prevented through lower radon exposure.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 1,881 | 1,981 | 2,083 | 2,162 | Deaths |
| **Actual** | 1,482 | 1,578 | 1,684 | 1,795 | 1,894 | 1,970 |  |  | Prevented |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$6.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$1,777.0 / +3.4 FTE) This increase in resources supports efforts to restore EPA's staff expertise, analysis, and capacity in the indoor air radon program in order to better lead the federal government's response to radon and to implement the Agency's own multi-pronged radon program. This investment includes $684.0 thousand for payroll.

**Statutory Authority:**

Title III of the Toxic Substances Control Act (TSCA); Title IV of the Superfund Amendments and Reauthorization Act (SARA); Clean Air Act.

# Radiation:  Protection

Program Area: Indoor Air and Radiation
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Reduce Exposure to Radiation and Improve Indoor Air

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$8,390* | *$9,088* | *$11,748* | *$2,660* |
| Science & Technology | $2,321 | $1,683 | $2,416 | $733 |
| Hazardous Substance Superfund | $2,081 | $2,472 | $3,144 | $672 |
| Total Budget Authority | $12,792 | $13,243 | $17,308 | $4,065 |
| Total Workyears | 57.3 | 54.8 | 67.2 | 12.4 |

## Program Project Description:

EPA has  general and specific duties to protect human health and the environment from harmful and avoidable exposure to radiation under multiple statutes. EPA's Radiation Protection Program carries out these responsibilities through its federal guidance and standard-setting activities, including: regulatory oversight and implementation of radioactive waste disposal standards for the Department of Energy's (DOE) Waste Isolation Pilot Plant (WIPP); the regulation of airborne radioactive emissions; general disposal standards for nuclear waste repositories; and the development and determination of appropriate methods to measure and to model radioactive releases and exposures under Section 112 of the Clean Air Act (CAA).[174] The Radiation Protection Program also supports EPA, state, local and tribal authorities by providing radiation protection scientific analyses and recommendations needed to inform risk management policies, and the necessary radiation risk communications expertise to support local community engagement on issues related to legacy contamination and environmental justice (EJ) needs.

## FY 2025 Activities and Performance Plan:

Work in this program directly supports Goal 4/Objective 4.2, Reduce Exposure to Radiation and Improve Indoor Air in the *FY 2022 - 2026 EPA Strategic Plan*.

EPA will meet its statutory obligation to implement its regulatory oversight responsibilities for DOE activities at the WIPP facility, as mandated by Congress in the WIPP Land Withdrawal Act of 1992. In FY 2025, EPA anticipates concluding a detailed review of an initial DOE request for expanding the WIPP repository to address needs for more waste disposal area, permitting disposal of previously identified transuranic waste as well as more recently identified needs for disposal of surplus plutonium. EPA will engage with stakeholders and community groups as part of the WIPP review and will review and implement regulations or guidance, as necessary.

---

[174] For more information on EPA's radiation protection program: http://www.epa.gov/radiation.

202

Building on related efforts from FY 2023-24, EPA anticipates increased regulatory activity related to the Clean Air Act and Atomic Energy Act. A key area for ongoing work is related to the management of phosphogypsum wastes, including both requests for approval of alternate uses and rulemaking. The increased interest in advanced nuclear reactors is expected to affect EPA's regulatory programs and require reconsideration of rules related to nuclear power operations, uranium recovery, and radioactive waste disposal.

The Agency will provide technical and policy analysis supporting scientific goals for space exploration. EPA serves on the Interagency Nuclear Safety Review Board with the National Aeronautics and Space Agency (NASA) and the Department of Defense (DOD) to provide launch safety analysis.[175]

EPA scientists will participate, as appropriate, in interagency working groups to examine issues of low-dose radiation health impacts and identify any needed changes to existing technical and policy guidance. EPA radiation risk communicators will provide radiation-related website and communications product content that is clear and accessible to the general public, including those with limited English proficiency.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$90.0 /+0.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements.

- (+$2,570.0 / +7.3 FTE) This program change is an increase that supports efforts to restore EPA's staff expertise, analysis, and capacity in the radiation protection program to provide radiation protection scientific analyses and recommendations needed to inform risk management policies. It also supports the necessary radiation risk communications expertise for local community engagement on issues related to legacy contamination and environmental justice needs. This investment includes $1.4 million for payroll and additional fixed support costs.

**Statutory Authority:**

Atomic Energy Act of 1954; Clean Air Act; Energy Policy Act of 1992; Nuclear Waste Policy Act of 1982; Public Health Service Act; Safe Drinking Water Act; Uranium Mill Tailings Radiation Control Act (UMTRCA) of 1978; Waste Isolation Pilot Plant Land Withdrawal Act of 1992; Marine Protection, Research, and Sanctuaries Act; Clean Water Act.

---

[175] For more information, please see: https://sma.nasa.gov/docs/default-source/sma-disciplines-and-programs/nuclear/insrb-charter---508d.pdf?sfvrsn=7862c7f8_2.

# Radiation:  Response Preparedness

Program Area: Indoor Air and Radiation
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Reduce Exposure to Radiation and Improve Indoor Air

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$2,111* | *$2,650* | *$3,185* | *$535* |
| Science & Technology | $3,200 | $3,596 | $4,802 | $1,206 |
| Total Budget Authority | $5,311 | $6,246 | $7,987 | $1,741 |
| Total Workyears | 29.6 | 33.3 | 41.4 | 8.1 |

**Program Project Description:**

EPA responds to radiological emergencies; conducts essential national and regional radiological response planning and training; and develops response plans for radiological incidents or accidents. EPA will continue to conduct assessment and preparedness for response to incidents involving foreign and domestic nuclear technology used in space nuclear systems and advanced reactor technologies. EPA generates policy guidance and procedures for the Agency's radiological emergency response under the National Response Framework (NRF) and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). The Agency maintains its own Radiological Emergency Response Team (RERT) and is a member of the Department of Homeland Security/Federal Emergency Management Agency Federal Radiological Preparedness Coordinating Committee (FRPCC), the Interagency Nuclear Safety Review Board, and leads the Federal Advisory Team for Environment, Food and Health (the "A-Team"). The A-Team includes radiation protection experts from EPA, the Centers for Disease Control and Prevention (CDC), the Food and Drug Administration (FDA), and the Department of Agriculture (USDA); and their function is to advise federal, state, local, and tribal authorities during radiological/nuclear emergencies on public safety issues including evacuation, sheltering, and contamination concerns for food, drinking water and other resources.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.2, Reduce Exposure to Radiation and Improve Indoor Air in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to streamline activities and fill gaps in the expertise that is critical for essential preparedness work, restoring critical capacity to meet EPA's core mission. The RERT will maintain essential readiness to support federal radiological emergency response and recovery operations under the NRF and NCP. EPA will participate in interagency training and exercises to maintain readiness levels needed to fulfill EPA's responsibilities.

Evaluation of Response Plans

In FY 2025, EPA will continue to work with interagency partners, including those under the FRPCC as well as those at the state, local, and tribal levels to examine and, as needed, revise radiation emergency response plans, protocols, and standards. Under the NRF, EPA serves various roles during nuclear incidents, for example, as a supporting agency for incidents in the United States and as a coordinator for communicating with the U.S. public during foreign nuclear incidents, such as the Fukushima accident. In FY 2025, EPA will maintain staff readiness and training needed to meet the Agency's mission during such incidents. EPA will review and revise preparedness guidance to ensure that the Agency's response efforts address the needs of the public, with special emphasis on the most vulnerable.

EPA will support the U.S. Government assessment of foreign and domestic nuclear technology used in space nuclear systems and advanced reactor technologies. Building on efforts in FY 2024, EPA will continue work on the safety evaluations of the Defense Advanced Research Projects Agency's (DARPA) Demonstration Rocket for Agile Cislunar Operations (DRACO) mission and the National Aeronautics and Space Administration's Dragonfly mission for potential impacts to human health and the environment from these space nuclear systems. EPA will continue radiological contingency planning and preparedness for DRACO and Dragonfly mission launches.

Coordinating Preparedness Efforts

EPA will continue essential planning and will participate in interagency tabletop and field exercises, including radiological accident and incident response and anti-terrorism activities with the Advisory Team for Environment, Food, and Health, the Nuclear Regulatory Commission, the Department of Energy (DOE), the Department of Defense, the Department of State, and the Department of Homeland Security (DHS). The Agency also will provide technical support on priority issues to federal, state, local, and tribal radiation, emergency management, solid waste, and health programs responsible for implementing radiological emergency response and preparedness programs. The Agency will continue to train and advise on the Protective Action Guidance[176] and use lessons learned from incidents and exercises to ensure the effective delivery of EPA support in coordination with other federal, state, local, and tribal authorities.

**Performance Measure Targets:**

**(PM RAD2) Percentage of radiation emergency response program personnel and assets that meet functional readiness requirements necessary to support federal radiological emergency response and recovery operation.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 90 | 92 | 92 | 92 | Percent |
| **Actual** |  |  |  | 92 | 87.7 | 87.1 |  |  |  |

---

[176] For additional information, please see: https://www.epa.gov/sites/production/files/2017-01/documents/epa_pag_manual_final_revisions_01-11-2017_cover_disclaimer_8.pdf.

**FY 2025 Change from 2024 Annualized CR (Dollars in Thousands):**

- (+$535.0 / +3.1 FTE) This program change is an increase that supports efforts to restore EPA's staff expertise, analysis, and capacity in the radiation response program in order to examine and, as needed, revise radiation emergency response plans, protocols, and standards and continue essential planning for preparedness efforts. This investment includes payroll and additional changes to fixed support costs.

**Statutory Authority:**

Homeland Security Act of 2002; Atomic Energy Act of 1954; Clean Air Act; Post-Katrina Emergency Management Reform Act of 2006 (PKEMRA); Public Health Service Act (PHSA); Robert T. Stafford Disaster Relief and Emergency Assistance Act; Safe Drinking Water Act (SDWA).

**Reduce Risks from Indoor Air**

Program Area: Indoor Air and Radiation
Goal: Ensure Clean and Healthy Air for All Communities
Objective(s): Reduce Exposure to Radiation and Improve Indoor Air

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$13,281* | *$13,593* | *$47,570* | *$33,977* |
| Science & Technology | $27 | $278 | $185 | -$93 |
| Total Budget Authority | $13,309 | $13,871 | $47,755 | $33,884 |
| Total Workyears | 35.3 | 39.2 | 71.4 | 32.2 |

**Program Project Description:**

Title IV of the Superfund Amendments and Reauthorization Act of 1986 (SARA) authorizes EPA to conduct and coordinate research on indoor air quality, develop and disseminate information, and coordinate risk reduction efforts at the federal, state, and local levels. Poor indoor air quality represents one of the most significant public health risks within EPA's responsibility.[177] EPA uses a range of strategies to reduce health risks from poor indoor air quality in homes, schools, and other buildings through partnerships with non-governmental, professional, federal, state, and local organizations. Through these partnerships EPA provides information, guidance, and technical assistance that equips industry, the health care community, the residential, school, and commercial building sectors, and the general public to take action. As technical experts working at the intersection of the built environment and health, EPA is focused on policy and guidance to improve building conditions, including for disproportionately impacted communities, to reduce indoor air risk and achieve improvements in environmental and health outcomes.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 4/Objective 4.2, Reduce Exposure to Radiation and Improve Indoor Air in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will promote actions and interventions to make improvements in public health including efforts targeted to children, underserved communities, and other vulnerable populations. The Program will include a particular focus on opportunities to accelerate the adoption of best indoor air quality practices including ventilation, filtration, and air cleaning to help suppress the transmission of airborne infectious disease and indoor exposure to wildfire smoke. EPA will continue to lead on these issues by providing technical assistance and guidance for residential, commercial, and public buildings, emphasizing that building improvements will be beneficial to not only pandemic preparedness, climate change and disaster resilience, but also improved public health in the long-term.

---

[177] For additional information, please visit: https://www.epa.gov/iaq.

EPA will continue to equip school leaders and the school sector, through the Indoor Air Quality Tools for Schools program, to put in place comprehensive indoor air quality management programs that implement sustainable ventilation, filtration, and other indoor air quality improvements to promote healthy school environments for students and staff. EPA will provide and promote technical assistance, training, outreach, and other support to improve indoor air in schools nationwide, including those in low-income and disadvantaged communities.

Additionally, EPA will collaborate with public and private sector organizations to provide clear and verifiable protocols and specifications for promoting good indoor air quality and support adoption of these protocols and specifications into existing healthy, energy efficiency, and green building programs and initiatives to promote healthy buildings for a changing climate. EPA also will equip the housing sector with guidance to promote the adoption of these best practices with the aim of creating healthier, more energy efficient homes, including for low-income families.

In FY 2025, EPA will build the capacity of community-based organizations to provide comprehensive asthma care that integrates management of indoor environmental asthma triggers and health care services, with a particular focus on low-income, minority, and tribal communities. As of FY 2023, EPA had equipped 2,954 programs to support the infrastructure, delivery, and sustainability of comprehensive asthma care. In FY 2025, EPA's goal is to have equipped 3,155 programs.

EPA, in collaboration with other federal agencies, and partners will continue to work to ensure access to affordable, reliable, sustainable, and modern energy for all. EPA will continue to work with partners to increase the sustained use of clean fuels and stoves and cleaner and efficient biomass cookstoves worldwide, not only to address the more than three million premature deaths worldwide attributed annually to cookstove emissions, but also as an important component of the Administration's climate strategy. EPA, in collaboration with the Clean Cooking and Climate Consortium, will continue to work to encourage national governments to include household energy emissions reductions in their Nationally Determined Contributions (NDCs), or Paris Climate Plans). In FY 2025, 115 countries will have household energy emissions reductions in their NDCs.

**Performance Measure Targets:**

**(PM IA) Number of programs, annually, equipped to support the infrastructure, delivery and sustainability of comprehensive asthma care.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 1,800 | 2,855 | 3,005 | 3,155 | Programs |
| **Actual** | 1,232 | 1,645 | 2,132 | 2,446 | 2,705 | 2,954 |  |  | |

**(PM NDC) Number of countries with household energy in their NDCs (Nationally Determined Contributions or Paris Climate Plans).**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  |  | 100 | 115 | Countries |
| **Actual** |  |  |  |  |  |  |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$33,977.0 / +32.2 FTE) This program change is an increase to restore EPA's staff expertise, analysis, and capacity in the indoor air program. Funds also support efforts to address indoor air quality during wildfires, reduce asthma disparities, promote healthy school facilities in low-income communities in the U.S., and address the international climate crisis by improving public health through the adoption of clean cookstoves. This investment includes $6.154 million for payroll and additional changes to fixed support costs.

**Statutory Authority:**

Title IV of the Superfund Amendments and Reauthorization Act (SARA); Title III Toxic Substances Control Act; Clean Air Act.

**International Programs**

**International Sources of Pollution**
Program Area: International Programs
Goal: Tackle the Climate Crisis
Objective(s): Advance International and Subnational Climate Efforts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$7,214* | *$7,323* | *$26,183* | *$18,860* |
| Total Budget Authority | $7,214 | $7,323 | $26,183 | $18,860 |
| Total Workyears | 33.0 | 33.4 | 50.9 | 17.5 |

**Program Project Description:**

The United States works with international partners to address global sources of pollution, including greenhouse gases (GHGs), as well as the impacts of pollution from the United States on other countries, regions, and the global environment. International sources of pollution impact air, water, land, the oceans, food crops, and critical supply chains. Healthy environments, ecosystems, and communities provide the foundation for protecting human health and the environment and creating sustainable economic development, job opportunities, and sustainable growth.

*Tackling the Climate Crisis, Accelerating Environmental and Economic Justice*

Through this program, EPA works with international partners, such as foreign governments and international organizations, to deploy assistance for measures that can strengthen on the ground action to tackle the climate crisis and reduce transboundary pollution that impacts local communities and travels through the environment to impact other communities across the globe; this assistance also can strengthen the fundamental environmental rule of law. EPA's international mission is essential to addressing transboundary pollution and adverse environmental impacts in the United States and helps facilitate a cleaner and healthier environment around the world. Strengthening environmental protection abroad so that it is on par with practices in the U.S. helps level the playing field for industry and creates incentives for innovation and deploying cleaner technologies. EPA's international programs also play an important role in fulfilling national security and foreign policy objectives and creating a platform for promoting U.S. innovation and showcasing state and local breakthrough programs and policies.

An important example of this work is EPA's engagement with the Group of Seven (G7) and the Group of Twenty (G20) through environment ministerial meetings, which negotiate outcomes on key EPA issues such as climate change, food waste, marine litter, resource efficiency, lead pollution, and air quality. EPA's engagement with international financial institutions, United Nations (UN) entities, and the Organization for Economic Cooperation and Development (OECD) has helped advance recognition of the critically important role of environmental factors, including air pollution and toxic chemicals, that contribute to the global burden of non-communicable diseases (NCDs), and of the role that sound environmental laws can play in reducing these risks.

211

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 1/Objective 1.3, Advance International and Subnational Climate Efforts in the *FY 2022 – 2026 EPA Strategic Plan.* In FY 2025, EPA will continue to engage bilaterally, regionally, and through multilateral institutions to improve international cooperation to reduce greenhouse gases, increase resilience and adaptive capacity, as well as prevent and address the transboundary movement of conventional pollution and waste.

*Climate and Equity*

Specifically, in line with the *FY 2022 – 2026 EPA Strategic Plan*, EPA will provide technical assistance through the transfer of tools and knowledge to address climate change with partner countries, with the goal of leveling the playing field, addressing disproportionate adverse human health and environmental impacts in vulnerable and underserved communities, and helping to ensure that all countries make meaningful progress in implementing their nationally determined contributions under the Paris Agreement. This helps fulfill EPA's commitment to implementing at least 40 international climate engagements that result in an individual partner commitment or action to reduce GHG emissions, adapt to climate change, or improve resilience in a manner that promotes equity by 2026.

In FY 2025, EPA is requesting $18 million and 16 FTE above FY 2024 Annualized CR levels to enhance capacity building governance programs for priority countries with increasing GHG footprints and increase their capacity to implement partnerships as well as legislative, regulatory, and legal enforcement efforts. These programs also will work to improve adaptive capacity and mitigation strategies of pollution-burdened, vulnerable, and indigenous communities. Actions will include partnering with the Secretariat of Partnership for Clean Fuels and Vehicles (PCFV) to assist project partners in transitioning to electric mobility solutions in key countries, particularly in underserved and vulnerable communities, to finalize a high ambition work plan with the Secretariat and work to develop or advance environmental standards for critical mineral supply chains. They also will include technical assistance and capacity building to strengthen environmental assessment processes and improve transparency and meaningful community participation in decision making.

In FY 2025, the Agency will work with like-minded Arctic Council countries to identify external resources and needs of indigenous Arctic communities and Alaskan Native Villages (ANVs) to better understand pollution sources and management best practices that may impact local health conditions. EPA also will continue to co-chair the Arctic Council expert group on short-lived climate pollutants (SLCPs) to facilitate the development and implementation of projects to reduce SLCP emissions, relying upon procedures for engagement developed by the White House and Department of State.

EPA also will continue to share agency tools that can help partners increase their adaptive capacity to climate change and understand the impacts of climate change on vulnerable and underserved communities through the UN Environment Program's Global Adaptation Network, and existing and new bilateral work programs with a focus on Africa.

*Marine Pollution*

EPA will continue to engage internationally to prevent and reduce plastic pollution and marine litter through sharing best practices and U.S. innovation as well as through the development of a new global agreement. Marine plastic litter is a prominent global issue and one that can negatively impact water quality, tourism, industry, and public health in the United States. EPA will provide critical technical and policy expertise through a multilateral intergovernmental negotiating committee (INC) process to develop a new binding international arrangement to end plastic pollution.[178] Since 80 percent of plastic marine litter comes from land-based sources of waste,[179] countries with inadequate waste management contribute to the pollution in our shared oceans. Improving integrated waste management and working on source reduction in these countries will continue to be a priority.

Since the beginning of the *FY 2022-2026 EPA Strategic Plan*, EPA has implemented 90 actions overseas to mitigate marine litter and improve water quality and national air quality. In FY 2025, EPA will continue to share tools and provide technical assistance, including through efforts related to Trash Free Waters (TFW), to key contributing countries in Asia and Africa as well as building on the results of past projects in Latin America and the Caribbean. In FY 2025, EPA will further deploy TFW in Asia using materials that were translated into Thai, Vietnamese, and a common Indonesian language. In Africa, EPA will help key countries develop and implement TFW projects to prevent litter from entering the marine environment. EPA will continue to strengthen actions with a regional focus on major source countries in Southeast Asia and key partners in Latin America, the Caribbean, and Africa through bilateral relationships and/or partnerships with UNEP leaders on implementing and disseminating governance measures, policies, and technology to prevent marine litter.

In FY 2025, EPA will continue to work on the Kootenai Watershed, including with the regional and national level governments in Canada, as a priority matter. EPA's work on reducing transboundary mining pollution aims to improve human health and the environment in the watershed and protect salmon, steelhead, and other fish in the Columbia River System (CRS).

*Air Quality*

EPA will engage with key priority countries and UN institutions to address air pollution that contributes significant pollution to the domestic and international environment. For example, several Asian countries (*e.g.*, Thailand) are implementing national air quality monitoring, planning, and control strategies with advice and lessons learned from the United States. In Africa, EPA will continue its work to increase air quality monitoring and characterization, climate co-benefit assessments, and air quality management planning. Environmental policies adopted and implemented overseas will improve competitiveness for U.S. businesses, drive demand for U.S. emissions control technologies, and expand exports of U.S. environmental goods and services, which will create green jobs at home and improve air quality conditions in the United States.

---

[178] For more information, please see: https://www.unep.org/about-un-environment/inc-plastic-pollution.
[179] J. R. Jambeck, R. Geyer, C. Wilcox, T. R. Siegler, M. Perryman, A. Andrady, R. Narayan, and K. L. Law, "Plastic waste inputs from land into the ocean," Science, 2015, Volume 347, Number 622.

*Food Waste*

In FY 2025, EPA will continue to cooperate with the United Nations and the Office of Management and Budget to ensure that methodologies used to track international progress on reducing food waste accurately reflect U.S. progress and to better understand the climate benefits of reducing food waste. Approximately eight to ten percent of global greenhouse gas emissions are from food loss in the agricultural supply chain and consumer food waste.[180] The Agency will continue to advance food waste efforts, which is an increasing portion of landfill waste in rapidly urbanizing cities in developing countries, and explore awareness raising work with Canada and Mexico.

*Chemicals*

EPA also will maintain efforts to reduce environmental threats to U.S. citizens from global contaminants impacting air, water, and land. EPA will continue technical and policy assistance for global, regional, and bilateral efforts to address international sources of harmful pollutants, such as mercury. Since 70 percent of the mercury deposited in the U.S. comes from global sources,[181] both domestic efforts and international cooperation are important to address mercury pollution. EPA will continue to work with international partners and key countries to fully implement obligations under the Minamata Convention on Mercury to protect the U.S. population from mercury emissions originating in other countries, including from artisanal and small-scale gold mining. EPA also continues its leadership role within the United Nations Environment Program's Global Mercury Partnership.

With respect to mercury, EPA continues to work with partner countries to develop National Action Plans (NAPs) that demonstrate how they will reduce or eliminate the use of mercury in the Artisanal and Small-Scale Gold Mining (ASGM) sector. ASGM is the largest source of global mercury releases[182] and the development of NAPs called for by the Minamata Convention on Mercury is a critical first step to help major emitters reduce the use and release of mercury into the environment.

EPA will continue to play a leadership role in the Lead Paint Alliance to increase the number of countries that establish effective laws to limit lead in paint, which remains a priority health concern following successful efforts to eliminate lead in gasoline worldwide. In addition, EPA will continue to work with International Arctic partners to further develop a joint project proposal on per- and polyfluoroalkyl substances (PFAS). This effort will focus on aqueous film-forming fire-fighting foams (AFFFs) in arctic airports through in-kind technical expertise.

---

[180] For more information, please see: Intergovernmental Panel on Climate Change (IPPC) Special Report on Climate Change and Land, Chapter 5 Food Security, pg 440, https://www.ipcc.ch/site/assets/uploads/sites/4/2021/02/08_Chapter-5_3.pdf.

[181] For more information, please see: https://www.epa.gov/international-cooperation/minamata-convention-mercury and www.mercuryconvention.org.

[182] For more information, please see: Global mercury assessment | UNEP - UN Environment Programme.

**Performance Measure Targets:**

**(PM E13a) Number of climate engagements that result in an individual partner commitment or action to reduce GHG emissions, adapt to climate change, or improve resilience in a manner that promotes equity.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 8 | 10 | 10 | 10 | Engagements |
| **Actual** | | | | | 8 | 10 | | | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$486.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$304.0 / +1.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements.

- (+$18,070.0 / +16.0 FTE) This program change increases FTE and resources to support efforts for international climate change work, including greenhouse gas guidance, pilot programs, and indigenous engagements on climate change. This increase will enhance capacity building governance programs for priority countries with increasing GHG footprints to increase their ability to implement partnerships as well as support legislative, regulatory, and legal enforcement efforts. This includes $3.244 million in associated payroll.

**Statutory Authority:**

In conjunction with the National Environmental Policy Act (NEPA) § 102(2)(F): Clean Air Act § 103(a); Clean Water Act § 104(a)(1)-(2); Safe Drinking Water Act (SDWA) § 1442(a)(1); Resource Conservation and Recovery Act (RCRA) § 8001(a)(1); Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) §§ 17(d), 20(a); Toxic Substances Control Act (TSCA) §10(a); Marine Protection, Research, and Sanctuaries Act (MPRSA) § 203(a)(1); E.O. 13547; E.O. 13689; U.S.-Mexico-Canada Agreement (USMCA) Implementation Act, 19 U.S.C. §§ 4501-4372.

<u>**Trade and Governance**</u>

Program Area: International Programs
Goal: Tackle the Climate Crisis
Objective(s): Advance International and Subnational Climate Efforts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$7,390* | *$5,510* | *$7,201* | *$1,691* |
| Total Budget Authority | $7,390 | $5,510 | $7,201 | $1,691 |
| Total Workyears | 13.9 | 15.3 | 18.0 | 2.7 |

**Program Project Description:**

EPA has played a key role in trade policy development since the 1972 Trade Act mandated that the U.S. Trade Representative (USTR) engage in interagency consultations. Specifically, EPA is a member of the Trade Policy Staff Committee, the Trade Policy Review Group, and relevant subcommittees–interagency mechanisms that provide advice, guidance, and clearance to the Office of the U.S. Trade Representative in the development of U.S. international trade and investment policy. Trade influences the nature and scope of economic activity and therefore the levels of pollutant emissions and natural resource use. EPA's role in trade negotiations is to ensure that agreements have provisions that are consistent with the Administration's environmental protection goals while not putting the United States at an economic disadvantage. EPA offers technical assistance and environmental governance capacity building for trade partners to support implementation of environmental commitments made in Free Trade Agreements. EPA also provides technical expertise on environmental governance and policy for international financial institutions, including environmental policy reviews and project-level environmental guidance.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 1/Objective 1.3, Advance International and Subnational Climate Efforts in the *FY 2022 – 2026 EPA Strategic Plan.*

*Free Trade Agreements and United States-Mexico-Canada Agreement (USMCA)*

In FY 2025, EPA will continue its participation in the North American Commission for Environmental Cooperation (CEC), which provides regional and international leadership to advance environmental protection, human health, and sustainable economic growth in North America. EPA will continue to work on the implementation of the Environment Chapter of the United States-Mexico-Canada Agreement (USMCA) and other free trade agreements. The CEC work on border watersheds supports America the Beautiful (AtB); specifically, the Administration is pursuing a national conservation goal to protect or conserve at least 30 percent of U.S. lands and waters by 2030. Additional cooperation under the CEC is aimed at enhancing climate resilience in environmental justice communities, contributing to the Agency's Justice 40 objectives. EPA

216

activities will include monitoring and verifying provisions pertaining to global and national environmental requirements in the agreement and providing subject matter expertise, including activities that enhance capacity building governance programs in North America that increase the capability to implement partnerships as well as legislative, regulatory, and legal enforcement to reduce the overall GHG footprint.

EPA will continue active participation in the USTR-led Interagency Environment Committee for Monitoring and Environment (IECME) established to access implementation and maintenance by Mexico and Canada in compliance with their environmental obligations. EPA also will continue to strengthen the environmental governance of trade partner countries so that they can implement and enforce effective climate mitigation and adaptation activities and incorporate environmental justice principles.

In addition, EPA will continue to play an active role in the negotiation of agreements with other countries to facilitate trade and to promote good regulatory practices and anti-corruption measures, and then provide technical assistance to support implementation of environmental commitments within those agreements. At present, EPA is focused on collaboration through the USTR-led interagency process to support the negotiation of a new trade arrangement between the U.S. and Kenya, the Indo-Pacific Economic Framework for Prosperity, and the U.S.-Taiwan Initiative on 21st Century Trade. Further, given the Biden Administration 2022 Trade Agenda emphasis on achieving climate change objectives and supporting underserved and vulnerable communities, including possibly through trade measures, EPA will continue to track and provide technical advice and input for the negotiation of a sectoral agreement with the EU on steel and aluminum that will lead to decarbonizing production and the development of new critical minerals partnerships and agreements, and monitor measures to develop implicit or explicit carbon pricing mechanisms across countries.

In FY 2025, EPA will continue to work with partners (including the Treasury Department, State Department, U.S. Agency for International Development, and the U.S. International Development Finance Corporation) to support the environmental performance of international financial institutions such as the development of environmental safeguards, including climate performance. In addition, EPA will endeavor to improve environmental governance of U.S. funded international development projects that enhance capacity building governance programs for priority countries with increasing GHG footprints and increase their capacity to implement partnerships as well as legislative, regulatory, and legal enforcement.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$1,691.0 / +2.7 FTE) This program change supports an increase in resources to provide support and capacity building for regional and international Trade and Governance programs

and projects addressing climate change and environmental justice. This includes $530.0 thousand in associated payroll and additional changes to fixed support costs.

**Statutory Authority:**

In conjunction with the National Environmental Policy Act (NEPA) § 102(2)(F): Clean Air Act § 103(a); Clean Water Act § 104(a)(1)-(2); Safe Drinking Water Act (SDWA) § 1442(a)(1); Resource Conservation and Recovery Act (RCRA) § 8001(a)(1); Federal Insecticide Fungicide and Rodenticide Act (FIFRA) §§ 17(d), 20(a); Toxic Substances Control Act (TSCA) §10(a); Marine Protection, Research, and Sanctuaries Act (MPRSA) § 203(a)(1); E.O. 12915; E.O. 13141; E.O. 13277; U.S.-Mexico-Canada Agreement (USMCA) Implementation Act, 19 U.S.C. §§ 4501-4372.

# US Mexico Border

Program Area: International Programs
Goal: Tackle the Climate Crisis
Objective(s): Advance International and Subnational Climate Efforts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$2,512* | *$2,993* | *$5,132* | *$2,139* |
| Total Budget Authority | $2,512 | $2,993 | $5,132 | $2,139 |
| Total Workyears | 10.9 | 12.4 | 17.4 | 5.0 |

**Program Project Description:**

The two-thousand-mile border between the United States and Mexico is one of the most complex and dynamic regions in the world, where the benefits of international programs are perhaps most apparent. This region accounts for three of the ten poorest counties in the U.S. and is characterized by higher-than-average poverty, unemployment, uninsurance, and lower-than-average median incomes.[183] In addition, over 500 thousand of the 15 million people in the region live in colonias,[184] which are unincorporated communities characterized by substandard housing and unsafe drinking water or wastewater systems. Population growth indexes show a trend of increasing growth, related among other factors to the influx of migrants from different regions. This trend has increased the pressure on basic infrastructure and services in border cities, which struggle to keep up with population growth. The adoption of the Border Programs has gone a long way to protect and improve the health and environmental conditions along a border that extends from the Gulf of Mexico to the Pacific Ocean.

The Border 2025 Program will continue to emphasize local priority-setting, focus on measurable environmental results, and encourage broad public participation. Specifically, Border 2025 builds on earlier program work, which includes project-promoted solutions or monitoring related to air quality, used tire management, environmental health promotion, response to environmental emergencies, and treatment of wastewater.[185]

The Border 2025 Program identifies four long-term goals to address the serious environmental and environmentally related public health challenges, including the impact of transboundary transport of pollutants in the border region. These strategic goals are: Goal 1) Reduce Air Pollution; Goal 2) Improve Water Quality; Goal 3) Promote Sustainable Materials and Waste Management and Clean Sites; and Goal 4) Improve Joint Preparedness for and Response to Hazardous Environmental Emergencies. Within the goals are specific objectives that identify actions that will

---

[183] For additional information, please visit:
https://www.ruralhealth.us/NRHA/media/Emerge_NRHA/Advocacy/Policy%20documents/05-11-18-NRHA-Policy-Border-Health.pdf.

[184] For more information, please see: https://www.dallasfed.org/~/media/documents/cd/pubs/lascolonias.pdf.

[185] For more information, please see: https://www.epa.gov/sites/default/files/2021-05/documents/final_b2020_acc_report_may_24_2021.pdf.

be taken in support of the program's mission. The Border 2025 Program supports the President's Executive Order on Diversity, Equity, Inclusion, and Accessibility in the Federal Workplace as well as cross-agency efforts of tackling the climate crisis and advancing environmental justice.

Guiding principles support the mission statement, ensure consistency among all aspects of the Border 2025 Program, and continue successful elements of previous binational environmental programs. Prioritizing environmental equity and addressing disproportionate environmental impacts in border communities by protecting, improving, and promoting environmental awareness and environmental and human health is one of the Program's core principles. This principle aligns with one of EPA's priorities to promote equity for underserved communities and civil rights in the U.S. border region.

The Border 2025 Program is under the Justice40 Initiative that has as its goal to ensure that 40 percent of overall benefits of federal investments are directed to disadvantaged communities. To help support Justice40 implementation, activities may include developing benefits methodologies and identifying, tracking, analyzing, and reporting Justice40 data. EPA and the Secretariat of Environment and Natural Resources (SEMARNAT) will continue to closely collaborate with the ten border states (four U.S./six Mexican), 27 U.S. federally recognized tribes, indigenous communities including the afro-Mexican community in Mexico, and local communities in prioritizing and implementing projects that address their particular needs.

Note: The border water and wastewater infrastructure programs are described in the State and Tribal Assistance Grants (STAG) appropriation, Infrastructure Assistance: Mexico Border Program.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 1/Objective 1.3, Advance International and Subnational Climate Efforts in the *FY 2022-2026 EPA Strategic Plan.*

*Air Pollution*

In FY 2025, EPA will continue to focus on air pollution reductions in binational airsheds, work on reducing emissions through implementing policy-based or technology-based programs, and maintain effective air quality monitoring networks and timely access to air quality data along the border region to help support the Administration's goal of reducing air pollution and the effects of climate change. This effort to meet health-based air quality standards, especially for particulate matter and/or ozone, is expected to mitigate negative effects on public health by deploying innovative strategies or technologies and building public awareness of associated health risks to protect public health and advance environmental justice.

EPA and SEMARNAT will continue to build on the successful air quality efforts conducted in the Border 2020 Program, which resulted in complete greenhouse gas emissions inventories for each Mexico border state, and improved public health, especially in underserved communities. In addition, building upon over 20 years of binational air quality success within the New Mexico,

Texas, and Chihuahua shared air basin, local coordinated efforts will advance work to address mobile sources at two designated border cities.

EPA will assist in expanding technical training to promote standardized approaches and improvements to emissions inventory development, improved compliance with vehicle emission standards, establishment of and compliance with vehicle inspection and maintenance programs, increased data-sharing on used vehicle emissions testing, and strengthened Green Freight Programs such as Transporte Limpio (Mexico) and SmartWay (United States). Cooperation across the border has a high positive impact in protecting U.S. citizens and vulnerable populations in Texas' largest populated border city of El Paso, which makes up a metropolitan area with Juarez, Mexico, that shares and breathes the same air. In addition, EPA will provide support to update and/or complete climate action plans in each of the six northern Mexican Border States (as appropriate) and build the necessary capacity to guarantee sustained implementation. Along the U.S. border, California, Arizona, and New Mexico have completed Climate Change Action Plans.

*Water Management*

In FY 2025, the Agency will continue to address border water management in the Tijuana River Watershed. The United States-Mexico-Canada Trade Agreement (USMCA) authorizes and directs EPA to coordinate with specific federal, state, and local entities to plan and implement high priority infrastructure projects that address transboundary pollution affecting San Diego County, California. EPA will advance implementation of projects to prevent and reduce the levels of trash and sediment entering high priority binational watersheds. Other projects that prevent/reduce marine litter should primarily focus on preventing waste at the source through improvements to solid waste management systems, education campaigns, and monitoring as well as reducing trash entering the aquatic environment through the capture of litter using river booms in known watershed litter hot spots. Additionally, EPA will improve access to transboundary water quality data by developing spill notification protocols, increasing awareness of beach contamination, displaying timely information on water quality in high-priority watersheds, and continuing the work of the binational water quality improvement plan.

*Sustainable Materials Management*

In FY 2025, EPA will continue to collaborate and partner on sustainable materials management demonstration projects to prevent waste and improve the recovery of materials, such as plastic, e-waste, and scrap tires, through public-private partnership programs and infrastructure investments in the border region to mitigate public health and environmental impacts and avoid costly cleanup efforts. Additionally, EPA will work to increase institutional capacity for resource efficiency and sustainable management of materials and develop/implement strategies to reduce illegal dumping and landfill fires, maximize material recovery, and promote environmentally sound disposal practices and clean sites. Each region of the border has different economic, social, and cultural situations, with different capacities to mitigate the generation and management of waste and secondary materials.

EPA will continue to work to increase institutional capabilities in planning and technical assistance, enabling the development of programs, projects, or actions which consider the life cycle

analysis on natural resource economics, manufacturing, transport, and other market factors to effectively collect and use materials and avoid them being lost to landfills.

*Emergency Preparedness and Response*

Additionally, the United States and Mexico will work together to enhance joint preparedness for environmental response and facilitate easier transboundary movement of emergency response equipment and personnel by activities such as: updating Sister City Plans with preparedness and prevention and providing training to emergency responders on preparedness and prevention related activities. As part of the efforts for binational emergency preparedness and response, the Program will continue updating the Mexico-U.S. Joint Contingency Plan in both Spanish and English as well as conducting knowledge exchange and tabletop exercise activities to build partnership capacity and provide locals with the opportunity to test and improve emergency plans in their areas. In addition, both countries will coordinate binational efforts border-wide.

**Performance Measure Targets:**

**(PM E13b) Number of Border 2025 actions implemented in the U.S.-Mexico Border area to improve water quality, solid waste management and air quality including those that address climate change, and advance emergency response efforts.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 3 | 10 | 10 | 10 | Actions |
| Actual |  |  |  |  | 6 | 10 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$336.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs due to adjustments to provide essential workforce support and changes to benefits costs.

- (+$1,803.0 / +5.0 FTE) This program change increase supports efforts addressing pollution and climate change related activities along the United States and Mexico Border. To address the priority needs in the region and in support of the Border 2025 Program priorities, this effort continues to focus on smaller scale sustainability and core capacity building projects designed to improve the environment and protect the health of people living along the U.S.-Mexico border. This includes $928.0 thousand in associated payroll.

**Statutory Authority:**

In conjunction with the 1983 Agreement between the United States of America and the Mexican United States on Cooperation for the Protection and Improvement of the Environment in the Border Area (La Paz Agreement) and National Environmental Policy Act (NEPA) § 102(2)(F): Clean Air Act § 103(a); Clean Water Act § 104(a)(1)-(2); Safe Drinking Water Act (SDWA) §§ 1442(a)(1); Resource Conservation and Recovery Act (RCRA) § 8001(a)(1); Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) §§ 17(d), 20(a); Toxic Substances Control Act (TSCA) § 10(a); Marine Protection, Research, and Sanctuaries Act (MPRSA) § 203(a)(1); U.S.-Mexico-Canada Agreement (USMCA) Implementation Act, 19 U.S.C. §§ 4501-4372.

**IT/ Data Management/ Security**

# Information Security

Program Area: IT / Data Management / Security
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$8,188* | *$9,142* | *$23,937* | *$14,795* |
| Hazardous Substance Superfund | $1,494 | $1,062 | $6,012 | $4,950 |
| Total Budget Authority | $9,682 | $10,204 | $29,949 | $19,745 |
| Total Workyears | 10.3 | 14.1 | 17.1 | 3.0 |

**Program Project Description:**

Digital information is a valuable national resource and a strategic asset that enables EPA to fulfill its mission to protect human health and the environment. The Information Security Program's mission is to protect the confidentiality, integrity, and availability of EPA's information assets. The information protection strategy includes, but is not limited to, risk management, oversight, and training; network management and protection; and incident management.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $14.6 million and 3.0 FTE to support enhancements to protect the Agency's information technology (IT) portfolio. This investment will improve EPA's IT resiliency and limit vulnerabilities in the event of a malicious attack. EPA will continue to work toward full compliance with high priority directives (Adoption of Multifactor Authentication, Encryption of Data At Rest, Encryption of Data In Transit, Cybersecurity Supply Chain Risk Management, Zero Trust Architecture, and Event Logging) in Executive Order (EO) 14028: *Improving the Nation's Cybersecurity*.[186]

---

[1] Work in this program takes direction for IT implementation practices and priorities from the following:

- EO 14028:  *Improving the Nation's Cybersecurity (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/05/12/executive-order-on-improving-the-nations-cybersecurity/)*.
- OMB Memo M-19-26:  *Update to the Trusted Internet Connection (TIC) Initiative (https://www.whitehouse.gov/wp-content/uploads/2019/09/M-19-26.pdf)*.
- OMB Memo M-21-30: *Protecting Critical Software Through Enhanced Security Measures (https://whitehouse.gov/wp-content/uploads/2021/08/M-21-30.pdf)*.
- OMB Memo M-21-31: *Improving the Federal Government's Investigative and Remediation Capabilities Related to Cybersecurity Incidents (https://www.whitehouse.gov/wp-content/uploads/2021/08/M-21-31-Improving-the-Federal-Governments-Investigative-and-Remediation-Capabilities-Related-to-Cybersecurity-Incidents.pdf)*.
- OMB Memo M-22-01: *Improving Detection of Cybersecurity Vulnerabilities and Incidents on Federal Government Systems through Endpoint Detection and Response (https://www.whitehouse.gov/wp-content/uploads/2021/10/M-22-01.pdf)*.

**Improving the Defense and Resilience of Government Networks**

*Zero Trust Architecture (ZTA)*

A key priority for EPA's information security will be implementing zero trust capabilities addressing gaps identified by the Agency to enable the development of networks which can resist malevolent actions regardless of their origin. ZTA will grant authorized users full access to the tools and resources needed to perform their jobs but limit access to unnecessary areas. Proper permissions for a given user's needs are a critical component of ZTA, and coding for more granular control over the network environment is an information security priority. The Agency also will focus addressing the need to ensure all devices in EPA's environment are compliant with information security requirements prior to accessing network resources. EPA will continue efforts to elevate awareness of and harden isolated environments with enhanced security measures by integrating those environments with continuous monitoring capabilities to improve visibility and reduce risk.

EPA will continue to improve defense and resilience of government networks in accordance with ZTA security principles, which focus on virtual identity management capabilities. These improvements ensure agency staff can access necessary software applications while providing resistance to malicious phishing campaigns and sophisticated online attacks. For those system environments not integrated into the larger enterprise system (*i.e.*, those that may not be compatible with the enterprise-wide identity management capabilities), EPA will continue efforts to harden those systems with continuous monitoring capabilities to reduce risk.

The Agency will continue to implement cybersecurity enhancements necessary to support a larger remote workforce, which includes strengthening cloud security monitoring and access to sensitive data, cyber incident response, and cloud platform management services. These enhancements allow agency staff to securely use systems and services in the cloud while also improving application performance associated with Trusted Internet Connections (TIC). The Agency also will pilot enterprise web application control tools to protect web applications by preventing malicious traffic from accessing the web application or agency data. The Agency will continue to build its Insider Threat Program for the unclassified network to monitor Privileged Users and Systems Administrators activity, as recommended by several cybersecurity assessments,[187] and to monitor and report on EPA networks and systems.

---

- OMB Memo M-22-09: *Moving the U.S. Government Toward Zero Trust Cybersecurity Principles* (*https://www.whitehouse.gov/wp-content/uploads/2022/01/M-22-09.pdf*).
- OMB Memo M-22-16: *Administration Cybersecurity Priorities for the FY 2024 Budget* (*https://www.whitehouse.gov/wp-content/uploads/2022/07/M-22-16.pdf*).
- OMB Memo M-23-03: *Fiscal Year 2023 Guidance on Federal Information Security and Privacy Management Requirements* (https://www.whitehouse.gov/wp-content/uploads/2022/12/M-23-03-FY23-FISMA-Guidance-2.pdf).
- OMB Memo M-23-18: *Administration Cybersecurity Priorities for the FY 2025 Budget* (https://www.whitehouse.gov/wp-content/uploads/2023/06/M-23-18-Administration-Cybersecurity-Priorities-for-the-FY-2025-Budget-s.pdf).
- NIST 800-53 (https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf).

[187] These assessments include Annual Assessments and Classified briefings with the Department of Homeland Security and EPA's Office of Homeland Security, as well as a 2017 OIG Report, available at: https://www.epa.gov/sites/production/files/2017-10/documents/_epaoig_20171030-18-p-0031.pdf.

*IT Modernization for Federal Cybersecurity by Design*

EPA will continue to strengthen IT assets and develop resiliency against potential cybersecurity threats. This work includes enhancing Multifactor Authentication to strengthen access controls to data and evaluating areas which still may require implementation of encryption for Data at Rest and Data in Transit to protect data. EPA has prioritized investments to protect the most sensitive systems and information. Additionally, EPA will work with the Department of Homeland Security and the Continuous Diagnostics and Mitigation (CDM) Program to ensure up-to-date technologies are implemented.

Cyberattacks are rapidly increasing in volume and sophistication, impacting both IT and operational technology systems. EPA's Agency IT Security and Privacy (AITSP) Program enables agencywide implementation, management, and oversight of the Chief Information Officer's (CIO) Information Security and Privacy Programs through continuous monitoring functions; one objective includes the maturation of the Continuous Authorization to Operate (ATO). These capabilities serve to identify and address security vulnerabilities and incidents quickly, ensuring that EPA's information environment remains safe.

EPA will continue to support the ongoing implementation of capabilities for data labeling and data loss prevention, which will improve security information and event management by collecting, synthesizing, managing, and reporting cybersecurity events for systems across the Agency.

The Information Security Program supports EPA's Enterprise Security Operations Center (SOC), which manages the Computer Security Incident Response Capability (CSIRC) processes to support identification, response, alerting, and reporting of suspicious activity. EPA will continue maturing the system logging capabilities in Event Logging (EL) Level 3 for Advanced Logging requirements at all criticality levels, leveraging Security Orchestration, Automation, and Response tools to streamline threat and vulnerability management, incident response, and security operations automation. Additionally, EL 3 will utilize User Behavior Monitoring analytics to enable early detection of malicious behavior. Through CSIRC, EPA will continue to collaborate with other federal agencies and law enforcement entities, as needed, to support the Agency's mission.

The Agency's Security Operations Center will continue maturing End Point Detection and Response capabilities with the CDM Program to support proactive detection of cybersecurity incidents, active cyber threat hunting, containment and remediation, and incident response. EPA will continue modernizing its network and system logging capabilities (on-premises systems and connections hosted by third parties, such as Cloud Service Providers) for both investigation and remediation purposes.

EPA leverages CDM capabilities to address the Agency's cybersecurity security gaps and efficiently identify and respond to government-wide cybersecurity threats and incidents. In FY 2025, as part of the work with the Department of Homeland Security to support implementation of current and future Phase CDM requirements, the CDM Program will continue closing remaining gaps in asset management. Privileged access to EPA's network will continue to provide critical security controls for the Agency's cloud applications. The CDM Program also will review interior

EPA network boundary protection from interconnections to external networks and expand endpoint detection and response capabilities. EPA also will continue to mature and promote utilization of the CDM dashboard to rapidly identify and respond to potential threats in the information technology environment. EPA will continue collaborating with DHS on enhancing threat hunting capabilities. In line with Office of Management and Budget (OMB) and DHS direction, the CDM Program will implement priority capabilities as they are identified. In FY 2025, EPA estimates a $15 million budget for the CDM Program.

**Strengthening the Foundations of our Digitally-Enabled Future**

*Securing Infrastructure Investments*

The Agency collects Federal Information Security Modernization Act (FISMA) metrics and evaluates related processes, tools, and personnel to identify gaps and opportunities for improvement.[188] EPA's CIO, who also is the Senior Agency Official for Privacy (SAOP), in coordination with the Chief Information Security Officer, will continue to monitor and report on these metrics. EPA will:

- Modernize and automate the methodology and workflow for collecting Federal Information Registry data supporting the System of Record Notice Management process.
- Continue implementing Ground Truth Testing to validate security and find weaknesses through manual and automated penetration testing and red team exercises.

The Agency continues to work on refinements to improve the ability to track and report on critical software used by the Agency in compliance with Federal Information System Reporting and OMB direction. EPA includes cybersecurity and privacy components in senior leadership program reviews. These reviews enhance CIO oversight by enabling better risk area determination and targeted improvement to system and mission program managers. While EPA program and regional offices maintain responsibility for improving their performance in specific cybersecurity measures, EPA's senior leadership routinely reviews performance results and potential challenges for achieving continuous improvement.

The Agency will be making investments in securing mission activities from risks posed by leading edge technologies such as Generative Artificial Intelligence (AI), Robotic Process Automation (RPA) and Quantum Computing.[189] These investments will help to ensure that agency personnel can perform their business mission activities efficiently and securely with the implementation of the necessary controls to allow use of leading-edge technologies within the environment and prevent malicious actors from leveraging these technologies to disrupt business operations.

---

[188] Including those found in Federal Information Security Modernization Act of 2014 and Federal Information Security Cybersecurity Act of 2015.
[189] OMB Memo 23-02: Migrating to Post-Quantum Cryptography: https://www.whitehouse.gov/wp-content/uploads/2022/11/M-23-02-M-Memo-on-Migrating-to-Post-Quantum-Cryptography.pdf.

*Human Capital*

EPA will further enhance agency-specific role-based training to ensure personnel in key cybersecurity roles have a comprehensive understanding of modern, secure IT and cybersecurity requirements, with the skills, knowledge, and capabilities to effectively support EPA's cybersecurity posture.

*Technology Ecosystems*

EPA will build on efforts to fully implement the Agency's Cybersecurity Supply Chain Risk Management Controls to comply with the Government Accountability Office findings.[190] This work includes coordinating across the Agency with personnel from Information Technology, Information Security, and Procurement to update the policy and obtain the necessary tools to address these critical security requirements. EPA will continue to implement standards, procedures, and criteria to harden and secure software development environments, and investigate the addition of automated tools to secure the development environment.

## Performance Measure Targets:

**(PM ALR) Implementation of advanced event logging requirements (EL3) across EPA networks.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | EL1 | EL3 | EL3 | EL3 | Tier |
| **Actual** |  |  |  |  | EL0 | EL0 |  |  | |

**(PM DAR) Percentage of EPA data at rest in compliance with encryption requirements.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 90 | 95 | 100 | Percent |
| **Actual** |  |  |  |  |  | 93 |  |  | |
| **Numerator** |  |  |  |  |  | 110 |  |  | Systems |
| **Denominator** |  |  |  |  |  | 118 |  |  | |

**(PM DIT) Percentage of EPA data in transit in compliance with encryption requirements.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 90 | 98 | 100 | Percent |
| **Actual** |  |  |  |  |  | 98 |  |  | |
| **Numerator** |  |  |  |  |  | 116 |  |  | Systems |
| **Denominator** |  |  |  |  |  | 118 |  |  | |

---

[190] Government Accountability Office Report on information and communications technology (ICT) Supply Chain: GAO-21-164SU.

**(PM MFA) Percentage of EPA systems in compliance with multifactor authentication requirements.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 75 | 85 | 100 | 100 | Percent |
| **Actual** |  |  |  |  | 48 | 79 |  |  |  |
| **Numerator** |  |  |  |  | 223 | 321 |  |  | Applications |
| **Denominator** |  |  |  |  | 463 | 406 |  |  |  |

**(PM ZTA) Percentage of "Zero Trust Architecture" projects completed on time.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 100 | 100 | 100 | Percent |
| **Actual** |  |  |  |  |  | 50 |  |  |  |
| **Numerator** |  |  |  |  |  | 1 |  |  | Projects |
| **Denominator** |  |  |  |  |  | 2 |  |  |  |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$149.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$14,646.0 / +3.0 FTE) This program change supports enhancements to protect the Agency's information technology infrastructure portfolio and advance the implementation of EO 14028: *Improving the Nation's Cybersecurity*. This investment will increase EPA's information technology resiliency and limit vulnerabilities in the event of a malicious attack. This investment includes $625.0 thousand for payroll.

## Statutory Authority:

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98-80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Cybersecurity Act of 2015; Federal Information Security Modernization Act (FISMA); Government Performance and Results Act (GPRA); Government Management Reform Act (GMRA); Clinger-Cohen Act (CCA).

## IT / Data Management

Program Area: IT / Data Management / Security
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$95,631* | *$91,821* | *$108,601* | *$16,780* |
| Science & Technology | $3,489 | $3,197 | $3,346 | $149 |
| Hazardous Substance Superfund | $22,040 | $19,764 | $19,645 | -$119 |
| Total Budget Authority | $121,160 | $114,782 | $131,592 | $16,810 |
| Total Workyears | 457.5 | 490.9 | 510.9 | 20.0 |

Total work years in FY 2025 include 175.0 FTE to support IT/Data Management working capital fund (WCF) services.

**Program Project Description:**

This program supports the maintenance of EPA's Information Technology (IT) and Information Management (IT/IM) services that enable citizens, regulated facilities, states, and other entities to interact with EPA electronically to access, analyze and understand, and share environmental data on-demand. The Information Technology/Data Management (IT/DM) Program also provides support to other IT development projects and essential technology to EPA staff, enabling them to conduct their work effectively and efficiently in the context of federal IT requirements, including the Federal Information Technology Acquisition Reform Act (FITARA); Technology Business Management (TBM); Capital Planning and Investment Control (CPIC); and the Open, Public, Electronic, and Necessary Government Data Act.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, in accordance with Executive Order 14110[191] on Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence, EPA will encourage the use of AI in the federal space, and do so with transparency, responsibility, safety, and ethical standards. The Agency will maintain EPA's current AI Inventory and develop a compliance plan, strategy, and AI governance committee. EPA forecasts that workforce demand for AI tools and training will increase and is addressing this need through the development of training and pilot programs. Security and privacy risks are of utmost importance and governance channels already exist which are constantly evaluating risks associated with AI. EPA will be working to integrate AI into these existing governance channels.

---

[191] For more information, please see: https://www.federalregister.gov/documents/2023/11/01/2023-24283/safe-secure-and-trustworthy-development-and-use-of-artificial-intelligence.

In FY 2025, in line with OMB Memoranda M-23-15 *Measuring, Monitoring, and Improving Organizational Health and Organizational Performance in the Context of Evolving Agency Work Environments*, EPA will make investments in IT infrastructure to support meaningful, in-person work across the Agency. Investments include modernizing and enhancing available tools to ensure the workforce has the proper technology to operate as effectively as possible in a modern capacity to implement the Agency's mission. Additionally, resources will be utilized to provide a high-quality service delivery experience for the public.

Additionally, EPA requests $6.2 million in FY 2025 for the maintenance and modernization of the Agency's enterprise network switch infrastructure. This funding ensures critical infrastructure is replaced when it reaches end of life/end of support. Failure to replace switch infrastructure may result in network degradation, which leaves EPA vulnerable to cybersecurity threats, and can disrupt operations.

In FY 2025, EPA will continue implementation of its agencywide Digitization Strategy, which includes the operation of two EPA digitization centers and the operation of the Agency Records Management System (ARMS), which is necessary to meet the requirements of Memoranda M-19-21 *Transition to Electronic Records* issued by the Office of Management and Budget and the National Archives and Records Administration.[192] In FY 2025, EPA will digitize, validate, and upload electronic files into the ARMS. Additionally, EPA will leverage artificial intelligence and machine learning to assist staff with appropriately scheduling electronic records that are saved to ARMS. The Agency will operate the Paper Asset Tracking Tool (PATT) to track paper records as they are submitted and processed through the digitization centers.

The Agency also will continue implementing the 21st Century Integrated Digital Experience Act (P.L. 115-336), which includes modernization of internal and public-facing websites and digital services, as well as digitization of paper forms and non-digital services. EPA will continue digitizing the Agency's public-facing paper forms in compliance with the 21st Century Integrated Digital Experience Act and based on the completed inventory of the Agency's forms.

In FY 2025, EPA will continue to maintain and manage its core IT/DM services, including Information Collection Requests, the National Library Network, the Agency's Docket Center, and EPA's Section 508 Program, which directly supports the requirements under Executive Order (EO) 14035: *Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce*.[193]

Key initiatives include:

- Further strengthening the Agency's IT acquisition and portfolio review process as part of the implementation of FITARA. In the most recent FITARA scorecard, released in September 2023,[194] EPA scored an overall B. EPA will continue to use the results of the FITARA scorecard to drive agency priorities and investments.

---

[192] For additional information, please refer to: https://www.whitehouse.gov/wp-content/uploads/2019/08/M-19-21-new-2.pdf.

[193] For more information, please refer to Executive Order: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/06/25/executive-order-on-diversity-equity-inclusion-and-accessibility-in-the-federal-workforce/.

[194] For additional information, please refer to: https://fitara.meritalk.com/.

- Continuing work to convert internal administrative paper or analog workflows into modern digital workflows to speed up routine administrative tasks, reduce burdensome paperwork for EPA employees and managers, improve internal data collection and reporting, and improve cross-agency data interoperability and delivery to the public. In FY 2025, application development work will continue to automate processes identified in the Agency high priority list.
- Continuing to implement EPA's Controlled Unclassified Information Program to standardize, simplify, and improve information management and IT practices to facilitate the sharing of important sensitive data within the Agency, with key stakeholders outside of the Agency, and with the public, meeting federal standards as required by Executive Order 13556: *Controlled Unclassified Information*.[195]
- Increasing the use of registries, continue migration to a cloud infrastructure, and improve registry quality by modernizing from custom built solutions to commercial off-the-shelf tools with expanded capabilities. Registries are shared data services in which common data are managed centrally but shared broadly; they improve data quality in EPA systems, enable integration and interoperability of data across program silos, and facilitate discovery of EPA information publicly and internally.

EPA's Customer Experience (CX) Program will focus on improving the mission support experience of EPA staff to improve their ability to serve the public, in line with the guidance in Executive Order 14058.[196] The Program focuses on collaborations such as the Hiring and Onboarding process, which collects feedback from IT professionals, hiring managers, regions, programs, and other stakeholders to improve the experience for hiring authorities and new employees at EPA. The CX Program collects customer feedback, conducts data analytics, assesses priorities within a governing community of practice, and presents recommendations to senior leaders to allocate resources to improve CX initiatives.

In FY 2025, the Agency will continue to support the essential capabilities of GeoPlatform, a shared technology enterprise for geospatial information and analysis. By implementing geospatial data, applications, and services such as the Facility Registry System, the Agency can integrate, interpret, and visualize multiple data sets and information sources to support environmental decisions. The Agency will continue developing and increasing capabilities of EPA's Data Management and Analytics Platform, which has both internal and public facing elements, such as Envirofacts. EPA will partner with other agencies, states, tribes, and academic institutions to propose innovative ways to use, analyze, and visualize data through EPA's Data Management and Analytics Platform. In FY 2025, EPA will continue implementation of a governance framework for enterprise data life cycle approach for managing regulated facility data.

In FY 2025, Web Infrastructure Management will continue to modernize EPA's web presence to support internal and external users with information on EPA business, support employees with internal information, and provide a clearinghouse for the Agency to communicate initiatives and

---

[195] For more information, please refer to Executive Order:  https://www.federalregister.gov/documents/2010/11/09/2010-28360/controlled-unclassified-information.

[196] For additional information, please refer to: https://www.federalregister.gov/documents/2021/12/16/2021-27380/transforming-federal-customer-experience-and-service-delivery-to-rebuild-trust-in-government.

successes. EPA also will continue to upgrade its web infrastructure to ensure that it meets current statutory and evolving security requirements.

The EPA Chief Data Officer (CDO), with support from the Agency's Data Governance Council (DGC) will continue to develop enterprise scale data governance, including data policies, procedures, and standards to ensure all priority data assets are fully available. Additionally, they will promote data management that emphasizes equitability and FAIR (Findable, Accessible, Interoperable, and Reusable) data principles. EPA's enterprise data governance implementation plans depend on coordination across the Agency's program offices and regions. Currently, EPA relies on a network of data managers and stewards across the Agency to implement governance. To facilitate effective communication between the DGC and responsible parties, as well as to ensure development and implementation of the most effective data policies, procedures, and standards, EPA has established a data officer position in each EPA program office and region. These data officers fulfill essential communication and coordination functions and serve as anchors for building a stronger culture of utilizing data to build evidence and support decision making across EPA.

**Performance Measure Targets:**

**(PM GOPA) Number of priority internal administrative processes automated.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 1 | 1 | 3 | Processes |
| **Actual** |  |  |  |  |  | 1 |  |  |  |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$695.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$6,200.0) This change to fixed and other costs is an increase to provide funding for the enterprise network switch infrastructure necessary for the operations of the EPA network including data centers. This funding ensures critical infrastructure is replaced when it reaches end of life/end of support. Failure to replace switch infrastructure may result in network degradation, leave EPA vulnerable to cybersecurity threats, and disrupt EPA operations.

- (+$3,878.0 / +16.0 FTE) This program change supports critical agencywide implementation of Evidence Act data stewardship and governance requirements; Executive Order 14028 cybersecurity requirements; electronic discovery for FOIA and litigation support; and implementation of Trusted Vetting 2.0. This investment includes $3.0 million for payroll.

- (+$4,000.0) This program change is an increase to provide the necessary support for a modern workforce and will require the integration of facilities and infrastructure, human

resources, and information technology programs to successfully re-envision the federal work environment.

- (+$2,007.0 / +4.0 FTE) This change is to implement Executive Order on Artificial Intelligence. Activities including establishing a compliance plan, establishing an AI governance committee, and implementing pilot programs to encourage the use of AI in a secure and productive manner.  This investment includes $751.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Federal Information Technology Acquisition Reform Act; Federal Information Security Modernization Act (FISMA); Government Performance and Results Act (GPRA); Government Management Reform Act (GMRA); Clinger-Cohen Act (CCA); Rehabilitation Act of 1973 § 508; Foundations for Evidence-Based Policy Making Act of 2018; Geospatial Data Act of 2018.

**Legal/ Science/ Regulatory/ Economic Review**

<div align="right">

## Administrative Law

</div>

<div align="right">

Program Area: Legal / Science / Regulatory / Economic Review
Cross-Agency Mission and Science Support

</div>

<div align="center">

(Dollars in Thousands)

</div>

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$5,223* | *$5,395* | *$6,195* | *$800* |
| Total Budget Authority | $5,223 | $5,395 | $6,195 | $800 |
| Total Workyears | 19.3 | 25.8 | 25.8 | 0.0 |

**Program Project Description:**

This program supports EPA's Administrative Law Judges (ALJs) and the Environmental Appeals Board (EAB).

*Administrative Law Judges*

The ALJs preside in hearings and issue initial decisions in cases initiated by EPA's enforcement program concerning environmental, civil rights, and government program fraud related violations. Additionally, pursuant to an interagency agreement providing for reimbursement of services, the ALJs also adjudicate enforcement actions brought by National Oceanic and Atmospheric Administration (NOAA), primarily under statutes protecting marine mammals and endangered species over which EPA and NOAA share jurisdiction, such as the Marine Protection, Research, and Sanctuaries Act and Endangered Species Act. The Fifth Amendment of the Constitution of the United States of America guarantees the regulated community the right to due process of the law. The ALJs issue orders and decisions under the authority of the Administrative Procedure Act (APA) and the various environmental, civil rights, and anti-fraud statutes that establish administrative enforcement authority and implement the Constitution's guarantee of due process.

The ALJs preside in hearings in cases initiated at EPA Headquarters and in each of EPA's 10 regional offices. The ALJs also offer an opportunity for alternative dispute resolution to completely resolve disputed issues or narrow the issues to be decided after a hearing, which may further reduce costs. Parties participating before the ALJs include local and national community groups, private parties, and federal, state, and local governments.

The ALJs promote public participation in the administrative hearing process through remote hearings and prehearing conferences. They maintain an extensive, publicly accessible website, containing all initial decisions and case filings.[197] Additionally, to promote access to justice, participants in cases pending before the ALJs may file documents electronically and are not required to pay a filing fee or be represented by counsel. The ALJs maintain a "Citizen's Guide" on its public website, which contains downloadable templates of common pleadings filed in

---

[197] For additional information, please refer to: https://www.epa.gov/alj#colorbox-hidden2.

proceedings before the ALJs. Together with the recently published "Practice Manual: A Guide to Frequently Asked Practice Questions," the Citizen's Guide serves as an informal explanatory aid to proceedings before the ALJs for parties unfamiliar with the administrative hearing processes.

The right of affected persons to appeal ALJ initial decisions is conferred by various statutes, regulations, and constitutional due process rights. A small subset of the initial decisions issued by the ALJs are appealed to the Environmental Appeals Board (EAB).

*Environmental Appeals Board*

The Environmental Appeals Board is a four-member appellate tribunal established by regulation in 1992 to hear appeals and issue decisions in environmental adjudications under all major environmental statutes that EPA administers. The EAB furthers the Agency's mission to advance environmental justice (EJ) and address climate-related issues by ensuring the integrity of federal decision-making and fairness in its adjudication of administrative appeals.

Since the 1994 Executive Order on Environmental Justice[198] was issued, the EAB has played a pioneering role in ensuring that the Agency meets its obligation with respect to EJ and, for example, in the context of permitting, has remanded several permit cases where the record did not support a finding that the permit authority reasonably considered the contested EJ issues in their permit decision making process.

To promote access to justice, parties appearing before the EAB are not required to be represented by counsel or pay a filing fee. Additionally, the EAB promotes public participation in the appeals process through remote oral arguments and maintaining an extensive website, accessible to the public, containing all final EAB decisions and case filings. Among others, parties participating before the EAB include local and national community groups, tribal nations, private parties, and state and local governments. The EAB also recently published a "Guide to the U.S. Environmental Protection Agency's Environmental Appeals Board," which provides general information about the Board including how to participate in the administrative appeal process.

The EAB also decides petitions for reimbursement under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Section 106(b); hears appeals of pesticide licensing and cancellation proceedings under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); and serves as the final approving body for proposed settlements of enforcement actions initiated at EPA. The EAB issues decisions in a fair and timely manner consistent with the APA and the applicable environmental statutes, and under the authority delegated by the Administrator and pursuant to regulation, ensuring consistency in the application of legal requirements. In approximately 90 percent of matters decided by the EAB, no further appeal is taken to federal court, providing a final resolution to the dispute. The EAB also offers an opportunity for alternative dispute resolution.

---

[198] Executive Order 12898 - Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, https://www.archives.gov/files/federal-register/executive-orders/pdf/12898.pdf.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the ALJs will continue to convene formal hearings either remotely or in the location of the alleged violator or violation, as required by statute. As the Agency continues its focus on reviewing FIFRA registrations and making determinations on certain claims against the Superfund under CERCLA into FY 2025, the ALJs will support adjudication of these time-sensitive matters.

In FY 2025, the EAB will continue to efficiently and fairly adjudicate permit and enforcement appeals under all statutes as well as petitions for reimbursement under CERCLA, and expediting appeals such as Clean Air Act New Source Review cases and FIFRA licensing proceedings that are particularly time sensitive. The EAB anticipates addressing a potential increase in Underground Injection Control permits under the Safe Drinking Water Act related to carbon sequestration projects. In FY 2025, the EAB will support the implementation of the American Innovation and Manufacturing Act (AIM Act) of 2020, specifically administrative enforcement of its provisions concerning hydrofluorocarbons (HFCs), which are designed to phase down the production and consumption of listed HFCs, manage these HFCs, and facilitate transition to next generation technologies.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$726.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$74.0) This program change is an increase to support programmatic investments relating to advancing environmental justice through the Administrative Law Program.

**Statutory Authority:**

Administrative Procedure Act (APA); Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Comprehensive Environmental Response, Compensation and Liability Act (CERCLA); Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); Clean Water Act (CWA); Clean Air Act (CAA); Toxic Substance Control Act (TSCA); Solid Waste Disposal Act (SWDA); Resource Conservation and Recovery Act (RCRA); Safe Drinking Water Act (SDWA); Emergency Planning and Community Right-to-Know Act (EPCRA); Marine Protection, Research, and Sanctuaries Act (MPRSA); Mercury-Containing and Rechargeable Battery Management Act (MCRBMA); the Act to Prevent Pollution From Ships (APPS).

## Alternative Dispute Resolution

Program Area: Legal / Science / Regulatory / Economic Review
Goal: Enforce Environmental Laws and Ensure Compliance
Objective(s): Hold Environmental Violators and Responsible Parties Accountable

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$845* | *$972* | *$2,820* | *$1,848* |
| Hazardous Substance Superfund | $758 | $791 | $1,841 | $1,050 |
| Total Budget Authority | $1,602 | $1,763 | $4,661 | $2,898 |
| Total Workyears | 4.7 | 5.9 | 14.0 | 8.1 |

**Program Project Description:**

EPA's Alternative Dispute Resolution (ADR) Program offers cost-effective processes for preventing and resolving conflicts on environmental matters and some workplace conflicts as an alternative to litigation and to support collaboration. The Program provides facilitation, mediation, public involvement, training, and consensus building advice and support for the entire Agency. The Program's ADR services especially support the meaningful engagement of EPA programs with communities and other stakeholders, including states and tribes, by helping to develop collaborative and effective partnerships.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 3/Objective 3.1, Hold Environmental Violators and Responsible Parties Accountable in the *FY 2022 - 2026 EPA Strategic Plan.*

In FY 2025, EPA requests an additional $1.8 million and 5.7 FTE for the ADR Program. EPA will continue to provide conflict prevention and ADR services to all EPA programs and external stakeholders on environmental matters. EPA expects the need for these services to increase in FY 2025 in support of achieving the Agency's environmental justice (EJ) and equity goals. This program will continue to support implementation of Executive Order (EO) 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government.*[199] This investment also will be used to build capacity to improve oversight and enforcement of civil rights compliance and to prioritize and advance EJ concerns.

Specifically, the ADR Program will:

- Administer its five-year Environmental Collaboration and Conflict Resolution (ECCR) Services contract, which will be awarded in Spring 2024 and is expected to have an $85

---

[199] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

million capacity. The ADR Program provides most of its conflict prevention and resolution services to the Agency through this contract. The contract supports facilitation and mediation services for more than 150 active projects involving stakeholders across the Agency and is expected to take on an additional 30 to 40 projects in FY 2025. The ADR Program expects continued growth in the areas of EJ, climate change, and Title VI civil rights cases. Contract support contributes to more productive engagement between EPA programs and communities, especially underserved and overburdened communities.

- Provide facilitation, mediation, and training services through the conflict resolution specialists on staff and the Regional ECCR specialists, who perform environmental ADR work as collateral duty with support from the ADR Program. The ADR Program expects to provide support through conflict resolution specialists and ECCR specialists for agency programs and stakeholders by providing facilitation, mediation, or other consensus building support on 30 to 40 projects in FY 2025, including up to 10 Title VI civil rights cases. The ADR Program provides facilitation services to resolve Title VI civil rights complaints as part of the Informal Resolution Agreement process and the demand for facilitation services to resolve complaints continues to grow. As with contract support, direct staff support promotes greater collaboration among EPA and its stakeholders, as well as greater inclusion of overburdened and underserved communities.

- Provide training to EPA staff in conflict resolution concepts and skills. The ADR Program offers this training through eight interactively designed courses to all national program offices and regions. The ADR Program created virtual versions of its trainings during COVID, which has expanded its reach throughout the Agency. In FY 2023, the ADR Program and ECCR specialists delivered 17 trainings to more than 900 EPA employees. The ADR Program expects a continued increase in training requests in FY 2025. Trainings include the building of skills such as working across cultural divides and supporting productive dialogue, which help EPA programs better engage with communities.

- Help to achieve the goals of President Biden's Justice40 initiative by tracking the number of ADR projects in which services are provided to underserved and overburdened communities. From January to December 2023, the ADR Program initiated 22 new projects that provide conflict prevention or ADR services to benefit underserved and overburdened communities, and the Program expects to increase services in FY 2025.

The following are examples of FY 2023 accomplishments:

- Successfully managed a $53 million Conflict Prevention and Resolution Services contract and administered 410 contract actions valued at slightly over $50 million in the first four years. Through contract support, the ADR Program provided conflict resolution services for multiple projects and in dozens of communities to promote greater collaboration and inclusion of underserved and overburdened communities.

- Supported 106 environmental collaboration and conflict resolution cases nationwide, including a community-led cumulative environmental health impact assessment in Michigan, as well as training support for Community Lead Awareness Sessions in underserved communities and on tribal lands. To support these projects, the ADR Program provided design and facilitation support to gather public input on controversial issues, supported community outreach efforts by facilitating listening sessions, and helped key stakeholders to reach agreement.

240

- Provided facilitation services for eight Title VI civil rights cases to support the inclusion of all parties in the development of Informal Resolution Agreements between EPA and recipients of Title VI complaints.
- Trained more than 600 EPA personnel in conflict resolution skills through 14 courses and supported additional conflict resolution trainings, led by Regional ECCR Specialists, for 300 EPA staff and managers.

**Performance Measures Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$26.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$1,796.0 / +5.6 FTE) This program change is an increase for the use of alternative dispute resolution processes, such as mediation and facilitation, to promote equity by including underserved communities in negotiations. This investment includes $1.1 million for payroll.

- (+$26.0 / +0.1 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $19.0 thousand for payroll.

**Statutory Authority:**

Administrative Dispute Resolution Act (ADRA) of 1996; Negotiated Rulemaking Act of 1996; Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

**Civil Rights Program**

Program Area: Legal / Science / Regulatory / Economic Review
Goal: Take Decisive Action to Advance Environmental Justice and Civil Rights
Objective(s): Strengthen Civil Rights Enforcement in Communities with Environmental Justice
Concerns, Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$10,146* | *$12,866* | *$32,227* | *$19,361* |
| Total Budget Authority | $10,146 | $12,866 | $32,227 | $19,361 |
| Total Workyears | 52.9 | 66.4 | 145.6 | 79.2 |

**Program Project Description:**

EPA has long held and elevated three fundamental principles: to follow the science, follow the law, and be transparent. In 2022, EPA also added a fourth foundational principle: advance justice and equity. By so doing, EPA solidified its recognition that it was time to infuse the consistent and systematic, fair, just, and impartial treatment of all individuals into all EPA policies, practices, and programs. These principles form the basis of the Agency's culture and guide its operations and decision making – whether with respect to the public and communities, or EPA's workforce.

EPA's Civil Rights Program enhances efforts to meet regulatory responsibilities under Title VI and VII of the Civil Rights Act of 1964, as amended among other applicable civil rights statutes and regulations, including 40 C.F.R. Parts 5 and 7, 29 C.F.R. § 1614.102(c)[200] and U.S. Equal Employment Opportunity Commission (EEOC) Management Directive 110,[201] which require federal agencies to fully fund its civil rights program. The Civil Rights Program enforces federal civil rights laws that prohibit discrimination against EPA employees and applicants for employment and by applicants for and recipients of EPA federal financial assistance.

EPA is committed to strengthening external civil rights enforcement to address health and environmental disparities, eliminate discriminatory barriers to clean air, water, and land, and ensure the protection of human health and the environment for all persons in the United States. There are two offices within the Agency's civil rights program, the Office of Civil Rights (OCR) and the Office of External Civil Rights Compliance (OECRC). OCR has responsibility for the internal enforcement of several civil rights laws related to equal employment opportunity (EEO), and OECRC carries out the external enforcement of several civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from EPA. Together, both offices comprise EPA's civil rights program and its foundational commitment to the advancement of justice, equality, and equity.

---

[200] For more information, please see: https://www.ecfr.gov/current/title-29/subtitle-B/chapter-XIV/part-1614/subpart-A/section-1614.102.
[201] For more information, please see: https://www.eeoc.gov/federal-sector/management-directive/management-directive-110.

EPA's Civil Rights Program provides leadership, direction, and guidance in carrying out the Agency's civil rights mission to all EPA employees, applicants, and recipients of federal financial assistance in carrying out civil rights responsibilities. The Program provides counseling and investigates discrimination complaints filed against EPA and EPA federal financial assistance recipients. The Program identifies triggers and eliminates barriers to EEO and environmental justice.

In addition, the Program promotes alternative dispute resolution mechanisms to resolve discrimination complaints. The Program develops policy to clarify recipients' legal obligations. It conducts training and accountability visits (TAVs) of EPA offices to encourage compliance with civil rights laws and EPA policy against discrimination. It also conducts pre-award reviews and affirmative post-award compliance reviews and audits of recipients of federal financial assistance. EPA also provides technical assistance to recipients and enhances communication and engagement with environmentally overburdened and disadvantaged communities. The Program also processes accommodation requests due to disability that are made by employees and applicants and issues final agency decisions in employment discrimination complaints.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 2/Objective 2.3, Strengthen Civil Rights Enforcement in Communities with Environmental Justice Concerns in the *FY 2022- 2026 EPA Strategic Plan*.[202] Work in this program also directly supports progress toward the FY 2024-2025 Agency Priority Goal: Implement guidance, tools, and metrics for EPA and its Tribal, state, local, and community partners to advance environmental justice and external civil rights compliance. By September 30, 2025, advance cumulative impacts practice across agency programs, finalize, and deploy external civil rights guidance, and apply at least 10 indicators to drive disparity reductions in environmental and public health conditions. As highlighted in the strategic plan and FY 2025 Annual Performance Plan, EPA must enforce applicable civil rights laws in the same manner as environmental statutes.

In FY 2025, the Agency requests an additional $19.3 million and 79.2 FTE to strengthen its Civil Rights Program. This investment will increase capacity to enforce the Nation's external civil rights laws, advance EEO at EPA, support Evidence Act data stewardship and governance requirements, and enable agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan as required by Executive Order 14035.[203]

<u>**Internal Civil Rights**</u>

In FY 2025, EPA must ensure progress in affirmative employment as mandated by the EEOC with the goal of making EPA a model EEO employer. EPA must meet statutory and regulatory requirements to address potential barriers to employment and advancement and deliver training and services to EPA employees. EPA endeavors to assess organizational EEO efforts through listening sessions and during TAVs with program and regional offices. EPA typically has more requests for these interactive TAVs than time and resources to support them all in a year.

---

[202] It also provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.
[203] For more information, please see: https://www.federalregister.gov/documents/2021/06/30/2021-14127/diversity-equity-inclusion-and-accessibility-in-the-federal-workforce.

With the two additional FTE requested, EPA will address the increasing number of reasonable accommodation requests[204], more complex EEO complaints and Final Agency Decisions, and the additional special projects that accompany the responsibilities of a model EEO program. EPA will continue to prioritize its interagency agreements to ensure impartial investigations of EEO complaints. Additionally, EPA will actively support and lead specific efforts and workgroups to implement its DEIA Strategic Plan.

*Employee Complaints and Resolution (ECR)*

In FY 2025, the Internal Civil Rights Program will dedicate most of its resources to the processing of discrimination complaints. It will market the benefits of the Alternative Dispute Resolution (ADR) Program to address informal complaints. It also will continue to take proactive steps, including educating through trainings, listening sessions, and community outreach. EPA is expected to engage in the following activities:

- Track and manage investigations, draft final agency decisions, and track compliance of EEOC decisions within standard timelines set by the EEOC.
- Evaluate the effectiveness of the revised procedures for processing final agency decisions.
- Implement strategies for transparently communicating and addressing trends in formal complaints at program and region offices.
- Implement ADR training (for management and staff) to strengthen participants' knowledge and to increase offers and participation in the ADR process.
- Implement a communications campaign to educate the workforce on the benefits of ADR.
- Conduct at least four region and program office TAVs.
- Recruit and provide training, from the EEOC, to new collateral duty EEO Counselors.
- Update and maintain the EEO Case Management database to effectively track EEO complaints, ensure timeliness, and the ability to produce annual required reports to the EEOC, Congress, OPM, and the Department of Justice.

*Affirmative Employment, Analysis, and Accountability (AEAA)*

In FY 2025, EPA will continue to focus on identifying and eliminating barriers to employment and advancement at the Agency. EPA dedicates a significant amount of labor to assembling and analyzing data and statistics for the Management Directive 715 Report (MD-715), EPA's annual report to the Equal Employment Opportunity Commission.

The MD-715 highlights EPA's efforts to establish and maintain a model civil rights program, identifies EEO priorities, and drives the State of the EEO briefing to the Administrator each year. This effort will include guiding every region and program office through the collection of enhanced data and investigating workforce data triggers. In FY 2025, EPA expects to engage in the following activities:

---

[204] On December 26, 2023, the EEOC sent out an email and attachment seeking to address concerns from the community about return to office and the increase in reasonable accommodation requests.

- Analyze, complete, close and/or monitor, as appropriate, two other Barrier Analysis efforts: "Upward Mobility of Hispanic Employees into the Senior Executive Service (SES)" and "Upward Mobility of Employees into the Senior Executive Service (SES) based on the EEO Categories of Race and Sex."
- Continue to implement recommendations resulting from the EPA MD-715 priority regarding the collection of applicant flow data for Career Development Opportunities.[205]
- Evaluate the underrepresentation of EEO groups from MD-715 reports.
- Monitor and assist the Administrator's Office and regional and program offices with implementation of their workforce EEO Actions Plans.
- Manage EPA's ten Special Emphasis Programs.[206]
- Provide the National Special Emphasis Program Managers additional subject matter training.
- Recruit new collateral duty Special Emphasis Program Managers and train all Special Emphasis Program Managers.
- Collaborate in the planning of EPA's National Commemorative Programs.
- Conduct at least four region and program office TAVs.
- Provide effective training and tools for managers to report and carry out their responsibilities under the MD-715.

*National Reasonable Accommodations Program (NRAP)*

In FY 2025, EPA will work to enhance the effectiveness of services through training, policy development, and improving the support functions of the Local Reasonable Accommodation Coordinators (LORACs). EPA expects to hire an Assistant Director for the National Reasonable Accommodation Program to lead the National Reasonable Accommodation Coordinators (NRACs) and LORACs. The Agency has a legal obligation to provide an effective accommodation for employees and applicants with disabilities absent an undue hardship. In FY 2025, EPA expects to engage in the following activities:

- Receive, track, advise on response, and monitor requests for, and the delivery of reasonable accommodations for all national program offices and oversee similar actions in every region, including applicants to the EPA.
- Evaluate the effectiveness of revised procedures for providing Personal Assistant Services.
- Support the Agency's efforts to improve accessibility for persons with disabilities.
- Evaluate the Reasonable Accommodations Management System (RAMS) and upgrade/enhance features as necessary.
- Conduct recertification training for LORACs.
- Conduct at least four region and program office TAVs.

To be an effective internal civil rights program, it must be trusted by all EPA employees for its impartiality and transparency.

---

[205] For more information, please see: https://www.epa.gov/system/files/documents/2023-04/EPA%20FY%202022%20MD-715%20Report%20FINAL.pdf.

[206] For more information, please see: https://www.epa.gov/ocr/affirmative-employment-analysis-and-accountability#special.

**External Civil Rights**

In FY 2025, EPA requests an additional $17.6 million and 76.5 FTE to enforce the Nation's external civil rights laws through EPA's Headquarters program as well as the regional offices. This investment will provide essential program support to investigate and resolve critical civil rights complaints, initiate affirmative compliance reviews, and work toward achieving measurable environmental, public health, and quality of life improvements in the most overburdened, vulnerable, and underserved communities.

EPA will continue to elevate environmental justice and external civil rights within the Agency and integrate environmental justice considerations and full compliance with civil rights obligations across all of EPA's policies, programs, and activities. EPA also will continue to advance its commitment to bring justice to frontline communities that experience the worst impacts of environmental pollution.

Through the continued implementation of Goal 2 of EPA's *FY 2022 - 2026 Strategic Plan:* "Take Decisive Action to Advance Environmental Justice and Civil Rights." EPA will promote further the integration of environmental justice and external civil rights throughout EPA and carry out the objectives, sub-objectives, and annual and long-term goals articulated in Strategic Plan Goal 2. In particular, EPA's request includes critical FTE for external civil rights compliance activities in the regional offices, including participation in pre-award reviews and post-award complaint and compliance review investigations and resolutions.

Specifically, with respect to external civil rights, in FY 2025, EPA will:

- Continue its shift to proactive activities, by initiating proactive pre-award and post-award civil rights compliance reviews to address the impacts of potentially discriminatory activities on overburdened communities.
- Fully implement its authority to address actions, policies, and practices by recipients of EPA funding that subject overburdened and disadvantaged communities to discrimination.
- Continue to develop and implement clear and strong civil rights guidance and corresponding training and technical assistance to increase recipients' compliance with civil rights laws.
- Conduct timely and effective civil rights complaint investigations and resolutions – including investigations and informal resolution agreements that effectively address discriminatory practices.
- Continue to update and refine the Case Resolution Manual.to ensure it provides civil rights staff with current and strategic tools and procedures for timely and effective investigation and resolution of cases.
- Fully implement the EPA Limited English Proficiency policy and procedures and Order, revised in FY 2023, and develop and finalize an EPA Order to ensure meaningful access for persons with disabilities to EPA programs services and activities.
- Enhance communication and engagement with environmentally overburdened communities to meaningfully inform EPA's civil rights complaint resolution work and to empower and increase their participation in critical decision making.

246

- Increase transparency by continuing to affirmatively provide information and case-related documents to the public through the interactive "Complaint Docket" online.[207]
- Strengthen federal interagency collaboration and coordination on complaints, compliance reviews, and policy guidance to enforce federal civil rights laws.

## Performance Measure Targets:

**(PM EJCR06) Percentage of required civil rights procedural safeguard elements implemented by state permitting agencies that are recipients of EPA financial assistance.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 20 | 40 | 70 | 90 | Percent |
| **Actual** |  |  |  |  | 33 | 58 |  |  | |
| **Numerator** |  |  |  |  | 138 | 236 |  |  | Elements |
| **Denominator** |  |  |  |  | 408 | 408 |  |  | |

**(PM EJCR13) Percentage of EPA national programs and regions that have established environmental justice and external civil rights implementation plans.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 100 | 100 | 100 | Percent |
| **Actual** |  |  |  |  |  | 100 |  |  | |
| **Numerator** |  |  |  |  |  | 17 |  |  | Regions and Programs |
| **Denominator** |  |  |  |  |  | 17 |  |  | |

**(PM EJCR14) Percentage of EPA programs and regions that have implemented program and region-specific language assistance plans.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 30 | 35 | 60 | 80 | Percent |
| **Actual** |  |  |  |  | 0 | 5 |  |  | |
| **Numerator** |  |  |  |  | 0 | 1 |  |  | Programs and Regions |
| **Denominator** |  |  |  |  | 23 | 19 |  |  | |

**(PM EJCR15) Percentage of EPA programs and regions that have implemented program and region-specific disability access plans.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | No Target Established | 10 | 25 | Percent |
| **Actual** |  |  |  |  |  | 0 |  |  | |
| **Numerator** |  |  |  |  |  | 0 |  |  | Programs and Regions |
| **Denominator** |  |  |  |  |  | 19 |  |  | |

---

[207] For more information, please see: https://www.epa.gov/external-civil-rights/external-civil-rights-docket-2014-present.

**(PM EJCR16) Number of proactive post-award civil rights compliance reviews initiated to address discrimination issues in environmentally overburdened and underserved communities.**

|        | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|-------|
| Target |         |         |         |         | 3       | 6       | 4       | 10      | Compliance Reviews |
| Actual |         | 1       | 1       | 0       | 1       | 0       |         |         |       |

**(PM EJCR17) Number of audits completed to ensure EPA financial assistance recipients are complying with federal civil rights laws.**

|        | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|-------|
| Target |         |         |         |         | 25      | 30      | 30      | 60      | Audits |
| Actual |         |         |         | 0       | 0       | 1       |         |         |       |

**(PM EJCR18) Number of information sharing sessions and outreach and technical assistance events held with overburdened and underserved communities and environmental justice advocacy groups on civil rights and environmental justice issues.**

|        | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|--------|---------|---------|---------|---------|---------|---------|---------|---------|-------|
| Target |         |         |         |         | 8       | 90      | 650     | 1,100   | Sessions and Events |
| Actual |         |         |         | 40      | 30      | 235     |         |         |       |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$1,162.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This increase includes critical agencywide infrastructure support for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$17,625.0 / +76.5 FTE) This program change increases staffing and capacity to enforce the Nation's external civil rights laws and to work toward the goal of achieving measurable environmental, public health, and quality of life improvements in the most overburdened, vulnerable, and underserved communities; supports activities including investigations into claims of discrimination by underserved communities and pre-award reviews and post-award compliance reviews and audits This investment includes $14.6 million for payroll.

- (+$434.0 / +2.0 FTE) This program increase supports the Office of Civil Rights' internal civil rights program to advance EEO at EPA. This investment includes $382.0 thousand for payroll.

- (+$140.0 / +0.7 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $133.0 thousand for payroll.

**Statutory Authority:**

Equal Pay Act of 1963; Title VI of the Civil Rights Act of 1964; Title VII of the Civil Rights Act of 1964; Age Discrimination in Employment Act (ADEA) of 1967; Title IX of the Educational Amendments of 1972; Federal Water Pollution Control Act Amendments of 1972 § 13; Rehabilitation Act of 1973 §§ 501, 504, 505, 508; Rehabilitation Act of 1973 § 504; Age Discrimination Act of 1975; Americans with Disabilities Act of 1990; ADA Amendments Act of 2008; and Genetic Information Nondiscrimination Act (GINA) of 2008; and Pregnant Workers Fairness Act (2022).

**Integrated Environmental Strategies**

Program Area: Legal / Science / Regulatory / Economic Review
Goal: Tackle the Climate Crisis
Objective(s): Accelerate Resilience and Adaptation to Climate Change Impacts

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$9,702* | *$11,297* | *$40,197* | *$28,900* |
| Total Budget Authority | $9,702 | $11,297 | $40,197 | $28,900 |
| Total Workyears | 43.8 | 55.5 | 79.0 | 23.5 |

**Program Project Description:**

The Integrated Environmental Strategies (IES) Program advances the Agency's mission of protecting human health and the environment by focusing on cross-media environmental concerns. The IES Program provides tools, training, advice, and resources to help EPA work as a more effective organization. Nationally, IES is focused on: 1) partnering with states, territories, tribes, local governments, businesses, other federal agencies, and others to adapt to and increase the resilience of the Nation to the impacts of climate change, with a particular focus on advancing climate justice; 2) providing for the development of efficient, accurate, and timely reviews for permitting and approval processes that support automation, oversight, and integration of environmental justice (EJ) and climate change in environmental permitting; 3) working with industrial sectors to identify and develop innovative approaches to better protect the environment and public health; 4) collaborating with partners, including federal, state, tribes, municipalities, communities, businesses, and other stakeholders, to implement locally-led, community-driven approaches to environmental protection through technical assistance, policy analysis, and training; and 5) helping "energy communities" facing economic impacts from mine and power plant closures with strategic planning, technical assistance and project implementation, and the leveraging of private sector funding and federal resource matching for energy transformation and economic diversification.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 1/Objective 1.2, Accelerate Resilience and Adaptation to Climate Change Impacts in the *FY 2022 – 2026 EPA Strategic Plan*.

In FY 2025, EPA requests a total investment of $40.2 million and 79.0 FTE for the IES Program. Within this amount, $19.3 million and 14.5 FTE are needed to accelerate the Agency's work in the Climate Adaptation Program; $3.0 million and 6.0 FTE are needed to advance the coordination, streamlining, oversight, automation, and integration of EJ and climate change into environmental permitting; and $5 million dollars and 3.0 FTE are needed to enhance the Agency's assistance to energy communities to transition from coal to green energy. The remaining resources will be used to support core program work (including sectors and communities) and Administration priorities

250

focused on achieving the goals of the *FY 2022 – 2026 EPA Strategic Plan*. The Program will continue to focus on the five aforementioned major areas, each presenting unique opportunities to improve delivery of environmental protection across multiple media and stakeholders.

*Climate Adaptation Program*

The impacts of climate change affect people in every region of the country, threatening lives and livelihoods and damaging infrastructure, ecosystems, and social systems in communities across the Nation. Climate change also challenges EPA's ability to accomplish its mission to protect human health and the environment. The Climate Adaptation Program is taking action to ensure that EPA continues to fulfill its mission even as the climate changes and is working with other federal agencies to increase the resilience of the Nation.

The Program recognizes that certain parts of the population, such as communities of color, low-income communities, children, the elderly, tribes and indigenous people, and small rural communities, are often especially vulnerable to the impacts of climate change. To that end, the Program will focus on engaging the most overburdened and vulnerable groups of people and communities to improve their capacity to anticipate, prepare for, and adapt to or recover from climate change impacts.

The Climate Adaptation Program's overarching goals and expected accomplishments are 1) ensuring EPA continues to fulfill its mission of protecting human health and the environment even as the climate changes and disruptive impacts increase; 2) meeting (or exceeding) the Long-Term Performance Goals in Objective 1.2 of the *FY 2022-2026 EPA Strategic Plan*; and 3) ultimately empowering communities across the Nation and all 574 tribes to adapt to the risks of climate change, with a particular focus on advancing climate justice.

In FY 2025, EPA requests approximately $19.3 million and 14.5 FTE for its work in the Climate Adaptation Program. With this investment, EPA will continue to provide targeted assistance to states, tribes and indigenous peoples, territories, local governments, communities, and businesses to bolster these groups' climate resilience efforts. The National Tribal Caucus's (NTC) Climate Subgroup collaborates closely with the U.S. Environmental Protection Agency (EPA) to ensure that the EPA's Climate Adaptation Program is attuned to the unique needs of Tribal communities. In the year 2025, EPA, in conjunction with the NTC Climate Subgroup, will sustain the Tribal Climate Town Hall listening sessions, enhance tribal capacity through the Tribal Climate Intensive Education events, and provide targeted support to tribes—especially those with high needs and lower climate capacity—via direct assistance and a peer-to-peer mentorship program. The Agency will focus resources on communities with environmental justice concerns to develop new strategies that strengthen their adaptive capacity and increase climate resilience across the Nation. EPA also will produce and deliver training, tools, technical assistance, financial incentives, and information the Agency's partners indicate they need to adapt and increase resilience to climate change.

In FY 2025, EPA will focus on achieving the priorities of a new FY 2024-2027 Climate Adaptation Plan, while completing implementation of its 2021 Climate Adaptation Action Plan and the 20

251

Climate Adaptation Implementation Plans developed by the Program and Regional Offices.[208] EPA will leverage the additional resources provided in FY 2025 to support priority commitments in the Climate Adaptation Implementation Plans; specifically, additional priority actions for which funding is not currently available. These additional actions will enhance the adaptive capacity and resilience of stakeholders by providing technical assistance through the Program and Regional offices. These actions align with the National Climate Resilience Framework, which calls for providing communities with information and resources needed to assess their climate risks and develop the climate resilience solutions most appropriate for them as well as helping communities become not only more resilient, but also more safe, healthy, equitable, and economically strong.

EPA will continue to monitor progress toward established targets for each of the Long-Term Performance Goals in Objective 1.2 ("Accelerate Resilience and Adaptation to Climate Change Impacts") of the *FY 2022-2026 EPA Strategic Plan.* The baseline and additional priority actions identified in the 20 Climate Adaptation Implementation Plans support EPA's efforts to continue to fulfill its mission in the presence of climate change and associated impacts. This includes analyzing each of EPA's programs for climate-related fiscal and programmatic risks, especially in climate sensitive programs, and investing mitigation of the risks. The requested resources also will be used to advance climate justice through the provision of technical assistance to protect communities that are disproportionately affected by climate change. In FY 2023, EPA completed 177 priority actions committed to in EPA's Climate Adaptation Action Plan and in the Program and Regional Implementation Plans, exceeding the annual target of 100. These actions are in addition to the 151 priority actions completed in FY 2022.

In FY 2025, the Program will continue to modernize EPA financial assistance programs to encourage climate-resilient investments across the Nation. Particular attention will be given to ensuring that the outcomes of investments made with funds from the Infrastructure Investment and Job Act (IIJA) and the Inflation Reduction Act (IRA) to modernize the Nation's infrastructure will be resilient to the impacts of climate change, as well as support climate mitigation goals. EPA will implement practices provided by the Climate-Smart Infrastructure Interagency Working Group to minimize the projected climate change impacts on federal infrastructure and all of EPA's infrastructure programs.

The *FY 2022-2026 EPA Strategic Plan* commits the Agency to consider the current and future impacts of climate change in its rulemaking processes. As such, EPA will continue to integrate climate adaptation into regulations and permits to make its regulatory actions resilient and adaptive to climate change and natural hazards. EPA is already making progress integrating considerations of climate change risks into rulemakings. For example, in May 2023, EPA proposed a rule related to Coal Combustion Residuals (CCR) from Electric Utilities, including CCR surface impoundments, CCR management units, and CCR landfills that considers climate change impacts on facilities.

In FY 2025, EPA will continue to enhance the climate literacy of its workforce with respect to adaptation and resilience by coordinating, facilitating, and sustaining peer-to-peer learning

---

[208] For additional information, please see: https://www.epa.gov/climate-adaptation/climate-adaptation-plans.

and engagement on climate adaptation across program and regional offices. EPA will continue to track and coordinate its climate adaptation learning and training opportunities.

*Permitting Strategies*

EPA implements its statutory authority through various permitting programs. In FY 2025, EPA requests an additional investment of $3.0 million and 6.0 FTE. The Agency continues to focus efforts across EPA program and regional offices and with state and tribal co-regulators to support coordination, efficiencies, oversight, automation, and integration of EJ and climate change for environmental permitting. The Office of Federal Activities (OFA) coordinates across 13 other federal agencies, the Federal Permitting Improvement Steering Council, the Council on Environmental Quality, and the Office of Management and Budget to coordinate on permitting and meet EPA's Permitting Action Implementation Plan goals. EPA uses its EPA Permitting Action Implementation Plan to help address the expansion of permitting for major infrastructure projects, expanded FAST-41 covered sectors,[209] and to address seven critical elements of the Plan:

- Accelerating smart permitting through early cross-agency coordination.
- Establishing clear timeline goals and tracking key project information.
- Engaging in early and meaningful outreach and communication with stakeholders.
- Improving agency responsiveness, technical assistance, and support.
- Using agency resources and the environmental review process to improve environmental and community outcomes.
- Ensuring staffing levels are adequate to address anticipated environmental review and permitting-related workloads.
- Addressing, elevating, and resolving schedule delays, disputes, and other issues impacting the environmental and permitting process in a timely manner.

Additionally, OFA addresses cross-cutting permitting and major infrastructure topics that are identified as critical for infrastructure development. These topics, often new or cutting-edge national priorities (*e.g.,* critical minerals production, quantum processing/manufacture, etc.), require integration of permitting policy, implementation, and evaluation.

EPA is working to transition the Agency's major permitting programs from paper submissions to electronic processes through the automation of permit application review and issuance. The benefits of permit automation will reduce the processing time on issuing permits, decrease the time between receiving monitoring data and engaging in enforcement actions, and increase transparency by allowing communities to search, track, and access permit actions easily. Permit automation improves the integration of climate change and EJ considerations into permit processes and ensures that climate change and EJ are evaluated and addressed appropriately within the terms and conditions of the permit. For the regulated community, permit automation provides a simplified, streamlined, and transparent permitting process, resulting in both time and cost savings.

To start physical permit automation, EPA had to complete a number of tasks, including defining automation, inventorying existing automated processes, identifying processes that needed to be

---

[209] Current covered sectors are renewable or conventional energy production, electricity transmission, surface transportation, aviation, ports and waterways, water resource, broadband, pipelines, manufacturing, mining, and carbon capture sectors. FPISC is currently undergoing rulemaking to add a critical mineral sector.

automated, and establishing a baseline of processes to automate, all of which was completed in FY 2022. With those determinations made, EPA has automated one process out of the thirteen baseline processes identified and is currently automating two other processes. EPA has committed to automate an additional 30 percent of its baseline (or 3.9 processes) in FY 2024 and the same amount in FY 2025, and is on track to achieving those commitments.

EPA's renewed focus on effective integration of EJ and climate change considerations within the Agency's various decentralized permitting programs continues to play a leading role in coordinated efforts aligned with the Administration's priorities including:

1. Coordinating permit support for major infrastructure projects, including carbon capture/use/sequestration and renewable energy projects requiring a permit.
2. Supporting integration of EJ and climate change analysis into permit development.
3. Supporting EPA and FAST-41 oversight, permit quality, permit timelines, and permit program integrity.
4. Documenting best practices and addressing cross-cutting permitting and policy issues (*e.g.,* Endangered Species Act and National Historic Preservation Act coordination); and, in partnership with other federal agencies, state and tribal permitting offices, continuing to streamline and gain efficiencies in the review of all permits.
5. Expanding a successfully piloted e-permitting application tool to other permitting program areas.

*Smart Sectors*

EPA's Smart Sectors Program (SSP) provides a platform for the Agency to collaborate with industry to develop innovative approaches to protect the environment and public health from a multi-media perspective. SSP serves as a hub for understanding and addressing sector-specific environmental challenges and opportunities, facilitating dialogue with industry representatives and other stakeholders, and managing a network of SSPs in all 10 EPA regional offices. The Program will continue as a liaison to connect, convene, and facilitate discussions among agency experts and business leaders to address discrete issues unique to each sector and help sectors drive improvements that serve the Agency's greater mission of protecting human health and the environment.

In FY 2025, SSP will continue to focus activities in three areas: broad multi-stakeholder engagement, cross-agency coordination, and policy and program initiatives as they relate to industry sectors. Multi-stakeholder engagements will provide a platform for working with industry trade associations and leading companies, as well as other stakeholders on key issues such as climate change, EJ, and fostering environmentally sustainable infrastructure development. In addition to industry, the Program will work with non-governmental organizations, organized labor, the academic community, state/local governments, and overburdened and vulnerable communities with EJ concerns, as appropriate. The Program will coordinate or lead cross-agency, sector-based projects and activities to address the Administration's priorities, including tackling climate change, delivering EJ, advancing green procurement, and securing environmentally responsible and resilient supply chains.

*Community-Driven Environmental Protection*

The IES Program delivers technical assistance, training, and tools to economically distressed communities and coordinates the Agency's work with communities to increase efficiency, effectiveness, and accountability, leading to improved environmental and public health protection. In FY 2023, the Program prioritized interagency collaboration towards the development of community driven approaches to support reinvestment in underserved communities with water, air, and infrastructure driven challenges. In FY 2025, the Program will continue to deliver direct technical assistance to communities, especially in underserved areas of the country. EPA will continue to deploy tools and expertise, through technical assistance delivery. These resources will continue to strengthen EPA's efforts to leverage public and private sector investments in support of improved economic development and environmental outcomes.

In FY 2025, the Program will continue to support community-driven solutions to local environmental challenges, focusing on the Administration's priorities, such as leveraging private investment and aligning federal investments to maximize benefits to vulnerable and underserved communities, and increasing climate resilience. Technical assistance and training are the cornerstones of EPA's cooperative approach to addressing environmental challenges in communities, particularly communities that are economically distressed. In FY 2025, the Program will continue to prioritize technical assistance, capacity building and training, and promote more equitable approaches towards improved public health and environmental resilience. Where appropriate, EPA will partner with stakeholders to help achieve locally led, community-driven approaches towards protecting air, land, and water in parallel with supporting equitable development and revitalization. In FY 2025, the Program will partner with EPA programs and regional offices to support their delivery of outreach, resources, and assistance to communities in ways that align with the principles of community driven solutions. The Program will continue to expand on partnerships, like the Recreation Economies for Rural Communities initiatives in FY 2023, providing assistance to rural communities and small towns to help them leverage the power of a growing outdoor recreation economy. EPA worked with the USDA Forest Service, the Northern Border Regional Commission, and the Appalachian Regional Commission, to develop and complete 25 workshops in FY 2023. This type of community-driven assistance, and others like it, are focusing on technical assistance, capacity building and training, to promote more equitable approaches towards improved public health and environmental resilience.

In FY 2025, the Program will continue analyses on emerging trends, innovative practices, and tools that support equity, climate resilience, greenhouse gas (GHG) reduction, and clean air, land, and water outcomes. EPA will continue to develop tools to help interested communities incorporate innovative, equitable approaches to infrastructure and land development policies. This assistance helps deliver multiple economic, community, and human health goals embedded in EPA's core mission, including managing stormwater, improving local air and water quality, cleaning up and reusing previously developed sites, and supporting revitalization and redevelopment in economically distressed communities to create economic opportunities while reducing GHG emissions and protecting the environment.

*Energy Communities*

In FY 2025, EPA will continue its cross-government leadership role on the federal *Interagency Working Group on Coal & Power Plant Communities & Economic Revitalization* (IWG). The additional $5.0 million and 3.0 FTE will be used to support and increase the cross-government number of Rapid Response Teams (RRTs) in energy communities from three in FY 2023 to at least ten by the end of FY 2025. The RRTs will help energy communities in transition address their critical redevelopment challenges. A desired outcome is the transition to low carbon electricity generation as a competitive advantage for economic redevelopment.

## Performance Measures Targets:

**(PM AD07) Number of priority actions completed in EPA's Climate Adaptation Action Plan and Program and Regional Implementation Plans.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 100 | 100 | 105 | 105 | Priority |
| **Actual** |  |  |  |  | 151 | 177 |  |  | Actions |

**(PM AD09) Cumulative number of federally recognized tribes assisted by EPA to take action to anticipate, prepare for, adapt to, or recover from the impacts of climate change.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 100 | 150 | 330 | 370 | Tribes |
| **Actual** |  |  |  |  | 110 | Data Avail 3/2024 |  |  |  |

**(PM AD10) Cumulative number of states, territories, local governments, and communities (*i.e.*, EPA partners) assisted by EPA to take action to anticipate, prepare for, adapt to, or recover from the impacts of climate change.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 250 | 300 | 500 | 525 | Partners |
| **Actual** |  |  |  |  | 242 | Data Avail 3/2024 |  |  |  |

**(PM AD11) Number of tribal, state, regional, and/or territorial versions of the Climate Change Adaptation Resource Center (ARC-X) or similar systems developed by universities with EPA support.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 3 | 6 | 7 | 8 | Systems |
| **Actual** |  |  |  |  | 1 | 7 |  |  |  |

**(PM AD12) Hours of appropriate subject matter expert time provided by EPA to help communities adapt to climate impacts, build long-term resilience, and support the most underserved and vulnerable communities after federally declared disasters.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | No Target Established | No Target Established | No Target Established | No Target Established | Hours |
| **Actual** |  |  |  |  | 9,763 | 7,130 |  |  |  |

**(PM AD13) Number of capacity building trainings, tools, and events, developed or hosted by EPA, that serve a unique purpose, unique audience, and/or provide new or updated information.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  |  | 27 | 32 | Actions |
| **Actual** |  |  |  |  |  | 17 |  |  |  |

**(PM OCR02) Cumulative number of communities that, as a result of OCR assistance, have been able to attract new investment and/or enact policies that produce improved public health and environmental outcomes.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  |  | No Target Established | TBD | Communities |
| **Actual** |  |  |  |  |  |  |  |  |  |

**(PM PAT) Annual Percentage of EPA permitting processes automated.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 10 | 30 | 30 | Percent |
| **Actual** |  |  |  |  |  | 8 |  |  |  |
| **Numerator** |  |  |  |  |  | 1 |  |  | Permitting Processes |
| **Denominator** |  |  |  |  |  | 13 |  |  |  |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$700.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$19,300.0 / +14.5 FTE) This change is an increase provided for EPA's Climate Adaptation Program to support increased resilience of EPA programs and strengthen the adaptive capacity of states, tribes, territories, local governments, communities, and businesses. This investment includes approximately $2.8 million for payroll.

- (+$5,000.0 / +3.0 FTE) This program change will support additional cross-government rapid response teams assisting energy communities challenged by mine and power plant closures. It also with support EPA's interagency work as part of the *Interagency Working Group on Coal & Power Plant Communities & Economic Revitalization* (IWG). This investment includes $572.0 thousand for payroll.

- (+$3,000.0 / +6.0 FTE) This program change is an increase to integrate Administration priorities to support the coordination, streamlining, oversight, automation, and integration of EJ considerations and climate change within the scope of environmental permitting decisions on all FAST-41 covered projects across the Agency's decentralized permitting authorities. This investment includes $1.1 million for payroll.

- (+$900.0) This program change is an increase to support core program capacity and build the Program by addressing the Administration's priorities and adhering to the goals in the *FY 2022 – 2026 EPA Strategic Plan*.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); National Environmental Policy Act; CAA § 309; Endangered Species Act; National Historic Preservation Act; Archaeological and Historic Preservation Act; Fishery Conservation and Management Act; Fish and Wildlife Coordination Act; and Title 41 of the Fixing America's Surface Transportation Act.

## Legal Advice: Environmental Program

Program Area: Legal / Science / Regulatory / Economic Review
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$60,207* | *$60,061* | *$86,615* | *$26,554* |
| Hazardous Substance Superfund | $844 | $599 | $482 | -$117 |
| Total Budget Authority | $61,051 | $60,660 | $87,097 | $26,437 |
| Total Workyears | 258.8 | 273.3 | 352.5 | 79.2 |

Total Workyears in FY 2025 include 8.3 FTE funded by TSCA fees and 22.0 FTE to support Legal Advice working capital fund (WCF) services.

**Program Project Description:**

The Legal Advice: Environmental Program provides legal representational services, legal counseling, and legal support for all the Agency's environmental activities. The legal support provided by this program is essential to the Agency's core mission to protect human health and the environment. The personnel assigned to this program possess essential expertise in critical fields that EPA relies on for all decisions and activities in furtherance of its mission. The Program includes the Office of General Counsel's (OGC's) Air and Radiation Law Office, Cross-Cutting Issues Law Office, Ethics Office, National Freedom of Information Act (FOIA) Office, Pesticides and Toxic Substances Law Office, Resource Management Office, Solid Waste and Emergency Response Law Office, and Water Law Office, as well as ten Offices of Regional Counsel (ORCs).

The Program provides legal counsel on nearly every major action the Agency takes. It plays a central role in all statutory and regulatory interpretation of new and existing rules, as well as rule and guidance development under EPA's environmental authorities. The Program also provides essential legal advice for every petition response and emergency response. When the Agency acts to protect the public from pollutants or health-threatening chemicals in the air we breathe, in the water we drink, or in the food we eat, the Program provides counsel on the Agency's authority to take that action. The Program then provides the advice and support necessary to finalize and implement that action. When agency action is challenged in court, the Program defends it, in coordination with the U.S. Department of Justice (DOJ). The Program also provides support and legal counsel in adhering to court orders and mandates. The Program also supports EPA's National FOIA Office and the Ethics Office as part of the legal services activity within the Agency's Working Capital Fund.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

259

In FY 2025, the Agency requests an additional investment of $26.6 million and 75.2 FTE for the Program to provide legal advice and counsel and to defend EPA's environmental programs as the Agency undertakes increased efforts to tackle the climate crisis, protect drinking water sources and waters of the United States, and safeguard the public from harmful toxic substances, among many other initiatives and responsibilities. This investment includes an increase of approximately $5.8 million in fixed costs for existing FTE. The Program will continue to provide expert legal counseling for agency programs and regional offices, as well as support for judicial and administrative litigation, under all the environmental statutes administered by EPA. The Program also will continue to provide cross-cutting legal advice and counsel on important administrative law developments that are crucial to EPA's issuance of durable and defensible actions.

In FY 2025, the Program will use the additional resources to strengthen staffing and attorney training for those who provide legal advice and counsel in furtherance of the Agency's mission to protect human health and the environment. The Program will provide legal support to EPA's environmental programs under the Clean Air Act (CAA), Clean Water Act (CWA), Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Federal Insecticide Fungicide and Rodenticide Act (FIFRA), Food Quality Protection Act (FQPA), Resource Conservation and Recovery Act (RCRA), Safe Drinking Water Act (SDWA), Toxic Substances Control Act (TSCA), and other authorities within the Agency's purview. The Program also will continue to strengthen its FOIA implementation to enhance transparency and work toward achieving the *FY 2022 - 2026 EPA Strategic Plan* long-term performance goal to eliminate the backlog of overdue FOIA responses. The Program also will continue to lead the Agency's ethics program.

Legal counseling resources continue to be highly sought after, and the Program has experienced increasing demand for its services in the last ten years. The Program has seen a significant increase in work on rulemakings related to the regulation of greenhouse gas (GHG) emissions and toxic substances such as per- and polyfluoroalkyl substances (PFAS), among many other high priority agency matters that the Program supports. EPA OGC's and ORCs' workloads have significantly outpaced staffing resources, particularly as the Program has added work on critical Administration priorities, including climate change and environmental justice. Many of the FTE requested would increase staffing for the Program's ORCs. The Program's FOIA workload (which is now within the ORCs' purview) has increased and the ORCs' civil rights and environmental justice portfolios also have increased exponentially in recent years, as has other environmental law work. Increasing FTE for the ORCs, and the Program overall, is critical to ensuring continued legal support for the Agency's headquarters and ten regional offices.

The following are examples of recent FY 2023 accomplishments and work being completed to illustrate this program's role in implementing the Agency's core mission:

- The Program provided critical legal and strategic counsel in developing the Heavy-Duty Nitrogen Oxides ($NO_x$) Rule, the strongest ever national clean air standards to cut smog- and soot-forming emissions from heavy-duty trucks. Program attorneys were crucial to the development of EPA's proposed New Source Performance Standards and Emission Guidelines for Greenhouse Gas Emissions from Fossil-Fuel-Fired Power Plants to help ensure that the rulemaking is developed and implemented in a legally durable manner. The

Program also continues to play a key role in implementing the American Innovation and Manufacturing (AIM) Act, which requires the phase down of hydrofluorocarbons (HFCs), a potent class of GHGs.

- The Program was EPA's legal advisor (at both the headquarters and regional level) on the East Palestine train derailment. Program attorneys provided crucial legal advice on all aspects of the response, including key issues related to interstate transportation of hazardous waste, public disclosure of waste shipments, and other challenging issues. The Program's critical legal advice concerning PFAS contamination has been central to advancing the Agency's efforts on this top Administration priority; for example, Program attorneys counseled on two ongoing RCRA rulemakings that will help promote cleanup of PFAS contamination at RCRA hazardous waste management facilities. Program attorneys also provided important legal counseling on multiple actions pertaining to coal combustion residuals (CCR), including the Agency's issuance of a proposed rule to regulate legacy CCR surface impoundments and management units.

- Program attorneys provided significant legal support on development of the Agency's latest rulemaking defining "waters of the United States," a key CWA term that defines the limits of federal jurisdiction over discharges into, or filling of, surface waters throughout the United States. The Program also played a crucial role in responding to the May 2023 Supreme Court decision in *Sackett v. EPA*, which was the most consequential decision the Court has ever rendered regarding CWA jurisdiction. Program attorneys also provided significant legal support for high profile agency actions under SDWA to address PFAS, including through a new precedent-setting drinking water standard.

- Program attorneys provided specialized legal and strategic expertise to programs and other EPA attorneys on a wide range of cross-cutting legal issues. For example, Program attorneys provided critical counseling on the Major Questions Doctrine. The Program provided expert counsel on a range of National Environmental Policy Act (NEPA) activities, including support for EPA's responsibilities under CAA Section 309 to review federal agency environmental impact statements. The Program also published the Cumulative Impacts Addendum to EPA Legal Tools to Advance Environmental Justice (EJ), which furthers the Agency's Strategic Plan goals related to EJ and equity. In addition, the Program continued to serve an essential role in counseling on the Agency's international law efforts and initiatives.

- Program attorneys provided key legal support to EPA's Office of Pesticide Programs on an update to the Endangered Species Act (ESA) Workplan, which proposed interim ecological measures intended to reduce exposure to non-target species. The Program provided crucial legal advice in support of EPA's implementation of numerous high-priority, time-sensitive actions under amended section 6 of TSCA, including the Agency's development of the proposed risk management rulemaking on methylene chloride, one of the first 10 chemicals that underwent risk evaluation under TSCA. The Program also concluded a 12-year megasuit with a unique settlement that avoids the lengthy process of ESA pesticide consultation for several of the remaining active ingredients.

261

- The Program continued to manage the overall agency ethics program to ensure that employees carry out their duties ethically. The Program met programmatic goals for confidential financial disclosure filing. Of the more than 7,700 confidential financial disclosure reports filed across the Agency, nearly 96 percent were timely filed and nearly 89 percent of those were timely reviewed and certified. Program attorneys also continued to provide excellent customer service to the Agency's 100 plus deputy ethics officials, as well as to EPA employees and former employees. Program attorneys also continued to deliver high quality trainings within and outside of EPA.

- The Program continued to lead the Agency's implementation of the FOIA program and nationwide FOIA policies. The National FOIA Office procured and deployed FOIAXpress, the Agency's new FOIA case management system. The Program led EPA's efforts to reduce the backlog of overdue FOIA responses by nearly 26 percent, reducing the backlog from 950 down to 704 requests. The Program provided critical legal support for 70 of EPA's most complex and high profile FOIA requests, including requests pertaining to the East Palestine, Ohio train derailment and emergency response. The Program also completed the initial review and assignment of 5,238 FOIA requests, processed 275 expedited FOIA processing requests and 769 applications for fee waiver, and processed and closed more than 1,171 FOIA requests.

**Performance Measure Targets:**

(PM FO2) Number of FOIA responses in backlog.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 845 | 712 | 474 | 236 | Responses |
| Actual | 2,761 | 2,128 | 1,395 | 1,056 | 950 | 704 | | | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$5,751.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$10,389.0 / +37.0 FTE) This program change addresses a need for increased demand for legal counseling services, supporting the Agency on defensive litigation on all its environmental programs in the regions and headquarters. The Program will provide legal support to EPA's environmental programs under the Clean Air Act (CAA), Clean Water Act (CWA), Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Federal Insecticide Fungicide and Rodenticide Act (FIFRA), Food Quality Protection Act (FQPA), Resource Conservation and Recovery Act (RCRA), Safe Drinking Water Act (SDWA), Toxic Substances Control Act (TSCA), and other authorities within the Agency's purview. These additional resources also will assist EPA in tackling the climate crisis and securing environmental justice. This investment includes $8.7 million in payroll.

- (+$10,051.0 / +36.7 FTE) This program change addresses a need for increased demand of legal counseling services, including in the Agency's Offices of Regional Counsel, which support the Agency on defensive litigation, civil rights, and environmental justice-related counseling. This investment includes $8.6 million for payroll.

- (+$363.0 / +1.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes $354.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

## Legal Advice: Support Program

Program Area: Legal / Science / Regulatory / Economic Review
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$15,922* | *$18,957* | *$20,584* | *$1,627* |
| Total Budget Authority | $15,922 | $18,957 | $20,584 | $1,627 |
| Total Workyears | 73.4 | 83.7 | 93.7 | 10.0 |

Total Workyears in FY 2025 include 6.1 FTE funded by TSCA fees.

**Program Project Description:**

The Legal Advice: Support Program includes the Office of General Counsel's (OGC's) Civil Rights and Finance Law Office (CRFLO) and General Law Office (GLO), as well as certain positions in EPA's ten Offices of Regional Counsel (ORCs). The Program supports EPA, across the Agency's headquarters and ten regional offices, in maintaining high professional standards throughout the Agency and in complying with all laws and policies that govern EPA's operations. The Program provides critical support for EPA's work under various civil rights statutes, including comprehensive counseling on civil rights matters, such as equal protection. The Program provides crucial legal representational services, legal counseling, and legal support for a wide variety of activities necessary for EPA's operation and success, including providing legal counseling and support on a range of employment, appropriations, intellectual property, national security, and information law-related matters.

The Program's legal support is key to fulfilling the Agency's role in Executive Order 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*,[210] and is instrumental in advancing the environmental justice (EJ) and civil rights goals in the *FY 2022 - 2026 EPA Strategic Plan*. The Program provides critical legal support for EPA's newly formed Office of Environmental Justice and External Civil Rights (OEJECR), which was created in Fall 2022 to improve oversight and enforcement of civil rights and prioritize and advance EJ concerns. The Program's employment law expertise is critical to ensuring fair and impartial hiring and retention of a qualified workforce, and to supporting the Agency in adverse employment actions. The Program also provides counsel and advice for settlement of Equal Employment Opportunity (EEO) claims against the Agency. In addition, the Program's Freedom of Information Act (FOIA) legal counseling and litigation support are key to ensuring transparency and accountability.

---

[210] Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, 86 Fed. Reg. 7009 (Jan. 20, 2021), *available at* https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the Agency requests an additional investment of $1.6 million and 7.0 FTE to strengthen EPA's Legal Advice: Support Program. In FY 2025, EPA will continue to provide legal support for the Agency's crucial civil rights work, which has expanded considerably in recent years and continues to increase; will continue to provide legal counsel and support on legal advice and support on matters related to contracts, grants, finance, appropriations, and employment law matters for the Agency, including work related to the Federal Tort Claims Act (FTCA), which has increased in recent years and involves incredibly complex, billion-dollar cases; and will continue to counsel and advise on information law matters. The requested investment also is critical to ensuring that the Program has staffing resources sufficient to provide legal support for the new OEJECR.

Legal counseling resources continue to be highly sought after, and the Program has experienced increasing demand for its services in the last 10 years. EPA OGC's and ORCs' workloads in program areas have significantly outpaced staffing resources. In particular, the Program has seen a significant increase in workload related to providing critical legal support for the Agency on civil rights matters, which support key Administration priorities. The Program also has seen an increase in demand for legal counseling from certain agency programs related to implementation of Congressionally Directed Spending (CDS) and has seen increased demand for legal support related to FTCA matters. The majority of the FTE requested would increase staffing for the Program's ORCs. Additional resources also are necessary to provide legal support for the newly formed OEJECR. Increasing FTE for the ORCs, and the Program overall, is critical to ensuring continued legal support for the Agency's headquarters and ten Regional offices.

The Program is critical to ensuring the Agency's compliance with its legal obligations so that the Agency can focus on fulfilling its core mission of protecting human health and the environment. The additional resources for this program are crucial to ensuring that the Agency continues to make legally sound decisions that advance EPA's mission, support EPA's operations, and serve the American public. Increasing FTE for the ORCs' work in these program areas is critical to ensuring continued legal support for the Agency's ten regional offices. Additional resources are required to maintain staffing levels sufficient to keep pace with the increasing demands placed on the Program and the ORCs' work in Program areas, and to support OEJECR.

The following are examples of FY 2023 accomplishments:

- The Program completed over 3,770 Confidential Business Information (CBI) determinations on CBI claims submitted pursuant to the Toxic Substances Control Act (TSCA). Program attorneys also provided critical legal counseling and support on several significant TSCA-related rulemakings. This determination rate represents an extraordinarily successful effort to improve transparency and reduce litigation risk that continues the significant achievements gained in FY 2022. The TSCA CBI team is now working on some of the most complex and oldest pending determinations. In January 2021,

265

the TSCA CBI team's backlog was at 1,160. This backlog was reduced to 207 at the end of FY 2022. At the end of July 2023, the TSCA CBI team further reduced its backlog to fewer than 28 TSCA CBI determinations and hopes to clear out its backlog by the end of FY 2023.

- The Program counseled the Agency on its Diversity, Equity, Inclusion, and Accessibility (DEIA) efforts, including the Agency's DEIA Action plan, DEIA data reporting, and barrier analyses. This activity furthers the Agency's implementation of Executive Order 14035's directive to advance equity within the Federal Government and "cultivate a workforce that draws from the full diversity of the nation." The Program facilitated the completion of OGC's Equity Assessment contract, which advanced OGC's efforts to assess equity in the workplace and captured suggestions for ways to improve the workplace. The Program also is working to improve DEIA hiring, outreach, and recruitment efforts through a new outreach program as well as informational interviewing.

- Program attorneys successfully defended the Agency in both information law and employment law litigation. Specifically, the Program skillfully defended EPA in 43 FOIA cases and more than 90 employment law matters, including 15 district court cases or court of appeals employment matters. In addition, the Program resolved more than 44 matters through settlement or victory on the merits. The Program also timely completed 92 FOIA administrative appeals.

- The Program counseled the Agency's infrastructure programs on evaluating the applicability of the Build America, Buy America (BABA) Act and implementation of BABA requirements throughout the Agency. This BABA authority was included in the Infrastructure Investment and Jobs Act and applied domestic preference requirements to several EPA infrastructure program as well as Superfund. Program attorneys provided comprehensive legal guidance to impacted agency programs The Program also helped to develop government-wide BABA regulations promulgated in 2023.

- The Program provided expert legal counsel to EPA's regional offices, as well as the Office of Water (OW), Office of Land and Emergency Management (OLEM), and Office of Research and Development, to support the Community Project Funding (CPF)/CDS/Community Grants grant program. Program attorneys assisted OW with the development and publication of the final implementation guidance for the newly formed grant program, providing CDS recipients training on federal procurement requirements under EPA assistance agreements; ensuring EPA's regional offices have the appropriate delegations of authority in place to be able to approve grant awards; working with regional staff regarding applicant and recipient questions pertaining to their projects; and resolving cross-cutting legal issues involving the Davis-Bacon Act, National Environmental Policy Act, and BABA/American Iron and Steel compliance.

- In FY 2023, the Program provided critical legal support for 66 external civil rights and compliance cases and 47 EEO cases. The Program also developed and led 20 equal protection law trainings for agency leadership and staff in programs including OW, OLEM,

266

the Office of Enforcement and Compliance Assurance, and the Office of Air and Radiation, as well as several regional offices.

- Program attorneys analyzed the legal intersections between Clean Air Act's Section 110(a)(2)(E)'s requirement for State Implementation Plan submissions to demonstrate a necessary assurance of compliance with federal laws and Title VI of the Civil Rights Act's requirement that recipients of federal financial assistance must comply with all federal civil rights laws. The Program collaborated on various policy deliverables regarding EPA's Lead and Copper Rule and initiatives associated with lead service line replacements, which included discussions about Title VI of the Civil Rights Act and due process legal risks that may arise as well as risk mitigation.

**Performance Measure Targets:**

Work under this program supports performance results in the Legal Advice: Environmental Program under the EPM appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$158.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$1,469.0 / +7.0 FTE) This net program change addresses a need for increased demand for legal counseling services and support on defensive litigation; increased demand for advising on FOIA and other information law matters; ensuring the Agency's work on contracts, grants, and appropriations is handled in accordance with the law; and providing sufficient legal support for the new OEJECR. This change will provide critical staffing resources particularly to the Program's ORCs and includes $1.6 million in payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

## Regulatory/Economic-Management and Analysis

Program Area: Legal / Science / Regulatory / Economic Review
Goal: Take Decisive Action to Advance Environmental Justice and Civil Rights
Objective(s): Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$16,032* | *$17,475* | *$19,526* | *$2,051* |
| Total Budget Authority | $16,032 | $17,475 | $19,526 | $2,051 |
| Total Workyears | 71.4 | 73.7 | 77.2 | 3.5 |

Total workyears in FY 2025 include 0.2 FTE to support Regulatory/Economic, Management, and Analysis working capital fund (WCF) services.

**Program Project Description:**

The Regulatory/Economic, Management, and Analysis Program is responsible for reviewing the Agency's regulations to ensure that they are developed in accordance with the governing statutes, executive orders, and agency commitments and are based on sound technical, economic, scientific, and policy assumptions. Further, the Program ensures consistent and appropriate economic analysis of regulatory actions, conducts analyses of regulatory and non-regulatory approaches, and considers interactions between regulations across different environmental media. The Program provides technical support on the Social Cost of Greenhouse Gases (GHGs) to develop final social cost of carbon (SC-$CO_2$), social cost of nitrous oxide (SC-$N_2O$), and social cost of methane (SC-$CH_4$)for use in regulatory and programmatic analysis, consistent with Executive Order (EO) 13990, *Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis*.[211] The Program helps to implement EO 14094 *Modernizing Regulatory Review*[212] and EO 14096 *Revitalizing Our Nation's Commitment to Environmental Justice for All*[213] by developing appropriate modeling, data, and analysis to inform the consideration of environmental justice (EJ) concerns in regulatory and non-regulatory actions. The Program ensures the Agency's regulations comply with statutory and EO requirements, including the Congressional Review Act,[214] the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act),[215] and EOs 12866, *Regulatory Planning and Review*[216] , 13563, *Improving*

---

[211] For more information on EO 13990, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/.

[212] For more information on EO 14094, please see: https://www.federalregister.gov/documents/2023/04/11/2023-07760/modernizing-regulatory-review.

[213] For more information on EO 14096, please see: https://www.federalregister.gov/documents/2023/04/26/2023-08955/revitalizing-our-nations-commitment-to-environmental-justice-for-all.

[214] For more information on the Congressional Review Act, please see Subtitle E: https://www.govinfo.gov/content/pkg/PLAW-104publ121/pdf/PLAW-104publ121.pdf.

[215] For more information on the Regulatory Flexibility act, please see: https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg1164.pdf. and as amended by the Small Business Regulatory Enforcement and Fairness Act, please see: https://www.govinfo.gov/content/pkg/PLAW-104publ121/pdf/PLAW-104publ121.pdf.

[216] For more information on EO 12866 Regulatory Planning and Review, please see https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf.

*Regulation and Regulatory Review*[217] , and 14094, *Modernizing Regulatory Review*[218] regarding the Office of Management and Budget (OMB) regulatory review. The Program manages the development and deployment of EPA's economy-wide model for analyzing the economic impacts of environmental regulations and the macroeconomic impacts from climate transition and physical risks. The Program also includes the Agency's Chief Statistical Official charged with implementing major elements of the *Foundations for Evidence Based Policy Act*.[219]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Strategic Goal 2/Objective 2.2, Embed Environmental Justice and Civil Rights into EPA's Programs, Policies, and Activities in the *FY 2022 - 2026 EPA Strategic Plan*.

The Program assists the Administrator and other senior agency leaders in implementing regulatory policy priorities. In FY 2025, EPA requests a total investment of $19.5 million and 77.0 FTE in the Regulatory/Economic, Management, and Analysis Program. This includes an additional $2.1 million and 3.5 FTE in support of the Administration's goal to tackle the climate crisis. The Agency will continue its efforts to assess and review the benefits and costs to communities, businesses, government entities, and the broader economy associated with each economically significant regulatory action to maximize the net benefits of policies protecting human health and the environment. EPA will conduct and integrate analysis of EJ concerns in the rulemaking process to address the Administration's priorities. EPA will collect data and build models to assess regulatory proposals and their impacts on benefits, economic performance, and EJ. Planned key program activities in FY 2025 include:

- Conduct analysis, engage the public, stakeholders, and experts, as appropriate, and develop tools to support the updating and application of the Social Cost of GHGs, including the $SC-CO_2$, $SC-N_2O$ and $SC-CH_4$ to ensure that these costs are based on the best available economics and science.

- Represent EPA in recommending improvements to modernize the regulatory review process to promote policies that reflect new developments in scientific and economic understanding, fully accounts for regulatory benefits that are difficult or impossible to quantify and does not have harmful anti-regulatory or deregulatory effects. Develop procedures that consider the distributional consequences of regulations as part of any quantitative or qualitative analysis of the benefits and costs of regulations, to ensure that regulatory initiatives appropriately benefit and do not inappropriately burden underserved, vulnerable, or marginalized communities across all life stages.

- Support EPA's Chief Statistical Official, who will provide technical support for projects under EPA's Learning Agenda, evaluation plan, and capacity assessment; design

---

[217] For more information on EO 13563 Improving Regulation and Regulatory Review, please see: https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulation-and-regulatory-review.
[218] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2023/04/06/executive-order-on-modernizing-regulatory-review/.
[219] For more information, please see: https://www.congress.gov/115/plaws/publ435/PLAW-115publ435.pdf.

statistically sound policy analyses and evaluations; assist in the continued development of EPA's Learning Agenda; and promote a culture of evidence-based decision making.

- Conduct training for EPA regulatory staff on a broad range of topics, including EPA's internal Action Development Process, developing EJ analysis for rulemakings, *Guidelines for Preparing Economic Analyses,* and Congressional Review Act requirements to help ensure that rules meet policy goals and address legal and administrative requirements and are informed by high quality EJ and economic analyses.

- Expand analytic capabilities for conducting EJ analyses for rulemaking through development of flexible analytic tools and novel datasets.

- Implement EPA's updated *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis*, including training on new additions that address how the EJ analysis can be used to inform policy options and newer techniques for conducting EJ analyses.

- Provide updates to *EPA's Guidelines for Preparing Economic Analyses*, revised to incorporate updated analytic requirements and practices developed under the President's Memorandum on *Modernizing Regulatory Review,*[220] updates to OMB's Circular A-4, and the recommendations from the Science Advisory Board's peer review. The guidelines help ensure that EPA's economic analyses provide a complete accounting of the economic benefits, costs, and impacts of regulatory actions, including distributional consequences, and are consistent across EPA programs.

- Continue to deploy both long-run and near-term models of the U.S. economy to assess how climate change impacts and the risk of extreme weather events affect Americans and the economy. This includes assessing distributional impacts, costs, and broader macroeconomic performance of the U.S. economy in the face of physical impact and transition risks under EO 14030, *Climate-Related Financial Risk*.[221]

- Continue to deploy and develop EPA's economy-wide model for analyzing the economic impacts of environmental regulations.[222] EPA will continue to update the model consistent with recommendations from EPA's Science Advisory Board, deploy the model in regulatory analyses where appropriate, and advance the development of open-source data resources to support transparent analyses. This modeling capacity provides critical evidence-based analyses to inform decision making.

- Continue to manage EPA's response to recently issued EOs, including EO 14094, particularly with an eye toward identifying regulatory actions that advance human health and environmental protection for all people.  Position EPA to effectively respond to recent

---

[220] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/modernizing-regulatory-review/.
[221] For more information on EO 14030, please see: https://www.federalregister.gov/documents/2021/05/25/2021-11168/climate-related-financial-risk.
[222] For more information, please see: https://www.epa.gov/environmental-economics/cge-modeling-regulatory-analysis.

OMB guidance on *Broadening Public Participation and Community Engagement in the Regulatory Process*.

- Review economic analyses prepared by EPA to ensure compliance with statutory and other related requirements. Provide the Administrator and the public with high-quality analyses of the costs, benefits, and impacts on jobs, businesses, and communities of major regulatory proposals to better inform decision-making and ensure transparency about the consequences of regulation.[223]

- As the economy makes structural shifts to dramatically reduce greenhouse gas emissions, this program will use macroeconomic and sectoral models to assess the economic effects of climate policy, to ensure equitable outcomes, spur well-paying union jobs and economic growth, and identify regions and subpopulations that need additional assistance as the economy transitions. Continue development of open-source data and economic models, including sector-specific cost models, to support these efforts in a manner that maximizes the transparency of these EPA analyses.

- Continue development of a modeling platform capable of assessing the benefits of national regulations that affect water quality. This effort will provide important evidence-based data and analyses, consistent with economic science best practices, to inform decision making.

- Strengthen available data and methods to estimate the monetized benefits of health outcomes of chemical exposures, water pollution, and air pollution for use in EPA's benefit cost analyses.

- Lead EPA's support for the U.S. System of National Environmental Accounts in line with the national strategy.[224]

- Continue to develop EPA's semiannual unified Regulatory Agenda and manage EPA's compliance with the Congressional Review Act.[225]

- Manage EPA's internal Action Development Process and expand and upgrade regulatory planning and tracking tools to facilitate timely decisions and coordination across programs, on multimedia regulatory and policy issues such as Per- and Polyfluoroalkyl Substances (PFAS), climate, and EJ.

- Review all regulatory actions prior to signature by the EPA Administrator to ensure agency actions are of consistently high quality and supported with strong analysis.

- Serve as EPA's liaison with the Office of Information and Regulatory Affairs within OMB.

---

[223] For more information, please see: https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses.
[224] For more information on the National Strategy to Develop Statistics for Environmental-Economic Decisions, please see: https://www.whitehouse.gov/wp-content/uploads/2023/01/Natural-Capital-Accounting-Strategy-final.pdf.
[225] For more information on the Congressional Review Act, please see: https://www.govinfo.gov/content/pkg/PLAW-104publ121/pdf/PLAW-104publ121.pdf.

- Serve as EPA's liaison with the Office of the Federal Register by reviewing, editing, and submitting documents for publication, so that the public, states, other agencies, and Congress are informed about EPA's regulatory activities in a timely manner.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands**):

- (-$2,488.0) This net change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$1,442.0 / +1.0 FTE) This program change is an increase to supports the Administration's goal to tackle the climate crisis and ensures consistent and appropriate economic analysis of regulatory actions including advancements in the ability to model the economic impacts of climate change for assessing the mitigation benefits and macroeconomic effects. This investment includes $192.0 thousand for payroll.

- (+$1,400.0) This program change will support the Climate-Macro Interagency Technical Working Group and assessments of the Federal Financial Climate Risk Interagency Working Group.

- (+$1,001.0 / +1.0 FTE) This program change is an increase for the National Center for Environmental Economics and natural capital accounting work, in line with the national strategy.

- (+$696.0 / +1.5 FTE) This program change is an increase to support cross-agency coordination, analysis, and review of regulatory activity across statutory programs in which particular emphasis is to be placed on pending climate regulations. This investment includes $288.0 thousand for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

# Science Advisory Board

Program Area: Legal / Science / Regulatory / Economic Review
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$4,219* | *$4,155* | *$4,671* | *$516* |
| Total Budget Authority | $4,219 | $4,155 | $4,671 | $516 |
| Total Workyears | 19.3 | 18.7 | 18.7 | 0.0 |

**Program Project Description:**

EPA's Science Advisory Board Staff Office (SABSO) manages two Federal Advisory Committees. Congress established the Agency's Science Advisory Board (SAB) in 1978, under the Environmental Research, Development, and Demonstration Act, to advise the Administrator on a wide range of highly visible and important scientific matters. The Clean Air Scientific Advisory Committee (CASAC) was established under the Clean Air Act Amendments of 1977 to provide independent advice to EPA Administrator on the technical bases for EPA's National Ambient Air Quality Standards (NAAQS). The SAB and the CASAC, both statutorily mandated chartered Federal Advisory Committees, draw from a balanced range of non-EPA scientists and technical specialists from academia, states, tribes, independent research institutions, non-governmental organizations, and industry. The Program provides management and technical support to these advisory committees. The Committees provide EPA's Administrator independent advice and objective scientific peer review on the technical aspects of environmental issues as well as the science used to establish criteria, standards, regulations, and research planning, as requested.[226]

Thus far in FY 2024, the SAB has finalized four scientific peer reviews of regulatory actions and submitted two reports on the science supporting decisions regulatory reviews. As of January 2024, the SAB also is actively working on three peer reviews and multiple regulatory action reviews. Thus far in FY 2024, CASAC has been forming a panel to assess the Nitrogen Oxides NAAQS. SABSO expects these totals to maintain at their current level in FY 2024 and FY 2025 as both Committees have several current activities on-going that we anticipate completing this fiscal year. In September 2024, the Program expects to announce new members for both the SAB and CASAC to serve as expert advisors to EPA. This will include a new Chair of the CASAC. SABSO is following a thorough and transparent public process and the new members will have scientific and technical expertise that align with the Agency's strategic priorities. We anticipate the Administrator will make his final membership selections in August 2024. Since SABSO provides an in-house resource for EPA peer reviews, the Program costs are low in comparison to external peer review conducted by groups such as the National Academy of Sciences (NAS).

---

[226] For more information, please see: http://www.epa.gov/sab/ and http://www.epa.gov/casac/.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

Using the best available science and a credible, defensible, and transparent scientific approach, SABSO supports EPA's mission by conducting independent, scientific, public, peer reviews of some of the most challenging regulatory and science-based topics facing EPA and America. In FY 2025, SABSO anticipates SAB and CASAC will complete 16-18 peer reviews, consultations, and regulatory reviews. In FY 2025, the CASAC is expecting completing reviews of NAAQS for several critical NAAQS pollutants, including nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$), ozone, and lead. The SAB will conduct peer reviews on Integrated Risk Information System (IRIS) chemical reviews, risk assessment models, climate science reports, economic analyses, Environmental Justice (EJ) reports, and other similar projects. In addition, SABSO also expects to conduct four to seven regulatory reviews.

The SAB will directly support EPA Administrator Michael Regan's message "Our Commitment to Environmental Justice" issued on April 7, 2021,[227] in addition to supporting implementation of Executive Order (EO) 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*; [228] EO 14008: *Tackling the Climate Crisis at Home and Abroad*;[229] and Strategic Goal 4, *Ensure Clean and Healthy Air for all Communities*. In FY 2024, the EJ Science Committee and Climate Science Committee (both standing committees of the SAB) expect to complete three climate and EJ risk analyses. Included in these reports will be an SAB self-initiated report on how to best conduct EJ analyses to support rulemaking activities.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$58.0) This change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$574.0) This program increase supports the Science Advisory Board in conducting independent, scientific, public, peer reviews of priority regulatory and science-based topics, including PFAS and several critical pollutants.

---

[227] For more information, please see: https://www.epa.gov/newsreleases/epa-administrator-regan-announces-new-initiatives-support-environmental-justice-and.

[228] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[229] For more information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/.

**Statutory Authority:**

Environmental Research, Development, and Demonstration Authorization Act (ERDDAA); Federal Advisory Committee Act (FACA); and Clean Air Act (CAA).

## Science Policy and Biotechnology

Program Area: Legal / Science / Regulatory / Economic Review
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$1,628* | *$1,811* | *$1,642* | *-$169* |
| Total Budget Authority | $1,628 | $1,811 | $1,642 | -$169 |
| Total Workyears | 5.1 | 4.6 | 4.6 | 0.0 |

**Program Project Description:**

The Science Policy and Biotechnology Program provides scientific and policy expertise supporting independent, external scientific peer review of matters related to pesticides and toxic substances, including biotechnology. The Program primarily supports two federal advisory committees: the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP), and the Science Advisory Committee on Chemicals (SACC) established under the 2016 amendments to the Toxic Substances Control Act (TSCA). The FIFRA SAP and the SACC are both statutorily mandated, chartered Federal Advisory Committees drawing from a balanced range of non-EPA scientists and technical specialists from, for example, academia, other federal government agencies, states, non-governmental organizations, and industry. These Committees provide the EPA's Administrator independent advice and objective scientific peer review on the technical aspects of pesticide and toxic substance issues as well as the science used to establish guidelines and regulations, as requested. The scientific peer review conducted under this program promotes coordination among EPA programs including but not limited to pesticides, toxic substances, air, water, and research and development, facilitating coherent and consistent scientific policy from a broad agency perspective.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan*.

In FY 2025, the Science Policy and Biotechnology Program will continue to support the peer review of the scientific and technical issues associated with pesticide and chemical safety. In addition, other science policy issues will be supported by the Program when decisions require expert scientific advice from independent, external scientific peer reviewers (*e.g.*, biotechnology and new approach methodologies).

FIFRA Scientific Advisory Panel

The FIFRA SAP, operating under the rules and regulations of the Federal Advisory Committee Act, will continue to serve as the primary external independent scientific peer review mechanism for EPA's pesticide programs. As the Nation's primary pesticide regulatory agency, EPA makes decisions that require EPA to review scientific data on pesticide risks to wildlife, farmworkers, pesticide applicators, sensitive and vulnerable populations, ecosystems, and the general public. The scientific data involved in these decisions are complex. A critical component of EPA's use of the best available science to address such issues is seeking technical advice and scientific peer review from the FIFRA SAP.

The FIFRA SAP conducts reviews each year on a variety of scientific topics. Specific topics to be placed on the FIFRA SAP agenda are usually confirmed in advance of each session and include difficult, new, or controversial scientific issues identified in the course of EPA's pesticide program activities. In FY 2024, EPA will address four vacancies that will occur on the FIFRA SAP as a result of expiring membership terms. Three to six FIFRA SAP meetings are tentatively planned for FY 2024. Consistent with the FIFRA SAP Charter, EPA anticipates convening approximately five FIFRA SAP meetings in FY 2025. These meetings will focus on the impact of pesticides on human health and the environment and include the peer review of scientific data, methodologies, models, and assessments, as needed.

Science Advisory Committee on Chemicals

The SACC, operating under the rules and regulations of the Federal Advisory Committee Act, will continue to serve as the primary external independent scientific peer review mechanism for EPA's chemical safety programs. EPA makes decisions that require the Agency to review scientific data on risks that chemicals pose to a variety of populations including women, children, and other potentially exposed or susceptible subpopulations. The scientific data, assessments, methodologies, and measures involved in these decisions are complex. Many of EPA's tools and models for examining exposures to industrial chemicals rely on inputs that are sensitive to climate data. The SACC provides independent, expert scientific advice and recommendations to EPA on the scientific basis for risk assessments, methodologies, and pollution prevention measures and approaches for chemicals regulated under the Toxic Substances Control Act (TSCA) and is a critical component of EPA's use of the best available science to protect human health and the environment.

The SACC conducts reviews each year on a variety of scientific topics. Similarly, to the FIFRA SAP, specific topics to be placed on the SACC agenda include difficult, new, or controversial scientific issues identified in the course of EPA's chemicals program activities. In FY 2024, EPA will address nine vacancies that will occur on the SACC as a result of expiring membership terms. Two SACC meetings are planned for FY 2024. Consistent with the SACC Charter, EPA anticipates convening approximately four to six SACC meetings in FY 2025. These meetings will focus on the impact of industrial chemicals on human health and the environment and include the peer review of scientific data, methodologies, models, and assessments, as needed.

<u>Planned Committee Meetings</u>
Based on the estimates reflected in the 2022-2024 committee charters,[230] EPA anticipates convening up to a total of nine to eleven meetings in FY 2025. These meetings will focus on the impact of pesticides and chemicals on human health and the environment and include the peer review of scientific data, methodologies, models, and assessments, as needed.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$169.0) This program change is a decrease that will reduce support of science advisory committee oversight and reflects additional changes to fixed support costs.

**Statutory Authority:**

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); Federal Food, Drug and Cosmetics Act (FFDCA), §408; Toxic Substances Control Act (TSCA); Federal Advisory Committee Act (FACA).

---

[230] For additional information, please visit: https://www.epa.gov/sap/fifra-scientific-advisory-panel-charter and https://www.epa.gov/tsca-peer-review/science-advisory-committee-chemicals-charter.

**Operations and Administration**

**Acquisition Management**

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$33,034* | *$37,251* | *$42,085* | *$4,834* |
| Leaking Underground Storage Tanks | $173 | $181 | $136 | -$45 |
| Hazardous Substance Superfund | $22,835 | $27,247 | $34,172 | $6,925 |
| Total Budget Authority | $56,042 | $64,679 | $76,393 | $11,714 |
| Total Workyears | 268.9 | 307.7 | 355.7 | 48.0 |

**Program Project Description:**

Environmental Programs and Management (EPM) resources in the Acquisition Management Program support EPA's contract activities, which cover planning, awarding, and administering contracts for the Agency. Efforts include issuing acquisition policy and interpreting acquisition regulations; administering training for contracting and program acquisition personnel; providing advice and oversight to regional procurement offices; and providing information technology (IT) improvements for acquisition.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $4.8 million and 20.0 FTE for this program. The Agency will continue to strengthen EPA's capacity to process new, increased, and existing contract award actions in a timely manner; advance EPA utilization of small and disadvantaged businesses; support "Made in America" initiatives; and address supply chain risk management activities for information and communication technology. EPA processes and awards contract actions in line with Federal Acquisition Regulation (FAR) and guidance from the Office of Management and Budget's (OMB) Office of Federal Procurement Policy (OFPP).

In FY 2025, EPA will continue to support the implementation of supply chain risk requirements in Section 889 of the 2019 National Defense Authorization Act and the "Made in America Laws" referenced in Executive Order 14005, *Ensuring the Future Is Made in All of America by All of America's Workers,*[231] while furthering Category Management. The Agency will develop a Made in America Acquisition training curriculum to train EPA's acquisition workforce and will develop a comprehensive EPA Made in America intranet site which includes resources on agency and

---

[231] For additional information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/25/executive-order-on-ensuring-the-future-is-made-in-all-of-america-by-all-of-americas-workers/.

Federal Market Resources, compliance requirements and process guidance for both procurement and assistance agreements. EPA also will establish a Supply Chain Risk Management (SCRM) Program Management Office and task force to formally develop a comprehensive architecture for the Agency's supply chain, as well as mechanisms to identify and mitigate risk.

In FY 2025, EPA will continue to identify activities and resources to enhance and modernize its acquisition process. This will allow the Agency to connect with a more diverse business base to address inequities in the acquisition process and build domestic markets and capabilities. EPA will leverage its three-year Acquisition Forecast database and existing spend data to engage in early market research to ensure adequate time to thoroughly analyze the market for domestic vendors or seek a waiver if none exist. The Agency will overhaul the Advance Procurement Planning component of the Agency's requisition dashboard to easily gather data regarding the planning phase of the procurement process. In FY 2023, EPA launched the Acquisition Lab Toolkits for Agency Acquisition personnel. Furthermore, EPA will expand the Acquisition Portal to include an up to date Made in America toolkit, a Contingency Planning toolkit, and a repository for vendor marketing information.

In FY 2025, EPA will continue working to eliminate barriers to full and equal participation in agency procurement and contracting opportunities for all communities and will continue serving as an active member of the Procurement Equity Workgroup. The Agency will promote the equitable delivery of government benefits and opportunities by making contracting and procurement opportunities available on an equal basis to all eligible providers of goods and services. This work aims to increase the percentage of EPA contract spend awarded to small businesses located in Historically Underutilized Business Zones (HUBZones). These businesses often lack dedicated resources and in-house capacity to capitalize on agency acquisition and financial assistance opportunities.

EPA remains committed to leveraging Category Management principles and enabling Spend Under Management (SUM) in each of its programs and purchasing areas to save taxpayer dollars and improve mission outcomes.  In FY 2025, EPA will continue to utilize data provided by OFPP and the General Services Administration, to implement spend analysis, trend analysis, and data visualization tools to measure progress toward EPA's Category Management goals.

OMB's SUM initiative focuses on managed total acquisition spend and agency activities which transition spend to contract vehicles aligned with Category Management principles. Since FY 2023, EPA has elevated its focus on employing Category Management from purely strategic sourcing to broader monitoring and management of EPA's primary spend categories—Facilities & Construction, Professional Services, IT, Industrial Products & Services, Office Management, and Human Capital. Category Liaisons were established to oversee and improve progress with EPA's development of Category-level strategies in the primary spend categories. In FY 2025, EPA Category Liaisons will partner with Federal and EPA Category Managers to execute established Category-level strategies to enable greater SUM and improve the Agency's ability to achieve its Category Management goals.

In FY 2025, EPA will continue to implement SUM principles to leverage pre-vetted agency and government-wide contracts. Through SUM solutions, acquisition experts will optimize spending

within the government-wide category management framework and increase the transactional data available for agency-level analysis of buying behaviors. To modernize the acquisition process and remove barriers to entry for obtaining government contracts, EPA has developed two innovative tools available agencywide: the EPA Solution Finder, which provides solution and ordering information for all EPA enterprise-wide contract solutions; and the SUM Opportunity Tool, which recommends existing solutions to address newly identified agency requirements for commodities and services and those supported on expiring contracts.

EPA also will elevate its focus on the Category Management approach to improve management and results of its portfolio of contracts. EPA will continue to maximize considerations for implementing Strategic Sourcing Initiatives (SSIs), thereby enhancing purchase coordination, improving price uniformity and knowledge-sharing, and leveraging small business capabilities to meet acquisition goals. EPA will continue to implement strategic sourcing initiatives first launched in FY 2023 in the areas of Lab Equipment Maintenance; Diversity, Equity, Inclusion, and Accessibility; Organizational Development and Coaching; Business and Financial Services; and Intellitrak software.

The Category Management Program allows the Agency to research, assess, and award contract vehicles that will maximize time and resource savings. Long-term implementation of the Category Management Program is transforming the Agency's acquisition process into a strategically driven function, ensuring maximum value for every acquisition dollar spent. In FY 2023, EPA realized approximately $20.3 million in cost avoidance in specific, measurable costs for twelve agencywide solutions: Secure Socket Layer (SSL) certificates; print services; cellular services; content and data subscriptions; shipping; infrastructure services; office supplies; lab supplies; computers; furniture and furniture management services; COVID-19 testing; and laboratory equipment maintenance. Since the Category Management Program's inception in 2013, EPA has avoided approximately $924 million in costs.

In support of the IT Category-level Strategy, EPA will continue to increase transparency and visibility for IT purchases, including improving the Financial Information Technology Acquisition Reform Act (FITARA) process.[232] Since FY 2023, EPA developed a FITARA numbering system and the FITARA Approval ID custom data field in the EPA Acquisition System (EAS) agency contract writing system. The Agency can now track IT purchases from FITARA approval to contract award, which expands the potential to build greater effectiveness in identifying trends in IT acquisitions, streamlines the applicability of FITARA approvals to classes of contracts, and enables the Agency to be responsive to audits and inquiries.

For the Professional Services Category, the Agency will continue to build understanding of mission-critical services and explore opportunities to develop enterprise-wide solutions in mission support areas nuanced to EPA's specific needs. In FY 2022, EPA established the Office of Air and Radiation (OAR) Environmental, Analytical, Research, Technical, and Hybrid (EARTH) Support Services Blanket Purchase Agreement, its first omnibus mission support acquisition solution available for agencywide use. OAR EARTH has proven integral to the effective execution of EPA activities funded by the Infrastructure Investment and Jobs Act (IIJA) and Inflation Reduction Act

---

[232] For additional information, please refer to: https://www.congress.gov/113/plaws/publ291/PLAW-113publ291.pdf#page=148%5D.

(IRA). In FY 2025, EPA will expand its mission support solutions to the Office of Land and Emergency Management and the Office of Water. These enterprise-wide mission support solutions focus on small business utilization through use of total small business set-asides or support area "tracks" restricted to small business awards, which furthers EPA's emphasis on small business utilization and ensures continued alignment of federal category management and equity goals.

**Performance Measure Targets:**

Work under this program supports performance results in the Small Minority Business Assistance Program under the EPM appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$700.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$4,134.0 / +20.0 FTE) This program change will strengthen EPA's capacity to process new, increased, and existing award contract actions in a timely manner; advance EPA utilization of small and disadvantaged business; support "Made in America" initiatives; and support supply chain risk management activities for information and communication technology. This investment includes $3.65 million for payroll.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

# Central Planning, Budgeting, and Finance

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$85,840* | *$87,099* | *$100,595* | *$13,496* |
| Leaking Underground Storage Tanks | $373 | $457 | $474 | $17 |
| Hazardous Substance Superfund | $32,914 | $31,338 | $30,512 | -$826 |
| Total Budget Authority | $119,128 | $118,894 | $131,581 | $12,687 |
| Total Workyears | 441.2 | 472.0 | 486.7 | 14.7 |

Total workyears in FY 2025 include 2.0 FTE funded by TSCA fees.
Total workyears in FY 2025 include 45.7 FTE to support Central Planning, Budgeting, and Finance working capital fund (WCF) services.

## Program Project Description:

Activities under the Central Planning, Budgeting, and Finance Program support the management of integrated planning, budgeting, financial management, performance and accountability processes, risk assessments and reporting, and financial systems to ensure effective stewardship of resources. This includes managing and supporting the Agency's financial management systems. The Program functions include financial payment and support services for EPA; general and specialized fiscal and accounting services for many of EPA's programs; strategic planning and accountability for environmental, fiscal, and managerial results; developing and executing an Enterprise Risk Management Program to support mission delivery and decision-making; providing policy, systems, training, reports, and oversight essentials for EPA's financial operations; managing the agencywide Working Capital Fund (WCF); and managing the Agency's annual budget process. This program supports agency activities to meet requirements of the Government Performance and Results Modernization Act (GPRMA) of 2010,[233] as amended by the Foundations for Evidence-Based Policymaking Act of 2018 ("Evidence Act"), with an emphasis on Title I of the Act;[234] the Digital Accountability and Transparency (DATA) Act of 2014;[235] the Federal Information Technology Acquisition Reform Act (FITARA) of 2015;[236] the Federal Management Financial Integrity Act (FMFIA);[237] the Inspector General Act of 1978.[238]

---

[233] For more information, please see: https://www.congress.gov/111/plaws/publ352/PLAW-111publ352.pdf.
[234] For more information, please see: https://www.congress.gov/115/plaws/publ435/PLAW-115publ435.pdf.
[235] For more information, please see: https://www.congress.gov/113/plaws/publ101/PLAW-113publ101.pdf.
[236] FITARA became law as a part of the National Defense Authorization Act for Fiscal Year 2015 (Title VIII, Subtitle D), https://www.congress.gov/113/plaws/publ291/PLAW-113publ291.pdf.
[237] For more information, please see: https://www.govinfo.gov/content/pkg/STATUTE-96/pdf/STATUTE-96-Pg814.pdf.
[238] For more information, please see: https://www.govinfo.gov/content/pkg/USCODE-2012-title5/pdf/USCODE-2012-title5-app-inspector.pdf.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan.*

In FY 2025, the Program requests an additional $13.5 million and 13.1 FTE. This increase includes an investment in a solution that would move the Agency forward in assessing enterprise and programmatic risk, internal control and audit management; expands agency capacity for conducting evaluations and provides for necessary fixed costs increases. The additional FTE will support evidence and evaluation work, system enhancements, and agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. EPA will continue to provide resource stewardship to ensure that all agency programs operate with fiscal responsibility, management integrity, and efficient financial services are delivered nationwide. The Program will continue maintaining key planning, budgeting, performance measurement, and financial management activities. Additionally, the Program also will implement enhancements to technical training, outreach, and reporting to assistance programs with the goal of reducing the barriers of managing complex federal requirements. The Program will ensure secure operations and maintenance of core agency financial management systems: Compass, PeoplePlus (Time and Attendance), Budget Formulation System, which includes a Performance Module, and related financial reporting systems.

The Agency continues to modernize its financial systems to gain greater efficiencies through leveraging the accounting system, providing accessible tools to manage resources and track agency performance goals. In FY 2025, Robotics Process Automation (RPA) will be incorporated as a part of the overall strategy to reduce manual work and improve efficiency of the Agency's financial management responsibilities. The Program will begin activities for major upgrades to the Agency's financial management system (Compass) based on an alternatives analysis conducted in FY 2024. EPA will continue to expand and enhance easy to use financial dashboards for management and other analysis work. Dashboards are now in place to support payroll and FTE management. The dashboards support GPRMA performance planning and systematic tracking of supplemental funding. The Program will continue to modify systems and data flows to meet Justice40 location reporting needs. This will involve extensive evaluation of systems architecture to streamline and modernize interconnections and to improve system performance for customer experience.

In FY 2025, EPA will continue to standardize and streamline internal business processes. In FY 2023, EPA began processing new interagency agreements within G-invoicing, as per the Treasury guidelines. This improved process and system implementation will continue to evolve over the next few years as more agencies come online and start to do business with the Agency in G-invoicing. EPA will continue to work transferring its entire catalog of interagency agreements to G-invoicing by the end of FY 2025, however, this transfer is dependent on the trading partners' ability to move into G-invoicing. In FY 2024, EPA will prepare to initiate the acquisition process and transition planning for the Agency's Time and Attendance system based on the results of its FY 2023 alternatives analysis.

In the current climate of cybercrime, data hacking and foreign interference, the Program is focused on the Agency's ability to adapt network and data systems to meet increased transparency and

cybersecurity needs. The DATA Act reporting will continue to evolve with more stringent timelines, certification requirements, data standardization, validation checks, as well as additional areas of federal financial spending. The Agency plans to be flexible to adapt to the new transparency requirements and to provide timely and accurate spending information to the public while ensuring appropriate security controls and data governance are in place.

In FY 2025, the Program will continue to support formal evaluations, improve critical data collections and data sharing in priority areas as directed by the Evidence Act. In alignment with the Act, EPA has been steadily building the capacity for this important work, and in FY 2022 the Agency published its first Learning Agenda. The first Learning Agenda helped established the policy framework for the Agency's evaluation program. In FY 2025, the Agency will continue implementing the objectives of the Act. In alignment with the Act, EPA is strategically assessing its capacity to engage in three areas of evidence-building activity – program evaluation, statistics, and continuous improvement. In FY 2023 and 2024, all organizations will report the activities, staff expertise, infrastructure, and resources that they have committed to each evidence-building area, as well as their plans to expand these activities over the next three years. In FY 2025, the results will be used to identify baseline skills and capabilities, offer resources, training, and tools. The results will be used to inform the development of the *FY 2026 – FY 2030 EPA Strategic Plan*, underscoring the Agency's progress in incorporating evidence into core management deliberations and decision-making. The Act requires EPA to develop an evidence-building portfolio to support policy and program implementation decisions by generating evaluation studies to help the Agency improve, advance, or modify existing programs, policies, projects, or operations. In order to build a portfolio of evaluation findings and build staff capacity to oversee and implement evaluations, the Agency is funding evaluations that leverage administrative and other readily available data. Evaluations will be conducted in FY 2024 and will be expanded in FY 2025 to support evaluation studies for decision-making and continuous improvement. In FY 2025, EPA will continue to execute the Agency's Learning Agenda, build evaluation and evidence-building into the planning for new and enhanced programs, enhance strategic and annual planning, collaborate with external evaluation experts, and implement EPA's evaluation policy framework. EPA will invest in evaluation and other evidence-building activities addressing environmental justice (EJ), climate change, community engagement, and diversity, equity, inclusion, and accessibility (DEIA). With a commitment to reversing decades of underinvestment in small, disadvantaged, and Tribal communities that are most impacted by environmental hazards, pollution, and climate change. The Program will offer cooperative agreement awards to help develop tools, strategies, and technical assistance that will build knowledge and skills in the evidence-building process. The cooperative agreement awards will enhance communities' evidence-building capacity to generate high-quality information that supports learning and improvement of outcomes and impacts.

In FY 2025, the Program will continue to focus on core responsibilities in the areas of strategic planning; performance measurement, assessment, and reporting; and enterprise risk management. As the Agency lead in designing and implementing performance measurement and risk management strategies that inform agency decision-making and advance mission results, the Program will focus on driving progress toward the Administrator's priorities by regularly assessing performance results against targets, monitoring and mitigating risks, and adjusting strategies as needed. This includes convening Quarterly Performance Reviews (QPRs) to assess progress; promoting an increased use of data analytics and evidence-based decision-making practices;

286

working collaboratively with agency programs to assess and analyze performance and risk data; and providing technical assistance on agencywide measures of governance to enhance data quality. EPA also will continue to use the performance data evidence to answer fundamental business questions and identify opportunities for service improvements.

During FY 2025, EPA will continue to leverage a management system that uses Lean Management techniques and tools to promote continuous improvement. Lean Management techniques will continue to complement EPA's performance framework to help the Agency meet the requirements of the GPRMA. As of December 2023, EPA has improved more than 1,500 processes and implemented over 11,500 employee ideas. Improvements and innovations have been made in a variety of administrative areas, such as hiring and DEIA improvements.

EPA has made significant strides in recent years to strengthen programs considered susceptible to improper payment. However, the Agency continues to be vigilant in reducing fraud, waste, abuse, and strengthening internal controls over improper payments. In addition, as required by the Payment Integrity Information Act of 2019 (PIIA) (P.L. 116-117)[239] and OMB Memorandum M-21-19 Appendix C,[240] EPA conducts risk assessments of all its payment streams. Other improvements include the recent implementation of upgraded systems used for payments and invoice processing through which the Agency anticipates even fewer payment errors moving forward. To strengthen our processes, the Program is developing risk assessment plans for significant increases or new funding the Agency receives. These risk assessments will outline potential areas that may require additional guidance for tracking and reporting, performance measures, and internal controls to prevent and detect possible improper payment activities.

The Program will continue to conduct internal control program reviews and use the results and recommendations from the Office of Inspector General to provide evidence of the soundness of EPA's financial management program and identify areas for further improvement. Annually, the Agency conducts internal control reviews of multiple programs. The Program will collect key operational statistics for its financial management program to further evaluate its operations and for management decision-making. In FY 2023, EPA enhanced their enterprise risk management and risk assessment processes to help the collection and analysis of the Agency's risks and mitigating controls. In future years, EPA will be enhancing its controls on payments by re-evaluating and adjusting its Payment Integrity operations to allow for a broader reviews of payment transactions.

With increased focused on internal controls, audit management, and enterprise risk assessment, in FY 2025, the Agency will continue to expand the Program's efforts in this area including implementing a new internal control tool. The new tool will allow the Agency to easily crosswalk the anticipated increase in the number of audits for program integrity to the 600+ risks and internal controls. The tool also will help the Agency to better monitor the effectiveness, impact and testing of the internal controls set in place.

---

[239] For more information, please see: https://www.congress.gov/116/plaws/publ117/PLAW-116publ117.pdf.
[240] For more information, please see: https://www.whitehouse.gov/wp-content/uploads/2021/03/M-21-19.pdf.

The Program will continue to support FITARA requirements in accordance with EPA's Implementation Plan.[241] The Chief Information Officer will continue to be engaged throughout the budget planning process to ensure that information technology needs are properly planned and resourced in accordance with FITARA.

**Performance Measure Targets:**

**(PM OP1) Number of operational processes improved.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | 25 | 50 | 72 | 500 | 200 | 200 | 200 | 200 | Operational Processes |
| Actual | N/A | 66 | 502 | 507 | 208 | 236 |  |  |  |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$5,018.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure support for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$6,420.0 / +7.2 FTE) This program change supports implementation of the Evidence Act to continue to support the data, reporting, and evidence-building capacity of EPA grant recipients. In addition, this funding will boost support for EPA's central evaluation function, including evaluation policy implementation activities and EPA's program evaluation capacity. It also will support 3 to 4 comprehensive program evaluations and allow for a higher degree of planning to better prioritize and integrate evidence-building and evidence-based decision-making into agency programs. This investment includes $1.3 million for payroll.

- (+$1,570.0 / +3.4 FTE) This investment supports a new management integrity tool to turn manual data collection and analysis activities into a streamlined, customer-focused and agencywide tool that meets the agencywide analytical needs supporting enterprise risk management, internal control, and audit environments. The FTE will support system configuration, training, on-going administrative functions and expanded agency analysis activities. This investment includes $630.0 thousand for payroll.

- (+$488.0 / +2.5 FTE) This investment supports additional FTE to help the agencywide implementation process of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment provides $463.0 thousand for payroll.

---

[241] For more information, please see: http://www.epa.gov/open/fitara-implementation-plan-and-chief-information-officer-assignment-plan.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98-80, 97 Stat. 485 (codified as Title 5 App.) (EPA's organic statute).

# Facilities Infrastructure and Operations

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$275,614* | *$283,330* | *$308,134* | *$24,804* |
| Science & Technology | $65,328 | $67,500 | $72,906 | $5,406 |
| Building and Facilities | $17,502 | $42,076 | $98,893 | $56,817 |
| Leaking Underground Storage Tanks | $803 | $754 | $729 | -$25 |
| Inland Oil Spill Programs | $692 | $682 | $643 | -$39 |
| Hazardous Substance Superfund | $74,115 | $65,634 | $72,349 | $6,715 |
| Total Budget Authority | $434,054 | $459,976 | $553,654 | $93,678 |
| Total Workyears | 304.7 | 321.8 | 331.1 | 9.3 |

Total work years in FY 2025 include 6.1 FTE to support Facilities Infrastructure and Operations Working Capital Fund (WCF) services.

## Program Project Description:

Environmental Programs and Management (EPM) resources in the Facilities Infrastructure and Operations Program fund the Agency's rent, utilities, and security. The Program also supports centralized administrative activities and support services, including health and safety, environmental compliance and management, facilities maintenance and operations, space planning, sustainability and energy conservation, property management, mail, and transportation services. Funding for such services is allocated among the major appropriations for the Agency.

This program also supports the Agency's Protection Services Detail (PSD) that provides physical protection for the Administrator through security for daily activities and events. The PSD coordinates all personnel and logistical requirements including scheduling, local support, travel arrangements, and the management of special equipment. The Program also provides personnel and support for the Office of Federal Chief Sustainability Officer per Executive Order 14057 *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability,* Section 501.[242][243]

## FY 2025 Activities and Performance Plan:

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

---

[242] For additional information, please refer to: https://www.sustainability.gov/about.html.
[243] For additional information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/08/executive-order-on-catalyzing-clean-energy-industries-and-jobs-through-federal-sustainability/.

In FY 2025, EPA requests an additional $24.8 million and 8.8 FTE in the Facilities Infrastructure and Operations Program to support agencywide climate sustainability and resiliency initiatives, and EPA facilities' operating costs and projects. Investing in the reconfiguration of EPA's workspaces enables the Agency to release office space and avoid long-term rent costs, consistent with the *Federal Assets Sale and Transfer Act*.[244] These resources are essential to help EPA reduce the number of occupied leased facilities, consolidate and optimize space within owned facilities, and reduce square footage. The Agency's space consolidation and energy efficiency efforts result in cost avoidances due to projected rent and utility increases in out-years. For FY 2025, the Agency requests $154.22 million for rent, $5.8 million for utilities, and $23.8 million for security in the EPM appropriation. EPA uses a standard methodology to ensure that rent charging appropriately reflects planned and enacted resources at the appropriation level.

EPA will continue conducting climate resiliency assessments at EPA-owned facilities to identify critical upgrades that are necessary to improve facility resiliency against the impacts of climate change, such as roof stabilization or seawall construction projects. EPA also will continue incorporating natural hazard and climate vulnerability assessments into their real property risk management process. In FY 2025, EPA will conduct climate assessments at the Andrew W. Breidenbach Environmental Research Center, and Center Hill Research Facility in Cincinnati, OH, and the National Vehicle and Fuel Emissions Laboratory in Ann Arbor, MI. As a result of FY 2022 assessments, EPA initiated two high priority projects in FY 2023: a feasibility study to improve the resilience of the causeway leading to the Gulf Ecosystem Measurement and Modeling Division campus in Gulf Breeze, FL, and a solar array feasibility study at the research facility in Narragansett, RI.

Space consolidation and reconfiguration enables EPA to reduce its footprint to create a more efficient, collaborative, and technologically sophisticated workplace. In FY 2025, the Agency will continue to reconfigure EPA's workplaces to ensure the space footprint can accommodate a growing and hybrid workforce.[245] EPA will consider all opportunities for supporting organizational health, in line with OMB Memoranda M-23-15 – *Measuring, Monitoring, and Improving Organizational Health and Organizational Performance in the Context of Evolving Agency Work Environments*. Even if modifications are kept to a minimum, each move requires initial funding to achieve long-term cost avoidance and sustainability goals. These investments support sustainable federal infrastructure and the clean energy goal of net-zero emissions by 2050.

In FY 2025, EPA will implement energy, water, and building infrastructure requirements with emphasis on environmental programs *(e.g.*, Environmental Management Systems, Environmental Compliance Programs, Leadership in Energy and Environmental Design Certification, alternative fuel use, fleet reductions, telematics, and sustainability assessments). This funding will support investments in infrastructure (*e.g.*, architectural and design) and mechanical systems (*e.g.*, Optimized Building Managements Systems for heating and cooling with load demand driven

---

[244] For additional information, please refer to: https://www.congress.gov/bill/114th-congress/house-bill/4465, *Federal Assets Sale and Transfer Act of 2016*.
[245] Work in this program takes direction for climate change and sustainability related initiatives from the following: EO 14008: *Tackling the Climate Crisis at Home and Abroad* (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/) and EO 14057: *Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability* (https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/08/executive-order-on-catalyzing-clean-energy-industries-and-jobs-through-federal-sustainability/).

controls). Further, EPA will direct $4 million to continue transitioning to electric vehicles through direct purchase (mobile lab vehicles) or lease with the General Services Administration (GSA), and to build out the necessary charging infrastructure at EPA facilities. In line with federal sustainability goals, EPA will work to utilize 100 percent carbon pollution-free electricity on a net annual basis by 2030.

EPA also will meet regulatory Occupational Safety and Health Administration (OSHA) obligations determined through audits and assessments and will provide health and safety training to field staff (*e.g.,* inspections, monitoring, and on-scene coordinators). The Agency will continue its partnership with GSA to utilize shared services solutions, *USAccess*, and Enterprise Physical Access Control System (ePACS) programs. *USAccess* provides standardized HSPD-12 approved Personal Identity Verification (PIV) card enrollment and issuance and ePACS provides centralized access control of EPA facilities, including restricted and secure areas.

**Performance Measure Targets:**

**(PM CAA) Number of EPA-owned facility climate adaptation assessments completed.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 2 | 7 | 11 | 14 | Assessments |
| **Actual** |  |  |  |  | 1 | 7 |  |  | |

**(PM CRP) Percentage of priority climate resiliency Projects for EPA-owned facilities initiated within 24 months of a completed facility climate assessment and Project prioritization.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 100 | 100 | 100 | Percent |
| **Actual** |  |  |  |  |  | 100 |  |  | |
| **Numerator** |  |  |  |  |  | 1 |  |  | Projects |
| **Denominator** |  |  |  |  |  | 1 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$2,764.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$10,694.0) This change to fixed and other costs is an increase due to adjustments to rent, utilities, security, and transit subsidy needs.

- (+$5,646.0 / +7.8 FTE) This program change supports implementation of EO 14057: Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability requirements that will require EPA to increase facility resiliency against the impact of climate change and to advance sustainability of EPA operations. EPA will invest in facility climate assessments and Optimized Building Management Systems; EPA facilities projects to

ensure EPA has optimal footprint to support the proposed FTE increase in the FY 2025 Budget request; and EPA's Climate Adaptation Action Plan. This investment includes $1.6 million for payroll.

- (+$4,000.0) This program change supports the continuing implementation of transitioning the Agency's Federal motor vehicle fleet to clean and zero emission vehicles, as well as building out necessary charging infrastructure at EPA facilities.

- (+$1,700.0 / +1.0 FTE) This program change provides the Office of the Chief Sustainability Officer additional FTE and resources necessary to lead implementation of Executive Order 14057.

**Statutory Authority:**

Federal Property and Administration Services Act; Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98-80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

## <u>Financial Assistance Grants / IAG Management</u>

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$28,225* | *$30,188* | *$34,745* | *$4,557* |
| Hazardous Substance Superfund | $4,855 | $4,002 | $4,660 | $658 |
| Total Budget Authority | $33,079 | $34,190 | $39,405 | $5,215 |
| Total Workyears | 145.5 | 156.8 | 184.5 | 27.7 |

**Program Project Description:**

Environmental Program and Management (EPM) resources in the Financial Assistance Grants and Interagency Agreement (IA) Management Program support the management of grants and IAs as well as suspension and debarment activities for assistance and procurement programs. Grants and IAs historically comprise a significant percentage of EPA's annual appropriations. Resources in this program ensure EPA manages grants and IAs to meet the highest fiduciary standards and achieve measurable results for environmental programs and agency priorities, and that the government's financial resources and business interests are protected from fraud and mismanagement.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan.*

In FY 2025, EPA requests an additional $4.6 million and 23.0 FTE for this program. The Agency will continue implementing the FY 2021-2025 Grants Management Plan, focusing on efficient award and management of assistance agreements, enhancing partnerships within the grants management community, promoting environmental justice (EJ), and ensuring effective grant oversight and accountability.

EPA will continue to provide technical assistance and outreach to recipients of federal funding; improve capacity for oversight and tracking of new and increased grant investments; and process financial assistance agreements in a timely manner. EPA will conduct a robust training program for EPA staff and grant applicants and recipients that will focus on:

1) Helping applicants find and apply for competitive and non-competitive grant opportunities.
2) Providing compliance assistance to ensure applicants and recipients are prepared to receive and administer funding from the annual appropriations as well as the Infrastructure Investment and Jobs Act (IIJA), the Inflation Reduction Act (IRA), and Congressionally Directed Spending.

294

3) Ensuring recipients understand and comply with the federal requirements that apply to them and primary recipients.

EPA will use and adapt the grant competition and grant-making processes to promote equity and support for underserved communities. For example, EPA will provide technical assistance to potential grantees from underserved communities on sound financial management practices to reduce barriers to competition for EPA grant resources. EPA also will track grant place of performance to help determine whether underserved communities realize the benefits of EPA grant programs.

EPA also will continue to ensure compliance with the Build America, Buy America Act and policies in its financial assistance programs, consistent with Executive Order 14005 and Office of Management and Budget (OMB) Memorandum M-24-02.[246,247] These efforts include establishing appropriate terms and conditions, developing information to share with recipients, conducting market research and industrial engagement, and, where absolutely necessary, providing limited and targeted waivers consistent with statutory requirements and OMB directive.

In FY 2025, the Agency will continue to make use of discretionary debarments and suspensions as well as statutory disqualifications under the Clean Air Act and Clean Water Act to protect the integrity of federal assistance and procurement programs. Congress and federal courts have long recognized federal agencies' inherent authority and obligation to exclude non-responsible parties from eligibility to receive government contracts and federal assistance awards (*e.g.,* grants, cooperative agreements, loans, and loan guarantees).

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$637.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$3,920.0 / +23.0 FTE) This net program change will support technical assistance and outreach to first time recipients of federal funding; improve capacity for oversight and tracking of new and increased grant investments; and the timely processing of financial assistance agreements. This investment includes $4.2 million for payroll.

---

[246] For more information, please refer to: https://www.federalregister.gov/documents/2021/01/28/2021-02038/ensuring-the-future-is-made-in-all-of-america-by-all-of-americas-workers.
[247] For more information, please refer to: https://www.whitehouse.gov/wp-content/uploads/2023/10/M-24-02-Buy-America-Implementation-Guidance-Update.pdf.

**Statutory Authority:**

Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute); Federal Grant and Cooperative Agreement Act; Federal Acquisition Streamlining Act § 2455.

## Human Resources Management

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$51,882* | *$51,261* | *$68,124* | *$16,863* |
| Hazardous Substance Superfund | $7,382 | $7,419 | $9,303 | $1,884 |
| Total Budget Authority | $59,264 | $58,680 | $77,427 | $18,747 |
| Total Workyears | 210.6 | 254.4 | 328.7 | 74.3 |

Total work years in FY 2025 include 1.5 FTE to support Human Resources Management working capital fund (WCF) services.

**Program Project Description:**

Environmental Programs and Management (EPM) resources for the Human Resources (HR) Management Program support human capital management (HCM) activities throughout EPA. HCM activities include diverse outreach, recruitment, hiring, employee development, performance management, leadership development, strategic planning (including workforce planning, succession management, employee acclimation and experience management), data analysis and labor union engagement. These factors are critical for building, developing, and retaining a diverse and talented workforce at EPA. Additional HCM activities supported by EPM resources include personnel and payroll processing through the Human Resources Line of Business. EPM resources also support overall federal advisory committee management and Chief Human Capital Officer Council activities under applicable statutes and guidance, including the Agency's Human Capital Operating Plan.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $18.75 million and 74.3 FTE across EPM and Superfund resources for the HR Management Program to continue to implement EPA's Diversity, Equity, Inclusion, and Accessibility (DEIA) Strategic Plan, establish a centralized EPA intern program, implement evidence-gathering and application under EPA's Learning Agenda, and strengthen agencywide capacity to hire and onboard staff in a timely and equitable manner. The activities supported by EPA's HR Management Program contribute to effective workforce management and are critical for strengthening the workforce, retaining expertise, and capturing institutional knowledge. EPA continues developing mechanisms to ensure employees have the right skills to successfully achieve the Agency's core mission today and in the future.

EPA is committed to advancing equity, in line with President Biden's Executive Orders (EOs) 13985,[248] 13988,[249] 14020,[250] 14035,[251] and 14075.[252] In FY 2025, in line with EO 14035, EPA requests an additional $7.826 million to implement the actions identified in the DEIA Strategic Plan and to assess whether agency recruitment, hiring, promotion, retention, professional development, performance evaluations, pay and compensation policies, reasonable accommodations access, and training policies and practices are equitable. EPA will undertake an evidence-based and data-driven approach to determine whether, and to what extent, agency practices result in inequitable employment outcomes, and whether agency actions may help to overcome systemic societal and organizational barriers. Further, the Agency's Chief Diversity Officer will oversee the assessment of the status and effects of existing DEIA initiatives or programs and review the institutional resources available to support human resources activities. For areas where evidence is lacking, the Agency will propose opportunities to advance DEIA. EPA will continue to involve employees at all levels of the organization in the assessment of DEIA initiatives and programs.

In FY 2025, EPA will manage and propose an additional $1.36 million investment in its Senior Executive Service Candidate Development Program. The Program will focus on incorporating DEIA strategies to ensure future executives reflect the diversity of the American population and possess the skills necessary to lead a diverse and talented workforce operating in a hybrid work environment. The Agency will continue to implement a centralized paid internship program and with the additional funds requested, will expand on existing internship opportunities across the Agency to strengthen talent and workforce acquisition. This paid internship program focuses on expanding federal work experience opportunities for underrepresented and underserved populations which may have experienced barriers to applying or fully participating in existing opportunities. EPA's program will provide a total of approximately 180 four-month internship opportunities across EPA Programs and Regional Offices. Additionally, EPA will implement a plan to convert eligible interns to permanent federal service based on performance and completing program requirements.

EPA has increased efforts to improve DEIA with virtual outreach events targeting diverse networks such as veterans, persons with disabilities, Returned Peace Corps Volunteers, and Historically Black Colleges and Universities and other Minority Serving Institutions. To recruit EPA's next generation of employees, EPA will continue outreach to new potential sources for future employees and use all available hiring authorities including Schedule A and recruitment incentives. In FY 2025, EPA will continue to work with Science, Technology, Engineering, and Mathematics-focused institutions and organizations such as the Society of Hispanic Professional Engineers and National Society of Black Engineers. EPA also will participate in the President's Management Council Interagency Rotational Program to create leadership development

---

[248] For additional information, please refer to: https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government.

[249] For additional information, please refer to: https://www.federalregister.gov/documents/2021/01/25/2021-01761/preventing-and-combating-discrimination-on-the-basis-of-gender-identity-or-sexual-orientation.

[250] For additional information, please refer to: https://www.federalregister.gov/documents/2021/03/11/2021-05183/establishment-of-the-white-house-gender-policy-council.

[251] For additional information, please refer to: https://www.federalregister.gov/documents/2021/06/30/2021-14127/diversity-equity-inclusion-and-accessibility-in-the-federal-workforce.

[252] For additional information, please refer to: https://www.federalregister.gov/documents/2022/06/21/2022-13391/advancing-equality-for-lesbian-gay-bisexual-transgender-queer-and-intersex-individuals.

assignments for GS 13-15 level employees. EPA will continue to review applicant flow diversity data every quarter to assess progress and identify areas for improvement.

In FY 2025, in line with OMB Memoranda M-23-15 - *Measuring, Monitoring, and Improving Organizational Health and Organizational Performance in the Context of Evolving Agency Work Environments*,[253] EPA will continue to implement, and update as necessary, its Work Environment Plan in a manner that emphasizes meaningful in-person work and advances organizational health and performance. EPA will continue to assess and implement any necessary investments in information technology and real property necessary to implement its Work Environment Plan. EPA also will continue to support front-line supervisor training for managing individuals and teams working in hybrid environments and effectively delivering results to customers and stakeholders. EPA will continue to support a data-driven culture which routinely uses performance measures for measuring, monitoring, and improving organizational health and organizational performance.

The Agency will continue to build Talent Teams to effectively expand recruitment and hiring to meet critical agency skill needs, as well as continue to leverage childcare subsidies to support retention. EPA also will continue to support and invest in evidence-building activities to carry out a workforce strategy guided by data-driven decisions as part of its implementation of the Evidence Act through the Workforce Planning learning priority area in EPA's Learning Agenda. This work also addresses implementing OMB's Statistical Policy No. 15, Standards for the Classification of Federal Data on Race and Ethnicity. This work includes determining Mission Critical Competencies, enhancement of EPA's competency assessment tool, conducting a skills gap analysis across the Agency, and implementing knowledge transfer strategies to support Succession Management.

In FY 2025, EPA will continue to operate and maintain the Talent Enterprise Diagnostic (TED) tool to allow EPA to make data-driven, strategic workforce decisions. TED data will serve a crucial role in EPA's Workforce Planning and Succession Management activities by identifying potential competency gaps across the Agency and by increasing management's understanding of where needed skill sets should reside within EPA. Additionally, EPA will continue to maintain and operate dashboards related to Mission Critical Occupations, Workforce Demographics, and Diversity. These dashboards provide data visualizations and easy-to-understand information about the current workforce, assisting EPA with Succession Management by identifying workforce gaps due to anticipated retirements and attrition trends. This is critical considering approximately 22 percent of EPA's workforce is retirement eligible and another 15 percent of the current workforce will become retirement eligible over the next five years.

The Agency will continue to implement Executive Order 14003, *Protecting the Federal Workforce*,[254] issued on January 22, 2021. EPA reviewed its unions' agreements to identify and eliminate provisions influenced by four revoked executive orders and will increase the focus on pre-decisional involvement and interest-based bargaining. In FY 2025, EPA will continue working to reset and repair relationships and involve unions in a collaborative way, promoting the Agency's

---

[253] For additional information, please see: https://www.whitehouse.gov/wp-content/uploads/2023/04/M-23-15.pdf.
[254] For additional information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/22/executive-order-protecting-the-federal-workforce/.

and the unions' shared goal of the positive and equitable treatment of newly empowered employees.

Finally, EPA's advisory committees have proven effective in building consensus among the Agency's diverse external partners and stakeholders. In line with President Biden's *Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking,*[255] EPA remains committed to ensuring highly qualified external experts serve on agency committees and members and future nominees of EPA advisory committees reflect the diversity of America in terms of gender, race, ethnicity, geography, and other characteristics.

**Performance Measure Targets:**

**(PM DEIA) Diversity, Equity, Inclusivity, and Accessibility (DEIA) actions completed toward Maturity Level "Leading and Sustaining" achieved.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  |  | 2 | 4 | 6 | Actions |
| **Actual** |  |  |  |  |  | 2 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$2,877.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, changes to benefits costs, and changes to workers compensation and childcare.

- (+$3,104.0 / +45.0 FTE) This program change is an increase to continue to develop and diversify its new paid internship program to strengthen talent and workforce acquisition and focus on expanding federal work experience opportunities for underrepresented and underserved populations. This investment includes $2.6 million for payroll.

- (+$7,257.0 / +5.0 FTE) This program change is an increase to support the implementation of Executive Order 14035 – Diversity, Equity, Inclusion, and Accessibility (DEIA) in the Federal Workforce, carry out the actions identified in EPA's DEIA Strategic Plan, and assess whether agency recruitment, hiring, promotion, retention, professional development, performance evaluations, pay and compensation policies, reasonable accommodations access, and training policies and practices are equitable. This investment includes $812.0 thousand for payroll.

- (+$1,629.0 / +8.5 FTE) This program change strengthens agencywide capacity to quickly increase staff levels in key offices and programs (*i.e.*, environmental justice, climate, infrastructure programs, etc.). This investment includes $1.4 million for payroll.

---

[255] For additional information, please see: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/.

- (+$1,000.0) This program change is an increase to support the continuation of the Senior Executive Service Candidate Development Program with a goal that EPA senior leaders reflect the diversity of the American people and will include a special focus on developing diversity, equity, accessibility, and inclusivity competencies.

- (+$996.0 / +5.2 FTE) This program change is an increase in support of the Foundations for Evidence-Based Policymaking Act of 2018. Resources will be used for Learning Agenda's evidence-gathering activities. This investment includes $844.0 thousand for payroll.

**Statutory Authority:**

Title 5 of the U.S.C.; Reorganization Plan No. 3 of 1970, 84 Stat. 2086, as amended by Pub. L. 98–80, 97 Stat. 485 (codified at Title 5, App.) (EPA's organic statute).

**Regional Science and Technology**

Program Area: Operations and Administration
Cross-Agency Mission and Science Support

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$1,879* | *$1,554* | *$7,287* | *$5,733* |
| Total Budget Authority | $1,879 | $1,554 | $7,287 | $5,733 |
| Total Workyears | 0.3 | 1.7 | 16.7 | 15.0 |

**Program Project Description:**

EPA's Regional Science and Technology (RS&T) Program provides direct regional support to multiple Agency programs including implementing the Resource Conservation and Recovery Act (RCRA); Toxic Substances Control Act (TSCA); Clean Water Act (CWA); Safe Drinking Water Act (SDWA); Clean Air Act (CAA); and Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The RS&T Program supports the Agency's strategic goals by performing laboratory analysis, and mobile laboratory services to provide credible scientific data on environmental pollutants and conditions for agency decision-makers. The RS&T Program also assists state environmental agencies by providing specialized technical assistance including assistance to vulnerable and highly exposed communities. Additionally, the Program assists tribal communities to help build tribal capacity for environmental monitoring and assessment.

The RS&T Program provides essential expertise and scientific data for a wide array of environmental media, including ambient air; surface, drinking, and groundwater; soil and sediment; solid and hazardous waste; and biological tissue. This work focuses on the immediate scientific information needed to make short-term local decisions. A strategic strength of the regional laboratories is their ability to respond to events requiring surge capacity. In the event of an emergency or project impacting a large area, regional laboratories work together to leverage the strengths and capacities of individual lab facilities and deploy mobile laboratory services where needed.

Extreme weather events often disproportionally affect vulnerable and highly exposed populations including fence line communities most closely adjacent to chemical facilities. As extreme weather events and related wildfires, flooding, and service interruptions increase in frequency due to climate change, the public expectation for a rapid and effective response will continue to grow over time. These events often require assistance from EPA's regional labs for quick turnaround sample analyses as well as technical support. When extreme weather events occur, local area laboratories can become overwhelmed. Each year, in response to natural and/or man-made disasters across the county, the regions mobilize to provide critical support of urgent analytical results to assist communities whose drinking water is threatened, air quality is impacted, or properties are inundated. Regional laboratories have a strong record of backing up each other during incidents when there is a high demand for services, such as 2021's Winter Storm Uri, where

302

Regions 4 and 7 assisted Region 6. Regional laboratories continue to stand ready to assist each other during increasing wildfire events and other natural disasters.

The RS&T Program provides support for areas such as environmental biology, microbiology, chemistry, field sampling, enforcement and criminal investigations, and quality assurance, as well as support for special or non-routine analytical requests that EPA cannot readily obtain from other sources within required timeframes. Funding for up-to-date scientific equipment and related IT security investments under this program is essential for maintaining high-level capabilities in EPA regional laboratories. New and improved technology strengthens science-based decision-making for regulatory efforts, environmental assessment of contaminants, and the development of critical and timely environmental data in response to accidents and natural or man-made disasters. As technology improves, the sensitivity of equipment advances to detect lower levels of contaminants. Newer, more advanced instrumentation improves environmental data collection, allows tight turn-around-time frames to be met with more reliable equipment, and enhances laboratory analytical capability for clients' needs.

**FY 2025 Activities and Performance Plan:**

Work in this program provides Cross-Agency Mission and Science Support and is allocated across strategic goals and objectives in the *FY 2022-2026 EPA Strategic Plan*.

In FY 2025, resources will continue to support regional implementation of the Agency's statutory mandates through fixed and mobile laboratory operations for environmental sampling, monitoring, and enforcement compliance support. Resources improve timely decision-making in regional program management and implementation of regulatory work across all media and enable the Agency to address environmental issues specific to geographic areas (*e.g.*, energy extraction, mining, wood treating operations, specialty manufacturing), natural disasters and extreme climate events such as flooding, drought and wildfires, and homeland security threats.

In FY 2025, regional laboratories will continue to coordinate within the Regional Laboratory Network (RLN) to provide needed expert analytical services. The regional laboratories have the capability to analyze a full suite of contaminants using an array of established methods, including regulatory or guidance methods such as the RCRA, CWA, and SDWA methods. Laboratories also utilize new methods and adapt methods based on immediate needs or circumstances. These efforts help support the underserved communities that benefit from response times for both routine and enforcement sample analyses related to contaminated sites in urban areas where legacy contamination persists. As the Agency implements an ambitious agenda on climate change, Environmental Justice, aging infrastructure, and emerging contaminants, the need for sound analytical capabilities and capacity increases. Additional state-of-the-science instrumentation is necessary to address these complex and interconnected challenges.

The RLN is experiencing an expansion of demands due to climate change, novel chemical threats, and increased impacts on our vulnerable populations. The RLN must adapt to these changes and be equipped to analyze emerging contaminants often at lower levels of detection. The FY 2025 investment will help the RLN adapt to these changing needs and provide necessary expertise and services to our partners (*e.g.*, other agency offices, states, and tribal communities).

In FY 2025, the regional laboratories will continue to work toward the replacement and upgrading of aging analytical equipment and the modernization of associated critical IT infrastructure. This will support the risk identification and assessment associated with pesticides, organic chemicals, and other high-risk chemicals. The Agency's mission to protect human health and the environment often requires the availability of scientific data at lower detection levels, which requires specialized equipment. Almost all scientific instrumentation is computer-controlled or interfaced. As computer technology improves, instrument efficiencies and sensitivity also improve – these advances in technology leading to lower detection levels of contaminants are essential for some compounds where health-based risk levels are decreasing (*e.g.*, hexavalent chromium and per- and polyfluoroalkyl [PFAS] chemicals). When measuring these compounds, the instrument detection levels need to be as low as technically feasible, requiring laboratories to modify an existing method, modify existing equipment, or purchase newer instrumentation.

**Performance Measure Targets**:

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$83.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$5,650.0 / +15.0 FTE) This new investment will be used to replace and upgrade aging analytical equipment, modernize associated critical IT infrastructure, and provide additional staff necessary to meet increasing demands for immediate scientific information needed to make short-term local decisions. This investment includes $2.627 million in payroll.

**Statutory Authorities:**

Resource Conservation and Recovery Act (RCRA); Toxic Substances Control Act (TSCA); Clean Water Act (CWA); Safe Drinking Water Act (SDWA); Clean Air Act (CAA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); Pollution Prevention Act (PPA); Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)

**Pesticides Licensing**

## Pesticides: Protect Human Health from Pesticide Risk

Program Area: Pesticides Licensing
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$59,740* | *$62,125* | *$66,281* | *$4,156* |
| Science & Technology | $3,034 | $2,894 | $5,902 | $3,008 |
| Total Budget Authority | $62,774 | $65,019 | $72,183 | $7,164 |
| Total Workyears | 398.6 | 385.6 | 385.6 | 0.0 |

**Program Project Description:**

Under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)[256] and the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended by the Food Quality Protection Act of 1996 (FQPA) and the Pesticide Registration Improvement Act of 2022 (PRIA 5),[257] EPA is charged with protecting people from the health risks that pesticide use can pose. FIFRA requires EPA to register pesticide products before they are marketed for use in the U.S. Registration is based on the review of scientific data sufficient to demonstrate that the product can perform its intended function without unreasonable adverse effects on people or the environment. This program emphasizes the use of reduced risk methods of pest control, including the use of reduced risk pesticides and helping growers and other pesticide users learn about new, safer products and methods of using pesticides.

Under FFDCA, if a pesticide is to be used in a manner that may result in pesticide residues in food or animal feed, EPA must establish a tolerance, or maximum legal residue level, or an exemption from the requirement of a tolerance before it can be registered. To establish a tolerance, EPA must find that the residues are "safe," which, under FFDCA, means that there is a reasonable certainty of no harm to human health from aggregate exposure to the pesticide residue in food and from all other exposure except occupational exposure.[258] EPA must periodically review the registration and tolerances that the Agency issues to ensure that public health is adequately protected.

---

[256] For additional information on FIFRA, please visit: https://www.epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act.

[257] On December 29, 2022, Pesticide Registration Improvement Extension Act of 2022 (PRIA 5) was signed into law, which reauthorizes PRIA for 5 years through fiscal year 2027 and updates the fee collection provisions of the Federal Insecticide, Fungicide, and Rodenticide Act.

[258] Additional information related to pesticide registration, the setting of tolerance levels, and the pesticide risk assessment process can be found at the following location: https://www.epa.gov/pesticide-tolerances/setting-tolerances-pesticide-residues-foods.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan.*

Pesticide Review and Registration
In FY 2025, EPA will continue to review and register new pesticides, new uses for existing pesticides, and other registration requests in accordance with statutory requirements, making sure exposure to infants and children is reflected in the human health risk assessments supporting these regulatory determinations. Many assessments also address potential exposure to pregnant women. In addition, the Agency will evaluate pesticides that are already in the market against current scientific standards for human health. To advance EPA's work supporting environmental justice (EJ) and children's health, EPA also will evaluate these registration requests with special consideration for impacts on members of overburdened communities and sensitive life stages, especially infants and children. Under the FQPA, EPA is statutorily required to ensure that its regulatory decisions are protective of children's health and other vulnerable subpopulations. EPA also will continue to emphasize the registration of reduced risk pesticides, including biopesticides, to provide farmers and other pesticide users with new, safer alternatives. The Agency, in collaboration with the U.S. Department of Agriculture (USDA), also will work to ensure that minor use registrations receive appropriate support and that needs are met for reduced risk pesticides for minor use crops. EPA also will assist farmers and other pesticide users in learning about new, safer products and methods of using existing products through workshops, demonstrations, small grants, and materials on the website and in print.

In FY 2025, EPA will continue to review the registrations of existing pesticides with a focus on assessing and ensuring that pesticides are used safely, without unreasonable adverse effects to human health and the environment. The goal of the registration review process, as mandated by statute, is to review pesticide registrations every 15 years to determine whether they continue to meet the FIFRA standard for registration.[259] With the reauthorization of PRIA 5 on December 29, 2022, the deadline to complete the initial registration review of each pesticide or pesticide case was extended four years to October 1, 2026, and EPA will continue working on registration review cases in FY 2025. For pesticides registered before October 1, 2007, EPA is required to make registration review decisions by October 1, 2026. EPA will focus its FY 2025 resources on completing decisions for cases with the FY 2026 statutory deadline and on cases with 15-year due dates in FY 2025 and beyond. Regarding the 789 registration review cases due by October 1, 2026, through FY 2023 Q4, there were 717 cases for which draft risk assessments were completed or not needed, and 614 final or interim decisions completed, with 72 draft risk assessments and 175 final or interim decisions remaining to be completed to meet the FY 2026 statutory deadline.

As EPA approaches the October 1, 2026 deadline, many of the remaining cases involve highly complex scientific and regulatory issues, which have resulted in requests from stakeholders to extend the comment periods for proposed decisions, lengthening the amount of time needed to complete the necessary reviews. In addition, EPA continues to await data and/or registrant input critical to finalizing several registration review decisions. Further ongoing challenges in

---

[259] For additional information please visit the EPA Pesticide Registration Internet site: https://www.epa.gov/pesticide-registration.

completing actions that are due in October 2026 and beyond include: delayed registrant submittal of additional data, the need for inter- and intra-agency coordination, and resource constraints.

In FY 2025, EPA will continue the transformation of the pesticide programs information technology systems. Expanding the capabilities of the existing systems will reduce paperwork burden and maximize efficiency, in accordance with the President's Management Agenda (PMA), by converting paper-based processes into electronic processes and corresponding workflows for the Pesticide Program's regulated entities. In addition, these enhancements will create an iterative/inclusive, streamlined electronic workflow to support pesticide product registration, chemical reviews, and assessments, and will be used as a centralized data repository to electronically store associated data as they relate to regulatory decisions and scientific information. Overall, the Agency projects that these efforts will improve over 150 existing business process workflows supporting the implementation of PRIA. This digital transformation will consolidate over 30 different custom-built systems into a single platform to track registration or re-registration of a chemical from the moment EPA receives a case to the final regulatory decision. Being able to track all reviews in a single system will eliminate the need for hundreds of spreadsheets or Access databases that are currently used to track work at a team, branch, divisional, or office level. This transformation focuses on improving both the employee's experience and the customer experience.

Reducing Pesticide Risks to People through the Registration of Lower Risk Pesticides

In FY 2025, EPA will continue to promote reduced-risk pesticides by giving registration priority to pesticides that have lower toxicity to humans and non-target organisms such as birds, fish, and plants; low potential for contaminating groundwater; lower use rates; low pest resistance potential; and compatibility with Integrated Pest Management (IPM).[260] Several other countries and international organizations also have instituted programs to facilitate registering reduced-risk pesticides. EPA works with the international scientific community and the Organization for Economic Cooperation and Development (OECD) member countries to register new reduced-risk pesticides and to establish related tolerances (maximum residue limits). Through these efforts, EPA will help reduce risks to Americans from foods imported from other countries.  In FY 2025, EPA will continue to assist pesticide users in learning about new, safer products as well as safer methods for using existing products. Through its Center for IPM, educational webinars, science-based publications, informational social media outreach, and collaborations with federal partners, states, commodity and other non-governmental organizations, the Agency also will encourage the use of IPM tools, biological pesticides, and biotechnology where they present lower-risk solutions to pest problems.

Protecting Workers from On-the-Job Pesticide Risks

Millions of America's workers are exposed to pesticides in occupations such as agriculture, lawn care, food preparation, and landscape maintenance. A very large proportion of these workers are members of communities with EJ concerns. EPA's work in this area will be guided by Executive Order (EO) 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* and, where regulatory action is taken, by the Agency's *Guidance on*

---

[260]For more information, please see: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/overview-risk-assessment-pesticide-program. Please also see EPA's IPM website: https://www.epa.gov/safepestcontrol/integrated-pest-management-ipm-principles#for_more-information.

*Considering Environmental Justice During the Development of an Action*[261] and its companion *Technical Guidance for Assessing Environmental Justice in Regulatory Analysis*.[262] Protecting pesticide applicators, handlers and agricultural workers from potential effects of pesticides is an important role of the Pesticide Program. Pesticide handlers in a number of sectors may be exposed to pesticides when they prepare pesticides for use, such as by mixing a concentrate with water or loading and applying the pesticide. In FY 2025, EPA will continue to support the implementation of the Agricultural Worker Protection Standard (WPS)[263] and the Certification of Pesticide Applicators (CPA)[264] rule through regulation development, guidance development, education and outreach, and grant programs. Efforts to implement the WPS include addressing EJ issues in rural communities, especially by considering farmworkers and their families. In FY 2025, following the anticipated FY 2024 publication of a final rule for the WPS's Application Exclusion Zone provisions, EPA plans to develop and issue guidance and conduct outreach to support its implementation. Programs include a subaward program that supports community-based projects for the development of pesticide educational resources and training targeted toward agricultural workers and pesticide handlers. Efforts include addressing the education needs of the target audience to ensure trainings are effective and in the appropriate cultural context. PRIA 5 amended FIFRA to require farmworker training and health care provider training grant programs. In FY 2025, EPA will manage these grants to further support the implementation of the WPS, protect farmworkers from pesticide exposure, and to support healthcare providers in the recognition and management of pesticide-related illnesses. The health care provider training grant program will focus on training health care providers serving the migrant and seasonal farmworker community, aiming to improve the treatment of agricultural workers and rural communities potentially exposed to pesticides. Support also will include efforts to improve reporting of occupation-related pesticide incidents. In addition, EPA will continue to support the development of resources, training, and educational forums for applicators, including the ongoing development of a virtual pesticide training for certification of private applicators in Indian Country covered under the EPA-administered plan to meet the requirements of using restricted use pesticides in agriculture.

Implementation of the CPA rule also includes continued support of state Pesticide Safety Education Programs, which play a crucial role in training and certifying pesticide handlers in proper pesticide use, thereby enabling the handlers to protect themselves and other workers, as well as the public and the environment. Certification plans were amended to comply with the 2017 revisions to the CPA rule and were to be approved by early FY 2024. In FY 2025, EPA will continue to focus on implementation of amended state, tribal, and federal certification programs based on the 2017 CPA rule. EPA will support that effort by providing technical assistance for updates to state/tribal applicator training materials including manuals, exams, and other recertification materials to meet the CPA rule requirements.

PRIA 5 also amended FIFRA to require bilingual labeling on end use pesticide products for those parts of the label where translation exists in EPA's Spanish Translation Guide and provides a

---

[261] For more information, please see: https://www.epa.gov/environmentaljustice/guidance-considering-environmental-justice-during-development-action.

[262] For more information, please see: https://www.epa.gov/environmentaljustice/technical-guidance-assessing-environmental-justice-regulatory-analysis.

[263] For more information, please see: https://www.epa.gov/pesticide-worker-safety/agricultural-worker-protection-standard-wps.

[264] For additional information, please visit: https://www.epa.gov/pesticide-worker-safety/revised-certification-standards-pesticide-applicators.

schedule for incremental implementation by registrants based on pesticide type and acute toxicity categories. EPA is directed to work with states on implementation and with stakeholders on ways to make these labels accessible to farmworkers, and to develop a plan to track adoption of the bilingual labeling. In FY 2025 EPA will continue the implementation of these bilingual labeling requirements.

Public Health Antimicrobials and Pandemic Preparedness

In FY 2025, the Pesticide Program will continue to update and modernize EPA's registered disinfectant lists. There are currently 16 disinfectant lists, lists A-Q, with different target public health microorganisms. The most viewed list, List N, contains disinfectants that are effective against SARS-CoV-2. The newest list, list Q, includes products that are effective against emerging viral pathogens including mpox (formerly monkeypox). Upcoming priorities include the announcement of enhanced search and sort functions for each of the disinfectant lists to improve usability and the creation of a new bloodborne pathogens list which will consolidate several existing lists into one comprehensive resource. OCSPP also is co-leading a PPDC (Pesticide Program Dialogue Committee) Emerging Pathogens Implementation Committee to develop implementation strategies for stakeholder recommendations and revisions/proposed additions to EPA's Emerging Viral Pathogen's guidance. In FY 2025, EPA expects to continue implementing recommendations from the Workgroup including but not limited to education through webinars and conferences on proper and effective antimicrobial pesticide use for different stakeholder groups (*e.g.*, schools, food service, hospitality, etc.)

In FY 2025, the Pesticide Program also is working on policy and method updates that will expand the range of public health antimicrobial products available. We anticipate finalization of minimum testing criteria to support chemical air treatment claims for unoccupied spaces and posting for comment testing criteria for occupied spaces. There are very few registered antimicrobial products intended to treat the air, an important route of transmission from public health pathogens. In addition, the Pesticide Program anticipates finalization of a policy to expand virucidal claims to sanitizer products which were previously not eligible to have these claims. Currently, revisions to the policy are being considered after the public comment period.

General Pesticide Outreach and Education

In FY 2025, the Pesticide Program will continue environmental education and training efforts for growers, pesticide applicators, and workers, as well as the public in general. Giving priority to reduced risk and Integrated Pest Management (IPM) friendly pesticides are two steps toward protecting human health. Also, the Pesticide Safety Education Program provides education through training and is a key component to the implementation of applicator certification programs across the nation, including on tribal lands and along the US-Mexico border, and helps ensure pesticides are used in a manner to protect human health and the environment. In addition, EPA will continue to make information easily accessible to the public and pesticide users, update safety information on pesticides, support the National Pesticide Information Center[265] that provides a bilingual hotline for pesticide information and develop outreach materials for the public and incident reporting.

---

[265] For additional information, please visit: http://npic.orst.edu/.

Tribal Pesticide Program Council (TPPC)

The Pesticide Program also will continue to manage the Tribal Pesticide Program Council (TPPC) cooperative agreement. This national partnership group was formed in 1999 as a forum for tribes and Alaska Native Villages to work with EPA to address pesticide issues and concerns. The TPPC also provides a forum for tribes and Alaska Native Villages to provide input in developing policies that would strengthen their pesticide programs, provide guidance for tribes that do not have such programs, and provide networking opportunities and support for tribal pesticide regulators. In FY 2025, EPA will continue to work with the TPPC to identify concerns related to EJ and climate change that EPA can begin to address.

Reducing Animal Testing

In FY 2025, the Agency will continue to use its guiding principles on data needs[266] to ensure that it has sufficient information to support strong regulatory decisions to protect human health, while reducing and, in some cases, eliminating unnecessary animal testing. EPA's Hazard and Science Policy Council (HASPOC) plays an important role in the implementation of the vision of the 2007 National Academy of Sciences (NAS) report on toxicity testing in the 21st Century—which recommended moving toward smarter testing strategies by waiving human health toxicity studies that do not provide useful information. Since its inception, HASPOC has waived hundreds of studies resulting in the saving of tens of thousands of animals and tens of millions of dollars without compromising the integrity of the science supporting EPA's regulatory decision-making for pesticides. In addition, the Agency will continue to develop and implement 21st Century toxicology and exposure methods, including additional retrospective analysis of the reproductive avian study, and the use of computer-modeling and in vitro testing techniques for acute oral toxicity, skin and eye irritation, and inhalation toxicity. All of these activities advance more efficient and effective human health risk assessments that support sound, risk-based, regulatory decision-making.

Performance Measurement

EPA will be tracking metrics related to pesticide safety training of farmworkers funded through a cooperative grant for the *National Farmworker Training Program* that runs through March 2026; metric details will be provided by the grantee and will capture the number of farmworkers trained and knowledge comprehension based on pre- and post-training assessment.

**Performance Measures Targets:**

**(PM WPS1a) Number of farmworkers receiving EPA-supported WPS pesticide safety training.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 20,000 | 12,000 | 13,000 | 13,000 | Farmworkers |
| Actual |  |  |  |  | 12,716 | 15,155 |  |  |  |

---

[266] Additional information on reducing animal testing may be found at: https://www.epa.gov/pesticides/new-epa-guidance-testing-pesticides-will-reduce-animal-testing.

**(PM WPS1b) Percentage of pesticide safety content knowledge demonstrated by farmworker/trainees upon completion of EPA-supported WPS pesticide training.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 95 | 95 | 95 | 95 | Percent |
| Actual | | | | | 96 | 97 | | | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$706.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0. requirements.

- (+$3,450.0) This program change is an increase of resources for the modernization of the pesticides incident database where the regulated community reports human health and ecological incidents related to misuse of, or an unexpected adverse event related to pesticide usage. EPA plans to make this data more accessible to the Public which requires a rebuild of the database to safeguard Personally Identifiable Information (PII) and other sensitive information.

**Statutory Authority:**

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); Federal Food, Drug, and Cosmetic Act (FFDCA) § 408.

## Pesticides: Protect the Environment from Pesticide Risk

Program Area: Pesticides Licensing
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$45,217* | *$48,704* | *$75,963* | *$27,259* |
| Science & Technology | $2,468 | $2,334 | $4,239 | $1,905 |
| Total Budget Authority | $47,685 | $51,038 | $80,202 | $29,164 |
| Total Workyears | 299.4 | 259.6 | 282.1 | 22.5 |

**Program Project Description:**

The goal of this program, authorized under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), as amended by the Food Quality Protection Act of 1996 (FQPA) and the Pesticide Registration Improvement Act of 2022 (PRIA 5), is to protect the environment from the potential risks posed by pesticide use. To achieve this goal, EPA must conduct risk assessments before the initial registration of each pesticide for each use, as well as re-evaluate each pesticide at least every 15 years, as required by FQPA. This periodic review is accomplished through EPA's Pesticide Registration Review Program.[267] In addition to FIFRA responsibilities, the Agency has distinct obligations under the Endangered Species Act (ESA),[268] which include ensuring that pesticide regulatory decisions will not destroy or adversely modify designated critical habitat or jeopardize the continued existence of species listed as threatened or endangered by the U.S. Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS) (jointly, "the Services"). Most EPA pesticide decisions do not comply with the ESA, creating significant legal vulnerability for the Agency and frustration uncertainty about the continued availability of pesticides among stakeholders. For these reasons, complying with the ESA is one of the pesticide program's top priorities.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan*.

Protection of Endangered Species

EPA is responsible for complying with the Endangered Species Act (ESA) and for ensuring that federally endangered and threatened species are not harmed from exposure when it registers pesticides. This presents a great challenge given that there are approximately 1,200 active

---

[267] FIFRA requires EPA to register a pesticide if, among other things, the product "will also not generally cause unreasonable adverse effects on the environment" when used in accordance with labeling and common practices.
[268] For additional information, please visit: https://www.epa.gov/endangered-species.

ingredients in more than 17,000 pesticide products—many of which have multiple uses. Endangered species risk assessments are extraordinarily complex, national in scope, and involve comprehensive evaluations that consider risks to over 1,600 listed endangered species and 800 designated critical habitats in the U.S. with diverse biological attributes, habitat requirements, and geographic ranges.

Given the complexity of evaluating potential effects to diverse listed species under ESA, EPA has been subject to numerous successful litigation challenges to registration and registration review actions. This litigation has impacted EPA's ability to carry out its mission of protecting human health and the environment, including most recently in December 2023 where the court vacated EPA's registration of a new use for a currently registered chemical because the Agency did not meet its ESA obligations. In April 2022, EPA released its first-ever comprehensive workplan describing priorities for coming into full compliance with ESA across the many types of pesticide actions it completes each year. In the near term and given its existing resources, EPA prioritized meeting its ESA obligations for all conventional new active ingredient applications whereby all new active ingredient registrations will only be registered under conditions that comply with ESA. EPA also continued to prioritize ESA determinations in response to litigation commitments and court decisions. The increase that EPA received in the FY 2023 enacted budget serves as initial funding, which supports a portion of EPA's near-term work in meeting these specific workplan and court-ordered commitments.

In November 2022, EPA released a Workplan Update describing how it will incorporate additional mitigations for listed and non-listed species into registration review processes. The update also describes additional initiatives to expedite progress on some of our ESA goals. In particular, the update describes multiple programmatic approaches that the Agency is currently developing and will continue to be conducted and/or implemented in FY 2025 and beyond such as (1) developing mitigations for listed species that are particularly vulnerable to pesticides and applying them across pesticides (vulnerable species pilot), and (2) grouping pesticides such as herbicides for ESA analyses and early mitigations; and developing region-specific strategies such as for Hawai'i.

In FY 2023 and early FY 2024, EPA made significant progress towards developing more efficient, programmatic approaches. EPA released for public comment a draft: 1) vulnerable species pilot white paper which proposes mitigations for 27 species that EPA identified as being particularly vulnerable to pesticide exposure; 2) herbicide strategy that describes a framework to reduce pesticide exposure to listed plants and listed species that depend on plants; and 3) rodenticide (pesticides that target pest rodents such as rats and mice) strategy that identifies mitigations to reduce exposure to listed species with direct consumption or secondary consumption (consumption of poisoned prey) of rodenticides. The goal of the proposed mitigations in the vulnerable species pilot and strategies is to minimize exposure to listed species and their designated critical habitat, and thereby reduce potential population-level effects to listed species. In FY 2024 and 2025, after considering public comments, EPA plans to finalize all three of these efforts. EPA also is developing and plans to finalize a Strategy for the approximately 40 percent of the U.S. listed species that occur in Hawai'i. In FY 2025, EPA will be in the early stages of applying these frameworks to future pesticide registration and registration review decisions using existing mechanisms it already uses to register and re-register pesticides. The Agency also will continue to conduct outreach and develop and disseminate training materials to promote awareness and

compliance with these new ESA efforts. EPA also will continue to develop and expand on these programmatic approaches, which will ultimately reduce the Program's workload for future ESA environmental assessments and identification of mitigations for listed species for pesticide registration and registration review actions.[269] EPA has already begun developing a strategy for insecticides that will describe a framework to reduce pesticide exposure to listed insects (and resulting impacts to species that rely on insects as prey or for pollination services) which EPA plans to draft and release for public comment in FY 2024, and finalize and begin applying in FY 2025. EPA also continues to meet its court obligations for producing biological evaluations for specific pesticides. In FY 2025, along with the rodenticide strategy, EPA has committed to finalizing effects determinations for listed species as documented in biological evaluations for 11 rodenticide active ingredients. In addition to these efforts, EPA also has committed to drafting two additional draft and final biological evaluations in FY 2025.

In FY 2025, EPA requests an additional $27 million and 20 FTE for the Pesticide Program in order to continue to support EPA's priority ESA commitments and increase the extent to which EPA can integrate ESA mandates into the pesticide registration processes as described in the Workplan and Update. As described above, these resources will enable EPA to make additional progress towards complying with the ESA for more pesticide registrations and registration review decisions. This includes resources to ensure EPA can implement the mitigations required in biological opinions from the Services following completion of consultation and to develop tools to expedite the incorporation of measures to protect listed species in pesticide decisions. These additional resources are needed to continue to demonstrate measured progress and increase EPA's ability to comply with its ESA obligations for all pesticides actions, and particularly to make progress in meeting its obligations for hundreds of conventional new use pesticide applications.

In FY 2025, the Agency also will assess whether listed endangered or threatened species or their designated critical habitat may be affected by use of pesticide products in a manner described in reports to Congress.[270] Where effects are identified in a biological evaluation, EPA will continue to work with the Services in a consultation[271] process to ensure these new or existing pesticide registrations meet the ESA standard.[272] As required by the 2018 Farm Bill, EPA will continue to develop processes to protect listed species earlier in the regulatory and consultation processes, and work with the Services, the U.S. Department of Agriculture (USDA), and other agencies to improve the consultation process and apply appropriate methods and exposure reduction measures to selected pesticide risk assessments.[273] EPA also will continue to work with the Services towards developing approaches to conduct consultations programmatically, which also will increase efficiency and reduce needed resources for EPA and the Services.

The Agency will continue to provide technical support for compliance with the requirements of the ESA. In FY 2025, EPA also will continue the advancement and integration of state-of-the-art

[269] For more information, please see: https://www.epa.gov/system/files/documents/2022-11/esa-workplan-update.pdf.
[270] For additional information, please visit: https://www.epa.gov/endangered-species/reports-congress-improving-consultation-process-under-endangered-species-act.
[271] For additional information, please visit: https://www.epa.gov/endangered-species/assessing-pesticides-under-endangered-species-act.
[272] Additional information on how EPA protects endangered species from pesticides can be found at: https://www.epa.gov/endangered-species.
[273] For more information, please see: https://www.epa.gov/endangered-species/epas-workplan-and-progress-toward-better-protections-endangered-species.

315

science models, knowledge bases, and analytic processes to increase productivity and better address the challenge of potential risks of specific pesticides to specific species. Interconnection of the various databases within the Program also will provide improved support to the risk assessment process during registration review by allowing risk assessors to analyze complex scenarios more easily regarding endangered species. EPA also will continue to improve its system used to implement spatially explicit protections for listed species, *Bulletins Live! Two* (BLT).[274] EPA plans to continue to solicit and receive feedback on the usability of BLT, maintain and improve the underlying data, and enhance the usability of the system based on feedback as more bulletins continue to be created and released as part of registration and registration review decisions.

## Assessing the Risks Pesticides Pose to the Environment

To accomplish the goals set out in FIFRA, in FY 2025 EPA will continue to conduct ecological risk assessments[275] to determine what risks are posed by each pesticide to plants, animals, and ecosystems that are not the targets of the pesticide and whether changes are necessary to protect these resources.[276] In FY 2025, EPA will continue to examine all toxicity and environmental fate data submitted with each new pesticide registration application to determine what potential risks the new active ingredient may pose to the environment. In FY 2025, EPA will continue to increase the number of pesticide registrations that include protections for listed species. When complex scientific issues arise, the Agency may solicit external review, such as consultation with the FIFRA Scientific Advisory Panel,[277] for independent scientific advice.

## Ensuring Proper Pesticide Use through Labeling

In FY 2025, EPA will continue to use pesticide labels to indicate what uses are appropriate and to ensure that the pesticide is used at the application rates and according to the methods and timing approved.[278]

## Pesticide Registration Review

In FY 2025, EPA's activities will involve increased efforts on comprehensive risk assessments to protect the environment. With the reauthorization of PRIA on December 29, 2022, the deadline to complete the initial Registration Review of each pesticide or pesticide case was extended four years to October 1, 2026, and EPA will continue working on registration review cases in FY 2025. For pesticides registered before October 1, 2007, EPA is required to make registration review decisions by October 1, 2026. EPA will focus its FY 2025 resources on completing decisions for cases that meet the FY 2026 statutory deadline and on cases with 15-year due dates in FY 2025 and beyond. Regarding the 789 registration review cases due by October 1, 2026, through FY 2023 Q4, there were 717 cases for which draft risk assessments were completed or not needed, and 614 final or interim decisions completed, with 71 draft risk assessments and 175 final or interim decisions remaining to be completed to meet the FY 2026 statutory deadline.

---

[274] For additional information, please visit: https://www.epa.gov/endangered-species/bulletins-live-two-blt-tutorial.

[275] For additional information, please visit: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/factsheet-ecological-risk-assessment-pesticides.

[276] Additional information may be found at: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/overview-risk-assessment-pesticide-program.

[277] For additional information, please visit: https://www.epa.gov/sap.

[278] Under FIFRA, it is illegal to use a registered pesticide in a manner inconsistent with the label instructions and precautions.

As EPA approaches the October 1, 2026, deadline, many of the remaining cases involve highly complex scientific and regulatory issues, which has resulted in requests from stakeholders to extend the comment periods for proposed decisions, lengthening the amount of time needed to complete the necessary reviews. In addition, EPA continues to await data and/or registrant input critical to finalizing several registration review decisions. Further ongoing challenges in meeting the FY 2026 deadline include delayed registrant submittal of additional data, the need for inter- and intra-agency coordination, and resource constraints.

Pesticide Registration and Risk Reduction Through the Use of Safer Pesticides and Methods

In FY 2025, EPA will continue to promote biopesticides and reduced-risk conventional pesticides by giving registration priority to pesticides that have lower toxicity to people and non-target organisms such as birds, fish, and plants; low potential for contaminating groundwater; lower use rates; low pest resistance potential; and compatibility with Integrated Pest Management (IPM).[279,280] Several other countries and international organizations also have instituted programs to facilitate registering reduced-risk pesticides. EPA works with the international scientific community and the Organization for Economic Cooperation and Development (OECD) member countries to register new reduced-risk pesticides and to establish related tolerances (maximum residue limits). Through these efforts, EPA will help reduce risks to Americans from foods imported from other countries. In FY 2025, EPA will continue to assist pesticide users in learning about new, safer products as well as safer methods for using existing products. Through its Center for IPM, EPA will provide support for educational webinars, science-based publications, informational outreach, and collaborations with federal partners, states, commodity and other non-governmental organizations to encourage use of IPM and resistance management tools. The Agency also will increase its support for advancing biotechnology, where they present lower-risk solutions to pest problems.

Reducing Animal Testing

In FY 2025, EPA will continue its efforts to promote the use of alternative methods to whole animal toxicity testing for characterizing the effects of pesticide active ingredients on terrestrial and aquatic vertebrates. EPA also will continue its partnership with the National Toxicology Program Interagency Center for the Evaluation of Alternative Toxicological Methods (NICEATM). A focus area will be the evaluation of Collaborative Acute Toxicity Modeling Suite (CATMoS) estimates of acute oral toxicity to potentially replace mammal testing in ecological risk assessment. EPA will continue an evaluation of the feasibility of reducing the number of tested species of fish used to characterize acute effects, based on the published results of a collaboration with NICEATM. This effort is expected to complement EPA's work with other federal agencies to collect, describe, and develop performance-based evaluations for a suite of *in-silico* and *in-vitro* methods for estimating acute lethal endpoints in fish. By addressing both the endpoint needs and the available estimation tools concurrently, EPA expects to increase the efficiency of performance evaluation and narrow the scope of needed estimation methods for consideration, thereby

---

[279] Attaining risk reduction would be significantly hampered without availability of alternative products to these pesticides for consumers. Consequently, the Registration Program's work in ensuring the availability of reduced risk pesticides plays a significant role in meeting the environmental outcome of improved ecosystem protection. For additional information on pesticide risk, please visit: https://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/overview-risk-assessment-pesticide-program.

[280] For additional information on IPM, please visit: https://www.epa.gov/safepestcontrol/integrated-pest-management-ipm-principles.

expediting the acceptance process. Additionally, through stakeholder discussions and participation in intergovernmental working groups, the Agency will work to identify opportunities to reduce the use of animals in ecological hazard testing. EPA also will reach out to non-governmental organizations to collaborate on projects (*e.g.,* to retrospectively analyze the results of ecological hazard testing). Based on the results of those projects, EPA will then develop and disseminate guidance materials for companies to clarify ecotoxicology testing requirements/needs.

<u>Minimizing Environmental Impacts through Outreach and Education</u>
Through public outreach, the Agency will continue to encourage the use of IPM and other practices to maximize the benefits pesticides can yield while minimizing their impacts on the environment. As a continued requirement of the Office of Chemical Safety and Pollution Prevention's National Program Guidance, regional pesticide offices will initiate specific IPM-related projects that target disadvantaged communities, or vulnerable populations, such as children attending preschools and tribal schools. The Agency also will develop and disseminate pesticide safety brochures, videos, links, and webinars which provide education on potential benefits of IPM and promote outreach through its Center for IPM on the success of IPM to encourage its use.[281] To encourage responsible pesticide use that does not endanger the environment, EPA also will reach out to the public through its website and social media accounts, and to workers and professional pesticide applicators through worker training programs. The Pesticide Safety Education Program[282] provides education to professional pesticide applicators through training and is a key component to the implementation of applicator certification programs across the nation and helps ensure pesticides are used in a manner to protect human health and the environment.

<u>Pollinator Protection</u>
Bees and other pollinators play a critical role in ensuring the production of food. USDA is leading the federal government's effort to understand the causes of declining pollinator health and identify actions that will improve pollinator health. EPA is part of this effort and is focusing on the potential role of pesticides while ensuring that the pesticides used represent acceptable risks to pollinators and that products are available for commercial beekeepers to manage pests that impact pollinator health.

EPA continues to carefully evaluate potential effects that pesticides may have on bees through the registration of new active ingredients and registration review, in cooperation with the Government of Canada and the California Department of Pesticide Regulation. EPA is continuing to work with USDA to identify and address factors associated with declines in pollinator health. EPA also has been working with a wide range of stakeholders in the government and private sectors, both domestically and internationally, to develop and implement strategies to address factors associated with pollinator declines and to ensure that the best available science serves as a foundation for regulatory decisions. EPA is working on advancing its scientific approaches and data needs for assessing and mitigating pesticide risks to pollinators.

---

[281] For additional information, please visit: https://www.epa.gov/safepestcontrol/integrated-pest-management-ipm-principles.
[282] For additional information, please visit: https://www.epa.gov/pesticide-worker-safety/pesticide-safety-education-programs-0.

In FY 2025, EPA also will continue to apply the best available science and risk management methods to reduce potential exposures to pollinators from pesticides.[283] In addition, some of the endangered species protection work described previously will protect pollinators. For example, the herbicide strategy is intended protect several pollinator species and plants that sustain pollinator species. Similarly, the vulnerable species pilot includes several listed pollinating insects and plants that depend on pollinators. As described earlier, EPA has already begun work on a similar strategy for insecticides and potential impacts to listed insects and species that depend on insects, including pollinators.

Protection of Water Resources

Reduced concentration of pesticides in water sources is an indication of the effectiveness of EPA's risk assessment, management, mitigation, and communication activities. In FY 2025, the Agency will continue to evaluate monitoring data as it prepares aquatic exposure assessments and will continue to apply risk management measures, when appropriate, to reduce pesticide loadings in water. EPA also will update aquatic benchmarks so that states and other stakeholders can determine if measured pesticide levels might impact aquatic life. Water quality is a critical endpoint for measuring exposure and risk to the environment and a key factor in assessing EPA's ability to reduce exposure from these key pesticides of concern.[284]

**Performance Measurement:**

In FY 2025, the Agency will be measuring performance for the registration review cases with 15-year due dates in FY 2024 and beyond, tracking intermediate stages such as docket openings, draft risk assessment completion, and final registration review case completions under the 15-year cycle of pesticide registration review. The Agency expects to improve protections to endangered species by increasing the percentage of new active ingredient registrations and registration review risk assessments that incorporate considerations of threatened and endangered species and leverage those improvements for other related processes in subsequent years (*e.g.*, new uses). EPA is only registering new conventional and biopesticide active ingredients under conditions that address potential impacts to endangered species. Increasing the extent to which EPA can incorporate ESA into its registration review actions also is consistent with the 2022 Omnibus Appropriations Bill, which states that "any covered interim registration review decisions shall include, where applicable, measures to reduce the effects of the applicable pesticides on (A) species listed under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); or (B) any designated critical habitat."

---

[283] Additional actions EPA is taking to protect pollinators from pesticides can be found at: https://www.epa.gov/pollinator-protection.

[284] The most sensitive aquatic benchmarks for the chemicals are posted on the website: http://www.epa.gov/pesticide-science-and-assessing-pesticide-risks/aquatic-life-benchmarks-pesticide-registration.

**Performance Measure Targets:**

**(PM ESA1) Percentage of risk assessments supporting pesticide registration decisions for new active ingredients that consider the effects determinations or protections for federally threatened and endangered species.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 40 | 80 | 90 | 90 | Percent |
| Actual | | | 50 | 62 | 100 | 100 | | | |
| Numerator | | | 8 | 8 | 14 | 12 | | | Risk |
| Denominator | | | 16 | 13 | 14 | 12 | | | Assessments |

**(PM ESA2) Percentage of risk assessments supporting pesticide registration review decisions that include effects determinations or protections of federally threatened and endangered species.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 20 | 30 | 20 | 50 | Percent |
| Actual | | | 27 | | 79 | 78 | | | |
| Numerator | | | 29 | | 27 | 7 | | | Risk |
| Denominator | | | 107 | | 34 | 9 | | | Assessments |

**(PM FIFRA3a) Number of pesticide registration review cases completed.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 15 | 8 | 4 | 5 | Cases |
| Actual | | | | | 16 | 15 | | | |

**(PM FIFRA3b) Number of pesticide registration review dockets opened for registration review cases.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 25 | 20 | 25 | 28 | Dockets |
| Actual | | | | | 35 | 25 | | | |

**(PM FIFRA3c) Number of draft risk assessments completed for pesticide registration review cases.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target | | | | | 9 | 16 | 4 | 4 | Draft |
| Actual | | | | | 25 | 10 | | | Assessments |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$1,764.0) This change to fixed and other costs is a decrease due to the recalculation of base workforce costs due to annual payroll changes, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$478.0/ +2.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment also includes $478 thousand in payroll costs and essential workforce support costs.

- (+$28,545.0 / +20.0 FTE) This program change supports an increase in resources for EPA to increase its ability to meet its Endangered Species Act (ESA) obligations into pesticide regulatory decisions beyond those prioritized in the near term. These additional non-pay resources will allow EPA to continue to train employees across the Program, and develop the regulatory processes, strategies, and approaches to allow EPA to better meet requirements of the ESA and begin to close current gaps. This investment also includes $3.816 million in payroll.

**Statutory Authority:**

Federal Insecticide, Fungicide and Rodenticide Act (FIFRA); Endangered Species Act (ESA).

## Pesticides: Realize the Value of Pesticide Availability

Program Area: Pesticides Licensing
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$5,774* | *$7,637* | *$8,316* | *$679* |
| Science & Technology | $963 | $925 | $1,040 | $115 |
| Total Budget Authority | $6,738 | $8,562 | $9,356 | $794 |
| Total Workyears | 30.0 | 35.8 | 35.8 | 0.0 |

**Program Project Description:**

This program seeks to realize the value of pesticides that can be used safely to yield many benefits, such as killing viruses and bacteria in America's hospitals. These benefits also include guarding the Nation's abundant food supply, protecting the public from disease-carrying pests, and protecting the environment from the introduction of invasive species from other parts of the world. In fulfilling its mission, the Program manages the following types of pesticide registrations and regulatory actions under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA):[285]

- Special Local Needs under FIFRA Section 24(c).
- Federal registrations at the national level under FIFRA Section 3.
- Experimental Use Permit Section 5.
- Emergency, Quarantine, and Crisis Exemption Section 18; and,
- Periodic review of existing chemicals under the Registration Review Program.[286]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan*.

Meeting Agriculture's Need for Safe, Effective Pest Control Products
With the passage of the Food Quality Protection Act (FQPA), Congress acknowledged the importance of and need for "reduced-risk pesticides" and supported expedited agency review to

---

[285] The primary federal law that governs how EPA oversees pesticide manufacture, distribution, and use in the United States is the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Originally enacted in 1947, FIFRA has been significantly amended several times, including by the Food Quality Protection Act of 1996 (FQPA) and the Pesticide Registration Improvement Extension Act of 2018 (PRIA). FIFRA requires that EPA register pesticides based on a finding that they will not cause unreasonable adverse effects to people and the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide.
[286] Additional information may be found here: https://www.epa.gov/pesticide-registration/types-registrations-under-fifra.

help these pesticides reach the market sooner and replace other pesticides of higher risk.[287] In FY 2025, EPA will continue to support and develop procedures and guidelines for expedited review of applications for registration or amendments for reduced risk pesticides. EPA incentivizes this project area by reducing the review service fee and decision time periods for evaluating these actions. EPA expects to receive and review approximately 10 reduced risk pesticide applications in FY 2025.

Registration of Generic Pesticides

FIFRA authorizes EPA to register products that are identical to or substantially similar to already registered products (also known as "me too products"). Applicants for these products may rely on, or cite data already submitted by another registrant. The entry of these new products into the market can cause price reductions resulting from new competition and broader access to products, benefitting farmers and consumers. The Agency will continue to prioritize and review generic registrations consistent with the statutory decision-making schedule. Application submissions for these actions can generally be reviewed in four months. The Agency completed 755 conventional pesticide, 1,151 antimicrobial pesticide, and 358 biopesticide new products actions and amendments in FY 2022. The Agency expects to complete a similar volume of registrations in FY 2025.

Outreach and Education

The Pesticide Program is invested in outreach and training efforts for people who use pesticides and the public in general. In FY 2025, the Agency will continue to encourage Integrated Pest Management (IPM), which emphasizes minimizing the use of broad-spectrum chemicals and maximizing the use of sanitation, biological controls, and selective methods of application. Providing on-the-ground assistance to our partners, EPA's regional offices work with states, tribes, and territories to implement their pesticide programs and carry out IPM projects that inform pesticide users about the pest control options, which pesticides to use, how to use them, and how to maintain the site so pests do not return. In addition, the Pesticide Program and its Center for IPM will provide outreach through webinars on a range of pest management and pollinator protection topics, many of which are important in areas with environmental justice (EJ) concerns and tribal communities.

Review and Registration

During FY 2025, EPA will continue to review and register new pesticides and new uses for existing pesticides, and act on other registration requests in accordance with FIFRA and Federal Food, Drug, and Cosmetic Act standards, as well as Pesticide Registration Improvement Extension Act timeframes. Many of these actions will be for reduced-risk conventional pesticides and biopesticides, which, once registered and used by consumers, will increase societal benefits, including for infants and children as well as susceptible subpopulations. Working together with the affected communities, through IPM and related activities, the Agency plans to accelerate the adoption of lower-risk products.

---

[287] The law defines a reduced risk pesticide as one that "may reasonably be expected to accomplish one or more of the following: (1) reduces pesticide risks to human health; (2) reduces pesticide risks to non-target organisms; (3) reduces the potential for contamination of valued, environmental resources, or (4) broadens adoption of Integrated Pest Management (IPM) or makes it more effective."

During FY 2025, the Agency will continue to make progress on meeting its Endangered Species Act (ESA) obligations for registration and registration review. Per its policy released in January 2022, EPA will continue to only register new conventional active ingredients under conditions that are compliant with ESA. Moreover, as detailed in the Agency's April 2022 ESA Workplan and November 2022 ESA Workplan Update, EPA will continue to improve protections to non-target species, including federally threatened and endangered (listed) species, earlier in the process through pesticide registration review and other FIFRA actions. The Agency also will accelerate protections for listed species impacted by conventional herbicide use and ensure protections across conventional outdoor pesticides for some of the most vulnerable listed species as it implements its final herbicide strategy and final vulnerable species pilot into applicable registration and registration review actions.

The Agency's work to harmonize pesticide tolerance levels with its top trade partners will reduce international trade barriers. For FY 2025, EPA will undertake regulatory decisions on a number of new chemicals with food uses. For each of these evaluations, EPA will consider whether there are existing Maximum Residue Levels (MRLs) set by trade partners, and whether tolerance harmonization will be a component of a portion of these decisions. Also, during FY 2025, EPA will continue rulemaking and implementation efforts to improve its crop group system which provides the regulatory definitions for crops which are in inter-state and international commerce. Phase VI of this rulemaking project was completed in September 2022. The next steps for additional crop group expansion for a new group of crops will be undertaken in 2024 and will include a focus on harmonizing with Codex crop groups to further facilitate international trade.

Emergency, Quarantine, and Crisis Exemptions

In FY 2025, EPA will continue to prioritize emergency exemptions under FIFRA Section 18, which authorizes EPA to allow an unregistered use of a pesticide for a limited time in the event of an emergency, such as a severe pest infestation, public health emergency, or invasive pest species quarantine. The economic benefit of the Section 18 Program to growers is the avoidance of losses incurred in the absence of pesticides exempted under FIFRA's emergency exemption provisions. In addition, exemptions serve as important public health controls to avert pests that may cause significant risk to human health. In FY 2021, 2022, and 2023 the Agency received 76, 31, and 39 requests for emergency uses respectively; and EPA has received 5 requests for emergency uses in FY 2024 to date. Although emergency exemption submissions cannot be precisely predicted, EPA estimates it may receive approximately 45 requests in FY 2025.

Performance Measurement

In FY 2025, the Agency will be measuring performance for the registration review cases with 15-year due dates in FY 2025 and beyond, tracking intermediate stages such as docket openings, draft risk assessment completion, and final registration review case completions under the 15-year cycle of pesticide registration review. The Agency will continue to track metrics on the percentage of new active ingredient registrations and registration review risk assessments (conventionals, biopesticides, and antimicrobials) that incorporate considerations of threatened and endangered species and leverage those improvements for other related processes in subsequent years (*e.g.*, new uses). Additionally, EPA will be tracking metrics related to pesticide safety training of farmworkers funded through a cooperative grant for the National Farmworker Training Program that runs through March 2026.

**Performance Measure Targets:**

Work under this program supports performance results in the Pesticides: Protect the Environment from Pesticide Risk Program under the EPM appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$154.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (+$525.0) This program change is an increase that supports enhancement of pesticides registration processes for the program.

**Statutory Authority:**

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA); Federal Food, Drug, and Cosmetic Act (FFDCA) § 408.

325

**Resource Conservation and Recovery Act (RCRA)**

## RCRA:  Corrective Action

Program Area: Resource Conservation and Recovery Act (RCRA)
Goal: Safeguard and Revitalize Communities
Objective(s): Clean Up and Restore Land for Productive Uses and Healthy Communities

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$37,176* | *$40,512* | *$42,105* | *$1,593* |
| Total Budget Authority | $37,176 | $40,512 | $42,105 | $1,593 |
| Total Workyears | 162.5 | 174.9 | 174.4 | -0.5 |

**Program Project Description:**

To reduce risks from exposure to hazardous wastes, EPA's Resource Conservation and Recovery Act (RCRA) Corrective Action Program ensures that contaminated facilities subject to RCRA requirements are cleaned up by the responsible party, returns contaminated property to productive use, and keeps costs from being transferred to the taxpayer-funded portion of the Superfund Program. Implementing the Program's 2030 Goals[288] and RCRA Corrective Action regulations and administrative orders, EPA and authorized states will continue to oversee cleanups conducted by facility owner/operators to ensure that the facilities meet their cleanup obligations and to protect taxpayers from having to pay the bill. RCRA cleanups contribute many environmental and economic benefits to their communities. A 2021 EPA analysis of 79 RCRA cleanups showed that these facilities support 1,028 on-site businesses providing economic benefits including $39 billion in annual sales revenue, over 82 thousand jobs, and $7.9 billion in estimated annual employment income.[289] A similar economic analysis is planned for FY 2025.

Approximately 118 million Americans live within three miles of a RCRA corrective action facility (roughly 35 percent of the U.S. population),[290] and the total area covered by these corrective action sites is approximately 18 million acres.[291] Additionally, a recent study has found evidence that the completion of cleanup leads to an average six to seven percent appreciation in the value of homes near treatment, storage or disposal facilities (TSDFs). A total capitalization of $295 million can be attributed to the 195 TSDFs that were remediated since the inception of RCRA. The authors estimate that the completion of cleanup yields an average lower bound, ex post benefit of about $14,000 per household.[292]

---

[288] U.S. EPA, Office of Resource Conservation and Recovery, 2020. RCRA Corrective Action Program Vision/Mission/Goals for 2030. https://www.epa.gov/sites/default/files/2020-09/documents/rcra_corrective_action_program_vision.pdf.
[289] U.S. EPA, Office of Resource Conservation and Recovery, 2022. Summary of 2021 RCRA Corrective Action Economic Benefits Study and Research Methodology.
[290] U.S. EPA, Office of Land and Emergency Management, 2023. Data collected includes: 1) RCRA CA site information as of the end of FY 2022; and 2) population data from the 2017-2021 American Community Survey.
[291] Compiled RCRAInfo data.
[292] Journal of the Association of Environmental and Resource Economists, May 2023, Hazardous Waste and Home Values: An Analysis of Treatment and Disposal Sites in the U.S., Dennis Guignet and Christoph Nolte.

EPA works in close partnership with 44 states and one territory authorized to implement the Corrective Action Program[293] to ensure that cleanups protect human health and the environment. The Corrective Action Program allows for the return of properties to beneficial use, which benefits the surrounding communities, reduces liabilities for facilities, and allows facilities to redirect resources to productive activities. The Agency provides program direction, leadership, and support to its state partners. This includes specialized technical and program expertise, policy development for effective program management, national program priority setting, measurement and tracking, training and technical tools, and data collection/management/documentation. In addition, through work-sharing, the Agency serves as lead or support for a significant number of complex and challenging cleanups in both non-authorized and authorized states.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.1, Clean Up and Restore Land for Productive Uses and Healthy Communities in the *FY 2022 - 2026 EPA Strategic Plan.*

In FY 2025, EPA requests a total investment of $42.1 million and 174.4 FTE for the RCRA Corrective Action Program. The Program will focus its resources on continuing cleanup of 3,983 priority contaminated facilities (the Corrective Action Progress Track), which include highly contaminated and technically challenging sites, and on assessing others to determine whether cleanups are necessary. As of the end of FY 2023, only 41 percent of these facilities have completed final and permanent cleanups, leaving approximately 2,300 facilities still requiring oversight and technical support to reach final facility-wide cleanup objectives. In FY 2023, EPA approved 117 RCRA corrective action facilities as ready for anticipated use (RAU), bringing the total number of RCRA RAU facilities to 2,043. In addition, in FY 2023, the Program achieved remedy construction at 48 facilities, resulting in a total of 2,943 with remedies constructed; and achieved performance standards attained at 58 facilities, resulting in a total of 1,716 facilities with standards attained.[294] The Program's goals are to control human exposures, control migration of contaminated groundwater, complete final cleanups for the Corrective Action Progress Track facilities, and identify, assess, and clean up additional priority facilities.

In FY 2025, EPA will:

- Continue to make RCRA corrective action sites RAU, ensuring that properties are returned to productive use and human health and the environment are protected into the future.

- Assess its universe of cleanup facilities, priorities, and measures to ensure that resources are directed to addressing those facilities that present the greatest risk to human health and the environment and supporting environmental justice and climate resiliency.

- Provide technical assistance to authorized states in the areas of site characterization, sampling, remedy selection, reaching final cleanup goals, and long-term stewardship for

---

[293] State implementation of the Corrective Action Program is funded through the STAG Categorical Grant: Hazardous Waste Financial Assistance and matching state contributions.
[294] For more information concerning RCRA 2020 corrective action baseline facilities, please refer to:
https://www.epa.gov/hw/lists-facilities-resource-conservation-and-recovery-act-rcra-2020-corrective-action-baseline.

cleanups with contamination remaining in place in order to support communities at risk from multiple health stressors and/or climate change impacts.

- Prioritize and focus the Program on completing site investigations to identify the most significant threats, establishing interim remedies to reduce or eliminate exposure, and selecting and constructing safe, effective long-term remedies that also maintain the economic viability of operating facilities.

- For high priority facilities, utilize oversight tools and work-sharing agreements to assist with facilities that have complex issues or special tasks.[295]

- Continue to improve cleanup approaches and share best practices and cleanup innovations to speed up and improve cleanups.[296]

- Update and maintain RCRAInfo, which is the primary data system that many states rely upon to manage their RCRA permitting, corrective action, and hazardous waste generator programs; and which EPA relies upon to track hazardous waste imports and exports. RCRAInfo receives data from hazardous waste handlers for the National Biennial RCRA Hazardous Waste Report. The data from the 2021 biennial reporting cycle showed there were 19,141 generators of over 36 million tons of hazardous waste. RCRAInfo provides the only national-level RCRA hazardous waste data and statistics to track the environmental progress of approximately 20,000 hazardous waste units at 6,600 facilities.

- Contribute to efforts ensuring the proper management, disposal, and cleanup of per- and polyfluoroalkyl substances (PFAS).

**Performance Measure Targets:**

(PM CA5RC) Number of RCRA corrective action facilities with final remedies constructed.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | 98 | 98 | 73 | 55 | 55 | 44 | 44 | Facilities |
| **Actual** | 70 | 80 | 64 | 57 | 55 | 48 | | | |

(PM RSRAU) Number of RCRA corrective action facilities made ready for anticipated use.

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | 75 | 91 | 117 | 133 | 114 | 100 | 85 | 70 | Facilities |
| **Actual** | 117 | 127 | 169 | 146 | 124 | 117 | | | |

---

[295] For example, vapor intrusion, wetlands contamination, or extensive groundwater issues.
[296] For more information, please refer to: https://www.epa.gov/hw/toolbox-corrective-action-resource-conservation-and-recovery-act-facilities-investigation-remedy.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$2,101.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes an increase for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (-$508.0 / -0.5 FTE) This program change reduces FTE support for RCRA Corrective Action activities including cleanups. This includes a reduction of $92.4 thousand for payroll.

**Statutory Authority:**

Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA) §§ 3004, 3005, 8001.

# RCRA:  Waste Management

Program Area: Resource Conservation and Recovery Act (RCRA)
Goal: Safeguard and Revitalize Communities
Objective(s): Reduce Waste and Prevent Environmental Contamination

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$70,129* | *$75,958* | *$91,500* | *$15,542* |
| Hazardous Waste Electronic Manifest System Fund | $10,962 | $0 | $0 | $0 |
| Total Budget Authority | $81,091 | $75,958 | $91,500 | $15,542 |
| Total Workyears | 296.9 | 307.8 | 353.3 | 45.5 |

Total workyears in FY 2025 include 15.0 FTE funded by e-Manifest fees.

**Program Project Description:**

The Resource Conservation and Recovery Act (RCRA) established EPA's role as a federal leader in the conservation and recovery of resources. Under RCRA, EPA sets national standards for managing solid and hazardous wastes and provides federal agencies, state, tribal, and local governments, and industries with technical assistance on solid waste management, resource recovery, and resource conservation. Approximately 60 thousand facilities generate and safely manage hazardous waste in the United States.[297] Eighty percent of the U.S. population live within three miles of one of these facilities, making national standards and procedures for managing hazardous wastes a necessity.[298]

The Waste Management Program safeguards the American people while facilitating commerce by supporting an effective waste management infrastructure. Cradle-to-grave hazardous waste management regulations help ensure safe management practices through the entire process of generation, transportation, recycling, treatment, storage, and final disposal. The Program increases the capacity for proper hazardous waste management in states by providing grant funding and technical support.

The RCRA permitting program serves to protect the millions of people in surrounding communities by facilitating clean closure where applicable and managing permits and other controls to protect human health and the environment for the approximately 6,700 hazardous waste units (*e.g.*, incinerators, landfills, and tanks) located at 1,300 permitted treatment, storage, and disposal facilities.[299] Just as businesses innovate and grow, the waste management challenges they

---

[297] Memorandum, February 18, 2014, from Industrial Economics to EPA, Re: Analysis to Support Assessment of Economic Impacts and Benefits under RCRA Programs: Key Scoping Assessment, Initial Findings and Summary of Available Data (Section 1), pages 5-11.
[298] U.S. EPA, Office of Solid Waste and Emergency Response Estimate. 2014. Data collected includes: 1) site information as of the end of FY 2011 from RCRAInfo; and 2) census data from the 2007-2011 American Community Survey.
[299] As compiled by RCRAInfo.

face also evolve; this requires new direction and changes in the federal hazardous waste program through updated regulations, guidance, and other tools.

EPA directly implements the RCRA Program in Iowa, Alaska, in some territories, and on tribal lands. EPA provides leadership, work-sharing, and support to the remaining states and territories authorized to implement the permitting program. Additionally, the Toxic Substances Control Act (TSCA) polychlorinated biphenyls (PCB) cleanup and disposal program is implemented under the Waste Management Program to reduce PCB exposure from improper disposal, storage, and spills. The Program reviews and approves PCB cleanup, storage, and disposal activities. This federal authority is not delegated to state programs. PCBs were banned in 1979, but legacy use and contamination still exist, and PCBs can still be released into the environment from poorly maintained operations and sites that contain them.

Maintaining updated permits and controls ensures that facilities: 1) have consistent and protective standards to prevent release; 2) have proper standards for waste management to protect human health and prevent land contamination/degradation; and 3) avoid future cleanups and associated substantial costs. EPA will work with authorized states to ensure that permit decisions, including decisions to issue, renew, or deny permits, reflect the latest technology and standards. EPA also will work with authorized states to ensure that all communities, including those who are marginalized and overburdened, have an equitable opportunity to engage in the permitting process.

States, tribes, territories, communities, and RCRA facilities are beginning to experience impacts from climate change, such as extreme weather and wildfires, and these impacts are expected to increase in the future. EPA is working to implement the EPA Climate Adaptation Action Plan;[300] increase resilience of Corrective Action, PCB, and RCRA permitted facilities to extreme weather events and sea level rise; assist municipalities with natural disaster preparedness and debris management planning; and strengthen the capacity of states, tribes, territories, communities, and businesses to adapt to climate change.

Where communities adversely impacted by environmental conditions are advocating for more transparency or involvement in decision-making or where the trust is strained, providing enhanced, tailored engagement through the Community Engagement and Technical Assistance (CETA) Program will allow EPA to build a better bridge between the region, state, facility, and community. The CETA Program serves as the vehicle to deliver risk communications, technical assistance, and engagement support to fenceline and overburdened communities, ensuring equitable access and the opportunity to participate in environmental decisions that impact their health and wellbeing.

There continues to be increased public and congressional attention to issues around post-consumer materials management, especially plastics, in the environment and EPA's role in addressing them (*e.g.*, marine litter prevention and reduction, environmental justice concerns in countries to which the U.S. exports plastics, and the climate impacts of single-use plastics). Marine litter and plastic pollution is an increasingly prominent global problem that can negatively affect public health, the

---

[300] For additional information, please see: https://www.epa.gov/system/files/documents/2021-09/epa-climate-adaptation-plan-pdf-version.pdf, https://www.epa.gov/system/files/documents/2022-10/bh508-OLEM%20CAIP_August%202022_POST_OGCreview_9.12.2022.pdf.

environment, and the economy. Most marine litter and plastic is from land-based sources and makes its way into the Nation's waterways and ultimately to the ocean, creating a direct link between waste management practices and ocean pollution.[301] The Save Our Seas 2.0 Act,[302] enacted in December 2020, was passed with bipartisan congressional support and provides EPA with authority to further act on post-consumer materials management.

The Program also plays a central role in establishing and updating standards for analytical test methods that are used across the country and the world to provide consistent, reliable determinations as to whether waste is hazardous, as well as the presence and extent of hazardous waste in the environment. This work provides the foundation that underlies waste management approaches and ensures that method standards evolve with technology for conducting these analyses.

In addition to overseeing the management of hazardous waste under RCRA Subtitle C, EPA also plays a role in solid waste management under Subtitle D. While much of this area is delegated to the states, EPA is actively working on aspects of coal combustion residuals (CCR) under this area of the law, including the establishment and refinement of appropriate regulations and, as directed by the 2016 Water Infrastructure Improvements for the Nation Act (WIIN Act), the development of a new federal permitting program for CCR surface impoundments and landfills. In implementing regulations for CCR, EPA is taking action to ensure that the concerns of nearby communities are addressed in a protective manner.

While the majority of the work is focused on domestic issues, the Program also is responsible for issues related to international movement of wastes. EPA oversees the notification and consent process for hazardous waste imports and exports. Most of these movements are for recycling and, thus, are critical to resource conservation. In coordination with other agencies and departments, EPA represents the U.S. Government in numerous international forums concerned with waste issues. This type of representation is vital to protecting U.S. interests and furthering U.S. policy goals.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.2, Reduce Waste and Prevent Environmental Contamination in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $15.5 million and 45.5 FTE for the RCRA Waste Management Recycling Program. The Program will:

- Provide technical assistance, guidance, tools, and support to regions, states, and tribes regarding the development and implementation of solid waste programs (*e.g*., the RCRA hazardous waste generator, transporter, treatment, storage, and disposal regulations and implementing guidance; the RCRA non-hazardous waste program; the TSCA PCB disposal and cleanup program; and the hazardous waste import/export program).

---

[301] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Ocean Service, "Ten Things you should Know about Marine Debris," https://oceanservice.noaa.gov/news/marinedebris/ten-things.html.
[302] For additional information, please refer to: https://www.congress.gov/116/plaws/publ224/PLAW-116publ224.pdf.

- Enhance risk communications and deliver technical assistance support directly to communities, particularly fenceline communities, with environmental concerns related to RCRA facilities.

- Provide technical and implementation assistance, oversight, and support to facilities that generate, treat, store, recycle, and dispose of hazardous waste.

- Review and approve PCB cleanup, storage, and disposal activities to reduce exposures, particularly in sensitive areas like schools and other public spaces. Issuing PCB approvals is a federal responsibility and is not delegated to states.

- Manage and monitor the RCRA permitting program and ensure the issuance of permits efficiently to achieve program goals. This includes progress towards meeting the Agency's goal of increasing the percentage of permits kept up to date for the approximately 6,700 hazardous waste units (*e.g.,* incinerators, landfills, and tanks) located at 1,300 permitted treatment, storage, and disposal facilities.

- Implement the EPA Climate Adaptation Action Plan and provide technical assistance and guidance to strengthen the capacity of states, tribes, territories, communities, and facilities to adapt to climate change.

- Continue analysis of existing regulations to ensure protective standards for managing solid and hazardous waste. In FY 2025, this includes assessment of RCRA regulations to reflect current standards, policies, and practices.

- Manage the hazardous waste import/export notice and consent process in order to make shipping hazardous waste across borders more efficient. Managing hazardous waste imports and exports is a federal responsibility, non-delegable to states.

- Provide technical hazardous waste management assistance to tribes to encourage sustainable practices and reduce exposure to toxins from hazardous waste.

- Directly implement the RCRA Program in unauthorized states, on tribal lands, and other unauthorized portions of state RCRA programs. Issue and update permits, including continuing to improve permitting processes.

- Establish and update standards for analytical test methods that are used across the country and the world to provide consistent, reliable determinations as to whether waste is hazardous, as well as the presence and extent of hazardous waste in the environment.

- Take action to ensure protective management of CCR through the implementation of existing regulations, promulgation of additional regulations to address legacy surface impoundments, and the launch of a federal permitting program. The Agency promulgated regulations specifying improved management and disposal practices to ensure people and

334

ecosystems are protected. The Agency will continue to work with stakeholders through technical assistance and guidance as it develops and implements regulations.

- Implement applicable provisions of the WIIN Act, which enables states to submit state CCR permit programs for EPA approval. The Agency will continue to work closely with state partners to review and make determinations on state programs. Subject to appropriations, EPA will implement a permit program for CCR disposal facilities in non-participating states and on tribal lands.

- As part of an EPA effort to reduce ocean pollution and plastics, the Program will provide technical expertise and funding to support development and implementation of solid waste management systems and infrastructure to help ensure that non-hazardous waste items are appropriately collected, recycled, reused, or properly disposed of to prevent litter from entering waterways from land.

**Performance Measure Targets:**

**(PM HW5) Number of updated permits issued at hazardous waste facilities.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | 64 | 64 | 105 | 100 | 90 | 100 | 105 | 117 | Permits |
| **Actual** | 109 | 124 | 104 | 130 | 107 | 114 | | | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$2,700.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$6,754.0 / +22.0 FTE) This program change will expand the Community Engagement and Technical Assistance Program to help protect economically disadvantaged communities from hazardous substance releases from facilities. This investment includes $4.2 million for payroll.

- (+$4,598.0 / +21.0 FTE) This program change is to provide sufficient staffing levels to implement the coal combustion residual federal permitting program. This investment includes $3.9 million for payroll.

- (+$1,190.0 / +1.0 FTE) This program change will help implement the EPA Climate Adaptation Action Plan, support increased resilience at Treatment, Storage, and Disposal Facilities and PCB Storage facilities, and strengthen the capacity of states, tribes, territories, communities, and businesses to adapt to climate change. This investment includes $190.0 thousand for payroll.

- (+$300.0 / +1.5 FTE) This program change increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements. This investment includes approximately $285.0 thousand for payroll.

**Statutory Authority:**

Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA) §§ 3002, 3004, 3005, 3017; Toxic Substances Control Act (TSCA) § 6. Save our Seas 2.0, 2020, Pub. L. 116-224.

## RCRA:  Waste Minimization & Recycling

Program Area: Resource Conservation and Recovery Act (RCRA)
Goal: Safeguard and Revitalize Communities
Objective(s): Reduce Waste and Prevent Environmental Contamination

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$9,375* | *$10,252* | *$15,799* | *$5,547* |
| Total Budget Authority | $9,375 | $10,252 | $15,799 | $5,547 |
| Total Workyears | 39.7 | 43.4 | 68.4 | 25.0 |

**Program Project Description:**

EPA's Resource Conservation and Recovery Act (RCRA) Waste Minimization and Recycling Program supports the sustainable management of resources, including managing materials that sustainably promote economic growth, reducing environmental impacts, and advancing a circular economy for all.

The U.S. recycling industry provides approximately 680 thousand jobs and $5.5 billion annually in tax revenues and there is opportunity for greater contribution to the economy and environmental protection, as recent data indicate materials worth as much as $9 billion are thrown away each year.[303] Recycling is an important part of a circular economy, which refers to a system of activities that is restorative to the environment, enables resources to maintain their highest values, and designs out waste. A circular economy approach provides direct, measurable reductions in greenhouse gas (GHG) emissions, as natural resource extraction and processing make up approximately 50 percent of total global GHG emissions.[304]

Further, living near waste and waste-related facilities can place burdens on communities when waste is not properly managed, which can lead to higher levels of chronic health issues. Communities whose residents are predominantly persons of color, Indigenous, or low-income continue to be disproportionately impacted by high pollution levels, resulting in adverse health and environmental impacts. It is critical to implement materials management strategies that are inclusive of communities with environmental justice concerns as well as pursue innovations that offer the benefits of cleaner processing of materials to all. Recycling is not enough to achieve a circular economy, but it is an important part of addressing climate change, creating jobs, and reducing environmental and social impacts.

EPA established a National Recycling Goal to increase the recycling rate from a rate of 32.1 percent in 2018 to 50 percent by 2030,[305] and finalized and released the National Recycling

---

[303] For more information, please refer to: https://www.epa.gov/smm/recycling-economic-information-rei-report.
[304] U.N. Environment International Resource Panel, Global Resources Outlook, 2019, p. 8.
https://www.resourcepanel.org/reports/global-resources-outlook.
[305] In 2018, in the United States, approximately 292 million tons of municipal solid waste (MSW) were generated. Of the MSW

Strategy on November 15, 2021.[306] The National Recycling Strategy is part one of a series of strategies the Agency is developing to build a stronger, more resilient, and cost-effective recycling system and a circular economy for all. Reducing waste helps alleviate burdens on populations that bear the brunt of poorly run waste management facilities and transfer stations. When applied to critical minerals, a circular economy approach facilitates end-of-life recycling and the recovery of critical minerals in order to support a secure supply chain. In 2023, EPA released parts two and three of the series, the *Draft Strategy to Prevent Plastic Pollution*, and the *Draft National Strategy for Reducing Food Loss and Waste and Recycling Organics*. Future strategies will focus on critical minerals and electronics, textiles, and the built environment (*e.g.*, construction and demolition debris).

Congressional and public interest continues to grow regarding plastics in the environment and EPA's role in addressing them (*e.g.*, ocean plastics, environmental justice concerns in countries to whom the U.S. exports plastics, and the climate impacts of single-use plastics). The Save Our Seas 2.0 Act,[307] enacted in December 2020, was passed with bipartisan congressional support and provides EPA with authority to further act on domestic recycling and address plastic waste through new grant programs, studies, and increased federal coordination. Additionally, the Infrastructure Investment and Jobs Act (IIJA), as well as STAG annual appropriations, provide funding for recycling infrastructure grants authorized by section 302(a) of the Save Our Seas 2.0 Act. IIJA also provided funding for education and outreach grants focused on improving material recycling, recovery, and management and established new programs focused on battery recycling and labeling. EPA also was charged with developing a model recycling program toolkit, increasing coordination and review of federal procurement guidelines, and providing assistance to the educational community to incorporate recycling best practices into school curriculum.

The RCRA Waste Minimization and Recycling Program also promotes the efficient management of food as a resource. Reducing food loss and waste means more food for communities, fewer GHG emissions and climate impacts, and increased economic growth. EPA works to meet the national goal of reducing food loss and waste by 50 percent by 2030 by providing national estimates of food waste generation and management; convening, educating, and supporting communities seeking to reduce food waste; working collaboratively with the U.S. Department of Agriculture and U.S. Food and Drug Administration to reduce food waste; and providing funding to demonstrate anaerobic digester applications.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.2, Reduce Waste and Prevent Environmental Contamination in the *FY 2022 – 2026 EPA Strategic Plan*.

In FY 2025, EPA requests an additional $5.5 million, including 25.0 FTE for the RCRA Waste Minimization and Recycling Program to manage grants under the new Solid Waste Infrastructure for Recycling (SWIFR) grant program. This investment also will focus on efforts to strengthen the

---

generated, approximately 94 million tons were recycled or composted, equivalent to a 32.1 percent recycling and composting rate. https://www.epa.gov/sites/default/files/2021-01/documents/2018_ff_fact_sheet_dec_2020_fnl_508.pdf.

[306] For more information, please refer to: https://www.epa.gov/system/files/documents/2021-11/final-national-recycling-strategy.pdf.

[307] For more information, please refer to: https://www.congress.gov/116/plaws/publ224/PLAW-116publ224.pdf.

U.S. recycling system by investing in solid waste management infrastructure and consumer education and outreach, address the global issue of plastic waste, engage communities, and prevent and reduce food loss and waste. The Program will conduct the following activities:

- Provide national leadership and direction on approaches to reduce environmental impacts and increase the safe and effective reuse/recycling of materials, with a special focus on plastic waste, food waste, and critical minerals and electronics.

- Contribute towards global climate change efforts and demonstrate U.S. leadership internationally through participation in resource efficiency dialogues.

- Implement the National Recycling Strategy through the SWIFR grant program, the Recycling Education and Outreach (REO) grant program, and other activities.

- Develop, finalize, and/or implement additional strategies in key areas with the greatest potential to reduce the lifecycle impacts of materials, including plastic waste, food waste, critical minerals and electronics (*e.g.*, batteries), textiles, and construction and demolition debris.

- Gather data and provide high-quality scientific information on materials management. Information on the status of the Nation's solid waste generation and management will provide evidence for prioritizing programs, grant monies, and policy development. This information also will illustrate how the U.S. is striving toward the National Recycling Goal to increase the nation's recycling rate to 50 percent by 2030 and the U.S. 2030 Food Loss and Waste Reduction Goal to cut food loss and waste in half by the year 2030. To track progress on these goals, EPA's efforts will focus on gathering data on national waste management pathways, including recycling participation and food loss and waste generation rates.

- Continue to administer grants for state, territorial, tribal, and local governments to build and enhance recycling capacity, infrastructure, and consumer education and outreach around the country. The grant programs will continue to support state, territorial, and tribal communities seeking to enhance their capacity to recover and recycle materials by modernizing local waste management systems and improving education and outreach.

- Provide technical assistance to communities to enhance their capacity to apply for federal funding opportunities. Announce new funding opportunities for the SWIFR and REO grant programs that are primarily funded by IIJA.

- Administer and enhance the model recycling program toolkit developed for use in carrying out the REO grant program funded by IIJA and provide assistance to the educational community to promote the introduction of recycling principles and best practices into public school curricula.

- Continue coordinating with federal agencies to reduce food waste in their facilities, increase composting, complete food waste prevention pilot projects, and connect stakeholders with food waste reduction technologies such as anaerobic digestion.

- Enhance the Knowledge Management System for grant programs for recycling infrastructure and education and outreach to assist in tracking funded project development through completion and expedite result reporting.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$1,363.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. This includes an increase for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$4,184.0 / +25.0 FTE) This program change is an increase to assist EPA with implementation of the National Recycling Strategy, oversight of the Infrastructure Investment and Jobs Act grants, and challenges on recycling and the circular economy. This investment includes $4.5 million for payroll.

**Statutory Authority:**

Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA); Save our Seas 2.0 Act, 2020, Pub. L. 116-224; Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58

**Toxics Risk Review and Prevention**

## Endocrine Disruptors

Program Area: Toxics Risk Review and Prevention
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$6,010* | *$7,614* | *$7,701* | *$87* |
| Total Budget Authority | $6,010 | $7,614 | $7,701 | $87 |
| Total Workyears | 6.9 | 7.6 | 7.6 | 0.0 |

**Program Project Description:**

The Endocrine Disruptor Screening Program (EDSP) was established in 1996 under authorities contained in section 408(p) of the Food Quality Protection Act (FQPA) and the Safe Drinking Water Act (SDWA) amendments. Envisioned as a two-tiered screening and testing program, the EDSP was developed to screen chemicals for their potential to disrupt the endocrine system of humans and wildlife. Section 408(p) also requires EPA to "as appropriate, take action...to ensure the protection of public health" for "any substance that is found...to have an endocrine effect on humans." After over two decades of challenges in implementing the EDSP and other aspects of section 408(p), EPA is now rebuilding the EDSP, especially by obtaining needed endocrine data and by integrating the FQPA endocrine data and decisions into FIFRA decisions.

In October 2023, EPA issued new policies and scientific explanations to advance these objectives and engage stakeholders in the process. These new policies will help ensure that EPA is meeting its section 408(p) FQPA obligations and reducing litigation risk. EPA also will continue to advance the science on screening and testing chemicals that may disrupt the endocrine system of humans or wildlife. For example, EPA will continue to transition to using high throughput (HT) screening and computational toxicology (*CompTox*)[308] tools that can screen thousands of chemicals for endocrine activity. This will allow EPA to more rapidly and meaningfully prioritize the evaluation of chemicals for possible endocrine disrupting effects and integrate that information into registration and registration review decisions, thereby ensuring chemical safety by protecting human health and the environment from endocrine disrupting chemicals. Implementing EDSP work into the Agency's risk assessment and risk management functions also supports EPA's environmental justice (EJ) priorities, both by targeting substances based on effects to sensitive life stages and deploying rapid methods for assessing disparate chemical exposures to vulnerable communities.

For over two decades, EPA's progress in implementing the EDSP and other obligations in section 408(p) has been limited for several reasons. One reason is that the Agency did not arrive at clear

---

[308] For additional information, please visit: https://www.epa.gov/endocrine-disruption/use-high-throughput-assays-and-computational-tools-endocrine-disruptor.

internal decisions on how to address several complex science-policy issues, including what types of data to require of pesticide registrants. This led to implementation of section 408(p) that was largely separate from implementation of FIFRA. As part of rebuilding the EDSP, EPA is starting with two overall approaches to address its historic challenges with the Program. First, EPA intends to use the FIFRA registration and registration review processes to obtain needed endocrine data to support the Agency's FIFRA determinations and its FQPA determinations related to endocrine effects. This approach will allow EPA to efficiently use an existing process (FIFRA) to obtain endocrine data as part of our FQPA mandates. Second, EPA will integrate FQPA endocrine decisions into FIFRA decisions. Specifically, when EPA is registering a new pesticide active ingredient or reevaluating an existing active ingredient as part of registration review, the Agency will begin to integrate its FQPA endocrine data and decisions into the FIFRA decision. This will help ensure that EPA is timely identifying endocrine data needs and making FQPA decisions.

On October 27, 2023, EPA published a Federal Register Notice (FRN), EDSP Near-Term Strategies for Implementation (EPA–HQ–OPP–2023–0474; FRL–11384–01–OCSPP), that describes these overall approaches in further detail and that describes three initial strategies to support implementation. The strategies include prioritizing potential human endocrine effects while EPA pursues other strategies to protect wildlife from chemical exposure; using existing endocrine data to inform FIFRA and FQPA decisions and to inform whether additional endocrine data are needed for conventional pesticide active ingredients; and through registration review, phasing in any new data requirements to address potential human estrogen, androgen, and thyroid effects for registered conventional pesticide active ingredients, starting with priority chemicals. In conjunction with the FRN, EPA released a list of 30 priority chemicals for public comment and intends to begin issuing FIFRA data call-ins for needed endocrine data for these chemicals in spring 2024. In addition to identifying the 30 first priority chemicals, EPA identified 86 chemicals for which it likely has sufficient estrogen and androgen data for human health, and listed second priority (126 chemicals) and third priority (161 chemicals) groupings for determining additional endocrine data needs. Finally, to further support the Near-Term Strategies, EPA released a science document and an update on data recommendations for List 1 chemicals which had previously gone through Tier 1 endocrine screening.

Embedded into the EDSP approach is a focus on sensitive life stages during the tiered testing and assessment processes. As these data are incorporated into conceptual risk assessment models, they can specifically inform decisions important to EJ and vulnerable subpopulations, including children's health, women's health, and reproductive health more broadly. To advance endocrine science, EPA continues to explore enhancements to existing test methods and has run thousands of chemicals through HT assays, including the estrogen receptor (ER) and androgen receptor (AR) pathway models and the HT steroidogenesis assay. The Agency continues to engage the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) Scientific Advisory Panel (SAP) in the scientific peer review of endocrine screening methods including HT tools to evaluate their use in chemical screening and testing. In some cases, these new methods may serve as alternatives to existing guideline tests. Further, as EDSP prioritizes future chemical assessments, HT tools such as *ToxCast*[309] and *ExpoCast*[310] may assist in the identification of priority chemical targets with vulnerable subpopulations and EJ concerns for further investigation.

---

[309] For additional information, please visit: https://www.epa.gov/chemical-research/toxicity-forecasting.

[310] For additional information, please visit: https://www.epa.gov/chemical-research/rapid-chemical-exposure-and-dose-research.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan*.

Under the current tiered framework, imposing the EDSP Tier 1 battery for all 10,000+ substances in the EDSP Universe of Chemicals would cost the regulated community more than $10 billion in addition to EPA resources for staff to manage the regulatory infrastructure to order and review the tests.[311] Given the current national and international laboratory testing capacity, it would take many years to complete, and involve the sacrifice of many millions of animals. To address these issues, in FY 2025, the Agency will:

- Continue implementing a multi-year plan for the EDSP for pesticide active ingredients and inserts, focusing first on conventional pesticide active ingredients.
- Make chemical-specific decisions on whether the Agency has enough data through Tier 2 testing or other scientifically relevant information to issue FQPA and FIFRA decisions for potential human endocrine effects such that Tier 1 data are not required, consistent with the policy that EPA announced in October 2023.
- Continue collaborations with EPA's research programs to optimize available endocrine screening and testing methods and increase scientific confidence in HT approaches, which will support a more efficient, refined, and integrated approach to EDSP chemical screening and assessment.
- In collaboration with EPA's research programs, continue HT screening on pesticide substances that were not part of the *ToxCast* chemical sets, considering the priority groupings that were announced in October 2023.

In FY 2025, consistent with the implementation strategies announced in October 2023, these efforts will address several key milestones in implementing EDSP evaluations of conventional pesticide active ingredients to support pesticide registrations and registration review, in line with Administration priorities on EJ. EPA will ensure that new, conventional pesticide active ingredients have adequate data to address endocrine effects in humans and will phase any additional human endocrine data needs for existing chemicals into the registration review process, starting with 30 high priority active ingredients. The EDSP screening and testing framework explicitly includes evaluations on vulnerable subpopulations such as differences among life stages including pregnancy, infancy, and early childhood. Moreover, the EDSP Tier 1 battery is designed to identify potential effects on reproduction, a key indicator for EJ.  In FY 2025, EPA also will continue research to develop and refine methods to evaluate endocrine effects in wildlife.

The EDSP will continue to collaborate with relevant bodies and international partners, such as the Interagency Coordinating Committee on the Validation of Alternative Methods (ICCVAM), the Organization for Economic Co-operation and Development (OECD), the World Health Organization (WHO), and bilateral partners to maximize the efficiency of EPA's resources and

---

[311] https://www.sciencedirect.com/science/article/pii/S0273230011000055?via%3Dihub, https://www.epa.gov/endocrine-disruption/universe-chemicals-potential-endocrine-disruptor-screening-and-testing &
https://www.federalregister.gov/documents/2023/01/19/2023-00940/availability-of-new-approach-methodologies-in-the-endocrine-disruptor-screening-program-notice-of.

promote adoption of internationally harmonized test methods, particularly high throughput, or computational approaches, for evaluating the potential endocrine effects of chemicals. EPA represents the U.S. as either the lead or a participant in OECD and other international projects involving pesticide regulation and the improvement of assay systems, including the development of both animal and non-animal screening and testing methods.

Consistent with recommendations in the 2021 OIG report, the October 2023 release of the EDSP Near-Term Strategies for Implementation represents the new strategic plan for the Program. EPA is developing performance metrics to track implementation progress and intends to regularly update the public via the EPA website and other outreach.[312]

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$101.0) This net change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs.

- (-$14.0) This is a programmatic decrease for endocrine disruption screening contractual support.

**Statutory Authority:**

Federal Food Drug and Cosmetic Act (FFDCA), § 408(p); Safe Drinking Water Act (SDWA), § 1457.

---

[312] https://www.epa.gov/office-inspector-general/report-epas-endocrine-disruptor-screening-program-has-made-limited

## Pollution Prevention Program

Program Area: Toxics Risk Review and Prevention
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Promote Pollution Prevention

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$12,568* | *$12,987* | *$29,193* | *$16,206* |
| Total Budget Authority | $12,568 | $12,987 | $29,193 | $16,206 |
| Total Workyears | 47.9 | 51.2 | 69.2 | 18.0 |

**Program Project Description:**

EPA's Pollution Prevention (P2) Program is one of the Agency's primary tools for advancing environmental stewardship and sustainability for federal, state, and tribal governments as well as for businesses, communities, and individuals. The Program is the primary implementation mechanism for the Pollution Prevention Act (PPA) of 1990. The P2 Program seeks to alleviate environmental problems by helping businesses and others with developing and implementing source reduction practices before pollution is created. As a result of these approaches, the P2 Program protects the environment by conserving and protecting natural resources while strengthening economic growth through cost reductions and increased market opportunities. P2 approaches include, but are not limited to, reducing or eliminating hazardous releases to air, water, and land; use of hazardous materials; generation of greenhouse gases; and/or use of water. The Program's efforts advance EPA's priorities to pursue sustainability; to act on climate change; to make a visible difference in communities, including advancing environmental justice (EJ) in disadvantaged communities; and to ensure chemical safety. The Program includes a counterpart P2 Categorical Grants Program in the State and Tribal Assistance Grants (STAG) account.[313]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.2, Promote Pollution Prevention in the *FY 2022 – 2026 EPA Strategic Plan*. FY 2025 funding will continue to support the following P2 programs:

P2 Technical Assistance
The P2 technical assistance program supports businesses, states, tribes, and other partners to promote and facilitate the adoption of source reduction approaches that make good business sense and to improve multimedia environmental conditions and climate impacts through reductions in the release of hazardous materials and pollutants such as greenhouse gases. EPA invests in analyses, tool development, training, outreach, and partnerships to provide the information and tools needed to bring awareness to industries of P2 approaches and benefits and to enable their

---

[313] For additional information about the EPA P2 Program, please visit: http://www.epa.gov/p2/.

widespread implementation to prevent or reduce pollution. The P2 Program leverages the success of EPA grantees and client businesses by amplifying and replicating environmental stewardship and sustainability successes for similar businesses in other locales.[314] Such economies of scale for P2 are central to maximizing the effectiveness of the program.

To further advance EJ in FY 2025, EPA will use analyses of toxic chemical releases from the Toxics Release Inventory (TRI) and other chemical release data to identify facilities and industries near communities with EJ concerns. These analyses will be combined with sector-specific case studies, best practices, and outreach and training efforts to facilitate adoption of P2 practices in such communities. In FY 2025, EPA also will continue efforts to work with stakeholders to identify technically and economically feasible opportunities for small businesses to adopt safer alternatives for uses of TSCA High Priority Substances undergoing risk evaluation.

P2 reporting under the TRI Program collects information on facility-level P2 practices associated with reductions in use and release of toxic chemicals. With requested funding for a grant program to facilitate small business transitions to use of safer chemicals in FY 2025, EPA will evaluate and integrate P2 case studies and best practices relevant to TSCA risk management efforts by small businesses, clarify technical and economic factors associated with such transitions, and develop and deploy pilot programs to leverage training and ongoing support for small businesses expected to make P2 transitions in response to TSCA risk management.

Safer Choice Program
Safer Choice is a voluntary program that certifies safer products so consumers, businesses, and purchasers can find products that work well and contain ingredients safer for human health and the environment, including helping reduce exposure to carcinogens in products. EPA certifies and allows use of the Safer Choice label[315] on products containing ingredients that meet stringent health and environmental criteria and undergo annual audits to confirm the products are manufactured in conformance with the Safer Choice Standard's rigorous health and environmental requirements.  Under the same stringent criteria, EPA certifies disinfectant products registered under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) using the Design for the Environment logo.

With hundreds of partner companies and about 1,800 certified products in the marketplace, companies have invested heavily in this EPA partnership. Consumer, retailer, and industry interest in Safer Choice and safer chemical products continues to grow across chemical product value chains.  Through a stakeholder engagement process started in August 2023, the Safer Choice Program will expand into additional product categories and implement pollution prevention approaches in seeking to increase consumer and commercial recognition of Safer Choice products, including certifying products in categories that currently contain PFAS ingredients (and which would have to avoid PFAS ingredients to gain Safer Choice certification). In 2023, EPA also solicited comment on technical updates to the Safer Choice Standard to reflect the latest science and will finalize these updates in 2024. In FY 2025, EPA will continue its Partner of the Year

---

[314] For additional information, please see the Pollution Prevention Program narrative under the STAG account/appropriation.
[315] For additional information about the Safer Choice Program, please visit: https://www.epa.gov/saferchoice.

Awards Program,[316] which recognizes organizations and companies for their leadership in formulating products made with safer ingredients and making them available to communities.

In FY 2025, Safer Choice will integrate and address EJ concerns through outreach and partnership activities. Efforts to make Safer Choice-certified products more accessible to communities with EJ concerns will expand with particular focus on low-income, tribal, and indigenous populations and other vulnerable populations such as the elderly, children, and those with pre-existing medical conditions. Safer Choice will work with retailers and product manufacturers to help them develop even more products containing safer chemical ingredients that are easy to identify and purchase. Safer Choice will work to empower custodial staff and house cleaning companies and enable facilities through education to gain access to Safer Choice-certified products to improve indoor air quality and reduce exposure-related asthma.[317]

To enhance transparency and to facilitate expansion and use of safer chemicals and products, EPA has included on the Program's website a list of non-confidential chemicals that meet the Safer Choice Program criteria and that are allowed in the Program's labeled products. In FY 2023, the Safer Chemical Ingredients List (SCIL) contained 1,071 safer chemicals, and EPA will continue to update this list in future years as the Program evaluates additional chemical ingredients and chemical categories (including finalizing removal of PFAS from SCIL) and approves products for the use of the Safer Choice label.

Environmentally Preferable Purchasing Program (EPP)
The Environmentally Preferable Purchasing (EPP) Program[318] implements direction provided to EPA in the Pollution Prevention Act, the National Technology Transfer and Advancement Act,[319] Federal Acquisition Regulations, and Executive Orders that mandate and set goals for sustainable federal procurement. The EPP Program assists all federal agencies in meeting these various requirements and goals including through development and use of private sector sustainability standards and ecolabels. In FY 2015 the EPP Program issued the EPA Recommendations of Specifications, Standards, and Ecolabels for Federal Purchasing (Recommendations) per direction from E.O. 13693. The Recommendations help federal purchasers determine which private sector standards and ecolabels are appropriate and effective in meeting various sustainability goals such as net-zero emissions procurement, identification of products that do not contain or use substances of concern such as PFAS reduction of single-use plastics, circularity, embodied carbon, environmental justice and more. The Recommendations have been updated and maintained through all subsequent fiscal years and now include over 40 private sector standards and ecolabels covering over 30 product and service categories. Per the latest Executive Order 14057 and the Federal Sustainability Plan, federal purchasers are required to use the Recommendations to the "maximum extent practicable". In addition, the Federal Acquisition Regulation (FAR) is in the process of being updated to align with the latest E.O. directives (FAR Case 2022-006).

---

[316] For additional information on the Partner of the Year Awards program, please visit: https://www.epa.gov/saferchoice/safer-choice-partner-year-awards.
[317] For additional information, please see:
https://journals.lww.com/joem/Fulltext/2003/05000/Cleaning_Products_and_Work_Related_Asthma.17.aspx.
[318] For additional information on the EPP Program, please visit:http://www.epa.gov/greenerproducts/buying-green-federal-purchasers.
[319] For additional information on the National Technology Transfer and Advancement Act, please visit:
https://www.nist.gov/standardsgov/national-technology-transfer-and-advancement-act-1995.

In FY 2023, the EPP Program began the process to expand and update the Recommendations to continue to support the Biden-Harris Administration's federal sustainable procurement goals and mandates. The Program received applications to assess over 80 standards/ecolabels from 42 organizations for potential inclusion in the Recommendations for federal purchasing. Based on available resources, the Program moved forward with assessing standards and ecolabels in the following five categories: Food service ware, laboratories, healthcare, professional services, and uniforms/clothing. Any standards/ecolabels that pass the assessment process will be added to the Recommendations in FY 2024 following a notice and comment period and input from an Interagency Advisory Group. The Program will continue to expand into additional product and service categories as time and resources allow.

The EPP Program also is working with the Council on Environmental Quality (CEQ), General Services Administration (GSA) and Office of Management and Budget's Office of Federal Procurement Policy (OMB OFPP) to complete a review of all Best in Class (BIC) contracts through our Sustainability Check program. The Sustainability Check initiative will ensure that language in the federal government's largest contracts align with federal sustainable purchasing requirements. This work is ensuring effective integration of, and compliance with, the applicable sustainable procurement requirements, which will further help to shift the market to offering more sustainable products and services.

The EPP Program has generated significant cost savings and environmental benefits to the federal government. For example, for electronics products, the federal government purchased nearly 9 million Electronic Product Environmental Assessment Tool (EPEAT)-registered products in 2022, resulting in a cost savings to the federal government of about $291 million and reduction of about 1.5 billion kilograms of $CO_2$ equivalents. EPEAT is just one of the over 40 private sector sustainability standards and ecolabels included in the Recommendations that help federal purchasers identify and procure environmentally preferable products and services.[320]

The EPP Program also coordinates closely with the General Services Administration, and other federal agencies to implement the Recommendations and all other applicable sustainable purchasing requirements into key federal procurement tools and contracts.

In FY 2023 and FY 2024, as a first step toward helping federal purchasers avoid the purchase of products that contain per- and polyfluoroalkyl substances (PFAS), the EPP Program published a new webpage that describes whether and how the private sector standards/ecolabels included in the Recommendations either restrict or eliminate PFAS in products. Additionally, EPA hosted a webinar with the standard/ecolabel organizations included in the Recommendations to facilitate the sharing of best practices to address PFAS through standards and encouraged the organizations to update or develop new criteria to address PFAS.

In FY 2025, the EPP Program will continue to protect human health and the environment via sustainable products and procurement through the following activities:

---

[320] For additional information on Recommendations for Specifications, Standards and Ecolabels for Federal Purchasing, please visit: https://www.epa.gov/greenerproducts/recommendations-specifications-standards-and-ecolabels-federal-purchasing.

- Continue to assess and recommend additional private sector ecolabels and standards in key federal purchase categories that support the various sustainability goals including PFAS use reduction[321], climate impact mitigation, plastics use reduction, advancing circularity, EJ, and more.
- Continue to build, implement, maintain, and update tools for integrating EPA recommendations into federal e-procurement systems and initiate identification and monitoring of relevant government contracts for sustainable purchasing requirements. Initiate and engage in private sector standards development activities in partnership with EPA's Office of Resource Conservation and Recovery (ORCR) that will result in the significant reduction of single use plastics.

Green Chemistry

The Green Chemistry Challenge Award Program[322] encourages and recognizes the sustainable design of chemical products and processes. This program serves a critical role in raising the profile, importance, and credibility of innovative and market-ready green and sustainable chemistry technologies. During the Program's more than 25 years of progress, EPA has received more than 1,800 nominations and presented awards to 133 technologies, demonstrating the interest among stakeholders to be recognized at the national level for developing market-ready and/or market-mature green chemistry solutions. The contribution of greener chemistries to addressing climate change is clear. Winning technologies are estimated to eliminate 7.8 billion pounds of carbon dioxide equivalents released to air—the equivalent of taking 770,000 cars off the road each year.[323] In FY 2025 EPA will develop training materials to help state, tribal, local, and industry stakeholders acquire information and understanding of the benefits from these innovations.[324]

In FY 2025 the Green Chemistry Program will continue to work with awardees and nominees to pursue the goal of market-oriented environmental and economic progress through increased adoption of these innovations. EPA will support and lead portions of EPA's responsibilities for implementation of the Sustainable Chemistry Research and Development Act of 2020.

Climate Adaptation

An additional $1.6 million and 1.0 FTE will fund the implementation of activities to fulfill the P2-related Long-Term Performance Goals of EPA's Strategic Plan (Objective 1.2), meet commitments in the EPA Climate Adaptation Action Plan, support increased resilience of EPA's programs, strengthen the adaptive capacity of states, tribes, territories, communities, and businesses, and increase the resilience of the nation, with a particular focus on advancing environmental justice. Resources will be used to oversee the integration of climate adaptation planning into these programs, policies, rules, and operations (including ensuring EPA facilities and supply chains are resilient to climate impacts).

---

[321] For additional information, please visit: https://www.epa.gov/greenerproducts/how-epas-recommended-standards-and-ecolabels-address-and-polyfluoroalkyl-substances.

[322] For additional information on the Green Chemistry Program, please visit: https://www.epa.gov/greenchemistry.

[323] For additional information, please visit: https://www.epa.gov/greenchemistry/information-about-green-chemistry-challenge.

[324] P2 Training materials are available to the public on various EPA websites including but not limited to: 1) https://www.epa.gov/p2/grant-programs-pollution-prevention (Grant Programs for P2); 2) https://www.epa.gov/p2/p2-grant-program-resources-applicants (Resources for grant applicants [FAQs, application checklist, P2-EJ Facility Mapping Tool and a recorded webinar]); 3) https://www.epa.gov/p2/pollution-prevention-tools-and-calculators (P2 Tools and calculators); and 4) https://www.epa.gov/p2/p2-resources-business (P2 resources for business).

Providing needed resources for the P2 technical assistance program is an important part of the Agency's efforts to mitigate the effects of climate change, and to support identification and adoption of P2 practices that promote transitions to safer chemistry by small businesses, thereby complementing and amplifying EPA's work under TSCA through a targeted grant program. The environmental results of the P2 technical assistance program are numerous and varied. EPA's strategic plan focuses on the impacts on the reduction of metric tons of carbon dioxide equivalent (MMTCO2e) released attributed to EPA P2 grants. MMTCO2e is calculated by using an online tool to convert standard metrics for electricity, green energy, fuel use, chemical substitutions, water management, and materials management into MMTCO2e. In FY 2022, there was a reduction of 0.98 MMTCO2e[325]. Providing needed resources for the P2 technical assistance program is an important part of the Agency's efforts to mitigate the effects of climate change.

**Performance Measure Targets**:

**(PM P2mtc) Reduction in million metric tons of carbon dioxide equivalent (MMTCO2e) released per year attributed to EPA pollution prevention grants.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  | No Target Established | 1.2 | 1.2 | 1.2 | 1.2 | MMTCO2e |
| **Actual** | 1.6 | 1.5 | 1.4 | 1.1 | 1.0 | Data Avail 10/2024 |  |  | |

**(PM P2sc) Number of products certified by EPA's Safer Choice program.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 1,950 | 2,000 | 1,792 | 1,795 | Products |
| **Actual** | 1,958 | 1,989 | 1,929 | 1,892 | 1,835 | 1,788 |  |  | |

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$544.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$7,830.0 / +9.0 FTE) This program change is an increase to the grant program supporting small businesses with transitioning to TSCA compliant practices and with mitigation of economic impacts. This includes $1.757 million in associated payroll and essential workforce support costs.

- (+$6,180.0/ +8.0 FTE) This program change is an increase supporting analyses, tool development, training, outreach, and partnerships to provide the information and tools needed to bring awareness to industries of P2 approaches and benefits and to enable their

---

[325] Source https://www.epa.gov/p2/pollution-prevention-tools-and-calculators.

widespread implementation to prevent or reduce pollution. This includes $1.562 million in associated payroll and essential workforce support costs.

- (+$1,652.0 / +1.0 FTE) This program change is an increase to implement the EPA Climate Adaptation Action Plan, support increased resilience of EPA's programs, and strengthen the capacity of states, tribes, territories, communities, and businesses to adapt to climate change. This includes $195 thousand in associated payroll and essential workforce support costs.

**Statutory Authority:**

Pollution Prevention Act of 1990 (PPA); Toxic Substances Control Act (TSCA).

## <u>Toxic Substances:  Chemical Risk Review and Reduction</u>

Program Area: Toxics Risk Review and Prevention
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$91,216* | *$82,822* | *$131,900* | *$49,078* |
| Total Budget Authority | $91,216 | $82,822 | $131,900 | $49,078 |
| Total Workyears | 297.3 | 360.8 | 534.8 | 174.0 |

Total program workyears in FY 2025 includes 83.0 FTE funded by TSCA fees. TSCA Service Fees and associated FTE are not included in the budget formulation nor in the explanations of change. TSCA fee collections are dependent on full funding of the program.

**Program Project Description:**

EPA has significant responsibilities under the Toxic Substances Control Act (TSCA) for ensuring the safety of chemicals in or entering commerce and addressing unreasonable risks to human health and the environment. These responsibilities are executed by EPA as part of its Chemical Risk Review and Reduction (CRRR) Program.

The CRRR Program plays an important role in achieving the Administration's goals to enhance environmental justice (EJ) and to tackle the climate crisis. Examples include engaging underserved and vulnerable communities, including tribes, in identifying exposure pathways; issuing proposed risk management regulations to ensure needed low-global warming potential chemicals are available to manufacture refrigerants as the American Innovation and Manufacturing (AIM) Act is implemented; incorporating into TSCA chemical risk evaluations the assessment of risks to communities potentially facing disproportionate impacts from chemical exposure because they are located near industrial activity; adhering to EPA's Guidance on Considering Environmental Justice During the Development of Regulatory Actions and TSCA's statutory requirement to consider risks to potentially exposed and susceptible subpopulations;[326] ensuring that TSCA chemical safety data analytical tools are made publicly available in ways that are accessible to vulnerable communities; and informing decision making that advances the introduction of more environmentally sustainable chemicals into commerce.

Under TSCA, EPA works to ensure the safety of:

- Existing chemicals,[327] by collecting chemical data, prioritizing chemicals for risk evaluation, conducting risk evaluations, and developing and issuing risk management rules to prevent any

---

[326] For more information, please see EPA's Guidance on Considering Environmental Justice During the Development of an Action.
[327] "Existing Chemicals" are those already in use when TSCA was first enacted in 1976 and those which have since gone through review by the TSCA New Chemicals Program. These include certain prevalent, high-risk chemicals known generally as "legacy

unreasonable risk posed by their manufacture, processing, use, distribution in commerce, and/or disposal; and

- New chemicals, by reviewing new chemical submissions from manufacturers and processors and taking action to mitigate unreasonable risks to health or the environment before those chemicals enter the marketplace.

Many elements of EPA's implementation of TSCA, including new chemicals, existing chemicals, and the information technology supporting those programs, contribute to the Biden-Harris Administration's Cancer Moonshot. While not all chemicals cause cancer, when information about a chemical designated for TSCA evaluation indicates that cancer risk may be a concern, EPA evaluates the risk of an individual getting cancer during their lifetime from exposure to the chemical. If the Agency finds that the risk is unreasonable, EPA establishes requirements and regulations to eliminate the unreasonable risk.

TSCA authorizes EPA to collect fees from chemical manufacturers and processors to defray up to 25 percent of the costs for administering certain sections[328] of TSCA.[329] Fee levels are set by regulation and may be adjusted on a three-year basis for inflation and to ensure that fees defray approximately 25 percent of relevant costs. The first TSCA Fees rule became effective on October 1, 2018.[330] TSCA program fees collected in FY 2019–21 under this rule equated to approximately 14 percent of estimated program costs. EPA proposed revisions to the rule in January 2022, and in light of public comments supplemented the proposal in November 2022.[331]  EPA expects to publish a final rule in the second quarter of FY 2024.

The final rulemaking is intended to establish TSCA fees that would defray up to 25 percent of relevant costs, as statutorily allowed,[332] and consistent with direction by Congress that the Agency should properly consider full costs in its rulemaking as intended by the Lautenberg Act.[333]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety, in the *FY 2022 – 2026 EPA Strategic Plan.*

---

chemicals" (*e.g.,* PCBs, mercury), which were previously covered in a separate Chemical Risk Management (CRM) budget justification. The CRM program area was combined with Chemical Risk Review and Reduction effective FY 2015.

[328] The costs of implementing TSCA Sections 4-6 are defrayable up to the statutory caps, as are the costs of collecting, processing, reviewing, and providing access to and protecting from disclosure, as appropriate, chemical information under Section 14.

[329] The authority to assess fees is conditioned on appropriations for the CRRR Program, excluding fees, being held at least equal to the amount appropriated for FY 2014.

[330] The statute authorizes EPA to collect fees from chemical manufacturers (including importers) and, in limited instances, processors who: are required to submit information (Section 4); submit notification of or information related to intent to manufacture a new chemical or significant new use of a chemical (Section 5); manufacture (including import) a chemical substance that is subject to an EPA-initiated risk evaluation (Section 6); or request that EPA conduct a risk evaluation on an existing chemical (Section 6), subject to the Agency's approval of the request.

[331] For more information on 87 FR 68647, please see https://www.epa.gov/tsca-fees/proposed-revisions-tsca-fees-rule.

[332] This rule is expected to go into effect in FY 2024. https://www.federalregister.gov/documents/2022/11/16/2022-24137/fees-for-the-administration-of-the-toxic-substances-control-act-tsca

[333] Joint Explanatory Statement from the House and Division G – Department of Interior, Environment, and Related Agencies Appropriations Act, 2022.

In FY 2025, EPA will continue to emphasize the integrity of scientific products, adherence to statutory intent and requirements, and timelines applicable to pre-market review of new chemicals, chemical risk evaluation and management, data development and information collection, the review of Confidential Business Information (CBI) claims, and other statutory requirements. The FY 2025 budget includes an additional $49 million for the Program above FY 2024 annualized continuing resolution level. These additional resources are essential for EPA to address its substantial workload, including:

- Maintaining at least 20 EPA-initiated existing chemical risk evaluations in development at all times and completing EPA-initiated existing chemical risk evaluations within the statutory timeframe.
- Having up to 10 existing chemical risk evaluations requested by manufacturers in development.
- Issuing protective regulations in accordance with statutory timelines addressing unreasonable risks identified in each risk evaluation.
- Establishing a pipeline of chemicals to be prioritized for future risk evaluation.
- Using test orders and a new strategy for tiered data collection, requiring development of data critical to existing chemical risk evaluation and risk management activities, and systematically collecting, reviewing, and synthesizing data for risk assessments in a transparent manner as mandated by the 2016 TSCA Amendments.
- Conducting risk assessments for approximately 500 new chemical notices and exemption submissions and managing the identified risks associated with the chemicals.
- Maintaining the statutorily required TSCA Inventory under Section 8(b) which includes over 86,000 chemicals manufactured or processed, including imports, in the United States for uses under TSCA.
- Continuing to support the implementation of a collaborative research program focused on developing new scientific approaches for increasing the scientific defensibility and timeliness of risk assessments for new chemical substances.
- Reviewing and making determinations on CBI claims contained in TSCA submissions; making certain non-CBI information available to stakeholders; and publishing identifiers for each chemical substance for which a confidentiality claim for specific chemical identity is approved.
- Stabilizing and modernizing the information technology (IT) environment that supports all aspects of EPA's TSCA program.
- Carrying out other required TSCA CRRR activities as described below.

<u>Primary TSCA Implementation Activities</u>

*Section 4: Testing of Chemical Substances and Mixtures.* In FY 2025, the resources requested will support agency review of test protocols; review of test data submitted voluntarily or in response to Test Orders, Test Rules, and Enforceable Consent Agreements (ECAs); initial implementation of additional phases of the National Per- and polyfluoroalkyl substances (PFAS) Testing Strategy; and issuance of additional Test Orders. In January 2021, the Agency issued Test Orders for nine additional chemicals undergoing TSCA risk evaluation and issued additional Test Orders for eight of these chemicals in March 2022. EPA will continue to support remaining testing requirements in these Test Orders as recipients complete the required testing. Additionally, EPA anticipates it will issue Test Orders to support data needs for additional chemicals undergoing TSCA risk

evaluation. In addition, EPA will continue to implement and refine the National PFAS Testing Strategy in FY 2025. EPA issued the first Test Orders for PFAS starting in June 2022. EPA will issue additional Test Orders for PFAS chemicals in FY 2025. In parallel with the Test Order approach, EPA has requested voluntary submission of PFAS test data. In FY 2025, EPA intends to refine the initial structural categories developed by EPA's Office of Research and Development (ORD) to incorporate additional substances as appropriate, to consider physical-chemical properties and potential exposure.

*Section 5: New Chemicals.* The New Chemicals Program is critical for ensuring the safety of new chemicals before they enter commerce. The 2016 TSCA amendments significantly changed the way EPA implemented the New Chemicals Program. Under the prior law, EPA issued formal written unreasonable risk determinations for about 20 percent of new chemical submissions. Under the amended law, EPA is required to issue determinations for 100 percent of new chemical submissions (a five-fold increase). In FY 2025, the Agency expects to conduct risk assessments for approximately 500 new chemical notices and exemption submissions;[334] make affirmative determinations on whether unreasonable risks are posed under those chemicals' conditions of use; manage identified risks associated with the chemicals through the issuance of Orders and Significant New Use Rules (SNURs); and require development of additional data where information is insufficient to conduct a reasoned evaluation and then evaluate such data received.[335] The Agency also will conduct a similar effort on notices received in previous years that are not yet complete.

In FY 2025, EPA will continue to implement innovative approaches to add consistency and efficiency to new chemical submission reviews for categories such as has been done for, mixed metal oxides, photo acid generators, and PFAS and to develop new streamlined approaches. Additionally, the Agency will continue to support outreach to submitters on how to provide the most complete submissions to enable timely reviews. EPA also intends to continue its commitment to transparency by making information generated in the review of notices available to the public via the *ChemView* database[336] and on EPA websites, including TSCA Sections 5 and 8(e) data, CDR 2024 data, TSCA section 5 communications from submitters received via CDX, Notice of Commencement (NOC) data, and TSCA section 4 data.

In FY 2025, EPA expects to complete finalization of three SNURs associated with approximately 150 consent orders previously issued for PFAS. Issuance of the SNURs will ensure that companies planning a significant new use beyond those allowed for these PFAS must notify EPA. Following its Framework for Addressing New PFAS and New Uses of PFAS, EPA will then have the opportunity to conduct a risk assessment of the new use and impose any needed restrictions before it is allowed into commerce. Additionally, EPA will continue to implement a performance metric to measure compliance with past TSCA regulatory actions, including consent orders and SNURs

---

[334] New chemical submissions may include Pre-Manufacture Notices (PMNs), significant new use notifications (SNUNs), microbial commercial activity notices (MCANs), low volume exemptions (LVEs), low releases and low exposures exemptions (LoREX), test marketing exemption (TME), TSCA experimental release application (TERA), and Tier 1 and 2 exemptions.

[335] For PMNs, MCANs, and SNUNs, as required by law, the Agency must generally complete the review, determination, and associated risk management activities within 90 days of receiving the submission, subject to extensions or suspension under certain circumstances.

[336] To access *ChemView*, please visit: https://chemview.epa.gov/chemview.

issued for PFAS. Through this measure, the Agency is tracking its success in managing the risks presented by new chemicals.

EPA will continue to implement its Framework for Addressing New PFAS and New Uses of PFAS, which outlines EPA's planned approach when reviewing new PFAS and new uses of existing PFAS to ensure that, if allowed to enter commerce, they will not be harmful to human health and the environment.[337]

The New Chemicals Program also will continue implementation of its PFAS Low Volume Exemption (LVE) Stewardship Program to encourage industry to voluntarily withdraw LVEs for PFAS already granted under the exemption. EPA anticipates finalization of a rulemaking amending TSCA section 5 procedural regulations to better align with the 2016 Lautenberg Amendments in FY 2025. If the rulemaking is finalized in FY 2025, EPA will begin implementation of the rule. Among other provisions, this rule would codify EPA's current policy of generally denying LVEs submitted for PFAS and also would make certain persistent, bioaccumulative, and toxic chemicals ineligible for LVEs (88 FR 34100). EPA also will continue to make strides in its efforts to review and revise hundreds of critical high-priority standard operating procedures (SOPs) and science policies to increase consistency and ensure protection of human health and the environment when conducting new chemical reviews.

The New Chemicals Program has developed and implemented new strategies that will standardize new chemical review and risk management approaches to support the Administration's climate adaptation goals. Under the Office of Chemical Safety and Pollution Protection's Climate Adaptation Plan, goals and priorities have been established to take actions that directly support climate adaptation related to new chemistries and innovative technologies or other related processes. Additionally, the New Chemicals Program is complementing the office's work related to the Climate Adaptation Plan with improvements in information technology systems and models under Section 60115 of the Inflation Reduction Act to increase efficiency in reviews of new chemicals in sectors that support climate adaptation.

In addition, EPA continues to implement the standardized risk assessment and risk management approach for mixed metal oxides (MMOs), which include new and modified cathode active materials (CAMs), which are a key component in lithium-ion batteries used in electric vehicles. MMOs also have applications in semi-conductors and renewable energy generation and storage, such as solar cells and wind power turbines. Both efforts support the Biden-Harris Administration's agenda to tackle the climate crisis and will complement resources provided to EPA from legislative enactments such as clean energy initiatives under the Inflation Reduction Act, tax credits for electric vehicles, and the Bipartisan Infrastructure Law.

*Section 6: Existing Chemicals.* TSCA requires a continuing process of prioritizing existing chemicals for evaluation to identify unreasonable risks and, where unreasonable risks for existing chemicals are found, the Agency also must commence risk management action under TSCA to address those risks. The resources requested in FY 2025 are critical for the Agency to continue

---

[337] Please see https://www.epa.gov/reviewing-new-chemicals-under-toxic-substances-control-act-tsca/framework-addressing-new-pfas-and.

implementing these additional requirements to prioritize, evaluate, and address the risks of existing chemicals, including:

- **Prioritization.** The initial step in the process of evaluating existing chemicals under TSCA, prioritization, is codified in a final Chemical Prioritization Process rule.[338] The purpose of prioritization is to designate a chemical substance as either High-Priority for further risk evaluation or Low-Priority for which risk evaluation is not warranted at the time.[339,340] TSCA requires that upon completion of a risk evaluation for a High-Priority Substance (HPS), EPA designate at least one additional HPS to take its place, ensuring that at least 20 EPA-initiated risk evaluations are constantly underway. In December 2023, EPA initiated the prioritization process for five additional chemical substances. In FY 2025 EPA will continue working to identify, initiate, and designate additional HPS for which sufficient data are available to conduct scientifically sound risk evaluations. EPA plans to do this by obtaining, validating, and analyzing reasonably available hazard and exposure information on different HPS candidates, to build a more manageable and sustainable chemical evaluation pipeline, EPA intends to prioritize chemicals in smaller groups on an annual basis, consistent with the completion of risk evaluations currently in process.

**Risk Evaluation.** EPA initiated risk evaluations for the first 10 chemicals in December 2016. EPA missed the statutory deadline for completing TSCA risk evaluations for nine of the chemicals, and work on many of those chemical risk evaluations has continued.[341] In FY 2021 and FY 2022, EPA developed approaches for the consideration of exposure pathways (*i.e.*, air, water, disposal) that were originally omitted from the scopes of the HPS and Manufacturer-Requested Risk Evaluations (MRREs) and to consider risks from environmental releases, often to exposed vulnerable and underserved populations adjacent to the perimeter of manufacturing facilities, for seven of the first 10 chemical risk evaluations. This work added to the challenge of completing additional risk evaluations.[342] EPA issued the final scope document for "Asbestos Part 2: Supplemental Evaluation Including Legacy Uses and Associated Disposals of Asbestos" in June 2022, issued for public comment and peer review *White Paper: Quantitative Human Health Approach to be Applied in the Risk Evaluation for Asbestos Part 2* in August 2023 which concluded in December

---

[338] For additional information, please visit: https://www.regulations.gov/document?D=EPA-HQ-OPPT-2016-0636-0074.

[339] TSCA required that EPA designate by December 2019 at least 20 chemical substances as High-Priority for risk evaluation and also at least 20 chemical substances as Low-Priority. On December 20, 2019, EPA finalized the designation of 20 chemical substances as High-Priority for upcoming risk evaluations. For additional information, please visit: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/chemical-substances-undergoing-prioritization-high.

[340] On February 20, 2020, EPA finalized the designation of 20 chemical substances as Low-Priority. For additional information, please visit: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/low-priority-substances-under-tsca.

[341] EPA revised its risk determinations for eight of the first 10 chemicals to reflect EPA's unreasonable risk finding on the chemical substance as a whole, rather than on individual conditions of use; in addition, the revised risk determinations do not assume that workers always and appropriately wear personal protective equipment (consideration of PPE will be part of risk management). EPA also re-examined the risk evaluations of seven of those chemicals to address overlooked and/or inadequately assessed exposure pathways (including those affecting fenceline, underserved, or disproportionately burdened communities), is developing a supplemental risk evaluation for one chemical due to omission of exposure pathways, in part as a result of litigation against the Agency, and is conducting a second risk evaluation for asbestos to include types and uses that were excluded from the first one.

[342] In January 2022, EPA released for public comment and peer review version 1.0 of a screening methodology that will be used to further examine whether the policy decision to exclude air and water exposure pathways from the risk evaluations will lead to a failure to identify and protect fenceline communities. Review of the screening level methodology will include review by the Science Advisory Committee on Chemicals (SACC). *See*, https://www.epa.gov/newsreleases/epa-releases-screening-methodology-evaluate-chemical-exposures-and-risks-fenceline.

2023. EPA will issue the draft and final Part 2 risk evaluations before the court-mandated deadline of December 1, 2024.[343] In July 2023, EPA also issued a draft supplement to the 1,4-dioxane risk evaluation and a draft revised risk determination that considers air and water exposure pathways excluded from the earlier risk evaluation and exposure to 1,4-dioxane generated as a byproduct. Revisions are ongoing based on peer review and public comment which concluded respectively in September and November 2023. In FY 2024-2025, EPA expects to issue a final supplement and risk determination for 1,4-dioxane and commence risk management for any identified unreasonable risks.

EPA initiated risk evaluations for the first set of 20 HPS in December 2019.[344] On September 4, 2020, EPA released final scoping documents for these chemicals.[345] Because of resource constraints and policy shifts, EPA did not meet the December 2022 statutory deadline for completing these risk evaluations. In addition, manufacturers may submit requests to EPA to evaluate specific additional chemicals. The first two Manufacturer Requested Risk Evaluations (MRREs) began in FY 2020. A third was started in FY 2021, and a fourth request is currently being considered. Those initial MRREs will continue throughout FY 2024 and are for chemicals on the 2014 TSCA Work Plan.[346] To support a sustainable flow of HPS risk evaluations, EPA will finalize a subset of these 20 HPS risk evaluations and three MRREs each year and then designate a corresponding number to replace them. Before the end of December 2024, EPA will issue at least nine draft risk evaluations and complete its risk evaluations for five: a flame retardant (tris[2-chloroethyl] phosphate (TCEP), the draft risk evaluation for which was released in December 2023), formaldehyde, a chlorinated solvent (1,1-dichloroethane), and two MRRE phthalates (DIDP and DINP). Before the end of December 2025, EPA will complete its risk evaluations for at least seven additional chemicals. Before the end of December 2026, EPA will complete its risk evaluations for the remaining HPS and MRRE chemicals. In December 2023, EPA initiated the prioritization process for five chemical substances in anticipation of completion of pending risk evaluations. EPA continues to look for efficiencies to meet statutory deadlines including fit-for-purpose analyses, systematic review, and peer review.

In October 2023, the Agency proposed and took comment on revisions to the 2017 risk evaluation procedures rule to better align with statutory language, court decisions, and executive orders; build on the Agency's experience with its first 10 risk evaluations; and increase program clarity, transparency, sustainability, and flexibility. The Agency expects to finalize this rule in FY 2024. The Agency is expanding the focus of the risk evaluations to ensure that exposure pathways affecting the general public (*e.g.,* through ambient air and drinking water) and overburdened communities are evaluated in accordance with the law. Specifically, it is expected that the Agency's consideration of potentially exposed and susceptible subpopulations (a term defined in the statute) will include environmental justice considerations and reflect engagement with overburdened communities through mechanisms including the National Tribal Operations

---

[343] The Asbestos Part 2 risk evaluation is in response to the ruling in *Safer Chemicals, Healthy Families v. U.S. EPA*, 943 F.3d 397 (9th Cir. 2019) as well as the subject of the abeyance in *ADAO et al. v. U.S. EPA et al.*, 9th Cir. No. 21-70160 and under consent decree from *ADAO et al. v. U.S. EPA et al.*, N.D. Cal. No. 21-cv-3716.

[344] For additional information, please visit: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/chemical-substances-undergoing-prioritization-high.

[345] For additional information, please visit: https://www.epa.gov/chemicals-under-tsca/epa-releases-final-scope-documents-and-list-businesses-subject-fees-next-20.

[346] *See* https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/tsca-work-plan-chemicals.

Committee (NTOC) and the National Tribal Toxics Council (NTTC). In addition, in February 2023, EPA released for public comment and peer review a set of principles for evaluating cumulative risks under the Toxic Substances Control Act (TSCA) and a proposed approach for applying those principles to the evaluation of the cumulative risk posed by certain phthalate chemicals undergoing TSCA section 6 risk evaluation.[347]

The resources requested for FY 2025 will support efforts to meet statutory mandates and other requirements related to the evaluation of existing chemicals while maintaining EPA's commitment to evidence-based decisions guided by the best available science and data.

- **Risk Management.** When unreasonable risks are identified in the final risk evaluation, EPA must promulgate risk management actions under TSCA Section 6(a) to address the unreasonable risks. EPA commenced development of risk management actions in FY 2020 and 2021 to address unreasonable risks identified for the first 10 chemicals evaluated under TSCA Section 6. EPA expects to finalize nine of these actions by or in FY 2025 and will engage in implementation activities associated with these final actions, including development of compliance guides and outreach to impacted entities. EPA will continue in FY 2025 to develop up to seven proposed risk management actions for chemicals with risk evaluations anticipated to be drafted or finalized in FY 2024. This work will adhere to EPA's Guidance on Considering Environmental Justice During the Development of an Action and its companion Technical Guidance for Assessing Environmental Justice in Regulatory Analysis.[348]

TSCA also mandates that EPA promulgate Section 6 risk management rules for certain Persistent, Bioaccumulative, and Toxic (PBT) chemicals on the 2014 TSCA Work Plan without undertaking further risk evaluation.[349] EPA issued five final rules for PBTs in January 2021. EPA requested and received comments on the January 2021 PBT rules and in September 2021 announced its intent to initiate a new rulemaking to further reduce exposures, promote environmental justice, and better protect human health and the environment, as well as implementation changes that may need to be made to current exclusions. In November 2023, EPA proposed revised rules for two PBTs (decaBDE and PIP (3:1)), with finalization of those anticipated in FY 2024.

In addition, risk management actions for existing chemicals under TSCA Section 5 are ongoing. EPA expects to propose SNURs in FY 2024 for discontinued uses of the 20 high-priority substances (HPS) undergoing risk evaluation (*e.g.,* SNURs for three flame retardants were proposed in June 2023). When final, these rules will ensure that any phased-out uses of the 20 HPS cannot resume without EPA review and action, as necessary, to protect health and the environment from potential unreasonable risks. In January 2023, EPA issued a proposed SNUR for inactive PFAS to ensure these uses cannot restart without prior EPA risk assessment and action, as necessary, under section 5. EPA finalized this SNUR in January 2024.

*Section 14: Confidential Business Information.* EPA is required under TSCA Section 14 to review and make determinations on CBI claims contained in TSCA submissions; to process requests from

---

[347] Please see https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/cumulative-risk-assessment-under-toxic-substances.

[348] For additional information, please visit: https://www.epa.gov/environmentaljustice/technical-guidance-assessing-environmental-justice-regulatory-analysis.

[349] TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, Section 6(h) (1) and (2).

TSCA submitters and to make certain CBI information available to states, tribes, health, and medical professionals, and first responders under defined circumstances; and to assign and publish unique identifiers for each chemical substance for which a confidentiality claim for a specific chemical identity is approved. In FY 2025, EPA will assign unique identifiers to chemicals where CBI claims for chemical identity are approved and expects to complete CBI claim reviews for more than 1,500 new cases and approximately 1,500 chemical identity claims made in existing Notice of Activity reports under the 2017 TSCA Inventory Notification (Active-Inactive) Requirements rule.

These reviews are expected to be conducted in accordance with new and updated procedures and with reporting and communications tools developed in the new CBI procedures rule, which was finalized on June 1, 2023.[350] The rule provides the regulatory infrastructure necessary to develop further internal procedures and reporting tools to support the review of expiring CBI claims, beginning in FY 2026.

*TSCA Information Technology (IT) and Data Tools Infrastructure.* IT systems development and maintenance will continue in FY 2025 with the goal of minimizing reporting burdens on industry and streamlining data management by EPA, including the following activities:

- Continuing enhancement of the TSCA Chemical Information System to reduce manual handling of data, to increase internal EPA access to data relevant to chemical assessments, and to expedite review of chemicals.
- Initiating development of new tools for hazard and exposure identification, assessment, and characterization while improving existing tools to better assess chemical risks.
- Maintaining the functionality of *ChemView,[351]* continuing to increase transparency, and expanding the information ChemView makes available to the public, including newly completed chemical assessments, worker protection information, and other new data reported to EPA under TSCA.
- Continuing TSCA CBI LAN network, Central Data Exchange (CDX), and Chemical Information System stabilization and modernization efforts.
- Putting in place systems and IT capabilities to begin implementation of the TSCA CBI Sunset Program starting in June 2026.

Implementing TSCA depends on the collection and availability of information on chemicals from a wide variety of public and confidential sources. EPA's data currently resides in multiple formats including paper files, microfiche, and numerous old electronic file formats. A critical need for improving EPA's performance on TSCA implementation is modernizing the IT systems necessary for chemical data collation, storage, and curation and making the data received under TSCA available in structured and consistent formats. The funding requested will support the following activities: advancing modernization of the existing TSCA IT infrastructure including regulatory community-facing reporting applications in CDX; enhancing the New Chemical Review (NCR) system; initiating steps toward automating publication of New Chemical Consent Orders and SNURs; continuing efforts regarding remaining TSCA CBI review workflow enhancements

---

[350] Please see https://www.epa.gov/tsca-cbi/final-rule-requirements-confidential-business-information-claims-under-tsca.

[351] For additional information, please visit: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/introduction-chemview.

including enhancement of workflows to support the sunsetting of CBI claims; analyzing and updating TSCA records data to identify and organize records for publication; making progress toward the development of a framework for enabling CIS to automatically assign unique identifiers (UIDs) as CBI claims are approved; making progress in the effort to digitize the remaining legacy 8(e)s and publish them in *ChemView*; and initiating digitization of legacy documents.

*Chemical Data Management Modernization.* The international regulatory community has been moving toward using the International Uniform Chemical Information Database (IUCLID) to capture, store, maintain, and exchange data on intrinsic and hazardous properties of chemical substances. Data in IUCLID is centered around standardized reporting templates consistent with internationally accepted test guidelines and has CBI protection built in. EPA has initiated the process to incorporate IUCLID template structures and related OECD Harmonized Templates into OPPT's CBI LAN. With the promulgation of the CBI Procedural Rule, submission of these templates is required, but resource constraints have limited EPA's implementation and adoption of IUCLID. With increased resources in FY 2025, the TSCA Program will continue to collaborate with ORD to implement a IUCLID instance in its CBI LAN to capture, store, and maintain data on intrinsic and hazard properties of chemicals. The Agency also will work with international partners to modify software applications to ensure EPA's unique needs and federal IT requirements are incorporated. Along with integration and consolidation of other legacy data systems, this initiative will modernize EPA's chemical data management infrastructure and deliver more efficient searching, collating, managing, and integrating of data on chemicals, resulting in significant time and cost savings.

*Collaborative Research Program to Support New Chemical Reviews.[352]* In FY 2025 EPA will continue to develop and implement a multi-year collaborative research program in partnership with ORD and other federal agencies. This collaboration is focused on developing new science approaches for performing risk assessments on new chemical substances under TSCA. The effort is expected to bring innovative science to new chemical reviews; modernize the approaches used; increase the transparency of the human health and ecological risk assessment process; and expand utilization of current information technology tools and databases. The resources requested for FY 2025 will allow EPA to accelerate implementation of the collaborative research program, including new approach methodologies (NAMs), and the new chemicals program in accordance with statutory mandates and to address the backlog of older submissions. These resources also are critical to ensuring that the Agency can conduct robust risk assessments using best available science and data within the statutory timelines.

Other TSCA Sections, Mandates, and Activities

*Chemical Data Reporting (CDR) & Tiered Data Reporting (TDR) Rule.[353]* In FY 2024, EPA plans to propose a rule that expands reporting requirements for chemicals that are candidates for or selected as high-priority substances. The purpose is to acquire the most relevant and applicable

---

[352] *See*, https://www.epa.gov/newsreleases/epa-announces-collaborative-research-program-support-new-chemical-reviews.
[353] Section 8(a) of TSCA requires manufacturers (including importers) to provide EPA with information on the production and use of chemicals in commerce. In March 2020, EPA amended the Chemical Data Reporting (CDR) rule to reduce burden for certain CDR reporters, improve data quality, and align reporting requirements with amended TSCA. The Calendar Year 2020 CDR Reporting Cycle, which occurs every four years and covers CY 2016-2019, commenced on June 1, 2020, and concluded on January 29, 2021.

data that will support risk evaluation. EPA plans to finalize the Rule in FY 2025, after responding to comments on the proposed Rule and modifying certain CDR requirements. Additionally, in FY 2025, EPA will review data submitted (including CBI claims) and publish the non-CBI CDR data collected for the 2024 CDR reporting cycle.

*Other Section 8 Activities*. In FY 2025, EPA will continue to implement and issue new data gathering requirements to obtain data needed for chemicals undergoing Section 6 prioritization and risk evaluations or other chemicals of concern as well as analyze information submitted by industry. Data gathering actions to implement and/or issue in FY25 include the 8(a)(7) PFAS Data Reporting rule finalized in 2023, a section 8(d) rule to require submission of copies and lists of unpublished health and safety studies of identified chemical substances, and section 8(c) call-ins for adverse effect records of identified chemical substances. EPA continues to develop and test the reporting tools and internal database infrastructure for each of these actions ahead of their respective data submission periods and will analyze received data following the associated submission periods. Information analysis includes review of information submissions from these previously described section 8 actions as well as 300 Substantial Risk (Section 8(e)) Notifications submitted by industry.

*PFAS Roadmap Support*. PFAS have been manufactured and used in a variety of industries globally since the 1940s, and they are still being used today. Work in FY 2025 will include continuing to implement the PFAS national testing strategy; ensuring a robust review process for new PFAS using the "Framework for Addressing New PFAS and New Uses of PFAS"; reviewing previous decisions on PFAS; implementing actions to close the door on abandoned PFAS and uses; implementing a new PFAS reporting rule; and leading the development of a voluntary PFAS Stewardship Program. The final rule for the inactive PFAS was signed in January 2024. The funding requested in FY 2025 will allow EPA to improve the Agency data submission process for test data and ensure early engagement with Test Order recipients and, where there is interest expressed, with other key stakeholders to facilitate robust data collection. The requested funding also will allow EPA to review study plans required to be submitted as a result of Test Orders and data submitted pursuant to the first round of Test Orders issued under TSCA for human health effects; to integrate submitted data into systematic review databases; and to analyze existing data in preparation for issuing additional orders to require additional testing for chemicals already subject to testing.

*Polychlorinated Biphenyls (PCBs)*. PCBs are a nationwide problem and found in every region. TSCA requires essential work in evaluating a site for PCB exposures and reducing risks at that site. EPA Regions do this by making site-specific PCB "use" determinations, evaluating exposures, and providing recommendations and specialized technical support to address the risks associated with PCBs legally and illegally "in use." EPA's Regional offices will work with building owners to implement practical interim measures; to develop outreach and technical assistance materials to prevent or reduce exposure to PCBs; and to conduct risk evaluation of PCB exposure at local sites.

*Mercury.* In FY 2025 EPA will maintain the Mercury Electronic Reporting Application[354] and conduct outreach to stakeholders on reporting requirements. EPA also will continue work under the Mercury Export Ban Act and amendments related to prohibiting export of certain mercury compounds and to supporting compliance with the Minamata Convention on Mercury to which the United States is a party. EPA will collect and prepare information for publication in the CY 2024 update to the national mercury inventory and consider recommending actions to further reduce mercury use.

*TSCA Citizen Petitions.* In FY 2025, EPA will continue to meet the requirements of section 21 of TSCA, which authorizes citizen petitions for the issuance, amendment, or repeal of certain actions (rules and orders) promulgated under specific components of TSCA sections 4, 5, 6, and 8. The Agency must grant or deny a section 21 petition within 90 days. If EPA grants a petition, the requested action must be initiated in a timely fashion. EPA has received a total of 32 TSCA section 21 petitions since September 2007. 13 of those petitions have been submitted since enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act.[355]

*Formaldehyde Standards for Composite Wood Products.* In FY 2025, EPA will continue implementing regulations under the TSCA Title VI Formaldehyde Standards for Composite Wood Products Act (Public Law 111-199), which established national emission standards for formaldehyde in new composite wood products.[356] Beginning on March 22, 2024, laminated product producers must meet the formaldehyde emission standards for hardwood plywood and will be responsible for formaldehyde emissions testing and third-party certification unless exempted by using no-added formaldehyde or lower emitting phenol formaldehyde resins. EPA provided laminated product producers seven years to transition to no-added formaldehyde or phenol formaldehyde resins to avoid being subject to formaldehyde testing and third-party certification.

*TSCA User Fees.* TSCA section 26 authorizes EPA to collect user fees to offset 25 percent of the Agency's full costs for implementing TSCA sections 4, 5, 6, and 14.[357] In FY 2021 EPA collected $28.6 million: $3.3 million from Section 5, $24.05 million from 19 of the 20 Section 6 EPA-Initiated Risk Evaluations, and $1.25 million from one Section 6 MRRE for a TSCA Work Plan chemical.[358] EPA's FY 2021 collections were as follows:

| | Amount Collected | | |
|---|---|---|---|
| TSCA Section | FY 2021 | FY 2022 | FY 2023 |
| Section 4 Test Orders | | $0.88 million | $0.09 million |
| Section 5 Submissions | $3.3 million | $3.47 million | $3.42 million |
| Section 6 EPA-Initiated Risk Evaluations | $24.05 million | $1.48 million | |

---

[354] The Mercury Electronic Reporting application is an electronic reporting interface and database within the Central Data Exchange (CDX).

[355] For additional information, please visit: https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/tsca-section-21.

[356] For additional information, please visit: http://www2.epa.gov/formaldehyde/formaldehyde-emission-standards-composite-wood-products.

[357] TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, Section 26(b) (1) and (4).

[358] The Agency invoiced $88.2 thousand for Section 4 Test Orders in FY 2020 and FY 2021 but did not start receiving submissions until FY 2022.

| Section 6 MRREs | $1.25 million | | |
|---|---|---|---|
| *Total* | *$28.6 million* | *$5.04 million* | *$3.51 million* |

Based on its current workplan, EPA is projected to collect $35.45 million in FY 2024[359] and $30.83 in FY 2025.[360] EPA proposed revisions to its 2018 fee rule in January 2021. Based on public comments received on the proposed rule, as well as stakeholder engagement and EPA's continued experience in implementing the 2018 Rule, the Agency issued a supplemental notice of proposed rulemaking in November 2022 that added to and modified the 2021 proposal. EPA expects the final rule to be published in early 2024.

*Aggregate Exposure and Cumulative Risk Methodologies.* EPA is developing aggregate exposure and cumulative risk approaches to characterizing chemical exposure and risk in risk evaluations under TSCA. In FY 2025, the following foundational activities will be conducted to support statutory deadlines:

- Apply approaches to determine when aggregating chemical exposure across conditions of use is applicable in risk evaluations.
- Develop approaches to identify co-exposure to chemicals to inform prioritization and to determine when cumulative assessments should be considered for relevant chemicals.
- Continue to apply, where appropriate and feasible, approaches for conducting aggregate exposure and cumulative risk assessments.
- Apply, where relevant and feasible, the using biomonitoring data in risk evaluations.
- To begin integrating cumulative assessment into the TSCA Program. In May 2023, EPA released for public comment and SACC peer review, a cumulative risk assessment framework and an approach for the phthalates undergoing risk evaluation. In FY 2025, EPA will release the individual draft risk evaluations and the draft cumulative risk assessment for the phthalates, incorporating the public comments and peer review from FY 2023.

*Continuous Improvement of TSCA Implementation.* In FY 2025, the Agency will continue to monitor and evaluate its progress related to core responsibilities under TSCA, such as completing all EPA-initiated risk evaluations and associated risk management actions for existing chemicals within statutory timelines. In addition, EPA will continue to reduce the backlog and work towards meeting the applicable review period of 90 days for Section 5 new chemicals submissions (such as PMNs, MCANs, and SNUNs). EPA also will undertake other forms of assessment and data gathering in FY 2025. Based on experience and chemical-specific information EPA will continue to apply fit-for-purpose application of systematic review to support TSCA risk evaluations.

---

[359] Estimated $10.2 million in Section 5 submissions, $125 thousand from section 4 Test Order invoices, and an additional amount from one TSCA Section 6 Manufacturer-Requested Risk Evaluation at $1.497M if the MRRE request is granted.
[360] Estimated $10.2 million in Section 5 submissions, $25.4 million from the next round of Section 6 EPA-initiated chemical risk evaluations, $125 thousand from section 4 Test Order invoices, and an additional amount from one TSCA Section 6 Manufacturer-Requested Risk Evaluation at $1.497M if the MRRE request is granted.

**Performance Measure Targets:**

**(PM TSCA4) Number of HPS TSCA risk evaluations completed within statutory timelines.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 0 | 0 | 1 | 6 | Evaluations |
| **Actual** | | | 1 | 0 | 0 | 0 | | | |

**(PM TSCA5) Percentage of existing chemical TSCA risk management actions initiated within 45 days of the completion of a final existing chemical risk evaluation.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 100 | 100 | 100 | 100 | Percent |
| **Actual** | | | | | N/A | 100 | | | |
| **Numerator** | | | | | | 6 | | | Actions |
| **Denominator** | | | | | | 6 | | | |

**(PM TSCA6a) Percentage of past TSCA new chemical substances decisions with risk management actions reviewed.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | 5 | 25 | 30 | 90 | Percent |
| **Actual** | | | | | N/A | 16 | | | |
| **Numerator** | | | | | | 40 | | | Decisions |
| **Denominator** | | | | | | 258 | | | |

**(PM TSCA6b) Percentage of TSCA new chemical substances with risk management actions reported to the 2020 CDR reviewed for adherence/non-adherence with TSCA Section 5 risk management actions that are determined to adhere to those requirements.**

| | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** | | | | | N/A | 25 | 30 | 90 | Percent |
| **Actual** | | | | | N/A | 70 | | | |
| **Numerator** | | | | | | 28 | | | Substances |
| **Denominator** | | | | | | 40 | | | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$5,483.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$43,595.0 / +112.5 FTE) This increase provides critical support for EPA to implement the revised and expanded TSCA, which gives EPA substantial new responsibilities and workload to ensure chemical safety. This increase enables EPA to develop and review data critical to existing chemical risk evaluation and risk management activities; update and develop 21st century information technology and data tools to meet increasing demands;

and begin to transform New Chemicals review into an efficient and sustainable process to complete cases in keeping with the statutory requirements. This program change also will support an agencywide multi-year collaborative research program for new chemicals that are focused on modernizing the process and incorporating scientific advances in new chemical evaluations under TSCA. This investment also includes $21.258 million in payroll costs and essential workforce support costs.

**Statutory Authority:**

Toxic Substances Control Act (TSCA).

# Toxic Substances:  Lead Risk Reduction Program

Program Area: Toxics Risk Review and Prevention
Goal: Ensure Safety of Chemicals for People and the Environment
Objective(s): Ensure Chemical and Pesticide Safety

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$11,777* | *$14,359* | *$14,597* | *$238* |
| Total Budget Authority | $11,777 | $14,359 | $14,597 | $238 |
| Total Workyears | 58.6 | 62.9 | 62.9 | 0.0 |

**Program Project Description:**

EPA's Lead Risk Reduction Program contributes to the goal of reducing lead exposure and works toward addressing historic and persistent disproportional vulnerabilities of certain communities.[361] This program thereby plays an important role in achieving the Administration's goals to enhance environmental justice (EJ) and equity by:

- Implementing standards governing lead paint hazard identification and abatement practices.
- Identifying and providing access to a national pool of certified firms and individuals trained to carry out lead paint hazard identification and abatement practices and/or renovation, repair, and painting projects while adhering to the lead-safe work practice standards and minimizing lead dust hazards created in such projects; and
- Providing information and outreach to housing occupants and the public so they can make informed decisions and take actions about lead paint hazards in their homes.

Lead is highly toxic, especially to young children. Exposure to lead is associated with decreased intelligence, impaired neurobehavioral development, decreased stature and growth, and impaired hearing acuity. According to the Centers for Disease Control and Prevention (CDC), no safe blood lead level in children has been identified, and effects of lead exposure cannot be corrected.[362,363] Reducing exposure to lead-based paint (LBP) in old housing continues to offer the potential to significantly decrease blood lead levels in the largest number of children. Housing units constructed before 1950 are most likely to contain LBP. The most recent national survey estimated that 34.6 million homes in the United States have LBP and that 29 million homes have significant LBP hazards.[364] Children living at or below the poverty line who live in older housing are at

---

[361] Childhood blood lead levels (BLL) have declined substantially since the 1970s, due largely to the phasing out of lead in gasoline and to the reduction in the number of homes with lead-based paint hazards. The median concentration of lead in the blood of children aged 1 to 5 years dropped from 15 micrograms per deciliter in 1976–1980 to 0.7 micrograms per deciliter in 2013–2014, a decrease of 95%. *See*, *America's Children and the Environment* (EPA, 2019), found at: https://www.epa.gov/americaschildrenenvironment.

[362] Centers for Disease Control and Prevention, Blood Lead Levels in Children, found at: http://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm.

[363] *America's Children and the Environment* (EPA, 2019), found at: https://www.epa.gov/americaschildrenenvironment.

[364] *See*, *American Healthy Homes Survey II Lead Findings* (HUD, 2021), found at: https://www.hud.gov/sites/dfiles/HH/documents/AHHS_II_Lead_Findings_Report_Final_29oct21.pdf.

greatest risk. Additionally, some racial and ethnic groups and those living in older housing are disproportionately affected by LBP.[365]

Because of historic and persistent disproportional vulnerabilities of certain racial, low-income, and overburdened and underserved communities, the Lead Risk Reduction Program has the potential to create significant EJ gains and provides strategic opportunities to advance EPA's work in support of the Administration's goals to enhance EJ and equity as seen in the *Strategy to Reduce Lead Exposures and Disparities in U.S. Communities.*[366]

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 7/Objective 7.1, Ensure Chemical and Pesticide Safety in the *FY 2022 – 2026 EPA Strategic Plan.*

EPA's Strategic Plan includes a measure that tracks the percentage of expiring lead-based paint firm certifications renewed before the expiration date. Federal law requires all Renovation, Repair, and Painting (RRP) firms working in housing, or facilities where children are routinely present, built before 1978, to be certified to perform renovations or dust sampling. EPA helps the public find certified repair and renovation firms through a directory. Funding for this program helps ensure that people can access firms qualified to mitigate or eliminate the risks posed by residential lead exposure.

Renovation, Repair and Painting Program
In FY 2025, EPA will continue to implement the RRP Rule to address lead hazards created by renovation, repair, and painting activities in homes and child-occupied facilities[367] and to advance EPA's EJ goals. Fifteen states and one tribe have been authorized to administer this program and rule. In the remaining non-authorized states, tribes, and territories, EPA will continue to accredit training providers, track training class notifications, and certify renovation firms. EPA also will assist in the development and review of state and tribal applications for authorization to administer training and certification programs, provide information to renovators and homeowners, provide oversight and guidance to all authorized programs, and disseminate model training courses for lead-safe work practices. As of September 2023, there were 285 accredited RRP training providers and almost 58,000 certified renovation firms. Through September of FY 2023, about 30 percent of renovation firms with expiring certifications were recertified before their certifications expired.

DLHS, Definition of LBP, DLCL, and Public and Commercial Buildings (P&CBs)
As a result of a May 2021 decision by the U.S. Court of Appeals for the Ninth Circuit, EPA is revising the dust-lead hazard standards (DLHS), the dust-lead clearance levels (DLCL), the

---

[365] Among children ages 1 to 5 years in families with incomes below poverty level, the 95th percentile BLL was 3.0 µg/dL, and among those in families at or above the poverty level, it was 2.1 µg/dL, a difference that was statistically significant. The 95th percentile BLL among all children ages 1 to 5 years was 2.5 µg/dL. The 95th percentile BLL in Black non-Hispanic children ages 1 to 5 years was 3.0 µg/dL, compared with 2.4 µg/dL for White non-Hispanic children, 1.8 µg/dL for Mexican-American children, and 2.7 µg/dL for children of "All Other Races/Ethnicities." The differences in 95th percentile BLL between race/ethnicity groups were all statistically significant, after accounting for differences by age, sex, and income. See *America's Children and the Environment* (EPA, 2019), found at: https://www.epa.gov/americaschildrenenvironment.
[366] Strategy to Reduce Lead Exposures and Disparities in U.S. Communities (EPA, 2022) found at https://www.epa.gov/system/files/documents/2022-11/Lead%20Strategy_1.pdf .
[367] For additional information, please visit: https://www.epa.gov/lead/lead-renovation-repair-and-painting-program.

definition of LBP, and the soil-lead hazard standard (SLHS) regulations.[368] The DLHS defines hazardous levels of lead in residential paint, dust, and soil, and post abatement clearance levels for lead in interior house dust. In August 2023, EPA proposed updating the DLHS and DLCL. If finalized as proposed, the DLHS for floors and windowsills would be any reportable level greater than zero, as analyzed by any laboratory recognized by EPA's National Lead Laboratory Accreditation Program. The new DLCL would be three micrograms per square foot ($\mu g/ft^2$) for floors, 20 $\mu g/ft^2$ for windowsills, and 25 $\mu g/ft^2$ for window troughs. EPA expects to finalize the DLHS and DLCL rule early in FY 2025.

FY 2025 funding will enable EPA to conduct activities necessary to revisit the definition of LBP and SLHS. In addition, EPA must continue work to evaluate whether hazards are created from renovations of P&CBs. Reconsideration and development of these rulemakings will help ensure the most protective approaches are taken to reduce lead exposure in homes and child-occupied facilities, with benefits for overburdened and underserved communities where disproportionate impacts occur from LBP in support of the Administration's goals to enhance EJ and equity.

As resources allow, EPA will conduct technical analyses and rulemaking efforts to address issues related to preventing childhood lead poisoning; revising the soil-lead hazard standards (SLHS); and continuing work to identify and subsequently address LBP hazards identified in public and commercial buildings. The definition of lead-based paint is incorporated throughout the lead-based paint regulations, and application of this definition is central to how the lead-based paint program functions. In collaboration with the Department of Housing and Urban Development (HUD), EPA will revisit the definition of LBP and, as appropriate, revise the definition to make it more protective.

In FY 2025, EPA will continue to evaluate risk from renovations of public and commercial buildings pursuant to TSCA §402(c)(3), which directs EPA to promulgate regulations for renovations in target housing, public buildings built before 1978, and commercial buildings that create lead-based paint hazards. EPA will determine whether such renovations create LBP hazards and, if they do, EPA will address those hazards by promulgating work practice, training, and certification requirements for public and commercial buildings. Because low-income, minority children are disproportionally vulnerable to lead exposure, these efforts, as well as others that focus on reducing environmental lead levels, have the potential to create significant EJ gains.

<u>Lead-Based Paint (LBP) Activities</u>
In FY 2025, EPA will continue to implement the LBP Activities (Abatement, Risk Assessment, and Inspection) Rule by administering the federal program to review and certify firms and individuals and to accredit training providers. Ensuring that those who undertake LBP Activities are properly trained and certified is a critical aspect of federal efforts to reduce lead exposure and to work toward addressing the historic and persistent disproportional vulnerabilities of certain racial, low-income, and overburdened and underserved communities. Additionally, the Agency will continue to review and process requests by states, territories, and tribes for authorization to administer the lead abatement program *in lieu* of the federal program. Thirty-nine states, four tribes, the District of Columbia, and Puerto Rico have been authorized to run the LBP abatement program.

---

[368] For additional information, please visit: https://cdn.ca9.uscourts.gov/datastore/opinions/2021/05/14/19-71930.pdf.

Education and Outreach

In FY 2025, the Agency will continue to provide education and outreach to the public on the hazards of LBP, emphasizing compliance assistance and outreach to support implementation of the RRP rule and to increase public awareness about preventing childhood lead exposure and lead poisoning. The Agency will further its work in reaching contractors and the public in underserved communities through the "Enhancing Lead-Safe Work Practices through Education and Outreach" initiative, by increasing the number of RRP certified contractors and by providing community leaders a means to educate their own communities about lead hazards, reducing and preventing potential exposure to lead, and the importance of hiring certified lead professionals. This initiative, in combination with other regional outreach, is designed to reduce harm to children from exposure to lead in underrepresented and underserved communities disproportionately affected by lead exposure, including a focus on low income, overburdened, underserved, and tribal communities. The Agency will continue to provide multimedia outreach for the National Lead Poisoning Prevention Week, a collaboration with the Centers for Disease Control (CDC) and HUD. Actions include formal announcements, social media, web revisions, and other outreach. Finally, EPA will continue to provide support to the National Lead Information Center (NLIC) to disseminate information to the public.[369]

## Performance Measure Targets:

**(PM RRP30) Percentage of lead-based paint RRP firms whose certifications are scheduled to expire that are recertified before the expiration date.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 32 | 33 | 34 | 34 | Percent |
| Actual | 17 | 19 | 40 | 36 | 31 | 31 |  |  | |
| Numerator | 1,134 | 1,185 | 9,006 | 6,524 | 2,874 | 2,308 |  |  | RRP Firms |
| Denominator | 6,855 | 6,091 | 22,384 | 18,158 | 9,423 | 7,529 |  |  | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$568.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (-$330.0) This program change is an offset to contracts for the increase in payroll fixed costs.

## Statutory Authority:

Toxic Substances Control Act (TSCA), 15 U.S.C. 2601 *et seq.* – Sections 401-412.

---

[369] For additional information, please visit: https://www.epa.gov/lead/forms/lead-hotline-national-lead-information-center.

**Underground Storage Tanks (LUST/UST)**

## LUST / UST
Program Area: Underground Storage Tanks (LUST / UST)
Goal: Safeguard and Revitalize Communities
Objective(s): Reduce Waste and Prevent Environmental Contamination

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$11,034* | *$12,021* | *$14,604* | *$2,583* |
| Leaking Underground Storage Tanks | $8,426 | $9,991 | $14,776 | $4,785 |
| Total Budget Authority | $19,460 | $22,012 | $29,380 | $7,368 |
| Total Workyears | 84.5 | 97.9 | 108.6 | 10.7 |

**Program Project Description:**

Environmental Program Management (EPM) resources fund EPA's work in the Leaking Underground Storage Tank (LUST)/UST Program to help prevent releases of petroleum through activities such as inspection and compliance assistance support. The EPM LUST/UST Program provides states[370] and tribes with technical assistance and guidance and directly funds projects that assist states and tribes in their program implementation, such as the Tribal Underground Storage Tanks Database (TrUSTD). EPA is the primary implementer of the UST Program in Indian Country. With few exceptions, tribes do not have independent UST program resources. EPA will provide facility-specific compliance assistance for UST facility owners and operators in communities with environmental justice concerns in Indian Country.

This program supports the Administration's priority of mitigating the negative environmental impacts to communities that are historically underserved, marginalized, and adversely affected by persistent poverty and inequality, as articulated in Executive Order 13985: *Advancing Racial Equity and Support for Underserved Communities Through the Federal Government*.[371] As of July 2021, approximately 71 million people lived within a quarter mile of an active UST facility, representing 21 percent of the total U.S population. These communities tend to be more minority, low income, linguistically isolated, and less likely to have a high school education than the U.S. population as a whole.[372]

In 2005, Congress passed the Energy Policy Act (EPAct) which, along with other release prevention measures, requires states to inspect facilities at least once every three years. EPA has

---

[370] States as referenced here also include the District of Columbia and five territories as described in the definition of state in the Solid Waste Disposal Act.

[371] For more information, please refer to: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[372] U.S. EPA, Office of Land and Emergency Management 2021. Data collected includes: 1) Underground Storage Tank/Leaking Underground Storage Tank information from states as of 2018-2019 and from Tribal lands and U.S. territories as of 2020-2021 from Office of Research Development & Office of Underground Storage Tanks, UST Finder https://epa.maps.arcgis.com/apps/webappviewer/index.html?id=b03763d3f2754461adf86f121345d7bc; and 2) population data from the 2015-2019 American Community Survey.

been supporting states in these efforts. Between fiscal years 2008 and 2023, the number of annual confirmed releases has decreased by 41 percent (from 7,364 to 4,354).[373]

An EPA study suggests that increased UST compliance is a result of increasing inspection frequency. EPA's statistical analysis, using UST data from the states of Louisiana and Arkansas, showed a positive and statistically significant effect of increased inspection frequency on facility compliance.[374] This evidence supports the data trends the Agency witnessed: compliance rates rose notably after fully implementing the three-year inspection requirement.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 6/Objective 6.2, Reduce Waste and Prevent Environmental Contamination in the *FY 2022 - 2026 EPA Strategic Plan.*

EPA estimates that only two percent of the Nation's 125,000 retail fuel locations have the appropriate equipment to store higher blends of ethanol, which means that the remaining UST systems will need some level of upgrade before they can safely and legally store ethanol blend E15. This could pose a greater risk of an accidental fuel release in nearby communities. To help address this, EPA requests an additional $1.8 million and 5.5 FTE to increase activities to improve the compatibility of UST systems with E15 in fenceline communities where E15 is more prevalently used. Requested resources will be used to:

- Conduct outreach and education to UST owners to ensure they both understand the regulatory requirements to store E15 and the technical process they can use to determine their compatibility in complying with those requirements so they can safely store E15; and

- Hire staff to support state inspection programs and to conduct direct E15 compliance inspections in Indian Country.

In FY 2025, EPA will continue to engage in the following core activities:

- Support enhanced inspections and evaluations for UST owners/operators to ensure that UST systems meet current regulations. This will include expanded development and use of a facility specific compliance assistance application for use in Indian Country. A portion of EPM funding is used for EPA's Senior Environmental Employment (SEE) Program staff to help conduct inspections to assist states that do not have sufficient inspection capacity in house. Constrained resources in recent years have made it increasingly challenging to meet the Agency's Energy Policy Act requirements of inspecting every UST at least once every three years.

---

[373] For more information, please refer to https://www.epa.gov/system/files/documents/2023-11/fy-23-eoy-final-report-11-21-2023.pdf.
[374] Sullivan, K. A.; Kafle, A (2020). *The Energy Policy Act of 2005: Increased Inspection Frequency and Compliance at Underground Storage Tank Facilities*. OCPA Working Paper No. 2020-01, https://www.epa.gov/sites/default/files/2020-10/documents/ust_ocpa_orking_paper_august2020.pdf.

- Develop tools and resources to assist states in adapting to the impacts of climate change and extreme weather events. This includes developing tools and resources to assist states in identifying facilities that are more prone to flooding or wildfires and helping these facilities prepare for these events before they occur.

- Provide oversight for state LUST prevention grants and provide compatibility compliance assistance for tribal facilities.

- Continue research studies that identify the compatibility of new fuel formulations with current tank systems.

- Continue to coordinate with state UST prevention programs.

- Provide technical assistance, compliance help, and expert consultation to states, tribes, and stakeholders on both policy and technical matters. This support strives to strengthen the network of federal, state, tribal, and local partners (specifically communities and people living and working near UST sites) and assists implementation of the UST regulations.

- Provide guidance, training, and assistance to the regulated community to improve understanding and compliance.

- Continue to work with industry, states, and tribes to identify causes and potential solutions for corrosion in diesel tanks. Work in this area is important given the significant findings regarding the increasing prevalence of corrosion of UST system equipment containing ethanol or diesel fuels.[375]

EPA will continue to collect data regarding both the compliance rate and the number of new releases for UST systems in Indian Country. The compliance rate will help determine progress toward meeting EPA's revised regulations and help identify any areas that need specific attention. In addition, EPA will continue its work to evaluate the effectiveness of its 2015 regulations, which are designed to ensure existing UST equipment continues to function properly.

**Performance Measure Targets:**

Work under this program supports performance results in the LUST Prevention Program under the LUST appropriation.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$328.0) This change to fixed and other costs is an increase due to the recalculation of base payroll costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefits costs. It also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements,

---

[375] For more information, please refer to: www.epa.gov/ust/emerging-fuels-and-underground-storage-tanks-usts#tab-3.

electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$2,255.0 / +5.5 FTE) This program change requests additional FTE to conduct direct E15 compliance inspections in Indian Country. Resources also will be used for the development and coordination of outreach materials to the regulated community. This investment includes $1.0 million for payroll.

**Statutory Authority:**

Resource Conservation and Recovery Act §§ 8001, 9001-9011.

**Water Ecosystems**

## National Estuary Program / Coastal Waterways

Program Area: Protecting Estuaries and Wetlands
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$38,790* | *$40,000* | *$32,611* | *-$7,389* |
| Total Budget Authority | $38,790 | $40,000 | $32,611 | -$7,389 |
| Total Workyears | 34.8 | 36.9 | 36.9 | 0.0 |

**Program Project Description:**

The National Estuary Program (NEP)/Coastal Waterways Programs work to restore the physical, chemical, and biological integrity of estuaries of national significance and coastal watersheds by protecting and restoring water quality, habitat, and living resources.[376]

The Nation's coasts are facing devastating ecological and societal stress, and communities with environmental justice concerns, especially people of color, low-income, and indigenous communities, are experiencing disproportionate climate impacts. Sea level rise and shoreline loss, dead zones, harmful algal blooms, coral bleaching, coastal acidification, wetland and habitat loss, shifts in species composition and habitat, frequent flooding, degraded water quality, saltwater intrusion, and storms that result in billion-dollar damages are becoming routine. The water quality and ecological integrity of estuarine and coastal areas is critical to the economic vitality of the U.S. While the estuarine regions of the U.S. comprise just 12.6 percent of U.S. land area, they contain 40 percent of the U.S. population and provide 47 percent of all U.S. economic output.[377] The economic value of coastal recreation in the U.S. for beachgoing, fishing, bird watching, and snorkeling/diving has been conservatively estimated by the National Oceanic and Atmospheric Administration to be in the order of $20 billion to $60 billion annually.[378]

Wetlands and healthy ecosystems protect coastal property, providing a buffer against storms, floods, and high waves. They stabilize shorelines, prevent land from eroding, and provide carbon sequestration. The storm damage mitigation services provided by wetlands are valued at over $23 billion dollars annually. The NEP has collectively protected and restored just over 2.8 million acres of habitat, including wetlands, within 28 estuaries of national significance since 2000, providing the benefits described above to coastal watersheds and their communities stretching across 39 percent of U.S. shoreline miles and containing 40 percent[379] of the U.S. population. The NEP achieves these successes by the 28 locations working collaboratively and proactively with local

---

[376] For more information, please visit https://www.epa.gov/nep.
[377] For more information, please visit https://www.fisheries.noaa.gov/national/habitat-conservation/estuary-habitat.
[378] For more information, please visit https://www.fisheries.noaa.gov/national/habitat-conservation/coastal-wetlands-too-valuable-lose.
[379] For more information, please visit: https://estuaries.org/wp-content/uploads/2022/11/2021-Final-Report.pdf

governments and other partners through broad networks and leveraging other sources of funding. On average, the designated NEPs leverage more than $16 for every dollar provided by EPA and, since 2006, the NEP has exceeded $7.4 billion primary leveraged dollars.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will:

- Provide $19.6 million in Clean Water Act Section 320 grants for the 28 NEPs ($700 thousand per NEP). This is a highly leveraged program with projects that address coastal, estuarine, and inland freshwater ecosystem needs. On average, the NEPs leverage more than $16 for every dollar provided by EPA. Funding for this program will strengthen EPA's staff and internal resource capacity to support and manage core programmatic activities, including the implementation of each NEP's Comprehensive Conservation and Management Plan, conducting and addressing findings from regular program evaluations of individual NEPs, collecting and analyzing annual data from the NEPs, oversight of the day-to-day operations of the NEPs, and management of Clean Water Act Section 320 grant funds;

- Provide capacity to support NEP programs that address priority issues such as nutrient management, habitat protection and restoration, water quality, green infrastructure, and marine litter reduction. Throughout the NEPs' work, the program seeks to prioritize climate adaptation and resiliency and greenhouse gas mitigation co-benefits while equitably distributing federal investments and their benefits, including to disadvantaged communities. They engage and educate stakeholders and students and implement collaborative projects with regional, state, tribal, and local partners. These projects include restoration of submerged aquatic vegetation and blue carbon measures, nutrient and harmful algal bloom reduction, and development and implementation of climate adaptation and resiliency strategies;

- Support the Clean Water Act Section 319 Program to manage nonpoint source pollution in coastal waterways;

- Support the NEPs in developing the skills and capacity to integrate environmental and climate justice into their guiding documents, daily operations, and project selection. These activities will benefit disadvantaged communities and help achieve the goals of the Administration's Justice40 initiative;

- Conduct regular Program Evaluations to assess how the NEPs are making progress in achieving programmatic and environmental results through implementation of their Comprehensive Conservation and Management Plans. The evaluation process has proven to be an effective, interactive management process that ensures national program accountability and transparency, while incorporating local priorities and considerations. It

also demonstrates the value of federal investment in estuarine and coastal watershed restoration and protection at the local and regional levels;

- Support the Climate Ready Estuaries (CRE) Program[380] and other important coastal program activities, including restoration and protection of coastal wetlands (*e.g.,* avoiding and removing tidal restrictions) and addressing marine litter. CRE develops resources and provides technical support to the NEPs and other coastal community leaders and advises on coastal climate resiliency nationally. EPA will continue to work with other federal agencies, states, and tribes to assess challenges such as increasing temperatures, sea level rise, and ocean and coastal acidification and identify opportunities to implement actions to mitigate the effects of climate change on the Nation's coastal waters and shorelines; and,

- The FY 2025 request includes $2.5 million for the NEP Coastal Watersheds Grant Program.

EPA continues to work with states, tribes, trust territories, the NEPs, and federal agencies to implement the National Aquatic Resource Survey (NARS) in coastal/estuarine waters. In FY 2023, the NARS coastal survey completed analysis and interpretation of the sample results and shared them with state and tribal partners. The web-report and results dashboard for the 2020 National Coastal Condition Assessment will be released in FY 2024. In FY 2025, EPA will initiate planning activities with our partners for the 2025 National Coastal Condition Assessment.

EPA, as the federal chair of the Gulf Hypoxia Task Force, will work with other Task Force member federal agencies and twelve member states to continue implementation of the 2008 Gulf Hypoxia Action Plan. This activity complements other coordination and implementation resources in the Geographic Program: Gulf of Mexico and Surface Water Protection Program. A key goal of the Gulf Hypoxia Action Plan is to improve water quality in the Mississippi River Basin and reduce the size of the hypoxic zone in the Gulf of Mexico by implementing existing and innovative approaches to reduce nitrogen and phosphorus pollution in the Basin and the Gulf.

EPA will continue to work with states, territories, tribes, and other partners to identify impaired waters in coastal watersheds, as required by CWA Section 303(d), and on developing and implementing total maximum daily loads (TMDLs) for listed impaired waterbodies. TMDLs focus on clearly defined environmental goals and establish a pollutant budget, which is then implemented through local, state, and federal watershed plans and programs to restore waters. EPA will work with and provide support to states, territories, and tribes to ensure that TMDLs for coastal waters are effective and ready for implementation. EPA also will support states, territories, and tribes develop other restoration approaches and plans for the protection of unimpaired or high-quality waters in coastal watersheds. In addition, EPA will continue to support development and application of tools and applications (*e.g.*, the Watershed Academy, How's My Waterway, and Restoration and Protection Screening (RPS)) that educate the public and help states and territories efficiently prioritize coastal waters for restoration and protection.

---

[380] For more information, please visit: https://www.epa.gov/cre.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$1,167.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (-$8,556.0) This program change reduces the resources available for this program. Significant additional funding for these activities is available in FY 2025 through the Infrastructure Investment and Jobs Act.

**Statutory Authority:**

2021 Protect and Restore America's Estuaries Act; 1990 Great Lakes Critical Programs Act of the Clean Water Act; Great Lakes Legacy Reauthorization Act of 2008; Clean Water Act; Estuaries and Clean Waters Act of 2000; Protection and Restoration Act of 1990; North American Wetlands Conservation Act; Water Resources Development Act; 2012 Great Lakes Water Quality Agreement; 1987 Montreal Protocol on Ozone Depleting Substances; 1909 Boundary Waters Treaty; Marine Debris Research, Prevention and Reduction Act of 2006; Marine Plastic Pollution Research and Control Act of 1987, Save our Seas 2.0 Act, and the Harmful Algal Bloom and Hypoxia Research and Control Act of 1998 (16 U.S.C. 1451 note).

## Wetlands

Program Area: Protecting Estuaries and Wetlands
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$19,656* | *$21,754* | *$26,995* | *$5,241* |
| Total Budget Authority | $19,656 | $21,754 | $26,995 | $5,241 |
| Total Workyears | 117.9 | 118.4 | 138.0 | 19.6 |

**Program Project Description:**

EPA's Wetlands Protection Program has two primary components: 1) the Clean Water Act (CWA) Section 404 regulatory program and 2) the state and tribal wetland development program. Major activities of the Wetlands Protection Program include timely and efficient review of CWA Section 404 permit applications submitted to the United States Army Corps of Engineers (USACE) or authorized states; engaging and partnering with USACE, states, and other stakeholders to develop stream and wetland assessment tools, and improve compensatory mitigation effectiveness and availability of credits; assisting in building capacity and the development of state and tribal wetlands and other aquatic resource protection and restoration programs under CWA, including 404 program assumption and Section 401 water quality certification; and providing technical assistance to the public on wetland management and legal requirements.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

Working with federal, state, tribal, and local partners, EPA will strive to ensure an effective, consistent approach to wetlands and other aquatic resource protection, restoration, and permitting. To achieve this goal, the Agency will continue its collaborative relationship with USACE in the CWA Section 404 permitting program. In addition, EPA will continue its work with states and tribes to build their wetlands programs to monitor, protect, and restore wetlands to achieve multiple societal benefits, including adapting to and mitigating the effects of climate change.

## CWA Section 404

Section 404 of the CWA is an established program to regulate the discharge of dredged or fill material into waters of the United States, including wetlands. USACE is responsible for managing

the day-to-day permit processes nationwide under CWA Section 404.[381] EPA engages in the CWA 404 permit process to ensure compliance with the CWA Section 404(b)(1) guidelines as the permitting authority formulates their proposed permits. EPA will perform its CWA responsibilities to support new infrastructure projects funded through the Infrastructure Investment and Jobs Act of 2021. In 2008, EPA and USACE issued a final rule governing compensatory mitigation for activities authorized by the CWA 404 and associated losses of aquatic resources. The regulation prescribes a review and approval process for the establishment and management of mitigation banks and in-lieu of fees program. EPA and USACE will continue to work together to evaluate the effectiveness of the Program, provide training to regulators and the public, and consider further enhancements to the rule and program.

In FY 2025, EPA will continue to support the development of stream and wetland assessment methods, trainings for regulators, and regional crediting protocols for compensatory mitigation to improve the efficiency and environmental outcomes of federal and state agency review. In addition, EPA will continue to build internal capacity through trainings and improve efficiencies in federal CWA Section 404 permitting to help with reducing potential costs and delays; increasing consistency and predictability; improving protection of public health and the environment, including assessing climate impacts and impacts to disadvantaged communities; and ensuring permit decisions are legally defensible.

EPA also will continue carrying out its responsibilities as a member of the Gulf Coast Ecosystem Restoration Council authorized under the Resources and Ecosystem Sustainability, Tourist Opportunities, and Revived Economies of the Gulf Coast States (RESTORE) Act, and as a Natural Resource Damage Assessment (NRDA) Trustee for the Deepwater Horizon oil spill under the Oil Pollution Act (OPA). Under CWA Section 404, the RESTORE Act, and OPA, EPA's responsibilities include timely, environmentally sound, and compliant implementation of National Environmental Policy Act (NEPA) review and associated permitting. Under NRDA, EPA is a cooperating or lead federal agency for NEPA on all Deepwater Horizon Trustee Implementation Group restoration plans and ensures the appropriate level of NEPA analysis is integrated into those referenced restoration plans. EPA's RESTORE responsibilities include NEPA analysis for projects that the Council assigns to EPA. As a NRDA Trustee, EPA undertakes mandatory independent third-party financial audits every three years to ensure accountability regarding the use of funds provided under a 2016 consent decree.[382] The first independent third-party financial audit was initiated in FY 2018 and concluded in FY 2020 with no negative findings. The second audit was initiated in FY 2021 and concluded in FY 2022 with no significant findings. EPA anticipates initiating its third audit in FY 2024.

## **Building State and Tribal Aquatic Resource Programs**

EPA will continue to work with states and tribes to target Wetlands Protection Program funds to core statutory requirements while providing states and tribes flexibility to best address their priorities. This includes providing assistance to states and tribes interested in assuming the

---

[381] Currently, three states, Michigan, New Jersey, and Florida, have assumed the CWA Section 404 permit program. CWA Section 404(g) gives states and tribes the option of assuming, or taking over, the permitting responsibility and administration of the CWA Section 404 permit program for certain waters.

[382] For more information, please see:  https://www.epa.gov/deepwaterhorizon.

administration of the CWA Section 404(g) program. EPA intends to finalize a regulation in FY 2024 to update the existing state and Tribal program regulations on CWA Section 404(g) program assumption. EPA also will continue to administer Wetland Program Development Grants, which is a Justice40 covered program, in support of state and tribal wetland programs. The Agency will focus on working more efficiently with states and tribes to achieve specific program development outcomes including protecting and restoring wetlands and other aquatic resources to address water quality and climate impacts, provide benefits to disadvantaged communities, support state and tribal assumption of the CWA Section 404 program, and support states and tribes with implementing CWA Section 401.[383]

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$123.0) This change to fixed and other costs is a decrease due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (+$5,364.0 / +19.6 FTE) This increase of resources and FTE supports the implementation of the Clean Water Act to protect and restore wetlands and other aquatic resources. This investment also includes $3.431 million in payroll.

**Statutory Authority:**

CWA § 404, § 104(b)(3).

---

[383] For more information, please see: https://www.epa.gov/wetlands.

**Ensure Safe Water**

## Beach / Fish Programs

Program Area: Ensure Safe Water
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$1,673* | *$2,246* | *$2,391* | *$145* |
| Total Budget Authority | $1,673 | $2,246 | $2,391 | $145 |
| Total Workyears | 1.7 | 2.7 | 3.8 | 1.1 |

**Program Project Description:**

The Beach/Fish Program provides up-to-date science, guidance, technical assistance, and nationwide information to state, tribal, and federal agencies to protect human health of beachgoers from contaminated recreation waters, as well as recreational and subsistence fishers (*e.g.*, tribal communities and other underserved populations) from consumption of contaminated fish.

The Agency implements the following activities under this Program:

- Develop and disseminate methodologies and guidance that states and tribes use to sample, analyze, and assess fish tissue in support of waterbody specific or regional consumption advisories.

- Develop and disseminate guidance that states and tribes can use to conduct local fish consumption surveys.

- Develop and disseminate guidance that states and tribes can use to communicate the risks of consuming chemically contaminated fish.

- Gather, analyze, and disseminate information to the public and health professionals that informs decisions on when and where to fish, and how to prepare fish caught by recreational and subsistence fishers.

- Provide best practices on public notification of beach closures and advisories.

- Develop tools such as the sanitary survey app, predictive modeling, and improved analytical methods.

- Maintain the E-Beaches IT system to collect data required by the Beaches Environmental Assessment and Coastal Help (BEACH) Act.

In addition to providing technical support to states and tribes on beach monitoring and data reporting, these programs are part of EPA's ongoing effort to increase public awareness of the risks to human health associated with contact with recreational water contaminated with pathogens or harmful algal blooms, and with eating locally caught fish that contain pollutants such as mercury, polychlorinated biphenyls (PCBs), or per- and polyfluoroalkyl substances (PFAS) at levels of concern. These efforts are directly linked to the Agency's mission to protect human health.

**FY 2025 Activities and Performance Plan:**

Work in this Program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to:

- Update science and public policy to assess and manage the risks and benefits of fish consumption.

- Provide analytical tools and collect data associated with beach monitoring.

- Provide technical support to states in the operation of their fish consumption advisories and beach monitoring programs.

- Build program capacity, particularly in areas related to environmental justice, water infrastructure support and oversight, climate change resilience, and regulatory reviews.

- Complete National Aquatic Resource Surveys (NARS) National Lakes Assessment analysis of fish tissue for contaminants including PFAS;

- Per the Agency's PFAS Roadmap, complete reporting for the first time of PFAS levels in fish collected from lakes nationwide;

- Conduct monitoring of PFAS and other contaminants in fish collected from the Great Lakes and (for the first time) coastal estuaries as part of the NARS National Coastal Condition Assessment; and

- Implement the Justice 40 initiative in the BEACH Act Program.

In FY 2025, EPA also will make investments in providing up-to-date science, guidance, and technical assistance so states and tribes have equitable and effective beach and fish advisory programs. This information allows the public, including underserved communities, to make informed choices about recreational activities in local waters and eating locally caught fish. EPA will maintain the E-Beaches IT system and make updates if needed.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$78.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (+$67.0 / +1.1 FTE) This program change in resources and FTE builds program capacity, particularly in areas related to environmental justice, water infrastructure support and oversight, climate change resilience, and regulatory reviews.

**Statutory Authority:**

Clean Water Act, § 101, 104, and 303.

## Drinking Water Programs

Program Area: Ensure Safe Water
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Ensure Safe Drinking Water and Reliable Water Infrastructure

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$109,958* | *$121,607* | *$143,886* | *$22,279* |
| Science & Technology | $5,474 | $5,098 | $7,043 | $1,945 |
| Total Budget Authority | $115,432 | $126,705 | $150,929 | $24,224 |
| Total Workyears | 471.0 | 539.4 | 554.5 | 15.1 |

**Program Project Description:**

Safe drinking water is critical for protecting human health and the economic vitality of the Nation. Approximately 320 million Americans rely on public water systems to deliver safe tap water that complies with national drinking water standards.[384] EPA's Drinking Water Program is based on a multiple-barrier and source-to-tap approach to protect public health from contaminants in drinking water.[385] EPA protects public health through:

- Source water assessment and protection;
- Promulgation of new or revised National Primary Drinking Water Regulations (NPDWRs);
- Training, technical assistance, and financial assistance programs to enhance public water system capacity to comply with regulations and provide safe drinking water;
- Underground Injection Control (UIC) programs;
- Support for implementation of NPDWRs by state and tribal drinking water programs through regulatory, non-regulatory, and voluntary programs and policies; and
- Funding, assistance, and resources for states and tribes to support the financing of water infrastructure improvements nationwide that will improve compliance, address drinking water contaminants such as lead, and ensure water systems are more resilient to threats, like cyber-attacks and natural hazards such as climate change.[386]

Current events, including the detection of lead and per- and polyfluoroalkyl substances (PFAS) in drinking water, highlight the importance of drinking water protection programs that safeguard public health. It also is important to protect the sources of drinking water. Moreover, incidents of drinking water contamination with lead and PFAS, such as perfluorooctanoic acid (PFOA), perfluorooctane sulfonate (PFOS), and GenX chemicals, exemplify the increased demand for risk

---

[384] For more information on the U.S. Environmental Protection Agency Safe Drinking Water Information System (SDWIS/FED), please see: http://water.epa.gov/scitech/datait/databases/drink/sdwisfed/index.cfm.
[385] For more information, please see: https://www.epa.gov/sites/production/files/2015-10/documents/guide_swppocket_2002_updated.pdf.
[386] For more information, please see: https://www.epa.gov/ground-water-and-drinking-water.

communication and other resources that can help communities protect public health and address these chemicals.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.1, Ensure Safe Drinking Water and Reliable Water Infrastructure in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, the program will continue to support the Agency's national drinking water priorities, including:

- Addressing lead and emerging contaminants such as PFAS and

- Improving resilience in drinking water systems to address natural hazards, including climate change, and human threats by enhancing cybersecurity; and, improving drinking water access and water quality across the Nation, especially in rural, small, underserved, and disadvantaged communities across the country.

In FY 2025, EPA will continue to work to integrate climate adaptation planning into water programs, policies, and rulemaking processes, and consult and partner with states, tribes, territories, local governments, environmental justice organizations, community groups, businesses, and other federal agencies to strengthen the adaptive capacity and increase the resilience of the Nation. The Agency is also requesting resources to support regulatory analysis, development and training, and technical assistance for state, tribal, and local communities to address drinking water contaminants (including lead and emerging contaminants like PFAS) in their efforts to ensure safe and affordable drinking water.

The Agency will continue to improve the effectiveness and efficiency of its programs for states and tribes, including work to ensure EPA water programs and resources reach communities that too often have been overburdened, including rural and tribal communities. In FY 2023, over 2,100 tribal, small, rural, or underserved communities were provided with technical, managerial, or financial assistance to improve operations of their drinking water or wastewater systems. The Drinking Water Program supports this effort by providing training and assistance to state drinking water programs, tribal drinking water officials, drinking water systems, and technical assistance providers. The training includes:

- Achieving and maintaining compliance at drinking water systems;

- Developing and amplifying best practices and providing technical assistance;

- Protecting sources of drinking water, including through the UIC program;

- Strengthening state and tribal program capacity; and

- Certifying drinking water operators and maintaining an essential workforce.

EPA oversees state drinking water programs by completing the annual public water system supervision (PWSS) program review for each primacy agency as required under the Safe Drinking Water Act (SDWA). Information gained during the Program reviews, which occur throughout the year, includes an analysis of the completion of sanitary surveys by primacy agencies and an evaluation of whether each primacy agency is implementing its programs in accordance with SDWA. The annual program reviews directly support the work of the states and the Agency to reduce the number of community water systems in noncompliance with health-based standards. As of September 30, 2023, 3,042 of the 3,508 systems with health-based violations on September 30, 2017, have been returned to compliance (*i.e.,* 466 systems are still in violation). EPA recognizes that many of the remaining systems have complex compliance issues or may require capital infrastructure improvements to help address noncompliance. While Infrastructure Investment and Jobs Act (IIJA) and State Revolving Fund (SRF) funding will support these systems, infrastructure projects can take many years to complete. In FY 2025, EPA will continue to provide technical assistance and work with states towards long-term remediation of systems with health-based violations.

The Agency is continuing to work with states on completing the development of the Drinking Water State-Federal-Tribal Information Exchange System (DW-SFTIES) as the long-term replacement for the Safe Drinking Water Information System for states (SDWIS-State) by early 2026. As of FY 2023, 42 states use SDWIS-State for day-to-day information management for implementing state drinking water programs. In FY 2025, EPA continues to support and prepare states in their transition planning activities to DW-SFTIES. The information gained from the PWSS reviews, and the database modernization efforts will continue to support evidence-building activities as part of EPA's implementation of the Foundations for Evidence-Based Policymaking Act of 2018 (Evidence Act).

The Agency also continues to provide training and collaborate with states on:

- Helping underserved, small, and disadvantaged communities with SDWA compliance and providing households access to drinking water services and household water quality testing, including testing for unregulated contaminants;

- Maintaining the states' capacity development programs and providing resources, tools, and technical assistance to help water systems with SDWA compliance;

- Effectively implementing PWSS programs; and

- Providing operator certification programs to support the water sector workforce.

Water Infrastructure
The Nation's aging infrastructure poses a significant challenge for the drinking water and wastewater sectors to protect public health and the environment. These challenges are particularly pressing in small, rural, overburdened, and underserved communities. In FY 2025, EPA will continue to support improvements to the Nation's drinking water infrastructure, including identification of infrastructure needs and assistance for underserved and tribal communities. The Agency also will support activities to leverage and encourage public and private collaborative

efforts and investments. This Program also supports the Agency's efforts in implementing the IIJA. EPA will continue to provide direct technical assistance to water systems and collaborate with the states to help small and underserved communities access the funding provided by IIJA.

Every four years, EPA is required to conduct the Drinking Water Infrastructure Needs Survey Assessment (DWINSA) by working with states and community water systems to estimate the Drinking Water State Revolving Fund (DWSRF) eligible needs of systems by state over the next 20 years. EPA uses this information as part of the formula for state allocations of the DWSRF. The 2021 or the 7th DWINSA effort concluded and the new allotment formula was announced and used starting in FY 2023. EPA submitted the 2021 DWINSA Report to Congress in FY 2023. Findings included capital investment needs and also estimates on lead service line prevalence and replacement costs, current concerns for a sustainable certified operator workforce, and an assessment of the uses of iron and steel products. In late FY 2023 to early FY 2024, EPA conducted a one-time update of the service line material information for the seventh DWINSA. This additional information will update the Lead Service Line Replacement funding allotments for the DWSRF programs and be used starting in FY 2024. In addition, planning activities will begin for the 8th DWINSA. EPA plans to reach out to state partners to discuss 'Lessons Learned' with the previous DWINSA efforts and identify ways to improve the next survey. In FY 2024 through FY 2025, EPA expects to develop the survey instrument, conduct trainings, and begin data collection for the 8th DWINSA. The FY 2025 request includes up to $1.5 million set aside from the DWSRF to ensure there are consistent and reliable resources to fund this important work.

In addition to the DWSRF Program, in FY 2025, EPA will continue to support drinking water infrastructure programs by implementing the following statutes:

- Consolidated Appropriations Acts of 2022 and 2023 (EPA Community Grants) and any future Community Grant appropriations;
- Drinking Water and Wastewater Infrastructure Act of 2021 (DWWIA) within IIJA;
- Build America, Buy America (BABA) Act of 2021 within IIJA;
- America's Water Infrastructure Act of 2018 (AWIA);
- Water Infrastructure Improvements for the Nation Act of 2016 (WIIN); and
- Water Infrastructure Finance and Innovation Act of 2014 (WIFIA).

Collectively, these laws strengthened existing programs and created new ones to tackle significant public health concerns and environmental needs. The programs created in these laws are vital to protecting public health, continuing to grow the United States' economy, and ensuring that rural and urban communities from coast-to-coast can thrive. EPA will continue to provide WIIN, AWIA, and IIJA grant funding to support projects focusing on reducing lead and addressing emerging contaminants in drinking water and to enhance water system resiliency to natural hazards such as climate change and man-made threats such as cyber-attacks, with a focus on small and disadvantaged communities. Funding for these projects also will bolster the U.S. economy through domestic preference requirements for federally funded infrastructure projects.

Funding for infrastructure supports EPA's goal to increase the cumulative amount of non-federal dollars leveraged by water infrastructure finance programs by $9.5 billion in FY 2025. These water infrastructure finance programs include the DWSRF, CWSRF, and the WIFIA program. In FY

2023, $11.4 billion was leveraged by these programs, increasing the funds available to improve, repair, and modernize the Nation's water infrastructure.

<u>Drinking Water Program Implementation</u>

In FY 2025, the Agency is requesting additional resources to support continued work with states to implement requirements for all NPDWRs to ensure that systems install, operate, and maintain appropriate levels of treatment and effectively manage their drinking water plants and distribution systems. The Program activities are designed to improve drinking water and water quality across the Nation, especially in tribal and underserved and vulnerable communities. Activities include:

- Working with states to provide training, direct technical assistance, and resources to conduct lead service line inventories, replace lead service lines, and optimize corrosion control treatment, develop other strategies to minimize exposure to lead, and maintain simultaneous compliance;

- Developing guidance manuals, tools, and trainings for states to support water systems and primacy agencies in implementing the Lead and Copper Rule Improvements (LCRI) and its revision;

- Developing guidance, tools, and trainings to support water systems and primacy agencies in implementing the PFAS Rule;

- Implementing regulations to improve the clarity, readability, and accuracy of information in Consumer Confidence Reports;

- Implementing SDWA Section 1414 requirements allowing states to mandate water system restructuring assessments;

- Focusing on the reduction of the number of community water systems with health-based violations, especially small systems, tribal systems, and systems in underserved communities;

- Coordinating with the Indian Health Service and other federal partners to provide financial and technical assistance to tribal communities;

- In preparation of the PFAS NPDWR, supporting the development of the draft Small System Compliance Guidance Document; and,

EPA will continue to complete the development of DW-SFTIES and support state migration to DW-SFTIES and to the Compliance Monitoring Data Portal, which enables drinking water utilities and laboratories to report drinking water data electronically. In addition, EPA will continue the development of efficient program data management and reporting tools focusing on drinking water regulation, system technical, managerial, and financial capacity, and activities that inform status of SDWA compliance and decisions to support human health protection.

In FY 2025, EPA will conduct the following activities to facilitate compliance with drinking water rules:

- Overseeing the national PWSS Program by administering grants to states and measuring program results based on state reporting of health-based rule violations at public water systems for over 90 drinking water contaminants;

- Offering training and technical assistance opportunities to states, tribes, and public water systems, especially those in underserved and disadvantaged communities, with a priority on addressing significant noncompliance with the NPDWRs;

- Bolstering its strong partnership with the states to provide direct small system technical assistance, especially in disadvantaged communities, with a focus on compliance with rules, operational efficiencies, and system sustainability and resiliency to ensure public health protection;

- Directly implementing the Aircraft Drinking Water Rule, designed to protect millions of people who travel on approximately 5,700 aircraft in the United States annually; and

- Directly implementing the Drinking Water Program where states and tribes do not have primacy (*e.g.,* Wyoming, the District of Columbia, and tribal lands other than the Navajo Nation).

In FY 2025, EPA will continue to implement the Evidence Act and make evidence-based decisions guided by the best available science and data. EPA will continue to help develop statistical evidence where it is lacking and improve EPA's capacity to generate and share science and data, and use it in policy, budget, operational, regulatory, and management processes and decisions. Specifically, the Agency will be conducting evidence-building activities and gathering information from SDWIS that inform the data quality of the Agency's drinking water compliance information. Through these efforts, EPA has identified a need for access to states' compliance monitoring data and is developing the regulatory authority and tools necessary to fill this gap. Furthermore, EPA expects to identify additional data needs, potential sources of additional information, and mechanisms to fill data gaps. EPA also will identify system characteristics that support compliance and those that cause compliance challenges. EPA will use these findings to inform and develop policy instruments.

Drinking Water Standards

To assure the American people that their water is safe to drink, EPA's drinking water regulatory program monitors for a broad array of contaminants, evaluates whether contaminants are a public health concern, and regulates contaminants when there is a meaningful opportunity for health risk reduction for persons served by public water systems. In FY 2025, the Agency also will address drinking water risks with the following actions:

- Continuing to develop the new NPDWR, LCRI. In FY 2021, EPA issued the Lead and Copper Rule Revisions (LCRR) and subsequently reviewed those revisions in accordance

394

with Executive Order 13990.[387] Through this review, the Agency concluded that there are significant opportunities to improve the LCRR to support the overarching goal of proactively removing lead service lines and more equitably protecting public health (86 FR 71574). EPA announced the proposed LCRI on November 30,2023 and intends to finalize by October 16, 2024.

- Conducting human health effects assessments for water contaminants to support SDWA actions, including the derivation of maximum contaminant level goals, drinking water health advisories, and human health benchmarks. Consideration of those potentially most at risk – especially sensitive subpopulations and critical life stages (*e.g.*, infants and children) – is key in development of health effects assessments for contaminants in water.

- Continuing to develop guidance materials and webinar content to assist stakeholders with preparing for their responsibilities under the final NPDWR for PFAS in drinking water.

- Continuing the development of the SDWA-mandated draft Regulatory Determinations (Reg Det) for the Fifth Contaminant Candidate List (CCL 5) and preparing to publish the final Reg Det for CCL 5 in FY 2026.

- Developing and publishing the draft Sixth Contaminant Candidate List (CCL 6) in FY 2025.[388]

- Continuing to participate in interagency actions and support cross-agency efforts to address PFAS; establishing better understanding of the health impacts and extent of their occurrence in the environment and resulting human exposures; and supporting priorities identified by the EPA's PFAS Council and in EPA's PFAS Strategic Roadmap.

- Developing drinking water health advisories for PFAS with final toxicity values.

- Continuing to develop risk communication and other tools to support states, tribes, and localities in managing PFAS and other emerging contaminants in their communities.

- Continuing to support state and tribal efforts to manage cyanotoxins in drinking water, including providing technical assistance.

- Proposing revisions to the existing Microbial and Disinfection Byproducts Rules based on evaluations of the National Drinking Water Advisory Council (NDWAC) recommendations and working towards a final rule by FY 2027.

- Providing support to drinking water systems and laboratories as they collect and analyze samples during implementation of the fifth Unregulated Contaminant Monitoring Rule. Conclude monitoring for PFAS and lithium under UCMR 5 in FY 2025. Continuing to

---

[387] For additional information, please see: https://www.federalregister.gov/documents/2021/01/25/2021-01765/protecting-public-health-and-the-environment-and-restoring-science-to-tackle-the-climate-crisis.
[388] For additional information, please see: https://www.epa.gov/ccl/draft-contaminant-candidate-list-6-ccl-6.

publish data summaries and detailed results and conduct occurrence data analyses. Continuing the development of UCMR 6 towards the publication of the proposal in FY 2025.

- Collecting and analyzing Community Water System Survey data to capture changes and update information related to the conditions of public water systems.

<u>Source Water Protection</u>

SDWA requires drinking water utilities that meet the definition of a public water system to meet requirements for source water protection set by EPA and state primacy agencies. Protecting source water from contamination helps reduce treatment costs and may avoid or defer the need for complex treatment. EPA will continue to partner with states, federal counterparts, drinking water utilities, and other stakeholders to identify and address current and potential threats to sources of drinking water. In FY 2025, the Agency will be:

- Continuing to develop data-layers and decision support tools to assist source water assessment, planning, and emergency preparation, including updates to the Drinking Water Mapping Application for Protecting Source Waters (DWMAPS) on EPA's web-based geospatial platform, *GeoPlatform*;[389]

- Working with state, federal, utility, and local stakeholders to leverage resources, support efforts to assist communities in source water protection activities and projects, and promote ongoing efforts, including funding opportunities through the Funding Integration Tool for Source water (FITS), to protect drinking water sources;

- Continuing to partner with the Department of Agriculture (USDA)'s Natural Resources Conservation Service and Forest Service and state partners to support implementation of the source water protection provisions of the Agriculture Improvement Act of 2018 (2018 Farm Bill) and provide support in the development and implementation of the subsequent Farm Bill. Additionally, exchanging spatial data, resources, and funding information across multiple federal and state partners to facilitate achievement of shared goals. This presents an opportunity to forge stronger connections between EPA and USDA to address agriculture-related impacts to drinking water sources;

- Continuing to provide support for workshops that promote source water protection at the local level and support the integration of source water protection into related programs at the state and federal levels, focusing on reducing nutrient pollution impacts on drinking water sources;

- Providing support to states and tribes in identifying and planning for the use of IIJA and IRA funding available from federal agencies to address source water protection priorities, especially as it relates to addressing emerging drinking water contaminants; and

---

[389] For more information, please see: https://www.epa.gov/sourcewaterprotection/dwmaps.

- Building partnerships and developing source water protection planning resources and communications materials related to source water protection priorities as part of EPA's membership in the National Source Water Collaborative.

Underground Injection Control

Roughly one-third of the United States' population is served by public water systems that receive water from groundwater. To safeguard current and future underground sources of drinking water from contamination, the UIC Program regulates the use of injection wells that place fluids underground for storage, disposal, enhanced recovery of oil and gas, and minerals recovery. Protecting groundwater requires proper permitting, construction, operation, and closure of injection wells. In FY 2025, planned activities in the UIC Program include:

- Supporting implementation of DWWIA to support comprehensive carbon dioxide infrastructure in the United States by working with applicants on Class VI permits for secure geologic storage of carbon dioxide and with state UIC programs seeking to obtain primacy for the Class VI program;

- Supporting the implementation of the UIC STAG and IIJA funded Class VI programs, including a grant program that assists states and tribes in obtaining primacy;

- Supporting efforts to advance environmental justice in UIC programs;

- Supporting states and tribes in applying for primary enforcement responsibility and implementing UIC Program revisions;

- Continuing to provide technical assistance, tools, and strategies to states to improve implementation of UIC programs, including development of e-learning material, and to support permitting in direction implementation;

- Using national UIC data to assist with promoting consistent approaches to program oversight of state and EPA's UIC programs; and

- Streamlining EPA's UIC direct implementation permitting process and reducing the permit application backlog.

Water Reuse

To assure a safe and reliable source of water that is resilient to drought, flooding, and population growth, EPA is working to advance water reuse nationwide. This work is being done in collaboration with a broad group of stakeholders, including non-governmental organizations, states, tribes, and local governments. In FY 2025, EPA will continue to support the National Water Reuse Action Plan and the Federal Water Reuse Interagency Working Group. The Agency will develop and pursue actions that prioritize advancing technical and scientific knowledge on water

reuse to ensure its safety across a range of uses and applications. EPA also will pursue actions that provide technical and financial tools for stakeholders to ensure the accessibility of water reuse.[390]

One Water/One Community

In FY 2025, EPA will coordinate CWA and SDWA resources toward historically underserved and overburdened communities that are facing greater climate and water equity challenges to achieve greater resilience, access to clean and safe water, and an improved quality of life. This program will provide holistic support to communities as they respond to the climate crisis by increasing funding for planning and implementation actions across the country. Additionally, EPA will work with federal partners and tribes to meet the unique water infrastructure challenges and other needs in tribal nations.

Permitting Related to Infrastructure

In FY 2025, EPA is requesting additional resources to help process the increase in permits across the country driven by this Administration's historic investment in infrastructure. These additional FTE are necessary to handle the influx in a variety of different permit types that require EPA approval.

This program also includes resources to support the increasing and new costs associated with mandatory Agency support services provided through the Working Capital Fund (WCF), support delegated responsibilities for Mission Support functions across the Agency, and support Agency-wide implementation of OMB Cybersecurity mandates.

**Performance Measure Targets:**

(PM DW-02) Number of community water systems still in noncompliance with health-based standards since March 31, 2021.

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  | 875 | 640 | 450 | 425 | 400 | CWSs |
| Actual | 1,718 | 1,128 | 1,048 | 654 | 537 | 466 |  |  |  |

(PM DW-07) Number of drinking water and wastewater systems, tribal and state officials, and water sector partners provided with security, emergency preparedness, and climate resilience training and technical assistance.

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 2,000 | 3,500 | 4,500 | 4,500 | Systems and Partners |
| Actual |  |  |  |  | 3,939 | 3,895 |  |  |  |

---

[390] For more information, please see https://www.epa.gov/waterreuse.

**(PM DWT-02) Number of community water systems in Indian Country still in noncompliance with health-based standards since March 31, 2021.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 100 | 55 | 35 | 30 | CWSs |
| **Actual** |  |  |  |  | 74 | 54 |  |  |  |

**(PM INFRA-06) Number of tribal, small, rural, or underserved communities provided with technical, managerial, or financial assistance to improve system operations.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 339 | 542 | 1,100 | 1,300 | Communities |
| **Actual** |  |  |  | 187 | 1,668 | Data Avail 4/2024 |  |  |  |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$8,970.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs. It also includes support for critical Agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$407.0 / +2.2 FTE) This program change is an increase to resources and FTE to support Agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements and other Evidence Act activities.

- (+$1,285.0 / +1.0 FTE) This program change is an increase to support implementation of EPA's Climate Adaptation Action Plan. This increase will support priority commitments, such as actions to integrate climate adaptation into EPA programs, policies, and processes, efforts to address climate adaptation science and data needs, and efforts to consult and partner with outside stakeholders This investment includes $185.0 thousand in payroll.

- (+$11,617.0 / +7.9 FTE) This program change is an increase in resources and FTE that supports regulatory analysis, development, training, permit review, and technical assistance for state, tribal, and local communities to address drinking water contaminants (including Lead and PFAS) in their efforts to ensure safe and affordable drinking water. This increase also supports development of the Lead and Copper Rule Improvements and the Unregulated Contaminant Monitoring Rule. This investment also includes $1.459 million in payroll.

## Statutory Authority:

SDWA; CWA.

## Preparation for Water Emergencies

Program Area: Ensure Clean Water
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Ensure Safe Drinking Water and Reliable Water Infrastructure

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$0* | *$0* | *$30,000* | *$30,000* |
| Total Budget Authority | $0 | $0 | $30,000 | $30,000 |
| Total Workyears | 0.0 | 0.0 | 30.0 | 30.0 |

**Program Project Description:**

Fulfilling EPA's emergency response obligations during a water crisis is a top priority for the Agency and the Administration and an imperative for communities experiencing such emergencies. Responding quickly to drinking water and wastewater emergencies often requires action beyond what is considered the traditional role of EPA's water, enforcement, or emergency response programs. The new Water Emergencies Program would enable EPA to respond to water and wastewater emergencies where EPA has determined that water quality poses a risk to public health, and the affected community lacks access to safe and clean water in a timely or effective manner. The Agency presently lacks resources to respond to, and sustain, water and wastewater emergency response operations. This new program and the resources requested to implement this proposal is an important towards filling this gap.

EPA will assume a lead role in assisting communities in the response to and recovery from a water incident, particularly environmental justice communities which may be more vulnerable to water and wastewater emergencies. EPA has taken a lead role during water crises, through various EPA programs, within the past few years, including water systems with elevated water lead levels in Clarksburg, WV, and Benton Harbor, Michigan; the leakage of stored jet fuel into a drinking water source in Oahu, HI; arsenic contamination of a public well in Coachella Valley, CA; and the crisis in Jackson, MS.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.1, Ensure Safe Drinking Water and Reliable Water Infrastructure in the *FY 2022 - 2026 EPA Strategic Plan*.

It is incumbent on the EPA, under Presidential Policy Directive (PPD)-44 (Enhancing Domestic Incident Response), to develop capacity and capabilities in the event that the President designates EPA as the Lead Federal Agency (LFA) for a water emergency. As LFA, the Agency is expected to perform multiple complex and time critical duties, including the following key actions:

- Enhance federal government unity of effort;
- Develop strategic objectives, priorities and planning for the incident;
- Identify gaps that response efforts should address;
- Coordinate the federal incident response strategy with senior federal, state, local, tribal and territorial officials, as well as the private sector and nongovernmental entities;
- Communicate with senior U.S. Government officials to raise and resolve issues;
- Facilitate appropriate incident information reporting;
- Serve as or designate a principal spokesperson to lead communication efforts with affected parties and the public;
- Establish unified coordination through a Unified Coordination Group (UCG) or similar construct and supporting organizational structure;
- Identify federal, State, Local, Tribal and Territorial (SLTT), private sector, and non-governmental organization (NGO) stakeholders with roles in responding to the incident and working with stakeholders to:
  - o Develop strategic objectives, priorities, and planning efforts necessary for the response.
  - o Assess the nature of the incident, including identifying and mitigating operational and policy gaps to effectively respond to the incident.
  - o Establish roles, responsibilities, and clear expectations across the UCG.
  - o Clearly identify reporting relationships internally and externally.
  - o Establish an operational tempo and meeting schedule.
- Establish an entity responsible for engagement and outreach to each stakeholder or set of stakeholders, to ensure stakeholders needs are integrated with incident planning and operations;
- Initiate operational planning to develop appropriate response tactics and facilitate the effective application of resources to meet incident objectives including:
  - o Set common incident objectives corresponding to the identified operational issues and gaps.
  - o In coordination with stakeholders, develop and communicate performance indicators for each incident objective that can be used to track progress against the objective.
  - o Identify resources (authorities, capabilities, grants, programs, personnel) within federal, SLTT, private sector, NGO, and other appropriate sectors, that could close identified gaps.
  - o Identify gaps in the response that require operational planning to solve and establish planning initiatives with cross-agency and cross-jurisdictional representation for each operational gap or incident objective.
  - o Ensure appropriate agency subject matter experts are available to provide strategic and operational input.
  - o Establish a common picture of cost accounting and expenditures by LFA and Support Federal Agency (SFA).
- Communicate with senior federal officials to raise and resolve issues related to the response and recovery outcomes, including addressing national-level resource and strategic policy issues through the National Security Council interagency policy process; and
- Identify possible thresholds for completion of incident objectives that will allow the unified coordination structure to stand-down.

401

Accordingly, and to be better prepared to accomplish this critically important work, EPA is requesting $30 million and 30 FTE in FY 2025 to establish a new program that would expand the Agency's water emergency response capabilities across the following two components:

- Ensuring the availability of trained personnel and resources at EPA Headquarters and in the Regions
  - EPA water, enforcement, and other program staff currently perform emergency response activities, with their emergency response role considered ancillary to their primary duties of implementing programs under the Safe Drinking Water Act and Clean Water Act. EPA will need additional staff and resources in order to effectively act in a water or wastewater emergency.
  - $10 million would provide the resources necessary for EPA to serve as the LFA upon possible designation by the President of the United States in the event of an emergency compromising the ability of a water system to provide safe and clean water. To support EPA's designation as a LFA and associated primary duties across the Agency, additional staff and funding are needed to fully implement, and address emergency response responsibilities.

- Establishing a Water Emergency Fund
  - If a significant water or wastewater emergency requiring direct EPA action arises or EPA is designated by the President as an LFA under PPD-44, EPA will not have access to emergency response funds under CERCLA or the Stafford Act, but nonetheless will have the responsibility to provide staffing and material support to restore drinking water and wastewater services. EPA can only achieve this essential mission with a no-year fund dedicated to emergency response actions for water incidents.
  - $20 million is included to provide direct assistance to affected communities which could be in the form of bottled water, filters, obtaining assistance from other federal agencies under the Economy Act, reimbursing the water system or state for mutual aid assistance, providing trained personnel to operate or manage drinking water and wastewater services, among other tasks.

EPA is requesting new appropriations language that will provide no-year funding, broaden the authorization to include both publicly and privately owned drinking water and wastewater systems, and provide more inclusive language for using SDWA 1442(b) authorities for technical assistance, grants, and contract support regardless of whether the Administrator determines that such actions would not be taken without such emergency assistance for this work. Additionally, the appropriations language requested will allow EPA to respond faster to emergencies.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program at this time.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+30,000.0 / +30.0 FTE) This increase provides funding for a new program to support the implementation and priorities to better prepare the Federal government, states, and communities for potential water emergency situations in direct support of the EPA's mission to protect human health. This investment includes $5.4 million in payroll.

**Statutory Authority:**

SDWA 1442(b) and 1431, CWA

**Ensure Clean Water**

**Marine Pollution**

Program Area: Ensure Clean Water
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

| | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$8,081* | *$10,187* | *$12,724* | *$2,537* |
| Total Budget Authority | $8,081 | $10,187 | $12,724 | $2,537 |
| Total Workyears | 26.8 | 32.8 | 38.0 | 5.2 |

**Program Project Description:**

EPA's Marine Pollution Program aims to: 1) protect human health and the marine environment from pollution through implementation of the Marine Protection, Research and Sanctuaries Act (MPRSA) permitting, site designation, and site management and monitoring program; 2) address incidental discharges, including sewage, under the Clean Water Act Section 312; and 3) reduce marine litter in the Nation's waterways and oceans, improve trash capture and source reduction activities across the country, and support the Trash Free Waters Program.

**FY 2025 Activities and Performance Plan:**

Work in this program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

*MPRSA Program*

The MPRSA regulates the transportation and disposition of any material in the ocean unless expressly excluded under MPRSA. In the United States, MPRSA implements the requirements of the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter of 1972, known as the London Convention treaty, one of the first international agreements for the protection of the marine environment from human activities. The United States has signed but not ratified the London Protocol, a free-standing treaty intended to modernize and eventually replace the London Convention. Among other things, Contracting Parties to the London Convention and London Protocol have taken steps to address potential harm to the marine environment from the evaluation of new experimental technologies designed to reduce carbon dioxide in the atmosphere or mitigate its adverse effects (*e.g.*, marine geoengineering).

In FY 2025, EPA will evaluate MPRSA permitting inquiries and requests for the transportation and disposition of all materials except dredged materials and, as appropriate, issue MPRSA emergency, research, general, and special permits for all materials other than dredged material. This will include addressing MPRSA permitting requests for climate mitigation approaches, including ocean-based carbon dioxide removal activities or ocean-based solar radiation

405

management activities, and investigating any needed regulatory updates. EPA will administer MPRSA general permits (some of which require consultation, for example, to ensure applicability or to identify an appropriate disposal location at sea) for the burial at sea of cremated or non-cremated human remains, the transport and disposal of vessels at sea, the transport of target vessels for ocean disposal by the U.S. Navy for the Sink Exercise Program (SINKEX), the ocean disposal of man-made ice piers by National Science Foundation in Antarctica, and the ocean disposal of marine mammal carcasses.

The U.S. Army Corps of Engineers uses EPA's ocean-dumping criteria when evaluating requests for MPRSA permits and MPRSA federal project authorizations for the ocean dumping of dredged material (*e.g.,* to support the expansion of ports and harbors or maintenance of navigation channels including to support the transport of offshore wind infrastructure built on land for installation offshore). All dredged material MPRSA permits and federal project authorizations are subject to EPA review and written concurrence, and EPA will continue to work expeditiously consistent with the Permitting Action Plan. In FY 2025, EPA will manage approximately one hundred EPA-designated MPRSA ocean sites, conduct oceanographic surveys at approximately four to six EPA-designated MPRSA ocean sites to ensure that ocean dumping will not unreasonably degrade or endanger human health or the environment, to verify that unanticipated adverse effects are not occurring from past or continued use of the site, and to ensure that terms of the MPRSA permit/federal project authorization are met. EPA will evaluate lessons learned from sites and evaluate lessons learned from each survey and review and update, as necessary, MPRSA-required site management and monitoring plans established for each EPA-designated site. EPA will evaluate requests to designate new MPRSA sites and/or modify (*i.e.,* expand the capacity of) existing EPA-designated MPRSA sites (through rulemaking) for the disposal of dredged material (sediment) removed from the bottoms of the navigable waters to maintain the navigation channels and coastal ports of the U.S. marine transportation system.

EPA will perform its MPRSA responsibilities to support new port and navigation infrastructure projects funded through the Infrastructure Investment and Jobs Act of 2021. EPA will work to maintain national program capacity by training EPA staff and developing technical/regulatory tools to improve MPRSA permitting, site designation, and site management and monitoring. EPA will provide training for new Chief Scientist candidates and existing Chief Scientists responsible for designing and implementing ocean monitoring surveys to meet MPRSA requirements.

In FY 2025, EPA will serve as the Head of the United States Delegation for the annual London Convention (LC) and London Protocol (LP) Scientific Groups Meetings, serve as Alternate Head of the United States Delegation for the annual Consultative Meeting of the LC and LP Parties, and represent the United States at the annual LP Compliance Group Meeting. An EPA representative will chair the annual LC/LP Consultative Meeting. With the U.S. Army Corps of Engineers, EPA will submit the annual United States permit and ocean monitoring report to the International Maritime Organization to meet LC treaty obligations.

*Vessels Program*

EPA is responsible for developing regulations under the Clean Water Act to address vessel discharges. The vessel regulations help protect the environment from harmful pollutants such as

sewage, metals, and aquatic nuisance species. In FY 2025, EPA will continue to work with the states on the designation of vessel sewage no-discharge zones as needed. EPA also will continue to work with the U.S. Coast Guard (USCG) on implementation of Vessel Incidental Discharge Act (VIDA) regulations including but not limited to discharge standards, no-discharge zones, and emergency orders. Additionally, in FY 2025, EPA will continue working on the development of ballast water discharge regulations for vessels of the Armed Forces. EPA will work to maintain national program capacity by training EPA staff and developing technical/regulatory support tools to improve implementation. EPA also will continue to provide support to the USCG in their role as the head of delegation at the International Maritime Organization (IMO). The IMO is a specialized agency of the United Nations with the responsibility to develop and maintain a comprehensive regulatory framework for worldwide shipping. Lastly, in FY 2025, EPA will continue to conduct extensive research on the management of ballast water in the Great Lakes.

*Trash Free Waters Program*

The FY 2025 request includes resources and Full Time Equivalents (FTE) to support trash capture and prevention programs across the United States which are tied to water quality and waste management goals, as well as to implement activities under the Save Our Seas 2.0 Act. This program provides education and outreach and technical support to Tribes, states, municipalities and non-governmental organizations across the country, including communities in coastal regions and on major river systems, with a special focus on lower-income areas with environmental justice concerns.

FY 2025 funding will allow the Program to:

- Support the installation of trash capture systems in stormwater conveyance systems and in waterways using technologies that are cost-effective and that have high trash-removal efficiencies;

- Provide assistance on integrating trash prevention provisions into municipal stormwater management permits and practices, as well as broader watershed plans;

- Aid targeted source reduction efforts;

- Promote appropriate protocols for trash monitoring efforts;

- Research and address microplastics (including microfibers) in waterways;

- Engage in targeted outreach and education efforts in support of place-based trash capture and reduction; and

- Validate and replicate the most effective tools, projects, metrics, and partnerships across the Nation for subsequent application in locations within the United States and in countries with the greatest need.

The Trash Free Waters Program has been able to increase the number of place-based projects year by year through active engagement with partners. Since 2013, well over two hundred aquatic trash related projects have been undertaken with EPA's assistance, including projects addressing public education and outreach, research, the development and implementation of regional strategies, and more. EPA will continue to work with its partners to advance this initiative in FY 2025 and evaluate progress by reviewing best practices and challenges and applying lessons learned to future projects.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (+$304.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs.

- (+$2,233.0 / +5.2 FTE) This increase of resources and FTE builds program capacity, particularly in areas related to environmental justice, navigation and other water infrastructure support and oversight, climate change mitigation, and permitting. This investment also includes $1.013 million in payroll.

**Statutory Authority:**

Marine Protection, Research, and Sanctuaries Act (Ocean Dumping Act); Clean Water Act; Marine Debris Research, Prevention and Reduction Act of 2006; Marine Plastic Pollution Research and Control Act of 1987; Save Our Seas 2.0 Act.

## Surface Water Protection

Program Area: Ensure Clean Water
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$213,320* | *$224,492* | *$270,573* | *$46,081* |
| Total Budget Authority | $213,320 | $224,492 | $270,573 | $46,081 |
| Total Workyears | 938.1 | 1,010.3 | 1,056.4 | 46.1 |

**Program Project Description:**

The Surface Water Protection Program, under the Clean Water Act (CWA), directly supports efforts to protect, improve, and restore the quality of the Nation's coastal waters, rivers, lakes, wetlands, and streams. EPA works with states and tribes to make continued progress toward clean water goals.

EPA uses a suite of regulatory and non-regulatory programs to protect and improve water quality and ecosystem health in the Nation's watersheds. In partnership with other federal agencies, tribes, states, territories, local governments, and non-governmental partners, EPA works collaboratively with public and private sector stakeholders nationally and locally to establish innovative, broad-scale, and location-appropriate programs to achieve the Agency's goals.

This Program also supports implementation of water quality standards, effluent guidelines, impaired waters listing, water quality monitoring and assessment, water quality certification, National Pollutant Discharge Elimination System (NPDES) permitting, and management and oversight of the Clean Water State Revolving Fund (CWSRF).

**FY 2025 Activities and Performance Plan:**

Work in this Program directly supports Goal 5/Objective 5.2, Protect and Restore Waterbodies and Watersheds in the *FY 2022 - 2026 EPA Strategic Plan*.

In FY 2025, EPA will continue to work with states and tribes to target funds to core requirements while providing states and tribes with flexibility to best address their priorities for surface water protection. The FY 2025 request provides an increase of $22.4 million and 22.8 FTE above FY 2024 annualized CR levels that will allow EPA to focus on the advancement of clean water infrastructure programs, with an emphasis on building climate change resilience, conducting CWA regulatory reviews, and advancing environmental justice through technical assistance and stakeholder engagement. The FY 2025 request also provides an increase of $14.1 million and 22 FTE above FY 2024 annualized CR levels that will focus on investing in programs to put in place the national regulatory requirements needed to identify and control discharge of per- and

polyfluoroalkyl substances (PFAS), nutrients and bacteria in surface waters and publicly owned treatment works (POTWs).

<u>Program Implementation</u>

*Water Quality Criteria and Standards.* Water quality criteria and standards provide the scientific and regulatory foundation for water quality protection programs under the CWA. EPA will provide new and revised national recommended ambient water quality criteria as required by CWA Section 304. EPA also will be supporting states and tribes with the adoption and implementation of water quality standards in accordance with 40 CFR part 131. In FY 2025, the Agency will place special emphasis on engaging with underserved communities in the review and setting of state water quality standards. The Agency also will place special emphasis on improving the water quality standards in tribal waters on reserved lands and in waterways where tribes retain treaty rights to better ensure that tribes' health and natural resources are protected.

*Effluent Limitations Guidelines (ELGs).* As required under the CWA, EPA will continue to annually review industrial sources of pollution. In FY 2025, EPA will seek to finalize 1) a rulemaking to establish more protective nutrient limits on wastewater discharges from meat and poultry product facilities and 2) a rulemaking to establish PFAS limits for the organic chemical manufacturing industry. As EPA finalizes detailed studies on the textile industry for PFAS discharges and the Concentrated Animal Feeding Operation (CAFO) industry for nutrient discharges, the Agency will consider the data and conclusions of these detailed studies in the ELG plan. Additionally, EPA will collect a national dataset on additional industrial discharges of PFAS to surface waters and influent to POTWs and conduct rulemakings on one or more additional categories of industrial dischargers of PFAS as the Agency determines necessary.

*Clean Water Act Analytical Methods Program.* EPA will continue developing and updating analytical methods (test procedures) that are used by industries and municipalities to analyze the chemical, physical, and biological components of wastewater and other environmental samples. EPA periodically updates existing analytical methods to reflect advances in analytical instrumentation and to foster innovation and improvement in the analytical chemistry community. In addition, as novel pollutants are identified for regulation under CWA programs, EPA develops and promulgates new analytical methods that can then be incorporated into NPDES and other permits. During FY 2025, EPA intends to finalize analytical methods that were multi-lab validated in previous years for determining PFAS in industrial wastewater to support ongoing PFAS industrial category rulemakings and NPDES permits, as well as investing in updating existing analytical methods for pollutants such as pesticides/herbicides, microbial contaminants, radiological contaminants, and nutrients in wastewater.

*Biosolids.* EPA will continue to implement the Biosolids (sewage sludge) Program as required under CWA Section 405, including reviewing the biosolids regulations at least every two years to identify additional toxic pollutants and promulgate regulations for such pollutants consistent with the CWA. EPA also will continue to develop tools to conduct risk assessments for chemicals and pathogens found in biosolids. EPA will focus resources on obtaining and using the latest scientific knowledge to identify resource recovery and reuse alternatives, understanding, and managing the biosolids lifecycle, engaging partners — particularly those communities most affected — and

410

conducting research. Investment in the biosolids program is critical to addressing near term risks from chemicals known to be in domestic sewage sludge that is currently applied to land.

*Impaired Waters Listings and Total Maximum Daily Loads (TMDLs).* EPA will work with states, territories, tribes, and other partners to identify impaired waters, as required by CWA Section 303(d), and on developing and implementing TMDLs for listed impaired waterbodies. TMDLs focus on clearly defined environmental goals and establish a pollutant budget, which is then implemented through local, state, and federal watershed plans and programs to restore waters. EPA will work with and provide support to states, territories, and tribes to ensure that TMDLs are effective and implementation ready. EPA also will support states, territories, and tribes develop other restoration approaches and plans for the protection of unimpaired or high-quality waters.

The TMDL Program is at an important inflection point as EPA began implementing the new "2022 - 2032 Vision for the Clean Water Act Section 303(d) Program" and continues to build on the work done throughout the first 10-year 303(d) Vision. As part of the 2022 - 2032 Vision, EPA provided four themes to consider in the CWA Section 303(d) program implementation - 1) Environmental Justice, 2) Climate Change, 3) Tribal Water Quality and Program Development, and 4) Program Capacity Building.

*Monitoring and National Aquatic Resource Surveys (NARS).* EPA will continue working with states and tribes to support the NARS statistically representative monitoring of the condition of the Nation's waters and fish which supports CWA Section 305(b). EPA will explore opportunities to leverage NARS data analysis to gain insight on disparities in water quality and the impacts of climate change. EPA will leverage NARS training programs to support workforce development in water quality monitoring and build tribal capacity for monitoring and assessment. EPA will continue working with states and tribes to support base water quality monitoring programs and priority enhancements that serve state and tribal CWA programs in a cost-efficient and effective manner. The FY 2025 request would support EPA's assistance for states and tribes to expand monitoring and reporting for PFAS and other priority water quality concerns. In addition, the request will support continued monitoring and reporting of contaminants (including PFAS) nationwide in fish. EPA will continue supporting state and tribal water quality data exchange and tools to maximize the use of data from multiple organizations to support water quality management decisions and continue supporting applications like How's My Waterway to make water quality information readily accessible to the public and water quality managers.

*Managing Nonpoint Sources of Pollution.* EPA will continue to use staff and extramural resources to administer the Section 319 nonpoint source management grant program and continue efforts to reduce nonpoint sources of pollution. EPA will continue to emphasize and provide technical support to state, territory, and tribal Nonpoint Source programs to develop and implement watershed-based plans, which is central to achieving NPS load reductions contained in TMDLs to achieve water quality standards. Watershed-based plans enable states, territories, tribes, and local communities to track progress and make changes over time to meet their water quality goals. EPA will continue to forge and strengthen strategic partnerships with other EPA and federal agency programs to reduce nonpoint source pollution, promote the implementation of green infrastructure, and to build capacity in natural hazard mitigation planning and residence co-benefits.

*Waters of the United States.* EPA and the Department of the Army published the final revised definition for the "Waters of the United States" rule in January 2023. Considering the May 2023 U.S. Supreme Court decision in *Sackett*, the agencies finalized a new conforming rule to amend the 2023 "Waters of the United States" rule on August 29.[391] EPA also will continue to support the development of tools and resources with state and federal partners to facilitate implementation, such as the Streamflow Duration Assessment Methods.

*Water Quality Certification.* In accordance with Executive Order 13990, EPA completed a review of the 2020 CWA Section 401 certification rule and proposed a new rule on June 9, 2022, which was finalized in September 2023 and took effect on November 27, 2023. EPA will continue to support the development of tools and resources with the federal licensing and permitting agencies as well as the certifying states, territories, and tribes. Section 401 of the CWA gives states and authorized tribes the authority to address potential adverse water quality impacts of discharges from federally permitted or licensed projects that may affect the "Waters of the United States."

*Water Quality Programs.* The NPDES Program protects human health, safety, and the environment by regulating point sources that discharge pollutants into waters of the United States. In an average year, over 10 thousand permits are issued to address discharges from among the approximately 15 thousand wastewater treatment facilities, nearly 60 categories of industries, and almost 300 thousand stormwater facilities. EPA authorizes the NPDES permit program to state, tribal, and territorial governments, and currently 47 states and the U.S. Virgin Islands have authorized programs.

In FY 2025, EPA will continue to implement the NPDES program that helps control point source discharges through permitting and pretreatment programs. The permitting process is a vital tool for protecting waterways, particularly in underserved communities that may suffer from a combination of economic, health, and environmental burdens, by setting effluent limits, monitoring, and reporting requirements, and other provisions. As climate change increases the stress on waterways, these permits allow EPA and the states to set appropriate requirements for wastewater and stormwater discharges to protect water quality and public health.

In addition, as required under the CWA and Executive Order 12866: *Regulatory Planning and Review,*[392] EPA will continue to support cost-benefit analysis for CWA regulatory actions. EPA will work with states, tribes, territories, and local communities to safeguard human health; maintain, restore, and improve water quality; and make America's water systems sustainable and secure, supporting new technology and innovation wherever possible.

*Nutrient and Harmful Algal Bloom (HAB) Reductions.* The FY 2025 budget includes resources and FTE to support efforts to reduce nutrient pollution and HABs, which remain the most significant widespread water quality challenge across the country, despite decades of efforts to

---

[391] For more information, please see: https://www.epa.gov/wotus/amendments-2023-rule.
[392] For more information, please see: https://www.epa.gov/laws-regulations/summary-executive-order-12866-regulatory-planning-and-review.

achieve reductions.[393] Climate change is exacerbating HABs. The sources and impacts of nutrient pollution and HABs vary depending on geographic location, and span urban, rural, and coastal landscapes. EPA has been working with its partners to address these challenges. Since 2022, over 13 thousand square miles of watersheds with waters identified as impaired by nutrients are now attaining standards. The FY 2025 request will allow EPA to assist states, territories, and authorized tribes in the development of numeric nutrient criteria through the Nutrient Scientific Technical Exchange Partnership & Support (N-STEPS) Program, establishment of numeric targets to apply narrative water quality standards (WQS), perform assessments and identify impaired waters, develop TMDLs, and support science research related to HABs.

*Per- and Polyfluoroalkyl Substances (PFAS).* The FY 2025 request directs resources toward addressing PFAS in surface waters through the development of national recommended ambient water quality criteria for PFAS; biosolids risk assessments for PFOA and PFOS; methods for detecting PFAS in wastewater; national collection of information on discharges of PFAS from industrial point source categories to determine if revisions to ELGs are warranted; revising existing ELGs for metal finishing operations, organic chemical manufacturers, and landfills to include numeric effluent limits on PFAS discharges; incorporating PFAS monitoring requirements in NPDES permits; recommending inclusion of PFAS in state and tribal fish tissue monitoring and fish advisory programs. In FY 2025, EPA will continue to implement the four-year PFAS Strategic Roadmap which contains a comprehensive set of actions that guide the Agency's efforts on PFAS.

*Water Reuse.* To assure that communities have safe, reliable sources of water that are resilient to drought, flooding, and population growth, EPA is working to advance water reuse nationwide. This work is being done in collaboration with a broad group of stakeholders including non-governmental organizations, states, tribes, and local governments. In FY 2025, EPA will continue to support the National Water Reuse Action Plan and the Federal Water Reuse Interagency Working Group. The Agency will develop and pursue actions that prioritize advancing technical and scientific knowledge on water reuse to ensure its safety across a range of uses and applications. EPA also will pursue actions that provide technical and financial tools to stakeholders to ensure the accessibility of water reuse.[394]

*WaterSense.* The WaterSense Program is a key component of the Agency's efforts to ensure long-term sustainable water infrastructure and help communities respond to water shortages that can be caused by drought, growth, or aging infrastructure. WaterSense provides consumers with a simple label to identify and select water-efficient products and homes to help them save water and money and provides resources and tools to help water utilities carry out efforts to manage water demand and wastewater flows. Products and homes may only bear the WaterSense label after being independently certified to ensure that they meet WaterSense criteria for efficiency and performance. As of December 2023, the Program has labeled close to 45 thousand models of plumbing and irrigation products, and more than 10 thousand homes have earned the WaterSense label. Through 2022, the Program helped save more than 7.5 trillion gallons of water and 337 metric tons of greenhouse gases.[395] In FY 2025, the Program will finalize or implement new

---

[393] For more information, please see: https://www.epa.gov/nutrientpollution.
[394] For more information, please see https://www.epa.gov/waterreuse.
[395] WaterSense Accomplishment Reports (updated annually). For more information visit:
https://www.epa.gov/watersense/accomplishments-and-history.

specifications for point-of-use reverse osmosis water treatment systems and irrigation spray sprinkler nozzles, issue a revised specification for tank-type toilets, release proposals to label or provide guidance on other product categories, and carry out consumer campaigns that encourage consumers to switch to WaterSense-labeled products and adopt water-efficient behaviors.

*Urban Waters Federal Partnership Program (UWFP).* The Urban Waters Federal Partnership Program (UWFP)[396] reconnects urban communities with their waterways, particularly communities that are overburdened and underserved. The Program supports local urban water champions (Ambassadors) who work with diverse local stakeholder groups to collaborate on community-led revitalization efforts to improve the Nation's waters and promote their economic, environmental, and social well-being. At the national level, EPA leads a coalition of over 15 federal agencies that support 21 designated UWFP partnership locations. In FY 2025, through its Urban Waters Learning Network (UWLN)[397], the UWFP will continue to share resources, best practices, tools, trainings, mentoring, and financial assistance to support locations and other communities as they collaborate, develop solutions, and elevate new approaches on how to effectively integrate equity into climate resilience.[398] In FY 2025, UWFP will implement metrics to estimate the environmental and programmatic impact of the program and evaluate the health of the partnership in the 21 locations.[399]

*One Water/One Community*: EPA will coordinate CWA and Safe Drinking Water Act resources toward historically underserved and overburdened communities that are facing greater climate and water equity challenges to achieve greater resilience, access to clean and safe water, and an improved quality of life. This program will provide holistic support to communities as they respond to the climate crisis by increasing funding for planning and implementation actions across the country. Additionally, EPA will work with tribes to meet the unique needs of their communities.

Infrastructure

EPA will continue its support of the Nation's infrastructure, focusing on efforts to leverage and encourage public and private collaborative efforts and investments in improving the Nation's water infrastructure. This program supports the policy and fiduciary oversight of the Clean Water State Revolving Fund (CWSRF) Program, which provides low-interest loans and additional subsidization to help finance wastewater treatment facilities and other water quality projects.[400] Federal capitalization to the SRFs is significantly leveraged; since 1988, the CWSRF Program has made over 48 thousand assistance agreements, funding approximately $172 billion in wastewater infrastructure and other water quality projects.

---

[396] For more information visit: https://www.epa.gov/urbanwaters.
[397] For more information, please see: https://urbanwaterslearningnetwork.org/.
[398] For more information, please see https://urbanwaterslearningnetwork.org/equitable-climate-resilience-2/.
[399] Pending approval by Office of Management and Budget of an UWFP Information Collection Request.
[400] For more information, please see https://www.epa.gov/cwsrf.

The FY 2025 request:

- Supports funding for the Environmental Finance Centers Program which will help communities across the country improve their wastewater and stormwater systems, particularly through innovative financing.

- Drives progress on water infrastructure by increasing non-federal dollars leveraged by EPA water infrastructure finance programs (CWSRF, Drinking Water State Revolving Fund, and Water Infrastructure Finance Innovation Act). EPA leveraged $11.4 billion in non-federal dollars in FY 2023 and expects to leverage another $9.5 billion in FY 2025.

- Supports decentralized systems (septic or onsite) that provide communities and homeowners with a safe, affordable wastewater treatment option by implementing the 2020 Decentralized Wastewater Management Memorandum of Understanding and by improving access to CWSRF financing for communities who rely on decentralized systems.

- Supports the Wastewater Technology Center that provides accurate and objective resources on innovative and alternative wastewater technologies with a focus on small, mid-sized, and underserved communities.

- Supports the Wastewater Technology Clearinghouse, a searchable database that will provide reliable, objective information on proven innovative and alternative technologies for decentralized and centralized alternative wastewater treatment, such as water reuse, small system technologies used by lagoons, resource recovery, and nutrients.

- Supports the Sustainable Utility Management programs, implemented in partnership with industry associations and designed to protect and improve infrastructure investments through the Effective Utility Management Program, the Water Workforce Initiative, and tools such as augmented alternatives analysis that help communities leverage investments to achieve water protection goals and other community economic and societal goals; and

- Supports the Water Infrastructure and Resiliency Finance Center in assisting local leaders in identifying financial approaches for their drinking water, wastewater, and stormwater infrastructure needs.

Program Oversight/Accountability

*The Assessment TMDL Tracking Implementation System (ATTAINS).* ATTAINS is an online system for accessing information about the conditions in the Nation's surface waters. ATTAINS provides key information to the Agency, as well as states, territories, and tribes, who play a critical role in implementing the CWA. The Agency will continue to support states, tribes, and territories in electronically reporting CWA Section 303(d) and Section 305(b) assessment conclusions through ATTAINS to track improvements in impaired waters. This tool allows states and EPA to track and report progress in meeting water quality standards.

In FY 2023, over 15 thousand square miles of state waters were covered by priority TMDLs, other restoration approaches, or protection plans. EPA will continue to track progress of state waters covered by priority plans. However, beginning in FY 2025, EPA will transition to tracking a new universe for this work consistent with the new 2022-2032 Vision.

EPA continues to support streamlining efforts to allow states to reduce the time they spend on administrative reporting. EPA will work on improved reporting of the Agency's metric to reduce the number of square miles of watershed with surface water not meeting standards. Since FY 2022, over 27 thousand square miles of watersheds that contained previously impaired waters attained compliance with water quality standards.

*NPDES Oversight.* The National Program continues to work with the federal and state permitting authorities to provide oversight, technical assistance, and training to permit writers to support program implementation and pursue comprehensive protection of water quality on a watershed basis. EPA's oversight includes the National Pretreatment Program, which is a cooperative effort of federal, state, and local governments that perform permitting and enforcement tasks for discharges to publicly owned treatment works.

EPA continues to collaborate with the federal and state permitting authorities to identify opportunities to enhance the integrity and timely issuance of NPDES permits and permitting backlogs. After program improvements, between March 2018 and the end of FY 2023, the backlog of EPA-issued new and existing NPDES permits decreased from 106 to 12 and 547 to 194, respectively.

In FY 2025, EPA will continue to host NPDES-related workshops and provide technical assistance to build permit writer capacity on a range of topics including permit writing, pretreatment, whole effluent toxicity, stormwater, and nutrients. EPA also will issue general permits where appropriate to address the timeliness of permit issuance and continue to reduce the backlog of permits.

In FY 2025, EPA will continue to work with the federal and state permitting authorities to address PFAS in NPDES permitting. In FY 2023, EPA published a memorandum titled, *Addressing PFAS Discharges in NPDES Permits and Through the Pretreatment Program and Monitoring Programs,* which provides detailed instructions regarding how permitting authorities can address PFAS discharges in NPDES permits. EPA encourages permitting authorities to include monitoring requirements at facilities where PFAS are expected or suspected to be present in wastewater and stormwater discharges, utilizing EPA's recently published analytical method 1633, which addresses 40 unique PFAS. In FY 2025, EPA will continue to utilize the NPDES Program to monitor, report, and control discharges of PFAS and build upon the existing guidance by compiling best practices from state permitting authorities to address PFAS in NPDES permits, conducting training, and sharing the latest research and practices to prevent these contaminants from reaching surface waters.

EPA will address permits and litigation related to the *County of Maui v. Hawaii Wildlife Fund* Supreme Court decision that held that discharges from point sources through groundwater that eventually reach a water of the United States require an NPDES permit if they are the "functional equivalent" of a direct discharge to a water of the United States. In FY 2025, EPA will continue

to provide technical assistance and guidance to permit writers to implement this decision effectively in permits.

*Integrated Planning.* Clean water infrastructure investment needs are documented to be several hundred billion dollars, with wet weather improvements (combined sewer overflows [CSOs], sanitary sewer overflows [SSOs], bypasses, and stormwater discharges) comprising a significant portion of this total. Investment needs of this magnitude affect utility rates and disproportionately impact underserved communities. Integrated planning, utilizing green infrastructure, and other tools allow communities to synchronize infrastructure investments with broader community development goals. An integrated approach creates opportunities for affordable, multi-benefit investments that protect public health and enhance resiliency. As an effort to promote the adoption of green infrastructure as an effective solution to advance climate resilience and enhance the resilience of gray infrastructure, EPA has reinvigorated the Green Infrastructure Federal Collaborative.[401] This cooperative effort fosters engagement and cooperation between agencies that actively work to promote the implementation of green infrastructure. In FY 2025, EPA will continue to implement integrated planning and green infrastructure practices to address wet weather challenges and increase infrastructure resiliency.

*Combined Sewer Overflows:* Combined sewers have been a large focus for over two decades and EPA recognizes the tremendous investments that communities have made to significantly reduce combined sewer overflows and the substantial environmental progress that has been made. EPA's latest data indicate that there are more than 740 CSO communities (down from over 900) located in over 30 states and the District of Columbia. Even as communities have made progress in reducing both the number of overflows and the amount of untreated sewage discharged, remaining CSO discharges may be a concern for water quality and public health even following the completion of the projects in communities' long-term control plans. In FY 2025, EPA will continue developing guidance, seeking public comment on new draft guidance, and working to finalize the guidance for CSO communities. The guidance will clarify the permitting flexibilities and best implementation practices available as communities work toward water quality goals under the CWA. It will emphasize available integrated planning tools and permitting approaches that support equitable, resilient, and community-driven infrastructure decision-making.

*Building Coalitions to Advance the Permitting Program.* EPA continues to work with stakeholders and industry to identify challenges in implementation and best management practices. In FY 2025, EPA will continue to lead the Animal Agriculture Discussion Group (AADG), which consists of animal agriculture representatives from the U.S. Department of Agriculture, the animal feeding industry, and the states. AADG provides a forum for industry to engage with permitting authorities, resulting in a shared understanding of how to enhance agricultural practices that lead to greater water quality protection.

In FY 2023, EPA initiated the development of an NPDES general permit that the U.S. Forest Service intends to seek coverage under to address point source discharges to waters of the United States from the aerial application of fire retardants in geographic areas where EPA is the permitting authority. EPA estimates that approximately 30 months are needed to develop and issue a general permit and will continue to work on this permit development in FY 2025. In the interim, EPA

---

[401] For more information please visit: https://www.epa.gov/green-infrastructure/green-infrastructure-federal-collaborative.

entered into a federal facility compliance agreement with the Forest Service that will allow the Forest Service to continue the use aerially delivered fire retardant in accordance with direction outlined in the agreement.

*Improving National Aquatic Resource Survey (NARS) Data.* Another process improvement effort is focused on streamlining the flow of NARS data from EPA labs to state partners and data analysts. The Agency will continue to implement these process improvements and monitor the impact of data delivery on timeliness of analysis and reporting.

*401(a)(2) Notifications.* In FY 2025, EPA intends to use a tracking system for all 401(a)(2) notifications and actions. EPA will track whether a "may affect" determination has been made and to who (state or tribe) and then note the follow-up coordination, as applicable, including whether a state or tribe objects to the issuance of a license or permit, potential public hearings, and EPA recommendations. The notifications will mostly come from the Army Corps of Engineers but can come from any federal licensing or permitting agency. This information will be used for future Information Collection Requests and to inform future implementation efforts to ensure a consistent and streamlined section 401(a)(2) process (*e.g.*, development of templates and standard operating procedures for evaluating notifications and objections).

*Permitting Related to Infrastructure.* EPA is requesting additional resources to help process the increase in permits across the country driven by the Administration's historical investment in infrastructure. These additional FTE are necessary to handle the influx in a variety of different permit types that require EPA approval or review, including Section 401 certification.

## Performance Measure Targets:

**(PM INFRA-06) Number of tribal, small, rural, or underserved communities provided with technical, managerial, or financial assistance to improve system operations.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 339 | 542 | 1,100 | 1,300 | Communities |
| **Actual** |  |  |  | 187 | 1,668 | Data Avail 4/2024 |  |  | |

**(PM NPDES-03) Number of existing EPA-issued NPDES individual permits in backlog.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  | 360 | 280 | 230 | 250 | 210 | 200 | 210 | Permits |
| **Actual** | 456 | 373 | 333 | 284 | 229 | 194 |  |  | |

**(PM SWP-01) Annual increase in square miles of watersheds with surface water meeting standards that previously did not meet standards.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| **Target** |  |  |  |  | 8,000 | 8,000 | 17,100 | 7,900 | Square Miles |
| **Actual** |  |  |  |  | 20,511 | 7,121 |  |  | |

**(PM SWP-02) Annual increase in square miles of watersheds with previously impaired surface waters due to nutrients that now meet standards for nutrients.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  | 2,100 | 1,400 | 1,400 | 650 | Square Miles |
| Actual |  |  |  |  | 12,833 | 904 |  |  | |

**(PM TMDL-03) Square miles of priority areas covered by TMDLs, other restoration plans, or protection approaches.**

|  | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | Units |
|---|---|---|---|---|---|---|---|---|---|
| Target |  |  |  |  |  | 7,940 | 19,280 | TBD | Square Miles |
| Actual |  |  |  |  |  | 15,432 |  |  | |

## FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):

- (+$9,352.0) This change to fixed and other costs is an increase due to the recalculation of base workforce costs for existing FTE due to annual payroll increases, adjustments to provide essential workforce support, and changes to benefit costs. This change also includes support for critical agencywide infrastructure for Executive Order 14028 cybersecurity requirements, electronic discovery for FOIA and litigation support, and implementation of Trusted Vetting 2.0.

- (+$14,107.0 / +22.0 FTE) This program change, increases FTE and resources to accelerate progress on EPA's PFAS Strategic Roadmap, to enable EPA to move more quickly on policy, regulatory, and enforcement actions across multiple statutory authorities, and to support states and tribes in taking action on PFAS. This investment also includes $4.107 million in payroll.

- (+$243.0 / +1.3 FTE) This program change, increases FTE to support agencywide implementation of EPA's Diversity, Equity, Inclusion, and Accessibility Strategic Plan and Evidence Act data stewardship and governance requirements.

- (+$22,379.0 / +22.8 FTE) This increase of resources and FTE supports the advancement of clean water infrastructure programs, with an emphasis on building climate change resilience, conducting Clean Water Act regulatory and permit reviews, and advancing environmental justice. This investment includes $4.3 million in payroll.

## Statutory Authority:

Clean Water Act; Marine Protection, Research, and Sanctuaries Act; Marine Debris Research, Prevention and Reduction Act of 2006; Marine Plastic Pollution Research and Control Act of 1987; Save Our Seas 2.0 Act.

**Congressional Priorities**

**Congressional Priorities**

Program Area: Clean and Safe Water Technical Assistance Grants
Goal: Ensure Clean and Safe Water for All Communities
Objective(s): Protect and Restore Waterbodies and Watersheds

(Dollars in Thousands)

|  | FY 2023 Final Actuals | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2025 President's Budget v. FY 2024 Annualized CR |
|---|---|---|---|---|
| *Environmental Programs & Management* | *$25,700* | *$30,700* | *$0* | *-$30,700* |
| Science & Technology | $23,283 | $30,751 | $0 | -$30,751 |
| Total Budget Authority | $48,983 | $61,451 | $0 | -$61,451 |

**Project Description:**

The purpose of the Water Quality Research and Support Grants Program is to provide training and technical assistance for small public water systems, to help such systems achieve and maintain compliance with the Safe Drinking Water Act (SDWA), and to provide training and technical assistance for small publicly owned wastewater systems, communities served by onsite / decentralized wastewater systems, and private well owners improving water quality under the Clean Water Act (CWA).

**FY 2025 Activities and Performance Plan:**

Resources are proposed for elimination for this program in FY 2025 States have the ability to develop technical assistance plans for their water systems using Public Water System Supervision Program grant funds and set asides from the Drinking Water State Revolving Fund.

**Performance Measure Targets:**

EPA's FY 2025 Annual Performance Plan does not include annual performance goals specific to this program.

**FY 2025 Change from FY 2024 Annualized CR (Dollars in Thousands):**

- (-$30,700.0) This program change proposes to eliminate the Water Quality Competitive Grant Program. Resources are available through other existing programs and states are best positioned to develop technical assistance plans for their water systems.

**Statutory Authority:**

SDWA § 1442(e); Federal Food, Drug and Cosmetic Act; Food Quality Protection Act; Endangered Species Act; CWA § 104(b)(3).

# EXHIBIT 9




New to X?

Sign up now to get you

G Sign ι

 Sign 

Creat

By signing up, you agre
Privacy Policy, includir

← **Post**

**Lee Zeldin** ✓
@epaleezeldin

···

The One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund, which included a $7 billion pot called "Solar for All".

In some cases, your tax dollars were diluted through up to FOUR pass-through entities, each taking their own cut off the top!

The bottom line is this: EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive.

Today, the Trump EPA is announcing that we are ending Solar for All for good, saving US taxpayers ANOTHER $7 BILLION!



11:07 AM · Aug 7, 2025 · **525.7K** Views

○ 968    ↻ 5.5K    ♡ 20K    ◻ 385    ⬆

○ Read 968 replies

What's happe

Entertainment · Trend
**James Earl Jones**

Trending in United Sta
**Hilary Knight**

Sports · Trending
**Amen Thompson**

Sports · Trending
**#Pistons**

Show more

Terms of Service | Priva
Accessibility | Ads info

**Don't miss what's happening**
People on X are the first to know.

Log in

EXHIBIT 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HARRIS COUNTY, TEXAS, | |
| *Plaintiff,* | |
| v. | Civil Action No. 1:25-cv-03646-TSC |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.,* | |
| *Defendants.* | |

**[PROPOSED] BRIEF OF SENATORS WHITEHOUSE, SANDERS, MERKLEY, REPRESENTATIVES FLETCHER, CLEAVER, PALLONE, AND 78 ADDITIONAL MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Patrick R. Jacobi (D.C. Bar. No. 974532)
Alexandra L. St. Romain (*pro hac vice pending*) (D.C. Bar No. 90032261)
Center for Applied Environmental Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@caelp.org

*Counsel for Members of Congress* Amici Curiae

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTEREST OF *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION ................................................................................................................ 2

ARGUMENT ....................................................................................................................... 4

I.  The Court can vacate an unlawful agency action related to Congressional appropriations. . 4

II.  The OBBBA does not provide cover for EPA's unlawful cancellation of the Solar for All program. ...................................................................................................................... 6

    A.  The OBBBA only rescinded unobligated funds. ................................................... 6

    B.  The OBBBA neither sanctions EPA's unlawful termination of Solar for All nor renders that termination unreviewable............................................................... 10

    C.  The GGRF repeal addressed potential future re-obligation, not currently obligated grants........................................................................................................................ 11

CONCLUSION.................................................................................................................... 14

APPENDIX: LIST OF *AMICI CURIAE* .......................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Ala. Power Co. v. EPA,*
  40 F.3d 450 (D.C. Cir. 1994) ............................................................... 4

*Bates v. United States,*
  522 U.S. 23 (1997) ................................................................................ 7

*BedRoc Ltd. v. United States,*
  541 U.S. 176 (2004) .............................................................................. 7

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ............................................................................ 11

*Climate United Fund v. Citibank, N.A.,*
  778 F. Supp. 3d 90 (D.D.C. 2025) ..................................................... 13

*Climate United v. Citibank N.A.,*
  154 F.4th 809 (D.C. Cir. 2025), *vacated and reh'g granted*, 2025 WL 3663661
  (D.C. Cir. Dec. 17, 2025) ..................................................................... 3

*Dean v. United States,*
  556 U.S. 568 (2009) .............................................................................. 7

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) .............................................................................. 13

*INS v. Chadha,*
  462 U.S. 919 (1983) ............................................................................ 11

*In re Aiken Cnty.,*
  725 F.3d 255 (D.C. Cir. 2013) ......................................................... 2, 6

*Indep. U.S. Tanker Owners Comm. v. Dole,*
  809 F.2d 847 (D.C. Cir. 1987) ............................................................. 4

*Keystone-Conemaugh Projects LLC v. EPA,*
  100 F.4th 434 (3d Cir. 2024) ............................................................... 4

*Lamie v. U.S. Tr.,*
  540 U.S. 526 (2004) .............................................................................. 7

*Mistretta v. United States,*
  488 U.S. 361 (1989) ............................................................................ 11

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*,
595 U.S. 109 (2022) ................................................................................ 11

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 599 U.S. 670
(2023) ...................................................................................................... 4

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ................................................................................ 10

*Vartelas v. Holder*,
566 U.S. 257 (2012) ................................................................................ 7

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................................ 11

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ......................................................................... 2, 6

U.S. Const. art. I, § 9, cl. 7 ......................................................................... 2, 6

**Statutes**

2 U.S.C. § 683(b) ....................................................................................... 10

31 U.S.C. § 1552 ........................................................................................ 10

42 U.S.C. § 7434 ........................................................................................ 2, 7

Pub. L. No. 117-169, § 60103, 136 Stat. 1818 (2022) .................................. 2

Pub. L. No. 119-21, § 60002, 139 Stat. 72 (2025) ....................................... 3, 7

**Other Authorities**

Adams, John, "Thoughts on Government," in 4 *Works of John Adams* (C. Adams ed. 1851) ...... 2

Cong. Budget Off., "CBO Explains How It Estimates Savings from Rescissions" (May 26, 2023), https://www.cbo.gov/publication/59209 .................................................. 10

Cong. Budget Off., "Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline" (July 21, 2025), https://www.cbo.gov/publication/61570 .......................... 8

iv

Cong. Rsch. Serv., "The Budget Reconciliation Process: The Senate's 'Byrd Rule'" (Sep. 28, 2022), https://www.congress.gov/crs-product/RL30862 ....................................................... 12

DeMarban, Alex, *EPA axes program that would have injected $125 million in Alaska for small-scale solar projects*, Anchorage Daily News (Aug. 24, 2025), https://perma.cc/PR54-JWYZ . 9

Former President Trump Remarks at the Economic Club of New York, at 21:05-21:35, C-SPAN (Sep. 5, 2024), https://www.c-span.org/program/campaign-2024/former-president-trumpremarks-at-the-economic-club-of-new-york/648558 ....................................................... 7

Gov't Accountability Off., *Principles of Federal Appropriations Law*, 4th ed., ch. 5, § 2.a, GAO-04-261SP (Washington, D.C.: Jan. 2004)....................................................... 10

H. Comm. on Energy & Commerce, Full Committee Markup of Budget Reconciliation Text (May 13, 2025), https://energycommerce.house.gov/events/full-committee-markup-of-budget-reconciliation-text ....................................................... 9

*In re Funding of Replacement Contracts*, 60 Comp. Gen. 591 (1981)....................................................... 5

*In re Navajo Nation Oil & Gas Co.*, B-270723, 96-1 CPD P 187, 1996 WL 174689 (Comp. Gen. Apr. 15, 1996) ....................................................... 5

Lee Zeldin (@EPALeeZeldin), X (Aug. 7, 2025, 2:07 PM), https://x.com/epaleezeldin/status/1953518426602803684 ....................................................... 6

Letter from Reps. Frank Pallone, Jr., Paul D. Tonko, and Yvette D. Clarke, to Lee Zeldin, Administrator, EPA (Aug. 11, 2025), *available at* https://perma.cc/CLK5-HNXW ................ 8

Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. on Envtl. & Pub. Works, et al., to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), *available at* https://perma.cc/9YL9-QFPL ....................................................... 8, 12

Metzger, Gilliam E., *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075 (2021)..........11

*The Federalist No. 47* (James Madison) (Clinton Rossiter ed., 1961) ....................................................... 2

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* listed in the attached appendix are members of Congress. *Amici curiae* include the Ranking Members of the Senate Committee on Environment and Public Works and the House Committee on Energy and Commerce, which have jurisdiction over the Greenhouse Gas Reduction Fund ("GGRF"); the original champions of the Solar for All program and GGRF; the Ranking Member of the Senate Committee on the Budget; multiple members of the Senate and House Committees on Appropriations, which have jurisdiction over appropriations and rescissions; House members representing Harris County; and other members of Congress. Similarly, *amici* partook in negotiations around the One Big Beautiful Bill Act ("OBBBA").

*Amici* have a strong interest in ensuring that Congress's statutory mandates and plenary power over appropriations and spending are protected. They submit this brief because of the important separation-of-powers issues implicated by the Environmental Protection Agency's ("EPA's") unauthorized termination of obligated Solar for All grants. As members of Congress, *amici curiae* are well-positioned to provide insights that may assist the Court in evaluating the parties' arguments concerning Congressional intent, the appropriations process, and separation-of-powers principles.

---

[1] No party or counsel for any party authored this brief in whole or in part, no party or party's counsel contributed any money intended to fund the preparation or submission of this brief, and no person other than *amici* or their counsel contributed money intended to fund this brief. *See* L.C.R. 7(*o*)(5); Fed. R. App. P. 29(a)(4) (*amicus* brief disclosure requirements).

**INTRODUCTION**

The Founders divided power between the three branches to prevent "accumulation of all powers, legislative, executive, and judiciary, in the same hands," because such accumulation "may justly be pronounced the very definition of tyranny." *The Federalist No. 47*, at 301 (James Madison) (Clinton Rossiter ed., 1961).[2]  The Constitution grants the power of the purse to Congress, not the President or his agents.  U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  Congress obligates funds for specific programs, and it is a "settled, bedrock principle[] of constitutional law" that an agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).

This case concerns EPA's ongoing attempts to evade its statutory obligations, aggrandizing executive power at the expense of settled legislative prerogatives.  As part of the Inflation Reduction Act ("IRA") of 2022, Congress created the GGRF and appropriated $27 billion—$7 billion of which was designed to "enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies."  Pub. L. No. 117-169, 136 Stat. 1818, 2065-67 (2022) (creating a new § 134 of the Clean Air Act, 42 U.S.C. § 7434).  EPA created the Solar for All program in accordance with the statutory directive and obligated all GGRF grant funding, including all $7 billion in Solar for All funding, before the program's statutory deadline of September 30, 2024.  In Section 60002 of the OBBBA, enacted after all grant funding had been obligated and authorization for this program had expired, Congress

---

[2] Likewise, John Adams observed: "The dignity and stability of government in all its branches . . . depends so much upon an upright and skillful administration of justice, that the judicial power ought to be distinct from the legislative and executive, and independent upon both, that so it may be a check upon both, as both should be checks upon that."  John Adams, "Thoughts on Government," in 4 *Works of John Adams* 195 (C. Adams ed. 1851).

rescinded *unobligated* GGRF funds and repealed the GGRF.[3]  The only unobligated funds remaining were $19 million that Congress had separately appropriated to EPA for GGRF oversight costs.  Yet, following the OBBBA's enactment, EPA sent every Solar for All grantee a termination notice, claiming that the OBBBA's rescission of unobligated oversight funding and repeal of the GGRF program justified EPA's termination of the obligated funds.[4]  Pl.'s Mem. of Law in Supp. of Harris County's Mot. for Summ. J. ("Pl.'s MSJ"), ECF No. 32, Ex. A at 1 (Jan. 30, 2026) (August 7 Notice).

EPA has provided "shifting, post-hoc, and unsupported allegations" to justify its termination of the GGRF programs, including Solar for All.  *Climate United v. Citibank N.A.*, 154 F.4th 809, 842 (D.C. Cir. 2025) (Pillard, J. dissenting), *vacated and reh'g granted*, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025).  EPA now seeks to avoid accountability for its unlawful cancellation of the Solar for All program, in violation of the plain text of the OBBBA and explicit Congressional intent.  According to EPA, its improper termination can only be remedied by issuing replacement grants, which it claims it cannot issue under Section 60002 of the OBBBA.  *See* Defs.' PI Opp'n at 25–26.  But the Agency fails to show that a replacement contract is required, rather than judicial vacatur, to remedy its *ultra vires* actions.

The Solar for All funds were fully obligated by September 2024.  Congress's subsequent repeal of the by-then expired GGRF program and rescission of unobligated funds did not

---

[3] Section 60002 states, in its entirety: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded."  Pub. L. No. 119-21, 139 Stat. 72, 154 (2025).

[4] In this litigation, EPA has shifted away from its initial justification for the termination and now argues that OBBBA either required or allowed EPA to terminate the program.  *See generally* Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj., ECF No. 20 (Nov. 10, 2025) ("Defs.' PI Opp'n").

sanction EPA's wholesale elimination of the already-obligated Solar for All program. EPA's elimination of the Solar for All program was not justified, and this Court should restore the status quo before EPA's wrongful terminations.

**ARGUMENT**

I.     **The Court can vacate an unlawful agency action related to Congressional appropriations.**

As a threshold matter, Plaintiff asks this Court to vacate EPA's unlawful termination of the Solar for All program and restore its original grant. Pl.'s MSJ at 43–45. EPA argues that the only way to remedy the Agency's unlawful grant termination would be to issue replacement grants, which EPA claims it cannot do post-OBBBA. Defs.' PI Opp'n at 25. That is not correct.

Judicial vacatur "does nothing but re-establish the status quo absent the unlawful agency action." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 599 U.S. 670 (2023); *see also Ala. Power Co. v. EPA*, 40 F.3d 450, 456 (D.C. Cir. 1994) ("To vacate means to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.") (cleaned up); *Keystone-Conemaugh Projects LLC v. EPA*, 100 F.4th 434, 446 (3d Cir. 2024) ("[A] vacated agency action is a nullity that has no force and effect."); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854–55 (D.C. Cir. 1987) (explaining that vacatur of an agency rule returns conditions to the status quo ante). When an agency action is contested and a reviewing court confirms that the action was unlawful, the court can set aside that action and restore the status quo in place before the unlawful act.

The Court need not reach the question of whether EPA has authority to issue replacement grants; that question is a red herring. If this Court finds EPA's termination unlawful, it can vacate that termination. EPA cites two Comptroller General opinions that are not germane to

EPA's claims.  In *In re Navajo Nation Oil & Gas Co.*, the Comptroller General described that a "replacement contract doctrine" exists to "facilitate contract administration . . . should a replacement contract be required because, for example, the initial contract is terminated for default because of poor performance or is terminated for convenience *because a court or other competent authority determines that a contract was improperly awarded*."  B-270723, 96-1 CPD P 187, 1996 WL 174689, at *3 (Comp. Gen. Apr. 15, 1996) (emphasis added).  Nothing in that opinion supports the proposition that a replacement contract is the remedy required, rather than vacatur, when a court finds an agency's grant termination to be improper.  *See also In re Funding of Replacement Contracts*, 60 Comp. Gen. 591, 593 (1981) (making clear that a replacement contract enables an agency to contract with *a different party* after terminating a contract for default: "this reprocurement arrangement became known as a replacement contract").  The Comptroller General opinions assume regularity in an agency's termination and do not speak to the relief available where a court holds the agency's termination unlawful.  And they by no means question a court's ability to review the lawfulness of termination in the first place.  EPA's position mischaracterizes appropriations law and fails to show that a replacement contract is required to remedy an unlawful termination.

EPA has given no reason why its unlawful actions to unwind Congressional appropriations should stand.  This is not a case where a bankrupted recipient, a criminally charged senior executive, or a flooded-out physical location creates an occasion for executive "discretion" to withhold duly appropriated and obligated funds in a particular grant.  This is an agency's attempted (and out-of-time) blanket veto of a program.  This Court has the power—and duty—to vacate EPA's unlawful elimination of the Solar for All program.

## II.     The OBBBA does not provide cover for EPA's unlawful cancellation of the Solar for All program.

By its plain text, the OBBBA rescinded only *un*obligated funds and prospectively repealed the only GGRF program.  Congress could not have made clearer its intention to leave the already-obligated Solar for All grants untouched, as evident in the statutory text and in contemporaneous statements.  EPA nonetheless cancelled the Solar for All grants, claiming that the OBBBA justified that termination.  In a mind-bending display of circular reasoning, EPA now argues that, regardless, the OBBBA renders its cancellation of the obligated Solar for All grants unreviewable.  Defs.' PI Opp'n, at 25–27.  It simply cannot be the case that an executive agency can unilaterally cancel a Congressionally mandated program in its entirety—and in violation of the terms of a reconciliation bill—and then use that same statute as cover to evade accountability for its unlawful action.

### A.     The OBBBA only rescinded unobligated funds.

Congress holds the power of the purse.  U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  When Congress obligates funds for specific programs, an agency's policy objections cannot override those Congressional mandates.  *Aiken Cnty.*, 725 F.3d at 259.  EPA has been vocal in its animosity to the Solar for All program, with Administrator Zeldin publicly calling Solar for All a "grift" and a "boondoggle" and announcing his intention to "end this program for good."  *See* Lee Zeldin (@EPALeeZeldin), X (Aug. 7, 2025, 2:07 PM), https://x.com/epaleezeldin/status/1953518426602803684.  Yet EPA does not allege, or even suggest, in this Court that grantees acted in bad faith or committed fraud.  In pursuit of its single-minded quest to cancel Solar for All, which President Trump has derided

as part of the "Green New Scam,"[5] EPA contends that OBBBA forecloses review of an action OBBBA did not authorize.

The OBBBA rescinded *unobligated* funds from numerous IRA grant programs, including unobligated GGRF funds.  In keeping with this pattern, the OBBBA section relating to the GGRF provided: "Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded."  Pub. L. No. 119-21, § 60002, 139 Stat. at 154 (emphasis added).  "The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there."  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).  In the absence of ambiguity or absurd results—neither of which is present here—courts decline to "read an absent word into the statute."  *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004); *see also Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *Dean v. United States*, 556 U.S. 568, 572 (2009) (same).  Thus, the OBBBA rescinded only unobligated GGRF funds (of which the only remaining funds were GGRF's oversight funds), and it did not create authority for EPA to cancel obligated grant funds.  The Solar for All grants were fully obligated and not within the scope of the OBBBA rescission on July 3, 2025.  And, in case there was any doubt, Section 60002 has no retroactive effect. "[C]ourts read laws as prospective in application unless Congress has unambiguously instructed retroactivity."  *Vartelas v. Holder*, 566 U.S. 257, 266 (2012).  Section 60002 contains no such unambiguous instruction.

---

[5] Former President Trump Remarks at the Economic Club of New York, at 21:05-21:35, C-SPAN (Sep. 5, 2024), https://www.c-span.org/program/campaign-2024/former-president-trumpremarks-at-the-economic-club-of-new-york/648558.

The budget score from the non-partisan Congressional Budget Office ("CBO") reinforces this reading of the plain statutory text. Lawmakers relied on CBO's "score," or the estimated cost or savings of each provision, to ensure the reconciliation bill met each Committee's savings or spending instructions as set by the Budget Committees. *See* Cong. Budget Off., "Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline" (July 21, 2025), https://www.cbo.gov/publication/61570.

When the proposed repeal and rescission of unobligated GGRF funds was initially proposed in the Senate Environment and Public Works Committee, CBO scored the provision as saving $19 million of the $30 million in funding set aside from the GGRF grant programs for EPA administration and oversight. *See* Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. on Envtl. & Pub. Works, et al., to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), *available at* https://perma.cc/9YL9-QFPL; Letter from Reps. Frank Pallone, Jr., Paul D. Tonko, and Yvette D. Clarke, to Lee Zeldin, Administrator, EPA (Aug. 11, 2025), *available at* https://perma.cc/CLK5-HNXW. The upshot is that not a penny from the actual grant programs would be saved, because those funds were already obligated; only the unobligated oversight funds would be recoupable. If the OBBBA had authorized EPA to claw back GGRF money that the federal government had already obligated, the budget score would have reflected savings of another $27 billion: $7 billion for Solar for All and $20 billion for the GGRF's green bank programs. CBO further confirmed that repeal of the program language did not create any additional savings. *See* Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. on Envtl. & Pub. Works, et al., to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), *available at* https://perma.cc/9YL9-QFPL.

Consistent with the statutory text and its budgetary score, members of Congress confirmed that the OBBBA did not claw back obligated Solar for All funding or authorize EPA to do so. During the House Energy & Commerce Committee mark-up of the OBBBA on May 13, 2025, Congressman Morgan Griffith, then-Chair of the Environment Subcommittee, stated:

> I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . [W]e can't rescind expenditures that have already been obligated.

H. Comm. on Energy & Commerce, Full Committee Markup of Budget Reconciliation Text (May 13, 2025).[6] And after EPA cancelled the Solar for All program, the office of Senator Lisa Murkowski, chair of the Senate Appropriations Committee's Subcommittee on Interior, Environment, and Related Agencies, reiterated the impropriety of that cancellation and emphasized that EPA must reinstate the grants:

> We disagree with EPA's termination of all obligated funding under the Solar For All program. The reconciliation bill explicitly rescinded unobligated balances and we had assurances from the agency through the morning of the announcement that no Alaska recipients would be harmed. *After an investigation and potentially litigation, we expect EPA to reverse course and reinstate previously obligated funds for this program*.

Alex DeMarban, *EPA axes program that would have injected $125 million in Alaska for small-scale solar projects*, Anchorage Daily News (Aug. 24, 2025), https://perma.cc/PR54-JWYZ (emphasis added).

---

[6] https://energycommerce.house.gov/events/full-committee-markup-of-budget-reconciliation-text.

**B.      The OBBBA neither sanctions EPA's unlawful termination of Solar for All nor renders that termination unreviewable.**

Just as the OBBBA did not authorize EPA to terminate obligated Solar for All grants, the Act did not foreclose judicial review of EPA's unlawful termination.  "[It is] core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).  Yet EPA goes even further here, inventing authority that simply cannot be found in the text of the OBBBA.  EPA's claim that the OBBBA prevents this Court from redressing Plaintiff's injuries by vacating EPA's elimination of the Solar for All program, Defs.' PI Opp'n at 25, is simply wrong.

Rescissions are a relatively commonplace tool Congress uses to retake control of unobligated funds.  But that tool cannot extend to already obligated funds; that is, funds for which another party may have a legal claim.[7]  *See* Gov't Accountability Off., *Principles of Federal Appropriations* Law, 4th ed., ch. 5, § 2.a, GAO-04-261SP (Washington, D.C.: Jan. 2004) ("Congress may pass a law to rescind the unobligated balance of a[n] . . . appropriation at any time prior to the accounts closing."); Impoundment Control Act, 2 U.S.C. § 683(b) (describing rescission as relating to amounts "available for obligation"); Cong. Budget Off., "CBO Explains How It Estimates Savings from Rescissions" (May 26, 2023), https://www.cbo.gov/publication/59209 (explaining that a rescission will not impact funds that are obligated).

---

[7] Congress has separately established a procedure for closing accounts, five years after a Congressional authorization ends.  *See* 31 U.S.C. § 1552.  That housekeeping provision enables the cancellation of even obligated funds at that point, on the theory that if there is still money in the account it is unlikely to be needed to meet obligations.  In the case of Solar for All and the other GGRF programs, this provision would not go into effect until five years from September 30, 2024, and thus this procedure did not apply.

Agencies such as EPA are "creatures of statute" that "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022); *see also West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("Agencies have only those powers given to them by Congress. . . ."); *Biden v. Nebraska*, 600 U.S. 477, 494, 503 (2023) (concluding that agencies may neither "rewrite [a] statute from the ground up" nor "seiz[e] the power of the Legislature").  If Congress itself could not rescind obligated Solar for All funds through the OBBBA, it is self-evident that EPA cannot use the OBBBA as cover to do so—especially using language that says no such thing.  Such a position would represent a dizzying accrual of power to the Agency at the expense of Congress's constitutional appropriations power.  Indeed, it is difficult to see what appropriations authority Congress retains if EPA can rely on a statutory rescission of unobligated funds to retroactively claw back obligated funds that Congress deliberately and expressly did not touch.[8]

### C.      The GGRF repeal addressed potential future re-obligation, not currently obligated grants.

Finally, EPA mischaracterizes Section 60002's repeal of the GGRF language as enabling it to claw back existing obligations.  But Congress repealed the GGRF language to address the much narrower scenario of potential re-obligation.

---

[8] In the face of increasingly brazen executive encroachment, it is necessary for courts to exercise their fundamental role as protectors of the constitutional balance of powers.  *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 382 (1989) ("It is this concern of encroachment and aggrandizement that has animated our separation-of-powers jurisprudence and aroused our vigilance against the 'hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power.'") (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)); Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1082 (2021) (explaining that judicial reticence to wade into appropriations disputes has increasingly led to "the creation of a de facto presidential spending authority and a corresponding weakening of congressional control of the purse").

Congress enacted the OBBBA through the budget reconciliation process. Under the

Senate's "Byrd Rule," only provisions with budgetary impacts may be included in reconciliation

bills. *See* Cong. Rsch. Serv., "The Budget Reconciliation Process: The Senate's 'Byrd Rule'"

(Sep. 28, 2022), https://www.congress.gov/crs-product/RL30862. As described above, the CBO

scored Section 60002 as having $19 million in budgetary savings—the amount saved by the

rescission of the unobligated oversight funds that remained in the GGRF program. If the repeal

language somehow clawed back the already-obligated GGRF grant funds that Congress could

not touch through the rescission, the CBO score would have shown savings of $27 billion. When

asked, the CBO confirmed that the repeal language did not create any additional savings. *See*

Letter from Sen. Sheldon Whitehouse, Ranking Mem. of S. Comm. on Envtl. & Pub. Works, et

al., to Lee Zeldin, Administrator, EPA (Aug. 14, 2025), *available at* https://perma.cc/9YL9-

QFPL.

　　　If the GGRF repeal had no budgetary impact, then how did it make it into a reconciliation

bill, notwithstanding the Byrd Rule? The GGRF repeal survived the Byrd Rule because of the

potential for a limited "re-obligation." The initial GGRF appropriation required EPA to issue all

Solar for All grants by September 30, 2024. That statutory deadline to obligate the GGRF

funding was an outlier in the IRA; the statutory deadlines for other EPA-jurisdictional IRA

programs were years later.[9] Sometimes, however, funds are re-obligated, for instance if a

grantee does not spend its entire grant or if EPA *lawfully* terminates a grant. This was a salient

possibility in the case of the GGRF program because EPA had already sought to cancel the other

two GGRF programs, the National Clean Investment Fund and Clean Communities Investment

---

[9] *See, e.g.*, IRA Section 60105 (Air Pollution Monitoring Grants) (authorizing a grant program until September 30, 2031); IRA Section 60109 (Funding for Hydrofluorocarbons Phaseout) (authorizing a grant program until September 30, 2026).

Accelerator.  Litigation over those attempted cancellations was already in progress when the

OBBBA was passed,[10] so there was a known possibility that if a court upheld EPA's

terminations of those grant programs, the $20 billion in funding from those programs would

revert to EPA.  And if that funding reverted to EPA with the GGRF program still on the books,

EPA would likely have to issue replacement grants.  Repealing the GGRF language addressed

that possibility, ensuring that if EPA prevailed in the *Climate United* litigation, the $20 billion

would revert to the Treasury via funds that could no longer be re-obligated and would therefore

be considered savings under a budgetary impact analysis.  It is due to this potential $20 billion

savings that the repeal provision of Section 60002 did not run afoul of the Byrd Rule.  The repeal

thus reflects Congress's decision that if EPA were to prevail in the *Climate United* litigation, the

Agency should not be required to start the obligations process anew for those grant programs.

In contrast, at the time Congress passed the OBBBA, EPA had not yet attempted to

terminate the fully obligated Solar for All program.  So there is simply no way that Congress

could have expected—much less intended—that the repeal would sanction EPA's cancellation of

Solar for All and attempted claw back of the $7 billion in obligated Solar for All funds.

Moreover, as a matter of statutory interpretation, it would make no sense for Congress to state in

Section 60002 that it was only rescinding "unobligated" funds if the GGRF repeal in that exact

same provision could be used to also claw back obligated funds.  *See, e.g.*, *Henson v. Santander

Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (courts should presume "that the legislature says

what it means and means what it says") (cleaned up).

---

[10] *See Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 116 (D.D.C. 2025) ("*Climate United*").

EPA's argument here puts the cart before the horse.  Recognizing that the repeal had a budgetary impact *in case* a court ruled in EPA's favor in the *Climate United* litigation is not the same as EPA's argument here—that EPA's termination of the Solar for All program means a court *must* rule in its favor and refrain from judicial review.  The fact that Congress repealed GGRF so that EPA would not need to redistribute lawfully re-obligated funding does not provide cover for EPA to unlawfully terminate grants and then claim that Plaintiff has no recourse.

## CONCLUSION

EPA asks this Court to find hidden in Section 60002 a loophole that directly conflicts with the plain meaning of its text, is inconsistent with federal appropriations law, and improperly aggrandizes EPA's power at the expense of Congress's constitutional appropriations authority. Doing so would radically alter the balance of power between Congress and the executive.  It would also harm the American people, the intended beneficiaries of the Solar for All program. This Court should not sanction EPA's attempted power grab. This Court has the power to vacate EPA's unlawful elimination of Solar for All, and *amici* respectfully urge the Court to exercise that power.

Dated: February 11, 2026

Respectfully submitted,

/s/ *Patrick R. Jacobi*
Patrick R. Jacobi (D.C. Bar. No. 974532)
Alexandra L. St. Romain (*pro
    hac vice pending*) (D.C. Bar No. 90032261)
Center for Applied Environmental Law and
    Policy
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@caelp.org

*Counsel for Members of Congress* Amici Curiae

## APPENDIX: LIST OF *AMICI CURIAE*

**Sheldon Whitehouse**
    Senator from Rhode Island

**Bernie Sanders**
    Senator from Vermont

**Jeff Merkley**
    Senator from Oregon

**Richard Blumenthal**
    Senator from Connecticut

**Mazie K. Hirono**
    Senator from Hawai'i

**Edward Markey**
    Senator from Massachusetts

**Cory Booker**
    Senator from New Jersey

**Chris Van Hollen**
    Senator from Maryland

**Lizzie Fletcher**
    Representative of Texas

**Emanuel Cleaver, II**
    Representative of Missouri

**Frank Pallone**
    Representative of New Jersey

**Eleanor Holmes Norton**
    Representative of the District of
    Columbia

**Robert C. "Bobby" Scott**
    Representative of Virginia

**Nydia M. Velázquez**
    Representative of New York

**Lloyd Doggett**
    Representative of Texas

**Danny K. Davis**
    Representative of Illinois

**Diana DeGette**
    Representative of Colorado

**James P. McGovern**
    Representative of Massachusetts

**Adam Smith**
    Representative of Washington

**John B. Larson**
    Representative of Connecticut

**Jan Schakowsky**
    Representative of Illinois

**Betty McCollum**
    Representative of Minnesota

**Stephen F. Lynch**
    Representative of Massachusetts

**Kathy Castor**
    Representative of Florida

**Steve Cohen**
    Representative of Tennessee

**Joe Courtney**
    Representative of Connecticut

**André Carson**
    Representative of Indiana

**Paul D. Tonko**
    Representative of New York

**Mike Quigley**
    Representative of Illinois

**Judy Chu**
    Representative of California

**Suzanne Bonamici**
    Representative of Oregon

**Suzan K. DelBene**
    Representative of Washington

**Dina Titus**
    Representative of Nevada

**Julia Brownley**
    Representative of California

**Joaquin Castro**
    Representative of Texas

**Jared Huffman**
    Representative of California

**Juan Vargas**
    Representative of California

**Marc Veasey**
    Representative of Texas

**Ed Case**
    Representative of Hawai'i

**Donald S. Beyer, Jr.**
    Representative of Virginia

**Mark DeSaulnier**
    Representative of California

**Veronica Escobar**
    Representative of Texas

**Debbie Dingell**
    Representative of Michigan

**Sylvia R. Garcia**
    Representative of Texas

**Ted W. Lieu**
    Representative of California

**Susie Lee**
    Representative of Nevada

**Bonnie Watson Coleman**
    Representative of New Jersey

**Kim Schrier, M.D.**
    Representative of Washington

**Nanette Barragán**
    Representative of California

**Greg Stanton**
    Representative of Arizona

**Pramila Jayapal**
    Representative of Washington

**Rashida Tlaib**
    Representative of Michigan

**Ro Khanna**
    Representative of California

**Deborah K. Ross**
    Representative of North Carolina

**Raja Krishnamoorthi**
    Representative of Illinois

**Marilyn Strickland**
    Representative of Washington

**Darren Soto**
    Representative of Florida

**Troy A. Carter, Sr.**
    Representative of Louisiana

**Madeleine Dean**
    Representative of Pennsylvania

**Melanie Stansbury**
    Representative of New Mexico

**Shontel M. Brown**
    Representative of Ohio

**Becca Balint**
    Representative of Vermont

**Greg Casar**
    Representative of Texas

**Jasmine Crockett**
    Representative of Texas

**Valerie P. Foushee**
    Representative of North Carolina

**Daniel Goldman**
    Representative of New York

**Summer L. Lee**
    Representative of Pennsylvania

**Seth Magaziner**
    Representative of Rhode Island

**Morgan McGarvey**
    Representative of Kentucky

**Robert J. Menendez**
    Representative of New Jersey

**Kevin Mullin**
    Representative of California

**Brittany Pettersen**
    Representative of Colorado

**Andrea Salinas**
    Representative of Oregon

**Eric Sorensen**
    Representative of Illinois

**Shri Thanedar**
    Representative of Michigan

**Jill Tokuda**
    Representative of Hawai'i

**Wesley Bell**
    Representative of Missouri

**Janelle S. Bynum**
    Representative of Oregon

**Herb Conaway**
    Representative of New Jersey

**Laura Friedman**
    Representative of California

**Sarah McBride**
    Representative of Delaware


**Dave Min**
    Representative of California


**Emily Randall**
    Representative of Washington


**Christian Menefee**
    Representative of Texas

# EXHIBIT 11

ENERGY

## Trump vows to pull back climate law's unspent dollars

The former president also pledged to establish a government efficiency commission floated by Tesla's Elon Musk, who he suggested could lead the commission.



Former President Donald Trump did not specify which IRA programs he would target. | Alex Brandon/AP

By **KELSEY TAMBORRINO**
09/05/2024 03:48 PM EDT

   

Donald Trump pledged Thursday to rescind any "unspent" funds under the Inflation Reduction Act should he be elected in November — potentially upending key parts of the Democrats' climate law and its benefits to Republican-led communities.

"To further defeat inflation, my plan will terminate the Green New Deal, which I call the Green New Scam," the former president said before the Economic Club of New York in wide-ranging remarks focused on the economy, likening Biden's agenda to a "waste" of money.

Advertisement

"It actually sets us back, as opposed to moves us forward. And [I will] rescind all unspent funds under the misnamed Inflation Reduction Act," Trump added.

Trump's formal threat to the climate law will likely only underscore the urgency for the Biden administration to get money from the law out the door. And it ups the ante in the ongoing debate among Republicans over how to address the law that is already bringing projects and investment dollars to GOP districts, should they gain control of both houses of Congress.

Trump did not specify which IRA programs he would target. Some Republicans in Congress have criticized the law's funding for green banks and other programs while other GOP leaders have expressed support for maintaining some IRA tax credits that support manufacturing. And Trump's former trade adviser Robert Lighthizer has suggested that some of the law's provisions, like those that support U.S. factories, could be kept in place under a second Trump administration.

The administration has announced billions of dollars in IRA funding to support clean energy projects. But it is unclear exactly how much of that funding has been obligated or spent, which would offer them some legal protection against an effort by Trump to claw it back.

POLITICO's analysis earlier this year showcased the enormity of the challenge for the Biden administration to spend those direct funding programs. The analysis from April found that of the $145 billion in direct spending on energy and climate programs in the IRA, the administration had announced roughly $60 billion in tentative funding decisions. That number has only grown since April, but many of the funding decisions will need to meet certain metrics before the money is formally spent.

The former president outlined a plan Thursday to establish a government efficiency commission floated by Tesla's Elon Musk, who Trump has increasingly embraced and who he suggested could lead the new commission.

The former president also said he plans to issue a national emergency declaration to increase domestic energy supply and reiterated arguments that Vice President Kamala Harris is waging a "war" on U.S. energy — despite record U.S. oil production under the Biden administration.

Advertisement



The majority of the IRA's emissions reductions come via a wide swath of new and expanded tax credits for clean energy technologies, which is separate from the direct spending under the law for grant programs and loans and would take congressional action to repeal.

The law includes grant programs, including those to reduce methane emissions, increase energy efficiency and create green banks across the country — some of which have already drawn Republicans' ire. It also boosts funding for a loan office under the Energy Department that has grown under Biden but that slowed down under the previous Trump administration.

And the stakes are high for Democrats: Should Trump get elected, his administration would have wide latitude to slow down or reelevate direct spending under the law, as POLITICO has also reported — particularly as the former president has promised to restore a presidential authority to withhold congressionally approved spending that he considers wasteful.

The efficiency commission floated by Trump would be tasked with "a complete financial and performance audit" of the entire federal government and make "recommendations for drastic reforms." The Wall Street Journal was first to report on Trump's plans on Thursday.

The goal would be to identify ways to eliminate "fraud and improper payments" within six months — which could potentially target other major programs under the IRA beyond those focused on climate and energy.

The IRA also included major health care and tax provisions. A March report from the U.S. Treasury Inspector General for Tax Administration found the IRS, for example, had expended roughly 10 percent of its $57.8 billion in IRA funding.

Musk "has agreed to head that task force," Trump said Thursday. Musk posted on X earlier Thursday that: "I look forward to serving America if the opportunity arises. No pay, no title, no recognition is needed."

A Trump campaign spokesperson did not immediately respond to a request seeking further specifics. But Trump has repeatedly derided what he deems as wasteful spending of taxpayer dollars under Biden that is driving inflation and energy costs. He's previously pledged to redirect unspent money for "important projects like roads, bridges, dams" and to ensure money is not spent on "meaningless Green New Scam ideas."

Trump said Thursday his plan would "cut energy prices in half or more than that within 12 months of taking office" and said that oil production would be four times higher than today should he enter office.

Advertisement

AD

Trump also said his administration would "blast through every bureaucratic hurdle" to issue rapid approvals for new drilling, pipelines, refineries, power plants and reactors, as well as make the U.S. a major producer of rare earth minerals that are crucial for clean energy technologies. And Trump pledged to eliminate a "minimum of 10 old regulations" for every one new regulation.

"It will be an economic revival of our country like no one has ever seen before," Trump said.

The Harris campaign issued a memo Thursday touting her economic agenda and panning Trump's plan for a second term.

"Trump may try to distort objective reality on his dangerous plans, but mainstream experts agree on the devastating results of his agenda: shrinking the economy, undermining job growth, driving up inflation, exploding the national debt, and raising taxes on the middle class," the Harris campaign memo said.

Trump also emphasized a focus on restoring domestic manufacturing — something the IRA aims to do through its tax credits and other incentives. The law has already spurred billions of dollars in planned U.S. manufacturing facilities across the country — the majority of which are in GOP-held congressional districts.

While repealing tax credits under the IRA would require congressional action, Republicans are already looking at renewing Trump's 2017 tax law and provisions under the IRA have emerged as potential pay-fors for that endeavor. House Republicans have also sought to repeal tax credits and other programs under the IRA — despite several House Republicans who've urged protecting the investments in their districts stemming from the law.

Treasury Secretary Janet Yellen, speaking in Raleigh, North Carolina, Thursday morning, underscored the economic case for protecting the law's tax provisions — the rolling back of which she said would be "a historic mistake" that would raise costs for families and could give China and other countries, which are also investing to compete in clean energy industries, "a leg-up."

**FILED UNDER:**
ELECTIONS, DONALD TRUMP, INFLATION, ELON MUSK, 2024 ELECTIONS,
DONALD TRUMP PRESIDENTIAL ELECTION 2024

## Power Switch

Your guide to the political forces shaping the energy transformation

**EMAIL**

Your Email

**EMPLOYER**

Employer

\* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT



POLITICO



### Neither Left nor Right: A Newsletter for Libertarians.

If you are tired of echo chambers and partisan news, try this daily newsletter. No cost.

Reason



### 28 Photos That Show The Dark Side Of Cruise Ships

Remember these stories about cruise ships the next time you decide where to vacation.

Dippy



### Every American Should Be Using This Retirement Loophole In 2026

If You're Not Using This IRS Loophole, You Should Be

Goldco



### Mick Jagger's Family Pleads For Help After Granddaughter's Longtime Partn...

TipHero



### Taylor Swift hinting at ending engagement with Travis Kelce?

The Celeb Post



### Donald Trump's Golf Footage Sparks Curiosity About His Legs

TMSPN



### Caitlin Clark Unsure About Playing in the WNBA as League Questions Linger

TMSPN - NBA

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

FAQ

Feedback

Headlines

Photos

Press

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

2/23/26, 10:07 PM
Case 2:25-cv-02015-TMC    Document 180-1    Filed 03/24/26    Page 686 of 686
Trump vows to pull back climate law's unspent dollars - POLITICO

© 2026 POLITICO LLC