Receipt number AUSFCC-10802293

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| MARYLAND CLEAN ENERGY CENTER, STATE OF ARIZONA, CALIFORNIA PUBLIC UTILITIES COMMISSION, STATE OF COLORADO, STATE OF CONNECTICUT, DISTRICT OF COLUMBIA, STATE OF HAWAI'I, ILLINOIS FINANCE AUTHORITY, OFFICE OF THE GOVERNOR *EX REL.* ANDY BESHEAR, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY, STATE OF MAINE, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, NEVADA CLEAN ENERGY FUND, STATE OF NEW JERSEY, STATE OF NEW MEXICO, NEW YORK STATE ENERGY RESEARCH AND DEVELOPMENT AUTHORITY, STATE OF NORTH CAROLINA, STATE OF OREGON, PENNSYLVANIA ENERGY DEVELOPMENT AUTHORITY, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, WISCONSIN ECONOMIC DEVELOPMENT CORPORATION, | | Civ. No. **25-1738 C** |
| Plaintiffs, | | |
| v. | | |
| UNITED STATES OF AMERICA, | | |
| Defendant. | | |

**COMPLAINT**

1. This case is a breach-of-contract action arising from the U.S. Environmental Protection Agency's (EPA) decision to unilaterally terminate competitive grants awarded to Plaintiffs under the Solar for All zero-emissions technologies program ("Grant Agreements"). Each Grant Agreement gave rise to binding contractual obligations between the EPA and each Plaintiff, and Plaintiffs seek money damages resulting from the EPA's breach.

2.      The Solar for All program was established as part of the Inflation Reduction Act of 2022, which amended the Clean Air Act.  Pub. Law 117-169, § 60103, 136 Stat. 1818, 2065–66 (Aug. 16, 2022).  The newly-enacted Section 134 of the Clean Air Act, codified at 42 U.S.C § 7434, directed the EPA to make competitive grants to States, municipalities, Tribes, and eligible nonprofits "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities."  *Id.* § 7434(a).  Congress appropriated $7 billion to fund this grant program, which the EPA subsequently called "Solar for All."

3.      On April 22, 2024, after a time- and cost-intensive application process, the EPA announced that it had selected 60 qualified recipients and awarded the $7 billion appropriated by Congress to carry out the Solar for All program.  Plaintiffs—Solar for All grantees in the states of Maryland, Arizona, California, Colorado, Connecticut, Hawai'i, Illinois, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and in the District of Columbia—were among those selected to carry out Congress's mandate.

4.      By February 2025, the EPA had entered into binding Grant Agreements with each Plaintiff and obligated the funding to each Plaintiff from the Solar for All program.

5.      Plaintiffs received the full amount of their awards in their Automated Standard Application for Payment (ASAP) accounts and began to perform under the Grant Agreements.

6.      On or about August 7, 2025, however, the EPA announced the cancellation of the Solar for All program and unilaterally terminated all the Plaintiffs' Grant Agreements—a clear, unambiguous, and material breach of the agreements between the EPA and Plaintiffs.

2

7.      A few days later, the EPA withdrew approximately 90 percent of grant funds from Plaintiffs' ASAP accounts.

8.      The EPA's unilateral terminations breached the express terms of Plaintiffs' Grant Agreements, which allowed for termination only in the narrow circumstances of substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud or abuse, or material misrepresentation of eligibility status—none of which occurred.

9.      The EPA's actions interfered with Plaintiffs' performance under the Grant Agreements and destroyed Plaintiffs' reasonable expectations regarding the fruits of their Grant Agreements.

10.     The EPA purportedly acted based on its misguided understanding of the One Big Beautiful Bill Act ("H.R. 1"), which repealed Section 134 of the Clean Air Act and rescinded only "the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)."  Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) (emphasis added).  Because the Solar for All funds awarded to Plaintiffs were fully obligated well before the enactment of H.R. 1, the balances were not "unobligated" on the day before enactment of H.R. 1 and therefore were not rescinded by that Act.

11.     Despite Congress's express decision to rescind only "unobligated balances," the EPA interpreted H.R. 1 as somehow rescinding *all* appropriations related to Solar for All.

12.     Not only erroneous as a matter of statutory interpretation, but the EPA's view is also erroneous as a matter of contract law: the EPA's interpretation of H.R. 1 does not constitute grounds for termination under the express terms and conditions of the Grant Agreements.

3

13. By unilaterally cancelling the Grant Agreements without any legally sound justification and seizing the award money from Plaintiffs, the EPA breached the express terms of the Grant Agreements and violated the covenant of good faith and fair dealing.

14. Plaintiffs file this suit to recover money damages for the EPA's breach of the Grant Agreements.

## JURISDICTION AND VENUE

15. Jurisdiction over the claims advanced in this case is proper in this Court pursuant to 28 U.S.C. § 1491 (the "Tucker Act").[1]

## PARTIES

### I. Plaintiffs

16. The Maryland Clean Energy Center (MCEC) is an instrumentality of the State of Maryland, a sovereign state of the United States of America. Md. Code Ann., Econ. Dev't § 10-806. MCEC is the recipient of Grant Number (FAIN) 84090101 from the U.S. Environmental Protection Agency. MCEC is represented by and through Maryland's chief legal officer, Attorney General Anthony G. Brown, who has been authorized by MCEC's Board to file this action.

17. The State of Arizona is a sovereign state of the United States of America. Arizona's Solar for All grant recipient is the Governor's Office of Resiliency, an Office within the Executive Office of the State of Arizona, which received Grant Number (FAIN) 84092001 from the U.S. Environmental Protection Agency. Arizona is represented by and through its chief legal officer, Attorney General Kristin K. Mayes.

---

[1] Plaintiffs file this action to obtain money damages for Defendant's breach of the Solar for All Grant Agreements, and do not waive any rights to challenge any agency action related to Solar for All in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring)

18. The California Public Utilities Commission (CPUC) is an independent constitutional body created by the California Constitution, Cal. Const. art. XII, § 2, 4, 6, and is an instrumentality of the State of California, a sovereign State of the United States of America. The CPUC is responsible for regulating investor-owned utilities within California, including electricity, natural gas, telecommunications, water companies, and common carriers. *Id.* The CPUC is the recipient of Grant Number (FAIN) 84092302 from the U.S. Environmental Protection Agency.

