UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STATE OF ARIZONA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br><br>PROTECTION AGENCY, et al.,<br><br>Defendants. | Case No. 2:25-cv-02015-TMC<br><br>ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT |

## I.    INTRODUCTION

Under Section 134 of the Clean Air Act, the Environmental Protection Agency ("EPA") issued $7 billion in grants to support a national expansion of solar energy projects via the Solar for All ("SFA") program. In July 2025, Congress repealed Section 134 and rescinded the unobligated balances due under those grants. The EPA then terminated Plaintiffs' SFA grants and rescinded 93 percent of grant funds—including billions of dollars in *obligated* balances.

Plaintiffs primarily challenge the EPA's recission of the SFA grants under the Administrative Procedure Act ("APA"). Both parties have moved for summary judgment. Dkts. 129, 137.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 1

Because Plaintiffs' claims are contractual in nature, the Tucker Act vests exclusive jurisdiction over them in the Court of Federal Claims. Lacking jurisdiction, this Court must DISMISS Plaintiffs' claims WITHOUT PREJUDICE. The Court therefore DENIES Plaintiffs' motion for summary judgment (Dkt. 129) and GRANTS Defendants' motion for summary judgment (Dkt. 137).

## II.   BACKGROUND

The following facts are either not genuinely disputed in the summary judgment record or are taken in the light most favorable to Plaintiffs.

**A.   Section 134 and the SFA program**

As part of the 2022 Inflation Reduction Act, Congress amended the Clean Air Act, adding Section 134 and establishing the Greenhouse Gas Reduction Fund ("GGRF"), which directed the EPA to:

> [M]ake grants . . . to States, municipalities, Tribal governments, and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities, as determined appropriate by the [EPA] Administrator.

42 U.S.C. § 7434 (2024) ("Section 134"), *repealed by*, One Big Beautiful Bill Act, Public Law 119-21, 139 Stat. 72, 154 (July 4, 2025).

On April 22, 2024, the EPA created the SFA program to "expand existing solar programs for low-income and disadvantaged communities and launch new ones" and selected sixty qualified SFA recipients to receive $7 billion appropriated by Congress. Dkt. 128 ¶ 53–54 (citation modified). Plaintiffs—22 states, or their governmental bodies overseeing SFA grants, and the District of Columbia—were among those selected. *Id*. ¶¶ 3, 14–37. Plaintiffs worked with the EPA to draft work plans and propose budgets detailing how each would use SFA

funding. *Id*. ¶ 57; *see, e.g.,* Dkt. 87-1 at 49–72. The EPA deposited Plaintiffs' grant awards into their Automated Standard Application for Payments ("ASAP") accounts but only allowed access to two percent of total obligated funds during this period. Dkt. 128 ¶ 5, 57. By December 2024, the EPA had approved Plaintiffs' work plans, executed Assistance Agreements with each Plaintiff, and granted each Plaintiff access to their entire award. Dkt. 128 ¶ 5, 58.

Plaintiffs began implementing their SFA grants throughout the first half of 2025. *Id*. ¶ 56. During a "Program Planning Period," they developed detailed plans for solar installations, financial incentives, technical assistance, education and outreach, and workforce development— all with the goal of expanding access to solar power. *Id*. ¶ 59; *see* Dkt. 80 ¶ 23; Dkt. 82 ¶¶ 31–33; Dkt. 84 ¶¶ 13–14; Dkt. 89 ¶¶ 15–22. Plaintiffs hired additional staff and created the infrastructure necessary to administer their grant programs. *See, e.g.*, Dkt. 80 ¶ 24 (North Carolina established a "vendor registration program" to "ensure only reputable contractors could participate"); Dkt. 87 ¶ 16 (Vermont hired three full-time positions to administer SFA funds). States also worked closely with EPA officials and stakeholders (such as installers, utility companies, and low-income residents) to solicit input on program design. Dkt. 86 ¶ 17; Dkt. 87 ¶ 17.