19. The State of Colorado is a sovereign state of the United States of America. Colorado's Solar for All grant recipient is the Colorado Energy Office, an executive agency of the State of Colorado, which received Grant Number (FAIN) 84090401 from the U.S. Environmental Protection Agency. Colorado is represented by and through its chief legal officer, Attorney General Philip J. Weiser.

20. The State of Connecticut is a sovereign state of the United States of America. Connecticut's Solar for All grant recipient is the Department of Energy and Environmental Protection, an executive agency of the State of Connecticut, which received Grant Number (FAIN) 84090001 from the U.S. Environmental Protection Agency. Connecticut is represented by and through its chief legal officer, Attorney General William Tong.

21. The District of Columbia is a municipal corporation organized under the Constitution of the United States. The District's Solar for All grant recipient is the Department of Energy and Environment (DOEE), an executive agency of the District of Columbia, which received Grant Number (FAIN) 840088001 from the U.S. Environmental Protection Agency. The District is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and

through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

22.    The State of Hawai'i is a sovereign state of the United States of America. Hawai'i's Solar for All grant recipient is the Hawai'i Green Infrastructure Authority, an executive instrumentality of the State of Hawai'i, which received Grant Number (FAIN) 84091801 from the U.S. Environmental Protection Agency. Hawai'i is represented by and through its chief legal officer and chief law enforcement officer, Attorney General Anne Lopez.

23.    The Illinois Finance Authority (IFA) is an instrumentality of the State of Illinois, a sovereign state of the United States of America. 20 ILCS 3501/801 et seq. IFA is the recipient of Grant Number (FAIN) 5H-84090501 from the U.S. Environmental Protection Agency. IFA is represented by and through Illinois's Attorney General, Kwame Raoul, who is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law and by IFA's request. *See* 15 ILCS 205/4.

24.    Office of the Governor *ex rel.* Andy Beshear brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81; *Beshear v. Bevin*, 498 S.W.3d 355, 369 (Ky. 2016) (citing Ky. Const. § 81). Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. §§ 11.060, 11.065. The Governor's Executive Cabinet consists of the Secretaries of executive branch cabinets, including the Kentucky Energy and Environment Cabinet

6

that is the Solar for All grantee for Kentucky (Grant Number (FAIN) 84088701).  In fulfilling his constitutional duties, the Governor has authority to bring this action.

25.    The State of Maine is a sovereign state of the United States of America.  Maine's Solar for All grant recipient is the Department of Energy Resources (DOER), an executive agency of the State of Maine.  DOER, as successor to the Governor's Energy Office, *see* PL 2025, c. 476, is the recipient of Grant Number (FAIN) 84088301 from the U.S. Environmental Protection Agency.  Maine is represented by and through its chief legal officer, Attorney General Aaron M. Frey.

26.    Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts's Solar for All grant recipient is the Massachusetts Department of Energy Resources, an executive agency of the Commonwealth of Massachusetts, which received Grant Number (FAIN) 84090201 from the U.S. Environmental Protection Agency.  Massachusetts is represented by Attorney General Andrea Joy Campbell, who is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

27.    The State of Michigan is a sovereign state of the United States of America, and is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.  Michigan's Solar for All grant recipient is the Michigan Department of Environment, Great Lakes, and Energy (EGLE), a principal department of the State of Michigan.  *See* Mich. Compl. Law § 324.99923.  EGLE is the recipient of Grant Number (FAIN) 84090701 from the U.S. Environmental Protection Agency.

28.    The State of Minnesota is a sovereign state of the United States of America.  Minnesota's Solar for All grant recipient is the Department of Commerce, an executive agency of the State of Minnesota*,* which received Grant Number 5H-84089501 from the U.S.

Environmental Protection Agency.  Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison.

29.     The Nevada Clean Energy Fund is an independent corporation created for public benefit by the Nevada Legislature.  Nev. Rev. Stat. §§ 701B.930–995.  It received Grant Number (FAIN) 84091901 from the U.S. Environmental Protection Agency.  It has authorized Nevada Attorney General Aaron D. Ford to represent it in this action.

30.     The State of New Jersey is a sovereign state of the United States of America.  The New Jersey Department of the Treasury, an executive agency of the State of New Jersey, is the recipient of Grant Number (FAIN) 84091101 from the U.S. Environmental Protection Agency.  Separately, the New Jersey Board of Public Utilities is responsible for administering the State of New Jersey's Solar for All programs and using the federal funds granted to the New Jersey Department of the Treasury.  New Jersey is represented by and through its chief legal officer, Attorney General Matthew J. Platkin.

31.     The State of New Mexico is a sovereign state of the United States of America.  New Mexico's Solar for All grant recipient is the Energy, Minerals and Natural Resources Department, an executive agency of the State of New Mexico, which received Grant Number (FAIN) 84087801 from the U.S. Environmental Protection Agency.  New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

32.     The New York State Energy Research and Development Authority (NYSERDA) is a New York public benefit corporation.  N.Y. Pub. Auth. Law § 1850 *et seq*.  NYSERDA is the recipient of Grant Number (FAIN) 84088901 from the U.S. Environmental Protection

Agency. NYSERDA is represented by and through New York's chief legal officer, Attorney General Letitia James, who is authorized by NYSERDA to file this action.

33. The State of North Carolina is a sovereign state of the United States of America. North Carolina's Solar for All grant recipient is the Department of Environmental Quality, an executive agency of the State of North Carolina, which received Grant Number (FAIN) 84091701 from the U.S. Environmental Protection Agency. North Carolina is represented by and through its chief legal officer, Attorney General Jeff Jackson.