Plaintiffs then entered into contracts or grant agreements with external entities to carry out SFA programs. Dkt. 79 ¶¶ 15–17; Dkt. 80 ¶ 23; Dkt. 81 ¶ 17. Some exited the Program Planning Period and took further steps towards implementing their programs. *See, e.g.*, Dkt. 70 ¶ 18 (Illinois prepared a $1.5 million contract for an 800kW solar project); Dkt. 78 ¶ 19 (Michigan awarded $13.5 million to 13 community solar projects, including rooftop installations on a church, a wastewater treatment plant, and dozens of homes). Collectively, Plaintiffs spent tens of thousands of employee hours designing and implementing SFA programs. *See, e.g.*, Dkt. 80 ¶ 16 (2,279 hours); Dkt. 83 ¶ 34 (2,100 hours); Dkt. 88-1 at 11 (5,000 hours).

**B.      Initial attempts to terminate SFA funding**

With the inauguration of President Trump and appointment of EPA Administrator Lee Zeldin in January 2025, the federal government reversed course on solar energy. The President issued an executive order instructing agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022." Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 29, 2025). The Federal Office of Management and Budget ("OMB") directed agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance[] and other relevant agency activities," including "financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." Dkt. 130-1 at 203. The EPA froze Plaintiffs' funding through ASAP on January 30, 2025. Dkt. 89 ¶ 20. In an email to Plaintiffs, the EPA stated that the awarded money could not be disbursed while the EPA "worked 'diligently to implement the [OMB] Memorandum.'" *New York v. Trump*, 764 F. Supp. 3d 46, 53 (D.R.I. 2025). Plaintiffs successfully moved for a temporary restraining order ("TRO") in the District of Rhode Island prohibiting the EPA from giving effect to the OMB directive or otherwise freezing Plaintiffs' grant money.[1] *Id*. at 53–54. Some Plaintiffs' funding remained inaccessible until around February 19, 2025. Dkt. 69 ¶ 16; Dkt. 89 ¶ 20.

With their accounts unfrozen, states continued to incorporate the SFA while the EPA forecasted that it still sought to dismantle the program. *See Climate United Fund v. Citibank*, *N.A.*, 778 F. Supp. 3d 90, 103 (D.D.C. 2025) ("On February 23, 2025, Administrator Zeldin discussed the GGRF funds on a television program, stating that the agency was working to 're-

---

[1] The court later granted a preliminary injunction to the same effect. *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I.). In March 2026, the First Circuit vacated the portion of the *New York* court's order requiring the government to make disbursements available again, on the basis that the district court lacked jurisdiction to do so under the Tucker Act (discussed further below, *see infra* Section V.A.). *New York v. Trump,* 171 F.4th 1, 29 (1st Cir. 2026).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 4

establish accountability and oversight' over the grant programs, and that the 'entire scheme, in [his] opinion, is criminal.'"). In March 2025, EPA officials directed the EPA Office of the Inspector General ("OIG") to investigate "misconduct, waste, conflicts of interest, and potential fraud" within the GGRF program and SFA. Dkt. 130-1 at 205. The OIG ultimately completed its review on January 7, 2026, highlighting several risks (such as limited EPA funding available for program oversight) but finding no wrongdoing and making no recommendations to the EPA. *Id.* at 210–20.

**C.      The One Big Beautiful Bill Act**

On July 4, 2025, the President signed the "One Big Beautiful Bill Act," or H.R. 1. Pub. L. 119-21, 139 Stat. 72. Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. at 154.

Consistent with the text of the statute, the congressional record indicates legislators intended Section 60002 to only rescind *unobligated* balances and to leave alone any funds already distributed.

First, during the House Energy & Commerce Committee's mark-up of the bill, Congressman Griffith (then-Chair of the Environment Subcommittee) stated this fact multiple times:

> I just want to point out that these provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward. . . .
>
> If the grant has already been granted and the money is obligated, then this—then our language does not affect that. . . .
>
> . . . [W]e can't rescind expenditures that have already been obligated.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 5

171 Cong. Rec. S4282 (daily ed. July 9, 2025). Representative Brett Guthrie, Chair of the Energy and Commerce Committee, confirmed that Section 60002 "does not close the grants on any obligated funds." *Id*. at S4283.