34. The State of Oregon is a sovereign state of the United States of America. Oregon's Solar for All grant recipient is the Oregon Department of Energy, an executive agency of the State of Oregon, which received Grant Number (FAIN) 84092901 from the U.S. Environmental Protection Agency. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

35. The Pennsylvania Energy Development Authority (PEDA) is a public corporation and governmental instrumentality exercising public powers of the Commonwealth of Pennsylvania. 71 P.S. § 720.6. PEDA has the power to commence litigation based on a majority vote of its board of directors, *id.* §§ 720.3(b), (d), 720.6(3), which occurred on October 9, 2025.

36. The State of Rhode Island is a sovereign state in the United States of America. The State of Rhode Island is the recipient of Grant Number (FAIN) 84091001 from the U.S. Environmental Protection Agency. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

37. The State of Vermont is a sovereign State in the United States of America. The Vermont Public Service Department is an administrative department of the State of Vermont. It is the recipient of Grant Number (FAIN) 8409901 from the U.S. Environmental Protection

9

Agency. The State of Vermont is represented by Vermont Attorney General Charity Clark, who is authorized to bring this action.

38. The State of Washington is a sovereign state of the United States of America. Washington's Solar for All grant recipient is the Washington State Department of Commerce (Commerce), a cabinet level agency. Commerce received Grant Number (FAIN) 84093001 from the U.S. Environmental Protection Agency. Washington is represented by Attorney General Nicholas W. Brown, the State's chief legal officer.

39. The Wisconsin Economic Development Corporation (WEDC) is a public body corporate and politic created by the legislature of the state of Wisconsin, a sovereign state of the United States of America. Wis. Stat. § 238.02(1). WEDC is the recipient of the U.S. Environmental Protection Agency Solar for All grant, Grant Number (FAIN) 84090801. WEDC is represented by its Chief Legal Officer, Jennifer H. Campbell.

## II. Defendant

40. Defendant is the United States of America, acting through the United States Environmental Protection Agency—an independent agency within the executive branch of the United States government—and its Administrator, Lee Zeldin.

## FACTUAL BACKGROUND

## I. Congress establishes the Greenhouse Gas Reduction Fund

41. On August 16, 2022, the Inflation Reduction Act was signed into law. Pub. Law 117-169, 136 Stat. 1818 (Aug. 16, 2022).

42. One provision of the Inflation Reduction Act created a $27 billion "Greenhouse Gas Reduction Fund" by adding a new Section 134 to the Clean Air Act. *Id.* at 2065–66, *repealed by* Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025).

10

43. As part of the Greenhouse Gas Reduction Fund, Congress appropriated $7 billion for the EPA to use to support "zero-emission technologies." 136 Stat. at 2066. Specifically, Congress directed the EPA "to make grants, on a competitive basis . . . to States" (and other "eligible recipients") "for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.*

44. Congress thereby provided statutory authorization for the EPA's authorized representatives to bind the United States in grant agreements created from the Greenhouse Gas Reduction Fund.

45. Congress appropriated this $7 billion for fiscal year 2022, directed that the EPA begin making grants "not later than 180 calendar days after August 16, 2022," and provided that the appropriated funds would "remain available until September 30, 2024." *Id.* Thus, the EPA had a 2-year period to award the funds that Congress had created.

46. Congress also appropriated $30 million to the EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the Greenhouse Gas Reduction Fund. *Id.*

## II. EPA creates the Solar for All grant program

47. Beginning in October 2022, the EPA undertook a months-long public stakeholder engagement process to inform its implementation of the Greenhouse Gas Reduction Fund appropriations, including how to design its competitive grant programs. *See* Richard K. Lattanzio, Cong. Research Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* 1–2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.

48.     On June 28, 2023, the EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emissions technology competitive grant program, which the agency called "Solar for All."  On August 31, in a revised NOFO, the EPA extended the application deadline, adjusted award size requirements, and made other minor adjustments.  EPA, Funding Opportunity No. EPA-R-HQ-SFA-23-01, *available at* https://www.grants.gov/search-results-detail/348957.  A true and exact copy of the Revised Solar for All NOFO is attached as Exhibit A.

49.     The NOFO invited States and other eligible applicants to apply for one of up to 60 Solar for All awards—totaling approximately $7 billion—that would "advance the three overarching [Greenhouse Gas Reduction Fund] program objectives": (1) "Reduc[ing] emissions of greenhouse gases and other air pollutants"; (2) "Deliver[ing] benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities"; and (3) "Mobiliz[ing] financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects."  *Id.* at 6–7, 24.

50.     To be eligible to apply to the Solar for All competition, applicants were required to submit Notices of Intent that described, among other things, the expected number of applications, the program locations, and the expected amount of funding requested.  *Id.* at 18–20.  Plaintiffs submitted these Notices of Intent as required by July 31, 2023.

51.     Each Solar for All application had to adhere to extensive requirements prescribed by the EPA in the NOFO.  Each applicant was asked to, among other things: provide a specific program narrative explaining "how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities"; provide a program administrative narrative describing "how you will administer the grant program and demonstrate you have the

12

policies, procedures, tools, and capabilities to successfully achieve the program goals"; and provide a reporting plan describing a "plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes." *Id.* at 44–49.

52. The NOFO made clear that the competitive Solar for All grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." *Id.* at 5. The Solar for All grants were intended to help "transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities" and "deliver on the climate and environmental justice goals of the United States." *Id.* As the NOFO recognized, "[p]er Section 134(a)(1) of the Clean Air Act, 100% of Solar for All funds must be deployed 'to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.'" *Id.*

53. Applications for awards were to be submitted by October 12, 2023, at 11:59 p.m. *Id.* at 39. Plaintiffs each submitted an application by this deadline. As an example, a true and exact copy of MCEC's Solar for All application is attached as Exhibit B. The other Plaintiffs' applications are substantially similar in format.

54. The EPA rated each Solar for All application that met certain threshold criteria under a 245-point rating system. *Id.* at 51. Points were assigned primarily based "on the quality and extent to which [each application] articulates a plan to use grant funds to advance [Greenhouse Gas Reduction Fund] program objectives." *See id.* at 51–62.

55. After the Solar for All grant application period closed in October 2023, the EPA commenced a rigorous, six-month application review process. According to the EPA, "[t]his

multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection" from across multiple agencies.  U.S. EPA, News Release, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-7-billion-solar-all-grants-deliver-residential.