Second, the Congressional Budget Office reviewed Section 60002 when it was before the Senate Environment and Public Works Committee and "scored" the provision as saving $19 million in administrative and oversight funding—rather than billions of dollars in already-issued grants. *Id*. at S4282–3; Dkt. 130-1 at 223, 228. There is no evidence that any legislator disputed this finding. *Id*. at 223.

**D.    Defendants terminate SFA**

On August 7, 2025, EPA Associate Deputy Administrator Travis Voyles circulated a memorandum to EPA officials "detailing the recommendation that the agency terminate the [SFA] program and all existing grants because the EPA no longer has the statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients." Dkt. 126-14; Dkt. 126-15 (the "Voyles Memo"). The Voyles Memo asserts that, by repealing Section 134, Congress "made its intent clear . . . that the SFA program is no longer to operate." *Id*. at 1. The memo further acknowledges that "[c]ertain reliance interests may have led to initial plans, cost outlays, and staffing for various projects," but that "the program's relatively nascent status and the limited funding distributions which took place prior to enactment of [H.R. 1] support termination at this juncture." Dkt. 126-15 at 3–4. According to the memo, any disruptions caused by grant recission "could be lessened further by effective use of the closeout process set out in the grant agreements" so "recipients receive any appropriate distributions for expenses reasonably occurred [sic] in reliance on the program." *Id*. at 4.

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 6

EPA Deputy Administrator David Fotouhi responded in agreement three hours later, asking Voyles to "proceed accordingly." Dkt. 126-14. Voyles then informed EPA staff to "immediately implement the termination of the SFA program and existing grants." Dkt. 126-16 at 1; Dkt. 126-20 (the "Program Termination Directive"). Later that morning, Administrator Zeldin publicly announced SFA's termination through his X account. Dkt. 130-1 at 653. Writing that H.R. 1 "eliminated [GGRF], which included a $7 billion pot called 'Solar for All,'" Zeldin asserted that "EPA no longer has the statutory authority to administer the program or the appropriated funds to keep this boondoggle alive." *Id*.

That afternoon, EPA officials sent grant termination letters to Plaintiffs. Dkt. 126-40. The letters stated that Section 60002 "repeal[ed] the underlying authority" for Section 134 and SFA "and rescind[ed] unobligated amounts to carry out Section 134." *Id*. at 2. Like with the Voyles Memo, these letters acknowledged that "program participants may have begun to rely on [SFA] funds" but that any interests would be "remediable by the close out processes outlined in the program grants." *Id*. The letters detailed the closeout process and gave grant recipients 30 days to dispute termination. *Id*. at 2–3. All Plaintiffs received a termination letter by 9:30 PM on August 7. Dkt. 126-24.

On August 8, 2025, the EPA blocked Plaintiffs' access to their ASAP accounts. *See* Dkt. 86 ¶¶ 22–23; Dkt. 88 at ¶ 25. The EPA reopened Plaintiffs' accounts over the next few weeks but reduced funds in all accounts to seven percent of the grant award. *Id*. ¶ 25; Dkt. 86 ¶¶ 22–23; Dkt. 102-1 ¶ 9. Defendants assert that they "deobligated" the other 93 percent of the grant funds but "preserved a recorded obligation" of seven percent "for each recipient to pay allowable pretermination and closeout costs." *Id*. ¶¶ 8–9 (the "Deobligation Directive"). Ultimately, each Plaintiff's SFA ASAP account was placed into a "liquidated" status, the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 7

performance period was changed to end on December 8, 2025, and the available balance was reduced to seven percent of the grant award. Dkt. 88 ¶¶ 25–26; Dkt. 89 ¶¶ 27–28.