56.     On April 22, 2024, the EPA announced that it had selected 60 applicants to receive Solar for All grants, including "states, territories, Tribal governments, municipalities, and nonprofits." *Id.*  Plaintiffs were among the Solar for All recipients.

57.     Between April and August of 2024, the EPA worked with each of the selected applicants to finalize how each Solar for All recipient would operate its Solar for All program, which was memorialized in a Grant Agreement (hereinafter the "Initial Grant Agreement").  Each Plaintiff's Initial Grant Agreement is substantially similar in substance and format, differing only in the specifics of each award recipient, payee, amount, program name, and individual signatories.  True and exact copies of each Plaintiff's Initial Grant Agreement are attached as Exhibits C1–C25.

58.     Under each Initial Grant Agreement, the EPA awarded each Plaintiff a sum of money and informed it that "[t]he recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after EPA award or amendment mailing date." *E.g.*, Ex. C1 [MCEC Initial Grant Agreement (July 12, 2024)] at 1.

59. Each Plaintiff would also agree to be subject to an array of requirements in implementing the Initial Grant Agreement. For example, each Solar for All recipient agreed to, among other things: "submit performance reports and transaction-level and project level data, *id.* at 7; "implement this grant in accordance with its EPA-approved Solar for All Workplan," *id.* at 17; "only use the award to support . . . allowable activities" and "not use the award for . . . unallowable activities, *id.* at 18; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies," *id.* at 18.

60. The EPA entered into each Initial Grant Agreement pursuant to its statutory mandate to "make grants . . . for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." 136 Stat. at 2066.

61. Each Initial Grant Agreement also contained a termination provision in the terms and conditions. The termination provision is the same in each Grant Agreement and reads:

> EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR [§] 200.339 and 2 CFR [§] 200.340, when the noncompliance with the terms and conditions is substantial such that effective performance of the assistance agreement is materially impaired or there is sufficient evidence of waste, fraud, or abuse, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the assistance agreement, EPA must (1) deobligate uncommitted funds and reobligate them to another Eligible Recipient to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 calendar days of the deobligation and (2) amend the recipient's assistance agreement to reflect the reduced amount, based on the deobligation. In accordance with 2 CFR [§] 200.341, EPA must provide the recipient notice of termination.

15

*E.g.*, Ex. C1 [MCEC Initial Grant Agreement] at 30.

62.     The Initial Grant Agreement became binding on both parties "21 days after EPA award . . . mailing date," by the recipient either "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." *E.g.*, *id.* at 1.  For example, the mailing date on MCEC's Grant Agreement was July 17, 2024, so MCEC's Initial Grant Agreement became binding on both parties by August 7, 2024.  *Id.*

63.     Each Initial Grant Agreement was signed by an EPA award official on behalf of the United States.  *See, e.g.*, *id.*

64.     The Initial Grant Agreements anticipated that recipients would spend time working with the EPA to finalize program workplans and budgets before beginning to implement their programs and funding projects in early 2025.  *See*, *e.g.*, *id.* at 16–17.

65.     Relying on the funds, Plaintiffs and other Solar for All recipients negotiated work plans and proposed budgets with the EPA.  The work plan process included identifying program areas for funding, detailing how funds would be allocated, and outlining terms and conditions. Until the work plans were approved, Solar for All recipients were restricted to drawing down no more than 2% of their obligated funds to ensure that adequate funds would be available for their projects after they were launched to the public.  *See id.* at 1.  True and exact copies of each Plaintiff's Solar for All Work Plan are attached as Exhibits D1–D24.

66.     In December 2024—after Plaintiffs finalized their work plans with the EPA's approval—the EPA issued Assistance Amendments (hereinafter the "Amended Grant Agreements") that lifted the 2% funding restriction, allowing each Plaintiff to move forward with their programs with the full benefit of their obligated funds.  Each Plaintiff's Amended Grant Agreement is substantially similar in format, differing only in the specifics of each award recipient,

16

payee, amount, program name, and individual signatories.  True and exact copies of each Plaintiff's Amended Grant Agreement are attached as Exhibits E1–E24.

67.     Each Amended Grant Agreement contained an updated termination provision in the terms and conditions.  The termination provision is the same in each Grant Agreement and reads:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.  If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation.  In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination.  If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re-obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

*E.g.*, Ex. E1 [MCEC Amended Grant Agreement (Dec. 13, 2024)] at 37.

68.     The termination provision in the Amended Grant Agreements is identical to the one in the Initial Grant Agreements, except that (a) the version of 2 C.F.R. § 200.340 is specified to the version "effective as of October 1, 2024," (b) "material misrepresentation of eligibility status" is added to the grounds for termination; and (c) the EPA agreed to "re-obligate funds to [an] Eligible Recipient" that "assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient."

69.     On January 22, the EPA mailed its last Amended Grant Agreement to Plaintiff California Public Utilities Commission, which substituted a revised grant number.  *See* Ex. E4

17

[CPUC Amended Grant Agreement (Jan. 22, 2025)] at 1.  Thus, each Plaintiff's Amended Grant Agreement became binding no later than February 6, 2025, "21 days after EPA award . . . mailing date," either by the Plaintiff "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions."  *E.g.*, Ex. E1 [MCEC Amended Grant Agreement (Dec. 13, 2024)] at 1; Ex. E4 (CPUC Amended Grant Agreement (Jan. 22, 2025)] at 1.

70.     Each Amended Grant Agreement was signed by an EPA award official on behalf of the United States.  *See, e.g.*, *id.*

71.     Through the first months of 2025, Plaintiffs continued to perform under the Grant Agreements.  Many Plaintiffs continued to draw down funds under the Grant Agreements from their ASAP accounts.  True and exact copies of statements from each Plaintiff's ASAP account are attached as Exhibit F1–F24.  For example, MCEC's ASAP Account Settlement Report— downloaded at 9:48 a.m. on August 14, 2025—shows that MCEC regularly drew down on its Grant between January and August of 2025.  Ex. F1 [MCEC ASAP Account Statement (Aug. 14, 2025)].