All Plaintiffs (except Virginia) filed administrative disputes under 2 C.F.R. § 1500.15. Dkt. 129 at 11 (citing Dkt. 88 ¶¶ 27–28). The EPA either ignored these disputes or rejected them. *Id.*; Dkt. 102-1 ¶ 6 ("EPA has issued 35 decisions denying grant reinstatement, including to the 23 Plaintiffs"); Dkt. 89 ¶ 33 ("IFA received a letter from EPA stating that, due to the initiation of legal proceedings . . . it had determined that the IFA's dispute was moot.").

## III.    PROCEDURAL HISTORY

On October 15, 2025, Plaintiffs brought a breach-of-contract claim against the United States in the Court of Federal Claims. *Maryland Clean Energy Center v. U.S.A.*, No. 1:25-cv 01738-LAS, Dkt. 1 (Ct. Cl. Oct. 15, 2025). There, Plaintiffs sought "money damages resulting from the EPA's breach" of the grant agreements that it maintained with each Plaintiff under the SFA program. *Id.* ¶ 1.

On October 16, 2025, Plaintiffs filed a complaint in this Court against the EPA and Administrator Zeldin. Dkt. 1. With Defendants' consent, Plaintiffs amended their complaint on February 24, 2026. Dkt. 128. Plaintiffs allege that Defendants "erroneously interpreted H.R. 1 to eliminate the statutory basis for the SFA Program" and "illegally and arbitrarily liquidated and removed from Plaintiffs' ASAP accounts approximately 90% of the funds that were obligated to Plaintiffs before August 16, 2024, despite the fact that H.R. 1 explicitly limited rescission to funds that were unobligated as of July 3, 2025." Dkt. 128 ¶¶ 8, 10. Plaintiffs bring APA, Appropriations Clause, Separation of Powers, and ultra vires claims. *Id.* ¶¶ 132–77.

Plaintiffs filed a motion for a preliminary injunction on November 14, 2025, asking the Court to "prohibit[] deobligation or diversion of SFA funds" during the pendency of this case. Dkt. 64-1 at 26. After hearing oral argument from the parties, Dkt. 120, the Court denied the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 8

motion because Plaintiffs did not show "that the funds [were] likely to be irrevocably expended" before the Court could issue a decision on the merits. Dkt. 122 at 5. Specifically, "the grant funds, even those that have been deobligated from Plaintiffs' grant[s], remain in the treasury account that was used to manage the [SFA] program, and they will remain available in that account until September 30th, 2031." *Id*. (citing Dkt. 102-1 ¶ 10).

Plaintiffs then moved for summary judgment on February 24, 2026. Dkt. 129. Defendants filed a response and cross-motion for summary judgment on March 17. Dkt. 137. Plaintiffs replied on March 31, and Defendants replied on April 14. Dkts. 144, 146. The Court heard oral argument on the motions on May 8. Dkts. 150, 151.

### IV.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256). Where, as with Plaintiffs' motion, the party moving for summary judgment "will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

party." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

## V.    DISCUSSION

### A.    The Court of Federal Claims has exclusive jurisdiction over breach-of-contract claims against the United States.

#### 1.    The Tucker Act

The United States has sovereign immunity, which protects it from civil suits. *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). "[T]he United States can be sued only to the extent that it has waived its immunity." *United States v. Orleans*, 425 U.S. 807, 814 (1976). The plaintiff in a case against the United States "bears the burden of demonstrating an unequivocal waiver of immunity." *Mitchell v. United States*, 787 F.2d 466, 467 (9th Cir. 1986), *cert. denied*, 484 U.S. 856 (1987). District courts may not exercise subject matter jurisdiction over claims that do not "fall squarely within the strict terms of a waiver of sovereign immunity." *Sager v. McHugh*, 942 F. Supp. 2d 1137, 1146 (W.D. Wash. 2013) (citing *Mundy v. United States*, 983 F.2d 950, 952 (9th Cir.1993)).