**III.    Congress repeals Clean Air Act § 134 but rescinds only unobligated funds**

72.     On July 3, 2025, Congress passed a budget reconciliation bill, H.R. 1. Pub. L. 119-21, 139 Stat. 72 (July 4, 2025).  Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. at 154.

73.     By its explicit terms, H.R. 1 rescinded only "the *unobligated* balances of amounts made available to carry out" section 134 of the Clean Air Act.  *Id.*  Accordingly, any Greenhouse Gas Reduction Fund funds that *were* obligated as of July 3, 2025, were not rescinded.

18

74.     Plaintiffs' funds were all obligated well before July 3, 2025, and were, therefore, not rescinded by H.R. 1.

75.     Legislative history further underscores that H.R. 1 did not rescind any obligated funds and likewise did not end the Solar for All program created by those obligated funds.

76.     During the markup of the Energy and Commerce Committee title on H.R. 1 on May 13, 2025, Representative Morgan Griffith (R-Va.), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, stated:

> [T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances.  So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . . If the grant has already been granted and the money is obligated, then . . . then our language does not affect that. . . . [W]e can't rescind expenditures that have already been obligated.

*See* 171 Cong. Rec. S4282–83 (July 9, 2025).

77.     Representative Brett Guthrie (R-Ky.), Chair of the House Energy and Commerce Committee likewise explained that H.R. 1 "does not close the grants on any obligated funds." *See id.* at S4283.

78.     The Budget Committee's Report on H.R. 1 stated that H.R. 1 "would decrease the federal deficit by approximately $104,934 as a result of repealing authorizations and rescinding unobligated funds that were appropriated to the U.S. Environmental Protection Agency (EPA) under the Inflation Reduction Act." Rep. No. 119-106(I), 119th Cong., 1st Sess., at 556 (May 20, 2025).  The small amount of deficit reduction envisioned further confirms that H.R. 1 did not rescind the $7 billion in funds already obligated for the entire Solar for All program.

79.     In the same report, the minority members agreed that "[t]he budgetary significance of" H.R. 1's "repeal [of] section 134 of the Clean Air Act and resci[ssion] [of] unobligated funds for the Greenhouse Gas Reduction Fund" was "questionable, as only $19 million is available out

19

of the entire $27 billion appropriated.  This remaining money is allocated for administrative purposes." *Id.* at 627.

80.    After H.R. 1 was enacted, the Congressional Budget Office issued a July 21, 2025, report estimating that repealing and rescinding unobligated funds from all three of the Greenhouse Reduction Fund grant programs would only net $19 million in savings.  *See* CBO, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline*, tab Title VI, lines 19–21 (July 21, 2025), https://www.cbo.gov/publication/61570.

81.    Upon information and belief, $19 million is approximately the remaining balance of the funds appropriated for the EPA's administrative costs under 42 U.S.C. § 7434(a)(4).

82.    H.R. 1 also did not eliminate the EPA's entire administrative budget.  To the contrary, on March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection Agency—Environmental Programs and Management" in fiscal year 2025, which was not touched by H.R. 1.[2] F ull Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

**IV.    The EPA unilaterally terminates each Plaintiff's Grant Agreement**

83.    Beginning in August of 2025—one month after H.R. 1 was enacted—the EPA terminated each Plaintiff's Solar for All Grant Agreement.  The EPA did so by sending each Plaintiff a Termination Memorandum and another Assistance Amendment to its Solar for All Grant Agreement (hereinafter the "Termination Amendment")

---

[2] Notably, the EPA had requested additional funding for this appropriations account specifically to support administration of the Greenhouse Gas Reduction Fund. U.S. EPA, *Fiscal Year 2025 Justification of Appropriation Estimates for the Committee on Appropriations, Tab 05: Environmental Programs and Management* 40 (March 2024), https://www.epa.gov/system/files/documents/2024-04/fy25-cj-05-epm.pdf.

84.     In terminating each Plaintiff's Grant Agreement, the EPA committed a clear and material breach of the Grant Agreements entered between the EPA and Plaintiffs, which expressly limited the grounds for termination to three circumstances: (1) substantial noncompliance with the terms and conditions of the agreement that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) material misrepresentation of eligibility status.  None of those conditions were satisfied here.

85.     The rationale for the EPA's termination was expressed in a Termination Memorandum to each Plaintiff, stating that it was terminating their Solar for All Grant Agreement. The Termination Memoranda asserted that the EPA intended to terminate each Plaintiff's Grant Agreement based on the EPA's interpretation of H.R. 1.  Each Termination Memorandum is substantially similar in substance and format, differing only in the identity of the recipients.  True and exact copies of the Termination Memorandum received by each Plaintiff are attached as Exhibits G1–G24.

86.     The Termination Memorandum stated that "pursuant to the One Big Beautiful Bill Act (OBBBA)," the EPA was "hereby terminating [each Plaintiff's] Assistance Agreement." *E.g.*, Ex. G1 [MCEC Termination Memorandum (Aug. 7, 2025)] at 1.

87.     The Termination Memorandum further asserted:

> Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. [§] 7434, and rescinds unobligated amounts to carry out Section 134.  The repeal of the grant appropriations in CAA 134(a)(1)–(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All.  As both the grant appropriations and EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All.  Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or

21

appropriated funds for that purpose, is no longer legally permissible. EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

*Id.*

88.     The Termination Memorandum further provided that the "process for closeout is generally outlined in 2 CFR [§] 200.344," and that the EPA would require certain closeout reports within 120 days of closeout. *Id.* at 1–2.

89.     The interpretation of H.R. 1 in the Termination Memorandum aligns with statements by EPA officials, including Administrator Lee Zeldin, that the Solar for All program was terminated because "[t]he One Big Beautiful Bill eliminated the Greenhouse Gas Reduction Fund." Lee Zeldin (@epaleezeldin), X (Aug. 7, 2025 @ 2:07 p.m.), https://x.com/epaleezeldin/status/1953518426602803684.