The APA waives sovereign immunity for suits "seeking relief other than money damages" against a federal agency, so long as no other statute "expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. One such statute is the Tucker Act, which "vests exclusive jurisdiction in the Court of Federal Claims over any claim against the United States founded 'upon any express or implied contract with the United States.'" *Washington v. United States Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025) (quoting 28 U.S.C. § 1491(a)(1)). The Tucker Act "impliedly forbids" an APA action seeking injunctive and declaratory relief only if it is a "disguised" breach-of-contract claim. *United Aeronautical Corp. v. United States Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

"To determine whether an action falls under the Tucker Act because it is an action in contract—'disguised or otherwise," courts in the Ninth Circuit have adopted the two-part test from the D.C. Circuit's decision in *Megapulse*. *Pacito v. Trump*, 169 F.4th 895, 925 (9th Cir. 2026) (citing *Megapulse*, 672 F.2d at 968)). The *Megapulse* test looks to (1) "the source of the rights upon which the plaintiff bases its claims" and (2) "the type of relief sought." *United Aeronautical Corp.*, 80 F.4th at 1026. "If rights and remedies are statutorily or constitutionally based, then districts courts have jurisdiction; if rights and remedies are contractually based then only the Court of Federal Claims does, even if the plaintiff formally seeks injunctive relief." *Id*. Thus, a district court has jurisdiction to set aside an agency action under the EPA "even if that judgment eventually results in the agency paying sums of money, if that 'outcome is a mere by-product of that court's primary function of reviewing the [Administrator's] interpretation of federal law.'" *Washington v. United States Dep't of Educ.*, No. C25-1228-KKE, 2025 WL 2966255, at *8 (W.D. Wash. Oct. 21, 2025) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 11

2.    *Two-track litigation*

The Supreme Court applied the Tucker Act to two grant termination cases in 2025. In *Dep't of Educ. v. California*, the Court stayed a district court's TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." 604 U.S. 650, 651 (2025). The Court found the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id*. While a district court's jurisdiction "is not barred by the possibility" that setting aside an agency's action could result in the agency paying money, the Court held that the TRO was essentially an order "to enforce a contractual obligation to pay money" that the district court lacked jurisdiction to impose. *Id*. (first quoting *Bowen*, 487 U.S. at 910; and then quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

Similarly, in *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, the Court stayed "judgments vacating the Government's termination of various research-related grants." 145 S. Ct. 2658 (2025) ("*NIH*"). These terminations were based on the agency's new guidance that it would "not fund research related to DEI objectives, gender identity, or COVID-19." *Id*. at 2658, 2661 (Barrett, J., concurring). Critically, however, the Court in *NIH* only stayed the reinstatement of grants—leaving in place the district court's vacatur of the underlying agency guidance. *Id*. In Justice Barrett's controlling concurrence, she explained that the mere fact that a challenged agency guidance "discusses internal policies related to grants" does not transform the challenge "into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear." *Id*. (quoting 28 U.S.C. § 1491(a)(1)).

Justice Barrett suggested that these "legally distinct" claims should be handled via two-track litigation in separate forums—breach-of-contract challenges to grant terminations belong in

the Court of Federal Claims, and APA challenges to the underlying agency guidance belong in district court. *Id*. at 2661–62. According to Justice Barrett:

> Both logic and law . . . support channeling challenges to the grant terminations and guidance to different forums. First, logic: Vacating the guidance does not reinstate terminated grants. If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself. *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 910, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (one judgment vacating HHS decision). Here, by contrast, the District Court separately "vacated" the grant terminations and ordered the Government to pay plaintiffs sums due under the agreements "forthwith." Second, law: Even if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it, as the First Circuit recognized. 145 F.4th 39, 50 (CA1 2025); *see also, e.g., D. A. M. v. Barr*, 486 F.Supp.3d 404, 415 (DDC 2020) (vacatur does not necessarily "eras[e] from legal existence all past adjudications under the vacated rule"). The claims are legally distinct. And if the CFC has exclusive jurisdiction over the grant terminations, *see California*, 604 U. S., at —––, 145 S.Ct., at 968–969, the plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance.

*Id*. (internal record citations omitted).