90. The EPA's interpretation of H.R. 1 is contrary to the statutory text, which states explicitly that only "the unobligated balances of amounts made available to carry out [Section 134 of the Clean Air Act] (as in effect on the day before the date of enactment of this Act) [were] rescinded." 139 Stat. at 154. The legislative history of that provision further confirms that Congress rescinded only the approximately $19 million from the Greenhouse Gas Reduction Fund that had not yet been obligated and had been appropriated directly to the EPA to support its costs in administering Greenhouse Gas Reduction Fund programs.

91. The EPA's erroneous interpretation of H.R. 1 is the only justification the EPA has provided to the Plaintiffs for its decision to terminate the Plaintiffs' Grant Agreements.

92. In addition to the Termination Memoranda and the Zeldin social media post, the EPA sent each Plaintiff a Termination Amendment to its Solar for All Grant Agreement. Each Termination Amendment is substantially similar in substance and format, differing only in the identity of the recipients and the amount of funding originally awarded. True and exact copies of each Plaintiff's Termination Amendment are attached as Exhibits H1–H24.

93. The Termination Amendments stated: "This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added." *E.g.*, Ex. H1 [MCEC Termination Amendment (Aug. 8, 2025)] at 1.

94. The Termination Amendments further stated: "Per 2 CFR [§] 200.340 and the Termination General Terms and Conditions of this agreement, the EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions." *E.g.*, *id.*

23

95.     The Termination Amendments further stated: "The Agency is asserting its right under 2 CFR [§] 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award.  This amendment serves as required notice under 2 CFR [§] 200.341." *E.g.*, *id.* at 4.

96.     Under 2 C.F.R. § 200.340, a federal award "may be terminated in part or its entirety" in four circumstances: (1) by the federal agency if the recipient or subrecipient fails to comply with the terms and conditions of the award, (2) by all parties if they agree to terminate the award, (3) by the recipient or subrecipient upon sending notice of a reason to terminate the award, or (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1)–(4).

97.     Section 200.340 also provides that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b).

98.     The terms and conditions of each Federal award—contained in each Plaintiff's Initial and Amended Grant Agreements—contain a termination provision that sets forth grounds for termination.  The termination provision in each Amended Grant Agreement allows the EPA "to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." *E.g.*, Ex. E1 [MCEC Amended Grant Agreement (Dec. 13, 2024)] at 37.

24

99.     Therefore, each Grant Agreement clearly and unambiguously specifies only three bases for the EPA's unilateral termination—(1) substantial noncompliance that materially impairs effective performance, (2) adequate evidence of waste, fraud, or abuse, or (3) material misrepresentation of eligibility status.

100.     The EPA has never alleged (nor could it) that any Plaintiff is in substantial noncompliance with the terms and conditions of its Grant Agreement, that there is any evidence of waste, fraud, or abuse, or that any Plaintiff has materially misrepresented its eligibility status.

101.     In terminating each Grant Agreement without satisfying the conditions provided in the termination clause, the EPA therefore breached each Grant Agreement.

**V.     Plaintiffs timely submitted administrative disputes to the EPA**

102.     Each Termination Amendment provided that "[i]f the recipient disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to EPA Award Official within 21 days after EPA award or amendment mailing date.  In case of disagreement, and until the disagreement is resolved, the recipient should not draw down on the funds provided by this award/amendment, and any costs incurred by the recipient are at its own risk." *E.g.*, Ex. H1 [MCEC Termination Amendment (Aug. 8, 2025)] at 1.

103.     Plaintiffs timely filed notices of disagreement with the Termination Amendments. For example, a true and exact copy of MCEC's Notice of Disagreement is attached as Exhibit I.

104.     Separately, the Termination Memorandum announcing the cancellation of Solar for All provided:

> If you wish to dispute this termination decision, the Disputes Decision Official (DDO), molina.michael@epa.gov, must receive the Dispute no later than 30 calendar days from the date this termination notice is electronically sent to you.  Disputes must be sent electronically by email to

25

> the DDO, with a copy to EPA Award Official, brown.devon@epa.gov within the 30-day period stated above. The Dispute submitted to the DDO must include: (1) A copy of the disputed Agency Decision; (2) A detailed statement of the specific legal and factual grounds for the Dispute, including copies of any supporting documents; (3) The specific remedy or relief you seek under the Dispute; and (4) The name and contact information, including email address, of your designated point of contact for the Dispute. *See* 2 CFR [§] 1500.15.

*E.g.*, Ex. G1 [MCEC Termination Memorandum (Aug. 7, 2025)] at 2.

105. Plaintiffs timely submitted disputes to the EPA pursuant to Part 1500 and thereby challenged the termination of the Solar for All program and each of their individual Solar for All Grant Agreements. For example, a true and exact copy of MCEC's Formal Dispute is attached as Exhibit J.

106. The EPA acknowledged Plaintiffs' Formal Disputes via email. For example, a true and exact copy of the EPA's acknowledgment email to MCEC is attached as Exhibit K.

107. Although Plaintiffs chose to submit administrative disputes, neither their Grant Agreements nor applicable statutes or regulations require them to exhaust administrative remedies or otherwise obtain administrative decisions before an action in this Court.

108. Moreover, requiring Plaintiffs to continue pursuing their administrative claims before litigating their Tucker Act claims would be futile, inadequate, and result in irreparable injury. *See Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90, 105-07 (D.C. Cir. 1986).

109. As of the date of this filing, the EPA has not resolved Plaintiffs' Disagreements nor their Formal Disputes.

## VI. The EPA begins the closeout process for Solar for All Grant Agreements

110. On or about October 1, the EPA emailed Plaintiffs with information about Closeout Instructions for the Solar for All Program. The Closeout Instructions were identical for each

Plaintiff. For example, a true and exact copy of the Closeout Instructions sent to MCEC is attached as Exhibit L.