The Ninth Circuit has since held that *California* and *NIH* do not limit district courts' jurisdiction where plaintiffs "have not suffered or sought any monetary damages." *Washington*, 161 F.4th at 1140. The plaintiffs in *Washington*, for example, sought "purely prospective relief regarding multiyear grant discontinuations" that had not yet taken effect. *Id*. Because vacatur of the discontinuation decisions "would not result in the automatic reinstatement or continuance of those grants or the payment of any money to grantees," the Ninth Circuit held that the district court likely had jurisdiction to vacate those decisions. *Id*. Similarly, the court in *Pacito* affirmed a district court's jurisdiction over APA claims where the terminated agreements did not "contemplate[] the payment of damages for breach of the agreement" and did not "qualify as contracts for purposes of the Tucker Act." 169 F.4th at 928 (citing *United States v. Testan*, 424 U.S. 392, 400 (1976)). In contrast, the court in *Thakur* found that *NIH* precluded APA relief where the plaintiffs sought vacatur of grant termination notices and reinstatement of the

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 13

terminated grants. *Thakur v. Trump*, No. 25-4249, 2026 WL 1466303, at *7 (9th Cir. May 26, 2026). These cases suggest that, when applying the *Megapulse* factors in light of *California* and *NIH*, courts should consider both the relief that plaintiffs explicitly seek as well as that which will necessarily flow from vacatur of the agency's guidance. *See NIH*, 145 S. Ct. at 2661 ("Vacating the guidance does not reinstate terminated grants. If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself.").

**B.    This Court lacks jurisdiction to address Plaintiffs' claims.**

The Tucker Act precludes this Court's jurisdiction over Plaintiffs' claims. True, Plaintiffs "have never asked this Court" to reinstate SFA grant agreements. Dkt. 144 at 23. But Plaintiffs' requested vacatur ultimately boils down to a retroactive reinstatement of their grants, a form of relief this Court cannot provide. The Court begins by applying the *Megapulse* factors.

*1.    First* Megapulse *factor: the source of the rights*

"[W]hen analyzing an action under *Megapulse*, a court need not accept a plaintiff's proffered characterization of its asserted right in its complaint; rather, a court must conduct its own searching inquiry into the 'essence' of the plaintiff's claims." *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 581 (S.D.N.Y. 2025) (citing *Megapulse*, 672 F.2d at 968). Here, the grant agreements are the essence of Plaintiffs' claims.

Courts addressing the first *Megapulse* factor should begin by "look[ing] to the complaint," which means "examining the claims asserted, how those claims are styled, and the legal theory upon which the claims are based." *Id*. at 580. Here, Plaintiffs' complaint exclusively challenges the Directives' impact on grant funds. Dkt. 128 ¶¶ 139–40 ("Section 60002 H.R. 1 did not authorize or direct Defendants to rescind any funds that were obligated prior to the date H.R. 1 was enacted. Section 60002 expressly excluded Plaintiffs' awards from rescission."); *id*. ¶ 155

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 14

("Defendants ignored Plaintiffs' and subrecipients substantial reliance interests . . . [and] failed to consider alternatives to terminating the entire program.").

Looking beyond the complaint, the record further demonstrates that Plaintiffs are essentially challenging the rescission of their SFA grants. The sole purpose of the challenged EPA Directives was to rescind SFA and deobligate 93 percent of SFA grant funds. Dkt. 126-16; Dkt. 126-20; Dkt. 102-1 ¶ 9. The termination letters stated that their purpose was to notify each Plaintiff that their grant agreement was terminated. Dkt. 126-40 at 2. And Plaintiffs agree that the SFA program and the grant agreements are one and the same:

> [T]here is no ongoing Solar for All program only to the extent that the agency has unlawfully terminated all of these grant agreements. That's—essentially what the program is is these grant agreements that were terminated. So it is likely true that in the event of a vacatur and remand, EPA will have no other option but . . . to reinstate these grants.

Dkt. 153 at 9. When Plaintiffs attempted to obtain injunctive relief, they largely submitted evidence of "harm flowing from the loss of the grant funds themselves," and could not show that any harm external to the grant agreements was likely. Dkt. 122 at 27. "The weight of these indicia points to an asserted right to the money offered in the terminated grant awards." *Nat'l Sci. Found.*, 793 F. Supp. 3d at 585.