111. The Closeout Instructions provide that "[t]he award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition." *Id.*

112. The Closeout Instructions further provide that "[m]oving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant." *Id.*

113. The Closeout Instructions require that each Plaintiff submit reports to the EPA "[w]ithin 120 calendar days of the end of the performance period (the date of termination that is listed in the award amendment)." *Id.*

114. The Closeout Instructions do not mention Plaintiffs' outstanding Disagreements or Formal Disputes with the EPA.

## VII. The EPA's actions harmed Plaintiffs

115. The EPA has terminated Plaintiffs' Grant Agreements, ordered Plaintiffs to stop working, seized large sums of money from Plaintiffs' ASAP accounts, and frozen remaining balances in Plaintiffs' ASAP accounts, all causing harm to Plaintiffs.

116. Within one week of terminating each Plaintiff's Grant Agreement, the EPA withdrew from each Plaintiff's ASAP account approximately 90 percent of the money that had been awarded to each Plaintiff.

117. For example, on August 7, MCEC's ASAP account had an available balance of $61,061,101.35. On August 11, MCEC's ASAP account had an available balance of only $4,128,856.58. *See* Ex. F1 [MCEC ASAP Account Statement (Aug. 14, 2025)] at 1.

118. On August 7, 2025, the Pennsylvania Energy Development Authority's ASAP account had an available balance of $155,720,000. On August 11, 2025, PEDA's ASAP account had an available balance of only $10,900,400. *See* Ex. F20 [PEDA ASAP Account Statement (Sept. 26, 2025)] at 1.

119. Similarly, prior to the Termination Memorandum, New Jersey's ASAP account had an available balance of $156,120,000.00. On August 11, 2025, New Jersey's ASAP account had an available balance of $10,900,400. *See* Ex. F15 [New Jersey ASAP Account Statement (Sept. 29, 2025)] at 1.

120. The EPA seized Plaintiffs' grant money without notice, without reasoning, and without explanation for the amount of money taken.

121. The EPA restricted Plaintiffs' use of the remaining grant money in their ASAP accounts to "allowable" costs for financial obligations incurred prior to the termination date. *See, e.g.,* Ex. G1 [MCEC Termination Amendment (Aug. 8, 2025)] at 4.

122. The EPA's actions—including terminating Plaintiffs' Grant Agreements and ordering Plaintiffs to stop work— harm Plaintiffs even beyond the loss of the funds awarded in the Grant Agreement. In Massachusetts, for example, the Department of Energy Resources (DOER) was expecting to use its Solar for All award to serve 9,000 low-income households, reducing electrical bills by $372,000,000 over the lifetime of supported energy systems. With the loss of the previously obligated funds, DOER will no longer be able to offer zero-interest solar loans, accelerated solar leases, and grants for enabling upgrades to low-income homeowners; grants and bridge loans that would enable solar on affordable multifamily properties; and grants to enable community solar projects delivering savings and serving low-income households and incorporating meaningful benefits such as community ownership and workforce development

initiatives. Additionally, DOER will no longer be able to offer the anticipated opportunity of reduced energy costs to state-subsidized public housing properties.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of the Solar for All Grant Agreements**

123. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

124. To recover for breach of contract, Plaintiffs must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

125. Each Solar for All Grant Agreement is a binding contract that contemplates money damages.

126. Each Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

127. The EPA breached the express terms of each Plaintiff's Grant Agreement by wrongfully terminating each Grant Agreement.

128. Each Solar for All Grant Agreement contained a provision by which the EPA agreed to make a specified amount of federal funds available to the respective Plaintiff for its Solar for All projects.

129. In each Amended Grant Agreement, the EPA and each Plaintiff mutually agreed to limit the EPA's unilateral termination rights under 2 C.F.R. § 200.339 and 2 C.F.R. § 200.340 to situations involving substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud, or abuse, or a misrepresentation of eligibility status.

29

130. Specifically, the termination provisions in each Plaintiff's Grant Agreement provides as follows:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, *when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status*, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.

*See, e.g.,* Ex. E1 [MCEC Amended Grant Agreement (Dec. 13, 2024)] at 37 (emphasis added).

131. Under the express terms of the Grant Agreements, the EPA could therefore issue a unilateral termination based only on (1) substantial noncompliance that materially impairs performance, (2) evidence of waste, fraud, or abuse, or (3) a material misrepresentation of eligibility.

132. The bases for EPA's termination of each Plaintiff's Grant Agreement did not include substantial noncompliance that materially impaired performance, evidence of waste, fraud, or abuse, or a material misrepresentation of eligibility status.

133. Instead, the EPA wrongfully terminated each Plaintiff's Solar for All Grant Agreement, purportedly based on the EPA's erroneous interpretation of H.R. 1. *See, e.g.*, Ex. G1 [MCEC Termination Memorandum (Aug. 7, 2025)] at 1.

134. The EPA's unilateral terminations breached the express terms of each of the Plaintiffs' Grant Agreements because the termination provisions in each of those Grant Agreements did not allow the EPA to issue unilateral terminations based on its interpretation of H.R. 1., let alone based on its erroneous interpretation.

135. The EPA's breach of each Plaintiff's Solar for All Grant Agreement has caused each Plaintiff to suffer damages in an amount to be determined at trial.

## COUNT II
### Breach of the Duty of Good Faith and Fair Dealing

136. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

137. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citation omitted).

138. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

139. Each Solar for All Grant Agreement is a binding contract that contemplates money damages.

140. Each Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

141. Each Solar for All Grant Agreement contained a provision by which the EPA agreed to make a specified amount of federal funds available to the respective Plaintiff for its Solar for All projects.

142. Plaintiffs entered into the Grant Agreements with the EPA with the reasonable expectation that the EPA would comply with the terms of the Grant Agreements and that the EPA would act in good faith and deal fairly with Plaintiffs.

143. The EPA breached the Grant Agreements' implied duty of good faith and fair dealing.

31

144. The EPA breached this implied duty by, among other things, targeting each Plaintiff's Grant Agreement for unilateral termination based on an erroneous and bad faith interpretation of H.R. 1, directing Plaintiffs to stop work under the Grant Agreements, withdrawing funds already awarded to Plaintiffs (without prior notice or explanation), preventing Plaintiffs from spending money already awarded to them, and imposing new terms and conditions on Plaintiffs.

145. The EPA's actions interfered with Plaintiffs' performance under the Grant Agreements and destroyed Plaintiffs' reasonable expectations regarding the fruits of their Grant Agreements.