When faced with similar APA challenges to grant programs, the Supreme Court held the claims were "based on the [] grants." *Thakur*, 2026 WL 1466303, at *7 (quoting *NIH*, 145 S. Ct. at 2658). The Court finds so here.

2.      *Second* Megapulse *factor: the type of relief sought*

Throughout this case, Plaintiffs have maintained that they are not asking this Court to reinstate the terminated SFA grants. *See* Dkt. 120 at 12 ("We are not asking Your Honor to order any funds, to order any grants reinstated. We are just asking you to hold unlawful and set aside and vacate these unlawful agency actions and send this case back to EPA to look with fresh eyes

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 15

at what the law requires them to do."); Dkt. 129 at 14–15 ("Plaintiffs do not seek damages in this Court. Nor do Plaintiffs seek an order reinstating funds.") (internal citations omitted); Dkt. 153 at 3–4 ("Defendants insist that we're asking this Court to reinstate grants. But that's just not the case, Your Honor. We're asking this Court to vacate the agency's decision to terminate the Solar for All program and deobligate funding, to make clear for the agency what the law is, and ultimately to remand to the agency to make a new determination. This is the same basic relief sought in most any other APA case.").

This fact is important—indeed, the lack of an explicit demand for grant reinstatement sets this case apart from those where courts have found the Tucker Act to preclude jurisdiction. *Thakur*, 2026 WL 1466303, at *6; *California*, 604 U.S. at 650; *Sustainability Inst. v. Trump*, 165 F.4th 817, 826 (4th Cir. 2026). At the same time, another critical fact distinguishes this case from those finding jurisdiction existed: here, vacatur would only provide retroactive relief and would not influence EPA policy "going forward." *NIH*, 145 S. Ct. at 2661.

Congress repealed Section 134 in July 2025. 139 Stat. 72, 154. As the government notes, "Section 134 only ever authorized EPA to use a one-time appropriation to award and administer grants; it did not create any ongoing program apart from the grants."[2] Dkt. 137 at 25. Plaintiffs contend that they seek prospective relief because the EPA "will be prohibited from applying [the Directives] going forward." Dkt. 153 at 17. But because Section 134 has been repealed and there are no future grants to be awarded, the requested relief simply orders the EPA to take a second look at the terminated grants and deobligated funds. *See* Dkt. 153 at 17–18 ("And that's all we're

---

[2] Plaintiffs note that SFA also "includes all sorts of technical assistance, none of which is clearly outlined in Section 134." Dkt. 153 at 35; Dkt. 129 at 6. The EPA's agreements to provide this assistance were included in the grants themselves, however. *See, e.g.*, Dkt. 65-1 at 36 (describing EPA monitoring, oversight, and consultation obligations).

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 16

seeking here, is a new decision made lawfully."). This is not prospective relief, but retroactive relief akin to specific performance of a contract.

That same distinction precludes the two-track litigation suggested by Justice Barrett in *NIH*. 145 S. Ct. at 2662. In *NIH*, the agency issued guidance stating it would "not fund research related to DEI objectives, gender identity, or COVID-19," nor "continue the practice of awarding grants to researchers based on race." *Id.* at 2661. Similarly, the Plaintiffs in *Washington* sought "purely prospective relief regarding multiyear grant discontinuations" which had not yet taken effect.[3] 161 F.4th at 1140. And in *New York*, the First Circuit vacated portions of the district court's injunction which required agency defendants to release frozen funds, while leaving in place portions that barred defendants from freezing appropriated funds in the future. 171 F.4th at 27.