146. Upon information and belief, the EPA's actions were intended to interfere with Plaintiffs' operation of the Solar for All program despite lacking any legal authority to do so.

147. The EPA's actions caused Plaintiffs to suffer substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against the United States as follows:

    i.    Awarding money damages to Plaintiffs in an amount to be determined at trial;

    ii.    Award any allowable pre- and post-judgment interest;

    iii.    Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    iv.    Granting other such relief as this Court may deem proper.

Dated: October 15, 2025                Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By: */s/ Lauren Gorodetsky*

By */s/ Joshua A. Katz*

Lauren Gorodetsky
Keith M. Jamieson
   *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-7057
LGorodetsky@oag.state.md.us
kjamieson@oag.state.md.us

*Counsel for the Maryland Clean Energy Center*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Dylan C. Redor*
Dylan C. Redor*
Theodore A. McCombs*
Myung Park*
Marie Logan*
Rebecca Hunter*
Abigail Blodgett*
   *Deputy Attorneys General*
California Department of Justice
300 S. Spring St.
Los Angeles, CA 90013
(213) 269-6706
dylan.redor@doj.ca.gov

*Counsel for the California Public Utilities Commission*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Jill Lacedonia*
Jill Lacedonia*
   *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5250

Mary M. Curtin*
   *Senior Litigation Counsel*
Joshua A. Katz
   *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-7000
Mary.curtin@azag.gov
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Carrie Noteboom*
Carrie Noteboom*
   *Assistant Deputy Attorney General*
David Moskowitz*
   *Deputy Solicitor General*
Cynthia Vitale*
   *Assistant Attorney General*
Colorado Office of the Attorney General
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Carrie.Noteboom@coag.gov
David.Moskowitz@coag.gov
Cynthia.Vitale@coag.gov

*Counsel for the State of Colorado*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

By: */s/ William Stephens*
William Stephens
   *Assistant Deputy Attorney General*
Lauren Marks*
Lauren Cullum*

33

jill.lacedonia@ct.gov

*Counsel for the State of Connecticut*

*Special Assistant Attorneys General*
Office of the Attorney General for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, D.C. 20001
William.Stephens@dc.gov
Lauren.marks@dc.gov
lauren.cullum@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAI'I

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes*
  *Solicitor General*
Hawai'i Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai'i*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo*
  *General Counsel*
Taylor Payne*
  *Chief Deputy General Counsel*
Laura C. Tipton*
  *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Katharine Roller*
Katharine Roller*
  *Complex Litigation Counsel*
Elizabeth B. Scott*
  *Assistant Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov

*Counsel for Illinois Finance Authority*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Caleb Elwell*
Caleb E. Elwell*
  *Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.elwell@maine.gov

*Counsel for the State of Maine*

(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: /s/ Amy Laura Cahn
Amy Laura Cahn*
Molly Teague*
  *Special Assistant Attorneys General*
Terrence Vales*
  *Assistant Attorney General*
Katherine Dirks*
  *Chief State Trial Counsel*
Vanessa Arslanian*
  *State Trial Counsel*
One Ashburton Place
Boston, MA 02108
(617) 963-2277
amy.laura.cahn@mass.gov
molly.teague@mass.gov
terrence.vales@mass.gov
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
Polly Synk
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
SynkP@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Ryan Pesch*
Ryan Pesch*
Cat Rios-Keating*
  *Special Assistant Attorneys General*
Brian Carter*
  *Special Counsel*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
651-728-7116

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: /s/ K. Brunetti Ireland
K. Brunetti Ireland*
  *Chief Deputy Attorney General*
  *Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for Nevada Clean Energy Fund*

ryan.pesch@ag.state.mn.us
catherine.rios-keating@ag.state.mn.us
brian.carter@ag.state.mn.us

*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Daniel Resler*
Daniel Resler*
Lauren E. Van Driesen*
Jack Ventura*
  *Deputy Attorneys General*
Office of the Attorney General
33 Washington Street, Ninth Floor
Newark, NJ 07101
(973) 648-4726
Daniel.Resler@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Matthew Eisenson*
Matthew Eisenson*
Kelsea Suarez*
  *Assistant Attorneys General*
Environmental Protection Bureau
Office of the Attorney General
28 Liberty Street, 19th Floor
(212) 416-8481
matthew.eisenson@ag.ny.gov

*Counsel for the New York State Energy Research and Development Authority*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Coby Howell*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ J. Spenser Lotz*
J. Spenser Lotz*
  *Assistant Attorney General*
Environmental Protection Bureau
201 Third St. NW, Suite 300
Albuquerque, NM 87102
(505) 616-7560
slotz@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel T. Wilkes
Daniel T. Wilkes*
  *Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*

**PENNSYLVANIA ENERGY DEVELOPMENT AUTHORITY**

By: */s/ Michael J. Heilman*

Coby Howell*
   *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Counsel for the State of Oregon*


**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Nicholas M. Vaz*
Nicholas M. Vaz*
   *Special Assistant Attorney General*
Office of the Attorney General
Environment and Energy Unit Chief
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ C. L. Junine So*
C. L. Junine So*
Sarah E. Smith-Levy*
Leah A. Brown*
   Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
(206) 464-7744
junine.so@atg.wa.gov
sarah.e.smith-levy@atg.wa.gov
leah.brown@atg.wa.gov

Michael J. Heilman*
   *Litigation Coordinator*
Michael A. Braymer*
   *Chief Counsel*
Pennsylvania Department of Environmental
Protection
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222
Phone: 412-442-4241
Email: mheilman@pa.gov

*Counsel for Pennsylvania Energy
Development Authority*


**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
   *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**WISCONSIN ECONOMIC
DEVELOPMENT CORPORATION**

By: */s/ Jennifer H. Campbell*
Jennifer H. Campbell*
   *Chief Legal Officer*
2352 S. Park St., Suite 303
Madison, WI 53713
(608) 210-6811
jennifer.campbell@wedc.org

*Counsel for Wisconsin Economic
Development Corporation*

37

*Counsel for the State of Washington*

*\* Pro hac vice application forthcoming*