The threat of future agency action does not exist here. Congress had already decided to end the SFA grant program going forward; the challenged agency guidance here was simply EPA's decision to terminate the existing grants. Plaintiffs have not cited any case, and the Court is not aware of any, where a district court maintained jurisdiction over an APA claim stemming from the termination of an existing grant program when there was no future program to which the challenged guidance might also apply. This lack of prospective relief tilts the second *Megapulse* factor in favor of the government—shifting this case from one where contract

---

[3] Further, in both cases, "vacatur would not result in the automatic reinstatement or continuance of those grants or the payment of any money to grantees." *Washington*, 161 F.4th at 1140; *see NIH*, 145 S. Ct. at 2261 ("Vacating the guidance does not reinstate terminated grants. If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself."). In contrast, the Plaintiffs here presume that grant reinstatement *will* flow from vacatur. Dkt. 120 at 8 ("[I]f we get the order that we are ultimately requesting . . . presumably EPA will follow the law and reinstate Solar for All."); Dkt. 153 at 6 ("EPA would then make a new determination. And presumably, hopefully, the determination that they would make is that they cannot terminate Solar for All.").

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 17

performance is "a mere by-product" of APA review, *Bowen*, 487 U.S. at 910, to one seeking "the classic *contractual* remedy of specific performance." *Sustainability Inst.*, 165 F.4th at 828 (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)).

Because Plaintiffs' claims sound in contract and essentially seek only retroactive, contractual relief, the Tucker Act impliedly precludes this Court's jurisdiction. Plaintiffs' APA claims in Counts I and II are therefore DISMISSED. Dkt. 128 ¶¶ 132–56.

## C.   Plaintiffs' constitutional claim is essentially statutory and barred by *Dalton v. Specter.*

In addition to their APA claims, Plaintiffs allege that Defendants violated the Appropriations Clause and the Separation of Powers Doctrine of the U.S. Constitution. Dkt. 128 ¶¶ 157–170. Plaintiffs assert that the EPA's interpretation of H.R. 1 violated the law's plain text, which required only the rescission of *unobligated* funds, and that the EPA's rescission of *obligated* funds thus fell outside of the authority granted to the agency by Congress. *Id*. ¶¶ 164–169.

The Court agrees with Defendants that this claim "repackages" the APA claims discussed above. Dkt. 137 at 26. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims" subject to separate judicial review. *Dalton v. Specter*, 511 U.S. 462, 473–74 (1994) (citing *Franklin v. Massachusetts*, 505 U.S. 788 (1992)).

Here, Plaintiffs' constitutional claim turns on their argument that "through the H.R. 1 Interpretation, the Program Termination Directive, and the Deobligation Directive, Defendants have overridden Congress's considered judgments by attempting to terminate the SFA Program and rescind obligated SFA Funds." Dkt. 128 ¶ 169. This is identical to Plaintiffs' APA claim. *Compare id*. *with id*. ¶ 142 ("The H.R. 1 Interpretation, Program Termination Directive, and Deobligation Directive are contrary to law because, among other things: . . . (b) Congress did not

direct or otherwise authorize Defendants to terminate the SFA Program."). At their core, both claims allege "that the [Government] has exceeded [its] statutory authority." *Sustainability Inst.*, 165 F.4th at 831 (quoting *Dalton*, 511 U.S. at 473)).

"Because Plaintiffs' claims are statutory, they must stay within 'the painstakingly delineated procedural boundaries' of 'nonstatutory ultra vires review.'" *Id*. at 832 (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 679–81 (2025)). And Plaintiffs concede that their ultra vires claim could only proceed if "APA review of Defendants' actions is unavailable," which is not the case here. Dkt. 129 at 28 n.3 (citing *Nuclear Regul. Comm'n*, 605 U.S. at 682).

The Court therefore DISMISSES Plaintiffs' constitutional claim (Count III) and ultra vires claim (Count IV). Dkt. 128 ¶¶ 157–77.

## VI.    CONCLUSION

The Court DENIES Plaintiffs' motion for summary judgment (Dkt. 129) and GRANTS Defendants' motion for summary judgment (Dkt. 137). Plaintiffs' claims are DISMISSED without prejudice for lack of jurisdiction. *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (dismissal for lack of jurisdiction based on sovereign immunity is without prejudice).

Dated this 1st day of June, 2026.

Tiffany M. Cartwright
United States District Judge

ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - 19